UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| TRINITY MEDICAL SERVICES, LLC, | * | |
| PERFORMANCE LABS, LLC, AND | * | CIVIL ACTION NO.  3:17-00592-JWD-EWD |
| PRESTIGE WORLDWIDE LEASING, | * | |
| LLC | * | |
| | * | JUDGE DEGRAVELLES |
| VERSUS | * | |
| | * | |
| MERGE HEALTHCARE SOLUTIONS, | * | MAGISTRATE JUDGE WILDER-DOOMES |
| INC. | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * *

**MERGE HEALTHCARE SOLUTIONS, INC.'S
MEMORANDUM IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT ON LOST-PROFITS DAMAGES**

Defendant Merge Healthcare Solutions, Inc. ("Merge"), pursuant to Federal Rule of Civil Procedure 56, submits this memorandum in support of its motion for summary judgment seeking dismissal of plaintiffs' claim for lost-profits damages.  Plaintiffs cannot prove lost-profits damages for two, independent reasons: (i) plaintiffs cannot show that the allegedly defective Merge laboratory information system software ("Merge LIS software") caused the damages sought, as plaintiffs' business failures were caused by sanctions from regulators, not Merge LIS; and (ii) plaintiffs faced countless uncertainties and obstacles after those sanctions were finally lifted, which render any estimate of lost-profits entirely speculative and unrecoverable.

Shortly after it began to operate in late 2013, plaintiff Performance Labs (the only plaintiff-entity through which plaintiffs claim lost-profits) was found to have failed to comply with a host of regulations.  Performance Labs was sanctioned and effectively shut down by state and federal regulators as of the end of 2015.  Plaintiffs admit that Performance Labs' regulatory failures and the ensuing sanctions are completely unrelated to the Merge LIS software, which was not

1

purchased until January 2016—after the bulk of the sanctions were imposed. There is no evidence Performance Labs ever earned any revenue for testing patient samples conducted after the imposition of sanctions, which were not fully lifted until June 2017, well-after Performance Labs had ceased any pretense of operating. Neither is there any evidence that Merge LIS prevented plaintiffs from re-opening or earning revenue. As such, plaintiffs cannot prove entitlement to any lost-profits—much less to the degree of certainty required under Louisiana law. Summary judgment should be entered dismissing plaintiffs' claim for lost-profits with prejudice.

## **PRELIMINARY STATEMENT**

This case involves a toxicology laboratory that Trinity owned called Performance Labs, which briefly operated in Mandeville, Louisiana. Performance Labs earned revenue through toxicological testing on patient samples, and billing for those tests to Medicare, private insurance, or individual patients. Performance Labs started testing patient samples in late 2013, but beginning in 2015—just over a year after opening its doors—Performance Labs began operating at a rate one of its three owners described as "[w]ay too fast." As a result, in June 2015 the laboratory ran into significant compliance issues after failing an inspection conducted by the Louisiana Department of Health and Hospitals ("LDHH") and the Centers for Medicare and Medicaid Services ("CMS").

Inspectors found in June 2015 that Performance Labs failed to adhere to numerous conditions required under the Clinical Laboratory Improvement Act ("CLIA")—the regulations contained in 42 C.F.R. § 493 that govern laboratories. Performance Labs' problems with compliance continued throughout 2015, and by December of 2015, additional inspections of Performance Labs revealed persistent regulatory violations throughout the laboratory, leading CMS to impose serious sanctions on the lab, including but not limited to: (i) requiring Performance Labs to submit various plans of correction to address the deficiencies; (ii) barring Performance

Labs from accepting live patient samples; (iii) prohibiting Performance Labs from receiving any Medicare and Medicaid payments; (iv) suspending Performance Labs' CLIA license and preventing the laboratory from "solicit[ing] or accept[ing] materials derived from the human body for laboratory examination," *see* 42 U.S.C. § 263a, and (v) requiring Performance Labs to send notices to each of its prior clients to advise them of the compliance issues and possible unreliable results from tests conducted in 2015.

These sanctions effectively shuttered plaintiffs' business and Performance Labs never re-opened as a profitable toxicology lab. There is no evidence that Performance Labs' past accounts ever returned, or attempted to return, to the laboratory after the sanctions were imposed in late 2015. The sanctions forced Performance Labs to downsize significantly to a "barebones" operation with the minimum instrumentation necessary to clear regulatory deficiencies. Performance Labs (i) drastically reduced its lab staff to just two individuals, (ii) sent most of its equipment and employees in early 2016 to a new laboratory technically owned and operated by third parties in Mississippi,[1] and (iii) cut the types of tests it offered to physicians leading plaintiffs' owner—Blake Bourque—to admit that "[w]e know we don't have a commercially viable panel."

Defendant Merge came into this picture ***only after*** regulators imposed sanctions on Performance Labs in 2015 and early January 2016. Merge developed, sold and supported its LIS software which, among other functions, facilitates the transmission of laboratory test results from instruments to patient reports. Trinity licensed Merge's LIS software in a Sales Order dated January 11, 2016, and when Merge LIS was installed at Performance Labs in April and May 2016, the laboratory was still under sanctions that barred it from accepting live patient samples.

