UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| TRINITY MEDICAL SERVICES, LLC, PERFORMANCE LABS, LLC, AND PRESTIGE WORLDWIDE LEASING, LLC<br><br>VERSUS<br><br>MERGE HEALTHCARE SOLUTIONS, INC. | *  <br>*  CIVIL ACTION NO. 3:17-00592-JWD-EWD<br>*  <br>*  <br>*  JUDGE DEGRAVELLES<br>*  <br>*  <br>*  MAGISTRATE JUDGE WILDER-DOOMES<br>*  <br>* |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MERGE HEALTHCARE SOLUTIONS, INC.'S**
**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT ON LOST-PROFITS DAMAGES**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56, defendant Merge Healthcare Solutions, Inc. ("Merge") submits this statement of material facts as to which there is no genuine issue to be tried, in support of Merge's motion for summary judgment seeking dismissal of plaintiffs' claims for lost profits.

1.  Plaintiff Trinity Medical Services, LLC ("Trinity") is a holding company and the sole owner of Performance Labs, LLC ("Performance Labs"), a toxicology laboratory that operated in Mandeville, Louisiana. Prestige Worldwide Leasing, LLC ("Prestige"), also wholly owned by Trinity, provided employees and laboratory management services to Performance Labs. Blake Bourque is the only owner of all three plaintiff-entities. (Ex. A, Rule 30(b)(6) Deposition of Trinity Medical Services, L.L.C., at 12:8–12, 104:11–12 (hereinafter, "Trinity Dep."))

2.  The only lost profits plaintiffs allege are those of Trinity, through Performance Labs. Performance Labs is the only plaintiff-entity that operated a toxicology laboratory for

revenue, and that was licensed under the Clinical Laboratory Improvement Act ("CLIA") to perform testing on live samples. (Ex. A, Trinity Dep. at 138:19–139:5.)

3. Performance Labs opened its doors and began testing patient samples in October 2013. (Ex. A, Trinity Dep. at 62:11-12.)

4. In June 2015, LDHH conducted a multi-day investigation of Performance Labs concluding that it exhibited "condition-level deficiencies" with CLIA requirements that "constitute[d] an immediate jeopardy to patients." (Ex. C, July 31, 2015, Letter from CMS to Performance Labs, attaching CMS Survey, at 4.) LDHH identified several errors with Performance Labs' pre-analytical procedures, and required Performance Labs to submit various plans of correction to address deficiencies. (*Id.* at 2.)

5. During the inspection, Performance Labs advised CMS that the laboratory would cease patient testing on two instruments for which CMS had cited for deficiencies. (*Id.* at 2; Ex. D, June 11, 2015 Letter from Performance Labs to CMS.)

6. Performance Labs submitted various deficient plans of correction to CMS in the fall of 2015, and inspectors conducted an additional, weeklong, on-site visit of Performance Labs from November 30 to December 4, 2015. (Ex. E, December 23, 2015 Letter from CMS to Performance, at 3.)

7. Inspectors concluded after that inspection from November 30 to December 4, 2015 that Performance Labs "demonstrated continued systemic and pervasive problems throughout the laboratory which has led to findings of continued immediate jeopardy." (*Id.*) In addition to finding that Performance Labs failed to correct the original deficiencies from June 2015, CMS uncovered new deficiencies. (*Id.*) Notably, CMS also discovered that Performance Labs had tested 9982 patient specimens in violation of its agreement to cease testing on two instruments, and CMS noted

Performance Labs "failed to adhere to [its] cease testing letter." (*Id.*, at 3-4.) As a result of the compliance deficiencies, CMS imposed various sanctions on Performance Labs.

8. On December 24, 2015, CMS barred Performance Labs from accepting live patient samples because of the "immediate jeopardy" finding regarding the laboratory's deficiencies. (Ex. F, December 30, 2015 Emails from CMS, at 3.)

9. On December 30, 2015, CMS precluded Performance Labs from receiving payments from Medicare and Medicaid. (*Id.*)

10. CMS required Performance Labs (as a part of its plan of correction) to notify each and every client who may have ordered patient testing at Performance Labs—via 985 individual letters—that "the CLIA laboratory test results [each client] may have received in the past from Performance Labs may not be accurate or reliable" because of the compliance issues. Performance Labs also notified its clients that they "should send [their] specimens directly to another CLIA certified laboratory and not to Performance Labs." (Ex. G, January 12, 2016 Plan of Correction, at 46.)

