1           UNITED STATES DISTRICT COURT

2           MIDDLE DISTRICT OF LOUISIANA

ORIGINAL

3

4    TRINITY MEDICAL SERVICES,      * Civil Action

5    LLC, ET AL                     * NO.  3:17-00592

6                                   *

7    VERSUS                         * JUDGE:

8                                   * DEGRAVELLES

9                                   *

10   MERGE HEALTHCARE SOLUTIONS,    * MAGISTRATE:

11   INC.                           * WILDER-DOOMES

12      *    *    *    *    *    *    *    *

13

14                      *    *    *

15

16           **Deposition of CHAD EDWIN HOWELL**, given

17   at the Courtyard by Marriott, 101 Northpark

18   Boulevard, Covington, Louisiana 70433, on July

19   19th, 2019.

20

21

22

23   REPORTED BY:

24           JOSEPH A. FAIRBANKS, JR., CCR, RPR

25           CERTIFIED COURT REPORTER #75005

**EXHIBIT B**

```
 1   APPEARANCES:

 2   REPRESENTING THE PLAINTIFFS:

 3            FISHMAN HAYGOOD LLP

 4            (BY:  JESSE C. STEWART, ESQUIRE)

 5            201 St. Charles Avenue, 46th Floor

 6            New Orleans, Louisiana 70170-4600

 7            504-586-5252

 8

 9   REPRESENTING THE DEFENDANTS:

10            BARRASSO USDIN KUPPERMAN FREEMAN &

11            SARVER, L.L.C.

12            (BY:  LAURENCE D. LESUEUR, JR.,

13            ESQUIRE)

14            909 Poydras Street, 24th Floor

15            New Orleans, Louisiana 70112

16            504-589-9700

17

18

19

20

21

22

23

24

25
```

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

## E X A M I N A T I O N   I N D E X

EXAMINATION BY:                                    PAGE

MR. LESUEUR    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

MR. STEWART    . . . . . . . . . . . . . . . . . . . . . . . . . . . .303

MR. LESUEUR    . . . . . . . . . . . . . . . . . . . . . . . . . . . .312


## E X H I B I T   I N D E X

EXHIBIT NO.                                         PAGE

Exhibit 1     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .98

Exhibit 2     . . . . . . . . . . . . . . . . . . . . . . . . . . . .112

Exhibit 3     . . . . . . . . . . . . . . . . . . . . . . . . . . . .148

Exhibit 4     . . . . . . . . . . . . . . . . . . . . . . . . . . . .163

Exhibit 5     . . . . . . . . . . . . . . . . . . . . . . . . . . . .172

Exhibit 6     . . . . . . . . . . . . . . . . . . . . . . . . . . . .178

Exhibit 7     . . . . . . . . . . . . . . . . . . . . . . . . . . . .192

Exhibit 8     . . . . . . . . . . . . . . . . . . . . . . . . . . . .202

Exhibit 9     . . . . . . . . . . . . . . . . . . . . . . . . . . . .242

Exhibit 10    . . . . . . . . . . . . . . . . . . . . . . . . . . . .253

Exhibit 11    . . . . . . . . . . . . . . . . . . . . . . . . . . . .270

Exhibit 12    . . . . . . . . . . . . . . . . . . . . . . . . . . . .272

Exhibit 13    . . . . . . . . . . . . . . . . . . . . . . . . . . . .294

**EXHIBIT B**

STIPULATION

1  <u>S T I P U L A T I O N</u>

2  IT IS STIPULATED AND AGREED by and

3  among counsel for the parties hereto that the

4  deposition of the aforementioned witness may be

5  taken for all purposes permitted within the

6  Federal Rules of Civil Procedure, in accordance

7  with law, pursuant to notice;

8  That all formalities, save reading

9  and signing of the original transcript by the

10 deponent, are hereby specifically waived;

11 That all objections, save those as to

12 the form of the question and the responsiveness

13 of the answer, are reserved until such time as

14 this deposition, or any part thereof, is used

15 or sought to be used in evidence.

16

17

18                    *    *    *

19

20

21

22 JOSEPH A. FAIRBANKS, JR., CCR, RPR,

23 Certified Court Reporter in and for the State

24 of Louisiana, officiated in administering the

25 oath to the witness.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

CHAD EDWIN HOWELL

711 Waxwing Drive, Mandeville, Louisiana 70448,

a witness named in the above stipulation,

having been first duly sworn, was examined and

testified on his oath as follows:

EXAMINATION BY MR. LESUEUR:

Q. All right. Good afternoon, Mr.

Howell. My name is Lon LeSueur. I just

introduced myself. I'm an attorney that

represents Merge Healthcare in this lawsuit.

Can you start by -- I know you just

told the court reporter your name and address.

Could you repeat that for the record, please?

A. Chad Edwin Howell.

Q. And your address, please?

A. 711 Waxwing Drive, Mandeville,

Louisiana 70448.

Q. Have you ever been deposed before?

A. No.

Q. Okay. So I'm going to go over a few

things to make this go easier. The first --

A. Sure.

Q. -- the first being that the court

reporter is writing down everything we say. So

I'll be asking you questions, you'll be

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1 answering them. It's important that we don't

2 talk over each other, which is easy to do,

3 especially when we're motivated to go quickly.

4 But it's important that we wait so that we

5 don't talk over each other 'cause he can only

6 write down one of us at a time.

7 In that vein, your answer should be

8 verbal instead of head nods or head shakes. He

9 needs verbal responses to be able to write

10 those down. Is that okay?

11 A. Sure.

12 Q. And then if anything I ask is

13 confusing, just ask me to rephrase it. If you

14 do answer, I'm gonna assume you understood the

15 question. Is that fair?

16 A. Yes.

17 Q. Okay. Did you do anything to prepare

18 for today?

19 A. Nope.

20 Q. Okay. Review any documents?

21 A. Haven't. Nine years.

22 Q. Nine years? Okay. Talk to counsel?

23 A. We had lunch just now, be we didn't

24 really talk much about content. Just kind of

25 prepared me for the format.

**EXHIBIT B**

1    Q.    Okay.   Talk to Jason or Jesse before

2  today about the deposition?

3    A.    Unh-unh.

4    Q.    About the case at all?

5    A.    Not since the first time with ever sat

6  down with them.

7    Q.    When was that?

8    A.    2016.   It would have been '16.

9    Q.    '16?

10    A.    Yeah.

11    Q.    Okay.   Would that have been right

12  before the lawsuit was filed?

13    A.    Um --

14    Q.    Or after?

15    A.    No, it must have been before.   Yeah.

16  It's when we first started digging in, when the

17  companies were still up and running.

18    Q.    Okay.   So I think that might have been

19  2017.   Does that sound fair?

20    A.    Maybe so.   Yeah.

21    Q.    And we'll go through the time --

22    A.    Yeah.

23    Q.    -- a little later.

24    A.    Yeah.   2017.   You're right.

25    Q.    2017.   So you haven't talked to them

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  since then.

2      A.    That's right.

3      Q.    Okay.  What about Blake Bourque; did

4  you talk to him?

5      A.    No.  We don't really talk at all

6  anymore.  I haven't heard from him -- a peep in

7  months.

8      Q.    Okay.

9      A.    And it's been years signs we've really

10  connected.

11      Q.    Okay.  You said in months.  When was

12  the last time you talked to him?

13      A.    He reached out actually about -- what

14  was it about?  I mean, it was brief.  And he

15  said something about being prepared for this

16  call coming.  Didn't say anything about it.

17  Um -- and that's pretty much it.  And I said,

18  well, when they're ready to talk to me they can

19  talk to me.

20      Q.    Okay.

21      A.    Basically my response to him.

22      Q.    Okay.  So it was about this

23  deposition --

24      A.    Yes.

25      Q.    -- and the case?  Okay.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1          And how did you all -- you and Blake

2   communicate that one time a few months ago?

3      A.   Text.

4      Q.   Text?

5      A.   Yeah.

6      Q.   Okay.  And haven't talked since?

7      A.   Unh-unh.

8      Q.   What about any other former or current

9   employees at Trinity, Performance, Prestige,

10  did you talk to them before today?

11     A.   I keep in touch with some of my

12  tech -- my IT folks that were on my team fee.

13     Q.   Who is that?

14     A.   Like Anand was on the team.  Jamie,

15  Danny were both on the team all the way

16  through.  And that's really it.

17     Q.   Okay.  Anand?  Who's that?

18     A.   He was one of my developers.

19     Q.   What's his last name?

20     A.   Ramish?

21     Q.   Anand.  You mentioned Jamie?

22     A.   Uh-huh.

23     Q.   Jamie who?

24     A.   Um -- Abney was her maiden name.  I

25  forget what --

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1   Q.   Abney Catalanotto?

2   A.   That's it.   That's it, yeah.

3   Q.   And Danny.   Danny Boseman?

4   A.   That's right.

5   Q.   Anybody else?

6   A.   Unh-unh.

7   Q.   And you talked to these three folks

8   about this case, or about what?

9   A.   We keep in touch about technical

10  stuff.   We work together on and off with

11  different things.   We just kept up with each

12  other.

13  Q.   Okay.

14  A.   They did mention we were all kind of

15  being deposed at the same time, so we kinda

16  said, hey, you get a call for this, it's kinda

17  weird so.

18  Q.   Right.

19  A.   But we really don't really get into

20  any of the old stuff.   It's just -- you know, I

21  don't see 'em often.   It like a once-a-month

22  kind of thing, we just tag each other.

23  Q.   Right.   Right.   Have you talked to any

24  of these folks since they've been deposed about

25  their depositions?

EXHIBIT B

1    A.   No.  Not about it in depth.  I talked

2  to Danny the other day during the hurricane,

3  'cause he lives in Denham and I was checking on

4  him, to be honest.

5    Q.   Uh-huh.

6    A.   He said -- I mean, outside of him

7  saying that they did it, and asked a bunch of

8  old crazy questions, half of 'em it's hard to

9  remember, and -- you know, no real content,

10  though.

11    Q.   Didn't share any documents or look at

12  any documents?

13    A.   No, not the bit.  Not a bit.  No.

14    Q.   Have you read any deposition

15  transcripts in this case?

16    A.   I have not.

17    Q.   Okay.  Were you sent any?

18    A.   I was not.  No.

19    Q.   What about any meetings or talks with

20  any of the expert witnesses in this cases?

21    A.   I don't know who an expert witness is.

22    Q.   Chris Harrell?

23    A.   No.

24    Q.   Larry Small?

25    A.   No.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1    Q.    Harold Asher?

2    A.    No.

3    Q.    Jeffrey Meyers?

4    A.    No.

5    Q.    The name LabPath Consulting ring a

6    bell?

7    A.    No idea.

8    Q.    Lighthouse Consulting ring a bell?

9    A.    Um -- no.  Not -- not -- no, I

10    don't --  kind of rings a bell, Lighthouse, but

11    no.  The answer is no.  I don't know what that

12    is.

13    Q.    Okay.  You said you met with the

14    attorneys before the suit was filed.  What's

15    your understanding of what the lawsuit is

16    about?

17    A.    Um -- well, we uncovered a ton of

18    problems with the platform, um -- you know,

19    functional issues, security issues, you name

20    it.  It goes pretty deep.  I uncovered all

21    those problems, so we basically came the table

22    with all of them to get some feedback and some

23    help with what.  Um -- ultimately, drove

24    forward with calling those out.  And I guess,

25    you know, initially the lawsuit was looked at

**EXHIBIT B**

1   as being, um -- well, it kind of took tiers,

2   where at first it was like we should bet our

3   money back.  And then it kinda grew from there.

4   Ultimately, trying to open Performance Labs.

5   And this was involved with that, so there were

6   bumps along the way there.

7            But, um -- you know, that's pretty

8   much the understanding I have is that it

9   just -- it caused turmoil across the board, and

10  basically we got sold something that was -- had

11  the potential to really cause some major, major

12  problems from a HIPAA standpoint.  And, um --

13  and just was not -- was not -- you know, did

14  not perform the way it was understood that it

15  should have.

16       Q.   Okay.  Apart from meeting with the

17  attorneys, did you provide any, like,

18  substantive input about what the lawsuit was

19  about, or what the claims were, anything like

20  that?

21       A.    I've never worked with the attorneys,

22  outside of sitting in the conference room in

23  one of those first couple of meetings and just

24  talked about the scenarios that we found.

25       Q.   Okay.  And since it's been filed, have

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1   you ever been asked to, like, pull documents or

2   look into anything --

3      A.   No.

4      Q.   -- or provide any assistance.

5      A.   No.  I'm not involved at all.

6      Q.   So after that meeting, you haven't --

7      A.   That's right.

8      Q.   All right.

9      A.   Well, let me be clear.  That meeting

10  happened, we were still part of a company

11  working together.

12     Q.   Right.

13     A.   There was a period of time there where

14  we continued to look and document and do

15  things.

16     Q.   Uh-huh.

17     A.   As of, I don't know, Q2 of 2017,

18  everything separated, everything blew up, and I

19  haven't touched it since.

20     Q.   Okay.  All right.  So want to start

21  with a little bit or your background.  First,

22  educational background, and then employment.

23     A.   Sure.

24     Q.   So I'd like to take those separately,

25  just to as efficient as possible.

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1          So could you start with telling me

2   your educational -- the degrees you've gotten

3   since high school, where, and years, and what

4   degrees, and what schools.

5        A.   Graduated from UL 2004 in BSAT.

6        Q.   What is that?

7        A.   Business system analysis and

8   technology.

9        Q.   Okay.  Is that a bachelor's?

10       A.   Bachelor's degree.

11       Q.   In science or arts?

12       A.   Science.

13       Q.   Science.  Okay.

14       A.   No.  Sorry.  Business.

15       Q.   Business.  Okay.

16       A.   Yeah.

17       Q.   And any master's or post be it

18  bachelor's degrees?

19       A.   No.  Continuing education, like, here

20  and there, but nothing -- nothing that sticks,

21  really, you know.

22       Q.   Okay.  Any -- take any classes or have

23  any educational background in health care?

24       A.   I've worked in health care a good part

25  of my career.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    Q.    Right.  But anything school-related?

2    A.    No.  Didn't like science a whole lot.

3    Q.    Right.  What about software

4  development, was that a part of your degree?

5    A.    That was what I did.  Yeah.

6    Q.    That was part of your degree?

7    A.    Yeah.  BSAT was basically a third

8  development, a third business project

9  management type IT-related business elements,

10  and a third process reengineering, workflow

11  sort of analysis, a lot of -- a lot of

12  basically process-oriented stuff.

13        So I very much leveled towards the

14  development side, the core computer science

15  side of it, um -- and excelled in it, never

16  looked back, developed my whole career.  Had an

17  intern two years in college, started developing

18  for a company then, and then just flew from

19  there.

20    Q.    Okay.  What about -- you mentioned

21  some, like, continuing education.

22    A.    I mean, seminars here and there on

23  usability and software development and

24  Microsoft things where you get little pamphlets

25  here and there, and taking little extra

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1  courses, but nothing that -- you know, no

2  letters behind the name, so to speak.

3      Q.    Right.  Right.

4      A.    But I've always --

5      Q.    No graduation ceremonies.

6      A.    That's right.  But I've always been

7  involved in that, you know, just learning -- I

8  mean, it's technology.  You gotta keep up to

9  date.

10     Q.    Right.  Right.  And any similar

11 continuing education in health care, or would

12 that all be software development side stuff?

13     A.    Yeah, from a technology standpoint.

14 Not medical, but HIPAA compliancy, HL7

15 interfacing, and how the language works with

16 HL7, I mean in-depth.

17          I worked at Ochsner Hospital for four

18 and a half years, roughly.  And so they put us

19 through a ton of leadership training, and I

20 managed the development team at that place.  We

21 managed their entire EMR in-house developed

22 systems.

23          They rolled out Epic, and during that

24 rollout process, which was lengthy, I basically

25 took over all in-house support and had Danny

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  Boseman was on my team there, and a handful of

2  others, and we basically supported all aspects

3  of that EMR.  Um -- you know, EMR is pretty

4  widespread, but there was a good half dozen

5  different elements that were core to the

6  hospital systems there that we supported and

7  managed.

8      Q.    Apart from Ochsner, any continuing

9  legal -- or continuing -- not legal, but

10 education outside of that -- outside of working

11 at Ochsner?

12     A.    I mean, yeah.  I'd say Ochsner was the

13 experience that laid me -- laid my ground into

14 medical.  But I took a lot of external courses

15 and went -- those types of things.  HIPAA,

16 HL7 -- you know, those type of things.

17     Q.    Do you recall any of the names of

18 those courses or who gave them?

19     A.    Don't.  No.

20     Q.    Okay.  So let's go into employment.

21 You said you started out of college as an

22 intern?  Where was that?

23     A.    Quick path here, two years while in

24 school internship developing for a book

25 company -- book selling nonprofit company.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    From there moved to Stellar Settings.
2  They developed and manufactured jewelry in
3  Lafayette.  I was a software developer there
4  for about a year and a half.
5    Jumped into PHI, which is oil and gas
6  transportation.  Helicopters, basically.  They
7  do oil and gas transportation, and EMS for --
8  with the helicopters.  Worked there for two
9  years, two and a half years.
10    From there I moved to Mandeville,
11  started at Ochsner.  Worked there for four
12  years, for four and a half years.  In parallel
13  to that, started a business on the side doing
14  biometric monitoring where we monitored vital
15  signs, um -- and all types of different
16  elements that we could collect from wearable
17  devices, created a program that basically
18  interfaced with all of these different devices,
19  interfaced with external sources like weather
20  and other kinds of environmental sort of
21  elements, um -- and basically offered a
22  wellness and safety program for the oil and gas
23  worker and industrial working in general, to
24  where we could monitor their vitals, track
25  fatigue, and keep them in save zones so that

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  they can work the duration of their trip and

2  their hitch.  So that was all taking place in

3  parallel with Ochsner.  About four and a half

4  into Ochsner, that started taking some legs.

5       Left Ochsner, went to that full time.

6  Tracked that for another probably three, four

7  years.  Once we got towards the end of that,

8  oil and gas started getting shaky, the industry

9  started falling, we started a lab on the side.

10  Brought some skill sets in that had the science

11  backgrounds which we did not, and started a

12  laboratory.

13       The oil and gas efforts really faded

14  out.  One of our bigger partners sold their

15  other company for mega millions and he left.

16  So we started the lab business and rolled

17  through there.  Got shut down.

18       And I focused on that fully from -- we

19  started in 2012, so I started building software

20  at that point.  Started bringing in some teams

21  together to work on that.  Did that from 2012

22  early, all the way through -- we opened doors

23  in '13.  We got shut down in '15.

24       At that point I stopped worrying about

25  the lab and I started focusing on, um --

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1   NextPhaseMD.  It -- partnered up with a few
2   doctors late 2015.  Basically, they had an
3   algorithm sort or questionnaire that allowed
4   for the annual wellness visit for Medicare
5   patients.  Me and a handful of my developers
6   who no longer had a purpose any longer 'cause
7   the laboratory got shut down, I took them off
8   to the side, we started focusing on that 100
9   percent.  We built out the system and the
10  portal to be able to encapsulate all of those
11  questions, and build the environment, then
12  basically went out and started marketing it.
13          I did that all through 2016, ran
14  basically the efforts around that, um -- and I
15  went out and started selling, and I was
16  basically the spokesman for that, essentially
17  the product manager of that product, as my team
18  developing, and I was basically driving force
19  on feature sets and whatnot.
20          That all went through, and I mean
21  traveled a good bit, worked on that project,
22  until very late '16, if not very early '17.  At
23  that point, the laboratory -- the laboratory
24  stuff just kind of -- basically, the company
25  imploded.  We had no more -- no more fuel in

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  the tanks.  Everything basically shut down.

2          The Conrads came in, and we put that

3  to bed along with it.  It basically got sunk

4  with the rest of the ship.

5          At that point, I no longer was

6  employed.  I took on a consulting position with

7  the Conrads to run their IT efforts, managed

8  their LIMS system, which was Merge at first,

9  and then we migrated away from that went to

10  LIMSABC, managed all of that, migrated their

11  server.  Basically did the full IT oversight of

12  that company for a year, pretty much on the dot

13  which was kind of crazy.

14          I was ready to leave.  In the

15  meantime, I was consulted with other

16  development efforts, my own consulting work.

17  I've been doing that all the way through.  I

18  been doing any own consulting work on the side,

19  except when the businesses were really busy I

20  stopped.  So I had a few clients around that I

21  was doing just ad hoc development for, building

22  out different -- one of them was a medical

23  company.  I was building out software for them.

24  A couple others were lill small little jobs.

25          And so I basically tracked, from 2017,

**EXHIBIT B**

1   about April, all the way through till about --
2   till 2018, and midyear, and, um -- left --
3   stopped working in the laboratory and got a job
4   where I'm am today.  Um -- we're now -- we're
5   now known as Truce Software.  I got hired as VP
6   of Product Management. I manage five
7   development teams, and I basically oversee and
8   facilitate all product development, roadmap,
9   communication -- anything having to do with the
10  product, I'm basically -- central man -- you
11  know, central guy for that.
12          Um -- I still do a little bit of work
13  on the side, so develop a bit on the side.
14  Still work with a few other guys that do some
15  work on the side.  Um -- no longer doing
16  medical:  I say that.  I got one client that's
17  still medical but it's light client.  Um -- and
18  that's where I'm at today.
19      Q.   Okay.  Great.  I'm gonna ask you a few
20  followup questions.  But I appreciate that.
21  That will go a long way.
22      A.   That's all on LinkedIn, by the way.
23  You can go pull what.
24      Q.   Right.  I got that here.
25          The book company that you worked for

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  out of college, what was the name of that?

2      A.    BooksXYZ.

3      Q.    And the next place you worked was

4  Stuller?

5      A.    Stuller Settings.

6      Q.    What kind of software did they make?

7      A.    No.  It was a -- it's a jewelry

8  manufacturing company.  So they sell wholesale

9  everything, diamonds, rings, they make jewelry,

10 all that.  So when I went in I supported their

11 in-house, um -- actually, I was on the web

12 team, so I was supporting their e-commerce sort

13 of system that was selling the stuff online,

14 and I built a lot of internal integration

15 systems that automated electronic ordering and

16 allowed for drop ship to take place to your

17 site.  So I was the very early stages of

18 building their drop ship system.

19     Q.    Okay.  And at PHI, what kind of

20 software -- you mentioned it was oil and gas.

21     A.    I built everything.  When I got there,

22 there were no developers.  They had a big

23 third-party platform that they used, out of a

24 company in India.  Basically, I got there, on

25 the first day, the CEO says, go find problems

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1   and fix 'em.

2          So for the next 2-1/2 years I

3   basically walked around that place and made

4   best friended with every department in there.

5   I built an HR portal.  I bought -- I built an

6   accounts payable system, accounts receivable

7   system, I had integration between those two

8   that allowed them to talk.  I built an

9   inventory platform that integrated with all the

10  shipping departments.

11         It was widespread.  I built a

12  certification system for the pilots to help

13  manage their certs and make sure that they were

14  up to date on things.  It was -- it was a

15  fast-running almost -- seems like a dream when

16  I think back on all the things that I built

17  while I was there so.

18     Q.   Yeah.  Okay.  And then I'm gonna skip

19  over Ochsner for now, and ask you a few

20  questions about that biometric company.  That's

21  Paradigm Safety; right?

22     A.   That's right.

23     Q.   So tell me how that got started.

24          Whose idea was that?

25     A.   Um -- Blake met a doctor.  Doctor

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

had -- is an orthopedic surgeon. He does
physiology -- physiological, like,
assessments -- you know, VO2 testing,
essentially -- for athletes. And long story
short, he wanted to do something with it. He
said, the technology's great. He was testing
polar devices on his kids on the soccer field,
and he was like I can see when someone is
fatigued, and, you know, this is real data, you
can collect data and make action from it.

　　　　　And so that basically was the seed.
The day Blake met him, he communicated out to
me. I was living in Mandeville. He was still
in Lafayette. And he says, man, I met this
doctor, it's an interesting thing. You know,
we gotta start thinking about something.

　　　　　So we played around -- basically,
Blake and I played around with ideas. Should
we go to a sports complex? Should we go to
high school sports? Should we go to, like, a
health care -- a fitness type of gym? Ended up
landing on industrial workers. And that
basically was the seed that we used to drive
from there.

　　　　　So we brought on a partner that was a

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1  young guy who was a technical writer and had a

2  job as a safety trainer, and then another one

3  that actually the doctor knew who was a nurse,

4  um -- that had physiological background and

5  just really brought that kind of health portion

6  of it to the table.

7       And, um -- and then I start building

8  software. I started dabbling with different

9  technologies. I started investigating what's

10  out there, and building all kinds of awesome

11  software and cool things that we're doing, and,

12  um -- and it just basically kept growing from

13  there. We got couple of lill pilots here and

14  there. We split off from the doctor at some

15  point.

16       Some other folks came in and put up

17  some money. One of them at the very end there,

18  last year or two, was, um -- was an established

19  oil and gas company that had big contacts and

20  big relationships. So we drove with him to

21  Chevron, did -- we finished up our stint in

22  2013 with a year contract, pretty hefty bill on

23  that too, and they paid it, funded it, and we

24  did full -- we had a full successful program.

25  And at the end of it, they all -- they all

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1   approved for us to move forward.  And pretty

2   much right in that same motion, the two head

3   guys in that division, which was the Gulf of

4   Mexico, they quit.  One retired and one moved

5   to Global, and the middle management folks

6   said, we can't really do anything.  Those were

7   the guys that were pulling it along.  And oil

8   and gas tanked.

9       Q.    Right.

10      A.    And then we just moved on.

11      Q.    You mentioned with Paradigm Safety,

12  Chevron was the client there?

13      A.    That was one of them.  One of the few.

14  But that was the big one.  That was the only --

15      Q.    Okay.

16      A.    -- you know, bona fide client.

17      Q.    What are the other ones then?  What do

18  you mean?

19      A.    I mean, we worked with Seacor Lee, I

20  mean, we were at the table with a bunch of

21  people doing little pilots, Shell, Exxon -- I

22  mean, you name it, we were -- we were traveling

23  around doing a lot.

24      Q.    Uh-huh.

25      A.    We had other pilots, like official

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    pilots I forget. I don't recall the names,

2    though.

3        Q.   Chevron was the only one that paid you

4    guys, though?

5        A.   No.  They all -- we had a lot of 'em

6    that paid little.  Chevron was the one that

7    said, we want this, we want to be the first to

8    introduce this to the market, we're gonna pay

9    you a good hefty sum and have y'all come in and

10   basically service a good portion of our

11   land-based areas.  And then we had one product

12   that I developed that we deployed out to about

13   14 of their rigs.  And we did that for the

14   better part of a year.  And -- yeah.

15       Q.   How much did Chevron pay?  You said

16   you guys --

17       A.   1.3 million.

18       Q.   Okay.  That was like all lump sum?

19       A.   Pretty well, yeah.

20       Q.   Yeah.  Were you an owner of that

21   company?

22       A.   I was.

23       Q.   Okay.  What did you -- what the owners

24   take home from that company?  I mean, was it

25   dissolved?

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1    A.   Nothing.  Yeah.  Nothing.  Um --

2    Q.   You took a salary though?

3    A.   Yeah.

4    Q.   Okay.

5    A.   Yeah.  Our strategic partner who came

6  in and introduced to all these folks, they

7  basically covered all the bills.  So we ended

8  up coming on with them.  We were basically

9  forming Paradigm as a division of Gulfstream

10 Services.

11    Q.   Okay.

12    A.   Who came in and paid in.  So we ended

13 up becoming employees Gulfstream, company

14 trucks, kind of the whole bit.  Right?

15    Q.   Uh-huh.

16    A.   And we were basically running that

17 side company that was directed to be, or, you

18 know, in the direction of being a division of.

19    Q.   Understood.  So what happened with all

20 that software and equipment?  Is Gulfstream

21 using it?  Or is it just, like, nobody's using

22 it?

23    A.   Just like a lot of other great stuff

24 that I built, it's sitting nice and tidy on the

25 shelf.  You know?

**EXHIBIT B**

```
 1      Q.    Right.   Okay.

 2      A.    Damned shame.

 3      Q.    Tell me about your job at Ochsner.

 4   What was your job title?

 5      A.    I started -- I believe I was hired as

 6   senior software development.   It was very

 7   generic.   Or maybe it was just programmer to

 8   start with.   But very soon after, promoted to

 9   senior development.

10           I was -- it was me and one other guy.

11   We were both the senior guys over about a team

12   of 10.   Um -- but we had others that were

13   working in our project forum.   We had PMOs, we

14   had QAs, we had a lot of different folks who

15   over shared a lot with that group.

16           That was basically my role, amongst

17   other things that I did with other groups, like

18   architectural work and some strategic groups

19   that I worked in.   But we built software.   We

20   rebuilt a lot of things.   They had a lot of

21   legacy systems that we were rebuilding.   So we

22   were building everything from scheduling

23   patients to keeping track of diagnoses and

24   remedies, kind of tracking a lot of that.

25           And this was kind of early in the time
```

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  where all of this medical necessities started

2  kicking in.  And meaningful use was kicking in

3  right when I was there.  So I cut my teeth

4  pretty heavily in those rule bases.  It was

5  while I was at Ochsner that that all hit the

6  industry.

7           Ultimately, we ended -- we basically

8  got a new CEO right at about Year 3 that I was

9  there, and at that same time -- and this was --

10  right after Katrina they bought like four or

11  five hospitals.  And right about this time when

12  I was there, they started realizing the

13  significance of trying to synchronize all of

14  these different hospitals to meet meaningful

15  use.  So they made the decision to bring in

16  Epic.

17           When they brought in Epic, 80 percent

18  of the IT department basically converted to

19  Epic, and myself and about five developers

20  still sat in a separate sort of queue

21  maintaining all system across all locations of

22  Ochsner.  As they rolled out one location, and

23  then another, and -- I left soon after the

24  second location was rolled out, which was about

25  a year, year and a half in the roll.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1      Q.    Before that Epic project, when they

2  were rolling that out, what other kind -- you

3  mentioned software for scheduling and for

4  diagnoses?

5      A.    Yeah.

6      Q.    Any other kinds?

7      A.    Yeah.   I mean, we tracked history,

8  like all the medical history.   So we had

9  systems that were tracking medications, um -- I

10  mean it was -- I think we called it problems.

11  It was just, like, basically all the issues

12  that they had.

13      Q.    Okay.

14      A.    Um -- what else?

15      Q.    Were those softwares built in-house;

16  those were all in-house?

17      A.    Yep.

18      Q.    Any third parties, besides Epic, that

19  you were responsible for?

20      A.    We had a bunch of vendors and things

21  that I worked with, but nothing having -- I

22  mean, nothing core.   I mean, we had add-on

23  little components.   Right?

24      Q.    Right.   Right.

25      A.    So there are always little pieces and

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1   parts, but no, this was home grown .net

2   development -- microsoft.net.

3       Q.   Okay.

4       A.   We managed our own systems, we had to

5   build all the integration to get all data --

6   that was one of our biggest tasks as well, was

7   getting this data into Epic.  So we worked very

8   closely with Epic.  We got to basically -- they

9   do all this in a very secure way.  We had a

10  very clear understanding on that.  Medical

11  data, in this system and in this system,

12  although the data's the same, could be

13  interpreted differently.  Right?  So there's a

14  lot of information and knowledge that we had,

15  and techniques that we had to follow, to make

16  sure that that was happening accordingly.

17           I was at the table with upper

18  leadership, basically, orchestrating that

19  migration and helping with the plans from a

20  technical standpoint on making that happen.

21      Q.   And what did Epic do?  I mean --

22      A.   Everything.

23      Q.   Everything?

24      A.   Everything.

25      Q.   Like, for example --

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1      A.    It replaced -- it replaced 30 home

2   grown system at Ochsner.

3      Q.    Okay.

4      A.    30 separate ones.  It does everything

5   from lab -- so there's a LIMS system in there.

6   It does lab, it does patient scheduling, it

7   does inpatient, outpatient surgery, it does

8   everything.  It's got patient portals.  It

9   does -- anything and everything you can

10  imagine, it does it.  From many a medical side

11  of things.

12     Q.    You mentioned the LIMS component it

13  had.  Did you work at all on that?

14     A.    We actually didn't take their LIMS,

15  because our LIMS was better.

16     Q.    Okay.

17     A.    The LIMS that we had in house.  I

18  didn't build the LIMS at Ochsner.  But the one

19  that was there, we helped support port some of

20  it.

21     Q.    Uh-huh.

22     A.    They decided early on that we weren't

23  going to change that.

24     Q.    Okay.

25     A.    And later in life I got pretty good at

**EXHIBIT B**

1 labs, so I started really looking back, and

2 it's probably because we were -- they were so

3 well integrated with all the instrumentation

4 and everything that was going on, they said, we

5 don't want to bite that one off.

6      Q.   Right.

7      A.   Later in life I believe they did end

8 up switching over to the new one, and they are

9 100 percent Epic at this point.

10      Q.   Okay.  What do you mean -- not wanting

11 to bite that off; what do you mean by?

12      A.   Because the effort that it would take

13 to migrate from their current LIMS system, with

14 all the instrument integration, all the test

15 details, you know, levels and whatnot that go

16 into laboratory testing --

17      Q.   Right.

18      A.   -- it's a significant undertaking.

19 And so the magnitude of them replacing 30

20 different systems with Epic, and also, you

21 know, upgrading and migrating all of their

22 locations to it, they probably looked at the

23 long list and they said, it's going to be such

24 a heavy load to implement the -- just the lab

25 piece alone, let's go ahead and leave that

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    alone loan right now, let's focus on all this

2    stuff.

3        Q.    Okay.    That makes sense.    And I'll

4    ask -- I'm gonna ask about Trinity and Pathway

5    later, but what is the company that you work

6    for now?

7        A.    Truce Software.    T-R-U-C-E.

8        Q.    Truce?    And what kind of software did

9    they make?

10       A.    We have a contextual mobile device

11   management platform that runs --

12       Q.    Explain what that means to me.

13       A.    So it's a mobile application that

14   basically recognizes context.    So our context

15   now is in this board room -- in this conference

16   room.    Context could be while you're driving,

17   it could be operating a forklift.    So our

18   software basically overcomes all cues and

19   activity on the device, and enforces policy at

20   the time of that context.    So we are able to

21   stop any type of alerts, we're able to stop

22   access to applications, we're able to stop

23   certain type of phone calls, hands-free or

24   otherwise.

25            And so traditionally, the company has

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    been a mobile distraction -- a vehicle-focused

2    driver-distraction type of platform.  Since

3    I've started, we've taken it beyond that and

4    we've gone into heavy equipment, and just

5    general location.  So now we're working with

6    construction companies, forklifts, still very

7    heavily in the vehicle space.

8        Q.    Uh-huh.

9        A.    But yes --

10        Q.    Just broader than a car?

11        A.    -- just working anywhere there is a

12    device.  So right now, you know, I'm being

13    nice, I'm not looking at my phone.  But if we

14    were to implement our system, then we wouldn't

15    be able to touch the phone while we talk.

16        Q.    It uses, like, GPS and stuff to figure

17    out where you are?  How does it know context?

18        A.    We don't track.  In the vehicle, GPS

19    is used to know that you're driving.  In here,

20    we have beacons that we would implement in

21    different places.  So we'd have one box that

22    sits somewhere hidden under the shelf, or

23    whatever it may be.  And so if you have our app

24    installed, it walks in, it recognizes it, it

25    says I'm in a conference room, enforce the

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1    policy.

2        Q.    Got you.

3        A.    So different policies for each

4    environment.        ·

5        Q.    Does that software have, like, a

6    specific name?

7        A.    Truce.

8        Q.    Truce?   That's all?

9        A.    Truce Software is our platform.

10       Q.    Okay.

11       A.    Right.

12       Q.    Anything else besides that mobile --

13       A.    We have a web console.  We have a

14   hardware device that's developed in-house.  So

15   I have four, maybe five development teams --

16   five, technically.  We a web team, a platform

17   team which is infrastructure, we have an IOS,

18   and in android team, and we have a hardware

19   team, all developing, in their own right,

20   integrating together.

21       Q.    But that's for that same kind of one

22   product, right?

23       A.    It's a SAS service.  So the software

24   is a service.  We offer this product out.  You

25   pay by the subscription based on the

1    installation of the mobile application, and the
2    hardware is deployed as necessary to cover the
3    areas that you need covered.
4        Q.    Okay.  So this isn't like software
5    designed for the medical space, specifically.
6    Right?
7        A.    It's not at all medical space.
8        Q.    Okay.  And you mentioned you had one
9    client, though, that was --
10       A.    Oh, that's a separate -- I do
11   consulting on the side.
12       Q.    Okay.
13       A.    So I've been working with this
14   particular client, really, since early 2017.
15   They're a durable medical company.  So they
16   sell durable goods, you know, gloves and
17   everything.
18       Q.    Syringes, that kind of stuff?
19       A.    Everything.
20       Q.    What are you doing for them?
21       A.    So I've developed a system that does
22   order entry and basically process of order to
23   claim.  So basically it keeps track of all the
24   information coming in, all types of dashboards
25   and analytics around, you know, different

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

statuses and whatnot of where things are. If
medical necessity is necessary, they have ways
in there that they can basically triage these
things and go out back up to the sales force to
get more info. We have a sales portal portion
of it where they can go in and see that
information and plug in the necessary details.
And then ultimately it kicks out, nightly, all
of the claims that are ready to bill to their
billing software, which is a separate system,
and then they take over from there with the
billing. So that's -- that is the scope of my
system that I built for them.

    Q.    You're a consultancy, is that under a
company name, or is that just you?

    A.    I mean, I've branded it. Symplexit.
S-I-M-P-L-E-X-I-T.

    Q.    Do you have like a website or anything
like that?

    A.    No.

    Q.    You have an LLC?

    A.    I do have an LLC.

    Q.    Okay. Any other employees, or just
you?

    A.    No, just me.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1     Q.    Okay.  Have you ever -- before

2   Trinity, have you had you ever rolled out,

3   like, a thirty-party LIMS or LIS system before?

4           MR. STEWART:

5                Object to form.

6                You can answer if you understand.

7     A.    Um -- have I ever rolled out a

8   third-party system?

9   EXAMINATION BY MR. LESUEUR:

10    Q.    Third-party LIMS or LIS system.

11    A.    Oh.  No.

12    Q.    Okay.  Any of your previous work

13  before Trinity involve like cybersecurity

14  stuff?

15    A.    Um --

16    Q.    Either directly or indirectly?

17    A.    Everything involves cybersecurity and

18  internet security.  So I would say yes.

19    Q.    Okay.

20    A.    Every aspect of it.  You have to have

21  security on the end -- I mean, I only worked

22  minimally with server and hardware security.

23  But from a software standpoint, it's very --

24  it's very dangerous having this externally

25  facing platform.  So yeah, having the proper

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1   best practices in place, making sure things are

2   secure, protected, and handled accordingly, as

3   far as passwords and all those things go.

4          Interfaces as well.  I've done a ton

5   of integration work over the years at pretty

6   much every job I've had.  And so working

7   through that transfer of data behind the scenes

8   is equally as important just to sure that no,

9   you know, holes are made.

10      Q.    Right.  You mentioned best practices.

11  Where does that come from?

12      A.    Where does the term come from?

13      Q.    Well, the term -- where do the

14  practices come from?

15      A.    Best practices is a moving target.  As

16  technology grows and cybersecurity becomes more

17  of a problem, those best practices increase.

18      Q.    Right.

19      A.    So if you're not keeping up with the

20  times, you're out of best practice,

21  essentially.  It's anything from making sure

22  your passwords are encrypted, making sure you

23  have a certain length of password, and sort of

24  rules based in there to where it's not just

25  ABC123.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    Q.   Right.

2    A.   It's making sure that you have SSL

3 certificates protecting you, so that way any

4 transfer of data on the Internet is encrypted.

5         It is minimizing the exposure of any

6 end points.  So making sure you have one point

7 of entry that you can focus security on.  So

8 there's architectural, you know, aspects of

9 best practice.  There's basic fundamental

10 aspects of best practice.  And then there's

11 coding best practices to make sure you're

12 stuff's sufficient and secure enough to where,

13 you know, you're not going to be vulnerable.

14         It coul be things like a text box and

15 do sequel injection, where they can just go

16 into a text box, and if you're savvy enough,

17 you can actually inject SQL, which is a

18 database language, and actually insert data

19 into tables.  It was actually a project we did

20 back in college, and we actually saw it happen.

21 Somebody injected SQL in tables and ended up

22 having crazy -- all of the columns were all

23 wild and crazy, and so it was a good learning

24 experience back then:

25         But, um -- but yeah, best practice is

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    a general term that just means check your --
2    you know, check the basics.
3         Q.    Right.  Is there any, like, one source
4    of group of sources where you could go find
5    these best practices, like any publications,
6    anything like that?
7              MR. STEWART:
8                   Object to form.
9                   You can answer if you understand
10             the question.
11        A.    No.
12   EXAMINATION BY MR. LESUEUR:
13        Q.    No.  This is just industry
14   knowledge --
15        A.    You got it --
16        Q.    -- experience, that kind of stuff?
17        A.    That's right.
18        Q.    Okay.  Is there any one best practice?
19   Could you ever say that, um -- well, let me
20   think about how to ask this better.
21             Are there any other, any regulatory
22   bodies coming around, knocking on doors, and
23   saying you're compliant with best practices, or
24   not compliant with best practices?
25             MR. STEWART:

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

                    Object to form.
     A.    The answer's no.  Industry specific?
Maybe.  But globally, for technology?  No.
EXAMINATION BY MR. LESUEUR:
     Q.    Independent specific.  Which ones?
     A.    I mean, HIPAA is a huge compli -- you
know, regulatory component.
     Q.    Right.
     A.    Um -- from a lab standpoint, it'd be
CMS, it'd be Medicare.  Right?
     Q.    Right.
     A.    I mean, every industry has some level
of compliance oversight.  You know, it might be
OSHA in the industrial area.
     Q.    Right.
     A.    So they all have their own rules and
their own thoughts.  Whereas in the medical
side of things, they're gonna have a real
problem if you publish something that has
patient names, and a date.
     Q.    Right.
     A.    Whereas if you go to the industry
side, they're gonna not give a damn.
     Q.    Right.
     A.    So yeah, very different all around.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1   You gotta know the industry you're in, and you
2   gotta be able to conform to those best
3   practices.  There are general best practices,
4   though, that exist, and it's nothing -- one
5   silver bullet, it's just general, you know --
6       Q.   Guidelines.
7       A.   -- guidelines.  Yeah.
8       Q.   HIPAA.  Does HIPAA have any specific
9   rule -- do you know if HIPAA has any specific
10  rules or regulations about cybersecurity?
11          MR. STEWART:
12              Object to form.
13  EXAMINATION BY MR. LESUEUR:
14      Q.   For the health care space?
15          MR. STEWART:
16              Same objection.
17      A.   It is based on data protection for the
18  medical.  So anything beyond a number that
19  represents an employee starts to step on HIPAA
20  and PHI problems.
21  EXAMINATION BY MR. LESUEUR:
22      Q.   Okay.
23      A.   Just looking at your name in a medical
24  system, or in a medical document, really is
25  almost getting to the gray area.  Any data

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1    beyond that basically is a no go.

2        Q.   Right.

3        A.   So if I know the date that you showed

4    up somewhere, or if I just have your date of

5    birth, although your name and date of birth is

6    not medical related, it's PHI.

7        Q.   Right.

8        A.   And that -- that fits within that

9    realm.  So anytime you're within the medical

10   context, you need the have -- make sure that

11   your data is super secure, and that you have no

12   exposure of personal information whatsoever or

13   any way that anybody could access that.

14            So, for instance, from Ochsner's

15   standpoint, I remember a laptop was lost.  That

16   laptop had some unknown amount of data.

17       Q.   Right.

18       A.   I mean, full press release had to

19   happen.  It was a full public exposure that

20   Ochsner had to do, to say this happened,

21   there's a list of, you know, hundreds of

22   patients that potentially could have been

23   exposed.  And they got in front about it.  If

24   they didn't, they coulda got shut down.

25            And they didn't even know that

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1  anything was actually breached.

2      Q.   Right.

3      A.   They just knew that it was possible

4  that it could have been preached.

5      Q.   Right.  So HIPAA has certain rules

6  about the types of information that you can't

7  disclose.  Do you know if HIPAA has any rules

8  about how you protect that information?

9          MR. STEWART:

10             Object to form.

11     A.   No.  They do not put out technical

12  guidelines or rules.  They do not define best

13  practices.  They basically say practically

14  speaking, this is what cannot happen.

15  EXAMINATION BY MR. LESUEUR:

16     Q.   Right.

17     A.   And they judge based on the event or

18  the situation at hand.

19     Q.   Okay.

20     A.   It is up to you as a technologist to

21  understand how to properly protect, how to go

22  above and beyond protection when necessary.

23     Q.   Okay.  Other than your experience with

24  Trinity, Performance, Pathway, those groups,

25  any other work in toxicology before?

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1     A.    No.

2     Q.    Okay. All right. So let's move on to

3 Trinity -- Trinity, Performance and Prestige.

4 I'm going to kind of refer to them all

5 collectively as Trinity. If I have any

6 specific questions about either entity, or if

7 your answer depends on the entity, just let me

8 know.

9     A.    Okay.

10     Q.    But I'll be sure to make that clear.

11     A.    Okay.

12     Q.    But when I use Trinity I mean to

13 encompass all three flee of those entities. Is

14 that okay?

15     A.    That's good. Sure.

16     Q.    Okay.

17     MR. STEWART:

18        And I will just insert a standing

19        objection to the extent that there's

20        not any clarity about it we reserve

21        the right to clarify.

22 EXAMINATION BY MR. LESUEUR:

23     Q.    So tell me how that project got

24 started -- that business got started.

25     A.    Project?

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1      Q.    Yeah.

2      A.    We were working on Paradigm.  We had a

3  team of about eight or nine folks, mostly

4  engineers, working on the actual solution.  And

5  um -- Blake bumped into Rhett Bunce who was

6  good friends of ours from high school, and made

7  a comment about somebody he met that was in the

8  lab business and was doing well.

9            And so we started looking into it.

10  And, um -- we basically -- we say the oil and

11  gas industry starting to suffer, so we started

12  really digging in deeper.  My background in

13  medical software let me directly into the point

14  of, yeah, we can definitely build the software

15  that's necessary for this to happen, and

16  started to network with different folks in the

17  industry.

18            A family friend of mine who I was

19  actually at the table talking to about some

20  interesting partnership work on the Paradigm

21  industrial side, he actually had a laboratory

22  in Houston that he was running with a group of

23  people.  So it kind of was like serendipity

24  here, like, wow, we have two things that we

25  were looking at the same time together.  So we

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1   started working with that group out of Texas,

2   kinda learning the ropes from them. They had a

3   long history in lab business, a lot of experts

4   over there that were working on things. And we

5   kinda became kind of an external support group

6   and started talking about the plans of, hey,

7   let's do a Mandeville location, you know, we're

8   all here.

9           So long story short, we worked with

10  them for a good while, ended up not moving

11  completely forward with them, and we just kept

12  running with the ball that was already started.

13  Hired some talent that had, you know,

14  certifications, you know, that were qualified

15  for lab, started off really slow.

16          2013, October we opened the doors.

17  Um -- at that point, we brought on a LIMS

18  sys -- so I need to correct an answer. Have I

19  rolled out a LIMS system before? I have. The

20  third-party LIMS system I rolled out was

21  Paracelsus. I actually rolled it two times.

22          So anyway, I rolled out that system a

23  number of times. And I rolled out a third

24  system, actually, LIMSABC.

25      Q.   Right.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1     A.    And so anyway, I've rolled out a bunch

2 of LIMS systems.

3     Q.    Right.

4     A.    So I retract my statement from before.

5 I have rolled ought a number of LIMS systems.

6     Q.    Well, I think my question before was

7 before Trinity.

8     A.    Oh, before Trinity.

9     Q.    Yeah.

10     A.    Got it.

11     Q.    Paracelsus you rolled out.

12     A.    I rolled out at the beginning.  They

13 basically promised that they could do

14 everything we needed.  They were primarily a

15 screening-only system, but they were working

16 towards the LC-MS side.  They had -- from what

17 I saw, and I did some investigation of other

18 systems out there, more than one of them, and I

19 basically saw that this system Paracelsus was

20 the most current out of all of them.  The rest

21 seemed very old and clunky to me.

22          So we went with Paracelsus.  They had

23 a great platform for the screening side of the

24 lab.  But when it came to LC-MS, they flopped.

25 They did not have the integration tuned up

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  right. I had to drop everything, and I spent

2  weeks and weeks with their support guys. Their

3  system just wasn't ready. And they basically

4  said, we haven't done enough testing, you know,

5  we need more time to be ready for this. Y'all

6  are going to be our first to use it.

7       And I was kind of open to the

8  opportunity to get that going, but we ended up

9  not being able to do that side of it. So we

10  kept 'em on the screen side.

11       I was building my platform with a

12  plan, and I basically had to abandon that plan

13  and jump to the middle and say, I need to

14  billed integration with this LC-MS system so

15  that we can get results off, have them reviewed

16  and approved, and then I need to create a

17  report. So I basically focused all my efforts

18  on that, and within a couple of weeks I had

19  that built. So we at that point were able

20  to -- we were doing manual, paper. We were

21  building out, um -- we were able to actually

22  push results out from Paracelsus and from the

23  LC-MS.

24       Q.   Your --

25       A.   With my system, right. I integrated

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    with Paracelsus.  They gave me the screening

2    data, and then I got -- you know, my system

3    basically spoke to the bigger instruments.

4         Q.   Okay.

5         A.   So anyway, I digress.

6         Q.   No.  No.  That's fine.

7         A.   We continue on the path, start very,

8    very slowly, very smartly.  We go into 2014

9    really just happy about where we're headed.

10   Very, very slow pace.  I'm building like a

11   banshee.  I brought on Danny.  Soon later I

12   brought on Jamie.  Um -- and we just -- I mean,

13   we're building every day, every night.  It was

14   a nonstop -- completely nonstop effort.

15            And um -- we get kind of towards the

16   end of 2014, clipping at a decent pace,

17   great -- great momentum, had about maybe 50

18   employees at the end of '14.

19            And then we had the vision to grow the

20   next stage of things.  We brought on a bunch of

21   sales folks.  We met a gentleman that had kind

22   of a band of sales folks that were looking for

23   a new home, and we kind of looked at it and

24   said, well, I guess we'll do both.  So we had

25   our owner team and we had his team.  And 2015

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  just took off like a rocket.  Way too quick.

2  Way too fast.  Um -- you know.

3       Anyway, continue on in the world.  We

4  get up to 150 employees, the software was just

5  rolling, we had 10 or 11 instruments running,

6  LC-MS instruments, 400-plus samples a day.  It

7  was just nonstop rolling.

8       Got shut down at the end of 2015.

9  Christmas Eve we got the letter.  Full stop,

10 laid off, you know, not enough people right

11 after the first of year.  I think we gave

12 everybody till kind of the end of Q1, and we

13 just had to drop, you know, a good bit of

14 people.

15      And at that point, like I said, I

16 focused my attention elsewhere.  And basically,

17 um -- a lot of the employees that we had that

18 were working under Prestige went and worked for

19 the Performance Labs, consulting, kind of a --

20 you know, employee relationship with what

21 group.

22      Q.    You mean Pathway; right?

23      A.    Pathway.  Right.  Prestige had the

24 employees.  Pathway basically paid the bill.

25 That was an employee agreement with those guys.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    But I didn't really step foot in the

2 lab much at that point.  I focused full

3 attention on NextPhaseMD.  And outside of just

4 a little bit of direction and just keeping me

5 in the loop, I basically kept my focus on that

6 for the better part of 2016, um -- anyway.

7   Q. Great.

8   A. That was Trinity in my memory.  And

9 then it all just blew up, or imploded, at the

10 end of '16.

11   Q. Right.  And we'll get to there.  I

12 want to ask a few follow-up questions about

13 that beginning period for Trinity.  You said,

14 you know, that you guys opened the doors in

15 October '13.

16   A. Yep.

17   Q. Y'all started with Paracelsus;

18 correct?

19   A. That's right.

20   Q. And it was just used -- or y'all just

21 used its LIS for screening --

22   A. That's correct.

23   Q. And used your system to link up

24 Paracelsus to do confirmatory testing.  Right?

25   A. No.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1      Q.    No?

2      A.    Paracelsus worked with the screening

3  instruments.  My software worked with the LC-MS

4  instruments.

5      Q.    Okay.

6      A.    I communicated to Paracelsus to pull

7  the screening data over.  So my system was the

8  central point that pulled data from Paracelsus,

9  which was the screening data, and from the

10  LS-MS directly, meshed it together, provided

11  the screen for our scientists to review.  They

12  did their science work, and then the kicked out

13  a pdf document that was flown out over the

14  letterhead, basically.

15      Q.    Right.

16      A.    And that was the patient result.

17      Q.    Okay.  The, um -- why was there -- you

18  know, why were y'all still developing your own,

19  um -- you know, how well did that work?

20      A.    Fantastic.

21      Q.    Okay.  So why keep developing your own

22  software?

23          MR. STEWART:

24              Object to form.

25              You can answer.

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1     A.    Because we could do it better.

2 EXAMINATION BY MR. LESUEUR:

3     Q.    Okay.  Like faster, or more --

4     A.    Faster.

5     Q.    -- accurately?

6     A.    Faster, more agile, more current.

7 Significantly more current.

8     Q.    And what do you mean?

9     A.    The industry is very old.  Many, many

10 LIMS systems, like Merge, especially, and many

11 others, they were old practice management

12 systems that were migrated and meshed to be

13 lab.  At least that's how they feel.  Coming

14 from Ochsner, I recognized how old software

15 looked in the medical space, the very outdated

16 industry.  It's now caught up pretty well now

17 with some of these big Epic type systems.  But

18 traditionally, and at that time especially, it

19 was a never old system.

20         So you look at -- I've gone through

21 dozens or LIMS systems out there doing

22 competitive analysis work, doing inspection on

23 new opportunity to work with other companies.

24 I've got a tremendous amount of that work that

25 I've done.  And time and time again, they're

**EXHIBIT B**

clunky, they're old, they're not agile, they're

not flexible.

        And everything's a moving target, such

as best practices.  It changes as time goes

along.

    Q.    Uh-huh.

    A.    So we had -- I had a team that I was

able to pull together that had great current

experience in both medical and in software, so

we were able to work on a whim.

        So, for instance, we a bottleneck

within our laboratory space where we have four

LC-MSs running, we have five or six scientists,

and we have bottlenecks that exist.  We sit

down you, we get on the white board, we draw

out the needs, we start writing out a plan, a

process, and we go to work, and we build it,

and a week later we have a solution.

Completely changed the way they operate.  Did

that 10 times over.

    Q.    Right.

    A.    So that was the life that we lived is,

basically, you got a problem?  Let's talk about

it, and we'll have a solution for you in the

very near future.  And that was the cycle that

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  happened.  It was continuous improvement.  It

2  was a fantastic system we coulda done a lot

3  with.

4      Q.    Yeah.    When was the date that y'all

5  stopped using Paracelsus?

6      A.    We used it for a long time.  Yeah.

7  There were many times where we said we could

8  rebuild it -- or rebuild that portion of the

9  functionality.  But to be honest, we had a

10  pretty decent contract with them.  It paid for

11  itself, essentially.

12      Q.    Right.

13      A.    And they were pretty much -- there

14  were many more fish to fry from a development

15  side of things.  So we used Paracelsus all the

16  way through.

17          In the very end, we were starting to

18  build out our -- when we were looking at

19  actually marketing and making this a product, I

20  mean, you know, to market out externally, we

21  started building into the screening side, but

22  never went live, never actually completed that

23  project.

24      Q.    Okay.

25      A.    So we used Paracelsus all the way

**EXHIBIT B**

1    through.

2        Q.    Okay.  So Trinity LIMS -- y'all never

3    used Trinity LIMS on its own.

4            MR. STEWART:

5                Object to form.

6        A.    Um -- that's not true.  We never used

7    it for the screening -- we never used it to

8    talk to the screening instrument.  Essentially,

9    what we were able to do with Paracelsus is we

10   did nothing in that system except it was

11   like -- it was like a middle ware component

12   that just passed data from one to the other.

13       Q.    Okay.

14       A.    So I was able to work with Paracelsus,

15   and we automated an integration process where I

16   would communicate to Paracelsus with basically

17   cryptic numbers, so to speak, that would say,

18   all right, this is the order that I need on

19   this sample.  Paracelsus would tell the

20   instrument that, instrument would kick out

21   results, and it would give back results.  So

22   turned Paracelsus from being a front end

23   application to just being a black box that

24   communicated to and from the instrument.

25       Q.    Like a conduit?

**EXHIBIT B**

A.    That's exactly right.  And so all
ordering too place within our system.  All
results, reviewing, everything essentially took
place within our system.  We just never did
build the direct interface to the instrument on
the screening side because Paracelsus was doing
it for us and it was a cheap enough contract
that it just made sense to keep it.

Q.    Okay.  So in terms of, like, the lab
staff and the people in the office, they're
using Trinity LIMS.

A.    That's right.

Q.    But Paracelsus is in the background?

A.    That's right.  They can go look at it,
at logs, if they wanted to see things
transferring.  They had like some level of data
there, but there was nothing done within
that -- no typing in the system.

Q.    Was there ever a time when you were
all were doing Trinity LIMS without that
conduit Paracelsus element?

A.    Um -- not in production.  We had built
the tools.  We actually had a Version 2 of LIMS
that we had built.  So we built two LIMS
systems, actually, in this time period.  And

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  the second system never worked with Paracelsus.

2  But again, Paracelsus turned into a black box.

3  It was just another interface --

4      Q.   Right.

5      A.   -- end point.  Just like the

6  instrument would have been, to be honest.

7      Q.   Right.

8      A.   It was just an easier interface 'cause

9  it was a web-based system and we could use more

10 current types of techniques, where that was an

11 old, old, old -- those screening instruments

12 were old, and you had to do, like, weird, weird

13 hardware sort of interfacing, which was not --

14 you know, not something that we really wanted

15 to dive into.

16     Q.   Okay.  So Paracelsus was always used

17 as a conduit in the background, at least from a

18 production standpoint.

19     A.   That's right.

20     Q.   Right?  So there weren't any live

21 patient samples run through Trinity LIMS

22 without Paracelsus.

23     A.   That is correct.

24     Q.   Going back to you, Rhett, and Blake

25 starting Trinity, what were y'all's three

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  roles?  Like did y'all come to the table with
2  three different backgrounds, three different
3  expertise, or did y'all kind of all come from
4  the same background?

5      A.   No.

6      Q.   I mean, what was the --

7      A.   I mean, I was the only guy with a
8  technology background.  So that was a clear
9  place for me.  Blake's background was -- was
10 finance, and -- and vision, call it, if you
11 want.  You know, so he kind of just -- he kind
12 of played in the sales side, and he took the
13 CEO role.  He kind of -- he just -- he just
14 kind of handled all that side of things.

15     Rhett landed in operations because it
16 made sense.  He's more of the generalist.

17     Q.   Okay.

18     A.   Blake had a lot more background with
19 leadership in corporate worlds, and, you know,
20 sales, and talk -- speaking, and all that kind
21 of stuff.  Right?  So he took kind of the other
22 head of the table.

23     Q.   So Rhett and Blake, no IT background
24 from them?

25     A.   (Shakes head negatively.)  No.

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1   They've gotten better, though.

2       Q.   Right.   What about health care

3   background for those two guys?

4            MR. STEWART:

5                 Object to form.

6   EXAMINATION BY MR. LESUEUR:

7       Q.   Did they have any?  Do you know?

8            MR. STEWART:

9                 Object to form.

10      A.   I don't believe so.  No.

11  EXAMINATION BY MR. LESUEUR:

12      Q.   Sounds like you were the -- like, the

13  most value owner, then.

14           MR. STEWART:

15                Object to form.

16      A.   No comment.

17  EXAMINATION BY MR. LESUEUR:

18      Q.   You wouldn't agree to that?

19      A.   What's that?

20      Q.   You wouldn't agree with that.

21      A.   What's that?

22      Q.   That you were the most valuable, you

23  had both the IT and the health care experience

24  when you started.

25      A.   No.  I'm not gonna agree to that.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    Q.   Okay.  I think -- you know, I'll pull

2   out your LinkedIn page if you want, but it says

3   that you never had experience before Trinity in

4   the specific lab space.  Is that right?

5        MR. STEWART:

6             Object to form.

7    A.   Um -- before Trinity, lab space.  The

8   answer is right.  That's right.

9   EXAMINATION BY MR. LESUEUR:

10   Q.   Yeah.  And you said then in your

11  LinkedIn page that you had much to letter.  Do

12  you agree that?

13   A.   Always have.

14        Do you have much to learn?

15   Q.   Yes.

16   A.   Yeah.  We all do.

17   Q.   Right.

18   A.   Yeah.

19   Q.   But that was true with respect to the

20  lab space when y'all started Trinity?

21   A.   Um -- let me -- let me attack that one

22  for a second there.  So I have much to learn in

23  everything that I do in life, being a father,

24  being a professional, being a software

25  developer.  Medical is just another industry.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  It's no different than anything else.

2        So no, I don't have much to learn

3  about the medical industry specifically.  I

4  have much o learn about life in general.  So

5  that's a twisted question.  I don't want to

6  answer it.

7        Q.   Okay.

8        A.   Not happening.  You're not gonna twist

9  words on me like that.  I'm not doing that, by

10 the way.

11       Q.   Okay.  Any reason to disagree with

12 anything that's in your LinkedIn page, though?

13       A.   Oh, no.  No.  Not all.

14       Q.   Okay.  Everything in there is

15 accurate; right?

16       A.   Sure.

17       Q.   Okay.  In 2015, you said that

18 something about growing way too quickly and way

19 too fast.

20       A.   Yep.

21       Q.   Tell me what you mean by that.

22       A.   Um -- you know, it's one of those

23 things, how do you say no?  We just had a lot

24 of opportunity that just kept kind of piling,

25 um -- and we just, with the team to handle the

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  volume.  And yeah, retrospective, I would have

2  raised my hand a whole lot louder and quicker

3  and said, we need to slow the F down.

4          Me and my team were running so fast --

5  we weren't really involved in the sales or

6  operations, or anything else.  We were just

7  churning through development, keeping things

8  going.  There was so much data flying around,

9  that was our big focus.  Right?  And the bigger

10  we got, the more that happened, and the less we

11  could really help with doing anything else.

12          So, um -- I mean, from our localized

13  sort of standpoint, the volume grew so quickly,

14  um -- that I wasn't able, as a partner and a

15  leader, to help in other places.  We kept the

16  wheels turning, and we did a damned good job at

17  it, but everything else just went the same

18  route.  We just -- we grew so quickly that,

19  um -- that it's just to keep up.  Right?  It's

20  hard to keep the training to a good level, and,

21  um -- you know, ultimately it was just not

22  necessary.

23          I mean, we ran a good lab, we had

24  freakin top notch staff, we had Ph.Ds, we had

25  ridiculous expertise around the room to handle

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

the areas that we weren't experts in, but in the end there was no need for us to grow that quickly, obviously, now looking back. But yeah we should have kept on the pace of 2014, and not gone like we did with 2015. Some folks had bigger eyes on 'em than others, and it just kept happening. So --

Q.   When you say volume, you mean patient samples?

A.   Um-I mean, that's a -- that's a pretty good leading indicator of, you know --

Q.   The pace?

A.   -- of pace of this company, yeah.

Q.   Yeah.

A.   Of this industry.

Q.   Yeah.

A.   It's just number of doctors, number of employees, number of -- all relative back to the amount of samples you got coming through your door.

Q.   All right. You mentioned there were kind of two separate sales arms? Or there was a group -- an external group and an internal group? Can you explain that for me?

A.   Basically local -- more local

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    Louisiana and Houston, Texas, kind of area, and
2    then the others were more spread -- wide
3    spread. We had, you know, some California,
4    some Colorado, I think. Kind of a little bit
5    more spread out. You know?
6        Q.    Was that a separate company that y'all
7    were working with in sales and marketing, or
8    like y'all's -- Trinity's employees going out,
9    flying all over the country?
10       A.    No. They were located in those
11   different areas. And so there was a separate
12   group of folks that came on, and they were
13   basically coming to be part of Trinity. So
14   there was a period of time where it was a
15   separate group, but we had sort of a JV sort of
16   arrangement, or some kind of group, you know,
17   um -- you know, we brought them into the fold,
18   basically, so they had benefits, they had --
19   they were getting, you know, all of that stuff.
20   It basically happened where they'd come in and
21   become part of the company. And that was the
22   course of, like, the second half. I mean, it
23   happened so quick. It was kind of, you know,
24   mid-2015 we started to get rolling, and six
25   months later it happened.

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1      So in the midst of kind of setting all

2   that up, the growth pattern just freakin shot,

3   'cause they had a ton of relationships, and

4   they were bringing a lot to the table.

5      Q.   Yeah.

6      A.   And it just all -- it all stopped

7   pretty much before it got started, to be

8   honest.

9      Q.   That other sales group that y'all

10  brought in, did they have, like, a company

11  name?  Like what --

12     A.   Tiva.

13     Q.   Tiva?

14     A.   Yeah.

15     Q.   Was that like a -- that's a standalone

16  company?

17     A.   I mean, that was an LLC somebody

18  created, you know, and they were representing

19  that way, so.

20     Q.   How did y'all get hooked up with them,

21  do you know?

22     A.   Um -- through a mutual contact in the

23  industry.

24     Q.   Do you know who?

25     A.   No.  Chris Franklin, I believe, was

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    the introduction there.  Local guy.  Lab guy.

2        Q.    And who was the family friend that was

3    running the lab in Texas that you mentioned?

4        A.    In Texas.  Oh.  Um -- it was my

5    grandmother's boyfriend's son.  So when I say

6    family friend, it's an extended family friend.

7    Um -- what was his name?  I don't remember his

8    name.

9        Q.    Okay.

10       A.    Yeah.  I don't remember his name.

11       Q.    Well, do you remember the name of

12   their lab?

13       A.    It's on the tip of my brain, but I do

14   not.  If it comes to me I'll blurt it out.

15       Q.    You were an owner of Trinity; right?

16       A.    Yes.

17       Q.    Are you still an owner of Trinity?

18       A.    No.

19       Q.    When did you give up your ownership?

20       A.    April, I believe, of 2017.

21       Q.    Okay.  Were you paid anything?

22       A.    Unh-unh.

23       Q.    No?  Just walked away?

24       A.    Not a bit.  Yep.

25       Q.    Did you ever take anything home as an

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

```
 1   owner, or just a salary?

 2           MR. STEWART:

 3               Object to form.

 4       A.    Yeah.  We had -- we had some -- We got

 5   some distributions.

 6   EXAMINATION BY MR. LESUEUR:

 7       Q.    Okay.  How much?

 8       A.    Minimal.

 9       Q.    Yeah.

10       A.    Um -- how much, like, total?

11       Q.    Yeah.

12       A.    Maybe -- in all, maybe like four or

13   five hundred thousand.

14       Q.    Okay.  Over the course of from --

15       A.    The whole time.

16       Q.    -- October of '13 to April of 2017?

17       A.    Right.  Roughly, I guess.

18       Q.    Were those like periodic, or just kind

19   open random --

20       A.    Random.

21       Q.    What money was put up to start

22   Trinity?

23           MR. STEWART:

24               Object to form.

25       A.    Um -- we had -- how did it happen?  I
```

**EXHIBIT B**

1   mean, we each put up minimal amounts, like five

2   or ten thousand, I believe.  If my memory

3   serves.  Through the work that we were doing

4   with the Texas contact, we were able to make

5   some commissions off of that.  Because some of

6   the first things we did with them was actually

7   work as a sales sort of extension to them.

8   Right?  We had some local contacts around here.

9   So we were working with them on a commission

10  standpoint early on, doing sales.  And so that

11  sort of -- that became our nest egg, I guess,

12  to get things started.

13       Q.   Okay.  Do you remember how much that

14  was?

15       A.   A couple hundred grand, maybe.

16       Q.   Okay.  Any loans y'all took out at the

17  start?

18       A.   No.

19       Q.   No.  Tell me about what the IT team

20  looked like over time.

21       A.   Hired Danny early, probably '14.

22  Always kept in contact with him.  I believe he

23  might have done a little bit of work with me

24  early on as a consultant, but at some point he

25  and I had some big talks, and he came on board.

1    Um -- fast forward another six months,
2    maybe, mid-'14, Jamie came on.  Danny was a
3    core developer.  Jamie was database and
4    testing, basically.  And so it was the two of
5    us that basically ran the ropes for a better
6    part of '14.
7    Um -- once we got into '15, things
8    were running so quickly, um -- I was looking at
9    more talent.  I ended up bringing in two
10   consultants.  One of them was Anand Ramish that
11   we talked about.  The other one is Paul
12   something -- I forget his last name.  Both just
13   1099 consultants.
14   And basically what I did with them was
15   instead of just continuing to build on top of
16   the systems that I had, I wanted to kind of see
17   a new light come out of it.  We learned a lot
18   through developing that, and looking back we
19   should have stayed with it, because it was
20   robust, it was formed like it needed to be.
21   And, um -- anyway, we had -- I had them working
22   on a new environment.
23   So Paul had experience developing
24   software in the past for lab, so I had him
25   focus on lab specifically, working on

**EXHIBIT B**

1  instrument implementa -- you know, integration

2  and all that.  So he focused just on the

3  modular lab.  Where Anand was working on things

4  that complemented our current LIMS, which was

5  external, like, doctor portals, and all that

6  kind of stuff, dashboards and whatnot.

7  So at that point I had me and my two

8  core folks with the two consultants, and that

9  was -- that took us to about early -- you know,

10  early '15 is when they came on.

11  And then from that point on, we

12  brought in two network engineers, hired a CTO

13  to help me out, because there was so work much

14  work I was doing in development I needed

15  bandwidth.  We hired a help desk person, a

16  SharePoint developer to manage our in-house

17  SharePoint efforts, and then we had two project

18  managers later in the year.  There were other

19  roles that weren't directly kind of organized

20  in my group, but we had some business analysts

21  and some, you know, business intelligence type

22  roles as well that worked real closely with us.

23  Q.   Where did all those folks work?  I

24  understand some of them were remote and some of

25  them in the office.  Who was the --

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    A.    Danny was he only one remote.

2    Q.    Oh, okay.

3    A.    Yeah.

4    Q.    Everybody else worked in the office?

5    A.    Yeah.  Jamie had -- you know, she'd

6    flex time.  She worked at home some, but she

7    was in the office a lot too.

8    Q.    Okay.  Do y'all have anyone dedicated

9    solely to security?  Cybersecurity?

10   A.    Our CTO had a -- was black hat.  You

11   know what black hat is?

12   Q.    No.

13   A.    It's like an old school hacker that

14   basically has, like, full-on security

15   credentials.  And I mean, he was -- he was

16   significant.  Older gentleman -- I mean, not

17   older, but he was older than us, about -- he

18   had about 10 years experience on us.  He came

19   from Entergy.  Very high level IT guy, ran all

20   kinds of -- mostly hardware, not really

21   software related as far as the development

22   goes, but I mean the security that this man had

23   was over the top.

24   Q.    What was this name?

25   A.    Um -- I'm terrible with names.  Um --

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  Noz. What is it? Noz. Noz. Noz. I don't

2  remember.

3      Q.  Don't remember?

4      A.  I don't remember this his name.

5      Q.  When did he come in?

6      A.  Must have been about mid-ish, Q2,

7  maybe. Yeah, about mid-2015.

8      Q.  Mid-2015.

9      A.  It must have been.

10     Q.  And how long did he stay on?

11     A.  Oh, he was one of the ones that went

12 early '16 after the shutdown.

13     Q.  He was, like, laid off?

14     A.  Yeah.

15     Q.  Okay.

16     A.  Yeah. And my timing may be off. We

17 may have have started hiring up folks like that

18 early '15. The more I think about I, I think

19 it was. I think most of my IT group, from a

20 development standpoint, was mobilized by the

21 end of '14. And then once we saw '15

22 happening, Q1, we started, you know,

23 expanding --

24     Q.  Scaling up?

25     A.  -- my team, yeah, with servers and all

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1   the stuff that came with it.

2       Q.   Okay.

3       A.   He was the one that basically drove

4   the server efforts to get internal data centers

5   and all that stuff in place.

6            Wozniak.  John Wozniak.

7       Q.   Same name -- last name as the Apple

8   guy, right?

9       A.   Like the Apple guy, yeah.  I'll never

10  forget that.  He loved that.

11      Q.   The guy who says to not use Facebook.

12      A.   That's right.

13      Q.   Wozniak, he was the dedicated

14  cybersecurity guy.

15      A.   He was my CTO.  So he was dedicated

16  for cybersecurity, overall just infrastructure.

17  He basically oversaw the network engineers, and

18  he basically facilitated, with them, the

19  development of our servers, and all of the

20  safeguards around it.

21      Q.   Okay.  And he left at to beginning of

22  '16.  Right?

23      A.   That's right.

24      Q.   Anyone else fill his role after he

25  left?

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

```
 1        A.    Um -- no.  I mean -- yes.  We Burton,
 2   and we have Ben, who were both very, very
 3   experienced, and also, you know, from a
 4   security networking standpoint, have, you know,
 5   a long history.
 6        Q.    Uh-huh.
 7        A.    I wouldn't -- I wouldn't say to his
 8   caliber, but absolutely.  They built -- they're
 9   basically the ones who built this thing from
10   the ground up.  So they had their hands on it,
11   and they supported it all the way through.
12        Q.    Okay.  But you said those, Ben and --
13        A.    Burton.
14        Q.    -- Burton didn't have the experience
15   Wozniak had?
16        A.    I mean, just by age.
17        Q.    Okay.
18        A.    You know?  I mean, you know, he had
19   around -- Burton and them were around my age.
20   He had about 10 years on us.
21        Q.    Did Burton and Ben fulfill CTO role --
22        A.    No.
23        Q.    -- or that was just vacant?
24        A.    Yeah.  Well, I mean, I was CIO, so,
25   you know, that's my role, basically.
```

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1     Q.   It fell under your job
2 responsibilities?
3     A.   Right.  Right.  But those guys,
4 they're proficient.  I mean, they're skilled in
5 the art by far.  So --
6     Q.   When did they start?
7     A.   They actually started before -- no.
8 They started -- John -- John Wozniak actually
9 recruited them.  So they must have started
10 right around, you know, the Q2 of '15,
11 probably.
12     Q.   Okay.
13     A.   Shortly after.  I mean, when John came
14 in and saw what we were doing, he says, all
15 right, we need some engineers to help me bring
16 this thing to life.
17     Q.   Okay.  Who was in charge of, like,
18 hiring and firing all the IT teams?  Was that
19 you, or was that John?
20     A.   Um -- well, John was one of 'em, so
21 no --
22     Q.   Right.
23     A.   -- he wasn't in charge of that.  I
24 mean, we had -- we had HR that pretty much
25 facilitated all that.  I was -- you know, I was

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  in there when John got let go. I mean, we all

2  kind of like took care of our teams. Basically

3  it was a --

4     Q.   Okay.

5     A.   -- shitty time. But yeah. Um -- we

6  all -- we all basically took control of that.

7     Q.   And you mentioned he, um -- well,

8  before I ask that, was there anyone hired --

9  after y'all bought Merge, was there anyone

10 hired specifically to -- like, earmarked for

11 the implementation or rollout of or support of

12 Merge?

13          MR. STEWART:

14               Object to form.

15               You can answer.

16    A.   Um -- from an IT standpoint?

17 EXAMINATION BY MR. LESUEUR:

18    Q.   Uh-huh.

19    A.   Jamie handled a lot of it. Um -- Ben

20 and Burton both were overseeing all he server

21 components. So they were very much -- anything

22 having to do with those servers, they were

23 heavily involved with all that.

24          Um -- we had -- I mean, there were

25 other folks in the company that weren't

**EXHIBIT B**

1  necessarily developers and technologists like

2  my group that were also part of the team to

3  facilitate.  So we kind of pulled people from

4  different groups.

5      Q.    Right.   But I guess my question is a

6  little different.   Were those -- those -- Jamie

7  and Ben and Burton, they had already been

8  working --

9      A.    That's right.

10     Q.    -- with you guys.

11     A.    We did not hire anybody new.

12     Q.    So on one new hired just for Merge.

13     A.    That's correct.   We reallocated --

14 yeah.   We weren't hiring --

15     Q.    Everyone's just jobs kind of changed a

16 little bit.

17     A.    Refocused.

18     Q.    Yeah.   Refocused.

19          Tell me about that server and database

20 structure you guys had, that infrastructure

21 y'all had.

22     A.    I can't -- I don't -- I don't really

23 have all the details around the server,

24 honestly.   That not my -- I'm not a hardware

25 guy.   I know it was way more than we probably

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  needed.  But it was like -- it was like Fort

2  Knox.  I mean, we had enough to support

3  probably 10,000 people.  It was -- it was too

4  much.  More than we needed.

5      But I don't have any details.  I mean,

6  I know from a -- I know from a user side of it,

7  right, it was all standards, best practices

8  that I experienced at Ochsner and other

9  corporations that I worked for.  We had, um --

10  VPN access, if you're external.  Secured

11  networks coming in.  We had passwords for

12  everything.  We had randomized -- and we had

13  rules around those passwords to make sure they

14  were appropriate.  Auto resets.  All of the

15  basic sort of things that should exist, all

16  your general best practices.

17      We had -- as far as the software is

18  concerned, we had encryption in and out of the

19  servers from the web and into our environment.

20  So I mean we had all of that secured from a

21  software side -- the LIMS side, rather.  And

22  um -- and I mean, yeah, it's, um -- it was

23  pretty robust.

24      Q.    VPN.  Explain that for me.

25      A.    VPN is when you have a brick wall in

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1   place and you can't get through it.  VPN allows
2   you, with a secured client application that's
3   installed on your device here, your computer
4   here, you basically can unlock one little small
5   segment of that brick wall and put a pipe
6   through to where you can actually get in and
7   work within that environment from an external
8   location.
9           So I don't recall the acronym, but
10  it's a very standard way, and an appropriate
11  way for you to access a secure network.
12      Q.   Remotely, right?
13      A.   Remotely.  Off site.
14      Q.   What kind of security do y'all have in
15  place for that process?
16      A.   I don't understand the question.
17      Q.   Sure.  I assume you need, like, a
18  login to be able to do that.
19      A.   Yeah.  User name and password.
20      Q.   User name and password?
21      A.   That's right.  And there's a
22  certificate, as well, that would be -- that
23  would identify that installation.
24          And then many times, as well -- I say
25  many times.  We also had IP filtering as well.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  So, like, Danny, for instance, worked out of

2  his house.  His house -- his static IP at his

3  house was entered into our server as an

4  approved location to log in.

5      Q.  Okay.

6      A.  So we had that as well.

7      Q.  So if you just pulled up a random

8  laptop and tried to use it, you wouldn't be

9  able to use the VPN to get in?

10     A.  Right.

11         MR. STEWART:

12             Object to form.

13 EXAMINATION BY MR. LESEUER:

14     Q.  Okay.  And the passwords, are those --

15 you mentioned, like, the cycling.  Did those

16 change?

17     A.  Yeah.  We had three months, I believe,

18 was the timing on it.  And they would have to

19 be, like -- that was one of the things

20 everybody screamed about when we put it in

21 place, obviously.  But it was, like, 10

22 characters, and it had, you know, a certain

23 number of symbols, certain number of upper

24 case, lower case -- it was pretty --

25     Q.  Right.

**EXHIBIT B**

1    A.    -- it was pretty over the top.

2    Q.    What about just the work computers

3  themselves, those required a Windows password

4  too?

5    A.    Yeah.  All of our networks, all of our

6  end points were all secured with profiles from

7  our server.  So it wasn't just logging into a

8  personal computer and doing what you had to do.

9  Like, we actually had all of our computers

10  configured with security and profiling to where

11  policy was pulled from our servers onto those

12  devices to enforce auto reboots, auto pass --

13  you know, password was really more of a server

14  component.  But, um -- it was -- they basically

15  were part of our network.  Right?

16          And that's where the VPN came in, is

17  that we identified those computers because of

18  that profile that was there.  And it is -- it's

19  part of our infrastructure essentially.  They

20  were controlled end points from that.  And so

21  when you log into that computer, it -- it's

22  communicating to the servers, recognizing that

23  account, and authenticating through that.

24    Q.    Okay.  The e-mail also required a

25  password, I assume?  Y'all used Outlook?

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1     A.    Used Outlook.  Um -- I mean, you had

2   to -- to get it onto your computer.  But you

3   didn't have to log in every time you wanted to

4   look at it.

5     Q.    Every time.  Okay.

6           What about databases, those have

7   passwords too?

8     A.    Oh, sure.

9     Q.    Yeah.  What kind?  Can you describe

10  that for me?

11     A.    Um -- so we had -- the way you access

12  database -- I mean, it's all password -- user

13  name password.  So we all had our own accounts

14  for that.  Um -- the way that our developers

15  worked on that was you either accessed the

16  database directly from your computer if you

17  were connected through VPN -- many times, the

18  way we did it is we had virtual servers set up

19  within our server environment to where you

20  would have VPN remote desktop to those servers

21  which are housed within our server environment,

22  and then that server would basically be -- you

23  know, have access to the database.  Again,

24  through user name and password.  So there was

25  two ways to get to the database, but all was

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1  within this --

2      Q.   All protected.

3      A.   All protected within the VPN.

4      Q.   Who had access to the databases?

5      A.   Me, Danny, Jamie.  Um -- may -- may --

6  our -- our -- we had a bunch of databases, so

7  some of them maybe for the SharePoint guy, if

8  it was ap -- relevant for him.

9           THE REPORTER:

10              I'm sorry.  Restate.  Some what?

11     A.   We had a SharePoint developer, and he

12 had access to only database tables that were

13 relevant to his efforts.

14     Q.   He didn't have access to all

15 databases.

16     A.   That's right.  Yeah.

17     Q.   Did you, Jamie, and Danny have access

18 to all databases?

19     A.   Yeah.  Yes.

20     Q.   Anybody else besides them?

21     A.   Um -- my 1099 consultant had some

22 level of database access based on their needs.

23     Q.   Not full, though.

24     A.   That's right.

25     Q.   Okay.  And passwords for those.  Those

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1 rotate, just like the VPN?

2    A.   It's all synchronized.  So computer

3 passwords, server passwords, it was basically

4 our Microsoft profile within our server.  So a

5 single sign on across everything from the

6 standpoint of being the same password.  You

7 didn't have to remember password across all of

8 'em.

9    Q.   Okay.

10    A.   If it changes, you change it on the

11 computer, and it changes it everywhere.

12    Q.   Okay.  You mentioned, you know,

13 y'all's server being Fort Knox.  Ever

14 experience any hacking or any cybersecurity

15 breaches?

16    A.   No.  These guys -- I mean, they would

17 laugh when they would see attempts coming from

18 China and different places, and they would just

19 freakin wipe -- they would do whatever they do,

20 and it would just --

21    Q.   Go away?

22    A.   Yeah.  It never penetrated, but we

23 monitored externally any type of activity or

24 noise that took place outside of our servers.

25    Q.   Oh, really.

EXHIBIT B

1  A.  And that happens all the time.  I

2  mean, they're always pinging all over the

3  place.  Cybersecurity is a significant thing.

4  Q.  Just got my identify stolen.

5  A.  Did you?  So yeah, these guys would

6  come in and be like, yeah, we got something --

7  some activity going on in Russia.  There's,

8  like, some, you know, activity, and don't

9  worry, they're not getting through this I

10  promise you.  You know.

11  Q.  How did they monitor that?  Is that,

12  like a program or --

13  A.  They had, yeah, a system -- we had

14  systems and -- yeah.

15  Q.  Okay.

16  A.  Sophos, I think, was the name.  It

17  was, like, the cream of the cream, like,

18  network security components that were

19  installed.  I think was like the most expensive

20  thing on the rack.

21  Q.  Really.  So they could find out if

22  someone was trying to hack --

23  A.  Right.  It monitors the outside, the

24  inside, and basically locks it down fully.  So

25  the only way to have penetration essentially is

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  if somebody makes -- like if somebody opens it
2  and makes a mistake.  Otherwise, you can't --
3  you can't get through these things.
4      Q.   Or if someone internally --
5      A.   Opens a hole or something.
6      Q.   Right.  Yeah.
7      A.   Or like, you know, an IT guy building
8  software basically puts software out there
9  that's housed on our system that has a back
10 door, that would be a pretty big deal too.
11     Q.   And then y'all ever have any
12 experience with any, like, disgruntled
13 employees leaving and, you know, doing
14 something untoward, or hacking, or leaving you
15 viruses, or anything like that?
16     A.   Nobody had access.  I mean, yeah.
17 None of my team were ever -- were disgruntled.
18 they all were very pleased with how we worked.
19     Q.   So any employee -- any experiences
20 with that at Trinity?
21     A.   No.  Not from an IT concern.
22     Q.   Okay.  I think that we're at a good
23 time to take a break, if that's all right.
24     A.   Sure.
25          (Brief recess.)

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

EXAMINATION BY MR. LESUEUR:

Q. So I want to talk -- go back to Trinity LIMS for a little bit, the system y'all had created.

How long did y'all work on that before it was used with live patient samples? Do you remember, like, the date or the time frame in which it started?

A. Probably about six months -- six to eight months before we opened the doors. Um -- we weren't planning on running patient samples quite that early, but again, the story with the LC-MS challenges, I basically abandoned the path of development that I was heading towards and jumped in the middle, where normally that effort would have been sort of the latter part where I would have worked on front end order entry, you know, more maybe portal access for our clients, kind of more the prettier stuff that could be out front and that was the starting point.

Q. Uh-huh.

A. But instead, I jumped right into the middle of the lab and basically built out that. So I basically built that part and then just

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1  kind of expanded back from there.  So a little

2  bit of a different strategy we took.

3          But up to that point I had been

4  working on the basic infrastructure, the

5  user -- you know, user authentication and

6  management components, the database, the

7  server, like the basic bones of the

8  application.  And then you start filling in the

9  pages and filling in the navigation, and one

10  page after another comes, and it starts

11  actually being used.

12      Q.    So you remember -- six months after

13  y'all opened the doors, that's when Trinity

14  LIMS was used with patient samples?  With

15  Paracelsus?

16      A.    No.

17      Q.    No.

18      A.    Six -- I started developing it in

19  2012.

20      Q.    Okay.

21      A.    I don't recall exactly when, but it

22  was early '12, I'd say.  Or, no.  Sorry.  It

23  was had early '13.  Right?  So we started

24  dabbling in lab, started looking at different

25  softwares that were out there, more for my

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  curiosity, just to see what was out there.  And
2  then I started developing kind of right at the
3  end of '12, probably early '13.  And then we
4  opened the doors in October.
5      Q.    Okay.
6      A.    So it was a good six months of -- at
7  least six months of development getting the
8  basics of the system in place.  Knowing that I
9  didn't want to roll out an entire system across
10  the lab to start with we went Paracelsus.  And
11  we had the doors open for probably -- I don't
12  remember the time line, but there was a period
13  of time -- it may have been -- it may have been
14  six months after opening the doors only doing
15  screening before we got the first LC-MS.
16          Soon as that LC-MS hit the floor we
17  realized we got a problem, we're not going to
18  be able to use Paracelsus for this.
19      Q.    Okay.
20      A.    So, you know, it was probably close to
21  a year of development before we actually went
22  in production with LIMS in the lab.
23      Q.    Okay.  So do you have any idea what
24  date that is?
25      A.    Of when we started using it?

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1     Q.    Yeah.  With patient samples.

2     A.    October -- Q1 of 2014, I would say.

3     Q.    Okay.  Y'all work closely with the lab

4 in developing Trinity LIMS?

5          MR. STEWART:

6              Object to form.

7     A.    You mean the department?  The lab

8 department?

9     Q.    Right.

10    A.    As opposed to my IT department?

11    Q.    Correct.

12    A.    Oh, every day.

13    Q.    Every day.  It's important; right?

14    A.    Every day.  Yeah.

15    Q.    Why is it important?

16    A.    Well, I learned -- I learned -- as

17 they progressed, their -- lab is similar to

18 development in that everyone can do it slightly

19 different.  There's a technique to it.  There's

20 a style to it.  There's a process to it.  So

21 what works for one does not necessarily work

22 for all.  And so as we were able to conform our

23 development efforts around a process, and then

24 just slowly iterate, both from a technology

25 standpoint and a lab standpoint, we kind of

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  grew together.  So it was a continuous

2  improvement effort on both sides of the table.

3        And as soon as we ran into a

4  bottleneck or a challenge on the lab side, we

5  would point in step with them to advance the

6  systems, change the systems, twist the workflow

7  slightly, move this data element here, whatever

8  it might be, to continue the path forward and

9  improve.

10      Q.    Yeah.  So -- I mean, it sounds like

11  y'all's efforts are kinda dependent on each

12  other.

13      A.    Absolutely.

14      Q.    Yeah.  I'll show you our first

15  document today.  I'm gonna mark Exhibit 1.

16  There you go.  (Tendering.)

17        I just handed you what's marked as

18  Exhibit 1.  It is an e-mail from Lynn Caviness

19  to you, Blake Bourque, and Rhett Bunce, dated

20  September 4th, 2015.  Take your time to review

21  that, as much time as you'd like.

22        (Exhibit 1 was marked for

23  identification and is attached hereto.)

24      A.    Okay.

25  EXAMINATION BY MR. LESUEUR:

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

```
 1        Q.   Do you recall receiving this?

 2        A.   No.

 3        Q.   Do you recall receiving anything like

 4   this?

 5        A.   Sure.

 6        Q.   Yeah.  These are pretty typical?

 7        A.   Yeah.  This is actually a really good

 8   one.  Lynn was one of lab -- technical savvy

 9   lab people that worked very closely with me.

10   So she was basically directed to help with this

11   type of feedback.  So this is fantastic

12   feedback.  Yeah.

13        Q.   Yeah.  Um -- and this is part of that

14   process you just described --

15        A.   That's right.

16        Q.   -- right?

17        A.   That's right.

18        Q.   Y'all working together?

19        A.   Most of this is organizational type

20   stuff.  Right?

21        Q.   Uh-huh.

22        A.   So yeah, I mean, I'm familiar with the

23   scenario, obviously, but no, I don't remember

24   the e-mail.

25        Q.   But you did receive it.  Right?
```

**EXHIBIT B**

1     A.   Sure.

2     Q.   What was the Lynn's job title?  What

3 was her --

4     A.   She was a certified scientist.

5     Q.   Okay.

6     A.   I forget.

7     Q.   Job title, but she was a science

8 person?

9     A.   She was an LC-MS tech.  You know,

10 yeah, lab tech.  I don't know -- I forget the

11 exact terminology for --

12     Q.   You mention these are organizational

13 issues listed in this e-mail?

14     A.   Right.  Like data organization.

15 Right?

16     Q.   Yeah.  So I mean, it doesn't seem to

17 me that these are, like, um -- issues that

18 would stop production.

19     A.   That's right.

20     Q.   Right?

21     A.   I mean, it's -- it's basically putting

22 a light on things that could be cleaned up as

23 far as confusion is concerned, and just make

24 things more efficient.  Right?

25     Q.   Right.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    A.    To prevent the chance of a problem

2  coming down the line.

3    Q.    Right.   But I mean, an e-mail like

4  this isn't, hey, we gotta stop using our LIMS

5  or we gotta stop accepting patient samples.

6  Right?

7    A.    I would say not necessarily the

8  e-mail, but the content, just reading through

9  this I'm familiar with this -- the pages that

10  they're talking about here.   And it's

11  essentially a grid that represents a list of

12  all the different samples and the current

13  status they're in.   And she's -- and there's

14  just basically a line in here talking about

15  needing better filtering on that grid.   So

16  yeah, this -- the issues here are not anything

17  that I would lose my skin over.   They're things

18  that need to be addressed.

19    Q.    Uh-huh.

20    A.    But I mean, just the format of this in

21  itself isn't necessarily relevant to the

22  question, I guess.   Right?

23    Q.    I guess my question is, is there

24  anything on this e-mail that jumps out at you

25  to say that this is like a, um -- would stop

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1 the lab from --

2     A.    Right.    No.

3     Q.    -- processing samples?

4     A.    No.

5     Q.    Okay.    It would not; right?

6     A.    It would not.

7     Q.    Okay.    And then at the end she -- Lynn

8 writes, we're all very excited to see the new

9 LIMS 2.0 progress.    And I think you mentioned

10 that earlier.

11     A.    Yeah.

12     Q.    When was that planned to be rolled

13 out?

14     A.    We were rolling it out at -- where

15 were we with that?    We were starting to roll

16 that out at the end of 2015.    We literally had

17 a pilot program going on with one instrument.

18 The plan was -- we were really pushing hard to

19 roll it out before Christmas.    But ultimately,

20 the plan was to come back from the New Year and

21 roll out that in a planned progression.    But we

22 had to it mobilized, we had it ready.    We it

23 testing.

24         Lynn was actually our key person

25 testing that platform.    And we got a good

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1 little letter from CMS the day before Christmas

2 Eve. So it sort of stopped that progress.

3     Q. Okay. And that's where we'll go next.

4 But the, um -- you mentioned kind of the

5 development process of software. This

6 e-mail -- things like this part of that ongoing

7 development process for any software; right?

8         MR. STEWART:

9           Object to form.

10     A. I would say in the early stages of a

11 development effort, yeah. These are just

12 typical -- you know, these are more user

13 experience challenges.

14     Q. Uh-huh.

15     A. Not -- you know, not terribly scary

16 issues. Right?

17     Q. Right.

18     A. Not fundamental problems with work

19 flow or any of that, it's just really user

20 experience. So yeah. The answer is yes.

21     Q. Is her feedback here about LIMS 1.0?

22     A. Yes.

23     Q. Okay. And then at this point,

24 September to '15, y'all are still using Trinity

25 LIMS in the same way you described earlier,

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1   with Paracelsus as the black box conduit?

2       A.   That's right.   Yes.

3       Q.   So Paracelsus is being used in the

4   background, users are plugging in and entering

5   into Trinity LIMS.

6       A.   Yes.   The answer is yes.

7       Q.   Did y'all have any compliance or

8   regulatory department at Trinity?

9           MR. STEWART:

10              Object to form.

11      A.   Yes.

12  EXAMINATION BY MR. LESUEUR:

13      Q.   Okay.   Who was that?

14      A.   Um -- we had legal -- we had internal

15  legal counsel.   We had -- Robert Saenz came in

16  early '15, or early to mid-'15.   He was an ex

17  FBI agent, worked in the lab business for many,

18  many years.   Just significant background.

19  Crazy background.   He oversaw compliance, you

20  know, through the latter part of the year and

21  into -- through '16 as well.   So yeah, we hired

22  up pretty heavily for compliance.

23          As far as more external compliance.

24  Internal laboratory, we had a Ph.D.   We had the

25  Spruills who had a great -- great history.   We

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1   had a number of other qualified people that had

2   been in lab business for varying amounts of

3   years.

4                (Reporter interruption.)

5   EXAMINATION BY MR. LESUEUR:

6        Q.    What was his role?  Saenz's role?  Or

7   job title.  Sorry.

8        A.    Um -- he had a few, I think.  But I

9   think ultimately he was, like, chief compliance

10  officer.  Yeah.

11               And before that, we had folks

12  internally that were overseeing it.  So Tyler

13  actually took that title for a while.  Which

14  Tyler was really more of an operational

15  compliance officer collecting the right

16  information, consulting with external

17  resources.

18               We had a lot of external folks and I

19  don't recall their names, I didn't work with

20  them very closely.  But we had -- I mean, we've

21  always had some level of representation or

22  consulting feedback for compliance.

23       Q.    Either external or internal?

24       A.    That's right.  Right.  And so I know

25  Rob -- Tyler Lafleur did carry a compliance

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1 role for a while, but mainly to organize the

2 efforts and make sure that the right

3 information was flowing to and from.

4     Q. The right compliance people. Right?

5     A. Between internal efforts and questions

6 to external qualified, paid-for compliance

7 people.

8     Q. Right.

9     A. Right? He was kind of the middle

10 ground between the 2 two.

11     Q. Anybody at Trinity, internally or

12 externally, um -- in a compliance role directly

13 oversee the Trinity LMS software?

14     MR. STEWART:

15         Object to form.

16     A. Involvement? Sure. Yeah. I mean,

17 not the technology as far as how to develop it.

18 Right? That was our realm. But as far as how

19 the data should be represented, how it should

20 be collected, how it should be signed off on,

21 what's the proper mechanisms for single,

22 double, triple sort of review processes, like

23 the process in which the software --

24     Q. Is used.

25     A. -- is used and built, by all means, it

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1   was all part of it.

2       Q.   Okay.  Just not the development side.

3       A.   Not the technology infrastructure and

4   he coding, sure.  They weren't IT.

5       Q.   Okay.  Did y'all register Trinity LIMS

6   with the FDA?

7       A.   No.

8       Q.   No.  Why not?

9       A.   Because it wasn't necessary.  I mean,

10  we were n't, um -- yeah.  I don't know the

11  answer to that.  But it's not necessary.

12      Q.   Yeah.

13      A.   You know, I'm familiar with the

14  process and all, but it's not something that

15  our system needed to be --

16      Q.   Okay.  Do you know why?

17      MR. STEWART:

18          Object to form.

19      A.   No.  I'm not -- no.

20  EXAMINATION BY MR. LESUEUR:

21      Q.   I mean, who did y'all hire, or

22  consult, for that decision?

23      MR. STEWART:

24          Object to form.

25      A.   Um -- no one specifically.  But we

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1   consulted with folks, and it was just -- it's
2   not -- it wasn't anything that was necessary.
3   EXAMINATION BY MR. LESUEUR:
4       Q.   Okay.  Anyone you remember exactly
5   that you talked to?
6       A.   No.
7       Q.   Okay.  Did you guys register Trinity
8   LIMS with any regulatory agency?  Any
9   governmental body?
10      A.   No.
11      Q.   No.
12      A.   We were n't selling it.  Right?  So it
13  was one of those things that if you were
14  selling it as a -- as a -- as a widget that
15  would go into a hospital and basically work in
16  their space, then it might be something that
17  needs to be covered in that space.
18           This was hosted in our environment. it
19  was a Web-based environment.  It was our
20  portal, basically, for you to interact with our
21  lab.  So we never handed off that system to
22  someone else to say, hey, here's a tool but put
23  it in your environment.  Right?  It was like a
24  website, essentially, that collected data from
25  them, and then provided results.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

So there was no externally approved process. We just needed to make sure we covered our bearings as far as HIPAA and security and all those things, which we checked the boxes for, but there was no need for external approval of that.

Now, if we were going into the space we're heading towards of selling externally, then we were very much aware of those types of possibilities, and we just never got there.

Q.   Okay.  So y'all were planning on selling Trinity LIMS at some point?

MR. STEWART:

Object to form.

EXAMINATION BY MR. LESUEUR:

Q.   Are at least licensing it to other people?

A.   SAS.  Software is a service.  Yeah. Subscription-based, basically.

Q.   Okay.  When did that, I guess, idea fizzle?  Like, why -- it sounds like it had already been developed.  Why didn't y'all go forward with that?

MR. STEWART:

Object to form.

**EXHIBIT B**

1    A.    Um -- one of the partners basically

2  pulled the plug, decided that -- he said

3  there's better stuff out there.

4  EXAMINATION BY MR. LESUEUR:

5    Q.    Who is that?

6    A.    Blake.

7    Q.    Yeah.

8    A.    Yeah.

9    Q.    When was that?

10    A.    That was right after we got shut down,

11  um -- kind of going into -- really going into

12  the next stage.  At that point we were working

13  with some folks out of California, and we knew

14  we needed a LIMS out there.  We were not ready

15  or equip -- we shouldn't have even have been in

16  California working.  But anyway, we were not

17  ready to roll out our LIMS out there and

18  support it.  'Cause it was just not feasible

19  with the team we had.

20         So we started looking for a lab system

21  for them.  That's how Merge came about.  And

22  then when we got to a point where we got shut

23  down, we were ready to roll -- our system was

24  already rolled out.  Two of 'em, really, were

25  about to be rolled out.

EXHIBIT B

1     And yeah, basically, there was --
2   there was pretty good turmoil going on in the
3   board room at that point.  And yeah, that was
4   it.  Basically, it didn't move forward.  The
5   vote basically happened, and it was decided to
6   be put on the shelf.
7     Q.    Never reconsidered again?  Or it was
8   just -- died that day?
9     A.    Um -- yeah, it died that day.  I mean,
10  I heard stories here and there that he might
11  have tried to do something with my software
12  later, but that's neither here nor there.
13    Q.    Yeah.  Where did you hear that?
14    A.    I mean, nowhere particularly.  I just
15  know he had it.  You know, he has a copy of it.
16  So.
17    Q.    He has a copy of it?
18    A.    Yeah.
19    Q.    Do you ever ask for it back?
20    A.    We both have a copy of it.
21    Q.    Okay.  But did you ever ask for it
22  back so he can't sell it to anybody?
23    A.    I'm not worried about it.
24    Q.    Okay.  Why not?
25    A.    Um -- good luck.  I mean, he doesn't

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  really know it.  You know what I mean?  He'd

2  have to go hire another developer.  And if he

3  wants to do it, look, I'm really fine at this

4  point.  I'm not --

5      Q.  Right.

6      A.  You know, I don't hold -- I moved on

7  with life --

8      Q.  Right.

9      A.  -- from all of it.  You know?  So I

10  don't look back and -- you know, it is what it

11  is.  Best of luck.

12      Q.  You're not aware of him licensing it

13  to anybody else, though.

14      A.  No.  He's not.

15      Q.  Okay.

16      A.  Not that I'm aware of.

17      Q.  All right.  The next exhibit I'm going

18  to show you I'm marking as No. 2.  You've

19  mentioned this a few times.  (Tendering.)

20          (Exhibit 2 was marked for

21  identification and is attached hereto.)

22      A.  Is that the fun one?

23  EXAMINATION BY MR. LESUEUR:

24      Q.  Yeah.  I'd like you to -- actually, if

25  you could start in the very back of that one.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  And I don't know why this is like this, but the

2  cover e-mail's in the very back.

3     A.   Yeah.   That is it.   December 23rd.

4     Q.   That's a good memory.

5     A.   Yeah.   It's hard to miss that day.

6     Q.   Yeah.   So this last -- the last page

7  of Exhibit 2 --

8     A.   Yeah.

9     Q.   -- is an e-mail from Blake to, um --

10  you, Rhett, Tyler LaFleur, Kris Franklin --

11     A.   Yep.   I know it.

12     Q.   -- Lacie Jo Lafleur.

13          You remember receiving this?

14     A.   I do.

15     Q.   Yeah.   Blake mentions it's not good.

16  And he's forwarding, um -- a letter from Sandy

17  Pearson.   Right?

18     A.   Yep.

19     Q.   Okay.

20          MR. STEWART:

21               And I'm just going to make a

22          notation for the record.   This one

23          doesn't have Bates numbers on it.

24          MR. LESUEUR:

25               Yeah.   I don't know why.   But

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

```
 1              this is a Trinity produced document.
 2        MR. STEWART:
 3              I don't have any reason to doubt
 4        that it is, but I feel like we've
 5        looked at one with Bates numbers
 6        before so we'll reserve the objection.
 7        MR. LESUEUR:
 8              Okay.
 9  EXAMINATION BY MR. LESUEUR:
10        Q.   Before we get into the letter itself,
11  you mentioned Tyler Lafleur.  Who is he again?
12        A.   Tyler was a -- he was working with us
13  for the Paradigm stuff.
14        Q.   Okay.
15        A.   And he stayed with us through the lab
16  stuff.  Later on, ended up bringing him in as a
17  smaller owner because he had been with us from
18  the beginning.  Him and his wife left right at
19  early '16, I want to say.  Was it sooner?  It
20  must have have been right after -- right after
21  the shutdown, essentially.
22        Q.   Right after this letter.
23        A.   They had just had a kid, and him and
24  his wife -- his wife worked for us.  She was
25  out director of HR.  And, yeah, they made a
```

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1   good decision.

2       Q.    Why is that?

3       A.    Just because they had a young family

4   starting off.   They live in Lafayette and they

5   were, like, too much going on.   Yeah.

6       Q.    Yeah.

7       A.    Personal --

8       Q.    So they just voluntarily left.

9       A.    Basically, yeah, we're checking out.

10      Q.    They weren't laid off?

11      A.    Yeah.   Right.   It was time for them to

12  go home.

13      Q.    Okay.   And I know you're not the -- a

14  lab tech person, but I just want to flip

15  through a few things in the letter --

16      A.    Sure.

17      Q.    -- that you may know or not know.

18      A.    I'll tell you what I heard.   That's

19  about all I can do.

20      Q.    That's fine.   So the letter itself,

21  after the fax cover page, it's a December 23rd,

22  2015, letter, and it's addressed to Dr. Martin

23  and Mr. Bourque.

24            Who's Dr. Martin?

25      A.    He was the lab director.

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

```
 1        Q.    And it starts by -- the second
 2   paragraph describes an inspection on June 8th,
 3   and June 12th, 2015.  You recall that?
 4        A.    I do.
 5        Q.    Were you there during the inspection?
 6        A.    Um -- I was -- I don't think I was.  I
 7   was there for one.  I was there for the big
 8   inspection.  Which I want to say it happened
 9   later than that.
10        Q.    Yeah.  We'll get to that.
11        A.    Okay.  But no, these were short er.  I
12   wasn't there for those, no.
13        Q.    Okay.  Did you ever -- I mean, how
14   often would you visit the lab itself?
15        A.    Um -- I mean, we were right across
16   the -- pretty much right across or right down
17   the street.  We moved a few times with offices.
18   I mean, there would be some times where I would
19   go weeks, or sometimes more, without showing
20   face.  But I was always -- I mean, just like
21   anyone, we were remote -- we're talking on the
22   phone, we were on chat, we were having
23   conferences with people as needed.
24        Q.    Right.
25        A.    I mean, anytime I'd show up I wasn't
```

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  at my desk typing away.  Right?  So we stayed

2  pretty close to just fixing problems and

3  monitoring, you know, a command center,

4  essentially.  But I was there enough to stay

5  engaged and --

6      Q.    Right.

7      A.    -- push forward.

8      Q.    After that second paragraph it, um --

9  Ms. Pearson writes that they identified

10  condition level noncompliance with CLIA

11  condition which posed an immediate jeopardy to

12  patients.  Specifically, your laboratory did

13  not meet the following CLIA conditions.

14         Then it lists three things.

15      A.    Yeah.

16      Q.    I mean, I'm not going to belabor the

17  point because I know you're not a lab person.

18  But is it your understanding that those things

19  had to do with software?

20      A.    Unh-unh.

21      Q.    Right?  What was your understanding

22  what they had to do with?

23      A.    From what I remember, there was some

24  pre-analytical stuff where they -- that's like

25  pretesting, basically, is what I think that

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1　means, and it was something to do with, um --

2　testing out temperature of the sample before it

3　gets to the lab to ensure that it didn't get

4　too hot or something.

5　　　Q.　Uh-huh.

6　　　A.　Um -- something to do with that type

7　of stuff.

8　　　Q.　Okay.

9　　　A.　And it was like best practices again.

10　I mean, I guess it's similar to IT, all of our

11　technology, or lab people were like, this is

12　crazy, no one has ever done that type of thing.

13　Like, this is -- we used FDA labels that are on

14　the bottles, and we -- you know, abide by those

15　things. So anyway, there was a whole reasoning

16　of why it doesn't get done, and evidently no

17　labs do it, but they were reading the fine

18　print and it had something to do with that pre

19　part.

20　　　　　Toxicology is pretty big. I don't

21　know what that was. High complexity testing,

22　laboratory director -- I don't know what those

23　are.

24　　　　　But I remember the pre part because

25　that was something everyone was, like,

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    scratching their head over.

2         Q.    Right.    Nothing to do with software,

3    these three sanctions, though; right?

4         A.    No.

5         Q.    Or these three issues there.

6         A.    That's right.

7         Q.    Then in the next paragraph, it goes on

8    to say the LDH received a letter dated

9    June 11th, 2015, which was provided and signed

10   by James Bourland, Ph.D., laboratory director,

11   which outlined your laboratory cessation of

12   patient testing.

13          Do you know anything about that?

14        A.    So they came in earlier in the year,

15   probably these dates, um -- and they claimed

16   that one of our instruments had to be shut down

17   because it didn't have a letterhead, literally

18   a binder this thick of details.    It didn't have

19   a letterhead on top that basically gave, like,

20   a summary and like a -- some very basic

21   explanation.    And so they said, that needs to

22   be -- halt testing.    I mean, it was just kind

23   of crazy.

24          And then they had another -- we had

25   another two instruments that in the manual it

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

says for research use only. This was AB
Scxiex, very standard industry grade system.
And the young inspectors that came interpreted
that by the wording in the back and said, oh,
that is not meant for patients samples. Stop
testing.

When in fact it's not really the case,
and it turned out that way.

The letter basically said that we
would stop testing, we would get the letterhead
fixed on this instrument, and we need more
feedback about this other one because this is
crazy. Um -- and so that was the letter.

Q. Did you ever see that letter?

A. I had no interaction with it. So no.
It may between on an e-mail with me, but no, I
didn't really dig into any of that.

Q. That wasn't -- who is Dr. Bourland, by
the way?

A. He was our chief laboratory officer I
think was his name. He was Ph.D., you know,
30, 40 years experience in laboratory. I mean,
he's one of those bigger hires that we did
that's like, we don't have to worry about this
anymore, it's covered.

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1    Q.   Hired the right person.

2    A.   Yeah.

3    Q.   Trusted him to --

4    A.   Yeah.

5    Q.   Um -- the letter itself.  He didn't

6    run that by the owners, I assume, if you never

7    saw it.

8         MR. STEWART:

9              Object to form.

10   A.   Not -- not me.

11   EXAMINATION BY MR. LESUEUR:

12   Q.   Not you.

13   A.   I wasn't involved in that stuff.

14   Q.   Okay.  Do you know if he ran it by

15   Blake or Rhett?

16   A.   Yeah.

17   Q.   He did?

18   A.   We would have worked with them, yeah.

19   Q.   Okay.  And they would have signed off

20   on it?

21   A.   Yeah.

22   Q.   Okay.  The next page describes a few

23   plans of correction that the CMS required, some

24   deficient plans of correction, and then

25   describes another inspection from

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1  November 30th, 2015, to December 4th, 2015.  Is

2  that the one you remembered, the big one you

3  remembered?

4      A.    Oh, yeah.

5      Q.    Okay.  Tell me about that one.

6      A.    So we got a call from the lab.  We

7  were right across the street at the office.

8  And they said they got a whole group of people

9  that showed up.  So we had two CMS inspectors,

10 and two fully military, like admirals and

11 higher -- one of the guys was even higher --

12 show up.  And they spent a full week there,

13 eight hours a day.  And they dug through every

14 single nook and cranny, every detail.  They

15 wanted data samples -- so me and -- you know,

16 and Danny was on remote, I was in the office

17 plugging through, we had our legal counsel

18 there, our internal counsel there.

19         And we basically just sat in the back

20 and just -- you know, the lab people were all

21 working.  Kris Franklin was working for us at

22 the time.  We had let go Bourland, whatever his

23 name --

24     Q.    Bourland.  Yeah.

25     A.    Bourland.  We let him go at this

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    point.  And so Kris Franklin was there and did

2    a fantastic job to get, you know, us through

3    the week.  But to no end.

4         Q.    Right.  The list of -- the letter goes

5    on to list additional CLIA conditions that

6    Sandy Pearson says the lab didn't meet.

7         Is your understanding -- do you have

8    any understanding that these had to do with

9    software?

10        A.    Unh-unh.

11        Q.    No.

12        A.    No, I do not.

13        Q.    Are you aware of any CMS findings

14   saying Trinity LIMS is noncompliant or anything

15   like that?

16        A.    No, not with our system.  We had

17   nothing -- I mean, I would say that there --

18   no.  The answer is no.  There was nothing --

19   nothing that was really specific.

20        I mean, we had to produce data.  And

21   there was some parts where we weren't prepared

22   to produce the data they were asking for, just

23   because I didn't have reports for that

24   particular thing.  And so there were some

25   delays with some of the stuff.  But it had

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1  nothing to do with any of this.  It just -- you
2  know --
3      Q.   Right.
4      A.   -- it was just a challenge in the
5  freakin four-week -- you know, the week long of
6  efforts --
7      Q.   Right.
8      A.   -- that we were churning through.  So
9  we were a part of it.  We were pulling a ton of
10 information out of the systems, and giving them
11 evidence of this sample, and that run, and this
12 date, and that date, and matching patients, and
13 it was a lot.  But no, none of these -- this a
14 all lab-related stuff.
15     Q.   Okay.  And then she, Sandy Pearson, at
16 the bottom of that second page writes, the
17 following is a summary of the survey findings.
18 You know, your laboratory failed to correct all
19 condition level citations, plus new ones were
20 identified; No. 2, lab failed to implement
21 those portions of your plans of correction; 3,
22 your laboratory failed to provide acceptable
23 plans of correction; and then 4 -- which starts
24 on the third -- the top of the third page --
25 Ms. Pearson writes that based on the -- they

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1  had received the letter from Dr -- the cease

2  testing letter, however, based on the revisit

3  survey findings your laboratory failed to

4  adhere to your ceased testing letter.

5      Do you know anything about that?

6      MR. STEWART:

7          I'm just going to interject

8          quickly, because you said a couple of

9          times Sandra Pearson writes.  That is

10         not the author on the back of the

11         letter.  Not that we need to repeat

12         that, but just to make the record

13         clear.

14  EXAMINATION BY MR. LESUEUR:

15     Q.    CMS writes.

16     A.    Yeah.  So, yeah.  Um -- basically,

17  we -- I was in a meeting with Sandy Pearson and

18  Blake and all of them, and many of us were in

19  there.  We sat back and let Blake talk in that

20  meeting.  And um -- it really came down to

21  asking them, okay, so we satisfied the letter

22  as far as the cover sheet goes.  That's done.

23  The other, we validated clearly that the

24  statement in the execution of shutting down

25  those, since it's, for the reason that they

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1  applied, research use only, was not valid. Can

2  we start testing?

3        And so I remember that day they said

4  it's a business decision that you will have to

5  make at59 this point whether you will start

6  testing or not. Pretty cryptic.

7        At some point, laterally through our

8  development support efforts, we were constantly

9  working with data, Danny and I both, and we

10 were working on some data elements, just

11 helping -- helping move things along, and

12 whatever we were doing, and we saw -- I saw

13 samples coming through from one of these

14 systems that was part of this thing. And --

15 because that's when I found out that we started

16 testing on those again. But evidently those

17 instruments, after that meeting, were turned

18 back on for some level of testing.

19     Q.    Okay.  Do you know whose decision that

20 was?

21     A.    It would have to have been Blake or

22 Rhett.

23     Q.    Yeah.  Not the lab director

24 independently?

25     A.    Um -- well, no.  It wouldn't have been

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  independently.

2      Q.    Okay.   It would have had some sign off

3  from ownership?

4      A.    Right.

5      Q.    But not you.

6      A.    Right.

7      Q.    Okay.   At the time of these

8  inspections -- and I think -- I just want to

9  make sure this is clear -- y'all still had the

10  same setup that you described earlier with

11  Trinity LMS and Paracelsus.   Correct?

12      A.    That's right.

13          MR. STEWART:

14              Object to form.

15  EXAMINATION BY MR. LESUEUR:

16      Q.    And that would be Trinity LMS is being

17  used, Paracelsus just as a black box conduit --

18      A.    Transferring data.   Yep.

19      Q.    Okay.   Did CMS ever tell you all that

20  you couldn't use Trinity LIMS anymore?

21          MR. STEWART:

22              Object to form.

23  EXAMINATION BY MR. LESUEUR:

24      Q.    No.

25      A.    No.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1      Q.    Any comments by them about Trinity

2   LIMS at all?

3      A.    No.

4      Q.    So I guess that's a good segue into

5   the decision to buy Merge.

6           Tell me -- tell me what happened after

7   this letter, this Christmas Eve 2015 letter --

8      A.    Yeah.

9      Q.    -- and how, um -- how the decision to

10  buy Merge kind of originated.

11     A.    Um -- from my standpoint, I thought it

12  was a bad idea.  I looked at a number of

13  systems.  Um -- looking at it from the

14  California side of things -- that's really what

15  geared it, which I was on board with the fact

16  that we needed another system to service that

17  lab out there, because I didn't want to take

18  that on.

19          Um -- but it ended up coming down to a

20  couple of options.  The only reason we really

21  leaned -- the reason I leaned towards Merge was

22  because there was some blood and, um -- certain

23  testing that has been done through Merge that

24  we never did with LIMS, and that we needed for

25  the California lab.  So that was the only thing

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1   that really kind of led me towards the thought
2   of Merge.
3            But the fact of buying Merge and
4   replacing our LMS system was completed
5   something that I was opposed of.
6       Q.   Right.  Because you built your own
7   system.
8       A.   I built the system.  I knew it was
9   good.  I knew just looking at Merge that it was
10  going to be a rocky thing.  I knew it was going
11  to be -- you know, no changes could happen on
12  the fly or any reasonable turnaround.
13      Q.   Right.
14      A.   Yeah.  I was pretty much told, we're
15  either going to move on or we're not going to
16  be friends anymore, was kind of the
17  conversations that happened.
18           So I said, fine, let's just mark my
19  words.
20           And so basically that's what happened.
21  We switched it.  We ended up not doing the
22  California work.  But we rolled out Merge in
23  Performance, and then the Mississippi lab that
24  we were working with needed a LIMS, so we did
25  it there as well, and were able to -- the

1     thought was and the message was that we were

2     able to have two locations and make it work

3     pretty seamlessly. There were some challenges,

4     obviously, that we ran into with that.

5          But that was it. Again, it was a hunt

6     to find something for California, and it --

7     just the timing just happened to where we got

8     shut down. And we said, you know what? Let's

9     just remove our own system out of it, was the

10    thought of others, and basically take that out

11    of the equation so that it can -- so we can

12    have something that's been proven and been used

13    before with others.

14       Q. Okay. So I'm going to ask you about

15    that last statement you made. So the thought

16    from others, that would be who?

17       A. That would be Blake.

18       Q. Blake mostly?

19       A. Yeah.

20       Q. That would be to buy a third-party

21    LIMS or LIS system --

22       A. Right.

23       Q. -- because CMS was on --

24       A. Because we were in such a rocky place,

25    we needed to not have any guesswork taking

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1   place.

2       Q.   Okay.

3       A.   Which is valid enough.  I mean, hey, I

4   mean, let's get something in here.  And at that

5   point in time, honestly, I was like -- once it

6   happened and we made the commitment to it, I

7   said, that's fine, I'm walking away anyway, to

8   focus on other things, which was NextPhaseMD.

9           And so that's kind of where I exited

10  left stage and said, you know what?  That's

11  fine.  Good luck with the labs.  Let me know if

12  I can help.  And there was some back end work

13  that I helped with along the way.

14      Q.   Uh-huh.

15      A.   But for the most part, it was really

16  honing in on that and building on that.

17      Q.   Okay.  So I take it you're not happy

18  with that decision in hindsight, to go with

19  Merge.

20          MR. STEWART:

21              Object to form.

22      A.   No regrets.

23  EXAMINATION BY MR. LESUEUR:

24      Q.   No regrets.  But you all had put a lot

25  of resources into Trinity LIMS.  Right?

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

```
 1      A.    Sure.  Tons.

 2      Q.    A lot of manpower, a lot of hours --

 3      A.    Sure.

 4      Q.    -- a lot of money?

 5      A.    Yeah.  I mean, if I could rewrite the

 6 story it would be a whole different way.  But

 7 it doesn't have anything to do with that

 8 decision.

 9      Q.    Right.

10      A.    You know?  I mean, you don't have to

11 go there.  It's not relevant.

12      Q.    Did you all get -- ask -- solicit, ask

13 for any advice from CMS about what LIMS to buy?

14           MR. STEWART:

15                Object to form.  What are you

16           asking?  Are you asking whether they

17           were asked by CMS, or whether they

18           asked CMS?  Maybe you'll have to just

19           rephrase the question.

20           MR. LESUEUR:

21                I thought it was pretty clear.

22           Maybe you weren't listening.

23 EXAMINATION BY MR. LESUEUR:

24      Q.    Did y'all ever solicit CMS for advice

25 about which LIMS to buy?
```

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    A.   No.

2    Q.   Did they ever tell you which LIMS to

3 buy?

4    A.   No.  They -- the conversation of LIMS

5 came up with them, and they said, that's not

6 our problem or concern.  All we want to make

7 sure -- they are the HIPAA regulations side of

8 things where it says, I don't care how you do

9 it, it needs to be by the book.

10    Q.   Got it.  And their focus is really

11 more on the lab space.  Right?  Not like the IT

12 infrastructure space.  Right?

13       MR. STEWART:

14         Object to form.

15    A.   Yeah.  IT infrastructure doesn't

16 matter to them.  They just want to make sure

17 that we're able to facilitate the workflow of

18 the laboratory in a way that produces compliant

19 and proveable results.

20 EXAMINATION BY MR. LESUEUR:

21    Q.   Uh-huh.  And accurate results.  Right?

22    A.   And accurate results.

23    Q.   Y'all have any issues with reporting

24 inaccurate results out of Trinity LIMS, hat

25 you're aware of?

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    MR. STEWART:

2        Object to form.

3    A.    No.

4    EXAMINATION BY MR. LESUEUR:

5    Q.    So once the -- do you recall when that

6    meeting you had with Blake and Rhett where the

7    decision was made that we're going to buy a

8    third-party LIMS system?

9    A.    Do I know where it happened?

10   Q.    When?  Or where, and when?

11   A.    It was over a period of time.  I mean,

12   I would say the first -- first couple -- two,

13   three months, probably first quarter, was when

14   the decision was made to move beyond LIMS.  And

15   then it was probably second quarter or so, or

16   sometime -- we were in California, I believe,

17   when we actually pulled the trigger, when we

18   went through Byline, did the loan and actually

19   did the purchase.

20   Q.    Okay.  But that first discussion where

21   y'all were going to move away from Trinity

22   LIMS, do you remember when that happened?

23   A.    It was after Christmas 2015.

24   Q.    Okay.  So it would have been after

25   that CMS letter?

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1     A.   Oh, yeah.

2     Q.   And actually, let's go back to the --

3 you mentioned the California lab.  What was

4 going on there; what was that lab?

5     A.   We had a guy that he we had met early

6 on through a contact that we -- that we bumped

7 into along the way that had -- old guy had a

8 lab, was credentialed with all of the payers

9 over there, kind of one of those little

10 hole-in-the-wall, nothing little corner shops

11 that had all these, you know, qualified

12 credentials with payers, which is very, very

13 difficult to get in California.  And so we were

14 looking at helping him pick his lab up and

15 actually make it a profitable, you know, thing.

16 As we was kind of in his -- latter part of the

17 year, kind of help him get up and mobilized,

18 and eventually buy him out was kind of the

19 long-term play.

20     Q.   What was his name?

21     A.   I don't know.  Ed or something.  I

22 don't know.  I don't recall.  It was something

23 simple like that.  I don't remember it.

24     Q.   Okay.  Whatever happened with that

25 plan?

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    A.    It just -- it just never happened.
2  You know.
3    Q.    Do you know why?
4    A.    We were trying to do too much, to be
5  completely fair about it.  You know, we were,
6  like, playing the squirrel game and chasing
7  every new opportunity.  And so as we're working
8  back at the house, we have a new opportunity or
9  California, and it just lingered.  It was on
10  board at every meeting.  It was like, we gotta
11  do something about this.  So it was -- it was
12  just one of the many drains that happened from
13  the business side of things.
14    Q.    Okay.
15    A.    We worked with him.  We did samples.
16  We had some work out there.  We set up -- you
17  know, we had business going through that
18  laboratory, but it just never got to -- we were
19  a million miles away.
20    Q.    Right.  It never fully materialized?
21    A.    That's right.
22    Q.    Yeah.  Who was in charge of finding
23  the new third-party LIMS system?  Was that you?
24    A.    Yeah.
25    Q.    Anybody else?

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    A.    I mean, I consulted with a bunch of

2  folks to do it.  Like lab folks and, you know,

3  different people.  Yeah.

4    Q.    Lab folks internally?

5    A.    Some internally.  Someone consultants.

6  Yeah.  I asked around.  Um -- I mean, Merge was

7  obviously a popular name.  I got some good and

8  some bad feedback about it.  Looking over

9  everything, I mean, all of them had their flaws

10  in my opinion.  I didn't really see anything in

11  most of my searching that was really something

12  I would say, wow, this is a nice piece of

13  technology.

14         I knew what we were getting into as

15  far as the general kind of feel of what the

16  system would bring.  You know, nothing detailed

17  about it, obviously.  But I knew it was going

18  to be an old system, and we weren't going to

19  get any good responses, and if you had a

20  question, or request a change, it would be

21  months if not years to change it.  So I kind of

22  knew that was going to be case, and that was

23  the case for many of the systems I was looking

24  at.

25         But yeah, I consulted with a lot of

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1   folks. I put together, like, my top three, and

2   I presented the pros and cons. And I mean, I

3   went through a full competitive analysis around

4   it.

5      Q. And who did you present to, Blake and

6   Rhett?

7      A. Yeah. I mean, I let them know about

8   it. Lab folks, you know, probably the

9   Spruills, and probably whoever. Right?

10   Whoever was in our organization at the time

11   that had some background.

12      Q. You mentioned that changes would take

13   months and years. I mean, how do you know

14   that?

15      A. So just from experience of working

16   with big third-party systems like that.

17   They're not real agile. They don't really

18   change very quickly on a whim. I mean, that's

19   kind of the nature of having a product,

20   obviously, in the field. You can't just change

21   everything that somebody asks for.

22      Q. Right.

23      A. But just the general feel of these

24   older systems, they're not typically very quick

25   to make adjustments.

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1     Q.   And you all knew that before y'all

2  purchased Merge or any other software. Right?

3     A.   I didn't know it. But I had my

4  doubts.

5     Q.   Right.

6     A.   I knew it would be less than what we

7  had. It would be worse than what we had.

8  Like, the biggest benefit we had is that we

9  could adjust on a whim and fly and --

10     Q.   Right.

11     A.   -- make things happen immediately.

12     So going into it, I knew my hands were

13  going to be tied. And essentially that's what

14  ended up happening. It was like I can't do

15  anything anymore. Right? So we just stepped

16  away and were like, here's your system. Right?

17  Good luck.

18     Q.   Uh-huh.

19     A.   I mean, from a standpoint of change.

20  Right? Specifically to this point. There's

21  nothing I could do to change the way Merge

22  works, and going into it I knew that would have

23  been the case.

24     Q.   And you knew those changes would take

25  time.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    A.    If ever.  Yeah.  Sure.

2    Q.    Yeah.  What about the -- what was your

3 understanding of how long it would take to

4 implement any third-party -- new third-party

5 software?

6         MR. STEWART:

7             Object to form.

8    A.    I mean, you know, they all vary.  A

9 system like this, you know, it -- I don't know.

10 I mean, I forget what was actually promised.  A

11 couple of months or something like that.  I

12 mean, it takes -- it takes some time to

13 implement a system, there's no doubt about it.

14 You got a lot of data you gotta put in there.

15 There's migrations efforts that have to happen.

16    Q.    Instruments to coordinate with.

17 Right?

18    A.    Right.  Right.  So you got all that

19 stuff that has to happen.  So yeah, I don't

20 really have a specific answer.  I mean it's --

21 it generally takes a little time to implement

22 certain things.

23         A system like this, with this type of

24 profile, you gotta install, you gotta do a

25 bunch of kind of heavy lifting to get it all

EXHIBIT B

1  going.  Um -- it's the discovery after --
2  post-implementation, really, that is where I
3  think we ran into a lot of things with Merge.
4      Q.   Okay.
5      A.   A lot.
6      Q.   So that implementation process, that
7  wasn't problematic for you guys?
8      A.   Well, no.  It was -- my team would
9  walk out of every meeting scratching their
10  head, like you would not believe what we gotta
11  do to make this happen, or that happen.  Right?
12          So it was not a proficient system.  It
13  looks like something that was built way, way,
14  way, way, way back in the day, late eighties
15  kind of system, and it's just been piecemealed
16  and built out, another little piece here,
17  another piece there, and you end up with this
18  very big platform that just takes a lot of
19  switches and a lot of plugs and a lot of
20  different things to make it work.
21          It was not simple.  It was not
22  streamlined.  So yeah, I mean, you got
23  infrastructure installation, and then you got
24  the actual -- just the ability to learn how to
25  actually use it.  And once you do that, then

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1   it's the ongoing day-to-day efforts that have

2   surprises that pop up.  Right?  Just the

3   usability of it.

4       Q.   Right.

5       A.   So you can break it up into three

6   different areas there.  And it was all pretty

7   challenging.

8       Q.   Yeah.  But that -- I guess going back

9   to my question about the implementation

10  process, I mean, you all knew -- did you know

11  before you bought Merge that that wouldn't

12  happen overnight?

13          MR. STEWART:

14              Object to form.

15      A.   I knew it wouldn't be easy, with

16  Merge.

17  EXAMINATION BY MR. LESUEUR:

18      Q.   Right.  Or any third party.  Right?

19      A.   Not any.  But any system that's --

20  that I saw as meeting the profile of what Merge

21  was.

22      Q.   Uh-huh.  And you saw it and demoed it

23  before you guys bought it.  Right?

24      A.   Right.

25      Q.   So you knew it was -- kind of what it

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1  looked like and how worked a little bit.

2  Right?

3          MR. STEWART:

4              Object to form.

5      A.   Right.

6  EXAMINATION BY MR. LESEUER:

7      Q.   Okay.  Were y'all looking for anything

8  specifically when you were buying?  Like, what

9  were your considerations when you were looking

10 for the new third-party LIS system?

11     A.   I mean, initially it was to find

12 something that could handle toxicology and

13 other specialties.  LIMS, although we could

14 have built it, obviously, we had never done

15 anything else outta tox.

16     Q.   Uh-huh.

17     A.   Um -- so, you know, many established

18 systems out there check that box.  Merge had a

19 few extra specialties that they claimed to have

20 been doing in the past, which we never actually

21 used.  But like I said, for the California lab

22 we needed some of those extra special sort of

23 specialties.  So that's what kind of had us

24 leaning towards Merge.

25              Um -- but as far as what I was looking

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  for, I mean, I was a tough -- I was -- you
2  know, I was pretty tough.
3      Q.    Well, you had built your own system.
4  Right?
5      A.    I was a tough sell.  Like, I knew -- I
6  knew everything about this system and what it
7  needed to do, honestly, so I was pretty tough
8  with them.  And they were all, like, wow, you
9  know more about this system than anybody we've
10  met.  You know, early on in the evaluation
11  process.  So I pushed 'em pretty dang hard with
12  it.  Um -- and, you know, I came out of it
13  with, like all right, so they got the basic
14  checked off the list, the basic ideas.  I mean,
15  this was clearly just a demo in conversation
16  with sales, so it's really hard to learn too
17  much about it at that point.
18      Q.    Right.
19      A.    But, uh -- but yeah.  I mean, I was
20  going into it pretty skilled in the art to look
21  for what I needed to be able to produce some
22  level of workflow that mimicked a reasonable
23  workflow that we'd been -- been building on.
24      Q.    What you guys had been doing in the
25  past.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

```
1        A.    Right.

2        Q.    Anyone else besides you that

3   communicated with Merge?

4        A.    I mean, I had others that participated

5   on demos and calls.

6        Q.    Uh-huh.

7        A.    I was point guy.

8        Q.    You were the point guy, though; right?

9        A.    Yeah.  Yeah.

10       Q.    Anybody that you looked -- above you

11  that you looked up to for guidance on what to

12  pick, or what looking for?

13       A.    You mean from lab standpoint?  Yes.

14  Technology standpoint?  No.  I mean, it was a

15  collaboration of the experts that I had around

16  me.  But yeah, I didn't -- I didn't try to

17  claim any kind of lab knowledge outside of the

18  workflow and the experiences that I had.

19            So yeah, I mean, I used Kris Franklin

20  a good bit at the time.  He's been around and

21  back.  And anyone else that has been around

22  lab, you know, I worked with them.

23            We had -- at this time we had

24  consultants on that were helping with some of

25  the compliance issues, the CLIA shutdown.
```

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1   They'd been around and back, and they actually

2   voiced some issues and some challenges with

3   Merge.  Um -- but in the end, that's ended up

4   where we going anyway.

5        Q.   Who voiced those concerns to you?

6        A.   Uh -- Aurora McKinney, and I forget

7   who the other -- she was the main person.  She

8   was helping out with the lab.  She said --

9   she -- she's like a lab consultant -- a

10  compliance lab consultant.  She goes around

11  and -- she basically follows the tracks of CMS

12  and people they shut down, and she moves in.

13  Pretty good business model.

14       Q.   Yeah.  Right.

15            (Reporter interruption.)

16       A.   So we had a laboratory consultant.

17  EXAMINATION BY MR. LESUEUR:

18       Q.   That is before buying Merge; right?

19       A.   This the kind of in the midst of the

20  selection.

21       Q.   Okay.  Right.

22       A.   We got shut down, we got the contact

23  of Aurora McKinney, she came in.  And so

24  talking with her, she said, I've seen Merge in

25  different labs, I know that there's some

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

challenges, people have voiced some issues with
quality assurance and other things.  But
nothing super specific.

    Q.   Okay.  Any other issues you remember
her mentioning?

    A.   It was a short conversation.

    Q.   Okay.

    A.   Nothing much.

    Q.   All right.

    A.   Her conversation actually was why
don't you just keep what you got, it seems to
be a pretty good system.  Now that I remember
correctly.

    Q.   Yeah.  Which I'm sure you didn't fight
her on.

    A.   I'm like, well, whatever.  No, moving
on.

    Q.   All right.  I'm going to show you the
next document marked as Exhibit 3 to the Ron
Poe deposition.  So I'm not gonna mark it.
(Tendering.)  And take your time to look
through this.

        MR. STEWART:

            Are you marking this Exhibit 3 to
            this deposition?

1 challenges, people have voiced some issues with
2 quality assurance and other things.  But
3 nothing super specific.
4     Q.   Okay.  Any other issues you remember
5 her mentioning?
6     A.   It was a short conversation.
7     Q.   Okay.
8     A.   Nothing much.
9     Q.   All right.
10     A.   Her conversation actually was why
11 don't you just keep what you got, it seems to
12 be a pretty good system.  Now that I remember
13 correctly.
14     Q.   Yeah.  Which I'm sure you didn't fight
15 her on.
16     A.   I'm like, well, whatever.  No, moving
17 on.
18     Q.   All right.  I'm going to show you the
19 next document marked as Exhibit 3 to the Ron
20 Poe deposition.  So I'm not gonna mark it.
21 (Tendering.)  And take your time to look
22 through this.
23         MR. STEWART:
24             Are you marking this Exhibit 3 to
25             this deposition?

**EXHIBIT B**

```
1              MR. LESUEUR:
2                  I'm just gonna use the same
3              exhibit number.  That's what you guys
4              have been doing when you use the
5              exhibits from other depositions, so
6              I'm just going to continue doing that
7              if that's okay.
8              MR. STEWART:
9                  I don' think that's what we've
10             been doing.
11                 Off the record.
12                 (Off the record.)
13  EXAMINATION BY MR. LESUEUR:
14     Q.  So what I just handed you, Chad, was
15  previously marked in Ron Poe's deposition as
16  No. 3.  I'm marking it for today's deposition
17  also No. 3.
18         (Exhibit 3 was marked for
19  identification and is attached hereto.)
20     A.  Okay.
21  EXAMINATION BY MR. LESUEUR:
22     Q.  Do you recognize this?
23     A.  No.  I mean, but -- yeah.  I mean, I
24  recognize the content, I guess, but I don't
25  recognize the actual e-mail.
```

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1     Q.   That's your name on these e-mails;

2 right?

3     A.   Yes.

4     Q.   You've sent a few and received a few

5 in this chain; right?

6     A.   Yep.

7     Q.   Okay.  First of all, who is Rick

8 Ornelas?

9     A.   He was a sales something or other

10 leader.  He was -- our internal sales group

11 that I mentioned, he was -- he was over them.

12     Q.   The leader of that?

13     A.   Yep.

14     Q.   How long did he stay on with Trinity?

15     A.   Um -- pretty much less than a year.

16 Most folks that came in that next wave started

17 early '15, and end --

18     Q.   Early '16 they were --

19     A.   That's right.  And I think Rick

20 actually -- Blake and him had their crosses.

21 And, um -- I think he actually left before the

22 shutdown.

23     Q.   Okay.  So this e-mail chain is dated

24 November 19th, 2015.

25     A.   Okay.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    Q.   This would be before the Christmas Eve

2  CMS letter?

3    A.   Yeah.  And he made it longer in the

4  year than I thought.

5    Q.   And it mentions CVDL in here.  That's

6  that California lab; right?

7    A.   Yeah.

8    Q.   So I'll start at the last e-mail which

9  is the earliest one in the group.  It's dated

10  November 19th, at 12:35 p.m.  Do you see that?

11    All right.  So in chronological, the

12  way these are produced, the earliest e-mail is

13  at the end, but before the attachments.

14    A.   Got it.

15    Q.   So the bottom right there are page

16  numbers, and it will be Page No. TRINITY

17  123079.

18    A.   Got it.

19    Q.   See that?  Okay.

20    A.   Yep.

21    Q.   Great.  So in the middle of that page

22  there is an e-mail from Ron to Rick and you,

23  November 19th, at 12:35 p.m.  Um --

24    A.   Yep.

25    Q.   Would this be before the decision to

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    go with the -- before or after the decision to
2    go with Trinity -- to abandon Trinity LIMS and
3    go with a third party?
4         A.    Before.    This is when we were rolling
5    it out.    This is when we were moving forward
6    with this for California.
7         Q.    Okay.    California only.
8         A.    That's right.    That was the original
9    plan.    Right?    I was soughting [sic] out a
10   third party, because we were so busy.
11        Q.    Right.
12        A.    Found Merge.    We started looking at
13   rolling it out there.
14        Q.    Okay.
15        A.    And then once the lab got shut down,
16   that's when it was decided that we already got
17   this system here, let's see if we can just
18   extend it to all of our labs -- you know, to
19   our lab and that lab.    Right?
20        Q.    Right.
21        A.    And stop.    So yes, that's when this
22   happened.
23        Q.    Okay.    At the bottom, Ron writes,
24   sorry for all the questions, but I want to be
25   sure that I configure the system that best fits

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1   your needs.  We don't use a cookie cutter

2   approach at Merge.  Each system is configured

3   specific to our customer's needs.

4           Do you see that?

5       A.   Uh-huh.

6       Q.   Any reason to disagree with that?

7           MR. STEWART:

8               Object to form.

9       A.   I mean, they don't custom build our

10  system.  So I think he is using a little bit of

11  a sales approach, in my opinion.  I'm an IT

12  guy.  I understand how it works.  He's

13  configuring the system custom to our needs.

14  EXAMINATION BY MR. LESUEUR:

15      Q.   Right.

16      A.   He's not building the system custom to

17  our needs.

18      Q.   Right.  Right.  Right.  But it's

19  config -- he's right that it's configured

20  specific to your needs.

21      A.   Got it.  Right.  So you enter -- I

22  mean, it's a -- you know, when you're entering

23  in a lab panel, you have a name of the drug,

24  you have an abbreviation, and you have certain

25  levels that have to be applied to test the --

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  validate -- you know, validity and the result

2  of that sample.  It's all custom based on the

3  instrumentation configuration.  That

4  configuration would be mimicked here.

5          So yeah, there's a data element

6  involved in what he's talking about here.  Just

7  to be specific.

8      Q.   Right.  And that would be true for any

9  LMS system.  Right?

10     A.   Sure.

11     Q.   They all have to be configured for

12 each lab and instrument and --

13     A.   They gotta be apples to apples.  You

14 have to talk the same from the system --

15 interfacing between those two have to be --

16 yes, have to be the same.

17     Q.   So you agree?

18         MR. STEWART:

19             Object to form.

20     A.   I agree.

21 EXAMINATION BY MR. LESUEUR:

22     Q.   Okay.  Then you sent on some

23 information in the next e-mail in response to

24 Ron's questions about the tests and instruments

25 run at CVDL; right?

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1     A.    Right.

2     Q.    Um -- then Rick chimes in with some

3 more information on the next e-mail, on

4 November 19th, at 3:12?  And then Ron writes

5 back to Rick on November 19th at 3:36, um --

6 with a few more questions.  And then in the

7 third paragraph it starts with, the Merge LIS.

8          You see that?

9     A.    Yep.

10     Q.    It says, the Merge LIS is capable of

11 handling all of the different lab disciplines

12 you have mentioned below in one system.  We do

13 have a completely paperless microbiology

14 module.  We also handle toxicology and routine

15 lab studies in the same systems.  I have

16 attached some sample reports and other customer

17 sites' dummy data for review.

18     A.    Yeah.  That was the specialty thing

19 that I was talking about earlier, that

20 microbiology.

21     Q.    That's what y'all were looking for for

22 California.

23     A.    That was the one that I was like, ooh,

24 that's one that -- it was not as common.

25     Q.    In other LIS systems.

EXHIBIT B

1    A.    In other systems that I've seen,

2  right.

3    Q.    Okay.  That stood out because Merge

4  had it; right?

5    A.    Right.

6    Q.    And then it looks like Rick forwards

7  Ron's e-mail to you and Larry Trujillo at the

8  top.  Right?  You see that?

9    A.    Yep.

10    Q.    Who's Larry Trujillo?

11    A.    He was our -- he was a sales guy over

12  in California.  He's the one we worked with,

13  and was an employee, and basically connected us

14  to a bunch of California opportunity.  He was

15  the kind of the big contact over there for a

16  lot of the stuff we did.

17    Q.    Okay.  So -- and then the attachments,

18  you see them listed in Rick's e-mail --

19    A.    Yeah.

20    Q.    -- at the top by name.  And then

21  they're attached at the back.

22    A.    Right.

23    Q.    Do you remember receiving any of

24  those?

25    A.    No.

**EXHIBIT B**

1    Q.    Do you remember looking at any of

2  those?

3    A.    Probably not in depth.  I don't know.

4  Does it have anything -- I mean, remember, at

5  this point in time I was helping to facilitate

6  this part, still very much focused on the

7  production laboratory.

8    Q.    Right.

9    A.    So, um -- I mean, when it comes to

10 setting up that lab, I really didn't have an

11 integral part of it.  From the California side.

12 Right?  I mean, this all -- those are -- all of

13 the lists that are provided there are basically

14 all of the instruments, and a list of tests

15 that are on it.  Some are blood, some are tox,

16 some are tissue, whatever it may be.  They did

17 a lot of different things.

18        So I was helping to facilitate that,

19 and really, I remember at this point I was

20 getting Rick to get involved, like, you need to

21 take over this relationship right now.

22    Q.    This your lab; right?

23    A.    This is your lab, like, you're working

24 on, this is your initiative.  And so I'm here

25 to help where I can, but I can only help so

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1 much when it comes to the Merge side. Like,

2 when you need a server set up we'll set it up

3 for you. So yeah. It --

4          Any questions here about these

5 attachments?

6     Q.   Yeah. Anything -- do you remember

7 seeing anything that caught our eye in these

8 about Merge that stood out to you?

9     A.   A lot of these are just reports. I

10 mean, it just looks like marketing stuff.

11 Remote processing issues; paperless -- yeah,

12 these are, like, marketing testimonials and

13 things. I mean, things you would expect to

14 see. Right?

15     Q.   Right.

16     A.   Um -- so no, nothing that gleans out.

17     Q.   Nothing in here that caught your eye

18 to say, hey, I saw this, we need to buy Merge?

19     A.   At this point we had already committed

20 to Merge for California.

21     Q.   For California.

22     A.   Right.

23     Q.   But not for Louisiana.

24     A.   Not for local.

25     Q.   Okay.

EXHIBIT B

1    A.   I wouldn't have chose to roll out

2  Merge in Louisiana.  That wasn't my choice.  I

3  wouldn't have done it.  So with all of this, it

4  still -- I still held the same feeling about

5  it.  So none of this stuff would have swayed me

6  one way or the other.  Like, this is fluff to

7  me.

8    Q.   Okay.  The attachments; right?

9    A.   Yeah.  The marketing sort or

10  testimonials and all that, yeah.

11    Q.   Okay.

12    A.   You know, we automate things, we make

13  it efficient -- Great.

14    Q.   Right.  That's what everybody says.

15    A.   Sure you do.

16    Q.   Right.

17    A.   Prove it.

18    Q.   Right.  Do you remember if you passed

19  those materials along to anybody?

20    A.   Probably not.  I don't think I would

21  have.  I mean -- these are --

22    Q.   You wouldn't -- these wouldn't be

23  important to your decision; right?

24        MR. STEWART:

25             Object to form.

**EXHIBIT B**

EXAMINATION BY MR. LESUEUR:

Q.    In selecting an LIS?

A.    Like I said, I've already selected the
LIS at this point in time.  There was no more
selection needed from my side of it.  They
asked me to find a good solution for the
California lab, and that's what I put in place
and handed off, essentially.

So this right here, at this point in
time was irrelevant, really, to me.  And I
think that was Ron's statement, was I'm not
sure that I shared this with Chad but figured
I'd go ahead and share with y'all.  Since y'all
are about to bite off this cookie --

Q.    Right.

A.    -- let me go ahead and let you know
some of our -- some of our hype and happiness.

Q.    Right.

A.    And so I have -- yeah, this doesn't
impact anything for me.  Like, I can read right
through all this.  I'm -- I'd be more
interested in understanding the technical side.

Marketing stuff is great, but it
doesn't impact my decision making.  And it
wouldn't have.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1     Q.   And then you got these on November 19,

2  2015.  Your statement about not -- wouldn't

3  impact your decision to buy Merge, that would

4  be true also in December of 2015 after those

5  sanctions.  Right?

6         MR. STEWART:

7            Object to form.

8     A.   As it relates to these specific

9  documents, yeah.  That wouldn't have had any

10  impact on me.  A testimonial from someone

11  doesn't give me any comfort, really, to be

12  honest.

13     Q.   Right.  You need to see the system.

14     A.   Yeah.

15     Q.   Use the system?

16     A.   Right.  I don't know who this person

17  is that wrote the testimonials, so I'm not real

18  interested in that.  No, that stuff's not

19  anything that would impact my decision making.

20     Q.   Okay.  Do you recall doing a demo at

21  around this time?  Like, right after it?

22     A.   Of Merge?

23     Q.   Of Merge.

24     A.   Yeah.  I had them -- them giving us a

25  demo; right?

**EXHIBIT B**

1    Q.   Right.

2    A.   Yeah.  There were a number of times,

3 yeah.

4    Q.   Yeah.

5    A.   Especially if I we started moving

6 towards it, I probably corralled a lot of our

7 lab teams and whatnot and had 'em give another

8 dog and pony show to give 'em a little look at

9 it.

10    Q.   In the Complaint it alleges that there

11 was a demo on November 23rd, 2015.  Does that

12 sound right?  It would be, I guess, four days

13 after these e-mails.

14    A.   Okay.  Yeah.  I'm not -- I wouldn't --

15 that sounds right.

16    Q.   Yeah.  No reason --

17    A.   Not to my memory.  But no reason that

18 I wouldn't have, yeah.  And it may have been

19 more of the California group.  If we were

20 working towards this, it very well could have

21 been the California team who was very much

22 disconnected.  I never worked with them,

23 really.

24    Q.   Right.

25    A.   But they probably got them pulled

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  together, and I helped facilitate the setup of

2  that through Ron.

3      Q.   Okay.  Do you remember anything

4  specifically about that?  I mean, you didn't

5  really remember the dates.  I assume you don't

6  really remember anything specifically about

7  that demo.

8      A.   Not at all.

9      Q.   Nothing Merge said?

10      A.   Not a bit.

11      Q.   Nothing stands out?

12      A.   Not a bit, man.

13      Q.   You recall any, like, questions that

14  were asked?  Any questions that you had of

15  Merge?

16            MR. STEWART:

17                Objection.  He just said he

18            didn't remember.

19      A.   I don't remember it, man.  That was a

20  trying time.  November 2015.

21  EXAMINATION BY MR. LESUEUR:

22      Q.   Thanksgiving too.

23            Okay.  The next document I'm going to

24  show you I'm marking as Exhibit 4.  This is an

25  e-mail chain between Blake Bourque, you, Tyler

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993
EXHIBIT B

1    Lefleur, Rhett, and Lacie Jo Lefleur.  I assume

2    that's Tyler's wife?

3            (Exhibit 4 was marked for

4    identification and is attached hereto.)

5        A.   Yes.

6    EXAMINATION BY MR. LESUEUR:

7        Q.   Okay.  Take your time to read this

8    one.

9        A.   Okay.

10       Q.   Do you recall receiving this?

11       A.   I remember the general conversation, I

12   guess, at that point in time, but no --

13       Q.   And you did receive that, though,

14   that --

15       A.   Yes.  Yes.

16       Q.   Okay.  It starts with an e-mail from

17   Ron Poe at Merge to you, December 23rd, 2015,

18   which would be the same date as that CMS

19   letter.  Right?

20       A.   Wow.  Yeah.

21       Q.   That we looked at?

22       A.   Interesting.

23       Q.   Right.  He's giving you a quote.  And

24   then in the middle of the page you are

25   forwarding that to certain folks, and you say,

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1  for what it's worth, folks, this is from the

2  Merge sales rep regarding the addition of

3  Performance labs to the original CVDL quote?

4     A.   Yeah.

5     Q.   So that's in line with what you

6  described before, that, you know, Merge was

7  originally supposed to be for CVDL only?

8     A.   Right.

9     Q.   And then after the shut down --

10    A.   We moved this, right.

11    Q.   -- y'all wanted to add Performance and

12 the Louisiana operations --

13    A.   Right.

14    Q.   -- into Merge.

15    A.   That's right.

16    Q.   So that's why Ron added the --

17 Performance to the quote?

18       MR. STEWART:

19          Object to form.

20    A.   That's right.  And so the dates

21 here -- you know, what may have been going on

22 here is that it might have been right -- so

23 before the shutdown happened we knew we had

24 this compliance challenge over our head waiting

25 for an answer.  So the big -- the big

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1   conversation in the conference room may have

2   happened slightly before.  'Cause if this

3   happened before -- the letter came in the same

4   day.  So maybe there was a little overlap there

5   where the decision was made just prior t the

6   shutdown.

7      Q.   Okay.

8      A.   But basically, yeah --

9      Q.   It's around the same time.

10     A.   Around the same time.  I mean, for

11  what it's worth, it's like, yeah, we'll --

12  probably twofold in that statement but.

13     Q.   What do you mean twofold, like double

14  meaning?

15     A.   Double meaning.

16     Q.   What are the two meanings?

17     A.   One is we don't have a lab anymore;

18  and the other is this freakin very expensive

19  piece of software that -- to roll this thing

20  further.  And so anyway --

21     Q.   Yeah.

22     A.   Blake said, yeah, let's do it.

23     Q.   So you went with his advice.  Right?

24     A.   Yeah.

25     Q.   He writes, I think you do it once you

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  have the info you need but we ask to be moved
2  to the front of the line and pay a little more.
3  We are not going away, we just need to do this
4  thing right.
5          What did you understand him to mean by
6  that?
7          MR. STEWART:
8              Object to form.
9      A.   Just that -- yeah, I mean, he was
10 still fighting.  Yeah.  I mean, just what it
11 says, I think.
12 EXAMINATION BY MR. LESUEUR:
13     Q.   He says, once you have the info you
14 need.  I mean, did you need any more info at
15 this point from Merge's side, do you know?
16     A.   I don't.  I don't recall at the moment
17 what I tracking down.  But I imagine there's,
18 um -- I imagine there was a little more detail
19 context around --
20     Q.   Everything.
21     A.   -- everything.  Right?  Up front cost,
22 maybe, or -- you know, I speculate.  I don't
23 recall what exactly he talks about there.
24     Q.   Okay.  So you don't know -- you don't
25 remember exactly what information you may

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  have --

2    A.   I would imagine it's more context

3  around the actual sale.

4    Q.   Like price?

5    A.   How to price it --

6    Q.   Financing?

7    A.   Financing, all that.

8    Q.   Okay.  Do you ever recall asking

9  anyone at Merge about it's history with the FDA

10  before y'all signed the sales agreement?

11    A.   We knew that it had an FDA approval.

12  It was kind of another one of those things that

13  we looked at as being a sure shot that this is

14  going to be what we need, 'cause it's been

15  approved for FDA.  But, yeah, like I -- you

16  know, for us, we didn't require FDA approval.

17  As a customer, it wasn't like we were in an

18  environment that would need that.  So it

19  doesn't really apply, except that it's just an

20  extra badge of honor to say that you have it.

21    Q.   Uh-huh.

22    A.   So -- yeah, I don't recall -- I mean,

23  I know that it was known, I think, earlier on.

24  But it wasn't anything that I thought -- you

25  know, that I recall, like, getting into or

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1  anything.

2      Q.   Okay.   Not following up with questions

3  or anything about its FDA registration or

4  anything like that.

5      A.   Not in the early stage, yeah.

6      Q.   Okay.   Did you ever ask whether the

7  software had been recalled?

8      A.   No.   We didn't.   We didn't -- we were

9  never told and never knew about that until

10  later.

11      Q.   Right.   But did you ask before you

12  guys signed the contract whether it had been

13  recalled?

14      A.   No.   Not a typical question in my line

15  of thinking.

16      Q.   Do you remember ever asking about its

17  security functionality or features?

18      A.   There was a big level of assumption

19  with some of that, as best practices would

20  typically be how an enterprise level system

21  that just got bought out from IBM for a billion

22  dollars, that has an FDA approval, would cover.

23  So no, I didn't dig into the minutia of the

24  technology platform with Ron, um -- you know.

25      Q.   You made those assumptions?

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    A.   I made some assumptions that day.  At

2  least we'd have had the base.

3    Q.   Did you didn't ask any questions

4  about, hey, how are passwords kept, how are

5  passwords stored, anything like that?

6    A.   I mean, I touched -- I would have

7  touched on some level of security around

8  password protection, and around some simple

9  questions.  But as a sales person would

10  typically do, I'm sure it was, like, yeah, no

11  problem, we handle all that.

12       So I don't have any specific memory of

13  the questions I've asked, but, you know, um --

14  I didn't dig into the depth of what I found.

15  Right?  I didn't ask about those things on the

16  front end.

17    Q.   Right.  Do you remember him telling

18  you anything about -- besides that I guess more

19  general statement, do you remember him saying

20  specifically, hey, this is --

21    A.   A problem?

22    Q.   Yeah, or this is how passwords are

23  stored, or this is how --

24    A.   No.  He wouldn't have done that.  I

25  doubt Ron even knew.  I very much doubt it.

1    You know, he's not a tech guy.

2        Q.    Right.    Do you recall asking about

3    what version of Apache or Tomcat it used?

4        A.    Um -- again, no.    I mean, during

5    implementation, my team again -- I wasn't

6    involved in a lot of those meetings 'cause I

7    was focused elsewhere.    But a lot of times we'd

8    have our kinda roundup just to get updates on

9    what's going on, and we were scratching our

10   heads like, so they did it this way, and this

11   and that, you know.    And so no, that was a

12   discovery process as we started rolling things

13   out.

14       Q.    Not something you asked about on the

15   front end, though.    Right?

16       A.    That's right.

17       Q.    What about any defects; did you ask

18   Ron or anyone else at Merge about whether there

19   were any defects or bugs in the system?

20           MR. STEWART:

21               Object to form.

22       A.    I asked -- I mean, I would always ask

23   what -- where -- where are he holes in the

24   process?    All systems, you know, will have some

25   level of usability challenges, or some level

**EXHIBIT B**

of, you know, process that needs to be known.
Um -- almost a best practice of how to use a
system. Right? And so with that, as I'm going
through, I'm asking kind of checkpoints
throughout. And, um -- you know, so I bridged
the topic there of where areas of challenge is,
where are some things that your customers have
had trouble with in the past, that type of line
of questioning.

And again, as you would expect, there
was always that good answer of, well, you know,
pour customers would typically have had trouble
with this part, but they would -- as long as
you do it this way, it works well enough, you
know. And we kind of fished through the
conversation that way.

Q. Okay. Do you remember anything
specifically that you asked -- or anything that
was specifically told?

A. I do not.

Q. Or when it happened?

A. I mean, that would have been very
early on, probably prior to this -- you know,
prior to December of 2015, earlier
conversations with Ron as I was evaluating

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1   things.

2       Q.    But no memory of any specific date or

3   anything like that?

4       A.    No.   I mean, I wrote -- I'm sure you

5   have it -- I wrote up competitive comparisons,

6   and pros and cons, and things that I recognized

7   as being positive and negative of different

8   systems.   So my notes, you know, to the most

9   part, would have been recorded in there so.

10      Q.    Okay.

11      A.    But no, I don't remember specifics.

12      Q.    And nothing outside of those notes you

13  remember?   Do you remember anything?

14      A.    No.   Just a gut feeling, but there's

15  nothing tangible.

16      Q.    Okay.   I'm going to do the same thing.

17  This is Exhibit 4 to Lorrie Dillon's

18  deposition.   I'm going to mark it as Exhibit 5

19  and notate that it's for Chad Howell's

20  deposition at the bottom.   And this is MERGE

21  23840, the Bates number.

22          (Exhibit 5 was marked for

23  identification and is attached hereto.)

24              (Brief recess.)

25  EXAMINATION BY MR. LESUEUR:

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    Q.   You recognize this, Chad?

2    A.   Yeah.

3    Q.   Exhibit 4?

4    A.   I remember seeing it.

5    Q.   This is the sales order with Merge

6    dated -- there's two dates on it, but the

7    document date is January 5th, 2016.  And then

8    if you flip to the third page, which is Merge

9    23842, it has the signature.  Is that your

10   signature?

11   A.   Yes.

12   Q.   It's like a e-signature; right?

13   A.   DocuSign.

14   Q.   DocuSign.  Do you remember signing

15   that?

16   A.   Yes.

17   Q.   On that date?  January 11th, 2016?

18   A.   Um -- yeah.  I mean, that was me.  I

19   think we were in California, I believe.

20   Q.   When you signed it?

21   A.   Uh-huh.

22   Q.   You remember, like, being at the

23   computer?

24   A.   I remember being -- it was on the

25   phone, I think.  I remember being in the room

**EXHIBIT B**

1   and we locked down everything on that day.

2      Q.   What do you mean being on the phone?

3      A.   DocuSign. On the phone.

4      Q.   Oh, like an app.

5      A.   Yeah. They send out a DocuSign form.

6   You can sign on your phone.

7      Q.   Got you. Did you ever read the sales

8   order before you signed it?

9      A.   Yeah. I mean, we all read it, I

10   think, yeah.

11      Q.   Yeah.

12      A.   I was -- the cost was horrendous to

13   me. But again, I went with the decisions of

14   the group.

15      Q.   Yeah. When you say we all read it,

16   who's we?

17      A.   I mean, I assume the other guys read

18   it. But, I mean, yeah, everybody looked over

19   it.

20      Q.   You men Blake and Rhett, or anybody

21   else?

22      A.   Right. Blake and Rhett. And yeah, I

23   would imagine we had some legal counsel. I

24   don't recall exactly. But we had legal counsel

25   at the time, so they looked over it as well.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1     Q.   They looked at it too?

2     A.   Yeah.

3     Q.   Do you remember if they, like, said

4 hey, you gotta check out this, or hey, be wary

5 of this, or --

6          MR. STEWART:

7             Object.  That's getting into

8             issues of lawyer/client privilege.  He

9             was an employee of Trinity at the

10            time.

11         MR. LESUEUR:

12             Well, I'll ask it a little

13             differently.

14 EXAMINATION BY MR. LESUEUR:

15     Q.   Do you remember if Blake or Rhett

16 raised any issues with anything in the contract

17 before you signed it?

18     A.   No.  Not that I recall.

19     Q.   Okay.  And then all of the -- it's got

20 a Exhibit A with a product list.  Those are --

21 I mean, this would have been reviewed to make

22 sure all this was accurate.  Right?  Before you

23 signed it?

24     A.   Yeah.  I mean, even still looking at

25 I, it's convoluted as can be for a software

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1 agreement. But yes, we looked over it, and --

2     Q. It had the right products that you

3 were buying?

4     A. Right. E-macro -- these are just

5 different, like, specialty labs. Right?

6 E-clinic is like blood. So yes. The answer is

7 yes.

8     Q. And you wouldn't have signed it if you

9 saw anything in the contract that you disagreed

10 with. Right?

11     A. Um -- right.

12     Q. Okay. If you flip to -- back to your

13 signature page, on Page 3, do you see the -- at

14 the very top, it says 2, Execution, all bold.

15 It says, this sales order is governed by and

16 subject to the terms and conditions for

17 software license, hardware, and/or services

18 attached hereto as Exhibit B and made part

19 hereof.

20     And if you flip forward a couple pages

21 to Page 7 of the same document, MERGE 23846,

22 it's that Exhibit B with the terms and

23 conditions. Do you see that?

24     A. I do.

25     Q. In the second page of Exhibit B, in

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  the bottom right-hand corner, do you see

2  Paragraph 9?

3      A.    I do.

4      Q.    Limitations of liability?

5      A.    (Nods affirmatively.)

6      Q.    That section's in all caps; right?

7      A.    Yes.

8      Q.    And that's different from the other

9  paragraphs.  Right?

10     A.    It appears that way.

11     Q.    Yeah.  It's easier to see than the

12  rest; right?

13         MR. STEWART:

14             Object to the form.

15     A.    It's all pretty difficult to see from

16  my side, but yeah, I can see it.

17  EXAMINATION BY MR. LESUEUR:

18     Q.    Yeah.  None of the rest of this part

19  of the agreement is in all caps; right?  That's

20  the only paragraph in all caps?

21     A.    That's right.  Except for the titles.

22     Q.    Right.  Do you remember reading that

23  section when you signed it?

24     A.    Um -- not specifically.

25     Q.    Do you remember anybody, um --

EXHIBIT B

1   alerting -- like, anybody, Rhett or Blake,

2   alerting that to you before you signed it?

3       A.   No.  No.

4       Q.   Okay.  And you routinely signed

5   contracts for Trinity.  Right?

6       A.   Yes.

7       Q.   That was --

8       A.   Technology-based stuff, yeah.

9       Q.   Right.  The stuff that was in your

10  department; right?

11      A.   That's right.  Yes.

12      Q.   It wasn't abnormal for you to have

13  signed this.

14      A.   That's right.

15      Q.   And you had the authority to do so.

16  Right?

17      A.   Yes.

18      Q.   Okay.  I'm going to show you what I've

19  marked as Exhibit 6.  This is a January 25th,

20  2016, e-mail chain between you, Ron Poe,

21  Madeline Young at Merge, Shirley Bang at

22  Trinity, Phil Martinez at Trinity, and Kyle

23  Mouton at Trinity.

24           Do you recognize this e-mail chain?

25           (Exhibit 6 was marked for

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1　identification and is attached hereto.)

2　　　A.　Um -- no, I do not recognize it.

3　EXAMINATION BY MR. LESUEUR:

4　　　Q.　But that's you on --

5　　　A.　Yes, it is --

6　　　Q.　-- it.  Right?

7　　　A.　-- me, yes.

8　　　Q.　So you received it?

9　　　A.　Yes.

10　　　Q.　And you sent this one e-mail that's at

11　the bottom of the first page and the top of the

12　second page.  Right?

13　　　A.　Yes.

14　　　Q.　Okay.  So the first e-mail in the

15　chain that starts on the second page is from

16　Dianna Powell to you, copying Ron and Madeline

17　Young.  Do you know who Dianna Powell is?

18　　　A.　I remember the name.  I don't remember

19　her role, though.

20　　　Q.　Someone on Merge?

21　　　A.　Implementation, I think.

22　　　Q.　Someone on the Merge side?

23　　　A.　Yes.

24　　　Q.　Okay.  She writes, hi, Chad.  Madeline

25　Young let me know; you and your team are

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1   interested in a follow-up demo of Merge LIS in

2   preparation for the coming installation at

3   CVDL.

4           Do you remember that?

5       A.   I remember the time period, but

6   nothing specific about it.  But it appears

7   we're looking to still push forward to roll out

8   in CVDL, and the demo offering was to give more

9   of a training introduction to folks so they

10  knew what was coming.

11      Q.   Okay.  You guys had already purchased

12  Merge; right?  You had already signed that

13  agreement on January 11th; right?

14      A.   That's right.

15      Q.   So this was just for training

16  purposes.  Right?

17      A.   That's right.

18      Q.   Do you know if anything in this demo

19  convinced you guys to buy Merge?

20      A.   I believe we already bought it.

21      Q.   Yeah.  You had already bought it;

22  right?

23      A.   Yeah.

24      Q.   So nothing in this demo, um -- you

25  know, persuaded you guys to choose Merge over

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  anybody else; right?

2      MR. STEWART:

3          Object to form.

4      A.   We already bought Merge.

5  EXAMINATION BY MR. LESUEUR:

6      Q.   Okay.  And then you ask, at the top of

7  the page, can we lock down Thursday -- she asks

8  for a time, and you ask can we lock down

9  Thursday morning at 7:00 a.m.  And Thursday, on

10 the calendar, is January 28th, 2016.  If I told

11 you that was the date you guys did a demo,

12 would you have any reason to disagree with

13 that?

14     A.   No.

15     Q.   Okay.  Yeah.  The complaint alleges

16 you guys did a demo January 28th, and it

17 matches that three-day time period.  Is that

18 fair?

19     A.   That's fair.

20     Q.   Okay.  And that January 28th demo

21 would be the one you described earlier about

22 Trinity.  Right?

23     A.   Yes.

24     Q.   Okay.

25     A.   Seems that way.

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1      Q.   How involved were you with the

2  implementation of Merge after it was purchased?

3         MR. STEWART:

4            Object to form.

5      A.   Um -- minimal.

6  EXAMINATION BY MR. LESUEUR:

7      Q.   Yeah.

8      A.   I, um -- I basically had full focus on

9  NextPhaseMD, so I was working with three

10  doctors, laying out all of the functionality of

11  that product. Um -- the majority of my team

12  was dedicated to that effort with me. Some of

13  the team were playing kind of dual roles, and

14  then eventually fully devoted to that.

15      Q.   Uh-huh. So were you, like, there at

16  the lab when it was being, implemented and

17  installed?

18      A.   No.

19      Q.   No?

20      A.   No.

21      Q.   Okay.

22      A.   I didn't even sit through the early

23  meetings. I mean, I was part of the early

24  introduction maybe, but when it got down to,

25  like, all right -- the guy, the technical guy,

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1    whatever his name was, whenever he got there to

2    actually go through the administrative setup

3    and all that, outside of me saying, guys, you

4    know --

5        Q.   Go do it?

6        A.    -- this is your job now, take over,

7    um -- that was -- I wasn't involved in any of

8    that.

9        Q.   Okay.  Do you recall any specific

10   issues that came -- I mean, you described a few

11   things earlier, but do you recall any, like,

12   specific problems, issues that came up hurdles

13   that came up in the implementation process?

14       A.   Um -- outside of just the challenge

15   and the scope of what it would take, nothing

16   specific.  I mean, nothing specific as far as

17   an issue that was discovered.  It was just,

18   like, wow, you should see how they do this.

19   And oh, my goodness, like, this is done a

20   certain way.

21           Jamie is very skilled in the art.  She

22   calls things out.  I think you got to meet her.

23   She's very good.  She really does call things

24   out really well.  And she works hard.  But

25   anyway, she was, like -- even the guy who was

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1   out there helping used some of her ideas and

2   some of her ways of doing things to kind of

3   improve the way he trains people.

4          And so there were some challenges

5   trust from that.  It seemed like a very clunky

6   sort of experience getting things even at the

7   early stage.

8       Q.   Uh-huh.  But nothing specific where,

9   like, hey, this --

10      A.   That's a problem.  Right.

11      Q.   Yeah.

12      A.   No.

13      Q.   Nothing like that.

14      A.   General exper -- user experience sort

15  of challenge.

16      Q.   Could have been improved.

17      A.   Yeah.

18      Q.   Okay.  And it was never installed at

19  CVDL.  Right?

20      A.   That's right.

21      Q.   Okay.  Had that plan for, like,

22  abandoning CVDL, was that before or after that

23  contract was signed?

24          MR. STEWART:

25              Object to form.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    A.    After.    Sure.

2  EXAMINATION BY MR. LESUEUR:

3    Q.    After.

4    A.    Yeah.

5    Q.    So after the contract was signed,

6  that's when y'all decided to go with

7  Mississippi instead?  Is that right?

8         MR. STEWART:

9              Object to form.

10    A.    Um -- I mean, it was kinda a separate

11  thing.  Like, we were partnering with -- we

12  partnered with both labs, essentially.  Right?

13  It was the same sort of model.  Like, we had

14  employees that had experience.  We had

15  technology in our data centers, and in our just

16  general infrastructure that we had.  So the

17  idea that we did with CVDL, that we were

18  heading towards with CVDL to kinda help with

19  the management of the lab, bring in experts in

20  all the different areas that we had, we

21  essentially did the same with Pathway.  We were

22  able to bring that in.  And so initially, the

23  decision between leaving LIMS and going to

24  Merge, um -- happened before we started working

25  with Pathway.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1     Q.   Uh-huh.

2     A.   Otherwise, we probably would have

3 rolled out LIMS at Pathway.  Right?  It would

4 have been an extension of our local technology

5 efforts.

6     Q.   Right.

7     A.   But since that decision was made and

8 LIMS was put on the shelf, Merge was dropped in

9 place, and essentially that was our new

10 offering as the centralized management --

11 laboratory management sort of offering.

12     Q.   Uh-huh.  Did y'all cancel Paracelsus?

13     A.   At that point we did.

14     Q.   When was that?  I guess after --

15     A.   When the lab got shut down.  Right?

16 When the lab got shut down we stopped using

17 Paracelsus.

18     Q.   Okay.  Were you able to cancel that,

19 like, without consequence?  Or, like, did y'all

20 have --

21     A.   There was -- I think there was --

22     Q.   -- some sort of penalty?

23     A.   -- a little bit of a rift there.  But

24 I think ultimately --

25     Q.   Yeah.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1     A.     -- it played out. Yeah.

2     Q.     Do you know when Performance labs went

3 live with using Merge, like when it started

4 processing patient samples?

5     A.     I mean, it never fully went up and

6 running. I don't remember when -- at one point

7 we were able to process a small number and we

8 had like one doctor that was coming through.

9 But I don't recall specifically. It was

10 sometime in 2016.

11     Q.     Sometime in '16?

12     A.     Yeah. I don't recall. I wasn't

13 really -- I had even less involvement with

14 Performance as I did with, you know, helping

15 with Pathway or any of that.

16     Q.     Right.

17     A.     It was very minimal effort.

18     Q.     What about Pathway, do you know when

19 they started going live?

20     A.     I would -- just based on the timing,

21 and thinking through it, mid-'16, probably --

22     Q.     Uh-huh.

23     A.     -- is when they got kind of up and

24 running and got things started.

25     Q.     Any idea of when Pathway's go live

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    date compares to Performance's?

2        A.    It was earlier.   Yeah.   So Performance

3    must have been later.

4        Q.    Okay.

5        A.    Yeah.

6        Q.    Any reason for that?

7        A.    Compliance.   We were -- Performance

8    was shut down.

9        Q.    Sanctions.

10       A.    Yeah.   Performance couldn't run

11   samples.   It had to run through and redevelop

12   all of its methods and basically start pretty

13   much from the ground up with a lot of what the

14   did.

15       Q.    Uh-huh.

16       A.    And they -- you know, and I don't know

17   the minutia of it, but there was a cycle of

18   test and approve, test and approve, test and

19   approve.   And once the lab director and

20   Michelle Spruill, who was basically the only

21   person dedicated to Performance, once they were

22   happy and confident that we had repeatable

23   results, that's when CMS would come in, do a

24   light review, and say, yep, you can start

25   taking some patient samples in a very

1  controlled and minimal way, and then we'll come

2  back in down the road and further test.

3      Q.    Okay.

4      A.    That's -- basically, that's the story

5  that I remember, you know, as far as how the

6  process works.

7      Q.    Right.

8      A.    That was my understanding of it.

9      Q.    Are you aware of any other reasons

10 that prevented Performance from going live

11 earlier than that date, other than the

12 sanctions?

13          MR. STEWART:

14              Object to form.

15     A.    I do not.  Nothing.

16 EXAMINATION BY MR. LESUEUR:

17     Q.    And when Pathway started going -- when

18 Pathway went live, you said mid-'16, it was

19 using Merge.  Right?

20     A.    Yes.

21     Q.    Okay.  Did you have -- how much did

22 you use Merge in your day-to-day job after --

23     A.    (Witness gesturing.)

24     Q.    Zero.  Did you have login credentials?

25     A.    Not -- no.  Actually, no.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    Q.    Yeah.

2    A.    I couldn't -- I didn't support it at

3  all.

4    Q.    So you just did a zero sign to me, but

5  I forgot we had him.

6    A.    Oh, I'm sorry.

7    Q.    So my question was, did you

8  specifically use Merge in your day-to-day job?

9    A.    No.

10    Q.    Did you have login credentials?

11    A.    No.  At some point down the road I may

12  have had login credentials.

13    Q.    Okay.

14    A.    But initially I had none.  And even

15  once I did, I avoided it at all cost.

16    Q.    Do you know when you got the

17  credentials?

18         MR. STEWART:

19              Object to form.

20    A.    Yeah.  It would have been -- that

21  would have been in 2017, probably, even.

22  Right?  It would have been later.  Once I

23  started being more dedicated to Pathway.

24  EXAMINATION BY MR. LESUEUR:

25    Q.    Okay.

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1    A.    Um -- yeah.  Which was April 2017 is
2 when the bottom dropped, and I was hired on
3 from the Conrads at Pathway.

4    Q.    So that's when you started using Merge
5 more.

6    A.    That's when I actually stepped foot in
7 the lab and actually participated at all in the
8 operations of that lab.

9    Q.    Okay.  In Pathway.

10    A.    That's right.

11    Q.    Okay.  Did you know you could open a
12 support ticket, like, in Merge, in the
13 software?

14    A.    I'm not surprised.

15    Q.    Okay.

16    A.    But I didn't necessarily ever do it.

17    Q.    Okay.

18    A.    But yeah, I'm not -- yeah.  Folks used
19 it.  I know the team used that kinda stuff.  I
20 mean, they put in tickets a lot for that, to my
21 knowledge.  But no, I didn't know specifically
22 how to it.

23    Q.    Right.  But you knew it had that
24 function?

25    A.    Yes.

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1     Q.   And you knew it had -- Merge had a

2  technical support line you could call.  Right?

3     A.   Yes.

4     Q.   Okay.  The next document which I'm

5  marking as Exhibit 7.  This is Merge 19558.

6  And the first two e-mails are internal Merge

7  ones, and then -- which are forwarding

8  correspondence between you and Kristen Kleist.

9         (Exhibit 7 was marked for

10  identification and is attached hereto.)

11     A.   Yep.

12  EXAMINATION BY MR. LESUEUR:

13     Q.   You recognize this e-mail chain?

14     A.   Yeah.

15     Q.   At least the beginning parts before

16  the Merge internal ones?

17     A.   Yeah.  Generally, overall, yeah, this

18  is when, yeah, we started really having some

19  pains.

20     Q.   Okay.  So this is -- this e-mail chain

21  starts with a December 15th, 2016, e-mail from

22  Cochise Health and Wellness to you and some

23  others at Trinity.

24     A.   Right.

25     Q.   Well, I guess, let me back up.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1         Before, you said this is when you

2 first started feeling some pains.  Do you

3 recall what if any pains y'all had before this

4 date?

5     A.   I say that.  This definitely

6 represents pain.  I don't know if this was --

7 you know, earlier or later in that process.  It

8 was challenging all the way through.  That is

9 is an example of that.  Right?  Just issues

10 with results not going out.  And my involvement

11 with Merge started to get a little bit more

12 spiked, essentially, and I got pulled in, in

13 the latter part of '16, just from a -- just

14 from an organizational standpoint here, to have

15 the team say, we're having issue after issue.

16 And I start poking my head in kind of at that

17 point, mid to late November '16, to start

18 really triaging and understanding what the

19 challenges really are.

20     Q.   So there were issue before this date,

21 you said.  Right?

22     A.   Yeah.

23     Q.   Do you know what they were?

24     A.   I mean, they had a ton of workaround

25 situations.  The interface work that needed to

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

be done was pretty significant. Like we had to

basically -- some of the development team, once

NextPhaseMD development, which was kind of the

first half of '16, once it hit a point where we

kinda had the dev work pretty well under hand,

um -- a lot of the team that was still left,

which was mainly Jamie -- Jamie always had her

hands in Merge, she kind of was the point

person, but Danny as well, they kind of focused

back into helping the lab work through a lot of

these challenges.

     Danny was on he development side,

building and helping with some workflow, um --

patches, I would say, just kind of filling in

some gaps. And Jamie kind of took the brunt of

it, trying to help with more logistical efforts

internally and work through and all that.

    Q. Do you remember any of those specific

workarounds or any of those -- I mean, those

were before you got involved.

     MR. STEWART:

       Object to form.

    A. Yeah. I mean, I didn't know the inner

workings of the actual system itself, talk to

it a whole lot. I know they had in issue with,

**EXHIBIT B**

like, pack, um -- containers. There was some
very strange thing about containers that was
happen that was causing a lot of problems.
Just a ton of just real -- like at the user
experience level, they had some significant
breakdowns in how things worked, and how one
thing could affect another. And they were just
finding very significant sort of discrepancies
in how things were happening. And so they had
the kind of build workarounds. And, like, the
system didn't reject samples. Or couldn't just
reject a sample, which is a very prominent part
of what you do in a lab. So they had to work
around that. And they had the build out,
basically customize how, um -- how the lab did
their process to work around the gaps in the
Merge.

And a lot of that we went to support
for, and we went and said, well, what do you do
for this? Like this is, you know, very
important in our lab workflow.

And, oh, we don't really do that.
This is what we've seen other labs do.

So, you knee, I know the team worked
through a lot of those challenges where they

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1  basically gave some feedback and creative ways
2  to work around the user experience side of
3  things.  And then there were some that were
4  just -- you know, that just continued to keep
5  surfacing -- you know, resurfacing from that
6  standpoint.  And that affects patient samples,
7  it affects a lot of what they had challenges
8  with at that lab.
9        Q.   Okay.  This e-mail -- do you remember
10 this specific e-mail and an issue from Cochise
11 and sent from Jeff Bivens?
12       A.   I remember a lot of challenges with
13 this particular name, that doctor.  Um -- so
14 this one right here had to do with the
15 interface.  So there was a real clunky setup
16 the way Merge had the interface in place.  And
17 many times it would get stuck, essentially.
18 Like, it would just stop working.
19             And so lab work would take place,
20 workflow would happen, and whenever a result
21 was ready to be released, Merge would drop
22 those result files, HL7, onto the server, we
23 would pick that up and set it out.  And so
24 there were many times where we would have
25 problems like this where results wouldn't come

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  through.  And we'd go look, and we'd have to go
2  into the server and look at Merge, and there
3  was, like, this reboot process on one of the
4  components of Merge that we had to go reboot,
5  and then at that point, shoom (gesturing), it
6  would just drop a whole bunch.  So I think
7  that's what this was, is that they're saying,
8  we have 200 lab samples drop all of a sudden at
9  once.
10           That reboot took place because we
11  realized that samples reports weren't going
12  out, which is a pretty significant problem, and
13  basically they're just calling out the fact
14  that it just dropped 200 files at one time, why
15  did we get such a backlog?  So I think
16  specifically that's what this was about.
17       Q.   Okay.
18       A.   And that was an ongoing challenge.
19       Q.   So you forward this e-mail from Jeff
20  Bivens to Kristen Kleist.  Who is Kristen
21  Kleist?
22       A.   Dallas IBM?  I don't even know.
23       Q.   Okay.  She was -- I'll represent to
24  you she was a Merge employee.
25       A.   Okay.

1    Q.    To Ron, John Hearn -- Who's John

2  Hearn?

3    A.    He was over sales at Pathway.

4    Q.    Okay.  By the way, this issue from

5  Cochise, was Cochise one of Pathway's clients,

6  or Performance?

7    A.    Pathway.

8    Q.    Pathway.  So this issue has to do with

9  Pathway.

10    A.    That's right.

11    Q.    Okay.  You write, please see the

12  e-mail below.  This is one from one of our

13  largest clients.

14    So this would be one of Pathway's

15  largest clients.  Right?

16    MR. STEWART:

17      Object to form.

18  EXAMINATION BY MR. LESUEUR:

19    Q.    Sorry.  Can you answer audibly?

20    A.    Yes.

21    Q.    Thank you.  Sorry.

22    And then you write and ask for a call

23  with Kristen.  Kristen responds, have time for

24  a conference call tomorrow at 3:30 eastern?

25    A.    Yeah.  She's the HL7 implementation

**EXHIBIT B**

1    person.  So that's her role.

2        Q.    Okay.

3        A.    Right?  My story about that --

4        Q.    Right.

5        A.    That's her.

6        Q.    And then you respond to her that that

7    time works, will you set up a meeting invite.

8              Do you remember having that call with

9    Kristen?

10       A.    We had many.

11       Q.    You had a lot of calls?

12       A.    So no, I don't recall.

13       Q.    Okay.  And then Kristen asks you to

14   send the list of issue and concerns.  I'm gonna

15   share this with my team prior to our January

16   meeting.  Do you know what she means by that,

17   that January meeting?

18       A.    No, I do not.

19       Q.    And then you attached -- you send, on

20   December 19, the attachment at the back of this

21   e-mail chain which is on Merge 19564.  It's a

22   document called Known Merge Shortcomings.  Do

23   you recognize this?

24       A.    It's an early stage of that document.

25       Q.    Early stage.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1     A.    Yeah.

2     Q.    So you recognize it.

3     A.    Yes.

4     Q.    Did you draft this?

5     A.    Yes.

6     Q.    Okay.  It's -- did you do this in,

7 like, Word or Excel?  Do you remember?

8     A.    OneNote.  Microsoft OneNote.

9     Q.    OneNote.  Okay.  And the date at the

10 top is Monday, October 17th, 2016.  Do you know

11 what that date refers to?

12     A.    So OneNote dates the file as soon as

13 you create that page.

14     Q.    Okay.

15     A.    So this could've -- that date could

16 have been just --

17     Q.    The first date that --

18     A.    That I actually hit a button and said

19 create a new page, and I titled it --

20     Q.    Known Merge Shortcomings.

21     A.    Known Merge Shortcomings, and then,

22 you know, started chipping away at it slowly.

23     Q.    Okay.  So this wouldn't be the date

24 that it was first sent to Merge.  Right?

25     A.    No.  This was a work in progress.

**EXHIBIT B**

1 This was a culmination of working with the
2 teams, working with different folks, getting
3 feedback, validating their feedback. Right? I
4 basically became the -- I became the issues
5 consultant, basically, looking into these
6 problems, finding root causes, and determining
7 if they are, in fact, problems, or just
8 training issues, and what have you.
9      Q.   Okay.
10      A.   So I kind of became the support sort
11 of person to investigate, and this was the
12 outcome of that.
13      Q.   Okay. And so the words on here, you
14 typed them all? I mean, you said you
15 collaborated with some other folks.
16      A.   Yeah. I would have typed.
17      Q.   You would is have typed this.
18      A.   Right.
19      Q.   Okay.
20      A.   I would have interpreted from them
21 into this, yes.
22      Q.   Right. Do you know if you sent --
23 well, actually, I'll show you. I'm going to
24 mark as Exhibit 8 this document. Exhibit 8 is
25 TRINITY 195072. It's a December 16th, 2016,

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  letter.  So this would be one day after the
2  e-mail in Exhibit 7 in which, um -- you have
3  the call with Kristen.  And you write here,
4  thank you both for the time today -- so I
5  assume you had the call on December 16th --
6      A.    Yes.
7      Q.    -- with Kristen?
8          (Exhibit 8 was marked for
9  identification and is attached hereto.)
10     A.    Yep.
11 EXAMINATION BY MR. LESUEUR:
12     Q.    And then you're attaching the Known
13 Merge Shortcomings document.
14         Do you know if you sent that document
15 at any time earlier than this date?
16     A.    I do not know that I had.
17     Q.    Okay.  So let's look at the issues.
18 And I just want to take these one at a time on
19 the attachment.  And the attachment is on the
20 back of the exhibit.  Okay.  So the first one:
21 Setting user to disable doesn't stop the user
22 from logging in.  You have to rest their
23 password so they -- assume you meant reset --
24     A.    Reset.
25     Q.    -- their password so they can't log

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  on.

2          What's that issue?

3      A.    Basically, you have an employee that

4  leaves and you deactivate their account.  They

5  can log in, still, even with a deactivated

6  account.  So there was no way to lock out a

7  user.  And we didn't realize that for some

8  time.  We had somebody who was an ex-employee

9  who logged in -- and I forget exactly how we

10  found out, but we figured out that they had

11  logged in, and, uh -- and realized that all of

12  our deactivated accounts were still active.

13      Q.    How would they have access to

14  Trinity's system after they were, like, let go

15  or left y'all?  Like, how would they --

16      A.    So this is --

17      Q.    Would they have to have a work

18  computer?

19          MR. STEWART:

20              Object to form.

21              You can answer.

22      A.    This is a web-based system.  You can

23  access it from anywhere in the world.  You need

24  a login, user name and password to get in.  The

25  user name and password gets deactivated but

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1  still allows you to authenticate and get into
2  that system and use it as if you were still
3  active.
4  EXAMINATION BY MR. LESUEUR:
5      Q.   Okay.  But then the second sentence,
6  it says, you have to reset their password so
7  they can't log in.  So y'all a Trinity could --
8  after someone left, y'all could change their
9  password so they couldn't do that.  Right?
10      A.   Right.  Well, that's what we found
11  out.
12      Q.   That was the workaround.
13      A.   That was the workaround, is to just go
14  change their password.  And then they just
15  don't --
16      Q.   They wouldn't know it --
17      A.   And they didn't authenticate at that
18  point.
19      Q.   Right.  Passwords in plain text --
20  passwords in database are in plain text.  No
21  encrypted -- not encrypted.  Major security
22  flaw.  What's this issue?
23      A.   This would be one of those no-brainer
24  standard best practices that you'd get a
25  failing grade in college for trying to do a

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1  system.  You log into the database and you look

2  at the columns, like an Excel file, but it's a

3  database.  Right?  You actually can see the

4  password in plain text.  Um -- which means -- I

5  mean, it's not encrypted.  Right?  It's not.

6  There's no security around that.  So basically,

7  if that database would be compromised, whether

8  internally or externally, you would basically

9  be able to log into the system as if you were a

10  valid user, using anybody's login credentials.

11      Q.    So it would be -- that's everybody's

12  password.

13      A.    Everybody's password is listed.

14  Right?  And then you got the problem of

15  personal data protection where now you take

16  that and you can go sell that in the open

17  market.  Many of us use the same password for a

18  lot systems that we have.  So the cybersecurity

19  side of that is if someone does compromise that

20  database and pull a copy, and you go and sell

21  that on the open market, now they can go around

22  and ping every system in the -- you know, every

23  bank -- bank system or credit card system out

24  there.

25      Q.    Try your passwords.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    A.    Try all of those user names and
2  passwords, and I mean, you have a
3  significant -- I mean, that's what people do.
4  If they can compromise your account
5  information, they'll go log into every single
6  system that exists out there with financial
7  backing, and be able to, you know, access that.
8  So.  Pretty significant.
9    Q.    You mentioned the -- they are stored
10  in the database.  Would that be Merge's
11  database or Trinity's database?
12    A.    Yeah.  This is all Merge.
13    Q.    Merge's --
14    A.    Merge's database.
15    Q.    Okay.  How do you get into Merge's
16  database?
17    A.    So it's on our server.  It is -- it's
18  a MySQL database it's called.  It's a free
19  version of a relational database.  So it's a
20  user name and password type of access to get
21  into it.  Um -- and so, yeah.  I mean, we -- it
22  was protected behind our firewall, but still
23  very open, you know.  And this was one of
24  early -- one of the first things that we
25  recognized during implementation.  Like, one of

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1 those -- one of those head scratchers with my

2 team walking out of the room like you wouldn't

3 believe what I just discovered, they have

4 passwords that are freely open text.

5    Q.    Wow.

6    A.    You know, and it was like, oh, My God,

7 like, what else -- you know, like, what are we

8 in store for?  That was an early discovery.

9    Q.    Early discovery.  But do you know when

10 y'all notified Mere about that one?

11    A.    Oh, right away.

12    Q.    Right away?

13    A.    Yeah.  I mean, they were talking to

14 the implementation guy about that, and he was

15 like, yeah, it's kinda always been that way.

16    Q.    Do you know of any written

17 correspondence, any support tickets open for

18 that issue?

19    A.    Um -- not to my knowledge.  I mean, I

20 know it was an open conversation.  It was a

21 known kind of thing, but --

22    Q.    To get into Merge's database on

23 y'all's server, you said it needed a user name

24 and password?

25    A.    That's right.

1      Q.   Would that be a Merge user name and

2  password?

3      A.   Yep.

4      Q.   How would you know those credentials?

5      A.   They would provide it to us.

6      Q.   By who?

7      A.   The technology -- the, um -- the

8  implementation guy that came out.  I forget his

9  name.

10     Q.   Okay.  Chris Floyd?

11     A.   Chris Floyd.  Yes.  Chris.  He became

12  my buddy.

13     Q.   Did y'all ask for it, or he just gave

14  it to you?

15     A.   Um -- we did ask for it.  He -- yeah.

16  He didn't give it away right away, but I think

17  after a minute he got approval, or I think

18  he -- you know, he ended up giving that to us.

19     Q.   Okay.  Why did y'all ask for it?

20     A.   Because we needed to be able to see

21  the data and look at it and learn it a little

22  bit.  You know we wanted to be able to look at

23  our data.  I mean, it's our data.  We bought

24  it.  Right?  It's in our servers.  We should

25  have access to look at our data.

EXHIBIT B

1    Q.    Do you know if That's typical for labs
2    to have access to -- like to LIS's as own
3    database?
4    A.    If it's an internal system like this,
5    you know, on our servers, then I would say it's
6    not untypical.  It's not -- it's very
7    technically an easy thing to do.  But, you
8    know, if it's a web-based system absolutely
9    not, because it's not housed within your
10   environment.
11   Q.    What about Paracelsus; did y'all have
12   access to the Paracelsus' database?
13   A.    They were a web-based system.  It
14   wasn't located on our servers.  So it wasn't
15   part of our infrastructure.  I mean, we put
16   down additional security measures within our
17   server on some of these things because it was
18   just lacking, some of that.
19   Q.    Okay.
20   A.    So, I mean, having access to some of
21   those things were kind of necessary for us to
22   understand and start to understand what was
23   actually there.  You know?
24   Q.    Okay.  So to get -- to find these
25   unencrypted passwords, y'all would need the

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  password to -- I guess, if I were to walk in
2  the doors at Trinity Medical Services and
3  wanted to find those unencrypted passwords,
4  walk me through that.
5      A.   Um -- I mean, you would have -- if you
6  were a non IT --
7      Q.   Yeah.  Like me.
8      A.   -- person --
9      Q.   Assume it was me.
10     A.   You wouldn't be able to.
11     Q.   Okay.
12     A.   You'd have to be skilled in the art.
13 You'd have to be able to get into the server,
14 and I mean it would be a, uh -- it would be a
15 malicious act to get into the system and
16 actually view it.
17     Q.   Yeah.
18     A.   But the final result is something that
19 could be very easily resolved.  Right?  But
20 yeah, it's one of those things, you'd have to
21 have a user name and password to get into it.
22     Q.   Uh-huh.  You'd have to be able to --
23 like, invited to the doors at Trinity; right?
24     A.   That's right.
25     Q.   Have some kind of credentials to log

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  on to a computer.  Right?

2     A.    That's right.

3     Q.    Then log on to the server?

4     A.    That's right.

5     Q.    And then have the Merge credentials

6  for the database.

7     A.    That's right.

8     Q.    And then get around -- and you said

9  you had fire walls as well?

10    A.    Yeah.  For external access.

11    Q.    So I'd have to get through the fire

12 walls too.

13    A.    Yeah.  And as Merge, that'd be a lot

14 of assumptions to make.  Right?

15    Q.    What do you mean?

16    A.    Well, because the system basically

17 allows for the free viewing of passwords, and

18 so the assumption is that there's going to a

19 lot of other safeguards out there that'll stop

20 you from getting here.  So it doesn't really

21 hold water.  It not a valid defense against the

22 best practices and the security measures needed

23 for a software system, especially in the

24 medical industry.  You can't make assumptions

25 like that.  Right?

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    And if something can happen it will.

2  And so, you know, I told earlier we had China

3  and Russia pinging our stuff.

4    Q.   Right.

5    A.   Right?  A lesser man would have been

6  hacked, and could have been compromised, you

7  know.  And that type of compromise wouldn't

8  have been a company impact, it would have been

9  a lot of personal-medical-related people

10 impact.

11   Q.   Okay.

12   A.   By thousands of 'em.

13   Q.   Right.  But at least with respect --

14 you said there's a lot of assumptions -- would

15 be a lot of assumptions.  But at least from

16 Trinity's standpoint --

17   A.   Right.

18   Q.   -- it would be -- I mean, what are the

19 odds of this happening?

20       MR. STEWART:

21           Object to form.

22   A.   Um --

23 EXAMINATION BY MR. LESUEUR:

24   Q.   Very, very low; right?

25   A.   Less than normal.

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1    Q.    Right.    Very, very little; right?

2    A.    Yes.

3    Q.    Okay.    And y'all created fire walls

4  around this once you found out about it.

5  Right?

6    A.    Right.    Servers were all secured.

7    Q.    Right.    And then what's the next

8  issue?    No medication reflex ordering.

9    A.    So it was a CMS requirement for

10  medical necessity that basically said when you

11  do your screening, which gives you just a

12  positive and negative on the family of drugs --

13  let's call it opiates, for instance -- if I had

14  a negative -- if I have a positive opiate

15  result, then the reflex of that would be to

16  order the opiates on the confirmation side for

17  confirmation.

18    Q.    Okay.

19    A.    And so, around this point in time,

20  medical necessity became an absolute must, a

21  requirement.    Insurance payers stopped paying

22  unless you had it.    And so an integral part of

23  that is, basically, the logic in the system to

24  be able to do what I just described, but over

25  the course of 80 different drugs potentially.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1 Right? 80 tests.

2       So to be able to say, all right, based

3 on the results of the screening, as well as the

4 medications that the patient is on, it

5 basically triggers the proper confirmation so

6 that you can --

7     Q.  How does that happen without

8 automated -- it being automated?

9       MR. STEWART:

10          Object to form.

11     A.  It's a very manual, monotonous

12 process.  Yeah.

13 EXAMINATION BY MR. LESUEUR:

14     Q.  Somebody has to go in and plug it in;

15 right?

16     A.  That's right.

17     Q.  Did -- when y'all used Trinity LIMS

18 and Paracelsus, did you have that reflex

19 ordering?

20     A.  Oh, yeah.

21     Q.  Did y'all ask if Merge had that

22 capability before you bought it?

23     A.  We did.  We did ask that early on.

24 That was one of the things that they said they

25 did do.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

```
 1      Q.    They did --
 2      A.    Yeah.  Going into it, there was --
 3  there was the ability to do that type of thing.
 4  And when we got into it, it really didn't do
 5  what we thought it did.  They had some level of
 6  reflex in one little -- I don't recall what it
 7  was.
 8      Q.    But it wasn't the level of reflex --
 9      A.    It may have -- what it may have been
10  is on the medications, but not on the screen.
11      Q.    Okay.
12      A.    It was something like that.  Like a
13  portion of it was there, so it was a valid
14  statement that, yeah, we have reflex.  But it
15  wasn't complete.
16      Q.    It wasn't what you were looking for.
17      A.    Right.  It wasn't what we really
18  needed across the board.
19      Q.    Would this be -- would you
20  characterize this as, like, a software bug,
21  or --
22      A.    No.
23      Q.    Like a feature; right?
24      A.    That's more of a limitation that we
25  were like, we need this.  There's no way we can
```

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  manually handle the mapping of this stuff over
2  hundreds of samples a day.
3      Q.    Uh-huh.
4      A.    So this was kind of one of those, my
5  gosh, we really need to look at this.  So this
6  would be more of a feature request.
7      Q.    Okay.
8      A.    Yeah.
9      Q.    The next one -- and I'll try to move
10 more quickly through these, but the next one is
11 under the Usability/Risk column.  And these
12 sound -- the next two sound similar.  But if
13 you could explain what those two issues are,
14 that would be great.  To the extent you know.
15     A.    Yeah.  These are all crazy scenarios.
16 Yeah.  So they had issues where -- I mean, the
17 first one basically means that you could create
18 a group.  So let's say for the opiate side, on
19 the confirmation side you can say, I want to
20 order opiates on the confirmation.  Bundled
21 within that would be hydrocodone and
22 hydromorphone, let's say, those two analytes.
23 Let's say that's what's actually tested on the
24 instrument.  If someone accidentally orders the
25 opiate group, which shows the opiate group on

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  the list, and hydrocodone individually, now it

2  shows hydrocodone on the list, and they look at

3  it and say, it's duplicate, this covers that,

4  go ahead and delete the single one, we still

5  got the group, and when you delete the single

6  one it actually deletes that hydrocodone from

7  the group as well, so behind the scenes you

8  don't realize that the system did that, but by

9  removing one you actually are removing both.

10  Q.  Got you.

11  A.  And so that caused us to report out a

12  lot of things, and bill for a lot of things, I

13  believe, that actually weren't tested.

14  Q.  Okay.

15  A.  Because essentially, we didn't test a

16  result out hydrocodone, but it was ordered.

17  Right?  And it looked like it was ordered in

18  the system, but it didn't actually go through

19  and talk -- the instrument didn't actually get

20  that response.

21  Q.  Okay.

22  A.  And then similarly, here, once we

23  realized the problem, we said okay, so let's

24  just delete everything and re-add everything,

25  just to be safe.  Well, when you did that, it

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

actually deletes the entire order. So you
create an order, then you're gonna start adding
tests to it. Then you realize, oh, crap, I
made that mistake, let me delete all these
tests. Well, when you do that, behind the
scenes it actually deletes this order. So then
the order kind of disappears from the workflow.
And so there were points there where we weren't
actually testing samples at all.

   And we realized, why did this thing
get deleted? I don't understand. And so we
were able to discover that, oh, so it actually
deletes it when you remove all the tests from
it, and it doesn't actually tell you.

  Q. Okay.

  A. So there was some just -- that's
significant bugs and workflow issues.

  Q. When you say crazy scenarios, what did
you mean? Is that what you mean by that?

  A. Earlier?

  Q. Yeah.

  A. Yes.

  Q. Okay.

  A. Things that I couldn't -- I wouldn't
have remembered off the top of my head, but

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1 now, reading it, I'm like I remember 'em

2 talking about that, that's insane.

3     Q.    These would only happen -- I mean, you

4 used the word accidentally, and mistakes. So I

5 mean, these would only happen under that --

6 those scenarios. Right? If you accidentally

7 included and extra order?

8         MR. STEWART:

9           Object to form.

10 EXAMINATION BY MR. LESUEUR:

11     Q.    That was already in a group?

12         MR. STEWART:

13           Same objection.

14     A.    Yeah. I mean -- I mean, yeah, I guess

15 so. I mean, if you ordered opiate, and then

16 you order hydrocodone on the order, you know --

17     Q.    Yeah.

18     A.    -- it would be under that

19 circumstance, I guess.

20     Q.    Right. It wouldn't happen if you

21 ordered the group and the group was fine and

22 you sent it out.

23     A.    That's correct.

24     Q.    Okay. Do you know how many -- you

25 mentioned that y'all were sending out samples

1  with -- bills for tests that weren't run.

2  Right?

3      A.    That what this could impose.  I don't

4  have a number, though.  No.  I didn't --

5      Q.    Do you know of any?  That happened

6  with any?

7      A.    Uh -- duh, duh, duh, duh -- I -- I --

8  I don't know for sure.

9      Q.    Okay.

10      A.    I know it came up when we looked at

11  this, but I was -- I was less involved in the

12  billing side of things than I was in --

13      Q.    You were more in the lab side.

14      A.    Right.  So no, I don't know the answer

15  to that.

16      Q.    What about -- do you know what lab

17  that would have happened to?  Would that have

18  been Pathway or Performance?

19      A.    Pathway.

20      Q.    The forth column, COC Workflow.  What

21  do you mean by COC?

22      A.    Chain of custody.

23      Q.    Chain of custody.  Okay.

24           Can you explain that first issue for

25  me?

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    A.    So this was the one I mentioned
2  earlier.  The containers -- I want to say that
3  the containers basically represented a certain
4  instrument, or like an organization structure
5  on how tests are actually preformed.
6         Like, for instance, one method on the
7  LC-MS might be negative mode, which is like THC
8  and barbiturates, and I don't remember what
9  else, fits in that negative mode.  Well, then
10 you have positive mode which has a bunch of
11 other stuff.  And you might have another method
12 that's like, uh -- bath salts, let's say.  You
13 have three different areas, three different
14 tests.  So when you're creating an order, you
15 basically -- all of the tests that need to go
16 to one of those three would go into a
17 container, from what I recall.  And regardless
18 how the container is set up, I'm pretty sure
19 that's what the containers were tied to, the
20 problem that happens here is that if the
21 container -- if an issue is found in the way
22 the order was entered, and they delete the
23 container, which deletes everything below it,
24 and then they go in and they say, all right,
25 let me start over add adjust hydrocodone, like

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1   I mentioned earlier, it will add it to the list

2   but it won't actually be tested because

3   automatically hydrocodone gets added as part of

4   this positive mode container. But since that

5   container was previously deleted and then this

6   new test was added, which would basically put

7   it back into that container, the container was

8   still marked as delete.

9       Q.   Okay.

10      A.   So it didn't -- it deleted the actual

11  container piece, and then when you re-added the

12  sample it didn't undelete the container, so the

13  system never --

14      Q.   It stayed deleted?

15      A.   It stayed deleted. So that test shows

16  up, but the actual container that holds it

17  within Merge was marked as delete, so the rest

18  of the process, this chain of custody process,

19  which is the handoff from one step to the next,

20  it never progressed, because it just sat within

21  that deleted container.

22          So that would happen all the way

23  through the end of the process when our team

24  was reviewing samples, and they would say,

25  where the heck is my hydrocodone? I see it's

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

```
1   on the order.  Why am I not seeing it on my R
2   result?  We would have go in, look at the
3   database, look a the data behind it, and we
4   would say, ah, the container that it's in is
5   actually marked as delete.  We undelete it,
6   reimport samples, and then it appears.
7        Q.   Okay.  So y'all found a workaround for
8   that one.
9        A.   We got the workaround.  And it was
10  very -- yeah.
11       Q.   And then that one -- that issue, is it
12  like the previous two in that it would only
13  occur if there was some mistake, or, um --
14  something that needed to be corrected on the
15  original order entry?
16            MR. STEWART:
17                 Object to form.
18       A.   So I would say mistake.  And the word
19  accidental is probably not the right way to
20  describe it.
21  EXAMINATION BY MR. LESUEUR:
22       Q.   Okay.
23       A.   These are situational scenarios that
24  happen.
25       Q.   Okay.
```

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1     A.    They always happen.  Right?  I mean,

2  you're talking about hundreds of samples a day,

3  80-something tests per sample, potentially, all

4  kinds of logic around is this positive versus

5  test here, all the reflection stuff I

6  described.  So it's not a -- I'm not ordering

7  tennis shoes here.  Right?  We're ordering a

8  significant amount of data.  So these aren't,

9  like, accidental, you know, intermittent

10  scenarios.  These are happening 20, 30 times a

11  day.

12     Q.    Okay.

13     A.    Right?  So it's very much a

14  reoccurring process.

15     Q.    Uh-huh.

16     A.    And yeah, if we were all robotic and

17  could, you know, never make a misstep, then I

18  would say, yeah, it may flow as it should.  But

19  that's not how it actually happens.

20     Q.    Okay.  So again, to answer my

21  question, this would happen in the same

22  scenarios, and if we don't use the words

23  mistake or accidental, it would happen when an

24  order or something is entered that shouldn't be

25  and needs to be fixed.

**EXHIBIT B**

1      A.    It has to be changed.  That's right.

2      Q.    Okay.

3      A.    Yes.

4      Q.    And then the second dot in the COC

5 Workflow column is Merge has no way to reject

6 an accession.  This is a crucial step in he

7 laboratory workflow.

8      A.    Yeah.

9      Q.    Tell me about that one.

10      A.    So anytime a sample comes in, there

11 are certain validations that have to be done.

12 If it's spilled, if there's not enough sample,

13 if there's missing, uh -- enough identifiers --

14 I mean, like two or three identifiers.  Um --

15 there's a number of reasons why the lab staff,

16 the certified lab staff would say that take

17 this sample has to be rejected.  And so it's a

18 very critical part of the compliance world in

19 the lab.  Like, that's a big part of what CMS

20 looks at:  Show me your rejection process.

21 Show me all your rejections.  Let's make sure

22 they're documented appropriately, make sure you

23 notif -- you have to send a rejection letter,

24 uh -- result, basically, along with your normal

25 patient results, to say, you gave me a sample

**EXHIBIT B**

1  for your patient, it was rejected for these
2  specific reasons.
3          That didn't exist in Merge, which was
4  crazy.  Not something I necessarily asked
5  during the demo, but one of those things where
6  it was like, it wouldn't even have crossed my
7  mind to ask because it's such a fundamental
8  thing in a lab.  How in the world have y'all
9  gone this far without a rejection piece?  So
10 that was a surprising --
11     Q.    Right.
12     A.    -- finding.
13     Q.    Yeah.
14     A.    But ultimately, we had to work around
15 that.
16     Q.    What was the workaround there?
17     A.    I think what we did was create a
18 fake -- which we have to do this a lot to work
19 around things.  We created a fake test in the
20 system, like hydrocodone, except this was one
21 called rejection, and essentially added that
22 new test order to the order.  Right?  That test
23 to the order.  And then we had to tweak our
24 filtering capabilities to be able to say, don't
25 show this test on the report.  And then we'd

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1 have to do some other things -- they did a lot,

2 to basically trigger off of this test that was

3 added. Any order that had this test on it

4 means it was rejected, and then there was an

5 external, manual process, and there were other

6 things that had to be done to basically

7 acknowledge that --

8     Q. It was rejected.

9     A. -- it was rejected.

10     Q. Okay. Do you know when that issue was

11 found, and the workaround was fund?

12     A. It must have been pretty early on,

13 'cause that's pretty critical.

14     Q. Okay.

15     A. Yeah. Early to mid '16.

16     Q. Okay. And is that something -- did

17 Ron or anyone at Merge say, hey, it has this

18 feature, it can reject samples? I mean, you

19 said you don't recall asking about it. Did

20 you --

21     A. Yeah. He never said that. When I

22 asked him, he was, like, yeah, I know, that's

23 one of those things but -- you know.

24     Q. Yeah. That was after.

25     A. That was after, yeah.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1    Q.    Okay.   The third one in that column:

2  No way to associate a doctor/clinic with a

3  sales rep for volume numbers.

4    A.    That's a feature.   That would be more

5  of a feature thing.

6    Q.    Okay.   Did Paracelsus do that?   Did

7  Trinity LIMS do that?

8    A.    Trinity LIMS did it very well.

9    Q.    Okay.

10    A.    Paracelsus didn't, but we didn't need

11  it to.

12    Q.    Okay.

13    A.    So that was --

14    Q.    Was that something y'all asked about

15  or knew about in the front end before you

16  bought Merge?

17    A.    Um -- not to my recollection.

18    Q.    Okay.   And then the fourth one:   No

19  option to attach files to an order except for

20  the results.

21    A.    Yeah.   So, you know, being able to

22  attach the req form, any kind of compliance

23  document on a sample -- I mean, there's a

24  number of paper trial type things that need to

25  be attached to that sample.   Um -- and they

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1 didn't have any ability to attach files.  So, I

2 mean, I would say that would be one of those

3 shortcomings that's more of a --

4      Q.    Feature?

5      A.    Feature.

6      Q.    Okay.

7      A.    We have to manually store it in files

8 and kind of go the old way.

9      Q.    Right.  Did Paracelsus and Trinity

10 LIMS do that?

11      A.    Yeah.

12      Q.    They did?

13      A.    Pretty fundamental for any system.

14      Q.    The last one:  Receiving containers

15 does not always push the sample onto the

16 corresponding work list.

17           What's that one?

18      A.    Um -- I mean, basically, the work list

19 would be screening, or LC-MS.  It may get more

20 in depth.  But simply put, like, those are two

21 different teams that are working their samples.

22 EXAMINATION BY MR. LESUEUR:

23      Q.    Right.

24      A.    And so there was an issue where the

25 samp -- when it would move from one to the

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  other, it wouldn't always go.  Um -- and I know

2  they always had problems when they were, like,

3  sort of losing view of samples because they

4  just never progressed to the next stage of

5  things.  Unrelated to the other container

6  issues with were more result sort of test

7  related, this was more, like, the general --

8  you know, the overall container that contained

9  those, they didn't move around as they should.

10  I don't recall the detail of why --

11      Q.  Okay.

12      A.  -- but I remember them constantly

13  having that challenge where they had to go look

14  the step prior to find it, and it was just kind

15  of a constant hassle for them to locate the

16  stuff.

17      Q.  Okay.  Do you know, like, how many

18  times that happened?

19      A.  Unh-unh.

20      Q.  Anything like that, any details?

21      A.  It was an ongoing issue --

22      Q.  Okay.

23      A.  -- but I don't recall the -- and it

24  made the list, so it was significant enough

25  where they were screaming at me about it.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    Q.    Okay.  Who's they?

2    A.    All the lab people.

3    Q.    Lab people?

4    A.    And Jamie, 'cause she was helping.

5  She was catching the brunt of it.

6    Q.    Right.  And then -- well, I guess

7  we're on to the next column, now, for Science.

8  The first one:  Unable to review and approve

9  results by batch grouping.

10    A.    Yeah.  So when you're testing samples

11  on an LC-MS, you could be testing upwards of 50

12  patient samples at a time.  Maybe more.  Some

13  of our plates I think had upwards of 80 or so.

14  And so all of those samples have to have

15  correspondence with the QA results that were

16  ran on that same -- for the batch.  When those

17  samples come of, those 80-some-odd -- 50 to 80

18  samples come off, and they go into Merge, they

19  would just get shuffled in and get, basically,

20  mixed up amongst all the other samples that had

21  come in.  So there was no way to look at all

22  the samples that came off of this instrument to

23  know --

24    Q.    At this time --

25    A.    -- at this time, with these

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1 corresponding QCs, so it was literally, like,
2 on a paper, having to look and find the number
3 of the next item on the batch, and then go look
4 through and find that there. And it was
5 just -- it was, like, they were -- they were
6 going crazy having to figure out the scavenger
7 hunt to basically review samples.

8     Q. Because they weren't, like, sorted or
9 anything like that.

10     A. There was no way to base -- there was
11 no recollection or -- or -- you know, context
12 of where that sample came from. It just landed
13 in there and was mixed up amongst. And we had
14 five or six instruments running, so samples
15 were coming from all of these. So you've got
16 hundreds of samples listed in a list, and each
17 scientist is supposed to the work their
18 instrument and approve their samples, and there
19 was just no way of really making -- making
20 sense of it.

21     Q. Okay.

22     A. So I mean, I would say this was a
23 significant challenge and problem. It would be
24 a fairly straight -- from a software side, a
25 fairly straightforward change to basically

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1   organize this better.

2       Q.   Uh-huh.

3       A.   Um -- but in the end, it -- you know,

4   it caused a lot of turmoil, a lot of challenges

5   for that lab.

6       Q.   Would you characterize this as a

7   feature request or a bug?

8            MR. STEWART:

9                Object to form.

10      A.   I would say it's a -- it's a -- it's a

11  much-needed feature request.

12  EXAMINATION BY MR. LESUEUR:

13      Q.   Okay.

14      A.   It worked as designed.  It's not like

15  a bug that's happening --

16      Q.   Right.

17      A.   -- outside of the design.

18      Q.   And for this one, did y'all ask about

19  how it batched, on the front end, before you

20  bought it?  Did they will you anything about

21  how it batched samples, on the front end,

22  before --

23      A.   No detail to my recollection.  I know

24  we talked about their approval processes.  That

25  detail may not have been mentioned, but I don't

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    recall.

2        Q.    Okay.  So you don't remember if they

3    ever told you, like, oh, yeah, they're

4    batched --

5        A.    They're batched --

6        Q.    -- and organized.

7        A.    Right.  Not to my recollection --

8        Q.    Okay.

9        A.    -- at all.  I mean, I know we looked

10   at that process then, but not specifically to

11   this maybe.

12       Q.    Okay.  And then system does not allow

13   the QC ranges to be adjusted in the middle of a

14   lot.  Create a new lot each time you change the

15   range.

16             What's that one?

17       A.    And so QC is basically you have -- you

18   create a big tub of QC chemicals, you know, and

19   it could last -- depending on how big the tub

20   is, it could last a long time.  But you're

21   constantly having to adjust the levels that

22   those QCs are compared against, to make sure

23   that the instrument is still configured

24   appropriately.  So it's a constant monitoring

25   process where you're running QCs every day,

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1   multiple times a day sometimes.

2        And so having to change those levels

3   accordingly, based on wear and tear of in the

4   instrument, as that instrument approaches

5   maintenance schedules, those levels will

6   change. A lot of factors go into that. And so

7   you need to be able to tweak that.

8        Well, with this scenario here, you

9   couldn't just change the levels and allow it to

10  continue, you had to actually end that lot,

11  start a new lot, and then change the levels

12  from there. So you missed all the history of

13  that lot that was actually created, which is

14  very valuable when it comes to compliance and a

15  lot of the things they looked at from a quality

16  standpoint.

17       So, um -- this is one that, again, I

18  would say -- I man, a lot of this stuff was by

19  design with Merge, so it's not necessarily what

20  they may see as a bug. But from a compliance

21  and a workflow standpoint in the lab, very,

22  very challenging, and caused a lot of extra

23  overhead outside of the system to keep up with

24  it.

25       Q.   Okay.  Do you know when that one was

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    discovered?

2        A.    I don't know exactly when, no.    It's

3    one of those things that the lab staff dealt

4    with for a while.    And then once the

5    investigation process started of us figuring

6    out all of this, it was, like, this is one that

7    needs to be on the board.

8        Q.    Right.    The last two are under the

9    Compliance section.    Take your time if you need

10   to read 'em, but -- if you could, describe

11   those to me.

12       A.    Yeah.    So this is a big one.    Same

13   story, around QCs.    Which is a big reason why a

14   lot of shutdown stuff happens.    Right?    I mean,

15   those guys, they look at quality of samples.

16   That's, like, a big focal point.

17           This here is basically -- you have QCs

18   that run in a day.    It's only valid for that

19   day.    Sometimes you even have to run 'em for

20   every batch that you run on the instrument.

21   But that has to be matched up to the run.

22           The Merge system did not keep track of

23   the actual day that the sample ran.

24           So the instrument, when it kicks out

25   results, it kicks out, you know, ten columns,

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

maybe, the name of the test, the date it was

ran -- like, the actual date, time that it

actually ran on the instrument, the results,

and a number of other values that are on there.

Merge never -- would not absorb the

date that came off of the instrument. It just

took the name of the drug, or the test, and the

values of the result. So it comes into the

system, and the date stamp that appears on that

sample is the date that it was received by

Merge, the import date. So if we have a sample

that runs, and the results aren't imported,

let's say, until the next day, or whatever it

may be -- I mean, even if it's run over night,

and then the next day we import that, which is

often how it worked, we would run things

overnight, basically you go back and look at

the reports, and you're showing that this

sample was run on the 15th, let's compare it to

the QC on the 15th, we got failed results.

Why did you release these patient

samples? That's like compliance shutdown

potential right there. And that -- they -- I

remember them -- the turmoil -- that -- they

were scratching their heads for a while on it,

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1   and they realized, wait a minute, this is not

2   the right QC to compare it to.  I need to

3   compare it to the day before because it

4   actually ran on this day.

5       Q.   Right.

6       A.   And so there was no way to really

7   track that, so they had to manually keep logs,

8   once they discovered it, that this batch ran on

9   this date, and basically keep it up that way.

10       Q.   That issue, from my understanding,

11   would only happen, though, if the import date

12   was different than the run date.  Right?

13       A.   That's correct.

14       Q.   Okay.  And do you know when you all

15   discovered that one?

16       A.   It wasn't right away, because there

17   was this -- you know, we ran into the problem a

18   lot from a compliance side.  I mean, a lot of

19   the -- a lot of the review processes happened,

20   and they ended up digging in, and Jamie got

21   involved and really started looking at it

22   technically, why in the world is it happening?

23   So late '16 sometime, I would say.  I don't

24   know exactly.

25       Q.   Okay.  And then what's this last

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  issue?

2      A.   So when a sample is ran on an

3  instrument and those results are imported into

4  Merge and they appear in Merge, um -- the QC

5  process that has to take place to make sure

6  quality is right, um -- many times a subset of

7  the samples need to be reran.  Because a sample

8  could have up to, let's say, 80 different tests

9  ran.  Right?  Hydrocodone, hydromorphone, all

10  these things.

11        Well, we may find that hydrocodone has

12  a problem.  And it's broken down by the test

13  level.  So out of this whole batch, every

14  sample on here that has hydrocodone on it needs

15  to be reran.  Just so that we can get a new

16  hydrocodone value.

17        So there was no way in the system to

18  basically do that.  It stopped at that point.

19  So you look in Merge, you see all the samples.

20  There's no significant -- there's no signal,

21  rather, that tells you that -- don't report

22  those samples out, because this one value is

23  wrong.

24        Manually, they're having to go through

25  it and pull those samples, put 'em on the next

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  batch to rerun it.  When they come in, it comes

2  in as a whole new set of results.  Now they're

3  having to match up results from both sides and

4  basically merge the two together and make sure

5  that they're not releasing these samples before

6  that whole process happens because then the

7  doctor will be getting false hydrocodone

8  results.

9         And it was just, like -- it was a

10  complete, crazy mess for them to have to handle

11  all that.

12     Q.   Was that a feature or a bug?  A

13  feature request or a bug?

14         MR. STEWART:

15              Object to form.

16     A.   Um -- very much a lack in necessary

17  functionality.  So I would say, again, by

18  design, whoever built this system, as we said

19  with a couple of these others, it was not

20  something that was foreseen as a need, but in a

21  real world laboratory, for toxicology

22  especially, it's a lack in a fundamental

23  component of what's needed.  Otherwise, yeah,

24  you run into the problem I just described.

25     Q.   But not like a software bug; right?

**EXHIBIT B**

 1              MR. STEWART:

 2                   Object to form.

 3      A.    Um -- that's right.  Based on -- yeah.

 4  Based on how it was built, it wasn't a bug.

 5  Right?  It was more workflow.

 6  EXAMINATION BY MR. LESUEUR:

 7      Q.    Right.  For all these things, for all

 8  these issue that you listed, these were all

 9  happening at Pathway, I assume?

10              MR. STEWART:

11                   Object to form.

12      A.    Yes.

13  EXAMINATION BY MR. LESUEUR:

14      Q.    Do you know if they were happening at

15  Performance?

16      A.    Yes.  On -- I mean, during this time,

17  in Performance, it wasn't taking patient

18  samples.  It was very much in a testing phase.

19      Q.    Okay.

20      A.    So a lot of these challenges were

21  surfacing, um -- through the research and

22  development process.

23      Q.    Okay.  But not happening with patient

24  samples?

25      A.    That's right.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    Q.   Okay.  I'm going to show you what's

2  marked as Exhibit 9.

3         (Exhibit 9 was marked for

4  identification and is attached hereto.)

5    A.   Okay.  This is a fun one here.

6  EXAMINATION BY MR. LESEUER:

7    Q.   Do you remember this e-mail chain?

8    A.   Um -- yes.  I remember.  I definitely

9  remember the topic.

10   Q.   Yeah.  And that's you --

11   A.   Yes.

12   Q.   -- included in here?

13   A.   Yes, it is.

14   Q.   Exhibit 9 is an e-mail chain between

15 you, Ben Caston, Phil Martinez, Blake Bourque,

16 um -- subject line is Holy Shit.  It's dated

17 March 2nd, 2017.  The first message starts with

18 Blake at the bottom.

19        He writes, they actually sponsor a

20 data breach study.  If they have 50 million

21 patients on their platform -- platform supports

22 you're looking at 7.9 is possible cost from the

23 Merge security breach alone.

24        Um -- do you know what he's talking

25 about here?

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1      A.    Oh, yeah.

2      Q.    What's that?

3      A.    So this is -- this is basically the

4  Tomcat Apache server.  It's a free server that

5  is open source.  There is a very standard

6  control panel link to that.  And so everybody

7  who has an Apache server, you can go to their

8  domain, xyzcom, forward slash, and some set,

9  you know, extension, to get to it.  So you use

10  a name and password to get in.  And in this

11  case, what was discovered is that Merge

12  provides us with that user name and password --

13  because again it's our server, it's on our

14  environment, we need access to that.

15          Um -- that user name and password is

16  essentially the same across all Merge systems.

17  And when you log in to that control panel you

18  have access to -- what he's saying here is you

19  have access to copy a SQL dump, you have access

20  to -- which goes back to the open password

21  piece.  Right?  You can't access it through our

22  front doors, but you go through this back door,

23  you could.

24          Um -- you could do a lot of things.

25  You could shut down the server completely.  You

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  could install programs on that server.  You can

2  pretty well raise havoc, with very little

3  knowledge, once you got into that server.

4      Q.   Okay.  The Apache Tomcat one; right?

5      A.   That's right.

6      Q.   Is Apache Tomcat made by Merge?

7      A.   No.

8      Q.   Okay.  You said that the user name and

9  password that Merge would provide for Apache

10 Tomcat --

11     A.   Right.

12     Q.   -- they'd provide it to each of their,

13 I guess, customers?

14     A.   They basically set a user name and

15 password for that server access.  And what they

16 do is, the way they deploy Merge is they take a

17 copy of the Merge platform and they install it

18 on everybody's servers.  Right?

19          So everybody in the he country that

20 used Merge had a copy -- different

21 configuration, but same system and

22 infrastructure, essentially, deployed to all of

23 their environments.

24          So that Apache access was the same on

25 all of 'em.  And what Merge missed very

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

critically here is they did not change that user name and password for that Apache server when they said copy and paste, copy and paste, copy and paste. And so what ends up happening is every single person that has a Merge system that was provided that user name and password was now provided the user name and password for ever other system out there that Merge has.

Q. Okay. So that would be exposure to other labs. Right?

A. That's right.

Q. Do you know if that would be exposed to the, like, outside world, or just people working in those labs -- those companies?

A. Outside world. Patient samples? Patients, like that --

Q. No. The password for the Tomcat server.

A. I don't understand the question.

Q. Sure. You said that the password that's provided for each of the deployments of Merge --

A. Right.

Q. Right? Included the Apache Tomcat password.

EXHIBIT B

1     A.   That's right.

2     Q.   You said it was essentially the same.

3     A.   It was the same.

4     Q.   It was the same.

5     A.   Yeah.

6     Q.   So that, in your mind, would allow

7 other labs to access other labs' --

8     A.   Right.  Right.

9     Q.   -- information.  Right?

10    A.   Or anyone who was able to obtain that

11 user name and password, whether it be an

12 ex-employee -- whether it be -- but yes,

13 anybody who was privy to the user name and

14 password from their localized installation

15 essentially would have access to --

16    Q.   Other labs.

17    A.   -- any other lab out there.

18    Q.   That used Merge.

19    A.   That used Merge.  That's right.

20    Q.   What -- Ben writes, in the second

21 e-mail here -- he writes, I just rooted the dev

22 server by uploading a Tomcat WAR file that

23 present a remote shell.

24    A.   Yeah.

25    Q.   What is he talking about there?

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

A.    So --

Q.    Excuse my ignorance.

A.    No.  No.  In this Apache portal, like I said, you could do a number of things.  You can shut it down, you can extract information and do, like, data dumps, and pull information. You can also deploy things like an exe file. Right?  Like a little program.

And so essentially what he's saying here is -- a WAR file is sort of like a ZIP file, think of, right?  To where it goes in nice and packaged, but once it lands to where it is, it unpackages it and you could do -- our incredible security that we had?  If someone would have found this, they could have dropped a very simple virus, for lack of a more complex word -- but they could have dropped a Trojan horse, essentially, into our servers, and that could have just exposed and started communicating externally and all that.

And we may have caught it eventually through our monitoring, but a lesser environment would not have and ultimately could -- coulda been a big deal.  You know?

Q.    Do you know if that ever happened,

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1    though?

2         A.    In our world?

3         Q.    Yeah.

4         A.    Uh -- not to our knowledge.  So no, I

5    mean, nothing that we saw.

6         Q.    Okay.

7         A.    I mean, as soon as we found this we

8    simply changed the password and user name of

9    our side.

10        Q.    Okay.

11        A.    You know?

12        Q.    So you could just change the password

13   on your end?

14        A.    Once you got into the Apache server

15   and all that, you could.

16        Q.    Okay.  Once you changed the password,

17   then the other labs wouldn't have it; right?

18        A.    That's right.  We would be protected.

19   Right?  So we had a partner lab that we worked

20   with at Pathway who also used Merge.  And it

21   was one of the reasons we were, like, hey,

22   we'll work well together, we both have Merge.

23   And just out of a test, we -- we have access to

24   their portal because we use -- you know, we

25   were working with them on samples.

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1        And we just said, let's just test it.

2   And we tried the password, and it worked.   And

3   we were like, okay, close.

4        Q.    Would there be any way -- besides what

5   you just described, testing that out, would

6   there be any other way to find that password?

7        MR. STEWART:

8             Object to form.

9        A.    Um -- I mean, people have very nifty

10  ways of looping through and hacking passwords,

11  absolutely.   I don't recall what the password

12  was, if it was a very cryptic, you know, best

13  practice password, I would predict probably no.

14        Um -- you know, you've seen movies,

15  the most obvious password is password, or, you

16  know, password123.   Right?

17        Q.    Yeah.

18        A.    So yeah, passwords can be hacked.

19  People do it all the time.   So yeah, it could

20  very well have been something that China could

21  have hacked, and through their magic, you know,

22  bridged a lot of stuff.

23        Q.    Uh-huh.

24        A.    But outside of someone who's very

25  skilled in the art of doing that would need to

1  obviously be given that password or somehow

2  access it --

3      Q.   Okay.

4      A.   -- from the lab.

5      Q.   And then outside of being given the

6  password, are you aware of anybody hacking

7  doing what you described from China, like

8  complicated --

9      A.   No.

10     Q.   When he talked about the dev server

11 here, is that y'all's server?

12     A.   Yeah.  We just -- proof of concept,

13 basically.  He installed -- made a copy of that

14 Apache server to test out if we would be able

15 to use the exposed tools that this Apache

16 server showed us.  So we didn't want to do it

17 in our production Merge server, so he made a

18 copy of it on a dev server of ours --

19     Q.   Oh, okay.

20     A.   -- and then just hacked it locally

21 within our environment --

22     Q.   As a test.

23     A.   -- as a pen test, basically --

24     Q.   Right.

25     A.   -- and then he was able to do it.

1    Pretty easily.

2      Q.    Apart from Ben doing this, do you know

3    if anybody else at Trinity did this? Even to

4    test or -- maliciously or for test purposes?

5      A.    Ben -- no, I mean, as far as, like,

6    the penetration testing of this specifically,

7    he did that. We did -- we did run a script and

8    try to find kind of the significance of how

9    many are out there, just to wrap our heads

10    around, like, is this link that goes to our

11    Apache server actually common? So, I mean, we

12    literally could do a Google search with some of

13    those path extensions on ours, and shoom

14    (gesturing), a list of other labs popped up

15    with a link to their, um -- to their Merge

16    portal, basically.

17      Q.    Okay.

18      A.    So we did do some other testing just

19    externally to see what else was out there and

20    see if this was something that was more widely

21    spread.

22      Q.    Right.

23      A.    But no, as far as the actually

24    testing, and the hitting of that Apache, this

25    was the only test we really did. That was

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1   enough to prove what we --

2      Q.   In, you know, finding out the other

3   labs sites, did y'all ever hack any other lab

4   sites --

5      A.   Oh, no.

6      Q.   -- using the password?

7      A.   No, no, no.  We wouldn't do that.

8      Q.   Okay.  That's what I figured.

9      A.   Yeah.  No.  No.

10      Q.   And that process that Ben describes, I

11   mean, that's not something like a lab

12   technician would be doing using Merge.  Right?

13   Like that wouldn't come up in the ordinary

14   workflow.

15      A.   That's right.  Yeah.  I mean -- that's

16   right.  Yes.

17      Q.   Like day to day --

18      A.   No.

19      Q.   -- this wouldn't occur.

20      A.   That's right.  Yes.

21      Q.   I'm going to hand you what I'm marking

22   as Exhibit 10.  Take your time.  The beginning

23   is internal Merge correspondence.  And then

24   you're copied on the very earliest e-mail.  And

25   I just want to look at that -- the earliest

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  e-mail and the attachment.  I don't care about

2  the beginning of the e-mails.

3        MR. STEWART:

4              That's starting with Merge 9038?

5        MR. LESUEUR:

6              Correct.

7        (Exhibit 10 was marked for

8  identification and is attached hereto.)

9     A.    All right.

10 EXAMINATION BY MR. LESUEUR:

11    Q.    So I'll start with Blake's e-mail to

12 Pete Nanos on February 20th, 2017, on Merge

13 9038.  Blake writes, Pete, attached is a

14 document that the team put together.  Hope this

15 leads us to working together sooner rather than

16 later.

17        Do you remember who Pete Nanos is?

18    A.    I do.

19    Q.    Okay.  Who was he?

20    A.    Leadership role at Merge.  But he

21 was -- he was one of the guys that it escalated

22 to after Ron, that we spoke to, for a short

23 period of time until things started getting a

24 little bit more escalated than him.

25    Q.    Okay.  Do you know why Blake was

**EXHIBIT B**

1 sending those issues to him?

2     A.   Well, because we'd gone through

3 iterations of conversation already, I think

4 we -- either before or after, and I don't know

5 the timing, but we were in the process of

6 talking to Ron, talking to some support guys.

7 We went through a number of conversations.

8 Um -- and again, maybe that came after this.

9        But essentially, we were trying to

10 reach out to Pete and let him know that these

11 were issues, um -- and that as far as the help

12 part goes, I mean, it was honestly an

13 opportunity, and it was something that Ron even

14 mentioned, that, you know, having a new -- some

15 new, fresh development effort going on,

16 somebody skilled in the practice of laboratory,

17 that's built multiple LIMS systems, that have a

18 head start already in that game, could walk in

19 and help a company like IBM retool this

20 critically suffering system here. And so that

21 was our perspective of it.

22     Q.   Right. Like a business opportunity

23 for you guys. Right?

24     A.   Yeah. An opportunity to make this

25 frown and make it actually something right.

**EXHIBIT B**

1      Q.    Helpful for both sides.

2      A.    Right.  We were in the process at this

3  point of looking at packaging our LIMS to be

4  able to go out and sell externally.  We weren't

5  focusing on it within or lab; but we were still

6  looking at it and still doing some work on the

7  side, as budget allowed, to really get it to

8  its final stage to go out with it.

9          We needed one more kind of push, and

10  that little last push never happened, but

11  ultimately, we saw this as an opportunity.

12  Like, I mean, this is like almost a perfect

13  storm here --

14      Q.    Right.

15      A.    -- where we could potentially do that.

16          So there was a moment of that thought

17  process, like, you know --

18      Q.    Right.

19      A.    -- maybe.

20      Q.    Yeah.  I mean, I see that from Blake's

21  e-mail.  He says, maybe -- you know, he ends

22  with one last thing, ask Merge to put us to

23  work on the fix.  Right?  Is that what you

24  understand he means by that?

25      A.    That's right.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1      Q.   Yeah.  And I see from other e-mails,

2  it seems to me that you all began an effort to

3  find issues.  Right?

4          MR. STEWART:

5              Object to form.

6  EXAMINATION BY MR. LESUEUR:

7      Q.   Is that right?

8      A.   Uh -- no.

9          MR. STEWART:

10             Can you show us any of those

11             e-mails?

12     A.   Yeah, no.  The issues definitely

13 slapped us in the face time and time again.

14 The only time -- the only part that I would say

15 was a find fact was once we've accumulated a

16 lot of the grid that we showed a second ago,

17 um -- and it became to a point where we

18 recognized the magnitude, I guess, and then we

19 dug a little deeper and found, like, the server

20 component, which was actually just stumbled

21 across, the previous Exhibit 9 -- that was

22 something that Ben stumbled across.  So I mean,

23 once we realized the magnitude of all these

24 problems that sort of materialized over the

25 course of time, it was then a matter of, okay,

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  let's take my root cause analysis to kind of

2  the next level, which is what came out of this

3  document.

4      Q.   Okay.  So how did Ben stumble upon

5  that server issue?

6      A.   I managed servers.  He always -- I

7  mean, him and Burton both were constantly --

8  that was their job, was to manage our servers,

9  look for back doors, look for loopholes.  You

10 know, like, they were in charge of that.

11     Q.   Okay.

12     A.   And so when we started recognizing a

13 lot of these issues and everything, he started

14 investing a little bit of that.

15     Q.   Yeah.

16     A.   And um -- he's like, they're on

17 Apache.  Let me just see what they did with

18 their Apache server, and found it and was,

19 like, wow, this is pretty significant.  And so

20 anyway, that's -- you know.  Looking slightly,

21 but it was a stumble approach type of finding.

22     Q.   Right.  Let's look at the exhibit.

23 And I don't want to reiterate everything that

24 we've talked about.  There's some overlap with

25 the issues.  But I just want to talk about any

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1 ones that might be new.

2      First of all, did you create this

3 attachment?

4     A.   Not all of it.  I created the

5 template, I created most of the left column,

6 and the description.

7     Q.   Okay.

8     A.   And the complaint risk category

9 component.  I was not involved in anything --

10 you see CFR and a crazy number?

11     Q.   Right.

12     A.   That a not me.

13     Q.   Okay.  Who would that be?

14     A.   That would be lab.  Probably Michelle.

15     Q.   Okay.

16     A.   And then, HIPAA -- you know, the

17 simple stuff was -- what I plugged in was under

18 risk.  Right?  These are clearly HIPAA security

19 compliance -- right?  Kind of the higher level

20 additional issues that are reported there.

21     Q.   Uh-huh.

22     A.   Anything that's not specifically

23 written as --

24     Q.   Like a statute?

25     A.   -- as cited compliance lab type stuff.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1      Q.   Okay.  So I see, just walking through,

2   stating from the beginning -- who else besides

3   lab folks contributed to this?  Do you know?

4      A.   I mean, it would have been my team and

5   lab, mainly.

6      Q.   Okay.

7      A.   You know.  Um --

8      Q.   Do you know specifically, though?

9   Remember specifically?

10     A.   I mean, Ben would have probably helped

11  with some of the detail.  Um -- and then from

12  the lab side it was probably mostly Michelle.

13  I don't think we brought in a whole lot of

14  others.  I mean, we kept it pretty close.

15     Q.   So just walking through each issue,

16  you know, we have the disabled user one that's

17  the same.  Passwords and plain text, that's the

18  same as the earlier Known merge Shortcomings

19  document.

20     A.   Right.

21     Q.   The third one, what is that one?

22     A.   Um -- and so we kept having the system

23  freeze up, kind of an example of that interface

24  issue where all of a sudden results would just

25  stop going out and we had to reboot.

1          There were other areas that were
2    causing this.  And so this was where we --
3    basically, the process behind Merge that was
4    running, it had a memory leak, which means the
5    longer it runs the more processing resources it
6    uses, and eventually it just conks out and just
7    dies.  Um -- so we -- and we tracked it.  We
8    actually could see the resources gauge just
9    continue to go.  So what we ended up having to
10   do was do an automatic reset on that to
11   basically fix that fundamental kind of core
12   problem with the system.
13        Q.   So you found a workaround for that
14   one?
15        A.   Yeah.  Rebooting it.  Right.
16        Q.   It says, weekly reboot the avoid the
17   system crashing which has happened multiple
18   times.
19             Do you know how many times that
20   happened?
21        A.   Dozens.  I don't know exactly.
22        Q.   Okay.
23        A.   Yeah, more than ten.
24        Q.   More than ten?
25        A.   Yeah.  I man, it was a pretty

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1    consistent thing.  We were catching it, you
2    know, at least once a month I would say.
3         Q.    Would that be at Pathway, or
4    Performance?
5         A.    Pathway.
6         Q.    The next issue on the next page, on
7    the second page of the Merge Shortcomings
8    document, a user can only be given access to
9    all sites or individual sites.  What's this
10   mean?
11        A.    I mean, I think the problem here was
12   just allowing access to less than all.  I mean,
13   if you needed access to two sites and not all
14   three, maybe.
15        Q.    Yeah.
16        A.    I'm not really familiar with this one.
17        Q.    Okay.  No problem.
18        A.    So yeah.
19        Q.    That would be -- what you describe
20   sounds like a feature, though.  Right?  Not a
21   bug?
22        A.    Well, the problem is that you have
23   somebody that doesn't have authority to access
24   patient samples for a certain location, but the
25   system doesn't allow for you to have granular

1  access controls around that user, then it could

2  be a problem for them to see that.  But yeah,

3  that would be, again, by design.  But just --

4  it could potentially cause problems.  If

5  there's, you know, access in the wrong areas --

6      Q.    Right.

7      A.    -- you shouldn't have it.  Workaround

8  would be multiple logins, essentially, and I

9  think is ultimately what we did.

10     Q.    Okay.  So do you, like, Chad Howell

11 Pathway versus Chad Howell Performance?

12     A.    Right.

13     Q.    Okay.  Next one:  Admin role creates

14 too many functions that need to be separated

15 across different users.

16     A.    This was another similar category,

17 except this one there was no workaround.  Um --

18 there were, let's say, a dozen functional

19 privileges that an admin had, but very few

20 people would need to have all twelve of those

21 functions.  They would need to have a couple

22 here or there based on their role in the

23 laboratory.  Very specifically stated from CMS

24 is that you have to be qualified and certified

25 to be able to do X.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    And so we what we ran into here was

2    that we had folks that were not qualified and

3    certified, that had access to do X and Y, and

4    they really shouldn't have been.  But they

5    needed to do this other thing, and the only way

6    to be able to have access to that is to have

7    this admin role.  So we had this one big

8    blanketed admin role that just gave you God

9    mode, basically.

10    Q.   Okay.

11    A.   And there was no way to slice that up

12    to properly organize access into the system.

13    Q.   So this almost similar to their

14    earlier one, that there's -- I mean, it's not

15    the same, but it's kind of like --

16    A.   Yeah.  The category of challenges that

17    it poses is similar.  The other one I would say

18    there's a workaround, as we discussed; this one

19    there is not.

20    Q.   Okay.

21    A.   This one is a fundamental problem

22    where CMS could come in and say, who has access

23    to do QC approval?  And you go pull the list of

24    admins.

25    And you know, like, why does your IT

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1 technician have access to approve result

2 quality checks?

3     Q.    Uh-huh.

4     A.    Well, he needs access to order new

5 supplies, and the only way for him to have

6 access to that is an admin role, and by having

7 admin you have access to all.

8     Q.    Okay.

9     A.    That's a bigger challenge.  And so

10 that was something I don't think we had a

11 workaround for.  It was just we had to very

12 much me careful who we gave access to.

13     Q.    Right.  Just limit the access; right?

14     A.    Right.  Which caused -- you know,

15 caused its own challenges with who could do

16 what.

17     Q.    But that's not like a software bug.

18 Right?

19         MR. STEWART:

20             Object to form.

21     A.    Um -- it would be by design.

22 EXAMINATION BY MR. LESUEUR:

23     Q.    Right.  The last ones on this issue I

24 think we've already addressed.  Right?  User

25 name password stored and the data base,

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  versions of Apache Tomcat, those are the
2  vulnerabilities we discussed earlier?
3      A.    Right.  No audit logging.
4      Q.    What is that one?
5      A.    HIPAA -- one of HIPAA's regulations
6  that they do enforce is that you need to have
7  logs that shows who accessed what data and
8  when.  So if I go jump into a medical system
9  and I start looking at you 'cause I'm curious
10 what your background is medical wise, that's
11 big no-no.  And so being -- and even thought I
12 work there and I have access to this data,
13 based on my role, it is not within my job duty
14 to go browse.
15     Q.    Right.
16     A.    At Ochsner we had a similar thing,
17 'cause we have football players and celebrities
18 going to Ochsner.
19     Q.    Right.  Right.
20     A.    Big no-no.  You get caught going in
21 and looking at Drew Breese's -- you know, what
22 happened in his last game and looking at his
23 knee issues -- significant; right?
24     Q.    Right.
25     A.    So same problem.  We had no way to

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1   know.

2      Q.   No way to know.  Is that something --

3   I mean, it says no audit logging or user

4   accounting.  I mean, did it have -- you

5   described a very specific kind of HIPAA-related

6   audit logging.  Right?

7      A.   Right.

8      Q.   Did it have -- I mean, was it lacking

9   any other kinds of audit logging?

10      A.   It no logging.  No logging.  You

11   couldn't see where users logged in.  You

12   couldn't see where they were -- what they

13   accessed.

14      Q.   But that would be tracking users.

15      A.   That's what I'm talking about.  A user

16   logs in and they do something in the system,

17   but there's no way to know what they did.  Are

18   they looking at patient -- looking up a buddy's

19   name and seeing what his tests were on the drug

20   testing results?  Is he going in and

21   manipulating something in there that he

22   shouldn't be manipulating?  There was no way to

23   track activity in the system for a logged in

24   user.

25      Q.   Bug or feature?

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1          MR. STEWART:

2                Same objection.

3     A.    Lack of fundamental medical --

4  EXAMINATION BY MR. LESUEUR:

5     Q.    Functionality?

6     A.    -- functionality.  Medical-based

7  functionality.  I mean, that's a requirement by

8  HIPAA, that you have to have a traceable, you

9  know, company in the system to be compliant in

10 that space.

11    Q.    Do you know what regulation or rule

12 says that?

13         MR. STEWART:

14              Object to form.

15    A.    No.  It's a best practice.  But it is

16 documented that you have to able to prove who

17 accesses what.  Right?  But I don't know.  I

18 can't cite it.

19 EXAMINATION BY MR. LESUEUR:

20    Q.    The last one, shared admin password

21 for Merge installations.  That's the one we

22 already talked about; right?

23    A.    Um -- no.  This is actually different.

24 So from the front end, when you log into the

25 Merge portal, they basically used the same user

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

name and password for that as well. So they
all shared that. So rather than you having
your own user name and password to the website,
and me having my own, and all of us having our
own, basically Merge introduced this shared
approach where we would all just use admin123
as our account.

And so that was an issue that was
discovered too. And I think we enforced
something on top of it, but that was an issue
that they had. So the IT guy, again, that was
implementing he had -- he was like, hey, you
can use my password. And he started sharing
passwords with all of us, his basic one, that's
how we always do it.

Q.    Was that the same password that you
all found --

A.    No, it was.

Q.    -- for the other sites?

A.    Different. One was the Apache server
access. The other is actually the front end
portal, like merge.com portal.

Q.    Okay.

A.    So that's not a bug. It's just a bad
practice.

EXHIBIT B

1   Q. Right.  By that employee.

2   A. Right.

3   Q. Because he gave you guys the password.

4   A. That's right.

5   Q. Aware of any security breaches caused

6 by that one?

7   A. Not to my knowledge.

8   Q. And then you said you had a workaround

9 for it.

10   A. We just changed passwords.

11   Q. Changed the password.

12   A. We changed the policy, yeah.

13   Q. Okay.  Going on, the next page, um --

14 the next -- I'm trying to look for something we

15 haven't discussed yet.  And I don't -- are

16 there any more on these that we haven't talked

17 about?

18   A. Let me go through 'em.

19   Q. Yeah.

20   A. Nope.  They're all the same.  Yeah.

21 This came -- I mean, this came from that

22 other --

23   Q. This building on that earlier project?

24   A. This is just, yeah, getting feedback

25 from others.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    Q.    Okay.

2          (Brief recess.)

3    EXAMINATION BY MR. LESUEUR:

4    Q.    I'm going to hand you Exhibit 11 --

5    what I'm marking as Exhibit 11.  It's Trinity

6    84007.

7          (Exhibit 11 was marked for

8    identification and is attached hereto.)

9    A.    Yeah.  This is what we covered just a

10   second ago.

11   EXAMINATION BY MR. LESUEUR:

12   Q.    Right.  So this is a chat between you

13   and Jamie Abney.  Right?

14   A.    Yep.

15   Q.    You recall this, specifically?

16   A.    Um -- no, not specifically.

17   Q.    But you received this and --

18   A.    Yes.

19   Q.    -- you wrote these words?

20   A.    Yes.

21   Q.    This is the disabled user issue that

22   you talked about.  Right?

23   A.    Yes.

24   Q.    And then Jamie writes, so even if a

25   user is area disabled, they're still able to

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  log in if they know their old password.  So I

2  have went in and changed all the disabled

3  users' passwords to something different.

4          So at least at this date is sounds

5  like y'all had the -- you knew the workaround

6  for this issue?

7      A.    Yeah.    I mean, the workaround was we

8  had database access, which is another reason

9  why we're glad we had it.    Soon as we disabled

10  the user, we were not only disabled on the

11  front end, as Merge was designed, but we would

12  log into the database directly and just

13  scramble the password, essentially.

14      Q.    Right.    So they could never find it

15  out.

16      A.    Right.

17      Q.    So disabled users could never log back

18  in.

19      A.    Right.    So anybody out there in the

20  world that doesn't have the IT support we had,

21  we talked about it, it was, like, so every

22  Merge system out there has disabled users that

23  still are active.    You know?    But yeah, we were

24  able to log in and actually --

25      Q.    Y'all were able to fix it.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1     A.   We were able to catch it.  Yes.

2     Q.   Okay.  And then -- I am missing a

3 document, so I'm going to give you my own copy.

4         Jesse's familiar with this.

5     MR. STEWART:

6         You're going to get an inside

7         peak into Lon's thinking.

8     MR. LESUEUR:

9         Right.

10 EXAMINATION BY MR. LESUEUR:

11     Q.   That's Exhibit 12.  (Tendering.)  It

12 was Exhibit 4 of Jamie's deposition.  So

13 actually let me write that down.  I'm marking

14 under 4 was Jamie's.  And then it's Exhibit 12

15 for this deposition.

16         Do you remember receiving this is

17 e-mail?

18         (Exhibit 12 was marked for

19 identification and is attached hereto.)

20     A.   The first one?

21 EXAMINATION BY MR. LESUEUR:

22     Q.   Uh-huh.

23     A.   Okay.  Yeah.  I remember kind of

24 correspondence with her.

25     Q.   Okay.  So you ask her if the newest

**EXHIBIT B**

1  Merge version fixed the, one, the security

2  issue, and two, the disabled users issue.

3  Right?

4      A.   Right.

5      Q.   And then she responds that it fixed --

6  the newest version fixed the disabled user

7  issue.  Right?

8      A.   That's right.

9      Q.   So the disabled users would get the

10  error flag if they tried to use that.  Right?

11      A.   That's right.

12      Q.   And it looks from what she's copied

13  and pasted that that fix was in 4.1.6.  Right?

14      A.   That's right.

15          MR. STEWART:

16              Object to form.

17  EXAMINATION BY MR. LESUEUR:

18      Q.   That was implemented at Merge on

19  November what date?

20      A.   15th.

21      Q.   Of what year?

22      A.   '16.  2016.

23      Q.   Okay.  So if we go back to Exhibit 11,

24  the date that Jamie found that disabled user

25  issue was October 10th.  Right?

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1      A.   Yep.

2      Q.   And then it's fixed in the version

3  installed at Merge just about a month later.

4  Right?

5      A.   Yep.

6      Q.   Okay.  After the sanctions in that

7  Christmas Eve letter that y'all got from CMS,

8  when was Performance Lab going to go back live

9  again?

10         MR. STEWART:

11              Object to form.

12              You can answer if you understand

13         it.

14     A.   When CMS said we could.

15  EXAMINATION BY MR. LESUEUR:

16     Q.   Okay.

17     A.   So like I said earlier, the process

18  would be we do a ton of research and

19  development internally, as the lab staff and

20  the lab director work together to validate the

21  new process and the new methods that were

22  developed.  They then call CMS and let 'em know

23  that we're ready.  CMS comes at some point in

24  time and does some level of minimal audit, and

25  then they -- you know, they get open to have

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1   patient samples. And then, you know, generally
2   that's how it worked.
3       Q.    And that happened. Right? CMS
4   eventually gave Performance Lab clearance to
5   test; right?
6       A.    Right. We had one -- I believe one
7   doctor that we moved over to just go through
8   that.
9       Q.    After that clearance from CMS -- I
10  mean, first of all, do you remember the date
11  when that happened?
12      A.    No. Not at all.
13      Q.    Do you remember the year?
14      A.    Um -- yeah, it was '16.
15      Q.    '16?
16      A.    It must have been probably Q3, or --
17  it was later 2016.
18      Q.    After that clearance, was there
19  anything that prevented Performance Labs from
20  getting back up and going?
21          MR. STEWART:
22              Object to form.
23      A.    I don't -- I wasn't really involved in
24  the decisions of stopping or not. So I don't
25  really have any knowledge of that, to be

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1   honest.

2   EXAMINATION BY MR. LESUEUR:

3       Q.    Okay.   So you don't know of any reason

4   why Performance Labs didn't start back up after

5   CMS cleared it.

6       A.    Right.   No.   I was really -- I mean, I

7   was focused heavily on -- I was traveling at

8   that time, focused on NextPhaseMD.   I had very

9   little -- outside of some of the work you see

10  here with Pathway and the efforts going on

11  around that, and ultimately I didn't really --

12  I wasn't involved in conversations with

13  Performance at all, with lab directors, or

14  with --

15      Q.    CMS?

16      A.    -- Sandy Pearson or any of them.

17  Right?

18      Q.    Okay.

19      A.    I mean, it was ultimately their choice

20  of letting us open or not.   And then the second

21  tier from that would be the lab director to

22  determine whether --

23      Q.    What to do?

24      A.    -- to continue or not.

25      Q.    Okay.   Pathway started in 2016; right?

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    A.    That's right.

2    Q.    Okay.  Tell me about that April 2017

3 time line with the Conrads coming in.  You

4 mentioned it earlier.  How did that come about?

5    A.    Um -- we talked with the Conrads

6 earlier on.  Early '16?  Maybe sooner; maybe

7 earlier.  But we had connected with them pretty

8 early on.  They were interested in getting into

9 the lab space.  We were talking about some

10 level of partnership, or some way to work

11 together.

12        You fast forward, a while later, and

13 you had -- Kyle and Phil had opened the lab

14 over there, because our focus was elsewhere.

15 We had all the employees, we had all this

16 technology, so we basically offered all of that

17 out.  And they basically put their name down

18 and went to work getting that lab up.

19        The Conrads came in and basically put

20 an offer on the table and said, we wanted a lab

21 then, we still want a lab now.  We'll take this

22 over.  They realized that we were in a downward

23 spiral kind of approach of things financially

24 and everywhere else around.  And so they took

25 over a lot of the responsibilities of all of

**EXHIBIT B**

the employees and everything else involved.
And, um -- you know, it was a bomb dropped in
the middle of it all. You know?

So yeah. I mean, it was -- it was a
lotta -- it was a lot of back and forth, a lot
of issues arise, a lot of personalities thrown
around the room. And on the other end of it,
they basically asked me to stick around to run
their technology side of things and help
them -- still support Merge to some extent,
which then we migrated away from Merge and
rolled out a new LIMS.

Q. Did -- you know, from what I
understand, y'all talked with them in early
2016, then you will talked to them again in
2017?

A. Yes. That's right.

Q. So who approached who in 2017?

A. I know Mark Lobell was connected to
them. That's who introduced us. I would say
he probably -- I don't know. Mark came to me
and said, hey, I just had a conversation with
the Conrads, and basically this is what they're
offering -- this is what they're saying.

So I don't know who approached who.

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1   It was either they approached Mark, or Mark

2   approached them. More than likely, they bumped

3   into each other and Mark was like, hey, y'all

4   still interested? There may be something we

5   can do.

6       Q.   Uh-huh.

7       A.   So I don't know the detail of that.

8       Q.   Okay. What were your thoughts on

9   selling?

10      A.   Um -- I was ready to be out.

11      Q.   Okay. So you were pro, in favor of

12   selling.

13      A.   I was in pro to try -- to try to

14   unwind as much and as quick as we could.

15      Q.   Why?

16      A.   There was just a lot of -- a lot of

17   turmoil, a lot of, you know, um -- it was

18   not -- it was not a good environment anymore

19   for me.

20      Q.   Okay.

21      A.   Right? I mean, the NextPhase effort

22   were going well enough. Um -- but then, to be

23   honest, the bank was drying up. Um -- a big

24   fight started between Blake and, um -- Robert

25   Saenz. And it just -- I mean, we weren't -- we

EXHIBIT B

1  didn't get paid for about a year. So we

2  drained every bit of savings and every bit of

3  money that we had in the bank, to help fuel

4  some payroll and everything else. So it was

5  just -- we should have gotten out a lot sooner

6  in my opinion.

7        I should have. Right? My personal

8  feeling is that I should have gotten out a lot

9  sooner.

10    Q.    Yeah.

11    A.    I wasn't interested in lab anymore. I

12  wasn't interested in really doing it. I stuck

13  around at Pathway and did my thing there and

14  helped them. But I wasn't involved in the lab

15  side of it at all.

16    Q.    They weren't using your software

17  and --

18    A.    That's right. I had a leadership

19  role, and I kept up with that. But even that

20  was just, like, I'm ready to get out of it.

21  And so I decided, you know, at some point, all

22  right, I'm buffing up the resume, and for the

23  first time in ten years went on some interviews

24  and found a job and got away from labs.

25        So yeah, I was ready to get out of

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  lab.  I was done with the whole fight.  I
2  was -- you know, it wasn't working out with the
3  partner relationships.  It was just turmoil
4  back and forth.
5          And when the Conrads approached and
6  there was an opportunity to potentially have
7  some level of support in the unwinding of what
8  was going on, I said, this is something we
9  should do.
10     Q.    Uh-huh.
11     A.    And it ended up blowing up even worse
12  than -- you know, even worse than it was.
13  'Cause not everybody wanted to do it.
14     Q.    Blake didn't went to do it?
15     A.    Oh, no.  Well, no, 'cause he had -- I
16  mean, he had the raw end of the stick, but I
17  felt like I kinda did too, because I was
18  obligated to stick around and work in his
19  laboratory for another year.  You know?
20     Q.    Right.
21     A.    Where I would have much rather been in
22  the life that I'm in now, on the path that I'm
23  on now, away from it all.  Right?
24     Q.    Right.
25     A.    I wasted a year of my life kinda,

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1 working there, but made the vest of it and got

2 through it.

3     Q.    Right.  Going back, what was that

4 dispute between Robert Saenz and Blake?  What

5 was that about?

6            MR. STEWART:

7               Object to form.

8     A.    Um -- I was working with Robert Saenz

9 very closely with the NextPhaseMD stuff.  I was

10 traveling a good bit to San Antonio and a lot

11 of places in Texas where his contacts are

12 really primary.  And the root of it was that we

13 were paying him way too much money, and it got

14 to a point where we confronted him and said,

15 man, we're not even paying ourselves.  Like,

16 we've got to have some relief.

17     Q.    Yeah.

18     A.    And he basically -- he bucked at it,

19 and he bumped back, but then ultimately came to

20 some resolution with him.  And me and Rhett

21 went and actually flew out there.  Because he

22 was gonna -- he was gonna put down lawsuits and

23 start the whole legal action thing about

24 collecting.  Which we didn't have any more

25 money to pay him, you know, it was like --

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

So me and Rhett went out here, talked
to him, appeased it, got to a real comfortable
spot.  He still was acting as our compliance
consultant in -- our internal compliance
coverage.  So we came to a pretty good
resolution.  His main thing was I understand
you guys are struggling right now, I'll
continue to stick around and support, just pay
my benefits and let -- let me continue to be an
employee at a lower level, and I'm happy to do
that, we can get cranking next time -- you
know, on the other end.  And, um -- it ended up
not happening.  Blake pulled the plug, and
Robert went ape shit, and it was -- it was a
crazy fight from there on.

    Q.    Lead to a lawsuit?

    A.    Yeah.

    Q.    Against who?

    A.    Uh -- Blake and Trinity.

    Q.    Okay.  Saenz against them?

    A.    Right.

    Q.    What does he want?  Or what did he
want?

    MR. STEWART:

        Object to form.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    A.    He wanted his full contract paid, plus

2  damages and all this other stuff.

3  EXAMINATION BY MR. LESUEUR:

4    Q.    How much money?

5    A.    A few hundred grand or so, a couple,

6  two grand.

7    Q.    How did that play out?

8    A.    They fought back and forth, a whole

9  bunch of crazy text messages back and forth, a

10  whole bunch -- you know, just a real turmoil

11  type of --

12    Q.    Right.

13    A.    -- type of battle.  Um -- we ended

14  up -- I say we.  Blake ended up collecting a

15  ton of information on Robert, as far as things

16  that he was doing, that Robert wouldn't have --

17  I mean, it started getting really, really

18  personal --

19    Q.    Yeah.

20    A.    -- is the bottom line.  So it got

21  really personal.  And a lot of the personal

22  things got documented, and basically, when

23  Robert saw the document that was put together

24  he said, all right, I'm leaving.  Y'all are

25  crazy.  I not getting into this.  'Cause he --

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  you know, he ended pulling together a pretty

2  significant, you know, case against him.  It

3  would have been -- it would have been pretty

4  bad for him to have that stuff exposed.

5      Q.  What was he doing that was bad?

6      MR. STEWART:

7          Object to form.

8      A.  Um -- I don't really recall the

9  details, to be honest. It was just -- I don't

10  know.

11  EXAMINATION BY MR. LESUEUR:

12      Q.  Like personal bad stuff, or Business

13  bad stuff?

14      A.  Um -- more personal, I think.  Just

15  more, like, reputational type stuff.

16      Q.  Okay.  I mean, you have any further

17  detail?  Any -- my mind is racing right now.

18      A.  No.

19      MR. STEWART:

20          Object.  I mean, there's no

21          relevance --

22      A.  Yeah, it's not relevant.  It's -- you

23  know, what, he was visiting titty clubs or

24  something.  I mean --

25      Q.  Okay.  Stuff like that?

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1      A.    I don't know.  Yeah.

2      Q.    Okay.

3      A.    I mean, it was just stuff that they

4  were fighting back and forth about.  And I'm

5  like, this a ridiculous.

6      Q.    Right.

7      A.    Hence, the like, I'm done.  Like, I

8  don't even want to be around this anymore.

9  Right?

10     Q.    The lawsuit just went away?

11     A.    Yeah.

12     Q.    No money exchanged?

13     A.    Right.

14     Q.    Okay.  And them you mentioned Blake's

15  reluctance to sell.  Why?  Why is that?

16         MR. STEWART:

17             Object to form.

18     A.    Um -- it wasn't a traditional sell.  I

19  mean, you know, we -- they were taking over the

20  ownership of Pathway that was suffering a bit

21  financially trying to get things up and going

22  with lab business and collections.  We had all

23  of the overhead from the employee side of

24  things.  So -- and we had a ton of vendors and

25  debt coming after us.  I mean, we had this

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    massive server, and we had all kinds of

2    systems, Merge is one of them, where it just

3    was -- we were upside-down to no end.

4           And so they basically came in and

5    said, we will help with this migration of this

6    transfer.  He worked with the owners of Pathway

7    for their deal of things.  But for us it was

8    basically, all of this infrastructure that you

9    guys have that is being used to support this

10    lab, we want to -- basically, they did kind of

11    a dual sort of approach here where they did the

12    buyout of the lab, and they did sort of a

13    transfer of ownership of some of the debts, all

14    of the operational debts, and some of the

15    assets, the active -- actively being used

16    assets.  So it a different kind of approach.

17      Q.  Right.

18      A.  And the bottom line came to they

19    didn't want Blake involved in any of it moving

20    forward.  Which I wasn't involved either,

21    except for a 1099 employee.  Right?  But I

22    mean, that -- that was the ticker is that he

23    just -- he didn't want to let go, basically, is

24    what it came to.

25      Q.  Yeah.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    A.    So I mean, yeah, from his standpoint,

2  you know, he got basically told, we're going to

3  take over all this stuff and move on, and you

4  can't come to the party with us.

5    Q.    Right.

6    A.    And so -- yeah, it just ended up being

7  a pretty difficult time.

8    Q.    Right.  You and Blake have any

9  disagreement at this time?

10    A.    Oh, yeah.

11    Q.    About?

12    A.    I mean, disagreements from the

13  standpoint of -- yeah, I would say so.

14    Q.    About what?

15    A.    Um -- I mean, it was just -- I don't

16  know.  I don't know how to articulate it, to be

17  honest.

18    Q.    All work-related stuff?

19    A.    Um -- yeah.  You could say that.

20    Q.    Like, business strategy decisions?

21    A.    Specifically around this point in

22  time?  I mean, it was one of those things where

23  it's like, I would rather this happen and try

24  to move on with a little assistance from these

25  guys who, you know, are promising to help, what

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  they're trying to bring, versus just riding

2  this ship and seeing if it'll actually float

3  with all the weights that we had tied behind

4  us.

5      Q.    Uh-huh.

6      A.    I chose Door No. A --

7      Q.    Right.

8      A.    -- and he didn't like that.

9      Q.    Okay.

10      A.    And so there was a lot of paranoia.

11  There was a lot of screaming and yelling.

12  There was a lot.

13      Q.    Paranoia like what?

14      A.    That I was working around him, trying

15  to make deals around him, and being sabotaging

16  of the whole situation, when I just was really

17  was trying to exit.

18      Q.    Right.  You weren't sabotaging

19  anything; right?

20      A.    That's right.

21      Q.    Okay.  You all, you Blake and Chad,

22  were personal guaranties on some notes too;

23  right?

24      A.    And Rhett.

25      Q.    And Rhett.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1     A.    Yeah.

2     Q.    Sorry.  I meant you, Blake, and Rhett.

3     A.    Right.

4     Q.    How many?

5     MR. STEWART:

6          Object to form.

7     A.   A ton.

8 EXAMINATION BY MR. LESUEUR:

9     Q.   A ton?

10    A.    Yeah.

11    Q.    Like different notes, or ton of money?

12    A.    Both.

13    Q.    Okay.  How many notes?

14    A.    I mean, the Merge Byline agreement was

15 about a hundred grand.  The building we had

16 signed up for, which had assets there to secure

17 it, but we were upside-down in that, it was

18 about -- I forget -- 2-point something million,

19 I think.  We had a Home Bank loan that was

20 about 1.2, 1.3 million.  We had another loan,

21 bank operational loan, that was about

22 600-700,000.  We had a couple others.

23    Q.    Were those all, um -- included in the

24 agreement with Robco that they were going to

25 handle?

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

MR. STEWART:

Object to form.

EXAMINATION BY MR. LESUEUR:

Q. Those things?

A. Uh -- yeah. They -- basically, when they came in they started to honor those debts. The started paying the minimums and just keeping them current. They went to work for us in the lab on the bigger loan, the big, uh -- Home Bank loan, 1.2 or something million. And they had a relationship with the bank, they went in, got it extended multiple times, when they really didn't want to do it. But Conrads came in, used their backing and their stout to basically walk in and get that done for us.

So all of the early signs of this thing was very much in that direction. And in the end they ended up satisfying a lot of 'em. But, you know, some of it was a lill too much.

The Byline thing with Merge was actually the straw that broke my back. And so it was $100,000, but they were going to put liens and everything else on my house for it.

And some of the things, at a certain point, the Conrads said, we can't -- we're not

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

gonna pay for all or these things, and we
helped with a lot of it.  And a lot of it Blake
kicked and screamed the whole way through, so
it kinda put a bad taste in their mouth to even
help.  But ultimately, they did help with a
good bit of it.

    Q.    Yeah.  Which ones do y'all remain on
the hook for now?  Do you know?

    A.    I'm not on any of them.

    Q.    That's good.  What about Blake and
Rhett?

    A.    Um -- I don't have a full update, to
be honest.  I mean -- yeah, I don't know what
they're doing.

    Q.    Why weren't -- why wouldn't you be
still on the hook, but they --

    A.    I went bankrupt.

    Q.    Okay.  When was that?

    A.    Um -- middle of '18.

    Q.    Is that filed in New Orleans, or?

    A.    Here.

    Q.    Baton Rouge?

    A.    Here.  Mandeville.

    Q.    Here in Mandeville?

    A.    Yeah.  Covington.

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

```
 1       Q.    What was the resolution of that; what
 2  happened?
 3       A.    Um -- what you mean?
 4       Q.    Like, what did that do to those debts?
 5  What happened?  It cleared those debts?
 6       A.    It cleared it, yeah.  Cleared and
 7  filed.  Yep.  And, you know -- and it's ironic,
 8  the Merge loan that we got was the thing that
 9  actually pushed it over.
10       Q.    What do you mean?
11       A.    Well, because they filed suit and they
12  were coming down here to put judgments on homes
13  and everything else.  And I got my family homme
14  and --
15       Q.    Byline was; right?
16       A.    Byline was.  Right.
17       Q.    All right.  And that one was resolved
18  in the bankruptcy?
19       A.    That's right.
20       Q.    Did y'all pay -- did Trinity pay
21  anything on that those Byline notes?
22       A.    Um -- yes.
23       Q.    How much?
24       A.    I don't remember.
25       Q.    Okay.
```

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    A.    We were paying the bills up until the

2    Conrads came in, and they started paying the

3    bills, essentially, on that.

4    Q.    Okay.

5    A.    And then eventually they --

6    Q.    So y'all were paying the minimums

7    after y'all purchased Merge?

8    A.    Um --

9    Q.    If there was a hundred grand left.

10    A.    Probably so, yeah.

11    Q.    Yeah.

12    A.    Interest was just getting hit.  You

13    know?

14    Q.    Yeah.

15         Just one more document to show you

16    which I'm going to mark as Exhibit 13.

17    (Tendering.)  Do you recognize this?

18         (Exhibit 13 was marked for

19    identification and is attached hereto.)

20    A.    I do.

21    EXAMINATION BY MR. LESUEUR:

22    Q.    All right.  What is this?

23    A.    It's all the documentation for the

24    buyout and takeover of all the assets and the

25    debts, and the -- you know, everything that we

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1   just talked through.

2        Q.    By the Conrads?

3        A.    By the Conrads, yeah.

4        Q.    Okay.  And then on the -- just to be

5   super clear, on Page 13 -- there's page numbers

6   on the bottom right -- that's your signature at

7   the top?

8        A.    Yes.

9        Q.    Okay.  I really only want to ask about

10  the debts that are listed on the second page.

11  I know you mentioned some of these before.

12       A.    Yep.

13       Q.    Any other debts, either Performance,

14  or Trinity, or Prestige, that existed at the

15  time of the sale other than those listed at the

16  top of Page 2?

17            MR. STEWART:

18                 Object to form.

19       A.    Um --

20  EXAMINATION BY MR. LESUEUR:

21       Q.    Like major commercial loans, I guess.

22            MR. STEWART:

23                 Same objection.

24       A.    Personally guaranteed loans, or just

25  general, with any --

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

EXAMINATION BY MR. LESUEUR:

    Q.    Either.

    A.    Oh, yeah.

    Q.    Okay.  Which other ones?

    A.    Um -- you got Xifin -- it's a billing software.  You got DocuSign.  You got some financial system that we were using.  I forget the name of it.  Financial software.  We had some HR portal that was bought that was implemented right before the shutdown.  You got Dell who finance all the servers.  You got a dozen more.

    Q.    Dozen more?

    A.    I mean, you got a lot.

    Q.    Yeah.

    A.    You know?  Those are the big ones, probably.

    Q.    Yeah.

    A.    And there may be three or four other big ones maybe.  But there were a lot more than just that.

    Q.    In terms of dollar amounts, when are we talking here?

        MR. STEWART:

            Object to form.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

```
1        A.    Four or five million.

2   EXAMINATION BY MR. LESUEUR:

3        Q.    Four or five million?

4        A.    I would think.  I mean, yeah.  Just

5   the list I gave you is probably thee --

6        Q.    Yeah.

7        A.    Two, maybe.

8        Q.    Okay.  Million; right?

9        A.    Uh-huh.

10       Q.    Was there any thoughts or

11  consideration, I guess before this -- before

12  the Robco came in and those discussions

13  started, was there any consideration from

14  Trinity and Performance's standpoint of buying

15  a new LIS system to replace Merge?

16       A.    Um -- I would say no, not necessarily.

17  I mean, I think at a certain point it was kind

18  of, uh -- you know, my early assessment of

19  grass is not greener on the other side came to

20  fruition and everybody says, Jesus, this was

21  not a good idea.  But no, I mean, at that

22  point, I -- we weren't really in a strategy

23  mode -- you know, mindset to say that we gotta

24  go and buy another LIMS.  Like, that's just not

25  happening.  Right?
```

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    Q.    Right.

2    A.    Once I took over the IT efforts of

3 Pathway under Robco, yeah, it was a clear line

4 of sight, and it was something that we needed

5 to look into.  Um -- that system was hosted on

6 the servers -- Trinity's servers still, so all

7 the infrastructure that Pathway was running on

8 was our servers.  That was the deal from the

9 start with Pathway.  So that was one -- you

10 know, when Robco came in, I mean, getting

11 everything off of that environment was, like,

12 100 percent priority for Robco and them.

13    Q.    Right.

14    A.    And so, yeah, we changed everything.

15 We went through with a whole new everything.

16 You know, a lot of the -- a lot of the bells

17 and whistles that had on our server and our

18 infrastructure that were being used, he was,

19 like, ah -- you know, if I don't own it I don't

20 want to use it, and we completely everything at

21 that point?

22    Q.    So I think you mentioned earlier you

23 don't own any -- have any ownership interest in

24 Trinity anymore.  Right?

25    A.    That's right.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

```
 1      Q.   When did you get rid of that?

 2      A.   All of that was early '16.  '17.  '17.

 3      Q.   Early '17.

 4      A.   April, I think, was the date.

 5      Q.   Around time of this Robco sale?

 6      A.   It's all the same.

 7      Q.   All the same.

 8      A.   Yeah.

 9      Q.   Why did you give up your ownership

10   interest?

11           MR. STEWART:

12                Object to form.

13      A.   Like I said, I was not interested in

14   fighting the fight that was going on.

15   EXAMINATION BY MR. LESUEUR:

16      Q.   Against Merge?

17      A.   No.  No.  Against --

18      Q.   Blake?

19      A.   Everything.

20      Q.   Against everything.

21           MR. STEWART:

22                Object to form.

23      A.   I just --

24   EXAMINATION BY MR. LESUEUR:

25      Q.   Wanted out?
```

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    A.    Right.   I didn't want to continue to

2  fight it.   So, you know -- and at that point I

3  was getting a lot of -- a lot of fight.   There

4  was a lot of fight going on with Blake at that

5  point.   You know, he thought I -- I mean, it

6  was -- it is what it is.   So instead of trying

7  to settle things out kind of smoothly, it went

8  the opposite direction.   And I was like -- I

9  wasn't intending on giving up ownership when

10 this thing happened.   But once it started

11 really going up, I walked away.

12     Q.    Yeah.

13     A.    I didn't have an intention --

14     Q.    And you didn't take anything.   Right?

15     A.    That's right.   I didn't want anything.

16     Q.    What about Rhett; same thing?

17     A.    He gave -- he tried to walk away a lot

18 earlier, actually.

19     Q.    Oh, really?

20     A.    Yep.

21     Q.    When?

22     A.    I wanna say it was '16.   Earlier '16.

23     Q.    After the sanctions?

24     A.    That's right.

25     Q.    Why didn't -- he wanted a buyout or

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  something?

2      A.    He didn't want any money either.  He

3  wanted to walk away.

4      Q.    Oh, really.

5      A.    Yeah.  He just wasn't -- he wasn't

6  comfortable, he was having some health issues,

7  he just wasn't, um -- he just --

8      Q.    Wanted out?

9      A.    Personal reasons.

10     Q.    Why didn't he, though?  I mean, could

11  he have?

12     A.    He -- I mean, he technically did.  I

13  mean, he submitted the document that basically

14  said I want out.  I'm sure you saw it.  He kind

15  of stuck around a little bit to help out a

16  little bit here and there.  Um -- and so yeah,

17  he had a minimal role at Pathway, and just

18  kinda helped focus on that, and he still works

19  with those guys a little bit today so.  He kept

20  a good relationship with 'em and pushed through

21  with the Robco guys.  But yeah, he didn't

22  really have any interaction with the rest of

23  it.

24     Q.    All right.  Oh, one last question:

25  Has Blake asked you to testify at trial?

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1     A.   No, he hasn't.

2     Q.   And he hasn't asked you to provide any

3 information for this lawsuit or anything like

4 that?

5     A.   No.

6     Q.   Any documents?

7     A.   Um --

8     MR. STEWART:

9         I think thing you subpoenaed him.

10    Right?

11    MR. LESUEUR:

12        Chad?

13    MR. STEWART:

14        Didn't you subpoena him?

15    MR. LESUEUR:

16        Oh. Yeah. Yeah.

17    A.   So I pulled some documents early on.

18 EXAMINATION BY MR. LESUEUR:

19    Q.   That would be CEH?

20    A.   Yeah. So yeah -- yeah, I pulled as

21 much as I could out. And, like, the

22 competitive analysis stuff, and those kind of

23 things, like, all that stuff was all pulled for

24 that.

25    Q.   Okay. anything other than that?

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1      A.   No.

2      Q.   Okay.  And has he asked that you

3   testify at trial?

4      A.   No.

5      Q.   Okay.  All right.  That's all I got.

6   EXAMINATION BY MR. STEWART:

7      Q.   I just got a few questions for you,

8   Chad.

9      A.   Sure.

10     Q.   If you go back to Exhibit 3, that was

11  the e-mail chain that had the marketing

12  materials on it.

13     A.   Yeah.

14     Q.   All right.  So this was sent to you on

15  November 19th, 2015, which is before the

16  purchase.  Correct?

17     A.   Yep.

18     Q.   Okay.  So if we go back in here, I

19  want to look at one document in particular, one

20  of the attachments.  It's the attachment that

21  begins Solving Remote Processing Issues,

22  Granite Diagnostic Laboratories, Florida.

23          Do you see that?

24     A.   Yep.

25     Q.   I really just want to draw your

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1  attention to the paragraph under the heading

2  The Solution.

3        You see that?

4    A.    Yep.

5    Q.    So I'll represent to you that the

6  beginning of this is this Granite Diagnostic

7  Laboratories identifying a particular problem.

8  They describe it as the challenge, and then

9  they have here the solution.  It says, after an

10 investigation of various LIS solutions in the

11 healthcare marketplace, GDL chose Merge's

12 Healthcare Merge LIS$^{TM}$.  Of primary concern to

13 GDL was Merge LIS's scalability and

14 configurability to meet the needs of their nine

15 individual labs.  GDL was also pleased with the

16 internet accessibility that it seamlessly

17 integrated into Merge LIS's core design.  The

18 system's internet connectivity features were

19 designed to meet the highest healthcare

20 standards for security, including user names

21 and passwords, industry standard hardware

22 security, encryption of all patient data

23 transmitted, SSL certificates for internet

24 access, and audit logging.

25        I'd just like to kind of break this

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1   down a little bit.

2       A.    When was this dated?  I'm curious.  Do

3   we know when this thing was written?

4       Q.    Well, we can see on the front it was

5   provided to you on November 19th --

6       A.    Right.  No, I'm just curious of the --

7   the point in time in history when this actual

8   solution -- you know, challenging solution was

9   discussed.  It would be relevant.

10      Q.    Why would that be relevant to you?

11      A.    Well, because my prediction here is

12  that either Merge wrote this or this is a

13  laboratory such as the one we worked with in

14  California who was an old gentleman who doesn't

15  have a clue or what computers are, has been

16  pushing paper around this laboratories for the

17  last 20 years, and now he's looking at a system

18  that has an internet-based environment, and is

19  like, wow, we can actually log into an

20  environment and actually do something without

21  having paper going around.

22          So it would be very relevant to have a

23  profile of who this person is and at what point

24  in time --

25      Q.    Uh-huh.

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1    A.    -- they started their business, and

2    what point in time this survey took place.

3    Q.    Okay.

4    A.    Because yeah, the things that are

5    listed here -- this guy doesn't know if data is

6    encrypted.  Right?  I mean, honestly, that's

7    how I would look at it from a technology side

8    of things.  Like I would look at this and say,

9    okay.  Anyways --

10   Q.    Well, let's just --

11   A.    -- I digress.

12   Q.    Let's just take it piece by piece.

13        It says here that GDL was pleased with

14   the internet accessibility that it seamlessly

15   integrated into Merge LIS's core design.

16        In your experience, do you agree with

17   the statement that the internet accessibility

18   is seamlessly integrated into Merge LIS's core

19   design?

20        MR. LESUEUR:

21             Objection to form.

22   A.    It doesn't actually make sense.

23   Internet accessibility is integrated into the

24   core of Merge's design.  Internet accessibility

25   is just a way you access a system.  It would be

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  like saying that their -- their computer access

2  is integrated into their core design. It's

3  literally how the front end is exposed. So --

4  no, I -- I wouldn't -- I don't -- I don't

5  really receive [sic] any of the stuff written

6  here, to be honest. Because you break it down,

7  it doesn't really make much sense. Internet

8  accessibility is integrated into the core

9  design of Merge. It's just a web-based system.

10  It's a website.

11        MR. LESUEUR:

12           It has internet.

13    A.   It has -- it's able to be looked at on

14  the internet. Like, it doesn't have any -- you

15  know, anyways, no, I don't -- I don't look at

16  that as being anything really specific. It's

17  just a play on words to say it's a web-based

18  environment.

19  EXAMINATION BY MR. STEWART:

20    Q.   Okay. Let's take he next sentence.

21  The system's internet connectivity features

22  were designed to meet the highest healthcare

23  standards for security, including user names

24  and passwords.

25        Do you agree with that statement based

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  on your experience?

2     A.   No.

3     Q.   Okay.  And why not?

4     A.   Well, just because you have to enter a

5  user name and password to get in past the home

6  page, or past the login screen, doesn't mean

7  that it actually complies to the standards of a

8  medical regulated industry.  So beyond the

9  point of having two text fields that you enter

10  values in to log in, that doesn't have any

11  relevance on the security aspects of it.

12     Q.   And in your experience, you were

13  describing the password issue where disabled

14  users were still able to access the system?

15     A.   Yep.

16     Q.   Would that seem to be contradictory to

17  this statement that you have the highest

18  healthcare standards for security, including

19  user names and passwords?

20     A.   Yep.  That would be one of 'em.

21     Q.   Okay.  What about the next statement,

22  the highest healthcare standards for security,

23  including user names and passwords, and

24  industry standard hardware security.

25     Do you have any idea what that means

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1  or could refer to?

2       A.   Um -- lemme see.   Hardware security --

3  industry standard --

4       Q.   Yep.

5       A.   Yeah.   So they were using a free,

6  out-of-date, MySQL database that was probably

7  five to ten generations old which, documented

8  online, had security holes in it.   There's

9  patches available, there's upgrades available.

10 But when Merge actually dropped their platform

11 onto our servers, they did that with a very,

12 very, very, very old data base instance.

13          Um -- so from that standpoint alone,

14 no.   The actual hardware and security of the

15 infrastructure, um -- it's -- it was all pretty

16 old stuff.   You know.

17      Q.   So with your background and experience

18 with Merge, you would disagree that they have

19 the highest healthcare standards for security,

20 including industry standard hardware security.

21          MR. LESUEUR:

22             Object to the form.

23      A.   Yeah.   I would say they were not

24 secure to any standard.

25 EXAMINATION BY MR. STEWART:

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1      Q.   Okay.   The next -- the same for the
2  next, high standards for encryption of all
3  patient data transmitted.   Do you have a reason
4  to agree or disagree with that?
5      A.   Um -- as far as looking specifically
6  at the transmission of data, they use HL7, they
7  had SSL, which is the basic structure of
8  accessing a site and having security over the
9  wire.   So I would say, specifically around the
10  in transit part, I have no knowledge of any
11  major lack in that part.   But if you dig deeper
12  into the patient data side, there's significant
13  problems but, um --
14      Q.   And what about this last -- audit
15  logging.   Highest healthcare standards for
16  audit logging.   Do you have a reason to
17  disagree or agree with that statement?
18      A.   We didn't have any -- there was no
19  audit logging in our system, so we didn't have
20  access to any of that.
21      Q.   So you would say they don't --
22      A.   They don't have --
23      Q.   The highest standards.
24      A.   Yeah.   They don't.
25      Q.   Okay.   And you have testified earlier

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1  that Merge is a web-based system.  That's one

2  of the things that it's advertising here;

3  correct?

4      A.   Yeah.

5      Q.   So does that mean that anybody with a

6  computer who types in the proper URL or website

7  can access Merge?

8      A.   They can get to the home page -- the

9  login page, yes.

10     Q.   And if they have the password, they

11 can get into, say, Pathway's --

12     A.   Yes.

13          MR. LESUEUR:

14              Object to the form.

15     A.   That's yes.

16 EXAMINATION BY MR. STEWART:

17     Q.   Can that person access the database

18 that you were talking about before from that --

19 from any computer in the world?

20     A.   No.

21     Q.   Okay.  So that's the point that you

22 were making when you said that somebody would

23 have to go in through the door and have the

24 credentials, in order to see the database.

25     A.   Yes.

JOHNS, PENDLETON, FAIRBANKS & FREESE
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

EXHIBIT B

1      Q.   But could that be exposed through this

2  Apache Tomcat problem that you identified?

3      A.   Yes.  To some extent, you wouldn't

4  have direct access to the database, but you

5  could work out ways to pull the data out of the

6  database.  You could actually extract a backup

7  file, so to speak, or a data dump of that

8  information.

9      Q.   Did Merge ever tell you that you

10  should change your Apache password so that it

11  was not the same as that for all the other --

12      A.   No.  No.  No.

13      Q.   And just the last thing:  That data

14  leak problem.  The workaround for that was a

15  reboot of the system every week.  Is that an

16  efficient workaround?

17          MR. LESUEUR:

18             Object to the form.

19      A.   No.

20          MR. STEWART:

21             Okay.  That's all I have.

22  EXAMINATION BY MR. LESUEUR:

23      Q.   Just one follow-up.  I promise.

24      A.   I'm charging for this one.

25      Q.   In that document, it mentions a few

**EXHIBIT B**

1    times, and you mentioned a few times, standards

2    in the healthcare industry for security.

3         A.    Yeah.

4         Q.    Is there any -- what source do I

5    look -- where would I find the standards?

6    Like, what -- is there a document?  A website?

7         A.    Um -- yeah, you -- I mean, you could

8    go -- you could Google healthcare, um --

9    software standards, security -- software

10   security standards, and you'll find a whole

11   slew of things.  Um --

12        Q.    Authored by who?  Like, is this, like,

13   from the government?  These are laws, or --

14        A.    Yeah.  You'll have -- you'll have --

15   you'll have regulatory bodies out there, y'all

16   have government, y'all have Medicare, CMS,

17   those types of things.

18        Q.    Okay.

19        A.    I mean, HIPAA has -- and I don't know

20   offhand exactly the name of the groups, but

21   there are, like, HIPAA, like, regulatory bodies

22   who kind of write the book --

23        Q.    Right.

24        A.    -- that everyone abides by.

25        Q.    So these are different -- coming from

1  different sources.  Right?

2        MR. STEWART:

3           Object to form.

4    A.    They all kind of inherit from each

5  other, so to speak.  Right?  So --

6  EXAMINATION BY MR. LESUEUR:

7    Q.    It's not a single source.

8    A.    Um --

9        MR. STEWART:

10          Object to form.

11    A.    It does all trickle back up to the

12  HIPAA rulebook.  Right?

13  EXAMINATION BY MR. LESUEUR:

14    Q.    Yeah.

15    A.    So HIPAA does present that.

16    Q.    Okay.

17    A.    Another example is, like, the

18  meaningful use thing.  Right?  There's a whole

19  lot of meaningful use regulations and rules

20  that have been written.  Those sort of coincide

21  with the HIPAA rules and requirements and other

22  things.

23    Q.    Okay.

24    A.    So no, not to my knowledge.  I don't

25  know the exact name of the source.  But yeah,

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

```
1  it out there for sure.
2      Q.   Okay.
3      A.   Yeah.
4      Q.   That's it.
5      A.   Yeah?
6      Q.   That's it.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

WITNESS' CERTIFICATE

I, **CHAD EDWIN HOWELL**, do hereby certify that the foregoing testimony was given by me, and that the transcription of said testimony, with corrections and/or changes, if any, is true and correct as given by me on the aforementioned date.

_____          _____
DATE SIGNED             **CHAD EDWIN HOWELL**

_____ Signed with corrections as noted.

_____ Signed with no corrections noted.

DATE TAKEN:  July 19th, 2018

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

# R E P O R T E R ' S   P A G E

I, JOSEPH A. FAIRBANKS, JR., Certified Court Reporter in and for the State of Louisiana, the officer, as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434(B) of the Louisiana Code of Civil Procedure, before whom this sworn testimony was given, do hereby state for the record;

That due to the nature of spontaneous discourse in the foregoing proceedings, dashes (--) have been used to indicate pauses, changes in thought, interruptions by other speakers, and/or talkovers;

That this is a complete transcription, and that dashes (--) do not indicate that words have been left out of this transcript;

That the phrase (spelled phonetically) is used to denote words and/or names which could not be verified through available references resources.

_____

JOSEPH A. FAIRBANKS, JR., CCR, RPR

CERTIFIED COURT REPORTER #75005

**JOHNS, PENDLETON, FAIRBANKS & FREESE**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

**EXHIBIT B**

1

2                    REPORTER'S CERTIFICATE

3

4              NOTE: This transcript certification is
   valid only when accompanied by my original
5     signature over my state seal.

6

7              I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,
   Certified Court Reporter in and for the State
8     of Louisiana, as the officer before whom the
   foregoing was taken, do hereby certify:
9              That the witness was sworn by me upon
   authority of R.S. 37:2554 and did testify as
10    set forth in the foregoing pages;
             That said proceeding and testimony was
11    reported by me in the stenotype reporting
   method, was thereafter transcribed and prepared
12    by me or under my personal direction and
   supervision, and is a true and correct
13    transcription to the best of my ability and
   understanding;
14             That this transcript was prepared in
   compliance with transcript format guidelines
15    established by statute or by rules of the
   Board;
16             That I am knowledgeable of the
   arrangements, financial and otherwise, with the
17    person on entity arranging for reporting
   services, and that I have acted in compliance
18    with the prohibition on contractural
   relationships as defined by the Louisiana Code
19    of Civil Procedure Article 1434 and in rules
   and advisory opinions of the Board;
20             That I am not related to counsel or to
   the parties herein, nor am I otherwise
21    interested in the outcome of this matter.

22

23    _____

24         JOSEPH A. FAIRBANKS, JR., CCR, RPR

25         CERTIFIED COURT REPORTER #75005

## A

**a.m** 181:9
**AB** 120:1
**abandon** 54:12
151:2
**abandoned** 94:13
**abandoning** 184:22
**abbreviation**
152:24
**ABC123** 43:25
**abide** 118:14
**abides** 313:24
**ability** 141:24
215:3 229:1
318:13
**able** 6:9 21:10
37:20,21,22 38:15
47:2 54:9,19,21
60:8,10 62:9,14
69:14 75:4 86:18
87:9 96:18 97:22
129:25 130:2
133:17 144:21
185:22 186:18
187:7 205:9 206:7
208:20,22 210:10
210:13,22 213:24
214:2 218:12
226:24 228:21
235:7 246:10
250:14,25 255:4
262:25 263:6
267:16 270:25
271:24,25 272:1
307:13 308:14
**Abney** 9:24 10:1
270:13
**abnormal** 178:12
**absolute** 213:20
**absolutely** 81:8
98:13 209:8
249:11
**absorb** 237:5
**acceptable** 124:22
**accepting** 101:5
**access** 37:22 48:13

85:10 86:11 89:11
89:23 90:4,12,14
90:17,22 93:16
94:18 203:13,23
206:7,20 208:25
209:2,12,20
211:10 243:14,18
243:19,19,21
244:15,24 246:7
246:15 248:23
250:2 261:8,12,13
261:23 262:1,5
263:3,6,12,22
264:1,4,6,7,12,13
265:12 268:21
271:8 304:24
306:25 307:1
308:14 310:20
311:7,17 312:4
**accessed** 89:15
265:7 266:13
**accesses** 267:17
**accessibility** 304:16
306:14,17,23,24
307:8
**accessing** 310:8
**accession** 225:6
**accidental** 223:19
224:9,23
**accidentally** 216:24
219:4,6
**accompanied** 318:4
**account** 88:23
203:4,6 206:4
268:7
**accounting** 266:4
**accounts** 25:6,6
89:13 203:12
**accumulated**
256:15
**accurate** 68:15
133:21,22 175:22
**accurately** 59:5
**acknowledge** 227:7
**acronym** 86:9
**act** 210:15

**acted** 318:17
**acting** 283:3
**action** 1:4 26:10
282:23
**active** 203:12 204:3
271:23 287:15
**actively** 287:15
**activity** 37:19
91:23 92:7,8
266:23
**actual** 51:4 141:24
148:25 167:3
194:24 222:10,16
236:23 237:2
305:7 309:14
**ad** 22:21
**add** 164:11 221:25
222:1
**add-on** 33:22
**added** 164:16 222:3
222:6 226:21
227:3
**adding** 218:2
**addition** 164:2
**additional** 123:5
209:16 258:20
**address** 5:12,15
**addressed** 101:18
115:22 264:24
**adhere** 125:4
**adjust** 139:9
221:25 234:21
**adjusted** 234:13
**adjustments**
138:25
**admin** 262:13,19
263:7,8 264:6,7
267:20
**admin123** 268:6
**administering** 4:24
**administrative**
183:2
**admins** 263:24
**admirals** 122:10
**advance** 98:5
**advertising** 311:2

**advice** 132:13,24
165:23
**advisory** 318:19
**affect** 195:7
**affirmatively** 177:5
**aforementioned**
4:4 316:8
**afternoon** 5:7
**age** 81:16,19
**agency** 108:8
**agent** 104:17
**agile** 59:6 60:1
**ago** 9:2 256:16
270:10
**agree** 66:18,20,25
67:12 153:17,20
306:16 307:25
310:4,17
**AGREED** 4:2
**agreement** 56:25
167:10 176:1
177:19 180:13
290:14,24
**ah** 223:4 298:19
**ahead** 36:25 159:13
159:16 217:4
**AL** 1:5
**alerting** 178:1,2
**alerts** 37:21
**algorithm** 21:3
**alleges** 161:10
181:15
**allow** 234:12 235:9
246:6 261:25
**allowed** 21:3 24:16
25:8 255:7
**allowing** 261:12
**allows** 86:1 204:1
211:17
**amount** 48:16
59:24 70:19 224:8
**amounts** 75:1
105:2 296:22
**analysis** 15:7 16:11
59:22 138:3 257:1

302:22
**analysts** 77:20
**analytes** 216:22
**analytics** 40:25
**Anand** 9:14,17,21
76:10 77:3
**and/or** 176:17
316:6 317:6,14,19
**android** 39:18
**annual** 21:4
**answer** 4:13 6:7,14
12:11 42:6 45:9
50:7 52:18 58:25
67:8 68:6 83:15
103:20 104:6
107:11 123:18
140:20 164:25
171:11 176:6
198:19 203:21
220:14 224:20
274:12
**answer's** 46:2
**answering** 6:1
**Antonio** 282:10
**anybody** 10:5
48:13 84:11 90:20
106:11 111:22
112:13 136:25
144:9 145:10
158:19 174:20
177:25 178:1
181:1 246:13
250:6 251:3
271:19 311:5
**anybody's** 205:10
**anymore** 8:6
120:25 127:20
129:16 139:15
165:17 279:18
280:11 286:8
298:24
**anytime** 48:9
116:25 225:10
**anyway** 52:22 53:1
55:5 56:3 57:6
76:21 110:16

118:15 131:7
146:4 165:20
183:25 257:20
**anyways** 306:9
307:15
**ap** 90:8
**Apache** 170:3
243:4,7 244:4,6,9
244:24 245:2,24
247:3 248:14
250:14,15 251:11
251:24 257:17,18
265:1 268:20
312:2,10
**Apart** 13:16 18:8
251:2
**ape** 283:14
**app** 38:23 174:4
**appear** 239:4
**APPEARANCES**
2:1
**appears** 177:10
180:6 223:6 237:9
**appeased** 283:2
**Apple** 80:7,9
**apples** 153:13,13
**application** 37:13
40:1 62:23 86:2
95:8
**applications** 37:22
**applied** 126:1
152:25
**apply** 167:19
**appreciate** 23:20
**approach** 152:2,11
257:21 268:6
277:23 287:11,16
**approached** 278:18
278:25 279:1,2
281:5
**approaches** 235:4
**appropriate** 85:14
86:10
**appropriately**
225:22 234:24
**approval** 109:6

167:11,16 168:22
208:17 233:24
263:23
**approve** 188:18,18
188:19 231:8
232:18 264:1
**approved** 28:1
54:16 87:4 109:1
167:15
**April** 23:1 73:20
74:16 191:1 277:2
299:4
**architectural** 31:18
44:8
**area** 46:14 47:25
71:1 270:25
**areas** 29:11 40:3
70:1 71:11 142:6
171:6 185:20
221:13 260:1
262:5
**arms** 70:22
**arrangement** 71:16
**arrangements**
318:16
**arranging** 318:17
**art** 82:5 144:20
183:21 210:12
249:25
**Article** 317:7
318:19
**articulate** 288:16
**arts** 15:11
**Asher** 12:1
**asked** 11:7 14:1
132:17,18 137:6
159:6 162:14
169:13 170:14,22
171:18 226:4
227:22 228:14
278:8 301:25
302:2 303:2
**asking** 5:25 123:22
125:21 132:16,16
167:8 168:16
170:2 171:4

227:19
**asks** 138:21 181:7
199:13
**aspect** 42:20
**aspects** 18:2 44:8
44:10 308:11
**assessment** 297:10
**assessments** 26:3
**assets** 287:15,16
290:16 294:24
**assistance** 14:4
288:24
**associate** 228:2
**assume** 6:14 86:17
88:25 121:6 162:5
163:1 174:17
202:5,23 210:9
241:9
**assumption** 168:18
211:18
**assumptions**
168:25 169:1
211:14,24 212:14
212:15
**assurance** 147:2
**at** 59 126:5
**athletes** 26:4
**attach** 228:19,22
229:1
**attached** 98:23
112:21 148:19
154:16 155:21
163:4 172:23
176:18 179:1
192:10 199:19
202:9 228:25
242:4 253:8,13
270:8 272:19
294:19
**attaching** 202:12
**attachment** 199:20
202:19,19 253:1
258:3 303:20
**attachments**
150:13 155:17
157:5 158:8

303:20
**attack** 67:21
**attempts** 91:17
**attention** 56:16
57:3 304:1
**attorney** 5:9
**attorneys** 12:14
13:17,21
**audibly** 198:19
**audit** 265:3 266:3,6
266:9 274:24
304:24 310:14,16
310:19
**Aurora** 146:6,23
**authenticate** 204:1
204:17
**authenticating**
88:23
**authentication**
95:5
**author** 125:10
**Authored** 313:12
**authority** 178:15
261:23 318:9
**auto** 85:14 88:12
88:12
**automate** 158:12
**automated** 24:15
62:15 214:8,8
**automatic** 260:10
**automatically**
222:3
**available** 309:9,9
317:20
**Avenue** 2:5
**avoid** 260:16
**avoided** 190:15
**aware** 109:9 112:12
112:16 123:13
133:25 189:9
250:6 269:5
**awesome** 27:10

---
**B**
---
**B** 3:8 176:18,22,25
**bachelor's** 15:9,10
15:18

**back** 13:3 16:16
25:16 36:1 41:4
44:20,24 62:21
64:24 70:3,18
76:18 93:9 94:2
95:1 102:20
111:19,22 112:10
112:25 113:2
120:4 122:19
125:10,19 126:18
131:12 135:2
136:8 141:14
142:8 145:21
146:1 154:5
155:21 176:12
189:2 192:25
194:10 199:20
202:20 222:7
237:17 243:20,22
257:9 271:17
273:23 274:8
275:20 276:4
278:5 281:4 282:3
282:19 284:8,9
286:4 291:21
303:10,18 314:11
**background** 14:21
14:22 15:23 27:4
51:12 63:13 64:17
65:4,8,9,18,23
66:3 104:4,18,19
138:11 265:10
309:17
**backgrounds** 20:11
65:2
**backing** 206:7
291:14
**backlog** 197:15
**backup** 312:6
**bad** 128:12 137:8
268:24 285:4,5,12
285:13 292:4
**badge** 167:20
**ball** 52:12
**band** 55:22
**bandwidth** 77:15

Bang 178:21
bank 205:23,23
  279:23 280:3
  290:19,21 291:10
  291:11
bankrupt 292:17
bankruptcy 293:18
banshee 55:11
barbiturates 221:8
BARRASSO 2:10
base 169:2 232:10
  264:25 309:12
based 39:25 43:24
  47:17 49:17 90:22
  124:25 125:2
  153:2 187:20
  214:2 235:3 241:3
  241:4 262:22
  265:13 307:25
bases 32:4
basic 44:9 85:15
  95:4,7 119:20
  144:13,14 268:14
  310:7
basically 8:21
  12:21 13:10 16:7
  16:12 17:24 18:2
  19:6,17,21 21:2
  21:12,14,16,18,24
  22:1,3,11,25 23:7
  23:10 24:24 25:3
  26:11,17,23 27:12
  29:10 30:7,8,16
  31:16 32:7,18
  33:11 34:8,18
  37:14,18 40:22,23
  41:3 48:1 49:13
  51:10 53:13,19
  54:3,12,17 55:3
  56:16,24 57:5
  58:14 60:23 62:16
  70:25 71:13,18,20
  76:4,5,14 78:14
  80:3,17,18 81:9
  81:25 83:2,6 86:4
  88:14 89:22 91:3

92:24 93:8 94:13
  94:24,25 99:10
  100:21 101:14
  108:15,20 109:19
  110:1 111:1,4,5
  115:9 117:25
  119:19 120:9
  122:19 125:16
  129:20 130:10
  146:11 155:13
  156:13 165:8
  182:8 188:12,20
  189:4 194:2
  195:15 196:1
  197:13 201:4,5
  203:3 205:6,8
  211:16 213:10,23
  214:5 216:17
  221:3,15 222:6
  225:24 227:2,6
  229:18 231:19
  232:7,25 234:17
  236:17 237:17
  238:9 239:18
  240:4 243:3
  244:14 250:13,23
  251:16 260:3,11
  263:9 267:25
  268:5 277:16,17
  277:19 278:8,23
  282:18 284:22
  287:4,8,10,23
  288:2 291:5,15
  301:13
basics 45:2 96:8
batch 231:9,16
  232:3 236:20
  238:8 239:13
  240:1
batched 233:19,21
  234:4,5
Bates 113:23 114:5
  172:21
bath 221:12
Baton 292:22
battle 284:13

beacons 38:20
bearings 109:3
becoming 30:13
bed 22:3
began 256:2
beginning 53:12
  57:13 80:21
  114:18 192:15
  252:22 253:2
  259:2 304:6
begins 303:21
belabor 117:16
believe 31:5 36:7
  66:10 72:25 73:20
  75:2,22 87:17
  134:16 141:10
  173:19 180:20
  207:3 217:13
  275:6
bell 12:6,8,10
bells 298:16
Ben 81:2,12,21
  83:19 84:7 242:15
  246:20 251:2,5
  252:10 256:22
  257:4 259:10
benefit 139:8
benefits 71:18
  283:9
best 25:4 43:1,10
  43:15,17,20 44:9
  44:10,11,25 45:5
  45:18,23,24 47:2
  47:3 49:12 60:4
  85:7,16 112:11
  118:9 151:25
  168:19 171:2
  204:24 211:22
  249:12 267:15
  318:13
bet 13:2
better 29:14 35:15
  45:20 57:6 59:1
  66:1 76:5 101:15
  110:3 233:1
beyond 38:3 47:18

48:1 49:22 134:14
  308:8
big 24:22 27:19,20
  28:14 59:17 69:9
  75:25 93:10 116:7
  118:20 122:2
  138:16 141:18
  155:15 164:25,25
  168:18 225:19
  234:18,19 236:12
  236:13,16 247:24
  263:7 265:11,20
  279:23 291:9
  296:16,20
bigger 20:14 55:3
  69:9 70:6 120:23
  264:9 291:9
biggest 34:6 139:8
bill 27:22 41:9
  56:24 217:12
billed 54:14
billing 41:10,12
  220:12 296:5
billion 168:21
bills 30:7 220:1
  294:1,3
binder 119:18
biometric 19:14
  25:20
birth 48:5,5
bit 11:13,13 14:21
  21:21 23:12,13
  30:14 56:13 57:4
  71:4 73:24 75:23
  84:16 94:3 95:2
  143:1 145:20
  152:10 162:10,12
  186:23 193:11
  208:22 253:24
  257:14 280:2,2
  282:10 286:20
  292:6 301:15,16
  301:19 305:1
bite 36:5,11 159:14
Bivens 196:11
  197:20

black 62:23 64:2
  78:10,11 104:1
  127:17
Blake 8:3 9:1 25:25
  26:12,18 51:5
  64:24 65:18,23
  98:19 110:6 113:9
  113:15 121:15
  125:18,19 126:21
  130:17,18 134:6
  138:5 149:20
  162:25 165:22
  174:20,22 175:15
  178:1 242:15,18
  253:13,25 279:24
  281:14 282:4
  283:13,19 284:14
  287:19 288:8
  289:21 290:2
  292:2,10 299:18
  300:4 301:25
Blake's 65:9 253:11
  255:20 286:14
blanketed 263:8
blew 14:18 57:9
blood 128:22
  156:15 176:6
blowing 281:11
blurt 73:14
board 13:9 37:15
  60:15 75:25 111:3
  128:15 136:10
  215:18 236:7
  318:15,19
bodies 45:22
  313:15,21
body 108:9
bold 176:14
bomb 278:2
bona 28:16
bones 95:7
book 18:24,25
  23:25 133:9
  313:22
BooksXYZ 24:2
Boseman 10:3 18:1

**EXHIBIT B**

bottleneck 60:11 98:4
bottlenecks 60:14
bottles 118:14
bottom 124:16 150:15 151:23 172:20 177:1 179:11 191:2 242:18 284:20 287:18 295:6
bought 25:5 32:10 83:9 142:11,23 168:21 180:20,21 181:4 208:23 214:22 228:16 233:20 296:9
Boulevard 1:18
Bourland 119:10 120:18 122:22,24 122:25
Bourque 8:3 98:19 115:23 162:25 242:15
box 38:21 44:14,16 62:23 64:2 104:1 127:17 143:18
boxes 109:5
boyfriend's 73:5
brain 73:13
branded 41:16
breach 242:20,23
breached 49:1
breaches 91:15 269:5
break 93:23 142:5 304:25 307:6
breakdowns 195:6
Breese's 265:21
brick 85:25 86:5
bridged 171:5 249:22
brief 8:14 93:25 172:24 270:2
bring 32:15 82:15 137:16 185:19,22 289:1

bringing 20:20 72:4 76:9 114:16
broader 38:10
broke 291:21
broken 239:12
brought 20:10 26:25 27:5 32:17 52:17 55:11,12,20 71:17 72:10 77:12 259:13
browse 265:14
brunt 194:15 231:5
BSAT 15:5 16:7
bucked 282:18
buddy 208:12
buddy's 266:18
budget 255:7
buffing 280:22
bug 215:20 233:7 233:15 235:20 240:12,13,25 241:4 261:21 264:17 266:25 268:24
bugs 170:19 218:17
build 21:11 34:5 35:18 51:14 60:17 61:18 63:5 76:15 152:9 195:10,14
building 20:19 22:21,23 24:18 27:7,10 31:22 54:11,21 55:10,13 61:21 93:7 131:16 144:23 152:16 194:13 269:23 290:15
built 21:9 24:14,21 25:5,5,8,11,16 30:24 31:19 33:15 41:13 54:19 63:22 63:24,24 81:8,9 94:24,25 106:25 129:6,8 141:13,16 143:14 144:3 240:18 241:4

254:17
bullet 47:5
bumped 51:5 135:6 279:2 282:19
bumps 13:6
Bunce 51:5 98:19
bunch 11:7 28:20 33:20 53:1 55:20 90:6 137:1 140:25 155:14 197:6 221:10 284:9,10
Bundled 216:20
Burton 81:1,13,14 81:19,21 83:20 84:7 257:7
business 15:7,14,15 16:8,9 19:13 20:16 50:24 51:8 52:3 77:20,21 104:17 105:2 126:4 136:13,17 146:13 254:22 285:12 286:22 288:20 306:1
businesses 22:19
busy 22:19 151:10
button 200:18
buy 128:5,10 130:20 132:13,25 133:3 134:7 135:18 157:18 160:3 180:19 297:24
buying 129:3 143:8 146:18 176:3 297:14
buyout 287:12 294:24 300:25
Byline 134:18 290:14 291:20 293:15,16,21

_____

                C

C 2:4
calendar 181:10
caliber 81:8
California 71:3

110:13,16 128:14 128:25 129:22 130:6 134:16 135:3,13 136:9 143:21 150:6 151:6,7 154:22 155:12,14 156:11 157:20,21 159:7 161:19,21 173:19 305:14
call 8:16 10:16 65:10 122:6 183:23 192:2 198:22,24 199:8 202:3,5 213:13 274:22
called 33:10 199:22 206:18 226:21
calling 12:24 197:13
calls 37:23 145:5 183:22 199:11
cancel 186:12,18
capabilities 226:24
capability 214:22
capable 154:10
caps 177:6,19,20
car 38:10
card 205:23
care 15:23,24 17:11 26:21 47:14 66:2 66:23 83:2 133:8 253:1
career 15:25 16:16
careful 264:12
carry 105:25
case 7:4 8:25 10:8 11:15 87:24,24 120:7 137:22,23 139:23 243:11 285:2
cases 11:20
Caston 242:15
Catalanotto 10:1
catch 272:1
catching 231:5

261:1
category 258:8 262:16 263:16
caught 59:16 157:7 157:17 247:21 265:20
cause 6:5 11:3 13:11 21:6 64:8 72:3 110:18 165:2 167:14 170:6 227:13 231:4 257:1 262:4 265:9 265:17 281:13,15 284:25
caused 13:9 217:11 233:4 235:22 264:14,15 269:5
causes 201:6
causing 195:3 260:2
Caviness 98:18
CCR 1:24 4:22 317:24 318:7,24
cease 125:1
ceased 125:4
CEH 302:19
celebrities 265:17
center 117:3
centers 80:4 185:15
central 23:10,11 58:8
centralized 186:10
CEO 24:25 32:8 65:13
ceremonies 17:5
certain 37:23 43:23 49:5 87:22,23 128:22 140:22 152:24 163:25 183:20 221:3 225:11 261:24 291:24 297:17
certificate 86:22 316:1 318:2
certificates 44:3 304:23

**certification** 25:12
318:4
**certifications** 52:14
**certified** 1:25 4:23
100:4 225:16
262:24 263:3
317:3,25 318:7,25
**certify** 316:4 318:8
**certs** 25:13
**cessation** 119:11
**CFR** 258:10
**Chad** 1:16 5:1,14
148:14 159:12
172:19 173:1
179:24 262:10,11
289:21 302:12
303:8 316:3,11
**chain** 149:5,23
162:25 178:20,24
179:15 192:13,20
199:21 220:22,23
222:18 242:7,14
303:11
**challenge** 98:4
124:4 164:24
171:6 183:14
184:15 197:18
230:13 232:23
264:9 304:8
**challenges** 94:13
103:13 130:3
146:2 147:1
170:25 184:4
193:19 194:11
195:25 196:7,12
233:4 241:20
263:16 264:15
**challenging** 142:7
193:8 235:22
305:8
**chance** 101:1
**change** 35:23 87:16
91:10 98:6 137:20
137:21 138:18,20
139:19,21 204:8
204:14 232:25

234:14 235:2,6,9
235:11 245:1
248:12 312:10
**changed** 60:19
84:15 225:1 248:8
248:16 269:10,11
269:12 271:2
298:14
**changes** 60:4 91:10
91:11 129:11
138:12 139:24
316:6 317:12
**characterize**
215:20 233:6
**characters** 87:22
**charge** 82:17,23
136:22 257:10
**charging** 312:24
**Charles** 2:5
**chasing** 136:6
**chat** 116:22 270:12
**cheap** 63:7
**check** 45:1,2
143:18 175:4
**checked** 109:4
144:14
**checking** 11:3
115:9
**checkpoints** 171:4
**checks** 264:2
**chemicals** 234:18
**Chevron** 27:21
28:12 29:3,6,15
**chief** 105:9 120:20
**chimes** 154:2
**China** 91:18 212:2
249:20 250:7
**chipping** 200:22
**choice** 158:2
276:19
**choose** 180:25
**chose** 158:1 289:6
304:11
**Chris** 11:22 72:25
208:10,11,11
**Christmas** 56:9

102:19 103:1
128:7 134:23
150:1 274:7
**chronological**
150:11
**churning** 69:7
124:8
**CIO** 81:24
**circumstance**
219:19
**citations** 124:19
**cite** 267:18
**cited** 258:25
**Civil** 1:4 4:6 317:6
317:7 318:19
**claim** 40:23 145:17
**claimed** 119:15
143:19
**claims** 13:19 41:9
**clarify** 50:21
**clarity** 50:20
**classes** 15:22
**cleaned** 100:22
**clear** 14:9 34:10
50:10 65:8 125:13
127:9 132:21
295:5 298:3
**clearance** 275:4,9
275:18
**cleared** 276:5 293:5
293:6,6
**clearly** 125:23
144:15 258:18
**CLIA** 117:10,13
123:5 145:25
**client** 23:16,17
28:12,16 40:9,14
86:2
**clients** 22:20 94:19
198:5,13,15
**clipping** 55:16
**close** 96:20 117:2
249:3 259:14
**closely** 34:8 77:22
97:3 99:9 105:20
282:9

**clubs** 285:23
**clue** 305:15
**clunky** 53:21 60:1
184:5 196:15
**CMS** 46:10 103:1
121:23 122:9
123:13 125:15
127:19 130:23
132:13,17,18,24
134:25 146:11
150:2 163:18
188:23 213:9
225:19 262:23
263:22 274:7,14
274:22,23 275:3,9
276:5,15 313:16
**COC** 220:20,21
225:4
**Cochise** 192:22
196:10 198:5,5
**Code** 317:7 318:18
**coding** 44:11 107:4
**coincide** 314:20
**collaborated**
201:15
**collaboration**
145:15
**collect** 19:16 26:10
**collected** 106:20
108:24
**collecting** 105:15
282:24 284:14
**collections** 286:22
**collectively** 50:5
**college** 16:17 18:21
24:1 44:20 204:25
**Colorado** 71:4
**column** 216:11
220:20 225:5
228:1 231:7 258:5
**columns** 44:22
205:2 236:25
**come** 29:9 43:11,12
43:14 65:1,3
71:20 76:17 79:5
92:6 102:20

188:23 189:1
196:25 231:17,18
231:21 240:1
252:13 263:22
277:4 288:4
**comes** 73:14 95:10
156:9 157:1
225:10 235:14
237:8 240:1
274:23
**comfort** 160:11
**comfortable** 283:2
301:6
**coming** 8:16 30:8
40:24 45:22 59:13
70:19 71:13 85:11
91:17 101:2
126:13 128:19
180:2,10 187:8
232:15 277:3
286:25 293:12
313:25
**command** 117:3
**comment** 51:7
66:16
**comments** 128:1
**commercial** 295:21
**commission** 75:9
**commissions** 75:5
**commitment** 131:6
**committed** 157:19
**common** 154:24
251:11
**communicate** 9:2
62:16
**communicated**
26:12 58:6 62:24
145:3
**communicating**
88:22 247:20
**communication**
23:9
**companies** 7:17
38:6 59:23 245:14
**company** 14:10
16:18 18:25,25

20:15 21:24 22:12
22:23 23:25 24:8
24:24 25:20 27:19
29:21,24 30:13,17
37:5,25 40:15
41:15 70:13 71:6
71:21 72:10,16
83:25 212:8
254:19 267:9
**compare** 237:19
238:2,3
**compared** 234:22
**compares** 188:1
**comparisons** 172:5
**competitive** 59:22
138:3 172:5
302:22
**complaint** 161:10
181:15 258:8
**complemented**
77:4
**complete** 215:15
240:10 317:15
**completed** 61:22
129:4
**completely** 52:11
55:14 60:19 136:5
154:13 243:25
298:20
**complex** 26:19
247:16
**complexity** 118:21
**compli** 46:6
**compliance** 46:13
104:7,19,22,23
105:9,15,22,25
106:4,6,12 145:25
146:10 164:24
188:7 225:18
228:22 235:14,20
236:9 237:22
238:18 258:19,25
283:3,4 318:14,17
**compliancy** 17:14
**compliant** 45:23,24
133:18 267:9

**complicated** 250:8
**complies** 308:7
**component** 35:12
46:7 62:11 88:14
240:23 256:20
258:9
**components** 33:23
83:21 92:18 95:6
197:4
**compromise**
205:19 206:4
212:7
**compromised**
205:7 212:6
**computer** 16:14
86:3 88:8,21 89:2
89:16 91:2,11
173:23 203:18
211:1 307:1 311:6
311:19
**computers** 88:2,9
88:17 305:15
**concept** 250:12
**concern** 93:21
133:6 304:12
**concerned** 85:18
100:23
**concerns** 146:5
199:14
**condition** 117:10
117:11 124:19
**conditions** 117:13
123:5 176:16,23
**conduit** 62:25
63:21 64:17 104:1
127:17
**conference** 13:22
37:15 38:25 165:1
198:24
**conferences** 116:23
**confident** 188:22
**config** 152:19
**configurability**
304:14
**configuration**
153:3,4 244:21

**configure** 151:25
**configured** 88:10
152:2,19 153:11
234:23
**configuring** 152:13
**confirmation**
213:16,17 214:5
216:19,20
**confirmatory** 57:24
**conform** 47:2 97:22
**confronted** 282:14
**confusing** 6:13
**confusion** 100:23
**conks** 260:6
**connected** 8:10
89:17 155:13
277:7 278:19
**connectivity**
304:18 307:21
**Conrads** 22:2,7
191:3 277:3,5,19
278:23 281:5
291:13,25 294:2
295:2,3
**cons** 138:2 172:6
**consequence**
186:19
**consideration**
297:11,13
**considerations**
143:9
**consistent** 261:1
**console** 39:13
**constant** 230:15
234:24
**constantly** 126:8
230:12 234:21
257:7
**construction** 38:6
**consult** 107:22
**consultancy** 41:14
**consultant** 75:24
90:21 146:9,10,16
201:5 283:4
**consultants** 76:10
76:13 77:8 137:5

145:24
**consulted** 22:15
108:1 137:1,25
**consulting** 12:5,8
22:6,16,18 40:11
56:19 105:16,22
**contact** 72:22 75:4
75:22 135:6
146:22 155:15
**contacts** 27:19 75:8
282:11
**contained** 230:8
**container** 221:17
221:18,21,23
222:4,5,7,7,11,12
222:16,21 223:4
230:5,8
**containers** 195:1,2
221:2,3,19 229:14
**content** 6:24 11:9
101:8 148:24
**context** 37:14,14,16
37:20 38:17 48:10
166:19 167:2
232:11
**contextual** 37:10
**continue** 55:7 56:3
98:8 148:6 235:10
260:9 276:24
283:8,9 300:1
**continued** 14:14
196:4
**continuing** 15:19
16:21 17:11 18:8
18:9 76:15
**continuous** 61:1
98:1
**contract** 27:22
61:10 63:7 168:12
175:16 176:9
184:23 185:5
284:1
**contracts** 178:5
**contractural**
318:18
**contradictory**

308:16
**contributed** 259:3
**control** 83:6 243:6
243:17
**controlled** 88:20
189:1
**controls** 262:1
**conversation** 133:4
144:15 147:6,10
163:11 165:1
171:16 207:20
254:3 278:22
**conversations**
129:17 171:25
254:7 276:12
**converted** 32:18
**convinced** 180:19
**convoluted** 175:25
**cookie** 152:1
159:14
**cool** 27:11
**coordinate** 140:16
**copied** 252:24
273:12
**copy** 111:15,17,20
205:20 243:19
244:17,20 245:3,3
245:4 250:13,18
272:3
**copying** 179:16
**core** 16:14 18:5
33:22 76:3 77:8
260:11 304:17
306:15,18,24
307:2,8
**corner** 135:10
177:1
**corporate** 65:19
**corporations** 85:9
**corralled** 161:6
**correct** 52:18 57:18
57:22 64:23 84:13
97:11 124:18
127:11 219:23
238:13 253:6
303:16 311:3

316:7 318:12
corrected 223:14
correction 121:23
121:24 124:21,23
corrections 316:6
316:13,15
correctly 147:13
correspondence
192:8 207:17
231:15 252:23
272:24
corresponding
229:16 232:1
cost 166:21 174:12
190:15 242:22
coul 44:14
could've 200:15
coulda 48:24 61:2
247:24
counsel 4:3 6:22
104:15 122:17,18
174:23,24 318:20
country 71:9
244:19
couple 13:23 22:24
27:13 54:18 75:15
125:8 128:20
134:12 140:11
176:20 240:19
262:21 284:5
290:22
course 71:22 74:14
213:25 256:25
courses 17:1 18:14
18:18
court 1:1,25 4:23
5:12,23 317:4,25
318:7,25
Courtyard 1:17
cover 40:2 113:2
115:21 125:22
168:22
coverage 283:5
covered 30:7 40:3
108:17 109:3
120:25 270:9

covers 217:3
Covington 1:18
292:25
cranking 283:11
cranny 122:14
crap 218:3
crashing 260:17
crazy 11:8 22:13
44:22,23 104:19
118:12 119:23
120:13 216:15
218:18 226:4
232:6 240:10
258:10 283:15
284:9,25
cream 92:17,17
create 54:16 200:13
200:19 216:17
218:2 226:17
234:14,18 258:2
created 19:17
72:18 94:4 213:3
226:19 235:13
258:4,5
creates 262:13
creating 221:14
creative 196:1
credentialed 135:8
credentials 78:15
135:12 189:24
190:10,12,17
205:10 208:4
210:25 211:5
311:24
credit 205:23
critical 225:18
227:13
critically 245:1
254:20
crossed 226:6
crosses 149:20
crucial 225:6
cryptic 62:17 126:6
249:12
CTO 77:12 78:10
80:15 81:21

cues 37:18
culmination 201:1
curiosity 96:1
curious 265:9
305:2,6
current 9:8 36:13
53:20 59:6,7 60:8
64:10 77:4 101:12
291:8
custody 220:22,23
222:18
custom 152:9,13,16
153:2
customer 154:16
167:17
customer's 152:3
customers 171:7,12
244:13
customize 195:15
cut 32:3
cutter 152:1
CVDL 150:5
153:25 164:3,7
180:3,8 184:19,22
185:17,18
cybersecurity
42:13,17 43:16
47:10 78:9 80:14
80:16 91:14 92:3
205:18
cycle 60:25 188:17
cycling 87:15

———————————
D
———————————
D 2:12 3:1,8
dabbling 27:8
95:24
Dallas 197:22
damages 284:2
damn 46:23
damned 31:2 69:16
dang 144:11
dangerous 42:24
Danny 9:15 10:3,3
11:2 17:25 55:11
75:21 76:2 78:1
87:1 90:5,17

122:16 126:9
194:9,12
dashboards 40:24
77:6
dashes 317:11,16
data 26:9,10 34:5,7
34:11 43:7 44:4
44:18 47:17,25
48:11,16 55:2
58:7,8,9 62:12
63:16 69:8 80:4
98:7 100:14
106:19 108:24
122:15 123:20,22
126:9,10 127:18
140:14 153:5
154:17 185:15
205:15 208:21,23
208:23,25 223:3
224:8 242:20
247:6 264:25
265:7,12 304:22
306:5 309:12
310:3,6,12 312:5
312:7,13
data's 34:12
database 44:18
76:3 84:19 89:12
89:16,23,25 90:12
90:22 95:6 204:20
205:1,3,7,20
206:10,11,11,14
206:16,18,19
207:22 209:3,12
211:6 223:3 271:8
271:12 309:6
311:17,24 312:4,6
databases 89:6
90:4,6,15,18
date 17:9 25:14
46:20 48:3,4,5
61:4 94:7 96:24
124:12,12 163:18
172:2 173:7,17
181:11 188:1
189:11 193:4,20

200:9,11,15,17,23
202:15 237:1,2,6
237:9,10,11 238:9
238:11,12 271:4
273:19,24 275:10
299:4 316:8,11,25
dated 98:19 119:8
149:23 150:9
173:6 242:16
305:2
dates 119:15 162:5
164:20 173:6
200:12
day 11:2 24:25
26:12 55:13 56:6
97:12,13,14 103:1
111:8,9 113:5
122:13 126:3
141:14 165:4
169:1 174:1 202:1
216:2 224:2,11
234:25 235:1
236:18,19,23
237:13,15 238:3,4
252:17,17
day-to-day 142:1
189:22 190:8
days 161:12
deactivate 203:4
deactivated 203:5
203:12,25
deal 93:10 247:24
287:7 298:8
deals 289:15
dealt 236:3
debt 286:25
debts 287:13,14
291:6 293:4,5
294:25 295:10,13
December 113:3
115:21 122:1
160:4 163:17
171:24 192:21
199:20 201:25
202:5
decent 55:16 61:10

decided 35:22 110:2 111:5 151:16 185:6 280:21
decision 32:15 107:22 115:1 126:4,19 128:5,9 131:18 132:8 134:7,14 150:25 151:1 158:23 159:24 160:3,19 165:5 185:23 186:7
decisions 174:13 275:24 288:20
dedicated 78:8 80:13,15 182:12 188:21 190:23
deep 12:20
deeper 51:12 256:19 310:11
defects 170:17,19
DEFENDANTS 2:9
defense 211:21
deficient 121:24
define 49:12
defined 317:5 318:18
definitely 51:14 193:5 242:8 256:12
DEGRAVELLES 1:8
degree 15:10 16:4,6
degrees 15:2,4,18
delays 123:25
delete 217:4,5,24 218:4 221:22 222:8,17 223:5
deleted 218:11 222:5,10,14,15,21 218:6,13 221:23
Dell 296:11
demo 144:15

160:20,25 161:11 162:7 180:1,8,18 180:24 181:11,16 181:20 226:5
demoed 142:22
demos 145:5
Denham 11:3
denote 317:19
department 25:4 32:18 97:7,8,10 104:8 178:10
departments 25:10
dependent 98:11
depending 234:19
depends 50:7
deploy 244:16 247:7
deployed 29:12 40:2 244:22
deployments 245:21
deponent 4:10
deposed 5:18 10:15 10:24
deposition 1:16 4:4 4:14 7:2 8:23 11:14 147:20,25 148:15,16 172:18 172:20 272:12,15
depositions 10:25 148:5
depth 11:1 156:3 169:14 229:20
describe 89:9 223:20 236:10 261:19 304:8
described 99:14 103:25 127:10 164:6 181:21 183:10 213:24 224:6 240:24 249:5 250:7 266:5
describes 116:2 121:22,25 252:10
describing 308:13
description 258:6

design 233:17 235:19 240:18 262:3 264:21 304:17 306:15,19 306:24 307:2,9
designed 40:5 233:14 271:11 304:19 307:22
desk 77:15 117:1
desktop 89:20
detail 122:14 166:18 230:10 233:23,25 259:11 279:7 285:17
detailed 137:16
details 36:15 41:7 84:23 85:5 119:18 230:20 285:9
determine 276:22
determining 201:6
dev 194:5 246:21 250:10,18
develop 23:13 106:17
developed 16:16 17:21 19:2 29:12 39:14 40:21 109:22 274:22
developer 19:3 67:25 76:3 77:16 90:11 112:2
developers 9:18 21:5 24:22 32:19 84:1 89:14
developing 16:17 18:24 21:18 39:19 58:18,21 76:18,23 95:18 96:2 97:4
development 16:4 16:8,14,23 17:12 17:20 22:16,21 23:7,8 31:6,9 34:2 39:15 61:14 69:7 77:14 78:21 79:20 80:19 94:14 96:7 96:21 97:18,23

103:5,7,11 107:2 126:8 194:2,3,12 241:22 254:15 274:19
device 37:10,19 38:12 39:14 86:3
devices 19:17,18 26:7 88:12
devoted 182:14
diagnoses 31:23 33:4
Diagnostic 303:22 304:6
diamonds 24:9
Dianna 179:16,17
died 111:8,9
dies 260:7
different 10:11 18:5 19:15,18 22:22 27:8 31:14 32:14 36:20 38:21 39:3 40:25 46:25 51:16 65:2,2 68:1 71:11 84:4,6 91:18 95:2,24 97:19 101:12 132:6 137:3 141:20 142:6 146:25 154:11 156:17 172:7 176:5 177:8 185:20 201:2 213:25 221:13,13 229:21 238:12 239:8 244:20 262:15 267:23 268:20 271:3 287:16 290:11 313:25 314:1
differently 34:13 175:13
difficult 135:13 177:15 288:7
dig 120:17 168:23 169:14 310:11
digging 7:16 51:12

238:20
digress 55:5 306:11
Dillon's 172:17
direct 63:5 312:4
directed 30:17 99:10
direction 30:18 57:4 291:17 300:8 318:12
directly 42:16 51:13 58:10 77:19 89:16 106:12 271:12
director 114:25 115:25 118:22 119:10 126:23 188:19 274:20 276:21
directors 276:13
disable 202:21
disabled 259:16 270:21,25 271:2,9 271:10,17,22 273:2,6,9,24 308:13
disagree 68:11 152:6 181:12 309:18 310:4,17
disagreed 176:9
disagreement 288:9
disagreements 288:12
disappears 218:7
disciplines 154:11
disclose 49:7
disconnected 161:22
discourse 317:11
discover 218:12
discovered 183:17 207:3 236:1 238:8 238:15 243:11 268:9
discovery 141:1 170:12 207:8,9

discrepancies 195:8
discussed 263:18 265:2 269:15 305:9
discussion 134:20
discussions 297:12
disgruntled 93:12 93:17
dispute 282:4
dissolved 29:25
distraction 38:1
distributions 74:5
DISTRICT 1:1,2
dive 64:15
division 28:3 30:9 30:18
doctor 25:25,25 26:15 27:3,14 77:5 187:8 196:13 240:7 275:7
doctor/clinic 228:2
doctors 21:2 70:17 182:10
document 14:14 47:24 58:13 98:15 114:1 147:19 162:23 173:7 176:21 192:4 199:22,24 201:24 202:13,14 228:23 253:14 257:3 259:19 261:8 272:3 284:23 294:15 301:13 303:19 312:25 313:6
documentation 294:23
documented 225:22 267:16 284:22 309:7
documents 6:20 11:11,12 14:1 160:9 302:6,17
DocuSign 173:13

173:14 174:3,5 296:6
dog 161:8
doing 19:13 22:17 22:18,21 23:15 27:11 28:21,23 40:20 51:8 54:20 59:21,22 63:6,20 68:9 69:11 75:3 75:10 77:14 82:14 88:8 93:13 96:14 126:12 129:21 143:20 144:24 148:4,6,10 160:20 184:2 249:25 250:7 251:2 252:12 255:6 280:12 284:16 285:5 292:14
dollar 296:22
dollars 168:22
domain 243:8
don' 148:9
door 70:20 93:10 243:22 289:6 311:23
doors 20:22 45:22 52:16 57:14 94:10 95:13 96:4,11,14 210:2,23 243:22 257:9
dot 22:12 225:4
double 106:22 165:13,15
doubt 114:3 140:13 169:25,25
doubts 139:4
downward 277:22
dozen 18:4 262:18 296:12,13
dozens 59:21 260:21
Dr 115:22,24 120:18 125:1
draft 200:4
drained 280:2

drains 136:12
draw 60:15 303:25
dream 25:15
Drew 265:21
drive 5:2,16 26:23
driver-distraction 38:2
driving 21:18 37:16 38:19
drop 24:16,18 54:1 56:13 196:21 197:6,8
dropped 186:8 191:2 197:14 247:15,17 278:2 309:10
drove 12:23 27:20 80:3
drug 152:23 237:7 266:19
drugs 213:12,25
drying 279:23
dual 182:13 287:11
due 317:10
dug 122:13 256:19
duh 220:7,7,7,7
duly 5:4
dummy 154:17
dump 243:19 312:7
dumps 247:6
duplicate 217:3
durable 40:15,16
duration 20:1
duty 265:13

E
E 3:1,1,8,8 317:1,1 317:1
E-clinic 176:6
e-commerce 24:12
E-macro 176:4
e-mail 88:24 98:18 99:24 100:13 101:3,8,24 103:6 113:9 120:16 148:25 149:23 150:8,12,22

153:23 154:3 155:7,18 162:25 163:16 178:20,24 179:10,14 192:13 192:20,21 196:9 196:10 197:19 198:12 199:21 202:2 242:7,14 246:21 252:24 253:1,11 255:21 272:17 303:11
e-mail's 113:2
e-mails 149:1 161:13 192:6 253:2 256:1,11
e-signature 173:12
earlier 102:10 103:25 119:14 127:10 154:19 167:23 171:24 181:21 183:11 188:2 189:11 193:7 202:15 212:2 218:20 221:2 222:1 259:18 263:14 265:2 269:23 274:17 277:4,6,7 298:22 300:18,22 310:25
earliest 150:9,12 252:24,25
early 20:22 21:22 24:17 31:25 35:22 40:14 75:10,21,24 77:9,10 79:12,18 94:12 95:22,23 96:3 103:10 104:16,16 114:19 135:5 144:10 149:17,18 168:5 171:23 182:22,23 184:7 199:24,25 206:24 207:8,9 214:23 227:12,15 277:6,8 278:14

291:16 297:18 299:2,3 302:17
earmarked 83:10
easier 5:21 64:8 177:11
easily 210:19 251:1
eastern 198:24
easy 6:2 142:15 209:7
Ed 135:21
education 15:19 16:21 17:11 18:10
educational 14:22 15:2,23
Edwin 1:16 5:1,14 316:3,11
efficient 14:25 100:24 158:13 312:16
effort 36:12 55:14 94:16 98:2 103:11 182:12 187:17 254:15 256:2 279:21
efforts 20:13 21:14 22:7,16 54:17 77:17 80:4 90:13 97:23 98:11 106:2 106:5 124:6 126:8 140:15 142:1 186:5 194:16 276:10 298:2
egg 75:11
eight 51:3 94:10 122:13
eighties 141:14
either 42:16 50:6 89:15 105:23 129:15 254:4 279:1 287:20 295:13 296:2 301:2 305:12
electronic 24:15
element 63:21 98:7 153:5
elements 16:9 18:5

19:16,21 126:10
em 10:21 11:8 25:1
  29:5 54:10 70:6
  82:20 91:8 110:24
  144:11 161:7,8
  212:12 219:1
  236:10,19 239:25
  244:25 269:18
  274:22 291:18
  301:20 308:20
employed 22:6
employee 47:19
  56:20,25 93:19
  155:13 175:9
  197:24 203:3
  269:1 283:10
  286:23 287:21
employees 9:9
  30:13 41:23 55:18
  56:4,17,24 70:18
  71:8 93:13 185:14
  277:15 278:1
employment 14:22
  18:20
EMR 17:21 18:3,3
EMS 19:7
encapsulate 21:10
encompass 50:13
encrypted 43:22
  44:4 204:21,21
  205:5 306:6
encryption 85:18
  304:22 310:2
ended 26:21 30:7
  30:12 32:7 44:21
  52:10 54:8 76:9
  114:16 128:19
  129:21 139:14
  146:3 208:18
  238:20 260:9
  281:11 283:12
  284:13,14 285:1
  288:6 291:18
ends 245:4 255:21
enforce 38:25
  88:12 265:6

enforced 268:9
enforces 37:19
engaged 117:5
engineers 51:4
  77:12 80:17 82:15
ensure 118:3
enter 152:21 308:4
  308:9
entered 87:3
  221:22 224:24
Entergy 78:19
entering 104:4
  152:22
enterprise 168:20
entire 17:21 96:9
  218:1
entities 50:13
entity 50:6,7
  318:17
entry 40:22 44:7
  94:18 223:15
environment 21:11
  39:4 76:22 85:19
  86:7 89:19,21
  108:18,19,23
  167:18 209:10
  243:14 247:23
  250:21 279:18
  298:11 305:18,20
  307:18
environmental
  19:20
environments
  244:23
Epic 17:23 32:16
  32:17,19 33:1,18
  34:7,8,21 36:9,20
  59:17
equally 43:8
equation 130:11
equip 110:15
equipment 30:20
  38:4
er 116:11
error 273:10
escalated 253:21,24

especially 6:3 59:10
  59:18 161:5
  211:23 240:22
ESQUIRE 2:4,13
essentially 21:16
  26:4 43:21 61:11
  62:8 63:3 88:19
  92:25 101:11
  108:24 114:21
  117:4 139:13
  159:8 185:12,21
  186:9 193:12
  196:17 217:15
  226:21 243:16
  244:22 246:2,15
  247:9,18 254:9
  262:8 271:13
  294:3
established 27:18
  143:17 318:15
ET 1:5
evaluating 171:25
evaluation 144:10
Eve 56:9 103:2
  128:7 150:1 274:7
event 49:17
eventually 135:18
  182:14 247:21
  260:6 275:4 294:5
everybody 56:12
  78:4 87:20 158:14
  174:18 243:6
  244:19 281:13
  297:20
everybody's 205:11
  205:13 244:18
Everyone's 84:15
everything's 60:3
evidence 4:15
  124:11
evidently 118:16
  126:16
ex 104:16
ex-employee 203:8
  246:12
exact 100:11

314:25
exactly 63:1 95:21
  108:4 166:23,25
  174:24 203:9
  236:2 238:24
  260:21 313:20
EXAMINATION
  3:3 5:6 42:9
  45:12 46:4 47:13
  47:21 49:15 50:22
  59:2 66:6,11,17
  67:9 74:6 83:7
  87:13 94:1 98:25
  104:12 105:5
  107:20 108:3
  109:15 110:4
  112:23 114:9
  121:11 125:14
  127:15,23 131:23
  132:23 133:20
  134:4 142:17
  143:6 146:17
  148:13,21 152:14
  153:21 159:1
  162:21 163:6
  166:12 172:25
  175:14 177:17
  179:3 181:5 182:6
  185:2 189:16
  190:24 192:12
  198:18 202:11
  204:4 212:23
  214:13 219:10
  223:21 229:22
  233:12 241:6,13
  242:6 253:10
  256:6 264:22
  267:4,19 270:3,11
  272:10,21 273:17
  274:15 276:2
  284:3 285:11
  290:8 291:3
  294:21 295:20
  296:1 297:2
  299:15,24 302:18
  303:6 307:19

309:25 311:16
  312:22 314:6,13
examined 5:4
example 34:25
  193:9 259:23
  314:17
Excel 200:7 205:2
excelled 16:15
exchanged 286:12
excited 102:8
Excuse 247:2
exe 247:7
execution 125:24
  176:14
exhibit 3:10,11,12
  3:13,14,15,16,17
  3:18,19,20,21,22
  3:23 98:15,18,22
  112:17,20 113:7
  147:19,24 148:3
  148:18 162:24
  163:3 172:17,18
  172:22 173:3
  175:20 176:18,22
  176:25 178:19,25
  192:5,9 201:24,24
  202:2,8,20 242:2
  242:3,14 252:22
  253:7 256:21
  257:22 270:4,5,7
  272:11,12,14,18
  273:23 294:16,18
  303:10
exhibits 148:5
exist 47:4 60:14
  85:15 226:3
existed 295:14
exists 206:6
exit 289:17
exited 131:9
expanded 95:1
expanding 79:23
expect 157:13
  171:10
expensive 92:19
  165:18

exper 184:14
experience 18:13
  44:24 45:16 49:23
  60:9 66:23 67:3
  76:23 78:18 81:14
  91:14 93:12
  103:13,20 120:22
  138:15 184:6,14
  185:14 195:5
  196:2 306:16
  308:1,12 309:17
experienced 81:3
  85:8
experiences 93:19
  145:18
expert 11:20,21
expertise 65:3
  69:25
experts 52:3 70:1
  145:15 185:19
explain 37:12 70:24
  85:24 216:13
  220:24
explanation 119:21
exposed 48:23
  245:12 247:19
  250:15 285:4
  307:3 312:1
exposure 44:5
  48:12,19 245:9
extend 151:18
extended 73:6
  291:12
extension 75:7
  186:4 243:9
extensions 251:13
extent 50:19 216:14
  278:10 312:3
external 18:14
  19:19 52:5 70:23
  77:5 85:10 86:7
  104:23 105:16,18
  105:23 106:6
  109:6 211:10
  227:5
externally 42:24

61:20 91:23
  106:12 109:1,8
  205:8 247:20
  251:19 255:4
extra 16:25 143:19
  143:22 167:20
  219:7 235:22
extract 247:5 312:6
Exxon 28:21
eye 157:7,17
eyes 70:6

─────────────
        F
─────────────
F 69:3
face 116:20 256:13
Facebook 80:11
facilitate 23:8 84:3
  133:17 156:5,18
  162:1
facilitated 80:18
  82:25
facing 42:25
fact 120:7 128:15
  129:3 197:13
  201:7 256:15
factors 235:6
faded 20:13
failed 124:18,20,22
  125:3 237:20
failing 204:25
fair 6:15 7:19 136:5
  181:18,19
FAIRBANKS 1:24
  4:22 317:3,24
  318:7,24
fairly 232:24,25
fake 226:18,19
falling 20:9
false 240:7
familiar 99:22
  101:9 107:13
  261:16 272:4
family 51:18 73:2,6
  73:6 115:3 213:12
  293:13
fantastic 58:20
  61:2 99:11 123:2

far 43:3 78:21 82:5
  85:17 100:23
  104:23 106:17,18
  109:3 125:22
  137:15 143:25
  183:16 189:5
  226:9 251:5,23
  254:11 284:15
  310:5
fast 56:2 68:19 69:4
  76:1 277:12
fast-running 25:15
faster 59:3,4,6
father 67:23
fatigue 19:25
fatigued 26:9
favor 279:11
fax 115:21
FBI 104:17
FDA 107:6 118:13
  167:9,11,15,16
  168:3,22
feasible 110:18
feature 21:19
  215:23 216:6
  227:18 228:4,5
  229:4,5 233:7,11
  240:12,13 261:20
  266:25
features 168:17
  304:18 307:21
February 253:12
Federal 4:6 317:6
fee 9:12
feedback 12:22
  99:11,12 103:21
  105:22 120:12
  137:8 196:1 201:3
  201:3 269:24
feel 59:13 114:4
  137:15 138:23
feeling 158:4
  172:14 193:2
  280:8
fell 82:1
felt 281:17

fide 28:16
field 26:7 138:20
fields 308:9
fight 147:14 279:24
  281:1 283:15
  299:14 300:2,3,4
fighting 166:10
  286:4 299:14
figure 38:16 232:6
figured 159:12
  203:10 252:8
figuring 236:5
file 200:12 205:2
  246:22 247:7,10
  247:11 312:7
filed 7:12 12:14
  13:25 292:20
  293:7,11
files 196:22 197:14
  228:19 229:1,7
fill 80:24
filling 95:8,9
  194:14
filtering 86:25
  101:15 226:24
final 210:18 255:8
finance 65:10
  296:11
financial 206:6
  296:7,8 318:16
financially 277:23
  286:21
Financing 167:6,7
find 24:25 45:4
  92:21 130:6
  143:11 159:6
  209:24 210:3
  230:14 232:2,4
  239:11 249:6
  251:8 256:3,15
  271:14 313:5,10
finding 136:22
  195:8 201:6
  226:12 252:2
  257:21
findings 123:13

124:17 125:3
fine 55:6 112:3
  115:20 118:17
  129:18 131:7,11
  219:21
finished 27:21
fire 211:9,11 213:3
firewall 206:22
firing 82:18
first 5:4,21,23 7:5
  7:16 13:2,23
  14:21 22:8 24:25
  29:7 54:6 56:11
  75:6 96:15 98:14
  134:12,12,13,20
  149:7 179:11,14
  192:6 193:2 194:4
  200:17,24 202:20
  206:24 216:17
  220:24 231:8
  242:17 258:2
  272:20 275:10
  280:23
fish 61:14
fished 171:15
FISHMAN 2:3
fitness 26:21
fits 48:8 151:25
  221:9
five 23:6 32:11,19
  39:15,16 60:13
  74:13 75:1 232:14
  297:1,3 309:7
fix 25:1 255:23
  260:11 271:25
  273:13
fixed 120:11 224:25
  273:1,5,6 274:2
fixing 117:2
fizzle 109:21
flag 273:10
flaw 204:22
flaws 137:9
flee 50:13
flew 16:18 282:21
flex 78:6

| | | | | |
|---|---|---|---|---|
| flexible 60:2 | followup 23:20 | 286:17 290:6 | 113:10 122:21 | fund 227:11 |
| flip 115:14 173:8 | foot 57:1 191:6 | 291:2 295:18 | 123:1 145:19 | fundamental 44:9 |
| 176:12,20 | football 265:17 | 296:25 299:12,22 | freakin 69:24 72:2 | 103:18 226:7 |
| float 289:2 | force 21:18 41:4 | 306:21 309:22 | 91:19 124:5 | 229:13 240:22 |
| floor 2:5,14 96:16 | foregoing 316:4 | 311:14 312:18 | 165:18 | 260:11 263:21 |
| flopped 53:24 | 317:11 318:8,10 | 314:3,10 | free 206:18 211:17 | 267:3 |
| Florida 303:22 | foreseen 240:20 | formalities 4:8 | 243:4 309:5 | funded 27:23 |
| flow 103:19 224:18 | forget 9:25 29:1 | format 6:25 101:20 | freely 207:4 | further 165:20 |
| flowing 106:3 | 76:12 80:10 100:6 | 318:14 | FREEMAN 2:10 | 189:2 285:16 |
| flown 58:13 | 100:10 140:10 | formed 76:20 | freeze 259:23 | future 60:25 |
| Floyd 208:10,11 | 146:6 203:9 208:8 | former 9:8 | fresh 254:15 | |
| fluff 158:6 | 290:18 296:7 | forming 30:9 | friend 51:18 73:2,6 | G |
| fly 129:12 139:9 | forgot 190:5 | Fort 85:1 91:13 | 73:6 | G 317:1 |
| flying 69:8 71:9 | forklift 37:17 | forth 220:20 278:5 | friended 25:4 | game 136:6 254:18 |
| focal 236:16 | forklifts 38:6 | 281:4 284:8,9 | friends 51:6 129:16 | 265:22 |
| focus 37:1 44:7 | form 4:12 42:5 | 286:4 318:10 | front 48:23 62:22 | gaps 194:15 195:16 |
| 57:5 69:9 76:25 | 45:8 46:1 47:12 | forum 31:13 | 94:17,20 166:2,21 | gas 19:5,7,22 20:8 |
| 131:8 131:10 | 49:10 58:24 62:5 | forward 12:24 28:1 | 169:16 170:15 | 20:13 24:20 27:19 |
| 182:8 277:18 | 66:5,9,15 67:6 | 52:11 76:1 98:8 | 228:15 233:19,21 | 28:8 51:11 |
| 301:18 | 74:3,24 83:14 | 109:23 111:4 | 243:22 267:24 | gauge 260:8 |
| focused 20:18 | 87:12 97:6 103:9 | 117:7 151:5 | 268:21 271:11 | GDL 304:11,13,15 |
| 54:17 56:16 57:2 | 104:10 106:15 | 176:20 180:7 | 305:4 307:3 | 306:13 |
| 77:2 156:6 170:7 | 107:18,24 109:14 | 197:19 243:8 | frown 254:25 | geared 128:15 |
| 194:9 276:7,8 | 109:25 121:9 | 277:12 287:20 | fruition 297:20 | general 19:23 38:5 |
| focusing 20:25 21:8 | 127:14,22 131:21 | forwarding 113:16 | fry 61:14 | 45:1 47:3,5 68:4 |
| 255:5 | 132:15 133:14 | 163:25 192:7 | fuel 21:25 280:3 | 85:16 137:15 |
| fold 71:17 | 134:2 140:7 | forwards 155:6 | fulfill 81:21 | 138:23 163:11 |
| folks 9:12 10:7,24 | 142:14 143:4 | fought 284:8 | full 20:5 22:11 | 169:19 184:14 |
| 27:16 28:5 30:6 | 152:8 153:19 | found 13:24 126:15 | 27:24,24 48:18,19 | 185:16 230:7 |
| 31:14 51:3,16 | 158:25 160:7 | 151:12 169:14 | 56:9 57:2 90:23 | 295:25 |
| 55:21,22 70:5 | 164:19 166:8 | 203:10 204:10 | 122:12 138:3 | generalist 65:16 |
| 71:12 77:8,23 | 170:21 174:5 | 213:4 221:21 | 182:8 284:1 | generally 140:21 |
| 79:17 83:25 | 177:14 181:3 | 223:7 227:11 | 292:12 | 192:17 275:1 |
| 105:11,18 108:1 | 182:4 184:25 | 247:15 248:7 | full-on 78:14 | generations 309:7 |
| 110:13 137:2,2,4 | 185:9 189:14 | 256:19 257:18 | fully 20:18 92:24 | generic 31:7 |
| 138:1,8 149:16 | 190:19 194:22 | 260:13 268:17 | 122:10 136:20 | gentleman 55:21 |
| 163:25 164:1 | 198:17 203:20 | 273:24 280:24 | 182:14 187:5 | 78:16 305:14 |
| 180:9 191:18 | 212:21 214:10 | four 17:17 19:11,12 | fun 112:22 242:5 | gesturing 189:23 |
| 201:2,15 259:3 | 219:9 223:17 | 20:3,6 32:10 | function 191:24 | 197:5 251:14 |
| 263:2 | 228:22 233:9 | 39:15 60:12 74:12 | functional 12:19 | getting 20:8 34:7 |
| follow 34:15 | 240:15 241:2,11 | 161:12 296:19 | 262:18 | 47:25 71:19 92:9 |
| follow-up 57:12 | 249:8 256:5 | 297:1,3 | functionality 61:9 | 96:7 137:14 |
| 180:1 312:23 | 264:20 267:14 | four-week 124:5 | 168:17 182:10 | 156:20 167:25 |
| following 117:13 | 273:16 274:11 | fourth 228:18 | 240:17 267:5,6,7 | 175:7 184:6 201:2 |
| 124:17 168:2 | 275:22 282:7 | frame 94:7 | functions 262:14 | 211:20 240:7 |
| follows 5:5 146:11 | 283:25 285:7 | Franklin 72:25 | 262:21 | 253:23 269:24 |
| | | | | 275:20 277:8,18 |

284:17,25 294:12
298:10 300:3
give 46:23 62:21
73:19 160:11
161:7,8 180:8
208:16 272:3
299:9
given 1:16 250:1,5
261:8 316:4,7
317:9
gives 213:11
giving 124:10
160:24 163:23
208:18 300:9
glad 271:9
gleans 157:16
Global 28:5
globally 46:3
gloves 40:16
go 5:20,21 6:3 7:21
18:20 23:21,23
24:25 26:19,19,20
36:15,25 41:4,6
43:3 44:15 45:4
46:22 48:1 49:21
55:8 60:17 63:14
83:1 91:21 94:2
98:16 103:3
108:15 109:22
112:2 115:12
116:19 122:22,25
131:18 132:11
135:2 151:1,2,3
159:13,16 183:2,5
185:6 187:25
197:1,1,4 203:14
204:13 205:16,20
205:21 206:5
214:14 217:4,18
221:15,16,24
223:2 229:8 230:1
230:13 231:18
232:3 235:6
237:17 239:24
243:7,22 255:4,8
260:9 263:23

265:8,14 269:18
273:23 274:8
275:7 287:23
297:24 303:10,18
311:23 313:8
God 207:6 263:8
goes 12:20 60:4
78:22 119:7 123:4
125:22 146:10
243:20 247:11
251:10 254:12
going 5:20 35:23
36:4,23 44:13
50:4 54:6,8 64:24
69:8 71:8 92:7
96:17 102:17
109:7 110:11,11
111:2 112:17
113:21 115:5
117:16 125:7
129:10,10,15,15
130:14 134:7,21
135:4 136:17
137:17,18,22
139:12,13,22
141:1 142:8
144:20 146:4
147:18 148:6
162:23 164:21
166:3 167:14
170:9 171:3
172:16,18 178:18
185:23 187:19
189:10,17 193:10
197:11 201:23
211:18 215:2
232:6 242:1
252:21 254:15
259:25 265:18,20
266:20 269:13
270:4 272:3,6
274:8 275:20
276:10 279:22
281:8 282:3
286:21 288:2
290:24 291:22

294:16 299:14
300:4,11 305:21
gonna 6:14 23:19
25:18 29:8 37:4
46:18,23 66:25
68:8 98:15 147:20
148:2 199:14
218:2 282:22,22
292:1
good 5:7 15:24 18:4
21:21 29:9,10
35:25 44:23 50:15
51:6 52:10 56:13
69:16,20,23 70:11
93:22 96:6 99:7
102:25 111:2,25
113:4,15 115:1
128:4 129:9
131:11 137:7,19
139:17 145:20
146:13 147:12
159:6 171:11
183:23 279:18
282:10 283:5
292:6,10 297:21
301:20
goodness 183:19
goods 40:16
Google 251:12
313:8
gosh 216:5
gotta 17:8 26:16
47:1,2 101:4,5
136:10 140:14,24
140:24 141:10
153:13 175:4
297:23
gotten 15:2 66:1
280:5,8
governed 176:15
government 313:13
313:16
governmental
108:9
GPS 38:16,18
grade 120:2 204:25

Graduated 15:5
graduation 17:5
grand 75:15 284:5
284:6 290:15
294:9
grandmother's
73:5
Granite 303:22
304:6
granular 261:25
grass 297:19
gray 47:25
great 23:19 26:6
30:23 53:23 55:17
55:17 57:7 60:8
104:25,25 150:21
158:13 159:23
216:14
greener 297:19
grew 13:3 69:13,18
98:1
grid 101:11,15
256:16
ground 18:13 81:10
106:10 188:13
group 31:15 45:4
51:22 52:1,5
56:21 70:23,23,24
71:12,15,16 72:9
77:20 79:19 84:2
122:8 149:10
150:9 161:19
174:14 216:18,25
216:25 217:5,7
219:11,21,21
grouping 231:9
groups 31:17,18
49:24 84:4 313:20
grow 55:19 70:2
growing 27:12
68:18
grown 34:1 35:2
grows 43:16
growth 72:2
guaranteed 295:24
guaranties 289:22

guess 12:24 55:24
74:17 75:11 84:5
101:22,23 109:20
118:10 128:4
142:8 148:24
161:12 163:12
169:18 186:14
192:25 210:1
219:14,19 231:6
244:13 256:18
295:21 297:11
guesswork 130:25
guidance 145:11
guidelines 47:6,7
49:12 318:14
Gulf 28:3
Gulfstream 30:9,13
30:20
gut 172:14
guy 23:11 27:1
31:10 65:7 73:1,1
78:19 80:8,9,11
80:14 84:25 90:7
93:7 135:5,7
145:7,8 152:12
155:11 170:1
182:25,25 183:25
207:14 208:8
268:11 306:5
guys 23:14 28:3,7
29:4,16 31:11
54:2 56:25 57:14
66:3 82:3 84:10
84:20 91:16 92:5
108:7 122:11
141:7 142:23
144:24 148:3
168:12 174:17
180:11,19,25
181:11,16 183:3
236:15 253:21
254:6,23 269:3
283:7 287:9
288:25 301:19,21
gym 26:21

H

H 3:8
hack 92:22 252:3
hacked 212:6
  249:18,21 250:20
hacker 78:13
hacking 91:14
  93:14 249:10
  250:6
half 11:8 17:18
  18:4 19:4,9,12
  20:3 32:25 71:22
  194:4
halt 119:22
hand 49:18 69:2
  194:5 252:21
  270:4
handed 98:17
  108:21 148:14
  159:8
handful 18:1 21:5
handle 68:25 69:25
  143:12 154:14
  169:11 216:1
  240:10 290:25
handled 43:2 65:14
  83:19
handling 154:11
handoff 222:19
hands 81:10 139:12
  194:8
hands-free 37:23
happen 34:20
  44:20 48:19 49:14
  51:15 74:25
  129:11 139:11
  140:15,19 141:11
  141:11 142:12
  195:3 196:20
  212:1 214:7 219:3
  219:5,20 222:22
  223:24 224:1,21
  224:23 238:11
  288:23
happened 14:10
  30:19 48:20 61:1
  69:10 71:20,23,25

111:5 116:8 128:6
129:17,20 130:7
131:6 134:9,22
135:24 136:1,12
151:22 164:23
165:2,3 171:21
185:24 220:5,17
230:18 238:19
247:25 255:10
260:17,20 265:22
275:3,11 293:2,5
300:10
happening 34:16
  68:8 70:7 79:22
  139:14 195:9
  212:19 224:10
  233:15 238:22
  241:9,14,23 245:4
  283:13 297:25
happens 92:1
  221:20 224:19
  236:14 240:6
happiness 159:17
happy 55:9 131:17
  188:22 283:10
hard 11:8 69:20
  102:18 113:5
  144:11,16 183:24
hardware 39:14,18
  40:2 42:22 64:13
  78:20 84:24
  176:17 304:21
  308:24 309:2,14
  309:20
Harold 12:1
Harrell 11:22
hassle 230:15
hat 78:10,11
havoc 244:2
HAYGOOD 2:3
head 6:8,8 28:2
  65:22,25 119:1
  141:10 164:24
  193:16 207:1
  218:25 254:18

headed 55:9
heading 94:14
  109:8 185:18
  304:1
heads 170:10
  237:25 251:9
health 15:23,24
  17:11 26:21 27:5
  47:14 66:2,23
  192:22 301:6
healthcare 1:10
  5:10 304:11,12,19
  307:22 308:18,22
  309:19 310:15
  313:2,8
hear 111:13
heard 8:6 111:10
  115:18
Hearn 198:1,2
heavily 32:4 38:7
  83:23 104:22
  276:7
heavy 36:24 38:4
  140:25
heck 222:25
hefty 27:22 29:9
held 158:4
helicopters 19:6,8
help 12:23 25:12
  69:11,15 77:13,15
  82:15 99:10
  131:12 135:17
  156:25,25 185:18
  194:16 254:11,19
  278:9 280:3 287:5
  288:25 292:5,5
  301:15
helped 35:19
  131:13 162:1
  259:10 280:14
  292:2 301:18
Helpful 255:1
helping 34:19
  126:11,11 135:14
  145:24 146:8
  156:5,18 184:1

187:14 194:10,13
231:4
hereof 176:19
hereto 4:3 98:23
  112:21 148:19
  163:4 172:23
  176:18 179:1
  192:10 202:9
  242:4 253:8 270:8
  272:19 294:19
hey 10:16 52:6
  101:4 108:22
  131:3 157:18
  169:4,20 175:4,4
  184:9 227:17
  248:21 268:12
  278:22 279:3
hi 179:24
hidden 38:22
high 15:3 26:20
  51:6 78:19 118:21
  310:2
higher 122:11,11
  258:19
highest 304:19
  307:22 308:17,22
  309:19 310:15,23
hindsight 131:18
HIPAA 13:12
  17:14 18:15 46:6
  47:8,8,9,19 49:5,7
  109:3 133:7
  258:16,18 265:5
  267:8 313:19,21
  314:12,15,21
HIPAA's 265:5
HIPAA-related
  266:5
hire 84:11 107:21
  112:2
hired 23:5 31:5
  52:13 75:21 77:12
  77:15 83:8,10
  84:12 104:21
  121:1 191:2
hires 120:23

hiring 79:17 82:18
  84:14
history 33:7,8 52:3
  81:5 104:25 167:9
  235:12 305:7
hit 32:5 96:16
  194:4 200:18
  294:12
hitch 20:2
hitting 251:24
HL7 17:14,16
  18:16 196:22
  198:25 310:6
hoc 22:21
hold 112:6 211:21
holds 222:16
hole 93:5
hole-in-the-wall
  135:10
holes 43:9 170:23
  309:8
Holy 242:16
home 29:24 34:1
  35:1 55:23 73:25
  78:6 115:12
  290:19 291:10
  308:5 311:8
homes 293:12
homme 293:13
honest 11:4 61:9
  64:6 72:8 160:12
  276:1 279:23
  285:9 288:17
  292:13 307:6
honestly 84:24
  131:5 144:7
  254:12 306:6
honing 131:16
honor 167:20 291:6
hook 292:8,16
hooked 72:20
Hope 253:14
horrendous 174:12
horse 247:18
hospital 17:17 18:6
  108:15

hospitals 32:11,14
hosted 108:18
  298:5
hot 118:4
hours 122:13 132:2
house 35:17 87:2,2
  87:3 136:8 291:23
housed 89:21 93:9
  209:9
Houston 51:22 71:1
Howell 1:16 5:1,8
  5:14 262:10,11
  316:3,11
Howell's 172:19
HR 25:5 82:24
  114:25 296:9
huge 46:6
hundred 74:13
  75:15 284:5
  290:15 294:9
hundreds 48:21
  216:2 224:2
  232:16
hunt 130:5 232:7
hurdles 183:12
hurricane 11:2
hydrocodone
  216:21 217:1,2,6
  217:16 219:16
  221:25 222:3,25
  226:20 239:9,11
  239:14,16 240:7
hydromorphone
  216:22 239:9
hype 159:17

I

IBM 168:21 197:22
  254:19
idea 12:7 25:24
  96:23 109:20
  128:12 185:17
  187:25 297:21
  308:25
ideas 26:18 144:14
  184:1
identification

98:23 112:21
  148:19 163:4
  172:23 179:1
  192:10 202:9
  242:4 253:8 270:8
  272:19 294:19
identified 88:17
  117:9 124:20
  312:2
identifiers 225:13
  225:14
identify 86:23 92:4
identifying 304:7
ignorance 247:2
imagine 35:10
  166:17,18 167:2
  174:23
immediate 117:11
immediately
  139:11
impact 159:20,24
  160:3,10,19 212:8
  212:10
implement 36:24
  38:14,20 124:20
  140:4,13,21
implementa 77:1
implementation
  83:11 141:6 142:9
  170:5 179:21
  182:2 183:13
  198:25 206:25
  207:14 208:8
implemented
  182:16 273:18
  296:10
implementing
  268:12
imploded 21:25
  57:9
import 237:11,15
  238:11
important 6:1,4
  43:8 97:13,15
  158:23 195:21
imported 237:12

239:3
impose 220:3
improve 98:9 184:3
improved 184:16
improvement 61:1
  98:2
in-depth 17:16
in-house 17:21,25
  24:11 33:15,16
  39:14 77:16
inaccurate 133:24
included 219:7
  242:12 245:24
  290:23
including 304:20
  307:23 308:18,23
  309:20
increase 43:17
incredible 247:14
Independent 46:5
independently
  126:24 127:1
India 24:24
indicate 317:12,16
indicator 70:11
indirectly 42:16
individual 261:9
  304:15
individually 217:1
industrial 19:23
  26:22 46:14 51:21
industry 20:8 32:6
  45:13 46:2,12,22
  47:1 51:11,17
  59:9,16 67:25
  68:3 70:15 72:23
  120:2 211:24
  304:21 308:8,24
  309:3,20 313:2
info 41:5 166:1,13
  166:14
information 34:14
  40:24 41:7 48:12
  49:6,8 105:16
  106:3 124:10
  153:23 154:3

166:25 206:5
  246:9 247:5,6
  284:15 302:3
  312:8
infrastructure
  39:17 80:16 84:20
  88:19 95:4 107:3
  133:12,15 141:23
  185:16 209:15
  244:22 287:8
  298:7,18 309:15
inherit 314:4
initially 12:25
  143:11 185:22
  190:14
initiative 156:24
inject 44:17
injected 44:21
injection 44:15
inner 194:23
inpatient 35:7
input 13:18
insane 219:2
insert 44:18 50:18
inside 92:24 272:6
inspection 59:22
  116:2,5,8 121:25
inspections 127:8
inspectors 120:3
  122:9
install 140:24 244:1
  244:17
installation 40:1
  86:23 141:23
  180:2 246:14
installations
  267:21
installed 38:24 86:3
  92:19 182:17
  184:18 250:13
  274:3
instance 48:14
  60:11 87:1 213:13
  221:6 309:12
instrument 36:14
  62:8,20,20,24

63:5 64:6 77:1
  102:17 120:11
  153:12 216:24
  217:19 221:4
  231:22 232:18
  234:23 235:4,4
  236:20,24 237:3,6
  239:3
instrumentation
  36:3 153:3
instruments 55:3
  56:5,6 58:3,4
  64:11 119:16,25
  126:17 140:16
  153:24 156:14
  232:14
Insurance 213:21
integral 156:11
  213:22
integrated 25:9
  36:3 54:25 304:17
  306:15,18,23
  307:2,8
integrating 39:20
integration 24:14
  25:7 34:5 36:14
  43:5 53:25 54:14
  62:15 77:1
intelligence 77:21
intending 300:9
intention 300:13
interact 108:20
interaction 120:15
  301:22
interest 294:12
  298:23 299:10
interested 159:22
  160:18 180:1
  277:8 279:4
  280:11,12 299:13
  318:21
interesting 26:15
  51:20 163:22
interface 63:5 64:3
  64:8 193:25
  196:15,16 259:23

interfaced 19:18,19
Interfaces 43:4
interfacing 17:15
    64:13 153:15
interject 125:7
intermittent 224:9
intern 16:17 18:22
internal 24:14
    70:23 80:4 104:14
    104:24 105:23
    106:5 122:18
    149:10 192:6,16
    209:4 252:23
    283:4
internally 93:4
    105:12 106:11
    137:4,5 194:17
    205:8 274:19
internet 42:18 44:4
    304:16,18,23
    306:14,17,23,24
    307:7,12,14,21
internet-based
    305:18
internship 18:24
interpreted 34:13
    120:3 201:20
interruption 105:4
    146:15
interruptions
    317:13
interviews 280:23
introduce 29:8
introduced 5:9
    30:6 268:5 278:20
introduction 73:1
    180:9 182:24
inventory 25:9
investigate 201:11
investigating 27:9
investigation 53:17
    236:5 304:10
investing 257:14
invite 199:7
invited 210:23
involve 42:13

involved 13:5 14:5
    17:7 69:5 83:23
    121:13 153:6
    156:20 170:6
    182:1 183:7
    194:20 220:11
    238:21 258:9
    275:23 276:12
    278:1 280:14
    287:19,20
involvement
    106:16 187:13
    193:10
involves 42:17
IOS 39:17
IP 86:25 87:2
ironic 293:7
irrelevant 159:10
issue 183:17 193:15
    193:15,20 194:25
    196:10 198:4,8
    199:14 203:2
    204:22 207:18
    213:8 220:24
    221:21 223:11
    227:10 229:24
    230:21 238:10
    239:1 241:8 257:5
    259:15,24 261:6
    264:23 268:8,10
    270:21 271:6
    273:2,2,7,25
    308:13
issues 12:19,19
    33:11 100:13,17
    101:16 103:16
    119:5 133:23
    145:25 146:2
    147:1,4 157:11
    175:8,16 183:10
    183:12 193:9
    201:4,8 202:17
    216:13,16 218:17
    230:6 254:1,11
    256:3,12 257:13
    257:25 258:20

    265:23 278:6
    301:6 303:21
it'd 46:9,10
it'll 289:2
IT-related 16:9
item 232:3
iterate 97:24
iterations 254:3

————————————
            J
————————————
James 119:10
Jamie 9:14,21,23
    55:12 76:2,3 78:5
    83:19 84:6 90:5
    90:17 183:21
    194:7,7,15 231:4
    238:20 270:13,24
    273:24
Jamie's 272:12,14
January 173:7,17
    178:19 180:13
    181:10,16,20
    199:15,17
Jason 7:1
Jeff 196:11 197:19
Jeffrey 12:3
jeopardy 117:11
Jesse 2:4 7:1
Jesse's 272:4
Jesus 297:20
jewelry 19:2 24:7,9
Jo 113:12 163:1
job 23:3 27:2 31:3
    31:4 43:6 69:16
    82:1 100:2,7
    105:7 123:2 183:6
    189:22 190:8
    257:8 265:13
    280:24
jobs 22:24 84:15
John 80:6 82:8,8,13
    82:19,20 83:1
JOSEPH 1:24 4:22
    317:3,24 318:7,24
JR 1:24 2:12 4:22
    317:3,24 318:7,24

judge 1:7 49:17
judgments 293:12
July 1:18 316:25
jump 54:13 265:8
jumped 19:5 94:15
    94:23
jumps 101:24
June 116:2,3 119:9
JV 71:15

————————————
            K
————————————
Katrina 32:10
keep 9:11 10:9 17:8
    19:25 58:21 63:8
    69:19,20 147:11
    196:4 235:23
    236:22 238:7,9
keeping 31:23
    43:19 57:4 69:7
    291:8
keeps 40:23
kept 10:11 27:12
    52:11 54:10 57:5
    68:24 69:15 70:4
    70:7 75:22 169:4
    259:14,22 280:19
    301:19
key 102:24
kick 62:20
kicked 58:12 292:3
kicking 32:2,2
kicks 41:8 236:24
    236:25
kid 114:23
kids 26:7
kind 6:24 10:14,22
    12:10 13:1 21:24
    22:13 24:6,19
    27:5 30:14 31:24
    31:25 33:2 37:8
    39:21 40:18 45:16
    50:4 51:23 52:5
    54:7 55:15,21,23
    56:12,19 65:3,11
    65:11,13,14,20,21
    68:24 70:22 71:1
    71:4,16,23 72:1

    74:18 76:16 77:6
    77:19 83:2 84:3
    84:15 86:14 89:9
    94:19 95:1 96:2
    97:25 103:4 106:9
    110:11 119:22
    128:10 129:1,16
    131:9 135:9,16,17
    135:18 137:15,21
    138:19 140:25
    141:15 142:25
    143:23 145:17
    146:19 155:15
    167:12 171:4,15
    182:13 184:2
    187:23 193:16
    194:3,8,9,14,15
    195:10 201:10
    207:21 209:21
    210:25 216:4
    218:7 228:22
    229:8 230:14
    251:8 255:9 257:1
    258:19 259:23
    260:11 263:15
    266:5 272:23
    277:23 287:10,16
    297:17 300:7
    301:14 302:22
    304:25 313:22
    314:4
kinda 10:15,16
    13:3 52:2,5 98:11
    170:8 185:10,18
    191:19 194:5
    207:15 281:17,25
    292:4 301:18
kinds 19:20 27:10
    33:6 78:20 224:4
    266:9 287:1
Kleist 192:8 197:20
    197:21
knee 195:24 265:23
knew 27:3 49:3
    110:13 129:8,9,10
    137:14,17,22

139:1,6,12,22,24
142:10,15,25
144:5,6 164:23
167:11 168:9
169:25 180:10
191:23 192:1
228:15 271:5
**knocking** 45:22
**know** 5:11 10:20
11:9,21 12:11,18
12:25 13:7,13
14:17 15:21 17:1
17:7 18:3,16
23:11 26:3,9,15
28:16 30:18,25
36:15,21 38:12,17
38:19 40:16,25
43:9 44:8,13 45:2
46:7,13 47:1,5,9
48:3,21,25 49:7
50:8 52:7,13,14
54:4 55:2 56:2,10
56:13,20 57:14
58:18,19 61:20
64:14 65:11,19
66:7 67:1 68:22
69:21 70:11 71:3
71:5,16,17,19,23
72:18,21,24 77:1
77:9,21 78:5,11
79:22 81:3,4,18
81:18,25 82:10,25
84:25 85:6,6
87:22 88:13 89:23
91:12 92:8,10
93:7,13 94:18
95:5 96:20 100:9
100:10 103:12,15
104:20 105:24
107:10,13,16
111:15,15 112:1,1
112:6,9,10 113:1
113:11,25 115:13
115:17,17 117:3
117:17 118:14,21
118:22 119:13

120:21 121:14
122:15,20 123:2
124:2,5,18 125:5
126:19 129:11
130:8 131:10,11
132:10 134:9
135:11,15,21,22
136:2,3,5,17
137:2,16 138:7,8
138:13 139:3
140:8,9,9 142:10
143:17 144:2,9,10
144:12 145:22
146:25 151:18
152:22 153:1
156:3 158:12
159:16 160:16
164:6,21 166:15
166:22,24 167:16
167:23,25 168:24
169:13 170:1,11
170:24 171:1,5,11
171:15,23 172:8
179:17,25 180:18
180:25 183:4
187:2,14,18
188:16,16 189:5
190:16 191:11,19
191:21 193:6,7,23
194:23,25 195:20
195:24 196:4,5
197:22 199:16
200:10,22 201:22
202:14,16 204:16
205:22 206:7,23
207:6,7,9,16,20
208:4,18,22 209:1
209:5,8,23 212:2
212:7 216:14
219:16,24 220:5,8
220:10,14,16
224:9,17 227:10
227:22,23 228:21
230:1,8,17 231:23
232:11 233:3,23
234:9,18 235:25

236:2,25 238:14
238:17,24 241:14
242:24 243:9
245:12 247:24,25
248:11,24 249:12
249:14,16,21
251:2 252:2
253:25 254:4,10
254:14 255:17,21
257:10,20 258:16
259:3,7,8,16
260:19,21 261:2
262:5 263:25
264:14 265:21
266:1,2,17 267:9
267:11,17 271:1
271:23 274:22,25
275:1 276:3 278:2
278:3,13,19,21,25
279:7,17 280:21
281:2,12,19
282:25 283:12
284:10 285:1,2,10
285:23 286:1,19
288:2,16,16,25
291:19 292:8,13
293:7 294:13,25
295:11 296:16
297:18,23 298:10
298:16,19 300:2,5
305:3,8 306:5
307:15 309:16
313:19 314:25
**Knowing** 96:8
**knowledge** 34:14
45:14 145:17
191:21 207:19
244:3 248:4 269:7
275:25 310:10
314:24
**knowledgeable**
318:16
**known** 23:5 167:23
171:1 199:22
200:20,21 202:12
207:21 259:18

**Knox** 85:2 91:13
**Kris** 113:10 122:21
123:1 145:19
**Kristen** 192:8
197:20,20 198:23
198:23 199:9,13
202:3,7
**KUPPERMAN**
2:10
**Kyle** 178:22 277:13

---

**L**

**L** 4:1
**L.L.C** 2:11
**lab** 20:9,16,25 35:5
35:6 36:24 46:9
51:8 52:3,15
53:24 57:2 59:13
63:9 67:4,7,20
69:23 73:1,3,12
76:24,25 77:3
94:24 95:24 96:10
96:22 97:3,7,17
97:25 98:4 99:8,9
100:10 102:1
104:17 105:2
108:21 110:20
114:15 115:14,25
116:14 117:17
118:3,11 122:6,20
123:6 124:20
126:23 128:17,25
129:23 133:11
135:3,4,8,14
137:2,4 138:8
143:21 145:13,17
145:22 146:8,9,10
150:6 151:15,19
151:19 152:23
153:12 154:11,15
156:10,22,23
159:7 161:7
165:17 182:16
185:19 186:15,16
188:19 191:7,8
194:10 195:13,15
195:21 196:8,19

197:8 220:13,16
225:15,16,19
226:8 231:2,3
233:5 235:21
236:3 246:17
248:19 250:4
252:3,11 255:5
258:14,25 259:3,5
259:12 274:8,19
274:20 275:4
276:13,21 277:9
277:13,18,20,21
280:11,14 281:1
286:22 287:10,12
291:9
**lab-related** 124:14
**labels** 118:13
**laboratories**
303:22 304:7
305:16
**laboratory** 20:12
21:7,23,23 23:3
36:16 51:21 60:12
104:24 117:12
118:22 119:10,11
120:20,22 124:18
124:22 125:3
133:18 136:18
146:16 156:7
186:11 225:7
240:21 254:16
262:23 281:19
305:13
**LabPath** 12:5
**labs** 13:4 36:1
56:19 118:17
131:11 146:25
151:18 164:3
176:5 185:12
187:2 195:23
209:1 245:10,14
246:7,16 248:17
251:14 252:3
275:19 276:4
280:24 304:15
**labs'** 246:7

Lacie 113:12 163:1
lack 240:16,22
    247:16 267:3
    310:11
lacking 209:18
    266:8
Lafayette 19:3
    26:14 115:4
Lafleur 105:25
    113:10,12 114:11
laid 18:13,13 56:10
    79:13 115:10
land-based 29:11
landed 65:15
    232:12
landing 26:22
lands 247:12
language 17:15
    44:18
laptop 48:15,16
    87:8
largest 198:13,15
Larry 11:24 155:7
    155:10
late 21:2,22 141:14
    193:17 238:23
laterally 126:7
laugh 91:17
LAURENCE 2:12
law 4:7
laws 313:13
lawsuit 5:10 7:12
    12:15,25 13:18
    283:16 286:10
    302:3
lawsuits 282:22
lawyer/client 175:8
laying 182:10
LC-MS 53:16,24
    54:14,23 56:6
    58:3 94:13 96:15
    96:16 100:9 221:7
    229:19 231:11
LC-MSs 60:13
LDH 119:8
Lead 283:16

leader 69:15
    149:10,12
leadership 17:19
    34:18 65:19
    253:20 280:18
leading 70:11
leads 253:15
leak 260:4 312:14
leaned 128:21,21
leaning 143:24
learn 67:14,22 68:2
    68:4 141:24
    144:16 208:21
learned 76:17
    97:16,16
learning 17:7 44:23
    52:2
leave 22:14 36:25
leaves 203:4
leaving 93:13,14
    185:23 284:24
led 129:1
Lee 28:19
Lefleur 163:1,1
left 20:5,15 23:2
    32:23 80:21,25
    114:18 115:8
    131:10 149:21
    194:6 203:15
    204:8 258:5 294:9
    317:17
legacy 31:21
legal 18:9,9 104:14
    104:15 122:17
    174:23,24 282:23
legs 20:4
lemme 309:2
length 43:23
lengthy 17:24
lesser 212:5 247:22
LeSueur 2:12 3:4,6
    5:6,8 42:9 45:12
    46:4 47:13,21
    49:15 50:22 59:2
    66:6,11,17 67:9
    74:6 83:17 87:13

94:1 98:25 104:12
105:5 107:20
108:3 109:15
110:4 112:23
113:24 114:7,9
121:11 125:14
127:15,23 131:23
132:20,23 133:20
134:4 142:17
143:6 146:17
148:1,13,21
152:14 153:21
159:1 162:21
163:6 166:12
172:25 175:11,14
177:17 179:3
181:5 182:6 185:2
189:16 190:24
192:12 198:18
202:11 204:4
212:23 214:13
219:10 223:21
229:22 233:12
241:6,13 242:6
253:5,10 256:6
264:22 267:4,19
270:3,11 272:8,10
272:21 273:17
274:15 276:2
284:3 285:11
290:8 291:3
294:21 295:20
296:1 297:2
299:15,24 302:11
302:15,18 306:20
307:11 309:21
311:13 312:17,22
314:6,13
let's 18:20 36:25
    37:1 50:2 52:7
    60:23 129:18
    130:8 131:4 135:2
    151:17 165:22
    202:17 213:13
    216:18,22,23
    217:23 221:12

225:21 237:13,19
239:8 249:1 257:1
257:22 262:18
306:10,12 307:20
letter 56:9 67:11
    103:1 113:16
    114:10,22 115:15
    115:20,22 119:8
    120:9,13,14 121:5
    123:4 125:1,2,4
    125:11,21 128:7,7
    134:25 150:2
    163:19 165:3
    202:1 225:23
    274:7
letterhead 58:14
    119:17,19 120:10
letters 17:2
letting 276:20
level 46:12 63:16
    69:20 78:19 90:22
    105:21 117:10
    124:19 126:18
    144:22 168:18,20
    169:7 170:25,25
    195:5 215:5,8
    239:13 257:2
    258:19 274:24
    277:10 281:7
    283:10
leveled 16:13
levels 36:15 152:25
    234:21 235:2,5,9
    235:11
liability 177:4
license 176:17
licensing 109:16
    112:12
liens 291:23
life 35:25 36:7
    60:22 67:23 68:4
    82:16 112:7
    281:22,25
lifting 140:25
light 23:17 76:17
    100:22 188:24

Lighthouse 12:8,10
lill 22:24 27:13
    291:19
limit 264:13
limitation 215:24
Limitations 177:4
LIMS 22:8 35:5,12
    35:14,15,17,18
    36:13 42:3,10
    52:17,19,20 53:2
    53:5 59:10,21
    62:2,3 63:11,20
    63:23,24 64:21
    77:4 85:21 94:3
    95:14 96:22 97:4
    101:4 102:9
    103:21,25 104:5
    107:5 108:8
    109:12 110:14,17
    123:14 127:20
    128:2,24 129:24
    130:21 131:25
    132:13,25 133:2,4
    133:24 134:8,14
    134:22 136:23
    143:13 151:2
    185:23 186:3,8
    214:17 228:7,8
    229:10 254:17
    255:3 278:12
    297:24
LIMSABC 22:10
    52:24
line 96:12 101:2,14
    164:5 166:2
    168:14 171:8
    192:2 242:16
    277:3 284:20
    287:18 298:3
lingered 136:9
link 57:23 243:6
    251:10,15
LinkedIn 23:22
    67:2,16 68:12
LIS 42:3,10 57:21
    130:21 143:10

**EXHIBIT B**

154:7,10,25 159:2
159:4 180:1
297:15 304:10
LIS's 209:2 304:13
304:17 306:15,18
list 36:23 48:21
101:11 123:4,5
144:14 156:14
175:20 199:14
217:1,2 222:1
229:16,18 230:24
232:16 251:14
263:23 297:5
listed 100:13
155:18 205:13
232:16 241:8
295:10,15 306:5
listening 132:22
LISTM 304:12
lists 117:14 156:13
literally 102:16
119:17 232:1
251:12 307:3
little 7:23 14:21
16:24,25 22:24
23:12 28:21 29:6
33:23,25 57:4
71:4 75:23 84:6
84:16 86:4 94:3
95:1 103:1 135:9
135:10 140:21
141:16 143:1
152:10 161:8
165:4 166:2,18
175:12 186:23
193:11 208:21
213:1 215:6 244:2
247:8 253:24
255:10 256:19
257:14 276:9
288:24 301:15,16
301:19 305:1
live 61:22 64:20
94:6 115:4 187:3
187:19,25 189:10
189:18 274:8

lived 60:22
lives 11:3
living 26:13
LLC 1:5 41:21,22
72:17
LLP 2:3
LMS 106:13
127:11,16 129:4
153:9
load 36:24
loan 37:1 134:18
290:19,20,21
291:9,10 293:8
loans 75:16 295:21
295:24
Lobell 278:19
local 70:25,25 73:1
75:8 157:24 186:4
localized 69:12
246:14
locally 250:20
locate 230:15
located 73:10
209:14
location 32:22,24
38:5 52:7 86:8
87:4 261:24
locations 32:21
36:22 130:2
lock 181:7,8 203:6
locked 174:1
locks 92:24
log 87:4 88:21 89:3
202:25 203:5
204:7 205:1,9
206:5 210:25
211:3 243:17
267:24 271:1,12
271:17,24 305:19
308:10
logged 203:9,11
266:11,23
logging 88:7 202:22
265:3 266:3,6,9
266:10,10 304:24
310:15,16,19

logic 213:23 224:4
login 86:18 189:24
190:10,12 203:24
205:10 308:6
311:9
logins 262:8
logistical 194:16
logs 63:15 238:7
265:7 266:16
Lon 5:8
Lon's 272:7
long 23:21 26:4
36:23 52:3,9 61:6
79:10 81:5 94:5
124:5 140:3
149:14 171:13
234:20
long-term 135:19
longer 21:6,6 22:5
23:15 150:3 260:5
look 11:11 14:2,14
59:20 63:14 89:4
112:3,10 144:20
147:21 161:8
197:1,2 202:17
205:1 208:21,22
208:25 216:5
217:2 223:2,3
230:13 231:21
232:2,3 236:15
237:17 239:19
252:25 257:9,9,22
269:14 298:5
303:19 306:7,8
307:15 313:5
looked 12:25 16:16
36:22 55:23 59:15
75:20 114:5
128:12 143:1
145:10,11 163:21
167:13 174:18,25
175:1 176:1
217:17 220:10
234:9 235:15
307:13
looking 36:1 38:13

47:23 51:9,25
55:22 61:18 70:3
76:8,18 95:24
110:20 128:13
129:9 135:14
137:8,23 143:7,9
143:25 145:12
151:12 154:21
156:1 175:24
180:7 201:5
215:16 238:21
242:22 255:3,6
257:20 265:9,21
265:22 266:18,18
305:17 310:5
looks 141:13 155:6
157:10 225:20
273:12
loop 57:5
loopholes 257:9
looping 249:10
Lorrie 172:17
lose 101:17
losing 230:3
lost 48:15
lot 16:2,11,11 18:14
24:14 28:23 29:5
30:23 31:14,15,20
31:20,24 34:14
52:3 56:17 61:2
65:18 68:23 69:2
72:4 76:17 78:7
83:19 105:18
124:13 131:24
132:2,2,4 137:25
140:14 141:3,5,18
141:19,19 155:16
156:17 157:9
161:6 170:6,7
188:13 191:20
194:6,10,25 195:3
195:18,25 196:7
196:12 199:11
205:18 211:13,19
212:9,14,15
217:12,12 226:18

227:1 233:4,4
234:14,14 235:6
235:10,11,13,15
235:18,22 236:14
238:18,18,19
241:20 243:24
249:22 256:16
257:13 259:13
277:25 278:5,5,6
279:16,16,17
280:5,8 282:10
284:21 289:10,11
289:12 291:18
292:2,2 296:14,20
298:16,16 300:3,3
300:4,17 314:19
lotta 278:5
louder 69:2
Louisiana 1:2,18
2:6,15 4:24 5:2,17
71:1 157:23 158:2
164:12 317:5,7
318:8,18
loved 80:10
low 212:24
lower 87:24 283:10
LS-MS 58:10
luck 111:25 112:11
131:11 139:17
lump 29:18
lunch 6:23
Lynn 98:18 99:8
102:7,24
Lynn's 100:2

**M**

M 3:1
Madeline 178:21
179:16,24
magic 249:21
MAGISTRATE
1:10
magnitude 36:19
256:18,23
maiden 9:24
main 146:7 283:6
maintaining 32:21

| | | | | |
|---|---|---|---|---|
| maintenance 235:5 | 201:24 278:19,21 | 33:7,10,22,22 | 207:19 208:23 | measures 209:16 |
| major 13:11,11 | 279:1,1,3 294:16 | 34:21 36:10,11 | 209:15,20 210:5 | 211:22 |
| 204:21 295:21 | marked 98:17,22 | 41:16 42:21 46:6 | 210:14 211:15 | mechanisms |
| 310:11 | 112:20 147:19 | 46:12 48:18 50:12 | 212:18 216:16 | 106:21 |
| majority 182:11 | 148:15,18 163:3 | 55:12 56:22 59:8 | 218:19,19 219:3,5 | medical 1:4 17:14 |
| making 34:20 43:1 | 172:22 178:19,25 | 61:20 65:6,7 | 219:14,14,15 | 18:14 22:22 23:16 |
| 43:21,22 44:2,6 | 192:9 202:8 222:8 | 68:21 69:12,23 | 220:21 224:1 | 23:17 32:1 33:8 |
| 61:19 159:24 | 222:17 223:5 | 70:8,10 71:22 | 225:14 227:18 | 34:10 35:10 40:5 |
| 160:19 232:19,19 | 242:2,3 253:7 | 72:17 75:1 78:15 | 228:23 229:2,18 | 40:7,15 41:2 |
| 311:22 | 270:7 272:18 | 78:16,22 81:1,16 | 232:22 234:9 | 46:17 47:18,23,24 |
| malicious 210:15 | 294:18 | 81:18,24 82:4,13 | 236:14 237:14 | 48:6,9 51:13 |
| maliciously 251:4 | market 29:8 61:20 | 82:24 83:1,24 | 238:18 241:16 | 59:15 60:9 67:25 |
| man 23:10 26:14 | 205:17,21 | 85:2,5,20,22 89:1 | 248:5,7 249:9 | 68:3 210:2 211:24 |
| 78:22 162:12,19 | marketing 21:12 | 89:12 91:16 92:2 | 251:5,11 252:11 | 213:10,20 265:8 |
| 212:5 235:18 | 61:19 71:7 157:10 | 93:16 97:7 98:10 | 252:15 254:12 | 265:10 267:3 |
| 260:25 282:15 | 157:12 158:9 | 99:22 100:16,21 | 255:12,20 256:22 | 308:8 |
| manage 23:6 25:13 | 159:23 303:11 | 101:3,20 105:20 | 257:7 259:4,10,14 | Medical-based |
| 77:16 257:8 | marketplace | 106:16 107:9,21 | 261:10,11,12 | 267:6 |
| managed 17:20,21 | 304:11 | 111:9,14,25 112:1 | 263:14 266:3,4,8 | Medicare 21:4 |
| 18:7 22:7,10 34:4 | marking 112:18 | 116:13,15,18,20 | 267:7 269:21 | 46:10 313:16 |
| 257:6 | 147:24 148:16 | 116:25 117:16 | 271:7 275:10 | medication 213:8 |
| management 16:9 | 162:24 192:5 | 118:10 119:22 | 276:6,19 278:4 | medications 33:9 |
| 23:6 28:5 37:11 | 252:21 270:5 | 120:22 123:17,20 | 279:21,25 281:16 | 214:4 215:10 |
| 59:11 95:6 185:19 | 272:13 | 131:3,4 132:5,10 | 284:17 285:16,20 | meet 32:14 117:13 |
| 186:10,11 | Marriott 1:17 | 134:11 137:1,6,9 | 285:24 286:3,19 | 123:6 183:22 |
| manager 21:17 | Martin 115:22,24 | 138:2,7,13,18 | 286:25 287:22 | 304:14,19 307:22 |
| managers 77:18 | Martinez 178:22 | 139:19 140:8,10 | 288:1,12,15,22 | meeting 13:16 14:6 |
| Mandeville 5:2,16 | 242:15 | 140:12,20 141:22 | 290:14 292:13 | 14:9 125:17,20 |
| 19:10 26:13 52:7 | massive 287:1 | 142:10 143:11 | 293:3,10 296:14 | 126:17 134:6 |
| 292:23,24 | master's 15:17 | 144:1,14,19 145:4 | 297:4,17,21 | 136:10 141:9 |
| manipulating | match 240:3 | 145:13,14,19 | 298:10 300:5 | 142:20 199:7,16 |
| 266:21,22 | matched 236:21 | 148:23,23 152:9 | 301:10,12,13 | 199:17 |
| manpower 132:2 | matches 181:17 | 152:22 156:4,9,12 | 306:6 308:6 311:5 | meetings 11:19 |
| manual 54:20 | matching 124:12 | 157:10,13 158:21 | 313:7,19 | 13:23 170:6 |
| 119:25 214:11 | materialized | 162:4 165:10,13 | meaning 165:14,15 | 182:23 |
| 227:5 | 136:20 256:24 | 166:5,9,10,14 | meaningful 32:2,14 | mega 20:15 |
| manually 216:1 | materials 158:19 | 167:22 169:6 | 314:18,19 | memory 57:8 75:2 |
| 229:7 238:7 | 303:12 | 170:4,22 171:22 | meanings 165:16 | 113:4 161:17 |
| 239:24 | matter 133:16 | 172:4 173:18 | means 37:12 45:1 | 169:12 172:2 |
| manufactured 19:2 | 256:25 318:21 | 174:2,9,17,18 | 106:25 118:1 | 260:4 |
| manufacturing | McKinney 146:6 | 175:21,24 182:23 | 199:16 205:4 | men 174:20 |
| 24:8 | 146:23 | 183:10,16 185:10 | 216:17 227:4 | mention 10:14 |
| mapping 216:1 | mean 8:14 11:6 | 187:5 191:20 | 255:24 260:4 | 100:12 |
| March 242:17 | 16:22 17:8,16 | 193:24 194:19,23 | 308:25 | mentioned 9:21 |
| mark 98:15 129:18 | 18:12 21:20 28:18 | 201:14 205:5 | meant 120:5 | 16:20 24:20 28:11 |
| 147:20 172:18 | 28:19,20,22 29:24 | 206:2,3,21 207:13 | 202:23 290:2 | 33:3 35:12 40:8 |

EXHIBIT B

43:10 70:21 73:3
83:7 87:15 91:12
102:9 103:4
112:19 114:11
135:3 138:12
149:11 154:12
206:9 219:25
221:1 222:1
233:25 254:14
277:4 286:14
295:11 298:22
313:1
**mentioning** 147:5
**mentions** 113:15
150:5 312:25
**Mere** 207:10
**merge** 1:10 5:10
22:8 59:10 83:9
83:12 84:12
110:21 128:5,10
128:21,23 129:2,3
129:9,22 131:19
137:6 139:2,21
141:3 142:11,16
142:20 143:18,24
145:3 146:3,18,24
151:12 152:2
154:7,10 155:3
157:1,8,18,20
158:2 160:3,22,23
162:9,15 163:17
164:2,6,14 167:9
170:18 172:20
173:5,8 176:21
178:21 179:20,22
180:1,12,19,25
181:4 182:2
185:24 186:8
187:3 189:19,22
190:8 191:4,12
192:1,5,6,16
193:11 194:8
195:17 196:16,21
197:2,4,24 199:21
199:22 200:20,21
200:24 202:13

206:12 208:1
211:5,13 214:21
222:17 225:5
226:3 227:17
228:16 231:18
235:19 236:22
237:5,11 239:4,4
239:19 240:4
242:23 243:11,16
244:6,9,16,17,20
244:25 245:5,8,22
246:18,19 248:20
248:22 250:17
251:15 252:12,23
253:4,12,20
255:22 259:18
260:3 261:7
267:21,25 268:5
271:11,22 273:1
273:18 274:3
278:10,11 287:2
290:14 291:20
293:8 294:7
297:15 299:16
304:12,13,17
305:12 306:15,18
307:9 309:10,18
311:1,7 312:9
**Merge's** 166:15
206:10,13,14,15
207:22 304:11
306:24
**merge.com** 268:22
**meshed** 58:10
59:12
**mess** 240:10
**message** 130:1
242:17
**messages** 284:9
**met** 12:13 25:25
26:12,14 51:7
55:21 135:5
144:10
**method** 221:6,11
318:11
**methods** 188:12

274:21
**Mexico** 28:4
**Meyers** 12:3
**Michelle** 188:20
258:14 259:12
**microbiology**
154:13,20
**Microsoft** 16:24
91:4 200:8
**microsoft.net** 34:2
**mid** 193:17 227:15
**mid-'14** 76:2
**mid-'15** 104:16
**mid-'16** 187:21
189:18
**mid-2015** 71:24
79:7,8
**mid-ish** 79:6
**middle** 1:2 28:5
54:13 62:11 94:15
94:24 106:9
150:21 163:24
234:13 278:3
292:19
**midst** 72:1 146:19
**midyear** 23:2
**migrate** 36:13
**migrated** 22:9,10
59:12 278:11
**migrating** 36:21
**migration** 34:19
287:5
**migrations** 140:15
**miles** 136:19
**military** 122:10
**million** 29:17
136:19 242:20
290:18,20 291:10
297:1,3,8
**millions** 20:15
**mimicked** 144:22
153:4
**mind** 226:7 246:6
285:17
**mindset** 297:23
**mine** 51:18

**minimal** 74:8 75:1
182:5 187:17
189:1 274:24
301:17
**minimally** 42:22
**minimizing** 44:5
**minimums** 291:7
294:6
**minute** 208:17
238:1
**minutia** 168:23
188:17
**missed** 235:12
244:25
**missing** 225:13
272:2
**Mississippi** 129:23
185:7
**misstep** 224:17
**mistake** 93:2 218:4
223:13,18 224:23
**mistakes** 219:4
**mixed** 231:20
232:13
**mobile** 37:10,13
38:1 39:12 40:1
**mobilized** 79:20
102:22 135:17
**mode** 221:7,9,10
222:4 263:9
297:23
**model** 146:13
185:13
**modular** 77:3
**module** 154:14
**moment** 166:16
255:16
**momentum** 55:17
**Monday** 200:10
**money** 13:3 27:17
74:21 132:4 280:3
282:13,25 284:4
286:12 290:11
301:2
**monitor** 19:24
92:11

**monitored** 19:14
91:23
**monitoring** 19:14
117:3 234:24
247:22
**monitors** 92:23
**monotonous**
214:11
**month** 261:2 274:3
**months** 8:7,11 9:2
71:25 76:1 87:17
94:9,10 95:12
96:6,7,14 134:13
137:21 138:13
140:11
**morning** 181:9
**motion** 28:2
**motivated** 6:3
**mouth** 292:4
**Mouton** 178:23
**move** 28:1 50:2
98:7 111:4 126:11
129:15 134:14,21
216:9 229:25
230:9 288:3,24
**moved** 19:1,10 28:4
28:10 112:6
116:17 164:10
166:1 275:7
**moves** 146:12
**movies** 249:14
**moving** 43:15
52:10 60:3 147:16
151:5 161:5
287:19
**much-needed**
233:11
**multiple** 235:1
254:17 260:17
262:8 291:12
**mutual** 72:22
**MySQL** 206:18
309:6

---

**N**

**N** 3:1,1,1,8 4:1
**n't** 107:10 108:12

**name** 5:8,12 9:19
  9:24 12:5,19 17:2
  24:1 28:22 39:6
  41:15 47:23 48:5
  72:11 73:7,8,10
  73:11 76:12 78:24
  79:4 80:7,7 86:19
  86:20 89:13,24
  92:16 120:21
  122:23 135:20
  137:7 149:1
  152:23 155:20
  179:18 183:1
  196:13 203:24,25
  206:20 207:23
  208:1,9 210:21
  237:1,7 243:10,12
  243:15 244:8,14
  245:2,6,7 246:11
  246:13 248:8
  264:25 266:19
  268:1,3 277:17
  296:8 308:5
  313:20 314:25
**named** 5:3
**names** 18:17 29:1
  46:20 78:25
  105:19 206:1
  304:20 307:23
  308:19,23 317:19
**Nanos** 253:12,17
**nature** 138:19
  317:10
**navigation** 95:9
**near** 60:25
**necessarily** 84:1
  97:21 101:7,21
  191:16 226:4
  235:19 297:16
**necessary** 40:2 41:2
  41:7 49:22 51:15
  69:22 107:9,11
  108:2 209:21
  240:16
**necessities** 32:1
**necessity** 41:2

213:10,20
**need** 40:3 48:10
  52:18 54:5,13,16
  62:18 69:3 70:2
  82:15 86:17
  101:18 109:5
  120:11 125:11
  156:20 157:2,18
  160:13 166:1,3,14
  166:14 167:14,18
  203:23 209:25
  215:25 216:5
  221:15 228:10,24
  235:7 236:9 238:2
  239:7 240:20
  243:14 249:25
  262:14,20,21
  265:6
**needed** 53:14 76:20
  77:14 85:1,4
  107:15 109:2
  110:14 116:23
  128:16,24 129:24
  130:25 143:22
  144:7,21 159:5
  193:25 207:23
  208:20 211:22
  215:18 223:14
  240:23 255:9
  261:13 263:5
  298:4
**needing** 101:15
**needs** 6:9 60:16
  90:22 108:17
  119:21 133:9
  152:1,3,13,17,20
  171:1 224:25
  236:7 239:14
  264:4 304:14
**negative** 172:7
  213:12,14 221:7,9
**negatively** 65:25
**neither** 111:12
**nest** 75:11
**net** 34:1
**network** 51:16

77:12 80:17 86:11
  88:15 92:18
**networking** 81:4
**networks** 85:11
  88:5
**never** 13:21 16:15
  59:19 61:22,22
  62:2,6,7 63:4 64:1
  67:3 80:9 91:22
  108:21 109:10
  111:7 121:6
  128:24 136:1,18
  136:20 143:14,20
  161:22 168:9,9
  184:18 187:5
  222:13,20 224:17
  227:21 230:4
  237:5 255:10
  271:14,17
**new** 2:6,15 32:8
  36:8 55:23 59:23
  76:17,22 84:11,12
  102:8,20 124:19
  136:7,8,23 140:4
  143:10 186:9
  200:19 222:6
  226:22 234:14
  235:11 239:15
  240:2 254:14,15
  258:1 264:4
  274:21,21 278:12
  292:20 297:15
  298:15
**newest** 272:25
  273:6
**NextPhase** 279:21
**NextPhaseMD** 21:1
  57:3 131:8 182:9
  194:3 276:8 282:9
**nice** 30:24 38:13
  137:12 247:12
**nifty** 249:9
**night** 55:13 237:14
**nightly** 41:8
**nine** 6:21,22 51:3
  304:14

**no-brainer** 204:23
**no-no** 265:11,20
**nobody's** 30:21
**nods** 6:8 177:5
**noise** 91:24
**non** 210:6
**noncompliance**
  117:10
**noncompliant**
  123:14
**nonprofit** 18:25
**nonstop** 55:14,14
  56:7
**nook** 122:14
**Nope** 6:19 269:20
**normal** 212:25
  225:24
**normally** 94:15
**Northpark** 1:17
**notate** 172:19
**notation** 113:22
**notch** 69:24
**NOTE** 318:4
**noted** 316:13,15
**notes** 172:8,12
  289:22 290:11,13
  293:21
**notice** 4:7
**notif** 225:23
**notified** 207:10
**November** 122:1
  149:24 150:10,23
  154:4,5 160:1
  161:11 162:20
  193:17 273:19
  303:15 305:5
**Noz** 79:1,1,1,1
**number** 47:18
  52:23 53:5 70:17
  70:17,18 87:23,23
  105:1 128:12
  148:3 161:2
  172:21 187:7
  220:4 225:15
  228:24 232:2
  237:4 247:4 254:7

258:10
**numbers** 62:17
  113:23 114:5
  150:16 228:3
  295:5
**nurse** 27:3

**O**

**o** 3:1 4:1 68:4 317:1
**oath** 4:25 5:5
**Object** 42:5 45:8
  46:1 47:12 49:10
  58:24 62:5 66:5,9
  66:15 67:6 74:3
  74:24 83:14 87:12
  97:6 103:9 104:10
  106:15 107:18,24
  109:14,25 121:9
  127:14,22 131:21
  132:15 133:14
  134:2 140:7
  142:14 143:4
  152:8 153:19
  158:25 160:7
  164:19 166:8
  170:21 175:7
  177:14 181:3
  182:4 184:25
  185:9 189:14
  190:19 194:22
  198:17 203:20
  212:21 214:10
  219:9 223:17
  233:9 240:15
  241:2,11 249:8
  256:5 264:20
  267:14 273:16
  274:11 275:22
  282:7 283:25
  285:7,20 286:17
  290:6 291:2
  295:18 296:25
  299:12,22 309:22
  311:14 312:18
  314:3,10
**objection** 47:16
  50:19 114:6

162:17 219:13
267:2 295:23
306:21
**objections** 4:11
**obligated** 281:18
**obtain** 246:10
**obvious** 249:15
**obviously** 70:3
87:21 99:23 130:4
137:7,17 138:20
143:14 250:1
**occur** 223:13
252:19
**Ochsner** 17:17 18:8
18:11,12 19:11
20:3,4,5 25:19
31:3 32:5,22 35:2
35:18 48:20 59:14
85:8 265:16,18
**Ochsner's** 48:14
**October** 52:16
57:15 74:16 96:4
97:2 200:10
273:25
**odds** 212:19
**offer** 39:24 277:20
**offered** 19:21
277:16
**offering** 180:8
186:10,11 278:24
**offhand** 313:20
**office** 63:10 77:25
78:4,7 122:7,16
**officer** 105:10,15
120:20 317:5
318:8
**offices** 116:17
**official** 28:25
**officiated** 4:24
**oh** 40:10 42:11 53:8
68:13 73:4 78:2
79:11 89:8 91:25
97:12 120:4 122:4
135:1 174:4
183:19 190:6
195:22 207:6,11

214:20 218:3,12
234:3 243:1
250:19 252:5
281:15 288:10
296:3 300:19
301:4,24 302:16
**oil** 19:5,7,22 20:8
20:13 24:20 27:19
28:7 51:10
**okay** 5:20 6:10,17
6:20,22 7:1,11,18
8:3,8,11,20,22,25
9:6,17 10:13
11:17 12:13 13:16
13:25 14:20 15:9
15:13,15,22 16:20
18:20 23:19 24:19
25:18 28:15 29:18
29:23 30:4,11
31:1 33:13 34:3
35:3,16,24 36:10
37:3 39:10 40:4,8
40:12 41:23 42:1
42:12,19 45:18
47:22 49:19,23
50:2,9,11,14,16
55:4 58:5,17,21
59:3 61:24 62:2
62:13 63:9 64:16
65:17 67:1 68:7
68:11,14,17 73:9
73:21 74:7,14
75:13,16 78:2,8
79:15 80:2,21
81:12,17 82:12,17
83:4 87:5,14
88:24 89:5 90:25
91:9,12 92:15
93:22 95:20 96:5
96:19,23 97:3
98:24 100:5 102:5
102:7 103:3,23
104:13 107:2,5,16
108:4,7 109:11,20
111:21,24 112:15
113:19 114:8,14

115:13 116:11,13
118:8 121:14,19
121:22 122:5
124:15 125:21
126:19 127:2,7,19
130:14 131:2,17
134:20,24 135:24
136:14 141:4
143:7 146:21
147:4,7 148:7,20
149:7,23,25
150:19 151:7,14
151:23 153:22
155:3,17 157:25
158:8,11 160:20
161:14 162:3,23
163:7,9,16 165:7
166:24 167:8
168:2,6 171:17
172:10,16 175:19
176:12 178:4,18
179:14,24 180:11
181:6,15,20,24
182:21 183:9
184:18,21 186:18
188:4 189:3,21
190:13,25 191:9
191:11,15,17
192:4,20 196:9
197:17,23,25
198:4,11 199:2,13
200:6,9,14,23
201:9,13,19
202:17,20 204:5
206:15 208:10,19
209:19,24 210:11
212:11 213:3,18
215:11 216:7
217:14,21,23
218:15,23 219:24
220:9,23 222:9
223:7,22,25
224:12,20 225:2
227:10,14,16
228:1,6,9,12,18
229:6 230:11,17

230:22 231:1
232:21 233:13
234:2,8,12 235:25
238:14,25 241:19
241:23 242:1,5
244:4,8 245:9
248:6,10,16 249:3
250:3,19 251:17
252:8 253:19,25
256:25 257:4,11
258:7,13,15 259:1
259:6 260:22
261:17 262:10,13
263:10,20 264:8
268:23 269:13
270:1 272:2,23,25
273:23 274:6,16
276:3,18,25 277:2
279:8,11,20
283:20 285:16,25
286:2,14 289:9,21
290:13 292:18
293:25 294:4
295:4,9 296:4
297:8 302:25
303:2,5,18 306:3
306:9 307:20
308:3,21 310:1,25
311:21 312:21
313:18 314:16,23
315:2
**old** 10:20 11:8
53:21 59:9,11,14
59:19 60:1 64:11
64:11,11,12 78:13
135:7 137:18
229:8 271:1
305:14 309:7,12
309:16
**older** 78:16,17,17
138:24
**once** 20:7 76:7
79:21 131:5 134:5
141:25 151:15
165:25 166:13
188:19,21 190:15

190:22 194:2,4
197:9 213:4
217:22 236:4
238:8 244:3
247:12 248:14,16
256:15,23 261:2
298:2 300:10
**once-a-month**
10:21
**OneNote** 200:8,8,9
200:12
**ones** 28:17 35:4
46:5 79:11 81:9
124:19 192:7,16
258:1 264:23
292:7 296:4,16,20
**ongoing** 103:6
142:1 197:18
230:21
**online** 24:13 309:8
**ooh** 154:23
**open** 13:4 54:7
74:19 96:11
191:11 205:16,21
206:23 207:4,17
207:20 243:5,20
274:25 276:20
**opened** 20:22 52:16
57:14 94:10 95:13
96:4 277:13
**opening** 96:14
**opens** 93:1,5
**operate** 60:19
**operating** 37:17
**operational** 105:14
287:14 290:21
**operations** 65:15
69:6 164:12 191:8
**opiate** 213:14
216:18,25,25
219:15
**opiates** 213:13,16
216:20
**opinion** 137:10
152:11 280:6
**opinions** 318:19

opportunity 54:8
59:23 68:24 136:7
136:8 155:14
254:13,22,24
255:11 281:6
opposed 97:10
129:5
opposite 300:8
option 228:19
options 128:20
orchestrating
34:18
order 40:22,22
62:18 94:17 173:5
174:8 176:15
213:16 216:20
218:1,2,6,7 219:7
219:16,16 221:14
221:22 223:1,15
224:24 226:22,22
226:23 227:3
228:19 264:4
311:24
ordered 217:16,17
219:15,21
ordering 24:15
63:2 213:8 214:19
224:6,7
orders 216:24
ordinary 252:13
organization
100:14 138:10
221:4
organizational
99:19 100:12
193:14
organize 106:1
233:1 263:12
organized 77:19
234:6
original 4:9 151:8
164:3 223:15
318:4
originally 164:7
originated 128:10
Orleans 2:6,15

292:20
Ornelas 149:8
orthopedic 26:1
OSHA 46:14
ought 53:5
out-of-date 309:6
outcome 201:12
318:21
outdated 59:15
outlined 119:11
Outlook 88:25 89:1
outpatient 35:7
outside 11:6 13:22
18:10,10 57:3
91:24 92:23
145:17 172:12
183:3,14 233:17
235:23 245:13,15
249:24 250:5
276:9
outta 143:15
overall 80:16
192:17 230:8
overcomes 37:18
overhead 235:23
286:23
overlap 165:4
257:24
overnight 142:12
237:17
oversaw 80:17
104:19
oversee 23:7
106:13
overseeing 83:20
105:12
oversight 22:11
46:13
owner 29:20 55:25
66:13 73:15,17
74:1 114:17
owners 29:23 121:6
287:6
ownership 73:19
127:3 286:20
287:13 298:23

299:9 300:9

## P

P 4:1 317:1,1
p.m 150:10,23
pace 55:10,16 70:4
70:12,13
pack 195:1
packaged 247:12
packaging 255:3
page 3:3,10 67:2,11
68:12 95:10 113:6
115:21 121:22
124:16,24 150:15
150:16,21 163:24
173:8 176:13,13
176:21,25 179:11
179:12,15 181:7
200:13,19 261:6,7
269:13 295:5,5,10
295:16 308:6
311:8,9
pages 95:9 101:9
176:20 318:10
paid 27:23 29:3,6
30:12 56:24 61:10
73:21 280:1 284:1
paid-for 106:6
pain 193:6
pains 192:19 193:2
193:3
pamphlets 16:24
panel 152:23 243:6
243:17
paper 54:20 228:24
232:2 305:16,21
paperless 154:13
157:11
Paracelsus 52:21
53:11,19,22 54:22
55:1 57:17,24
58:2,6,8 61:5,15
61:25 62:9,14,16
62:19,22 63:6,13
63:21 64:1,2,16
64:22 95:15 96:10
96:18 104:1,3

127:11,17 186:12
186:17 209:11
214:18 228:6,10
229:9
Paracelsus' 209:12
Paradigm 25:21
28:11 30:9 51:2
51:20 114:13
paragraph 116:2
117:8 119:7 154:7
177:2,20 304:1
paragraphs 177:9
parallel 19:12 20:3
paranoia 289:10,13
part 4:14 14:10
15:24 16:4,6
29:14 57:6 71:13
71:21 76:6 84:2
88:15,19 94:16,25
99:13 103:6
104:20 107:1
118:19,24 124:9
126:14 131:15
135:16 156:6,11
171:13 172:9
176:18 177:18
182:23 193:13
195:12 209:15
213:22 222:3
225:18,19 254:12
256:14 310:10,11
participated 145:4
191:7
particular 40:14
123:24 196:13
303:19 304:7
particularly 111:14
parties 4:3 33:18
318:20
partner 26:25 30:5
69:14 248:19
281:3
partnered 21:1
185:12
partnering 185:11
partners 20:14

110:1
partnership 51:20
277:10
parts 34:1 123:21
192:15
party 142:18 151:3
151:10 288:4
pass 88:12
passed 62:12
158:18
password 43:23
86:19,20 88:3,13
88:25 89:12,13,24
91:6,7 169:8
202:23,25 203:24
203:25 204:6,9,14
205:4,12,13,17
206:20 207:24
208:2 210:1,21
243:10,12,15,20
244:9,15 245:2,6
245:7,17,20,25
246:11,14 248:8
248:12,16 249:2,6
249:11,13,15,15
250:1,6 252:6
264:25 267:20
268:1,3,13,16
269:3,11 271:1,13
308:5,13 311:10
312:10
password123
249:16
passwords 43:3,22
85:11,13 87:14
89:7 90:25 91:3,3
169:4,5,22 204:19
204:20 205:25
206:2 207:4
209:25 210:3
211:17 249:10,18
259:17 268:14
269:10 271:3
304:21 307:24
308:19,23
paste 245:3,3,4

pasted 273:13
patches 194:14
    309:9
path 18:23 55:7
    94:14 98:8 251:13
    281:22
Pathway 37:4
    49:24 56:22,23,24
    185:21,25 186:3
    187:15,18 189:17
    189:18 190:23
    191:3,9 198:3,7,8
    198:9 220:18,19
    241:9 248:20
    261:3,5 262:11
    276:10,25 280:13
    286:20 287:6
    298:3,7,9 301:17
Pathway's 187:25
    198:5,14 311:11
patient 35:6,8
    46:20 58:16 64:21
    70:8 94:6,11
    95:14 97:1 101:5
    119:12 187:4
    188:25 196:6
    214:4 225:25
    226:1 231:12
    237:21 241:17,23
    245:15 261:24
    266:18 275:1
    304:22 310:3,12
patients 21:5 31:23
    48:22 117:12
    120:5 124:12
    242:21 245:16
pattern 72:2
Paul 76:11,23
pauses 317:12
pay 29:8,15 39:25
    166:2 282:25
    283:8 292:1
    293:20,20
payable 25:6
payers 135:8,12
    213:21

paying 213:21
    282:13,15 291:7
    294:1,2,6
payroll 280:4
pdf 58:13
peak 272:7
Pearson 113:17
    117:9 123:6
    124:15,25 125:9
    125:17 276:16
peep 8:6
pen 250:23
penalty 186:22
penetrated 91:22
penetration 92:25
    251:6
people 28:21 51:23
    56:10,14 63:10
    84:3 85:3 99:9
    105:1 106:4,7
    109:17 116:23
    118:11 122:8,20
    137:3 146:12
    147:1 184:3 206:3
    212:9 231:2,3
    245:13 249:9,19
    262:20
percent 21:9 32:17
    36:9 298:12
perfect 255:12
perform 13:14
Performance 9:9
    13:4 49:24 50:3
    56:19 129:23
    164:3,11,17 187:2
    187:14 188:2,7,10
    188:21 189:10
    198:6 220:18
    241:15,17 261:4
    262:11 274:8
    275:4,19 276:4,13
    295:13
Performance's
    188:1 297:14
period 14:13 57:13
    63:25 71:14 96:12

134:11 180:5
    181:17 253:23
periodic 74:18
permitted 4:5
person 77:15 100:8
    102:24 115:14
    117:17 121:1
    146:7 160:16
    169:9 188:21
    194:9 199:1
    201:11 210:8
    245:5 305:23
    311:17 318:17
personal 48:12
    88:8 115:7 205:15
    280:7 284:18,21
    284:21 285:12,14
    289:22 301:9
    318:12
personal-medical...
    212:9
personalities 278:6
Personally 295:24
perspective 254:21
persuaded 180:25
Pete 253:12,13,17
    254:10
Ph.D 104:24
    119:10 120:21
Ph.Ds 69:24
phase 241:18
PHI 19:5 24:19
    47:20 48:6
Phil 178:22 242:15
    277:13
phone 37:23 38:13
    38:15 116:22
    173:25 174:2,3,6
phonetically
    317:18
phrase 317:18
physiological 26:2
    27:4
physiology 26:2
pick 135:14 145:12
    196:23

piece 36:25 137:12
    141:16,17 165:19
    222:11 226:9
    243:21 306:12,12
piecemealed
    141:15
pieces 33:25
piling 68:24
pilot 102:17
pilots 25:12 27:13
    28:21,25 29:1
ping 205:22
pinging 92:2 212:3
pipe 86:5
place 17:20 20:2
    24:3,16 25:3 43:1
    63:2,4 65:9 80:5
    86:1,15 87:21
    91:24 92:3 96:8
    130:24 131:1
    159:7 186:9
    196:16,19 197:10
    239:5 306:2
places 38:21 69:15
    91:18 282:11
plain 204:19,20
    205:4 259:17
PLAINTIFFS 2:2
plan 54:12,12
    60:16 102:18,20
    135:25 151:9
    184:21
planned 102:12,21
planning 94:11
    109:11
plans 34:19 52:6
    121:23,24 124:21
    124:23
plates 231:13
platform 12:18
    24:23 25:9 37:11
    38:2 39:9,16
    42:25 53:23 54:11
    102:25 141:18
    168:24 242:21,21
    244:17 309:10

play 135:19 284:7
    307:17
played 26:17,18
    65:12 187:1
players 265:17
playing 136:6
    182:13
please 5:13,15
    198:11
pleased 93:18
    304:15 306:13
plug 41:7 110:2
    214:14 283:13
plugged 258:17
plugging 104:4
    122:17
plugs 141:19
plus 124:19 284:1
PMOs 31:13
Poe 147:20 163:17
    178:20
Poe's 148:15
point 20:20,24
    21:23 22:5 27:15
    36:9 44:6 51:13
    52:17 54:19 56:15
    57:2 58:8 64:5
    75:24 77:7,11
    94:21 95:3 98:5
    103:23 109:12
    110:12,22 111:3
    112:4 117:17
    123:1 126:5,7
    131:5 139:20
    144:17 145:7,8
    156:5,19 157:19
    159:4,9 163:12
    166:15 186:13
    187:6 190:11
    193:17 194:4,8
    197:5 204:18
    213:19 236:16
    239:18 255:3
    256:17 274:23
    280:21 282:14
    288:21 291:25

297:17,22 298:21
300:2,5 305:7,23
306:2 308:9
311:21
**points** 44:6 88:6,20
218:8
**poking** 193:16
**polar** 26:7
**policies** 39:3
**policy** 37:19 39:1
88:11 269:12
**pony** 161:8
**pop** 142:2
**popped** 251:14
**popular** 137:7
**port** 35:19
**portal** 21:10 25:5
41:5 94:18 108:20
247:3 248:24
251:16 267:25
268:22,22 296:9
**portals** 35:8 77:5
**portion** 27:5 29:10
41:5 61:8 215:13
**portions** 124:21
**posed** 117:11
**poses** 263:17
**position** 22:6
**positive** 172:7
213:12,14 221:10
222:4 224:4
**possibilities** 109:10
**possible** 14:25 49:3
242:22
**post** 15:17
**post-implementa...**
141:2
**potential** 13:11
237:23
**potentially** 48:22
213:25 224:3
255:15 262:4
281:6
**pour** 171:12
**Powell** 179:16,17
**Poydras** 2:14

**practically** 49:13
**practice** 43:20 44:9
44:10,25 45:18
59:11 171:2
249:13 254:16
267:15 268:25
**practices** 43:1,10
43:14,15,17 44:11
45:5,23,24 47:3,3
49:13 60:4 85:7
85:16 118:9
168:19 204:24
211:22
**pre** 118:18,24
**pre-analytical**
117:24
**preached** 49:4
**predict** 249:13
**prediction** 305:11
**preformed** 221:5
**preparation** 180:2
**prepare** 6:17
**prepared** 6:25 8:15
123:21 318:11,14
**present** 138:5
246:23 314:15
**presented** 138:2
**press** 48:18
**Prestige** 9:9 50:3
56:18,23 295:14
**pretesting** 117:25
**prettier** 94:19
**pretty** 8:17 12:20
13:7 18:3 22:12
27:22 28:1 29:19
32:4 35:25 43:5
59:16 61:10,13
70:10 72:7 82:24
85:23 87:24 88:1
93:10 99:6 104:22
111:2 116:16
117:2 118:20
126:6 129:14
130:3 132:21
142:6 144:2,7,11
144:20 146:13

147:12 149:15
177:15 188:12
194:1,5 197:12
206:8 221:18
227:12,13 229:13
244:2 251:1
257:19 259:14
260:25 277:7
283:5 285:1,3
288:7 309:15
**prevent** 101:1
**prevented** 189:10
275:19
**previous** 42:12
223:12 256:21
**previously** 148:15
222:5
**price** 167:4,5
**primarily** 53:14
**primary** 282:12
304:12
**print** 118:18
**prior** 165:5 171:23
171:24 199:15
230:14
**priority** 298:12
**privilege** 175:8
**privileges** 262:19
**privy** 246:13
**pro** 279:11,13
**probably** 20:6 36:2
36:22 75:21 82:11
84:25 85:3 94:9
96:3,11,20 119:15
134:13,15 138:8,9
156:3 158:20
161:6,25 165:12
171:23 186:2
187:21 190:21
223:19 249:13
258:14 259:10,12
275:16 278:21
294:10 296:17
297:5 309:6
**problem** 43:17
46:19 60:23 96:17

101:1 133:6
169:11,21 184:10
197:12 205:14
217:23 221:20
232:23 238:17
239:12 240:24
260:12 261:11,17
261:22 262:2
263:21 265:25
304:7 312:2,14
**problematic** 141:7
**problems** 12:18,21
13:12 24:25 33:10
47:20 103:18
117:2 183:12
195:3 196:25
201:6,7 230:2
256:24 262:4
310:13
**Procedure** 4:6
317:6,8 318:19
**proceeding** 318:10
**proceedings** 317:11
**process** 16:10
17:24 40:22 60:17
62:15 86:15 97:20
97:23 99:14 103:5
103:7 106:23
107:14 109:2
141:6 142:10
144:11 170:12,24
171:1 183:13
187:7 189:6 193:7
195:16 197:3
214:12 222:18,18
222:23 224:14
225:20 227:5
234:10,25 236:5
239:5 240:6
241:22 252:10
254:5 255:2,17
260:3 274:17,21
**process-oriented**
16:12
**processes** 106:22
233:24 238:19

**processing** 102:3
157:11 187:4
260:5 303:21
**produce** 123:20,22
144:21
**produced** 114:1
150:12
**produces** 133:18
**product** 21:17,17
23:6,8,10 29:11
39:22,24 61:19
138:19 175:20
182:11
**production** 63:22
64:18 96:22
100:18 156:7
250:17
**products** 176:2
**professional** 67:24
**proficient** 82:4
141:12
**profile** 88:18 91:4
140:24 142:20
305:23
**profiles** 88:6
**profiling** 88:10
**profitable** 135:15
**program** 19:17,22
27:24 92:12
102:17 247:8
**programmer** 31:7
**programs** 244:1
**progress** 102:9
103:2 200:25
**progressed** 97:17
222:20 230:4
**progression** 102:21
**prohibition** 318:18
**project** 16:8 21:21
31:13 33:1 44:19
50:23,25 61:23
77:17 269:23
**prominent** 195:12
**promise** 92:10
312:23
**promised** 53:13

140:10
promising 288:25
promoted 31:8
proof 250:12
proper 42:25
    106:21 214:5
    311:6
properly 49:21
    263:12
pros 138:2 172:6
protect 49:8,21
protected 43:2 90:2
    90:3 206:22
    248:18
protecting 44:3
protection 47:17
    49:22 169:8
    205:15
prove 158:17 252:1
    267:16
proveable 133:19
proven 130:12
provide 13:17 14:4
    124:22 208:5
    244:9,12 302:2
provided 58:10
    108:25 119:9
    156:13 245:6,7,21
    305:5
provides 243:12
public 48:19
publications 45:5
publish 46:19
pull 14:1 23:23
    58:6 60:8 67:1
    205:20 239:25
    247:6 263:23
    312:5
pulled 58:8 84:3
    87:7 88:11 110:2
    134:17 161:25
    193:12 283:13
    302:17,20,23
pulling 28:7 124:9
    285:1
purchase 134:19

303:16
purchased 139:2
    180:11 182:2
    294:7
purpose 21:6
purposes 4:5
    180:16 251:4
pursuant 4:7
push 54:22 117:7
    180:7 229:15
    255:9,10
pushed 144:11
    293:9 301:20
pushing 102:18
    305:16
put 17:18 22:2
    27:16 49:11 74:21
    75:1 86:5 87:20
    108:22 111:6
    131:24 138:1
    140:14 159:7
    186:8 191:20
    209:15 222:6
    229:20 239:25
    253:14 255:22
    277:17,19 282:22
    284:23 291:22
    292:4 293:12
puts 93:8
putting 100:21

## Q

Q1 56:12 79:22
    97:2
Q2 14:17 79:6
    82:10
Q3 275:16
QA 231:15
QAs 31:14
QC 234:13,17,18
    237:20 238:2
    239:4 263:23
QCs 232:1 234:22
    234:25 236:13,17
qualified 52:14
    105:1 106:6
    135:11 262:24

263:2
quality 147:2
    235:15 236:15
    239:6 264:2
quarter 134:13,15
question 4:12 6:15
    45:10 53:6 68:5
    84:5 86:16 101:22
    101:23 132:19
    137:20 142:9
    168:14 190:7
    224:21 245:19
    301:24
questioning 171:9
questionnaire 21:3
questions 5:25 11:8
    21:11 23:20 25:20
    50:6 57:12 106:5
    151:24 153:24
    154:6 157:4
    162:13,14 168:2
    169:3,9,13 303:7
queue 32:20
quick 18:23 56:1
    71:23 138:24
    279:14
quicker 69:2
quickly 6:3 68:18
    69:13,18 70:3
    76:8 125:8 138:18
    216:10
quit 28:4
quite 94:12
quote 163:23 164:3
    164:17

## R

R 223:1 317:1,1
R' 317:1
R.S 318:9
racing 285:17
rack 92:20
raise 244:2
raised 69:2 175:16
Ramish 9:20 76:10
ran 21:13 69:23
    76:5 78:19 98:3

121:14 130:4
141:3 231:16
236:23 237:2,3
238:4,8,17 239:2
239:9 263:1
random 74:19,20
    87:7
randomized 85:12
range 234:15
ranges 234:13
raw 281:16
re-add 217:24
re-added 222:11
reach 254:10
reached 8:13
read 11:14 159:20
    163:7 174:7,9,15
    174:17 236:10
reading 4:8 101:8
    118:17 177:22
    219:1
ready 8:18 22:14
    41:9 54:3,5
    102:22 110:14,17
    110:23 196:21
    274:23 279:10
    280:20,25
real 11:9 26:9
    46:18 77:22
    138:17 160:17
    195:4 196:15
    240:21 283:2
    284:10
realize 203:7 217:8
    218:3
realized 96:17
    197:11 203:11
    217:23 218:10
    238:1 256:23
    277:22
realizing 32:12
reallocated 84:13
really 6:24 8:5,9
    9:16 10:19,19
    13:11 15:21 20:13
    22:19 27:5 28:6

36:1 40:14 47:24
51:12 52:15 55:9
57:1 64:14 69:5
69:11 78:20 84:22
88:13 91:25 92:21
99:7 102:18
103:19 105:14
110:11,24 112:1,3
120:7,17 123:19
125:20 128:14,20
129:1 131:15
133:10 137:10,11
138:17 140:20
141:2 144:16
156:10,19 159:10
160:11 161:23
162:5,6 167:19
183:23,24 187:13
192:18 193:18,19
195:22 211:20
215:4,17 216:5
232:19 238:6,21
251:25 255:7
261:16 263:4
275:23,25 276:6
276:11 280:12
282:12 284:17,17
284:21 285:8
289:16 291:13
295:9 297:22
300:11,19 301:4
301:22 303:25
307:5,7,16
realm 48:9 106:18
reason 68:11 114:3
125:25 128:20,21
152:6 161:16,17
181:12 188:6
236:13 271:8
276:3 310:3,16
reasonable 129:12
144:22
reasoning 118:15
reasons 189:9
225:15 226:2
248:21 301:9

**reboot** 197:3,4,10 259:25 260:16 312:15
**Rebooting** 260:15
**reboots** 88:12
**rebuild** 61:8,8
**rebuilding** 31:21
**rebuilt** 31:20
**recall** 18:17 29:1 86:9 95:21 99:1,3 105:19 116:3 134:5 135:22 160:20 162:13 163:10 166:16,23 167:8,22,25 170:2 174:24 175:18 183:9,11 187:9,12 193:3 199:12 215:6 221:17 227:19 230:10,23 234:1 249:11 270:15 285:8
**recalled** 168:7,13
**receivable** 25:6
**receive** 99:25 163:13 307:5
**received** 119:8 125:1 149:4 179:8 237:10 270:17
**receiving** 99:1,3 113:13 155:23 163:10 229:14 272:16
**recess** 93:25 172:24 270:2
**recognize** 148:22 148:24,25 173:1 178:24 179:2 192:13 199:23 200:2 294:17
**recognized** 59:14 172:6 206:25 256:18
**recognizes** 37:14 38:24
**recognizing** 88:22 257:12
**recollection** 228:17 232:11 233:23 234:7
**reconsidered** 111:7
**record** 5:13 113:22 125:12 148:11,12 317:9
**recorded** 172:9
**recruited** 82:9
**redevelop** 188:11
**reengineering** 16:10
**refer** 50:4 309:1
**references** 317:21
**refers** 200:11
**reflection** 224:5
**reflex** 213:8,15 214:18 215:6,8,14
**Refocused** 84:17,18
**regarding** 164:2
**regardless** 221:17
**register** 107:5 108:7
**registration** 168:3
**regrets** 131:22,24
**regulated** 308:8
**regulation** 267:11
**regulations** 47:10 133:7 265:5 314:19
**regulatory** 45:21 46:7 104:8 108:8 313:15,21
**reimport** 223:6
**reiterate** 257:23
**reject** 195:11,12 225:5 227:18
**rejected** 225:17 226:1 227:4,8,9
**rejection** 225:20,23 226:9,21
**rejections** 225:21
**related** 48:6 78:21 230:7 318:20
**relates** 160:8
**relational** 206:19
**relationship** 56:20 156:21 291:11 301:20
**relationships** 27:20 72:3 281:3 318:18
**relative** 70:18
**release** 48:18 237:21
**released** 196:21
**releasing** 240:5
**relevance** 285:21 308:11
**relevant** 90:8,13 101:21 132:11 285:22 305:9,10 305:22
**relief** 282:16
**reluctance** 286:15
**remain** 292:7
**remedies** 31:24
**remember** 11:9 48:15 73:7,10,11 75:13 79:2,3,4 91:7 94:7 95:12 96:12 99:23 108:4 113:13 117:23 118:24 126:3 134:22 135:23 147:4,12 155:23 156:1,4,19 157:6 158:18 162:3,5,6 162:18,19 163:11 166:25 168:16 169:17,19 171:17 172:11,13,13 173:4,14,22,24,25 175:3,15 177:22 177:25 179:18,18 180:4,5 187:6 189:5 194:18 196:9,12 199:8 200:7 219:1 221:8 230:12 234:2 237:24 242:7,8,9 253:17 259:9 272:16,23 275:10 275:13 293:24
**remembered** 122:2 122:3 218:25
**remote** 77:24 78:1 89:20 116:21 122:16 157:11 246:23 303:21
**Remotely** 86:12,13
**remove** 130:9 218:13
**removing** 217:9,9
**reoccurring** 224:14
**rep** 164:2 228:3
**repeat** 5:13 125:11
**repeatable** 188:22
**rephrase** 6:13 132:19
**replace** 297:15
**replaced** 35:1,1
**replacing** 36:19 129:4
**report** 54:17 217:11 226:25 239:21
**reported** 1:23 258:20 318:11
**reporter** 1:25 4:23 5:12,24 90:9 105:4 146:15 317:4,25 318:7,25
**REPORTER'S** 318:2
**reporting** 133:23 318:11,17
**reports** 123:23 154:16 157:9 197:11 237:18
**represent** 197:23 304:5
**representation** 105:21
**represented** 106:19 221:3
**representing** 2:2,9 72:18
**represents** 5:10 47:19 101:11 193:6
**reputational** 285:15
**req** 228:22
**request** 137:20 216:6 233:7,11 240:13
**require** 167:16
**required** 88:3,24 121:23
**requirement** 213:9 213:21 267:7
**requirements** 314:21
**reran** 239:7,15
**rerun** 240:1
**research** 120:1 126:1 241:21 274:18
**reserve** 50:20 114:6
**reserved** 4:13
**reset** 202:23,24 204:6 260:10
**resets** 85:14
**resolution** 282:20 283:6 293:1
**resolved** 210:19 293:17
**resources** 105:17 131:25 260:5,8 317:21
**respect** 67:19 212:13
**respond** 199:6
**responds** 198:23 273:5
**response** 8:21 153:23 217:20
**responses** 6:9 137:19
**responsibilities** 82:2 277:25
**responsible** 33:19
**responsiveness**

EXHIBIT B

4:12
rest 22:4 53:20
  177:12,18 202:22
  222:17 301:22
Restate 90:10
result 58:16 153:1
  196:20,22 210:18
  213:15 217:16
  223:2 225:24
  230:6 237:8 264:1
results 54:15,22
  62:21,21 63:3
  108:25 133:19,21
  133:22,24 188:23
  193:10 196:25
  214:3 225:25
  228:20 231:9,15
  236:25 237:3,12
  237:20 239:3
  240:2,3,8 259:24
  266:20
resume 280:22
resurfacing 196:5
retired 28:4
retool 254:19
retract 53:4
retrospective 69:1
review 6:20 58:11
  98:20 106:22
  154:17 188:24
  231:8 232:7
  238:19
reviewed 54:15
  175:21
reviewing 63:3
  222:24
revisit 125:2
rewrite 132:5
Rhett 51:5 64:24
  65:15,23 98:19
  113:10 121:15
  126:22 134:6
  138:6 163:1
  174:20,22 175:15
  178:1 282:20
  283:1 289:24,25

290:2 292:11
300:16
Rick 149:7,19
  150:22 154:2,5
  155:6 156:20
Rick's 155:18
rid 299:1
ridiculous 69:25
  286:5
riding 289:1
rift 186:23
right 5:7 7:11,24
  8:2 10:4,18,23,23
  14:7,8,12,20 16:1
  16:3 17:3,3,6,10
  17:10 23:24 25:21
  25:22 28:2,9
  30:14 31:1 32:3,8
  32:10,11 33:23,24
  33:24 34:13 36:6
  36:17 37:1 38:12
  39:11,19,22 40:6
  43:10,18 44:1
  45:3,17 46:8,10
  46:11,15,21,24
  48:2,7,17 49:2,5
  49:16 50:2,21
  52:25 53:3 54:1
  54:25 56:10,22,23
  57:11,19,24 58:15
  60:21 61:12 62:18
  63:1,12,14 64:4,7
  64:19,20 65:21
  66:2 67:4,8,8,17
  68:15 69:9,19
  70:21 73:15 74:17
  75:8 80:8,12,22
  80:23 82:3,3,10
  82:15,22 84:5,9
  85:7 86:12,21
  87:10,25 88:15
  90:16,24 92:23
  93:6,23 94:23
  95:23 96:2 97:9
  97:13 99:15,16,17
  99:20,25 100:14

100:15,19,20,24
100:25 101:3,6,22
102:2,5 103:7,16
103:17 104:2
105:15,24,24
106:2,4,4,8,9,18
108:12,23 110:10
112:5,8,17 113:17
114:18,20,20,22
115:11 116:15,16
116:16,24 117:1,6
117:21 119:2,3,6
121:1 122:7 123:4
124:3,7 127:4,6
127:12 129:6,13
130:22 131:25
132:9 133:11,12
133:21 136:20,21
138:9,22 139:2,5
139:10,15,16,20
140:17,18,18
141:11 142:2,4,18
142:18,23,24
143:2,5 144:4,13
144:18 145:1,8
146:14,18,21
147:9,18 149:2,5
149:19 150:6,11
150:15 151:8,9,11
151:19,20 152:15
152:18,18,18,19
152:21 153:8,9,25
154:1 155:2,4,5,8
155:22 156:8,12
156:21,22 157:14
157:15,22 158:8
158:14,16,18,23
159:9,15,18,20
160:5,13,16,21,25
161:1,12,15,24
163:19,23 164:8
164:10,13,15,20
164:22 165:23
166:4,21 168:11
169:15,17 170:2
170:15,16 171:3

173:12 174:22
175:22 176:2,4,5
176:10,11 177:6,9
177:12,19,21,22
178:5,9,10,11,14
178:16 179:6,12
180:12,13,14,16
180:17,22 181:1
181:22 182:25
184:10,19,20
185:7,12 186:3,6
186:15 187:16
189:7,19 190:22
191:10,23 192:2
192:24 193:9,21
196:14 198:10,15
199:3,4 200:24
201:3,18,22 204:9
204:10,19 205:3,5
205:14 207:11,12
207:25 208:16,24
210:19,23,24
211:1,2,4,7,14,25
212:4,5,13,17,24
213:1,1,5,6,7
214:1,2,15,16
215:17,23 217:17
219:6,20 220:2,14
221:24 223:19
224:1,7,13 225:1
226:11,22 229:9
229:23 231:6
233:16 234:7
236:8,14 237:23
238:2,5,12,16
239:6,9 240:25
241:3,5,7,25
243:21 244:4,5,11
244:18 245:10,11
245:23,24 246:1,8
246:8,9,19 247:8
247:11 248:17,18
248:19 249:16
250:24 251:22
252:12,15,16,20
253:9 254:22,23

254:25 255:2,14
255:18,23,25
256:3,7 257:22
258:11,18,19
259:20 260:15
261:20 262:6,12
264:13,13,14,18
264:23,24 265:3
265:15,19,19,23
265:24 266:6,7
267:17,22 269:1,2
269:4 270:12,13
270:22 271:14,16
271:19 272:9
273:3,4,7,8,10,11
273:13,14,25
274:4 275:3,5,6
276:6,17,25 277:1
278:17 279:21
280:7,18,22
281:20,23,24
282:3 283:7,21
284:12,24 285:17
286:6,9,13 287:17
287:21 288:5,8
289:7,18,19,20,23
290:3 293:15,16
293:17,19 294:22
295:6 296:10
297:8,25 298:1,13
298:24,25 300:1
300:14,15,24
301:24 302:10
303:5,14 305:6
306:6 313:23
314:1,5,12,18
right-hand 177:1
rigs 29:13
ring 12:5,8
rings 12:10 24:9
risk 258:8,18
road 189:2 190:11
roadmap 23:8
Rob 105:25
Robco 290:24
  297:12 298:3,10

298:12 299:5
301:21
**Robert** 104:15
279:24 282:4,8
283:14 284:15,16
284:23
**robotic** 224:16
**robust** 76:20 85:23
**rocket** 56:1
**rocky** 129:10
130:24
**role** 31:16 65:13
80:24 81:21,25
105:6,6 106:1,12
179:19 199:1
253:20 262:13,22
263:7,8 264:6
265:13 280:19
301:17
**roles** 65:1 77:19,22
182:13
**roll** 32:25 96:9
102:15,19,21
110:17,23 158:1
165:19 180:7
**rolled** 17:23 20:16
32:22,24 42:2,7
52:19,20,21,22,23
53:1,5,11,12
102:12 110:24,25
129:22 186:3
278:12
**rolling** 33:2 56:5,7
71:24 102:14
151:4,13 170:12
**rollout** 17:24 83:11
**Ron** 147:19 148:15
150:22 151:23
154:4 162:2
163:17 164:16
168:24 169:25
170:18 171:25
178:20 179:16
198:1 227:17
253:22 254:6,13
**Ron's** 153:24 155:7

159:11
**room** 13:22 37:15
37:16 38:25 69:25
111:3 165:1
173:25 207:2
278:7
**root** 201:6 257:1
282:12
**rooted** 246:21
**ropes** 52:2 76:5
**rotate** 91:1
**Rouge** 292:22
**roughly** 17:18
74:17
**roundup** 170:8
**route** 69:18
**routine** 154:14
**routinely** 178:4
**RPR** 1:24 4:22
317:24 318:7,24
**rule** 32:4 47:9
267:11 317:5
**rulebook** 314:12
**rules** 4:6 43:24
46:16 47:10 49:5
49:7,12 85:13
314:19,21 317:6
318:15,19
**run** 22:7 64:21
121:6 124:11
153:25 188:10,11
220:1 236:18,19
236:20,21 237:14
237:16,19 238:12
240:24 251:7
278:8
**running** 7:17 30:16
51:22 52:12 56:5
60:13 69:4 73:3
76:8 94:11 187:6
187:24 232:14
234:25 260:4
298:7
**runs** 37:11 237:12
260:5
**Russia** 92:7 212:3

| **S** |
|---|
| **S** 4:1 317:1 |

**S-I-M-P-L-E-X-I...**
41:17
**sabotaging** 289:15
289:18
**Saenz** 104:15
279:25 282:4,8
283:20
**Saenz's** 105:6
**safe** 217:25
**safeguards** 80:20
211:19
**safety** 19:22 25:21
27:2 28:11
**salary** 30:2 74:1
**sale** 167:3 295:15
299:5
**sales** 41:4,5 55:21
55:22 65:12,20
69:5 70:22 71:7
72:9 75:7,10
144:16 149:9,10
152:11 155:11
164:2 167:10
169:9 173:5 174:7
176:15 198:3
228:3
**salts** 221:12
**samp** 229:25
**sample** 62:19 118:2
124:11 153:2
154:16 195:12
222:12 224:3
225:10,12,17,25
228:23,25 229:15
232:12 236:23
237:10,11,19
239:2,7,14
**samples** 56:6 64:21
70:9,19 94:6,11
95:14 97:1 101:5
101:12 102:3
120:5 122:15
126:13 136:15
187:4 188:11,25

195:11 196:6
197:8,11 216:2
218:9 219:25
222:24 223:6
224:2 227:18
229:21 230:3
231:10,12,14,17
231:18,20,22
232:7,14,16,18
233:21 236:15
237:22 239:7,19
239:22,25 240:5
241:18,24 245:15
248:25 261:24
275:1
**San** 282:10
**sanctions** 119:3
160:5 188:9
189:12 274:6
300:23
**Sandra** 125:9
**Sandy** 113:16
123:6 124:15
125:17 276:16
**SARVER** 2:11
**SAS** 39:23 109:18
**sat** 7:5 32:20
122:19 125:19
222:20
**satisfied** 125:21
**satisfying** 291:18
**save** 4:8,11 19:25
**savings** 280:2
**savvy** 44:16 99:8
**saw** 44:20 53:17,19
79:21 82:14 121:7
126:12,12 142:20
142:22 157:18
176:9 248:5
255:11 284:23
301:14
**saying** 11:7 45:23
123:14 169:19
183:3 197:7
243:18 247:9
278:24 307:1

**says** 24:25 26:14
38:25 67:2 80:11
82:14 120:1 123:6
133:8 154:10
158:14 166:11,13
176:14,15 204:6
255:21 260:16
266:3 267:12
297:20 304:9
306:13
**scalability** 304:13
**Scaling** 79:24
**scary** 103:15
**scavenger** 232:6
**scenario** 99:23
235:8
**scenarios** 13:24
216:15 218:18
219:6 223:23
224:10,22
**scenes** 43:7 217:7
218:6
**schedules** 235:5
**scheduling** 31:22
33:3 35:6
**school** 15:3 18:24
26:20 51:6 78:13
**school-related** 16:1
**schools** 15:4
**science** 15:11,12,13
16:2,14 20:10
58:12 100:7 231:7
**scientist** 100:4
232:17
**scientists** 58:11
60:13
**scope** 41:12 183:15
**scramble** 271:13
**scratchers** 207:1
**scratching** 119:1
141:9 170:9
237:25
**screamed** 87:20
292:3
**screaming** 230:25
289:11

screen 54:10 58:11
  215:10 308:6
screening 53:23
  55:1 57:21 58:2,7
  58:9 61:21 62:7,8
  63:6 64:11 96:15
  213:11 214:3
  229:19
screening-only
  53:15
script 251:7
Scxiex 120:2
Seacor 28:19
seal 318:5
seamlessly 130:3
  304:16 306:14,18
search 251:12
searching 137:11
second 32:24 64:1
  67:22 71:22 116:1
  117:8 124:16
  134:15 176:25
  179:12,15 204:5
  225:4 246:20
  256:16 261:7
  270:10 276:20
  295:10
section 177:23
  236:9
section's 177:6
secure 34:9 43:2
  44:12 48:11 86:11
  290:16 309:24
secured 85:10,20
  86:2 88:6 213:6
security 12:19
  42:18,21,22 44:7
  78:9,14,22 81:4
  86:14 88:10 92:18
  109:4 168:17
  169:7 204:21
  205:6 209:16
  211:22 242:23
  247:14 258:18
  269:5 273:1
  304:20,22 307:23

308:11,18,22,24
309:2,8,14,19,20
310:8 313:2,9,10
see 10:21 26:8 41:6
  63:15 76:16 91:17
  96:1 102:8 120:14
  137:10 150:10,19
  151:17 152:4
  154:8 155:8,18
  157:14 160:13
  176:13,23 177:1
  177:11,15,16
  183:18 198:11
  205:3 208:20
  222:25 235:20
  239:19 251:19,20
  255:20 256:1
  257:17 258:10
  259:1 260:8 262:2
  266:11,12 276:9
  303:23 304:3
  305:4 309:2
  311:24
seed 26:11,23
seeing 157:7 173:4
  223:1 266:19
  289:2
seen 146:24 155:1
  195:23 249:14
segment 86:5
segue 128:4
selected 159:3
selecting 159:2
selection 146:20
  159:5
sell 24:8 40:16
  111:22 144:5
  205:16,20 255:4
  286:15,18
selling 18:25 21:15
  24:13 108:12,14
  109:8,12 279:9,12
seminars 16:22
send 174:5 199:14
  199:19 225:23
sending 219:25

254:1
senior 31:6,9,11
sense 37:3 63:8
  65:16 232:20
  306:22 307:7
sent 11:17 149:4
  153:22 179:10
  196:11 200:24
  201:22 202:14
  219:22 303:14
sentence 204:5
  307:20
separate 32:20 35:4
  40:10 41:10 70:22
  71:6,11,15 185:10
separated 14:18
  262:14
separately 14:24
September 98:20
  103:24
sequel 44:15
serendipity 51:23
server 22:11 42:22
  80:4 83:20 84:19
  84:23 87:3 88:7
  88:13 89:19,21,22
  91:3,4,13 95:7
  157:2 196:22
  197:2 206:17
  207:23 209:17
  210:13 211:3
  243:4,4,7,13,25
  244:1,3,15 245:2
  245:18 246:22
  248:14 250:10,11
  250:14,16,17,18
  251:11 256:19
  257:5,18 268:20
  287:1 298:17
servers 79:25 80:19
  83:22 85:19 88:11
  88:22 89:18,20
  91:24 208:24
  209:5,14 213:6
  244:18 247:18
  257:6,8 296:11

298:6,6,8 309:11
serves 75:3
service 29:10 39:23
  39:24 109:18
  128:16
services 1:4 30:10
  176:17 210:2
  318:17
set 89:18 136:16
  157:2,2 196:23
  199:7 221:18
  240:2 243:8
  244:14 318:10
sets 20:10 21:19
setting 72:1 156:10
  202:21
Settings 19:1 24:5
settle 300:7
setup 127:10 162:1
  183:2 196:15
shakes 6:8 65:25
shaky 20:8
shame 31:2
share 11:11 159:13
  199:15
shared 31:15
  159:12 267:20
  268:2,5
SharePoint 77:16
  77:17 90:7,11
sharing 268:13
she'd 78:5
sheet 125:22
shelf 30:25 38:22
  111:6 186:8
shell 28:21 246:23
ship 22:4 24:16,18
  289:2
shipping 25:10
Shirley 178:21
shit 242:16 283:14
shitty 83:5
shoes 224:7
shoom 197:5
  251:13
shops 135:10

short 26:5 52:9
  116:11 147:6
  253:22
shortcomings
  199:22 200:20,21
  202:13 229:3
  259:18 261:7
Shortly 82:13
shot 72:2 167:13
show 98:14 112:18
  116:25 122:12
  147:18 161:8
  162:24 178:18
  201:23 225:20,21
  226:25 242:1
  256:10 294:15
showed 48:3 122:9
  250:16 256:16
showing 116:19
  237:18
shows 216:25 217:2
  222:15 265:7
shuffled 231:19
shut 20:17,23 21:7
  22:1 48:24 56:8
  110:10,22 119:16
  130:8 146:12,22
  151:15 164:9
  186:15,16 188:8
  243:25 247:5
shutdown 79:12
  114:21 145:25
  149:22 164:23
  165:6 236:14
  237:22 296:10
shutting 125:24
sic 151:9 307:5
side 16:14,15 17:12
  19:13 20:9 21:8
  22:18 23:13,13,15
  30:17 35:10 40:11
  46:18,23 51:21
  53:16,23 54:9,10
  61:15,21 63:6
  65:12,14 85:6,21
  85:21 98:4 107:2

128:14 133:7
136:13 156:11
157:1 159:5,22
166:15 177:16
179:22 194:12
196:2 205:19
213:16 216:18,19
220:12,13 232:24
238:18 248:9
255:7 259:12
278:9 280:15
286:23 297:19
306:7 310:12
**sides** 98:2 240:3
255:1
**sight** 298:4
**sign** 91:5 127:2
174:6 190:4
**signal** 239:20
**signature** 173:9,10
176:13 295:6
318:5
**signed** 106:20
119:9 121:19
167:10 168:12
173:20 174:8
175:17,23 176:8
177:23 178:2,4,13
180:12 184:23
185:5 290:16
316:11,13,15
**significance** 32:13
251:8
**significant** 36:18
78:16 92:3 104:18
194:1 195:5,8
197:12 206:3,8
218:17 224:8
230:24 232:23
239:20 257:19
265:23 285:2
310:12
**Significantly** 59:7
**signing** 4:9 173:14
**signs** 8:9 19:15
291:16

**silver** 47:5
**similar** 17:10 97:17
118:10 216:12
262:16 263:13,17
265:16
**similarly** 217:22
**simple** 135:23
141:21 169:8
247:16 258:17
**simply** 229:20
248:8
**single** 91:5 106:21
122:14 206:5
217:4,5 245:5
314:7
**sit** 60:14 182:22
**site** 24:17 86:13
310:8
**sites** 252:3,4 261:9
261:9,13 268:19
**sites'** 154:17
**sits** 38:22
**sitting** 13:22 30:24
**situation** 49:18
289:16
**situational** 223:23
**situations** 193:25
**six** 60:13 71:24
76:1 94:9,9 95:12
95:18 96:6,7,14
232:14
**skill** 20:10
**skilled** 82:4 144:20
183:21 210:12
249:25 254:16
**skin** 101:17
**skip** 25:18
**slapped** 256:13
**slash** 243:8
**slew** 313:11
**slice** 263:11
**slightly** 97:18 98:7
165:2 257:20
**slow** 52:15 55:10
69:3
**slowly** 55:8 97:24

200:22
**small** 11:24 22:24
86:4 187:7
**smaller** 114:17
**smartly** 55:8
**smoothly** 300:7
**soccer** 26:7
**software** 16:3,23
17:12 19:3 20:19
22:23 23:5 24:6
24:20 27:8,11
30:20 31:6,19
33:3 37:7,8,18
39:5,9,23 40:4
41:14 42:23 51:13
51:14 56:4 58:3
58:22 59:14 60:9
67:24 76:24 78:21
85:17,21 93:8,8
103:5,7 106:13,23
109:18 111:11
117:19 119:2
123:9 139:2 140:5
165:19 168:7
175:25 176:17
191:13 211:23
215:20 232:24
240:25 264:17
280:16 296:6,8
313:9,9
**softwares** 33:15
95:25
**sold** 13:10 20:14
**solely** 78:9
**solicit** 132:12,24
**solution** 51:4 60:18
60:24 159:6 304:2
304:9 305:8,8
**solutions** 1:10
304:10
**Solving** 303:21
**somebody** 44:21
51:7 72:17 93:1,1
138:21 203:8
214:14 254:16
261:23 311:22

**son** 73:5
**soon** 31:8 32:23
55:11 96:16 98:3
200:12 248:7
271:9
**sooner** 114:19
253:15 277:6
280:5,9
**sorry** 15:14 90:10
95:22 105:7
151:24 190:6
198:19,21 290:2
**sort** 16:11 19:20
21:3 24:12 32:20
43:23 64:13 69:13
71:15,15 75:7,11
85:15 94:16 103:2
106:22 143:22
158:9 184:6,14
185:13 186:11,22
195:8 201:10
230:3,6 247:10
256:24 287:11,12
314:20
**sorted** 232:8
**sought** 4:15
**soughting** 151:9
**sound** 7:19 161:12
216:12,12
**sounds** 66:12 98:10
109:21 161:15
261:20 271:4
**source** 45:3 243:5
313:4 314:7,25
**sources** 19:19 45:4
314:1
**space** 38:7 40:5,7
47:14 59:15 60:12
67:4,7,20 108:16
108:17 109:7
133:11,12 267:10
277:9
**speak** 17:2 62:17
312:7 314:5
**speakers** 317:13

**speaking** 49:14
65:20
**special** 143:22
**specialties** 143:13
143:19,23
**specialty** 154:18
176:5
**specific** 39:6 46:2,5
47:8,9 50:6 67:4
123:19 140:20
147:3 152:3,20
153:7 160:8
169:12 172:2
180:6 183:9,12,16
183:16 184:8
194:18 196:10
226:2 266:5
307:16
**specifically** 4:10
40:5 68:3 76:25
83:10 107:25
117:12 139:20
143:8 162:4,6
169:20 171:18,19
177:24 187:9
190:8 191:21
197:16 234:10
251:6 258:22
259:8,9 262:23
270:15,16 288:21
310:5,9
**specifics** 172:11
**speculate** 166:22
**spelled** 317:18
**spent** 54:1 122:12
**spiked** 193:12
**spilled** 225:12
**spiral** 277:23
**split** 27:14
**spoke** 55:3 253:22
**spokesman** 21:16
**sponsor** 242:19
**spontaneous**
317:10
**sports** 26:19,20
**spot** 283:3

spread 71:2,3,5
251:21
Spruill 188:20
Spruills 104:25
138:9
SQL 44:17,21
243:19
squirrel 136:6
SSL 44:2 304:23
310:7
St 2:5
staff 63:10 69:24
225:15,16 236:3
274:19
stage 55:20 110:12
131:10 168:5
184:7 199:24,25
230:4 255:8
stages 24:17 103:10
stamp 237:9
standalone 72:15
standard 86:10
120:2 204:24
243:5 304:21
308:24 309:3,20
309:24
standards 85:7
304:20 307:23
308:7,18,22
309:19 310:2,15
310:23 313:1,5,9
313:10
standing 50:18
standpoint 13:12
17:13 34:20 42:23
46:9 48:15 64:18
69:13 75:10 79:20
81:4 83:16 91:6
97:25,25 128:11
139:19 145:13,14
193:14 196:6
212:16 235:16,21
288:1,13 297:14
309:13
stands 162:11
start 5:11 14:20

15:1 26:16 27:7
31:8 55:7 60:16
74:21 75:17 82:6
95:8 96:10 112:25
126:2,5 150:8
188:12,24 193:16
193:17 209:22
218:2 221:25
235:11 253:11
254:18 265:9
276:4 282:23
298:9
started 7:16 16:17
18:21 19:11,13
20:4,8,9,9,11,16
20:19,19,20,25
21:8,12,15 25:23
27:8,9 31:5 32:1
32:12 36:1 38:3
50:24,24 51:9,11
51:16 52:1,6,12
52:15 57:17 61:21
66:24 67:20 71:24
72:7 75:12 79:17
79:22 82:7,8,9
94:8 95:18,23,24
96:2,25 110:20
126:15 149:16
151:12 161:5
170:12 185:24
187:3,19,24
189:17 190:23
191:4 192:18
193:2,11 200:22
236:5 238:21
247:19 253:23
257:12,13 268:13
276:25 279:24
284:17 291:6,7
294:2 297:13
300:10 306:1
starting 51:11
61:17 64:25 94:21
102:15 115:4
253:4
starts 47:19 95:10

116:1 124:23
154:7 163:16
179:15 192:21
242:17
state 4:23 317:4,9
318:5,7
stated 262:23
statement 53:4
125:24 130:15
159:11 160:2
165:12 169:19
215:14 306:17
307:25 308:17,21
310:17
STATES 1:1
static 87:2
stating 259:2
status 101:13
statuses 41:1
statute 258:24
318:15
stay 79:10 117:4
149:14
stayed 76:19
114:15 117:1
222:14,15
Stellar 19:1
stenotype 318:11
step 47:19 57:1
98:5 222:19 225:6
230:14
stepped 139:15
191:6
STEWART 2:4 3:5
42:4 45:7,25
47:11,15 49:9
50:17 58:23 62:4
66:4,8,14 67:5
74:2,23 83:13
87:11 97:5 103:8
104:9 106:14
107:17,23 109:13
109:24 113:20
114:2 121:8 125:6
127:13,21 131:20
132:14 133:13

134:1 140:6
142:13 143:3
147:23 148:8
152:7 153:18
158:24 160:6
162:16 164:18
166:7 170:20
175:6 177:13
181:2 182:3
184:24 185:8
189:13 190:18
194:21 198:16
203:19 212:20
214:9 219:8,12
223:16 233:8
240:14 241:1,10
249:7 253:3 256:4
256:9 264:19
267:1,13 272:5
273:15 274:10
275:21 282:6
283:24 285:6,19
286:16 290:5
291:1 295:17,22
296:24 299:11,21
302:8,13 303:6
307:19 309:25
311:16 312:20
314:2,9
stick 278:8 281:16
281:18 283:8
sticks 15:20
stint 27:21
STIPULATED 4:2
stipulation 5:3
stolen 92:4
stood 155:3 157:8
stop 37:21,21,22
56:9 100:18 101:4
101:5,25 120:5,10
151:21 196:18
202:21 211:19
259:25
stopped 20:24
22:20 23:3 61:5
72:6 103:2 186:16

213:21 239:18
stopping 275:24
store 207:8 229:7
stored 169:5,23
206:9 264:25
stories 111:10
storm 255:13
story 26:4 52:9
94:12 132:6 189:4
199:3 236:13
stout 291:14
straight 232:24
straightforward
232:25
strange 195:2
strategic 30:5
31:18
strategy 95:2
288:20 297:22
straw 291:21
streamlined 141:22
street 2:14 116:17
122:7
structure 84:20
221:4 310:7
struggling 283:7
stuck 196:17
280:12 301:15
studies 154:15
study 242:20
stuff 10:10,20
16:12 17:12 21:24
24:13 30:23 37:2
38:16 40:18 42:14
45:16 65:21 71:19
77:6 80:1,5 94:19
99:20 110:3
114:13,16 117:24
118:7 121:13
123:25 124:14
140:19 155:16
157:10 158:5
159:23 178:8,9
191:19 212:3
216:1 221:11
224:5 230:16

235:18 236:14
249:22 258:17,25
282:9 284:2 285:4
285:12,13,15,25
286:3 288:3,18
302:22,23 307:5
309:16
stuff's 44:12
160:18
Stuller 24:4,5
stumble 257:4,21
stumbled 256:20
256:22
style 97:20
subject 176:16
242:16
submitted 301:13
subpoena 302:14
subpoenaed 302:9
subscription 39:25
Subscription-bas...
109:19
subset 239:6
substantive 13:18
successful 27:24
sudden 197:8
259:24
suffer 51:11
suffering 254:20
286:20
sufficient 44:12
suit 12:14 293:11
sum 29:9,18
summary 119:20
124:17
sunk 22:3
super 48:11 147:3
295:5
supervision 318:12
supplies 264:5
support 17:25
35:19 52:5 54:2
83:11 85:2 110:18
126:8 190:2
191:12 192:2
195:18 201:10

207:17 254:6
271:20 278:10
281:7 283:8 287:9
supported 18:2,6
24:10 81:11
supporting 24:12
supports 242:21
supposed 164:7
232:17
sure 5:22 6:11
14:23 25:13 34:16
43:1,8,21,22 44:2
44:6,11 48:10
50:10,15 68:16
85:13 86:17 89:8
93:24 99:5 100:1
106:2,16 107:4
109:2 115:16
127:9 132:1,3
133:7,16 140:1
147:14 151:25
153:10 158:15
159:12 167:13
169:10 172:4
175:22 185:1
220:8 221:18
225:21,22 234:22
239:5 240:4
245:20 301:14
303:9 315:1
surfacing 196:5
241:21
surgeon 26:1
surgery 35:7
surprised 191:14
surprises 142:2
surprising 226:10
survey 124:17
125:3 306:2
swayed 158:5
switched 129:21
switches 141:19
switching 36:8
sworn 5:4 317:8
318:9
symbols 87:23

Symplexit 41:16
synchronize 32:13
synchronized 91:2
Syringes 40:18
sys 52:18
system 15:7 21:9
22:8 24:13,18
25:6,7,12 32:21
34:11,11 35:2,5
36:13 38:14 40:21
41:10,13 42:3,8
42:10 47:24 52:19
52:20,22,24 53:15
53:19 54:3,14,25
55:2 57:23 58:7
59:19 61:2 62:10
63:2,4,18 64:1,9
92:13 93:9 94:3
96:8,9 107:15
108:21 110:20,23
120:2 123:16
128:16 129:4,7,8
130:9,21 134:8
136:23 137:16,18
139:16 140:9,13
140:23 141:12,15
142:19 143:10
144:3,6,9 147:12
151:17,25 152:2
152:10,13,16
153:9,14 154:12
160:13,15 168:20
170:19 171:3
194:24 195:11
203:14,22 204:2
205:1,9,22,23,23
206:9 209:4,8,13
210:15 211:16,23
213:23 217:8,18
222:13 226:20
229:13 234:12
235:23 236:22
237:9 239:17
240:18 244:21
245:5,8 254:20
259:22 260:12,17

261:25 263:12
265:8 266:16,23
267:9 271:22
296:7 297:15
298:5 305:17
306:25 307:9
308:14 310:19
311:1 312:15
system's 304:18
307:21
systems 17:22 18:6
24:15 31:21 33:9
34:4 36:20 53:2,5
53:18 59:10,12,17
59:21 63:25 76:16
92:14 98:6,6
124:10 126:14
128:13 137:23
138:16,24 143:18
154:15,25 155:1
170:24 172:8
205:18 243:16
254:17 287:2

---

**T**

t 3:1,8 4:1,1 165:5
317:1
T-R-U-C-E 37:7
table 12:21 27:6
28:20 34:17 51:19
65:1,22 72:4 98:2
277:20
tables 44:19,21
90:12
tag 10:22
take 14:24 15:22
24:16 29:24 35:14
36:12 41:11 73:25
93:23 98:20
128:17 130:10
131:17 138:12
139:24 140:3
147:21 156:21
163:7 183:6,15
196:19 202:18
205:15 225:16
236:9 239:5

244:16 252:22
257:1 277:21
288:3 300:14
306:12 307:20
taken 4:5 38:3
316:25 318:8
takeover 294:24
takes 140:12,12,21
141:18
talent 52:13 76:9
talk 6:2,5,22,24 7:1
8:4,5,18,19 9:10
25:8 38:15 60:23
62:8 65:20 94:2
125:19 153:14
194:24 217:19
257:25
talked 7:25 8:12
9:6 10:7,23 11:1
13:24 76:11 108:5
233:24 250:10
257:24 267:22
269:16 270:22
271:21 277:5
278:14,15 283:1
295:1
talking 51:19 52:6
101:10,14 116:21
146:24 153:6
154:19 207:13
219:2 224:2
242:24 246:25
254:6,6 266:15
277:9 296:23
311:18
talkovers 317:14
talks 11:19 75:25
166:23
tangible 172:15
tanked 28:8
tanks 22:1
target 43:15 60:3
tasks 34:6
taste 292:4
team 9:12,14,15
17:20 18:1 21:17

| | | | | |
|---|---|---|---|---|
| 24:12 31:11 39:16 | 178:8 | testing 26:3,6 36:16 | 282:23 283:6 | 302:23 306:4,8 |
| 39:17,18,19 51:3 | teeth 32:3 | 54:4 57:24 76:4 | 291:17,20 293:8 | 311:2 313:11,17 |
| 55:25,25 60:7 | tell 25:23 31:3 | 102:23,25 118:2 | 300:10,16 302:9 | 314:22 |
| 68:25 69:4 75:19 | 50:23 62:19 68:21 | 118:21 119:12,22 | 305:3 312:13 | think 7:18 25:16 |
| 79:25 84:2 93:17 | 75:19 84:19 | 120:6,10 125:2,4 | 314:18 | 33:10 45:20 53:6 |
| 110:19 141:8 | 115:18 122:5 | 126:2,6,16,18 | things 5:21 10:11 | 56:11 67:1 71:4 |
| 161:21 170:5 | 127:19 128:6,6 | 128:23 218:9 | 14:15 16:24 18:15 | 79:18,18,19 92:16 |
| 179:25 182:11,13 | 133:2 218:14 | 231:10,11 241:18 | 18:16 25:14,16 | 92:19 93:22 102:9 |
| 191:19 193:15 | 225:9 277:2 312:9 | 249:5 251:6,18,24 | 27:11 31:17,20 | 105:8,9 116:6 |
| 194:2,6 195:24 | telling 15:1 169:17 | 266:20 | 33:20 35:11 41:1 | 117:25 120:21 |
| 199:15 207:2 | tells 239:21 | tests 153:24 156:14 | 41:4 43:1,3 44:14 | 127:8 141:3 148:9 |
| 222:23 253:14 | temperature 118:2 | 214:1 218:3,5,13 | 46:18 51:24 52:4 | 149:19,21 152:10 |
| 259:4 | template 258:5 | 220:1 221:5,14,15 | 55:20 61:15 63:15 | 158:20 159:11 |
| teams 20:20 23:7 | ten 75:2 236:25 | 224:3 239:8 | 65:14 68:23 69:7 | 165:25 166:11 |
| 39:15 82:18 83:2 | 260:23,24 280:23 | 266:19 | 75:6,12 76:7 77:3 | 167:23 173:19,25 |
| 161:7 201:2 | 309:7 | Texas 52:1 71:1 | 85:15 87:19 93:3 | 174:10 179:21 |
| 229:21 | Tendering 98:16 | 73:3,4 75:4 | 100:22,24 101:17 | 183:22 186:21,24 |
| tear 235:3 | 112:19 147:21 | 282:11 | 103:6 108:13 | 197:6,15 208:16 |
| tech 9:12 100:9,10 | 272:11 294:17 | text 9:3,4 44:14,16 | 109:4 115:15 | 208:17 226:17 |
| 115:14 170:1 | tennis 224:7 | 204:19,20 205:4 | 117:14,18 118:15 | 231:13 247:11 |
| technical 10:9 27:1 | term 43:12,13 45:1 | 207:4 259:17 | 126:11 128:14 | 254:3 259:13 |
| 34:20 49:11 99:8 | terminology 100:11 | 284:9 308:9 | 131:8 133:8 | 261:11 262:9 |
| 159:22 182:25 | terms 63:9 176:16 | thank 198:21 202:4 | 136:13 139:11 | 264:10,24 268:9 |
| 192:2 | 176:22 296:22 | Thanksgiving | 140:22 141:3,20 | 285:14 290:19 |
| technically 39:16 | terrible 78:25 | 162:22 | 147:2 156:17 | 297:4,17 298:22 |
| 209:7 238:22 | terribly 103:15 | that'd 211:13 | 157:13,13 158:12 | 299:4 302:9 |
| 301:12 | test 36:14 152:25 | THC 221:7 | 167:12 169:15 | thinking 26:16 |
| technician 252:12 | 188:18,18,18 | thee 297:5 | 170:12 171:7 | 168:15 187:21 |
| 264:1 | 189:2 217:15 | thereof 4:14 | 172:1,6 183:11,22 | 272:7 |
| technique 97:19 | 222:6,15 224:5 | they'd 71:20 146:1 | 183:23 184:2,6 | third 16:7,8,10 |
| techniques 34:15 | 226:19,22,22,25 | 244:12 | 187:24 195:6,9 | 33:13 52:23 |
| 64:10 | 227:2,3 230:6 | thick 119:18 | 196:3 206:24 | 124:24,24 142:18 |
| technologies 27:9 | 237:1,7 239:12 | thing 10:22 26:15 | 209:17,21 210:20 | 151:3,10 154:7 |
| technologist 49:20 | 248:23 249:1 | 81:9 82:16 92:3 | 214:24 217:12,12 | 173:8 228:1 |
| technologists 84:1 | 250:14,22,23 | 92:20 118:12 | 218:24 220:12 | 259:21 |
| technology 15:8 | 251:4,4,25 275:5 | 123:24 126:14 | 226:5,19 227:1,6 | third-party 24:23 |
| 17:8,13 43:16 | tested 216:23 | 128:25 129:10 | 227:23 228:24 | 42:8,10 52:20 |
| 46:3 65:8 97:24 | 217:13 222:2 | 135:15 154:18 | 230:5 235:15 | 130:20 134:8 |
| 106:17 107:3 | testified 5:5 310:25 | 165:19 166:4 | 236:3 237:16 | 136:23 138:16 |
| 118:11 137:13 | testify 301:25 303:3 | 172:16 185:11 | 239:10 241:7 | 140:4,4 143:10 |
| 145:14 168:24 | 318:9 | 195:2,7 207:21 | 243:24 247:4,7 | thirty-party 42:3 |
| 185:15 186:4 | testimonial 160:10 | 209:7 215:3 | 253:23 277:23 | thought 128:11 |
| 208:7 277:16 | testimonials 157:12 | 218:10 226:8 | 278:9 284:15,22 | 129:1 130:1,10,15 |
| 278:9 306:7 | 158:10 160:17 | 228:5 255:22 | 286:21,24 287:7 | 132:21 150:4 |
| technology's 26:6 | testimony 316:4,6 | 261:1 263:5 | 288:22 291:4,24 | 167:24 215:5 |
| Technology-based | 317:8 318:10 | 265:16 280:13 | 292:1 300:7 | 255:16 265:11 |

**EXHIBIT B**

300:5 317:13
thoughts 46:17
  279:8 297:10
thousand 74:13
  75:2
thousands 212:12
three 10:7 20:6
  50:13 64:25 65:2
  65:2 87:17 117:14
  119:3,5 134:13
  138:1 142:5 182:9
  221:13,13,16
  225:14 261:14
  296:19
three-day 181:17
thrown 278:6
Thursday 181:7,9
  181:9
ticker 287:22
ticket 191:12
tickets 191:20
  207:17
tidy 30:24
tied 139:13 221:19
  289:3
tier 276:21
tiers 13:1
till 23:1,2 56:12
time 4:13 6:6 7:5
  7:21 8:12 9:2
  10:15 14:13 20:5
  31:25 32:9,11
  37:20 51:25 54:5
  59:18,25,25 60:4
  61:6 63:19,25
  71:14 74:15 75:20
  78:6 83:5 89:3,5
  92:1 93:23 94:7
  96:12,13 98:20,21
  115:11 122:22
  127:7 131:5
  134:11 138:10
  139:25 140:12,21
  145:20,23 147:21
  156:5 159:4,10
  160:21 162:20

163:7,12 165:9,10
174:25 175:10
180:5 181:8,17
197:14 198:23
199:7 202:4,15,18
203:8 213:19
231:12,24,25
234:14,20 236:9
237:2 241:16
249:19 252:22
253:23 256:13,13
256:14,25 274:24
276:8 277:3
280:23 283:11
288:7,9,22 295:15
299:5 305:7,24
306:2
times 43:20 52:21
  52:23 60:20 61:7
  86:24,25 89:17
  112:19 116:17,18
  125:9 161:2 170:7
  196:17,24 224:10
  230:18 235:1
  239:6 260:18,19
  291:12 313:1,1
timing 79:16 87:18
  130:7 187:20
  254:5
tip 73:13
tissue 156:16
title 31:4 100:2,7
  105:7,13
titled 200:19
titles 177:21
titty 285:23
Tiva 72:12,13
today 6:18 7:2 9:10
  23:4,18 98:15
  202:4 301:19
today's 148:16
told 5:12 129:14
  168:9 171:19
  181:10 212:2
  234:3 288:2
Tomcat 170:3

243:4 244:4,6,10
245:17,24 246:22
265:1 312:2
tomorrow 198:24
ton 12:17 17:19
  43:4 72:3 124:9
  193:24 195:4
  274:18 284:15
  286:24 290:7,9,11
Tons 132:1
tool 108:22
tools 63:23 250:15
top 69:24 76:15
  78:23 88:1 119:19
  124:24 138:1
  155:8,20 176:14
  179:11 181:6
  200:10 218:25
  268:10 295:7,16
topic 171:6 242:9
total 74:10
touch 9:11 10:9
  38:15
touched 14:19
  169:6,7
tough 144:1,2,5,7
tox 143:15 156:15
toxicology 49:25
  118:20 143:12
  154:14 240:21
traceable 267:8
track 19:24 31:23
  38:18 40:23
  236:22 238:7
  266:23
tracked 20:6 22:25
  33:7 260:7
tracking 31:24 33:9
  166:17 266:14
tracks 146:11
traditional 286:18
traditionally 37:25
  59:18
trainer 27:2
training 17:19
  69:20 180:9,15

201:8
trains 184:3
transcribed 318:11
transcript 4:9
  317:17 318:4,14
  318:14
transcription 316:5
  317:15 318:13
transcripts 11:15
transfer 43:7 44:4
  287:6,13
transferring 63:16
  127:18
transit 310:10
transmission 310:6
transmitted 304:23
  310:3
transportation
  19:6,7
traveled 21:21
traveling 28:22
  276:7 282:10
tremendous 59:24
triage 41:3
triaging 193:18
trial 228:24 301:25
  303:3
trickle 314:11
tried 87:8 111:11
  249:2 273:10
  300:17
trigger 134:17
  227:2
triggers 214:5
Trinity 1:4 9:9 37:4
  42:2,13 49:24
  50:3,3,5,12 53:7,8
  57:8,13 62:2,3
  63:11,20 64:21,25
  67:3,7,20 71:13
  73:15,17 74:22
  93:20 94:3 95:13
  97:4 103:24 104:5
  104:8 106:11,13
  107:5 108:7
  109:12 114:1

123:14 127:11,16
127:20 128:1
131:25 133:24
134:21 149:14
150:16 151:2,2
175:9 178:5,22,22
178:23 181:22
192:23 201:25
204:7 210:2,23
214:17 228:7,8
229:9 251:3 270:5
283:19 293:20
295:14 297:14
298:24
Trinity's 71:8
  203:14 206:11
  212:16 298:6
trip 20:1
triple 106:12
Trojan 247:17
trouble 171:8,12
Truce 23:5 37:7,8
  39:7,8,9
trucks 30:14
true 62:6 67:19
  153:8 160:4 316:7
  318:12
Trujillo 155:7,10
trust 184:5
Trusted 121:3
try 145:16 205:25
  206:1 216:9 251:8
  279:13,13 288:23
trying 13:4 32:13
  92:22 136:4
  162:20 194:16
  204:25 254:9
  269:14 286:21
  289:1,14,17 300:6
tub 234:18,19
tuned 53:25
turmoil 13:9 111:2
  233:4 237:24
  279:17 281:3
  284:10
turnaround 129:12

turned 62:22 64:2
120:8 126:17
turning 69:16
tweak 226:23 235:7
twelve 262:20
twist 68:8 98:6
twisted 68:5
two 16:17 18:23
19:8,9 25:7 27:18
28:2 51:24 52:21
63:24 66:3 70:22
76:4,9 77:7,8,12
77:17 89:25
106:10 110:24
119:25 122:9,10
130:2 134:12
153:15 165:16
173:6 192:6
216:12,13,22
223:12 225:14
229:20 236:8
240:4 261:13
273:2 284:6 297:7
308:9
twofold 165:12,13
Tyler 105:12,14,25
113:10 114:11,12
162:25
Tyler's 163:2
type 16:9 18:16
26:21 37:21,23
38:2 59:17 77:21
91:23 99:11,19
118:6,12 140:23
171:8 206:20
212:7 215:3
228:24 257:21
258:25 284:11,13
285:15
typed 201:14,16,17
types 18:15 19:15
40:24 49:6 64:10
109:9 311:6
313:17
typical 99:6 103:12
168:14 209:1

typically 138:24
168:20 169:10
171:12
typing 63:18 117:1

**U**

U 4:1
uh 144:19 146:6
203:11 210:14
220:7 221:12
225:13,24 248:4
256:8 283:19
291:5,9 297:18
Uh-huh 9:22 11:5
14:16 28:24 30:15
35:21 38:8 60:6
81:6 83:18 94:22
99:21 101:19
103:14 118:5
131:14 133:21
139:18 142:22
143:16 145:6
152:5 167:21
173:21 182:15
184:8 186:1,12
187:22 188:15
210:22 216:3
224:15 233:2
249:23 258:21
264:3 272:22
279:6 281:10
289:5 297:9
305:25
UL 15:5
ultimately 12:23
13:4 32:7 41:8
69:21 102:19
105:9 186:24
226:14 247:23
255:11 262:9
276:11,19 282:19
292:5
um 7:13 8:17 9:24
12:9,17,18,23
13:1,7,12 16:15
18:3 19:15,21
20:25 21:14 23:2

23:4,12,15,17
24:11 25:25 27:4
27:7,12,18 30:1
31:12 33:9,14
42:7,15 44:25
45:19 46:9 51:5
51:10 52:17 54:21
55:12,15 56:2,17
57:6 58:17,19
62:6 63:22 67:7
67:21 68:22,25
69:12,14,19,21
71:17 72:22 73:4
73:7 74:10,25
76:1,7,8,21 78:25
78:25 81:1 82:20
83:5,7,16,19,24
85:9,22,22 88:14
89:1,11,14 90:5
90:21 94:10 99:13
100:17 101:25
103:4 104:14
105:8 106:12
107:10,25 110:1
110:11 111:9,25
113:9,16 116:6,15
117:8 118:1,6
119:15 120:13
121:5 125:16,20
126:25 128:9,11
128:13,19,22
137:6 141:1
143:17,25 144:12
146:3 149:15,21
150:23 154:2,5
156:9 157:16
166:18 168:24
169:13 170:4
171:2,5 173:18
176:11 177:24,25
179:2 180:24
182:5,8,11 183:7
183:14 185:10,24
191:1 194:6,13
195:1,15 196:13
202:2 205:4

206:21 207:19
208:7,15 210:5
212:22 223:13
225:14 228:17,25
229:18 230:1
233:3 235:17
239:4,6 240:16
241:3,21 242:8,16
242:24 243:15,24
249:9,14 251:15
254:8,11 256:17
257:16 259:7,11
259:22 260:7
262:17 264:21
267:23 269:13
270:16 275:14
277:5 278:2
279:10,17,22,23
279:24 282:8
283:12 284:13
285:8,14 286:18
288:15,19 290:23
292:12,19 293:3
293:22 294:8
295:19 296:5
297:16 298:5
301:7,16 302:7
309:2,13,15 310:5
310:13 313:7,8,11
314:8
Um-I 70:10
Unable 231:8
uncovered 12:17
12:20
undelete 222:12
223:5
understand 42:6
45:9 49:21 77:24
86:16 152:12
166:5 209:22,22
218:11 245:19
255:24 274:12
278:14 283:6
understanding
12:15 13:8 34:10
117:18,21 123:7,8

140:3 159:22
189:8 193:18
238:10 318:13
understood 6:14
13:14 30:19
undertaking 36:18
unencrypted
209:25 210:3
Unh-unh 7:3 9:7
10:6 73:22 117:20
123:10 230:19
UNITED 1:1
unknown 48:16
unlock 86:4
unpackages 247:13
Unrelated 230:5
untoward 93:14
untypical 209:6
unwind 279:14
unwinding 281:7
update 292:12
updates 170:8
upgrades 309:9
upgrading 36:21
uploading 246:22
upper 34:17 87:23
upside-down 287:3
290:17
upwards 231:11,13
URL 311:6
usability 16:23
142:3 170:25
Usability/Risk
216:11
USDIN 2:10
use 32:2,15 50:12
54:6 64:9 80:11
87:8,9 96:18
120:1 126:1
127:20 141:25
148:2,4 152:1
160:15 171:2
189:22 190:8
204:2 205:17
224:22 243:9
248:24 250:15

268:6,13 273:10
298:20 310:6
314:18,19
**user** 85:6 86:19,20
89:12,24 95:5,5
103:12,19 184:14
195:4 196:2
202:21,21 203:7
203:24,25 205:10
206:1,20 207:23
208:1 210:21
243:12,15 244:8
244:14 245:2,6,7
246:11,13 248:8
259:16 261:8
262:1 264:24
266:3,15,24
267:25 268:3
270:21,25 271:10
273:6,24 304:20
307:23 308:5,19
308:23
**users** 104:4 262:15
266:11,14 271:17
271:22 273:2,9
308:14
**users'** 271:3
**uses** 38:16 260:6

───────────
**V**
**vacant** 81:23
**valid** 126:1 131:3
205:10 211:21
215:13 236:18
318:4
**validate** 153:1
274:20
**validated** 125:23
**validating** 201:3
**validations** 225:11
**validity** 153:1
**valuable** 66:22
235:14
**value** 66:13 239:16
239:22
**values** 237:4,8
308:10

**various** 304:10
**vary** 140:8
**varying** 105:2
**vehicle** 38:7,18
**vehicle-focused**
38:1
**vein** 6:7
**vendors** 33:20
286:24
**verbal** 6:8,9
**verified** 317:20
**version** 63:23 170:3
206:19 273:1,6
274:2
**versions** 265:1
**versus** 1:7 224:4
262:11 289:1
**vest** 282:1
**view** 210:16 230:3
**viewing** 211:17
**virtual** 89:18
**virus** 247:16
**viruses** 93:15
**vision** 55:19 65:10
**visit** 21:4 116:14
**visiting** 285:23
**vital** 19:14
**vitals** 19:24
**VO2** 26:3
**voiced** 146:2,5
147:1
**volume** 69:1,13
70:8 228:3
**voluntarily** 115:8
**vote** 111:5
**VP** 23:5
**VPN** 85:10,24,25
86:1 87:9 88:16
89:17,20 90:3
91:1
**vulnerabilities**
265:2
**vulnerable** 44:13

───────────
**W**
**wait** 6:4 238:1
**waiting** 164:24

**waived** 4:10
**walk** 141:9 210:1,4
254:18 291:15
300:17 301:3
**walked** 25:3 73:23
300:11
**walking** 131:7
207:2 259:1,15
**walks** 38:24
**wall** 85:25 86:5
**walls** 211:9,12
213:3
**wanna** 300:22
**want** 14:20 29:7,7
36:5 57:12 65:11
67:2 68:5 94:2
96:9 114:19
115:14 116:8
127:8 128:17
133:6,16 151:24
202:18 216:19
221:2 250:16
252:25 257:23,25
277:21 283:22,23
286:8 287:10,19
287:23 291:13
295:9 298:20
300:1,15 301:2,14
303:19,25
**wanted** 26:5 63:15
64:14 76:16 89:3
122:15 164:11
208:22 210:3
277:20 281:13
284:1 299:25
300:25 301:3,8
**wanting** 36:10
**wants** 112:3
**WAR** 246:22
247:10
**ware** 62:11
**wary** 175:4
**wasn't** 54:3 69:14
82:23 88:7 107:9
108:2 116:12,25
120:18 121:13

141:7 158:2
167:17,24 170:5
178:12 183:7
187:12 209:14,14
215:8,15,16,17
238:16 241:4,17
275:23 276:12
280:11,12,14
281:2 286:18
287:20 300:9
301:5,5,7
**wasted** 281:25
**water** 211:21
**wave** 149:16
**Waxwing** 5:2,16
**way** 9:15 13:6,14
20:22 22:17 23:1
23:21,22 34:9
44:3 48:13 56:1,2
60:19 61:16,25
68:10,18,18 72:19
81:11 84:25 86:10
86:11 89:11,14,18
92:25 103:25
120:8,19 131:13
132:6 133:18
135:7 139:21
141:13,13,14,14
141:14 150:12
158:6 170:10
171:14,16 177:10
181:25 183:20
184:3 189:1 193:8
196:16 198:4
203:6 207:15
215:25 221:21
222:22 223:19
225:5 228:2 229:8
231:21 232:10,19
238:6,9 239:17
244:16 249:4,6
263:5,11 264:5
265:25 266:2,17
266:22 277:10
282:13 292:3
306:25

**ways** 41:2 89:25
184:2 196:1
249:10 312:5
**we'll** 7:21 55:24
57:11 60:24 103:3
114:6 116:10
157:2 165:11
189:1 248:22
277:21
**we're** 6:3 23:4,4
27:11 29:8 37:21
37:22 38:5 52:7
55:9,13 93:22
96:17 102:8 109:8
115:9 116:21
129:14,15 133:17
134:7 136:7 180:7
193:15 224:7
231:7 271:9
274:23 282:15
288:2 291:25
**we've** 8:9 38:3,4
105:20 114:4
144:9 148:9
195:23 256:15
257:24 264:24
282:16
**wear** 235:3
**wearable** 19:16
**weather** 19:19
**web** 24:11 39:13,16
85:19
**web-based** 64:9
108:19 203:22
209:8,13 307:9,17
311:1
**website** 41:18
108:24 268:3
307:10 311:6
313:6
**week** 60:18 122:12
123:3 124:5
312:15
**weekly** 260:16
**weeks** 54:2,2,18
116:19

weights 289:3
weird 10:17 64:12
  64:12
wellness 19:22 21:4
  192:22
went 18:15 20:5
  21:12,15,20 22:9
  24:10 53:22 56:18
  61:22 69:17 79:11
  96:10,21 134:18
  138:3 165:23
  174:13 187:2,5
  189:18 195:18,19
  254:7 271:2
  277:18 280:23
  281:14 282:21
  283:1,14 286:10
  291:8,12 292:17
  298:15 300:7
weren't 35:22
  64:20 69:5 70:1
  77:19 83:25 84:14
  94:11 107:4
  115:10 123:21
  132:22 137:18
  197:11 217:13
  218:8 220:1 232:8
  255:4 279:25
  280:16 289:18
  292:15 297:22
whatnot 21:19
  36:15 41:1 77:6
  161:7
whatsoever 48:12
wheels 69:16
whim 60:10 138:18
  139:9
whistles 298:17
white 60:15
wholesale 24:8
wide 71:2
widely 251:20
widespread 18:4
  25:11
widget 108:14
wife 114:18,24,24

163:2
wild 44:23
WILDER-DOO...
  1:11
Windows 88:3
wipe 91:19
wire 310:9
wise 265:10
witness 4:4,25 5:3
  11:21 189:23
  318:9
WITNESS' 316:1
witnesses 11:20
word 200:7 219:4
  223:18 247:17
wording 120:4
words 68:9 129:19
  201:13 224:22
  270:19 307:17
  317:16,19
work 10:10 20:1,21
  22:16,18 23:12,14
  23:15 31:18 35:13
  37:5 42:12 43:5
  49:25 51:20 58:12
  58:19 59:22,23,24
  60:10,17 62:14
  75:3,7,23 77:13
  77:14,23 86:7
  88:2 94:5 97:3,21
  103:18 105:19
  108:15 129:22
  130:2 131:12
  136:16 141:20
  193:25 194:5,10
  194:17 195:13,16
  196:2,19 200:25
  203:17 226:14,18
  229:16,18 232:17
  248:22 255:6,23
  265:12 274:20
  276:9 277:10,18
  281:18 291:8
  312:5
work-related
  288:18

workaround
  193:24 204:12,13
  223:7,9 226:16
  227:11 260:13
  262:7,17 263:18
  264:11 269:8
  271:5,7 312:14,16
workarounds
  194:19 195:10
worked 13:21
  15:24 17:17 19:8
  19:11 21:21 23:25
  24:3 28:19 31:19
  33:21 34:7 42:21
  52:9 56:18 58:2,3
  64:1 77:22 78:4,6
  85:9 87:1 89:15
  93:18 94:17 99:9
  104:17 114:24
  121:18 136:15
  143:1 145:22
  155:12 161:22
  195:6,24 233:14
  237:16 248:19
  249:2 275:2 287:6
  305:13
worker 19:23
workers 26:22
workflow 16:10
  98:6 133:17
  144:22,23 145:18
  194:13 195:21
  196:20 218:7,17
  220:20 225:5,7
  235:21 241:5
  252:14
working 14:11
  18:10 19:23 23:3
  31:13 38:5,11
  40:13 43:6 51:2,4
  52:1,4 53:15
  56:18 71:7 75:9
  76:21,25 77:3
  84:8 95:4 99:18
  110:12,16 114:12
  122:21,21 126:9

126:10 129:24
  136:7 138:15
  156:23 161:20
  182:9 185:24
  196:18 201:1,2
  229:21 245:14
  248:25 253:15
  281:2 282:1,8
  289:14
workings 194:24
works 17:15 97:21
  139:22 152:12
  171:14 183:24
  189:6 199:7
  301:18
world 56:3 203:23
  225:18 226:8
  238:22 240:21
  245:13,15 248:2
  271:20 311:19
worlds 65:19
worried 11:23
worry 92:9 120:24
worrying 20:24
worse 139:7 281:11
  281:12
worth 164:1 165:11
wouldn't 38:14
  66:18,20 81:7,7
  87:8 126:25
  142:11,15 158:1,3
  158:22,22 159:25
  160:2,9 161:14,18
  169:24 176:8
  196:25 200:23
  204:16 207:2
  210:10 212:7
  218:24 219:20
  226:6 230:1
  248:17 252:7,13
  252:19 284:16
  292:15 307:4
  312:3
wow 51:24 137:12
  144:8 163:20
  183:18 207:5

257:19 305:19
Wozniak 80:6,6,13
  81:15 82:8
wrap 251:9
write 6:6,9 198:11
  198:22 202:3
  272:13 313:22
writer 27:1
writes 102:8 117:9
  124:16,25 125:9
  125:15 151:23
  154:4 165:25
  179:24 242:19
  246:20,21 253:13
  270:24
writing 5:24 60:16
written 207:16
  258:23 305:3
  307:5 314:20
wrong 239:23
  262:5
wrote 160:17 172:4
  172:5 270:19
  305:12

       **X**

X 3:1,1,8,8 262:25
  263:3
Xifin 296:5
xyzcom 243:8

       **Y**

Y 263:3
y'all 29:9 54:5
  57:17,20 58:18
  61:4 62:2 65:1,3
  67:20 71:6 72:9
  72:20 75:16 78:8
  83:9 84:21 86:14
  88:25 93:11 94:3
  94:5 95:13 97:3
  99:18 103:24
  104:7 107:5,21
  109:11,22 127:9
  132:24 133:23
  134:21 139:1
  143:7 154:21

159:13,13 164:11
167:10 185:6
186:12,19 193:3
203:15 204:7,8
207:10 208:13,19
209:11,25 213:3
214:17,21 219:25
223:7 226:8
228:14 233:18
252:3 271:5,25
274:7 278:14
279:3 284:24
292:7 293:20
294:6,7 313:15,16
**y'all's** 64:25 71:8
91:13 98:11
207:23 250:11
**yeah** 7:10,15,20,22
7:24 9:5 10:2
15:16 16:5,7
17:13 18:12 25:18
29:14,19,20 30:1
30:3,5 33:5,7
42:25 44:25 46:25
47:7 51:1,14 53:9
61:4,6 67:10,16
67:18 69:1 70:3
70:13,14,16 72:5
72:14 73:10 74:4
74:9,11 78:3,5
79:7,14,16,25
80:9 81:24 83:5
84:14,18 85:22
86:19 87:17 88:5
89:9 90:16,19
91:22 92:5,6,13
92:14 93:6,16
97:1,14 98:10,14
99:6,7,12,13,22
100:10,16 101:16
102:11 103:11,20
104:21 105:10
106:16 107:10,12
109:18 110:7,8
111:1,3,9,13,18
112:24 113:3,5,6

113:8,15,25
114:25 115:5,6,9
115:11 116:10
117:15 121:2,4,16
121:18,21 122:4
122:24 125:16,16
126:23 128:8
129:14 130:19
132:5 133:15
135:1 136:22,24
137:3,6,25 138:7
140:1,2,19 141:22
142:8 144:19
145:9,9,16,19
146:14 147:14
148:23 150:3,7
153:5 154:18
155:19 157:3,6,11
158:9,10 159:19
160:9,14,24 161:2
161:3,4,14,16,18
163:20 164:4
165:8,11,21,22,24
166:9,10 167:15
167:22 168:5
169:10,22 173:2
173:18 174:5,9,10
174:11,15,18,22
175:2,24 177:11
177:16,18 178:8
180:21,23 181:15
182:7 184:11,17
185:4 186:25
187:1,12 188:2,5
188:10 190:1,20
191:1,18,18
192:14,17,17,18
193:22 194:23
198:25 200:1
201:16 206:12,21
207:13,15 208:15
210:7,17,20
211:10,13 214:12
214:20 215:2,14
216:8,15,16
218:21 219:14,14

219:17 223:10
224:16,18 225:8
226:13 227:15,21
227:22,24,25
228:21 229:11
231:10 234:3
236:12 240:23
241:3 242:10
243:1 246:5,24
248:3 249:17,18
249:19 250:12
252:9,15 254:24
255:20 256:1,12
257:15 260:15,23
260:25 261:15,18
262:2 263:16
269:12,19,20,24
270:9 271:7,23
272:23 275:14
278:4 280:10,25
282:17 283:17
284:19 285:22
286:1,11 287:25
288:1,6,10,13,19
290:1,10 291:5
292:7,13,25 293:6
294:10,11,14
295:3 296:3,15,18
297:4,6 298:3,14
299:8 300:12
301:5,16,21
302:16,16,20,20
302:20 303:13
306:4 309:5,23
310:24 311:4
313:3,7,14 314:14
314:25 315:3,5
**year** 19:4 22:12
27:18,22 29:14
32:8,25,25 56:11
77:18 96:21
102:20 104:20
119:14 135:17
149:15 150:4
273:21 275:13
280:1 281:19,25

**years** 6:21,22 8:9
15:3 16:17 17:18
18:23 19:9,9,12
19:12 20:7 25:2
43:5 78:18 81:20
104:18 105:3
120:22 137:21
138:13 280:23
305:17
**yelling** 289:11
**yep** 33:17 57:16
68:20 73:24
113:11,18 127:18
149:6,13 150:20
150:24 154:9
155:9 188:24
192:11 202:10
208:3 270:14
274:1,5 293:7
295:12 300:20
303:17,24 304:4
308:15,20 309:4
**young** 27:1 115:3
120:3 178:21
179:17,25

———————
**Z**
———————
**zero** 189:24 190:4
**ZIP** 247:10
**zones** 19:25

———————
**0**
———————
**1**
———————
**1** 3:11 98:15,18,22
**1.0** 103:21
**1.2** 290:20 291:10
**1.3** 29:17 290:20
**10** 3:20 31:12 56:5
60:20 78:18 81:20
87:21 252:22
253:7
**10,000** 85:3
**100** 21:8 36:9
298:12
**100,000** 291:22
**101** 1:17

**1099** 76:13 90:21
287:21
**10th** 273:25
**11** 3:21 56:5 270:4
270:5,7 273:23
**112** 3:12
**11th** 119:9 173:17
180:13
**12** 3:22 95:22 96:3
272:11,14,18
**12:35** 150:10,23
**123079** 150:17
**12th** 116:3
**13** 3:23 20:23 57:15
74:16 95:23 96:3
294:16,18 295:5
**14** 29:13 55:18
75:21 76:6 79:21
**1434** 318:19
**1434(B)** 317:7
**148** 3:13
**15** 20:23 76:7 77:10
79:18,21 82:10
103:24 104:16
149:17
**150** 56:4
**15th** 192:21 237:19
237:20 273:20
**16** 7:8,9 21:22
57:10 79:12 80:22
104:21 114:19
149:18 187:11
193:13,17 194:4
227:15 238:23
273:22 275:14,15
277:6 299:2
300:22,22
**163** 3:14
**16th** 201:25 202:5
**17** 21:22 299:2,2,3
**172** 3:15
**178** 3:16
**17th** 200:10
**18** 292:19
**19** 160:1 199:20
**192** 3:17

**195072** 201:25
**19558** 192:5
**19564** 199:21
**19th** 1:19 149:24
  150:10,23 154:4,5
  303:15 305:5
  316:25

---

**2**

**2** 3:12 63:23 106:10
  112:18,20 113:7
  124:20 176:14
  295:16
**2-1/2** 25:2
**2-point** 290:18
**2.0** 102:9
**20** 224:10 305:17
**200** 197:8,14
**2004** 15:5
**201** 2:5
**2012** 20:19,21
  95:19
**2013** 27:22 52:16
**2014** 55:8,16 70:4
  97:2
**2015** 21:2 55:25
  56:8 68:17 70:5
  98:20 102:16
  115:22 116:3
  119:9 122:1,1
  128:7 134:23
  149:24 160:2,4
  161:11 162:20
  163:17 171:24
  303:15
**2016** 7:8 21:13 57:6
  173:7,17 178:20
  181:10 187:10
  192:21 200:10
  201:25 273:22
  275:17 276:25
  278:15
**2017** 7:19,24,25
  14:17 22:25 40:14
  73:20 74:16
  190:21 191:1
  242:17 253:12

  277:2 278:16,18
**2018** 23:2 316:25
**2019** 1:19
**202** 3:18
**20th** 253:12
**23840** 172:21
**23842** 173:9
**23846** 176:21
**23rd** 113:3 115:21
  161:11 163:17
**242** 3:19
**24th** 2:14
**253** 3:20
**25th** 178:19
**270** 3:21
**272** 3:22
**28** 317:5
**28th** 181:10,16,20
**294** 3:23
**2nd** 242:17

---

**3**

**3** 3:13 32:8 124:21
  147:19,24 148:16
  148:17,18 176:13
  303:10
**3:12** 154:4
**3:17-00592** 1:5
**3:30** 198:24
**3:36** 154:5
**30** 35:1,4 36:19
  120:22 224:10
**303** 3:5
**30th** 122:1
**312** 3:6
**37:2554** 318:9

---

**4**

**4** 3:14 124:23
  162:24 163:3
  172:17 173:3
  272:12,14
**4.1.6** 273:13
**40** 120:22
**400-plus** 56:6
**46th** 2:5
**4th** 98:20 122:1

---

**5**

**5** 3:4,15 172:18,22
**50** 55:17 231:11,17
  242:20
**504-586-5252** 2:7
**504-589-9700** 2:16
**5th** 173:7

---

**6**

**6** 3:16 178:19,25
**600-700,000** 290:22

---

**7**

**7** 3:17 176:21 192:5
  192:9 202:2
**7.9** 242:22
**7:00** 181:9
**70112** 2:15
**70170-4600** 2:6
**70433** 1:18
**70448** 5:2,17
**711** 5:2,16
**75005** 1:25 317:25
  318:25

---

**8**

**8** 3:18 201:24,24
  202:8
**80** 32:17 213:25
  214:1 231:13,17
  239:8
**80-some-odd**
  231:17
**80-something**
  224:3
**84007** 270:6
**8th** 116:2

---

**9**

**9** 3:19 177:2 242:2
  242:3,14 256:21
**9038** 253:4,13
**909** 2:14
**98** 3:11

**To:**      Howell, Chad[CHowell@TrinityMS.net]; Bourque, Blake[BBourque@TrinityMS.net]; Bunce, Rhett[RBunce@TrinityMS.net]
**Cc:**      BIU[SMO-15180UKBW@TrinityMS.net]
**From:**    Caviness, Lynn
**Sent:**    Fri 9/4/2015 11:03:24 PM
**Subject:** LIMS feedback report

Good evening gentlemen,

The theme behind this episode seems to be "we have no way of knowing"—I've heard that a lot in the feedback from the team. Basically, there seems to be a build-up of "junk" (i.e. samples rejected, approved, denied, things you don't need to always see unless looking for a particular accession) in LIMS combined with a lot of really long lists that are making it difficult to navigate and sort out/find what you're looking for. This also adds to the delay in finding the problems even exist. We want to work towards combining organization with up-front processes that will prevent finding problems way down the road and then struggling to figure out what happened. Below are some bullet points of the feedback I've gathered from the team related to this problem:

- PCS's creating accessions for next day's patient list, but if patient doesn't come they aren't always deleting them—no way of knowing what samples were misplaced vs. never came

- Many accessions hanging out in accession tracking that turn out just to be duplicates for the same patient and same collection date—need an alert if an order is being made for patient with same demographics/collection date.

- Need things to be rejected **up front;** if they accidentally forget to write "rejected" on the req form, and we find a sample down the road with no screen/confirmation we have no way of knowing if it was rejected or misplaced (we throw away the original sample cups, so we couldn't even dig for them if we don't find the problem until later).

- "there's not a good flow of data day-to-day"; everything seems to be compiled into large lists that stack up, instead of a daily/status driven interface

- Accession tracking needs more organization; oddly enough, I've heard requests for a structure similar to Paracelsus where there is a Worklist (accessions created)→Order List (samples received/prepped, name is misleading though)→Result List (approved samples). This will allow us to see what the day's end looks like, because as of right now we really have no clue when the day "ends" or our day's progress/what's left over etc.

  ○ This "day-to-day" and status-driven type of workflow would hopefully aid in discovering if something was a duplicate, never came to the lab, or if accessions will be late (because of instrument space, etc.) and marketers need to be notified

- "Where was this sample in that batch?"; with all the high priority and late/re-run samples, people have been searching through the Tecan scan files to find out where the accession is within a batch (i.e. to approve). The team would like visibility, and if it's in an area like accession tracking (where you're just going to view an overall summary of samples) it doesn't have to be interactive.

- Get rid of conflict status—with many re-preps, it's becoming quite tedious to manually merge conflicts—you have to expand the result, click each individual box for the drugs, merge, and then repeat for the page 2 drugs... for every sample! We didn't foresee this becoming a hassle but now that we've begun focusing on Compliance we have seen an increase in re-preps. It would be very helpful if we could do away with the Conflict Status/merging of results all together, but possibly have a link to them to review if necessary (and to identify them as a re-prep and not just an old sample).

- On another note, we've been experiencing some random glitches on the New Results Manager page where if you're not starting from the first sample in the list, it will not bring you to the next sample after approving. Also, sometimes the page will load the wrong sample (mostly I find this is when I've had the page open but inactive for about 5min), meaning it shows you've selected "A1" but it is showing the results for "A8".

And that sums up this week's LIMS feedback report! We're all very excited to see the new LIMS 2.0 progress, and appreciate you taking the lab's feedback into consideration ☺ .

EXHIBIT

CONFIDENTIAL

**EXHIBIT B** TRINITY_0027208

Have a great weekend,

Lynn Caviness
MT (AAB)
Trinity Medical Services
50 East Court, Suite 8, Mandeville, LA 70471
985-400-5466 office • 985-400-5492 fax • 985-373-0336 cell
Lynn@trinityms.net



*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the sender. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
1301 Young Street, Room 833
Dallas, Texas 75202



Division of Survey and Certification, Region VI   CENTERS FOR MEDICARE & MEDICAID SERVICES

# FAX - IMMEDIATE ATTENTION

**Date:**     12/23/15                    **Enforcement #:** E15-60 (6)

**Facility:**   **Howard Martin, MD, Laboratory Director**
**Blake N. Bourque, Owner**
**Performance Labs, LLC – 19D2065079**

**Fax #:**     985-400-5492

**From:**     **Sandy Pearson, MT(ASCP), Laboratory Consultant**
**Phone # (214) 767 - 4414  Fax # (443) 380-8865**

**Subject:**   Notice: Revisit onsite survey – November 30, 2015 to December 4,
2015. Sanction Notice Letter and CMS-2567.

**This fax consists of ( 370 ) pages including this cover sheet.**

---

## IF YOU RECEIVED THIS FAX IN ERROR,
## PLEASE CALL (214) 767- 4414 IMMEDIATELY!

**Privacy Information:** This fax may contain protected health and/or confidential information which should not be viewed or used by anyone other that the individual to whom the fax is sent and other authorized individuals as appropriate. The reader is hereby notified that nay copying, dissemination, distribution of this fax is prohibited. If you have received this fax by mistake, please telephone (collect if necessary) the sender and notify them that you have received the fax by mistake and that the document has been destroyed. Thank you.

Please **SIGN and FAX BACK** this page **TODAY**.
Fax # (443) 380-8865

**[ To save paper, a cover sheet is NOT needed! ]**

By my signature, I acknowledge receipt of this notification letter from the
Centers for Medicare & Medicaid Services dated_____.

Date **Received**:_____Date Faxed back to CMS:_____

_____(Signed)
Administrator or Authorized Representative

**EXHIBIT**
2

**EXHIBIT B**



## Division of Survey and Certification, Region VI

December 23, 2015

Howard Martin, MD, Laboratory Director
Blake N. Bourque, CEO (Trinity Medical Services, LLC)
Performance Labs, LLC
50 East Court, Suite B
Mandeville, LA  70471

**Reference**        **CLIA No.  19D2065079 – Complaint Investigation Revisit Survey**
                     **Findings:  Condition Level Non-Compliance – Immediate Jeopardy**

Dear Dr. Martin and Mr. Bourque:

In order for a laboratory to perform testing under the Clinical Laboratory Improvement
Amendments of 1988 (CLIA), Public Law 100-578, and bill for services provided to Medicare
beneficiaries or Medicaid recipients under Titles XVIII and XIX of the Social Security Act, it
must comply with all CLIA Requirements (42 CFR § 493). Federal regulations authorize surveys
to determine whether a laboratory complies with the applicable CLIA regulations.

The Louisiana Department of Health and Hospitals (LDHH) conducted a complaint investigation
survey of your laboratory on **June 8, 2015 and June 12, 2015** and identified condition level
noncompliance with the CLIA conditions which posed an immediate jeopardy to patients.
Specifically, your laboratory did not meet the following CLIA Condition(s):

- 42 CFR § 493.1240        Condition:  Pre-Analytic Systems;
- 42 CFR § 493.1213        Condition:  Toxicology; and
- 42 CFR § 493.1441        Condition:  Laboratory Director; high complexity testing.

During the exit conference on June 12, 2015, LDHH explained the Center for Medicare and
Medicaid Services' (CMS) enforcement process which provided the option for the laboratory to
voluntarily cease patient testing.  LDHH received a letter dated June 11, 2015, which was
provided and signed by James Bourland, Ph.D., laboratory director, which outlined your
laboratory's cessation of patient testing.  Based on this action, the immediate jeopardy was
abated and your laboratory was provided the opportunity to address the survey findings.

On July 9, 2015, the LDHH forwarded their survey and sanction recommendations to CMS.  On
July 31, 2015, the CMS sent a written request for a plan of correction and allegation of
compliance.  In addition, the CMS removed your laboratory's deems status (under COLA) as a
result of the condition level noncompliance identified in the original complaint investigation in
June, 2015.  The removal of the deemed status is still in effect.

**EXHIBIT B**

The laboratory's documents were received by CMS on August 19, 2015 and August 21, 2015 respectively. The Plans of Correction (PoCs) were found to be unacceptable. On September 2, 2015, CMS provided you with a written response as to why the PoCs were found unacceptable. In addition, on September 15, 2015, CMS and your staff had a joint conference call to provide your laboratory staff an opportunity to ask any questions regarding the unacceptable plans of correction.

The amended plans of correction were received on September 22, 2015. A review of all submitted documents was conducted and again the PoC's were found unacceptable. On October 8, 2015, CMS provided a written summary outlining those plans of correction that were acceptable and those that were unacceptable and the reasons as to why the plans of correction were found unacceptable. The amended plans of correction were received on October 20, 2015 (for those that were found unacceptable). A review of the documents once again found the PoC's to be unacceptable. As a result of the numerous unacceptable plans of correction submitted, an onsite revisit was conducted to assess what actions had been taken by the laboratory to achieve compliance.

<u>Onsite Revisit Survey Findings:</u>

LDHH and CMS conducted an onsite revisit of the laboratory from November 30, 2015 to December 4, 2015, and identified continued condition level noncompliance with the CLIA conditions which pose continued immediate jeopardy to patients. Specifically, your laboratory did not meet the following CLIA Condition(s):

- 42 CFR § 493.1240      Condition: Pre-Analytic Systems;
- 42 CFR § 493.1213      Condition: Toxicology;
- 42 CFR § 493.1290      Condition: Post Analytic Systems;
- 42 CFR § 493.1441      Condition: Laboratories performing high complexity testing; Laboratory Director;
- 42 CFR § 493.1447      Condition: Laboratories performing high complexity testing, Technical Supervisor;
- 42 CFR § 493.1487      Condition: Laboratories performing high complexity testing, Testing Personnel; and
- 42 CFR § 493.1771      Condition: Inspection Requirements applicable to all CLIA Certified and CLIA exempt laboratories.

The following is a summary of the survey findings:

1. Your laboratory failed to correct all condition level citations; plus new conditions were identified. Only one condition level citation was corrected.
2. Your laboratory failed to implement those portions of your plans of corrections that were accepted (letter dated October 8, 2015), thus resulting in a failure to correct the citations.
3. Your laboratory failed to provide acceptable plans of correction as summarized in the CMS letter dated October 8, 2015.

**EXHIBIT B**

4. On June 11, 2015, your laboratory director (Dr. Bourland) provided a cease testing letter, which abated the immediate jeopardy as in accordance with 42 CFR § 493.1912(a). However, based on the revisit survey findings, your laboratory failed to adhere to your cease testing letter. Based on the revisit survey findings, your laboratory tested patient samples from June 11, 2015, to December 3, 2015, thus resulting in the continuation of immediate jeopardy, without correcting condition level citations. The instruments involved were the Shimadzu 8050 (total number of patient accessions were 5,877) and the AB Sciex 4500 (total number of patient accessions were 4,105).

Based on the onsite revisit survey findings, your laboratory demonstrated continued systemic and pervasive problems throughout the laboratory which has led to findings of continued immediate jeopardy. Your laboratory's failure to demonstrate compliance substantially limits your laboratory's capacity to render adequate services and prevent the laboratory from complying with the CLIA Regulations. Under section 42 CFR § 493.1812(a), "If a laboratory's deficiencies pose immediate jeopardy, the following rules apply: CMS requires the laboratory to take immediate action to remove the jeopardy..."

Please be advised that there are several sanctions that will be imposed on your laboratory with specific time frames. Please review this letter carefully for those actions and time frames.

<u>Imposition of alternative sanctions:</u>

Laboratories that do not meet a CLIA Condition may not be certified for participation in the CLIA program. Based on the serious nature of the onsite revisit survey findings of continued condition level noncompliance with the CLIA Conditions, the laboratory's failure to correct all condition level citations, findings of new condition level noncompliance, and the authority under 42 CFR § 493.1804(b), (c), (e), CMS will impose the following sanctions effective **December 30, 2015:**

<u>Directed Plan of Correction:</u>

- 42 CFR § 493.1806(c) (1), 42 CFR § 493.1810 (a) (c)(1),(2)(i), and 42 CFR § 493.1832(a), (b)(1)(i)(ii) – Alternative Sanction: Directed Plan of Correction.

When CMS imposes a directed plan of correction, CMS directs the laboratory to take specific corrective action within specific timeframes, and adhere to the directions given as follows, in order to achieve compliance. CMS requires the laboratory to:

- Notify all the laboratory's clients of the identified CLIA noncompliance from June 8, 2015 to December 4, 2015, that final patient test results are untrustworthy; and the clients should have their patients retested by another CLIA certified laboratory;
- Notify all clients in writing on laboratory letterhead;
- Send written notice to all clients with confirmation of receipt of the notice; and
- Submit to CMS a copy of the written notice and confirmation of receipt by the client.

The written notification and confirmation of receipt must be submitted to CMS by **January 11, 2016.**

EXHIBIT B

Directed Portion of a Plan of Correction:

- 42 CFR § 493.1806(c)(1),42 CFR § 493.1810 (a)(c)(1),(2)(i), and 42 CFR § 493.1832(a), (b)(1) – Alternative Sanction: Directed Portion of a Plan of Correction.

  When CMS imposes a directed portion of a plan of correction, CMS directs the laboratory to take specific corrective action within specific timeframes, and adhere to the directions given as follows, in order to achieve compliance. CMS requires the laboratory to submit the names and addresses of all clients for notification purposes. The laboratory must provide, to CMS, the list of clients by **January 11, 2016.** The list of clients must include the names and addresses of all physicians, providers, suppliers and other clients who have used some or all of the services of the laboratory since the last certification inspection or within any other time frame specified by CMS (the date of the original complaint investigation of June 8, 2015 and June 12, 2015).

Suspension of all Medicare and Medicaid payments:

- 42 CFR § 493.1807 (b)(2); 42 CFR § 493.1809, 42 CFR § 493.1810 (a), (c )(1),(2)(i), and 42 CFR § 493.1828 (a)(1), (2)(i)(A), (3) – Alternative Sanction: Suspension of all Medicare Payments.

In accordance with 42 CFR § 493.1810 (b) and 42 CFR § 493.1828 (b), you may submit written evidence or other information against the imposition of the proposed sanction or sanctions to the Dallas Regional Office. The information must be received prior to **December 30, 2015.**

Plan of Correction & Allegation of Compliance:

The laboratory must prepare a complete new plan of correction and allegation of compliance. The original plans and allegation will not be accepted due to having a new laboratory director, technical supervisor, new citations, and failure to provide a complete acceptable plan of correction for the complaint investigation.

By **January 5, 2016,** the laboratory must submit a plan of correction (POC) to the LDHH, with copies to CMS, for the deficiencies cited on the enclosed CMS-2567 in the columns labeled "Provider Plan of Correction" and "Completion Date" located on the right side of the form, keying your responses to the deficiencies on the left. **The laboratory director must sign, date and return the completed CMS-2567.** Please retain a copy for your files.

An acceptable plan of correction (POC) must include:

- How the deficient practice will be corrected or how it has been corrected;
- When the corrective action(s) will be completed (date) or when corrected;
- What corrective actions(s) have been taken for patients found to have been affected by the deficient practice;
- Who will be responsible for implementing the corrections;
- How the laboratory has identified other patients having the potential to be affected by the same deficient practice and what corrective action(s) has been taken;

4

**EXHIBIT B**

- What measure(s) has been put into place or what systemic changes have been made to ensure that the deficient practice does not recur; and
- How the corrective action(s) is being monitored to ensure the deficient practice does not recur and who is monitoring the corrections.

Also by **January 5, 2016,** the laboratory must submit a credible allegation of compliance (AOC) to the LDHH with copies to CMS, in order to demonstrate that actions taken by the lab have addressed the immediate jeopardy and condition level deficiencies cited on the CMS-2567.

A credible AOC is a statement and documentation:

- Made by a representative of a laboratory with a history of having maintained a commitment to compliance and taking corrective action when required; and
- That is realistic in terms of the possibility of the corrective action being accomplished between the date of the survey and the date of the allegation; and
- That indicates the removal of the immediate jeopardy or the resolution of the deficiencies.

The AOC may be submitted as a separate document from the POC along with the supporting evidence.

The address for LDHH is:

> Alexa N. Little, MBEC, MLS (ASCP)
> CLIA Program
> Louisiana Department of Health and Hospitals
> Bienville Building
> 628 North 4th Street, 3rd floor
> Baton Rouge, LA 70802
> Alexa.Little@LA.GOV
> T: 225-342-9324; F: 225-342-9349

<u>Please be advised that due to the seriousness of the survey findings, the sanctions listed cannot be avoided by the closure of the laboratory, discontinuation of testing, voluntary withdrawal from the CLIA program, or changes in certificate to a lower level of testing.</u>

**<u>Additional Proposed Sanctions:</u>**

Laboratories that do not meet a CLIA Condition may not be certified for participation in the CLIA program. Based on the serious nature of the survey findings and laboratory's noncompliance (immediate jeopardy) with the CLIA Conditions and the authority under 42 CFR § 493.1804(b), CMS will impose the following sanctions:

- 42 CFR § 493.1810(d), 42 CFR § 493.1842(a)(1),(2),(b)(2) - Principal Sanction: **Cancellation of the laboratory's approval to receive Medicare** payments for laboratory services **effective on or after January 12, 2016.** In addition, under section 1902(a)(9)(C) of the Social Security Act and 42 CFR § 440.30(c), payment under the Medicaid program, will no longer be available to the laboratory for any laboratory services performed **effective on or after January 12, 2016.**

**EXHIBIT B**

In accordance with 42 CFR § 493.1842(b) (2), you may submit written evidence or other information against the cancellation of the laboratory's approval to receive Medicare payments for laboratory services to the Dallas Regional Office. The information must be received by **January 11, 2016.**

- 42 CFR § 493.61(c), (e), 42 CFR § 493.1806(a) & (b), 42 CFR § 493.1840(a)(3), (d)(2)(i) – Principle Sanction: **Suspension** of the laboratory's CLIA certificate **effective on or after January 12, 2016,** based on the finding of immediate jeopardy. Under suspension and cancellation, your laboratory may not legally perform or bill for any patient laboratory testing (to include waived and non-waived testing; or whether you charge for the test or bill to Medicare, Medicaid, or private insurance).

Your laboratory will be allowed to remain in operation, and may perform other procedures (i.e., quality control, personnel recruitment, training, proficiency testing, etc.) in order to demonstrate compliance.

Under 42 CFR § 493.1840(d)(2)(i) and 42 CFR § 493.1844(d)(2),(3), the suspension and cancellation will take effect regardless of whether or not a request for a hearing is filed and will remain in effect until the laboratory's CLIA certificate is revoked or an Administrative Law Judge renders a decision. Please note that in accordance with 42 U.S.C. 263a (i) (2) and 42 CFR § 493.1840(d)(2)(i), CMS is authorized to suspend the CLIA certificate of a laboratory before holding a hearing where the failure to comply with CLIA requirements presents an imminent and serious risk to human health, as has been determined in this case.

- 42 CFR § 493.1806(a), (b), 42 CFR § 493.1840(e), 42 CFR § 493.61(e), (f) - Principal Sanction: **Revocation** of your CLIA certificate, pending a decision from an Administrative Law Judge, if an appeal is filed. When the laboratory's CLIA certificate is suspended or revoked, the laboratory will not be permitted to perform testing including waived testing, regardless of whether or not the laboratory charges for the testing.

Reasons for Revocation:

Your laboratory's CLIA certificate will be revoked effective **February 23, 2016,** if one or all of the following occurs:
- A request for a hearing is not received by **February 22, 2016;** or
- CMS and the State does not receive an AOC and POC; or
- The laboratory fails to provide an acceptable AOC and POC; or
- CMS and the State continues to find immediate jeopardy and/or condition level noncompliance; or
- The laboratory fails to adhere to imposed sanctions.

General Information:

Please note that 42 U.S.C. 263a (i)(3) and 42 CFR § 493.1840(a)(8) prohibit the owner(s) or operator(s) (including director – see 42 CFR § 493.2) from owning or operating (or directing) a laboratory for at least two years from the date of the revocation.

6

**EXHIBIT B**

This prohibition applies to the owner(s) as well as the director at the time that the deficiencies were found which led to the current sanction actions. If the sanctions become effective as referenced above, in accordance with 42 CFR § 493.1850(a)(2), information regarding the actions against the laboratory's CLIA certificate will appear in the Laboratory Registry for the calendar year in which the actions are imposed.

In addition, pursuant to 42 CFR § 493.1844(g) (1), we will notify the general public by means of a notice published in a local newspaper, when the above sanctions are imposed. If the laboratory continues testing, after the sanctions are imposed, please be informed that under 42 CFR § 493.1806(e) and section 353(l) of the Public Health Service Act, any individual who is convicted of intentionally violating any CLIA requirement may be imprisoned or fined.

### Appeals Process:

If your facility/laboratory does not believe this determination to impose these actions against its CLIA certificate is correct, the laboratory may request a hearing before an administrative law judge (ALJ) of the Departmental Appeals Board in accordance with 42 C.F.R. § 493.1844(a)(1)-(2) and 42 C.F.R. §§ 498.40 through 498.78. A request for hearing must be filed **electronically** no later than **sixty (60) calendar days** after the date this letter is received (see 42 C.F.R. § 493.1844(f)). You should file your request for an appeal (accompanied by a copy of this letter) to the Department Appeals Board Electronic Filing System website (DAB E-file) at https://dab.efile.hhs.gov.

Please note: all documents must be submitted in Portable Document Format ("pdf:"). You are **required** to e-file your appeal request unless you do not have access to a computer or internet service. In such circumstances, you may file in writing, but must provide an explanation as to why you cannot file submissions electronically and request a waiver from e-filing in the mailed copy of your request for a hearing. Written request for appeals must also be filed no later than sixty (60) calendar days after the date this letter is received, and must be submitted to the following address:

> Department of Health and Human Services
> Departmental Appeals Board, MS 6132
> Civil Remedies Division
> 330 Independence Ave, SW
> Cohen Building, Room G-644, MS6132
> Washington, D.C. 20201

Please send a copy of your appeal to:

> Attention: CLIA Program – Sandy Pearson
> Division of Survey and Certification
> Centers for Medicare & Medicaid Services
> 1301 Young Street, Suite 833
> Dallas, Texas, 75202.

**EXHIBIT B**

A request for hearing should identify the specific issues, and the findings of fact and conclusions of law with which you disagree. It should also specify the basis for contending that the findings and conclusions are incorrect. You may be represented by counsel at a hearing at your own expense. If a hearing is conducted and CMS' determination is upheld, the laboratory may be assessed a fee to cover the government's cost related to the hearing.
See 42 CFR § 493.643(d) (2).

**How to File:** When using DAB E-File for the first time, you will need to create an account by a) clicking *Register* on the DAB E-File home page; b) entering the requested information on the *Register New Account* form; and c) clicking *Register Account* at the bottom of the form. Each representative authorized to represent you must register separately to use the DAB E-File on your behalf.

The e-mail address and password given during registration must be entered on the login screen at: *https:/dab.efile.hhs.gov/user sessions/new* to access DAB E-File. A registered user's access to DAB E-File is restricted to the appeals for which he/she is a party or an authorized representative. You can file a new appeal by a) clicking the *File New Appeal* link on the Manage Existing Appeals screen; then b) clicking *Civil Remedies Division* on the File New Appeal screen; and c) entering and uploading the requested information and documents on the File New Appeal-Civil Remedies Division form.

The Civil Remedies Division (CRD) requires all hearing requests to be signed and accompanied by the notice letter from CMS that addresses the action taken and your appeal rights. All submitted documents must be in Portable Document Format (PDF). Documents uploaded to DAB E-File on any day on or before 11:59p.m. ET will be considered to have been received on that day. You will be expected to accept electronic service of any appeal-related documents filed by CMS or that the CRD issues on behalf of the Administrative Law Judge (ALJ) via DAB E-File. Further instructions are located at: *https://dab.efile.hhs.gov/appeals/to_crd_instructions.* Please contact the Civil Remedies Division at 202-565-9462 if you have questions regarding the DAB E-Filing System. If you experience technical issues with the DAB E-Filing System, please contact E-File System Support at *OSDABImmediateOffice@hhs.gov* or call 202-565-0146 before 4:00p.m. ET.

**If you do not have access to a computer or internet service,** you may call the Civil Remedies Division at 202-565-9462 to request a waiver from e-filing and provide an explanation as to why you cannot file electronically or you may mail a written request for a waiver along with your written request for a hearing. A written request for a hearing must be filed no later than 60 days from the date of receipt of this letter via fax, by mailing to the address listed above.

**EXHIBIT B**

**Contact Information:**

If you have any questions about the administrative aspects of this enforcement, please contact Sandy Pearson, MT (ASCP) at Sandra.pearson@cms.hhs.gov or (214) 767-4414.   If you have questions about the technical/clinical aspects of this enforcement, please contact Alexa Little, MLS (ASCP), at (225) 342-9324.

Sincerely,

Diane Murphy, Manager
Survey Branch

Enclosure:  Form CMS-2567 – Revisit – continuing and new citations
            Form CMS-2567B – Revisit – corrected citation

cc:  LDHH

/smp/

9

**EXHIBIT B**

| From: | Blake Bourque (-O-EXCHANGELABS-OU-EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)-CN-RECIPIENTS-CN-67728DBB01DC4D7EA4015921F9FDD572-BLAKE BOURQ) |
|---|---|
| Sent: | Wednesday, December 23, 2015 7:26:53 PM |
| To: | Bunce, Rhett (rbunce@trinityms.net); Howell, Chad (chowell@trinityms.net); Lafleur, Tyler (tlafleur@trinityms.net); Franklin, Kris (kfranklin@trinityms.net); Lafleur, Lacie Jo (llafleur@trinityms.net); Spruill, Michelle (mspruill@trinityms.net) |
| Subject: | Fwd: Performance Lab - 19D2065079: Revisit survey findings |
| Attachments: | E15-60 (2) signed revisit letter 11-2015 .pdf; e15-60_revisit 113015 cms-2567b.pdf; e15-60_revisit cms-2567 part 1.pdf; e15-60_revisit cms-2567 part 2.pdf |

This is not good.

Sent from Outlook

---------- Forwarded message ----------
From: "**Pearson, Sandra M. (CMS/CQISCO)**" <Sandra.Pearson@cms.hhs.gov>
Date: Wed, Dec 23, 2015 at 10:44 AM -0800
Subject: Performance Lab - 19D2065079: Revisit survey findings
To: "tmartin@sagisdx.com" <tmartin@sagisdx.com>, "Blake Bourque" <BBourque@TrinityMS.Net>
Cc: "Wade, Diane (CMS/CQISCO)" <Diane.Wade@cms.hhs.gov>, "Alexa N. Little (Alexa.Little@LA.GOV)"
<Alexa.Little@LA.GOV>, "Ortiz, Gerardo (CMS/CQISCO)" <Gerardo.Ortiz@cms.hhs.gov>, "Vause, Lane N.
(CMS/CQISCO)" <Lane.Vause@cms.hhs.gov>, "Hesselgesser, Daniel H. (CMS/CQISCO)"
<Daniel.Hesselgesser@cms.hhs.gov>

Attached is our notice letter and CMS-2567 for the revisit survey of November 30 to December 4, 2015. Also enclosed is the CLIA fax cover sheet which must be signed, dated, and returned to this office. Due to the length of the CMS-2567, it is divided into part 1 (pages 1-180) and part 2 (pages 181 to 359). Please be sure to forward the documents to the new Technical Supervisor, Kris Franklin. I still do not have his contact information.

We will require a new Plan of correction (POC) and allegation of compliance (AOC) for the revisit survey findings. The CMS-2567 is quite lengthy; due to having deficiencies cited for both the original complaint investigation and the revisit. For a continuing deficiency, the Dtag citation will be bracketed – such as <D5300>. This means that both survey findings will be written under the same tag. CMS only requires a POC for the revisit. You will know when you come to the end of the revisit survey findings – there will be a " line of + signs" (+++++++) to separate the two survey findings.

If the dtag citation does not have a bracket, such as D5315, then the citation is a new deficiency and will only have the survey findings for the revisit survey.

If you should have any questions, please contact our office.

Sandy Pearson

**Sandy Pearson, MT(ASCP), MBA** ‖ Laboratory Consultant ‖ CMS/Dallas Regional Office/CLIA Survey Branch
‖1301 Young Street, # 833 ‖ Dallas, TX 75202 ‖ Phone: 214-767-4414 ‖ **Fax: (443) 380-8865** ‖ sandra.pearson@cms.hhs.gov

**EXHIBIT B**

**To:** Howell, Chad[CHowell@TrinityMS.net]; Larry Trujillo[ltrujillo@TrinityMS.net]
**From:** Rick Ornelas
**Sent:** Thur 11/19/2015 10:05:38 PM
**Subject:** FYI-FW: Merge LIS
Merge LIS Case Study--Granite Diagnostic Lab--Solving Remote Processing Issues.pdf
Merge LIS--BPC Combo report--routine lab plus toxicology--8.6.15.pdf
Merge LIS--Combined routine lab and Toxicology report--1-15-15.pdf
Merge LIS--sample combo report--12-31-14.pdf
Merge LIS.pdf
Merge LIS--New Tox Report with IBM Logo and Summary Of Findings--10.21.15.pdf


I'll reply to Ron and CC you. Thx

**Rick Ornelas**
Executive VP- Sales & Marketing
Trinity Health
50 East Court, Suite 8, Mandeville, LA 70471
805-704-5425 cell ▪ 985-400-5491 office ▪ 985-400-5492 fax
rick@trinityms.net



*The information contained in this email contains confidential information that may be legally privileged and protected by federal and state law. This information is intended for the use only by the entity or individual to whom it is addressed. The authorized recipient is prohibited from using this information after its stated need has been fulfilled.*

*If you are in possession of this protected health information, and are not the intended recipient, you are hereby notified that any improper disclosure, copying, or distribution of the contents is strictly prohibited. Please notify the sender of this information immediately and destroy the document or documents contained.*

**From:** Ron Poe [mailto:Ron.Poe@merge.com]
**Sent:** Thursday, November 19, 2015 3:36 PM
**To:** Rick Ornelas <Rick@TrinityMS.net>
**Subject:** RE: Merge LIS

Thanks Rick. If I understand you correctly, you have a centralized laboratory with two draw locations/patient service centers. Is that correct? Is any testing done at the remote sites?

Outreach in Merge LIS is available through our ePortal modules. This allows your client accounts to place orders into your Merge LIS, print instrument specific barcodes at the sample origination site and then to receive their results back to an "inbox" that is part of the system. We can also deposit the results into their EMR system via an HL-7 interface---if that is desired. We would be happy to show these functions during a web demo if you have availability.

The Merge LIS is capable of handling all of the different lab disciplines you have mentioned below in one system. We do have a completely paperless Microbiology module. We also handle toxicology and routine lab studies in the same system. I have attached some sample reports from other customer sites (dummy data) for your review.

I did explain to Chad that the next available installation times for a system will be in early to mid February if we come to an agreement by month's end. Please let me know how you would like to proceed.

**Ron Poe**
*Regional Sales Manager--LIS Division*

**Merge Healthcare, an IBM Company**
*350 N. Orleans, 1ˢᵗ Floor*
*Chicago, IL 60654*
**P:** *877.238.3322*
**F:** *866.887.1423*



EXHIBIT
3
CHAD HOWELL

EXHIBIT
3
Poe   5/1/19

M: *336.455.3584*
E: *ron.poe@merge.com*

*www.merge.com*

**PLEASE NOTE:** I will be out of office:

November 25th–December 4th, returning to my office on Monday December 7th.

**amplify** your imaging value

*PRIVACY STATEMENT: This message and all attachments are a private communication and may be confidential or protected by privilege. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited. Thank you.*

---

**From:** Rick Ornelas [mailto:Rick@TrinityMS.net]
**Sent:** Thursday, November 19, 2015 3:12 PM
**To:** Howell, Chad; Ron Poe
**Subject:** RE: Merge LIS

Ron,

Below are the answers to the rest of your questions. Feel free to call me for clarification.

Central Valley Diagnostics Laboratory- CVDL
31 W. Alexander Ave.
Merced, CA 95348  (209) 726-3846
Contact- Rick Ornelas –CEO      Jenny Mora- Billing Manager      Dr. Robert Ray- Lab Manager

CVDL is a full-service clinical laboratory with two patient service centers.  We currently do- Toxicology, Hematology, COAG, Urine, Chemistry, Glucose, Microbiology including BACTI, and a number of other specialized panels in house.
We send out some tests to Bio Reference

There are 12 people who work in the lab and an equal number of workstations.  We will need to provide results to Dr's via a physician web portal.

Please clarify what you mean by Outreach capabilities.

Thanks,

**Rick Ornelas**
**Executive VP- Sales & Marketing**
**Trinity Health**
50 East Court, Suite 8, Mandeville, LA  70471
805-704-5425 cell ▪ 985-400-5491 office ▪ 985-400-5492 fax
rick@trinityms.net



TRINITY
HEALTH

*The information contained in this email contains confidential information that may be legally privileged and protected by federal and state law. This information is intended for the use only by the entity or individual to whom it is addressed. The authorized recipient is prohibited from using this information after its stated need has been fulfilled.*

**EXHIBIT B**

*If you are in possession of this protected health information, and are not the intended recipient, you are hereby notified that any improper disclosure, copying, or distribution of the contents is strictly prohibited. Please notify the sender of this information immediately and destroy the document or documents contained.*

**From:** Howell, Chad
**Sent:** Thursday, November 19, 2015 1:03 PM
**To:** Ron Poe <Ron.Poe@merge.com>; Rick Ornelas <Rick@TrinityMS.net>
**Subject:** RE: Merge LIS

All, Please see below, I have added the tests in which the instruments run.
Thanks!

Instrumentation which exists in the laboratory (CVDL):
1. Olympus AU400 – 2 of them

   a. Na - Sodium
   b. K - Potassium
   c. Cl - Chloride
   d. ALB - Albumin
   e. ALP
   f. AMY - Amylase
   g. ALT
   h. AST
   i. TBIL – Total Bilirubin
   j. TBILB
   k. BUN – Bun (Urea Nitrogen)
   l. CHOL - Cholesterol
   m. GGT
   n. GLU - Glucose
   o. IPHOS - Phosphate
   p. LDH
   q. TPRO – Total Protein
   r. TIBC
   s. CO2 – Carbon Dioxide
   t. hsCRP
   u. CREAT – Creatinine
   v. Iron
   w. HDL
   x. LDL
   y. DILA – Dilantin (Phenytoin)
   z. CARB – Carbamazepine
   aa. Valporic Acid
   bb. Digoxin
   cc. Theo – Theophylline
   dd. CA – Calcium
   ee. Trig – Triglycerides
   ff. URIC – Uric Acid
   gg. CPK
   hh. LI – Lithium
   ii. DBILI
   jj. MG – Magnesium
   kk. Urine Panel same as Performance on second AU
2. Biorad D10 Hemoglobin A1c Analyzer
   a. Hgb A1c
3. Polymedco Sedimart 15- Sed-rate

   a. ESR
3. Sysmex 2000

TRINITY_0123077

**EXHIBIT B**

    a. White Blood Count
    b. Red Blood Count
    c. Hemoglobin
    d. Hematocrit
    e. MCV
    f. MCH
    g. MCHC
    h. Platelet count
    i. RDW
    j. MPV
    k. Neutrophils
    l. Lymphocytes
    m. Monocytes
    n. Eosinophils
    o. Basophils
    p. Immature Granulocyte (IG)

5. Tosoh 900
    a. Progesterone
    b. Estradiol
    c. FSH
    d. TSH
    e. FT4
    f. FT3
    g. Testosterone
    h. TT3
    i. T4
    J. Vitamin B12
    k. Folate
    l. Prolactin
    m. Vitamin D

6. Coulter ACL 100 – Automated Coagulation Analyzer

    a. Partial thromboplastin time
    b. Prothrombin time
    c. INR (international normalized ratio)

6. Consult Diagnostics Urine Analyzer

    a. Glucose
    b. Bilirubin
    c. Ketones
    d. Specific Gravity
    e. Blood
    f. pH
    g. Protein
    h. Urobilinogen
    l. Nitrite
    j. Leukocytes

BIOMAR – LIMs system currently in use which is hooked up to the following instruments directly to receive transmission of results
    1. AU400 – Clinical Chemistry
    2. Sysmex 2000
    3. Coulter ACL 100 - Automated Coagulation Analyzer

**EXHIBIT B**

**Chad Howell**
*Chief Information Officer*
**Trinity Medical Services**
www.TrinityMS.net

1385 Marion Lane STE E, Mandeville, LA 70471
985-373-5409 *cell* ▪ 985-400-5491 *office* ▪ 985-467-5550 *fax*
Chad@TrinityMS.net

 

*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the sender. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

**From:** Ron Poe [mailto:Ron.Poe@merge.com]
**Sent:** Thursday, November 19, 2015 12:35 PM
**To:** Rick Ornelas <Rick@TrinityMS.net>; Howell, Chad <CHowell@TrinityMS.net>
**Subject:** Merge LIS

Good morning Rick and afternoon Chad,

I need some information on you lab before I can prepare the quote that Chad requested yesterday. First, I need the name of the lab, address, phone number, contact person(s) and please include email addresses and areas of responsibility—Lab Manager, IT Director, etc.

Next, is this going to be a POL or a reference lab?
How many people will be in the lab who will need access to workstations, what type of testing are you going to be doing—routine clinical labs, microbiology (how extensive), toxicology, PGx, etc.?
What analyzers need to be interfaced (manufacturers and model numbers please)?
Will you need "outreach" capabilities?

Sorry for all the questions but I want to be sure that I configure the system that best fits your needs. We don't use a "cookie cutter" approach at Merge. Each system is configured specific to our customers' needs.

**Ron Poe**
*Regional Sales Manager--LIS Division*

**Merge Healthcare, an IBM Company**
*350 N. Orleans, 1ʳ Floor*
*Chicago, IL 60654*

P: *877.238.3322*
F: *866.887.1423*
M: *336.455.3584*
E: *ron.poe@merge.com*

*www.merge.com*

<u>**PLEASE NOTE:**</u> I will be out of office:

November 25th—December 4th, returning to my office on Monday December 7th.

CONFIDENTIAL

**EXHIBIT B**



*PRIVACY STATEMENT: This message and all attachments are a private communication and may be confidential or protected by privilege. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited. Thank you.*

**EXHIBIT B**



# **Solving** Remote Processing Issues

*Granite Diagnostic Laboratories | Florida*

## **"Merge LIS has eliminated printing**

a significant amount of laboratory results on paper. Our goal was to cut paper consumption by 85 percent and we've achieved it. Additionally, direct access to results by our clients eliminates the need for our couriers to hand deliver results, thus saving time, money and minimizing hydrocarbon emissions by less miles driven."

Rick Granite
Granite Diagnostic Laboratories

Founded in 1999, Granite Diagnostic Laboratories (GDL) is a state of the art, CLIA certified and Florida licensed Clinical Laboratory that offers diagnostic testing in the disciplines of Clinical Chemistry, Hematology, Coagulation and Urinalysis. Their full service laboratory is located in the Northern Pinellas county of Florida, along with eight branch facilities that offer an extensive spectrum of testing services close to the physician offices they serve and in the communities where patients reside. While other laboratories are transporting the specimens toward their final destinations, GDL has often already completed testing and delivered the results to physicians for proper and timely treatment of their patients.

GDL is owned and operated by two brothers, Rick and Brian Granite. Rick serves as president of the company and Brian is the vice president of operations, overseeing all daily activities of their laboratories.

### The Challenge

Due to an increase in business and their growing number of remote patient service center sites, GDL needed a lab information system (LIS) that not only provided workflow improvements, but also offered extensive remote processing capabilities. Their current LIS, which had been in place for several years, lacked the ability to efficiently handle remote processing, and did not provide the communication features necessary to facilitate physician order entry and results reporting. The system also lacked the Internet connectivity to communicate and coordinate the activities at all of their nine locations.

### The Solution

After an investigation of various LIS solutions in the healthcare marketplace, GDL chose Merge Healthcare's Merge LIS™. Of primary concern to GDL was Merge LIS's scalability and configurability to meet the needs of their nine individual labs. GDL was also pleased with the Internet accessibility that is seamlessly integrated into Merge LIS's core design. The system's Internet connectivity features were designed to meet the highest healthcare standards for security, including user names and passwords, industry standard hardware security, encryption of all patient data transmitted, SSL certificates for Internet Access, and audit logging.

In addition, with a track record of over 500 successful lab interfaces, there were no problems with Merge providing instrument interfaces.

 innovative imaging™

**EXHIBIT B**

### Benefits

"With the increasing deployment of electronic medical records (EMR), many of our physician clients were requesting direct order entry and results reporting for their EMRs. Merge LIS's HL7 compliant communications structure allows us to meet our clients' demand for this capability. Also, the system's SQL server platform allows us to rapidly customize the system to meet our unique processing needs at each of our facilities, which ensures uniformity and high quality of the results we report to our customers," explained Rick Granite.

The system's flexibility and extensive choices allowed us to configure the LIS to meet the needs of each of our clients. Even though we have only one system, it's like having several individual ones that meet the unique requirements of each client." Granite said.

Granite was also impressed with how easy Merge LIS is to learn and use. "Our staff was productive on the system in a very short time. The intuitive screens and menus make training new employees quick and painless. Most new lab techs can be ready and able to use the system with just a few hours of training, taking full advantage of the system's functionality," he said.

According to Rick, the system's greatest component is the ePortal. This feature allows physician to access results 24x7 from any authorized workstation, PDA or laptop, even if they don't have an EMR. With ePortal, physicians can view their results in real time, make their diagnoses end put together treatment regimens in a fraction of the time it used to take. This feature also significantly reduces calls to the lab requesting results.

"ePortal has eliminated printing a significant amount of laboratory results on paper. Our goal was to cut paper consumption by 85 percent and we've achieved it. Additionally, direct access to results by our clients eliminates the need for our couriers to hand deliver results, thus saving time, money and minimizing hydrocarbon emissions by less miles driven." Granite remarked.

"In addition to providing excellent benefits to our physician clients, the ePortal has also helped us market our services to new customers. Today's physician office personnel are trained to use electronic results. ePortal helps us compete with the very largest clinical reference labs by 'leveling the playing field.' We can provide all the services they do and just as efficiently," said Granite.

A physician can launch the ePortal by accessing the GDL website from any web device, and clicking on the login icon on the homepage. Once logged in securely, the lab results are presented in a familiar pdf format that is easy to read and interpret. Physicians can quickly see which test results are in or out of range. "Doctors truly appreciate the system's intuitive screens," explained Granite. "The results are presented in an "inbox format" when the doctor logs in with the patients' names and their results display in color-coded boxes all on one screen. Results presented in green boxes indicate they are within expected range, results in yellow boxes indicate out of range, and results presented in red boxes indicate critically out of range and need immediate attention. The doctor can click on a particular patient and see all resulted values in pdf format."

"We have been very pleased with our decision to go with Merge LIS and ePortal. They have streamlined our workflow and increased the efficiency in the way we service our clients' needs, while helping us contain costs and provide a positive impact on the environment. Our client physicians have also indicated they believe the improved speed in results reporting has enhanced the care they deliver." Granite concluded.

---

> **"We have been very pleased** with our decision to go with Merge LIS and ePortal. They have streamlined our workflow and increased the efficiency in the way we service our clients' needs, while helping us contain costs and provide a positive impact on the environment."
>
> Rick Granite,
> Granite Diagnostic Laboratories

**EXHIBIT B**



## About Merge Healthcare

Merge Healthcare is a leading provider of enterprise imaging and interoperability solutions. Merge solutions facilitate the sharing of images to improve the electronic healthcare experience. Merge provides solutions for radiology, cardiology, orthopaedics, eye care, clinical trials, financial and pre-surgical management: electronic health record and practice management solutions; applications that fuel the largest modality vendors in the world, and a network of patient-centric, wellness stations.

© Copyright 2012 Merge Healthcare



877.446.3743 x3 · merge.com



🐦 @MergeHealthcare

in linkedin.com/company/merge-healthcare

f facebook.com/MergeHealthcare

**EXHIBIT B**



## Final Report
### Birmingham Pain Center
7500 Hugh Daniel Dr. Suite 300
Birmingham, AL 3?
Phone: (205) 313-?
Lab Director - Dr. Robert Hardy, Ph?

| PATIENT NAME | | Requesting Site: | Patient Account | DOB | SEX |
|---|---|---|---|---|---|
| MOUSE, MICKEY J | | LAB | M1289 | 01/14/1965 | M |
| PHYSICIAN | LAB REF. # | COLLECTION DATE | | VERIFIED | |
| UNKNOWN, | 12007 | 08/05/2015 | | 08/05/2015 10:30 CDT | |
| COMMENT | | | | Page 1 of 2 | |

| TEST | RESULTS | FLAG | REFERENCE RANGE | UNITS |
|---|---|---|---|---|
| --- Department: CHEMISTRY --- | | | | |

### RENAL PROFILE (1)

| TEST | RESULTS | FLAG | REFERENCE RANGE | UNITS |
|---|---|---|---|---|
| SODIUM | 135 | | 135-145 | mEq/L |
| POTASSIUM | 2.0 | L | 3.5-5.1 | mEq/L |
| CHLORIDE | 100 | | 98-107 | mEq/L |
| CARBON DIOXIDE | 22 | | 21-31 | mEq/L |
| GLUCOSE | 75 | | 70-105 | mg/dL |
| BUN | 20 | | 7-25 | mg/dL |
| CREATININE | 1.0 | | 0.7-1.3 | mg/dL |
| CALCIUM | 10.0 | | 8.6-10.2 | mg/dL |
| PHOSPHORUS | 3.0 | | 2.5-5.0 | mg/dL |
| ALBUMIN | 4.0 | | 3.5-5.7 | g/dL |

### --- Department: HEMATOLOGY ---

### COMPLETE BLOOD COUNT (1)

| TEST | RESULTS | FLAG | REFERENCE RANGE | UNITS |
|---|---|---|---|---|
| WBC COMMENT TO DOCTOR: THIS IS A TEST. | 20.0 | HH | 3.5-10.0 | x10^3/UL |
| RBC | 4.00 | | 3.80-5.80 | x10^6/UL |
| HGB | 12.0 | | 11.0-16.5 | g/dL |
| HCT | 40.0 | | 35.0-50.0 | % |
| MCV | 85.0 | | 80.0-97.0 | fL |
| MCH | 27.0 | | 26.5-33.5 | PG |
| MCHC | 32.0 | | 31.5-35.0 | g/dL |
| RDW | 10.0 | | 10.0-15.0 | % |
| PLT | 200 | | 150-390 | x10^3/UL |
| MPV | 7.0 | | 6.5-11.0 | FL |
| LYMPH# | 2.0 | | 1.2-3.2 | x10^3/UL |
| MONO# | 0.5 | | 0.3-0.8 | x10^3/UL |
| MONO% | 10.0 | | 4.0-10.0 | % |
| LYMPH % | 20.0 | | 17.0-48.0 | % |

**EXHIBIT B**

**THE BIRMINGHAM PAIN CENTER**

Final Report

**Birmingham Pain Center**
7500 Hugh Daniel Dr, Suite 300
Birmingham, AL 35242
Phone: (205) 313-7246
Lab Director - Dr. Robert Hardy, PhD

| PATIENT NAME | | | | |
|---|---|---|---|---|
| MOUSE, MICKEY J | | | | |
| | DOB | Patient Account | Requesting Site: | SEX |
| | 01/14/1965 | M1289 | LAB | M |
| PHYSICIAN | LAB REF. # | COLLECTION DATE | VERIFIED | |
| UNKNOWN, | 12007 | 08/05/2015 | 08/05/2015 10:30 CDT | |
| COMMENT | | | | Page 2 of 2 |

--- Department: TOXICOLOGY ---

| TEST | RESULTS | OUTCOME | INTERPRETATION | CUT OFF / REF RANGE | UNITS |
|---|---|---|---|---|---|
| **AMPHETAMINES CONFIRMATION - LC/MS/MS (1)** | | | | | |
| AMPHETAMINE | 200 | POSITIVE | HIGH | 100 | ng/mL |
| METHAMPHETAMINE | NEGATIVE | | NORMAL | 100 | ng/mL |
| **OPIATES CONFIRMATION - LC/MS/MS (1)** | | | | | |
| MORPHINE | 100 | POSITIVE | HIGH | 50 | ng/mL |
| HYDROMORPHONE | 100 | POSITIVE | HIGH | 50 | ng/mL |
| HYDROCODONE | NEGATIVE | | NORMAL | 50 | ng/mL |
| CODEINE | NEGATIVE | | NORMAL | 50 | ng/mL |
| OXYCODONE | NEGATIVE | | NORMAL | 50 | ng/mL |
| OXYMORPHONE | NEGATIVE | | NORMAL | 50 | ng/mL |
| **BENZODIAZEPINES CONFIRMATION - LC/MS/MS (1)** | | | | | |
| 7-AMINO-CLONAZEPAM | NEGATIVE | | NORMAL | 25 | ng/mL |
| ALPHA-HYDROXYALPRAZOLAM | NEGATIVE | | NORMAL | 25 | ng/mL |
| LORAZEPAM | NEGATIVE | | NORMAL | 40 | ng/mL |
| OXAZEPAM | NEGATIVE | | NORMAL | 40 | ng/mL |
| TEMAZEPAM | NEGATIVE | | NORMAL | 50 | ng/mL |
| NORDIAZEPAM | 125 | POSITIVE | HIGH | 40 | ng/mL |
| **FENTANYL CONFIRMATION - LC/MS/MS (1)** | | | | | |
| FENTANYL | NEGATIVE | | NORMAL | 12.5 | ng/mL |
| **MEPERIDINE CONFIRMATION - LC/MS/MS (1)** | | | | | |
| MEPERIDINE | NEGATIVE | | NORMAL | 50 | ng/mL |
| **METHADONE CONFIRMATION - LC/MS/MS (1)** | | | | | |
| METHADONE | NEGATIVE | | NORMAL | 100 | ng/mL |
| EDDP | NEGATIVE | | NORMAL | 100 | ng/mL |
| **TRAMADOL CONFIRMATION - LC/MS/MS (1)** | | | | | |
| TRAMADOL | NEGATIVE | | NORMAL | 100 | ng/mL |

1. THE BIRMINGHAM PAIN CENTER, 7500 HUGH DANIEL DRIVE, SUITE 500, BIRMINGHAM, AL 35242. PHONE: 205-313-7282.

*Credentials: CLIA high complexity lab certification # 01D1005547; CAP# 7723-6-11-01; Drug confirmation quantitative quantitative analysis are conducted by isotope-dilution multiple reaction monitoring electro-ion spray liquid chromatography mass-spectrometry (LC/MS/MS).

## Summary of Findings
### VISION LABORATORIES
6130 SHALLOWFORD RD SUITE 100
CHATTANOOGA, TN 37421



| PATIENT NAME MOUSE, MICKEY J | | Patient ID 88888888 | DOB 1955-01-14 | SEX M |
|---|---|---|---|---|
| PHYSICIAN DEMO,PHYSICIAN | LAB REF # 12308 | COLLECTION DATE 01/15/2015 19:24 | RECEIVED DATE 01/15/2015 19:24 | |

**CONSISTENT RESULTS - REPORTED MEDICATION (PARENT DRUG AND/OR METABOLITE) DETECTED**

| REPORTED PRESCRIPTION | ANTICIPATED POSITIVE(S) | TEST OUTCOME | DETECTION WINDOW |
|---|---|---|---|
| Amobarbital | AMOBARBITAL | POSITIVE | |

**INCONSISTENT RESULTS - ANALYTE DETECTED BUT NO CORRESPONDING PRESCRIPTION REPORTED**

| DETECTED ANALYTE | LUCIT | MEASURED RESULT | CUTOFF | TEST OUTCOME | DETECTION WINDOW |
|---|---|---|---|---|---|
| MARIJUANA (THCCOOH) | Y | 76 ng/mL | 10 | POSITIVE | |

#### SPECIMEN VALIDITY TESTING

| TEST | TEST OUTCOME | MEASURED RESULT | REFERENCE RANGE |
|---|---|---|---|
| CREATININE | Normal | 165 mg/dL | 20-300 |
| pH | Normal | 6.2 | 4.5-9.0 |
| SPECIFIC GRAVITY | Normal | 1.003 | 1.001-1.020 |
| OXIDANT | Normal | 125 mg/L | 0-200 |
| NITRITE | Normal | 267 mg/L | 0-500 |

Reviewed By: _____     Date: _____

Ported On:
Printed:     01/15/2015   19:28
Page        1 of 1

Accession :      12308
Lab Results For:
Patient ID:      88888888

**EXHIBIT B**

Final Report
**COMPANION DX**
Toxicology Monitoring
10301 Stella Link Rd, Suite C
Houston, TX 77025
Phone: (888) 482-5327
Lab Director - Kevin P. Rosenblatt, M.D., PhD



| PATIENT NAME | | Requesting Site: | Patient Account | DOB | SEX |
|---|---|---|---|---|---|
| MOUSE, MICKEY J | | VISION | 88888888 | 01/14/1955 | M |
| PHYSICIAN | LAB REF. # | COLLECTION DATE | | VERIFIED | |
| DEMO,PHYSICIAN | 12308 | 01/15/2015 | | 01/15/2015 19:28 MST | |
| COMMENT | | | | Page 1 of 3 | |

PRESCRIBED MEDICATIONS

Amobarbital (01/15/2015), Codeine (01/15/2015), Fentanyl (01/15/2015)

| | RESULTS | UNITS | REFERENCE RANGE | TECH |
|---|---|---|---|---|
| --- Department: CHEMISTRY --- | | | | |
| **CREATININE (1)** | | | | |
| CREATININE | 1.4 | mg/dL | 0.6-1.3 | ADM |
| GFR AFRICAN AMERICAN | >60 | | >=60 | ADM |
| GFR CAUCASIAN | 55 | | >=60 | ADM |
| **LIPID PROFILE (1)** | | | | |
| CHOLESTEROL | 225 | mg/dL | 0-200 | ADM |
| TRIGLYCERIDES | 165 | mg/dL | 0-165 | ADM |
| HDL CHOLESTEROL | 65 | mg/dL | 0-70 | ADM |
| LDL (CALCULATED) | 127 | CALC | 0-130 | ADM |
| HDL RISK FACTOR | 3.5 | CALC | 0.0-5.0 | ADM |

**EXHIBIT B**

Final Report
**COMPANION DX**
Toxicology Monitoring
10301 Stella Link Rd, Su
Houston, TX 7
Phone: (888) 482-53
Lab Director - Kevin P. Rosenblatt, M.D., PhD

# CompanionDx.

| PATIENT NAME | | Requesting Site: | Patient Account | DOB | SEX |
|---|---|---|---|---|---|
| MOUSE, MICKEY J | | VISION | 88888888 | 01/14/1955 | M |
| PHYSICIAN | LAB REF. # | COLLECTION DATE | | VERIFIED | |
| DEMO,PHYSICIAN | 12308 | 01/15/2015 | | 01/15/2015 19:28 MST | |
| COMMENT | | | | Page 2 of 3 | |

## PRESCRIBED MEDICATIONS

Amobarbital (01/15/2015), Codeine (01/15/2015), Fentanyl (01/15/2015)

| TEST | RESULTS | UNITS | OUTCOME | INTERPRETATION | CUT OFF / REF RANGE |
|---|---|---|---|---|---|
| --- Department: TOXICOLOGY --- | | | | | |
| **SPECIMEN VALIDITY TESTING (1)** | | | | | |
| CREATININE | 165 | mg/dL | | NORMAL | 20-300 |
| pH | 6.2 | | | NORMAL | 4.5-9.0 |
| SPECIFIC GRAVITY | 1.003 | | | NORMAL | 1.001-1.020 |
| OXIDANT | 125 | mg/L | | NORMAL | 0-200 |
| NITRITE | 267 | mg/L | | NORMAL | 0-500 |
| **OPIATES/OPIOIDS CONFIRMATION - LC/MS/MS (1)** | | | | | |
| CODEINE | 0 | ng/mL | NEGATIVE | INCONSISTENT | 50 |
| | *Inconsistent with prescribed medication | | | | |
| MORPHINE | 0 | ng/mL | NEGATIVE | CONSISTENT | 50 |
| FENTANYL | 6 | ng/mL | POSITIVE | CONSISTENT | 2 |
| NORFENTANYL | 5 | ng/mL | POSITIVE | CONSISTENT | 2 |
| HYDROCODONE | 0 | ng/mL | NEGATIVE | CONSISTENT | 50 |
| HYDROMORPHONE | 0 | ng/mL | NEGATIVE | CONSISTENT | 50 |
| NORHYDROCODONE | 0 | ng/mL | NEGATIVE | CONSISTENT | 50 |
| MEPERIDINE | 0 | ng/mL | NEGATIVE | CONSISTENT | 50 |
| NORMERPERIDINE | 0 | ng/mL | NEGATIVE | CONSISTENT | 50 |
| OXYCODONE | 0 | ng/mL | NEGATIVE | CONSISTENT | 50 |
| NOROXYCODONE | 0 | ng/mL | NEGATIVE | CONSISTENT | 50 |
| OXYMORPHONE | 0 | ng/mL | NEGATIVE | CONSISTENT | 50 |
| PROPOXYPHENE | 0 | ng/mL | NEGATIVE | CONSISTENT | 50 |
| NORPROPOXYPHENE | 0 | ng/mL | NEGATIVE | CONSISTENT | 50 |
| TAPENTADOL | 0 | ng/mL | NEGATIVE | CONSISTENT | 25 |
| **BARBITURATES CONFIRMATION - LC/MS/MS (1)** | | | | | |
| AMOBARBITAL | 225 | ng/mL | POSITIVE | CONSISTENT | 100 |
| BUTALBITAL | 0 | ng/mL | NEGATIVE | CONSISTENT | 100 |
| PENTOBARBITAL | 0 | ng/mL | NEGATIVE | CONSISTENT | 100 |
| PHENOBARBITAL | 0 | ng/mL | NEGATIVE | CONSISTENT | 100 |
| SECOBARBITAL | 0 | ng/mL | NEGATIVE | CONSISTENT | 100 |
| **THC CONFIRMATION - LC/MS/MS (1)** | | | | | |
| MARIJUANA (THCCOOH) | 76 | ng/mL | POSITIVE | HIGH | 10 |
| | **Consistent with illicit drug use | | | | |

**EXHIBIT B**

Toxicology Monitoring
10301 Stella Link Rd, Suite C
Houston, TX 77025
Phone: (888) 482-5327
Lab Director - Kevin P. Rosenblatt, M.D., PhD

# CompanionDx

| PATIENT NAME | | Requesting Site: | Patient Account | DOB | SEX |
|---|---|---|---|---|---|
| MOUSE, MICKEY J | | VISION | 88888888 | 01/14/1955 | M |
| PHYSICIAN | LAB REF. # | COLLECTION DATE | | VERIFIED | |
| DEMO,PHYSICIAN | 12308 | 01/15/2015 | | 01/15/2015 19:28 MST | |
| COMMENT | | | | Page 3 of 3 | |

### PRESCRIBED MEDICATIONS

Amobarbital (01/15/2015), Codeine (01/15/2015), Fentanyl (01/15/2015)

| TEST | RESULTS | UNITS | OUTCOME | INTERPRETATION | CUT OFF REF RANGE |
|---|---|---|---|---|---|

--- Department: TOXICOLOGY ---

VISION LABORATORIES, 6130 SHALLOWFORD RD, SUITE 100, CHATTANOOGA, TN, 3742

*Credentials: CLIA high complexity lab certification # 45D2035245 Drug confirmation quantitative analysis are conducted by isotope-dilution multiple
reaction monitoring electro-ion spray liquid chromatography masspestrometry (LC/MS/MS).

**EXHIBIT B**



**Final Report**
**PREMIER PAIN SPECIALISTS**
Toxicology Monitoring
3800 Highland Ave. Suite
Downers Grove, IL 60
Phone: (630) 283-08
Lab Director - Dr. Eimad Zakariya, JD, MD

| PATIENT NAME | | Requesting Site: | Patient Account | DOB | SEX |
|---|---|---|---|---|---|
| TEST, STARVSALFLAG | | VISION | M1375 | 10/29/1975 | M |
| PHYSICIAN | LAB REF. # | COLLECTION DATE | | TESTED | |
| FLOREZ, M.D.,GERARDO | 12293 | 12/31/2014 | | 12/31/2014 09:24 MST | |
| PRESCRIBED MEDICATIONS | | | | Page 1 of 2 | |

| TEST | RESULTS | OUTCOME | UNITS | CUTOFF REF RANGE |
|---|---|---|---|---|
| **BASIC METABOLIC PROFILE** | | | | |
| SODIUM | L | 125 | mEq/L | 135-145 |
| POTASSIUM | | 3.7 | mEq/L | 3.5-5.0 |
| CHLORIDE | | 100 | mEq/L | 95-105 |
| CARBON DIOXIDE | | 23 | mEq/L | 22-28 |
| GLUCOSE | | 75 | mg/dL | 70-100 |
| BUN | | 15 | mg/dL | 7-20 |
| CREATININE | | 1.2 | mg/dL | 0.6-1.3 |
| BUN/CREAT RATIO | | 12.5 | CALC | |
| CALCIUM | H | 11.0 | mg/dL | 8.4-10.2 |
| **VITAMIN D 25-HYDROXY** | | | | |
| VIT D 25-HYDROXY | H | 125 | ng/mL | 30-74 |
| **OPIATES/OPIOIDS CONFIRMATION - LC/MS/MS** | | | | |
| CODEINE | I | 350 | ng/mL | 50 |
| | | *Inconsistent with prescribed medication | | |
| MORPHINE | C | 0 | ng/mL | 50 |
| FENTANYL | C | 0 | ng/mL | 2 |
| NORFENTANYL | C | 0 | ng/mL | 2 |
| HYDROCODONE | C | 0 | ng/mL | 50 |
| HYDROMORPHONE | C | 0 | ng/mL | 50 |
| NORHYDROCODONE | C | 0 | ng/mL | 50 |
| MEPERIDINE | C | 0 | ng/mL | 50 |
| NORMERPERIDINE | C | 0 | ng/mL | 50 |
| OXYCODONE | C | 0 | ng/mL | 50 |
| NOROXYCODONE | C | 0 | ng/mL | 50 |
| OXYMORPHONE | C | 0 | ng/mL | 50 |
| PROPOXYPHENE | C | 0 | ng/mL | 50 |
| NORPROPOXYPHENE | C | 0 | ng/mL | 50 |
| TAPENTADOL | C | 0 | ng/mL | 25 |
| **BENZODIAZEPINES CONFIRMATION - LC/MS/MS** | | | | |
| ALPRAZOLAM | C | 0 | ng/mL | 50 |
| ALPHA-HYDROXALPRAZOLAM | C | 0 | ng/mL | 50 |
| CLONAZEPAM | C | 256 | ng/mL | 50 |
| | | *Consistent with prescribed medication | | |
| 7-AMINO-CLONAZEPAM | C | 175 | ng/mL | 25 |
| DIAZEPAM | C | 0 | ng/mL | 50 |
| NORDIAZEPAM | C | 0 | ng/mL | 50 |
| FLURAZEPAM | C | 0 | ng/mL | 50 |
| FLUNITRAZEPAM | C | 0 | ng/mL | 50 |
| LORAZEPAM | C | 0 | ng/mL | 50 |
| MIDAZOLAM | C | 0 | ng/mL | 50 |
| OXAZEPAM | C | 0 | ng/mL | 50 |
| TEMAZEPAM | C | 0 | ng/mL | 50 |
| **BARBITURATES CONFIRMATION - LC/MS/MS** | | | | |
| AMOBARBITAL | C | 0 | ng/mL | 100 |
| BUTALBITAL | C | 0 | ng/mL | 100 |

**EXHIBIT B**

# Final Report
## PREMIER PAIN SPECIALISTS
Toxicology Monitoring
3800 Highland Ave. Suite 101
Downers Grove, IL 60515
Phone: (630) 283-0835
Lab Director - Dr. Elmad Zakariya, JD, MD

**PremierPain** SPECIALISTS

| PATIENT NAME | | Requesting Site: | Patient Account | DOB | SEX |
|---|---|---|---|---|---|
| TEST, STARVSALFLAG | | VISION | M1375 | 10/29/1975 | M |
| PHYSICIAN | LAB REF. # | COLLECTION DATE | | TESTED | |
| FLOREZ, M.D.,GERARDO | 12293 | 12/31/2014 | | 12/31/2014 09:24 MST | |

PRESCRIBED MEDICATIONS

Page 2 of 2

| TEST | RESULTS | OUTCOME | UNITS | CUT-OFF REF RANGE |
|---|---|---|---|---|
| PENTOBARBITAL | I 524 | *Inconsistent with prescribed medication | ng/mL | 100 |
| PHENOBARBITAL | C 0 | | ng/mL | 100 |
| SECOBARBITAL | C 0 | | ng/mL | 100 |

VISION LABORATORIES, 6130 SHALLOWFORD RD, SUITE 103, CHATTANOOGA, TN, 3742

*Credentials: CLIA high complexity lab certification # xxxxxxxxxx; COLA certification # xxxxx Drug confirmation quantitative analysis are conducted by isotope-dilution multiple reaction monitoring electro-ion spray liquid chromatography masspectrometry (LC/MS/MS) on a Agilent 6420 triple quad.

**EXHIBIT B**

**Merge** Clinical Lab Solutions 



# **Merge** LIS™

A scalable clinical laboratory information system

Laboratory data represent **60%** of the medical record and laboratories play a critical role in health care delivery by allowing for the rapid and timely utilization of health information by providers.

Your lab is increasingly busy. You need a lab information system that can improve efficiency while continuing to grow with your business.

Now you can.

### How We Help You

Merge LIS supports the expansion of your lab with a web-based, modular system that automates the entire lab process and gives you central point administration—so you can improve productivity and profitability.

MERGE

*innovative imaging*™ 

# **Merge** LIS

automates your lab process for increased efficiency. With Merge LIS you can....

    

Access and share real-time laboratory information in a single location or between multiple locations

Scale for any size lab from physician offices to multi-site clinics

Streamline workflow, increase processing and eliminate redundant tasks

Offer customized views based on specialty, giving each technician views of their top tests, improving their efficiency

Provide secure access to lab results from anywhere, any time via a web-based application

## Merge Clinical Lab Solution Suite

*Merge LIS™*

Automate your lab workflow and process for increased efficiency with a scalable clinical laboratory information system.

*Merge LabAccess™*

Transmit lab results electronically with a tool to provide connectivity between instruments and practices.

## Merge Clinical Lab Solutions

Merge Clinical Lab Solutions, originally designed by Fletcher Flora, provide scalable laboratory information systems and middleware connectivity for clinical labs of all sizes—from small physician office labs to large labs with multiple sites.

Merge Clinical Lab Solutions are designed with significant customer input and reflect the workflow and specific needs of the lab with stand-out features including modular functionality that allows you to grow as needed and have web-based access for real-time results.

LIS-836 rev 3.0



877.446.3743 x3 · merge.com

 @MergeHealthcare
 linkedin.com/company/merge-healthcare
facebook.com/MergeHealthcare

**EXHIBIT B**


M=RGE
An IBM Company

Summary of Findings
**MERGE TOXICOLOGY LAB**
350 N. Orleans Street, 1st Floor
Chicago, IL 60
Phone: 877.446.3743 ext. 3606 Fax: 800.512.
Lab Director - Robert Holbrook, H.

| PATIENT NAME HOWARD, SUSAN E | | | Patient ID 56488 | DOB 1988-09-14 | SEX F |
|---|---|---|---|---|---|
| PHYSICIAN GOLD,JACKSON | LAB REF # 12448 | COLLECTION DATE 09/10/2015 11:38 | | RECEIVED DATE 09/10/2015 11:38 | |

**CONSISTENT RESULTS - REPORTED MEDICATION (PARENT DRUG AND/OR METABOLITE) DETECTED**

| REPORTED PRESCRIPTION | ANTICIPATED POSITIVE(S) | TEST OUTCOME | DETECTION WINDOW |
|---|---|---|---|
| Hydrocodone | HYDROCODONE | POSITIVE | |
| Fentanyl | FENTANYL | POSITIVE | |
| Hydromorphone | MORPHINE | POSITIVE | |
| Morphine | MORPHINE | POSITIVE | |
| Butalbital | BUTALBITAL | NEGATIVE | |
| Hydromorphone | HYDROMORPHONE | POSITIVE | |

**SPECIMEN VALIDITY TESTING**

| TEST | TEST OUTCOME | MEASURED RESULT | REFERENCE RANGE |
|---|---|---|---|
| CREATININE | Normal | PASS | 5-300 |
| pH | Normal | PASS | 3.0 - 11.0 |
| SPECIFIC GRAVITY | Normal | PASS | 1.010-1.025 |
| OXIDANT | Normal | PASS | 10-70 |
| NITRITE | Normal | PASS | NORMAL |

**ADDITIONAL MEDICATIONS REPORTED BUT NOT TESTED FOR IN THIS REPORT**

Acetaminophen

**EXHIBIT B**

**M≡RGE**
An IBM* Company

350 N. Orleans Street, 6th Floor
Chicago, IL 60654
Phone: 877.446.3743
Fax: 800.512.1435
Lab Director - Robert Holbrook, PhD

| PATIENT NAME . HOWARD, SUSAN E | | Requesting Site: MERGE PAIN | Patient Account 56488 | DOB 09/14/1988 | SEX F |
|---|---|---|---|---|---|
| PHYSICIAN GOLD,JACKSON | LAB REF. # 12448 | COLLECTION DATE 09/10/2015 | | VERIFIED | |
| COMMENT | | | | Page 1 of 4 | |

PRESCRIBED MEDICATIONS

Acetaminophen, Butalbital, Fentanyl, Hydrocodone, Hydromorphone, Morphine

| TEST | RESULTS | OUTCOME | INTERPRETATION | CUT OFF / REF RANGE | UNITS |
|---|---|---|---|---|---|
| --- Department: TOXICOLOGY --- | | | | | |
| **OPIATES/OPIOIDS CONFIRMATION - LC/MS/MS (1)** | | | | | |
| METHADONE | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| EDDP (Methadone Metabolite) | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| BUPRENORPHINE | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| NORBUPRENORPHINE | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| CODEINE | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| MORPHINE | 45 | POSITIVE | CONSISTENT | 30 | ng/mL |
| FENTANYL | 35 | POSITIVE | CONSISTENT | 30 | ng/mL |
| HYDROCODONE | 44 | POSITIVE | CONSISTENT | 30 | ng/mL |
| HYDROMORPHONE | 60 | POSITIVE | CONSISTENT | 30 | ng/mL |
| OXYCODONE | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| OXYMORPHONE | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| TAPENTADOL | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| O-DESMETHYL-CIS-TRAMADOL | NEGATIVE | NEGATIVE · | CONSISTENT | 30 | ng/mL |
| NALOXONE | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| NALTREXONE | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| MEPERIDINE | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| TRAMADOL | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| **AMPHETAMINES CONFIRMATION - LC/MS/MS (1)** | | | | | |
| AMPHETAMINE | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| METHAMPHETAMINE | NEGATIVE | NEGATIVE | NORMAL | 30 | ng/mL |
| MDA | NEGATIVE | NEGATIVE | NORMAL | 30 | ng/mL |
| MDEA | NEGATIVE | NEGATIVE | NORMAL | 30 | ng/mL |
| MDMA | NEGATIVE | NEGATIVE | NORMAL | 30 | ng/mL |
| PHENTERMINE | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| LISDEXAMFETAMINE | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| **ILLICIT DRUGS - LC/MS/MS (1)** | | | | | |
| BENZOYLECGONINE (Cocaine Metabolite) | NEGATIVE | NEGATIVE | NORMAL | 30 | ng/mL |
| COCAINE | NEGATIVE | NEGATIVE | NORMAL | 30 | ng/mL |
| 6-ACETYL MORPHINE (Heroin Metabolite) THIS IS A 6-MAM RESULT COMMENT | NEGATIVE | NEGATIVE | NORMAL | 30 | ng/mL |
| PHENCYCLIDINE | NEGATIVE | NEGATIVE | NORMAL | 30 | ng/mL |
| **BENZODIAZEPINES CONFIRMATION - LC/MS/MS (1)** | | | | | |
| ALPRAZOLAM | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| ALPHA-HYDROXALPRAZOLAM | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |

**EXHIBIT B**

# MERGE TOXICOLOGY LABORATORY

**MERGE**
An IBM Company

350 N. Orleans Street, 6th Floor
Chicago, IL 60
Phone: 877.446.
Fax: 800.512.14
Lab Director - Robert Holbrook, PhD

| PATIENT NAME | | Requesting Site: | Patient Account | DOB | SEX |
|---|---|---|---|---|---|
| HOWARD, SUSAN E | | MERGE PAIN | 56488 | 09/14/1988 | F |
| PHYSICIAN | LAB REF. # | COLLECTION DATE | | VERIFIED | |
| GOLD, JACKSON | 12448 | 09/10/2015 | | | |
| COMMENT | | | | Page 2 of 4 | |

### PRESCRIBED MEDICATIONS

Acetaminophen, Butalbital, Fentanyl, Hydrocodone, Hydromorphone, Morphine

| TEST | RESULTS | OUTCOME | INTERPRETATION | CUT-OFF / REF RANGE | UNITS |
|---|---|---|---|---|---|
| --- Department: TOXICOLOGY --- | | | | | |
| CLONAZEPAM | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| 7-AMINO-CLONAZEPAM | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| DIAZEPAM | <15 | NEGATIVE | CONSISTENT | 30 | ng/mL |
| NORDIAZEPAM | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| OXAZEPAM | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| TEMAZEPAM | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| FLURAZEPAM | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| FLUNITRAZEPAM | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| 7-AMINOFLUNITRAZEPAM | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| LORAZEPAM | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| MIDAZOLAM | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| TRIAZOLAM | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| ALPHA-HYDROXYTRIAZOLAM | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| OLANZAPINE | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| **CARBAMATES CONFIRMATION - LC/MS/MS (1)** | | | | | |
| CARISOPRODOL | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| MEPROBAMATE | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| **ANTI-DEPRESSANTS CONFIRMATION - LC/MS/MS (1)** | | | | | |
| AMITRIPTYLINE | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| DESIPRAMINE | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| DOXEPIN | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| IMIPRAMINE | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| CLOMIPRAMINE | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| NORTRIPTYLINE | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| **PSYCHOTROPICS CONFIRMATION - LC/MS/MS (1)** | | | | | |
| DULOXETINE | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| FLUOXETINE | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| SERTRALINE | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| METHYLPHENIDATE | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| RITALINIC ACID (Methylphenidate Metabolite) | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| ZOLPIDEM | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| CITALOPRAM | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| VENLAFAXINE | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| **PROPOXYPHENE CONFIRMATION - LC/MS/MS (1)** | | | | | |
| PROPOXYPHENE | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |

**EXHIBIT B**



**MERGE TOXICOLOGY LABORATORY**

350 N. Orleans Street, 6th Floor
Chicago, IL 60654
Phone: 877.446.3743
Fax: 800.512.1435
Lab Director - Robert Holbrook, PhD

| PATIENT NAME HOWARD, SUSAN E | | Requesting Site: MERGE PAIN | Patient Account 56488 | DOB 09/14/1988 | SEX F |
|---|---|---|---|---|---|
| PHYSICIAN GOLD, JACKSON | LAB REF. # 12448 | COLLECTION DATE 09/10/2015 | | VERIFIED | |
| COMMENT | | | | Page 3 of 4 | |

PRESCRIBED MEDICATIONS

Acetaminophen, Butalbital, Fentanyl, Hydrocodone, Hydromorphone, Morphine

| TEST | RESULTS | OUTCOME | INTERPRETATION | CUT OFF / REF RANGE | UNITS |
|---|---|---|---|---|---|
| --- Department: TOXICOLOGY --- | | | | | |
| NORPROPOXYPHENE | <15 | NEGATIVE | CONSISTENT | 30 | ng/mL |
| **PREGABALIN CONFIRMATION - LC/MS/MS (1)** | | | | | |
| PREGABALIN | NEGATIVE | NEGATIVE | CONSISTENT | 100 | ng/mL |
| **GABAPENTIN CONFIRMATION - LC/MS/MS (1)** | | | | | |
| GABAPENTIN | <15 | NEGATIVE | CONSISTENT | 30 | ng/mL |
| **CLOBENZAPRINE CONFIRMATION - LC/MS/MS (1)** | | | | | |
| CYCLOBENZAPRINE | NEGATIVE | NEGATIVE | CONSISTENT | 30 | ng/mL |
| **BATH SALTS CONFIRMATION - LC/MS/MS (1)** | | | | | |
| MDPV | NEGATIVE | NEGATIVE | NORMAL | 30 | ng/mL |
| MEPHEDRONE | NEGATIVE | NEGATIVE | NORMAL | 30 | ng/mL |
| METHYLONE | NEGATIVE | NEGATIVE | NORMAL | 30 | ng/mL |
| **BARBITURATES CONFIRMATION - LC/MS/MS (1)** | | | | | |
| BUTALBITAL | NEGATIVE | NEGATIVE | CONSISTENT | 250 | ng/mL |
| AMOBARBITAL | NEGATIVE | NEGATIVE | CONSISTENT | 250 | ng/mL |
| PHENOBARBITAL | NEGATIVE | NEGATIVE | CONSISTENT | 250 | ng/mL |
| SECOBARBITAL | NEGATIVE | NEGATIVE | CONSISTENT | 250 | ng/mL |
| **CANNABINOIDS CONFIRMATION - LC/MS/MS (1)** | | | | | |
| THCCOOH | NEGATIVE | NEGATIVE | CONSISTENT | 10 | ng/mL |
| JWH-018 N-(5-Pentanoic Acid) metabolite | NEGATIVE | NEGATIVE | NORMAL | 20 | ng/mL |
| JWH-073 N-(3-hydroxybutyl) metabolite | NEGATIVE | NEGATIVE | NORMAL | 20 | ng/mL |
| JWH-073 N-(4-Butanoic Acid) metabolite | NEGATIVE | NEGATIVE | NORMAL | 20 | ng/mL |
| **SPECIMEN VALIDITY TESTING (1)** | | | | | |
| CREATININE | PASS | | NORMAL | 5-300 | |
| pH | PASS | | NORMAL | 3.0 - 11.0 | |
| SPECIFIC GRAVITY | PASS | | NORMAL | 1.010-1.025 | |
| OXIDANT | PASS | | NORMAL | 10-70 | |
| NITRITE | PASS | | NORMAL | NORMAL | |

TOXICOLOGIST REVIEW (1) R

Tests with Results Pending: URINE DRUG SCREEN
MERGE PAIN MANAGEMENT LAB, 350 N. Orleans Street, 6th Floor, Los Angeles, CA 90654, Phone: 941-223-5465.


An IBM Company

Interim Report

**MERGE TOXICOLOGY LABORATORY**

350 N. Orleans Street, 6th Floor
Chicago, IL 60
Phone: 877.446.3
Fax: 800.512.14
Lab Director - Robert Holbrook, PhD

| PATIENT NAME HOWARD, SUSAN E | | Requesting Site: MERGE PAIN | Patient Account 56488 | DOB 09/14/1988 | SEX F |
|---|---|---|---|---|---|
| PHYSICIAN GOLD,JACKSON | LAB REF. # 12448 | COLLECTION DATE 09/10/2015 | | VERIFIED | |
| COMMENT | | | | Page 4 of 4 | |

**PRESCRIBED MEDICATIONS**

Acetaminophen, Butalbital, Fentanyl, Hydrocodone, Hydromorphone, Morphine

Credentials: CLIA high complexity lab certification # 45D2067321; COLA# 23578; Drug confirmation quantitative analysis are conducted by isotope-dilution multiple reaction monitoring electro-ion spray liquid chromatography massspectrometry (LC/MS/MS).

**EXHIBIT B**

**To:** Howell, Chad[CHowell@TrinityMS.net]; Lafleur, Tyler[TLafleur@TrinityMS.net]; Bunce, Rhett[RBunce@TrinityMS.net];
Lafleur, Lacie Jo[LLafleur@TrinityMS.net]
**From:** Blake Bourque
**Sent:** Thur 12/24/2015 2:04:59 AM
**Subject:** Re: FW: Merge LIS quote for Trinity Health and Central Valley Diagnostics Laboratory

I think you do it once you have the info you need but we ask to be moved to the front of the line and pay a little more.

We are not going away we just need to do this thing right.

Sent from Outlook

On Wed, Dec 23, 2015 at 4:52 PM -0800, "Howell, Chad" <CHowell@TrinityMS.net> wrote:

For what it is worth folks.

This is from the MERGE sales rep regarding the addition of performance labs to the original CVDL quote.

Chad Howell
*Chief Information Officer*
**Trinity Medical Services**
www.TrinityMS.net

21385 Marion Lane STE E, Mandeville, LA  70471
985-373-5409 *cell* ▪ 985-400-5491 *office* ▪ 985-467-5550 *fax*
Chad@TrinityMS.net
▫




*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the sender. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

**From:** Ron Poe [mailto:Ron.Poe@merge.com]
**Sent:** Wednesday, December 23, 2015 6:34 PM
**To:** Howell, Chad <CHowell@TrinityMS.net>
**Subject:** Merge LIS quote for Trinity Health and Central Valley Diagnostics Laboratory

Hello Chad,

I wanted you to know that I have run some preliminary numbers for you. It still has to get approvals internally. It looks like the total costs, after applying the discounts that I promised as your "Year-end" special pricing, will be just shy of $140,000. It was $162,700 before discounts.

I will publish once all approvals are in and get it to you as soon as I can. Please be sure to complete the credit app information for yLine and return it to Monty Powell. His email is on the app.

Ron Poe
*Regional Sales Manager--LIS Division*

CONFIDENTIAL

EXHIBIT
4
CHAD HOWELL

EXHIBIT TRIN-B/_0074853

**Merge Healthcare, an IBM Company**
*350 N. Orleans, 1ˢᵗ Floor*
*Chicago, IL 60654*

**P:** *877.238.3322*
**F:** *866.887.1423*
**M:** *336.455.3584*
**E:** *ron.poe@merge.com*

*www.merge.com*

**amplify** your imaging value

*PRIVACY STATEMENT: This message and all attachments are a private communication and may be confidential or protected by privilege. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited. Thank you.*

 www.merge.com 

Merge Healthcare | 350 N. Orleans Street, 1st Floor | Chicago, IL | 60654 | 877.446.3743

## SALES ORDER

Trinity Medical Services, LLC
50 East Court, Suite 8
Mandeville, Louisiana 70471

| | |
|---|---|
| Quoted By: | Ron Poe |
| Pricing Valid Until: | 3/31/2016 |
| Document Date: | 1/5/2016 |
| Document Number: | SFDC-94301-4 |

## 1. PROJECT SUMMARY

| Software and Bundled Solutions | |
|---|---|
| Software | $67,437.00 |
| Bundled Solutions | $21,696.00 |
| **Total Software License and Bundled Solutions Fees** | **$89,133.00** |

| Hardware and Third Party Products | |
|---|---|
| Hardware | $7,725.70 |
| **Total Hardware and Third Party Product Fees** | **$7,725.70** |

| Professional Services | |
|---|---|
| Professional Services | $56,500.00 |
| **Total Professional Services Fees** | **$56,500.00** |

| | |
|---|---|
| Subtotal | $153,358.70 |
| Total Discount | ($22,905.00) |
| Balance Due | $130,453.70 |
| Shipping and Handling | $439.91 |
| Annual Support Services Fees for 1st Renewal Term | *$12,783.00* |

**Note: Refer to Exhibit A for Product List.**

Special Comments: Travel expenses and taxes are not included in the quoted price but will be invoiced separately. The Shimadzu interface is shown in the quote as TBD (To be determined). The interface is completed and deployed at other customer sites but the part number has not been added to the quote generator yet. This quote is for a core lab to be established at Trinity Medical Services in Mandeville, LA doing toxicology confirmations. A remote lab in Merced, CA (Central Valley Diagnostics Laboratory) will be performing routine clinical lab studies (including microbiology) and will be connected to the core lab and will reference toxicology studies to them. There is no Microbiology analyzer at this time at Central Valley Diagnostic Laboratory. This can be added later if desired..

Payment schedule for the balance due is as follows:

| | |
|---|---|
| Software/Hardware/Third Party Products/ Bundled Solutions/Professional Services | 40% due upon Effective Date. 35% due net 90 days from Effective Date. 25% due on the earlier of First Productive Use or 6 months from Effective Date. |
| Support: | Billed annually in advance, due and payable the first day of the Support Services Renewal Term. The Support Services Renewal Term will begin 18 months from Effective Date. |

1 of 9 -



**EXHIBIT**

tabbies

5

Chad Howitt



**EXHIBIT**

tabbies

4

**EXHIBIT B**

MERGE 0023840

DocuSign Envelope ID: 2D1F47E2-C54B-4F36-8AA1-B28860521064

 

Merge Healthcare | 350 N. Orleans Street, 1st Floor | Chicago, IL | 60654 | 877 446.3743

The payment terms set forth above shall apply to this Sales Order, regardless of terms in any other agreement between the parties.

Confidential

**EXHIBIT B**
MERGE 0023841

 

Merge Healthcare | 350 N. Orleans Street, 1st Floor | Chicago, IL | 60654 | 877 446.3743

## 2. EXECUTION

This Sales Order is governed by and subject to the Terms and Conditions for Software License, Hardware and/or Services attached hereto as Exhibit B and made part hereof.

It is the mutual intent of both Parties that this Sales Order constitutes a project separate and independent from any other executed or contemplated order(s). The fees due Merge Healthcare for this Sales Order are separate from any other executed or contemplated order(s), and the payment terms hereof are not intended to be dependent upon or otherwise coincide with performance criteria of any other executed or pending order(s). There are no products or services in this Sales Order that are interrelated or interdependent in terms of design, technology or function or are essential to the functionality of a product in any other executed or contemplated order(s).

Merge Healthcare Solutions Inc. and Trinity Medical Services, LLC have caused this Sales Order to be executed by its authorized representatives, effective as of the latter date below ("Effective Date").

| Merge Healthcare Solutions Inc.: | | Trinity Medical Services, LLC | |
|---|---|---|---|
| Signature: | Steve Nevermann | Signature: | Chad Howell |
| Print Name: | Steve Nevermann | Print Name: | Chad Howell |
| Title: | Manager, Fulfillment Operations | Title: | CIO |
| Date: | 1/11/2016 | Date: | 1/11/2016 |

Please submit executed proposal via fax (262) 367-0729 or by email to contracts@merge.com

Customer Billing Address:    Trinity Medical Services, LLC
50 East Court, Suite 8
Mandeville, Louisiana 70471

Customer Shipping Address:    Trinity Medical Services, LLC
50 East Court, Suite 8
Mandeville, Louisiana 70471

Customer: By signing above, you are acknowledging that the above-listed billing and shipping addresses are correct for this order. If any changes are necessary please indicate below:

_____

_____

_____

Please indicate whether this address change should be made ☐ to the Customer account or ☐ for this order only.

If you have an existing Merge Support contract, adding new applications or upgrading software or equipment may change your ongoing Support pricing.

*All trademarks are hereby acknowledged. © 2015 by Merge Healthcare Incorporated. All rights reserved.*
*Disclosure of this document to any third party is forbidden without the express written permission of Merge Healthcare Incorporated.*

Confidential

**EXHIBIT B**
MERGE 0023842

 MERGE Healthcare

| | | | Exhibit A Product List | | | | |
|---|---|---|---|---|---|---|---|
| **ITEM # QTY PART #** | | | **DESCRIPTION** | **LIST PRICE** | **DISCOUNT** | **NET PRICE** | **2nd YEAR SUPPORT** |

**SOFTWARE**

| ITEM# | QTY | PART# | DESCRIPTION | LIST PRICE | DISCOUNT | NET PRICE | 2nd YEAR SUPPORT |
|---|---|---|---|---|---|---|---|
| 1 | 1 | SD-LIS-00008 | MERGE LIS, ENTERPRISE SOFTWARE Supports multiple sites and unlimited instrument, host, and reference lab interfaces. Includes four modules: (1) Comprehensive QC with Levy-Jennings and Westgard rules; (2) System Report with Autofax; (3) Medical Necessity/ABN Training; (4) Container Tracking/Manifest. | $15,930.00 | $4,050.00 | $11,880.00 | $2,430.00 |
| 2 | 200 | SN-LIS-00028 | MERGE LIS, USER LICENSE Represents the number of users (licenses) for Merge LIS. | Included | | Included | |
| 3 | 1 | SN-LIS-00020 | MERGE LIS, ECLINIC MODULE Used by a remote site that has its own instruments. | $4,130.00 | $1,050.00 | $3,080.00 | $630.00 |
| 4 | 1 | SD-LIS-00195 | MERGE LIS, EMICRO MODULE Allows the processing of microbiology tests. | $6,077.00 | $1,545.00 | $4,532.00 | $927.00 |
| 5 | 1 | SD-LIS-00191 | MERGE LIS, OPEN REPORTS MODULE Provides access to the database for building reports. | $5,900.00 | $1,500.00 | $4,400.00 | $900.00 |
| 6 | 1 | SN-LIS-00031 | MERGE LIS, TEST ENVIRONMENT LICENSE Licensed copy of Merge LIS for use in a test environment. | $2,360.00 | $600.00 | $1,760.00 | $360.00 |
| 7 | 1 | SD-LIS-00353 | MERGE LIS, SOFTWARE - 3.8.1 Software applications for Merge LIS. | Included | | Included | |
| 8 | 1 | SD-LIS-00189 | MERGE LIS, INSTALLATION CD This disc holds the licenses for all your selected Merge LIS applications. | Included | | Included | |
| 9 | 1 | SN-LIS-12406 | MERGE LIS, EPORTAL ENTERPRISE WITH EORDERS MODULE | $33,040.00 | $8,400.00 | $24,640.00 | $5,040.00 |
| | | | **TOTAL SOFTWARE:** | **$67,437.00** | **$17,145.00** | **$50,292.00** | **$10,287.00** |

**BUNDLED SOLUTIONS**

| ITEM# | QTY | PART# | DESCRIPTION | LIST PRICE | DISCOUNT | NET PRICE | 2nd YEAR SUPPORT |
|---|---|---|---|---|---|---|---|
| 10 | 1 | SD-LIS-00002 | MERGE LIS, INSTRUMENT INTERFACE - TBD Interface to connect TBD instrument to Merge LIS | $1,808.00 | $480.00 | $1,328.00 | $208.00 |
| 11 | 1 | CB-LIS-00208 | MERGE LIS, INSTRUMENT INTERFACE - AB SCIEX LC-MS Instrument interface to Merge LIS | $1,808.00 | $480.00 | $1,328.00 | $208.00 |

Confidential

EXHIBIT 023843

MERGE Healthcare

| # | Qty | Code | Description | | | | |
|---|---|---|---|---|---|---|---|
| 12 | 4 | CB-LIS-00077 | MERGE LIS, INSTRUMENT INTERFACE - OLYMPUS AU 400/ 640<br>Instrument interface to Merge LIS | $7,232.00 | $1,920.00 | $5,312.00 | $832.00 |
| 13 | 1 | CB-LIS-00111 | MERGE LIS, INSTRUMENT INTERFACE - BIORAD D10<br>Instrument interface to Merge LIS | $1,808.00 | $480.00 | $1,328.00 | $208.00 |
| 14 | 1 | CB-LIS-00219 | MERGE LIS, INSTRUMENT INTERFACE TO SYSMEX XT-2000IV ANALYZER | $1,808.00 | $480.00 | $1,328.00 | $208.00 |
| 15 | 1 | CB-LIS-00125 | MERGE LIS, INSTRUMENT INTERFACE - TOSOH AIA 600 II / AIA 900<br>Instrument interface to Merge LIS | $1,808.00 | $480.00 | $1,328.00 | $208.00 |
| 16 | 1 | CB-LIS-00068 | MERGE LIS, INSTRUMENT INTERFACE - BECKMAN/COULTER ACL 100-5000<br>Instrument interface to Merge LIS | $1,808.00 | $480.00 | $1,328.00 | $208.00 |
| 17 | 1 | CB-LIS-00222 | MERGE LIS, INSTRUMENT INTERFACE TO PSS CONSULT URINE STRIP READER | $1,808.00 | $480.00 | $1,328.00 | $208.00 |
| 18 | 1 | SD-LIS-00003 | MERGE LIS, INSTRUMENT INTERFACE - NEW<br>Interface to connect new instrument to Merge LIS | $1,808.00 | $480.00 | $1,328.00 | $208.00 |
| | | | **TOTAL BUNDLED SOLUTIONS:** | **$21,696.00** | **$5,760.00** | **$15,936.00** | **$2,496.00** |

**HARDWARE**

| # | Qty | Code | Description | | |
|---|---|---|---|---|---|
| 19 | 2 | HW-LIS-00002 | MERGE LIS, SERVER PACKAGE - DELL<br>Package includes Dell mini tower running Windows 7 Pro OS, UPS, keyboard, mouse, 19' flat panel display, back-up battery, CDR spindle, USB expansion port, and laser printer with USB cable. | $4,336.48 | $4,336.48 |
| 20 | 6 | HW-LIS-00036 | LAB, EVO LASER BARCODE SCANNER | $983.64 | $983.64 |
| 21 | 6 | HW-LIS-00001 | LAB, LABEL PRINTER PACKAGE<br>Package includes serial bar code label printer, cable, and three rolls of labels. | $2,405.58 | $2,405.58 |
| | | | **TOTAL HARDWARE:** | **$7,725.70** | **$7,725.70** |

**PROFESSIONAL SERVICES**

| # | Qty | Code | Description | | |
|---|---|---|---|---|---|
| 22 | 26 | PS-LIS-00020 | LAB, ON-SITE INSTALLATION AND/OR TRAINING<br>Fee for one week day of on-site installation and/or training. Price does not include travel. | $39,000.00 | $39,000.00 |

Confidential

EXHIBIT B
MERGE 0023844

DocuSign Envelope ID: 2D1F47E2-C54B-4F36-8AA1-B28860521064



| 23 | 1 | PS-LIS-00032 | **MERGE LIS, INSTRUMENT INTERFACE DEVELOPMENT CHARGE** <br> Creation of a new instrument interface to Merge LIS | $1,500.00 | $1,500.00 |
|----|----|--------------|----|----|----|
| 24 | 32 | PS-LIS-00023 | **LAB, REMOTE SESSION** <br> Assessed time includes project management, system configuration, and build out. May also include remote training. | $16,000.00 | $16,000.00 |
| | | | **TOTAL PROFESSIONAL SERVICES:** | **$56,500.00** | **$56,500.00** |

Confidential

EXHIBIT B
MERGE 0023845

DocuSign Envelope ID: 2D1F47E2-C54B-4F36-8AA1-B28860521064



## EXHIBIT B
### TERMS AND CONDITIONS OF SALES ORDER

These *Terms and Conditions* are attached to the foregoing Sales Order (the "*Sales Order*") issued by Merge Healthcare Solutions Inc., a Delaware corporation, with an office located at 350 North Orleans Street, First Floor, Chicago, Illinois 60654 USA ("*Merge*") regarding the licensing of certain of Merge's proprietary software and/or the purchase and sale of related products and services. These *Terms and Conditions*, together with the Sales Order to which they are appended, constitute the "*Agreement*", which is entered into as of the Effective Date between Merge and the customer to whom the Sales Order is issued as identified in the Sales Order ("*Customer*"), and this Agreement shall govern the transactions set forth in the Sales Order. In the event terms of the Sales Order conflict with these *Terms and Conditions*, terms of the Sales Order shall control.

1. DEFINITIONS. "*Business Day*" means any day except Saturdays, Sundays and Merge holidays (with a calendar of such holidays being available to Customer at Customer's request). "*Confidential Information*" means information of a Party ("*Disclosing Party*") that the other Party ("*Receiving Party*") receives in connection with this Agreement, which based on the circumstances under which it was disclosed, a reasonable person would believe to be confidential to Disclosing Party, including, without limitation, the Software, Documentation, pricing of Products and Services, provisions of this Agreement and information that is defined as a 'trade secret' under applicable law ("*Trade Secret*"). "*Documentation*"means user and system administrator guides and manuals and similar documentation generally supplied by Merge assist licensees in the use of the licensed Software. "*First Productive Use*" means, as to the applicable Software, the date that Customer first uses the Software as a method of transmitting and/or processing live data or information for use in a clinical care or commercial setting or otherwise uses the Software for commercial purposes; provided that if Customer has delayed the first use of the Software as set forth above, First Productive Use shall be deemed to have occurred when the Software was installed and first able to process live data in a production environment. "*Hardware*" means the computers, workstations and other devices required to run or use the Software, modality equipment, and/or other equipment that Customer may be purchasing through Merge as specified in the Sales Order. "*Hardware/Third Party Products Page*" means the section of the Merge Web Page that contains the specific terms applicable to the Hardware and/or Third Party Products, if any, purchased under the Sales Order. "*HIPAA Page*" means the section of the Merge Web Page that contains a Business Associate Agreement. "*Merge Hardware*" means Hardware manufactured by Merge and sold to Customer as set forth in the Sales Order. "*Merge Products*" means Merge Software and Merge Hardware. "*Merge Software*" means Software that is proprietary to Merge and is licensed to Customer as set forth in the Sales Order. "*Merge Web Page*" means the specific terms on Merge's website applicable to the Products and Services that are the subjects of this Sales Order, found at http:// www.merge.com/common/Terms-(1).aspx. "*Party*"means Merge or Customer; "*Parties*"means Merge and Customer. "*Product Page*"means the section of the Merge Web Page that contains the specific terms applicable to the Merge Software licensed under the Sales Order. "*Products*"means Hardware and Software. "*Professional Services*"means installation, implementation, integration, configuration, consulting, training and other professional services offered by Merge to Customer. "*Services*" means Professional Services and Support Services. "*Services Page*"means the section of the Merge Web Page that contains the specific terms applicable to the Services, if any, purchased under the Sales Order. "*Software*" means the software identified in the Sales Order and provided by Merge hereunder, including Updates thereto that Merge provides to Customer. "Software" is the standard version of the applicable software product at the release level current as of the date of the Sales Order and is provided in object or executable code form. "*Support Services*"means the technical support and maintenance of the Products as set forth at http://www.merge.com/common/Terms-(2).aspx. "*Third Party Product*" means a product other than a Merge Product that is identified on the Sales Order as 'Third Party Hardware', 'Third Party Software', 'Third Party Product', or with the name of a Third Party Vendor."*Third Party Vendor*" means a third party vendor from which Merge obtains Third Party Products. "*Update*"means a version the Merge Software and/or Documentation that is from time-to-time released and that may include updates, modifications, bug fixes, corrections, and feature enhancements to the Merge Software and Documentation. Updates do not include new Merge products or modules that are marketed and priced separately by Merge or releases that materially increase the functionality of the Software. Whether a software release constitutes an Update is in Merge's sole discretion.

2. SOFTWARE LICENSE; OTHER PRODUCT SPECIFIC TERMS. Subject to all terms of this Sales Order, Merge grants to Customer a non-exclusive, non-sublicensable, non-transferable license as set forth in the Sales Order in conjunction with the applicable Product Page.
3. PAYMENT; DELIVERY

3.1. *Payment.*Fees for Products and Services (collectively, "*Fees*") are set forth in the Sales Order. Customer shall pay *Merge's fees on the dates specified in the* Sales Order, and if no date is specified in the Sales Order, Customer shall pay *Merge's invoices within thirty (30) days after the date of invoice. Unless otherwise agreed to in writing, all monetary sums are expressed in and shall be paid in U.S. Dollars. Overdue balances may be assessed interest at the rate of one- and-one-half percent (1.5%) per month, but not more than that allowed by law, and in no* event shall this interest provision be construed as a grant of permission for any delay of payment. Non-payment by Customer shall be deemed a material breach of this Agreement, and in the event any payment or invoice becomes overdue, Merge reserves the right, in addition to its other remedies, to suspend delivery and provision of and access to Products or Services until the account is brought current.

3.2. Taxes; Freight. Unless otherwise specifically indicated on the Sales Order, Fees do not include taxes, and Customer agrees to pay all applicable taxes (excluding taxes levied against Merge's taxable income) to Merge or to the proper taxing authority, as applicable. A tax-exempt Customer shall provide an appropriate exemption certificate to Merge. Third-party charges for freight, duty and other similar charges paid by Merge shall be reimbursed by Customer.

3.3. Delivery. Products are delivered FOB shipping point ("*Delivery*"), with risk of loss and, when applicable, title passing to Customer at the same point. Notwithstanding the preceding sentence, Merge may, at its option, deliver Software and Documentation to Customer through an FTP or other electronic transmission or download, in which event Merge will provide Customer with a password key (the "*Key*") necessary to download the Software, and provision of the Key to Customer shall constitute Delivery of the Software.

4. SERVICES.*(Applicable in the event the Sales Order provides for Services; see Services Page.)*

5. HARDWARE AND THIRD PARTY PRODUCTS.*(Applicable in the event the Sales Order provides for Hardware or Third Party Products; see Hardware/Third Party Products Page.)*

6. TERM AND TERMINATION

6.1. Term. The term of this Agreement shall commence as of the Effective Date and continue until terminated, as set forth below in Section 6.2 (the "*Term*").
6.2. Termination. This Agreement may be terminated as follows:
(a) *Bankruptcy.* A Party may immediately terminate this Agreement upon written notice if the other Party (i) becomes insolvent, (ii) is generally unable to pay, or fails to pay, its debts as they become due, (iii) files, or has filed against it, a petition for voluntary or involuntary bankruptcy or pursuant to any other insolvency Law, (iv) makes or seeks to make a general assignment for the benefit of its creditors, or (v) applies for, or consents to, the appointment of a trustee, receiver or custodian for a substantial part of its property or business.
(b) *For Cause.* A Party (the "*Terminating Party*") may terminate for cause as follows:

- If one Party (the "*Breaching Party*") is in breach of this Agreement, the Terminating Party may deliver to the Breaching Party a written notice setting forth detail as to the breach and identifying the specific provision(s) of the Agreement (or, if applicable, the Sales Order) of which the Breaching Party is in breach or default (the "*Default Notice*").

Merge Healthcare CONFIDENTIAL

**EXHIBIT B**
MERGE 0023846



- The Breaching Party shall then have thirty (30) days from its receipt of the Default Notice (the "Cure Period") to cure such that the Breaching Party is no longer in breach of the provisions set forth in the Default Notice.
- In the event that following the Cure Period, the Breaching Party remains in breach of the provisions set forth in the Default Notice, the Terminating Party may terminate the Agreement upon written notice to the Breaching Party.

6.1. Survival. All provisions of this Agreement which by their nature are intended to survive the termination of this Agreement (including, without limitation, the provisions of Sections 3, 7, 8, 9, 10 and 11) shall survive such termination.

7. CONFIDENTIALITY

7.1. Obligations as to Confidential Information. A Receiving Party shall (i) limit access and use of Disclosing Party's Confidential Information to those of Receiving Party's employees and agents that require such access and use in connection with this Agreement and who are bound by confidentiality provisions no less restrictive than those in this Agreement; (ii) not disclose Disclosing Party's Confidential Information to third parties, unless authorized under this Section 7.1; (iii) protect Disclosing Party's Confidential Information as it protects its own Confidential Information, but in any event with not less than a reasonable degree of care; and (iv) not use Disclosing Party's Confidential Information for any purpose except as required to perform its obligations hereunder or as otherwise specifically permitted hereunder. Each Receiving Party shall take appropriate action with its employees, Authorized Users, and other authorized third parties, to satisfy its obligations hereunder. The obligations set forth above in this section shall survive termination of this Agreement and continue thereafter for five (5) years following termination, except that for Confidential Information consisting of a Party's trade secrets, the Confidentiality Period shall be extended for as long as such Confidential Information remains a trade secret. Either Party may disclose the existence and general nature of this Agreement, but may not, without the prior consent of the other Party, disclose the specific terms of this Agreement.

7.2. Exceptions. Nothing in this Article shall prevent Receiving Party from disclosing Confidential Information to a third party to the extent that such Confidential Information is: (i) previously known to Receiving Party prior to disclosure by Disclosing Party, without any obligation of confidentiality; (ii) publicly known or becomes publicly known through no breach of this Agreement by Receiving Party; (iii) rightfully received from a third party under no confidentiality obligation with respect to the Confidential Information; or (iv) independently developed by Receiving Party without use of Disclosing Party's Confidential Information.

7.3. Mandatory Disclosure. If any judicial, legislative or administrative body seeks to compel disclosure of Confidential Information, Receiving Party shall promptly notify Disclosing Party. Receiving Party will comply with reasonable requests of Disclosing Party to assist Disclosing Party in obtaining a protective order and to prevent or minimize the disclosure of any Confidential Information, and Receiving Party may then disclose Confidential Information only if, and to the extent, required by law.

8. INDEMNIFICATION

8.1. Intellectual Property Infringement.

(a) Indemnity. Merge will defend any third party claim against Customer that arises due to a claim that the Merge Software infringes a valid United States copyright, United States patent or involves the misappropriation of a trade secret of a third party ("Claim"), and will pay or indemnify Customer from such damages or costs as are finally awarded against Customer in favor of the third party claimant to the extent that the Merge Software is found by the court to have actually infringed as alleged by the Claim or as agreed to by Merge in settlement for such Claim, provided that: (i) Customer provides Merge with written notice of the Claim or threatened Claim within ten (10) days of Customer learning of same; (ii) Merge has the sole control of the defense, negotiations and settlement of such claim; and (iii) Customer cooperates fully with Merge in the defense or settlement of the Claim.

(b) License Rights. In the event any Merge Software becomes the subject of a Claim, or in Merge's sole opinion is likely to become the subject of a Claim, Merge may, at its option and expense, either: (i) obtain for Customer the right to continue using

the Merge Software; or (ii) replace or modify the Merge Software with functionally equivalent software to make it non-infringing. Notwithstanding the foregoing, if Merge, in its sole discretion, determines that neither of the said options is commercially reasonably available, Merge may terminate Customer's license for the infringing Merge Software, in which event Merge shall refund to Customer as follows: (1) any prepaid unused fees for Support Services Fees and Professional Services for the infringing Merge Software, plus (2) For On-Premises Software Installations: a pro rata portion of the license fees paid by Customer for the infringing Merge Software (as depreciated over a five-year life or for the term of the license if less than five years); or for iConnect Network or other cloud based solutions: any prepaid fees attributable to the period subsequent to termination.

(c) Exclusions. Merge's obligations in the event of infringement, under this Section 8.1 or otherwise, shall not apply to a Claim that arises from or relates to: (i) use of the Product, Support Services or Professional Service other than as set forth in this Agreement and in the then-current version of the Documentation; (ii) any modification or alteration to or of the Software or Hardware performed by anyone other than Merge or its designees; (iii) Merge's compliance with Customer's Instructions; (iv) Customer's use of a superseded or altered release of the Product if the infringement would have been avoided by use of the current unaltered release of the Software or model of the Hardware; (v) combination, operation or use with software, hardware, information, data or other materials if infringement (including, without limitation, contributory infringement) would have been avoided by use without such software, hardware, information, data or other materials; or (vi) use of the Software or Hardware after Merge's notice to cease use of the Software or Hardware due to a claim of infringement.

(d) Sole Recourse. This SECTION 8.1 states Merge's entire liability and Customer's sole and exclusive remedy for any ACTUAL OR CLAIM OF intellectual PROPERTY INFRINGEMENT BY, OR WITH RESPECT TO, THE PRODUCTS AND SERVICES.

8.2. Medical Responsibility. Customer acknowledges and agrees that Merge is not engaged in the practice of medicine, and is not determining appropriate medical use of any of the Products and Services. Medical treatment and diagnostic decisions, including those arising from the analysis of data or images, are the responsibility of Customer and its professional healthcare providers. Customer shall indemnify and hold Merge and its affiliated companies harmless, and, if requested by Merge, defend Merge, from all claims brought by a third party to the extent such claim is based upon or arises out of any of the following: (a) professional malpractice, misdiagnosis, or any other medical treatment matter in connection with the use by Customer, Customer personnel, clients, or any third parties, of any Product or Service, except to the extent that such Losses are directly caused by negligent action or omission of Merge or its agents or any defect of the Merge Software;(b) use of the Products by Customer or by any Authorized User other than as authorized under this Agreement; or (c) any unlawful, negligent or wilful acts or omissions of Customer or of any Authorized User.

9. LIMITATIONS OF LIABILITY

9.1. Types of Damages. UNDER NO CIRCUMSTANCES SHALL MERGE, ITS SUPPLIERS, OR ANY RELATED PARTY, BE LIABLE OR RESPONSIBLE FOR ANY SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, OR DAMAGES ATTRIBUTABLE TO LOSS OF USE OR AVAILABILITY OF DATA, LOST PROFITS OR LOST GOODWILL, WHICH CUSTOMER MAY INCUR, EXPERIENCE OR CLAIM AND WHETHER FORESEEABLE OR UNFORESEEABLE, ARISING OUT OF ANY BREACH OF EXPRESS OR IMPLIED WARRANTY, BREACH OF CONTRACT, NEGLIGENCE, STRICT LIABILITY IN TORT OR OTHERWISE, ON ACCOUNT OF ENTERING INTO OR RELYING ON THIS AGREEMENT, EVEN IF MERGE HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY.

9.2. Amount of Damages. IN NO EVENT WILL MERGE'S AGGREGATE, CUMULATIVE MONETARY LIABILITY ARISING FROM OR RELATED TO THIS AGREEMENT, WHETHER IN CONTRACT OR IN TORT OR UNDER ANY OTHER LEGAL THEORY (INCLUDING STRICT LIABILITY AND NEGLIGENCE), EXCEED THE TOTAL FEES RECEIVED BY MERGE UNDER THIS SALES ORDER.

Merge Healthcare CONFIDENTIAL

EXHIBIT B
MERGE 0023847

DocuSign Envelope ID: 2D1F47E2-C54B-4F36-8AA1-B28860521064



9.3. Allocation of Risk. The provisions of Sections 8 and 9 allocate the risks under this Agreement between Merge and Customer, and the Parties acknowledge that such provisions are a material condition for their respective entry into this Agreement.

10. GOVERNMENTAL MATTERS; HIPAA

10.1. U.S. Government ("Government")Restricted Rights.The Merge Software provided under this Agreement is commercial computer software developed exclusively at private expense, and is in all respects the proprietary data belonging solely to Merge or its licensors. Products and Documentation that may be provided to the Government hereunder (by contracts or subcontract) are provided with the most restricted rights and limited rights permitted by law and regulation. Department of Defense: If the Software is acquired by or on behalf of agencies or units of the Department of Defense (DOD), then, pursuant to DOD FAR Supplement Section 227.7202 and its successors (48 C.F.R. 227.7202) the Government's right to use, reproduce or disclose the Software and any accompanying Documentation acquired under this Agreement is subject to the restrictions of this Agreement. Civilian Agency: If the Software is acquired by or on behalf of civilian agencies of the Government, then, pursuant to FAR Section 12.212 and its successors (48 C.F.R. 12.212), the Government's right to use, reproduce or disclose the Software and any accompanying Documentation acquired under this Agreement is subject to the restrictions of this Agreement.

10.2. Export Controls. The Parties shall comply fully with all relevant export laws and regulations, including but not limited to the U.S. Export Administration Regulations and Executive Orders.

10.3. HIPAA. In the event the Parties do not have a current Business Associate Agreement in force between them, then the Parties agree to the provisions of the Business Associate Agreement set forth on the HIPAA Page, with the same force and effect as if each Party executed said Business Associate Agreement as of the Effective Date of the Sales Order. Customer acknowledges that compliance with HIPAA, HITECH and other privacy and security rules is not solely determined by Products and Services and is a process that involves Customer's systems, facilities and practices.

10.4. Federal Equal Opportunity Regulations. The Parties and their subcontractors shall abide by the requirements of 41 CFR 60–300.5(a) and 41 CFR 60-741.5(a). These regulations prohibit discrimination against qualified protected veterans and against individuals on the basis of disability, and require affirmative action by covered prime contractors and subcontractors to employ and advance in employment qualified protected veterans and qualified individuals with disabilities.

11. GENERAL PROVISIONS. Parties' Relationship; No Third Party Beneficiaries. The Parties hereto are independent contractors to one another, and nothing herein shall be deemed to establish a partnership, joint venture or agency relationship between the Parties, and nothing in this Agreement will be construed as giving any right, remedy or claim to an entity other than the Parties, their permitted successors and permitted assigns, and persons and entities expressly indemnified hereunder. Assignment.Customer may not assign or transfer its interests, rights or obligations under this Agreement by written agreement, merger, consolidation, operation of law or otherwise, without the prior written consent of Merge. Subject to the foregoing, this Agreement shall inure to the benefit of and be binding upon each of the Parties and their respective permitted successors and assigns. Notices. All legal notices required or permitted to be given pursuant to this Agreement shall be in writing and delivered personally or by a commercially recognized national courier (such as Federal Express or UPS), and notices shall be effective upon receipt by the office of the Party to which the notice is directed. Neither Party shall refuse delivery of any notice hereunder. Legal notices hereunder to the Parties shall be to such Party's address set forth on the first page of this Agreement (with legal notices to Merge being directed to the attention of its General Counsel), provided that either Party may, by written notice to the other Party, direct that notices be sent to a different

address. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to its principles of conflicts of law or to the United Nations Convention on Contracts for the International Sale of Goods. Equitable Relief. Each Party agrees that, in the event injunctive or other equitable relief is appropriate to enforce compliance with confidentiality, license or property provisions of this Agreement, then such relief shall be in addition to any other remedies available to the aggrieved Party and that the aggrieved Party shall be entitled to seek such equitable relief without the requirement of any bond or security and without the necessity of having to establish the failure of legal remedies. Force Majeure. Neither Party shall be responsible for any delay or failure in performance of any part of this Agreement to the extent that such delay or failure is caused by fire, flood, explosion, war, embargo, government requirement, internet accessibility, utilities outage, inability to obtain products from a third party supplier, civil or military authority, act of God, act or omission of carriers or other similar causes beyond its control (collectively, a "Force Majeure Event"). The performance of the Party suffering the Force Majeure Event shall be excused and the time for performance shall be extended for the period of delay or inability to perform due to such Force Majeure Event. Contract Construction. This Agreement will not be presumptively construed in favor of or against either Party, including the Party that drafted the Agreement. The headings to the sections of this Agreement are for ease of reference only and shall not affect the interpretation or construction of this Agreement. Severability.If any term or condition of this Agreement is determined by a court of law (or arbitration proceeding to which both Parties are parties) to be invalid or unenforceable in whole or in part for any reason, this Agreement shall, to the greatest extent permitted by law, be reformed so as to be valid and enforceable consistent with the intention of the Parties as expressed herein. No Waiver. No term or provision of this Agreement shall be deemed waived and no breach excused, unless such waiver or excuse is in writing signed by the Party granting such waiver or excusing such breach. No consent to or waiver of a breach shall be deemed as a consent to, waiver of, or excuse for any different or subsequent breach by such Party. Entire Agreement. This Agreement, including the Schedules hereto and all Sales Orders hereunder, constitutes the entire agreement between the Parties with respect to the subject matter hereof, and supersedes all proposals, purchase orders, previous agreements, understandings, representations and any other communications (whether written or oral) between the Parties relating thereto. The terms and conditions contained in any purchase order or other purchase document issued by Customer or by any other party on Customer's behalf (collectively, "Purchase Order") shall be of no legal force or effect, even if such Purchase Order is delivered to Merge; such Purchase Order is signed or otherwise accepted by a Merge employee; and/or Merge provides Products and/or Services pursuant to such Purchase Order. Order Independence. This Sales Order is an order separate and independent from any other executed or contemplated order(s). Any fees due Merge for this Sales Order are separate from any other executed or contemplated order(s), and the payment terms for this Sales Order are not intended to be dependent upon or otherwise coincide with performance criteria of any other executed or pending order(s). No products or services that are the subject of this Sales Order are interrelated or interdependent in terms of design, technology or function or are essential to the functionality of a product in any other executed or contemplated order(s). Amendment. This Agreement may not be modified, except by a written amendment instrument that expressly refers to this Agreement and is signed by authorized representatives of each Party. Execution. This Agreement and Sales Order may be executed by the Parties in counterparts and may be executed and delivered by facsimile or by email. A signed document transmitted as an electronic document (such as a PDF) via email or other electronic means shall be afforded the same weight as a document with original ink signatures, and all such counterparts and electronic documents shall together constitute one and the same agreement.

Merge Healthcare CONFIDENTIAL

EXHIBIT B
MERGE 0023848

**To:** Howell, Chad[CHowell@TrinityMS.net]
**Cc:** Ron Poe[Ron.Poe@merge.com]; Madeline Young[Madeline.Young@merge.com]; Bang, Shirley[SBang@TrinityMS.net]; Phil Martinez[pmartinez@TrinityMS.net]; Mouton, Kyle[KMouton@TrinityMS.net]
**From:** Dianna Powell
**Sent:** Mon 1/25/2016 5:42:51 PM
**Subject:** RE: Demo of Merge LIS

Consider the time yours Chad! I will send the Web Meeting invitation out to the team later today.

Madeline will be joining us for the demo also.

Regards,

Dianna Powell
*Pre-Sales Clinical Consultant, LIS*

Merge Healthcare, an IBM Company
*71 S. Wacker Dr, 20th Floor*
*Chicago, IL 60606*

P: *877.446.3743 ext. 3606*
F: *760.255.4647*
M: *909.214.2098*
E: *dianna.powell@merge.com*

*www.merge.com*





**Connect with Merge Healthcare**

*PRIVACY STATEMENT: This message and all attachments are a private communication and may be confidential or protected by privilege. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited. Thank you.*

*IMPORTANT PRIVACY COMPLIANCE REMINDER REGARDING PATIENT INFORMATION: Merge Healthcare Customers and anyone else that sends emails to Merge Healthcare (collectively "Senders") must ensure that e-mail messages and attachments sent to Merge Healthcare do not contain any Protected Health Information, Personal Health Information or other patient information (collectively defined as "PHI"). In the event that it is not feasible for a Sender to remove all PHI, then the following shall apply: The extent of PHI disclosed by Sender shall be the minimum amount necessary under the Sender's policies that are compliant with and as intended by all applicable Privacy laws and regulations (including HIPAA) Senders must encrypt all PHI prior to sending to Merge Healthcare.*

**From:** Howell, Chad [mailto:CHowell@TrinityMS.net]
**Sent:** Monday, January 25, 2016 9:39 AM
Dianna Powell
**Cc:** Ron Poe; Madeline Young; Bang, Shirley; Phil Martinez; Mouton, Kyle
**Subject:** RE: Demo of Merge LIS



Thank you Dianna,
Can we lock down Thursday morning at 7:00AM PST?

Thanks,

**Chad Howell**
*Chief Information Officer*
**Trinity Medical Services**
www.TrinityMS.net

21385 Marion Lane STE E, Mandeville, LA 70471
985-373-5409 *cell* • 985-400-5491 *office* • 985-467-5550 *fax*
Chad@TrinityMS.net

 

*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the sender. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

**From:** Dianna Powell [mailto:Dianna.Powell@merge.com]
**Sent:** Monday, January 25, 2016 9:55 AM
**To:** Howell, Chad <CHowell@TrinityMS.net>
**Cc:** Ron Poe <Ron.Poe@merge.com>; Madeline Young <Madeline.Young@merge.com>
**Subject:** Demo of Merge LIS

Hi Chad.

Madeline Young let me know that you and your team are interested in a follow up demo of Merge LIS in preparation for the coming installation at CVDL.

I have some time later this week if we can find a window that will work for all . . .

Here is my availability:
Wednesday, 1/27/16 – any time after 10:00 AM PST
Thursday, 1/28/16 – 7:00 – 9:00 AM PST or after 1:00 PM PST
Friday, 1/29/16 – schedule open – available anytime

Please let me know what will work best for your group. Thank you and I look forward to meeting with your team soon!

Regards,

**Dianna Powell**
*Pre-Sales Clinical Consultant, LIS*

**Merge Healthcare, an IBM Company**
*71 S. Wacker Dr, 20th Floor*
*Chicago, IL 60606*

**P:** *877.446.3743 ext. 3606*
**F:** *760.255.4647*
**M:** *909.214.2098*
**E:** *dianna.powell@merge.com*

*www.merge.com*

CONFIDENTIAL



**amplify** your imaging value



Visit Us at HIMSS16
Feb 29 - March 4 | Booth #2116

MEET WITH US IN LAS VEGAS, NV

**Connect with Merge Healthcare**

*PRIVACY STATEMENT: This message and all attachments are a private communication and may be confidential or protected by privilege. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited. Thank you.*

*IMPORTANT PRIVACY COMPLIANCE REMINDER REGARDING PATIENT INFORMATION: Merge Healthcare Customers and anyone else that sends emails to Merge Healthcare (collectively, "Senders") must ensure that e-mail messages and attachments sent to Merge Healthcare do not contain any Protected Health Information, Personal Health Information or other patient information (collectively defined as "PHI"). In the event that it is not feasible for a Sender to remove all PHI, then the following shall apply: The extent of PHI disclosed by Sender shall be the minimum amount necessary under the Sender's policies that are compliant with and as intended by all applicable Privacy laws and regulations (including HIPAA). Senders must encrypt all PHI prior to sending to Merge Healthcare.*

CONFIDENTIAL

**EXHIBIT B** TRINITY_0100406

Message

| | |
|---|---|
| **From:** | rpoe@us.ibm.com [rpoe@us.ibm.com] |
| **Sent:** | 1/20/2017 5:38:48 AM |
| **To:** | rpoe@us.ibm.com |
| **Subject:** | Fw: lab results communicated via athennet |
| **Attachments:** | Untitled attachment 00003.jpg; Untitled attachment 00006.jpg; _.png; Untitled attachment 00009.jpg; Untitled attachment 00012.jpg; Untitled attachment 00015.jpg; Known Merge Shortcomings (as PDF).pdf |

With kindest regards,

| | | |
|---|---|---|
| **Ron Poe**<br>Regional Sales Manager<br>Merge, an IBM Company<br>Phone: +1 (877) 232-3322<br>Mobile: +1 (336) 456-3624<br>Fax: +1 (866) 557-1423<br>Email: rpoe@us.ibm.com | 71 South Wacker Drive<br>Chicago, IL 60606<br>United States<br>IBM Corporation | |

IBM **Watson Health**

----- Forwarded by Ron Poe/Greensboro/IBM on 01/20/2017 12:38 AM -----

From: Kristen Kleist/Dallas/IBM

To: Dianna Powell/Salt Lake City/IBM@IBMUS, John Waters/Austin/IBM@IBMUS, Christopher Floyd/Salt Lake City/IBM@IBMUS, Ron Poe/Greensboro/IBM@IBMUS

Date: 12/19/2016 05:12 PM

Subject: Fw: lab results communicated via athennet

---

Here is the list that Trinity has as far as Merge LIS issues and concerns. This is in preparation for the trinity meeting in

January.                              Known Merge Shortcomings (as PDF).pdf



EXHIBIT

1

Confidential

**Kristen Kleist**
HI7 Implementation
Merge, an IBM Company

**Office:** (262) 369-3142
**Mobile:** (714) 206-3669
**Email:** kkleist@us.ibm.com

IBM **Watson Health**

900 Walnut Ridge Drive
Hartland, WI 53029-8347
United States
IBM Corporation



—— Forwarded by Kristen Kleist/Dallas/IBM on 12/19/2016 04:09 PM ——

From: Chad Howell <CHowell@TrinityMS.net>
To: Kristen Kleist/Dallas/IBM@IBMUS
Date: 12/19/2016 02:41 PM
Subject: RE: FW: lab results communicated via athennet

---

Attached are the notes I went through last week.

Thank you,

**Chad Howell**
*Chief Information Officer*
**Trinity Medical Services**
www.TrinityMS.net
21385 Marion Lane STE E, Mandeville, LA 70471
985-373-5409 *cell* ▪ 985-400-5491 *office* ▪ 985-467-5550 *fax*

Chad@TrinityMS.net

*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the sender. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

**From:** Kristen Kleist [mailto:kkleist@us.ibm.com]
**Sent:** Monday, December 19, 2016 1:09 PM
**To:** Chad Howell <CHowell@TrinityMS.net>
**Subject:** RE: FW: lab results communicated via athennet

**EXHIBIT B**

Chad can you send your list of issues and concerns. I am going to share this with my team prior to our January meeting.

**Kristen Kleist**
HI7 Implementation
Merge, an IBM Company

Office: (262) 369-3142
Mobile: (714) 206-3669
Email: kkleist@us.ibm.com

IBM **Watson Health**

900 Walnut Ridge Drive
Hartland, WI 53029-8347
United States
IBM Corporation



From: Chad Howell <CHowell@TrinityMS.net>
To: Kristen Kleist/Dallas/IBM@IBMUS
Cc: Blake Bourque <BBourque@TrinityMS.net>, Dianna Powell/Salt Lake City/IBM@IBMUS, John Hearn <JHearn@TrinityMS.net>, Rhett Bunce
<RBunce@TrinityMS.net>, Ron Poe/Greensboro/IBM@IBMUS
Date: 12/15/2016 12:21 PM
Subject: RE: FW: lab results communicated via athennet

That time does work for me Kristen. Will you set up a meeting invite?

Please understand that I have gotten positive feedback from Danny as well while working with you which has been almost daily. The
challenges I am describing regarding the HL7 are not pertaining to the requests for additional data to be added to the file.

We have found many HL7 standards that do not add up such as required fields that are not populated by merge, entire tags that
should or should not be present based on the structure of data for a particular accession, and other thing that have caused either
further requests to you for correction or work-arounds for us to make the files compatible with other standard HL7 interfaces.

The Batch process has been kicked off more than once in the middle of business hours. The most recent of these events was on
Tuesday Dec 13th which took place at approximately 10:30 am CST. Fortunately, Danny and I was able to log into the server and
cancel the process but only after this job dropped hundreds of files on the production interface folder which locks up the production
report interfaces and causes a nightmare of additional work from our side to sort through what should go out and what shouldn't....
This was then reinitiated Tuesday at 7:00 pm CST as planned and we were able to disable our interface engine until it completed to
ensure no results when out.

We can discuss more on the call tomorrow.

**Chad Howell**
*Chief Information Officer*
**Trinity Medical Services**
www.TrinityMS.net

21385 Marion Lane STE E, Mandeville, LA 70471
985-373-5409 *cell* ▪ 985-400-5491 *office* ▪ 985-467-5550 *fax*
Chad@TrinityMS.net

**EXHIBIT B**

Confidential

*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the sender. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

**From:** Kristen Kleist [mailto:kkleist@us.ibm.com]
**Sent:** Thursday, December 15, 2016 12:04 PM
**To:** Chad Howell <CHowell@TrinityMS.net>
**Cc:** Blake Bourque <BBourque@TrinityMS.net>; Dianna Powell <powelld@us.ibm.com>; John Hearn <JHearn@TrinityMS.net>; Rhett Bunce <RBunce@TrinityMS.net>; Ron Poe <rpoe@us.ibm.com>
**Subject:** Re: FW: lab results communicated via athennet

Chad do you want to have a conference call tomorrow at 3:30 EST?

**Kristen Kleist**
HI7 Implementation
Merge, an IBM Company

Office: (262) 369-3142
Mobile: (714) 206-3669
Email: kkleist@us.ibm.com

IBM **Watson Health**

900 Walnut Ridge Drive
Hartland, WI 53029-8347
United States
IBM Corporation



---

From: Chad Howell <CHowell@TrinityMS.net>
To: Kristen Kleist/Dallas/IBM@IBMUS, Ron Poe/Greensboro/IBM@IBMUS, John Hearn <JHearn@TrinityMS.net>, Rhett Bunce <RBunce@TrinityMS.net>, Dianna Powell/Salt Lake City/IBM@IBMUS, Blake Bourque <BBourque@TrinityMS.net>
Date: 12/15/2016 11:32 AM
Subject: FW: lab results communicated via athennet

Please see the email below. This email is from one of our largest clients.

This is unacceptable and the many issues that we have been battling with Merge and it's "simple" results interface has now affected our business.

I do appreciate Kristen's quick response to action for the many issues that have been discovered but we have had countless issues with inconsistencies with the published standards and structure of the HL7 interface, results coming across in fragments without any standard flag to show at the accession level that it is not a complete results, 3 times our production environment has been affected and even brought down do to work being performed on our server during production hours, historical HL7 batch processes being kicked off during production hours after being very clear that this would affect our client with duplicate results and locking up the interface which is what the below email is referring to... The list goes on.

I am ready to pull the plug on the whole thing! I am really blown away by all of the constant challenges and shortcomings of this platform and how a company that is so well established and expensive could have so many fundamental issues.

**EXHIBIT B**

We have been pretty quit internally doing our best to get creative and work through these issue ourselves but I am now working on composing a list of all Workflow, Security, Compliance, Scientific, and Usability shortcomings and issues that we have had to work around so that we can communicate some reality to Merge about our satisfactions thus far.

My team is manually review every HL7 file at this point to ensure they are complete and arcuate before they are sent to our client's EMR. So far, my team has positive feedback on this specific matter and I can only hope that it is not too late to salvage the clients below and others that have been affected.

Unfortunate,

**Chad Howell**
*Chief Information Officer*
**Trinity Medical Services**
www.TrinityMS.net

21385 Marion Lane STE E, Mandeville, LA 70471
985-373-5409 *cell* • 985-400-5491 *office* • 985-467-5550 *fax*
Chad@TrinityMS.net

*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the sender. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

**From:** Cochise Health and Wellness [mailto:scott@cochisehealth.com]
**Sent:** Thursday, December 15, 2016 11:03 AM
**To:** Chad Howell <CHowell@TrinityMS.net>
**Cc:** Aisha Chavez <achavez@TrinityMS.net>; Jordan Brown <JBrown@TrinityMS.net>; John Hearn <JHearn@TrinityMS.net>
**Subject:** lab results communicated via athennet

Chad / ALL,

Not sure what efforts to remedy the lab integration issues continue. However, more than 200 lab result files dumped into Sarah's lab in-box in the EMR. All of these have already been reported, seen by her, and closed or routed appropriately. The 200+ result files each indicate either "cancelled" or "incomplete". This appears to be all toxicology (UDS) confirmation results which should only be coming as the .pdf format. These 200+files are for only 8 patients' results but each item reports separately. Athena is looking into this from their side (this is not something the tech support person I spoke with has ever seen before) in case it is an issue originating on their side of the integration. If it stems from the manner in which UDS is being reported, please have this to stop and resume the previous methodology. When you are able to process blood tests we will be able to assess whether or not integration has been completed for that testing. Many thanks.

Blessings,

*Jeffrey Scott Bivens*
Practice Manager
Cochise Health and Wellness, PC
520-439-2128
www.cochisehealthandwellness.com
**Disclaimer:** *The information contained in this electronic message is confidential, proprietary, and intended only for the use of the e-mail address listed as the recipient of this message. If you are not the intended recipient, you are hereby notified that any disclosure, dissemination, distribution, copying of this communication, or unauthorized use of the information is strictly prohibited and subject to prosecution to the fullest extent of the law! If you are not the intended recipient, please delete this electronic message and DO NOT ACT UPON, FORWARD, COPY OR OTHERWISE DISSEMINATE IT OR ITS CONTENTS.*

**EXHIBIT B**

[attachment "Known Merge Shortcomings (as PDF).pdf" deleted by Kristen Kleist/Dallas/IBM]

**EXHIBIT B**

# Known Merge Shortcomings

Monday, October 17, 2016   12:58 PM

| Security Risk | Order Entry | Usability/Risk | COC - Workflow | Science | Compliance |
|---|---|---|---|---|---|
| • Setting user to disabled doesn't stop the user from logging in. You have to rest their password so they can't login.<br>• Passwords in Database are in plain text. Not encrypted. Major security flaw! | - No medication Reflex ordering | - If you order a panel and also accidentally order a test individually that is included in the panel, you have to leave the test ordered. If you delete the individual test, it will also be deleted from the panel.<br><br>- If you delete all containers to correct a mistake and replace with another, the whole order will be deleted. Just as if you clicked the Delete Order button on the Accession tab and the entire order would need to be re-accession. | • When a container is deleted and then another test that goes into the same container type is ordered, it doesn't show up under the containers tab and is lost in the system do the container tab staying on Delete. A manual database change has to be made on the container status in the database back to "C" for it to show up.<br>• Merge has no way to reject an accession. This is a crucial step in the laboratory workflow.<br>• No way to associate a doctor/clinic with a sales rep for volume numbers<br>• No option to attach files to an order except for the results. (Order form, patient demographic forms, etc.)<br>• Receiving Containers does not always push the sample onto the corresponding worklist. (BUG) | • Unable to review and approve results by batch grouping.<br>• System does not allow the QC ranges to be adjusted in the middle of a lot.<br>   • Create a new lot each time you change the range | • The Instrument Run Date for any sample is not stored anywhere in the Database. (If a run in put on late in the day and not imported until the next day Merge is going to say that the accessions were ran on the import day which is not going to match up with the date that the QC was approved for that batch!!)<br>• No way to mark a sample as re-prep in Merge. (Having to manage this re-prep list externally on paper and has to make sure not to approve or it will go out to client with invalid results) |

## Requests

- On LCMS Instrument Worklist page switch Collection date with Import Date

Confidential

**EXHIBIT B**

MERGE 0019564

| | |
|---|---|
| **From:** | Chad Howell (-o-ExchangeLabs-ou-Exchange Administrative Group (FYDIBOHF23SPDLT)-cn-Recipients-cn-cb677207bd4b471a9a23dab70ffbb70f-chad) |
| **Sent:** | Friday, December 16, 2016 10:17:37 PM |
| **To:** | Ron Poe (rpoe@us.ibm.com); Kristen Kleist (kkleist@us.ibm.com) |
| **Subject:** | Meeting discussion |
| **Attachments:** | Known Merge Shortcomings (as PDF).pdf; image001.png |

I thank you both for the time today. Sorry for the information structure of this document but this contains the topics I discussed today. Happy for a follow up call at any time to discuss in more details.

Merry Christmas,

**Chad Howell**
*Chief Information Officer*
**Trinity Medical Services**
www.TrinityMS.net

21385 Marion Lane STE E, Mandeville, LA  70471
985-373-5409 *cell* ▪ 985-400-5491 *office* ▪ 985-467-5550 *fax*
Chad@TrinityMS.net

Trinity_logo_Corporate_Horz

*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the sender. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*



EXHIBIT
*CHAD HOWELL*
**EXHIBIT B**

TRINITY_0195072

# Known Merge Shortcomings

| Security Risk | Order Entry | Usability/Risk | COC - Workflow | Science | Compliance |
|---|---|---|---|---|---|
| • Setting user to disabled doesn't stop the user from logging in. You have to rest their password so they can't login.<br><br>• Passwords in Database are in plain text. Not encrypted. Major security flaw! | - No medication Reflex ordering | - If you order a panel and also accidentally order a test individually that is included in the panel, you have to leave the test ordered. If you delete the individual test, it will also be deleted from the panel.<br><br>- If you delete all containers to correct a mistake and replace with another, the whole order will be deleted. Just as if you clicked the Delete Order button on the Accession tab and the entire order would need to be re-accession. | • When a container is deleted and then another test that goes into the same container type is ordered, it doesn't show up under the containers tab and is lost in the system do to the container tab staying on Delete. A manual database change has to be made on the container status in the database back to "C" for it to show up.<br>• Merge has no way to reject an accession. This is a crucial step in the laboratory workflow.<br>• No way to associate a doctor/clinic with a sales rep for volume numbers<br>• No option to attach files to an order except for the results. (Order form, patient demographic forms, etc.)<br>• Receiving Containers does not always push the sample onto the corresponding worklist. (BUG) | • Unable to review and approve results by batch grouping.<br>• System does not allow the QC ranges to be adjusted in the middle of a lot.<br>  ◦ Create a new lot each time you change the range | • The Instrument Run Date for any sample is not stored anywhere in the Database. (If a run in put on late in the day and not imported until the next day Merge is going to say that the accessions were ran on the import day which is not going to match up with the date that the QC was approved for that batch!!)<br>• No way to mark a sample as re-prep in Merge. (Having to manage this re-prep list externally on paper and has to make sure not to approve or it will go out to client with invalid results) |

## Requests

- On LCMS Instrument Worklist page switch Collection date with Import Date

**EXHIBIT B**

TRINITY_ 0195073

Please show how it is done.  You rock Ben!

---

**From:** Ben Caston
**Sent:** Thursday, March 2, 2017 4:30:02 PM
**To:** Blake Bourque; Chad Howell; Phil Martinez
**Subject:** Re: Holy Shit

I just rooted the dev server by uploading a tomcat WAR file that presents a remote shell.

Since the database backups are stored on the same server, then I could grab a copy of the plain-text, un-encrypted SQL dump file.

This would allow a remote user to access patient data.

If you want, I can write this up and show how it's done.  (it'll be a short document since it's pretty easy)

---

**From:** Ben Caston
**Sent:** Thursday, March 2, 2017 4:25:06 PM
**To:** Blake Bourque; Chad Howell; Phil Martinez
**Subject:** Re: Holy Shit

Hey I want some of that!  Give me some more time.. I'll find a couple more.

----- Reply message -----
From: "Blake Bourque" <BBourque@TrinityMS.net>
To: "Chad Howell" <CHowell@BelleHealth.net>, "Phil Martinez" <PMartinez@TrinityMS.net>, "Ben Caston" <bcaston@bellehealth.net>
Subject: Holy Shit
Date: Thu, Mar 2, 2017 3:42 PM

They actually sponsor a data breach study.  If they have 50 million patients that their platform supports you are looking at a 7.9 is possible cost from the Merge security breach alone.

http://www-03.ibm.com/security/data-breach/

**Blake N Bourque**
*Chief Executive Officer*
**Trinity Medical Services**



EXHIBIT
4
CHAD HOWELL

**EXHIBIT B**

www.TrinityMS.net

21385 Marion Lane STE E, Mandeville, LA  70471
337-412-0271 *cell* ▪ 985-400-5491 *office* ▪ 985-467-5550 *fax*
Blake@TrinityMS.net



*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the sender. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

**EXHIBIT B**

| | |
|---|---|
| **From:** | derek.schooley@us.ibm.com [derek.schooley@us.ibm.com] |
| **Sent:** | 2/23/2017 8:24:01 PM |
| **To:** | Peter Nanos ["cn=peter nanos/ou=chicago/o=ibm@ibmus"]; Behrooz Behrooznia ["cn=behrooz behrooznia/ou=costa mesa/o=ibm@ibmus"]; David Grosenick ["cn=david grosenick/ou=milwaukee/o=ibm@ibmus"]; Terry Ronan ["cn=terry ronan/ou=orlando/o=ibm@ibmus"]; Mike Diedrick ["cn=mike diedrick/ou=milwaukee/o=ibm@ibmus"]; Lynda Viedenkamp ["cn=lynda viedenkamp/ou=des moines/o=ibm@ibmus"]; Dianna Powell ["cn=dianna powell/ou=salt lake city/o=ibm@ibmus"]; Andrew Warzecha ["cn=andrew warzecha/ou=somers/o=ibm@ibmus"]; Jeff Schmidt ["cn=jeff schmidt/ou=milwaukee/o=ibm@ibmus"]; Julie Pekarek ["cn=julie pekarek/ou=milwaukee/o=ibm@ibmus"]; Anatol Blass ["cn=anatol blass/ou=atlanta/o=ibm@ibmus"]; Peter Siavelis ["cn=peter siavelis/ou=chicago/o=ibm@ibmus"]; Ron Poe ["cn=ron poe/ou=greensboro/o=ibm@ibmus"]; Joseph Longo ["cn=joseph longo/ou=san diego/o=ibm@ibmus"]; Ron Poe ["cn=ron poe/ou=greensboro/o=ibm@ibmus"]; Craig Irvine ["cn=craig irvine/ou=houston/o=ibm@ibmus"]; Tony Dulkis Jr ["cn=tony dulkis jr/ou=costa mesa/o=ibm@ibmus"] |
| **Subject:** | RE: Meeting Summary re: Trinity/Performance Labs issues list |
| **Attachments:** | Untitled attachment 00003.gif; Untitled attachment 00006.gif; Untitled attachment 00009.jpg; Untitled attachment 00012.jpg; Untitled attachment 00015.jpg; Untitled attachment 00018.jpg; Untitled attachment 00021.jpg; Untitled attachment 00024.jpg; _.png; Trinity Support Issues.xlsx |

All,

Please see attached customer issues list that will be presented to the customer on today's call.

Pete,

We need to address them upfront on today's call that we cannot support them as a customer if they continue to modify our database. Dave Ricklefs found out working with Michelle from the site today that they are modifying orders and the only way to do that is through our database.



**EXHIBIT**

tabbies

10

Cara Hewei

Thank you,

**Derek Schooley**
Director Technical Support
Merge Healthcare, an IBM Company

Office: +1 (262) 912-3658
Mobile: +1 (262) 219-6580
Email: Derek.Schooley@us.ibm.com

**IBM Watson Health**

IBM.

900 Walnut Ridge Drive
Hartland, WI 53029
United States

**From:** Peter Nanos [mailto:peter.nanos@us.ibm.com]
**Sent:** Thursday, February 23, 2017 11:09 AM
**To:** Behrooz Behrooznia <b.behrooznia@us.ibm.com>; David Grosenick <dgrosen@us.ibm.com>; Terry Ronan <ronant@us.ibm.com>; Mike Diedrick <mike.diedrick@us.ibm.com>; Lynda Viedenkamp <lviedenk@us.ibm.com>; Dianna Powell <powelld@us.ibm.com>; Andrew Warzecha <warzecha@us.ibm.com>; Jeff Schmidt <jeffschmidt@us.ibm.com>; Julie Pekarek <jpekarek@us.ibm.com>; Anatol Blass <blassa@us.ibm.com>; Peter Siavelis <psiaveli@us.ibm.com>; Ron Poe <rpoe@us.ibm.com>; Joseph Longo <jlongo@us.ibm.com>; Ron Poe <rpoe@us.ibm.com>; Derek Schooley <Derek.Schooley@us.ibm.com>; Craig Irvine <craig.irvine@us.ibm.com>; Tony Dulkis Jr <jtdulkis@us.ibm.com>
**Subject:** Meeting Summary re: Trinity/Performance Labs issues list

**EXHIBIT B**

Update on Trinity:

The Merge team met internally this morning to review the updated issues
list and ensure Merge resources are aligned prior to the afternoon call
with the customer.  In addition to creating a case and Jira, support has
assigned a priority to each issue, identified the type of issue and
provided feedback regarding each issue.  The customer will be provided
this list prior to the call this afternoon sans Merge internal team
commentary.  This afternoons customer meetings purpose will be to present
a cataloged and researched listing of issues to the customer, to capture
any additional information regarding the issues and to align the priority
assigned by Merge with the customer priority.  I will also hand over the
support issue interaction with the customer to Behrooz and Derek.  A CCB
will follow this meeting to disposition the items into the appropriate
releases and a follow up will be conducted with the customer to notify
them of the proposed timeline to issue resolution.


Action Plan:

1.    ~~Support - open cases and jira for customer reported issues~~
2.    ~~Review cases, determine if further questions are needed (Tuesday)~~
3.    ~~Support - add onto and complete case/jira creation (Thursday Morning)~~
4.    Support/Dev/Solutions - to have an opportunity to ask questions of
customer re: issues list (Thursday Afternoon)
5.    Solutions - conduct CCB to review the jira and disposition as
appropriate (TBD)
6.    Support/Dev/Solutions - Escalate any jira as needed to DCHU for
review. (TBD)


Thank you,

Confidential

**EXHIBIT B**

MERGE 0009033

Peter C. Nanos

Vice President,
Solutions Management
Merge, an IBM Company

Telephone: (312) 870-
0152
Email:
peter.nanos@us.ibm.com

IBM **Watson Health**

71 South Wacker Drive
20th Floor
Chicago, IL 60606
United States
IBM Corporation

IBM

**From:** peter.nanos@us.ibm.com [mailto:peter.nanos@us.ibm.com]

**Sent:** Tuesday, February 21, 2017 1:53 PM

**To:** Behrooz Behrooznia <b.behrooznia@us.ibm.com>; David Grosenick <dgrosen@us.ibm.com>; Terry Ronan <ronant@us.ibm.com>; Mike Diedrick <mike.diedrick@us.ibm.com>; Lynda Viedenkamp <lviedenk@us.ibm.com>; Dianna Powell <powelld@us.ibm.com>; Andrew Warzecha <warzecha@us.ibm.com>; Jeff Schmidt <jeffschmidt@us.ibm.com>; Julie Pekarek <jpekarek@us.ibm.com>; Anatol Blass <blassa@us.ibm.com>; Peter Siavelis <psiaveli@us.ibm.com>; Ron Poe <rpoe@us.ibm.com>; Joseph Longo <jlongo@us.ibm.com>; Ron Poe <rpoe@us.ibm.com>; Derek Schooley <Derek.Schooley@us.ibm.com>; Craig Irvine <craig.irvine@us.ibm.com>; Tony Dulkis Jr <jtdulkis@us.ibm.com>

**Subject:** Meeting Summary re: Trinity/Performance Labs issues list

**EXHIBIT B**

Hello,

The Merge team met internally this morning.  Behrooz and team created
cases and issues in jira for the items provided by customer last week and
provided a summary of their initial findings.  The customer reported the
remainder of their issues to me last night and support did not receive
them until this morning.    Thus, the new issues are not reflected in the
list below.  Though not entered yet, the team reviewed the newly supplied
list and concluded that the new issues presented by Trinity/Performance
Labs, like the initial list, was not a of a major/blocking
caliber.  Behrooz and team will take the remaining items and enter them as
cases/jira and will provide their findings to this group on Thursday at
10:30am CST.  I will be contacting the customer this afternoon to plan a
follow up discussion with them for Thursday afternoon where Merge will
have an opportunity to ask any questions of Tinity/Performance Labs needed
to better understand the issues and communicate the remainder of the
action plan to the customer.

Summary:

Attendees: Behrooz, Derek, David, Lynda, Tony, Pete

Cases/Jira Total (17 issues represent the issues identified last week)

- 4 issues were previously reported
- 13 new issues in Jira.
- The total number will be lower as some of the Jira we reviewed
sounded familiar to many on the call, thus additional research will be
conducted to find any duplicate requests.
- 
- Breakdown by ticket type
- 8 of the items were known issues (3 may be duplicates)
- 4 enhancement requests
- 3 items need further clarification from customer though do not appear
to violate
- 2 working as designed.

Action Plan:

Confidential

**EXHIBIT B**

~~Support - open cases and jira for customer reported issues~~
~~Review cases, determine if further questions are needed (Tuesday)~~
Support - add onto and complete case/jira creation (Thursday Morning)
Support/Dev/Solutions - to have an opportunity to ask questions of customer re: issues list (Thursday Afternoon)
Solutions - conduct CCB to review the jira and disposition as appropriate (TBD)
Support/Dev/Solutions - Escalate any jira as needed to DCHU for review. (TBD)


Thank you,


| | | |
|---|---|---|
| **Peter C. Nanos**<br><br>Vice President, Solutions Management<br>Merge, an IBM Company<br><br>Telephone: (312) 870-0152<br>Email:<br>peter.nanos@us.ibm.com<br><br>IBM **Watson Health** | 71 South Wacker Drive<br>20th Floor<br>Chicago, IL 60606<br>United States<br>IBM Corporation | IBM. |

| | |
|---|---|
| | |

**EXHIBIT B**

**From:** Peter Nanos [mailto:peter.nanos@us.ibm.com]
**Sent:** Tuesday, February 21, 2017 9:57 AM
**To:** Behrooz Behrooznia <b.behrooznia@us.ibm.com>; David Grosenick <dgrosen@us.ibm.com>; Terry Ronan <ronant@us.ibm.com>; Mike Diedrick <mike.diedrick@us.ibm.com>; Lynda Viedenkamp <lviedenk@us.ibm.com>; Dianna Powell <powelld@us.ibm.com>; Andrew Warzecha <warzecha@us.ibm.com>; Jeff Schmidt <jeffschmidt@us.ibm.com>; Julie Pekarek <jpekarek@us.ibm.com>; Anatol Blass <blassa@us.ibm.com>; Peter Siavelis <psiaveli@us.ibm.com>; Ron Poe <rpoe@us.ibm.com>; Joseph Longo <jlongo@us.ibm.com>; Ron Poe <rpoe@us.ibm.com>; Derek Schooley <Derek.Schooley@us.ibm.com>; Craig Irvine <craig.irvine@us.ibm.com>; Tony Dulkis Jr <jtdulkis@us.ibm.com>
**Subject:** FW: Notification Of Security, Network, Hipaa, and Lab Compliance Issues (Trinity/Performance Labs)
**Importance:** High


Hello,


I had a phone call with the CEO of Trinity/Performance Labs over the weekend.  He mentioned that he had only shared two of his concerns out of a dozen.  He offered his team as consultants on the remainder.  While it may be possible that his development team could be a resource to Merge at some point, I explained that Trinity has brought forth concerns and the job of Merge is to take them very seriously.  I explained that if he would like for Merge to address any further issues that he must provide the issues so that they can be captured into our standard process and an action plan can be created.  I further explained that Merge would not be paying Trinity's staff to participate in a support process.  He agreed and has provided the remainder of the issues in his message to me last night (see below and attached).  The CEO further emailed me this morning with additional security concerns (see attached).  Behrooz and team, please review and begin entering these items per our standard operating procedure.  We are set to meet today at 11am CST to discuss what was previously provided by Trinity.  We will do so and I'll set up additional time to review this latest information.  I will remain in communication with Trinity and Merge will not engage them until we have an action plan in place.


Thank you,


**EXHIBIT B**

Confidential

| | | |
|---|---|---|
| **Peter C. Nanos**<br><br>Vice President,<br>Solutions Management<br>Merge, an IBM Company<br><br>Telephone: (312) 870-0152<br>Email:<br>peter.nanos@us.ibm.com<br><br>IBM **Watson Health** | 71 South Wacker Drive<br>20th Floor<br>Chicago, IL 60606<br>United States<br>IBM Corporation | IBM. |

| | |
|---|---|
| | |

**From:** Blake Bourque [mailto:BBourque@TrinityMS.net]

**Sent:** Monday, February 20, 2017 5:48 PM

**To:** Peter Nanos <peter.nanos@us.ibm.com>

**Cc:** Chad Howell <CHowell@BelleHealth.net>

**Subject:** Notification Of Security, Network, Hipaa, and Lab Compliance Issues

Pete, attached is a document that the team put together. We have more. I hope this leads us toward working together sooner rather than later. We would gladly fly to see you and your team to go over in detail.



**EXHIBIT B**

I will need some direction regarding our next steps and I feel after you review this document we should start talking serious about solutions. My point is, if we are the only ones who found this stuff, maybe we are the only ones to fix it. Could we schedule demos and get envolved in the conversation?

I promised you during our call I would get this to you today. It I had hoped for this morning.  My apologies for the delay.

One last thing, Ask Merge to put us to work on the fix!  This can't be the way my team goes out.

Get Outlook for iOS

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error, please notify the sender. This message contains confidential information and is intended only for the individual named. If you are not the named addressee then you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient, you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

**EXHIBIT B**

# MERGE SHORTCOMINGS

| ISSUE | RISK CATEGORY | DESCRIPTION | MERGE RESPONSE |
|---|---|---|---|
| Setting user to disabled doesn't stop the user from logging in. You have to reset their password so they can't login. | HIPAA Security Compliance Not compliant with CFR 493.1231 Standard: Confidentiality of patient information. The laboratory must ensure confidentiality of patient information throughout all phases of the total testing process that are under the laboratory's control | This issues would allow an ex-employee to log into the system and view and manipulate patient information and other areas of the system.<br><br>This happened to us with an ADMIN user and fortunately they were honest enough to let us know that their account still worked. | - *Known issue*<br>- *Workaround for now is the Password needs to be changed.*<br>- *Fix coming on v4.6* |
| Passwords in Database are in plain text. Not encrypted. Significant security and compliance risk! | HIPAA Security Compliance Legal Not compliant with CFR 493.1231 Standard: Confidentiality of patient information. The laboratory must ensure confidentiality of patient information throughout all phases of the total testing process that are under the laboratory's control | This is a major security risk for any software platform and opens the doors for major breach and risk across the board for patient information to be exposed<br><br>Risk of CMS declaration of immediate jeopardy. Sanctions include fines, lab director sanctions, ban from Medicare, and prevention from owning laboratory for multiple years. Usually a breach of a non-disclosure agreement. Also, increases company liability for anything that happens as a result of password breach. | - *Known issue*<br>- *Fix coming on v4.6* |
| Merge has an extreme memory leak which appears to be due to the Java controls. We have to set up a weekly reboot to avoid the system from crashing, which has happed multiple times ... | Production Business Interruption Not compliant with CFR 493.1230 Condition: General laboratory Systems. Each laboratory that performs nonwaived testing must meet the applicable general laboratory systems requirements in §§493.1231 through 493.1236, unless | This has caused a system wide crash of the system multiple time which prevents production work to proceed. Business can and has been slowed and interrupted as a consequence.<br><br>The lab must verify that these system crashes are not affecting patient results. | |

**EXHIBIT B**

|  |  |  |  |
|---|---|---|---|
|  | HHS approves a procedure, specified in Appendix C of the State Operations Manual (CMS Pub. 7), that provides equivalent quality testing. The laboratory must monitor and evaluate the overall quality of the general laboratory systems and correct identified problems as specified in §493.1239 for each specialty and subspecialty of testing performed<br><br>CFR 493.1232 Standard: The laboratory must establish and follow written policies and procedures that ensure positive identification and optimum integrity of a patient 's specimen from the time of collection or receipt of the specimen through completion of testing and reporting results |  |  |
| A user can only be given access to ALL sites or individual sites. | HIPAA Compliance Legal Not compliant with CFR 493.1231 Standard: Confidentiality of patient information. The laboratory must ensure confidentiality of patient information throughout all phases of the total testing process that are under the laboratory's control | With Merge being a multi-site system as described, this issue introduces compliance and HIPAA risk as the users that support the different locations/lab sites would have access to all other sites patient and client information. Having this access is usually a breach of contract under a signed non-disclosure agreement. |  |
| ADMIN role incorporates too many functions that | HIPAA Compliance | Too many features and processes within the system are only available to the |  |

| | | | |
|---|---|---|---|
| need to be separated across different users. | Not compliant with CFR 493.1231 Standard: Confidentiality of patient information. The laboratory must ensure confidentiality of patient information throughout all phases of the total testing process that are under the laboratory's control | ADMIN role (ex. Setting up new sites and client account). This causes us to have too many admins in the system who then have full access and full rights to change critical settings across all locations and access to all areas of the system that their job does not promote. | |
| **Additional Issues:** | | | |
| User data (username, password) is stored in plain text in the database | HIPPA Security Compliance | Website is publically available on the internet. Exploits to aged versions of Apache Tomcat and MySQL can be performed in order to retrieve user information | ? |
| Aged versions of Apache Tomcat, MySQL Community Edition open to vulnerabilities | HIPAA Security Compliance | Using publically available exploit tools, an attacker can perform a documented denial of service attack in order to shutdown Apache Tomcat. | ? |
| No audit logging or user accounting | HIPAA Security | When an action is performed, there is no record of that activity. The flat column in the table is simply updated. There is no history of what that record was prior to the change. | ? |
| The process of disabling a user according to the administrative manual does not disable a user. | HIPAA Security | Disabling a user does not prevent them from logging in. We learned this after a terminated employee was able to login and notified us. | Change the password for the user you are disabling. This is not indicated in the manual. |
| Shared admin password for Merge installations | HIPAA Security | Security standards on the publically accessible Merge website are so low that we are able to not only access administrative functions for the Apache Tomcat service on our system, but we are also to able to access other Merge customer sites with that same information. | ? |

**EXHIBIT B**

| ISSUE | RISK CATEGORY | DESCRIPTION | MERGE RESPONSE |
|-------|---------------|-------------|----------------|
| No Medication Reflex ordering | LAB Compliance<br>Billing Compliance<br>Legal<br><br>Not compliant with CFR 493.1240 Condition: Pre-analytic systems. Each laboratory that performs nonwaived testing must meet the applicable preanalytic system(s) requirements in §§493.1241 and 493.1242, unless HHS approves a procedure, specified in Appendix C of the State Operations Manual (CMS Pub. 7), that provides equivalent quality testing. The laboratory must monitor and evaluate the overall quality of the preanalytic systems and correct identified problems as specified in §493.1249 for each specialty and subspecialty of testing performed.<br><br>Not compliant with CFR 493.1241 Standard: Test request. (a) The laboratory must have a written or electronic request for patient testing from an authorized person (8) Any additional information relevant and necessary for a specific test to ensure accurate and timely testing and reporting of results, including interpretation, if | As of 2015, it has been a requirement from Medicare (and adopted by most of the large private payers as a result) that the ordering of toxicology tests and especially the billing of those orders must be directly related to reflex logic based on positives screens and prescribed medications.<br><br>With this not being a feature in the system it poses a compliance risk that can have a huge impact on billing and cause for major billing audits and recoupment. Lack of this and violation of Medicare can have substantial legal and practical consequences under the False Claims Act (criminal, civil, fines, etc.) It can also put laboratory personnel licenses at risk, and creates personal liability that is not protected by corporate structure.<br><br>Performance Labs has received this condition level deficiency and as a plan of correction has switched to the FDA approved Merge LIS system. If this deficiency is not effectively corrected, then CMS will impose the sanction of revocation of the CLIA certificate. | |

| | | | |
|---|---|---|---|
| | applicable, (e) If the laboratory transcribes or enters test requisition or authorization information into a record system or a laboratory information system, the laboratory must ensure the information is transcribed or entered accurately. | | |
| Incorrect orders in Merge (Test vs Panels) | Production Lab Compliance Billing Compliance Business Interruption Leagal

Not compliant with CFR 493.1240 Condition: Pre-analytic systems. Each laboratory that performs nonwaived testing must meet the applicable preanalytic system(s) requirements in §§493.1241 and 493.1242, unless HHS approves a procedure, specified in Appendix C of the State Operations Manual (CMS Pub. 7), that provides equivalent quality testing. The laboratory must monitor and evaluate the overall quality of the preanalytic systems and correct identified problems as specified in §493.1249 for each specialty and subspecialty of testing performed.

Not compliant with CFR 493.1241 Standard: Test request. (a) The laboratory must have | If you order a panel and also order a n individual test that is included in the ordered panel, you have to leave the test ordered. If you delete the individual test, it will also be deleted from the panel without anyone knowing. Consequently, the results will go out incomplete to the provider and the bill will not match the order. This has and will continue to cost users business due to disgruntled providers. Additionally, failure to complete testing, particularly on the clinical side, can have significant consequences if there is a high risk patient involved (failure to disclose a critical result immediately puts laboratory and physician at risk).

Performance Labs has received this condition level deficiency and as a plan of correction has switched to the FDA approved Merge LIS system. If this deficiency is not effectively corrected, then CMS will impose the sanction of revocation of the CLIA certificate. | - *Unknown fix* |

| | | | |
|---|---|---|---|
| | a written or electronic request for patient testing from an authorized person (8) Any additional information relevant and necessary for a specific test to ensure accurate and timely testing and reporting of results, including interpretation, if applicable, (e) If the laboratory transcribes or enters test requisition or authorization information into a record system or a laboratory information system, the laboratory must ensure the information is transcribed or entered accurately. | | |
| Order will unexpectedly be deleted which voids the assigned Accession number and all barcodes that have been circulated inside and outside the receiving lab | Lab Compliance Production Business Interruption<br><br>Not compliant with CFR 493.1240 Condition: Pre-analytic systems. Each laboratory that performs nonwaived testing must meet the applicable preanalytic system(s) requirements in §§493.1241 and 493.1242, unless HHS approves a procedure, specified in Appendix C of the State Operations Manual (CMS Pub. 7), that provides equivalent quality testing. The laboratory must monitor and evaluate the overall quality of the preanalytic systems and | If you delete all containers to correct a mistake and replace with another, the whole order will be deleted. Just as if you clicked the Delete Order button on the Accession tab and the entire order would need to be re-accession.<br><br>This can cause major confusion in the Chain of Custody workflow in the lab. Specimens are split into multiple containers and routed to different areas of the laboratory to be tested as well as different labs locations all together. This issues caused the Accession number which is the identifier on all specimen container in the form of the barcode sticker to be invalid and unidentifiable. It costs business if not caught.<br><br>This is the type of situation if caught on inspection can lead to cease testing. If pervasive, can cause laboratory to have to write to all providers that their results may be unreliable. Fallout from such consequences include Medicare and private payer recoupment. | - *When you remove the containers the order is marked as deleted.*<br><br>- *Unsure of the issues or when it would be fixed*<br><br>- *Chris will test to determine the root cause* |

EXHIBIT B

| | | | |
|---|---|---|---|
| | correct identified problems as specified in §493.1249 for each specialty and subspecialty of testing performed. | Performance Labs has received this condition level deficiency and as a plan of correction has switched to the FDA approved Merge LIS system. If this deficiency is not effectively corrected, then CMS will impose the sanction of revocation of the CLIA certificate. | |
| | Not compliant with CFR 493.1241 Standard: Test request. (a) The laboratory must have a written or electronic request for patient testing from an authorized person (8) Any additional information relevant and necessary for a specific test to ensure accurate and timely testing and reporting of results, including interpretation, if applicable, (e) If the laboratory transcribes or enters test requisition or authorization information into a record system or a laboratory information system, the laboratory must ensure the information is transcribed or entered accurately. | | |
| Test and Container assignment causes ordered test to not appear on order in Merge | Production Lab Compliance Business Interruption<br><br>Not compliant with CFR 493.1240 Condition: Pre-analytic systems. Each laboratory that performs nonwaived testing must meet the applicable preanalytic system(s) requirements in §§493.1241 and 493.1242, unless HHS | When a container is deleted and then another test that is associated to the same container type is ordered, it doesn't show up under the containers tab or anywhere on the order in Merge due to the previously deleted container status staying on Delete.<br><br>Our Database Admin has to manually update the database to change the container status in the database back to "C" for it to show up.<br><br>This is a huge interruption in the lab workflow. It costs business if not caught. | *- Merge team has taken a look at this and realize that deleting containers should not be allowed*<br><br>*- Unknown fix or timeline* |

| | | | |
|---|---|---|---|
| | approves a procedure, specified in Appendix C of the State Operations Manual (CMS Pub. 7), that provides equivalent quality testing. The laboratory must monitor and evaluate the overall quality of the preanalytic systems and correct identified problems as specified in §493.1249 for each specialty and subspecialty of testing performed. | This is the type of situation if caught on inspection can lead to cease testing. If pervasive, can cause laboratory to have to write to all providers that their results may be unreliable. Fallout from such consequences include Medicare and private payer recoupment. Performance Labs has received this condition level deficiency and as a plan of correction has switched to the FDA approved Merge LIS system. If this deficiency is not effectively corrected, then CMS will impose the sanction of revocation of the CLIA certificate. | |
| | Not compliant with CFR 493.1241 Standard: Test request. (a) The laboratory must have a written or electronic request for patient testing from an authorized person (8) Any additional information relevant and necessary for a specific test to ensure accurate and timely testing and reporting of results, including interpretation, if applicable, (e) If the laboratory transcribes or enters test requisition or authorization information into a record system or a laboratory information system, the laboratory must ensure the information is transcribed or entered accurately. | | |
| Merge has no way to reject an accession. | Lab Compliance Not compliant with CFR 493.1240 | This is a crucial step in the laboratory workflow and is a very serious area of focus for laboratory compliance and the inspection process. | *- Merge said they know that the system does not have the ability to reject specimens that said that* |

| | | | |
|---|---|---|---|
| | Condition: Pre-analytic systems. Each laboratory that performs nonwaived testing must meet the applicable preanalytic system(s) requirements in §§493.1241 and 493.1242, unless HHS approves a procedure, specified in Appendix C of the State Operations Manual (CMS Pub. 7), that provides equivalent quality testing. The laboratory must monitor and evaluate the overall quality of the preanalytic systems and correct identified problems as specified in §493.1249 for each specialty and subspecialty of testing performed.<br><br>Not compliant with CFR 493.1242 Standard: Specimen submission, handling, and referral. (a) the laboratory must establish and follow written policies and procedures for each of the following, if applicable: (6 Specimen processing. (7) Specimen acceptability and rejection. | Our team has made a workaround by creating a new test to the orderable list so that we can report on orders that were rejected. This is confusing and not a compliant process.<br><br>This is the type of situation if caught on inspection can lead to cease testing. If pervasive, can cause laboratory to have to write to all providers that their results may be unreliable. Fallout from such consequences include Medicare and private payer recoupment.<br><br>Performance Labs has received this condition level deficiency and as a plan of correction has switched to the FDA approved Merge LIS system. If this deficiency is not effectively corrected, then CMS will impose the sanction of revocation of the CLIA certificate. | *our work-around was very creative and the only way that this could be accomplished.* |
| No option to attach files to an order except for the results. (Order form, patient demographic forms, etc.) | Lab Compliance Billing Compliance<br><br>Not compliant with CFR 493.1240 Condition: Pre-analytic systems. Each laboratory that performs nonwaived testing must meet the applicable | These documents are required during any type of laboratory or billing audit and with Merge not allowing for these files to be attached in the system we have to have our own external process for storing these files which leaves a lot of room for error and the potential inability to produce the needed documentation during an inspection or audit. | *- Merge acknowledged that this feature in unavailable.* |

| | | preanalytic system(s) requirements in §§493.1241 and 493.1242, unless HHS approves a procedure, specified in Appendix C of the State Operations Manual (CMS Pub. 7), that provides equivalent quality testing. The laboratory must monitor and evaluate the overall quality of the preanalytic systems and correct identified problems as specified in §493.1249 for each specialty and subspecialty of testing performed.

Not compliant with CFR 493.1241 Standard: Test request. (a) The laboratory must have a written or electronic request for patient testing from an authorized person (8) Any additional information relevant and necessary for a specific test to ensure accurate and timely testing and reporting of results, including interpretation, if applicable, (e) If the laboratory transcribes or enters test requisition or authorization information into a record system or a laboratory information system, the laboratory must ensure the information is transcribed or entered accurately. | Performance Labs has received this condition level deficiency and as a plan of correction has switched to the FDA approved Merge LIS system. If this deficiency is not effectively corrected, then CMS will impose the sanction of revocation of the CLIA certificate. | |

| ANALYTICAL | | | |
| --- | --- | --- | --- |
| ISSUE | RISK CATEGORY | DESCRIPTION | MERGE RESPONSE |
| No audit trail when QC values are edited in QC Set Up | Lab Compliance<br><br>Not compliant with CFR 493.1445 Standard: Laboratory Director responsibilities. The laboratory director is responsible for the overall operation and administration of the laboratory, including the employment of personnel who are competent to perform test procedures, record and report test results promptly, accurately and proficiently, and for assuring compliance with the applicable regulations. (5) Ensure that the quality control and quality assessment programs are established and maintained to assure the quality of laboratory services provided and to identify failures in quality as they occur;<br><br>Not compliant with CFR 493.1451 Standard: Technical Supervisor Responsibilities. The technical supervisor is responsible for the technical and scientific oversight of the laboratory. The technical supervisor is not required to be on site at all times testing is performed; | Any update made to QC values or QC ranges in Merge is not tracked with an available audit trail for the end user.<br><br>Performance Labs has received this as a condition level deficiency and as a plan of correction has switched to the FDA approved Merge LIS system to effectively track quality control throughout the laboratory. If this deficiency is not effectively corrected, then CMS will impose the sanction of revocation of the CLIA certificate and the prohibition of the laboratory operators including the director and technical supervisor from operating a laboratory for at least two years from the date of revocation. | *-Merge said the user should manually add a comment each time a change is made* |

| | | | |
|---|---|---|---|
| | however, he or she must be available to the laboratory on an as needed basis to provide supervision as specified in (a) of this section: (4) Establishing a quality control program appropriate for the testing performed and establishing the parameters for acceptable levels of analytic performance and ensuring that these levels are maintained throughout the entire testing process from the initial receipt of the specimen, through sample analysis and reporting of test results; (5) Resolving technical problems and ensuring that remedial actions are taken whenever test systems deviate from the laboratory 's established performance specifications; | | |
| Updating QC ranges or values according to the instructions provided in the Merge user manual causes the new value and/or range to apply to all previously run QC | Lab Compliance Not compliant with CFR 493.1256 Standard: Control Procedures. Unless CMS Approves a procedure, specified in Appendix C of the State Operations Manual (CMS Pub. 7), that provides equivalent quality testing, the laboratory must-- Establish or verify the criteria for acceptability of all control materials. (i) When control materials providing | The user manual states that all lot ranges and values are maintained by the lot number, but are actually maintained by the QC lot description. This confusion causes all newly updated QC ranges to apply to all previously run QC giving the appearance of the laboratory accepting failing QC. Upon inspection the laboratory will be cited for each quality control material that appears to be out of range. Multi citation will elevate a standard level deficiency to a conditional level deficiency and can results in immediate jeopardy. Performance Labs has received this as a condition level deficiency and as a plan of correction has switched to the FDA approved Merge LIS system to effectively track quality control throughout the | -A new QC lot description should be created for every range update or new lot of QC. |

| | | | |
|---|---|---|---|
| | quantitative results are used, statistical parameters (for example, mean and standard deviation) for each batch and lot number of control materials must be defined and available. (ii) The laboratory may use the stated value of a commercially assayed control material provided the stated value is for the methodology and instrumentation employed by the laboratory and is verified by the laboratory. (iii) Statistical parameters for unassayed control materials must be established over time by the laboratory through concurrent testing of control materials having previously determined statistical parameters. | laboratory. If this deficiency is not effectively corrected, then CMS will impose the sanction of revocation of the CLIA certificate and the prohibition of the laboratory operators including the director and technical supervisor from operating a laboratory for at least two years from the date of revocation. | |
| There is no way to know the exact date and time a sample was run on instrumentation. | Lab Compliance<br><br>Not compliant with CFR 493.1256 Standard: Control Procedures. (a) for each test system, the laboratory is responsible for having control procedures that monitor the accuracy and precision of the complete analytic process. (3) At least once each day patient specimens are assayed or examined perform the following for – (i) Each quantitative procedure includes two control materials | Calibration and QC is run daily on the LCMSMS and is typically imported independently of patient specimen results. If these imports do not happen on the same day, it would appear patient specimens were run without calibration or QC. Upon inspection the laboratory will be cited for each patient specimen that appears to be run without quality control. Multi citations will elevate a standard level deficiency to a conditional level deficiency and can results in immediate jeopardy.<br><br>Performance Labs has received this as a condition level deficiency and as a plan of correction has switched to the FDA approved Merge LIS system to effectively track quality control throughout the laboratory. If this deficiency is not effectively corrected, then CMS will | - Merge acknowledged that this feature in unavailable. |

| | of different concentrations; (ii) Each qualitative procedure include a negative and positive control material | impose the sanction of revocation of the CLIA certificate and the prohibition of the laboratory operators including the director and technical supervisor from operating a laboratory for at least two years from the date of revocation. | |
|---|---|---|---|

ie Abney 3:44 PM:

Hey so we identified another bug in Merge and I have already reported it

Jamie Abney 3:45 PM:

so even if a user is disabled, they are still able to log in if they know their old password. So i have went and changed all the disabled users passwords to something different.

Chad Howell 3:51 PM:

what the...

Chad Howell 3:51 PM:

I'll call in a few mintues

Jamie Abney 3:51 PM:

I know right!

Jamie Abney 3:51 PM:

ok



CONFIDENTIAL



| From: | Jamie Catalanotto |
|---|---|
| To: | Chad Howell |
| Subject: | RE: Merge Issues |
| Date: | Monday, February 20, 2017 1:06:15 AM |
| Attachments: | image001.png |

Version Info                                                                Back

Merge LIS        4.1.6.8770 Tue Nov 15 10:31:12 CST 2016
Common Lib       4.1.6
Scheduler        4.1
Data Server      4.1.6

This version did correct the issue with disabled users being able to log in. Disabled users now get a message stating "**Error: User Disabled!**" when they try to login.



**Jamie Abney Catalanotto**
Database Administrator
Belle Health | bellehealth.net
985.629.3080 office
985.778.0285 fax
504.343.1882 cell

**From:** Chad Howell
**Sent:** Sunday, February 19, 2017 9:36 AM
**To:** Jamie Catalanotto <jcatalanotto@bellehealth.net>
**Subject:** Merge Issues

I am working on the document that better outlines the issues I have documented.

Do you know if the latest merge release corrected the issues with user active flag not working and the exception of the passwords in the database? I ask because in my notes from the Merge team they said that these two issues would be resolved in the new release version 4.6. Do you know what version was recently released?



**Chad Howell**
Chief Information Officer
Belle Health | bellehealth.net
985.629.3080 x1104 office
985.400.5492 fax
985.373.5409 cell



REL00528

**EXHIBIT B**

TRINITY_ 0210402

# SALE AGREEMENT

This **SALE AGREEMENT** ("Agreement") is entered into effective as of April __, 2017 by and among, Robco, LLC ("Robco"), Pathway Diagnostic, LLC ("Pathway"), Phoenix Health, LLC ("Phoenix"), Shamrock Holdings, LLC ("Shamrock"), K&S Innovative Holdings, LLC ("K&S"), Belle Health, LLC ("Belle"), Sophia Charlotte, LLC ("Sophia"), Charlotte Sophia, LLC ("Charlotte") BGM Holdings, LLC ("BG"), The Hearn Group, LLC (the "Hearn Group"), Peff Enterprises, LLC ("Peff"), Trinity Medical Services, L.L.C. ("Trinity"), CEH Holdings, LLC ("CEH"), Dixie Toxicology, LLC ("Dixie"), Strategic Productions Specialists, LLC ("Strategic"), BAAARE Family Holdings, LLC ("BF"), Trinity Wellness, LLC ("Trinity Wellness"), Performance Labs, LLC ("Performance"), Prestige Worldwide Leasing, LLC, ("Prestige"), Blake Bourque ("Bourque"), Chad Howell ("Howell"), Mark Lobell ("Lobell"), Rhett Bunce ("Bunce"), Philip A. Martinez ("Martinez"), Kyle Mouton ("Mouton"), Shea Spruill ("Spruill") and John Hearn ("Hearn")(collectively the "Parties").

## RECITALS

**WHEREAS,** Shamrock, K&S and Spruill (collectively "Pathway's Sellers") desire to convey their One Hundred (100%) Percent of the outstanding membership interest in Pathway(the interest shall be referred to as the "Transferred Interest of Pathway") to Robco on terms and conditions set forth hereinafter;

**WHEREAS,** Shamrock and K&S (collectively "Phoenix's Sellers") desire to convey their One Hundred (100%) Percent of the outstanding membership interest in Phoenix (the interest shall be referred to as the "Transferred Interest of Phoenix" or the Transferred Interest of Pathway and the Transferred Interest of Phoenix shall be collectively referred to as the "Transferred Interests") to Robco on terms and conditions set forth hereinafter;

**WHEREAS,** the Parties desire to enter into this Agreement for the purpose of the acquisition by Robco of the Transferred Interest of Pathway from Shamrock, K&S and Spruill and the Transferred Interest of Phoenix from Shamrock and K&S and the Equipment as defined hereinbelow and to provide for other matters in connection therewith; and

**WHEREAS,** the Parties to this Agreement acknowledge that it is in their respective best interest to enter into the transaction contemplated by this Agreement.

**NOW, THEREFORE,** in consideration of the above Recitals and of the mutual covenants, conditions, and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, it is agreed by the Parties that:

**1. TERMS.** Shamrock, K&S and Spruill hereby agree to simultaneously execute with this Agreement the Assignment of Membership Interest, attached as Exhibit "A", thereby conveying the Transferred Interest of Pathway to Robco and Shamrock and K&S hereby agree to simultaneously execute with this Agreement the Assignment of Membership Interest, attached as Exhibit "B", thereby conveying the Transferred Interest of Phoenix to Robco; in exchange Robco agrees to fund as required an amount not to exceed One Million Three Hund~~~ ~~~

EXHIBIT

13

CHAO HOWELL

EXHIBIT B
Pathway-Phoenix 000001

I

Thousand and No/100 ($1,350,000.00) Dollars (the "Funds") to Pathway and Phoenix, which the Parties acknowledge is a sufficient amount of funding to allow Pathway and Phoenix to not only meet Pathway and Phoenix's current obligations, but also, with participation from Performance as described below, service the following Performance debts:

    a.) Home Bank loan in the amount of $1.5 million (the "Home Bank Loan");

    b.) De Lage Financial in the amount of $1,491,894.40 million (the "DLL Loan");

    c.) Whitney Bank line of credit in the amount of $600,000; (the "Whitney Bank Loan"); and

    d.) Iberia loan in the amount of $160,000 (the "Iberia Bank Loan" and collectively referred to as the "Debts").

Robco agrees that it shall allow Pathway and/or Phoenix, to the extent the Debts are not discharged by Performance through its liquidation of assets or collection of outstanding accounts receivables, as set forth in Exhibit "C" (the "Dedicated Assets"), to service the Debts out of Pathway and/or Phoenix's cash flow and after tax income.

Immediately succeeding the assignment of the Transferred Interests to Robco, Robco shall utilize a portion of the Funds to remediate the default status of the Home Bank Loan and begin negotiations with DLL to either remediate the default status of the DLL Loan or enter into negotiations with a financial institution to refinance the Waters machines securing the DLL Loan that are currently being utilized by Pathway.

It is the intent of the Parties to this Agreement that all of the equipment, inventory, software and furniture and fixtures (collectively the "Equipment) that is being utilized by either Pathway or Phoenix in its current operations will be owned by Pathway and/or Phoenix upon the execution of this Agreement. The defined term Equipment does include all of the items listed on Exhibit "D" and any other items that are being used by Pathway or Phoenix that were inadvertently omitted from Exhibit "D". Accordingly, each of the Parties, other than Pathway and Phoenix, do hereby convey, sell, transfer and deliver to Pathway any item included in the Equipment that is owed by it, subject to any debt secured by the Equipment. The Party owning the CBC equipment shall transfer said CBC to Pathway within a reasonable amount of time. Additionally, any accounts receivable that have been generated by Pathway and have not yet been collected shall remain with Pathway and be used as described hereunder.

The Parties do agree to the following:

(a) to execute the Reference Lab Agreement, a copy of which is attached as Exhibit "E". Performance agrees that any net revenue Performance receives in excess of the rate agreed to in the reference lab agreement shall be used to pay down the Home Bank Loan.

(b) Attached as Exhibit "F" is a list of all of the expenses required to operate Pathway, Phoenix and Performance other than the salary of Bourque. Robco agrees that for four (4) months immediately following the Transferred Interests to Robco, Pathway and Phoenix agree to pay all of the expenses shown on Exhibit "F" in the New Expense List column for Performance and will pay Bourque Eight Thousand and No/100 ($8,000.00) Dollars per month. Notwithstanding, should Performance's revenues exceed its expenses during the four (4) month period referenced above, Performance shall reimburse Pathway for the actual expenses Pathway and Phoenix

incur on behalf of Performance. Bourque, however, shall receive the Eight Thousand and No/100 ($8,000.00) Dollars for the entire four (4) month period.

(c) Performance and Bourque agree to use their best efforts to liquidate the Dedicated Assets and to use the net proceeds solely to pay the Debts. William Pfefferle shall be allowed to monitor both the collection and disbursement of those funds as often as he sees fit.

(d) Simultaneously with the transaction contemplated by this Agreement, Pathway has transferred its receivables in the amount of Four Million and 00/100 ($4,000,000) Dollars, listed on Exhibit "G" (the "Pathway Receivables") to Prestige subject to the Whitney Bank Loan in the amount of Six Hundred Thousand and 00/100 ($600,000) Dollars that is secured by a pledge of the Pathway Receivables. This transfer is in payment of any and all debt that Pathway and/or Phoenix owes to Prestige and Prestige accepts the Pathway Receivables as full payment of any and all debt due by Pathway and/or Phoenix to Prestige. In order to facilitate the collection of the Pathway Receivables, Pathway will continue to use its best efforts to collect the Pathway Receivables. The funds collected by Pathway from the Pathway Receivables will be paid by Pathway to Whitney Bank until the Whitney Bank Loan is paid in full. Performance is owed a debt from Prestige in the amount of Three Million Two Hundred and Fifty-Five Thousand and No/100 ($3,255,000.00) Dollars (the "Prestige Receivable") that is part of the receivables included in the Dedicated Assets. Pathway will pay all proceeds collected from the Pathway Receivables after the discharge of the Whitney Bank Loan to Performance and credited to the Pathway Receivables. Performance is committed to pay the funds paid on the Pathway Receivables to pay on the Debt. To the extent the collection of Pathway Receivables exceeds the Whitney Bank Loan and the Debt, Pathway shall pay such excess directly to Prestige.

(e) Should Bourque or Performance use the funds collected from the sale of the Dedicated Assets for any purpose other than to pay the Debts, Performance and Bourque shall be in breach of this Agreement and Robco will no longer be obligated to pay Performance's expenses or pay Bourque the Eight Thousand and No/100 ($8,000.00) Dollars per month. Additionally, Pathway shall be entitled to take custody of the Dedicated Assets and use its best efforts to liquidate the Dedicated Assets to use the net proceeds toward the payment of the Debts.

The Parties further agree that any all contracts that may have existed between Pathway and/or Phoenix and any of the other Parties to this Agreement are hereby annulled and all Parties agree that no debts are due in connection with any contracts that may have existed.

Lobell agrees to convey his One Hundred (100%) Percent of his membership interest in Performance to Bourque, as evidenced by the Assignment of Membership Interest attached as Exhibit "H". Lobell acknowledges that his consideration for the assignment of his membership interest in Performance is the expectation that the Debts that he has personally guaranteed will be satisfied either from Performance's liquidation of the Dedicated Assets, or through Pathway and/or Phoenix's operations. Additionally, Lobell agrees to convey One Hundred Percent (100%) of his interest in NextPhazeMD Operations, LLC, as evidenced by the Assignment of Membership Interest attached as Exhibit "I", NextphazeMD Holdings, LLC, as evidenced by the

Assignment of Membership Interest attached as Exhibit "J", Trinity L.I.M.S., as evidenced the Assignment of Membership Interest attached as Exhibit "K", Trinity Wellness, as evidenced the Assignment of Membership Interest attached as Exhibit "L", Belle, as evidenced by the Assignment of Membership Interest attached as Exhibit "M", Trinity, as evidenced by the Assignment of Membership Interest attached as Exhibit "N", and North American Toxicology, LLC, as evidenced by the Assignment of Membership Interest attached as Exhibit "O" to Bourque. Lastly, Lobell hereby forfeits any rights Performance may have against MERGE in favor of Performance, as evidenced by the Assignment attached as Exhibit "S",. Within Five (5) business days of the execution of this Agreement, Bourque shall notify CMS of the changes in ownership for the above listed entities.

Lobell, Bourque, Howell, and Bunce who currently or previously collectively owned one hundred (100%) per cent of the membership interest of Performance through their respective entities, hereby agree to mutually release one another from any claims, known and unknown, each may have against the others in regards to Performance, Pathway, Prestige, Phoenix, Trinity, Trinity Wellness, Belle, NextPhazeMD Operations, LLC, NextphazeMD Holdings, LLC, North American Toxicology, LLC, or Trinity L.I.M.S., LLC.

Robco agrees that Pathway and/or Phoenix shall employ Howell and he shall receive a salary in the amount of Eight Thousand and No/100 ($8,000.00) Dollars per month.

Robco agrees that Mouton shall remain in his current employment with Pathway and continue to receive a salary of Six Thousand Eight Hundred Sixty-Five and 20/100 ($6,865.20) Dollars per month.

Robco agrees that Martinez, who is not currently employed by Pathway, will be contracted by Pathway and shall receive Eight Thousand and No/100 ($8,000.00) Dollars per month for a minimum of four (4) months. After such time, Robco and Martinez may enter into an arrangement agreeable by both parties or part ways at each's discretion.

Robco agrees to employ John Hearn and Shea Spruill at Pathway under agreed upon terms.

2.     **CLOSING.**  The closing contemplated by this Agreement for the transfer of the Transferred Shares, the execution and delivery of executed Exhibits A, B, C, D, E, F, G, H, I, J, K, L, M, N, O, P, Q, R, and S attached hereto and made a part hereof, shall take place at the office of the Konrad Law Firm, LLC at 5813 Citrus Blvd., Harahan, LA 70123, on or by April ___, 2017. Pathway's Sellers' certify that no certificates have ever been issued representing the outstanding membership interests. Phoenix's Sellers' certify that no certificates have ever been issued representing the outstanding membership interests.

3.     **REPRESENTATIONS AND WARRANTIES OF THE BUYER.**  Robco, as Buyer, hereby represents and warrants as follows:

To the best of Robco's respective knowledge of its own matters and interests, it has the full right, power, legal capacity, and authority to enter into, consent to and perform Buyers' obligations under this Agreement and is not barred by insolvency, bankruptcy or other financial condition

that would operate to vitiate the consent or invalidate the capacity or ability of said Buyer to enter into and fully perform under this Agreement.

This Agreement constitutes the legal, valid, and binding obligations of Robco in accordance with its terms.

**4.    BUYER INDEMNITY.**  Buyer shall hold Pathway's Sellers and Phoenix's Sellers harmless and indemnify Pathway's Sellers and Phoenix's Sellers from any loss resulting from a breach or misrepresentation of the above Buyer's representations and warranties that may occur. Additionally, Buyer hereby indemnifies and holds Pathway's Sellers and Phoenix's Sellers harmless for any damages, claims, liabilities or defenses necessitated by the actions of Buyer in its approval and execution of its respective obligations of authorization, performance and guaranty of its obligations hereunder to be delivered under this Agreement.

**5.    PATHWAY'S SELLERS AND PHOENIX'S SELLERS REPRESENTATIONS AND WARRANTIES.**  No representation or warranty or other statements made by Pathway's Sellers and Phoenix's Sellers in this Agreement contain any untrue statements or omits to state a material fact necessary to make any of them, in light of the circumstances in which it was made, not misleading. Pathway's Sellers and Phoenix's Sellers represent and warrant the following:

a.  To the best of Pathway's Sellers' knowledge, they have the full right, power, legal capacity, and authority to enter into and perform Pathway's Sellers' obligations under this Agreement, and are not barred by insolvency, bankruptcy or other personal or financial condition that would operate to vitiate the consent or invalidate the capacity or ability of said Pathway's Sellers to enter into and fully perform under this Agreement.

b.  To the best of Phoenix's Sellers' knowledge, they have the full right, power, legal capacity, and authority to enter into and perform Phoenix's Seller's obligations under this Agreement, and are not barred by insolvency, bankruptcy or other personal or financial condition that would operate to vitiate the consent or invalidate the capacity or ability of said Phoenix's Sellers to enter into and fully perform under this Agreement.

c.  To the best of Pathway's Sellers' knowledge, the Transferred Interests owned by Pathway's Sellers are not subject to any lien, claim, mortgage or pledge that would negatively affect Pathway's Sellers' ability to transfer said Transferred Interests to Buyer, other than the Whitney Bank Loan secured by the Pathway receivables disclosed in this Agreement.

d.  To the best of Phoenix's Sellers' knowledge, the Transferred Interests owned by Phoenix's Seller are not subject to any lien, claim, mortgage or pledge that would negatively affect Phoenix's Seller's ability to transfer said Transferred Interests to Buyer.

e.  Pathway's Sellers certify the accuracy of the attached Exhibits "C", "D", "F", "G" and "Q".

EXHIBIT B
Pathway-Phoenix 000005

f. Phoenix's Sellers certify the accuracy of the attached Exhibits "C", "D", "F", "G" and "R".

## 7. PATHWAY'S SELLERS' AND PHOENIX'S SELLERS' OBLIGATIONS AND DELIVERABLES AT CLOSING.

**a.** Pathway's Sellers shall deliver or cause to be delivered any existing certificates evidencing all membership interest of Pathway for the execution by Pathway's Seller for transfer and delivery to Buyer, or shall otherwise provide constructive delivery of all shares of interest noted in the stock registry of the limited liability company.

**b.** Phoenix's Sellers shall deliver or cause to be delivered any existing certificates evidencing all membership interest of Pathway for the execution by Pathway's Seller for transfer and delivery to Buyer, or shall otherwise provide constructive delivery of all shares of interest noted in the stock registry of the limited liability company.

## 8. PERFORMANCE AND/OR BOURQUE'S REPRESENTATIONS, WARRANTIES, OBLIGATIONS AND DELIVERABLES AT CLOSING:

**Confidentiality:** From and after the execution of this Agreement, Performance and/or Bourque shall, and shall cause their affiliates to hold, and shall use their reasonable best efforts to cause their respective representatives to hold, in confidence any and all information, whether written or oral, concerning the businesses of Pathway and/or Phoenix.

**Non-competition; Non-solicitation.** For a period of the shorter of payoff of the Debts or two (2) years (the "Restricted Period") commencing on the execution of this Agreement, Performance and/or Bourque shall not, and shall not permit any of their affiliates to, directly or indirectly, (i) own or operate a laboratory in Louisiana except through Performance; (ii) have an interest in any business that engages directly or indirectly in the confirmation or screening of urine or oral fluid in Louisiana except through Performance in any capacity, including as a partner, stockholder, member, employee, principal, agent, and trustee, however, notwithstanding the foregoing, Bourque may act as a consultant, provide services, and provide advice to other laboratories, and if such relationship results in reference samples, Bourque will use his best efforts to send them to Pathway or Performance; or (iii) cause, induce or encourage any material actual or prospective client, customer, supplier or licensor of the confirmation or screening of urine or oral fluid (including any existing or former client or customer of Pathway and/or Phoenix and any person that becomes a client or customer of Pathway and/or Phoenix after the execution of this Agreement), or any other person who has a material business relationship with Pathway and/or Phoenix, to terminate or modify any such actual or prospective relationship.

During the Restricted Period, Performance and/or Bourque shall not, and shall not permit any of their affiliates to, directly or indirectly, hire or solicit any person who is offered employment by Pathway and/or Phoenix or who is currently employed by Pathway and/or Phoenix during the Restricted Period or encourage any such employee to leave such employment or hire any such employee who has left such employment.

Performance and/or Bourque acknowledges that a breach or threatened breach of this section 8 would give rise to irreparable harm to Pathway and/or Performance, for which

monetary damages would not be an adequate remedy, and hereby agree that in the event of a breach or a threatened breach by Performance and/or Bourque of any such obligations, Buyer shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

Performance and/or Bourque acknowledge that the restrictions contained in this section 8 are reasonable and necessary to protect the legitimate interests of Buyer and constitute a material inducement to Buyer to enter into this Agreement and consummate the transactions contemplated by this Agreement. In the event that any covenant contained in this section 8 should ever be adjudicated to exceed the time, geographic, product or service or other limitations permitted by applicable law in any jurisdiction, then any court is expressly empowered to reform such covenant, and such covenant shall be deemed reformed, in such jurisdiction to the maximum time, geographic, product or service or other limitations permitted by applicable law. The covenants contained in this section 8 and each provision hereof are severable and distinct covenants and provisions. The invalidity or unenforceability of any such covenant or provision as written shall not invalidate or render unenforceable the remaining covenants or provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

Performance and Bourque certify the accuracy of the attached Exhibits "C", "D", "F", "Q" and "R".

**9.      HOWELL'S CONFIDENTIALITY.**  From and after the execution of this Agreement, Howell shall, and shall cause his affiliates to hold, and shall use his reasonable best efforts to cause his respective representatives to hold, in confidence any and all information, whether written or oral, concerning the businesses of Pathway and/or Phoenix.

**10.      FEES, EXPENSES AND REFUNDS.**  Each Party shall pay its own attorneys, accountants and other advisors. Each party shall be responsible for their respective federal, state or local income or other tax obligations resulting from or attributable to the transactions contemplated by this Agreement.

**11.      DISPUTE RESOLUTION.**  Any dispute relating to this Agreement may be brought in the Twenty-Fourth Judicial District Court for the Parish of Jefferson, State of Louisiana. The construction or interpretation of this Agreement shall be governed by the laws of the State of Louisiana without respect to conflicts of law.

**12.      ENTIRE AGREEMENT:**  This Agreement and the exhibit attachments constitute the entire Agreement between the parties relating to the sale of the Transferred Interests. There are no other promises, conditions, understandings or other agreements, whether oral or written, relating to terms or subject matter of this Agreement except as provided herein. This Agreement can only be modified in written form and agreed and signed by both parties.

**13.      BINDING EFFECT:**  The covenants and conditions contained in this Agreement shall apply to and bind the Parties and the heirs, legal representatives, successors and permitted assigns of the Parties.

**14. MUTUAL NEGOTIATION:** The Parties agree that they have participated jointly in the negotiation and drafting of this Agreement and, if there is an ambiguity or question of intent or question of interpretation concerning this Agreement, this Agreement shall be construed as having been jointly negotiated and drafted by all Parties without the creation of any burden of proof favoring or disfavoring any Party that arose from the negotiation and drafting of this Agreement.

**15. SEVERABILITY:** If any provision or part of this Agreement is deemed invalid or unenforceable by any court of competent jurisdiction, and if limiting such provision would make the provision valid, then such provision shall be deemed to be construed as so limited. If any part of this Agreement shall be held unenforceable for any reason, the remainder of this Agreement shall continue in full force and effect.

**16. MULTIPLE COUNTERPARTS:** This Agreement and its exhibits may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall, taken together, be considered one and the same agreement, it being understood that all of the parties need not sign the same counterpart. Copies of executed counterparts transmitted by telecopy or other electronic transmission service shall be considered original executed counterparts, provided that receipt of copies of such counterparts is confirmed and except where originals of documents are required for recordation to perfect the security interests to be conveyed thereby.

**17. NOTICE:** Any notice required or otherwise given pursuant to this Agreement shall be in writing and mailed certified return receipt requested, postage prepaid, or delivered by overnight delivery service:

    (a)    If to Robco:
               5813 Citrus Blvd.
               Harahan, LA 70123

    (b)    If to Performance/Blake Bourque:
               21385 Marion Lane, Suite B
               Mandeville, LA 70471

**18. ACKNOWLEDGMENT:** By signing below, the Parties each acknowledge that they have carefully read and fully understand this Agreement and have received a copy of it. The undersigned warrant that their signatures are legally sufficient to bind the Parties, respectively. Additionally, Pathway and Phoenix are being represented herein by one hundred percent (100%) of their members prior to the execution of this Agreement and one hundred percent (100%) of their members who have acquired their membership interest through this Agreement.

**[Remainder of Page Intentionally Left Blank, Signature Pages to Follow]**

By: _____
     Chad Howell, Manager

**Strategic Productions Specialists, LLC**

By: _____
     Chad Howell, Manager

**BAARE Family Holdings, LLC**

By: _____
     Rhett Bunce, Manager

**Dixie Toxicology, LLC**

By: _____
     Rhett Bunce, Manager

**The Hearn Group, LLC**

By: _____
     Mark Lobell, Manager

By: _____
     John Hearn, Manager

_____
BLAKE N. BOURQUE

_____
CHAD HOWELL

_____
PHILIP A. MARTINEZ

_____
KYLE J. MOUTON

_____
RHETT BUNCE

_____
MARK LOBELL

_____
JOHN K. HEARN

_____
SHEA SPRUILL

**ROBCO, LLC**

By: _____

**Pathway Diagnostic, LLC**

**Phoenix Health, LLC**

By: _____
Shamrock Holdings, LLC

By: _____
Shamrock Holdings, LLC

By: _____
K&S Innovative Holdings, LLC

By: _____
K&S Innovative Holdings, LLC

_____
Shea Spruill

**Pathway Diagnostic, LLC**

By: _____
Robco, LLC

**Phoenix Health, LLC**

By: _____
Robco, LLC

**K & S Innovative Holdings, LLC**

Shamrock Holdings, LLC, LLC

By: _____
    Kyle J. Mouton, Manager

By: _____
    Philip A. Martinez, Manager

**Trinity Medical Services, L.L.C.**

**Prestige Worldwide Leasing, LLC**

By: Charlotte Sophia, LLC

By: Trinity Medical Services, L.L.C.
    By: Charlotte Sophia, LLC

By: _____
    Blake Bourque, Manager

By: _____
    Blake Bourque, Manager

**Belle Health, LLC**

**Trinity Wellness, LLC**

By: Sophia Charlotte, LLC

By: Sophia Charlotte, LLC

By: _____
    Blake Bourque, Manager

By: _____
    Blake Bourque, Manager

**Performance Labs, LLC**

**Peff Enterprises, LLC**

By: Trinity Medical Services, L.L.C.
    By: Charlotte Sophia, LLC

By: _____
    Blake Bourque, Manager

By: _____
    William Pfefferle, Manager

**Charlotte Sophia, LLC**

Sophia Charlotte, LLC

By: _____
    Blake Bourque, Manager

By: _____
    Blake Bourque, Manager

**CEH Holdings, LLC**

**BGM Holdings, LLC**

**K & S Innovative Holdings, LLC**

By: *[signature]*
    Kyle J. Mouton, Manager

**Trinity Medical Services, L.L.C.**

By: Charlotte Sophia, LLC

By: _____
    Blake Bourque, Manager

**Belle Health, LLC**

By: Sophia Charlotte, LLC

By: _____
    Blake Bourque, Manager

**Performance Labs, LLC**

By: Trinity Medical Services, L.L.C.
    By: Charlotte Sophia, LLC

By: _____
    Blake Bourque, Manager

**Charlotte Sophia, LLC**

By: _____
    Blake Bourque, Manager

**CEH Holdings, LLC**

**Shamrock Holdings, LLC, LLC**

By: _____
    Philip A. Martinez, Manager

**Prestige Worldwide Leasing, LLC**

By: Trinity Medical Services, L.L.C.
    By: Charlotte Sophia, LLC

By: _____
    Blake Bourque, Manager

**Trinity Wellness, LLC**

By: Sophia Charlotte, LLC

By: _____
    Blake Bourque, Manager

**Peff Enterprises, LLC**

By: _____
    William Pfefferle, Manager

**Sophia Charlotte, LLC**

By: _____
    Blake Bourque, Manager

**BGM Holdings, LLC**

By: _(signature)_
Chad Howell, Manager

**Strategic Productions Specialists, LLC**

By: _(signature)_
Rhett Bunce, Manager

**Dixie Toxicology, LLC**

By: _(signature)_
Mark Lobell, Manager

_____
BLAKE N. BOURQUE

_____
PHILIP A. MARTINEZ

_(signature)_
RHETT BUNCE

_(signature)_
JOHN K. HEARN

**ROBCO, LLC**

By: _____

**Pathway Diagnostic, LLC**

By: _(signature)_
Chad Howell, Manager

**BAARE Family Holdings, LLC**

By: _(signature)_
Rhett Bunce, Manager

**The Hearn Group, LLC**

By: _(signature)_
John Hearn, Manager

_____
CHAD HOWELL

_(signature)_
KYLE J. MOUTON

_(signature)_
MARK LOBELL

_(signature)_
SHEA SPRUILL

**Phoenix Health, LLC**

By: _____
    Shamrock Holdings, LLC

By: _____
    K&S Innovative Holdings, LLC

_____
Shea Spruill

**Pathway Diagnostic, LLC**


By: _____
    Robco, LLC


**Phoenix Health, LLC**


By: _____
    Robco, LLC


By: _____
    Shamrock Holdings, LLC

By: _____
    K&S Innovative Holdings, LLC

| | |
|---|---|
| **K & S Innovative Holdings, LLC** | **Shamrock Holdings, LLC, LLC** |

By: _____
      Kyle J. Mouton, Manager

By: _____
      Philip A. Martinez, Manager

**Trinity Medical Services, L.L.C.**

**Prestige Worldwide Leasing, LLC**

By: Charlotte Sophia, LLC

By: Trinity Medical Services, L.L.C.
     By: Charlotte Sophia, LLC

By: _____
      Blake Bourque, Manager

By: _____
      Blake Bourque, Manager

**Belle Health, LLC**

**Trinity Wellness, LLC**

By: Sophia Charlotte, LLC

By: Sophia Charlotte, LLC

By: _____
      Blake Bourque, Manager

By: _____
      Blake Bourque, Manager

**Performance Labs, LLC**

**Peff Enterprises, LLC**

By: Trinity Medical Services, L.L.C.
     By: Charlotte Sophia, LLC

By: _____
      Blake Bourque, Manager

By: _____
      William Pfefferle, Manager

**Charlotte Sophia, LLC**

**Sophia Charlotte, LLC**

By: _____
      Blake Bourque, Manager

By: _____
      Blake Bourque, Manager

**CEH Holdings, LLC**

**BGM Holdings, LLC**

By: _____
     Chad Howell, Manager

**Strategic Productions Specialists, LLC**


By: _____
     Rhett Bunce, Manager

**Dixie Toxicology, LLC**


By: _____
     Mark Lobell, Manager


_____
BLAKE N. BOURQUE


_____
PHILIP A. MARTINEZ


_____
RHETT BUNCE


_____
JOHN K. HEARN

**ROBCO, LLC**


By: _____

**Pathway Diagnostic, LLC**


By: _____
     Chad Howell, Manager

**BAARE Family Holdings, LLC**


By: _____
     Rhett Bunce, Manager

**The Hearn Group, LLC**


By: _____
     John Hearn, Manager


_____
CHAD HOWELL


_____
KYLE J. MOUTON


_____
MARK LOBELL


_____
SHEA SPRUILL


**Phoenix Health, LLC**

By: _____
    Shamrock Holdings, LLC

By: _____
    K&S Innovative Holdings, LLC

_____
Shea Spruill

**Pathway Diagnostic, LLC**

By: _____
    Robco, LLC

**Phoenix Health, LLC**

By: _____
    Robco, LLC

By: _____
    Shamrock Holdings, LLC

By: _____
    K&S Innovative Holdings, LLC

| | |
|---|---|
| K & S Innovative Holdings, LLC | Shamrock Holdings, LLC, LLC |

By: _____
       Kyle J. Mouton, Manager

By: _____
       Philip A. Martinez, Manager

**Trinity Medical Services, L.L.C.**

By: Charlotte Sophia, LLC

**Prestige Worldwide Leasing, LLC**

By: Trinity Medical Services, L.L.C.
    By: Charlotte Sophia, LLC

By: _____
       Blake Bourque, Manager

By: _____
       Blake Bourque, Manager

**Belle Health, LLC**

By: Sophia Charlotte, LLC

**Trinity Wellness, LLC**

By: Sophia Charlotte, LLC

By: _____
       Blake Bourque, Manager

By: _____
       Blake Bourque, Manager

**Performance Labs, LLC**

By: Trinity Medical Services, L.L.C.
    By: Charlotte Sophia, LLC

**Peff Enterprises, LLC**

By: _____
       Blake Bourque, Manager

By: _____
       William Pfefferle, Manager

**Charlotte Sophia, LLC**

**Sophia Charlotte, LLC**

By: _____
       Blake Bourque, Manager

By: _____
       Blake Bourque, Manager

**CEH Holdings, LLC**

**BGM Holdings, LLC**

By: _____
     Chad Howell, Manager

**Strategic Productions Specialists, LLC**

By: _____
     Rhett Bunce, Manager

**Dixie Toxicology, LLC**

By: _____
     Mark Lobell, Manager

_____
BLAKE N. BOURQUE

_____
PHILIP A. MARTINEZ

_____
RHETT BUNCE

_____
JOHN K. HEARN

**ROBCO, LLC**

By: _____

**Pathway Diagnostic, LLC**

By: _____
     Chad Howell, Manager

**BAARE Family Holdings, LLC**

By: _____
     Rhett Bunce, Manager

**The Hearn Group, LLC**

By: _____
     John Hearn, Manager

_____
CHAD HOWELL

_____
KYLE J. MOUTON

_____
MARK LOBELL

_____
SHEA SPRUILL

**Phoenix Health, LLC**

## LIST OF EXHIBITS

Assignment of Membership Interest
Pathway Diagnostic, LLC                          Exhibit "A"

Assignment of Membership Interest
Phoenix Health, LLC                              Exhibit "B"

Dedicated Assets for Performance, LLC
Exhibit "C"

Equipment and Inventory Schedule
for Pathway and Phoenix                          Exhibit "D"

Reference Lab Agreement                          Exhibit "E"

Expense Schedule for Pathway,
Phoenix and Performance                          Exhibit "F"

Accounts Receivables Schedule
for Pathway                                      Exhibit "G"

Assignment of Membership Interest
Performance, LLC                                 Exhibit "H"

Assignment of Membership Interest
NextPhazeMD Operations, LLC                      Exhibit "I"

Assignment of Membership Interest
NextPhazeMD Holdings, LLC                        Exhibit "J"

Assignment of Membership Interest
Trinity L.I.M.S., LLC                            Exhibit "K"

Assignment of Membership Interest
Trinity Wellness, LLC                            Exhibit "L"

Assignment of Membership Interest
Belle Health, LLC                                Exhibit "M"

Assignment of Membership Interest
Trinity Medical Service, L.L.C.                  Exhibit "N"

Assignment of Membership Interest
North American Toxicology, LLC                   Exhibit "O"

Assignment of Membership Interest
Prestige Worldwide Leasing, LLC                  Exhibit "P"

Pathway's Balance Sheet            Exhibit "Q"

Phoenix's Balance Sheet            Exhibit "R"

Assignment of MERGE Rights         Exhibit "S"

Pathway-Phoenix 000021

## ASSIGNMENT OF INTEREST
## IN PATHWAY DIAGNOSTIC, LLC

This Assignment of Interest in Pathway Diagnostic, LLC by and among **SHAMROCK HOLDINGS, LLC, K&S INNOVATIVE HOLDINGS, LLC, SHEA SPRUILL** (hereinafter collectively referred to as "Assignors") and **ROBCO, LLC,** (hereinafter referred to as "Assignee") who declared that for and in consideration of the sum of TEN AND NO/100 ($10.00) DOLLARS and other valuable consideration, receipt of which is hereby acknowledged by Assignors, Assignors do hereby convey, give, grant, transfer, assign, set over and deliver all of their right, title and interest to Assignee, but not less than a One Hundred (100%) Percent interest of Assignors' membership interest in Pathway Diagnostic, LLC, a limited liability company organized under the laws of the State of Mississippi by virtue of Articles of Organization filed with the Louisiana Secretary of State on the 22nd day of January, 2016 to Assignee (the "Interest").

Assignors' hereby warrant that they collectively own One Hundred (100%) Percent of the membership interest of Pathway Diagnostic, LLC

Assignors hereby warrant title to the Interest and agrees to defend same against anyone claiming title thereto.

To have and to hold same unto Assignee, its successors and assigns forever.

Assignee does hereby accept the interest herein conveyed, and acknowledges delivery and possession thereof.

This Assignment of Membership Interest may be executed or delivered in one or more counterparts, including via facsimile, email, photostatic copy, pdf file, electronically imaged or scanned copy, or similar electronic means, all of which taken together shall constitute one instrument, and any counterpart executed or delivered by such electronic means shall be admissible and shall have the same force and effect as if bearing an original signature.

**[Remainder of Page Intentionally Left Blank, Signatur Pages to Follow]**

**EXHIBIT B**
**Pathway-Phoenix 000022**

**IN WITNESS WHEREOF**, the parties have duly executed this Agreement on the ____ day of April, 2017.

WITNESSES:

ASSIGNOR:
**SHAMROCK HOLDINGS, LLC**

_____

_____

**Print:**

**BY: PHILIP A. MARTINEZ**
**ITS: SOLE MEMBER**

_____

**Print:**

WITNESSES:

**K&S INNOVATIVE HOLDING, LLC**

_____

_____

**Print:**

**BY: KYLE MOUTON**
**ITS: SOLE MEMBER**

_____

_____

**Print:**

**SHEA SPRUILL**

**ASSIGNEE:**
**ROBCO, LLC**

_____

**BY: GORDON K. KONRAD**
**ITS: MANAGING MEMBER**

**IN WITNESS WHEREOF**, the parties have duly executed this Agreement on the \_\_\_ day of April, 2017.

**WITNESSES:**

_____
**Print:**

_____
**Print:**

**WITNESSES:**

Katrin Cuper
**Print:**

Laton Cuper
**Print:**
Kristin Dargis
Kristin Dargis

**ASSIGNOR:**
**SHAMROCK HOLDINGS, LLC**

_____
**BY: PHILIP A. MARTINEZ**
**ITS: SOLE MEMBER**

**K&S INNOVATIVE HOLDING, LLC**

Kyle Mouton
**BY: KYLE MOUTON**
**ITS: SOLE MEMBER**

_____
**SHEA SPRUILL**

**ASSIGNEE:**
**ROBCO, LLC**

_____
**BY: GORDON K. KONRAD**
**ITS: MANAGING MEMBER**

IN WITNESS WHEREOF, the parties have duly executed this Agreement on the _17th_ day of April, 2017.

WITNESSES:

_DebbieM.Smith_
Print:

_Greg L Smith_
Print:

ASSIGNOR:
SHAMROCK HOLDINGS, LLC

BY: PHILIP A. MARTINEZ
ITS: SOLE MEMBER

WITNESSES:

Print:

Print:

K&S INNOVATIVE HOLDING, LLC

BY: KYLE MOUTON
ITS: SOLE MEMBER

SHEA SPRUILL

ASSIGNEE:
ROBCO, LLC

BY: GORDON K. KONRAD
ITS: MANAGING MEMBER

# ASSIGNMENT OF INTEREST
# IN PHOENIX HEALTH, LLC

This Assignment of Interest in Phoenix Health, LLC by and among **SHAMROCK HOLDINGS, LLC** and **K&S INNOVATIVE HOLDINGS, LLC** (hereinafter collectively referred to as "Assignors") and **ROBCO, LLC,** (hereinafter referred to as "Assignee") who declared that for and in consideration of the sum of TEN AND NO/100 ($10.00) DOLLARS and other valuable consideration, receipt of which is hereby acknowledged by Assignors, Assignors do hereby convey, give, grant, transfer, assign, set over and deliver all of their right, title and interest to Assignee, but not less than a One Hundred (100%) Percent interest of Assignors' membership interest in Phoenix Health, LLC, a limited liability company organized under the laws of the State of Mississippi by virtue of Articles of Organization filed with the Louisiana Secretary of State on the 12th day of April, 2016 to Assignee (the "Interest").

Assignors' hereby warrant that they collectively own One Hundred (100%) Percent of the membership interest of Phoenix Health, LLC

Assignors hereby warrant title to the Interest and agrees to defend same against anyone claiming title thereto.

To have and to hold same unto Assignee, its successors and assigns forever.

Assignee does hereby accept the interest herein conveyed, and acknowledges delivery and possession thereof.

This Assignment of Membership Interest may be executed or delivered in one or more counterparts, including via facsimile, email, photostatic copy, pdf file, electronically imaged or scanned copy, or similar electronic means, all of which taken together shall constitute one instrument, and any counterpart executed or delivered by such electronic means shall be admissible and shall have the same force and effect as if bearing an original signature.

**[Remainder of Page Intentionally Left Blank, Signatur Pages to Follow]**

**IN WITNESS WHEREOF**, the parties have duly executed this Agreement on the ___ day of April, 2017.

WITNESSES:

ASSIGNOR:
SHAMROCK HOLDINGS, LLC

_____
Print:

_____
BY: PHILIP A. MARTINEZ
ITS: SOLE MEMBER

_____
Print:

WITNESSES:

K&S INNOVATIVE HOLDING, LLC

_____
Print:

_____
BY: KYLE MOUTON
ITS: SOLE MEMBER

_____
Print:

ASSIGNEE:
ROBCO, LLC

_____
BY: GORDON K. KONRAD
ITS: MANAGING MEMBER

IN WITNESS WHEREOF, the parties have duly executed this Agreement on the ___ day of April, 2017.

WITNESSES:

ASSIGNOR:
SHAMROCK HOLDINGS, LLC

_____

Print:

_____

BY: PHILIP A. MARTINEZ
ITS: SOLE MEMBER

Print:

WITNESSES:

K&S INNOVATIVE HOLDING, LLC

Print: Lauri lupe

BY: KYLE MOUTON
ITS: SOLE MEMBER

Kristi Dargi
Kristin Dargis
Print:

ASSIGNEE:
ROBCO, LLC

_____

BY: GORDON K. KONRAD
ITS: MANAGING MEMBER

**EXHIBIT B**
Pathway-Phoenix 000028

IN WITNESS WHEREOF, the parties have duly executed this Agreement on the 17th day of April, 2017.

WITNESSES:

Debbie M. Smith
Print:

Greg L Smith
Print:

ASSIGNOR:
SHAMROCK HOLDINGS, LLC

_____
BY: PHILIP A. MARTINEZ
ITS: SOLE MEMBER


WITNESSES:

_____
Print:

_____
Print:

K&S INNOVATIVE HOLDING, LLC

_____
BY: KYLE MOUTON
ITS: SOLE MEMBER

ASSIGNEE:
ROBCO, LLC

_____
BY: GORDON K. KONRAD
ITS: MANAGING MEMBER



Capital Equipment List

Department: Lab

| Entity | Equipment Name | Description of Equipment | Serial # | | Purchase Price | Dated Purchased | Location of Equipment Address & Suite # |
|---|---|---|---|---|---|---|---|
| Performance Labs | AU400 | screening instrument | 009044 | | | reagent lease agreement yr 2013 | 21385 Marion Lane, Suite B, Mandeville, LA 70471 |
| Performance Labs | AU400 | screening instrument | 4093035 | | | reagent lease agreement yr 2014 | 21385 Marion Lane, Suite B, Mandeville, LA 70471 |
| Performance Labs | 8050 LC-MS/MS | Mass Spectrometer | 01G835250030 | $ | 326,000.00 | Feb-15 | 21385 Marion Lane, Suite B, Mandeville, LA 70471 |
| Performance Labs | Nexera X2 - CBM-20A | control bus module | L20235255445 | | | Feb-15 | 21385 Marion Lane, Suite B, Mandeville, LA 70471 |
| Performance Labs | Nexera X2 - DGU-20A5R | degasser | L20705264027 | | | Feb-15 | 21385 Marion Lane, Suite B, Mandeville, LA 70471 |
| Performance Labs | Nexera X2 - Column Compartment | column manager | L20575250421 | | | Feb-15 | 21385 Marion Lane, Suite B, Mandeville, LA 70471 |
| Performance Labs | Nexera X2 - Pump | UHLPC pump | L20555251664 | | | Feb-15 | 21385 Marion Lane, Suite B, Mandeville, LA 70471 |
| Performance Labs | Nexera X2 - Pump | UHLPC pump | L20555251665 | | | Feb-15 | 21385 Marion Lane, Suite B, Mandeville, LA 70471 |
| Performance Labs | Shimadzu Autosampler | autosampler | L20645250084 | | | Feb-15 | 21385 Marion Lane, Suite B, Mandeville, LA 70471 |
| Performance Labs | Power Var Security Plus | uninterruptible power supply | 2205295R-1510005 | $ | 8,000.00 | Feb-15 | 21385 Marion Lane, Suite B, Mandeville, LA 70471 |
| Performance Labs | Power Var Security Plus | uninterruptible power supply | 2203090R-1340001 | | | reagent lease agreement yr 2014 | 21385 Marion Lane, Suite B, Mandeville, LA 70471 |
| Performance Labs | Power Var Security Plus | uninterruptible power supply | 2203090R-1320008 | | | reagent lease agreement yr 2015 | 21385 Marion Lane, Suite B, Mandeville, LA 70471 |
| Performance Labs | Instrument Table | ft LCMSMS Table w/ Phenolic Resin Top | N/A | $ | 1,500.00 | Jul-15 | 21385 Marion Lane, Suite B, Mandeville, LA 70471 |
| Performance Labs | E1-ClipTip 8-channel pipette | multi-channel pipette | LH30758 | $ | 1,000.00 | Jul-15 | 21385 Marion Lane, Suite B, Mandeville, LA 70471 |
| Performance Labs | Horizon Centrifuge | centrifuge for screening | 480913-23 | $ | 1,000.00 | Jul-15 | 21385 Marion Lane, Suite B, Mandeville, LA 70471 |
| Performance Labs | Adventure Pro analytical balance | balance for weighing | B341872965 | $ | 2,000.00 | yr 2014 | 21385 Marion Lane, Suite B, Mandeville, LA 70471 |
| Performance Labs | PEAK Genius 1051 | nitrogen generator for 8050 | A1603155 | $ | 19,000.00 | Mar-16 | 21385 Marion Lane, Suite B, Mandeville, LA 70471 |
| 50 East Court | TQS-MS/MS | Mass Spectrometer | WAB1311 (Ablus) | $486,000 | list price | Apr-16 | 50 East Court, Suite 7, Mandeville, LA 70471 |
| 50 East Court | Column Manager | Column Manager | M14CMP316G | | | Apr-16 | 50 East Court, Suite 7, Mandeville, LA 70471 |
| 50 East Court | Sample Manager | Sample Manager | K14USM256M | | | Apr-16 | 50 East Court, Suite 7, Mandeville, LA 70471 |
| 50 East Court | Solvent Manager | Solvent Manager | K14BUR111M | | | Apr-16 | 50 East Court, Suite 7, Mandeville, LA 70471 |
| 50 East Court | TQS-MS/MS | Mass Spectrometer | WAB1333 (Hermione) | $486,000 | list price | Apr-16 | 50 East Court, Suite 8, Mandeville, LA 70471 |
| 50 East Court | Column Manager | Column Manager | A15CMP651G | | | Apr-16 | 50 East Court, Suite 8, Mandeville, LA 70471 |
| 50 East Court | Sample Manager | Sample Manager | K114USM257M | | | Apr-16 | 50 East Court, Suite 8, Mandeville, LA 70471 |
| 50 East Court | Solvent Manager | Solvent Manager | M14BUR124M | | | Apr-16 | 50 East Court, Suite 8, Mandeville, LA 70471 |
| 50 East Court | Power Var Security Plus | uninterruptible power supply | 2205252R-1510029 | $ | 8,000.00 | Apr-16 | 50 East Court, Suite 7, Mandeville, LA 70471 |
| 50 East Court | Power Var Security Plus | uninterruptible power supply | 2205252R-1510030 | $ | 8,000.00 | Apr-16 | 50 East Court, Suite 7, Mandeville, LA 70471 |
| 50 East Court | Instrument Tables (2) | ft LCMSMS Table w/ Phenolic Resin Top | N/A | $ | 3,000.00 | Apr-16 | 50 East Court, Suite 7/8, Mandeville, LA 7047 1 Table per Suite |
| 50 East Court | Peak Generator | nitrogen generator | | | $14,850.00 | | 50 East Court, Suite 8, Mandeville, LA 70471 |
| 50 East Court | Biotage Extrahera | sample prep robot | 11547071 | $ | 40,000.00 | ######## | 50 East Court, Suite 8, Mandeville, LA 70471 |

Pathway-Phoenix 000030

**EXHIBIT B**



**Capital Equipment List**

Department: Lab

| Entity | Equipment Name | Description of Equipment | Serial # | Purchase Price | | Dated Purchased | Location of Equipment Address & Suite # |
|--------|----------------|------------------------|----------|----------------|---|-----------------|-----------------------------------------|
| Phoenix | Waters TQS-MS/MS | Mass Spectrometer | WAB1180 | $486,000 | list price | Jul-15 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | Column Manager | Column Manager | C15CMP552G | | | Jul-15 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | Sample Manager | Sample Manager | F15USM288M | | | Jul-15 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | Solvent Manager | Solvent Manager | F15BUR144M | | | Jul-15 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | Waters TQS-MS/MS | Mass Spectrometer | WAB1182 | $486,000 | list price | Jul-15 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | Column Manager | Column Manager | C15CMP595G | | | Jul-15 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | Sample Manager | Sample Manager | E15USM285M | | | Jul-15 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | Solvent Manager | Solvent Manager | F15BUR142M | | | Jul-15 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | Waters TQS-MS/MS | Mass Spectrometer | WAB1321 | $486,000 | list price | Jul-15 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | Column Manager | Column Manager | C15CMP591G | | | Jul-15 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | Sample Manager | Sample Manager | F15USM290M | | | Jul-15 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | Solvent Manager | Solvent Manager | F15BUR143M | | | Jul-15 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | Waters TQS-MS/MS | Mass Spectrometer | WAB1206 | $486,000 | list price | Jul-15 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | Column Manager | Column Manager | C15CMP565G | | | Jul-15 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | Sample Manager | Sample Manager | E15USM286M | | | Jul-15 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | Solvent Manager | Solvent Manager | F15BUR141M | | | Jul-15 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | Waters TQD-MS/MS | Mass Spectrometer | QCA1008 | $250,000 | | Jul-15 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | Column Manager | Column Manager | C15CMP605G | | | Jul-15 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | Sample Manager | Sample Manager | F15USM283M | | | Jul-15 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | Solvent Manager | Solvent Manager | F15BUR140M | | | Jul-15 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | Power Var Security Plus | uninterruptible power supply | !205252R-152001 | $ 8,000.00 | | Jul-15 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | Power Var Security Plus | uninterruptible power supply | !205252R-151002 | $ 8,000.00 | | Jul-15 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | Power Var Security Plus | uninterruptible power supply | !205252R-151003 | $ 8,000.00 | | Jul-15 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | Power Var Security Plus | uninterruptible power supply | !205252R-151004 | $ 8,000.00 | | Jul-15 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | Power Var Security Plus | uninterruptible power supply | !205252R-152001 | $ 8,000.00 | | Jul-15 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | Tecan Freedom Evo 150 | robotic automation | 1411012618 | $90,000.00 | | May-15 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | Tecan Evo 150 Table | Tecan table | N/A | $ 3,500.00 | | May-15 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | Eppendorf 5810 | centrifuge | 5810DO064066 | $10,000.00 | | Feb-15 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | DPX Pneumatic Extractor | semi-automated DPX extraction | R08-01-F0G0 | $ 3,500.00 | | Apr-16 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | Just Rite Flammable Cabinet | flammable storage cabinet | N/A | $ 700.00 | | Oct-13 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | Eagle Acid/ Base Cabinet | acid/ base storage cabinet | N/A | $ 700.00 | | Oct-13 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | E1-ClipTip 8-channel pipette | multi-channel pipette | LH30758 | $ 1,000.00 | | Feb-15 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | Desks (6) | Desks | N/A | $ 3,000.00 | | yr 2015 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | Instrument Tables (3) | ft LCMSMS Table w/ Phenolic Resin Tc | N/A | $ 4,500.00 | | Jul-15 | 00 Street A, Suite D, Picayune, MS 39466 |

Pathway-Phoenix 000031

**EXHIBIT B**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Phoenix | Jarvis Sit or Stand Desk (2) | pneumatic desks for Waters instrument | N/A | $ 1,800.00 | | Jul-15 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | Nitrogen Generator Part | house nitrogen system component | A15-03-031 | $ 21,100.00 | pay monthly | Mar-15 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | Nitrogen Generator Part | house nitrogen system component | D15-03-225 | $ 2,960.00 | pay monthly | Mar-15 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | Nitrogen Generator Part | house nitrogen system component | A15-03-217 | $ 17,950.00 | pay monthly | Mar-15 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | itachi Oil Free Scroll 11 MultiDriv | house nitrogen system component | SC2423-1890 | $ 31,025.00 | pay monthly | Mar-15 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | Bio Reference Centrifuge | centrifuge | 103014-253 | $ 1,000.00 | | yr 2014 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | Eppendorf 5430 | centrifuge | 5427CP319148 | $ 4,000.00 | | yr 2013 | 00 Street A, Suite D, Picayune, MS 39466 |
| Phoenix | Tor-Rey Fridge | fridge | E300684 | $ 1,500.00 | | yr 2013 | 00 Street A, Suite D, Picayune, MS 39466 |
| Pathway | 4 Mini splits | | | $15,000.00 | | | |
| Pathway | 10 tons of AC | | | $18,000.00 | | | |
| Pathway | 48 Generator | | | $20,000.00 | | | |
| Pathway | AU 680 | | | $92,000.00 | | | |
| Pathway | Access 2 | | | $34,000.00 | | | |
| Pathway | 6 Fridges | | | $6,000.00 | | | |
| Pathway | Vent Hood | | | $5,000.00 | | | |
| Pathway | Extractor | | | $24,000.00 | | | |
| Pathway | AU 400 | | | | reagent lease agreement | | |

Pathway-Phoenix 000032

EXHIBIT B 

 Employee Asset List

| *Asset Type | *Manufacturer | *Model | Status | Serial Number | Location | Client (e-mails, semicolon delimited) | Notes | Department | Asset Tag # |
|---|---|---|---|---|---|---|---|---|---|
| Desktop | Dell | OptiPlex 7440 AIO XCTO | Deployed | D893GB2 | Pathway Diagnostics | | Right side of accessioning table at Pathway | | PWL000739 |
| Desktop | Dell | OptiPlex 7440 AIO XCTO | In Stock | D891GB2 | Alamosa Suite E | | | Laboratory | |
| Desktop | Dell | OptiPlex 7440 AIO XCTO | Deployed | D88DFB2 | Pathway Diagnostics | | | | PWL000764 |
| Desktop | Dell | OptiPlex 7440 AIO XCTO | In Stock | D884GB2 | Alamosa Suite E | | Trinity main conference room | | |
| Desktop | Dell | OptiPlex 7440 AIO XCTO | Deployed | D88YFB2 | Pathway Diagnostics | | Pathway conference roomUsed for Pharmacy Rx | | PWL000729 |
| Desktop | Dell | OptiPlex 7440 AIO XCTO | In Stock | D892GB2 | Alamosa Suite E | | | | |
| Desktop | Dell | OptiPlex 7440 AIO XCTO | Deployed | D890GB2 | Pathway Diagnostics | | | Laboratory | |
| Desktop | Dell | OptiPlex 7440 AIO XCTO | Deployed | D882FB2 | Pathway Diagnostics | | Left side of rear accessioning table at Pathway | | PWL000737 |
| Desktop | Dell | OptiPlex 7020 | In Stock | HND6952 | Alamosa Suite E | | | | PWL000800 |
| Desktop | Dell | OptiPlex 7440 AIO XCTO | Deployed | D88WFB2 | Pathway Diagnostics | | Rear accessioning room at PathwayPlastic table | | PWL000758 |
| Desktop | Dell | OptiPlex 7440 AIO XCTO | Deployed | D883GB2 | Pathway Diagnostics | | | | PWL000759 |
| Desktop | Dell | OptiPlex 7010 | In Stock | 2BBR8Z1 | | | | | PWL000811 |
| Desktop | Dell | OptiPlex 7010 | In Stock | 2J1XCK1 | Alamosa Suite E | | | | |
| Desktop | Dell | OptiPlex 3020 | | CLKM0l52 | | Danny Bozeman [DBozeman@BelleHealth.net] | | Information Services | |
| Desktop | Dell | OptiPlex 7010 | Deployed | 2B9V8Z1 | Alamosa Suite E | Ben Caston [bcaston@bellehealth.net] | | | |
| Desktop | Dell | OptiPlex 3020 | | 4RCVV52 | | CVDL User [] [] | | | |
| Cell Phone | Apple | iPhone SE, Silver, 16GB | In Stock | F17RTB0QH2XH | Remote | | KCID 891480000133481903ZWas Romans | | |
| Cell Phone | Samsung | Galaxy S5 | In Stock | 990004939299164 | Alamosa Suite B | | Replaced Galaxy S5 | | |
| Cell Phone | Apple | iPhone SE, Silver, 16GB | Deployed | F17RT44DH2XH | Remote | Allen Green [] [AGreen@nextphazemd.com] | | | |
| Cell Phone | Apple | iPhone SE, Silver, 16GB | Deployed | F17RTBXXH2XH | Remote | Nathaniel Mullins [NMullins@bellehealth.net] | | | |
| Cell Phone | Apple | iPhone SE, Silver, 16GB | Deployed | F17RTCPJH2XH | Pathway Diagnostics | Aliesha Vieregge [avieregge@pathwaydi.com] | | Laboratory | PWL000841 |
| Mobile Hotspot Verizon | | Jetpack | In Stock | 990006371537530 | Alamosa Suite E | | Last known status: will not power on, changed batteries, changed chargers.  No life. | | PWL000788 |
| Mobile Hotspot Verizon | | Jetpack | In Stock | 990003324745609 | Alamosa Suite E | | | | PWL000354 |
| Mobile Hotspot Verizon | | Jetpack | In Stock | 990003321864197 | Alamosa Suite E | | | | PWL000939 |
| Mobile Hotspot Verizon | | Jetpack | Deployed | 990003324754601 | TIVA | Isabella Alonso [] [ialonso@trinityms.net] | Imei 990003324754601 | Laboratory - PCS | PWL000438 |
| Mobile Hotspot Verizon | | Jetpack | In Stock | 990006370758257 | Remote | Gabrielle Baca [] [GBaca@TrinityMS.net] | ICCID: 89148000002212573932 | | PWL000246 |
| Mobile Hotspot Verizon | | Jetpack | Deployed | 990003323603477 | Alamosa Suite E | Lisa Kim [lkim@pathwaydi.com] | | Laboratory - PCS | PWL000767 |
| Mobile Hotspot Verizon | | Jetpack | Deployed | 990003324518154 | Alamosa Suite E | Robin Kohl [RKohl@BelleHealth.net] | No SIM | Laboratory - PCS | PWL000768 |
| Mobile Hotspot Verizon | | Jetpack | Deployed | 358227056578029 | Remote | Swede Scarborough [SScarborough@BelleHealth.net] | | Sales | PWL000785 |
| Monitor | Dell | P2314H | In Stock | CN-07R1K3-74445-4CA-3S3L | Alamosa Suite E | | | | PWL000762 |
| Monitor | Dell | P2314H | In Stock | CN-07R1K3-74445-59F-C2DS-A0 | Alamosa Suite E | | | | PWL000542 |
| Monitor | Dell | P2314H | In Stock | CN-07R1K3-74445-59F-C2CS-A0 | Alamosa Suite E | | | | PWL000735 |
| Monitor | Dell | P2314H | In Stock | CN-07R1K3-74445-4BJ-584B | Alamosa Suite E | | | | PWL000825 |
| Monitor | Dell | P2314H | In Stock | CN-07R1K3-74445-4BJ-591B | Alamosa Suite E | | | | PWL000824 |
| Monitor | Dell | P2314H | In Stock | | Alamosa Suite D | | Returned 10/31 | | PWL0000529 |
| Monitor | Dell | U2713H | | C6F0KS1R06RL | | | | | |
| Monitor | Dell | U2713H | | C6F0KS1R0A3L | | | | | |
| Monitor | Dell | P2314H | In Stock | CN-00BMT5-64180-51S-4CU8 | Alamosa Suite E | | | | PWL000822 |
| Monitor | Dell | P2314H | | CN07R1K3744454B5848 | | | | | |
| Monitor | Dell | P2314H | | CN07R1K3744454B5918 | | | | | |
| Monitor | Dell | P2314H | | CN0V8JY274261331SKVL | | | | | |
| Monitor | Dell | P2314H | | CN07R1K3744454B5888 | | | | | |
| Monitor | Dell | P2314H | | CN07R1K3744454RA2X1 | | | | | |
| Monitor | Dell | P2314H | | CN07R1K3744454R548L | | | | | |
| Monitor | Dell | P2314H | | CN07R1K3744454R519L | | | | | |
| Monitor | Dell | P2314H | | CN07R1K3744454R552L | | | | | |
| Monitor | Dell | P2314H | | CN07R1K3744454CA3S3L | | | | | |
| Monitor | Dell | P2314H | | CN07R1K3744454R551L | | | | | |

| *Asset Type | *Manufacturer | *Model | Status | Serial Number | Location | Client (e-mails, semicolon delimited) | Notes | Department | Asset Tag # |
|---|---|---|---|---|---|---|---|---|---|
| Monitor | Dell | P2314H | | CN07R1X37444548R509L | | | | | |
| Monitor | Dell | P2314H | | CN07R1X37444548R540L | | | | | |
| Monitor | Dell | P2314H | | CN07R1X37444548R554L | | | | | |
| Monitor | Dell | P2314H | | CN07R1X374445485938 | | | | | |
| Monitor | Dell | P2314H | | CN07R1X37444548X6G2B | | | | | |
| Monitor | Dell | P2314H | | CN0XXFTR6418031P1JAL | | | | | |
| Monitor | Dell | E2013H | In Stock | CN-0XXTR-64180-2C9-212M | Alamosa Suite E | | | | PWL000830 |
| Monitor | Dell | P2314H | | D3LMTF091993 | | | | | |
| Monitor | Dell | P2314H | | CNC329PDCS | | | | | |
| Monitor | Dell | P2314H | | CN07R1X37444549903BL | | | | | |
| Monitor | Dell | P2314H | | CN07R1X374445499035L | | | | | |
| Monitor | Dell | P2314H | | CN07R1X37444548D383B | | | | | |
| Monitor | Dell | P2314H | | CN07R1X37444548X6Z6B | | | | | |
| Monitor | Dell | P2314H | | CN07R1X37444548R515L | | | | | |
| Monitor | Dell | P2314H | | CN07R1X37444548RA8WL | | | | | |
| Monitor | Dell | P2314H | | CN07R1X3744454700775 | | | | | |
| Monitor | Dell | P2314H | | CN07R1X3744454700835 | | | | | |
| Monitor | Dell | P2314H | | CN07R1X37444543BBCHS | | | | | |
| Monitor | Dell | P2314H | | CN07R1X37444543BBD2S | | | | | |
| Monitor | Dell | P2314H | | CN07R1X37444548RS13L | | | | | |
| Monitor | Dell | P2314H | | CN07R1X37444548RS11L | | | | | |
| Monitor | Dell | P2314H | In Stock | CN-07R1X3-74445-499-037L | Alamosa Suite E | | | | PWL000209 |
| Monitor | Dell | P2314H | | CN07R1X37444548RS43L | | | | | |
| Monitor | Dell | P2314H | | CN07R1X37444548RA17L | | | | | |
| Monitor | Dell | P2314H | | CN07R1X374445485603B | | | | | |
| Monitor | Dell | P2314H | | CN07R1X37444548X587B | | | | | |
| Monitor | Dell | E2314H | In Stock | CN-008MT5-64180-56F-0LZB | Alamosa Suite E | | | | PWL000166 |
| Monitor | Dell | P2314H | | 7R1X348X584B | | | | | |
| Monitor | Dell | P2314H | | 7R1X348X591B | | | | | |
| Monitor | Dell | U2713H | | C6F0X51X0097L | | | | | |
| Monitor | Dell | P2314H | | 0BMT55154CYB | | | | | |
| Monitor | Dell | P2314H (VGA) | | 7R1X348RA17L | | | | | |
| Monitor | Dell | P2314H (DP) | | 0BMT554908TB | | | | | |
| Monitor | Dell | P2314H (DP) | | 7R1X348RS43L | | | | | |
| Monitor | Dell | E2013H | | XKFTR2C9212M | | | | | |
| Monitor | Dell | P2314H | In Stock | CN-008MT5-64180-56F-0SYB | Alamosa Suite E | | | | PWL000178 |
| Monitor | Dell | P2314H | | 7R1X353X3615 | | | | | |
| Monitor | Dell | P2314H | | 7R1X353X3775 | | | | | |
| Monitor | Dell | U2713H | | C6F0X52F04XL | | | | | |
| Monitor | Dell | E2213H | | VBJY233S7GL | | | | | |
| Monitor | Dell | P2314H | | 7R1X348X588B | | | | | |
| Monitor | Acer | Acer X193W | | ETL0W0D000016093788507 | | | | | |
| Monitor | Dell | P2314H | | 7R1X348X598B | | | | | |
| Monitor | Dell | P2314H | | 7R1X348X662B | | | | | |
| Monitor | Dell | P2314H | In Stock | CN-07R1X3-74445-48R-A8WL | Alamosa Suite E | | | | PWL000860 |
| Monitor | Dell | P2314H | | 7R1X347O2545 | | | | | |
| Monitor | Dell | P2314H (DP) | | 0BMT55721NLL | | | | | |
| Monitor | Dell | P2314H (DP) | | 0BMT55721PJL | | | | | |

| *Asset Type | *Manufacturer | *Model | Status | Serial Number | Location | Client (e-mails, semicolon delimited) | Notes | Department | Asset Tag # |
|---|---|---|---|---|---|---|---|---|---|
| Monitor | Dell | P2314H | | 7R1X34CA364L | | | | | |
| Monitor | Dell | P2314H (DP) | | 7R1X34BRS11L | | | | | |
| Monitor | Dell | P2314H (DP) | | 7R1X34CA360L | | | | | |
| Monitor | Dell | P2314H | | 08MT556F05UB | | | | | |
| Monitor | Dell | P2314H | | 08MT556F0K0B | | | | | |
| Monitor | Dell | P2314H | | 08MT556F0LZB | | | | | |
| Monitor | Dell | P2314H | | 08MT556F0Q2B | | | | | |
| Monitor | Dell | P2314H | | 08MT556F05Q8 | | | | | |
| Monitor | Dell | P2314H | | 08MT556F05WB | | | | | |
| Monitor | Dell | P2314H | | 08MT556F0K1B | | | | | |
| Monitor | Dell | P2314H | | 08MT556F0WEB | | | | | |
| Monitor | Dell | P2314H | | 08MT556F0KEB | | | | | |
| Monitor | Dell | P2314H | | 08MT556F05TB | | | | | |
| Monitor | Dell | P2314H | | 7R1X353N378S | | | | | |
| Monitor | Dell | U2312HM | | WMT0W34I3M1L | | | | | |
| Monitor | Dell | P2314H (DP) | | 7R1X353N379S | | | | | |
| Monitor | Dell | P2314H | | 7R1X353N364S | | | | | |
| Monitor | Dell | P2314H (VGA) | | 7R1X353N380S | | | | | |
| Monitor | Dell | P2314H (DP) | | 7R1X353N381S | | | | | |
| Monitor | Dell | P2314H | | 7R1X34CA366L | | | | | |
| Monitor | Dell | P2314H | | 7R1X34CA356L | | | | | |
| Monitor | Dell | P2314H | In Stock | CN-00EMTS-64180-531-0Q7B | Alamosa Suite E | | | | PWL000766 |
| Monitor | Dell | P2314H | | 08MT554908LB | | | | | |
| Monitor | Dell | E2213H | In Stock | CN-0V8JY2-74261-317-2MJL | Alamosa Suite E | | | | PWL000813 |
| Monitor | Dell | P2314H | | 08MT554908SB | | | | | |
| Monitor | Dell | P2314H (VGA) | | 7R1X353N382S | | | | | |
| Monitor | Dell | P2314H | | 08MT561LDQ5B | | | | | |
| Monitor | Dell | P2314H | | 08MT55154CDB | | | | | |
| Monitor | Dell | P2314H (DP) | | 08MT554908UB | | | | | |
| Monitor | Dell | E2213H | In Stock | CN-0V8JY2-74261-317-39NL | Alamosa Suite E | | | | PWL000812 |
| Monitor | Dell | P2314H (DP) | | 08MT55720PUL | | | | | |
| Monitor | Dell | P2314H (DP) | | 08MT55721NYL | | | | | |
| Monitor | Dell | P2314H | | 7R1X34900J5L | | | | | |
| Monitor | Dell | E2213H | | V8JYZ31Z2MJL | | | | | |
| Monitor | Dell | P2314H | | 7R1X34990J8L | | | | | |
| Monitor | Dell | P2314H | In Stock | CN-07R1X3-74445-48R-511L | Alamosa Suite E | | | | PWL000879 |
| Monitor | Dell | P2314H (DP) | | 7R1X34CA352L | | | | | |
| Monitor | Dell | P2314H | | 08MT55154C5B | | | | | |
| Monitor | Dell | P2314H (DP) | | 7R1X34BRS52L | | | | | |
| Monitor | Dell | P2314H (DP) | | 7R1X34BRS15L | | | | | |
| Monitor | Dell | P2314H | | 7R1X34CA357L | | | | | |
| Monitor | Dell | P2314H | | 08MT55720PVL | | | | | |
| Monitor | Dell | P2314H | | 7R1X34CA367L | | | | | |
| Monitor | Dell | P2314H | | 7R1X34BRS13L | | | | | |
| Monitor | Dell | P2314H | | 7R1X34BRS09L | | | | | |
| Monitor | Dell | P2314H | | 7R1X34CA355L | | | | | |
| Monitor | Dell | P2314H | | 7R1X34CA365L | | | | | |
| Monitor | Dell | P2314H | | 7R1X347OO77S | | | | | |

| *Asset Type | *Manufacturer | *Model | Status | Serial Number | Location | Client (e-mails, semicolon delimited) | Notes | Department | Asset Tag # |
|---|---|---|---|---|---|---|---|---|---|
| Monitor | Dell | P2314H | | 7R1K34700835 | | | | | |
| Monitor | Dell | P2314H | | 7R1K348I6900 | | | | | |
| Monitor | Dell | P2314H | | 7R1K34CA3S4L | | | | | |
| Monitor | Dell | P2314H | | 0BMT556FDNQB | | | | | |
| Monitor | Dell | P2314H | | 0BMT55154CBB | | | | | |
| Monitor | Dell | P2314H (DP) | | 0BMT551L0Q2B | | | | | |
| Monitor | Dell | P2314H (DP) | | 7R1K348R5S1L | | | | | |
| Monitor | Dell | P2314H (DP) | | 7R1K34CA361L | | | | | |
| Monitor | Dell | P2314H (VGA) | | 7R1K3499040L | | | | | |
| Monitor | Dell | P2314H (VGA) | | 7R1K348R540L | | | | | |
| Monitor | Dell | P2314H (DP) | | 7R1K348R5S4L | | | | | |
| Monitor | Dell | E2213H | | V8JY231739NL | | | | | |
| Monitor | Dell | E2213H(Analog) | In Stock | CN-0V8JY2-74261-33I-4YPL | Alamosa Suite E | | | | PWL000831 |
| Monitor | Dell | E2213H(Analog) | | V8JY2335KVL | | | | | |
| Monitor | Dell | P2314H (DP) | | 0BMT556F0SSB | | | | | |
| Monitor | Dell | E2013H (Analog) | | XXFTR31P1JAL | | | | | |
| Monitor | Dell | P2314H (DP) | | 7R1K34CA359L | | | | | |
| Monitor | Dell | P2314H (DP) | | 7R1K34CA363L | | | | | |
| Monitor | Dell | P2314H (VGA) | | 0BMTS54903W8 | | | | | |
| Monitor | Dell | P2314H (DP) | | 7R1K353N3595 | | | | | |
| Monitor | Dell | P2314H | | 7R1K348I6268 | | | | | |
| Monitor | Dell | P2314H | | 7R1K348J3833 | | | | | |
| Monitor | Dell | P2314H | | 0BMT551L0Q7B | | | | | |
| Monitor | Dell | P2314H | | 7R1K348I6038 | | | | | |
| Monitor | Dell | P2314H (VGA) | | 7R1K34CA353L | | | | | |
| Monitor | Dell | P2314H (DP) | | 0BMT551L0Q4B | | | | | |
| Monitor | Dell | P2314H (VGA) | | 7R1K348I5878 | | | | | |
| Monitor | Dell | P2314H (DP) | | 0BMT55154CUB | | | | | |
| Monitor | Dell | P2314H | | 7R1K34380CH5 | | | | | |
| Monitor | Dell | P2314H | | 7R1K34388D25 | | | | | |
| Monitor | Dell | E2213H | | V8JY231B206L | | | | | |
| Monitor | Dell | P2314H | | 0BMT55721N04L | | | | | |
| Monitor | Dell | P2314H | | 0BMT55490590B | | | | | |
| Monitor | Dell | P2314H | | 0BMT551H09LB | | | | | |
| Monitor | Dell | P2314H (DP) | | 7R1K348RA8WL | | | | | |
| Monitor | Dell | P2314H (DP) | | 7R1K348R515L | | | | | |
| Monitor | Dell | E2213H | | V8JY23182TUL | | | | | |
| Monitor | Dell | P2314H | | 7R1K348RA2XL | | | | | |
| Monitor | Dell | P2314H | | 7R1K348R548L | | | | | |
| Monitor | Dell | E2314H | Deployed | CN008MT5641805721NLL | Alamosa Suite E | | | | PWL000245 |
| Monitor | Dell | P2314H | In Stock | CN-0088MTS-64180-56F-0Q2B | Alamosa Suite E | | | | PWL000167 |
| Monitor | Dell | E1915H | | 99WJF571DU1U | | | | | |
| Monitor | Dell | E1915H | | 99WJF57CDVVU | | | | | |
| Monitor | Dell | P2314H | In Stock | CN-07R1K3-7444S-4CA-360L | Alamosa Suite E | | | | PWL000107 |
| Monitor | Dell | P2314H | In Stock | CN-07R1K3-7444S-53N-3595 | Alamosa Suite E | | | | PWL000135 |
| Monitor | Dell | E2213H | In Stock | CN-0V8JY2-331-5KVL | Alamosa Suite E | | | | PWL000753 |
| Monitor | Dell | E2013H | In Stock | CN-0XXFTR-64180-31P-1JAL | Alamosa Suite E | | | | PWL000754 |

EXHIBIT B

| *Asset Type | *Manufacturer | *Model | Status | Serial Number | Location | Client (e-mails, semicolon delimited) | Notes | Department | Asset Tag # |
|---|---|---|---|---|---|---|---|---|---|
| Monitor | Dell | P2314H | Deployed | | Remote | Jamie Abney [I] [JAbney@TrinityMS.net] | | | PWL000792 |
| Monitor | Dell | P2314H | Deployed CN003MT5641B056F0X2B | | Remote | Robbie Arnado [D] [RArnado@TrinityMS.net] | | | PWL000517 |
| Monitor | Dell | U3014 (DP) | Deployed CN-0P1V6N-74445-561-086L | | 50 East Court | Robin Bordes [RBordes@GuruRev.net] | | Billing | PWL000801 |
| Monitor | Dell | P2314H | Deployed CN-07R1K3-74445-53N-364S | | Remote | Diane Courtney [DCourtney@GuruRev.net] | | | PWL000125 |
| Monitor | Dell | P2314H | Deployed CN-008MTS-64180-56F-05XB | | 50 East Court | Tiffany Gremillion [TGremillion@GuruRev.net] | | Billing | |
| Monitor | Dell | P2314H | Deployed CN-008MTS-64180-572-00J3L | | 50 East Court | Tiffany Gremillion [TGremillion@GuruRev.net] | | Billing | |
| Monitor | Dell | P2314H | Deployed CN008MT5641B05154CVB | | 50 East Court | Reem Haddad [RHaddad@BelleHealth.net] | | Accessioning | PWL000155 |
| Monitor | Dell | E2314H | Deployed CN07R1K37444S53N36ZS | | Remote | Robin Kohl [RKohl@BelleHealth.net] | | | PWL000185 |
| Monitor | Dell | P2314H | Deployed 7R1K34990H2L | | Remote | Phil Martinez [PMartinez@TrinityMS.net] | | Executive | PWL000529 |
| Monitor | Dell | P2314H | Deployed CN-07R1K3-74445-4BI-598B | | Pathway Diagnostics | Laura Matthews [I] [LMatthews@PathwayDL.com] | | Laboratory - PCS | PWL000732 |
| Monitor | Dell | P2314H | Deployed CN-07R1K3-74445-4BI-662D | | Pathway Diagnostics | Laura Matthews [I] [LMatthews@PathwayDL.com] | | | PWL000731 |
| Monitor | Dell | P2314H | Deployed CN-07R1K3-74445-4CA-361L | | Remote | Petrita Silvas [PSilvas@PhoenixHealthDL.com] | | | PWL000755 |
| Monitor | Dell | P2314H | Deployed CN-008MTS-64180-531K-0Q2B | | Remote | Petrita Silvas [PSilvas@PhoenixHealthDL.com] | | | PWL000124 |
| Monitor | Dell | P2314H (DP) | Deployed 08MT551H0N0B | | Remote | Paula Spearman [PSpearman@GuruRev.net] | | Billing | |
| Monitor | Dell | P2314H | Deployed CN-07R1K3-74445-48R-519L | | Remote | Shea Spruill [SSpruill@PhoenixHealthDL.com] | | | PWL000449 |
| Monitor | Dell | P2314H | Deployed CN-07R1K3-74445-48R-552L | | Remote | Shea Spruill [SSpruill@PhoenixHealthDL.com] | | | PWL000448 |
| Printer | Zebra | ZP505 | In Stock 27J142800436 | | Alamosa Suite E | | | | PWL000797 |
| Printer | Zebra | GC4200-200510-000 | Deployed | | Phoenix Health | | 2nd floor at Phoenix | | |
| Printer | Zebra | GC4200-200510-000 | Deployed 53J151600795 | | Pathway Diagnostics | | 2nd floor at Pathway DiagnosticsPart of the original Merge purchase | | |
| Printer | Zebra | GC4200-200510-000 | Deployed 53J151600791 | | Pathway Diagnostics | | Pathway DiagnosticsPart of the original Merge purchase | | |
| Printer | Zebra | GC4200-200510-000 | Deployed 53J151600820 | | Pathway Diagnostics | | Pathway DiagnosticsPart of the original Merge purchase | | |
| Printer | Zebra | GC4200-200510-000 | Deployed 53J151600813 | | Pathway Diagnostics | | Part of the original Merge purchase | | PWL000761 |
| Printer | Zebra | GC4200-200510-000 | Deployed 53J151405258 | | Pathway Diagnostics | | Part of the original Merge purchase | | PWL000760 |
| Printer | Zebra | GC4200-200510-000 | Deployed 53J151600790 | | Alamosa Suite B | | Performance LabsPart of the original Merge purchase | | |
| Printer | HP | Officejet 150 Mobile All-in-one | Trash MY4CLC107R | | Alamosa Suite E | | | | PWL000780 |
| Printer | Ricoh | SAVIN MP 3054 | G155RS30682 | | Lab - Suite B | | Gulf Coast 010587 | | |
| Printer | Ricoh | SAVIN MP C5503 | Deployed E185A6510011 | | Pathway Diagnostics | | | | |
| Printer | Ricoh | SAVIN MP C5503 | Deployed E185M560009 | | Alamosa Suite B | | Gulf Coast 010581 | | |
| Printer | Ricoh | SAVIN MP C5503 | Deployed E185M460344 | | Alamosa Suite D | | Gulf Coast 010582 | | |
| Printer | Ricoh | SAVIN MP C5503 | Deployed E185M460204 | | Alamosa Suite E | | Battery clip is brokenTrashed | | PWL000223 |
| Printer | HP | Officejet 150 Mobile All-in-one | Trash MY54NC105Q | | | | | | PWL000490 |
| Printer | Xerox | WorkCentre 7855 v1 Multifunction System | Deployed MX4356653 | | Phoenix Health | | | Laboratory | |
| Printer | Zebra | LP2824 Plus | In Stock 36J150600103 | | | | | | |
| Printer | HP | Officejet 150 Mobile All-in-one | Trash MY53C1032 | | | | THROWN OUT, DAMAGED. 8/16/2016 - JS | | PWL000201 |
| Printer | HP | Officejet 150 Mobile All-in-one | Trash MY4AHC10M4 | | | | Destroyed on 9/16Cracked LCD, unusableManufacturer warranty expired on Feb 19 2016 | | |
| Printer | HP | Officejet 150 Mobile All-in-one | Deployed CN35MJDXXCY | | Remote | Sabrina Arizmendez [I] [sarizmendez@trinityms.net] | | Laboratory | PWL000221 |
| Printer | HP | Officejet 150 Mobile All-in-one | Deployed MY55IC10CB | | TIVA | Gabrielle Baca [I] [GBaca@TrinityMS.net] | | | |
| Printer | HP | Officejet 150 Mobile All-in-one | Deployed MY4COC10DW | | TIVA | Julia Blalack [I] [JBlalack@TrinityMS.net] | | | |
| Printer | Ricoh | AFICIO SP 5200DN | Deployed S816S100001 | | 50 East Court | Robin Bordes [RBordes@GuruRev.net] | Gulf Coast 011099 | | |
| Printer | HP | Officejet 150 Mobile All-in-one | Deployed MY541C104C | | Clinic - McLean Cares Albany | Tequila Drake [TDrake@PathwayDL.com] | | Laboratory - PCS | PWL000148 |
| Printer | Brother | DCP-7065DN | Deployed U5271262JM226394 | | Pathway Diagnostics | Reem Haddad [RHaddad@BelleHealth.net] | | | |
| Printer | Brother | MFC-J680DW | Deployed U6403668H138D40 | | Remote | Tamela Hargadon [THargadon@PathwayDL.com] | | Laboratory - PCS | |
| Printer | HP | Officejet 150 Mobile All-in-one | Deployed MY4AHC10M4 | | TIVA | Amber Herd [I] [AHerd@TrinityMS.net] | | | PWL000201 |
| Printer | Zebra | LP2824 Plus | Deployed 36J150600097 | | Alamosa Suite E | Chad Howell [Chad@BelleHealth.net] | | | PWL000492 |
| Printer | Brother | MFC-J680DW | Deployed | | Remote | Zachary Jordan [zjordan@pathwaydl.com] | Drop shipped via Amazon on 3/30/2017 | Laboratory - PCS | |
| Printer | HP | Officejet 150 Mobile All-in-one | Deployed MY563C10N3 | | Remote | Lisa Kim [lkim@pathwaydl.com] | | Laboratory - PCS | PWL000519 |
| Printer | HP | Officejet 150 Mobile All-in-one | Deployed MY48IC102T | | Remote | Anna Kirby [AKirby@PathwayDL.com] | | Laboratory - PCS | PWL000765 |

| *Asset Type | *Manufacturer | *Model | Status | Serial Number | Location | Client (e-mails, semicolon delimited) | Notes | Department | Asset Tag # |
|---|---|---|---|---|---|---|---|---|---|
| Printer | HP | Officejet 150 Mobile All-in-one | Deployed MY52CC1073 | | Remote | Danielle Landry [i] [DLandry@TrinityMS.net] | | | PWL000503 |
| Printer | HP | Officejet 150 Mobile All-in-one | Deployed MY52HC1082 | | Clinic - Bienvenido Samson MD | Bobby Livingston [blivingston@pathwaydi.com] | | Laboratory - PCS | PWL000139 |
| Printer | HP | Officejet 150 Mobile All-in-one | Deployed MY5LSC1ORZ | | TIVA | James Muskant [i] [JMuskant@TrinityMS.net] | | | PWL000476 |
| Printer | HP | Officejet 150 Mobile All-in-one | Deployed MY4CDC10F1 | | Remote | Christian Perez [CPerez@PathwayDL.com] | | Laboratory - PCS | PWL000113 |
| Printer | HP | Officejet 150 Mobile All-in-one | Deployed MY54MC1085 | | Remote | Ellie Sobol [ESobol@PathwayDL.com] | | | PWL000247 |
| Printer | Ricoh | SAVIN MP C5503 | | | Phoenix Health | Shea Spruill [SSpruill@PhoenixHealthDL.com] | Gulf Coast Office ProductsTag: 010586 | | |
| Printer | HP | Officejet 150 Mobile All-in-one | Deployed MY2DC1002 | | Clinic - Gulf Coast Interventional Pain Mgmt Kaitlyn Spuhl [KSpuhl@PathwayDL.com] | | | Laboratory - PCS | PWL000117 |
| Printer | HP | Officejet 150 Mobile All-in-one | Deployed MY563C10NH | | Pathway Diagnostics | Sophia Streitfeld [i] [SStreitfeld@TrinityMS.net] | | Laboratory | PWL000508 |
| Printer | HP | Officejet 150 Mobile All-in-one | Deployed MY57HC1025 | | Remote | Jenny Taradena [i] [JTaradena@PathwayDL.com] | | | PWL000145 |
| Printer | HP | Officejet 150 Mobile All-in-one | Deployed MY4SED10YM | | Remote | Kamla Trimble [i] [KTrimble@TrinityMS.net] | | | PWL000243 |
| Printer | HP | Officejet 150 Mobile All-in-one | Deployed MY3VC10QY | | Remote | Wanda Valentine [i] [WValentine@TrinityMS.net] | | | PWL000244 |
| Printer | HP | Officejet 150 Mobile All-in-one | Deployed MY4SCC105Q | | Remote | Sonia Williams [i] [SWilliams@TrinityMS.net] | | | PWL000540 |
| Tablet | Zagg | Rugged Book ID6RGK-BB0-RS | In Stock | n/a | Remote | | | | PWL000774 |
| Tablet | Apple | iPad Pro 9.7 Gry 32gb | Deployed DMPRX267GXPX | | | | CHCS 02 | | PWL000783 |
| Tablet | Apple | iPad Pro 9.7 Gry 32gb | In Stock DM4PRX1DFGXPX | | Alamosa Suite E | | | | PWL000954 |
| Tablet | Microsoft | Surface 128G | In Stock 047SC04432S3 | | Alamosa Suite B | | | | |
| Tablet | Zagg | Rugged Book ID6RGK-BB0-RS | Deployed 3S-EA-29 | | Clinic - Dyer Health | | | | PWL000810 |
| Tablet | Apple | iPad Pro 9.7 Gry 32gb | Deployed DMS6126GXPX | | | | | | PWL000817 |
| Tablet | Zagg | Rugged Book ID6RGK-BB0-RS | Deployed 3S-EP-YU | | Remote | | | | PWL000775 |
| Tablet | Apple | iPad Pro 9.7 Gry 32gb | In Stock DMPS6037GXPX | | Alamosa Suite E | | | | PWL000776 |
| Tablet | Zagg | Rugged Book ID6RGK-BB0-RS | Deployed 3S-EY-HC | | Remote | | | | PWL000794 |
| Tablet | Apple | iPad Pro 9.7 Gry 32gb | In Stock DMPRX1XZGXPX | | Alamosa Suite E | | case also | | |
| Tablet | Apple | iPad Pro 9.7 Gry 32gb | Deployed DMPRX00QSGXPX | | Remote | | | | PWL000948 |
| Tablet | Apple | iPad Pro 9.7 Gry 32gb | Deployed DMPS60SSGXPX | | Remote | | | | PWL000777 |
| Tablet | Apple | iPad Pro 9.7 Gry 32gb | Deployed DMPUC81GXPX | | Clinic | | Dr. Haydel | Sales | PWL000795 |
| Tablet | Zagg | Rugged Book ID6RGK-BB0-RS | Deployed 3S-EY-H8 | | Remote | | | | PWL000769 |
| Tablet | Zagg | Rugged Book ID6RGK-BB0-RS | Deployed 3S-EA-2V | | Alamosa Suite E | Blake Bourque [BBourque@TrinityMS.net] | | | PWL000770 |
| Tablet | Apple | iPad Pro 9.7 Gry 32gb | Deployed DMPS2225GXPX | | Alamosa Suite F | Blake Bourque [BBourque@TrinityMS.net] | | | PWL000778 |
| Tablet | Apple | iPad Pro 9.7 Gry 32gb | Deployed DMPS60LAGXPX | | Remote | Jordan Brown [JBrown@BelleHealth.net] | | | PWL000779 |
| Tablet | Zagg | Rugged Book ID6RGK-BB0-RS | Deployed 3S-E7-XB | | Remote | Jordan Brown [JBrown@BelleHealth.net] | | Sales | PWL000828 |
| Tablet | Apple | iPad Pro 9.7 Gry 32gb | Deployed DMS60RXGXPX | | Remote | Jordan Brown [JBrown@bellehealth.net] | | Sales | PWL000845 |
| Tablet | Apple | iPad Pro 9.7 Gry 32gb | Deployed DMPRW7P6GXPX | | Clinic - Dyer Health | Annie Cohen [acohen@bellehealth.net] | | | PWL000784 |
| Tablet | Apple | iPad Pro 9.7 Gry 32gb | Deployed DMPS603XGXPX | | Remote | Kimberly Dyer [kim@dyerhealth.com] | | | |
| Tablet | Apple | iPad Pro 9.7 Gry 32gb | Deployed DMPRJC3DGXPX | | Alamosa Suite E | Allen Green [i] [AGreen@nextphazemd.com] | NPMD - Allen Green Test iPadDr Moores office | | |
| Tablet | Microsoft | Surface 128G | Deployed 00944133Z6S3 | | Alamosa Suite E | Tyler Lafleur [i] [TLafleur@TrinityMS.net] | | | PWL000237 |
| Tablet | Apple | iPad Pro 9.7 Gry 32gb | Deployed DMPS6032GXPX | | Alamosa Suite E | Paul Malsky [pmalsky@nextphazemd.com] | | Sales | PWL000796 |
| Tablet | Apple | iPad Pro 9.7 Gry 32gb | Deployed DMPRW7CZGXPX | | Clinic - Premiere Medical Care | Ryan Martin [info@peorlamedicalcenter.com] | | | PWL000816 |
| Tablet | Zagg | Rugged Book ID6RGK-BB0-RS | Deployed | | Clinic - Premiere Medical Care | Ryan Martin [info@peorlamedicalcenter.com] | | Sales | PWL000846 |
| Tablet | Apple | iPad Pro 9.7 Gry 32gb | Deployed DMPRX10ZGXPX | | Alamosa Suite E | Noe Mendoza [i] [NMendoza@PathwayDL.com] | | | |
| Tablet | Zagg | Rugged Book ID6RGK-BB0-RS | Deployed | | Remote | Zack Moye [ZMoye@BelleHealth.net] | | Sales | PWL000844 |
| Tablet | Apple | iPad Pro 9.7 Gry 32gb | Deployed DMPRX10DGXPX | | Remote | Zack Moye [ZMoye@BelleHealth.net] | Case also | Sales | PWL000835 |
| Tablet | Apple | iPad Pro 9.7 Gry 32gb | Deployed DMPR0H9GXPX | | Alamosa Suite E | Nathaniel Mullins [NMullins@bellehealth.net] | | | PWL000842 |
| Tablet | Apple | iPad Pro 9.7 Gry 32gb | Deployed DMPRW7MZGXPX | | Remote | Clay Rampey [crampey@bellehealth.net] | | Sales | |
| Tablet | Apple | iPad Pro 9.7 Gry 32gb | Trash DMPRW78TGXPX | | | Robert Saenz [i] [rsaenz@helpdesk.com] | LOST, NEVER RETURNEDLINE DEACTIVATED | | PWL000782 |
| Tablet | Zagg | Rugged Book ID6RGK-BB0-RS | Deployed 3S-EA-0X | | Remote | Swede Scarborough [SScarborough@BelleHealth.net] | | Sales | PWL000781 |
| Tablet | Apple | iPad Pro 9.7 Gry 32gb | In Stock DMPS6024GXPX | | Remote | Swede Scarborough [SScarborough@BelleHealth.net] | | Sales | PWL000789 |
| Tablet | Apple | iPad Pro 9.7 Gry 32gb | Deployed DMPS60DEGXPX | | Remote | Jeff Wells [jwells@bellehealth.net] | | | |

EXHIBIT B

| *Asset Type | *Manufacturer | *Model | Status | Serial Number | Location | Client (e-mails, semicolon delimited) | Notes | Department | Asset Tag # |
|---|---|---|---|---|---|---|---|---|---|
| Tablet | Zagg | Rugged Book IDGRGX-BBO-RS | Deployed | 3S-E7-WE | Remote | Jeff Wells [jwells@bellehealth.net] | | Sales | PWL000791 |
| Laptop | Dell | Latitude E5540 | Deployed | D4QCP12 | | | | | |
| Laptop | Dell | Latitude E5540 | | KMSJN12 | | | | | PWL000193 |
| Laptop | Dell | Latitude E5540 | In Stock | 4H0BF12 | Alamosa Suite E | | | | PWL000806 |
| Laptop | Dell | Latitude E5540 | In Stock | 4SPCP12 | Alamosa Suite E | | | | PWL000553 |
| Laptop | Dell | Latitude E7470 | Trash | 293VDC2 | Remote | | Flood damaged | | PWL000487 |
| Laptop | Dell | Latitude E5550 | In Stock | K0ZNS32 | Alamosa Suite E | | | | |
| Laptop | Dell | Latitude E7470 | In Stock | 533VDC2 | | | | | |
| Laptop | Dell | Latitude E5540 | In Stock | 3WM7N12 | Alamosa Suite E | | | | PWL000520 |
| Laptop | Dell | Latitude E5540 | In Stock | 1S3ZTY1 | Alamosa Suite E | | | | PWL000225 |
| Laptop | Dell | Latitude E6430 | In Stock | CODL4GN7JX1 | Alamosa Suite E | | Pour Room | Laboratory | PWL000497 |
| Laptop | Dell | Latitude E5550 | In Stock | SXY7ZS2 | Alamosa Suite E | | | Laboratory - PCS | PWL000453 |
| Laptop | Dell | Latitude E7450 | In Stock | 8G63LL2 | Alamosa Suite E | | | | PWL000242 |
| Laptop | Dell | Latitude E5550 | Trash | 7XRSZS2 | Alamosa Suite E | | Returned damaged | | PWL000496 |
| Laptop | Dell | Latitude E5540 | In Stock | GXSJN12 | Alamosa Suite E | | | | |
| Laptop | Dell | Latitude E5550 | Deployed | 29L3Q32 | Alamosa Suite B | | | | |
| Laptop | Dell | Latitude E5550 | In Stock | | | | | | |
| Laptop | Dell | Latitude E7470 | In Stock | 9VKTDC2 | | | | | |
| Laptop | Dell | Latitude E7470 | In Stock | CTKTDC2 | | | | | |
| Laptop | Dell | Latitude E5550 | In Stock | | Alamosa Suite B | | | | |
| Laptop | Dell | Latitude E7470 | In Stock | SJSTDC2 | Alamosa Suite E | | | | PWL000852 |
| Laptop | Dell | Latitude E5540 | In Stock | FRYQJ12 | Alamosa Suite E | | | | |
| Laptop | Dell | Latitude E7470 | In Stock | 84HVDC2 | | | | | |
| Laptop | Dell | Latitude E5540 | Trash | HJT8F12 | Alamosa Suite E | | Damaged rear USB ports | | PWL000194 |
| Laptop | Dell | Latitude E5540 | In Stock | 1PMCP12 | Alamosa Suite E | | | | PWL000804 |
| Laptop | Dell | Latitude E5540 | In Stock | F701112 | Alamosa Suite E | | | | PWL000818 |
| Laptop | Dell | Latitude E5540 | In Stock | 66S1J12 | Alamosa Suite E | | | | PWL000541 |
| Laptop | Dell | Latitude E5540 | Trash | 1G79F12 | Alamosa Suite E | | Missing "S" key on numpad | | PWL000105 |
| Laptop | Dell | Latitude E5550 | In Stock | D8MJ832 | Alamosa Suite E | | | | PWL000158 |
| Laptop | Dell | Latitude E7470 | Trash | CBSCQ72 | Alamosa Suite E | | 7/21/2016 Replaced; wont connect to both monitors. | | |
| Laptop | Dell | Latitude E6430 | In Stock | 4GN7JX1 | Alamosa Suite E | | | | |
| Laptop | Dell | Latitude E5540 | Deployed | CSK2J12 | Alamosa Suite B | | assigned to Dr. Moores office for NextphazeMD | | PWL000479 |
| Laptop | Dell | Latitude E5550 | Deployed | 7GWMS32 | Remote | | | | PWL000197 |
| Laptop | Dell | Latitude E5540 | Trash | SXK2J12 | Alamosa Suite E | | | Laboratory - PCS | PWL000226 |
| Laptop | Dell | Latitude E5550 | In Stock | 4FLVY52 | Alamosa Suite E | | | | PWL000819 |
| Laptop | Dell | Latitude E5540 | In Stock | G0PCP12 | Alamosa Suite C | | | | |
| Laptop | Dell | Latitude E6430 | In Stock | FGDYVY1 | Alamosa Suite E | | | | |
| Laptop | Dell | Latitude E5550 | | 4DG3M32 | | | | | |
| Laptop | Dell | Latitude E7450 | In Stock | FCKYC72 | Alamosa Suite E | | | | PWL000186 |
| Laptop | Dell | Latitude E5550 | Trash | 84NVY52 | Alamosa Suite B | | Bad power supply connector | | PWL000190 |
| Laptop | Dell | Latitude E5550 | In Stock | 6T75P32 | Alamosa Suite E | | | | |
| Laptop | Dell | Latitude E5550 | In Stock | FBN4Q32 | Alamosa Suite E | | | | |
| Laptop | Dell | Latitude E5550 | Trash | 2YH4P32 | Alamosa Suite E | | Damaged trackpad | | PWL000144 |
| Laptop | Dell | Latitude E6430 | | S3S7ZJX1 | | | | | |
| Laptop | Dell | Latitude E7450 | | 8X9NQN32 | | | Returned 10/20/2016 | | PWL000140 |
| Laptop | Dell | Latitude E5550 | In Stock | SXF5P32 | Alamosa Suite E | | | | |
| Laptop | Dell | Latitude E5540 | | SMY8F12 | | | | | PWL000805 |
| Laptop | Dell | Latitude E5540 | In Stock | 7PX8F12 | Alamosa Suite E | | | | |

EXHIBIT B

| *Asset Type | *Manufacturer | *Model | Status | Serial Number | Location | Client (e-mails, semicolon delimited) | Notes | Department | Asset Tag # |
|---|---|---|---|---|---|---|---|---|---|
| Laptop | Dell | Latitude E5540 | | 2479F12 | | | | | |
| Laptop | Dell | Latitude E5540 | | G5Q3F12 | | | | | |
| Laptop | Dell | Latitude E5550 | Deployed | GCDQH32 | Remote | | | Laboratory - PCS | PWL000537 |
| Laptop | Dell | Latitude E5540 | | 7251J12 | | | | | |
| Laptop | Dell | Latitude E5540 | | 1W1WK32 | | | | | |
| Laptop | Dell | Latitude E5540 | In Stock | 1Q5JN12 | Alamosa Suite E | | | | PWL000110 |
| Laptop | Dell | Latitude E5550 | Deployed | 2HY4P32 | Remote | Isabella Alonso [I] [ialonso@trinityms.net] | | | |
| Laptop | Dell | Latitude E7450 | Deployed | 7KXYC72 | Remote | Robert Amato [I] [RAmato@TrinityMS.net] | See ticket 1015 request for equipment. | | PWL000511 |
| Laptop | Dell | Latitude E5540 | Deployed | CCK2J12 | Remote | Sabrina Artzmenden [I] [sartzmenden@trishityms.net] | | | |
| Laptop | Dell | Latitude E5540 | Deployed | SQ7CP12 | TIVA | Gabrielle Baca [I] [GBaca@TrinityMS.net] | | Laboratory | PWL000222 |
| Laptop | Dell | Latitude E5540 | Deployed | 3PHCP12 | Clinic - James R Boyed | Josefina Bibiano [Jbibiano@pathwaydL.com] | | Laboratory - PCS | PWL000838 |
| Laptop | Dell | Latitude E5540 | Deployed | 60S4M32 | Alamosa Suite E | Robin Bordes [RBordes@GuruRev.net] | | Billing | PWL000101 |
| Laptop | Dell | Latitude E7470 | Deployed | 375C0172 | Alamosa Suite E | Blake Bourque [BBourque@TrinityMS.net] | | | PWL000432 |
| Laptop | Dell | Latitude E7470 | Deployed | 183VDC2 | Remote | Danny Bozeman [DBozeman@BelleHealth.net] | | | |
| Laptop | Dell | Latitude E7470 | Deployed | 8RB1FC2 | Remote | Danny Bozeman [DBozeman@BelleHealth.net] | | | |
| Laptop | Dell | Latitude E7450 | Deployed | 9TX7M32 | Alamosa Suite B | Larry Bracey [I] [LBracey@trinityms.net] | | | PWL000538 |
| Laptop | Dell | Latitude E9L3Q32 | Deployed | E9L3Q32 | Pathway Diagnostics | Jordan Brown [JBrown@BelleHealth.net] | | | |
| Laptop | Dell | Latitude E5540 | Deployed | GM29F12 | Alamosa Suite E | Rhett Bunce [RBunce@TrinityMS.net] | | | |
| Laptop | Dell | Latitude E5550 | Deployed | 5FDKS32 | Remote | James Campbell [jamescampbelldoinc@yahoo.com] | Family Medical Clinic 500 S. Elm PlaceBroken Arrow, OK 74012918-251-1391AM - Matt Young | Laboratory | NPMD Tag |
| Laptop | Dell | Latitude E5540 | Deployed | HVJ7N12 | Remote | Spring Carlisle [SCarlisle@PathwayDL.com] | | Laboratory | PWL000522 |
| Laptop | Dell | Latitude E7450 | Deployed | 0D2FM32 | Alamosa Suite E | Ben Caston [bcaston@bel/ehealth.net] | | Information Services | PWL000102 |
| Laptop | Dell | Precision M4600 | Deployed | 82DB4S1 | Alamosa Suite E | Jamie Catalanotto [JCatalanotto@BelleHealth.net] | | Software Development | PWL000550 |
| Laptop | Dell | Latitude E5550 | Deployed | JSKTZ52 | Remote | Aisha Chavez [achavez@belleheath.net] | | | PWL000514 |
| Laptop | Dell | Latitude E5540 | Deployed | FZH2J12 | Remote | Aisha Chavez [achavez@belleheath.net] | | Laboratory - PCS | PWL000798 |
| Laptop | Dell | Latitude E5550 | Deployed | HLJ5PN32 | Remote | Annie Cohen [acohen@belleheath.net] | | Sales | |
| Laptop | Dell | Latitude E5550 | Deployed | 52KN532 | Alamosa Suite B | LaTori Cooper [LCooper@BelleHealth.net] | | | |
| Laptop | Dell | Latitude E5550 | Deployed | 7Z2H532 | Alamosa Suite B | Diane Courtney [DCourtney@GuruRev.net] | | | |
| Laptop | Dell | Latitude E5550 | Deployed | 1GF5P32 | Alamosa Suite E | Diane Courtney [DCourtney@GuruRev.net] | | Billing | |
| Laptop | Dell | Latitude E5550 | Deployed | 6K1WK52 | Remote | Kristin Dargis [KDargis@GuruRev.net] | | | |
| Laptop | Dell | Latitude E5550 | In Stock | J31WK32 | Alamosa Suite E | Tameca Davis [I] [TDavis@TrinityMS.net] | | | PWL000189 |
| Laptop | Dell | Latitude E5550 | Deployed | 8525P32 | Clinic - McLean Cares Albany | Tequita Drake [TDrake@PathwayDL.com] | | Laboratory - PCS | PWL000141 |
| Laptop | Dell | Latitude E5550 | Deployed | 8HMJP32 | Alamosa Suite B | Michelle Dunaway [PDunaway@GuruRev.net] | | | |
| Laptop | Dell | Latitude E5550 | Deployed | 8GHYZ52 | TIVA | Harley Elliott [I] [HElliott@TrinityMS.net] | | Laboratory | PWL000512 |
| Laptop | Dell | Latitude E7470 | Deployed | 2GXTDC2 | Pathway Diagnostics | Patricia Fairley [PFairley@PathwayDL.com] | | Laboratory - PCS | PWL000834 |
| Laptop | Dell | Latitude E5550 | Deployed | C2J8Q32 | Remote | Karla Goss [kgoss@pathwaydl.com] | Received 10/20/2016 from Kellan Madrid | Laboratory - PCS | PWL000802 |
| Laptop | Dell | Latitude E7470 | Deployed | 6VWKP32 | Alamosa Suite E | Tiffany Gremillion [TGremillion@GuruRev.net] | | Billing | PWL000108 |
| Laptop | Dell | Latitude E7470 | Deployed | 1XXTDC2 | Alamosa Suite E | Reem Haddad [RHaddad@BelleHealth.net] | | | PWL000460 |
| Laptop | Dell | Latitude E5550 | Deployed | 4T9WM32 | Remote | Tamela Hargadon [THargadon@PathwayDL.com] | | Laboratory - PCS | PWL000543 |
| Laptop | Dell | Latitude E7470 | Deployed | HZTVDC2 | Alamosa Suite E | John Hearn [JHearn@BelleHealth.net] | | | |
| Laptop | Dell | Latitude E7470 | Deployed | FL6TDC2 | Alamosa Suite C | Lindsey Henry [LHenry@PathwayDL.com] | | | |
| Laptop | Dell | Latitude E5550 | Deployed | 3VWKP32 | Remote | Monica Hernandez [I] [MHernandez@TrinityMS.net] | | | PWL000858 |
| Laptop | Dell | Latitude E5550 | Deployed | DQ9WM32 | Alamosa Suite E | Jennifer Holley [JHolley@PathwayDL.com] | | Executive | PWL000815 |
| Laptop | Dell | Latitude E7470 | Deployed | 8DXTDC2 | Alamosa Suite E | Chad Howell [Chad@BelleHealth.net] | | Laboratory - PCS | |
| Laptop | Dell | Latitude E5550 | Deployed | 4LHWM32 | Remote | Tyrelle Johnson [TJohnson@Pathwayl.com] | | | |
| Laptop | Dell | Latitude E5550 | Deployed | 4HWM32 | Remote | Tyrelle Johnson [TJohnson@Pathwayl.com] | | Laboratory - PCS | PWL000151 |
| Laptop | Dell | Latitude E5550 | Deployed | 1XP4P32 | Remote | Zachary Jordan [zjordan@pathwaydl.com] | | | PWL000248 |
| Laptop | Dell | Latitude E5550 | Deployed | B9HWM32 | Remote | Lisa Kim [lkim@pathwaydl.com] | | Laboratory - PCS | PWL000147 |
| Laptop | Dell | Latitude E5550 | Deployed | S825P32 | Remote | Anna Kirby [AKirby@PathwayDL.com] | | | |

EXHIBIT B

| *Asset Type | *Manufacturer | *Model | Status | Serial Number | Location | Client (e-mails, semicolon delimited) | Notes | Department | Asset Tag # |
|---|---|---|---|---|---|---|---|---|---|
| Laptop | Dell | Latitude E7470 | Deployed 47DTDC2 | | Alamosa Suite E | Robin Kohl [RKohl@BelleHealth.net] | | | PWL000859 |
| Laptop | Dell | Latitude E7450 | In Stock FMS3L12 | | Alamosa Suite B | Lacie Jo Lafleur [] [LLafleur@TrinityMS.net] | | | |
| Laptop | Dell | Latitude E5550 | Deployed 8MS1JX32 | | Alamosa Suite C | Debbie Lewis [DLewis@PrestigewwLnet] | | | |
| Laptop | Dell | Latitude E5540 | Deployed GXNCP12 | | Clinic - Bienvenido Samson MD | Bobby Livingston [blivingston@pathwaydl.com] | | Laboratory - PCS | PWL000539 |
| Laptop | Dell | Latitude E7470 | Deployed 2N81FC2 | | Alamosa Suite D | Skip Lloyd [SLloyd@BelleHealth.net] | | Accounting & Finance | PWL000814 |
| Laptop | Dell | Latitude E5540 | Deployed D7SJM12 | | Remote | Mark Lobell [MLobell@TrinityMS.net] | | Executive | PWL000807 |
| Laptop | Dell | Latitude E5540 | Deployed 5LMCP12 | | Alamosa Suite D | Melanie Maceira [MMaceira@BelleHealth.net] | | Accounting & Finance | PWL000188 |
| Laptop | Dell | Latitude E5550 | Deployed D34WM32 | | Pathway Diagnostics | Melanie Maceira [MMaceira@BelleHealth.net] | | | |
| Laptop | Dell | Latitude E7450 | Deployed 6T2XS32 | | Remote | Dorothy Martin [DMartin@GuruRev.net] | | Laboratory | PWL000502 |
| Laptop | Dell | Latitude E5550 | Deployed 75WAKS32 | | Remote | Phil Martinez [PMartinez@TrinityMS.net] | | Executive | PWL000211 |
| Laptop | Dell | Latitude E5540 | Deployed 73PWM32 | | Clinic | Haley McConathy [I] [HMcConathy@TrinityMS.net] | | | |
| Laptop | Dell | Latitude E5550 | Deployed FWBXP32 | | Clinic | NextPhaze MD [I] [user@nextphazemd.com] | Avion Clinic Premier Family Care1130 E. Lansing, Broken Arrow, OK, 74012918-258-9990 | | NPMD Tag |
| Laptop | Dell | Latitude E5540 | Deployed 30X2J12 | | Remote | NextPhaze MD [I] [user@nextphazemd.com] | PMA Wellness613 Williams Blvd, Kenner, LA 70062Phone:(504) 441-5555 | | NPMD Tag |
| Laptop | Dell | Latitude E5550 | Deployed 7QZCP32 | | Clinic | NextPhaze MD [I] [user@nextphazemd.com] | Desert Pain5309 E. Baywood Ave.Mesa, AZ 85206Tel: 480-325-3801 | | NPMD Tag |
| Laptop | Dell | Latitude E5550 | Deployed 4GWLY52 | | Clinic | NextPhaze MD [I] [user@nextphazemd.com] | Arizona Clinic2375 E. Camelback Rd Suite 616Phoenix AZ 85016 | | NPMD Tag |
| Laptop | Dell | Latitude E5550 | Deployed 7FSWK32 | | Remote | Vianey Medina [I] [VMedina@TrinityMS.net] | Avion Clinic Winn Family PracticeCoweta, OK918 486 5564 | | NPMD Tag |
| Laptop | Dell | Latitude E7470 | Deployed 709VDC2 | | Pathway Diagnostics | Noe Mendoza [I] [NMendoza@PathwayDL.com] | | | PWL000853 |
| Laptop | Dell | Latitude E5550 | Deployed CL5JX12 | | Pathway Diagnostics | Kaycie Merrifield [kmerrifield@pathwaydl.com] | | Laboratory | PWL000531 |
| Laptop | Dell | Latitude E5550 | Deployed 7L51N32 | | Pathway Diagnostics | Marcia Miller [I] [MMiller@TrinityMS.net] | | | PWL000231 |
| Laptop | Dell | Latitude E5550 | Deployed BVZHS32 | | Phoenix Health | Christopher Mitchell [CMitchell@PathwayDL.com] | | Laboratory | PWL000854 |
| Laptop | Dell | Latitude E7470 | Deployed FSTVDC2 | | Pathway Diagnostics | Kyle Mouton [KMouton@PathwayDL.com] | | Sales | PWL000109 |
| Laptop | Dell | Latitude E5550 | Deployed HM2JP32 | | Remote | Zack Moye [ZMoye@BelleHealth.net] | | | |
| Laptop | Dell | Latitude E7470 | Deployed S2Q0FC2 | | Clinic | Nathaniel Mullins [NMullins@bellehealth.net] | | | PWL000114 |
| Laptop | Dell | Latitude E5550 | Deployed 5PIXP32 | | Remote | James Musicant [I] [JMusicant@TrinityMS.net] | | Billing | PWL000159 |
| Laptop | Dell | Latitude E5550 | Deployed 119NS32 | | Alamosa Suite E | Lillian Perrozzo [LPerrozzo@GuruRev.net] | | | PWL000241 |
| Laptop | Dell | Latitude E5550 | In Stock 36SFZS2 | | Remote | Priscilla Perez [I] [PPerez@TrinityMS.net] | | | PWL000212 |
| Laptop | Dell | Latitude E5550 | Deployed J24WM32 | | Remote | Christian Perez [CPerez@PathwayDL.com] | | | |
| Laptop | Dell | Precision M4800 | Deployed J72FN32 | | Alamosa Suite E | Anand Ramesh [aramesh@BelleHealth.net] | | Sales | PWL000861 |
| Laptop | Dell | Latitude E5540 | Deployed G5X2J12 | | Remote | Cloy Rampey [crampey@bellehealth.net] | | Laboratory | |
| Laptop | Dell | Latitude E5540 | Deployed JSS9F12 | | Alamosa Suite B | Constanze Rausch [CRausch@Performance-Labs.net] | | Sales | |
| Laptop | Dell | Latitude E7470 | Deployed HXTVDC2 | | Remote | Sweda Scarborough [SScarborough@BelleHealth.net] | | Laboratory | |
| Laptop | Dell | Latitude E5540 | Deployed 4S31J13 | | Alamosa Suite E | Lynn Scarlano [LScarlano@Performance-Labs.net] | | | PWL000143 |
| Laptop | Dell | Latitude E5550 | Deployed DDW4F32 | | Remote | Petrita Silvas [PSilvas@PhoenixHealthDL.com] | | | PWL000445 |
| Laptop | Dell | Latitude E5550 | Deployed 8P1WK32 | | Alamosa Suite E | Ellie Sobol [ESobol@PathwayDL.com] | | | |
| Laptop | Dell | Latitude E5550 | Deployed 6675062 | | Phoenix Health | Paula Spearman [PSpearman@GuruRev.net] | | Laboratory | |
| Laptop | Dell | Latitude E5540 | Deployed 6WWQJ12 | | Alamosa Suite B | Shea Spruill [SSpruill@PhoenixHealthDL.com] | | Laboratory | |
| Laptop | Dell | Latitude E5540 | Deployed 66XQJ12 | | Clinic - Gulf Coast Interventional Pain Mgmt | Michelle Spruill [MSpruill@Performance-Labs.net] | | Laboratory - PCS | PWL000803 |
| Laptop | Dell | Latitude E5540 | Deployed 2RQCP12 | | Alamosa Suite E | Kaitlyn Spuhl [XSpuhl@PathwayDL.com] | | | |
| Laptop | Dell | Latitude E7450 | Deployed 3563L12 | | Pathway Diagnostics | David Stelly [DStelly@TrinityMS.net] | | Laboratory | PWL000513 |
| Laptop | Dell | Latitude E5550 | Deployed 624VZS2 | | Alamosa Suite B | Sophia Stratsfeld [I] [SStratsfeld@TrinityMS.net] | | | PWL000515 |
| Laptop | Dell | Latitude E5550 | Deployed 8675062 | | Alamosa Suite E | Jenny Taradena [I] [JTaradena@PathwayDL.com] | | | PWL000742 |
| Laptop | Dell | Latitude E7470 | Deployed 4TKTDC2 | | Alamosa Suite B | Brooke Thompson [I] [BThompson@NextPhazeMD.com] | | Laboratory | PWL000142 |
| Laptop | Dell | Latitude E5550 | In Stock 304JF32 | | Alamosa Suite D | Hali Toups [HToups@PathwayDL.com] | | | PWL000240 |
| Laptop | Dell | Latitude E5550 | Deployed 13ELP32 | | Remote | Kamla Trimble [I] [KTrimble@TrinityMS.net] | | | |
| Laptop | Dell | Latitude E5550 | Deployed 5PDQX32 | | Remote | Liz Tucker [LTucker@GuruRev.net] | | | |
| Laptop | Dell | Latitude E5550 | Deployed 5PDQK32 | | Remote | Liz Tucker [LTucker@GuruRev.net] | | | |
| Laptop | Dell | Latitude E5550 | Deployed 6D05Q32 | | Remote | CVDL User [I] [] | | | PWL000536 |

| *Asset Type | *Manufacturer | *Model | Status | Serial Number | Location | Client (e-mails, semicolon delimited) | Notes | Department | Asset Tag # |
|---|---|---|---|---|---|---|---|---|---|
| Laptop | Dell | Latitude E5550 | In Stock | 8PLFZ52 | CVDL | Yolanda Vasquez [i] [YVasquez@TrinityMS.net] | | | PWL000500 |
| Laptop | Dell | Latitude E5550 | Deployed | 6NSSZS2 | Remote | Olga Vidal [ovidal@pathwaydl.com] | | Laboratory - PCS | PWL000498 |
| Laptop | Dell | Latitude E5550 | Deployed | S4YSSS2 | Pathway Diagnostics | Allesha Vieregge [avieregge@pathwaydl.com] | | Laboratory | PWL000352 |
| Laptop | Dell | Latitude E5550 | Deployed | JXVPN32 | Alamosa Suite E | Tawana Wall [twall@gururev.net] | | Billing | |
| Laptop | Dell | Latitude E5540 | Deployed | 9XNCP12 | Remote | Jeff Wells [jwells@bellehealth.net] | | Sales | PWL000752 |
| Laptop | Dell | Latitude E5550 | Deployed | 7NCQN32 | Remote | Alyssa Zelkovich [azelkovich@pathwaydl.com] | | Laboratory - PCS | PWL000840 |

EXHIBIT B

DocuSign Envelope ID: D6786F04-C534-43FC-BC5D-288AF633542F



# REFERENCE LABORATORY SERVICES

THIS REFERENCE LABORATORY SERVICES AGREEMENT (this "Agreement") is made on the 26 day of April____, 2017 ("Effective Date") by and between Pathway Diagnostics, LLC, a Mississippi limited liability company ("Pathway"), and Performance Labs, LLC, a Louisiana limited liability company ("Referring Lab").

## R E C I T A L S:

A. WHEREAS, the Referring Lab and Pathway each hereby agrees to maintain applicable licenses and certification in good standing which would allow each to operate a clinical laboratory in the state(s) where services are rendered. Either party shall advise the other of any adverse action related therewith regarding either party's license, permit, or certification that would impact its ability to refer or perform Lab Services as provided hereunder. Reasonable documentation of such credentials shall be provided upon request;

B. WHEREAS, Pathway has the equipment and personnel necessary to provide to the Referring Lab the requested laboratory services, which for purposes of this Agreement shall consist of clinical and toxicology screening laboratory testing services ("Lab Services" or "Services");

C. WHEREAS, the Referring Lab desires to obtain the Lab Services from Pathway for the benefit of Referring Lab's Clients in need of such Lab Services;

D. WHEREAS, Pathway desires to provide the Lab Services to the Referring Lab; and

E. WHEREAS, the parties to this Agreement desire to provide a full statement of their respective covenants, agreements and responsibilities during the term of this Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants and agreements set forth herein, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **PATHWAY.**

   A. <u>Lab Services:</u> Pathway agrees to provide Lab Services hereto for those tests which are ordered by a duly authorized provider and documented. Lab Services shall be provided in accordance with Pathway's standard guidelines and procedures. Lab Services will not be provided for a referred specimen if the specimen and accompanying documentation does not comply with Pathway's requirements, guidelines and procedures. Pathway shall give Referring Lab notice within seventy-two (72) hours of receipt of any non-compliant specimen. The Lab Services shall be clinical diagnostic tests and toxicology qualitative screening tests, which will be reported out as agreed upon by the parties.

**EXHIBIT B**
**Pathway-Phoenix 000043**

B. Testing Orders: <u>No laboratory service shall be rendered by Pathway without a complete and clear order through the agreed upon requisition form or electronic orders methodologies. Pursuant to a valid and clear test order, Pathway agrees to perform Lab Services for Referring Lab, in accordance with those tests and services specifically and clearly identified on the requisition forms or electronic orders.</u>

C. <u>Reports:</u> Pathway shall provide testing reports diligently and accurately. Reports shall be provided by Pathway to Referring Lab's clients via fax and/or Web Portal as agreed upon by the parties.

## 2.    REFERRING LAB.

A. <u>Specimens:</u> Referring Lab shall collect from Referring Lab's client and submit to Pathway for Lab Services in a process mutually agreed upon by the parties hereto.

A. <u>Licensure:</u> Referring Lab shall remain a duly licensed clinical laboratory under applicable federal, state and local law.  Reasonable documentation of such credentials shall be provided upon request. Reasonable documentation of such credentials shall be provided upon request. Referring Lab warrants that it is qualified to bill Medicare in accordance with Section 4154 of OBRA 1990, 42 U.S.C. 13951. Referring Lab shall continue to comply with and meet all requirements of the licensing and certification requirements under the Clinical Laboratory Improvement Amendments of 1988 as amended ("CLIA"), the Medicare and Medicaid programs, and any other applicable federal and state statutes and regulations. Accordingly, if either party, in good faith, determines at any time or is reliably informed by governmental authorities that the Agreement violates or is likely to be determined by a third party to violate such laws, rules, regulations, policies or interpretations, this Agreement will be deemed to be automatically modified to comply with such law or regulation.  The parties further agree to meet immediately upon such determination and in good faith to amend this Agreement so as to eliminate such concern or violation and to bring this Agreement into compliance with the foregoing. If the Agreement cannot be brought into compliance with such law or regulation, it shall be terminated.

B. <u>Supplies:</u> During the term of this Agreement, Referring Lab shall provide Pathway no supplies beyond the transportation devices in which the specimen is collected and any other product/supply necessary for the transportation to Pathway.

C. <u>No Requirement to Refer</u>: The Parties hereto agree and understand that there shall be no requirement of Referring Lab, or any of Referring Lab's affiliated, actual or potential referral sources to make referrals to Pathway. Additionally, there shall not be any restriction or limitation on any actual or potential referral source's choice with regard to

making referrals, subject to the restrictive covenants agreed to by Pathway pursuant to this Agreement.

D. Legitimate Business Purpose for Services: The aggregate services contracted for herein this Agreement does not exceed those that are reasonable and necessary for the legitimate business purposes of the arrangement. The services to be furnished hereunder do not involve the counseling or promotion of a business arrangement or other activity that violates any Federal or State law.

3. **TERM.**

A. Initial Term: The term of this Agreement shall commence on the last date of execution hereof by a party ("Effective Date") and shall continue in effect for one (1) years, unless earlier terminated pursuant the terms herein this Agreement ("Initial Term").

B. Renewal Term: This Agreement shall automatically be extended for one (1) year periods ("Renewal Term") unless notice of non-renewal is provided to Pathway within one (1) month prior to the then expiring term.

4. **TERMINATION.**

A. Without Cause: This Agreement may be terminated by either party without cause upon thirty (30) days advance written notice.

B. Cause: Notwithstanding the foregoing, this Agreement may be terminated by either party immediately if: 1) either party hereto is excluded from participation in or debarred from practice before any government sponsored health benefits program, such as Medicare, 2) the license, accreditation, or certification of either party is suspended or revoked by any State or Commonwealth in which its holds a license, 3) in the event any change in law or regulation or any governmental authority makes a determination that either party is acting in violation of any law or regulation which materially affects the rights or obligations of the parties under this Agreement, 4) Pathway can terminate immediately if Pathway determines or believes Referring Lab is out of compliance with any federal or state law, statute, regulation or guidance or fails to establish or maintain a compliance program as set forth in Section 6.C, 5) in the event that (i) Referring Lab defaults in the payment to Pathway hereunder and such amounts remains due and unpaid for ten (10) days following written notice of such default from Pathway; (ii) or should Referring Lab default in the performance of any other provisions of this Agreement and such default is not cured within thirty (30) days following written notice from Pathway specifying such default (unless such default is not reasonably capable of being cured within such thirty (30) day period and Referring Lab is diligently prosecuting such cure to completion), and 6) if a petition or filing of a case under the Bankruptcy Code, dissolution of any party or

subsidiary thereof responsible for performing services hereunder shall be filed by or against either party which is not stayed or terminated within thirty (30) days.

C. <u>Mutual Agreement:</u> This Agreement may be terminated at any time by mutual written agreement of the parties at any time.

5. <u>FEES:</u>

A. <u>Lab Services:</u> No invoices will be submitted to Referring Lab for the first sixty (60) days. Thereafter, Pathway will invoice Referring Lab for all Lab Services performed during the Term on a monthly basis and each invoice will provide adequate detail to allow Referring Lab to reconcile the charges reflected on each such invoice against test results received from Pathway during the month. Referring Lab agrees to pay Pathway's invoice within thirty (30) days following Referring Lab's receipt of such invoice if there are no discrepancies identified in such reconciliation. Pathway shall bill Referring Lab at the rates as set forth in **Exhibit A**.

B. <u>Shipping:</u> Refer to **Exhibit A** for shipping cost details.

C. <u>Fair Market Value:</u> The fees to be paid hereunder are intended solely to reflect the fair market value for the actual Lab Services rendered, and do not take into account the volume of value of referral or any other business conducted between the parties or any entities affiliated with them for which payment may be made in whole or in part under any federal or state health care program or under any other third party payor program. Referring Lab does not and cannot assure Pathway of any particular volume or number of laboratory testing services that will be referred to Pathway pursuant to this Agreement. The fees paid hereunder are not to be implicitly or explicitly tied to referrals of Federal health care program business and nor shall they be discounted as a "swap" for profitable non-discounted Federal health care program business. The fees shall be commercially reasonable in the absence of other, non-discounted business and shall not be below Pathway's average fully loaded costs.

    a. <u>Non-Monetary Compensation to Physicians:</u> To the extent Referring Lab elects to provide Non-Monetary Compensation to any customers or prospective customers, such Non-Monetary Compensation must comply fully with the limitations of the federal Stark Law.

D. <u>Billing Responsibility.</u> Referring Lab shall acquire all rights in and to billing and collection for the Lab Services provided by Pathway pursuant to this Agreement. Pathway shall have no rights to bill or collect from any responsible payor for Lab Services. Pathway's right to compensation under this Agreement shall be exclusively as addressed pursuant to Section 5 of this Agreement.

6. **MISCELLANEOUS.**

A. <u>Governing Law</u>:  This Agreement shall be construed and its validity determined by the laws of the State of Louisiana and any applicable federal law, rules or regulations, without regard to the conflict of law provisions of any jurisdiction.

B. <u>Compliance with Pathway's Rules and Regulations and All Applicable Laws</u>:  Pathway and Referring Lab understand that at all times the parties hereto shall comply with (a) all applicable rules and regulations, including HIPAA; (b) both parties hereto shall adhere to the industry's standards of care; and (c) any other applicable federal and state law. It is the intention of the Parties that the terms and conditions of this Agreement, including the compensation payable hereunder, be at all times compliant with applicable laws, rules, regulations, policies and interpretations and that the compensation payable hereunder not exceed the fair market value.  If a party reasonably believes in good faith that this Agreement or the performance by such party of any of its obligations under this Agreement violates any material law or regulation, presents a substantial risk of the loss or restriction of such party's (or its affiliates) licenses or right to bill or to participate in Medicare, Medicaid, or any other federal healthcare program, then such party may, upon written notice, require the other party to enter into good faith negotiations to amend the terms of this Agreement or the applicable Exhibits in a manner that attempts to retain as much as possible of the economic arrangements originally contemplated by the parties without violating any applicable legal or reimbursement requirements. The rights of the parties under this Section are in addition to any other termination rights under this Agreement.

C. <u>Exclusivity</u>:  This Agreement is non-exclusive for both parties and each party may receive and perform Lab Services for other third parties including from other referring labs. This provision shall not require any physician to refer any patients to Pathway, or otherwise limit a physician choice in making referrals to any subsidiary of the other party, whether during or after the Agreement.

D. <u>Status as Independent Contractor</u>: None of the provisions of this Agreement are intended to create, nor shall be deemed or construed to create any relationship between the parties other than that of independent entities contracting with each other hereunder solely for the purpose of effecting the provisions of this Agreement.  Neither of the parties hereto, nor any of their respective employees shall be construed to be the agent, employer and representative of the other.

E. <u>Withholding</u>: The parties hereto understands and agrees that neither party will withhold on behalf of the other any sums for income taxes, unemployment insurance, social

DocuSign Envelope ID: D6786F04-C534-43FC-BC5D-288AF633542F

security or other withholding applicable to employees. All such payments, withholdings and benefits, if any, are the sole responsibility of the respective party.

F. <u>Excluded Provider Representations</u>: Pathway warrants to Referring Lab that Pathway employees or owners have not been debarred, suspended, declared ineligible, or excluded from Medicare/Medicaid or any other governmental healthcare programs. Pathway warrants to Referring Lab that all services provided hereunder shall be performed in accordance with established and recognized clinical testing procedures and with reasonable care in accordance with applicable federal, state, and local laws. Referring Lab warrants to Pathway that neither it nor any of its officers, directors, employees or owners have been debarred, suspended, declared ineligible, or excluded from Medicare/Medicaid or any other governmental healthcare programs. Pathway hereby agrees to notify Pathway immediately after Pathway becomes actually aware of any threatened, proposed, or actual exclusion of Pathway from any federally funded health care program, including but not limited to Medicare and Medicaid.

G. <u>Confidentiality of Agreement</u>:

(1) All terms of this Agreement information, pricing, or data relating to the business or operations of any party to this Agreement acquired by either party hereto in connection with this Agreement shall be treated as confidential by the receiving party, and shall not, unless otherwise required by law or the requirements of any accrediting agency, be disclosed by the receiving party without the prior written permission of the party hereto to whom the information in question relates. This provision shall survive termination of this Agreement.

(2) The parties acknowledge that, as a result of this Agreement, the parties may receive access to confidential information from the other party, including but not limited to information relating to customers, clients, suppliers, distributors, investors, lenders, consultants, independent contractors and employees, price lists and pricing policies, financial statements and information, budgets and projections, business plans, market research, marketing, sales and distribution strategies, pending projects and proposals, new business plans and initiatives, research and development projects, trade secrets, designs, other intellectual property, and other confidential information and materials relating to the businesses of the other party (collectively, "Confidential Information").

(3) The parties acknowledge that Confidential Information is owned or licensed by the other party; is unique, valuable, proprietary and confidential; and derives independent actual or potential commercial value from not being generally known or available to the public. The parties agree that they will not at any time claim, any right, title or interest of any kind in or to any Confidential Information of the other party.

(4)     Should Confidential Information be disclosed to the other party, in any form or manner, the receiving party agrees to maintain the confidentiality of the Confidential Information at all times and will not, at any time, directly or indirectly, use any Confidential Information for the receiving party's own benefit or for the benefit of any other party, reveal or disclose any Confidential Information to any party other than authorized representatives of the receiving party, or remove or aid in the removal from the disclosing party any Confidential Information, except (A) in the legitimate performance of this Agreement or (B) with the prior written consent of an authorized officer of the disclosing party.  The covenants in this section will not apply to information that (x) is or becomes available to the general public through no breach of this Agreement or (y) a party is required to disclose by applicable law or court order; provided, however, that the subject party will notify the other party in writing of such required disclosure as much in advance as practicable in the circumstances and cooperate with the other party to limit the scope of such disclosure.

(5)     Upon the termination of this Agreement for any reason, the parties will turn over and return to the other party all Confidential Information in any form (including all copies and reproductions thereof), except a party may retain such information in its possession as may be required by law.  Notice shall be given to the other party of any such retained Confidential Information.

H.  Counterparts:  This Agreement may be executed in counterparts and shall be fully executed when each party whose signature is required has signed at least one counterpart, even though no one counterpart contains the signatures of all parties. A copy of this Agreement that is executed by a party and transmitted by that party to any other party by facsimile, email and other electronic means shall be binding on each signatory thereto to the same extent as a copy of this Agreement containing the signatory's original signature.

I.  Notices:  Except as otherwise provided herein, all notices, requests and demands to or upon a party hereto shall be in writing and shall be sent by hand delivery, by overnight or by certified mail, return receipt requested, and shall be deemed delivered and notice effective, if delivered by hand or overnight, when received or, if mailed, five (5) days after deposit in the mail, postage prepaid.

J.  No Waiver:  No failure on the part of either party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy by either party shall preclude any other or further exercise thereof.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.  No waiver by either party will be effective unless it is in writing, signed by such party, and then only to the extent specifically stated.

DocuSign Envelope ID: D6786F04-C534-43FC-BC5D-288AF633542F

K. <u>Indemnity:</u> The parties agree to save, indemnify and hold harmless the other from and against any and all losses, claims, suits, damages, liabilities and expenses of any nature or kind whatsoever arising out of or resulting from, directly or indirectly, any alleged negligent or intentional acts or omissions of its agents or employees based upon, arising out of or attributable to the negligent performance or non-performance of their respective obligations under this Agreement. Upon notice, the other party shall resist and defend at its own expense any such claim/action.

L. <u>Remedies:</u> In no event shall either party be responsible to the other party for any punitive damages or any consequential, incidental, indirect, or special damages (including lost profits or revenue), except to the extent of a party's gross fault/negligence, or knowing violation of federal or state law applicable to the conduct of the parties pursuant to this Agreement.

M. <u>Collateral Agreements; Amendment:</u> This Agreement constitutes the entire agreement between the parties for the provision of Lab Services by Pathway, and there are no representations, warranties or commitments, except as set forth herein. This Agreement shall supersede all previous oral or written agreements between the parties covering this or similar subject matter. This Agreement may be amended only by an instrument in writing executed by the parties hereto.

N. <u>Severability:</u> If any one or more of the provisions of this Agreement should be ruled wholly or partly invalid or unenforceable by a court or other governmental body of competent jurisdiction, then the validity and enforceability of all provisions of this Agreement not ruled to be invalid or unenforceable shall be unaffected.

O. <u>Compliance with Laws:</u> Each of the parties represents and warrants to the other party that it will comply with all applicable federal and similar state laws, rules or regulations ("Applicable Laws") as they may be amended from time to time. Applicable Laws include, but are not limited to, the Clinical Laboratory Improvement Amendments of 1988 as amended ("CLIA"), Physician Self-Referral Law, 42 U.S.C. 1395nn, and the regulations promulgated thereunder ("Stark Law"), Medicare/Medicaid Anti-kickback Law, and the regulations promulgated thereunder ("Anti-kickback Statute"), and the data privacy and security requirements of Health Insurance Portability and Accountability Act of 1996 and regulations promulgated thereunder ("HIPAA"). This paragraph will survive the termination or expiration of this Agreement to the extent that the Applicable Laws pertain to ongoing obligations of a party under this Agreement.

**IN WITNESS WHEREOF,** Referring Lab and Pathway have executed this Agreement by their duly authorized representatives to be effective on the Effective Date.

**PATHWAY:**                                   **REFERRING LAB:**

Pathway Diagnostics, LLC

Performance Labs, LLC

By: Trinity Medical Services, L.L.C., Manager

By: _____
Chad Howell, CEO

By: _____
Blake Bourque, CEO

DocuSign Envelope ID: D6786F04-C534-43FC-BC5D-288AF633542F

## EXHIBIT A
## FEE SCHEDULE

Pathway shall be reimbursed by Referring Lab in accordance with the fee schedule below or attached hereto.

| Volume | Base Rate Urine or OF | Discounted Rate | Shipping |
|--------|----------------------|-----------------|----------|
| 0-1000 | 110 | 22.72% = 80 | Not Included |
| 1000- | 110 | 27.27% = 75 | Included |

| SPECIALTY PANEL | CASH PAY/CLIENT BILL |
|-----------------|----------------------|
|  |  |

Reference Lab Agreement – Pathway/Performance

## EXHIBIT B
## Pathway-Phoenix 000052



Expense to be cut in the near future
Expense to be reduced or tempurary

| Vendor | Description | Monthly Amount | New Expense List | Company | Outstanding | Total Balance |
|---|---|---|---|---|---|---|
| **Office Space** | | | | | | |
| Whitney Bank | Alamosa Rent | $ 10,462.04 | $ 10,462.04 | ALL | | |
| Zacary Property Rental | 50 E Court Rent - Suite 7 and 8 | $ 4,497.83 | | Performance | *$9,501.00* | |
| Phoenix Rent - Williamson | Phoenix Rent | $ 2,250.00 | $ 2,250.00 | Pathway | | |
| Pathway Rent - Williamson | Pathway Rent | $ 1,250.00 | $ 1,250.00 | Pathway | | |
| Spinecare - Dr. Waguespack | Dr. Waguespack - Office | $ 1,000.00 | $ 1,000.00 | Pathway | | |
| TH DANG | Dr. Office Rent | $ 750.00 | $ 750.00 | Pathway | | |
| **Consulting** | | | | | | |
| Inchara - Anand Ramesh | Laboratory Software Consulting | $ 10,000.00 | | Pathway | | |
| Laboratory Director Solutions, LLC (Dr. Cangelosi | Performance Lab director (on hold from Dec 16 thru Fek | $ 4,000.00 | | Performance | *$20,000.00* | |
| The Pelon Group (Jamie Holmes) | Bonus Payments (Skip does not know the balance) | $ 5,000.00 | | Guru | *$25,000.00* | |
| A& J Laboratory Services (Aurora McKinney) | Consulting Pay - ($350 and hour) | $ 2,000.00 | | Performance | | |
| CRI and/or Skip Lloyd | Consulting Pay - | $ 5,000.00 | $ 5,000.00 | Pathway | | |
| Daphe Parish | Lab Director - Pathway | $ 3,500.00 | $ 3,500.00 | Pathway | | |
| Laboratory Technical Consultant | LCMS Technical Consultant | | $ 2,000.00 | Pathway | | |
| AZ Market Non-Compete Protection | | $ 15,000.00 | $ 15,000.00 | Pathway | | |
| **Reference Lab Outstanding** | | | | | | |
| Labsource | | | $ - | Pathway | *$15,900.00* | |
| Labcorp | | | $ - | Pathway | *$24,848.00* | |
| Pathlogic | | | $ - | Pathway | *$4,817.00* | |
| Cordant | | | $ - | Pathway | *$68,000.00* | |
| **AMEX** | | | | | | |
| Pathway | Average Lab expenses (materials, shipping, reagents, etc | $ 30,000.00 | $ 30,000.00 | Pathway | *$111,353.00* | |
| Phoenix | Average Lab expenses (materials, shipping, reagents, etc | $ 27,000.00 | $ 27,000.00 | Pathway | *$28,000.00* | |
| Pathway Sales Expense | Average Corporate/Sales Expenses | $ 14,500.00 | $ 14,500.00 | | *$45,767.00* | |
| Core Buiness Card | Used to pay a few bills on this page | $ - | $ - | | *$23,794.00* | |
| **Insurances and Benefits** | | | | | | |
| The Hartford | Worker's Compensation | $ 3,200.00 | $ 3,200.00 | ALL | | |
| State Farm | Building insurance | $ 966.00 | $ 966.00 | ALL | | |

Pathway-Phoenix 000053

**EXHIBIT B**

**Leases**

| | | | | | | |
|---|---|---|---|---|---|---|
| De Lage Landen | 25354752 -Printer | $ | 148.92 | $ | 148.92 | Pathway | |
| De Lage Landen | 25354836 - 3 Printers | $ | 801.83 | $ | 801.83 | Pathway | |
| De Lage Landen | 10070978 - 50 East need to be sold | | | | | Pathway | $541,612.18 |
| De Lage Landen | 10080031 - Phoenix and Pathway | | | | | Pathway | $1,491,894.40 |
| Westlake Pharmaceutical Services, Inc. | LCMS Generator (50 East Ct) | | | | | | $14,850.00 |
| Westlake Pharmaceutical Services, Inc. | Pathway LCMS Maintenance Contract | | | $ | 9,600.00 | Pathway | |
| Quantum Analytics | Compressor Lease/ Generators - Phoenix and Pathway | $ | 2,576.88 | $ | 2,576.88 | Pathway | |
| Dell Financial Services | 011-6714962-000 565278-11009 | $ | 10,475.00 | $ | 10,475.00 | Pathway | $41,900.00 |
| LEAF | Printer Lease -001 | $ | 280.04 | $ | 280.04 | Pathway | |
| LEAF | Printer Lease -002 | $ | 280.04 | $ | 280.04 | Pathway | |
| LEAF | Printer Lease - 003 | $ | 101.91 | $ | 101.91 | Pathway | |
| Leasing Associates of Barrigton | Blood Machine - Located Currently at CVDL | $ | 1,215.01 | | | | |
| Byline Financial Services | Merge Lease | $ | 2,059.30 | $ | 2,059.30 | Pathway | |
| Enterprise | Vehicle Fleet | $ | 2,000.00 | $ | 2,000.00 | Pathway | |
| Flex Fuel Cards | Fuel Cards | $ | 3,000.00 | $ | 3,000.00 | Pathway | |
| Ford Credit - 50306608 | Ford Truck Lease - | $ | 587.33 | $ | 587.33 | Chad | |
| Ford Credit - 50315216 | Ford Truck Lease - | $ | 573.45 | | | Blake | |
| Ally - | GMC Truck Lease - Rhett Bunce | $ | 619.11 | | | Rhett | |
| Hyundai Motor Credit | Hyundai - Mark Lobell | $ | 625.00 | | | Mark | |
| XEROX | Printer | $ | 400.00 | | | Pathway | |
| Navias Lease Corp #40156148 | Shimadzu lease | $ | 9,138.94 | | | Performance | |

**Loans and Lines of Credit**

| | | | | | | |
|---|---|---|---|---|---|---|
| Home Bank | Interest on LOC | | | | | Performance | $1,474,000.00 |
| Iberia Loan | Monthly Payment | $ | 4,874.38 | $ | 4,874.38 | Performance | $163,351.00 |
| Whitney (Interest only - 8%) | Pathway LOC | $ | 3,500.00 | $ | 3,500.00 | Pathway | $488,000.00 |

**Payroll**

| | | | | | |
|---|---|---|---|---|---|
| Paycom Payroll | Average Per Payroll Amount | $ | 209,602.14 | $ | 182,144.49 |

**EXHIBIT B**

## Other Expenses

| | | | | | |
|---|---|---|---|---|---|
| XIFIN | Performance billing software | $ 10,000.00 | | Performance | |
| KAREO BILLING | Pathway billing | $ 10,374.00 | $ 10,374.00 | Pathway | |
| Verizon | company cell phone and iPad plan | $ 1,200.00 | $ 800.00 | Pathway | |
| Change Healthcare | billing software for demographics | $ 900.00 | | Pathway | *$2,220.00* |
| H2O - Suite B | Alamosa Water Bill - per usage | $ 100.00 | | Performance | |
| H2O - Suite C | Alamosa Water Bill - per usage | $ 100.00 | | ALL | |
| H2O - Suite D | Alamosa Water Bill - per usage | $ 100.00 | | ALL | |
| H2O - Suite E | Alamosa Water Bill - per usage | $ 100.00 | | ALL | |
| Hunt Telecom | Phone/Internet/Data Center Rent | $ 3,400.00 | $ 2,800.00 | Pathway | |
| Software One | Microsoft Email and MS Office Software | $ 2,545.00 | $ 2,000.00 | Pathway | |
| Alt Bentley | HR | $ 150.00 | $ 150.00 | Pathway | |
| Intellicorp | HR | $ 100.00 | $ 100.00 | Pathway | |
| Cleco - All Suites | Electric Utility | $ 1,000.00 | | ALL | |
| Washington St. Tammany Electric | Electric bill - 50E Court | $ 2,000.00 | | Performance | |
| Mickey Jones | Landscaping | $ 320.00 | $ 320.00 | ALL | |
| Answer Now | Monthly | $ 330.00 | | Pathway | |
| Answer Now | Monthly | $ 700.00 | | NPMD | |
| FrontRunner | Billing Software for Insurance Verification | $ 500.00 | | Pathway | *$500.00* |
| Docusign - Neg. Payment...inv 18K - | Electronic Signature for account documents and orders | $ 5,000.00 | $ 5,000.00 | Pathway | |
| Pitney Bowes | Postage | $ 1,000.00 | $ 1,000.00 | ALL | *$1,943.00* |
| Kentwood and Community | Office Supplies | $ 250.00 | $ 250.00 | ALL | |
| Custom Security | Alomosa Security System | $ 150.00 | | ALL | |
| Office Depot / Office Market | Office Supplies | $ 500.00 | $ 500.00 | ALL | |
| Biscom | Fax Service | $ 500.00 | $ 500.00 | ALL | |
| Intacct | Accounting Software / Monthly | $ 3,000.00 | $ 3,000.00 | ALL | |
| Cintas | Paper and Rug Service | $ 200.00 | $ 200.00 | ALL | |
| Waste Management | Dumpster | $ 125.00 | $ 125.00 | ALL | |
| Star Service, Inc. | Building maintenance | $ 525.00 | $ 525.00 | ALL | |
| Charter Comm | 50 East Contract (Trying to cancel) | $ 640.00 | | NONE | *$6,420.00* |

## Merchant Services and Bank Fees

| | | | | | |
|---|---|---|---|---|---|
| Authorize.net - NPMD | credit card processing | $ 35.00 | | NPMD | |
| Authorize.net - PL | credit card processing | $ 39.99 | | Performance | |
| Cybersource - credit card services | processor NPMD | $ 5.00 | | NPMD | |
| Iberia Bank | Account Analysis Fees | $ 1,000.00 | | Performance | |
| Home Bank | Account Analysis Fees | $ 30.00 | $ 30.00 | Performance | |
| Whitney Bank | Account Analysis Fees | $ 700.00 | $ 700.00 | Pathway | |

Pathway-Phoenix 000055

**EXHIBIT B**

**PATHWAY Lab Expenses**

| | | | | | | |
|---|---|---|---|---|---|---|
| MicroGenics | Pathway Urine Tox Reagents | $ | 5,000.00 | $ 5,000.00 | Pathway | $1,500.00 |
| BioRad | Pathway Controls - QC | $ | 4,000.00 | $ 4,000.00 | Pathway | |
| U-Line | Shipping Supplies (ice packs, etc) | $ | 700.00 | $ 700.00 | Pathway | |
| Becman Culture | Pathway Reagents | $ | 7,000.00 | $ 7,000.00 | Pathway | |
| Medical Waste | Medical Waste | $ | 800.00 | $ 800.00 | Pathway | |
| Cost Electrical | Pathway/Phoenix Electrical Bill | $ | 2,500.00 | $ 2,500.00 | Pathway | |
| IPFS | Pathway Insurance | $ | 800.00 | $ 800.00 | Pathway | |
| McKesson | Lab Supplies | $ | 3,000.00 | $ 3,000.00 | Pathway | |
| Printing Charge for lab Req | Pathway Req Form Prints (5,000 qty) | $ | 3,000.00 | $ 3,000.00 | Pathway | |
| API | Pathway Proficiency Testing | $ | 1,000.00 | $ 1,000.00 | Pathway | |

**Additional Expenses**

| | | | | | |
|---|---|---|---|---|---|
| TECAN | TECAN | | $ 1,512.65 | | $9,063.90 |
| McDonald Hopkins | Pathway Compliance Legal Counsel Review | | | | $12,817.50 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | $ 468,654.14 | $ 395,482.16 | $ 446,313.00 | $ 4,158,857.58 |

Pathway-Phoenix 000056

**EXHIBIT B**



PATHWAY DIAGNOSTICS LLC

## Encounters Summary

For Posting Date June 1, 2016 through December 21, 2016

Learn more about this report

| Rendering Provider | Encounters | Procedures | Charges | Adjustments | Receipts | Ins Balance | Pat Balance | Total Balance |
|---|---|---|---|---|---|---|---|---|
| **Approved** | | | | | | | | |
| LLC Pathway Diagnostics | 5,561 | 49,673.75 | 11,630,247.89 | 7,129,509.00 | 522,142.22 | 3,450,854.39 | 526,092.28 | 3,976,946.67 |
| **Total Approved** | 5,561 | 49,673.75 | 11,630,247.89 | 7,129,509.00 | 522,142.22 | 3,450,854.39 | 526,092.28 | 3,976,946.67 |
| **Review** | | | | | | | | |
| LLC Pathway Diagnostics | 33 | 0.00 | 17,233.60 | - | - | 17,004.60 | 229.00 | 17,233.60 |
| **Total Review** | 33 | 0.00 | 17,233.60 | - | - | 17,004.60 | 229.00 | 17,233.60 |
| **Draft** | | | | | | | | |
| LLC Pathway Diagnostics | 3 | 0.00 | 3,573.85 | - | - | 3,573.85 | - | 3,573.85 |
| **Total Draft** | 3 | 0.00 | 3,573.85 | - | - | 3,573.85 | - | 3,573.85 |
| **All Status** | | | | | | | | |
| LLC Pathway Diagnostics | 5,597 | 49,673.75 | 11,651,055.34 | 7,129,509.00 | 522,142.22 | 3,471,432.84 | 526,321.28 | 3,997,754.12 |
| **GRAND TOTAL** | 5,597 | 49,673.75 | 11,651,055.34 | 7,129,509.00 | 522,142.22 | 3,471,432.84 | 526,321.28 | 3,997,754.12 |



EXHIBIT
H

## ASSIGNMENT OF INTEREST
## IN PERFORMANCE LABS, LLC

This Assignment of Interest in Performance Labs, LLC by and between **MARK LOBELL**, (hereinafter referred to as "Assignor") and **BLAKE BOURQUE**, (hereinafter referred to as "Assignee") who declared that for and in consideration of the sum of TEN AND NO/100 ($10.00) DOLLARS and other valuable consideration, receipt of which is hereby acknowledged by Assignor, Assignor does hereby convey, give, grant, transfer, assign, set over and deliver all of his right, title and interest to Assignee, but not less than a One Hundred (100%) Percent interest of Assignor's membership interest in Performance Labs, LLC, a limited liability company organized under the laws of the State of Louisiana by virtue of Articles of Organization filed with the Louisiana Secretary of State to Assignee (the "Interest").

Assignor hereby warrants title to the Interest and agrees to defend same against anyone claiming title thereto.

To have and to hold same unto Assignee, its successors and assigns forever.

Assignee does hereby accept the interest herein conveyed, and acknowledges delivery and possession thereof.

**IN WITNESS WHEREOF**, the parties have duly executed this Agreement as of the _26_ day of April, 2017.

**ASSIGNOR:**

_Mark Lobell_

Name: **Mark Lobell**

**ASSIGNEE:**

Name: **Blake Bourque**



## ASSIGNMENT OF INTEREST
## IN NEXTPHAZEMD OPERATIONS, LLC

This Assignment of Interest in NextphazeMD Operations, LLC by and between **MARK LOBELL,** (hereinafter referred to as "Assignor") and **BLAKE BOURQUE,** (hereinafter referred to as "Assignee") who declared that for and in consideration of the sum of TEN AND NO/100 ($10.00) DOLLARS and other valuable consideration, receipt of which is hereby acknowledged by Assignor, Assignor does hereby convey, give, grant, transfer, assign, set over and deliver all of his right, title and interest to Assignee, but not less than a One Hundred (100%) Percent interest of Assignor's membership interest in NextPhazeMD Operations, LLC, a limited liability company organized under the laws of the State of Louisiana by virtue of Articles of Organization filed with the Louisiana Secretary of State to Assignee (the "Interest").

Assignor hereby warrants title to the Interest and agrees to defend same against anyone claiming title thereto.

To have and to hold same unto Assignee, its successors and assigns forever.

Assignee does hereby accept the interest herein conveyed, and acknowledges delivery and possession thereof.

**IN WITNESS WHEREOF,** the parties have duly executed this Agreement as of the 26 day of April, 2017.

**ASSIGNOR:**

_____
Name: Mark Lobell

**ASSIGNEE:**

_____
Name: Blake Bourque



## ASSIGNMENT OF INTEREST
## IN NEXTPHAZEMD HOLDINGS, LLC

This Assignment of Interest in NextphazeMD Holdings, LLC by and between **MARK LOBELL,** (hereinafter referred to as "Assignor") and **BLAKE BOURQUE,** (hereinafter referred to as "Assignee") who declared that for and in consideration of the sum of TEN AND NO/100 ($10.00) DOLLARS and other valuable consideration, receipt of which is hereby acknowledged by Assignor, Assignor does hereby convey, give, grant, transfer, assign, set over and deliver all of his right, title and interest to Assignee, but not less than a One Hundred (100%) Percent interest of Assignor's membership interest in NextPhazeMD Holdings, LLC, a limited liability company organized under the laws of the State of Louisiana by virtue of Articles of Organization filed with the Louisiana Secretary of State to Assignee (the "Interest").

Assignor hereby warrants title to the Interest and agrees to defend same against anyone claiming title thereto.

To have and to hold same unto Assignee, its successors and assigns forever.

Assignee does hereby accept the interest herein conveyed, and acknowledges delivery and possession thereof.

**IN WITNESS WHEREOF,** the parties have duly executed this Agreement as of the 26 day of April, 2017.

ASSIGNOR:

Name: Mark Lobell

ASSIGNEE:

Name: Blake Bourque



## ASSIGNMENT OF INTEREST
## IN TRINITY LIMS, LLC

This Assignment of Interest in Trinity LIMS, LLC by and between **MARK LOBELL,** (hereinafter referred to as "Assignor") and **BLAKE BOURQUE,** (hereinafter referred to as "Assignee") who declared that for and in consideration of the sum of TEN AND NO/100 ($10.00) DOLLARS and other valuable consideration, receipt of which is hereby acknowledged by Assignor, Assignor does hereby convey, give, grant, transfer, assign, set over and deliver all of his right, title and interest to Assignee, but not less than a One Hundred (100%) Percent interest of Assignor's membership interest in Trinity LIMS, LLC, a limited liability company organized under the laws of the State of Louisiana by virtue of Articles of Organization filed with the Louisiana Secretary of State to Assignee (the "Interest").

Assignor hereby warrants title to the Interest and agrees to defend same against anyone claiming title thereto.

To have and to hold same unto Assignee, its successors and assigns forever.

Assignee does hereby accept the interest herein conveyed, and acknowledges delivery and possession thereof.

**IN WITNESS WHEREOF,** the parties have duly executed this Agreement as of the __26__ day of April, 2017.

**ASSIGNOR:**

_Mal Ybru_
Name: Mark Lobell

**ASSIGNEE:**

Name: Blake Bourque

DocuSign Envelope ID: 43390143-52AB-4F3F-BD0E-1FCE0A52B8CB



## ASSIGNMENT OF INTEREST
## IN TRINITY WELLNESS, LLC

This Assignment of Interest in Trinity Wellness, LLC by and between **MARK LOBELL**, (hereinafter referred to as "Assignor") and **BLAKE BOURQUE**, (hereinafter referred to as "Assignee") who declared that for and in consideration of the sum of TEN AND NO/100 ($10.00) DOLLARS and other valuable consideration, receipt of which is hereby acknowledged by Assignor, Assignor does hereby convey, give, grant, transfer, assign, set over and deliver all of his right, title and interest to Assignee, but not less than a One Hundred (100%) Percent interest of Assignor's membership interest in Trinity Wellness, LLC, a limited liability company organized under the laws of the State of Louisiana by virtue of Articles of Organization filed with the Louisiana Secretary of State to Assignee (the "Interest").

Assignor hereby warrants title to the Interest and agrees to defend same against anyone claiming title thereto.

To have and to hold same unto Assignee, its successors and assigns forever.

Assignee does hereby accept the interest herein conveyed, and acknowledges delivery and possession thereof.

**IN WITNESS WHEREOF**, the parties have duly executed this Agreement as of the 26 day of April, 2017.

**ASSIGNOR:**

_Mal Sbell_
Name: Mark Lobell

**ASSIGNEE:**

Name: Blake Bourque

**EXHIBIT B**
Pathway-Phoenix 000062



**EXHIBIT**
M

## ASSIGNMENT OF INTEREST
## IN BELLE HEALTH, LLC

This Assignment of Interest in Belle Health, LLC by and between **MARK LOBELL**, (hereinafter referred to as "Assignor") and **BLAKE BOURQUE**, (hereinafter referred to as "Assignee") who declared that for and in consideration of the sum of TEN AND NO/100 ($10.00) DOLLARS and other valuable consideration, receipt of which is hereby acknowledged by Assignor, Assignor does hereby convey, give, grant, transfer, assign, set over and deliver all of his right, title and interest to Assignee, but not less than a One Hundred (100%) Percent interest of Assignor's membership interest in Belle Health, LLC, a limited liability company organized under the laws of the State of Louisiana by virtue of Articles of Organization filed with the Louisiana Secretary of State to Assignee (the "Interest").

Assignor hereby warrants title to the Interest and agrees to defend same against anyone claiming title thereto.

To have and to hold same unto Assignee, its successors and assigns forever.

Assignee does hereby accept the interest herein conveyed, and acknowledges delivery and possession thereof.

**IN WITNESS WHEREOF**, the parties have duly executed this Agreement as of the 26 day of April, 2017.

**ASSIGNOR:**

_Mark Lobell_
Name: Mark Lobell

**ASSIGNEE:**

_DocuSigned by:_

_____
Name: Blake Bourque

DocuSign Envelope ID: 43390143-52AB-4F3F-BD0E-1FCE0A52B8CB



## ASSIGNMENT OF INTEREST
## IN TRINITY MEDICAL SERVICES, L.L.C.

This Assignment of Interest in Trinity Medical Services, L.L.C. by and between **MARK LOBELL,** (hereinafter referred to as "Assignor") and **BLAKE BOURQUE,** (hereinafter referred to as "Assignee") who declared that for and in consideration of the sum of TEN AND NO/100 ($10.00) DOLLARS and other valuable consideration, receipt of which is hereby acknowledged by Assignor, Assignor does hereby convey, give, grant, transfer, assign, set over and deliver all of his right, title and interest to Assignee, but not less than a One Hundred (100%) Percent interest of Assignor's membership interest in Trinity Medical Services, L.L.C., a limited liability company organized under the laws of the State of Louisiana by virtue of Articles of Organization filed with the Louisiana Secretary of State to Assignee (the "Interest").

Assignor hereby warrants title to the Interest and agrees to defend same against anyone claiming title thereto.

To have and to hold same unto Assignee, its successors and assigns forever.

Assignee does hereby accept the interest herein conveyed, and acknowledges delivery and possession thereof.

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the 26 day of April, 2017.

ASSIGNOR:

Name: Mark Lobell

ASSIGNEE:

Name: Blake Bourque

## ASSIGNMENT OF INTEREST
## IN NORTH AMERICAN TOXICOLOGY, LLC

This Assignment of Interest in North American Toxicology, LLC by and between **MARK LOBELL,** (hereinafter referred to as "Assignor") and **BLAKE BOURQUE,** (hereinafter referred to as "Assignee") who declared that for and in consideration of the sum of TEN AND NO/100 ($10.00) DOLLARS and other valuable consideration, receipt of which is hereby acknowledged by Assignor, Assignor does hereby convey, give, grant, transfer, assign, set over and deliver all of his right, title and interest to Assignee, but not less than a One Hundred (100%) Percent interest of Assignor's membership interest in North American Toxicology, LLC, a limited liability company organized under the laws of the State of Louisiana by virtue of Articles of Organization filed with the Louisiana Secretary of State to Assignee (the "Interest").

Assignor hereby warrants title to the Interest and agrees to defend same against anyone claiming title thereto.

To have and to hold same unto Assignee, its successors and assigns forever.

Assignee does hereby accept the interest herein conveyed, and acknowledges delivery and possession thereof.

**IN WITNESS WHEREOF**, the parties have duly executed this Agreement as of the ____ day of April, 2017.

**ASSIGNOR:**


_____

**Name: Mark Lobell**

**ASSIGNEE:**


_____

**Name: Blake Bourque**

DocuSign Envelope ID: 43390143-52AB-4F3F-BD0E-1FCE0A52B8CB



## ASSIGNMENT OF INTEREST
## IN PRESTIGE WORLDWIDE LEASING, LLC

This Assignment of Interest in Prestige Worldwide Leasing, LLC by and between **MARK LOBELL**, (hereinafter referred to as "Assignor") and **BLAKE BOURQUE**, (hereinafter referred to as "Assignee") who declared that for and in consideration of the sum of TEN AND NO/100 ($10.00) DOLLARS and other valuable consideration, receipt of which is hereby acknowledged by Assignor, Assignor does hereby convey, give, grant, transfer, assign, set over and deliver all of his right, title and interest to Assignee, but not less than a One Hundred (100%) Percent interest of Assignor's membership interest in Prestige Worldwide Leasing, LLC, a limited liability company organized under the laws of the State of Louisiana by virtue of Articles of Organization filed with the Louisiana Secretary of State to Assignee (the "Interest").

Assignor hereby warrants title to the Interest and agrees to defend same against anyone claiming title thereto.

To have and to hold same unto Assignee, its successors and assigns forever.

Assignee does hereby accept the interest herein conveyed, and acknowledges delivery and possession thereof.

**IN WITNESS WHEREOF**, the parties have duly executed this Agreement as of the __26__ day of April, 2017.

ASSIGNOR:

Name: Mark Lobell

ASSIGNEE:

Name: Blake Bourque



## Pathway Diagnostics LLC
## Balance Sheet

Reporting Book:                          ACCRUAL
As of Date:                              04/11/2017
Location:                               Pathway Diagnostics Laboratory, LLC

|  | 4/11/2017 |  |
|---|---|---|
| **Assets** | | |
| Current Assets | | |
| Cash and Cash Equivalents | | |
| 1024 - WB Pathway Diagnostics 0095 | 4,635.57 | |
| 1025 - WB Pathway Diagnostics DPT 0729 | 12,447.97 | |
| Total Cash and Cash Equivalents | 17,083.54 | 17,083.54 |
| Accounts Receivable, Net | | |
| Accounts Receivable | | |
| 1300 - Accounts Receivable | 106,953.40 | |
| Total Accounts Receivable | 106,953.40 | 0.00 |
| Total Accounts Receivable, Net | 106,953.40 | |
| Total Current Assets | 154,036.54 | 17,083.54 |
| Fixed Assets, Net | | |
| Fixed Assets | | |
| 1520 - Equipment | 138,134.17 | 2,015,447.67 |
| Total Fixed Assets | 138,134.17 | |
| Accumulated Depreciation | | |
| 1620 - Accum Dep - Equipment | 25,214.16 | 25,214.16 |
| Total Accumulated Depreciation | 25,214.16 | |
| Total Fixed Assets, Net | 112,920.01 | 1,990,233.5 |
| Other assets - goodwill | | 631,902.26 |
| **Total Assets** | **$ 266,956.55** | **2,639,219.31** |

**Liabilities and Equity**

Liabilities

Current Liabilities

| | | |
|---|---:|---:|
| Accounts Payable | | |
| 2000 - Accounts Payable | 1,458,454.43 | 210,725.31 |
| Total Accounts Payable | 1,458,454.43 | |
| | | |
| Loan Payable | | |
| 2401 - Whitney Bank LOC - Pathway | 538,000.00 | 538,000.00 |
| **** -Home Bank | | 355,000.00 |
| **** - DeLage | | 1,535,494.00 |
| Total Loan Payable | 538,000.00 | 2,428,494.00 |
| | | |
| Total Current Liabilities | 1,996,454.43 | 2,639,219.31 |
| | | |
| Total Liabilities | 1,996,454.43 | 2,639,219.31 |
| | | |
| Stockholders Equity | | |
| | | |
| Partners Equity | | |
| 3115 - K & S Innovative Holdings, LLC Contributions | 294,000.00 | 0.00 |
| Total Partners Equity | 282,950.00 | |
| | | |
| Total Member's Equity | (1,679,497.88) | 0.00 |
| | | |
| Total Liabilities and Equity | $ 266,956.55 | 2,639,219.31 |

Created on: 04/11/2017 12:29 PM



## Phoenix Health LLC
## Balance Sheet

Reporting Book:    ACCRUAL
As of Date:     03/31/2017
Location:      Phoenix Health, LLC

|  | Month Ending 03/31/2017 | | |
|---|---|---|---|
| **Assets** | | | |
| Current Assets | | | |
| Cash and Cash Equivalents | | | |
| 1026 - WB Phoenix Health 4061 | 12.59 | | 12.59 |
| 1027 - WB Phoenix Health 4536 DPT | 86.78 | | 86.78 |
| Total Cash and Cash Equivalents | 99.37 | | 99.37 |
| Accounts Receivable, Net | | | |
| Accounts Receivable | | | |
| 1300 - Accounts Receivable | 677,200.00 | (677,200.00) | 0.00 |
| Total Accounts Receivable | 677,200.00 | | |
| Total Accounts Receivable, Net | 677,200.00 | | |
| Total Current Assets | 677,299.37 | | |
| Fixed Assets, Net | | | |
| Fixed Assets | | | |
| 1520 - Accumulated Depreciation | (1,321.86) | | |
| 1520 - Equipment | 12,175.98 | | |
| 1535 - Leasehold Improvements | 6,330.12 | | |
| Total Fixed Assets | 17,184.24 | | |
| Total Fixed Assets, Net | 17,184.24 | | 29,012.64 |
| **Total Assets** | **$ 694,483.61** | | 29,112.01 |
| **Liabilities and Equity** | | | |
| Liabilities | | | |
| Current Liabilities | | | |
| Accounts Payable | | | |
| 2000 - Accounts Payable | 217,432.44 | -188320.43 | 29,112.01 |
| Total Accounts Payable | 217,432.44 | | |

| | | | |
|---|---|---|---|
| Total Current Liabilities | 217,432.44 | | 29,112.01 |
| **Other Liabilities** | | | |
| Other Liabilities | | | |
| 2900 - Long Term Lease 1 | | | |
| Total Other Liabilities | | | |
| **Total Other Liabilities** | | | |
| **Total Liabilities** | 217,432.44 | | 29,112.01 |
| **Stockholders Equity** | | | |
| Partners Equity | | | |
| 3125 - Shamrock Holdings, LLC Contributions | 110,200.00 | | |
| Total Partners Equity | 110,200.00 | (110,200.00) | 0 |
| Additional Paid in Capital | | | |
| 3031 - Retained Earnings | 361,356.34 | | |
| Total Additional Paid In Capital | 361,356.34 | (373,184.74) | 0.00 |
| Total Stockholders Equity | 471,556.34 | (471,556.34) | 0 |
| **Total Liabilities and Equity** | **$ 688,988.78** | | 29,112.01 |

Created on: 04/11/2017 09:54 AM

DocuSign Envelope ID: 43390143-52AB-4F3F-BD0E-1FCE0A52B8CB



**EXHIBIT**

**ASSIGNMENT OF INTEREST
IN RIGHTS AND PROCEEDS FROM MERGE LAWSUIT**

This Assignment of Interest in Rights and Proceeds from MERGE Lawsuit by and between **MARK LOBELL,** (hereinafter referred to as "Assignor") and **BLAKE BOURQUE,** (hereinafter referred to as "Assignee") who declared that for and in consideration of the sum of TEN AND NO/100 ($10.00) DOLLARS and other valuable consideration, receipt of which is hereby acknowledged by Assignor, Assignor does hereby convey, give, grant, transfer, assign, set over and deliver all of his right, title and interest to Assignee, but not less than a One Hundred (100%) Percent of the proceeds or payments received from Merge Healthcare and/or IBM for any lawsuit involving Bourque, directly or indirectly, and Merge Healthcare or IBM (the "Interest").

Assignor hereby warrants title to the Interest and agrees to defend same against anyone claiming title thereto.

To have and to hold same unto Assignee, its successors and assigns forever.

Assignee does hereby accept the interest herein conveyed, and acknowledges delivery and possession thereof.

**IN WITNESS WHEREOF,** the parties have duly executed this Agreement as of the 26 day of April, 2017.

**ASSIGNOR:**

_Mal Lobell_
Name: Mark Lobell

**ASSIGNEE:**

Name: Blake Bourque

**EXHIBIT B
Pathway-Phoenix 000071**

 **Byline Financial Group™** 2801 Lakeside Drive
Suite 212
Bannockburn, IL 60015-1849

**INVOICE** *Address Service Requested*

### Remittance Section

| | |
|---|---|
| Customer Number: | 033529 |
| Invoice Number: | 329732 |
| Total Amount Due: | $4,324.53 |
| Amount Remitted: | $ |

If paying other than balance due indicate how to apply your check.

Use enclosed envelope and make payable to:

TRINITY MEDICAL SERVICES, L.L.C. & PERFORMANCE LABS, LLC AS
21385 MARION LANE STE C
MANDEVILLE LA 70471-8715

BYLINE FINANCIAL GROUP-03
ACCOUNTS RECEIVABLE
BIN 88205
MILWAUKEE, WI 53288-8205

||ı|ı·ıı|ıı|ı·ıı||||||ıı|ı·ı||ı||ıı||ıı||ı·ıı·ıı·ıı||ıı·ıı||

205 033529 0000329732 0000432453 6

---

*Keep lower portion for your records - Please return upper portion with your payment.*

 **Byline Financial Group™**

| | | | |
|---|---|---|---|
| Customer Name: | Trinity Medical Services, L.L.C. & | Customer Number: | 033529 |
| | Performance Labs, LLC as Co-lessee's | Invoice Number | 329732 |
| Invoice Date: | 12/09/16 | Total Amount Due: | $4,324.53 |

## Important Messages

### Visit us at: Bylinefinancialgroup.com

If you have any questions regarding any insurance charges on your invoice, please call our Insurance group at 877-878-0379. For **ALL OTHER** inquiries, please contact our Customer Service Department. Customer Service contact information is on the back of this invoice.

## Invoice Summary

| ACCOUNT No. | DESCRIPTION | DUE DATE | AMOUNT |
|---|---|---|---|
| | Balance Forward | | 2,059.30 |
| 36733 | MERGE HEATHCARE LIS HARWARE AND S Late Charge - 12/01/16 Pmt | 01/01/17 | 205.93 |
| | MERGE HEATHCARE LIS HARWARE AND S Rental Payment | 01/01/17 | 2,059.30 |
| | | **TOTAL AMOUNT DUE:** | **$4,324.53** |

| Current | 1-30 Days | 31-60 Days | 61-90 Days | Over 90 Days |
|---|---|---|---|---|
| 2265.23 | 2059.30 | 0.00 | 0.00 | 0.00 |

If you have questions regarding your bill, please give us a call and we will be happy to assist you.  (877) 497-2811

page 1 of 2

**EXHIBIT B**
Pathway-Phoenix 000072

 **Byline Financial Group**
2801 Lakeside Drive
Suite 212
Bannockburn, IL 60015-1849

**INVOICE**

*Address Service Requested*

**Remittance Section**

| | |
|---|---|
| Customer Number: | 033529 |
| Invoice Number: | 359174 |
| Total Amount Due: | $4,530.46 |
| Amount Remitted: | $ |

If paying other than balance due indicate how to apply your check.

Use enclosed envelope and make payable to:

TRINITY MEDICAL SERVICES, L.L.C. & PERFORMANCE LABS, LLC AS
21335 MARION LANE STE C
MANDEVILLE LA 70471-6715

BYLINE FINANCIAL GROUP-03
ACCOUNTS RECEIVABLE
BIN 88205
MILWAUKEE, WI 53288-8205

205 033529 0000359174 0000453046 6

---

*Keep lower portion for your records - Please return upper portion with your payment.*

 **Byline Financial Group**

| | | | |
|---|---|---|---|
| Customer Name: | Trinity Medical Services, L.L.C. & | Customer Number: | 033529 |
| | Performance Labs, LLC as Co-lessee's | Invoice Number | 359174 |
| Invoice Date: | 04/10/17 | Total Amount Due: | $4,530.46 |

## Important Messages

### Visit us at: Bylinefinancialgroup.com

If you have any questions regarding any insurance charges on your invoice, please call our insurance group at 877-878-0379. For ALL OTHER inquiries, please contact our Customer Service Department. Customer Service contact information is on the back of this invoice.



## Invoice Summary

| ACCOUNT No. | DESCRIPTION | DUE DATE | AMOUNT |
|---|---|---|---|
| | Balance Forward | | 2,265.23 |
| 36733 | MERGE HEATHCARE LIS HARWARE AND S Late Charge - 04/01/17 Pmt | 05/01/17 | 205.93 |
| | MERGE HEATHCARE LIS HARWARE AND S Rental Payment | 05/01/17 | 2,059.30 |
| | | **TOTAL AMOUNT DUE:** | **$4,530.46** |

| Current | 1-30 Days | 31-60 Days | 61-90 Days | Over 90 Days |
|---|---|---|---|---|
| 2265.23 | 2265.23 | 0.00 | 0.00 | 0.00 |

If you have questions regarding your bill, please give us a call and we will be happy to assist you.  (877) 497-2811

---

**EXHIBIT B**
Pathway-Phoenix 000073

## Byline Financial Group™

**INVOICE**

2801 Lakeside Drive
Suite 212
Bannockburn, IL 60015-1849

*Address Service Requested*

### Remittance Section

| | |
|---|---|
| Customer Number: | 033529 |
| Invoice Number: | 366219 |
| **Total Amount Due:** | **$4,530.46** |
| Amount Remitted: | $_____ |

If paying other than balance due indicate how to apply your check.

9734003013   PRESORT 3013 1 MB 0.420 P1C11 <B>

TRINITY MEDICAL SERVICES, L.L.C. & PERFORMA
21385 MARION LANE STE C
MANDEVILLE LA 70471-8715

Use enclosed envelope and make payable to:

BYLINE FINANCIAL GROUP-03
ACCOUNTS RECEIVABLE
BIN 88205
MILWAUKEE, WI 53288-8205

*Pathway*

205 033529 0000366219 0000453046 8

*Keep lower portion for your records - Please return upper portion with your payment.*

## Byline Financial Group™

| | | | |
|---|---|---|---|
| Customer Name: | Trinity Medical Services, L.L.C. & Performance Labs, LLC as Co-lesses's | Customer Number: | 033529 |
| Invoice Date: | 05/10/17 | Invoice Number | 366219 |
| | | Total Amount Due: | $4,530.46 |

**Important Messages**

## Visit us at: Bylinefinancialgroup.com

If you have any questions regarding any insurance charges on your invoice, please call our Insurance group at 877-878-0379. For **ALL** **OTHER** inquiries, please contact our Customer Service Department. Customer Service contact information is on the back of this invoice.

## Invoice Summary

| ACCOUNT No. DESCRIPTION | DUE DATE | AMOUNT |
|---|---|---|
| Balance Forward | | 2,265.23 |
| 36733  MERGE HEATHCARE LIS HARWARE AND S Late Charge_05/01/17 Pmt | 06/01/17 | 205.93 |
| MERGE HEATHCARE LIS HARWARE AND S Rental Payment | 06/01/17 | 2,059.30 |
| | | |
| | | |
| | | |
| | TOTAL AMOUNT DUE: | $4,530.46 |

| Current | 1-30 Days | 31-60 Days | 61-90 Days | Over 90 Days |
|---|---|---|---|---|
| 2265.23 | 2265.23 | 0.00 | 0.00 | 0.00 |

If you have questions regarding your bill, please give us a call and we will be happy to assist you.  (877) 497-2811

page 1 of 2



An IBM Company

www.merge.com

REMIT TO:
Merge Healthcare
P.O. Box 205824
Dallas, TX 75320-5824

# Credit Invoice

Invoice Number    CR12547

Dec 21, 2016

Trinity Medical Services, LLC
50 East Court, Suite 8
Mandeville LA 70471

## Customer Information

| | |
|---|---|
| Customer Number | 21589 |
| Terms of Payment | 30 Days Net |
| Tax Identity | |
| Purchase Order Number | |
| Label Note | SFDC-99626 - Ptl Cr on CD1115124 |
| Contract | |

## Invoice Information

| | |
|---|---|
| Order Number | S49317 |
| Invoice Number | CR12547 |
| Invoice Date | Dec 21, 2016 |
| Ship Via | CTX-ICAT |
| Terms of Delivery | Prepaid and Bill - FOB Origin |
| Delivery Address | Trinity Medical Services, LLC |
| | 50 East CT |
| | Mandeville LA 70471-7798 |

| POS | PART NO | PART DESCRIPTION | Quantity | Unit | Sales Unit Price | Net Amount | Total with Tax |
|---|---|---|---|---|---|---|---|
| 5 | PS-LIS-00023 | LAB, REMOTE SESSION | 3 | EA | 500.00 | -1,500.00 | -1,500.00 |

Ptl Cr on CD1113154 & CD1115124 - Change order: Misquotd order.
   2  Due Net 60 Days
   50% of total amount  3000

| | | |
|---|---|---|
| Total Exclusive Tax | | -1,500.00 |
| Total Tax | | 0.00 |
| Invoice Amount | USD | -1,500.00 |

Company Name
Recieved_____
Entered_____
Approved_____
Paid_____

Duns: 06-562-6069    Fed ID: 59-2248411
900 Walnut Ridge Drive | Hartland, WI 53029-8347 | P: 262.367.0700

Page 1

**EXHIBIT B**
Pathway-Phoenix 000075



**MERGE**
An IBM Company

www.merge.com

REMIT TO:
Merge Healthcare
P.O. Box 205824
Dallas, TX 75320-5824

# Credit Invoice

Invoice Number    CR12546

Dec 21, 2016

Trinity Medical Services, LLC
50 East Court, Suite 8
Mandeville LA 70471

## Customer Information

| Customer Number | 21589 |
|---|---|
| Terms of Payment | 30 Days Net |
| Tax Identity | |
| Purchase Order Number | |
| Label Note | SFDC-99626 - Ptl Cr on CD1113154 |
| Contract | |

## Invoice Information

| Order Number | S49317 |
|---|---|
| Invoice Number | CR12546 |
| Invoice Date | Dec 21, 2016 |
| Ship Via | CTX-ICAT |
| Terms of Delivery | Prepaid and Bill - FOB Origin |
| Delivery Address | Trinity Medical Services, LLC 50 East CT Mandeville LA 70471-7798 |

| POS | PART NO | PART DESCRIPTION | Quantity | Unit | Sales Unit Price | Net Amount | Total with Tax |
|---|---|---|---|---|---|---|---|
| 5 | PS-LIS-00023 | LAB, REMOTE SESSION | 3 | EA | 500.00 | -1,500.00 | -1,500.00 |

Ptl Cr on CD1113154 & CD1115124 - Change order: Misquotd order.
1   Due On Effective Date
50% of total amount 3000

| | | |
|---|---|---|
| Total Exclusive Tax | | -1,500.00 |
| Total Tax | | 0.00 |
| Invoice Amount | USD | -1,500.00 |

Duns: 06-562-6069     Fed ID: 59-2248411
900 Walnut Ridge Drive | Hartland, WI 53029-8347 | P: 262.367.0700

Page 1

**EXHIBIT B**
Pathway-Phoenix 000076

**PATHWAY DIAGNOSTICS, LLC**
100 STREET A SUITE E
PICAYUNE, MS 39466

1396

65-036/653
42

DATE 8/14/2017

PAY
TO THE
ORDER OF  Byline Financial Group          $ 2265.23

two thousand two hundred sixty-five +23/100      DOLLARS

**Hancock Bank**
hancockbank.com

FOR Invoice # 379949

⑆001396⑆ ⑆065503681⑆ 0048590095⑆



## Byline Financial Group®

2601 Lakeside Drive
Suite 212
Bannockburn, IL 60015-1849

**INVOICE**

*Address Service Requested*

### Remittance Section

| | |
|---|---|
| Customer Number: | 033529 |
| Invoice Number: | 352148 |
| Total Amount Due: | $4,530.46 |
| Amount Remitted: | $_____ |

If paying other than balance due indicate how to apply your check.

2764003021    PRESORT 5021 1 MB 0.420 P1C11 <B>

TRINITY MEDICAL SERVICES, L.L.C. & PERFORMA
21385 MARION LANE STE C
MANDEVILLE LA 70471-8715

Use enclosed envelope and make payable to:

BYLINE FINANCIAL GROUP-03
ACCOUNTS RECEIVABLE
BIN 88205
MILWAUKEE, WI 53288-8205

205  033529  0000352148  0000453046  4

---

*Keep lower portion for your records - Please return upper portion with your payment.*

## Byline Financial Group®

| | | | |
|---|---|---|---|
| Customer Name: | Trinity Medical Services, L.L.C. & | Customer Number: | 039529 |
| | Performance Labs, LLC as Co-lesses's | Invoice Number | 352148 |
| Invoice Date: | 03/10/17 | Total Amount Due: | $4,530.46 |

### Important Messages

## Visit us at: Bylinefinancialgroup.com

If you have any questions regarding any insurance charges on your invoice, please call our insurance group at 877-878-0379. For **ALL** **OTHER** inquiries, please contact our Customer Service Department. Customer Service contact information is on the back of this invoice.

*[handwritten:] Company Name Performance*
*Recieved 3/20/2017*
*Entered 3/20/2017*
*Approved Lease*
*Paid 4/26/2017*

*[handwritten:] Principal 1454.41*
*Interest 430.53*

### Invoice Summary

| ACCOUNT No. DESCRIPTION | | DUE DATE | AMOUNT |
|---|---|---|---|
| | Balance Forward | | 2,265.23 |
| 35733 | MERGE HEATHCARE LIS HARWARE AND S Late Charge - 03/01/17 Pmt | 04/01/17 | 205.93 |
| 35733 | MERGE HEATHCARE LIS HARWARE AND S Rental Payment | 04/01/17 | 2,059.30 |
| | | | |
| | | | |
| | | | |
| | | **TOTAL AMOUNT DUE:** | **$4,530.46** |

| Current | 1-30 Days | 31-60 Days | 61-90 Days | Over 90 Days |
|---|---|---|---|---|
| 2265.23 | 2265.23 | 0.00 | 0.00 | 0.00 |

If you have questions regarding your bill, please give us a call and we will be happy to assist you.  (877) 497-2811

page 1 of 2

## BY Byline Financial Group

2801 Lakeside Drive
Suite 212
Bannockburn, IL 60015-1849

**INVOICE**

*Address Service Requested*

**Remittance Section**

| | |
|---|---|
| Customer Number: | 033529 |
| Invoice Number: | 373010 |
| Total Amount Due: | $4,530.46 |
| Amount Remitted: | $ |

If paying other than balance due indicate how to apply your check.

Use enclosed envelope and make payable to:

7848002992    PRESORT 2992 1 MB 0.420 P1C11 <8>

TRINITY MEDICAL SERVICES, L.L.C. & PERFORMA
21985 MARION LANE STE C
MANDEVILLE LA 70471-6715

BYLINE FINANCIAL GROUP-03
ACCOUNTS RECEIVABLE
BIN 88205
MILWAUKEE, WI 53288-8205

205  033529  0000373010  0000453046  5

*Keep lower portion for your records - Please return upper portion with your payment.*

## BY Byline Financial Group

| | | | |
|---|---|---|---|
| Customer Name: | Trinity Medical Services, L.L.C. & Performance Labs, LLC as Co-lessee's | Customer Number: | 033529 |
| | | Invoice Number | .373010 |
| Invoice Date: | 06/09/17 | Total Amount Due: | $4,530.46 |

**Important Messages**

## Visit us at: Bylinefinancialgroup.com

If you have any questions regarding any insurance charges on your invoice, please call our insurance group at 877-878-0379. For **ALL OTHER** inquiries, please contact our Customer Service Department. Customer Service contact information is on the back of this invoice.

### Invoice Summary

| ACCOUNT No. | DESCRIPTION | DUE DATE | AMOUNT |
|---|---|---|---|
| | Balance Forward | | 2,265.23 |
| 36733 | MERGE HEATHCARE LIS HARWARE AND S Late Charge - 06/01/17 Pmt | 07/01/17 | 205.93 |
| | MERGE HEATHCARE LIS HARWARE AND S Rental Payment | 07/01/17 | 2,059.30 |
| | TOTAL AMOUNT DUE | | $4,530.46 |

| Current | 1-30 Days | 31-60 Days | 61-90 Days | Over 90 Days |
|---|---|---|---|---|
| 2265.23 | 2265.23 | 0.00 | 0.00 | 0.00 |

If you have questions regarding your bill, please give us a call and we will be happy to assist you.  (877) 497-2011

page 1 of 2

**EXHIBIT B**
**Pathway-Phoenix 000079**

Pathway-Phoenix 000080

**PATHWAY DIAGNOSTICS LLC**
100 STREET A SUITE E
PICAYUNE, MS 39466

1359

85-358 655
42

DATE 7-10-17

PAY TO THE ORDER OF _Byline Financial Group_    $ 2,265 23

_Two thousand two hundred sixty five + 23/100_    DOLLARS

**Hancock Bank.**
hancockbank.com

FOR _____

_Hugh Moats_

⑈006 1359⑈ ⑈065503681⑈ 0048590095⑈

EXHIBIT B
Pathway-Phoenix 000081

**PATHWAY DIAGNOSTICS LLC**
100 STREET A SUITE E
PICAYUNE, MS 39466

1283

85-388/855
42

DATE  5-30-17

PAY
TO THE
ORDER OF  Byline Financial Group                    $ 2,265  23

Two thousand two hundred sixty five  +  23/100  ____ DOLLARS

**Hancock Bank**
hancockbank.com

FOR  Inv. 359174

Kyle M Gates

⑆001283⑆ ⑆065503681⑆ 0048590095⑆



*Paid*

**Byline Financial Group™**
**INVOICE**

2801 Lakeside Drive
Suite 212
Bannockburn, IL 60015-1849

*Address Service Requested*

## Remittance Section

| | |
|---|---|
| Customer Number: | 033529 |
| Invoice Number: | 366219 |
| Total Amount Due: | $4,530.46 |
| Amount Remitted: | $_____ |

If paying other than balance due indicate how to apply your check.

Use enclosed envelope and make payable to:

TRINITY MEDICAL SERVICES, L.L.C. & PERFORMANCE LABS, LLC AS
21385 MARION LANE STE C
MANDEVILLE LA 70471-8715

BYLINE FINANCIAL GROUP-03
ACCOUNTS RECEIVABLE
BIN 88205
MILWAUKEE, WI 53288-8205

205 033529 0000366219 0000453046 8

*Keep lower portion for your records - Please return upper portion with your payment.*

**Byline Financial Group™**

| | | | |
|---|---|---|---|
| Customer Name: | Trinity Medical Services, L.L.C. & Performance Labs, LLC as Co-lessee's | Customer Number: | 033529 |
| | | Invoice Number | 366219 |
| Invoice Date: | 05/10/17 | Total Amount Due: | $4,530.46 |

## Important Messages

### Visit us at: Bylinefinancialgroup.com

If you have any questions regarding any insurance charges on your invoice, please call our Insurance group at 877-878-0379. For ALL OTHER inquiries, please contact our Customer Service Department. Customer Service contact information is on the back of this invoice.

## Invoice Summary

| ACCOUNT No. | DESCRIPTION | DUE DATE | AMOUNT |
|---|---|---|---|
| | Balance Forward | | 2,265.23 |
| 36733 | MERGE HEATHCARE LIS HARWARE AND S Late Charge - 05/01/17 Pmt | 06/01/17 | 205.93 |
| | MERGE HEATHCARE LIS HARWARE AND S Rental Payment | 06/01/17 | 2,059.30 |
| | | | |
| | | | |
| | | | |
| | | TOTAL AMOUNT DUE: | $4,530.46 |

| Current | 1-30 Days | 31-60 Days | 61-90 Days | Over 90 Days |
|---|---|---|---|---|
| 2265.23 | 2265.23 | 0.00 | 0.00 | 0.00 |

If you have questions regarding your bill, please give us a call and we will be happy to assist you.  (877) 497-2611

page 1 of 2

**EXHIBIT B**
Pathway-Phoenix 000082



*Paid*

**Byline Financial Group**
2601 Lakeside Drive
Suite 212
Bannockburn, IL 60015-1849

**INVOICE**

*Address Service Requested*

**Remittance Section**

| | |
|---|---|
| Customer Number: | 033529 |
| Invoice Number: | 366219 |
| Total Amount Due: | $4,530.46 |
| Amount Remitted: | $ |

If paying other than balance due indicate how to apply your check.

Use enclosed envelope and make payable to:

TRINITY MEDICAL SERVICES, L.L.C. & PERFORMANCE LABS, LLC AS
21385 MARION LANE STE C
MANDEVILLE LA 70471-8715

BYLINE FINANCIAL GROUP-03
ACCOUNTS RECEIVABLE
BIN 88205
MILWAUKEE, WI 53288-8205

205 033529 0000366219 0000453046 8

---



**Byline Financial Group**

*Keep lower portion for your records - Please return upper portion with your payment.*

| | | | |
|---|---|---|---|
| Customer Name: | Trinity Medical Services, L.L.C. & | Customer Number: | 033529 |
| | Performance Labs, LLC as Co-lessee's | Invoice Number | 366219 |
| Invoice Date: | 05/10/17 | Total Amount Due: | $4,530.46 |

## Important Messages

### Visit us at: Bylinefinancialgroup.com

If you have any questions regarding any insurance charges on your invoice, please call our insurance group at 877-878-0379. For ALL OTHER inquiries, please contact our Customer Service Department. Customer Service contact information is on the back of this invoice.

## Invoice Summary

| ACCOUNT No. | DESCRIPTION | DUE DATE | AMOUNT |
|---|---|---|---|
| | Balance Forward | | 2,265.23 |
| 36733 | MERGE HEATHCARE LIS HARWARE AND S Late Charge - 05/01/17 Pmt | 06/01/17 | 205.93 |
| | MERGE HEATHCARE LIS HARWARE AND S Rental Payment | 06/01/17 | 2,059.30 |
| | | | |
| | | | |
| | | | |
| | **TOTAL AMOUNT DUE:** | | **$4,530.46** |

| Current | 1-30 Days | 31-60 Days | 61-90 Days | Over 90 Days |
|---|---|---|---|---|
| 2265.23 | 2265.23 | 0.00 | 0.00 | 0.00 |

If you have questions regarding your bill, please give us a call and we will be happy to assist you.  (877) 497-2811

page 1 of 2

**EXHIBIT B**
Pathway-Phoenix 000083

EXHIBIT B
Pathway-Phoenix 000084

**PATHWAY DIAGNOSTICS LLC**
100 STREET A SUITE E
PICAYUNE, MS 39466

1307

63-358/653
42

DATE 6/19/2017

PAY TO THE ORDER OF  _Byline Financial_                     $ 2,265.23

_two thousand two hundred sixty-five_ +23/100  DOLLARS

⊕ **Hancock Bank.**
hancockbank.com

FOR _Invoice # 366219_

⑈001307⑈ ⑆0655036 1⑈  0048590095⑈



**Byline Financial Group**
INVOICE

2801 Lakeside Drive
Suite 212
Bannockburn, IL 60015-1849

*Address Service Requested*

## Remittance Section

| | |
|---|---|
| Customer Number: | 033529 |
| Invoice Number: | 338195 |
| Total Amount Due: | $4,530.46 |
| Amount Remitted: | $ |

If paying other than balance due indicate how to apply your check.

TRINITY MEDICAL SERVICES, L.L.C. & PERFORMANCE LABS, LLC AS
21385 MARION LANE STE C
MANDEVILLE LA 70471-8715

Use enclosed envelope and make payable to:

BYLINE FINANCIAL GROUP-03
ACCOUNTS RECEIVABLE
BIN 88205
MILWAUKEE, WI 53288-8205

205 033529 0000338195 0000453046 1


**Byline Financial Group**

*Keep lower portion for your records - Please return upper portion with your payment.*

| | | | |
|---|---|---|---|
| Customer Name: | Trinity Medical Services, L.L.C. & | Customer Number: | 033529 |
| | Performance Labs, LLC as Co-lessee's | Invoice Number: | 338195 |
| Invoice Date: | 01/11/17 | Total Amount Due: | $4,530.46 |

## Important Messages

### Visit us at: Bylinefinancialgroup.com

If you have any questions regarding any insurance charges on your invoice, please call our insurance group at 877-878-0379. For <u>ALL</u> <u>OTHER</u> inquiries, please contact our Customer Service Department. Customer Service contact information is on the back of this invoice.

## Invoice Summary

| ACCOUNT No. | DESCRIPTION | DUE DATE | AMOUNT |
|---|---|---|---|
| | Balance Forward | | 2,265.23 |
| 36733 | MERGE HEATHCARE LIS HARWARE AND S Late Charge - 01/01/17 Pmt | 02/01/17 | 205.93 |
| | MERGE HEATHCARE LIS HARWARE AND S Rental Payment | 02/01/17 | 2,059.30 |
| | | **TOTAL AMOUNT DUE:** | **$4,530.46** |

| Current | 1-30 Days | 31-60 Days | 61-80 Days | Over 80 Days |
|---|---|---|---|---|
| 2265.23 | 2265.23 | 0.00 | 0.00 | 0.00 |

If you have questions regarding your bill, please give us a call and we will be happy to assist you.  (877) 497-2811

page 1 of 2

**EXHIBIT B**
Pathway-Phoenix 000085

 **Byline Financial Group™** 2801 Lakeside Drive
Suite 212
Bannockburn, IL 60015-1849

**INVOICE** *Address Service Requested*

## Remittance Section

| | |
|---|---|
| Customer Number: | 033529 |
| Invoice Number: | 345158 |
| Total Amount Due: | $6,795.69 |
| Amount Remitted: | $_____ |

If paying other than balance due indicate how to apply your check.

Use enclosed envelope and make payable to:

TRINITY MEDICAL SERVICES, L.L.C. & PERFORMANCE LABS, LLC AS
21385 MARION LANE STE C
MANDEVILLE LA 70471-8715

BYLINE FINANCIAL GROUP-03
ACCOUNTS RECEIVABLE
BIN 88205
MILWAUKEE, WI 53288-8205

||ı,ıı··||ıʳ·||||ı|ılı|·ı||·ılıı|||ıı||ʳı|ılı|ıı||ı·ı|||

205 033529 0000345158 0000679569 8

*Keep lower portion for your records - Please return upper portion with your payment.*

 **Byline Financial Group™**

| | | | |
|---|---|---|---|
| Customer Name: | Trinity Medical Services, L.L.C. & Performance Labs, LLC as Co-lesses's | Customer Number: | 033529 |
| Invoice Date: | 02/10/17 | Invoice Number | 345158 |
| | | Total Amount Due: | $6,795.69 |

## Important Messages

### Visit us at: Bylinefinancialgroup.com

If you have any questions regarding any insurance charges on your invoice, please call our Insurance group at 877-878-0379. For ALL OTHER inquiries, please contact our Customer Service Department. Customer Service contact information is on the back of this invoice.

## Invoice Summary

| ACCOUNT No. | DESCRIPTION | DUE DATE | AMOUNT |
|---|---|---|---|
| | Balance Forward | | 4,530.46 |
| 36733 | MERGE HEATHCARE LIS HARWARE AND S Late Charge - 02/01/17 Pmt | 03/01/17 | 205.93 |
| | MERGE HEATHCARE LIS HARWARE AND S Rental Payment | 03/01/17 | 2,059.30 |
| | | TOTAL AMOUNT DUE: | $6,795.69 |

| Current | 1-30 Days | 31-60 Days | 61-90 Days | Over 90 Days |
|---|---|---|---|---|
| 2265.23 | 2265.23 | 2265.23 | 0.00 | 0.00 |

If you have questions regarding your bill, please give us a call and we will be happy to assist you.  (877) 497-2811

**EXHIBIT B**
Pathway-Phoenix 000086

 Byline Financial Group™  2801 Lakeside Drive
Suite 212
Bannockburn, IL 60015-1849

**INVOICE**   *Address Service Requested*

### Remittance Section

| | |
|---|---|
| Customer Number: | 033529 |
| Invoice Number: | 352148 |
| Total Amount Due: | $4,530.46 |
| Amount Remitted: | $ |

If paying other than balance due indicate how to apply your check.

Use enclosed envelope and make payable to:

TRINITY MEDICAL SERVICES, L.L.C. & PERFORMANCE LABS, LLC AS
21385 MARION LANE STE C
MANDEVILLE LA 70471-8715

BYLINE FINANCIAL GROUP-03
ACCOUNTS RECEIVABLE
BIN 88205
MILWAUKEE, WI 53288-8205

ḷ₁ₚₗ₁₁₁₁₁ₗₗₚₗₗₚₗₗₗₚₗₗₗₗₗₗₗₗₗₗₗₗₗₗₗₗₗₗₗₗₗₗₗₗₗₗₗₗₚ

205 033529 0000352148 0000453046 4

*Keep lower portion for your records - Please return upper portion with your payment.*

 Byline Financial Group™

| Customer Name: | Trinity Medical Services, L.L.C. & | Customer Number: | 033529 |
|---|---|---|---|
| | Performance Labs, LLC as Co-lesses's | Invoice Number | 352148 |
| Invoice Date: | 03/10/17 | Total Amount Due: | $4,530.46 |

## Important Messages

### Visit us at: Bylinefinancialgroup.com

If you have any questions regarding any insurance charges on your invoice, please call our Insurance group at 877-878-0379. For **ALL OTHER** inquiries, please contact our Customer Service Department. Customer Service contact information is on the back of this invoice.

## Invoice Summary

| ACCOUNT No. DESCRIPTION | | DUE DATE | AMOUNT |
|---|---|---|---|
| | Balance Forward | | 2,265.23 |
| 36733 | MERGE HEATHCARE LIS HARWARE AND S Late Charge - 03/01/17 Pmt | 04/01/17 | 205.93 |
| | MERGE HEATHCARE LIS HARWARE AND S Rental Payment | 04/01/17 | 2,059.30 |
| | | **TOTAL AMOUNT DUE:** | **$4,530.46** |

| Current | 1-30 Days | 31-60 Days | 61-90 Days | Over 90 Days |
|---|---|---|---|---|
| 2265.23 | 2265.23 | 0.00 | 0.00 | 0.00 |

If you have questions regarding your bill, please give us a call and we will be happy to assist you.  (877) 497-2811

page 1 of 2

**EXHIBIT B**
Pathway-Phoenix 000087

 **Byline Financial Group**

**INVOICE**

2801 Lakeside Drive
Suite 212
Bannockburn, IL 60015-1849

*Address Service Requested*

**Remittance Section**

| | |
|---|---|
| Customer Number: | 033529 |
| Invoice Number: | 359174 |
| Total Amount Due: | $4,530.46 |
| Amount Remitted: | $ |

If paying other than balance due indicate how to apply your check.

Use enclosed envelope and make payable to:

TRINITY MEDICAL SERVICES, L.L.C. & PERFORMANCE LABS, LLC AS
21385 MARION LANE STE C
MANDEVILLE LA 70471-8715

BYLINE FINANCIAL GROUP-03
ACCOUNTS RECEIVABLE
BIN 88205
MILWAUKEE, WI 53288-8205

205 033529 0000359174 0000453046 6

*Keep lower portion for your records - Please return upper portion with your payment.*

 **Byline Financial Group**

| | | | | |
|---|---|---|---|---|
| Customer Name: | Trinity Medical Services, L.L.C. & Performance Labs, LLC as Co-lessee's | Customer Number: | 033529 |
| Invoice Date: | 04/10/17 | Invoice Number: | 359174 |
| | | Total Amount Due: | $4,530.46 |

## Important Messages

### Visit us at: Bylinefinancialgroup.com

If you have any questions regarding any insurance charges on your invoice, please call our insurance group at 877-878-0379. For ALL OTHER inquiries, please contact our Customer Service Department. Customer Service contact information is on the back of this invoice.

## Invoice Summary

| ACCOUNT No. | DESCRIPTION | DUE DATE | AMOUNT |
|---|---|---|---|
| | Balance Forward | | 2,265.23 |
| 36733 | MERGE HEATHCARE LIS HARWARE AND S Late Charge - 04/01/17 Pmt | 05/01/17 | 205.93 |
| | MERGE HEATHCARE LIS HARWARE AND S Rental Payment | 05/01/17 | 2,059.30 |
| | | TOTAL AMOUNT DUE: | $4,530.46 |

| Current | 1-30 Days | 31-60 Days | 61-90 Days | Over 90 Days |
|---|---|---|---|---|
| 2265.23 | 2265.23 | 0.00 | 0.00 | 0.00 |

If you have questions regarding your bill, please give us a call and we will be happy to assist you.  (877) 497-2811

page 1 of 2

**EXHIBIT B**
**Pathway-Phoenix 000088**

 **Byline Financial Group**

2801 Lakeside Drive
Suite 212
Bannockburn, IL 60015-1849

**INVOICE**

*Address Service Requested*

**Remittance Section**

| | |
|---|---|
| Customer Number: | 033529 |
| Invoice Number: | 366219 |
| Total Amount Due: | $4,530.46 |
| Amount Remitted: | $ |

If paying other than balance due indicate how to apply your check.

Use enclosed envelope and make payable to:

TRINITY MEDICAL SERVICES, L.L.C. & PERFORMANCE LABS, LLC AS
21385 MARION LANE STE C
MANDEVILLE LA 70471-8715

BYLINE FINANCIAL GROUP-03
ACCOUNTS RECEIVABLE
BIN 88205
MILWAUKEE, WI 53288-8205

205 033529 0000366219 0000453046 8

 **Byline Financial Group**

*Keep lower portion for your records - Please return upper portion with your payment.*

| | | | |
|---|---|---|---|
| Customer Name: | Trinity Medical Services, L.L.C. & Performance Labs, LLC as Co-lessee's | Customer Number: | 033529 |
| Invoice Date: | 05/10/17 | Invoice Number | 366219 |
| | | Total Amount Due: | $4,530.46 |

## Important Messages

### Visit us at: Bylinefinancialgroup.com

If you have any questions regarding any insurance charges on your invoice, please call our Insurance group at 877-878-0379. For **ALL** **OTHER** inquiries, please contact our Customer Service Department. Customer Service contact information is on the back of this invoice.

## Invoice Summary

| ACCOUNT No. | DESCRIPTION | DUE DATE | AMOUNT |
|---|---|---|---|
| | Balance Forward | | 2,265.23 |
| 36733 | MERGE HEATHCARE LIS HARWARE AND S Late Charge - 05/01/17 Pmt | 06/01/17 | 205.93 |
| | MERGE HEATHCARE LIS HARWARE AND S Rental Payment | 06/01/17 | 2,059.30 |
| | | **TOTAL AMOUNT DUE:** | **$4,530.46** |

| Current | 1-30 Days | 31-60 Days | 61-90 Days | Over 90 Days |
|---|---|---|---|---|
| 2265.23 | 2265.23 | 0.00 | 0.00 | 0.00 |

If you have questions regarding your bill, please give us a call and we will be happy to assist you.  (877) 497-2811

page 1 of 2

**EXHIBIT B**
**Pathway-Phoenix 000089**



**Byline Financial Group**

2801 Lakeside Drive
Suite 212
Bannockburn, IL 60015-1849

**INVOICE**

*Address Service Requested*

**Remittance Section**

| | |
|---|---|
| Customer Number: | 033529 |
| Invoice Number: | 373010 |
| Total Amount Due: | $4,530.46 |
| Amount Remitted: | $_____ |

If paying other than balance due indicate how to apply your check.

Use enclosed envelope and make payable to:

TRINITY MEDICAL SERVICES, L.L.C. & PERFORMANCE LABS, LLC AS
21385 MARION LANE STE C
MANDEVILLE LA 70471-8716

BYLINE FINANCIAL GROUP-03
ACCOUNTS RECEIVABLE
BIN 88205
MILWAUKEE, WI 53288-8205

||||‧||‧||‧|‧‧||‧‧‧|‧||‧‧|‧||‧||‧||‧‧||‧|‧|‧|‧|

205 033529 0000373010 0000453046 5

---

*Keep lower portion for your records - Please return upper portion with your payment.*



**Byline Financial Group**

| | | | |
|---|---|---|---|
| Customer Name: | Trinity Medical Services, L.L.C. & Performance Labs, LLC as Co-lesses's | Customer Number: | 033529 |
| Invoice Date: | 06/09/17 | Invoice Number | 373010 |
| | | Total Amount Due: | $4,530.46 |

## Important Messages

### Visit us at: Bylinefinancialgroup.com

If you have any questions regarding any insurance charges on your invoice, please call our Insurance group at 877-878-0379. For ALL OTHER inquiries, please contact our Customer Service Department. Customer Service contact information is on the back of this invoice.

## Invoice Summary

| ACCOUNT No. | DESCRIPTION | DUE DATE | AMOUNT |
|---|---|---|---|
| | Balance Forward | | 2,265.23 |
| 36733 | MERGE HEATHCARE LIS HARWARE AND S Late Charge - 06/01/17 Pmt | 07/01/17 | 205.93 |
| | MERGE HEATHCARE LIS HARWARE AND S Rental Payment | 07/01/17 | 2,059.30 |
| | | TOTAL AMOUNT DUE: | $4,530.46 |

| Current | 1-30 Days | 31-60 Days | 61-90 Days | Over 90 Days |
|---|---|---|---|---|
| 2265.23 | 2265.23 | 0.00 | 0.00 | 0.00 |

If you have questions regarding your bill, please give us a call and we will be happy to assist you.  (877) 497-2811

**EXHIBIT B**
Pathway-Phoenix 000090

 **Byline Financial Group™**

2801 Lakeside Drive
Suite 212
Bannockburn, IL 60015-1849

**INVOICE**

*Address Service Requested*

**Remittance Section**

| | |
|---|---|
| Customer Number: | 033529 |
| Invoice Number: | 379949 |
| Total Amount Due: | $4,530.46 |
| Amount Remitted: | $_____ |

If paying other than balance due indicate how to apply your check.

Use enclosed envelope and make payable to:

TRINITY MEDICAL SERVICES, L.L.C. & PERFORMANCE LABS, LLC AS
21385 MARION LANE STE C
MANDEVILLE LA 70471-8715

BYLINE FINANCIAL GROUP-03
ACCOUNTS RECEIVABLE
BIN 88205
MILWAUKEE, WI 53288-8205

205 033529 0000379949 0000453046 7

---

*Keep lower portion for your records - Please return upper portion with your payment.*

 **Byline Financial Group™**

| | | | |
|---|---|---|---|
| Customer Name: | Trinity Medical Services, L.L.C. & | Customer Number: | 033529 |
| | Performance Labs, LLC as Co-lessee's | Invoice Number | 379949 |
| Invoice Date: | 07/10/17 | Total Amount Due: | $4,530.46 |

## Important Messages

### Visit us at: Bylinefinancialgroup.com

**If you have any questions regarding any insurance charges on your invoice, please call our insurance group at 877-878-0379. For ALL OTHER inquiries, please contact our Customer Service Department. Customer Service contact information is on the back of this invoice.**

## Invoice Summary

| ACCOUNT No. | DESCRIPTION | DUE DATE | AMOUNT |
|---|---|---|---|
| | Balance Forward | | 2,265.23 |
| 36733 | MERGE HEATHCARE LIS HARWARE AND S Late Charge - 07/01/17 Pmt | 08/01/17 | 205.93 |
| | MERGE HEATHCARE LIS HARWARE AND S Rental Payment | 08/01/17 | 2,059.30 |
| | | **TOTAL AMOUNT DUE:** | **$4,530.46** |

| Current | 1-30 Days | 31-60 Days | 61-90 Days | Over 90 Days |
|---|---|---|---|---|
| 2265.23 | 2265.23 | 0.00 | 0.00 | 0.00 |

If you have questions regarding your bill, please give us a call and we will be happy to assist you.  (877) 497-2811

page 1 of 2

**EXHIBIT B**
**Pathway-Phoenix 000091**

 **Byline Financial Group**

2801 Lakeside Drive
Suite 212
Bannockburn, IL 60015-1849

**INVOICE**

*Address Service Requested*

**Remittance Section**

| | |
|---|---|
| Customer Number: | 032042 |
| Invoice Number: | 384172 |
| Total Amount Due: | $61.11 |
| Amount Remitted: | $_____ |

If paying other than balance due indicate how to apply your check.

Use enclosed envelope and make payable to:

OMAHA ECONOMIC DEVELOPMENT CORPORATION
1800 NORTH 24TH STREET # 111
OMAHA NE 68110-2374

BYLINE FINANCIAL GROUP-03
ACCOUNTS RECEIVABLE
BIN 88205
MILWAUKEE, WI 53288-8205

205 032042 0000384172 0000006111 6

---

*Keep lower portion for your records - Please return upper portion with your payment.*

 **Byline Financial Group**

| | | | |
|---|---|---|---|
| Customer Name: | Omaha Economic Development Corporation | Customer Number: | 032042 |
| Invoice Date: | 08/10/17 | Invoice Number | 384172 |
| | | Total Amount Due: | $61.11 |

## Important Messages

### Visit us at: Bylinefinancialgroup.com

If you have any questions regarding any insurance charges on your invoice, please call our insurance group at 877-878-0379. For ALL OTHER inquiries, please contact our Customer Service Department. Customer Service contact information is on the back of this invoice.

## Invoice Summary

| ACCOUNT No. | DESCRIPTION | DUE DATE | AMOUNT |
|---|---|---|---|
| 35001 | 3 HP EliteDesk 800 G1 SFF 1xCore Property Insurance*** | 09/01/17 | 61.11 |
| | | **TOTAL AMOUNT DUE:** | **$61.11** |

| Current | 1-30 Days | 31-60 Days | 61-90 Days | Over 90 Days |
|---|---|---|---|---|
| 61.11 | 0.00 | 0.00 | 0.00 | 0.00 |

If you have questions regarding your bill, please give us a call and we will be happy to assist you.  (877) 497-2811

page 1 of 2

**EXHIBIT B**
**Pathway-Phoenix 000092**

 **Byline Financial Group**

2801 Lakeside Drive
Suite 212
Bannockburn, IL 60015-1849

**INVOICE**

*Address Service Requested*

### Remittance Section

| | |
|---|---|
| Customer Number: | 033529 |
| Invoice Number: | 395339 |
| Total Amount Due: | $4,530.46 |
| Amount Remitted: | $ |

If paying other than balance due indicate how to apply your check.

Use enclosed envelope and make payable to:

TRINITY MEDICAL SERVICES, L.L.C. & PERFORMANCE LABS, LLC AS
21385 MARION LANE STE C
MANDEVILLE LA 70471-6715

BYLINE FINANCIAL GROUP-03
ACCOUNTS RECEIVABLE
BIN 88205
MILWAUKEE, WI 53288-8205

205 033529 0000395339 0000453046 1

*Keep lower portion for your records - Please return upper portion with your payment.*

 **Byline Financial Group**

| | | | |
|---|---|---|---|
| Customer Name: | Trinity Medical Services, L.L.C. & Performance Labs, LLC as Co-lessee's | Customer Number: | 033529 |
| | | Invoice Number | 395339 |
| Invoice Date: | 09/08/17 | Total Amount Due: | $4,530.46 |

## Important Messages

### Visit us at: Bylinefinancialgroup.com

If you have any questions regarding any insurance charges on your invoice, please call our insurance group at 877-878-0379. For ALL OTHER inquiries, please contact our Customer Service Department. Customer Service contact information is on the back of this invoice.

## Invoice Summary

| ACCOUNT No. | DESCRIPTION | · DUE DATE | AMOUNT |
|---|---|---|---|
| | Balance Forward | | 2,265.23 |
| 36733 | MERGE HEATHCARE LIS HARWARE AND S Late Charge - 09/01/17 Pmt | 10/01/17 | 205.93 |
| | MERGE HEATHCARE LIS HARWARE AND S Rental Payment | 10/01/17 | 2,059.30 |
| | | **TOTAL AMOUNT DUE:** | **$4,530.46** |

| Current | 1-30 Days | 31-60 Days | 61-90 Days | Over 90 Days |
|---|---|---|---|---|
| 2265.23 | 2265.23 | 0.00 | 0.00 | 0.00 |

If you have questions regarding your bill, please give us a call and we will be happy to assist you.  (877) 497-2811

**EXHIBIT B**
**Pathway-Phoenix 000093**

 **Byline Financial Group**

2801 Lakeside Drive
Suite 212
Bannockburn, IL 60015-1849

**INVOICE**

*Address Service Requested*

**Remittance Section**

| | |
|---|---|
| Customer Number: | 033529 |
| Invoice Number: | 402417 |
| Total Amount Due: | $4,530.46 |
| Amount Remitted: | $_____ |

If paying other than balance due indicate how to apply your check.

Use enclosed envelope and make payable to:

TRINITY MEDICAL SERVICES, L.L.C. & PERFORMANCE LABS, LLC AS
21385 MARION LANE STE C
MANDEVILLE LA 70471-6715

BYLINE FINANCIAL GROUP-03
ACCOUNTS RECEIVABLE
BIN 88205
MILWAUKEE, WI 53288-8205

205 033529 0000402417 0000453046 1

---

*Keep lower portion for your records - Please return upper portion with your payment.*

 **Byline Financial Group**

| | | | |
|---|---|---|---|
| Customer Name: | Trinity Medical Services, L.L.C. & Performance Labs, LLC as Co-lesses's | Customer Number: | 033529 |
| Invoice Date: | 10/10/17 | Invoice Number | 402417 |
| | | Total Amount Due: | $4,530.46 |

## Important Messages

### Visit us at: Bylinefinancialgroup.com

If you have any questions regarding any insurance charges on your invoice, please call our insurance group at 877-878-0379. For ALL OTHER inquiries, please contact our Customer Service Department. Customer Service contact information is on the back of this invoice.

## Invoice Summary

| ACCOUNT No. | DESCRIPTION | DUE DATE | AMOUNT |
|---|---|---|---|
| | Balance Forward | | 2,265.23 |
| 36733 | MERGE HEATHCARE LIS HARWARE AND S Late Charge - 10/01/17 Pmt | 11/01/17 | 205.93 |
| | MERGE HEATHCARE LIS HARWARE AND S Rental Payment | 11/01/17 | 2,059.30 |
| | | TOTAL AMOUNT DUE: | $4,530.46 |

| Current | 1-30 Days | 31-60 Days | 61-90 Days | Over 90 Days |
|---|---|---|---|---|
| 2265.23 | 2265.23 | 0.00 | 0.00 | 0.00 |

If you have questions regarding your bill, please give us a call and we will be happy to assist you.  (877) 497-2811

page 1 of 2

**EXHIBIT B**
Pathway-Phoenix 000094

 Byline Financial Group™

2801 Lakeside Drive
Suite 212
Bannockburn, IL 60015-1849

INVOICE

*Address Service Requested*

**Remittance Section**

| | |
|---|---|
| Customer Number: | 034180 |
| Invoice Number: | 395610 |
| Total Amount Due: | $14,380.25 |
| Amount Remitted: | $_____ |

If paying other than balance due indicate how to apply your check.

Use enclosed envelope and make payable to:

TRINITY EQUIPMENT RENTALS, INC.
8531 MISSION BLVD
JURUPA VALLEY CA 92509-2800

BYLINE FINANCIAL GROUP-03
ACCOUNTS RECEIVABLE
BIN 88205
MILWAUKEE, WI 53288-8205

205 034180 0000395610 0001438025 7

*Keep lower portion for your records - Please return upper portion with your payment.*

 Byline Financial Group™

| | | | |
|---|---|---|---|
| Customer Name: | Trinity Equipment Rentals, Inc. | Customer Number: | 034180 |
| Invoice Date: | 09/08/17 | Invoice Number | 395610 |
| | | Total Amount Due: | $14,380.25 |

**Important Messages**

## Visit us at: Bylinefinancialgroup.com

If you have any questions regarding any insurance charges on your invoice, please call our Insurance group at 877-878-0379. For **ALL** **OTHER** inquiries, please contact our Customer Service Department. Customer Service contact information is on the back of this invoice.

## Invoice Summary

| ACCOUNT No. | DESCRIPTION | DUE DATE | AMOUNT |
|---|---|---|---|
| | Balance Forward | | 10,812.23 |
| 37506 | 2016 Peterbilt Model: 367 VIN: 1X Late Charge - 09/01/17 Pmt | 10/01/17 | 324.37 |
| | 2016 Peterbilt Model: 367 VIN: 1X Loan Payment | 10/01/17 | 3,243.65 |
| | | **TOTAL AMOUNT DUE:** | **$14,380.25** |

| Current | 1-30 Days | 31-60 Days | 61-90 Days | Over 90 Days |
|---|---|---|---|---|
| 3568.02 | 3568.02 | 3351.78 | 324.37 | 3568.06 |

If you have questions regarding your bill, please give us a call and we will be happy to assist you. (377) 497-2611

page 1 of 2

**EXHIBIT B**
Pathway-Phoenix 000095



**Byline Financial Group™**
2801 Lakeside Drive
Suite 212
Bannockburn, IL 60015-1849

INVOICE

*Address Service Requested*

**Remittance Section**

| | |
|---|---|
| Customer Number: | 034180 |
| Invoice Number: | 388135 |
| Total Amount Due: | $17,299.53 |
| Amount Remitted: | $_____ |

If paying other than balance due indicate how to apply your check.

Use enclosed envelope and make payable to:

TRINITY EQUIPMENT RENTALS, INC.
6531 MISSION BLVD
JURUPA VALLEY CA 92509-2800

BYLINE FINANCIAL GROUP-03
ACCOUNTS RECEIVABLE
BIN 88205
MILWAUKEE, WI 53288-8205

ⅠⅠⅰⅠⅰⅠⅰⅠⅰⅠⅠⅰⅠⅰⅠⅠ

205 034180 0000388135 0001729953 1

*Keep lower portion for your records - Please return upper portion with your payment.*

**Byline Financial Group™**

| | | | |
|---|---|---|---|
| Customer Name: | Trinity Equipment Rentals, Inc. | Customer Number: | 034180 |
| Invoice Date: | 08/10/17 | Invoice Number | 388135 |
| | | Total Amount Due: | $17,299.53 |

**Important Messages**

## Visit us at: Bylinefinancialgroup.com

If you have any questions regarding any insurance charges on your invoice, please call our Insurance group at
877-878-0379. For **ALL OTHER** inquiries, please contact our Customer Service Department. Customer Service
contact information is on the back of this invoice.

**Invoice Summary**

| ACCOUNT No. | DESCRIPTION | DUE DATE | AMOUNT |
|---|---|---|---|
| | Balance Forward | | 13,731.51 |
| 37506 | 2016 Peterbilt Model: 367 VIN: 1X Late Charge - 08/01/17 Pmt | 09/01/17 | 324.37 |
| | 2016 Peterbilt Model: 367 VIN: 1X Loan Payment | 09/01/17 | 3,243.65 |
| | | TOTAL AMOUNT DUE: | $17,299.53 |

| Current | 1-30 Days | 31-60 Days | 61-90 Days | Over 90 Days |
|---|---|---|---|---|
| 3568.02 | 3568.02 | 3568.02 | 3351.78 | 3243.69 |

If you have questions regarding your bill, please give us a call and we will be happy to assist you.  (877) 487-2811

**EXHIBIT B**
**Pathway-Phoenix 000096**



**Byline Financial Group**

2801 Lakeside Drive
Suite 212
Bannockburn, IL 60015-1849

**INVOICE**

*Address Service Requested*

**Remittance Section**

| | |
|---|---|
| Customer Number: | 034180 |
| Invoice Number: | 402693 |
| Total Amount Due: | $9,244.44 |
| Amount Remitted: | $ |

If paying other than balance due indicate how to apply your check.

Use enclosed envelope and make payable to:

TRINITY EQUIPMENT RENTALS, INC.
8531 MISSION BLVD
JURUPA VALLEY CA 92509-2800

BYLINE FINANCIAL GROUP-03
ACCOUNTS RECEIVABLE
BIN 88205
MILWAUKEE, WI 53288-8205

205 034180 0000402693 0000924444 7

*Keep lower portion for your records - Please return upper portion with your payment.*



**Byline Financial Group**

| | | | |
|---|---|---|---|
| Customer Name: | Trinity Equipment Rentals, Inc. | Customer Number: | 034180 |
| Invoice Date: | 10/10/17 | Invoice Number: | 402693 |
| | | Total Amount Due: | $9,244.44 |

## Important Messages

### Visit us at: Bylinefinancialgroup.com

If you have any questions regarding any insurance charges on your invoice, please call our Insurance group at 877-878-0379. For ALL OTHER inquiries, please contact our Customer Service Department. Customer Service contact information is on the back of this invoice.

## Invoice Summary

| ACCOUNT No. | DESCRIPTION | DUE DATE | AMOUNT |
|---|---|---|---|
| | Balance Forward | | 5,676.42 |
| 37506 | 2016 Peterbilt Model: 367 VIN: 1X Late Charge - 10/01/17 Pmt | 11/01/17 | 324.37 |
| | 2016 Peterbilt Model: 367 VIN: 1X Loan Payment | 11/01/17 | 3,243.65 |
| | **TOTAL AMOUNT DUE:** | | **$9,244.44** |

| Current | 1-30 Days | 31-60 Days | 61-90 Days | Over 90 Days |
|---|---|---|---|---|
| 3568.02 | 3568.02 | 324.37 | 324.37 | 1459.66 |

If you have questions regarding your bill, please give us a call and we will be happy to assist you.  (877) 497-2811

page 1 of 2

**EXHIBIT B**
**Pathway-Phoenix 000097**

Check
Sent
10/06/2017

**PATHWAY DIAGNOSTICS LLC**
100 STREET A SUITE E
PICAYUNE, MS 39466

1459

85-384/655
42

DATE 10/6/2017

PAY TO THE ORDER OF   Byline Financial Group                    $ 2265.23

two thousand two hundred sixty-five + 23/100                    DOLLARS

**Hancock Bank.**
hancockbank.com

FOR INV# 36733

⑆001459⑆ ⑆065503681⑆ 0048590095⑆



## Byline Financial Group®

**INVOICE**

2801 Lakeside Drive
Suite 212
Bannockburn, IL 60015-1849

*Address Service Requested*

PAID ~~10/10/17~~
Check# 1459
Entered

2231002173   PRESORT 0975 1 MB 0.420 P1C10 ‹5›
|ˡ|ₗ|ₗₗ|ₗₗₗ|ₗₗ|ₗₗ|ₗ|ₗₗ|ₗ|ₗₗₗₗ|ₗₗ|ₗ|ₗ|
TRINITY MEDICAL SERVICES, LLC. & PERFORMA
21385 MARION LANE STE C
MANDEVILLE LA 70471-8715

**Remittance Section**

| | |
|---|---|
| Customer Number: | 033529 |
| Invoice Number: | 395339 |
| Total Amount Due: | $4,530.46 |
| Amount Remitted: | $ |

If paying other than balance due indicate how to apply your check.

Use enclosed envelope and make payable to:

BYLINE FINANCIAL GROUP-03
ACCOUNTS RECEIVABLE
BIN 88205
MILWAUKEE, WI 53288-8205

205  033529  0000395339  0000453046  1

---

*Keep lower portion for your records - Please return upper portion with your payment.*

## Byline Financial Group®

| | | | |
|---|---|---|---|
| Customer Name: | Trinity Medical Services, L.L.C. & Performance Labs, LLC as Co-lessee's | Customer Number: | 033529 |
| Invoice Date: | 09/08/17 | Invoice Number: | 395339 |
| | | Total Amount Due: | $4,530.46 |

### Important Messages



## Visit us at: Bylinefinancialgroup.com

If you have any questions regarding any insurance charges on your invoice, please call our insurance group at 877-878-0379. For ALL OTHER inquiries, please contact our Customer Service Department. Customer Service contact information is on the back of this invoice.

### Invoice Summary

| ACCOUNT No. | DESCRIPTION | DUE DATE | AMOUNT |
|---|---|---|---|
| | Balance Forward | | 2,265.23 |
| 36733 | MERGE HEATHCARE LIS HARWARE AND S Late Charge - 09/01/17 Pmt | 10/01/17 | -208.59 |
| | MERGE HEATHCARE LIS HARWARE AND S Rental Payment | 10/01/17 | 2,059.30 |
| | | | |
| | | | |
| | | | |
| | | TOTAL AMOUNT DUE: | $4,530.46 |

| Current | 1-30 Days | 31-60 Days | 61-90 Days | Over 90 Days |
|---|---|---|---|---|
| 2265.23 | 2265.23 | 0.00 | 0.00 | 0.00 |

If you have questions regarding your bill, please give us a call and we will be happy to assist you.  (877) 497-2811

page 1 of 2

**EXHIBIT B**
Pathway-Phoenix 000100

EXHIBIT B

Pathway-Phoenix 000101

**PATHWAY DIAGNOSTICS LLC**
100 STREET A SUITE E
PICAYUNE, MS 39466

1436

85-388/855
42

DATE 9/8/2017

PAY TO THE ORDER OF __Byline Financial Group__ | $ 2265.23

two thousand two hundred sixty-five + 23/100 DOLLARS

**Hancock Bank.**
hancockbank.com

FOR Invoice #887864

⑆001436⑆ ⑈065503681⑈ 0048590095⑆

**Byline Financial Group** 2801 Lakeside Drive
Suite 212
Bannockburn, IL 60015-1849

**INVOICE**

*Address Service Requested*

*entered*

**Remittance Section**

| | |
|---|---|
| Customer Number: | 033529 |
| Invoice Number: | 379949 |
| Total Amount Due: | $4,530.46 |
| Amount Remitted: | $_2,265.2_ |

If paying other than balance due indicate how to apply your check.

*pd. Check #1396*

Use enclosed envelope and make payable to:

BYLINE FINANCIAL GROUP-03
ACCOUNTS RECEIVABLE
BIN 88205
MILWAUKEE, WI 53288-8205

4152003011   PRESORT 3011 1 MB 0.420 P1C11 <B>

TRINITY MEDICAL SERVICES, L.L.C. & PERFORMA
21385 MARION LANE STE C
MANDEVILLE LA 70471-8715

205 033529 0000379949 0000453046 7

---

*Keep lower portion for your records - Please return upper portion with your payment.*

**Byline Financial Group**

| | | | |
|---|---|---|---|
| Customer Name: | Trinity Medical Services, L.L.C. & Performance Labs, LLC as Co-lesses's | Customer Number: | 033529 |
| Invoice Date: | 07/10/17 | Invoice Number | 379949 |
| | | Total Amount Due: | $4,530.46 |

**Important Messages**

## Visit us at: Bylinefinancialgroup.com

If you have any questions regarding any insurance charges on your invoice, please call our Insurance group at 877-878-0379. For **ALL OTHER** inquiries, please contact our Customer Service Department. Customer Service contact information is on the back of this invoice.

## Invoice Summary

| ACCOUNT No. | DESCRIPTION | DUE DATE | AMOUNT |
|---|---|---|---|
| | Balance Forward | | 2,265.23 |
| 36733 | MERGE HEATHCARE LIS HARWARE AND S Late Charge - 07/01/17 Pmt | 08/01/17 | 205.93 |
| | MERGE HEATHCARE LIS HARWARE AND S Rental Payment | 08/01/17 | 2,059.30 |
| | | | |
| | | | |
| | | | |
| | | TOTAL AMOUNT DUE: | $4,530.46 |

| Current | 1-30 Days | 31-60 Days | 61-90 Days | Over 90 Days |
|---|---|---|---|---|
| 2265.23 | 2265.23 | 0.00 | 0.00 | 0.00 |

If you have questions regarding your bill, please give us a call and we will be happy to assist you.  (877) 497-2811

page 1 of 2

**EXHIBIT B**
Pathway-Phoenix 000102

**PATHWAY DIAGNOSTICS LLC**
100 STREET A SUITE E
PICAYUNE, MS 39466

1396

85-356/655
42

DATE 8/14/2017

PAY TO THE ORDER OF Byline Financial Group $ 2265.23

two thousand two hundred sixty five + 23/100 DOLLARS

Hancock Bank.
hancockbank.com

FOR invoice # 379949

[signature]

⑈001396⑈ ⑆065503681⑆ 0048590095⑈

EXHIBIT B
Pathway-Phoenix 000103