---

[1]     As more fully explained below, the lab in Mississippi (Pathway Diagnostics) was incorporated in January 2016 following the imposition of sanctions on Performance Labs and began successfully operating in compliance with regulations beginning in summer 2016 using Merge LIS, and had no significant issues that prevented that laboratory from operating. (*See infra* Background, § II).

Performance Labs spent the remainder of 2016 attempting to achieve compliance, but CMS did not allow Performance Labs to perform certain screening testing until August 24, 2016 and CMS did not permit Performance Labs to conduct certain limited confirmatory testing until January 17, 2017. CMS did not fully lift its sanctions—including suspension of Performance Labs' CLIA license and the prohibition of receipt of Medicare payments—until June 2017.

Although CMS permitted Performance Labs to test earlier, it did not resume testing live patient samples until January 20, 2017, at which time it claims to have received a very small volume of live patient samples—five (5) to ten (10) per day—from a single physician for approximately three (3) weeks. This limited testing was not at all adversely impacted by any alleged issues with Merge LIS; in fact, Performance Labs represented to regulators that these patient results were not affected by any alleged complaints about Merge LIS. Further, Performance Labs has produced no documentation showing that this minimal amount of testing was conducted for commercial purpose—no bills or other documents were produced to show Performance Labs earned any revenue from this *de minimus* testing. Unsurprisingly, none of Performance Labs' pre-sanction clients resumed sending patient samples to the laboratory after CMS finally permitted testing, and plaintiffs have not identified a single client that was willing to resume doing business with plaintiffs after the 2015 sanctions. The obvious lack of revenue resulting from the sanctions had dire consequences for plaintiffs, as they were unable to stay current on millions in loans, and plaintiffs formally defaulted on at least one of those loans by April 3, 2017.

Plaintiffs filed suit on April 21, 2017, alleging that Merge LIS software is unfit for its intended purpose as a result of a number of alleged defects in the software.[2] Plaintiffs further allege that "mounting costs and diminished income caused by Merge's LIS operating system"

---

[2] Rec. Doc. 1-2.

caused plaintiffs to close Performance Labs.[3]  On the basis of that statement—shown by the evidence to be false—and without considering the devastating effects of the sanctions, plaintiffs' experts project that Performance Labs would have greater success than it did when it was actually in operation before the sanctions.  Notwithstanding the failure of plaintiffs' experts to meet Rule 702's reliability standards (as more fully set forth in Merge's motions seeking to exclude their testimony), *none* of those experts offered a single opinion concerning (or even considered the documents and evidence) regarding whether the Merge LIS software actually impacted plaintiffs' business.[4]  This is fatal to plaintiffs' claims, as Louisiana law requires plaintiffs to prove their claim for lost-profits with "reasonable certainty," which obligates plaintiffs to show that "but for" Merge's allegedly wrongful conduct, plaintiffs "would have been successful and generated profits." *Peaker Energy Grp., LLC v. Cargill, Inc.*, No. 14-2106, 2016 WL 7491851, at *1 (E.D. La. Dec. 30, 2016). Plaintiffs cannot meet this burden for two, independent reasons.

*First*, plaintiffs cannot prove a key basic fact underlying their claim: there is no evidence that Merge LIS caused Performance Labs' alleged lost profits.  The sanctions that forced Performance Labs to cease operating predated its use of Merge LIS, and the sanctions were not lifted until after Merge LIS was installed. Further,  Merge LIS did not cause Performance Labs to submit any inaccurate results or bills, fail any regulatory inspections, or lose any accounts. Neither does Merge LIS account for plaintiffs' limited sample volume: no witness (including plaintiffs' corporate representative) has identified any lost clients resulting from any of the alleged defects.

---

[3]      Rec. Doc. 38, at ¶ 88.

[4]      Plaintiffs have no technical or other expert that opines on the alleged defects or how they may have impacted plaintiffs' business. Merge's technical expert, on the other hand, explained that the defects alleged by Plaintiffs were not defects at all, and opined that the minor issues identified by plaintiffs could not have prevented plaintiffs from operating or re-opening their lab compliantly and profitably.

The uncontroverted evidence instead proves that Performance Labs' failure was caused by the devastating sanctions which required it to, *inter alia*, (i) stop accepting live patient samples – its source of revenue, (ii) notify each of its past clients of the regulatory deficiencies, (iii) significantly downsize their equipment and staff, (iv) drastically reduce its panel to a group of tests that was "no longer commercially viable," and finally, (v) caused plaintiffs default on millions in loans without any revenue source. None of these devastating consequences of the sanctions had anything to do with Merge LIS. Further, plaintiffs' lost-profits claim is disproved by the fact that Pathway Diagnostics (funded, created and effectively operated by plaintiffs' staff) was able to, starting from scratch, successfully operate in Mississippi using the ***exact same*** Merge LIS software for which plaintiffs now complain. Pathway Diagnostic's operations in Mississippi leave no doubt that Merge LIS did not cause plaintiffs' alleged lost-profits.