11. On January 12, 2016 CMS suspended Performance Labs' CLIA certificate and advised that during the suspension, the laboratory could perform functions to "achieve compliance," but could not perform patient testing unless and until specifically authorized by CMS to do so. (Ex. H, January 14, 2016 Email from CMS to performance Labs.)

12. None of the sanctions on Performance Labs resulted from its own LIS system in use at the time, or Merge LIS—which was not licensed until January 11, 2016. (Ex. B, C. Howell Dep., at 134:5–135:1; Ex. I, January 11, 2016 Sales Order.)

1698667_1

13. As a result of the sanctions, Performance Labs decided to downsize in an effort to achieve compliance with the "minimum laboratory testing equipment necessary to clear deficiencies." (Ex. J, January 27, 2016 Letter from Performance Labs to CMS.)

14. According to Performance Labs' own consultants, CMS' sanctions required Performance Labs to "start over as if it [were] a new lab" following the sanctions by reperforming all the establishment and validation studies on instruments to prove compliance with CLIA, as well as re-write laboratory standard operative procedures. (Ex. L, February 16, 2016 Email from A&J Lab Consultants to Performance Labs.)

15. Performance Labs also reduced the number of tests it sought CMS's permission to offer to physicians as a result of the sanctions and in order to achieve compliance as quickly as possible. (Ex. K, M. Spruill Dep., at 178:11-179:6.) Performance Labs' laboratory's technical supervisor and Mr. Bourque both acknowledged the panel was not "commercially viable" because Performance Labs would have to rely on costly reference laboratories to perform any tests ordered by a physician that were not offered by Performance Labs. (*Id.*, at 193:4-10; 188:19-187-10; Ex. M, March 2017 Email from M. Spruill attaching draft letter; Ex. N, March 2017 Email from Bourque.)

16. Pathway Diagnostics, LLC—another toxicology laboratory—opened in Picayune, Mississippi in 2016. Pathway Diagnostics was organized in January 2016 by Kyle Mouton (Mr. Bourque's brother-in-law, who previously worked at Performance Labs) and Phil Martinez (plaintiffs' in-house counsel). (Ex. O, K. Mouton Dep. at 17:-19-22; 18:22-20:3.)

17. With the exception of just three instruments (that remained in Louisiana at Performance Labs), Performance Labs' testing instruments and equipment were moved to Pathway Diagnostics. (Ex. K, M. Spruill Dep. at 120:3-15.) Additionally, many of Performance

Labs' staff—who were payroll employees of Prestige—began working in Mississippi for Pathway Diagnostics while Performance Labs was under sanctions in 2016. (Ex. O, K. Mouton Dep. at 30:9-10; 91:2-12.) Mr. Bourque also provided Pathway Diagnostics with start-up capital to pay expenses, as well as management and IT services, including Merge's LIS software. (*Id.*, at 106:12-19; 87:9-88-3.)

18. After being organized in January 2016, Pathway Diagnostics began accepting, testing and billing for live patient samples in June 2016 using Merge LIS. (*Id.*, at 55:4-14.) Pathway Diagnostics did not suffer from any adverse regulatory action (because of Merge LIS or otherwise), and Pathway Diagnostics was able to earn revenue using Merge LIS. (Ex. P, S. Spruill Dep., at 62:21-63:5; 124:21-125:25; Ex. Q, April 18, 2017 Email from C. Howell and attachment; Ex. A, Trinity Dep., at 131:5-9;381:24-25; Ex. R, "Trinity Companies Summary" at 2.) Pathway Diagnostics is not, and has never been, a party to this case, and has not otherwise brought any action against Merge.

19. After the regulatory sanctions on Performance Labs in December 2015 and January 2016, Merge LIS did not impede the laboratory's ability to clear CLIA deficiencies in 2016 or thereafter. (Ex. K, M. Spruill Dep., at 142:1-143:18.)