***Second***, the undisputed, significant changes to plaintiffs' business resulting from the sanctions preclude plaintiffs from showing lost-profits to any reasonably certain degree, as required under Louisiana law. Plaintiffs' experts' purport to determine what Performance Labs would have earned "but for" the impact of the alleged defects in Merge LIS, but their flawed, unreliable and untested methodologies reveal that plaintiffs' projections are entirely speculative and incapable of being proved with any degree of certainty.[5] But notwithstanding the inadmissibility of plaintiffs' experts' opinions, the sanctions on Performance Labs required it to start over as a "new lab," which indisputably presented numerous uncertainties and obstacles to success that prevent plaintiffs from showing lost-profits to any reasonably certain degree: (i) the absence of any actual clients, (ii) a lack of cash flow and crushing debt, (iii) limited staff and

---

[5] As more fully explained in the motions to exclude the testimony of Harold Asher, Larry Small, and Chris Harol, their testimony should be excluded under Rule 702. Those experts' flawed methodology supplies additional grounds for dismissing plaintiffs' lost-profits claim.

equipment, and (iv) a panel of tests that was "no longer commercially viable." None of those obstacles was caused by Merge LIS, and any one of them is sufficient to make plaintiffs' lost-profits claim too speculative to proceed.

Summary judgment should be entered against plaintiffs dismissing their claim for lost-profits, as plaintiffs have not offered the evidentiary support required under Louisiana law.

## FACTUAL BACKGROUND

Trinity is a holding company and the sole owner of Performance Labs and Prestige Worldwide. (Ex. A, Rule 30(b)(6) Deposition of Trinity Medical Services, at 12:8–12, 104:11–12 (hereinafter, "Trinity Dep.")) Prestige Worldwide was a "centralized payer" that provided employment services to Performance Labs (*Id.* at 105:19-20.) Performance Labs was a toxicology lab and the only plaintiff-entity that used the Merge LIS software. (*Id.* at 56:1–3; 138:2-10.) Neither Trinity nor Prestige was a lab or was certified by CMS under CLIA to perform toxicology testing; only Performance Labs held a requisite certificate to operate as a laboratory. (*Id.*, at 138:19–139:5.)[6] Performance Labs opened its doors and began testing patient samples in October 2013. (*Id.*, at 62:11-12.) Although Performance Labs initially operated throughout 2014 at a "[v]ery, very slow pace," it changed strategy and "took off like a rocket … [w]ay too quick" in 2015—until it ran into serious compliance issues. (Ex. B, C. Howell Dep., at 55:7-56:2.)

## I.     CMS Identifies Deficiencies in Performance Labs and Imposes Sanctions Before Merge LIS is Purchased.

In June 2015, LDHH conducted a multi-day investigation of Performance Labs concluding that it exhibited "condition-level deficiencies" with CLIA requirements that "constitute[d] an immediate jeopardy to patients." (Ex. C, July 31, 2015, Letter from CMS to

---

[6]     Neither Trinity nor Prestige have presented evidence of any alleged lost profits damages—other than those lost profits of Performance Labs—in discovery, and therefore summary judgment should be entered against those entities as well.

Performance Labs, attaching CMS Survey, at 4.) LDHH identified several errors with Performance Labs' pre-analytical procedures regarding verification of patient results, and required Performance Labs to submit various plans of correction to address deficiencies. (*Id.* at 2.) During the inspection, and in immediate recognition of the deficiencies, Performance Labs advised CMS that the laboratory would cease patient testing on two instruments for which CMS had cited for deficiencies. (*Id.*, at 2; Ex. D, June 11, 2015 Letter from Performance Labs to CMS.)

After Performance Labs submitted various deficient plans of correction to CMS in the fall of 2015, LDHH and CMS conducted a weeklong, on-site visit to assess the compliance status of Performance Labs in November and December 2015. (Ex. E, December 23, 2015 Letter from CMS to Performance, at 3.) Inspectors concluded after that inspection that Performance Labs "demonstrated continued systemic and pervasive problems throughout the laboratory which has led to findings of continued immediate jeopardy." (*Id.*) In addition to finding that Performance Labs failed to correct the original deficiencies from June 2015, CMS uncovered new deficiencies. (*Id.*) Notably, CMS also discovered that Performance Labs had tested 9982 patient specimens in violation of its agreement to cease testing on two instruments, and CMS chastised Performance Labs for "fail[ing] to adhere to [its] cease testing letter." (*Id.*, at 3-4.)

CMS imposed numerous, significant sanctions on Performance Labs as a result of its "continued systemic and pervasive" failure to comply with CLIA:

➢ On December 24, 2015, CMS barred Performance Labs from accepting live patient samples because of the "immediate jeopardy" finding regarding the laboratory's deficiencies. (Ex. F, December 30, 2015 Emails from CMS, at 3.) ("during our call on December 24, 2015, it was clearly stated to Mr. Franklin that your laboratory is not to accept patient specimens.")