20. Performance Labs wrote to CMS that it began accepting patient specimens on January 20, 2017 and thereafter received only five to ten samples to test per day, which were sent from a single clinic in Independence, Louisiana. (Ex. K, M. Spruill Dep., at 189:8–19.) There is no evidence that Performance Labs ever billed or earned revenue from these limited samples.

21. Merge LIS did not prevent plaintiffs from accepting patient specimens from any additional clients. (Ex. A, Trinity Dep., at 306:16-20; 307:9-11; 308:16-19; Ex. K, M. Spruill Dep., at 177:17-178:1; 182:4-9).

22. There is no evidence that Performance Labs' pre-sanction clients ever returned, or desired to return, to Performance Labs after the sanctions were imposed in December 2016 and January 2016.

23. There is no evidence that Performance Labs obtained any actual, or potential, paying clients at any time after CMS permitted Performance Labs to resume testing on live samples.

24. On February 10, 2017, Performance Labs voluntarily ceased testing those limited patient samples, citing an alleged issue with Merge LIS concerning the tracking of quality control data that purportedly was discovered on February 8, 2017. (Ex. W, March 6, 2017 Correspondence from Performance Labs to CMS.) Performance Labs' decision to cease testing in 2017 was not mandated by CMS, and just one day after finding the issue, Performance Labs formulated a corrective action "work-around" for the issue whereby the laboratory would simply retain a hard copy report to keep records of historical quality control data. (Ex. V, February 9, 2017 Corrective Action Report.)

25. On March 6, 2017, Performance Labs wrote CMS that "patient testing has not been affected" by the Merge LIS issue cited as the justification for Performance Labs' decision to voluntarily cease testing, and that "all quality control was acceptable at the time of use." (Ex. W, March 6, 2017 Correspondence from Performance Labs to CMS.)

26. Neither CMS—nor any other state or federal regulatory agencies—imposed any sanctions on plaintiffs as a result of Merge LIS. Neither did any regulatory agencies impose any sanctions on Merge for its LIS.

1698667_1

27. Performance Labs had millions in loans, and formally defaulted on at least one seven-figure loan from HomeBank on April 3, 2017. (Ex. Z, April 3, 2017 Email from HomeBank to Performance Labs.)

28. CMS did not lift the suspension of the lab's CLIA license and cancellation of Medicare and Medicaid payments until summer 2017, not because of issues with the Merge LIS, but because LDHH needed to conduct a revisit inspection which was not completed until June 2017. (Ex. U, January 24, 2017 Email between CMS and Performance Labs; Ex. Y, August 9, 2017 Correspondence from CMS.)

29. Louisiana's CMS region experienced "drastic changes" in regulatory requirements for toxicology labs in 2016, which Mr. Bourque himself described as a potential "company killer." (Ex. AA, January 19, 2017 Email from Bourque and attachment.)

30. There is no evidence Merge LIS caused Performance Labs to send any inaccurate patient reports or billings, or otherwise prevented Performance Labs from operating.

31. There is no evidence Merge LIS caused Performance Labs to lose any accounts, customers, clients, or revenue opportunities. Neither is there any evidence Merge LIS caused Performance Labs to incur any additional costs.

32. Plaintiffs have not alleged nor submitted evidence of any lost-profits on behalf of Trinity independent of Performance, nor have Plaintiffs alleged or submitted evidence of any lost-profits on behalf of Prestige.

33. The alleged defects for which plaintiffs complain are not actual defects, and could not have prevented plaintiffs' laboratory to operate or re-open. (Ex. BB, Report of Andy Splitz.)

Respectfully submitted,

*/s/ Stephen H. Kupperman*
Stephen H. Kupperman, 7890
Laurence D. LeSueur, Jr., 35206
Viviana Aldous, IL Bar 6320208 (*pro hac vice*)
BARRASSO USDIN KUPPERMAN
    FREEMAN & SARVER, L.L.C.
909 Poydras Street, Suite 2350
New Orleans, Louisiana 70112
Telephone: (504) 589-9700
skupperman@barrassousdin.com
llesueur@barrassousdin.com
valdous@barrassousdin.com

*Attorneys for Merge Healthcare Solutions, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been filed using this Court's CM/ECF, which will send electronic noticing to all counsel of record this 13th day of August, 2019.

*/s/ Stephen H. Kupperman*

1698667_1