➢ On December 30, 2015, CMS precluded Performance Labs from receiving payments from Medicare and Medicaid. (*Id.*)

➢ CMS required Performance Labs (as a part of its plan of correction) to notify each and every client who may have ordered patient testing at Performance Labs—via 985

individual letters—that "the CLIA laboratory test results [each client] may have received in the past from Performance Labs may not be accurate or reliable" because of the compliance issues. Performance Labs also notified its clients that they "should send [their] specimens directly to another CLIA certified laboratory and not to Performance Labs." (Ex. G, January 12, 2016 Plan of Correction, at 20, 46.)

➢ On January 12, 2016 CMS suspended Performance Labs' CLIA certificate and advised that during the suspension, the laboratory could perform functions to "achieve compliance," but could not perform patient testing unless and until specifically authorized by CMS to do so. (Ex. H, January 14, 2016 Email from CMS to performance Labs.)

After CMS imposed the bulk of its sanctions on Performance Labs in December 2015, Trinity decided to use third-party LIS software rather than its home-grown system—despite the fact that none of the sanctions related to plaintiffs' LIS system. (Ex. B, C. Howell Dep. at 134:5–135:1.) After weeks of negotiations, Trinity executed a Sales Order on January 11, 2016 for the license of Merge LIS. (Ex. I, January 11, 2016 Sales Order.) Because Trinity did not license the Merge LIS until January 11, 2016, obviously none of the sanctions were caused by or related to Merge LIS.

## II. Performance Labs Downsizes and its Instruments and Personnel Move to Mississippi, Where Pathway Operated Using Merge LIS Software.

As a result of the sanctions, Performance Labs decided to downsize in an effort to achieve compliance with the "minimum laboratory testing equipment necessary to clear deficiencies." (Ex. J, January 27, 2016 Letter from Performance Labs to CMS.) According to Performance Labs' technical supervisor, the laboratory was reduced to just three instruments that were moved to "a room in the back" of an office suite. (Ex. K, M. Spruill Dep., at 117:17-19). Performance Labs also gutted its staff after the sanctions, and its "barebones" operation only employed the technical supervisor and one technician in the laboratory, and by summer 2016, the technical supervisor was the only person working there. (*Id.* at 117:16-120:11; 130:16-131:12.)

According to Performance Labs' own consultants, CMS' sanctions required Performance Labs to "start over as if it [were] a new lab" following the sanctions by reperforming all the establishment and validation studies on instruments to prove compliance with CLIA, as well

as re-write laboratory standard operating procedures. (Ex. L, February 16, 2016 Email from A&J Lab Consultants to Performance Labs.) Consequently, Performance Labs also reduced the number of tests it sought CMS's permission to offer to physicians in order to achieve compliance as quickly as possible. (Ex. K, M. Spruill Dep., at 178:11-179:6.) Compared to the panel of tests offered in 2015, the new panel designed to achieve compliance in 2016 was "tiny" and the laboratory's technical supervisor and Bourque both acknowledged the limited panel was not "commercially viable" because Performance Labs would have to pay reference labs to conduct tests for which Performance Labs was not authorized to perform. (*Id*., at 193:4-10; 188:19-187-10; Ex. M, March 2017 Email from M. Spruill attaching letter; Ex. N, March 2017 Email from Bourque.) Adding additional tests to the panel would require performing new validation studies to prove compliance for each test, which could take up to nine months. (Ex. K, M. Spruill Dep., at 187:11-22.)

In addition to downsizing Performance Labs to achieve compliance, plaintiffs opened a new lab – Pathway Diagnostics – just across the state line in Mississippi and moved their staff and equipment there. Pathway Diagnostics was organized in January 2016 by Kyle Mouton (Bourque's brother-in-law, who previously worked at Performance Labs) and Phil Martinez (plaintiffs' in-house counsel). (Ex. O, K. Mouton Dep. at 17:-19-22; 18:22-20:3.) With the exception of just three instruments (that remained in Louisiana at Performance Labs), Performance Labs' testing instruments and equipment was moved to Pathway Diagnostics. (Ex. K, M. Spruill Dep. at 120:3-15.) Additionally, many of Performance Labs' staff—who were payroll employees of Prestige—began working in Mississippi for Pathway Diagnostics while Performance Labs was under sanctions in 2016. (Ex. O, K. Mouton Dep. at 30:9-10; 91:2-12.) Bourque also provided Pathway Diagnostics with start-up capital to pay expenses, as well as

management and IT services, including the ***exact same*** Merge LIS software installed at Performance Labs. (*Id.*, at 106:12-19; 87:9-88-3.)

After being organized in January 2016, Pathway Diagnostics began accepting, testing and billing for live patient samples in June 2016 using Merge LIS. (*Id.*, at 55:4-14.) Pathway Diagnostics did not fail any regulatory inspections using Merge LIS. (Ex. P, S. Spruill Dep., at 62:21-63:5; 124:21-125:25.) Further, Pathway Diagnostics was able to earn revenue using Merge LIS after opening in summer 2016; by April 2017, it had millions in accounts receivable for tests performed since June 2016. (Ex. Q, April 18, 2017 Email from C. Howell and attachment with "Pathway AR Aging Summary,"; Ex. A, Trinity Dep., at 131:5-9;381:24-25 ("Pathway was producing cash flow"); Ex. R, "Trinity Companies Summary" at 2 (stating that Pathway is expecting "huge growth through 2017" and accepting "approximately 2000/month specimens" for January 2017.) Pathway Diagnostics is not, and has never been, a party to this case, and has not otherwise brought any action against Merge.

### III.    Performance Labs Never Meaningfully Resumes Operations.

Although Pathway Diagnostics began testing and billing patient samples in June 2016, Performance Labs was forced to use its limited personnel and few remaining instruments during 2016 to achieve compliance, including performing validation and establishment studies required by CMS to prove Performance Labs could perform tests accurately, reliably, and compliantly. (Ex. K, M. Spruill Dep., at 154:23–155:5; 217:11–15.) Merge LIS was installed at this time, but Performance Labs' technical supervisor (who was responsible for the compliance efforts) acknowledged and agreed that Merge LIS did not impede the laboratory's ability to clear the CLIA deficiencies in 2016 or thereafter. (*Id.*, at 142:1-143:18.) After submitting some of the required studies, CMS permitted Performance Labs to conduct limited, less lucrative testing on

screening instruments only on August 24, 2016. (Ex. S, August 24, 2016 Email between CMS and Performance Labs.)[7] CMS did not allow Performance Labs to conduct more profitable confirmatory testing until January 17, 2017, because Performance Labs submitted inaccurate results to CMS in certain studies conducted in September 2016. (Ex. T, October 14, 2016 Email from CMS to Performance Labs.) Performance Labs' technical supervisor also agreed that the inaccuracy of the testing results Performance Labs submitted to CMS in September 2016 was in no way attributable to the Merge LIS. (Ex. K, M. Spruill Dep., at 143:5-18.)

After finally being cleared by CMS to receive live patient samples for confirmatory testing on its "very small" panel of tests that was "no longer commercially viable" on January 17, 2017, Performance Labs wrote to CMS that it began receiving patient specimens on January 20, 2017. (Ex. U, January 24, 2017 Emails between CMS and Performance Labs.) However, Performance Labs began receiving only five to ten samples to test per day, which were sent from a single clinic. (Ex. K, M. Spruill Dep., at 189:8–19.) There is no evidence that Performance Labs ever billed or earned revenue from these limited samples, which would be shown by requisition forms and final patient reports, none of which have been produced. (*Id*., at 181:14-182:9). More critically, Merge LIS did not prevent plaintiffs from accepting patient specimens from any additional clients—plaintiffs' corporate representative could not identify any customers lost as a result of any alleged Merge LIS issues. (Ex. A, Trinity Dep., at 306:16-20; 307:9-11; 308:16-19; Ex. K, M. Spruill Dep., at 177:17-178:1; 182:4-9).

Less than a month later, on February 10, 2017, Performance Labs voluntarily ceased testing those limited patient samples, citing an alleged issue with Merge LIS concerning

---

[7]     Screening testing involves determining  the presence or absence of any given substance in a patient sample.  Because it involves a less complex testing methodology, reimbursement rates for screening testing are much lower than for confirmatory tests, which measure the exact amount of a substance in a sample. (Ex. A, Trinity Dep. at 124:13-25; 183:7-25.)

the tracking of quality control data that purportedly was discovered on February 8, 2017. (Ex. W, March 6, 2017 Correspondence from Performance Labs to CMS.) ***Performance Labs' decision to cease testing in 2017 was not mandated by CMS***. Moreover, just one day after finding the issue, Performance Labs formulated a corrective action "work-around" for the issue whereby the laboratory would simply retain a hard copy report to keep records of historical quality control data. (Ex. V, February 9, 2017 Corrective Action Report.) This issue is not a software defect, and did not cause either Performance Labs or Pathway Diagnostics to submit any incorrect testing results. (Ex. W, March 6, 2017 Correspondence from Performance Labs to CMS.)[8] Performance did not advise CMS of its decision to cease testing, or the alleged issue with quality control data, until March 6, 2017, at which time it wrote to CMS that "patient testing has not been affected" by the Merge LIS issue and that "all quality control was acceptable at the time of use." (*Id*.) Along with the quality control issue, Performance Labs also presented CMS with a list and documentation regarding the laboratory's other purported issues with Merge LIS. (Ex. X, March 17, 2017 Email from CMS to Performance Labs.)

Despite plaintiffs' reporting these issues to CMS in March 2017, CMS never imposed any sanctions on Performance Labs (or Merge) as a result. (Ex. A, Trinity Dep., at 312:9-11.) Neither did CMS prolong any of its original sanctions of Performance Labs as a result of the issues raised with Merge LIS. (*Id.* at 367:2-10). In fact, CMS did not lift the suspension of the lab's CLIA license and cancellation of Medicare and Medicaid payments until summer 2017, not because of issues with Merge LIS, but because LDHH needed to conduct a revisit inspection that

---

[8]     Merge's expert regarding LIS software and the alleged defects at issue, Andy Splitz, evaluated this issue and confirmed that this issue was caused by plaintiffs' unusual workflow, as opposed to the Merge LIS. (Ex. BB, Report of A. Splitz.) Splitz also opined that it is common for labs to keep manual records and that this "work-around" is not an issue that would cause a lab to shut down or cease operations. Plaintiffs have no expert—nor fact witness—who can refute Splitz's opinion.

was not completed until June 2017. (Ex. U, Jan. 24, 2017 Email between CMS and Performance Labs; Ex. Y, Aug. 9, 2017 Correspondence from CMS.) By then, Performance Labs was already shuttered—it had formally defaulted on a seven-figure loan that was taken out in 2015 and had millions in other debts it could not pay. (Ex. A, Trinity Dep., at 386:17-387:4; Ex. B, C. Howell Dep. at 289:21-291:25; Ex. Z, April 3, 2017 Email from HomeBank.) None of these financial struggles, nor plaintiffs' inability to re-open and operate Performance Labs, were caused by Merge.

## ARGUMENT AND AUTHORITIES

Summary judgment is appropriate where, as here, there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movant bears the initial burden of providing the basis of its motion and identifying the pleadings and factual material demonstrating the absence of a material issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the movant does not bear the burden of proof on the pertinent issue at trial, then it may satisfy its summary judgment burden by pointing to the lack of evidence as to any element essential to the non-moving party's case. *Id.* The burden shifts to the non-moving party to produce evidence of a genuine dispute for resolution at trial. *Brandon v. Sage Corp.*, 808 F.3d 266, 270 (5th Cir. 2015) (citing *Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 355 (5th Cir. 2010)).

The non-moving party "must go beyond the pleadings and come forward with specific facts indicating a genuine issue for trial to avoid summary judgment." *Id.* (quotation marks omitted). Summary judgment may be rendered as to any claim or defense, or any part of a claim or defense. Fed. R. Civ. P. 56(a). Partial summary judgment is an efficient tool for narrowing and focusing the issues for trial, promoting efficient use of the federal courts. *Calpetco 1981 v. Marshall Expl., Inc.*, 989 F.2d 1408, 1415 (5th Cir. 1993).

Here, summary judgment is appropriate to dispose of plaintiffs' claim for lost-profits because it does not have any evidentiary support, and dismissing that claim now would terminate a significant portion of issues to be tried to the jury.

I.       **Plaintiffs Are Not Entitled To Lost-Profits Because They Cannot Prove Merge LIS Caused Performance Labs To Shut Down, Or That Merge LIS Prevented Performance Labs From Re-Opening.**

Louisiana law is settled that plaintiffs carry the burden of proving lost-profits with "reasonable certainty." *Peaker*, 2016 WL 7491851, at *1. This burden also includes proving causation, and to survive summary judgment, plaintiffs must prove "necessary causation" between Merge's alleged conduct and plaintiffs' claimed lost-profits. *See Jackson v. Lowe's Home Ctrs., LLC*, 243 So. 3d 1262, 1268 (La. App. 5 Cir. 2018) (granting summary judgment against plaintiff that failed to show "the necessary causation between [defendant's conduct] and [plaintiff's] claimed loss of wages and profits"). Plaintiffs have no evidence to show Merge LIS caused them any damages, much less lost-profits. Instead, the uncontroverted evidence shows that severe regulatory sanctions from CMS and LDHH caused plaintiffs' business failures.

While Bourque—testifying on behalf of Trinity—baldly claimed that the alleged defects with Merge LIS "destroyed my business," neither he (nor any other witness) ever articulated how or why that occurred. Instead, discovery revealed that none of plaintiffs' alleged issues with Merge LIS actually caused any inaccurate patient reports or billings. (Ex. K, M. Spruill Dep., at 192:10-19; 224:2-17.) Indeed, Performance Labs represented to CMS in March 2017 that its limited "patient testing has not been affected" by Merge LIS and that "all quality control was acceptable at the time of use." (Ex. W, March 6, 2017 Correspondence from Performance Labs to CMS; Ex. K, M. Spruill Dep., at 165:14-24; 192:9-14.) Further, not a single witness—including plaintiffs' corporate representative—has identified even an example of a lost account, customer,

missed revenue opportunity, or additional cost incurred that was caused by the Merge LIS. (Ex. A, Trinity Dep., at 306:16-20; 307:9-11; 308:16-19; Ex. K, M. Spruill Dep., at 182:4-9.) That is because there is none. Neither can it be said that Merge LIS caused any compliance issues for Performance Labs. It is undisputed the original sanctions in 2015 were unrelated to Merge LIS—which was purchased after the sanctions were imposed—and those sanctions were lifted only *after* Merge's LIS software was in use. (Ex. K, M. Spruill Dep., at 92:4-7.) It also is undisputed that Performance Labs' continued failure to meet CMS's requirements to clear deficiencies was *not* attributable to Merge LIS. (Ex. K, M. Spruill Dep., at 142:1-143:18.)

It is these repeated failures of plaintiffs to achieve compliance that caused Performance Labs to shutter, not Merge LIS. As a result of the CMS sanctions, Performance Labs was forced to (i) stop accepting live patient samples—its only revenue source; (ii) notify each and every one of its clients (via 985 individual letters) that its previous results were not accurate as a result of compliance deficiencies; (iii) "start over as if it [were] a new lab," beginning in 2016; (iv) downsize to just three instruments and two staff working in the laboratory; and (v) drastically cut the tests it could offer to physicians to a point where its offering was no longer "commercially viable." (Ex. K, M. Spruill Dep., at 117:16-120:11; 130:16-131:12; 178:11-179:6; 188:19-187-10; 193:4-10; Ex. L, February 16, 2016 Email from A&J Lab Consultants to Performance Labs; Ex. G, Plan of Correction, at 20, 46.) It is no surprise that these ruinous consequences of Performance Labs' compliance deficiencies and resulting 18-month suspension of its CLIA license prevented the laboratory from operating successfully.

Indeed, plaintiffs' entire lost-profits theory is disproved by the undisputed fact that Pathway Diagnostics operated compliantly and successfully using Merge LIS. In direct contrast to plaintiffs' claim that Merge LIS caused them to shut down, Pathway Diagnostics began testing

and billing in June 2016 using Merge LIS, and was able to produce revenue and cash flow throughout 2016 and 2017 using Performance Labs' former equipment and staff. (Ex. Q, April 18, 2017 Email from C. Howell and attachment; Ex. A, Trinity Dep., at 131:5-9;381:24-25; Ex. R, "Trinity Companies Summary" at 1.)

Bourque's conclusory, unsupported statement about Merge LIS as the cause of plaintiffs' business failures is not sufficient to create an issue of fact for trial, and should be disregarded. *Schwarzenberger v. La. State Univ. Health Scis. Ctr. New Orleans*, 226 So. 3d 1200, 1210 (La. App. 4 Cir. 2017) (affirming summary judgment on issue of lost profits because district court "properly discounted the self-serving and uncorroborated testimony of the appellant regarding loss of profits"); *First Alarm Fire Equip, Inc. v. Southland Int'l of La., Inc.*, 114 So. 3d 1168, 1172 (La. App. 2 Cir. 2013). Plaintiffs' failure to present any evidence that Merge LIS caused its lost profits is fatal to its claims. *See Jackson*, 243 So. 3d at 1268; *Schwarzenberger*, 226 So. 3d at 1210.

## II. Plaintiffs' Experts' Projections Of Alleged Lost-Profits Are Speculative And Plaintiffs' Cannot Show Lost-Profits To Any Degree Of Certainty.

Plaintiffs' claim for lost profits should be dismissed for a second, independent reason: plaintiffs' experts' projections of lost-profits cannot be proved with any certainty, much less the degree of reasonable certainty required under Louisiana law. *See Grand Acadian, Inc. v. Fluor Corp.*, No. 07-295, 2010 WL 1053701, at *3 (W.D. La. Mar. 22, 2010) (lost-profits damages are not available when they are "too remote and speculative to be proven with reasonable certainty"); *George W. Garig Transfer v. Harris*, 75 So. 2d 28, 33 (La. 1954) ("[L]ost profits, as an element of damages for the breach of a contract, may be recovered where they are not speculative or uncertain in their nature, and are susceptible of proof with reasonable certainty."). Notwithstanding their experts' failure to meet Rule 702's standard, plaintiffs cannot prove

entitlement to lost-profits because their experts' estimates are speculative, as Performance Labs faced countless uncertainties and obstacles re-opening, all of which are unrelated to Merge:[9]

1. **No Customers.** As a part of the sanctions imposed, Performance Labs was required to "[n]otify all the laboratory's clients of the identified CLIA noncompliance from June 8, 2015 to December 4, 2015, that final patient test results are untrustworthy; and the clients should have their patients retested by another CLIA certified laboratory." (Ex. E, Dec. 23, 2015 Correspondence from CMS.) Plaintiffs sent such letters. (Ex. G, Plan of Correction, at 20, 46.) There is no evidence that Performance Labs' customers from 2015 ever returned (or desired to return) to the lab in 2016 once it was finally permitted to accept live patient samples. Critically, Performance Labs has no evidence of ever having obtain *any* actual or potential paying clients at any time after the sanctions.

2. **No Cash Flow.** The sanctions precluded Performance Labs from earning any revenue after December 30, 2015, as it was prevented from testing or billing patient samples until August 2016, and thereafter had no live patient samples for which to test or bill. As a result, plaintiffs formally defaulted on at least one seven-figure loan and had millions in other loans that could not be paid off. (Ex. B, C. Howell Dep., at 289:21-291:25; Ex. Z, April 3, 2017 Email from HomeBank).

3. **No "Commercially Viable" Panel.** Performance Labs drastically reduced the types of testing it offered to achieve compliance as quickly and easily as possible, and the reductions were so significant that Bourque and Performance Labs' technical supervisor both acknowledged that the totality of the tests that the lab could offer was not "commercially viable" because Performance Labs would have to pay to other labs to perform, on its behalf, the tests Performance Labs could

---

[9]     As more fully explained in the accompanying motions in *limine*, the critical facts ignored by plaintiffs' experts, coupled with their unsupported assumptions and unreliable methodologies, render their opinions and testimony inadmissible under Rule 702. Although the flawed methodology behind plaintiffs' experts' projections supply additional justification for dismissing plaintiffs' lost profits claim, that claim should be dismissed notwithstanding the admissibility of their experts' opinions under Rule 702.

not perform. (Ex. N, March 2017 Email from Bourque; Ex. M, March 2017 Letter drafted by M. Spruill.)

**4. Minimal Staff and Instruments.** Performance Labs significantly downsized its equipment and staff as a result of the sanctions, retaining only three instruments and one or two people, which casts serious doubt on the laboratory's ability to operate as it did in 2015—when it had far more instruments and employees working in the lab. (Ex. K, M. Spruill Dep., at 117:17-19.)

**5. Regulatory Changes.** Louisiana's CMS region experienced "drastic changes" in regulatory requirements for toxicology labs in 2016, which Bourque himself described as a potential "company killer." (Ex. AA, January 19, 2017 Email from Bourque and attachment.) For example, heightened sample storage requirements, including increased scrutiny of the temperatures at which samples were shipped and preserved, "exponentially increase[] the cost to ship a sample," and led Bourque to conclude that "[s]amples coming from the west coast or mid-west are no longer potential revenue for the lab." (*Id.*)

These significant obstacles and uncertainties facing Performance Labs following the sanctions preclude plaintiffs from proving, with any reasonable degree of certainty, that the laboratory could have returned to operations and earned revenue, much less any profit. Indeed, plaintiffs "ignore[] the fact that some of the realities enabling [Performance Labs] to achieve [its 2015] results were different from what would have existed" for plaintiffs in subsequent years. *Frankel v. Exxon Mobil Corp.*, 923 So. 2d 55, 79 (La. App. 1st Cir. 2005) (affirming judgment for defendant on lost-profit damages). Those "realities" (that plaintiffs' purported experts wholly ignore) preclude an award of lost profits here. *See Schwamb v. Delta Air Lines, Inc.*, 516 So. 2d 452, 467-68 (La. App. 1st Cir. 1987) (affirming verdict denying lost-profits damages where injured airline passenger's proposed real estate venture "had received no financing whatsoever," had not

begun construction, and had purchased only 411 out of a proposed 5000 acres of land). For example, in *Peaker*, the court granted summary judgment to defendants on lost-profits damages regarding plaintiffs' failed oil terminal where plaintiffs—"brand-new business entities, without well-established track records"—had failed to secure final financing for their proposed project, secure sufficient customer agreements, and explain how they would navigate certain market uncertainties. 2016 WL 7491851, at *1. That reasoning applies here, as plaintiffs cannot prove with any degree of certainty how they would profit given the drastic changes to their business, lack of revenue sources, changing regulatory environment, and tarnished reputation resulting from compliance failures. Merge is not to blame for plaintiffs' poorly run and noncompliant business.

## CONCLUSION

Plaintiffs cannot obtain through litigation what they would never be able to obtain through business, and Merge is entitled to summary judgment on plaintiffs' claim for lost-profits damages. First, plaintiffs cannot demonstrate that Merge LIS prevented it from re-opening or operating. Second, there is no evidence to show it is reasonably certain that plaintiffs would have obtained profits but for alleged defects in Merge LIS. Any such, lost-profits damages are nothing more than speculation and conjecture, and unrecoverable as a matter of law.

Respectfully submitted,
*/s/ Stephen H. Kupperman*
Stephen H. Kupperman, 7890
Laurence D. LeSueur, Jr., 35206
Viviana Aldous, IL Bar 6320208 (*pro hac vice*)
BARRASSO USDIN KUPPERMAN
   FREEMAN & SARVER, L.L.C.
909 Poydras Street, Suite 2350
New Orleans, Louisiana 70112
Telephone: (504) 589-9700
skupperman@barrassousdin.com
llesueur@barrassousdin.com
valdous@barrassousdin.com

*Attorneys for Merge Healthcare Solutions, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing has been filed using this Court's CM/ECF, which will send electronic noticing to all counsel of record this 14th day of August, 2019.

_/s/ Stephen H. Kupperman_