Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

TRINITY MEDICAL SERVICES,    * Civil Action
LLC, ET AL          * NO. 3:17-00592
            *
VERSUS        * JUDGE GRAVELLES
            *
MERGE HEALTHCARE SOLUTIONS,  * MAGISTRATE:
INC.          * WILDER-DOOMES
  * * * * * * * *

      * * *

      Rule 30(b)(6) Deposition of TRINITY
MEDICAL SERVICES, LLC, THROUGH ITS DESIGNEE
BLAKE N. BOURQUE, given at Fishman Hayood, LLP,
201 St. Charles Avenue, 46th Floor, New
Orleans, Louisiana 70130, on April 10th, 2019.

VIDEOGRAPHER:
      TODD MEAUX (DEPO-VUE, INC.)
REPORTED BY:
      JOSEPH A. FAIRBANKS, JR., CCR, RPR
      CERTIFIED COURT REPORTER #75005

Page 2

1  APPEARANCES:
2  REPRESENTING THE PLAINTIFFS:
3      FISHMAN HAYGOOD LLP
4      (BY:  JESSE STEWART, ESQUIRE)
5      (BY:  JASON BURGE, ESQUIRE)
6      201 St. Charles Avenue, 46th Floor
7      New Orleans, Louisiana 70170-4600
8      504-586-5252
9
10  REPRESENTING THE DEFENDANTS:
11      BARRASSO USDIN KUPPERMAN FREEMAN &
12      SARVER, L.L.C.
13      (BY:  STEPHEN H. KUPPERMAN, ESQUIRE)
14      (BY:  LAURENCE LESUEUR, JR., ESQUIRE)
15      (BY:  VIVIANA ALDOUS, ESQUIRE)
16      909 Poydras Street, 24th Floor
17      New Orleans, Louisiana 70112
18      504-589-9700.
19
20
21
22
23
24
25

Page 3

1  EXAMINATION INDEX
2
3  EXAMINATION BY:          PAGE
4  MR. KUPPERMAN .................6
5  MR. STEWART .................391
6  MR. KUPPERMAN .................416
7  MR. STEWART .................433
8
9  EXHIBIT INDEX
10
11  EXHIBIT NO.          PAGE
12  Exhibit 1  .................12
13  Exhibit 2  .................79
14  Exhibit 3  .................113
15  Exhibit 4  .................123
16  Exhibit 5  .................160
17  Exhibit 6  .................164
18  Exhibit 7  .................249
19  Exhibit 8  .................250
20  Exhibit 9  .................255
21  Exhibit 10  .................314
22  Exhibit 11  .................319
23  Exhibit 12  .................327
24  Exhibit 13  .................333
25  Exhibit 14  .................335

Page 4

1  Exhibit 15  .................376
2  Exhibit 16  .................389
3  Exhibit 17  .................395
4  Exhibit 18  .................420
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

EXHIBIT A

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                April 10, 2019

Page 5

```
 1          S T I P U L A T I O N
 2       IT IS STIPULATED AND AGREED by and
 3   among counsel for the parties hereto that the
 4   deposition of the aforementioned witness may be
 5   taken for all purposes permitted within the
 6   Federal Rules of Civil Procedure, in accordance
 7   with law, pursuant to notice;
 8       That all formalities, save reading
 9   and signing of the original transcript by the
10   deponent, are hereby specifically waived;
11       That all objections, save those as to
12   the form of the question and the responsiveness
13   of the answer, are reserved until such time as
14   this deposition, or any part thereof, is used
15   or sought to be used in evidence.
16
17
18              * * *
19
20
21
22       JOSEPH A. FAIRBANKS, JR., CCR, RPR,
23   Certified Court Reporter in and for the State
24   of Louisiana, officiated in administering the
25   oath to the witness.
```

Page 6

```
 1       THE VIDEOGRAPHER:
 2          This deposition is being held at
 3   201 St. Charles Avenue in New Orleans,
 4   Louisiana, on April 10th, 2019, at the
 5   time indicated on the video screen,
 6   which is 9:07.
 7          At this time would counsel please
 8   introduce themselves for the record.
 9       MR. STEWART:
10          Jesse Stewart on behalf of
11   plaintiffs, with Jason Burge.
12       MR. KUPPERMAN:
13          Steve Kupperman, Lon Le Sueur,
14   and Viviana Aldous for the defendants.
15          BLAKE NICHOLAS BOURQUE
16   103 Woodlake Lane, Lafayette, Louisiana 70508,
17   a witness named in the above stipulation,
18   having been first duly sworn, was examined and
19   testified on his oath as follows:
20   EXAMINATION BY MR. KUPPERMAN:
21       Q.  Good morning, Mr. Bourgue.  Could you
22   state your full name for the record?
23       A.  Blake Nicholas Bourque.
24       Q.  And what is the business address for
25   Trinity Medical Services?
```

Page 7

```
 1       A.  Um -- 103 Woodlake Lane, Lafayette,
 2   Louisiana 70508.
 3       Q.  Have you ever been deposed before?
 4       A.  I have.
 5       Q.  And can you tell me when, or how
 6   often?  Let's start with that.
 7       A.  One time.
 8       Q.  In what matter?
 9       A.  It was a personal-injury case.
10       Q.  Were you a witness or a claimant?
11       A.  I was a claimant.
12       Q.  Okay.  You were the plaintiff?
13       A.  Yes.
14       Q.  Okay.  And who did you sue?
15       A.  Academy.
16       Q.  Academy?
17       A.  Academy, the store.
18       Q.  The sporting goods store?
19       A.  That's right.
20       Q.  And where was that?
21       A.  Lafayette, Louisiana.
22       Q.  In federal court?
23       A.  I do not remember.
24       Q.  Okay.  And when was that?
25       A.  Um -- I don't remember the exact year.
```

Page 8

```
 1   Sometime around 2011, 2012.
 2       Q.  Who was your counsel?
 3       A.  Um -- Blake David.
 4       Q.  And who was opposing counsel?
 5       A.  I do not remember.
 6       Q.  Were you the only plaintiff?
 7       A.  Yes.
 8       Q.  Okay.  And you sued in a personal
 9   capacity?
10       A.  I don't know what that means.
11       Q.  You sued for yourself.
12       A.  Yes.
13       Q.  Injuries you personally sustained.
14       A.  Yes.
15       Q.  Okay.  Thank you.  And you gave one
16   deposition in that case?
17       A.  Yes, sir.
18       Q.  Did you also testify at trail?
19       A.  No, sir.
20       Q.  The case was settled?
21       A.  Yes, sir.
22       Q.  Okay.  Okay.  Um -- I probably don't
23   need to do this, but -- because you've already
24   been in one deposition, but let me just go over
25   a couple of the rules --
```

2 (Pages 5 to 8)

EXHIBIT A

Page 9

1    A.  Please do.
2    Q.  -- for you.
3        Let's not talk over each other.  I'll
4    try to let you finish your answer; you try to
5    let me finish my question.  All the responses
6    have to be verbal, um -- in some manner, shape,
7    or form; they can't be grunts, or nods, or
8    shakes of the head, because the court reporter
9    can't take it down.
10       If I ask a question that's confusing
11   to you or that you don't understand, please let
12   me know, or ask me to rephrase it.  If you
13   don't do that, then we'll all assume that
14   you've understood the question as it was
15   intended.  Okay?
16   A.  Yes, sir.
17   Q.  Okay.  Good.  You are here today as a
18   corporate representative for Trinity Medical
19   Services; is that correct?
20   A.  That's correct.
21   Q.  And so if we refer to it as Trinity,
22   you understand that's what we're talking about.
23   Trinity Medical Services, LLC.
24   A.  Yes, sir.
25   Q.  Okay.  Are you also designated for the

Page 10

1    later depositions of Performance Labs LLC, and
2    Prestige Worldwide Leasing LLC?
3    A.  Yes, sir.
4    Q.  Okay.  There's not going to be anybody
5    else that's going to appear for those?
6    A.  No, sir.
7    Q.  Okay.  We plan on going through
8    Trinity's questions today, and Performance and
9    Prestige tomorrow.
10   A.  Okay.
11   Q.  Okay?  Um -- are you the sole
12   employee, at the current time, of all three of
13   these companies?
14   A.  Yes, sir.
15   Q.  Okay.  And when did you become the
16   sole employee?  Let's start with Trinity.
17   A.  April 2017.
18   Q.  Okay.  Is that the same time you
19   became the only employee of performance and
20   Prestige as well?
21   A.  No, sir.
22   Q.  Okay.  We'll cover them tomorrow,
23   then.  I don't want to get too distracted.
24       Um -- how many employees did Trinity
25   have before you became the sole employee in

Page 11

1    April of 2017?
2    A.  Trinity Medical Services never had,
3    um -- what we called employees.  They were all
4    employed by Prestige Worldwide Leasing.
5    Q.  Were you employed by Prestige?
6    A.  Yes, sir.
7    Q.  So you were never employed by Trinity
8    until April of 2017?
9    A.  Um -- I'm the -- I'm the sole owner of
10   the Trinity.  So I'm the only owner of Trinity
11   Medical Services.
12   Q.  Okay.  Um -- is that -- that's a -- is
13   that treated as a partnership for tax purposes?
14   So all the income flows to you?
15   A.  Yes, sir.
16   Q.  So you report the income for Trinity
17   on your personal returns?
18   A.  Yes, sir.
19   Q.  And what about Performance and
20   Prestige, are they also on your personal
21   returns?
22   A.  Do you want to talk about Performance
23   and Prestige today or tomorrow?
24   Q.  I want to talk about 'em tomorrow,
25   primarily, but I thought while I was on this

Page 12

1    you could tell me.
2    A.  Yeah.  Sure.  I just -- um Performance
3    and Prestige are owned, um -- solely by Trinity
4    Medical Services.  So my CPAs are to follow
5    United States Tax Code.
6    Q.  Okay.
7    A.  Yeah.
8    Q.  All right.  So you're the sole owner
9    of Trinity, and Trinity is the sole owner of
10   Performance, and Trinity is the sole owner of
11   Prestige.
12   A.  Yes, sir.
13   Q.  Okay.  All right.  Let me just, um --
14   show you a Deposition Notice for today's
15   deposition, and we'll mark it as Exhibit 1.
16   (Tendering.)  And my question is, have you seen
17   this before?
18       (Exhibit 1 was marked for
19   identification and is attached hereto.)
20   A.  Yes, sir, I have.
21   EXAMINATION BY MR. KUPPERMAN:
22   Q.  All righty.  And as I understand it,
23   you were here and prepared to testify on behalf of
24   Trinity as to all of the 29 topics that are
25   listed in the deposition notice.  Correct?

EXHIBIT A

Page 13

1    A.  Yes, sir.
2    Q.  Okay.  Um -- and you understand you're
3  here to testify on all information that is
4  available to Trinity.  Correct?
5    A.  Yes, sir.
6    Q.  So it's not just you individually or
7  personally, but from whatever source that the
8  company has.
9    A.  Yes, sir.
10    Q.  Okay.  Good.  And, um -- what did
11  you -- let's just go through, in general, what
12  did you do to prepare for the deposition today?
13    A.  Um -- read over this.  I read over --
14    Q.  This meaning the notice.
15    A.  I'm sorry.  Yeah.  Read over the
16  notice.
17    Q.  Okay.
18    A.  Um -- met with, uh -- Jason and Jesse
19  yesterday, uh -- in this room.
20    Q.  Uh-huh.
21    A.  And, um -- this morning I read over
22  the, uh -- Second Amended Complaint.
23    Q.  Did you -- um -- did you meet did
24  Jason and Jesse, or one or the other of them,
25  in preparation for this just once, yesterday?

Page 14

1    A.  Yes, sir.
2    Q.  And how long did that last?
3    A.  Um -- probably, with breaks, five
4  hours.
5    Q.  Okay.  Did you talk to anyone other
6  than counsel about the deposition?
7    A.  Yes.
8    Q.  And who is that?
9    A.  I notified a couple of my clients,
10  um -- my wife, um -- my family, um -- people,
11  that I would be out for the next two days,
12  effectively, that I work with.
13    Q.  Okay.  Um -- your wife and family.
14  Were there any substantive discussions there,
15  or just, I'm going to a deposition and will be
16  out?
17    A.  Um -- well, we -- we talked about what
18  was going on.
19    Q.  Okay.
20    A.  Um --
21    Q.  And what did you talk about?
22    MR. STEWART:
23        I'm going to object, at least to
24    the extent that he's talking with his
25    wife.

Page 15

1    MR. KUPPERMAN:
2        Okay.
3  EXAMINATION BY MR. KUPPERMAN:
4    Q.  You can go ahead and answer.
5    A.  Talked about, um -- how Jason and
6  Jesse told me that today I needed to tell the
7  truth, and stick to the facts.
8    MR. STEWART:
9        Object.  Objection.
10  EXAMINATION BY MR. KUPPERMAN:
11    Q.  You didn't need to be told to tell the
12  truth, did you?
13    A.  Um -- no.  Did not.
14    Q.  Yeah.  I mean, you already knew you
15  were supposed to tell the truth.  Right?
16    A.  Yeah, absolutely.
17    Q.  Okay.  Um -- how about anything
18  substantive on any of the topics that are in
19  the Notice of Deposition?  Did you have any
20  substantive discussions with your wife and/or
21  family as to those topics?
22    A.  No.
23    Q.  Okay.  Um -- you said you talked to
24  clients and notified them.  What clients?
25    A.  Um -- Matt Skinner who owns, um --

Page 16

1  Empire West Investments.  I'm a consultant for
2  him.  I let him know that I was going to be in
3  depositions.
4    Q.  Okay.  Any other clients?
5    A.  Um -- I am engaged in consulting a
6  firm called Phinance -- with a PH.  I let them
7  know that I was going to be out the next two
8  days.
9    Q.  And who is -- who were you working for
10  with Phinance?
11    A.  Phinance is a, um -- do you want to
12  know the type of company it is --
13    Q.  Sure.
14    A.  -- or the people?
15    Q.  Well, both.
16    A.  Both?  Um -- Phinance, um -- is a
17  private capital company that provides
18  consultive capital to molecular laboratories.
19  And so, um -- I am helping develop their
20  portfolio of molecular labs.
21    Q.  And how about the people?
22    A.  Harry Hats --
23    THE REPORTER:
24        Spelled as one might expect?
25    THE WITNESS:

**EXHIBIT A**

Page 17

1       Oh, I think it's H-A-I-T-Z.
2       A.  Darren Chiappinelli, Christopher
3   Eaves, one of the, um -- portfolio laboratories
4   that we are evaluating right now and doing due
5   diligence on, um -- the owner of that
6   laboratory is named John Scaggs.  John Scaggs
7   owns Zenith Labs.
8       EXAMINATION BY MR. KUPPERMAN:
9       Q.  And that's lab you're looking at?
10      A.  That's right.
11      Q.  Okay.
12      A.  And, um -- my, um -- partner in the
13  process, um -- Shea Spruill.
14          THE REPORTER:
15              Spell that for me, please.
16          THE WITNESS:
17              S-P-U-I-L-L, I believe?
18          MR. STEWART:
19              There's an R in there.
20      A.  There's an R somewhere in there.
21      EXAMINATION BY MR. KUPPERMAN:
22      Q.  Okay.  And Mr. Spruill is with you
23  with regards to Zenith Labs?
24      A.  Zenith Labs, and the factoring --
25  excuse me, um -- the, um -- Phinance.  So.

Page 18

1       Q.  Okay.  So both of them.
2       A.  Yes.
3       Q.  Okay.  And did you talk to any of
4   those people or clients about anything
5   substantive on any of the topics that are
6   listed in the notice of deposition?
7       A.  Nope.
8       Q.  Okay.  Did you talk to anyone who
9   previously had been employed by Trinity,
10  Performance, or --
11      A.  I missed one person.
12      Q.  Okay.
13      A.  Uh -- Mark Lobell.
14          MR. STEWART:
15              I'm just going to say don't talk
16          over Mr. Kupperman.
17          THE WITNESS:
18              Thank you.
19      EXAMINATION BY MR. KUPPERMAN:
20      Q.  And when did you speak to Mr. Lobell?
21      A.  Yesterday, in person.
22      Q.  And how long?
23      A.  Um -- an hour?
24      Q.  And what did you all discuss?
25      A.  Um -- a settlement with Whitney Bank,

Page 19

1   with counsel.
2       Q.  Okay.  This counsel or different
3   counsel?
4       A.  Different counsel.
5       Q.  Who is that?
6       A.  Um -- he's counsel for Linebacker.
7   Um -- I went blank on his name.  I can get you
8   his name.
9       Q.  That would be great.
10          Um -- and did you talk to Mr. Lobell
11  about anything substantive with regard to the
12  29 topics in the notice?
13      A.  Um -- the -- the tone of the
14  conversation, the conversation with -- with
15  Mark, was more in regards to the timing and the
16  scheduling order of the case, where we were in
17  depositions, and the trial was set on January,
18  you know, 2020.  That they -- it seemed like it
19  wasn't going to move, and that we were involved
20  now in the process.  That was pretty much it in
21  a nutshell.
22          He asked me questions about what did
23  he think, if it would go to trial, or if it
24  would settle, and, um -- general questions that
25  I really couldn't answer.

Page 20

1       Q.  Okay.  Did you discuss anything
2   substantive about those topics?
3       A.  I don't believe so.
4       Q.  Okay.  Did you talk to anyone other
5   than counsel with regard to trying to gather
6   information about any of these topics,
7   information that was available to Trinity?
8       A.  In, like, the last 24 hours of
9   preparation?
10      Q.  At any time.
11      A.  Or since the beginning?  Um -- yes.
12      Q.  And who is that?
13      A.  Um -- I reached out to Shea Spruill.
14      Q.  Okay.  Who else?
15      A.  Chad Howell.
16      Q.  Okay.  Anyone else?
17      A.  Jamie Abney.
18          THE REPORTER:
19              Jamie spelled how?
20          THE WITNESS:
21              Abney?
22          THE REPORTER:
23              Jamie.
24          THE WITNESS:
25              Jamie? J-A-M-I-E.

EXHIBIT A

Page 21

1  EXAMINATION BY MR. KUPPERMAN:
2      Q.  Anyone else?
3      A.  I can provide a thorough list of
4  communication to you, um -- if that's what you
5  need.  Off the top of my head right now, those
6  are the, um -- maybe Daniel Bozeman.  Philip
7  Martinez, as he was our corporate counsel.
8  Um -- Xifin --
9          THE REPORTER:
10             Spelled?
11         THE WITNESS:
12             X-I-F-I-N.
13     A.  Uh -- Skip Lloyd.  Um -- who did --
14  can I ask counsel a question?
15  EXAMINATION BY MR. KUPPERMAN:
16     Q.  Sure.
17     A.  Who did Skip Lloyd, uh -- what was the
18  CPA firm that he worked for?
19         MR. STEWART:
20             Carr, Riggs & Ingram.
21     A.  Yeah.  Carr, Riggs & Ingram.  Um -- I
22  tried to but did not and could not reach out or
23  communicate with Aurora McKinney.
24  EXAMINATION BY MR. KUPPERMAN:
25     Q.  Anyone else you did talk to?

Page 22

1      A.  Um -- the bank.
2      Q.  What bank?
3      A.  Iberia Bank.  Um -- Phyllis Guidry.
4      Q.  And who's that?
5      A.  She's is, um -- an assistant that
6  works at the bank the prepared some deposit
7  statements for me in pursuit of fulfilling one
8  of these obligations, financial statements and
9  bank statements.  That's what I'm going through
10  in my mind right now.
11         Is that correct?
12     Q.  Well, I don't know if it's correct --
13     A.  Okay.
14     Q.  -- but that's what -- I was asking
15  about --
16     A.  No.  Yeah.
17     Q.  -- substantive --
18     A.  Yeah.
19     Q.  -- conversations about the topic.
20     A.  Sure.  Sure.  And requesting
21  information to fulfill the obligations to turn
22  over this, I've turned to those people.  Those
23  are the folks that I have top of mind now.
24     Q.  Okay.  And can you tell me which
25  topics you talked to Shea Spruill about?

Page 23

1      A.  Um -- how some of the software -- oh.
2  Excuse me.  Also Kyle Mouton.
3      Q.  Okay.  Let's go back to Mr. Spruill.
4      A.  Sure.  Um -- talked to, um -- to Shea
5  generally of the, um -- the way that the tests
6  were -- were run -- a run-based test versus the
7  actual, um -- with the FDA recall, the second
8  one was about -- it was about the calculator
9  processing in a run-based test.  I asked him to
10  walk me through how a scientist would actually
11  process that.
12         Um -- we talked about the data
13  integration, how, um -- that you would grab a
14  file and actually drop a file on the desktop.
15  He walked me through that process.
16         Um -- we talked about, um -- the many
17  ways that -- that Merge would put patient
18  safety at risk.  Um -- some of the
19  conversations -- and he directed me to -- you
20  know, to Jamie and to Danny whenever it was a
21  database question.  Um -- and -- and basically
22  just fulfilled the, um -- because he was there
23  in Mississippi -- or in Mandeville, actually,
24  in the laboratory, helped me with gathering
25  some of this, jogging my memory so that way I

Page 24

1  could actually gather the information that we
2  turned over in discovery.
3      Q.  When did you talk to Spruill?
4      A.  Many times.
5      Q.  And when was the most recent?
6      A.  This morning.
7      Q.  And where is he?
8      A.  He is in Houston, Texas.  Actually,
9  north of Houston.  I'm not sure of the city
10  that he lives in, but it's north of Houston.
11     Q.  Who's he working for?
12     A.  He works for hisself.
13     Q.  In what?
14     A.  He's a laboratory consultant.
15     Q.  Okay.  And what about Mr. Howell,
16  what did you talk to him about, what topics?
17     A.  Did not have verbal communication with
18  him.  Did have text message and e-mail
19  conversation with him.  He, um -- sent me over
20  the recorded sales presentations.  He let me
21  know where those were in the, uh -- in the
22  system.  He sheared a Dropbox link with me.
23         Um -- we, um -- talked about how --
24  how hard it was through text message, um -- to
25  be able to use Merge, and, um -- he -- that's

EXHIBIT A

Page 25

1  about it.
2     Q.  Okay.
3     A.  In relation -- sorry for talking over.
4  In relation to this case.  We talked about
5  other -- other aspects, or just friendly
6  conversation, or just trying to repair our
7  relationship.  But we did not talk about this.
8  (Indicating.)
9     Q.  What do you mean tried to repair your
10 relationship?
11    A.  Um -- Chad and I, um -- haven't spoken
12 in, um -- in a year.
13    Q.  Why not?
14    A.  Um -- after we -- after we sold the,
15 uh -- the laboratory -- Chad -- Chad built the
16 L.I.M.S. system -- first L.I.M.S. system that
17 we made.  We forced him to, um -- I say forced
18 him.  He -- we voted to move forward with Merge
19 because it was FDA-approved and we were trying
20 to hit the easy button.  We didn't want to
21 build software anymore, we just wanted to run a
22 compliant laboratory.  So when we purchased the
23 Merge system, um -- we basically made Chad kick
24 his -- his, um -- the baby that he built, his
25 L.I.M.S system, to the curb, and then we forced

Page 26

1  him to implement this.  And, uh -- and then he
2  had to deal with all the problems with it.
3  And, uh -- a lot of blame happened.
4     Q.  What do you mean by that?
5     A.  Uh -- what part?
6     Q.  You said a lot of blame happened.
7  What do you mean?
8     A.  Well, um -- we were not -- as we
9  learned the Merge system and we learned the
10 many problems that it had, we always looked
11 inside of ourselves and blamed ourselves first
12 for the problem, like something was wrong with
13 us.  So we would look and try to discover,
14 like, what are we doing wrong?  Why -- why
15 aren't we getting this right?
16       And so there was a lot of
17 conversations, because we were, um -- we were
18 under intense scrutiny and we needed to make
19 sure that, you know, this went right.  And we
20 picked Merge for that reason, because they were
21 FDA-approved, they positioned themselves that
22 they were purchased by IBM for a billion
23 dollars, they were Watson.  And when we
24 couldn't get it right, we were, like, what's
25 wrong with us?

Page 27

1        And because he was in charge of the
2  project, he got, um -- unnecessarily blamed for
3  the slowdowns caused by Merge.
4     Q.  So he got blamed by Trinity?  By you?
5     A.  Yes.
6     Q.  Okay.  And, um -- did he get
7  terminated?
8     A.  No.
9     Q.  Okay.  He left voluntarily.
10    A.  Um -- Chad Howell was a partner in
11 Trinity Medical Services at the time that we,
12 um -- we purchased Merge.
13    Q.  Okay.  What happened?
14    A.  What happened with what?
15    Q.  Well, you said he was a partner, and
16 yet you told me he's not a partner today so --
17    A.  Yeah.  Um -- in April 2017, um -- we,
18 um -- investors were brought in to take over,
19 um, Pathway.  Um -- and, um -- which is a
20 laboratory in Mississippi that Prestige had a
21 management contract with, and, um -- Chad --
22 Chad went with that team.  And he needed to --
23 the first thing that he did was replace Merge.
24    Q.  So he went with Pathway.
25    A.  Yes, sir.

Page 28

1     Q.  Okay.  And you have not spoken to him,
2  until recently, since when?
3     A.  Um --
4     Q.  Since he left?
5        MR. STEWART:
6           Object.  I think that
7        mischaracterizes his former testimony
8        about speaking with him.
9        MR. KUPPERMAN:
10          I'm asking.
11    A.  Um -- I can't give you the exact -- I
12 can't give you the exact last date that he and
13 I spoke on the phone.  Um -- we've shared text
14 messages.  Um -- I don't remember the last date
15 that we spoke on the phone.
16 EXAMINATION BY MR. KUPPERMAN:
17    Q.  Okay.  Um -- now you said he told you
18 where the recorded sales presentations were
19 kept.
20    A.  Uh-huh.
21    Q.  Um -- what are the recorded sales
22 presentations?
23    A.  So as we were evaluating the L.I.M.S.
24 systems, um -- pre -- pre-purchase of Merge, we
25 recorded, um -- I believe it's Orchard we

EXHIBIT A

Page 29

1  recorded the presentation for.  I know for a
2  fact that we -- we recorded a Merge
3  presentation, 'cause I've listened to it.
4  Um -- and it was in a folder with three or four
5  other presentations, um -- that appeared to
6  also be recorded.
7      Q.  Okay.  And were the individuals
8  informed that they were being recorded before
9  the recording took place?
10     A.  I do not know.
11     Q.  Okay.  You left that to Mr. Howell?
12     A.  Um -- Mr. Howell provided the
13  documentation to me, or the -- I do not know.
14     Q.  Yeah.  I'm just saying, you left it to
15  Mr. Howell to tell people they were being
16  recorded.  Is that correct?
17     A.  Um -- we never had a discussion about
18  that.
19     Q.  Okay.  Um -- did you think it fair to
20  record people without their knowledge?
21         MR. STEWART:
22             Object.
23     A.  Um -- I don't know if they were told
24  or not.  So I don't have an opinion on it.
25  EXAMINATION BY MR. KUPPERMAN:

Page 30

1      Q.  Okay.  Well, I'm not asking in
2  particular in this case, but do you believe it
3  to be fair to record people without informing
4  them first that they are being recorded?
5      A.  I do not know the -- the -- I think it
6  is fair.  Absolutely.
7      Q.  Okay.  So -- okay.  Now, you said you
8  had text messages and e-mails with Mr. Howell?
9      A.  Yes, sir.
10     Q.  Okay.  Do you know if you turned all
11  of those over to your counsel?
12     A.  Um -- I did not turn over text
13  messages to counsel.
14     Q.  Okay.
15         MR. KUPPERMAN:
16             We would like those because I
17         think they're all relevant to this
18         based on what we've been told.  So --
19         MR. STEWART:
20             Sure.
21         MR. KUPPERMAN:
22             -- I would ask that you produce
23         the e-mails and texts.
24         MR. STEWART:
25             We'll look for them.

Page 31

1  EXAMINATION BY MR. KUPPERMAN:
2      Q.  Okay.  Let's go the Jamie Abney.  What
3  was your conversation with Jamie Abney?
4  Substantively.
5      A.  Substantively.  Um -- we spoke about
6  the database; we spoke about the security risk;
7  we spoke about, um -- I had verified that we
8  had -- did not manipulate any of the
9  programming inside of Merge, not ever; um -- I
10  asked her general questions about what she did
11  for -- for Merge; the time that she caught,
12  um -- the Merge help desk person going into one
13  of our -- our customers' databases and taking
14  the e-mail address and there not being an audit
15  log, um -- of that event.  Um -- you know,
16  basic -- basic -- she's a DB specialist, so
17  basic database questions.
18     Q.  Okay.  And where is she today?
19     A.  Um -- I believe that she lives in
20  Chalmette, Louisiana.
21     Q.  Uh-huh.  Okay.  You spoke to her by
22  phone?
23     A.  Yes.
24     Q.  Okay.  Danny Bozeman.
25     A.  Yes, sir.

Page 32

1      Q.  Let's cover him next.
2      A.  Danny Bozeman, um -- same general
3  conversations that I had with, uh -- with Jamie
4  Abney, um -- because he was also a DB person.
5  It was very brief conversations with him about,
6  um -- what he -- what he did in regards to his
7  daily activities with Merge.
8      Q.  And what did he tell you?
9      A.  Um -- I don't remember.
10     Q.  Okay.  Um -- and where is Mr. Bozeman?
11     A.  I believe, um -- near Baton Rouge,
12  possibly Denham Springs, Louisiana.
13     Q.  Um -- Mr. Martinez.  What were your
14  substantive discussions with him about these
15  topics?
16         MR. STEWART:
17             I'm going to object on the basis
18         that Mr. Martinez was corporate
19         counsel.  So to the extent it's
20         seeking any kind of privileged
21         information we object.
22         MR. KUPPERMAN:
23             Okay.
24  EXAMINATION BY MR. KUPPERMAN:
25     Q.  Um -- you talked to Mr. Martinez just

8  (Pages 29 to 32)

**EXHIBIT A**

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                                    April 10, 2019

Page 33

1  about matters that occurred while he was
2  corporate counsel for Trinity?
3      A.  Um -- Phil and I, um -- are -- are --
4  we talk about a lot of stuff.
5      Q.  Yeah.  But I'm talking about the
6  substantive matters on these topics.  I'm just
7  asking, did you talk to him only about things
8  that he did in his capacity, or that he knew
9  about in his capacity as counsel for Trinity?
10     A.  I'd have to answer yes to that.
11     Q.  Okay.  Xifin?
12     A.  Yes.
13     Q.  Now, um -- who was that?
14     A.  Xifin is a billing entity.
15     Q.  Yes.
16     A.  It's actually a healthcare billing
17  software.
18     Q.  Yes.
19     A.  And so, Xifin produced, um -- some of
20  the financial data for me that was required for
21  us to be able to produce the documentation I
22  was turning over to you.
23     Q.  Okay.  And who at Xifin did you speak
24  with?
25     A.  Their corporate counsel.

Page 34

1      Q.  Okay.  And tell me about those
2  substantive discussions.
3      A.  Um -- hey, can I have access to the
4  database that we had?
5          Yes, you can.  Pay us $5,000.
6          Okay.  Pay you $5,000.
7          They turned over the files.
8      Q.  Okay.  By the way, did you have any
9  text or e-mails with Mr. Spruill?
10     A.  Um -- substantive to this?
11     Q.  Yes.
12     A.  If I have them I will turn them over.
13     Q.  Thank you.
14         Ms. Abney.  Any text messages with
15  her?  Or e-mails.
16     A.  I can give you the same answer to --
17  to Jamie.  I can go back and look.  I don't
18  believe that I have any text messages around
19  this, except for maybe setting the appointment
20  for us to talk.
21     Q.  Okay.  Um -- Mr. Bozeman?
22     A.  I do not believe I have any text
23  message conversations with Danny almost at all,
24  but I can go back and look.
25     Q.  Okay.  Corporate counsel at Xifin?

Page 35

1      A.  No text messages.  Just the e-mail
2  communication between, um -- between he and I.
3      Q.  Okay.  Now, what about Skip Lloyd; do
4  you have any e-mail or text communications with
5  him?
6      A.  Yes, I do.
7      Q.  And have they been produced?
8      A.  Um -- no, they have not.
9      Q.  Okay.  I'd like those as well.
10     A.  Okay.
11     Q.  Okay.  Um --
12         MR. STEWART:
13             And just for clarification, I
14         believe that many of those were
15         produced.  Perhaps not all, but we'll
16         check.
17         MR. KUPPERMAN:
18             I don't believe we have any text
19         messages for him.  But, we do have
20         some e-mails, but I don't know if we
21         them all.
22         THE WITNESS:
23             Did I miss that we were supposed
24         to produce text messages?  Were we
25         asked?

Page 36

1          MR. STEWART:
2              We can discuss it.
3          THE WITNESS:
4              Okay.  I'm sorry.
5  EXAMINATION BY MR. KUPPERMAN:
6      Q.  But, yeah, the intent -- all documents
7  should include text messages as well.
8          Okay.  What did you talk to Mr. Lloyd
9  about?
10     A.  Uh -- taxes; financials; preparing,
11  um -- that information; where was it at.
12     Q.  Okay.  And he told you where it was,
13  and you got it and produced it?
14     A.  He, um -- told me where it was, and I
15  looked for it and it wasn't there.
16     Q.  Okay.  All right.  Any substantive
17  discussions with him another than where the
18  documents should have been?
19     A.  So we have to redact some of the words
20  that were used, probably.  Uh -- no, we -- I
21  hunted for -- I can't -- you know, I hunted for
22  the information.  Um -- I went to, um -- the
23  CPA firm that he worked for, we requested the
24  information that supported the tax returns,
25  and, um -- we cannot find them.  So I have to

JOHNS, PENDLETON, FAIRBANKS AND FREESE                                   504 219-1993

**EXHIBIT A**

Page 37

1  currently reproduce them now.
2      Q.  Okay.  Is Mr. Lloyd still with, um --
3  Carr, Riggs & Ingram?
4      A.  No, sir.
5      Q.  And where is he?
6      A.  I believe he's independently employed
7  now.
8      Q.  In New Orleans?
9      A.  Um -- no.  I believe he's --
10     Q.  In Lafayette?
11     A.  I believe he's in Mandeville.
12     Q.  Mandeville?
13     A.  I think he's on the north shore.  I
14  could be wrong.
15     Q.  Okay.
16     A.  Let me say I don't know.
17     Q.  Okay.  Someplace in the area.
18     A.  He's in -- he's on earth.
19     Q.  Okay.  Ms. Guidry.  She's the one you
20  spoke to from Iberia Bank?
21     A.  Uh-huh.
22     Q.  And what were your substantive
23  discussions with her about?
24     A.  Phyllis, can I have, um -- the 20 --
25  the year we asked for, it might have been '14,

Page 38

1  '15, of the -- I want to say it was maybe
2  Performance Labs' deposit accounts.  That was
3  it.  And she produced the statements for us.
4      Q.  And why did you want those?
5      A.  So that way I can rebuild the
6  financials because of, um -- the missing
7  information that Skip Lloyd could not produce
8  for me.  Or Carr, Riggs.
9      Q.  Okay.  Um -- Kyle Mouton.
10     A.  Yes.
11     Q.  What were your discussions with Kyle
12  Mouton?
13     A.  Um -- about the different ways that
14  Merge didn't work.  Um -- Kyle owned Pathway,
15  and we were speaking about, um -- some of the
16  issues that the techs had with it, some of the
17  things that he had found, the day that they
18  found the calculator processing issue.
19         He was talking about, um -- the -- the
20  tech crying -- how did that go?  It was the --
21  I think it was a validation -- the verification
22  of the data being presented the wrong way, or
23  the printers that would just turn on and start
24  printing, the server shutting down.  Like, he
25  had to deal all those problems, he knew the --

Page 39

1  the significant challenges that Merge presented
2  the laboratory to be able to operate, period.
3      Q.  Where is Mr. Mouton now?
4      A.  Um -- he lives in, um -- oh, where's
5  the old time Mardi Gras at?  Um --
6         MR. LESUEUR:
7            Mobile?
8      A.  No, not -- that's actually a great
9  answer.  The one that's in Louisiana.  They go
10  on horseback.
11  EXAMINATION BY MR. KUPPERMAN:
12     Q.  Breaux Bridge?
13     A.  No.  Um -- anyway, he's in the
14  Lafayette area.
15     Q.  Okay.  And what does he do now; who's
16  he work for?
17     A.  He's a mechanical engineer for, um --
18  it's a Schlumberger company.  It's a valve
19  company in, um -- in Ville Platte.
20     Q.  How long -- did you -- did you
21  communicate with Mr. Lloyd, Ms. Guidry, or
22  Mr. Mouton by text or e-mail?
23     A.  Um -- Mr. Lloyd, yes.  Text, e-mail
24  also, yes.  Ms. Guidry delivered the banking
25  information to me by e-mail.  And Kyle --

Page 40

1  in preparation and substantive conversations
2  here?  No.
3      Q.  Okay.
4         MR. KUPPERMAN:
5            Again, whatever the text or
6         e-mails are that you haven't produced,
7         I'd appreciate it.
8         MR. STEWART:
9            Sure.
10  EXAMINATION BY MR. KUPPERMAN:
11     Q.  Okay.  What did you want to talk to
12  Aurora McKinney about that you were unable to
13  speak to her about?
14     A.  Um -- the quality management system,
15  the documentation, the SOPs that we had, um --
16  created.
17     Q.  SOPs meaning standard operating
18  procedures?
19     A.  Standard operating procedures.  Yeah.
20     Q.  Okay.  And she was responsible for --
21  well, tell me, what was her responsibility?
22     A.  While she was a consultant for me?
23     Q.  Yes.
24     A.  Is that your question?
25     Q.  Yes.  While she was connected to

**EXHIBIT A**

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                    April 10, 2019

Page 41

1   Trinity in some manner, shape, or form.
2       A.  Sure.  So Aurora McKinney owned and
3   ran a company called A&J Consultants.
4       Q.  Uh-huh.
5       A.  Um -- and what A&J did was, um -- they
6   helped, um -- establish communication between
7   the CMS office and our laboratory.
8           MR. STEWART:
9               Will you define CMS?
10          THE WITNESS:
11              Center of Medicaid Services.
12          MR. STEWART:
13              Thank you.
14  EXAMINATION BY MR. KUPPERMAN:
15      Q.  CMS is the governmental agency that,
16  um -- regulates Medicare and Medicaid?
17      A.  Yes.  In this capacity, it sits on top
18  of the Department of Health and Hospitals,
19  which sits on top of CLIA at the state level.
20      Q.  Okay.  Health and hospitals -- so CMS
21  is federal, health and hospitals is state.
22  Correct?
23      A.  I'm not an expert on that -- in that
24  regulation, but that's how I understand it,
25  yes.

Page 42

1           THE REPORTER:
2               Give me the acronym CLIA you
3   referred to.
4           THE WITNESS:
5               CLIA?  C-L-I-A.
6   EXAMINATION BY THE REPORTER:
7       Q.  Okay.  And why don't you say what that
8   stands for.
9       A.  Clinical Laboratory Improvement Act.
10      Q.  And is that federal or state?
11      A.  I believe that's -- uh -- every --
12  it's administered at the state level.  I do
13  believe, though, it is a federal act.
14      Q.  Okay.  Um -- so as I understand it,
15  there are no topics in here that you feel you
16  are unprepared to respond to.  Correct?
17      A.  I'm prepared.
18      Q.  Okay.  Let's talk about your
19  background for a minute.  Can you just quickly
20  run through your educational background for me?
21      A.  Sure.  A general studies degree from
22  the University of Louisiana at Lafayette.
23  Minors in --
24      Q.  Go ahead.  Minors in?
25      A.  Um -- english, and marketing, I

Page 43

1   believe.
2       Q.  Okay.  And when did you graduate?
3       A.  December 2005.
4       Q.  Okay.  Any subsequent, um --
5   schooling?
6       A.  Um -- leadership courses; but no, no
7   further formal education.
8       Q.  Okay.  Do you hold any professional
9   licenses?
10      A.  Not anymore.  No.
11      Q.  Did you ever?
12      A.  I had a Series 6, a life, health, and
13  accident insurance license, whenever I was a
14  banker for JPMorgan Chase.
15      Q.  Any others?
16      A.  No, sir.
17      Q.  Okay.  All right.  Then let's go to
18  work your work history.  Can you kind of
19  briefly sketch that out for me?
20      A.  Sure.  Um -- had a, um -- right out of
21  college, I had a, um -- tree service.  The tree
22  service also, um -- had a television show.  We
23  did a property and home improvement show called
24  Cajun Spaces, um -- in Lafayette, Louisiana.
25          Um -- chased couple of storms, did

Page 44

1   debris removal, um -- for, you know, a couple
2   of different cities.  We chased Ivan and, um --
3   Hurricane Isabel in North Carolina.
4           And then, um -- I didn't understand
5   finance very well, so in between deciding to go
6   back to school I filed for bankruptcy, in May
7   31st, 2005.
8           That, um -- led me to my banking
9   career.  So I became a private banker, um -- in
10  March, March 29th, 2006.  That's my dad's
11  birthday.  That's why I remember it.  Um -- so
12  I became personal banker first, in a retail
13  location in Scott, Louisiana.  I got promoted
14  to the private bank at JPMorgan.  I was a top
15  performer there.  I really liked that job.
16          Um -- I got recruited over by the
17  President of -- the market president of Iberia
18  Bank to go and work for Iberia Bank's Private
19  Bank.  Um -- I did that for about two and a
20  half years.
21          And then, um -- I partnered with an
22  orthopedic surgeon for a, um -- a biometric
23  monitoring idea.  At the time it was called
24  Henry Safety Technologies.
25          Me and Chad Howell, uh -- raised some

11  (Pages 41 to 44)

EXHIBIT A

Page 45

1    money and bought him out, and we renamed the
2    company, um -- we set up a separate LLC, but we
3    renamed the venture Paradigm Safety
4    Integration.  With Paradigm Safety Integration,
5    we were actually writing algorithms to predict
6    fatigue in workers, wireless, while they
7    worked.
8        Um -- we partnered with several of the
9    technology companies back then.  This is before
10   the iWatch came out, so the monitors were a
11   little bit bigger, but we worked with a group
12   in London, in Cambridge, actually, U.K., um --
13   Equivital was their name -- and we -- together
14   we produced a Class 1, Div. 1, intrinsically
15   safe biometric monitor that was intrinsically
16   safe in gas groups C and D, meaning that it can
17   go into basically, like, a methane tank and be
18   used offshore, um -- which was a big deal.
19       Um -- we partnered with a company
20   called Gulf Stream Services.  They provided
21   capital for us.  With Gulf Stream's help and
22   their master services agreements, we then,
23   um -- did work for Chevron.  Did a million,
24   maybe a million two, a feasibility study for
25   Chevron.

Page 46

1        We -- we had three shore-based
2    locations.  In those shore-based locations we
3    were able to, um -- put workers through a VO2
4    test which measured their ability to metabolize
5    oxygen, and then we had the hardware that they
6    were wearing plugged into the software and we
7    were able to realtime monitor fatigue.
8        Um -- as you might know, in 2014, the
9    price of oil fell off a cliff, and, um --
10   Chevron shuffled a couple of key management
11   folks around, and our sponsor Gulf Stream
12   Services sold their business for -- how many
13   figures is 100,000,000?  So they had like a
14   $240 million exit, and our project effectively
15   was done.
16       Um -- Chad and I, uh -- Rhett Bunch,
17   gave us, uh -- gave me a call one day and,
18   um -- told me about one of his buddies that was
19   doing toxicology.  And that same exact day, I
20   had a conversation with a man from Chevron
21   called Noel Avocado -- or Avo-cay-do, I guess
22   depending -- to-mah-to, to-may-to.  He, um --
23   he asked us to do pre-employment drug screening
24   as part of our program.  So the door kind of
25   opened in my mind to investigate what

Page 47

1    toxicology would be like.
2        We actually told Chevron we did not
3    want to do the pre-employment screening.  Um --
4    because I didn't want the fail a customer.  I
5    mean fail an employee from being -- getting a
6    job because of our pre-employment screening.
7    That's not -- I didn't want to be in that
8    position.
9        But the research reminded me of some
10   of the physician-owned ventures that while I
11   was at the bank I was able to, um -- you know,
12   participate in funding and underwriting.  And
13   one of them was this physician-owned
14   laboratory.  So we got into toxicology because
15   I thought we were going to do a physician-owned
16   lab.
17       Um -- very quickly I realized I did
18   not want to be partnered with physicians.  I
19   didn't want the compliance risk.  I'm actually
20   very risk averse when it comes to -- to the
21   Stark laws, and the -- having that many
22   partners.  We did not like that, did not want
23   that.  Um -- so we just decided to start our
24   own laboratory.
25       So we took the money that we had

Page 48

1    earned from, um -- from Paradigm.  Um -- we
2    made -- I went and sold some toxicology
3    services, made some commissions, and we started
4    Trinity.  Myself, Rhett Bunce, and Chad Howell.
5        Q.  When did you start Trinity?
6        A.  2012, I believe.
7            THE REPORTER:
8                Bunce?
9            THE WITNESS:
10               Bunce.  B-U-N-C-E.
11   EXAMINATION BY MR. KUPPERMAN:
12       Q.  Okay.  So your first experience
13   related to the health-care field, as I
14   understand it, is when you partnered with this
15   orthopedic surgeon?
16       A.  That's right.
17       Q.  And what year was that?
18       A.  2011?  I'm not -- I don't remember for
19   sure, Steve, but I think it was 201.
20       Q.  And who was that?
21       A.  Um -- Dr. Barry Henry.
22       Q.  And where is he?
23       A.  He's in Lafayette, Louisiana.
24       Q.  And how did you meet Chad Howell?  I
25   think you said you bought Dr. Henry out with

12 (Pages 45 to 48)

EXHIBIT A

Page 49

1  Chad?
2      A.  Yes.
3      Q.  And how did that come about?  How was
4  your -- how did you have a relationship with
5  Chad Howell?
6      A.  I had a relationship with Chad Howell
7  since high school.  We went to high school
8  together.
9      Q.  Okay.  Okay.  Now, Mr. Howell is a
10 technology guy?
11     A.  Software.
12     Q.  And IT guy?
13     A.  Software.
14     Q.  You're not.
15     A.  No, sir.
16     Q.  Okay.  And the two of you, along with
17 Gulf Stream, owned Paradigm Safety Integration.
18     A.  Um -- we had other partners as well.
19     Q.  Okay.  And that -- Paradigm Safety was
20 sold?  Is that correct?
21     A.  No.
22     Q.  Explain what happened to Paradigm.
23 Because you were -- I'll tell you where I'm
24 confused.  You were talking about Gulf Stream
25 Services selling out.

Page 50

1      A.  Yes.
2      Q.  And I'm just trying to figure what
3  happened to the entity or new partners or
4  whatever.
5      A.  When, uh -- when Gulf Stream sold,
6  they sold, at their level, the new -- I guess
7  the private capital firm -- the private equity
8  way firm that bought Gulf Stream, um -- I don't
9  know if they ever knew about Paradigm or not.
10 We never had conversations with them.
11         Um -- the relationship with, um --
12 with Gulf Stream ended pretty abruptly after
13 their exit.  240,000,000.  They just stopped
14 answering.  But we -- we had moved on to
15 toxicology and knew what we wanted to do then.
16     Q.  So what happened to Paradigm Safety?
17     A.  It's -- it's just a company that's out
18 there now.  I don't even think it's --
19     Q.  It quit operating.
20     A.  Yes, sir.
21     Q.  Okay.  And when was that, that it
22 quit?
23     A.  Sometime in 20 and -- in between 2012
24 and 2013.
25     Q.  Okay.  So Paradigm basically lasted a

Page 51

1  year to a year and a half.
2      A.  About.
3      Q.  Okay.  And earlier you said Gulf
4  Stream sold out for $100 million-plus.
5      A.  Uh-huh.
6      Q.  You were not referring to selling out
7  of Paradigm; you were talking that somebody
8  bought Gulf Stream.
9      A.  Yes.
10     Q.  Okay.  I didn't understand that
11 originally.
12     A.  Okay.  Sorry.
13     Q.  Thank you.
14         Okay.  And from Paradigm, you closed
15 that and then went into the toxicology business
16 with Mr. Bunce?
17     A.  Bunce.
18         MR. STEWART:
19             Object to form.
20         MR. KUPPERMAN:
21             Pardon?
22         MR. STEWART:
23             Object to form.
24         MR. KUPPERMAN:
25             Okay.

Page 52

1      A.  Um --
2          MR. STEWART:
3              You can answer.
4          THE WITNESS:
5              Okay.
6  EXAMINATION BY MR. KUPPERMAN:
7      Q.  Bunce and Howell.
8      A.  Bunce and Howell.
9      Q.  Okay.
10     A.  And LTL, which was Tyler LaFleur and
11 Lacey Jo LaFleur.
12     Q.  And who were they?
13     A.  They were married.  Tyler was a
14 partner with us in, um -- in Paradigm, and he
15 was -- they're both registered nurses.  So
16 Lacey was originally our laboratory manager
17 before she, um -- was blessed with a child, and
18 then she became our HR director.
19     Q.  Um -- and you're talking about where,
20 at Paradigm?
21     A.  No, sir.  Well, um -- Tyler was a
22 partner with us in Paradigm.  When we formed
23 Trinity, we had LTL, which was Tyler and
24 Lacey's company, partner with us at Trinity.
25         So the question that you asked was,

EXHIBIT A

Page 53

1  um -- did I start Trinity with Howell and
2  Bunce?  And I'm including Lacey Jo and Tyler in
3  the makeup of Trinity right now.
4      Q.  Okay.  And ultimately, um -- well, did
5  they own part of Trinity?
6      A.  Yes.
7      Q.  Okay.  And ultimately, LTL, Bunce, and
8  Howell exited Trinity?
9      A.  LTL exited first and moved back to
10  Lafayette in March of '16.
11         Um -- and then um -- and then Bunce
12  exited, um -- due to health issues in
13  January 2017.
14         And Chad exited, um -- completely,
15  after -- either simultaneously or immediately
16  after the, um -- sale of, um -- Pathway and the
17  equity swaps that happened there.
18      Q.  And I think you said that was around
19  May of '17?
20      A.  April or May of '17.  That's right.
21      Q.  Um -- so your only experience, at
22  least in the medical field, was Paradigm and
23  Trinity.
24      MR. STEWART:
25         Object to form.

Page 54

1         You can answer.
2      A.  I was a patient.
3  EXAMINATION BY MR. KUPPERMAN:
4      Q.  Okay.  For business purposes.
5      A.  That's right.
6      Q.  Okay.  And you had no experience in
7  technology -- IT.  Correct?
8      A.  Um -- that's not correct.
9      Q.  Okay.  Straighten me out.
10      A.  Okay.  Straighten you out.
11         Um -- if you're -- you run software
12  teams, and you participate in software
13  development, and IT-related services.  And
14  health care is inherently now an IT business.
15  You have to learn IT.  You have to understand
16  IT.  And so I'm very fluent in -- in project
17  management, um -- and the -- the integration,
18  specifically the integrations and how to do it.
19         I'm not a coder, um -- but I am fluent
20  in IT.
21      Q.  Okay.  But you were -- until -- back
22  up.  Um -- until Paradigm Safety Integration,
23  you were not intricately or intimately involved
24  in IT; correct?
25      A.  That's correct.

Page 55

1      Q.  Okay.  Did you become involved in IT
2  at Paradigm?
3      A.  At Paradigm, I had to be involved in
4  IT.
5      Q.  And then you remained versed in, or
6  involved in IT at Trinity.
7      A.  Yes.
8      Q.  Okay.  Would you consider yourself an
9  expert in IT?
10      A.  No, sir.
11      Q.  Would you consider yourself an expert
12  in, um -- health-care businesses?
13      A.  Yes.
14      Q.  Okay.  Um -- besides Trinity
15  Performance, or Prestige, have you ever opened
16  a toxicology lab?
17      A.  Yes.
18      Q.  And where is that?
19      A.  The, um -- can you -- can you explain
20  opened?
21      Q.  Okay.  Let me back up.  Trinity is not
22  a toxicology lab, is it?
23      A.  No.
24      Q.  No meaning that's correct.
25      A.  That's correct.  Yes.

Page 56

1      Q.  Okay.  Performance is a toxicology
2  lab.
3      A.  Yes.
4      Q.  Prestige is not a toxicology lab.
5      A.  That's correct.
6      Q.  Okay.  Other than Performance, have
7  you created, started to operate, a toxicology
8  lab?
9      A.  Yeah.  The, um -- just to correct the
10  question, um -- you're asking me, have I been a
11  participant in a CLIA application to form a
12  toxicology laboratory, other than Performance
13  Labs?  Is that what you're asking?
14      Q.  I'll take that one for now.
15      A.  Okay.  Yes.  Um -- North American
16  Toxicology --
17      Q.  Any others?
18      A.  -- Mission Labs, and I believe Falcon.
19      Q.  Um -- North American
20  Toxicology.  Where was that?
21      A.  It was located in Mandeville,
22  Louisiana.
23      Q.  Okay.  And was that actually an
24  operating lab?
25      A.  Yes.

EXHIBIT A

Page 57

1    Q.  Okay.  When did that start?
2    A.  Around the same time as Performance.
3  Shortly thereafter.  We --
4    Q.  Okay.  Um -- and, um -- was North
5  American Toxicology located in the same
6  location as Trinity?
7    A.  Different suite number.
8    Q.  Same building.
9    A.  A completely different wall.  It
10  was -- it had, um -- North American toxicology
11  and Trinity -- or Performance Labs, one was I
12  believe Suite 7, and one was Suite 8.  We
13  actually physically separated them.
14    Q.  Right.  I was just asking, they were
15  in the same building, though?
16    A.  Yeah.  Same -- same building, yeah.
17    Q.  All right.  And what happened to North
18  American Toxicology?
19    A.  Um -- in the 2015, um -- inspection,
20  um -- the regulators determined that we -- they
21  basically asked us to make it dormant.
22    Q.  This is CMS.
23    A.  That's right.  Yeah.
24    Q.  Okay.  Why?
25    A.  I don't know why.

Page 58

1    Q.  You never asked?
2    A.  Um -- we didn't -- at that point we
3  couldn't really ask questions.  They were
4  telling us what to do.
5    Q.  Um -- so they fond some flaws, or
6  issues of patient safety, and ordered you to
7  stop?
8    A.  That is not what the reason was at
9  that time.
10    Q.  Okay.  Then tell me what the reason
11  was.
12    A.  They didn't, um -- I don't have, um --
13  an actual answer that I can rely on in my brain
14  right now.  I'd need to look at documentation
15  and tell you.
16    Q.  Okay.  So that North American
17  Toxicology shut down in 2015.
18    A.  I believe so, yes.
19    Q.  Okay.  It never restarted.
20    A.  That's right.
21    Q.  Okay.  Let's talk about Mission Labs.
22  When did that start?  When did that begin to
23  operate?
24    A.  We had an idea of funding medical
25  missions.  I do not remember when it started.

Page 59

1    Q.  Did it actually operate as a lab?
2    A.  No, sir.
3    Q.  Okay.  So you -- you submitted an
4  application but, in fact, never started the
5  laboratory.
6    A.  That's right.
7    Q.  Okay.  So that was more of an entity
8  on paper that never really operated?
9    A.  That's correct.
10    Q.  Okay.  What about Falcon; when did
11  that, um -- start?
12    A.  Falcon -- Falcon was a partnership.
13  Uh -- it was an intended partnership with a
14  separate group.  Um -- and it -- it kind of had
15  the start and stop that Mission did.
16    Q.  So it applied but never started.
17    A.  The actually applied and bought
18  equipment, and then, um -- never started.
19    Q.  Okay.  When you say that Mission and
20  Falcon applied, applied for what?
21    A.  Um -- applied for a CLIA.
22    Q.  Okay.  And what does that mean?
23    A.  A CLIA application is the application
24  that you turn in to the government to be able
25  to obtain a CLIA license.

Page 60

1    Q.  Okay.  And what good is a CLIA
2  license, and what does that mean?
3    A.  A CLIA license is, um -- allows you to
4  be able to perform testing.
5    Q.  Okay.  Was Mission Labs granted a CLIA
6  license?
7    A.  I don't remember.
8    Q.  What about Falcon; was it granted a
9  CLIA license?
10    A.  I believe so.
11    Q.  Okay.  Why didn't you actually start
12  operating Falcon?
13    A.  Um -- it was -- there was a couple of
14  just business reasons why it didn't work.
15  Um -- and then we -- we were in the middle of
16  the, um -- audit in, um -- for Trinity
17  medical -- excuse me, for Performance Labs, and
18  I had a meeting with the investors and advised
19  them that we wouldn't be able to give the time
20  and the energy that they required to get their
21  return.  So I told them to pull the plug on the
22  project.
23    Q.  You said there were business reasons
24  in addition to that.  Can you tell me what
25  those were?

Page 61

1      A.  The actual time and attention
2  necessary to run a business was not -- I could
3  not --
4      Q.  Okay.  So it was what you already
5  described.
6      A.  Yes, sir.
7      Q.  Okay.  Um --
8          MR. STEWART:
9             Steve, we've been going for about
10         an hour.  You want to take a break
11         soon?
12         MR. KUPPERMAN:
13             Um -- let me just ask this one
14         thing.
15  EXAMINATION BY MR. KUPPERMAN:
16     Q.  Did you attend any seminars, or
17  consult any books or articles, in particular,
18  that informed you how to run a toxicology lab?
19     A.  Um -- I would have to -- I mean --
20  books on how to run a toxicology lab.  Um --
21  no.
22     Q.  Okay.  Now, Paradigm was biometric
23  monitoring; right?
24     A.  Yes.
25     Q.  It was not a lab.

Page 62

1      A.  That's correct.
2      Q.  Okay.  So the very first lab that you
3  were ever involved in was Trinity?
4      A.  Was Performance Labs.
5      Q.  Ah.  I'm sorry.  Correct.  Because
6  Trinity wasn't a lab.
7      A.  That's right.
8      Q.  And when was Performance started?
9      A.  Um -- the same time; 2012, I believe.
10     Q.  Okay.  When did it start to operate?
11     A.  Um -- first patient samples I believe
12  rolled out October 2013.
13     Q.  Okay.  All right.  Thank you.
14         MR. KUPPERMAN:
15             Wanna take a break?
16         MR. STEWART:
17             Great.
18         THE VIEOGRAPHER:
19             We're going off the record.  The
20         time is 10:07.
21             (Brief recess.)
22         THE VIDEOGRAPHER:
23             We are back on the record.  The
24         time is 10:19.
25  EXAMINATION BY MR. KUPPERMAN:

Page 63

1      Q.  Mr. Bourque, you told us earlier that
2  you graduated from college in December of 2005
3  but had filed bankruptcy in May of 2005.
4  Correct?
5      A.  Correct.
6          MR. STEWART:
7             Object.  Mischaracterization of
8         his testimony.
9             You can answer.
10         MR. KUPPERMAN:
11             I think he did.
12  EXAMINATION BY MR. KUPPERMAN:
13     Q.  So you filed bankruptcy before you
14  graduated from college.
15     A.  Yes, sir.
16     Q.  And can you, um -- how old were you
17  when you declared bankruptcy, sir?
18     A.  25 years old.  On my birthday.
19     Q.  What were you doing for work, um --
20  before you filed bankruptcy?
21     A.  Um -- I had the businesses.  So it
22  was, uh -- Cajun Companies of Acadiana, Cajun
23  Spaces --
24     Q.  The ones --
25     A.  -- the tree businesses, yeah.

Page 64

1      Q.  Okay.  The ones you told me about
2  earlier.  And that was before the private
3  banking.
4      A.  Yes.
5      Q.  Okay.
6      A.  Um -- I started college in '98.  I
7  played college football.  2002, when I was done
8  with football, I, um -- I went straight into
9  business.  I didn't finish my degree at that
10  time.  I went into business and came back and
11  finished my degree.  That's why there's a --
12     Q.  A gap.
13     A.  -- there's a gap.  Yes, sir.
14     Q.  And so in 2000 is when you started the
15  tree service.
16     A.  Um -- I don't remember, but sometime
17  around the time --
18     Q.  Right after leaving school before
19  you --
20     A.  Right after leaving school, yes, sir.
21     Q.  Okay.
22         THE REPORTER:
23             Try to resist the temptation to
24         answer where you know his question's
25         going to go.  Okay?

16  (Pages 61 to 64)

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                    April 10, 2019

Page 65

1       THE WITNESS:
2           Yes.
3   EXAMINATION BY MR. KUPPERMAN:
4       Q.  Okay.  Um -- what were your -- if you
5   can recall, what were your debts and what were
6   your assets at the time of bankruptcy?
7       A.  I cannot recall.
8       Q.  Was the bankruptcy due in part to your
9   businesses?
10      A.  Yes.
11      Q.  The businesses did not do well?
12      A.  Um -- Steve, I've always attributed
13  the failure to me not understanding, at that
14  time, finance.
15      Q.  Okay.  But the businesses failed.
16      A.  Yes, sir.
17      Q.  And that's the tree service, the
18  debris removal --
19      A.  Uh-huh.
20      Q.  They both failed.
21      A.  Yes, sir.
22      Q.  And I gather the TV show -- the home
23  improvement TV show was not renewed, or, um --
24      A.  Um -- it was, um -- we bought the time
25  to be able to advertise.  Um -- that actually

Page 66

1   was a success.  But not without the tele -- not
2   without the tree service.  They all failed.
3       Q.  I got you.  Okay.  So the TV show was
4   really more of an advertising for the tree
5   service.
6       A.  Yes, sir.
7       Q.  Okay.  Okay.  So before Paradigm
8   Safety, the only companies that you actually
9   had been involved in running failed.
10      A.  Yes.
11      MR. STEWART:
12          Object to form.
13  EXAMINATION BY MR. KUPPERMAN:
14      Q.  Okay.  And then Paradigm Safety also
15  failed.  Correct?
16      MR. STEWART:
17          Object to form.
18      A.  Hmm.  I wouldn't categorize that as a
19  failure.
20  EXAMINATION BY MR. KUPPERMAN:
21      Q.  How old you categorize it?
22      A.  It -- we put it down.  It ceased to
23  exist.
24      Q.  Okay.  So you closed it.
25      A.  Yeah.  We -- the operation stopped.

Page 67

1       Q.  And that's -- you didn't close it
2   because it was making money, right?
3       A.  No, we closed it because we turned our
4   attention to toxicology.
5       Q.  Okay.  Were you making money in
6   Paradigm?
7       A.  Um -- Gulf Stream had the contract
8   with Chevron.  The relationship with Gulf
9   Stream, um -- we were employed by Gulf Stream,
10  and then Gulf Stream, uh -- would cover
11  Paradigm's expenses.
12      Q.  Okay.  Um --
13      A.  The answer is no, we were not making
14  money with Paradigm.
15      Q.  Okay.  Did you make money with North
16  American Toxicology?
17      A.  Yes, sir.
18      Q.  Until CMS shut it down?
19      A.  Yes, sir.
20      Q.  And when I say make money, did you
21  make a profit in that?
22      A.  Yes, sir.
23      Q.  Okay.  Let me ask you -- Mr. Howell,
24  to your knowledge, did he have any experience
25  in toxicology labs before becoming involved

Page 68

1   with North American Toxicology?
2       A.  Um -- Chad had experience with health
3   care, not toxicology labs.
4       Q.  Okay.  Um -- and North American
5   Toxicology was owned by whom?
6       A.  Um -- Trinity Medical Services.
7       Q.  Okay.  I'm sorry.  I think I did ask
8   you that.
9           What about Mr. Bunce, did he have any
10  experience with toxicology labs prior to North
11  American Toxicology?
12      A.  No, sir.
13      Q.  Okay.  What business was he in before
14  becomes involved with you in Trinity?
15      A.  He was a commercial builder.
16      Q.  So he was a general contractor?
17      A.  Yes, sir.
18      Q.  Okay.  North American Toxicology, it
19  had a LIS system?
20      A.  Um -- yes, sir.
21      Q.  Okay.  And what system was that?
22      A.  We called it Trinity L.I.M.S.
23  Laboratory Information Management System.
24      Q.  Uh-huh.  And is that the one that you
25  said Mr. Howell created?

17 (Pages 65 to 68)

**EXHIBIT A**

Page 69

1    A.  Yes, sir.
2    Q.  Okay.
3    A.  There was actually two LIS systems, or
4  L.I.M.S. systems, involved in the process of
5  producing samples for North American
6  Toxicology.
7    Q.  Tell me about those.
8    A.  One of 'em was named Paracelsus.
9       THE REPORTER:
10      Spelled?
11      THE WITNESS:
12      Oh, wow.
13      THE REPORTER:
14      P-A-R-A-C-E-L --
15      MR. STEWART:
16      We can get you that.
17    A.  The Father of modern toxicology;
18  Paracelsus.
19  EXAMINATION BY MR. KUPPERMAN:
20    Q.  Okay.  And the other was the Trinity
21  L.I.M.S. system?
22    A.  Trinity L.I.M.S. system.
23    Q.  And what did the Paracelsus do?
24    A.  Paracelsus integrated with a piece of
25  equipment that we owned called an AU400, an

Page 70

1  Olympus AU400 that.  That system did screening.
2  It's an amino assay analyzer.  So Paracelsus
3  would take the information off of the AU,
4  produce, um -- deposit it in a database.  We'd
5  integrate with the database and be able to take
6  those numbers and put 'em into our results.
7    Q.  Um -- okay.  And Trinity L.I.M.S.
8  System did what?
9    A.  Trinity L.I.M.S. integrated with the
10  software that sat, um -- inside of the LCMS.
11  So, um -- the LCMS that we had at the time that
12  we started Trinity was called, um -- an AB
13  Sciex, I believe the model number was a 3200.
14  So AB Sciex had it's own software that actually
15  ran the equipment, did the QCs and controls.
16  It produced data that would go into a database,
17  and then our software would integrate.  So our
18  software sat on top of both on the those two.
19    Q.  So when you say your software would
20  integrate, what does that mean?
21    A.  That means that we were receiving data
22  from the AB Sciex, and from Paracelsus, to be
23  able to produce reports, present the data to
24  scientists in a way that they could -- they can
25  see it, they can use it, and they can function

Page 71

1  in their day-to-day jobs.
2    Q.  Okay.  Um -- was Paracelsus ever used
3  at Performance?
4    A.  Yes, sir.
5    Q.  And Trinity L.I.M.S. also?
6    A.  Yes, sir.
7    Q.  Okay.  So you used that same system at
8  Performance that you used in North American
9  Toxicology?
10    A.  Yes, sir.
11    Q.  Okay.  You never used Merge at North
12  American Toxicology?
13    A.  No, sir.
14    Q.  Okay.  Is it Merge that replaced the
15  Trinity L.I.M.S. system at Performance?
16    A.  Yes, sir.
17    Q.  And did it also replace the Paracelsus
18  system?
19    A.  I believe so.
20    Q.  Okey-dokey.  Did the Trinity L.I.M.S.
21  system comply with all rules and regulations?
22    A.  I do not believe so.
23    Q.  Was it supposed to?
24    A.  Yes, sir.
25    Q.  Okay.  And Mr. Howell was unable to

Page 72

1  create a system that complied?
2    A.  Um --
3       MR. STEWART:
4       Object to form.
5    A.  Yeah.  Speaking to his abilities, he
6  was able to.
7  EXAMINATION BY MR. KUPPERMAN:
8    Q.  He did not.
9    A.  He did not.  He did not.
10    Q.  Has he ever created one that complied,
11  to your knowledge?
12    A.  Yes.  And to my knowledge --
13    Q.  Yes.
14    A.  -- we just never released it.
15       We were building a second L.I.M.S.
16  system, we called it limits 2.0, will we were
17  operating L.I.M.S. 1.0.  So we were building
18  its replacement with a separate set of, um --
19  of programmers.
20    Q.  Okay.  And 2.0, if we can just use
21  that for short --
22    A.  Sure.
23    Q.  -- 2.0, you believe, did comply with
24  all rules and regulations of federal and state
25  governments?

18  (Pages 69 to 72)

EXHIBIT A

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                                    April 10, 2019

Page 73

1    A.  I believe so.
2    Q.  Okay.
3    A.  It was never tested.  It was never
4  proven.  It is my belief.
5    Q.  Okay.  And you didn't use it because
6  it was never tested or proven?
7    A.  That's correct.
8    Q.  Okay.  Does L.I.M.S. system have to be
9  approved by CMS?
10    A.  It is part of your laboratory develop
11  testing process.  So it has to -- it has to,
12  um -- be written inside of your SOPs.  It's --
13  it's baked into the approval process that is
14  laid out for guidelines.
15    Q.  CMS basically has to be familiar with
16  the, um -- L.I.M.S. system that you're using?
17    A.  No.  They don't have to be familiar
18  with it.
19    Q.  Okay.  Well, then how do they know
20  whether it works or not and whether to approve
21  it?
22    A.  Um -- CLIA and COLA are the bodies
23  that you have to present your information to.
24  So it's not CMS that approves it.
25    Q.  Okay.  Does CLIA have to approve it?

Page 74

1    A.  You apply for your CLIA certificate,
2  and then -- our situation, at that time --
3  rules change.  But our situation, in 2012, and
4  '13, you apply for your CLIA, you file for an
5  accreditation by COLA.
6       Within a year, COLA comes in and
7  inspects your laboratory, and they look at the
8  a data, the systems, the processes, the SOP,
9  they do an official audit, a live person in
10  your -- in your -- in your space, and they
11  evaluate that L.I.M.S. system as well.
12       Um -- we had that inspection, and that
13  inspection -- out of a hundred questions, we
14  made a 97 on it.  Um -- and so our L.I.M.S.
15  system was approved by the accrediting body, by
16  a real COLA inspector, to use for patient
17  testing.
18    Q.  And you're talking about your system
19  meaning?
20    A.  L.I.M.S. 1.0.
21    Q.  1.0.  What about 2.0?
22    A.  2.0 was never tested.
23    Q.  So it was never approved.
24    A.  It was never approved.
25    Q.  Okay.  The Merge LIS software was also

Page 75

1  approved; correct?
2    A.  FDA-approved.
3    Q.  Okay.  Do you know whether it was
4  COLA-approved?
5    A.  That's not how that works.
6    Q.  Tell me how it works.
7    A.  Okay.  COLA is an accrediting body of
8  laboratories.  So COLA, um -- is a higher level
9  of accreditation, a higher standard than CLIA.
10       So they don't approve software; they
11  approve laboratories for testing.
12    Q.  Okay.  And, um -- did they approve
13  Performance, um -- using Merge?
14    A.  We did not go -- when -- when -- in
15  2016, when Performance Labs used Merge, we were
16  only, um -- CLIA.  We did got not apply for
17  COLA because we couldn't.
18    Q.  Why couldn't you?
19    A.  Um -- the directed plan of action of
20  20, um -- that we went through in 2016, um --
21  when you're underneath that directive plan of
22  action, you have to report -- you are only
23  CLIA.  And you have to report directly to the
24  CLIA office.
25    Q.  And directive plan of action, you

Page 76

1  mean -- this relates to after CMS shut down
2  North American Toxicology in 2015.
3    A.  Yes.
4    Q.  Okay.  All right.  Did CLIA -- does
5  CLIA, before you can get up and operating
6  again, have to approve your use of software?
7    A.  Um -- can you ask that question one
8  more time, please?
9    Q.  I can try.  Does CLIA have any, um --
10  ability to approve -- or does CLIA need to
11  approve a lab's, um -- let me back up.  Scratch
12  that.
13       Did CLIA have to approve anything
14  having to do with North American Toxicology?
15    A.  Um -- because we were a COLA
16  laboratory, North American Toxicology also
17  passed its COLA inspection.  And so, um --
18  it -- you report -- you report your survey
19  findings to a different organization than CLIA.
20  COLA does the audit for CLIA.
21    Q.  Uh-huh.
22    A.  So I'm not sure how to answer the
23  question.
24    Q.  Okay.  After North American Toxicology
25  was shut down by CMS in 2015, was there any,

19 (Pages 73 to 76)

EXHIBIT A

Page 77

1  um -- involvement of COLA or CLIA with regard
2  to that lab?
3      MR. STEWART:
4          I object.  It's a
5      mischaracterization of his testimony.
6      A.  I, um -- believe that we actually were
7  given a -- an option to voluntarily, um --
8  remove North American Toxicology.  I don't
9  think -- I think it was presented to us in a
10 way where we had to make the choice, but they
11 didn't come in and shut down North American.
12         I'd want to go back and review the
13 communication.  But I still don't know how to
14 answer your question.
15     Q.  Okay.  Is it fair to say that what
16 they did was they came in and said, you either
17 need to fix next all these problems or you need
18 to shut down?
19     A.  Um -- it was -- their issue was that
20 the common ownership of Trinity Medical
21 Services, having those two laboratories that
22 were that close together -- they just did not
23 like it.
24     Q.  Uh-huh.
25     A.  It was, um -- it was, um -- a general

Page 78

1  preference of the CLIA inspector to give us the
2  option to make it dormant.
3      Q.  So you either had to fix it or shut it
4  down.
5      A.  It wasn't a fix situation with North
6  American Toxicology.  Um -- the inspection
7  happened at Performance Labs.  So Performance
8  Labs was inspected.  Um -- there was no 2567
9  for North American.  So they gave us -- so it
10 wasn't a fix North American or get shut down;
11 it was, you have two CLIAs operating next door
12 the one another, we don't like it, we recommend
13 that while you go through the process of fixing
14 Performance Labs that you make North American
15 dormant.
16     Q.  So they found issues with Performance.
17     A.  Yes, sir.
18     Q.  And was Performance closed or
19 suspended, if you will, by CMS in 2015?
20     A.  Um -- December 23rd, 2015, we did
21 receive a letter from CMS.
22     Q.  And that effectively shut down
23 Performance?
24     A.  That -- that did shut down
25 Performance.

Page 79

1      Q.  Okay.  Um -- we've used various terms.
2  L.I.M.S. and LIS; are they the same thing?
3      A.  Yes.
4      Q.  Okay.  You also used some initials
5  LCMS.  What is that?
6      A.  Liquid chromatography mass
7  spectrometer.
8      Q.  Um -- I will not ask you to spell it,
9  but he might.
10         Okay.  Let me show you what I have
11 marked as Exhibit 2, and just ask if you
12 recognize this as a copy of the Operating
13 Agreement for Trinity Medical Services, LLC.
14         (Exhibit 2 was marked for
15 identification and is attached hereto.)
16     A.  I do recognize this as one of the
17 versions.  Yes.
18 EXAMINATION BY MR. KUPPERMAN:
19     Q.  Well, this is actually the final
20 version that is signed.  Correct?
21     A.  This is a -- this is a final version
22 at the time of the signature, Yes.
23     Q.  Were there other versions of this that
24 were signed?  There's other versions of an
25 Operating Agreement for Trinity Medical

Page 80

1  Services?
2      A.  There were -- yes.
3      Q.  And, um -- did they come subsequent to
4  this document?
5      A.  After.
6      Q.  Right.
7      A.  Yes.
8      Q.  Okay.  And how many versions were
9  there?
10     A.  I could not count.  I could tell you
11 the partnerships, though.
12     Q.  Okay.  Why don't you do that, at
13 least.
14     A.  Okay.  So, um -- we added LTL to this
15 particular partnership right here.  I believe
16 they had 6 percent.
17     Q.  Okay.
18     A.  Um --
19     Q.  Was there a new operating agreement
20 that changed any of the substantive terms at
21 that time?
22     A.  I do not believe so.
23     Q.  Okay.  Was there any amendment or
24 subsequent operating agreement that
25 substantively was different than Exhibit 2?

EXHIBIT A

Page 81

1    A.  Oh, I could not answer that without
2  looking at the documents.
3    Q.  Okay.
4      MR. KUPPERMAN:
5        I think, um -- Jesse, this is the
6      only one that we have received from
7      you all.  So to the extent there are
8      others, I would appreciate receiving
9      them as well.
10      MR. STEWART:
11        We'll have to look.
12  EXAMINATION BY MR. KUPPERMAN:
13    Q.  You recognize your signature on the
14  last page?  Or second --
15    A.  Yeah.  Yes, sir.
16    Q.  And you 57D recognize Mr. Howell's and
17  Mr. Bunce's signatures?
18    A.  Yes, sir.
19    Q.  Um -- all of you -- you've been
20  talking about the individuals, but it appears
21  as if all of you did this as members of other
22  organizations.  Is that fair?
23    A.  Yes, sir.  Yes, sir.
24    Q.  Do you still own Trinity as Charlotte
25  Sophia, or is that in your personal name?

Page 82

1    A.  I still own Trinity as Charlotte
2  Sophia.
3    Q.  Okay.  And are you the sole owner of
4  Charlotte Sophia?
5    A.  Yes, sir.
6    Q.  And Mr. Howell is the sole owner of
7  CEH?
8    A.  No, sir.
9    Q.  Who else was involved in that?
10    A.  His father and his brother, I believe.
11    Q.  And what about Mr. Bunce with
12  Strategic Production --
13    A.  I don't know.
14    Q.  Okay.  Okay.  Is there an entity
15  called Trinity Labs, LLC?
16    A.  Trinity Labs No. 1?
17    Q.  There is.
18    A.  Yes, sir.
19    Q.  There is not a Trinity Labs; it's just
20  Trinity Labs No. 1.
21    A.  Yes, sir.
22    Q.  Okay.  And what is that?
23    A.  So, um -- we had a group of, uh -- of
24  investors, partners, that, um -- we were
25  working with very early on in our Trinity

Page 83

1  Medical Services days.  And, uh -- that group
2  was moving little bit slow, and so, um -- we
3  needed to apply for a CLIA.  We knew we can do
4  a name change, but we needed to get the ball
5  rolling.  So we started that entity and just
6  named it Trinity Labs No. 1, knowing that we
7  would do a name change.
8    Q.  And the name change became Trinity
9  Medical Services?
10    A.  No, sir.
11    Q.  What was the name change?
12    A.  It never changed names.  It's still
13  Trinity Labs No.1 today.
14    Q.  Did it over operated?
15    A.  No, sir.
16    Q.  All right.  Turn, if you will, to the
17  page right there, you're looking at it, it says
18  agreement at the top, and look at Defined
19  Terms.  Under Agreement, or Operating
20  Agreement, it says, means this Operating
21  Agreement of Trinity Labs, LLC.
22    A.  Uh-huh.
23    Q.  Is that merely a typo, or is there --
24  or is that the same entity as Trinity Medical
25  Services?  Under Agreement -- I mean, under --

Page 84

1  yeah Agreement, or Operating Agreement.
2    A.  That's a typo, I would imagine.
3    Q.  All right.  Now, turn, if you
4  will, two pages later, under Paragraph 2.4,
5  Company Property, it talks about all property
6  is going to be owned by the company and titled
7  in its name.  Correct?
8    A.  Yes.
9    Q.  And that property that would be owned
10  by the company and titled in its name includes
11  the Merge LIS software.  Correct?
12    A.  Um -- we are not looking at the
13  operating agreement that was executed and in
14  power whenever we purchased the Merge LIS
15  software, so this is not a perfect document as
16  it's related to Merge.
17    Q.  Okay.  Um -- was the Merge LIS
18  software owned by the company and titled in its
19  name?
20    A.  Um -- the Merge LIS SOFTWARE, um --
21  I'm -- I'm trying to think it through the
22  accounting processes and whatnot.  I don't
23  know.
24    Q.  So you don't know if Trinity actually
25  owned, um -- the Merge license?

EXHIBIT A

Page 85

1        MR. STEWART:
2            Steve, I'm going to object.  I
3    mean, it's calling for a legal
4    conclusion.
5        MR. KUPPERMAN:
6            I'm asking him his understanding.
7    A.  I understand that Trinity purchased
8    the Merge software.  The part that I was
9    confused in the question was, and titled in its
10   name.
11   Q.  Okay.
12   A.  Yeah.
13   Q.  All right.  Well, Trinity considered
14   the Merge software to be owned by it.  Correct?
15   A.  Trinity did pay for it.
16   Q.  Okay.  And considered --
17   A.  Yes.
18   Q.  -- that it owned it.  Right?
19   A.  Yes.
20   Q.  Okay.  Was anybody else ever admitted
21   as a member of Trinity?  And when I say
22   Trinity, I'm gonna refer to Trinity Medical
23   Services --
24   A.  Yes, sir.
25   Q.  -- from now on.

Page 86

1        Other than LTL?
2    A.  For a -- in 2 -- I don't remember what
3    month it was in 2016, Steve, but, um -- we had
4    a Blue Cross/Blue Shield type of, um -- issue
5    with health -- with our health insurance, and
6    we admitted Phil Martinez, um -- I think Mark
7    Lobell, um -- possibly John Hearn, possibly
8    Kyle Mouton.
9    Q.  Okay.  So some of your discussions
10   with Mr. Martinez were as attorney, and some
11   were as investor.
12   A.  Um -- yes.
13   Q.  Okay.  Other than the initial capital
14   contributions that each of you made, were there
15   any additional capital contributions?
16   A.  To Trinity Medical Services?
17   Q.  Yes.
18   A.  Um -- not that I'm aware of.
19   Q.  Okay.  So, um -- and any of the people
20   who owned interests in Trinity after the
21   original three simply, um -- did they make
22   capital contributions?
23   A.  Um -- I don't ever remember a cash
24   exchange occurring at Trinity Medical Services.
25   No, sir.

Page 87

1    Q.  Okay.  Did they buy interests from the
2    existing owners?
3    A.  Um -- no, sir.
4    Q.  They were donated or paid through an
5    ownership -- in other words, paid for their
6    services through an ownership interest?
7    A.  Um -- as I understand it, yes.
8    Q.  Okay.  Did any of the investors in
9    Trinity make loans to the company?
10   A.  Ohh.  I don't -- I don't know if the
11   suspended guaranties, you know, payments, or,
12   um -- going without money, or distributions is
13   considered a loan.  There was no loans on the
14   books with Trinity Medical Services.
15   Q.  Okay.  Um -- turn, if you will, to
16   Article 7.  As I understand that -- are you
17   with me?
18   A.  Article -- on the same page?
19   Q.  I think it's the next page, or two
20   pages.
21        MR. STEWART:
22            Talking about the heading
23        Meetings and Management?
24        MR. KUPPERMAN:
25            Yes.

Page 88

1    EXAMINATION BY MR. KUPPERMAN:
2    Q.  Now, do I understand correctly that
3    essentially, um -- you managed Trinity, um --
4    and you couldn't be removed without your
5    consent?
6        MR. STEWART:
7            Object.  Can you just clarify who
8        you mean by you?
9        MR. KUPPERMAN:
10           Yeah.
11   EXAMINATION BY MR. KUPPERMAN:
12   Q.  You, through Charlotte Sophia, were
13   designated the manager of the company of
14   Trinity; correct?
15   A.  Um -- I'll repeat it again.  This
16   document, um -- isn't the document of the
17   decisions that were made at this particular
18   time --
19   Q.  Yes.
20   A.  -- and I do not -- I do not know the
21   dates when this document would have been
22   replaced, and what minority, um -- protection
23   language would have been in for some of the
24   smaller investors, because we modified language
25   dramatically when we brought in people that had

Page 89

1   smaller percentages, to protect them.
2       Q.  Uh-huh.
3       A.  So I can't answer that.
4       Q.  Well, you can answer that through
5   Charlotte Sophia you were the manager of the
6   company.  Correct?
7       A.  I was the manager of the company --
8       Q.  Okay.  And --
9       A.  -- Charlotte Sophia.
10      Q.  And, at least according to this
11  initial operating agreement, you could not be
12  removed without your consent.  Fair?
13      A.  This initial operating agreement.
14  That's what the language says, yeah.
15          MR. KUPPERMAN:
16              And I want to reserve my right to
17          come back and ask questions when the
18          other operating agreements are
19          produced because I don't think we have
20          them.
21          MR. STEWART:
22              To the extent that we can locate
23          the other operating agreements.  Okay.
24  EXAMINATION BY MR. KUPPERMAN:
25      Q.  Um -- and you remained the manager

Page 90

1   throughout the course of Trinity?
2       A.  Yes, sir.
3       Q.  Okay.
4       A.  Charlotte Sophia did.  Yes, sir.
5       Q.  Yes.  Um -- now, this also requires
6   regular meetings of the members.  Um -- did, in
7   fact, the members meet regularly?
8       A.  Yes, sir.
9       Q.  And were there minutes kept?
10      A.  Um -- many times, yes, sir.
11      Q.  Okay.  And where are they retained?
12      A.  Um -- in -- they were e-mailed out at
13  the end of our partner meetings.
14      Q.  And what happened to them?  Didn't the
15  company retain them in some place?
16      A.  Yes, sir.
17      Q.  And where was that?
18      A.  Um -- they would have been either in
19  e-mail, or they were filed away, um -- possibly
20  on SharePoint, which we don't have access to
21  anymore.  Um -- but I do know that they're
22  still on the e-mail database.
23      Q.  Okay.
24          MR. KUPPERMAN:
25              Again, I don't think we have any

Page 91

1   of the minutes.  We would like those.
2           MR. STEWART:
3               Again, to the extent they were
4           requested, to the extent they're
5           available, we'll --
6           MR. KUPPERMAN:
7               Well, they were requested.  I
8           don't know if they're available.
9           THE WITNESS:
10              I don't know how they don't -- I
11          don't know how they don't have those.
12          We definitely turned over all e-mails.
13          MR. STEWART:
14              We can take that up.
15          THE WITNESS:
16              Okay.
17  EXAMINATION BY MR. KUPPERMAN:
18      Q.  Okay.  Who was secretary of the
19  company?
20      A.  This was an LLC, not an incorporation,
21  so there wasn't an official secretary title.
22      Q.  Well, who kept the minutes of the
23  meeting?
24      A.  Um -- we had an actual, um -- we had
25  meeting instructions where we'd assign a

Page 92

1   timekeeper, a note taker, and somebody who,
2   um -- stopped me from going on tangents.  So
3   multiple people fulfilled the role of, um --
4   note taker.
5       Q.  Okay.  When Trinity bought the Merge
6   LIS software, was that a decision made solely
7   by you, or did all of the members join in that
8   decision?
9       A.  That was all of the members.
10      Q.  Okay.  So that -- was that, um --
11  recorded in minutes?
12      A.  It was recorded in e-mail.
13      Q.  Okay.  Um -- was it a unanimous
14  decision?
15      A.  Yes.
16      Q.  Um -- tell me what bank accounts
17  Trinity had.
18      A.  What banks or bank accounts?
19      Q.  Banks.  Let's start there.
20      A.  Yeah.  Um -- Iberia Bank.
21      Q.  Okay.
22      A.  Home Bank, and I believe Whitney Bank.
23      Q.  Okay.  And were they all maintained in
24  the name of Trinity?
25      A.  Trinity Medical Services.  Yes, sir.

EXHIBIT A

Page 93

1    Q.  Okay.  Were there -- were they all at
2  the same time, or were they some at one time
3  and another at another time?
4    A.  Um -- started with Iberia, um --
5  then -- I believe the way the progress was, I
6  think it started at Iberia, then Whitney --
7  excuse me, then Home Bank, then Whitney.
8    Q.  So were they all there at one time?
9    A.  What do you mean 1234?
10   Q.  Did you do banking with Iberia, Home,
11 and Whitney all at the same time?
12   A.  There were -- yeah, there were times
13 where we had a banking relationship with each
14 one of them.
15   Q.  Okay.  Now were there bank accounts at
16 each one of these, as opposed to loans?
17   A.  I believe so.
18   Q.  Okay.  Did all three of them make
19 loans to Trinity?
20   A.  I'd have to go back and see the
21 commercial guarantors, but I don't know if the
22 Home Bank loan -- if Trinity was a commercial
23 guarantor, or if it was just Performance Labs.
24 Um -- but I believe the answer is yes.
25   Q.  Okay.  Now, were you, through

Page 94

1  Charlotte Sophia, always the accounting member
2  of Trinity?
3    A.  Um -- when we had a -- I delegated my
4  duties to our CFO, or to our CPAs.
5    Q.  And who was the CFO?
6    A.  Um -- Scott Boudreaux.
7    Q.  And where is he today?
8    A.  I do not know.  I believe Mandeville,
9  Louisiana.
10   Q.  And he was your CFO?
11   A.  CFO.
12   Q.  Throughout the existence of Trinity?
13   A.  No.  He came on -- I don't remember
14 his hire date.  He left in the middle of 2016,
15 to take the CEO position at The Heart Hospital
16 in Lacombe.
17   Q.  Okay.  And who replaced him?
18   A.  Skip Lloyd, and the firm of --
19        MR. STEWART:
20            Call, Riggs & Ingram.
21   A.  Call, Riggs.  Yeah, Call, Riggs.
22 EXAMINATION BY MR. KUPPERMAN:
23   Q.  So you didn't have an in-house CFO at
24 that time.
25   A.  Um -- Skip was our in-house -- we

Page 95

1  basically contracted Call, Riggs, and Skip
2  would come and sit in the office and open
3  books, close books, and effectively manage
4  day-to-day financial operation.
5    Q.  Was Scott Boudreaux affiliated with
6  another company that you retained, or was he a
7  direct hire?
8    A.  He was a direct hire.  He came from
9  Ochsner.  He was a corporate division CFO at
10 Ochsner Hospital before we took him.
11   Q.  Okay.  Now, did you cause tax returns
12 to be prepared and filed for Trinity?
13   A.  Um -- yes.
14   Q.  You're the one who signed 'em?
15   A.  Um -- I don't -- I believe so, yes.
16   Q.  You reviewed 'em before?
17   A.  I reviewed 'em in 2015, yes.
18   Q.  You reviewed the --
19   A.  '13, '14, and '15.
20   Q.  How 'bout '16 and '17?
21   A.  '16, we sent 'em to be prepared.  I
22 got my personal returns.  I have not laid eyes
23 on the actual corporate returns.
24   Q.  So it's 2019 and you have seen no
25 corporate returns --

Page 96

1    A.  For '16.
2    Q.  -- for Trinity for '16.
3    A.  That's correct.
4    Q.  What about for '17?
5    A.  Same answer.
6    Q.  Okay.  Have you asked your CFO -- or
7  your former CFO what happened to 'em?
8    A.  You will read that in the text
9  messages.  Yes, sir.
10   Q.  Okay.  And what was the answer?
11   A.  Um -- I had a lot of answers.
12   Q.  Generally, can you describe them for
13 me?
14   A.  Um -- that they were done; they
15 were -- all the documentation was over at,
16 um -- the CPA firm -- I don't know why I can't
17 remember that name right now.
18       MR. STEWART:
19            Call, Riggs.
20       THE WITNESS:
21            Call, Riggs.  Sorry.
22   A.  All the documentation was at Call,
23 Riggs; um -- that it was possibly on a new
24 system at Call, Riggs, and that they were lost;
25 um -- I went round and round, Steve, with

EXHIBIT A

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                    April 10, 2019

Page 97

1  trying to get them to produce this, um,
2  multiple communications over multiple months,
3  um -- multiple times.  Like, in the dozens of
4  times.
5     EXAMINATION BY MR. KUPPERMAN:
6        Q.  Do you know if the IRS was ever
7  notified?
8        A.  Of what?
9        Q.  That you were not filing returns for
10  2016 or '17?
11       A.  I do not know.
12       Q.  Okay.  Um -- okay.  Who was
13  responsible at Trinity for software and
14  technology, was it Mr. Howell?
15       A.  Yes.  And a department behind him,
16  yes.
17       Q.  And he reported to you?
18       A.  We were equal partners.
19       Q.  So he didn't report to you.  You were
20  equal?
21       A.  We were equal partners.
22       Q.  Okay.  Um -- was there any individual
23  that was assigned specifically to Merge?
24       A.  There were several individuals that
25  were assigned specifically to Merge.

Page 98

1        Q.  And who are they?
2        A.  Jamie Abney, Daniel Bozeman, Lynn
3  Siscario -- S-C-A-R-I-E-O --
4     MR. STEWART:
5        I believe it's Scariano.
6     THE WITNESS:
7        Okay.
8     MR. STEWART:
9        S-C-A-R-I-A-N-O.
10       A.  Um -- Michelle Spruill.  Any of the
11  laboratory employees that were employed by
12  Prestige Worldwide that were at Pathway were
13  effectively assigned to do work inside of
14  Merge.  Chad Howell --
15     EXAMINATION BY MR. KUPPERMAN:
16       Q.  Okay.  Anybody else?
17       A.  Um -- Ben Caston.
18       Q.  Ben Caston?
19       A.  Ben Caston.  C-A-S-T-O-N.
20       Q.  Okay.  And where is he?
21       A.  Ben Caston is, um -- in Mandeville,
22  Louisiana.
23       Q.  And where is Lynn Scariano?
24       A.  I believe Mandeville, Louisiana.
25       Q.  Okay.  Anyone else?

Page 99

1        A.  Burton Cosse.
2        Q.  Where is he?
3        A.  Um -- I think he -- he has a home
4  maybe in Mississippi, but also I believe he has
5  a home in Hammond, Louisiana.
6        Q.  Anyone else?
7        A.  I would -- I'd put Shea Spruill,
8  specifically.
9        Q.  He's married to Michelle?
10       A.  He is.  They are married.
11       Q.  Anybody else?
12       A.  That's all I can remember right now.
13       Q.  Okay.  Tell me in general what the
14  source of revenue was to Trinity.
15       A.  Um -- pass-through -- pass-through
16  income from Prestige Worldwide Leasing and
17  Performance Labs.
18       Q.  Any other source?
19       A.  Um -- it had ownership in, um -- Lite
20  Consulting.
21       Q.  Light?
22       A.  Lite.
23       Q.  L-I-G-H-T?
24       A.  No.  L-I-T-E.  Laboratory Information
25  Technology and Equipment.

Page 100

1        Q.  And what kind of revenue did it
2  receive from that?
3        A.  It was -- Lite was a consulting
4  company that, uh -- Chris Franklin was, uh --
5  was, uh -- the manager of.  And, um -- they --
6  they did approval of specimens, and helped with
7  validity studies, and -- basically, laboratory
8  compliance.
9        Q.  It was not a lab, was it?
10       A.  It was not a lab.
11       Q.  Okay.  Did you own, um -- directly or
12  indirectly, any portion of Lite Consulting?
13       A.  You, Trinity Medical Services?
14       Q.  You.
15       A.  Blake Bourque?
16       Q.  Yes.
17       A.  Um -- through my ownership in Trinity
18  Medical Services and Charlotte Sophia.
19       Q.  How much did Trinity own of Lite?
20       A.  I think it was supposed to be -- it
21  was supposed to be 75 percent, but I can't
22  remember what the final tally was on that one
23  right now.
24       Q.  Okay.  How much revenue did Lite throw
25  off to Trinity?

25  (Pages 97 to 100)

EXHIBIT A

Page 101

1     A.  I don't remember.
2     Q.  Can you give me an approximate number
3  on an annual basis?
4     A.  Less than a million?
5     Q.  Okay.  Less than 500,000?
6     A.  I don't remember.
7     Q.  Okay.  Would all that show up in the
8  accounting records for Trinity?
9     A.  Um -- Lite had its own separate books.
10  Um -- it -- I do believe that Lite is mentioned
11  on the P&L maybe.  I need to look at the
12  documentation to tell you.
13     Q.  Okay.  Who did the, um -- accounting
14  work for Lite?
15     A.  It would have been, um -- Call, Riggs,
16  before that Wegmann Dazet.  It would have been
17  all part of the Trinity Medical Services work.
18     Q.  Okay.  Do you have any reason to
19  believe that any of the accounting records
20  retained for any of your companies, the ones
21  we've been talking about, Trinity, Performance
22  Prestige, Lite, any of these others, are
23  inaccurate?
24     A.  Incomplete.
25     Q.  But not inaccurate.

Page 102

1     A.  I don't believe them to be inaccurate;
2  I believe them to be incomplete.
3     Q.  Okay.  If we wanted more detail than
4  the documents themselves provide, who would we
5  go to?  Would it be Mr. Landry?
6     A.  Mr. Landry --
7     Q.  I'm sorry.  Would it by Call, Riggs?
8  Mr. Lloyd?
9     A.  Um -- at this point, I think it would
10  be -- I think I can turn over everything --
11  I've turned over everything that I do have, and
12  everything that the expert used.  Um -- I don't
13  know if there is anything else out there that I
14  can get.  I think the answer is no, there is
15  nobody else besides what I hold in my hands now
16  for more detail.
17     Q.  Okay.  Where was Trinity located?
18     A.  Mandeville, Louisiana.
19     Q.  Was that in the same building as North
20  American Toxicology?
21     A.  I don't think so.
22     Q.  Okay.
23     A.  It -- let me clarify that.  We had
24  several, um -- several leases, and owned
25  property at the time.  I don't remember if the

Page 103

1  corporate office for Trinity Medical Services
2  was located at 50 East Court, or if it was at
3  one of our other locations.  I cannot remember.
4     Q.  Trinity only had one office.
5     A.  Uh -- it -- yes.
6     Q.  And that was in Mandeville?
7     A.  Yes.
8     Q.  And it had no employees until April of
9  2017?
10     A.  I'm the only one who works for it.
11  That's right.
12     Q.  Okay.  Um -- you said, by the way,
13  Trinity -- the source of its revenue was passed
14  through from Prestige and Performance.
15     A.  That's right.
16     Q.  How did Prestige generate money?
17  Revenue.
18     A.  So Prestige, um -- provided employment
19  services to Performance Labs, to Pathway, to
20  CVDL, to -- there's several companies that --
21  it was a centralized payer, and at various
22  times there was a markup between maybe, you
23  know, 10 and 15 percent, on top of salary,
24  wages, and benefits, and any general expenses
25  that it paid for.

Page 104

1     Q.  So effectively, Trinity might retain
2  Prestige to, um -- supply all of its personnel,
3  and it would pay Prestige, and Prestige in turn
4  would pay the employees.
5     A.  Um -- it would be more like
6  Performance Labs would retain Prestige, and
7  then Prestige would provide all of the
8  personnel, and the fee income that Prestige
9  generated from those employees, that income
10  would then be passed up to Trinity Medical
11  Services.  Trinity Medical Services was a
12  holding company.
13     Q.  So Trinity Medical Services did not
14  engage employees from Prestige?
15        MR. STEWART:
16           Object to form.
17     A.  I would have to look and see.  We had
18  a, um -- we had a title on our, uh -- inside of
19  our books, like executives -- corporate or
20  executives, um -- the executive department.
21  And we would do that because we didn't want to,
22  um -- put undue costs on any of other partner
23  entities.  And so we'd separate out our
24  salaries.  But I do not know how that was
25  calculated on the actual global financials.

EXHIBIT A

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                    April 10, 2019

Page 105

EXAMINATION BY MR. KUPPERMAN:
1  Q.  What do you mean you'd separated out
2  your salaries?
3  A.  Um -- we weren't -- Performance Labs,
4  for example, did not, um -- Pathway didn't need
5  to have the top-heavy employees that we -- we
6  had.  Lite didn't need to have, you know, eight
7  programmers.  So each entity was -- it was
8  tracked, and we only charged payroll for the
9  dedicated employees or shared time.  So if I
10  wasn't dedicating my time, energy, and
11  resources to one of those ventures, we wouldn't
12  charge 'em for me.
13  Q.  I understand.  But I guess all I was
14  trying to say is that --
15  A.  Sure.
16  Q.  -- whoever worked at Trinity was
17  actually a prestige employee.
18  A.  Prestige was a centralized payer for
19  all entities.
20  Q.  Okay.  So I'm correct?
21  A.  You're correct.
22  Q.  Okay.  Um -- Performance.  Where did
23  Performance generate revenue from?  What was
24  its source?

Page 106

1  A.  Um -- it source was laboratory
2  billing.
3  Q.  I'm sorry.  Laboratory --
4  A.  Laboratory work.
5  Q.  -- work.
6  A.  Yeah.  Yes, sir.
7  Q.  And that, um -- then was paid by,
8  um -- insurers?
9  A.  Yes.
10  Q.  Or Medicare?
11  A.  Yes, sir.
12  Q.  Okay.  Tell me what training Trinity
13  gave to its lab personnel.
14  A.  Um -- very specific and detailed
15  training.
16  Q.  Um -- describe that for me.
17  A.  Um -- there are standard operations.
18  Um -- standard operating procedures.  The
19  laboratory director is in control of everything
20  that happens in the laboratory.  Effectively, I
21  can own a lab, but I cannot operate a
22  laboratory.  I cannot manipulate samples.  So
23  there is a very structured, um -- um --
24  training and delegation of duties, and, um --
25  quality management system that you have to

Page 107

1  follow in -- in the lab business.
2  So you have to physically watch the
3  patients -- excuse me, the employees, in
4  Louisiana either medical laboratory technicians
5  or medical technologists, that are going to go
6  ahead and manipulate samples.  Their supervisor
7  has got to train them, watch them, and approve
8  that they can do what they're doing.  And then
9  they have to be signed off, and that's put in
10  their personnel binder.
11  Q.  Okay.  Before they would be able to
12  take lab samples, or actually work in the lab,
13  what training was given to them?
14  A.  Uh -- it's -- the training was done by
15  their supervisor.  And it would be, if you
16  hired an experienced technician, they'd have to
17  show you proficiency in each one of the steps.
18  So the -- the trainings was done by the
19  supervisor.
20  Q.  Yeah.  And how long was the training
21  before they were allowed to actually work in
22  the lab?
23  A.  For as long as it would take for them
24  to prove proficiency in the testing process.
25  Q.  Could be a few minutes, or hours.

Page 108

1  A.  It could be few days, or weeks, or
2  months.
3  Q.  Okay.  Did it ever happen to take
4  days, or weeks, or months?
5  A.  To train a laboratory technician to be
6  able to approve.
7  Q.  Uh-huh.
8  A.  QC data?  Yeah.  Yeah.  It was like
9  a -- an apprenticeship almost.
10  Q.  Okay.  Who was the lab supervisor?
11  MR. STEWART:
12  Objection.
13  You can answer.
14  A.  Okay.  So there are actual terms for
15  each one of these people.  Lab supervisor isn't
16  one of them.
17  EXAMINATION BY MR. KUPPERMAN:
18  Q.  Okay.  Well, you were talking about
19  the supervisor.  So I'm trying to find out --
20  A.  Their supervisor.  Okay.
21  So you have a general supervisor, or a
22  technical supervisor.  Okay?
23  Q.  Same thing?
24  A.  No, sir.  Different.
25  Q.  Okay.

27 (Pages 105 to 108)

EXHIBIT A

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                          April 10, 2019

Page 109

1    A.  The technical supervisor is going
2  to -- over different times in the laboratory
3  there were different people.  Most of the time
4  it was Michelle Spruill was our technical
5  supervisor.  Um --
6    Q.  And --
7    A.  That -- that person is -- is --
8  they're responsible for the equipment; for
9  maintaining the actual equipment, proficiency
10  testing, all the technical aspects of the
11  equipment in the laboratory.
12    Q.  Okay.  What about the general
13  supervisor?
14    A.  The general supervisor is responsible
15  for, I guess, operations of the -- of the
16  laboratory, the day-to-day operation of the
17  lab.
18    Q.  And who was that?
19    A.  Um -- many -- most of the time it was
20  Shea Spruill.
21    Q.  All in the family.  Supervisors.
22    A.  Sure.
23    Q.  What about training by Trinity for IT
24  personnel?
25    MR. STEWART:

Page 110

1    Object.
2    You can answer.
3    A.  Um -- many times, with our IT folks,
4  um -- we hired through, um -- an agency.  So we
5  were -- I do not remember the agencies' names,
6  but we had a recruiter that would go out and
7  help us find skilled and trained IT people.
8  EXAMINATION BY MR. KUPPERMAN:
9    Q.  So Trinity didn't train any itself.
10    A.  Trinity did train individuals on our
11  own processes --
12    Q.  Okay.
13    A.  -- and what we needed them to do.
14    Q.  Okay.  And did Trinity have, um --
15  manuals or guidebooks or handbooks for any --
16  for all of its employees, other than what was
17  required by CMS?
18    A.  When we're talking -- let me just
19  clarify something real quick.  When we're
20  talking about Trinity right now, we're really
21  talking about Prestige Worldwide d/b/a Trinity
22  Health.
23    Q.  I understand.
24    A.  Okay.  I just wanted to make sure.
25    Q.  Okay.

Page 111

1    A.  Okay?  So repeat the question again?
2    Q.  We know that you had some standard
3  operating procedure manuals.  Right?  At
4  Trinity.
5    A.  For the laboratory, yes, sir.
6    Q.  Yes. Okay.  For Performance.
7    A.  For Performance Labs, yes, sir.
8    Q.  Okay.  And those standard operating
9  procedures are required by CMS.  Correct?
10    A.  Yes, sir.
11    Q.  Okay.  Did you have any manuals,
12  guidelines, or handbooks other than those that
13  are required by CMS?
14    A.  Yes, sir.
15    Q.  And what were they in?  What fields
16  fooled?
17    A.  It would be like the -- um -- whenever
18  you -- we'd -- somebody would be hired, we'd
19  give them the policies and procedures for the
20  company, like how the employee was to act,
21  times off, days, vacations, sick, you know,
22  those types of things.  Like --
23    Q.  Okay.
24    A.  -- we have a -- I think a BAA in
25  there; we have their HIPAA; we have OSHA

Page 112

1  training; we'd have, um -- training out of the
2  wazoo, really.
3    Q.  Okay.  But those are in the manuals.
4    A.  Yes, sir.
5    Q.  Okay.  Any -- in terms -- well, never
6  mind.  Okay.
7    MR. STEWART:
8    Steve, we're going on an hour.
9    THE VIDEOGRAPHER:
10    We're going off the record.  The
11  time is 11:12.
12    (Brief recess.)
13    THE VIDEOGRAPHER:
14    We are back on the record.  The
15  time is 11:20.
16  EXAMINATION BY MR. KUPPERMAN:
17    Q.  Was there ever an entity known as
18  Trinity Labs No. 2?
19    A.  I believe we kicked off Trinity Labs
20  No. 1 and Trinity Labs No. 2 at the same time.
21    Q.  And neither one was really
22  operational.
23    A.  Neither one was operational.
24    Q.  Okay.  Let me show you a document I've
25  marked as Exhibit 3.  (Tendering.)

28 (Pages 109 to 112)

EXHIBIT A

Page 113

1        You recognize this as an e-mail and
2    some organizational charts?
3        (Exhibit 3 was marked for
4    identification and is attached hereto.)
5        A.  Yes, I do.
6    EXAMINATION BY MR. KUPPERMAN:
7        Q.  Okay.  And who is Kelly Blackwell?
8        A.  She was a banker at Home Bank.
9        Q.  And who is Melanie Maceira?
10       A.  She was our controller in our finance
11   department and accounting department.
12       Q.  Okay.  Are these -- the attachments to
13   that are twofold; one is TMS ownership, and one
14   is Belle Health ownership.  Correct?
15       A.  Yes.
16       Q.  And is that ownership correct in 2017,
17   um -- February of 2017?  Are those charts
18   correct?
19       A.  Yeah.  I'm looking.  I'm just making
20   sure, 'cause we had several revisions, and --
21   um -- Rhett ended up, uh -- the Linebacker
22   Holdings chart down there?
23       Q.  Yes.
24       A.  I'd need to check and see the way,
25   um -- Rhett is still a guarantor on the

Page 114

1    Linebacker note.  Even though he gave us all of
2    his shares, I don't believe Mark accepted it.
3    So I believe Rhett Bunce is still, um -- an
4    owner of, um -- of Linebacker.
5        Q.  Okay.  What is Linebacker?
6        A.  Linebacker was a -- we were all
7    linebackers on the same high school football
8    team.  So we started that as -- it owned the
9    Alamosa property, the building, um -- where the
10   new Performance laboratory location was
11   located.  That was our headquarters.
12       Q.  New Performance lab located.  Where
13   was that?
14       A.  So, um -- the -- I forget the exact
15   address.  The first five letters now is Marian
16   Lane.  We were at 50 East Court until
17   December 2015.  Um -- upon, um -- the -- the
18   ruling by CMS, we decided that we were going
19   to, um -- downsize Performance Labs
20   dramatically, um -- from 8 LCMSs down to just
21   one.  Two analyzers -- and we moved, literally
22   maybe, about a half a mile away.  And that
23   location was owned by Linebacker.  I believe it
24   was Suite B.
25       Q.  Okay.  So that was a, um -- Linebacker

Page 115

1    owned the --
2        A.  Commercial property.
3        Q.  -- commercial property in which
4    Trinity was located.  I'm sorry.  In which
5    Performance Labs was located.
6        A.  Yes, sir.
7        Q.  Beginning in late 2015 or early 2016.
8        A.  That's correct.
9        Q.  Okay.  Did Linebacker owned own
10   anything else?
11       A.  It may have had some equipment titled
12   in its name, but nothing else.
13       Q.  Okay.  Nothing substantive.
14       A.  No, sir.
15       Q.  Okay.  Let's look at Belle Health.
16   Um -- what is Belle Health?
17       A.  Um -- a new entity.  It's not related
18   to Trinity Medical Services.
19       Q.  Okay.  What did it do?
20       A.  Um -- Belle Health is an entity that
21   included, um -- other members.  So where
22   Trinity Medical Services was just Blake, Chad,
23   and Rhett, Belle Health was a new entity that
24   had the, um -- Phil, John, Mark, and Kyle.  It
25   was a holding company similar to Trinity

Page 116

1    Medical Services.
2        Q.  Okay.  And what was it intended to do,
3    just hold these four companies that are below
4    it?
5        A.  Yes, sir.
6        Q.  Okay.  Very quickly, um -- Trinity
7    L.I.M.S.; what is that?
8        A.  That was, um -- we had, um -- I guess,
9    aspirations to develop a laboratory information
10   management system for the market.  And so we
11   formed Trinity L.I.M.S. in 2014, and, um -- it
12   was to have the IP associated with that, with
13   the software products.
14       Q.  So when Chad Howell and his group was
15   creating, um -- the Trinity L.I.M.S --
16       A.  Uh-huh.
17       Q.  -- whether it was 1.0 or 2.0 --
18       A.  Yes, sir.
19       Q.  -- the software he was creating was
20   actually owned by Trinity L.I.M.S., LLC?
21       A.  Yes, sir.
22       Q.  So it wasn't owned by Trinity Medical
23   Services.
24       A.  That's -- that's correct.
25       Q.  And it wasn't owned by Performance,

29 (Pages 113 to 116)

EXHIBIT A

Page 117

1 and it wasn't owned by Prestige.
2     A.   That's correct.
3     Q.   Okay.  What's Trinity Wellness?
4     A.   Trinity Wellness, um -- was an entity
5 that owned both NextPhaseMD, and NextPhaseMD
6 operations.  NextPhaseMD was, um -- is an
7 annual wellness visit software that we, um --
8 we merged with three physicians, and we made it
9 market-ready and we went to the market with it.
10         And -- are you familiar with that term
11 annual wellness visit?
12     Q.   Um -- I believe I am.  But why don't
13 you tell me what you mean by it.
14     A.   All right.  So, um -- it's a
15 Medicare-specific program for physicians to be
16 able to, um -- ask questions.  And it had an
17 Infirmit engine built into it --
18         THE REPORTER:
19           It had what engine?
20         THE WITNESS:
21           Infirmit, our term.
22     A.   And based on your answer, it would ask
23 a different question.
24 EXAMINATION BY MR. KUPPERMAN:
25     Q.   Trinity Wellness, was that simply a

Page 118

1 pass-through entity for NextPhase?
2     A.   There were, um -- yes.
3     Q.   Okay.  So it didn't really own
4 anything other than NextPhase.
5     A.   That's correct.
6     Q.   Okay.
7     A.   I -- I believe that to be true.
8     Q.   Guru.  What is Guru?
9     A.   Guru is a billing entity.  Guru
10 Revenue.
11     Q.   Okay.  And did -- so Guru owned
12 software for billing purposes?
13     A.   Yes.  Um -- it had, uh -- it didn't
14 own software for billing purposes; it had a
15 billing department.  Um -- these entities,
16 especially Guru and L.I.M.S., when we were
17 growing Performance Labs, we had, um -- a lot
18 of employees, present worldwide had a lot of
19 employees.  So this idea, we were effectively
20 taking these departments and we were making
21 businesses out of them.
22     Q.   Okay.  And Guru then was a billing
23 entity for -- I mean, it was going to send
24 bills out, say, for Performance Labs?
25     A.   For Performance, for Pathway, and it

Page 119

1 had, uh -- a couple of other client as well.
2     Q.   Okay.  Were all of its clients listed
3 on these charts?
4     A.   No, sir.
5     Q.   Okay.  Were there some clients who
6 were unrelated to you?
7     A.   Yes, sir.
8     Q.   Okay.  And what happened to Guru?
9     A.   Um -- when, in April and May 2017, all
10 of Prestige Worldwide's employees became
11 employees of Pathway, and I lost the, uh -- the
12 billing department.
13     Q.   Okay.  Is the billing department still
14 operated by Pathway?
15     A.   I do not know the state of the billing
16 department at Pathway.
17     Q.   Okay.  What's Belle HealthCare
18 Solutions?
19     A.   Um -- Belle HealthCare Solutions was,
20 um -- set up, um -- to eventually purchase or
21 take ownership of Pathway.
22     Q.   Okay.  And what was Pathway?
23     A.   Pathway was a, um -- for lack of a
24 better term, a blood and a tox lab.  So it had
25 a chemistry side where you did basic, you know,

Page 120

1 blood chemistries and blood work and wellness
2 work, and then it had a toxicology, a screening
3 side.  Um -- and Pathway and Phoenix, um --
4 Phoenix had all of the LCMSs.  And they were
5 located in Picayune, Mississippi.
6     Q.   So did Phoenix lease the equipment to
7 Pathway?
8     A.   That's not how the relationship's set
9 up.
10     Q.   Okay.  Tell me how that was set up.
11     A.   So you, um -- what's your question?
12     Q.   The relationship between Pathway and
13 Phoenix.
14     A.   Um -- Phoenix was a reference
15 laboratory.  Phoenix was never set up to do
16 any -- any billing.  It was effectively just
17 going to be a reference lab.
18     Q.   What's that mean?
19     A.   A reference laboratory, um -- is --
20 mainly, when we use the term, as lab people
21 we're talking about a lab that receives, uh --
22 money for purchased tests.  So I will only --
23 like, I'm a laboratory.  My equipment just went
24 down.  I will send my samples to your
25 laboratory and pay you to do the work.  You

30 (Pages 117 to 120)

Page 121

1  charge me 150 bucks for every sample that you
2  run.  In that capacity, I can still bill -- I
3  have to follow certain guidelines, but I can
4  still bill for the work because I purchased the
5  services from you.
6       So Pathway was to purchase services
7  from Phoenix.
8       Q.  And the services had to do with that
9  equipment?
10      A.  The confirmation of the toxicology
11  tests.
12      Q.  Okay.  And what exactly is a
13  confirmation of a toxicology test?
14      A.  So the screening is the first portion.
15  You screen for the families of drugs.  The
16  confirmation is the, um -- the confirmatory
17  testing that tells you with specificity and
18  accuracy what's actually in the patient's
19  sample, the metabolite and analyte from a
20  scientific standpoint.
21      Q.  So the screening will just tell you,
22  is a particular chemical or something that
23  you're searching for present?
24      A.  Or not.
25      Q.  Or not.  And the confirmatory will

Page 122

1  tell you in what, um -- volume it's present?
2       A.  Uh-huh.
3       Q.  Yeah?
4       A.  Yep.  Yes, sir.
5       Q.  Okay.  All righty.  So what was
6  Trinity's relationship with Pathway?
7       A.  There was none.
8       Q.  Okay.  And Trinity's relationship with
9  Phoenix?
10      A.  There was none.
11      Q.  Okay.
12      A.  Trinity Medical Services.  There was
13  none.
14      Q.  There was no contract between Trinity
15  and Phoenix, or Trinity and Pathway.
16      A.  No, sir.
17      Q.  Okay.  And did Performance have
18  relationship with Pathway or Phoenix?
19      A.  Um -- the only relationship would have
20  been, um -- there may have been a reference
21  agreement drafted for us to do some reference
22  testing there, but I don't know if it was ever
23  perfected.
24      Q.  Okay.  Um -- what's CMS Region 6?
25      A.  That's the region of, um -- Louisiana,

Page 123

1  Texas, um -- New Mexico, and I believe
2  Oklahoma.  Because Dallas sits on top of Region
3  6.
4       Q.  Okay.  So CMS's offices for this
5  general area are in Dallas.
6       A.  Yes, sir.
7       Q.  Okay.  Let me show you another
8  document that we have marked as Exhibit 4.
9  (Tendering.)  And you'll see at the top that is
10  an e-mail from you to Kelly Blackwell in
11  January of 2017.  Correct?
12      (Exhibit 4 was marked for
13  identification and is attached hereto.)
14      A.  That's correct.
15  EXAMINATION BY MR. KUPPERMAN:
16      Q.  Okay.  Now, in that you talk about
17  turning the lights back on to Performance Labs.
18  Can you tell me what that means?
19      A.  Um -- in January 2007, we were
20  given --
21      Q.  '17.
22      A.  '17.  Sorry.  Yes.  Thank you for
23  correcting me.  We were given, um -- let me
24  read it -- the e-mail first.
25      Q.  Uh-huh.

Page 124

1       I see you've finished the e-mail.
2       A.  Yes.  I did.
3       Q.  Yeah.  Can you tell me what that means
4  about turning the lights back on to Performance
5  Labs?
6       A.  So, the, um -- in January we were able
7  to start doing, um -- testing again at
8  Performance Labs.
9       Q.  Was that late January?
10      A.  Yes, sir.
11      Q.  So from December of 2015 until January
12  open 2017, Performance could not test.
13      A.  Let me clarify that.  Um -- there's a
14  document that we -- that I reviewed recently.
15  I believe if was in August that we were given
16  approval the start screening again.
17      Q.  August of?
18      A.  August of '16.  We were able to start
19  screen again.  And then the confirmatory
20  testing -- we can start doing the confirmatory
21  testing in January.
22      Q.  I gather confirmatory is going to be a
23  lot more lucrative, produce a lot more revenue
24  than screening?
25      A.  Sure.

31 (Pages 121 to 124)

EXHIBIT A

Page 125

1    Q.  Okay.  So when you talk about turning
2  the lights back on, you're referring to the
3  confirmatory testing?
4    A.  Yeah, the active -- yeah.  Active
5  business of Performance Labs.
6    Q.  Um -- you didn't consider just the
7  screening the active business of Performance?
8    A.  Um -- there was a lot of reasons why
9  we could not, um -- get to business again,
10 uh -- in August, many of which was because of
11 the patient safety issues, um -- that Merge had
12 baked in it, as we were discovering those
13 problems at Pathway.  But, um -- the lights
14 being turned back on for Performance, for us,
15 was the whole building is lit up, we're getting
16 after it now.
17   Q.  The confirmatory testing.
18   A.  Yes, sir.
19   Q.  Yeah.  I gather the screening testing
20 didn't really produce much in the way of
21 revenue?
22   A.  Um -- $100 a sample.
23   Q.  And --
24   A.  It was profitable.  It cost $12 to do
25 it.  It's not a bad business.

Page 126

1    Q.  So how much of that did you do between
2  August and January?
3    A.  Um -- we didn't do much at all at
4  Performance between August and January.
5    Q.  Okay.  Kind of de minimis,
6  inconsequential revenue from the screening from
7  August of '16 to January of '17?
8    A.  I would say that.  Yes, sir.
9    Q.  Okay.  Then it talks about the reason
10 for the move to Mississippi.
11   A.  Uh-huh.
12   Q.  Performance Labs moved from Mandeville
13 to Mississippi?
14   A.  No.  The, um -- equipment that
15 Performance Labs, um -- had leased and owned
16 moved to Mississippi.  I am, effectively, in
17 this very short paragraph, um -- capturing
18 hour-long discussions with ourselves and Home
19 Bank.
20   Q.  Uh-huh.
21   A.  So there was a lot that goes into this
22 particular paragraph.
23   Q.  Um -- I'm trying to just understand
24 what you refer to as the move to Mississippi.
25 Um -- so some equipment was moved from

Page 127

1  Mandeville to Mississippi?
2    A.  Oh, okay.
3    Q.  Is that correct?
4    A.  Yes, sir.
5    Q.  And why did that happen?
6    A.  Um -- in 20 -- January 2016, um -- we
7  purchased the Merge LIS.  We were -- in our
8  minds, we were, um -- going to be, um --
9  starting, um -- a California install for Merge.
10     We pivoted -- after CMS came in, in
11 December of 2015, we pivoted.  Rhett, um --
12 had, I think, a great idea of basically moving
13 the majority of the equipment over to Picayune,
14 Mississippi.  So that way we can manage the
15 setup of that equipment and setup of another
16 laboratory.
17   Q.  I don't understand why the move would
18 make a difference for management.
19   A.  Um -- the regulatory and compliance
20 guidelines inside of the state of Louisiana are
21 different than the regulatory guidelines and
22 compliance in the state of Mississippi.
23   Q.  So --
24   A.  And it's different than Texas as well.
25   Q.  So Louisiana is more stringent than

Page 128

1  Mississippi?
2    A.  Louisiana is one of the toughest in
3  the country.
4    Q.  And so you moved the equipment to
5  Mississippi so you could comply with the less
6  stringent Mississippi laws.
7    A.  It was, um -- more in the way of,
8  um -- the cost to operate.  Leases were cheaper
9  in Mississippi.  You can have more qualified,
10 um -- technicians in Mississippi, which is
11 counterintuitive when you think about Louisiana
12 having more stringent CLIA guidelines.  But in
13 Mississippi you could actually have very high
14 qualified people that can manipulate samples
15 that would not be able to manipulate samples in
16 the state of Louisiana.  So we felt like it
17 was --
18     In 2012, we were advised to go to
19 Mississippi and set up our laboratory there
20 anyway.  Being hometown boys, we wanted to be
21 in Mandeville.  So we just took that advice
22 four years too late.
23   Q.  Okay.  But -- and as I said, one of
24 the reasons for the move to Mississippi was so
25 you could -- didn't have to comply with the

EXHIBIT A

Page 129

1　more stringent Louisiana requirements.
2　Correct?
3　　　　MR. STEWART:
4　　　　　Object to form.
5　　　A.  Um -- that was one of the many factors
6　in the decision.  Yes, sir.
7　EXAMINATION BY MR. KUPPERMAN:
8　　　Q.  Now, you talked about, um -- in the
9　same sentence, talked about based on solid
10　forecasting and forward looking business
11　metrics.
12　　　　Can you tell me what you're talking
13　about there?  What forecasting and forward
14　looking business metrics?
15　　　A.  I went over it in the last little bit.
16　Um -- the leases in Mississippi were cheaper,
17　the price per square foot.  The costs for labor
18　was cheaper.
19　　　Q.  Okay.
20　　　A.  Um -- the -- all of that.
21　　　Q.  I don't need you to repeat it.  I
22　guess let me ask it this way:  Was there a
23　document that contained the forecasting or the
24　business metrics?
25　　　A.  There were a -- there was a pro forma

Page 130

1　that was built for the Pathway and the Phoenix
2　opportunities, yes.
3　　　Q.  And is the move to Mississippi related
4　to the Pathway and Phoenix opportunities?
5　　　A.  That -- they are -- they're the same.
6　　　Q.  Okay.  So the move to Mississippi was
7　in conjunction with Pathway and Phoenix.
8　　　A.  Yes.
9　　　Q.  Okay.  Okay.  And do you have any of
10　the documents I was just asking you about, the
11　metrics or forecasting plan?
12　　　A.  Yes.
13　　　Q.  Have they been produced?
14　　　A.  I don't know.
15　　　Q.  Okay.
16　　　MR. KUPPERMAN:
17　　　　We would like those too.
18　　　MR. STEWART:
19　　　　To my knowledge, they've been
20　　　produced.  If we have them.
21　　　MR. KUPPERMAN:
22　　　　All right.  Well, we will
23　　　double-check and let you know if we
24　　　can find them.
25　EXAMINATION BY MR. KUPPERMAN:

Page 131

1　　　Q.  At the end of that, you say, looking
2　back we were actually way ahead of what could
3　have been a company killer.  What does that
4　mean?
5　　　A.  Well, um -- we had diversified our
6　risk.  Pathway was having some sample volume
7　now, it was able to produce some revenue.  And
8　at that point in time, um -- even though it
9　took us, oh, I don't know, six months longer
10　for us to be able to operate Merge, we had,
11　um -- operated the laboratory with Merge in
12　place.  Um -- I don't yet know -- and when I
13　write this e-mail, I don't yet know that the QC
14　issue exists in Merge, and that my laboratory
15　is going to be unoperable.  So right here, I
16　think that we can go forward, um -- without
17　hurting or harming patients.  So I think we
18　made the right move.
19　　　Q.  So that's what you meant by you were
20　way head of a company killer?
21　　　A.  Yes.
22　　　Q.  Okay.  Let me just ask you to turn to
23　the document that begins with TRINITY 196458 at
24　the bottom.  It's the slide show, I think.
25　Right there.

Page 132

1　　　　I just want to make sure I understand
2　this document.  I don't want to waste our time
3　if this is better suited to questions of
4　Prestige.  So I'm looking at all these
5　documents that talk about Pathway and Prestige
6　that all follow each other.  Is this entire
7　slide show, um -- that ends with the page that
8　says Lean at the top --
9　　　MR. STEWART:
10　　　　What's the number on that page?
11　　　MR. KUPPERMAN:
12　　　　471.
13　EXAMINATION BY MR. KUPPERMAN:
14　　　Q.  My question is, is this all one
15　document from 458 to 471?
16　　　A.  I believe so, yes.
17　　　Q.  Okay.  And I take it, then, because it
18　talks about Prestige, that any questions I have
19　about the document are best answered by
20　Prestige as opposed to Trinity.
21　　　A.  Sure, but I'm open.
22　　　Q.  Okay.  Well, I want to make sure I get
23　the right entity to respond.
24　　　　Did Trinity have anything to do with
25　putting this document together?

EXHIBIT A

Page 133

1    A.  Um -- this document was produced to
2  let our employees know -- Prestige Worldwide
3  employees know to what to do.  Um --
4    Q.  Okay.  And did Trinity produce this,
5  or was this done by Prestige?
6    A.  I would say this was done -- this was
7  done by Prestige.
8    Q.  Okay.  Let me see.  Turn, if you will,
9  to the page that's 484.
10   A.  484?
11   Q.  Yes.  It's entitled Consulting and
12 Administrative Services Agreement.
13   A.  Yes.
14   Q.  That's -- that is the agreement
15 between Pathway and Prestige?  Is that correct?
16   A.  Yes, sir.
17   Q.  Okay.  Um -- and then if you turn -- a
18 few pages later there's a Trinity Companies
19 Summary of Services and Purpose?
20      MR. STEWART:
21         What page is that?
22      MR. KUPPERMAN:
23         493 is where it begins.
24   A.  Yes.
25 EXAMINATION BY MR. KUPPERMAN:

Page 134

1    Q.  Okay.  And was this created by
2  Trinity?
3    A.  Um -- I would say it was a
4  collaboration.
5    Q.  Okay.  And why was this created?
6    A.  I do not remember.
7        Can I read the document and give you a
8  better answer?
9    Q.  Um -- you're welcome to, but I don't
10 know that you need to.  It says it's for Home
11 Bank at the top.  Do you know what that was
12 for, or why Home Bank needed it or wanted it?
13   A.  Um -- we -- we would be, um --
14 letting -- giving our bank an update on the
15 state of the company.
16   Q.  Okay.  Under Performance Labs, it
17 talks about operating in what has become a very
18 competitive space.
19      Do you see that?
20   A.  Uh-huh.
21   Q.  And that refers to the fact that
22 toxicology labs are very competitive?
23   A.  Yes.
24   Q.  Small margins?
25   A.  No.

Page 135

1    Q.  Okay.  But there are a lot of them.
2    A.  Um -- yes.
3    Q.  Okay.  And, um -- was Performance Labs
4  offering anything that other labs were not
5  offering?
6    A.  Um -- at the -- in 2015, we had
7  probably one of the best oral fluid panels in
8  the country.
9    Q.  What about in 2016 and '17?
10   A.  2017, um -- we -- all of '16 and 2017
11 was spent, um -- getting reapproved by CMS and
12 working with the Merge system to be
13 operational.
14   Q.  Um -- okay.  And my question, though:
15 So I take it, then, Performance Labs did not
16 offer anything that other labs also did not
17 offer.
18   A.  That's correct.
19   Q.  Okay.  Um -- all righty.  It refers to
20 proprietary software, under Performance Labs.
21      Do you see that?
22   A.  Um -- where at?
23   Q.  That same sentence.
24      MR. STEWART:
25         (Indicating.)

Page 136

1    A.  Okay.
2  EXAMINATION BY MR. KUPPERMAN:
3    Q.  Is that referring to the Trinity
4  L.I.M.S. system?
5    A.  Um -- no, I don't believe so.
6    Q.  What does that refer to?
7    A.  Um -- we had other -- we had other
8  software that we utilized inside of the -- of
9  the company.  Um -- I believe that this
10 particular statement right here, um -- was a
11 boilerplate statement taken from another
12 presentation.
13   Q.  You talking about right here
14 meaning --
15   A.  Yeah.
16   Q.  -- Performance Labs.
17   A.  Performance Labs.  Yeah, between
18 Performance Labs is a full-service toxicology
19 laboratory -- I mean, that -- this was kind of
20 like our company way to be able to explain what
21 we do on, you know, different presentations so.
22   Q.  So what did the proprietary
23 software --
24   A.  Well, that's what I'm saying, is I --
25 at the time -- there was a time where we had

EXHIBIT A

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                          April 10, 2019

Page 137

1  proprietary software.  Um -- and this statement
2  may have come from that time and was just cut
3  and pasted and put on this --
4      Q.  Okay.
5      A.  -- presentation.
6      Q.  Um -- all right.  Is Trinity operating
7  today?
8      A.  Um -- there are no operations.
9      Q.  Okay.  What assets does it have?
10     A.  Trinity has no assets.
11     Q.  Okay.  No resources, no employees --
12     A.  No resources, no.
13     Q.  -- except for you.
14        Are you getting paid?
15     A.  No.
16     Q.  Okay.  What would it take for Trinity
17  to resume business?
18     A.  I hadn't contemplated it.
19     Q.  Okay.  So no plans to restart.
20     A.  Not at this point.
21     Q.  Okay.  For what purpose was Merge --
22  the Merge -- when I say Merge, I'm talking
23  about the LIS software.  For what purpose was
24  the Merge LIS software to be used at Trinity?
25     A.  At Performance Labs?

Page 138

1      Q.  No.  At Trinity.
2      A.  Um -- Trinity was to, um -- multi-site
3  installation.  So Trinity owned Performance
4  Labs.  Trinity owned Prestige Worldwide that
5  had a consulting contract with Pathway and
6  Phoenix.  So Trinity, um -- as dictated by the
7  financiers, um -- needed to guarantee it, so we
8  were on the contract for it.  But it was
9  installed at Performance Labs, and at Pathway
10  and Phoenix.
11     Q.  So basically, if I understand
12  correctly, Trinity itself, the company Trinity
13  Medical Services, LLC, the plaintiff in this
14  case --
15     A.  Uh-huh.
16     Q.  -- was not intending to use the Merge
17  software itself.  Correct?
18     A.  That's correct.
19     Q.  Okay.  Trinity wasn't permitted to
20  bill insurance companies or Medicare or
21  Medicaid; correct?
22     A.  Trinity was a holding company.
23     Q.  Okay.  So --
24     A.  It did not perform in that capacity.
25     Q.  And it didn't have a certificate from

Page 139

1  CLIA.
2      A.  It was not a laboratory.
3      Q.  Okay.  So it didn't have a
4  certificate.  Right?
5      A.  No.
6      Q.  Okay.  Did you read the Second Amended
7  Complaint before filing?
8      A.  Um -- I did read over it, yes.
9      Q.  Okay.  And you approved its filing, I
10  take it.
11     A.  Yes.
12     Q.  Okay.  You wanted it to be 100 percent
13  accurate; right?
14     A.  I did.
15     Q.  Okay.  I mean, you wouldn't have
16  authorized its filing if it contained anything
17  untrue.  Correct?
18     A.  It would have been unintentional.
19     Q.  Okay.  So as far as you were
20  concerned, it's 100 percent accurate.
21     A.  Um -- I caught a typo this morning
22  when I was looking at it.
23     Q.  Pardon?
24     A.  I said I caught a typo this morning
25  whenever I was looking at it.

Page 140

1      Q.  Well, I'm not referring just to
2  typographical errors.
3      A.  It says liquid crystal mass
4  spectrometer instead of liquid chromatography
5  mass spectrometer.  But that's it.
6         MR. KUPPERMAN:
7            That's on one of you guys.
8         MR. STEWART:
9            I'll take the fall.
10        MR. KUPPERMAN:
11           All right.
12  EXAMINATION BY MR. KUPPERMAN:
13     Q.  Okey-dokey.  Let me show you a copy --
14  I don't think I need to mark it.  It will save
15  some space.
16        MR. STEWART:
17           This not being marked as an
18        exhibit?
19        MR. KUPPERMAN:
20           No.  It's already in the record.
21  I don't think we need to --
22        MR. STEWART:
23           We won't object.
24        MR. KUPPERMAN:
25           I didn't think you would.

35 (Pages 137 to 140)

**EXHIBIT A**

Page 141

EXAMINATION BY MR. KUPPERMAN:
1  Q.  Okay.  Tell me, if you will, um --
2  what information Merge omitted that allegedly
3  induced Trinity to purchase the Merge software?
4  A.  Um -- it didn't tell us that it was on
5  FDA recall; um -- didn't tell us the known ways
6  that it did not follow the manual; did didn't
7  tell us the known ways it -- it did not
8  calculate patient tests correctly; it did not
9  tell us about the duplicate container defect;
10 it did not tell us that it can validate or
11 verify the wrong results; it did not tell us
12 that there was a huge security flaw and that
13 they hadn't updated their security since 2012;
14 they didn't till us that my patients were at
15 risk; they didn't tell us, um -- any of the
16 information that they -- now we know they knew
17 about.  They admitted a lot -- omitted a lot.
18 Q.  Okay.  Anything else you can think of?
19 A.  Oh, um -- they didn't tell us that
20 there was -- absolutely didn't tell us, in fact
21 they told us the contrary -- that, uh -- there
22 was audit logs; um -- they, um -- told us that
23 we can check QC, and that was incorrect; um --
24 log sites; run sites; um -- I'm thinking about

Page 142

1  the, um -- the presentation that was made to
2  the team right now.  And they told us it can do
3  all those things, and it couldn't.  Um --
4  that's what I can remember right now.
5  Q.  Were you present, personally, during
6  any of those presentations?
7  A.  Um -- the reason why they were
8  recorded, um -- is because, uh -- I was not
9  present.  And so in order for us to be able to
10 have a 100 percent vote, we would, uh -- we
11 would, um -- I'd review it later on.
12 Q.  Did you review all of them before the
13 purchase of any software?
14 A.  Merge.  (Nods affirmatively.)  After
15 the team evaluated who they wanted, what they
16 wanted, why they wanted it, we were were
17 looking at Merge.  We had evaluated Merge in
18 2013.  We had looked at it.  It was just too
19 expensive at the time for us.  Um -- so we
20 reengaged Ron Poe, L.I.M.S. XYZ.  The guys
21 looked at Orchard.  I remember reviewing, in
22 detail, the XYZ group as well as the Merge
23 group, because they were the final two.
24 Q.  Did Trinity vet Merge's history with
25 the FDA prior to purchasing?

Page 143

1  A.  No.
2  Q.  Nothing prevented you from doing that,
3  did it?
4  A.  Um -- meaning?  What do you mean?
5  Q.  You could have done it had you wanted.
6  MR. STEWART:
7  Object to form.
8  A.  Um -- I didn't have an inclination.
9  Yeah.  I could have if I wanted to.
10 EXAMINATION BY MR. KUPPERMAN:
11 Q.  Okay.  Did you look on the internet
12 for any recalls regarding Merge?
13 A.  When I looked on the Internet, what I
14 saw was, um -- a very well known thirty party
15 validating these -- the security, and -- the
16 Drummond -- I think it was the Drummond report,
17 possibly -- validating the safety and the
18 security of Merge, and the fact that it met
19 meaningful use, which it clearly does not.
20 On that report I also remember the
21 version that was on my contract was the version
22 that was on the report.  It's also the version
23 that was recalled.
24 Q.  And what version?
25 A.  If I remember correctly, maybe 3.8.

Page 144

1  Q.  Okay.  And you're 100 percent positive
2  that's what Trinity bought.
3  A.  I'm 100 percent positive that that was
4  on my contract.
5  Q.  Yes, sir.  But I'm not asking that.
6  I'm asking, you're 100 percent positive that
7  that's what Trinity bought.
8  MR. STEWART:
9  Object to form.
10 A.  Um -- I'm not 100 percent positive.
11 EXAMINATION BY MR. KUPPERMAN:
12 Q.  Are you 100 percent positive that
13 Version 3.8 is what Trinity had installed,
14 um -- wherever the software for Merge was
15 installed?
16 MR. STEWART:
17 Object.
18 You can answer.
19 A.  Um -- Ben Caston did a -- a search,
20 um -- probably in maybe February or March of
21 2017, um -- and I don't remember the outcome of
22 the search, or if he was able to determine or
23 not.
24 EXAMINATION BY MR. KUPPERMAN:
25 Q.  Okay.  Um -- did anyone at Trinity

36 (Pages 141 to 144)

EXHIBIT A

Page 145

1   search the internet before buying Merge to find
2   out if there had been any recalls?
3       A.  I do not know.
4       Q.  Nothing prevented you from doing that;
5   correct?
6       A.  Correct.
7       Q.  Okay.  Did you ask any employees to
8   look into Merge software about any recalls?
9       A.  Um -- I asked them to look into, um --
10  what Merge had purported was a billion dollar
11  acquisition by IBM.  So I asked them to look
12  into, hey, did they get purchased for a billion
13  dollars?  How did they get purchased for a
14  billion dollars?  And Merge LIS was, as IBM
15  described it to us, purchased for a billion
16  dollars.
17      Q.  Okay.  So that's the only thing that
18  you asked employees to look at, was the
19  purchase of Merge?
20      A.  Yeah.
21      Q.  Okay.
22      A.  The FDA approval and the purchase of
23  Merge.
24      Q.  And FDA had approved.  Right?
25      A.  They have FDA approval.

Page 146

1       Q.  Okay.  And where did they check to
2   find FDA approval?
3       A.  Um -- I don't remember.
4       Q.  Okay.  And when your employees checked
5   to find FDA approval, they did not find that
6   the version that was installed by Trinity, or
7   that Trinity bought, had been recalled.
8   Correct?
9           MR. KUPPERMAN:
10              Object to form.
11      A.  You have to ask that question again.
12  EXAMINATION BY MR. KUPPERMAN:
13      Q.  Yeah.  When your employees, prior to
14  purchase, looked to find out Merge and
15  the FDA, they did not see that the version
16  installed or bought by Trinity in fact had been
17  recalled; correct?
18          MR. STEWART:
19              Object to form.
20      A.  I do not, um -- know what search terms
21  the employees used.  It was not ever brought to
22  my attention, by my employees or by Merge, that
23  they had problems with the FDA, or that the FDA
24  had recalled their product.  Not one time.  Not
25  by my employees, and certainly not by the

Page 147

1   employees of Merge.
2   EXAMINATION BY MR. KUPPERMAN:
3       Q.  So you don't know if your employees
4   found it and did not tell you that.
5           MR. STEWART:
6               Object.
7   EXAMINATION BY MR. KUPPERMAN:
8       Q.  Or whether they simply didn't find it.
9       A.  Um -- I do not know --
10      Q.  Okay.
11      A.  -- what they fond.
12      Q.  Okeydokey.  Um -- there is something
13  called the duplicate container defect that has
14  been alleged.  Are you familiar with that?
15      A.  Yes.
16      Q.  Tell me what that is.
17      A.  It's described in the -- in the
18  complaint pretty well.  Um -- effectively,
19  um -- a duplicate specimen, or duplicate --
20  they -- Merge uses the word container, like the
21  container that the specimen may be in.  So for
22  blood laboratories, there's a bunch of
23  different types of tubes and vials, and we say
24  cups and whatnot.  So I believe they use it
25  as -- a container as whatever the specimen's

Page 148

1   in.
2           A duplicate container defect, as I
3   understand it, could allow a duplicate specimen
4   to be created.  Um -- then there's a lot of
5   problems that can happen from there.  But
6   that's the basics of the duplicate container.
7           A duplicate specimen could be created
8   in the system and quite possibly the wrong one
9   could be approved and released.
10      Q.  If it's duplicate, then they're
11  identical; correct?
12      A.  Um -- there's so many other problems,
13  Steve, with the Merge system that can come into
14  play with not being able to modify the orders
15  or being deleted or changed, that --
16      Q.  Uh-huh.
17      A.  -- there are -- there are various
18  degrees of problems with that particular flaw.
19      Q.  Tell me about them.  I'd like to know
20  all of the problems based -- that arise based
21  on the duplicate container defect -- or that
22  are caused by the duplicate container defect.
23      A.  Okay.  You could double bill; you
24  could bill the same specimen twice.  You could
25  approve the same specimen twice.  You could

EXHIBIT A

Page 149

1   have, um -- because of the way that the Merge
2   system handles the deletion or the modification
3   of an order, you could have the patient --
4   patient name, and the accession number in the
5   system and effectively through the workflow
6   lose track of being able to know what it is.
7   Um --
8       Q.  I'm sorry.  Lose track of what?  I
9   didn't --
10      A.  Well, there's no audit tracking inside
11  of Merge.  Okay?  So if we go in and you make a
12  modification to the duplicate container, you
13  have an employee that could be manipulating
14  that sample and you wouldn't know from a
15  hierarchy or control what they did or how they
16  did it.  So the problem with the duplicate
17  container is exacerbated by all the other
18  problems that Merge's software doesn't have
19  that are required by CLIA.
20      Q.  Okay.  We'll come back to that.
21          Do you know if the software created a
22  duplicate container for every -- that's an
23  awkwardly awkward way to put it.
24          Under what circumstances does the
25  Merge LIS create duplicate container?

Page 150

1       A.  We have experts within the
2   organization who did that day in and day out
3   that would be better at answering the duplicate
4   container defect than me.  I never, um --
5   pushed the buttons to create a duplicate
6   container defect.
7       Q.  Uh-huh.
8       A.  So Michelle Spruill, Shea Spruill, any
9   of the technicians, would be better to answer
10  that question than me.
11      Q.  Right.  But you're here to testify on
12  behalf of the company so that's what I would
13  like to know, everything the company knows.
14  Tell me under what circumstances the company
15  was aware that the Merge LIS software created
16  duplicate containers.
17          MR. STEWART:
18              Steve, I think he already
19          answered that question.
20      A.  A couple times.  We, um -- we found it
21  in our own workflow and reported it to Merge.
22  EXAMINATION BY MR. KUPPERMAN:
23      Q.  Okay.  But do you know when?  Did it
24  do it for every single specimen?
25      A.  I do not know.

Page 151

1       Q.  Did it do it only for some specimens
2   under some circumstances?
3           MR. STEWART:
4               Asked and answered.
5       A.  Yes.  Some specimens, under some
6   circumstances, a duplicate container would be
7   issued.  And we detailed it out how it would
8   happen, and I think, videotaped it.
9   EXAMINATION BY MR. KUPPERMAN:
10      Q.  Okay.  Um -- does Trinity have a
11  record of containers or customers that were
12  impacted by the duplicate container defect?
13      A.  Um -- we -- we never had enough live
14  patient samples in order to be able to -- at
15  Trinity, as the owner of Performance Labs?  In
16  that capacity, Steve?  Is that your question?
17      Q.  Uh-huh.
18      A.  We never had enough live patient
19  samples to be able to find it in our workflow.
20      Q.  I'm sorry.  To find what in your
21  workflow?
22      A.  So, um -- when you're doing
23  validations, and you're doing the laboratory
24  scientific -- the methods to be able to get
25  your equipment validated and verified to do

Page 152

1   samples, you run a lot of blanks.  And so the
2   workflows are done hundreds and hundreds and
3   hundreds of times.  But as far as patients, the
4   answer is no, Trinity does not have patients.
5       Q.  Um -- Trinity purchased the Merge LIS
6   software; correct?
7       A.  Um -- Trinity's -- yes.
8       Q.  Performance Labs did not purchase it;
9   correct?
10          MR. STEWART:
11              Object to form.
12      A.  Um -- Performance Labs was asked to
13  produce financials in the underwriting
14  process --
15  EXAMINATION BY MR. KUPPERMAN:
16      Q.  Uh-huh.
17      A.  -- and the entire time we presented
18  information to Merge it was for Trinity and for
19  Performance Labs --
20          Repeat your question?
21      Q.  Yeah.  Performance Labs did not
22  purchase the software.  That was Trinity that
23  purchased the software; correct?
24          MR. STEWART:
25              Object to form.

EXHIBIT A

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                    April 10, 2019

Page 153

1    A.  The, um -- correct.
2    EXAMINATION BY MR. KUPPERMAN:
3    Q.  Okay.  And Prestige did not purchase
4    the software either.  Correct?
5    A.  Correct.
6    Q.  Okay.  Um -- okay.  What software
7    companies did Trinity consider, other than
8    Merge?
9    A.  Um -- Orchard and the L.I.M.S. XYZ
10   come to mind right now.
11   Q.  Is it L.I.M.S. XYZ?
12   A.  I believe so.
13   Q.  Okay.  And can you tell me who you
14   dealt with at L.I.M.S. XYZ?
15   A.  I do not know.
16   Q.  Can you tell me who at Orchard?
17   A.  I do not know.
18   Q.  Who would know?
19   A.  Chad Howell.
20   Q.  Okay.  And that would be for both?
21   A.  Yes, sir.
22   Q.  Do you know what Trinity was told
23   about the Orchard or L.I.M.S. XYZ software?
24   A.  The meetings that I'm aware of,
25   Orchard, um -- it was my management team's

Page 154

1    impression was going to be a heavy system.
2    Q.  What's that mean?
3    A.  Um -- it's what Merge ended up being,
4    but Orchard presented probably more truth.
5    Um -- it was heavy install.  I believe it was a
6    lot of server work.  It was going to be a
7    longer lead time.  Um -- and it was, I believe,
8    more expensive as well.
9    Q.  Okay.
10   A.  Um -- L.I.M.S. XYZ, they were similar
11   to us.  They had developed a L.I.M.S. system,
12   hey seemed to have a very light, nimble, very
13   flexible design.  We liked them a lot, but they
14   weren't FDA approved and they weren't owned by
15   IBM.  And we were looking to have, like, a big
16   brother in compliance with Merge LIS and IBM.
17   Specifically from the LIS system.
18   Q.  You understand that Merge and IBM are
19   separate companies; correct?
20   A.  I understand that Merge is wholly
21   owned by IBM.
22   Q.  Yes.  And they're separated companies.
23   Correct?
24   A.  Correct.
25   Q.  Just like Performance Labs is wholly

Page 155

1    owned my Trinity but it's a separate entity.
2    Correct?
3    A.  Yes.
4    Q.  And Prestige is owned by Trinity but
5    it is a separate entity.
6    A.  Yes.
7    Q.  And so you know they have separate
8    existence.  Correct?
9    A.  Correct.
10   Q.  Okay.  In talking to Merge XYZ, LIS --
11   I'm sorry -- L.I.M.S. XYZ, Orchard, and Merge,
12   were all those communications between
13   Mr. Howell and those entities?
14   A.  I would say Howell and various other
15   participants.
16   Q.  Did you ever participate directly?
17   A.  No.
18   Q.  So who other than Howell?
19   A.  I cannot speak with, um -- 100 percent
20   confidence, but the presentations, I believe,
21   are videotaped too.
22   Q.  Was Mr. Howell responsible?  I guess
23   he was the upper level guy who was --
24   A.  He was a partner.
25   Q.  -- who was responsible for all the

Page 156

1    other people who were talking to Merge --
2    A.  Uh-huh.
3    Q.  -- Orchard, or L.I.M.S. XYZ?
4    A.  That's correct.
5    Q.  Okay.  I take it that Trinity had the
6    ability to ask Merge, Orchard, and L.I.M.S. XYZ
7    all of the questions that it had about the
8    software.  Correct?
9    MR. STEWART:
10       Object to form.
11   A.  Correct.
12   EXAMINATION BY MR. KUPPERMAN:
13   Q.  And, um -- Trinity did, in fact, ask
14   of each manufacturer anything that it believed
15   was important to know.  Correct?
16   MR. STEWART:
17       Object to form.
18   A.  Correct.
19   EXAMINATION BY MR. KUPPERMAN:
20   Q.  Okay.  So anything that Trinity
21   thought was critical or material would be
22   something that was discussed, um -- at these
23   meetings with Orchard, L.I.M.S. XYZ, and Merge.
24   Correct?
25   MR. STEWART:

39 (Pages 153 to 156)

EXHIBIT A

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                                      April 10, 2019

Page 157

1          Object to form.
2     A.   Right.
3     EXAMINATION BY MR. KUPPERMAN:
4     Q.   Okay.  Now, Byline Financial Group,
5     that is -- you're aware that's a separate
6     company not related to Merge.  Correct?
7     A.   Correct.
8     Q.   Okay.  And when you talked a little
9     while ago about submitting financial
10    information for Performance, that was submitted
11    to Byline.  Correct?
12    A.   Correct.
13    Q.   And that was to finance the purchase
14    of Merge.
15    A.   Correct.
16    Q.   Okay.  Similar to going to a bank to
17    finance the purchase, it was just a financing
18    entity; correct?
19    A.   Correct.
20    Q.   Okay.  All right.  Um -- you mentioned
21    earlier that, um -- you understood there was a
22    recall by the FDA of Merge LIS system, and you
23    seed you believe it was the version -- well,
24    actually I don't think you said that.  I think
25    you said you believe it was on, um -- a

Page 158

1     document.  Correct?
2          MR. STEWART:
3          Object to form.
4     EXAMINATION BY MR. KUPPERMAN:
5     Q.   The version 3.8 reference.
6     A.   Yes.
7     Q.   Okay.  Are you now aware that the
8     version Trinity received was not Version 3.8?
9     A.   Um -- I answered this previously.
10    Ben -- Ben did a search on the server, and I do
11    not remember, um -- what the search came back
12    for, if he was able to determine it.  But Ben
13    Caston would -- would know if that search
14    turned up anything.
15    Q.   Okay.  But I'm asking you on behalf of
16    Trinity because you're here to talk about
17    everything Trinity knows.
18    A.   Yeah.  On behalf of Trinity, I'm not,
19    um -- what I've -- what I reviewed was, when we
20    found that there was a -- an FDA recall, I went
21    back and I looked at the recall notice.  I then
22    looked at the contract.  I then looked at all
23    the change orders.  I then looked at all the
24    presentations.  I then looked at every single
25    piece of documentation that we had.  And I saw

Page 159

1     same version number that was recalled was the
2     same version number that was on my contract,
3     all the presentations and all the conversations
4     that we had.  So that's what I made my, um --
5     my -- started asking questions to Merge about
6     that recall, and realized that it wasn't just
7     that recall that we weren't noticed about,
8     there were other recalled that we weren't
9     noticed about as well.  And we, in fact, never
10    received a recall notice ever.
11    Q.   Okay.  When did you discover this
12    recall?
13    A.   Oh, it's documented because I talked
14    to Pete about it.  I don't remember the -- the
15    exact date.  I feel like it was around February
16    or March 2017.  Somewhere around the time
17    period.  Because that's when Pete Nanos and I
18    were talking very much.
19    Q.   Okay.  Was that after Trinity -- after
20    Performance Labs had stopped testing again?
21    A.   Um -- I can review -- I can review
22    some documents and tell you with accuracy right
23    now.
24    Q.   Okay.  Let's save that.  Maybe you can
25    do that while we're at lunch.

Page 160

1     A.   Sure.
2     Q.   Okay.
3          MR. KUPPERMAN:
4          Let me look at the next one.
5     EXAMINATION BY MR. KUPPERMAN:
6     Q.   All right.  I'm going to show you a
7     document we have marked as Exhibit 5.
8     (Tendering.)  You recognize this as an e-mail
9     you sent to Mr. Sood?
10         (Exhibit 5 was marked for
11    identification and is attached hereto.)
12    A.   Yes.
13    EXAMINATION BY MR. KUPPERMAN:
14    Q.   And Jaltek Group is who?
15    A.   Earlier, I referenced, um -- when I
16    was working with Paradigm, um -- Jaltek Group
17    owns that technology.  So the intrinsically
18    safe device that we, um -- we used, Anmol Sood
19    and Jaltek own that company.
20    Q.   Okay.
21    A.   We worked with him in the past.
22    Q.   All right.  So why are you writing to
23    him in 2017?  To Mr. Sood.
24    A.   I'm asking him, what's the -- what's
25    this mean?  I discovered the Merge software we

JOHNS, PENDLETON, FAIRBANKS AND FREESE                                      504 219-1993

EXHIBIT A

Page 161

1  purchased was recalled days after we bought it,
2  and weeks after our installation they never
3  notified us.  See the link below.  Have a great
4  weekend.  Like, what does that mean?  Because
5  he has FDA-approved products and software, so I
6  wanted to ask what I thought was an expert at
7  the time.
8       Q.  And, um -- what did he tell you?
9       A.  Um -- he said that it's very, um --
10  man, I don't remember the exact details of the
11  conversation.  Um --
12      Q.  So you don't know what his response
13  was?
14      A.  I don't remember off the top of my
15  head what his response was, no.
16      Q.  Okay.  Now, you say you discovered.
17  Did you personally discover it, or did somebody
18  else discover this?
19      A.  I personally discovered this.
20      Q.  And you discovered it on Saturday,
21  the, um -- 4th of March 2017?
22      A.  Yes.
23      Q.  Okay.  And you discovered it on that
24  link -- on that website link?
25      A.  I was, um -- I was doing research on

Page 162

1  Merge and FDA-approved processes, because one
2  of the things that Merge always old us was that
3  because they were FDA approved they couldn't
4  make these modifications in their software,
5  that their change order process was very
6  detailed.  And it flew in the face of what I
7  knew about patient safety.  Because they were
8  doing things that were hurting patients.
9       So I was, like, how in the heck can
10  this be real?  So I started researching FDA.  I
11  started researching FDA regulations, products,
12  just learning about it, because it's like, I
13  have to be able to speak these folks' language
14  in order to communicate with them.  So I
15  started learning FDA language.
16      So this was part of me -- I never read
17  a book on how to rate a laboratory, but I
18  Googled a whole lot of it.  So I was just
19  basically Googling information on this day.  I
20  remember where I was whenever this happened.
21      Q.  Where were you?
22      A.  I was in the bathroom.
23      Q.  I won't ask any more about that.
24      Do you have any contemporaneous
25  e-mails or documents that show the creation of

Page 163

1  duplicate containers?
2       A.  Oh.  Um -- can ask you the question
3  again in a --
4       Q.  Yeah.  Do you have any contemporaneous
5  documents at Trinity that show, um -- the
6  duplicate container defect and finding out
7  about it?
8       A.  Um -- I -- I do believe so.
9       Q.  And have those been provided?
10      A.  Presented to Merge and provided to
11  you.  Yes.
12      Q.  Okay.  All right.  Um -- who told you
13  about the duplicate specimen duplicate
14  container defect?
15      A.  First time I hard about it, it was in
16  one of our Monday morning meetings, the
17  executive team.  Um -- I think it was probably
18  Chad Howell.  And then I may have talked to
19  Shea Spruill about it, and then we talked to
20  Michelle about it on how to handle it.
21      Q.  And when was that?
22      A.  I don't remember.
23      Q.  Okay.  Do you know what patient
24  samples it affected?
25      A.  Um -- at Trinity in regards to

Page 164

1  Performance Labs?  I do not know.
2       Q.  Okay.  You can't identify -- Trinity
3  can't identify any samples that were deleted
4  because of it, or created because of the
5  duplicate container defect?
6       A.  Not at this time, no.
7       Q.  Okay.  Not at any time; right?
8       A.  I don't believe so, no.
9       Q.  Okay.  What -- never mind.
10      Okay.  Let me show you the next
11  document.  It's going to be Exhibit 6.
12  (Tendering.)
13      (Exhibit 6 was marked for
14  identification and is attached hereto.)
15      MR. STEWART:
16          When do you want to break for
17      lunch, Steve?
18      MR. KUPPERMAN:
19          I don't know.  Give me a little
20      while.  It won't be too long.
21  EXAMINATION BY MR. KUPPERMAN:
22      Q.  You recognize this as an e-mail from
23  Jamie Catalanotto to you?
24      A.  Yes.
25      Q.  Okay.  And this document talks about

41 (Pages 161 to 164)

**EXHIBIT A**

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                    April 10, 2019

Page 165

1    the versions of Merge that you all had.
2    Correct?
3        A.  Um --
4        Q.  You all meaning Trinity.
5        A.  Yes.
6        Q.  Okay.  And it shows the version and
7    the install date.  Correct?
8        A.  Um -- yes.
9        Q.  Okay.  So all versions of this are 4.1
10   and higher.  Correct?
11       A.  Um -- correct.
12       Q.  And the bottom part of that I think is
13   a screen shot of the About, um -- section of
14   the software.  Do you see that?
15       A.  Yes.
16       Q.  And that also shows Version 4.1 and
17   higher.  Correct?
18       A.  Yes.  Correct.
19       Q.  Do you have any doubt that Trinity
20   actually obtained Version 4.1?
21           MR. STEWART:
22               Object to form.
23   EXAMINATION BY MR. KUPPERMAN:
24       Q.  And higher.
25           MR. STEWART:

Page 166

1               Object.
2        A.  Do I have doubt in -- in -- in the
3    version that -- based on what I'm looking at
4    right now, the, um -- the date, 4/11/2016, the
5    install date, reflects eSuite Version 4.1. I'm
6    not sure what Fflex eSuite is, or Common Lib,
7    or the Scheduler, or the Data Server, or the
8    SCHEMA.  I'm not quite sure what those are.
9    Um -- they look like different programs.
10   EXAMINATION BY MR. KUPPERMAN:
11       Q.  Okay.  But my question was, do you
12   have any doubt, um -- that in fact what Trinity
13   received was Version 4.1 and higher?
14           MR. STEWART:
15               Object.
16       A.  I do have doubt.
17   EXAMINATION BY MR. KUPPERMAN:
18       Q.  Okay.  And is that based on what?
19       A.  That's based on me not being able to
20   see right now, um -- what -- the name that was
21   actually for the software that was on the
22   contract.
23       Q.  Okay.
24       A.  Do you have a contract?  Can we look
25   at it, and I can --

Page 167

1        Q.  Do you think Jamie Catalanotto would
2    have given you bad or incorrect information?
3        A.  No.  What I'm saying is is there's
4    one, two, three, four -- four different names
5    of different pieces of software that I do not
6    recognize, that have a version number that I
7    also do not recognize.  And what I would want
8    to do is see the version of the actual
9    software.
10       Q.  Uh-huh.
11       A.  I don't even know if this is a
12   software that's names are reported to the FDA.
13   So I have doubt that this document contains
14   accurate information in regards to the name of
15   the version that was recalled on the contract.
16   Yes.  I doubt it.
17       Q.  That was recalled on the contract?
18       A.  The version that's on the contract on
19   the FDA's website.
20       Q.  Uh-huh.
21       A.  Can I have --
22       Q.  That's 3.8, I think you told me
23   earlier.
24       A.  Yeah, I said 3.8.
25           MR. STEWART:

Page 168

1               Did you have a copy of the sales
2        contract that you can show him?
3            MR. KUPPERMAN:
4                Probably.  We'll get to it later.
5    EXAMINATION BY MR. KUPPERMAN:
6        Q.  Okay.  Basically, you're -- I don't
7    want to belabor this, and I think we're getting
8    there, but essentially, your only basis for
9    saying Trinity did not get 4.1 or higher is
10   something that you see on the contract.
11   Correct?
12           MR. STEWART:
13               Object to form.  I think that
14       mischaracterizes his testimony.
15           MR. KUPPERMAN:
16               I'm asking the question.
17   EXAMINATION BY MR. KUPPERMAN:
18       Q.  Sir, can you answer?
19       A.  I need -- I need a minute to look at
20   something.  Would you give me a minute to look
21   at something real quick?
22       Q.  Sure.
23           MR. STEWART:
24               Do you have a copy of the sales
25       contract?

42 (Pages 165 to 168)

504 219-1993

EXHIBIT A

Page 169

```
 1        MR. KUPPERMAN:
 2           Yeah.  We do, someplace.
 3        MR. STEWART:
 4           If you want to take a break, we
 5     can get it and take a look at it. he's
 6     just trying to refresh his memory for
 7     what is on it.
 8        MR. KUPPERMAN:
 9           Yeah.  Well, we will have to come
10        back because I can't find it right
11        here.
12     EXAMINATION BY MR. KUPPERMAN:
13        Q.  Let me ask you a couple of real quick
14     questions.  You talked about FDA approval of
15     the Merge software?
16        A.  Yes.
17        Q.  What does that mean, FDA approval?
18     What is your understanding?  What is Trinity's
19     understanding of what means?
20        A.  Trinity's understanding of that is
21     that, um -- merge has gone through the required
22     documentation by the FDA to get approval for,
23     um -- in this case, um -- patient testing.
24     It's safe for human beings to be able to have
25     reports on it.
```

Page 170

```
 1        Q.  And that's why it's important, because
 2     you want the FDA to say patient safety?
 3        A.  For -- for Trinity, speaking for
 4     Trinity --
 5        Q.  Yeah.
 6        A.  -- and Performance Labs, we had just,
 7     um -- did everything we possibly could to do it
 8     right.  And we still at the end of 2015 were
 9     shut down.
10        Q.  Uh-huh.
11        A.  All right?  So we gave, like, A+
12     effort, in our opinion, and it just didn't work
13     out.  So when we shifted to looking towards an
14     FDA product, um -- there's -- there's a
15     rigorous amount of documentation and processes
16     and auditing that need to be done for you to
17     have FDA approval.  So by buying Merge, we were
18     effectively buying a regulatory, um -- and it
19     was going to compress time on our ability to be
20     able to perform patient testing.  That's why we
21     thought.  Long answer.  Sorry about that.
22        Q.  No, that's okay.  I want the right
23     answer.  So it was important to get the
24     FDA-approved --
25        A.  Yes.
```

Page 171

```
 1        Q.  -- um, software.  Right?
 2        A.  Yes.
 3        Q.  Okay.  Have you ever been told that
 4     the lab violated the FDA?
 5        A.  Um -- Sandy Pearson told us that we
 6     needed to, um -- report these findings to the
 7     FDA -- Merge to the FDA.
 8        Q.  Who's Sandy Pearson?
 9        A.  She was the regional inspector of
10     Region 6.  She told me in an e-mail, report
11     your findings to the FDA.
12        Q.  That's CMS?
13        A.  CMS.  Yes, sir.
14        Q.  And did you report it?
15        A.  Um -- we went on, um -- I went on the
16     website of the FDA to look through it, and --
17     and they've like a burden of, like, the amount
18     of hours that it would take to be bow able to
19     go through that.  And so we started the
20     process, and, um -- did not finish it.
21        Q.  So you never did report it to the FDA.
22        A.  Not to the FDA.
23        Q.  Okay.  Um -- have you ever been told
24     that, um -- your labs violated any FDA
25     standard?
```

Page 172

```
 1        A.  Um -- not that I'm aware of.
 2        Q.  Okay.  Have you ever been told that
 3     Merge software violated the FDA standard?
 4        A.  Um -- I don't know how to answer this
 5     one because of, um --
 6        Q.  I guess it's easy.  Have you been told
 7     that?
 8        A.  I have been told that.
 9        Q.  By whom?
10        A.  Um -- for -- there's some -- for
11     the -- for the amount that I can speak to it,
12     there's from federal laws that I say can't
13     really speak to from whom.
14        Q.  I don't understand.  Can I see what
15     you're pointing to?  I see your lawyer gave you
16     something so.
17        MR. STEWART:
18           (Tendering.) 27.
19        MR. KUPPERMAN:
20           Yeah.  Okay.
21     EXAMINATION BY MR. KUPPERMAN:
22        Q.  I don't understand.  Can you explain
23     it to me?
24        MR. STEWART:
25           Well, we've objected.
```

43 (Pages 169 to 172)

**EXHIBIT A**

Page 173

```
1        MR. KUPPERMAN:
2      I know.
3        MR. STEWART:
4      He's told you --
5        MR. KUPPERMAN:
6      And I'd like an explanation -- I
7   don't understand why something
8   prevents him from talking to me and
9   telling me that, and I'd like an
10  explanation.
11       MR. STEWART:
12     I don't know that he can put the
13  explanation on the record.  If you
14  like, we take it off the record and we
15  can discuss all that, but I'm going to
16  object and instruct him not to answer.
17       MR. KUPPERMAN:
18     Okay.  Um -- okay.  Why don't we
19  go off the record.
20       THE VIDEOGRAPHER:
21     We're going off the record.  The
22  time is 12:30.
23     (Lunch break.)
24       THE VIDEOGRAPHER:
25     We are back on the record.  The
```

Page 174

```
1      time is 1:16.
2   EXAMINATION BY MR. KUPPERMAN:
3      Q.  Um -- sir, I understand while you've
4   been out for lunch that you found the
5   information as to who counsel was for
6   Linebacker and that was Scott Galante.  Is that
7   correct?
8      A.  That is correct.
9      Q.  Okay.  And you were also going to
10  check with lawyers, um -- about what you said
11  you couldn't tell us.
12     A.  Um -- so, um -- can you repeat the
13  question that was -- just so that way it flows?
14  I'm sorry.
15       MR. KUPPERMAN:
16     I don't know if I can.
17     Is there any way you can find it
18     and read it back?
19  EXAMINATION BY MR. KUPPERMAN:
20     Q.  Let me just go back.  Let me ask this:
21  Who told you that it was FDA noncompliant, the
22  Merge LIS software?
23     A.  So, um -- I remember receiving notice
24  from Michelle Spruill that if we found a Class
25  2 medical device that, um -- could harm
```

Page 175

```
1   patients, that it was the laboratory's
2   responsibility per CLIA to notify the company
3   and also to notify the FDA.  I remember
4   something around that.
5      I've done research with, um -- with
6   many, um -- professionals that, um -- led my
7   own beliefs to believe that it's noncompliant
8   with FDA.
9      Q.  Okay.  So no one told you it was
10  noncompliant.
11     A.  Michelle Spruill told us that if it
12  was going to hurt a patients, and patient
13  safety was at risk, that we -- that it was not
14  compliant with FDA.
15     Q.  Okay.  But she did not tell you that,
16  in fact, the Merge LIS software was not
17  compliant; correct?
18     A.  Um -- no.  As a group of
19  professionals, in -- in March and April --
20  into, you know, February and March when we were
21  looking at all the issues with Merge --
22     Q.  You're talking about 2017.
23     A.  -- 2017, um -- we -- we felt that
24  Merge's software was not FDA compliant.
25     Q.  No, I understand that.  But
```

Page 176

```
1   Ms. Spruill never told you that, in fact, the
2   Merge LIS software was noncompliant.  Is that
3   correct?
4      A.  That's correct.
5      Q.  Okay.  That was a conclusion you
6   reached, but no one actually told you that.
7   Scratch it.  I don't care about it.
8      Um -- the Drummond report you
9   mentioned, that was not authored by Merge.
10  Correct?
11     A.  That was authored by Drummond.
12     Q.  Okay.  You don't have any claim of
13  misrepresentation because of that; correct?
14       MR. STEWART:
15     I object to form.
16     A.  I don't know what that means, Steve.
17  EXAMINATION BY MR. KUPPERMAN:
18     Q.  Well, there's nothing in the report
19  that gives rise to your misrepresentation or
20  omission claims.  Correct?
21       MR. STEWART:
22     Object to form.
23     A.  As I understand it, correct.
24  EXAMINATION BY MR. KUPPERMAN:
25     Q.  Okay.  What happened to that Drummond
```

44 (Pages 173 to 176)

EXHIBIT A

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                April 10, 2019

Page 177

1    report?  I don't recall that it has been
2    produced.
3        A.  Um -- I saved it as a document.  I can
4    send it to you.
5        Q.  Please do.
6            You mentioned very early on today
7    that, um -- the documents you reviewed and
8    listed are some that your expert looked at or
9    relied on.  Do you recall that?
10       A.  What expert?
11       Q.  Have you spoken to an expert?
12       A.  Um --
13           MR. STEWART:
14               Object to form.
15   EXAMINATION BY MR. KUPPERMAN:
16       Q.  For this litigation.
17       A.  Um -- an expert in regards to what?
18       Q.  Anything.
19       A.  Yes.
20       Q.  Okay.  Who?
21       A.  Harold Asher.
22       Q.  Okay.  And he's an accountant.
23       A.  Yes, sir.
24       Q.  Okay.  So you've talked to him about
25   damage calculations?

Page 178

1        A.  Yes, sir.
2        Q.  Okay.  And what did you -- what did he
3    say to you, and what did you say to him?
4        A.  Lots.  I -- can you -- um --
5            MR. STEWART:
6                Can you be more specific?
7            MR. KUPPERMAN:
8                No.  I just want to get in
9            general.
10   EXAMINATION BY MR. KUPPERMAN:
11       Q.  What did y'all talk about?
12       A.  We spoke about, um -- documents,
13   checking accounts, profit and loss statements,
14   passwords with QuickBooks, getting access to
15   all the information, tracking down Skip,
16   tracking down Wegmann Dazet, lost profits
17   calculations, a very profitable business in
18   2015, um -- yep.
19       Q.  Okay.  Any -- did he, um -- tell you
20   what he was going to do for you as an expert?
21       A.  Um -- what he told me what he was
22   going to do for me as an expert?  He, um -- I
23   mean, it's my understanding that his role is to
24   be an expert witness in the case.  So he's
25   going to be an expert witness in the case.

Page 179

1        Q.  Um -- he's going to calculate damages
2    as high as he can; correct?
3            MR. STEWART:
4                Object to form.
5        A.  Um --
6    EXAMINATION BY MR. KUPPERMAN:
7        Q.  That's your understanding.
8        A.  Actually, no.
9        Q.  Okay.  He's going to calculate
10   damages; right?
11       A.  He's going to calculate accurate
12   damages.
13       Q.  Okay.  Now, um -- you keep talking
14   about patient safety.  What do you mean by
15   that?
16       A.  It's a laboratory term that they use.
17   If you -- if you cannot -- for example, if you
18   cannot verify QC on a sample and results that
19   are produced --
20       Q.  QC meaning?
21       A.  Quality control.  Yeah, good call.
22       Q.  Yeah.
23       A.  Quality control.  Um -- then you may,
24   will, misreport the data that the physicians
25   use to be able to prescribe medical care.

Page 180

1        Q.  What data?
2        A.  Um -- laboratory results.
3        Q.  What laboratory results.  All of them,
4    are particular ones?
5        A.  All of them.
6        Q.  Okay.  And tell me how that comes
7    about again?
8        A.  Okay.  So on a daily basis --
9        Q.  Yeah.
10       A.  -- you are -- every morning, you wake
11   up, you come into the laboratory, you run QC.
12   QC is a daily game.  Quality control.  It's a
13   daily game.  Um -- you run QC for the day, and
14   you compare it with the QC that you ran on your
15   lot.  So your lot would be the lot of reagents
16   that you're using.
17       Q.  Lot?
18       A.  Lot.  L-O-T, lot.  Like a lot of
19   reagents.  So you mix a batch or reagents.
20   Okay?  That's the chemicals that you use to be
21   able to, um -- do the scientific work.  I'm
22   gonna use general terms, 'cause I'm not a
23   degreed scientist, I'm a general studies major.
24           So just general terms here:  So the
25   lot allows us to be able to run the equipment

JOHNS, PENDLETON, FAIRBANKS AND FREESE                    504 219-1993

**EXHIBIT A**

Page 181

1    and get the results that we need.  We run QC on
2    the lot, and then daily, we run QC on the piece
3    of equipment to make sure that it is aligned
4    and in range with what that lot was.
5              You want to make sure that it doesn't
6    spoil, it's -- it's -- there's a lot of rules
7    around that.  If QC misreports, then your
8    results are out of range.  If you go back and
9    you look at your report and you don't actually
10   have QC, and you're not running -- you don't
11   have quality control that you can look at, or
12   you can trust, then all of your reports can be
13   out of range, as I understand it.  Which would
14   mean, as blood, that's PT/INR, that's
15   testosterone, estrogen, thyroid, and
16   toxicology.  That's -- that's any run based
17   test.
18      Q.  Okay.  When you say you run QC, you
19   said you run it on the lots and you run it on
20   the equipment.  Correct?
21      A.  Yes.
22      Q.  Every morning.
23      A.  Yes.
24      Q.  Okay.  What do you mean run QC on
25   lots?

Page 182

1       A.  So whenever you makes your batch,
2    that's your controls.  Right?  So you are --
3    you have a control that you're basically
4    testing all the patient samples against.
5       Q.  What do you mean mix your batch?
6       A.  Um -- that's -- that's where my
7    general talk stops.  You'd have to talk to a
8    scientist.
9       Q.  Okay.  But what do you mean by it?
10      A.  What do I mean by it is that there
11   are, um -- there are reagents that you order
12   from --
13           THE WITNESS:
14              You need me to slow down?
15      A.  There are reagents that you order
16   from, um -- companies like Thermo Fisher.
17   EXAMINATION BY MR. KUPPERMAN:
18      Q.  The reagents you said were chemicals?
19      A.  Yes.  Reagents are chemicals.
20      Q.  Okay.
21      A.  All right.  So in an AU400, which is
22   the immunoassay analyzer, that's the screening
23   instrument, that's very profitable, um -- that
24   screening instrument actually, um -- when
25   you -- you're going to run maybe, like, 12

Page 183

1    different -- or 12 panels is what they call it.
2    It could be opiates, it could be elicits, it
3    could be THC, could be benzos, it could be the
4    different families of the drugs.
5       Q.  Panels are simply the tests.
6       A.  That's right.
7       Q.  Okay.  The screening for a particular
8    item like THC.
9       A.  Like Coca-Cola.  Right?  And what the
10   confirmatory test is gonna do, and where you
11   have a lot there too, the confirmatory test is
12   going to tell you that this was not only
13   Coca-Cola, but it was Diet Coke, and it was
14   bottled on a specific day.  And so it's greater
15   specificity.  You order those tests mainly from
16   a company called Cerilliant.  But you have to
17   actually mix it at certain levels.  Okay?  So
18   if you've ever seen scientists that have, like,
19   pipettes, and so what they're doing is they're
20   literally making a batch.  They have to create
21   the chemicals at the exact right levels that
22   are based on the validation studies that they
23   did to even validate the equipment that were
24   approved by either COLA or CLIA, and -- and the
25   testing methodology.

Page 184

1              So your QC is like your daily gut
2    check to put your ranges back in order.
3    It's -- it's one of the biggest pieces of the
4    laboratory business is to be able to know and
5    verify QC.
6       Q.  Well, what does that mean, to run QC,
7    or verify it?  What does it do?
8           MR. STEWART:
9              Object.  I think he's already
10             answered the question.
11      A.  Yeah.
12   EXAMINATION BY MR. KUPPERMAN:
13      Q.  How does it do it?  When you say you
14   run QC, is it a button you push?  Is it
15   something you have to check on?  Is it some
16   chemical that you need to feed into a machine?
17   What is run QC?
18           MR. STEWART:
19              Again, object.  I think he's
20             already answered your questions to the
21             best of his knowledge.  He's a
22             generalist.
23           MR. KUPPERMAN:
24              Well, I'm here for Trinity.
25      A.  Sure.

46 (Pages 181 to 184)

EXHIBIT A

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                                    April 10, 2019

Page 185

1      MR. KUPPERMAN:
2          And I think he needs to answer on
3      behalf of the entire company. So I
4      would like to know and I didn't
5      understand running QC on the lot.
6      So --
7      A.  So there's a gap between your -- your
8  knowledge of science and my ability to be able
9  to, um -- educate you in science. Right? And
10 so somebody that is of a greater skill set and
11 scientist would probably able to answer
12 these questions better. So I would ask
13 Michelle Spruill, so that way you can
14 understand what QC is.
15     I understand it the way that I'm
16 saying it. I don't think I'm gonna be able to
17 explain it to you the way that you're going to
18 see it, because I'm not that good at that
19 particular piece of it.
20 EXAMINATION BY MR. KUPPERMAN:
21     Q.  Why do you need to run QC on lot if
22 every -- scratch that.
23     A.  I thought -- it's CLIA -- it's CLIA
24 regulations. It's the law.
25     Q.  You use the same chemicals or mix of

Page 186

1  chemicals to do the same type of test day after
2  day; correct?
3      A.  Correct.
4      Q.  Okay. So those mix of chemicals
5  should always be identical from day to day for
6  a particular test. Correct?
7      MR. STEWART:
8          Object to form.
9      A.  Yeah. So --
10 EXAMINATION BY MR. KUPPERMAN:
11     Q.  Is that correct?
12     A.  Um -- it's such a -- it's such a basic
13 question that isn't relative to the science.
14 What you're saying is correct, but there are so
15 many safeguards in place that you have to do
16 for patient safety.
17     Q.  I'm not asking about those. I'm just
18 asking you if the chemicals, the mix of
19 chemicals, is always going to be the same for
20 the same test day after day.
21     A.  They should.
22     Q.  Okay. And so what is QC doing on a
23 lot when you're running QC, whatever that
24 means? Are you just simply checking to make
25 sure that the chemical mixture is the same from

Page 187

1  one day to the next?
2      A.  Calibrating the equipment.
3      MR. STEWART:
4          Object. I think he's answered
5      that already. You've asked the same
6      question in different ways multiple
7      times, Steve. He's already answered
8      it.
9      MR. KUPPERMAN:
10         I don't think so.
11 EXAMINATION BY MR. KUPPERMAN:
12     Q.  But go ahead.
13     A.  Every -- you are -- first off, it's a
14 CLIA regulation. So being able to run QC and
15 produce QC is a -- is an actual, real,
16 regulatory, like, noted CFR. You have to be
17 able to produce QC for all the samples that you
18 report on. It doesn't matter my knowledge of
19 it. That's what you have to do to run a lab.
20     Q.  I'm understand, but I'm not asking
21 what you have to do to run a lab. I'm asking
22 you if running the QC on the lot is simply
23 making sure that the chemical mix one day is
24 the same chemical mix that you used another day
25 for the same test.

Page 188

1      A.  That's a great question.
2      MR. STEWART:
3          I'm gonna object.
4      THE WITNESS:
5          Sorry.
6      A.  I understand it now.
7      Yes.
8  EXAMINATION BY MR. KUPPERMAN:
9      Q.  Okay. So when you're running the QC
10 on a lot every day, all you're doing is
11 checking to make sure that the mixture has been
12 mixed appropriately by your personnel.
13 Correct?
14     MR. STEWART:
15         Object to form.
16     A.  Quality control. Yes.
17 EXAMINATION BY MR. KUPPERMAN:
18     Q.  Okay. Now, when you run QC on
19 equipment, what is that? How do you do that?
20     A.  So the two -- the two are hand in
21 hand. All right? So your equipment could not
22 be calibrated correctly, so you run QC.
23 Because you have the chemical mixture, and then
24 you have the piece of equipment, and you have
25 to make sure that you're able to produce the

47 (Pages 185 to 188)

EXHIBIT A

Page 189

1    results that you intend, based on the ranges
2    that you've set, between the two.  QC is part
3    of that process.
4        Q.  So the QC just checks to make sure
5    that the lab has calibrated its equipment
6    correctly.
7        A.  It ensures that the patients' results
8    are being reported out correctly.
9        Q.  Yes.  But you said you ran QC on
10   equipment.  So I'm just trying to find out what
11   exactly does that mean.  And my question is,
12   does it simply mean that in running QC you're
13   trying to determine whether the lab has in fact
14   calibrated the equipment it is going to use for
15   tests?
16       A.  It's -- Steve, it's called quality
17   control.  It's all the parts of the process.
18   It would -- it would let you know human error,
19   it would let you know equipment error, it would
20   let you know specimen prep error, it is the
21   way -- there are so many factors that come into
22   it.  So your QC takes into -- apart the method
23   and the process by which that you are approving
24   the samples.
25       Q.  Okay.  And that would be something

Page 190

1    that would be in your manuals?
2        A.  Sure.
3        Q.  Okay.  So running QC does what with
4    your written manuals?  I don't understand.
5            MR. STEWART:
6                Object to form.  Can you reask
7            that question?  I'm not sure I
8            understand what you're asking.
9            MR. KUPPERMAN:
10               I know what I'm trying to, but
11           I'm not sure I can explain it or
12           restate it.
13   EXAMINATION BY MR. KUPPERMAN:
14       Q.  Let me just go back to this one.  You
15   said there are lot of things that can go wrong
16   with equipment.  Okay?  So when you're running
17   QC on equipment, are you doing -- you're
18   checking calibration on the equipment.
19   Correct?
20       A.  Uh-huh.  I'm sorry.
21       Q.  You have to answer yes or no.
22       A.  So you -- you're -- you're --
23       Q.  Can you just answer my question first?
24       A.  I can't.
25       Q.  Okay.

Page 191

1        A.  I need to -- 'cause -- 'cause of the
2    way you're -- you're saying when you're running
3    QC on equipment.
4        Q.  Yes.
5        A.  And you know how you're on a box, in a
6    box, outside of a box?  Like, that's the wrong
7    language to use whenever you're describing it.
8    Like, you don't run the QC on equipment; you
9    run QC on your testing process.  It'll alert
10   you that -- if your equipment is not calibrated
11   correctly.
12       Q.  Okay.
13       A.  And a better scientist -- since I'm
14   not one -- would be much better to answer these
15   particular questions.
16       Q.  Okay.  Well, I don't have a better
17   scientist, all I have is you here to testify
18   you know behalf of the company, um -- as to all
19   knowledge the company had.  And by the way,
20   you're the one I think who used run QC on
21   equipment, which is why I keep using the
22   phrase.  And I apologize if it is the wrong
23   phrase.
24       A.  I apologize if I gave you the wrong
25   phrase.

Page 192

1        Q.  So run QC, other than running it on
2    the lot, is simply to test to see that your
3    process is accurate.
4        A.  Correct.
5        Q.  Okay.  Now that doesn't mean that,
6    um -- it is guaranteeing that your personnel
7    will in fact accurately follow the process.
8    Correct?
9            MR. STEWART:
10               Object to form.
11       A.  Um -- actually, it's the opposite of
12   that.  When your QC is accurate, it is
13   guaranteeing that they're following the
14   process.
15       Q.  On the test that is run for the QC;
16   correct?
17       A.  That's right.
18       Q.  It does not guarantee that later tests
19   that they run during the course of the day is
20   done according to your process; correct?
21       A.  If the -- if QC is correct, and
22   reports are generated outside of the range of
23   QC, they will not be approved, they will be
24   rerun.
25           Rerunning tests is also a problem

EXHIBIT A

Page 193

1　inside of Merge.  But they would be rerun.
2　　Q.  Okay.  Now, running QC to check
3　calibration, which is one of the things you
4　said happened, tells you that the equipment is
5　calibrated correctly as of the time of the
6　test.  Correct?  The QC test.
7　　A.  As a generalist, as I understand it,
8　yes.
9　　Q.  And it does not tell you that the
10　equipment -- it doesn't correct if the
11　equipment, later that day, changes calibration
12　or modifies its calibration.  Correct?
13　　　　MR. STEWART:
14　　　　　Object to the form.
15　EXAMINATION BY MR. KUPPERMAN:
16　　Q.  Because the QC has already been run.
17　　A.  You stated that.  I don't even know if
18　it was a question.
19　　Q.  It is.
20　　A.  You answered it.
21　　Q.  I'm asking.
22　　A.  Please ask it again.
23　　Q.  Okay.  When you run QC with regard to
24　the calibration of the equipment, that does not
25　tell you that the equipment will function

Page 194

1　according to that calibration later in the
2　course of the day, does it?
3　　　　MR. STEWART:
4　　　　　Object to form.  Steve, can you
5　　　　ask it as a question that he can
6　　　　answer.
7　　A.  It, um --
8　　　　MR. STEWART:
9　　　　　Steve, you want to restate the
10　　　　question --
11　　　　MR. KUPPERMAN:
12　　　　　No, I don't.
13　　　　MR. STEWART:
14　　　　　-- in the form of a question?
15　　　　MR. KUPPERMAN:
16　　　　　That is a form of a question.
17　　A.  I mean, you made a statement, and then
18　you said, do you agree with me?  I don't think
19　the statement is is -- is correct at all.
20　EXAMINATION BY MR. KUPPERMAN:
21　　Q.  Then tell me how you disagree.
22　　A.  Okay.  So, one, um --
23　　　　MR. STEWART:
24　　　　　Well, let's stop.
25　　　　Can you reread the question,

Page 195

1　please?
2　THE REPORTER:
3　　　　"When you run QC with regard to
4　the calibration of the equipment, that
5　does not tell you that the equipment
6　will function according to that
7　calibration later in the course of the
8　day, does it?"
9　MR. STEWART:
10　　　　And I'm going to maintain the
11　objection.  I still don't understand
12　what the question means.
13　　　　You can answer it to the extent
14　that you understand it.
15　　A.  Um -- I mean, there's no double
16　negative in there, it's just -- it's -- it's
17　confusing.  I'm gonna say, um --
18　MR. STEWART:
19　　　　And if you don't understand it
20　you can say that.
21　THE WITNESS:
22　　　　No, I want to get -- I want to
23　get an answer that he -- that he --
24　that he --
25　EXAMINATION BY MR. KUPPERMAN:

Page 196

1　　Q.  Let me ask it this way:
2　　A.  Sure.  Please.
3　　Q.  This may be easier for you.
4　　A.  Yeah.
5　　Q.  You run a QC with regard to the
6　calibration of the equipment at 8:00 am, say.
7　　A.  Uh-huh.
8　　Q.  Okay?  That does not tell you that a
9　test run on that same equipment at 5:00 in the
10　evening is in fact calibrated correctly; is
11　that correct?
12　　A.  Steve, I have never once in my life
13　ever run QC.
14　　Q.  Okay.
15　　A.  I am not -- cannot manipulate patient
16　samples, I can't prep samples, I've never
17　poured a cup of pee.  So we are not asking me
18　questions that I can -- I can answer right now.
19　At the time that I had my laboratory I had a
20　team of scientific licensed professionals,
21　Ph.Ds, pathologists, to be able to pull this
22　information from.  Today, it's just me.  I
23　can't still run a laboratory --
24　　Q.  Uh-huh.
25　　A.  -- by myself.

49 (Pages 193 to 196)

EXHIBIT A

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                    April 10, 2019

Page 197

1    Q.  Uh-huh.  And you're here to testify on
2  behalf of all the knowledge the corporation,
3  the company, has, Trinity Medical Services,
4  LLC.  So I'm simply asking you my question.
5      Can you answer the question?
6    A.  No.
7    Q.  Okay.  Did Merge ever promise that its
8  software would make Trinity compliant with all
9  applicable regulations?
10   A.  I don't remember one that they said
11 they wouldn't, so I would say --
12   Q.  I'm not asking that.  I'm asking if
13 they ever made the promise to you, to Trinity,
14 that the software would make Trinity compliant
15 with all applicable regulations.
16   A.  I do the remember those words being
17 used.
18   Q.  Okay.  Or anything similar to those
19 words.  Correct?
20   A.  Um -- no, there were similar
21 statements made.
22   Q.  Tell me by whom, and exactly what they
23 said.
24   A.  Sure.
25   Q.  And then when, as well, if you'd add

Page 198

1  that.
2    A.  Sure.  There is an e-mail, um --
3  circulated by Ron Poe, specifically addressed
4  to Rick Ornelas, where Rick talks about, um --
5  all of the testing that needs to be done at
6  CVDL.  And Ron Poe's answer is, we can do all
7  of those tests that you mentioned below inside
8  of one system.  Um --
9    Q.  Okay.
10   A.  The, um -- the -- the entire
11 presentation that was done on January 11th,
12 maybe January 20th, that was done by Diana
13 Powell and Ron Poe --
14   Q.  Of what?
15   A.  -- of the Merge presentation after the
16 install --
17   Q.  I'm sorry.  I'm trying to get a date.
18   A.  Okay.  And I'm giving you a range of
19 dates.  Around January.
20   Q.  Of?
21   A.  2017.  Excuse me -- 2016.
22   Q.  Was that after or before the Merge
23 system was bought?
24   A.  Uh -- it was after the Merge system
25 was bought.

Page 199

1    Q.  Okay.  And was the Ron Poe to Rick
2  Ornelas e-mail before or after?
3    A.  Before.
4    Q.  Okay.  Keep going.
5    A.  In -- in, um -- Merge's marketing
6  materials it markets itself as an industry
7  leader, scalable -- I mean, its own words, it
8  puts out there that it is -- it's compliant
9  with -- to the laboratory testing, as well as
10 FDA compliant.
11   Q.  Does it -- does it say that it is
12 compliant with all applicable regulations?
13   A.  Um -- I mean, again, that's a --
14 that's a big term.
15   Q.  Yes, sir.  That's what I'm asking.
16   A.  I mean, it comp -- is it -- with the
17 United States -- with the IRS Tax Code as a
18 regulations?  Or are you talking about
19 laboratory regulations?
20   Q.  All lab, food, drug, anything of that
21 nature.
22   A.  Um -- I do not remember seeing those
23 words used in its marketing materials.
24   Q.  Okay.  Anything else that you need
25 tell me other than the Ron Poe to Rick

Page 200

1  Ornelas --
2    A.  There -- there are several e-mails
3  where Ron is communicating with us that this
4  system is compliant, this system works.  And we
5  addressed our concerns to them because of how
6  we went through the Medicare -- the CMS audit.
7  And he said that this is -- this is IBM, man.
8    Q.  Compliant.
9    A.  This is compliant.
10   Q.  Okay.  And so everything that you know
11 about the communication where you think Merge
12 talked about being compliant is in those
13 e-mails?
14   A.  Yes.
15   Q.  Okay.  Now, um -- I think you
16 indicated Merge said that its -- I'm sorry, I
17 think you indicated that, um -- a version of
18 the Merge software was recalled by the FDA.
19 Correct?
20      MR. STEWART:
21        Object to form.
22   A.  Um -- I don't remember if I -- how I
23 used those words.
24 EXAMINATION BY MR. KUPPERMAN:
25   Q.  Well, was it the FDA recall?  Or was

JOHNS, PENDLETON, FAIRBANKS AND FREESE                    504 219-1993

EXHIBIT A

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                                            April 10, 2019

Page 201

1  it some other recall?
2      A.  Um -- from my understanding, it was a
3  an FDA -- it was a FDA recall, a self-reported
4  recall by Merge.
5      Q.  Okay.  I'm sorry.  A self what?
6      A.  Um -- the document that I've read
7  since talks about the FDA is in agreement with
8  Merge's decision to recall its product, da, da,
9  da, da, da.
10      Q.  So Merge decided to recall it, the FDA
11  didn't force it -- force a recall.  Correct?
12      A.  That's correct.
13          MR. STEWART:
14              Object to form.
15  EXAMINATION BY MR. KUPPERMAN:
16      Q.  Okay.  And the FDA did not shut down
17  Performance Labs.  Correct?
18      A.  Um -- that's correct.
19      Q.  CMS shut it down.
20      A.  What date?
21      Q.  Um -- December 2015?
22      A.  Yes, sir.
23      Q.  Okay.  How about after December of
24  2015?  The FDA still never shut down
25  Performance Labs; correct?

Page 202

1      A.  That's correct.
2      Q.  Okay.  Did CMS shut down Performance
3  Labs?
4      A.  When?
5      Q.  After December of 2015.
6      A.  Um -- no.
7      Q.  Okay.  It gave permission to start up
8  again in late January of 2017; correct?
9      A.  Actually --
10          MR. STEWART:
11              Object to form.
12  EXAMINATION BY MR. KUPPERMAN:
13      Q.  That's the confirmatory.
14      A.  Actually -- for the confirmatory
15  testing?
16      Q.  Yes.
17      A.  Yes.
18      Q.  Yeah, and I think you told me
19  earlier -- and correct me if I'm wrong, just to
20  make sure I'm on the right page with you --
21  that in August, CMS said you could do screen --
22  screenings -- screen testing.
23      A.  Uh-huh.
24      Q.  But that was fairly de minimis on your
25  part.  Correct?

Page 203

1      A.  Correct.
2      Q.  Okay.  All right.  Now, I think that
3  if you -- let me ask -- first let me find it.
4  Um -- there's an allegation in the Second
5  Amended Complaint that Trinity would not have
6  purchased the Merge LIS software because of the
7  software's historical results.
8          MR. STEWART:
9              Can you point to where you're
10          talking about?
11  EXAMINATION BY MR. KUPPERMAN:
12      Q.  57.  And it says the historical
13  results ran directly against Merge's
14  representations regarding the product's
15  capabilities.
16          Do you see that?  Do you recall that?
17      A.  Yes.
18      Q.  Okay.  What do you mean by software's
19  historical results?
20      A.  Um -- the -- after, um -- knowledge
21  that we gained after Merge's software was found
22  noncompliant by my laboratory director, when we
23  started digging into the historical results of
24  Merge, we did recognize that the FDA had sent a
25  warning letter to IBM, um -- basically saying

Page 204

1  that Merge wasn't, um -- doing things inside of
2  their Milwaukee factory, I believe -- I could
3  be wrong on that -- that followed FDA, um --
4  guidelines.  So there was a warning letter sent
5  to Merge pre $1 billion buy.  There was also a
6  warning letter sent to IBM about it.
7          Um -- and so if Merge would have clued
8  us in that they had some problems with the FDA,
9  since we were adamant about buying a
10  FDA-approved software, then, um -- we would not
11  have purchased it.
12          It also would have sped up our
13  decision -- like, we constantly thought that
14  Merge was helping us.  I mean, now we look
15  through the discovery and I realize that they
16  weren't even paying attention to us.  We were
17  documenting complaints -- per the FDA, you're
18  supposed to document all complaints, complaints
19  that you overhear, complaints that you read,
20  complaints that you see.  And they didn't
21  document any of 'em.
22          And so, you know, that -- that big
23  indicator right there, their communication, if
24  they would have told me, hey, we have problems
25  at our factory and we're not really FDA

51 (Pages 201 to 204)

Page 205

1  approved, it's on a recall, in June I could
2  have made a decision to pivot.
3      Q.  Well, let me ask you this:  Because
4  I'm not sure I got an answer to that.  What
5  was --
6      A.  I'm sorry.
7      Q.  -- the historical result, the result,
8  historically, that, um -- you're referring to?
9          MR. STEWART:
10             Object.  He has answered the
11         question.
12     A.  I went on a tangent after, but I did
13  answer the question.
14         Their, um -- the way that they handled
15  FDA policies and procedures inside of their
16  Milwaukee --
17  EXAMINATION BY MR. KUPPERMAN:
18     Q.  Okay.
19     A.  -- facility, the letter from IBM --
20  excuse me, from the FDA to IBM warning them
21  about that, um -- and the FDA recall that had
22  actually occurred, um -- if they would have
23  warned me of that, those were their historical
24  results in regard to the FDA.
25     Q.  If, in fact, the version that you

Page 206

1  received had none of those problems that you're
2  referring to --
3      A.  Uh-huh.
4      Q.  -- then, um -- you wouldn't have had a
5  problem with the Merge software, the historical
6  results, it wouldn't have mattered to you.
7  Right?
8          MR. STEWART:
9             Object to form.
10         MR. KUPPERMAN:
11             Yeah.  That's a fair objection,
12         since there are a confusing number of
13         questions in there.
14  EXAMINATION BY MR. KUPPERMAN:
15     Q.  Let me ask it this way:  If, in fact,
16  the version of the LIS software that Trinity
17  received did not have any of the issues or
18  problems that you just pointed out as
19  historical results, then you would have been
20  fine with the, um -- software; correct?
21         MR. STEWART:
22             Object to form.
23             But you can answer.
24     A.  Um -- if Merge's software did not have
25  a duplicate container, actually reported QC,

Page 207

1  had audit logs, didn't have a major security
2  risk, didn't risk patient safety, if it was
3  actually the software that they told us they
4  were, that they market and that they sold us
5  on, I would have had no problems and would have
6  ran a successful laboratory.
7  EXAMINATION BY MR. KUPPERMAN:
8      Q.  Okay.  Now what you're talking about,
9  though, is software's historical results, and
10  you pegged that as a letter from the FDA to IBM
11  with regard the problems at the Milwaukee
12  plant.  Do you recall that?
13     A.  Yes.
14     Q.  Okay.  So if the version that you got
15  had solved whatever the issues were at the
16  Milwaukee plant such that that FDA letter had
17  been satisfied, then am I correct that the
18  historical results would not have mattered to
19  you?
20         MR. STEWART:
21             I'm gonna object.  That's a
22         mischaracterization of his testimony.
23         He gave you three independent
24         historical results.
25  EXAMINATION BY MR. KUPPERMAN:

Page 208

1      Q.  Okay.  Can you go ahead and answer my
2  question?
3      A.  Um -- the reputation that we were
4  presented and the reputation that existed were
5  different.  And so I do not believe that if
6  Merge would have told me of their problems with
7  the FDA -- right? -- regardless of how the
8  software acted, we would be L.I.M.S. XYZ
9  customer today.
10     Q.  Okay.
11     A.  Which is who Pathway uses now.
12     Q.  Okay.  Now, was Trinity, Performance,
13  Prestige President licensed or approved by the
14  FDA?
15     A.  No, sir.
16     Q.  Okay.  None of them.
17     A.  No, sir.
18     Q.  Okay.  So FDA approval of a lab was
19  inconsequential to running that lab.  Correct?
20         MR. STEWART:
21             Object to form.
22     A.  Um -- I don't know if inconsequential
23  is the right term.  But they're not the
24  governing body over -- over that particular
25  type of laboratory.

EXHIBIT A

Page 209

1    EXAMINATION BY MR. KUPPERMAN:
2        Q.  You didn't need an FDA approval to run
3    a lab; correct?
4        A.  That's -- that's correct.
5        Q.  You had to comply with CMS and its
6    rules and regulations; correct?
7        A.  That's correct.
8        Q.  Okay.  All right.
9        A.  Actually, there are certain FDA rules
10   that you do have to comply with when you're
11   running a laboratory.  But CMS is still the
12   governing body of us.
13       Q.  Okay.  And did you comply with
14   whatever those FDA rules are?
15       A.  To the best of my understanding, we
16   did.
17       Q.  Okay.  And that was with or without
18   the Merge LIS.  Right?
19       A.  I believe so.
20       Q.  Okay.  What kind of car do you drive?
21           MR. STEWART:
22               Object to relevance.
23       A.  What kind of car do I drive?
24   EXAMINATION BY MR. KUPPERMAN:
25       Q.  Yeah.

Page 210

1        A.  I drove.
2            MR. BURGE:
3                Where's that in your list of
4            topics?
5            MR. KUPPERMAN:
6                I'm just asking.
7            MR. BURGE:
8                Where is it in your list of
9            topics?
10   EXAMINATION BY MR. KUPPERMAN:
11       Q.  Can you tell me?
12           MR. BURGE:
13               Objection.  It's not in your list
14           of topics.
15       A.  A 2013, um -- Lexus SUV.  A white one.
16   EXAMINATION BY MR. KUPPERMAN:
17       Q.  Lexus SUV ever been recalled before
18   you bought it?
19       A.  Um --
20       Q.  Has there ever been a recall for
21   Lexus?
22           MR. BURGE:
23               Object.
24           MR. STEWART:
25               Object.

Page 211

1        A.  I don't know.
2    EXAMINATION BY MR. KUPPERMAN:
3        Q.  Was it important to you whether there
4    was a recall or not before you bought your car?
5            MR. STEWART:
6                Object.
7        A.  It was important for me not to buy a
8    Toyota.
9    EXAMINATION BY MR. KUPPERMAN:
10       Q.  Uh-huh.
11       A.  But as far as for the brand of Lexus,
12   I'm okay with it.
13       Q.  Okay.  So it didn't matter to you if
14   it had been recalled before.
15           MR. STEWART:
16               Object.
17   EXAMINATION BY MR. KUPPERMAN:
18       Q.  If there had been a recall --
19       A.  It does -- yeah, it absolutely -- it
20   absolutely does.
21       Q.  What did you do to check to see if
22   there had been a recall on our Lexus?
23       A.  CARFAX.
24       Q.  Okay.  And does that always report
25   recalls?

Page 212

1            MR. STEWART:
2                Object.
3        A.  Are we talking about -- um -- to the
4    best of my knowledge, um -- Kelly Blue Book,
5    CARFAX, my father is a used car dealer, um -- a
6    salesman, and, um -- I got -- I have a safe car
7    that has a great safety rating.
8    EXAMINATION BY MR. KUPPERMAN:
9        Q.  Right.
10       A.  Because I have a 2-1/2-year-old girl
11   and I didn't want to put her at risk, and I
12   feel like this car is a safe car for her.  I
13   also have a -- a van.
14       Q.  Yeah, I understand.  My only question
15   is --
16       A.  A van.  They have transmission
17   problems.
18           MR. STEWART:
19               Steve, you asked the question,
20           he's answering.  I mean, if you're
21           gonna ask, you gotta give him a chance
22           to get his entire answer out.
23   EXAMINATION BY MR. KUPPERMAN:
24       Q.  You have a Toyota van you said?
25       A.  No.  I don't.  I have a Honda.

EXHIBIT A

Page 213

1    Q.  Oh, a Honda van.
2    A.  Uh-huh.
3    Q.  Honda ever been recalled?
4    A.  Um --
5        MR. STEWART:
6            Object.
7            To the extent you know, you can
8    answer the question.
9    A.  To the extent that I know, my -- my
10   Honda brand that I have has not been recalled.
11   EXAMINATION BY MR. KUPPERMAN:
12   Q.  How about an Honda brand, or any Lexus
13   brand?
14   A.  I -- I do not know.
15       MR. STEWART:
16           Object.
17           To the extent --
18   EXAMINATION BY MR. KUPPERMAN:
19   Q.  Okay.  You did not ask before buying;
20   right?  Is that correct?
21   A.  Um -- I, um -- I did Google research
22   before buying those cars.
23   Q.  Uh-huh.  Did you ask anybody if they
24   had been recalled?  That's my question.
25   A.  I did not.

Page 214

1    Q.  Okay.  And you didn't ask because that
2    wasn't important to you.  Correct?
3        MR. STEWART:
4            Object to form, and to relevance,
5            and because it's outside of the scope
6            of the 30(b)(6) notice.
7    A.  Um -- it is important to know.
8    EXAMINATION BY MR. KUPPERMAN:
9    Q.  But you never asked.
10   A.  I will now.
11   Q.  Okay.  All right.  Now, um -- you say
12   in Paragraph 62 that Merge falsely touted its
13   LIS software as a reliable, accurate, secure,
14   and safe toxicology laboratory operating
15   system.
16       Do you see that?
17   A.  Yes.
18   Q.  Is that just another way, really, of
19   saying that Merge said its software was free of
20   major defects?
21       MR. STEWART:
22           Object to form.
23   A.  Um -- it is another way of saying --
24   yeah, it's actually the exact way of saying its
25   reliable, accurate, and -- and safe

Page 215

1    toxicology laboratory software.  It says what
2    it says.
3    EXAMINATION BY MR. KUPPERMAN:
4    Q.  Okay.  And I see what it says.  But my
5    question to you is, um -- is that what you
6    meant when you put down those words?  Or when
7    your counsel put those words, is that how you
8    understood it?
9    A.  I -- yes.
10   Q.  Okay.  So basically, it was another
11   way of saying that the Merge software was free
12   from major defects.
13   A.  There's no basic, otherwise we would
14   have put it in there.  That's what it says.
15   That's what it says.
16   Q.  Okay.  So if there aren't any major
17   defects, then that would not be a
18   misrepresentation.  Correct?
19       MR. STEWART:
20           Object.  I'm just not sure I
21           understand the question, Steve.
22   A.  You're asking me if there's not major
23   defects then it would not be a
24   misrepresentation.
25   EXAMINATION BY MR. KUPPERMAN:

Page 216

1    Q.  Yeah.  What you've said here is that
2    Merge misrepresented that the software was
3    reliable, accurate, secure, and safe --
4    A.  Uh-huh.
5    Q.  -- and that that is another way of
6    saying that it was free from material defects.
7        And my question to you simply is, so
8    if there weren't any material defects, then
9    it's not a misrepresentation.  Right?
10   A.  That would be correct.
11   Q.  Okay.
12   A.  Thank you.
13   Q.  Okay.  When did Trinity first
14   experience the duplicate container defect?  And
15   by experience, I mean did it actually impact
16   something Trinity was doing?
17   A.  Um -- we -- there is an e-mail that --
18   that is -- is between either Shea or Michelle
19   explaining to us what they found.  Um -- I
20   don't remember the exact date.  I believe -- my
21   instincts right now tell me that it happened in
22   Pathway first, um -- as they were, um -- they
23   had live patient samples there.
24   Q.  Um -- do you remember approximately
25   when that was?

EXHIBIT A

Page 217

1      A.  Um -- August -- no earlier than
2    August 2016, in my mind.  Approximately
3    somewhere between August and, um -- August and
4    maybe, um -- before October.
5      Q.  Okay.  And what impact did that have
6    on Trinity?
7      A.  It -- one of the things was when we --
8    when we -- when we found that, it was a
9    surprise to us, um -- because it was a flaw in
10   this -- in the software.  Um -- and so it took
11   us a while for us to, um -- to understand the
12   problem.  And we tested it, and we talked about
13   it amongst ourselves, tried to figure out how
14   this thing actually happened.  We were
15   really -- really concerned with this possibly
16   causing an anti-kickback -- excuse me, not
17   anti-kickback -- a False Claims Act type of
18   scenario where you're doing double billing.
19   And so internally, we just put some safeguards
20   around it, made sure that it wasn't going to,
21   um -- be a major problem for us.  Um --
22        I mean, that's kind of -- that was the
23   temperature in the room whenever we -- whenever
24   we found it.
25     Q.  And did you put in safeguards so it

Page 218

1    wasn't a problem for you?
2      A.  Um -- I believe that the laboratory at
3    Pathway did do that, yes.
4      Q.  Okay.  And when did it do that?
5      A.  Uh -- I can't tell you with
6    specificity, Steve.
7      Q.  It was sometime between August and
8    October of 2016?
9      A.  I believe so.
10     Q.  So it never did impact any
11   confirmatory testing.  Correct?
12     A.  I can't state that.
13     Q.  Okay.  Well, you don't know of any
14   confirmatory testing --
15     A.  I don't know.
16     Q.  -- that it impacted; correct?
17     A.  Not to talk over you.  I'm sorry.
18        No, I do not know of any.  Not at
19   Pathway.
20     Q.  Well, but I'm talking Trinity.
21     A.  Trinity.  No.
22     Q.  No impact on Trinity.
23     A.  No impact.
24     Q.  The duplicate container defect had no
25   impact on Trinity.

Page 219

1      A.  No.  We weren't --
2      MR. STEWART:
3          Object to the form.  It seems
4      like you guys are talking about two
5      different things.  You asked about
6      confirmatory --
7      MR. KUPPERMAN:
8          Why don't you let me ask it.
9      MR. STEWART:
10         Okay.
11   EXAMINATION BY MR. KUPPERMAN:
12     Q.  Did the duplicate container defect,
13   the one you allege, have any impact on Trinity?
14     A.  No.
15     Q.  Okay.  In fact did -- all of the
16   defects that you allege in the Second Amended
17   Complaint, did any of them actually have an
18   impact on Trinity?
19     A.  Yes.
20     Q.  Okay.  Which ones?
21     A.  Um -- all of them destroyed my
22   business.  They did not allow us to be able to
23   operate a laboratory.
24     Q.  All right.  I'll backup and get to it
25   more particularly later.

Page 220

1      A.  Okay.
2      Q.  Were there any occasions in which
3    Trinity was precluded from receiving,
4    processing, or tracking individual specimen
5    containers?
6      MR. STEWART:
7          Object to the form.
8      A.  Can you repeat the question?
9    EXAMINATION BY MR. KUPPERMAN:
10     Q.  I can try.  Let me ask it this way:
11   Were there any occasions in which Trinity was
12   precluded from receiving individual specimen
13   containers?
14     A.  Are you speaking about duplicate
15   containers or actual spec -- like cups,
16   tubes -- what are you --
17     Q.  I'm talking about -- let's talk about
18   duplicate containers for now.
19     A.  Okay.  So --
20     Q.  Any occasions on which a duplicate
21   container defect precluded the receipt of
22   individual specimen containers?
23     A.  Precluded the receipt?
24     Q.  Yes.
25     A.  The receipt being like the --

EXHIBIT A

Page 221

1    Q.   Receiving the containers.
2    A.   The containers from, like, the mail?
3    Q.   (Nods affirmatively.)
4    A.   Right?  Um -- you're not asking a
5  question that makes sense.
6    Q.   Okay.
7    A.   And I'm not saying it because of the
8  way you're saying it; it's that that's not --
9  that wasn't the issue.
10        The containers, like the way that the
11  specimens -- Steve, this is just -- the way
12  that the specimens actually come to us, in
13  cups, that's -- the duplicate container
14  reference is more of a software database
15  reference.  It is not a we couldn't get
16  specimens in the mail.
17    Q.   I understand.  Look, if you will, at
18  Paragraph 64 of your Second Amended Complaint.
19    A.   Uh-huh.
20    Q.   Okay?  Do you see the first bullet
21  point there?  It talks about Ms. Powell made
22  specific material misrepresentations, and one
23  of them is the software makes it possible to
24  accurately and seamlessly receive individual
25  specimen containers.

Page 222

1        Do you see that?
2    A.   Uh-huh.
3    Q.   I'm trying to find out from you, how
4  is it a misrepresentation; in other words --
5  let me ask it this way:  The software, in fact,
6  did not make it difficult or impossible to
7  accurately receive individual specimens.
8  Correct?
9        MR. STEWART:
10            Object to the form.  The sentence
11        says, receive, process and track
12        individual specimen containers.
13        You're breaking out a part of --
14        MR. KUPPERMAN:
15            I am.  And the reason I'm doing
16        that is 'cause you objected to the
17        question when I read them all
18        together.  So I'm happy to take 'em
19        all together if you would like.
20  EXAMINATION BY MR. KUPPERMAN:
21    Q.   How does it make it impossible to
22  accurately and seamlessly receive, process, and
23  tract individual specimen containers?
24    A.   If I -- if you send me one
25  container --

Page 223

1    Q.   Yes.
2    A.   -- and then once I receive that
3  container it turns into two containers --
4    Q.   Yes.
5    A.   -- it makes it impossible for me to
6  seamlessly track, receive, or process.
7    Q.   Okay.
8    A.   Because seamless; not seamless.
9  (Indicating.)  One becomes two.
10    Q.   Okay.
11    A.   Not seamless.
12    Q.   All right.
13    A.   One becomes two.
14    Q.   And you told me previously that the
15  duplicate container defect did not impact
16  Trinity.  Correct?
17    A.   Did not -- we would not -- I told you
18  no.
19    Q.   Okay.
20    A.   The answer to your question is I did
21  tell you no.
22    Q.   Okay.  And in fact, you had figured
23  out a way to solve the duplicate container
24  defect by October of 2016.  Correct?
25    A.   There was no solving it.

Page 224

1    Q.   Work around it.
2    A.   Merge's words that we ended up using
3  as our own.
4    Q.   Okay.
5    A.   A known workaround --
6    Q.   Okay.
7    A.   -- to the duplicate container issue
8  that was recalled, that was supposedly fixed in
9  the software version that we had.
10    Q.   Uh-huh.  So you figured out a way of
11  avoiding any problems with the duplicate
12  container defect by October of 2016.  Correct?
13        MR. STEWART:
14            Object to form.
15    A.   Um -- we --
16  EXAMINATION BY MR. KUPPERMAN:
17    Q.   And by you I mean Trinity.
18    A.   Sure.  By Trinity.  Trinity --
19  Trinity, Prestige Worldwide, Performance Labs,
20  all, developed a manageable process for this
21  particular issue in early October, yeah.
22    Q.   Okay.  Of 2016.
23    A.   Of 2016.
24    Q.   Okay.  And the, um -- solution to the
25  duplicate container defect problem --

56 (Pages 221 to 224)

EXHIBIT A

Page 225

1    A.  Uh-huh.
2    Q.  -- that you've been talking about was
3  simply a change in the lab's process?
4    A.  Um -- I can't tell you with
5  specificity exactly what it was.
6    Q.  It was not a, um -- software
7  workaround, the lab simply changed the
8  procedure that it was using to test, and that
9  solved the problem?
10    A.  We put full-time people watching it.
11    Q.  Uh-huh.
12    A.  So that way we can -- we can make sure
13  that we didn't misreport because of Merge's
14  flaws.
15    Q.  Right.  But where I'm getting at,
16  though, is that you didn't have a problem
17  because you figured out a workaround that was
18  simply a change in the laboratory's process.
19    MR. STEWART:
20        Object to form.
21  EXAMINATION BY MR. KUPPERMAN:
22    Q.  The procedure.
23    A.  We changed a process to manage Merge's
24  risk.
25    Q.  Okay.  And the process that we're

Page 226

1  talking about is something that is contained in
2  manuals that are procedure manuals?
3    A.  Should be, yes.
4    Q.  Okay.  Now, the second bullet point on
5  64 talks about the software tracking manual
6  adjustments to patient testing in an audit log?
7  Do you see that?
8    A.  Sorry.  I moved my microphone.  The
9  second bullet point?
10    Q.  Yes.
11    A.  Yes.
12    Q.  Okay.  And that is a reference to what
13  you've referred to as the audit tracking
14  defect?  Is that correct?
15    A.  That's correct.
16    Q.  Okay.  And so if there is no audit
17  tracking defect, then there's no
18  misrepresentation.  Right?
19    A.  If -- sure.
20    Q.  Okay.  Um -- then if I flip the page,
21  it says, the software allows users to
22  accurately establish lab-specific assay control
23  ranges.  Um -- that is a reference to what you
24  term the back-dating defect; is that correct?
25    A.  What number?

Page 227

1    MR. STEWART:
2        I think you're referring to the
3  first full bullet point on Page 20?
4    MR. KUPPERMAN:
5        I am.
6    A.  The LIS software allows users to
7  accurately establish laboratory-specific assay
8  control ranges.  This a misrepresentation in
9  light of the back-dating defect.
10    Q.  Right.  Okay.
11    A.  (Nods affirmatively.)
12    Q.  And tell me what that means when you
13  say establish lab-specific assay control
14  ranges.
15    A.  Um -- do you remember when we were
16  talking about QC?
17    Q.  Yes, sir.
18    A.  That's it.
19    Q.  What are assay control ranges?
20    A.  Um -- assay is -- you develop an assay
21  to be able to determine, um -- the molecular
22  makeup of some type of thing that you're trying
23  to diagnose.  You can have an assay to
24  determine if olive oil is extra virgin or not.
25  Uh -- you can have an assay to determine how

Page 228

1  much aluminum is in the water.
2        Um -- our assays were to determine the
3  amount of pharmaceutical concentrations in
4  patients' urine or fluids.  So the term assay,
5  here, is the -- that test that has been
6  developed to be able to do that.
7        Control ranges goes back to what we
8  talked about, QC setting ranges.  So each one
9  of the tests, the control range for, um --
10  neuro hydromorphone is going to be different
11  than the QC range for, um -- the THC.  It'll
12  will different.
13        So you'll have -- each test has got a
14  different control range.  So if you're running
15  a panel that has 88 assays on it, then you have
16  88 individual control ranges.
17    Q.  And the control ranges were to be
18  set -- they were lab specific; right?
19    A.  Uh -- they're -- yes.
20    Q.  Each lab might be different.
21    A.  Absolutely.
22    Q.  Okay.  And that, um -- control ranges
23  were to be set by the lab personnel.
24    A.  Correct.  To be more specific, not
25  only are hey lab specific, they could be

EXHIBIT A

Page 229

1  equipment specific, brand of equipment
2  specific.  The wattage of the wall could change
3  the range on that particular piece of
4  equipment.
5      Q.  Okay.  Now, that problem --
6      A.  This problem makes every single test
7  that you report, um -- unbillable.  Not
8  compliant.
9      Q.  Now --
10     A.  Unreliable.  Sorry.
11         MR. STEWART:
12            Gentlemen, you've been talking
13         over each other a lot.  You've each
14         been interrupting each other.  Please
15         give each other a chance.
16     A.  Sorry.
17  EXAMINATION BY MR. KUPPERMAN:
18     Q.  How many manual adjustments to
19  toxicology testing ranges were there?
20     A.  How many manual adjustments.
21     Q.  Yes, sir.
22     A.  Are you back here?
23     Q.  No, I'm just asking the question.
24     A.  Um -- the -- the -- in Merge's system,
25  as I understand it, the manual defect, the

Page 230

1  manual backlog defect would happen, kind of
2  like the software would misreport the QC ranges
3  and the dates on its own.  So I can't -- I
4  can't calculate how many manual adjustments
5  there would be.
6      Q.  Okay.  Well, let me ask this:  If you
7  look at the second bullet point, for example --
8      A.  Uh-huh.
9          MR. STEWART:
10            What page are you on, Steve?
11         MR. KUPPERMAN:
12            19.
13  EXAMINATION BY MR. KUPPERMAN:
14     Q.  It talks about the software tracking
15  users manual adjustments.
16         Do you see that?
17     A.  Yes.
18     Q.  I'm just trying to find out how many
19  manual adjustments were there by users?
20     A.  Um -- there's -- there's no way for me
21  to give you an answer on that.
22     Q.  Yeah.  Could be a lot, it could be
23  very little.  Right?
24     A.  That's right.
25     Q.  Okay.  It could be none, could be

Page 231

1  thousands.  Right?
2      A.  I don't think it will ever be none.
3      Q.  It could be one, it could be
4  thousands.
5      A.  Yeah.  One could kill somebody.
6      Q.  Okay.  I'm not asking you what it
7  could do; I'm asking how many there actually
8  were.  And the answer is, you don't have any
9  idea.
10     A.  Correct.
11     Q.  Okay.  You'll agree with me, though,
12  that if there were no manual adjustments, then
13  there would be no problem.  Correct?
14         MR. STEWART:
15            Object to form.
16     A.  Incorrect.
17  EXAMINATION BY MR. KUPPERMAN:
18     Q.  Okay.  So --
19     A.  Like, it couldn't be more incorrect.
20     Q.  So the software automatically tracking
21  users manual adjustments, you're saying it
22  didn't matter whether it was manual or not?
23     A.  What I'm saying is is the ability for
24  somebody to be able to manually adjust data and
25  there not be an audit log of it is -- is no

Page 232

1  bueno.
2      Q.  Okay.  All right.  We -- we'll get
3  back to the audit log.  But forget about the
4  audit log.  Assume there's an audit log.  The
5  fact that -- you're only complaining about
6  manual adjustments; correct?
7          MR. STEWART:
8             Object to form.  And I think
9          that's a misrepresentation of his
10         testimony.
11         MR. KUPPERMAN:
12             I don't.
13  EXAMINATION BY MR. KUPPERMAN:
14     Q.  I'm asking right here.  I'm looking at
15  this, and it says that one of the
16  misrepresentations is that the software
17  automatically tracks users manual adjustments.
18  So you're not complaining about automatic
19  adjustments, it's just manual user adjustments.
20  Is that correct?
21         MR. STEWART:
22             Object to form.
23     A.  I would agree with what you just said.
24  EXAMINATION BY MR. KUPPERMAN:
25     Q.  Okay.  And the next one also is

58 (Pages 229 to 232)

EXHIBIT A

Page 233

1  producing an audit report identifying manual
2  adjustments.
3       So there's no problem with automatic
4  adjustments, or none adjustments, it's only
5  manual adjustments.
6       MR. STEWART:
7            Steve, I object.  In the context
8       of this specific allegation which
9       discusses a specific conversation that
10      is specifically recorded, these are
11      the misrepresentations that are made.
12           You can't make the generalized
13      statement that he's not also
14      complaining about other
15      misrepresentations that were made over
16      time.  So if we're talking about.
17      MR. KUPPERMAN:
18           I'm --
19      MR. STEWART:
20           -- this specific conversation --
21      MR. KUPPERMAN:
22           I think --
23      MR. STEWART:
24           -- I think your question is fair.
25      MR. KUPPERMAN:

Page 234

1            I think you're missing --
2       MR. STEWART:
3            If you're talking about all the
4       conversations that occurred over time,
5       then please just specify what you're
6       talking about.
7       MR. KUPPERMAN:
8            I have been specifying.  And I
9       think you're misunderstanding the
10      question.
11 EXAMINATION BY MR. KUPPERMAN:
12      Q.  Can you answer?
13      A.  Okay.  So what I hear you say was, if
14 automatic adjustments were made --
15      Q.  Let me --
16      A.  -- then I would have --
17      Q.  Let me -- if there's not a manual
18 adjustment --
19      A.  Okay.
20      Q.  -- then there is no problem with the
21 audit log, or audit -- lack of audit tracking
22 defect.
23      A.  Incorrect.
24      Q.  Okay.
25      A.  There is a problem.

Page 235

1       Q.  Okay.
2       A.  Okay.  I'll explain.  If the
3  information that is calculated by Merge is
4  incorrect -- all right? -- it's incorrect, then
5  we will always have a problem with there not
6  being an audit log.
7       Q.  Okay.
8       A.  So for the automatic.
9       Q.  Okay.  If it's incorrect.
10      A.  If it's incorrect.
11      Q.  Okay.  All right.  Who was your lab
12 director?  You mentioned the lab director.  Who
13 was that?
14      A.  At what time period?
15      Q.  Tell me who all your lab directors
16 were and what time.
17      A.  Um -- Jason Gregario was a start-up.
18      Q.  Who came after Mr. Gregario?
19      A.  Um -- I believe it was Trey Martin
20 then.  Oh, no.  Dr. James Bourland.
21      THE REPORTER:
22           Borlin?
23      THE WITNESS:
24           Bourland.  B-O-U-R-L-A-N-D.
25 EXAMINATION BY MR. KUPPERMAN:

Page 236

1       Q.  Then who?
2       A.  Then Dr. Trey Martin.
3       Q.  Then who?
4       A.  That's it.
5       Q.  Okay.  When was Jason Gregario?
6       A.  From the beginning until we hired a
7  full-time laboratory director, which was
8  Dr. Bourland.
9       Q.  Okay.
10      A.  And that was -- I don't remember his
11 hire date.  I don't.  Um --
12      Q.  How long was he there in that
13 capacity?
14      A.  About a year.
15      Q.  Okay.  And was he there full-time?
16      A.  Yeah.  He was full-time.
17      Q.  Okay.  And whe did Mr -- Dr. Martin
18 become the lab director?
19      A.  I think around October 2015.
20      Q.  Okay.  So it was Dr. Martin who was
21 the lab director at the time CMS shut down the
22 lab.
23      A.  Dr. Bourland was there for the
24 inspection in June, and then we had, um -- so
25 from June until, I don't know, man, it was

EXHIBIT A

Page 237

1  probably like 90 days where it was -- it was
2  hard conversations back and forth, and we
3  couldn't figure out -- he couldn't figure out
4  what to do, so we brought in -- brought in a
5  hired gun Trey Martin.
6      Q.  And Dr. Martin remained as your lab
7  director until --
8      A.  Yes.
9      Q.  -- 2017 when it ceased operating.
10     A.  Yes, sir.
11     Q.  Okay.  Um -- all right.  Let me ask
12 you to look at Paragraph 65.
13     A.  Okay.
14     Q.  And this purports to describe the
15 misrepresentations made before Trinity executed
16 the sales order.  Correct?
17     A.  Yeah.  The sales order was executed in
18 what, January 4th, 2016?  So all these dates
19 are before that.
20     Q.  Okay.  And, um -- there are four
21 bullet points.  One is just kind of a catchall
22 at the bottom.  But, um -- are the three bullet
23 points that are listed there all of the
24 misrepresentations made prior to execution of
25 the sales order?

Page 238

1      A.  Yes.
2      Q.  Okay.
3      A.  You said, were they all, or are these
4  all?
5      Q.  Are these all of the
6  misrepresentations that were made prior to
7  execution of the sales order?  The first three
8  bullet points in Paragraph 65.
9      A.  No.  There were more.
10     Q.  Okay.  Tell me what they were.
11     A.  Um -- there are thousands of e-mails
12 and documents that I -- I've reviewed.  I
13 can't -- I can't tell you, uh -- specifically,
14 right now, um -- with -- with great detail.  I
15 can tell you, though, that that last bullet
16 point is true.
17     Q.  Uh-huh.  Well, I'm trying to find out,
18 because I think I entitled to learn from
19 Trinity all of the misrepresentations that it
20 claims were made to it.  So we have three of
21 them here.
22     A.  Uh-huh.
23     Q.  I'd like to know all of the others.
24     A.  Okay.  Um -- would you like for me to
25 produce those for you at later time.

Page 239

1      Q.  No.  I'd like you to tell me right
2  now.  That's what you were supposed to be
3  prepared to discuss, among other things.
4      A.  Okay.  Um -- previous.  Ron Poe.
5  Um -- I can't tell you right now.
6      Q.  Okay.  So as far as you're -- as far
7  as Trinity is concerned, these are the only
8  three that were told to it prior to, uh --
9  signing the sales order that you can talk
10 about.
11     A.  No.
12         MR. STEWART:
13             Object.  Steve, is your question
14         that these three bullet points
15         describe misrepresentations, or that
16         within these three bullet points there
17         are only three misrepresentations?
18         Because I'm counting more.
19 EXAMINATION BY MR. KUPPERMAN:
20     Q.  Three bullet points contain all of the
21 misrepresentations that were made prior to
22 execution of the sales order.
23         MR. STEWART:
24             You may answer if you know.
25     A.  I know that there are more.  I just

Page 240

1  can't think of them in this moment right now.
2  EXAMINATION BY MR. KUPPERMAN:
3      Q.  Okay.  Um -- you understood you were
4  supposed to come here today prepared to answer
5  all questions with regard to the
6  misrepresentations made to or allegedly made to
7  Trinity.  Correct?
8      A.  Yes.  I answered your question.
9      Q.  Okay.  And you did come prepared to
10 answer those questions.  Right?
11     A.  I came as prepared as I possibly could
12 be.
13     Q.  Okay.  And these are the only three --
14 these three bullet points are the only ones you
15 are aware of or can think of now.  Correct?
16     A.  Correct.
17     Q.  Okay.  Tell me -- each one of these
18 three bullet points talks about a specific
19 conversation on or around certain dates.  Do
20 you see that?
21     A.  Uh-huh.
22     Q.  Were all of those conversations
23 recorded?
24     A.  I don't know.
25     Q.  Do you know if any were recorded?

EXHIBIT A

Page 241

1    A.  Um -- I don't know.
2    Q.  Okay.  Does Trinity have a recording
3  for any of them?
4    A.  Um -- the one that I know that I've
5  listened to is, um -- the one that we did after
6  the install.
7    Q.  Okay.
8    A.  Um -- so the answer is I don't know.
9    Q.  Okay.  Tell me -- the third bullet
10  point there just says that there was a second
11  web demo.  Can you tell me precisely what
12  misrepresentations were made at that demo on or
13  around December 28, 2015?
14    A.  Cannot tell you precisely.
15    Q.  How about imprecisely?  Generally.
16    A.  I can't tell you imprecisely or
17  precisely.
18    Q.  Okay.  Now, in the first bullet point
19  you quote Mr. Poe as saying, we don't use a
20  cookie-cutter approach, each system is
21  configured specific to the customer's needs,
22  and the software is capable of handling all the
23  different lab disciplines.  Correct?
24    A.  Correct.
25    Q.  Okay.  What did you understand him to

Page 242

1  mean when he said the system is capable of
2  handling all the different lab disciplines?
3    A.  Um -- we were -- he'd written an
4  e-mail to Rick Ornelas that was similar to that
5  too, capable of handling all the different lab
6  display.  This was in regards to, uh -- CVDL in
7  California, which is a laboratory that we
8  were -- had a purchase agreement on and we were
9  managing.  Um -- they had different disciplines
10  besides toxicology.  So they had basic
11  chemistry, they had microbiology, different
12  disciplines of laboratory science.
13    Q.  Okay.  And that was for use only at
14  CVDL?
15    A.  That's correct.
16    Q.  You never bought CVDL, did you?
17    A.  No, sir.
18    Q.  You never put the Merge system to work
19  at CVDL, did you?
20    A.  No, sir.
21    Q.  Okay.
22    A.  We, um -- we took the CVDL plan and we
23  put it at Pathway.
24    Q.  And that was sometime after you had
25  signed the purchase order?

Page 243

1    A.  Yes.
2    Q.  Okay.  What -- okay, what lab
3  disciplines was Merge not capable of handling?
4    A.  Well, all of them?
5    Q.  It couldn't handle any of them.
6    A.  Not if you misreport data, and QC, and
7  can't validate or verify your equipment.
8    Q.  Okay.  Do you recall the exact date
9  when the software went live at Trinity?  Or
10  wherever it was used?
11    A.  At Performance Labs?  Software went
12  live.  There was an install date, and then
13  there was a live date.  I've seen -- I mean
14  we've seen e-mails with those specific dates.
15  Off the top of my head, I can't -- they're
16  running together right now, Steve.
17    Q.  Okay.
18    MR. STEWART:
19       How we doing, Steve?  You want to
20       take a break pretty soon?
21    MR. KUPPERMAN:
22       I can take a break soon if you'd
23       like.  You want to do it now?  All
24       right.  Let's take five minutes.
25    THE VIDEOGRAPHER:

Page 244

1       We're going off the record.  The
2    time now is 2:22.
3       (Brief recess.)
4    THE VIDEOGRAPHER:
5       We are back on the record.  The
6    time is 2:30.
7  EXAMINATION BY MR. KUPPERMAN:
8    Q.  Who is Kris Franklin?
9    A.  Kris Franklin was, um -- a member of
10  Lite.  And he was -- used to be a member of
11  Lite, and he was, um -- a technical supervisor
12  at Performance Labs from, like, November 2015
13  until probably maybe, I don't know, January or
14  July of 20 and, um -- '16.
15    Q.  Um -- where is he today?
16    A.  Um -- I believe, based on LinkedIn,
17  he's in -- he's in Mandeville.  He may even run
18  and own a laboratory hisself now.
19    Q.  Okay.  Can tell me what FDA
20  regulations you believe Merge software
21  violated, or was noncompliant with?
22    A.  Noncompliant with?  Um -- the
23  misreporting the calculations of, um -- patient
24  samples.  There is an internal calculator
25  process that did not balance out math

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                    April 10, 2019

Page 245

1  correctly.  Um -- the way that it calculated
2  the math, if you had a, um -- let's just make
3  it simple.  If you had 1 -- if the numbers that
4  you needed to have were 1, 3, 3, 3, 7, 9, 9,
5  what it does is is it actually can't -- as I
6  understand it, it calculates these 3s just one
7  time, and it calculates these 9s just one time.
8  And so it doesn't do the math correctly.  Um --
9       Q.  And that --
10      A.  That would --
11      Q.  That's an FDA regulation?
12      A.  It misreports -- it misreports data.
13  It doesn't do what the FDA approved it to do.
14  It actually produces -- the calculator doesn't
15  do math.
16      Q.  I understand.  But I was asking what
17  FDA regulations it's not compliant with.
18      A.  Oh.  I'm not an expert in FDA
19  regulations.
20      Q.  Okay.  You don't know if Trinity --
21  sitting here today's testimony on behalf of
22  Trinity, up cannot tell me any FDA regulation
23  that the Merge software was not compliant with.
24  Is that correct?
25          MR. STEWART:

Page 246

1          Object to the form.  Are you
2       asking for particular CFRs, or --
3          MR. KUPPERMAN:
4          I'm just asking for anything.
5  EXAMINATION BY MR. KUPPERMAN:
6       Q.  You can't tell me, sitting here today,
7  on behalf of Trinity, what FDA regulations
8  Merge was not complying with.
9       A.  I like Jesse's question.  Are you
10  asking the CFR, or are you asking general?
11      Q.  I'm asking for any way you can give me
12  the answer.
13      A.  Okay.  So, uh -- the calculator
14  processor.
15      Q.  Okay.  That's an FDA reg?
16      A.  Uh -- yes.
17      Q.  You think?
18      A.  Yes.  I do believe take violates a FDA
19  reg.
20      Q.  Okay.
21      A.  All right?
22      Q.  Anything else.
23      A.  Um -- um -- this is my opinion: I
24  can't give you complete certainty on it.  I
25  can't give you complete certainty on it.

Page 247

1       Q.  Just give me the --
2       A.  I can give you the company's opinion.
3  You want the company's opinion?
4       Q.  Are you talking about the same FDA
5  regulation?
6       A.  I'm talking about just in general with
7  what I'm about to rattle off the top of my
8  head.
9       Q.  Okay.  Go ahead.
10      A.  Yeah.  Um -- the, um -- I believe the
11  QC, the misreporting of the QC, is a violation
12  of some FDA reg; um -- I believe the audit
13  logs, or not having to ability to audit, is a
14  violation of some FDA regs; um -- I believe
15  that the data breach, um -- could also be a
16  violation of the FDA reg; um -- the ability to
17  be able to manipulate the data, uh -- the
18  hierarchy of controls; I believe that the
19  manual that Merge has produced for laboratories
20  to use is incorrect, uh -- and if you use it
21  the way it's intended, it gives you results
22  that are not expected, so I believe that is a
23  violation of an FDA reg.  Those are off the top
24  of my head.
25      Q.  All of those you think are violations

Page 248

1  or regulations.
2       A.  I think.  My opinion.
3       Q.  Okay.  And now you told us you found
4  the duplicate container defect in August of
5  2016, approximately.  Correct?
6       A.  Say that again?
7       Q.  Yes.  You found the duplicate
8  container defect around August of 2016;
9  correct?
10      A.  As far as the date range, somewhere
11  around there.  I believe so.
12      Q.  Okay.  When was that reported by you
13  to Merge?
14      A.  I know for certain in, um -- October.
15  But I believe we started asking them questions.
16  I say I know for certain.  I'd have to look at
17  the e-mails and tell you what I know for
18  certain or not.
19      Q.  Okay.
20      A.  The e-mails exist to be able to verify
21  all of these dates.  The test of my memory as
22  for as the transactions, I had 150 employees,
23  and now it's just me so.
24      Q.  Okay.  Let me show you what I've
25  marked as Exhibit 7.  (Tendering.)  Um -- you

JOHNS, PENDLETON, FAIRBANKS AND FREESE                    504 219-1993

**EXHIBIT A**

Page 249

1  recognize this as a letter sent by your counsel
2  to us?  I just have a couple of quick
3  questions.
4        (Exhibit 7 was marked for
5  identification and is attached hereto.)
6        A.  I don't -- I can't say that I've
7  ever -- I've ever seen this before so.
8  EXAMINATION BY MR. KUPPERMAN:
9        Q.  Okay.  Well, um -- you trust whatever
10  your lawyer said in the letter; right?  As
11  being your position?
12        A.  Yeah.
13        Q.  Okay.  Um -- so if you notice on the
14  front page, they -- the lawyers say that the
15  documents that are the basis of these
16  allegations which are referred to previously up
17  above, are identified by the following Bates
18  numbers, and then he gives us four TRINITY
19  Bates numbers.  Right?
20        A.  I don't know what Bates numbers is.
21        Q.  Bates numbers are those numbers that
22  come after the TRINITY --
23        A.  Okay.
24        Q.  -- like --
25        A.  01575?

Page 250

1        Q.  Right.
2        A.  Correct.
3        Q.  You agree with me on those; right?
4        MR. STEWART:
5            What is the question?
6  EXAMINATION BY MR. KUPPERMAN:
7        Q.  Yeah.  These are the documents that
8  have been represented to us were produced by,
9  um -- Trinity, and these four documents form
10  the basis for the allegations.  Correct?
11        A.  Yes.
12        Q.  Okay.  Now, I'm going to show you four
13  documents which I've marked in globo as 8.
14  (Tendering.)  And I just have some real quick
15  questions for you.
16            The first one is an e-mail at the top
17  from Aurora to Kris, you, Chad and others --
18  Rhett, with a copy to Dr. Martin.  Correct?
19        (Exhibit 8 was marked for
20  identification and is attached hereto.)
21        A.  Correct.
22  EXAMINATION BY MR. KUPPERMAN:
23        Q.  And then there's a response from
24  Michelle Spruill to Kris Franklin.  Right?
25        A.  Uh -- the response.

Page 251

1        Q.  Yeah.  Just at the top.
2        A.  Just see attached?
3        Q.  Yeah.
4        A.  That's what you're asking for?
5        Q.  Yeah.
6        A.  Sure.
7        Q.  Okay.  Nowhere in here is there any
8  misrepresentation by Merge, is there?
9        MR. STEWART:
10            Steve, I'm going to object.  I
11        mean, you've produced -- you've
12        provided him a document that is not
13        from Merge.  The first bullet point
14        here is quoting a document from --
15        quoting a Merge document.  It's in our
16        complaint.  There seems to be a
17        discrepancy between the Bates number
18        and the quote.  But as he said, this
19        is first time he's seeing these.  This
20        was a letter prepared by counsel.
21        MR. KUPPERMAN:
22            Uh-huh.
23        MR. STEWART:
24            We can have a conversation about
25        locating the proper document, but --

Page 252

1        MR. KUPPERMAN:
2            Well, part of he problem is we've
3        been relying on the letter, um -- all
4        this time, and I just want to find
5        out -- you have these things, and I
6        don't see either the quote or the
7        document on here.  I don't see any
8        misrepresentation or omission, and
9        that's what this is supposed to be.  I
10        just want to make sure that I'm
11        reading these correctly.
12  EXAMINATION BY MR. KUPPERMAN:
13        Q.  You don't see any misrepresentation or
14  omission by Merge in this document, do you?
15        MR. STEWART:
16            I think a pretty easy way to
17        clear this up is by writing a letter
18        back to me saying, Hey, Jesse, I don't
19        see this particular quoted language
20        that you have on this letter in this
21        document --
22        MR. KUPPERMAN:
23            Yeah.  Can I just ask my
24        question?
25        MR. STEWART:

EXHIBIT A

Page 253

1         You can answer the question.
2    A.   Yeah.  This is a, um --
3    EXAMINATION BY MR. KUPPERMAN:
4    Q.   You don't see a misrepresentation by
5    Merge in there, do you?
6    A.   I don't see Merge at all in here.
7    Q.   Okay.  The next document which bears
8    Bates No. 157543, um -- and it's just this one
9    page.
10   A.   This right here?
11   Q.   No misrepresentation by Merge.
12   A.   I don't know.  I'd have to think about
13   it.
14        Can you ask the question again?
15   Q.   No misrepresentation; right?
16   A.   No.
17        MR. STEWART:
18           Same objection.
19   EXAMINATION BY MR. KUPPERMAN:
20   Q.   Same thing with the next document,
21   TRINITY 229769, which goes through 229777,
22   contains that?
23        If you look at 229777, there's no
24   misrepresentation there.  Correct?
25   A.   I don't see it.  I'm sorry.  I don't

Page 254

1    have it.
2    Q.   It's in this.
3    A.   Oh, it's in there.  Oh.
4    Q.   It's a document.
5    A.   I'm sorry.  Okay.
6    Q.   It is the page that says Federation of
7    State Medical Boards?
8    A.   Yeah.  This does not look like a
9    misimpression.
10       MR. STEWART:
11          Again, Steve, I'm going to make
12       the same objection.  The quoted
13       language is obviously a clue to you
14       regarding what we're after.  The
15       numbers, again, seem to be incorrect.
16       And this was a letter drafted by
17       counsel, so it would seem that the
18       appropriate follow-up would be to send
19       a letter back asking, hey, where are
20       these quotes that you appear to be
21       directing us to?
22       MR. KUPPERMAN:
23          You're wasting my time here.  I
24       just want to ask questions.  I
25       understand your position.

Page 255

1    EXAMINATION BY MR. KUPPERMAN:
2    Q.   The next one which is TRINITY 13958
3    also does not contain any Merge --
4    A.   It does not.
5    Q.   -- misrepresentation.  Okay.
6         Now, um -- all right.  Let me go
7    through this.
8         Bear with me a minute.
9         Okay.  Let me show you this document
10   which we will mark as Exhibit 9, I guess.
11   (Tendering.)  Okay.  And you recognize this as
12   a, um -- Merge document?
13        (Exhibit 9 was marked for
14   identification and is attached hereto.)
15   A.   Merge and IBM Company.  Yes.
16   Q.   Okay.  And have you ever seen this
17   before?
18   A.   I do vaguely remember seeing it.
19   Q.   Do you know if Trinity or any of the
20   plaintiffs received this document, um -- at any
21   time prior to deciding on the purchase or
22   signing the sales order?
23   A.   Um -- I don't, but the date on here
24   says October 6th, 2016, so I don't think
25   that's --

Page 256

1    Q.   It would have been after.
2    A.   Yes.
3    Q.   Do you remember if you received
4    anything similar prior to that?
5    A.   Yes.  I do.
6    Q.   And what was that?
7    A.   Um -- it was -- it was marketing
8    materials.  It was basically an explanation of
9    the system, some flow charts and diagrams,
10   um --
11   Q.   Similar?
12   A.   Very similar, yeah.
13   Q.   Okay.  All right.  Do you know what
14   the purpose of this document was?
15   A.   Um -- no, I don't.  As far as Merge's
16   intent?
17   Q.   I mean, did anybody ever say anything
18   about what that was for?
19   A.   Um -- it was maybe a pre sales type
20   of, um -- packet for them to give to us.
21   Q.   Was there anything -- any presentation
22   made by Merge on or about October 6th, 2016?
23   A.   Um -- I don't remember.
24   Q.   Okay.  Let me --
25   A.   I definitely wasn't a part of it on

**EXHIBIT A**

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                    April 10, 2019

Page 257

1  October 6th, 2016, personally.  It doesn't mean
2  that the meeting didn't happen.
3      Q.  Okay.  Let me show you one that I am
4  gonna mark as Exhibit 10.  I just got a quick
5  question for you on 10.  (Tendering.)  Um --
6  actually, I think I gave you the wrong
7  document.  I tell you what, let me have that
8  back.
9      A.  Yes.  I agree -- this isn't what you
10  wanted me to read?
11     Q.  Nah, I gave you the wrong document.
12     A.  The broken product one?
13     Q.  Yeah.
14     A.  Merge saying that?
15     Q.  Yeah.
16     A.  Okay.
17     Q.  That's not what I wanted.
18         MR. STEWART:
19             Are you sure?  I got a few
20         questions about that.
21         MR. KUPPERMAN:
22             No, I figured you would, but
23         that's okay, because I wanted to look
24         at something else and ask you.
25  EXAMINATION BY MR. KUPPERMAN:

Page 258

1      Q.  Well, I tell you what, let my just ask
2  you something about this.
3      A.  Sure.
4      Q.  I don't want to clutter it up, so I'm
5  not going to mark it as an exhibit, but it's
6  MERGE 5468 --
7      A.  Okay.
8      Q.  -- et seq.  My question to you is,
9  um -- this is talking about a reference lab
10  interface, isn't it?
11     A.  Yes.
12     Q.  And in fact, Trinity was told by Merge
13  that it couldn't install or calibrate an
14  interface in the time frame Trinity wanted.
15  Correct?
16     A.  Uh -- incorrect.
17     Q.  All right.  Um -- Trinity, in fact,
18  canceled the order for the reference lab
19  interface?
20     A.  Um -- Merge represented to us that
21  they could, and then -- then came back and said
22  that they couldn't, and I personally have read
23  a lot of conversation between Ron and his
24  people internally about this.
25     Q.  Uh-huh.

Page 259

1      A.  And there was like six months of
2  trying to figure out how to fix our statements
3  because of it.  So, um -- yeah.
4      Q.  Yeah.  But my question, I think, was
5  that Merge in fact eventually said to you it
6  could not install or calibrate the interface in
7  the time frame you wanted.  Right?
8      A.  Um -- yes.
9      Q.  And then Trinity --
10     A.  In the time frame that they previous
11  told us.
12     Q.  Which is the time frame you wanted.
13  Correct?
14     A.  The time frame that we agreed to, yes.
15     Q.  Yes.  Okay.  And so, in fact, Trinity
16  canceled the order.  Right?
17     A.  Yes.
18     Q.  So Trinity never did purchase a
19  reference lab interface from Merge.  Correct?
20     A.  Um -- I don't believe so.
21     Q.  And what is happening here is Ron Poe
22  is trying to get a refund on the convenience
23  fees for Trinity.  Correct?
24     A.  Correct.
25     Q.  Okay.  All righty.  How long did it

Page 260

1  take from the purchase in January of 2016 of
2  the Merge system to go live with Merge?
3      A.  The install -- excuse me.  The
4  install, um -- we purchased in January 2016.  I
5  believe the install happened around April.
6  Um -- and then the go live date, I guess
7  Performance Labs -- if you're Trinity,
8  Performance Labs didn't happen until -- we were
9  live validating the AUs, I want to say, late
10  June, early July.  And then we were able to get
11  approval from, you know, CMS to be able to
12  start doing screening like in August.  That's
13  kinda how it worked.
14     Q.  Okay.  So from January when you signed
15  the deal, to June or July when you went live.
16     A.  That's right.
17     Q.  Okay.  What implementation testing was
18  performed during that time?
19     A.  Um -- what do you mean?
20     Q.  What testing was done to make sure
21  that the instruments worked with the software
22  and rendered correct results and workflow?
23     A.  Um -- the testing that's required for
24  you to be able to do testing underneath CLIA
25  and CMS.

JOHNS, PENDLETON, FAIRBANKS AND FREESE                         504 219-1993

**EXHIBIT A**

Page 261

1    Q.   And what --
2    A.   Validation studies, stability studies,
3  all of the pre-analytical work, analytical,
4  post-analytical, all that.
5    Q.   Can you tell me exactly what those
6  tests are, for implementing?
7    A.   Um -- no.
8    Q.   Okay.  And was all of this done
9  between January and June of 2016?
10    A.   No, it was all done from -- we didn't
11  get the system until April.
12    Q.   So it was done between April and
13  June --
14    A.   Uh-huh.
15    Q.   -- of 2016?
16    A.   Uh-huh.
17    Q.   Okay.  And who did all this testing?
18    A.   Mainly Michelle Spruill, Lynn, Connie.
19  Paula -- oh, I don't know if Paula was working
20  for us.  Um -- some Shea.
21    Q.   Okay.  Who is Lynn?
22    A.   Lynn, uh -- I mispronounced her name
23  earlier.
24       MR. STEWART:
25           Scariano?

Page 262

1    A.   Scariano.
2  EXAMINATION BY MR. KUPPERMAN:
3    Q.   Okay.  What about Connie?
4    A.   Yeah.  Ms. Connie was one of our
5  techs.
6    Q.   Connie who?
7    A.   I don't remember Connie's last name
8  off the top of my head right now.  I can get it
9  for you.
10    Q.   Paula who?
11    A.   Um -- Paula -- I think we let Paula go
12  in December.  I don't think we kept Paula.  So
13  she wasn't there.  I misspoke when I said
14  Paula's name.
15    Q.   December of '15?
16    A.   Yes, sir.
17    Q.   Okay.  What was her last name?
18    A.   Paula?  Paula Bearb.
19    Q.   Beer?
20    A.   Bearb, I believe.  B-E, uh -- A-R-B,
21  Bearb.
22    Q.   Oh, Beard.
23    A.   Bearb, with a B at the end.
24    Q.   Okay.
25    A.   I'll get you the definitive -- the

Page 263

1  last names on Paula and Connie.
2    Q.   Okay.  Thank you.
3         Is Trinity in possession of documents
4  that show the validation testing that's
5  verified by somebody at Trinity?
6    A.   Um -- I don't know if -- I don't know
7  if I have the books or not.  Oh, it would be in
8  the e-mail.  Because we had to send them off to
9  Dr. Martin and to -- to Sandy and those folks.
10  We had to send those tests off.  So I can do an
11  e-mail search and -- and get it.
12    Q.   Um -- so you can give me documents, or
13  tell me the Bates numbers of documents, that
14  already have been produced, um -- where -- that
15  show Trinity validation testing that is
16  verified by somebody at Trinity?
17    A.   Verified by somebody at Trinity --
18    Q.   Yes.
19    A.   -- like today, or back then?
20    Q.   Back at the time.
21    A.   Back then?  I believe I can.
22    Q.   Okay.  I'd like those, please.
23    A.   Okay.
24    Q.   Did Trinity share any of that
25  validation testing with Merge?

Page 264

1    A.   I don't believe so.
2    Q.   Okay.  Did --
3       MR. STEWART:
4           And just to be clear, what time
5       frame are you requesting, Steve?
6       MR. KUPPERMAN:
7           Well, I think the witness has
8       already told me that all this
9       validation testing occurred between
10       May and June of 2016.
11    A.   Pre go live.
12  EXAMINATION BY MR. KUPPERMAN:
13    Q.   Correct.
14    A.   The validation testing that we needed
15  to do to go live.
16    Q.   Right.
17    A.   Okay.
18    Q.   Any of that validation testing
19  identify issues, um -- in resolutions or proof
20  of retests with the resolutions?
21    A.   I don't know.
22    Q.   Okay.  Um --
23    A.   For the screening go live date was
24  what we're focusing on right now?
25    Q.   I'm just talking about the

66 (Pages 261 to 264)

**EXHIBIT A**

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                                    April 10, 2019

Page 265

1  implementation testing.
2      A.  Implementation testing?  I don't know.
3      Q.  Did the documentation that you talked
4  about identify the issues that were found in
5  testing resolution, fixes, or proof of retests
6  with the resolutions?
7      A.  I don't know.  I'm gonna have to go
8  look at the documents, look at -- I have not
9  placed physical eyes on those documents.  I am
10  making an assumption that they exist because we
11  sent them to Dr. Martin and to Sandy Pearson.
12  So the inspectors were reviewing all of that
13  stuff so.
14      Q.  Okay.  Are any of the defects alleged
15  in the suit identified -- were they identified
16  during the initial implementation testing?
17      A.  Um -- we were just -- we were just
18  trying to get our arms around the software.  I
19  don't think we had -- we had really identified
20  anything in implementation.
21      Q.  Okay.  Did you ever identify it --
22  never mind.
23      Did anybody on behalf of Trinity
24  verify that workflow or software instruments
25  were validated and ready for accepting patient

Page 266

1  samples?
2      A.  Yes.
3      Q.  Who was that?
4      A.  Michelle.
5      Q.  And when?
6      A.  Um -- through the validation process
7  to get approved by -- so it would have been --
8  it would have been approved by -- by Michelle
9  first, then did Dr. Martin, um -- with the two
10  consultants Patty and Aurora McKinney, and then
11  presented to the inspector Alexa Little at the
12  CLIA office in Baton Rouge, copying Lane Vause,
13  Capt. Hesselgesser -- I think it's
14  Lt. Commander Lane Vause, Capt. Daniel
15  Hesselgesser, and Sandy Pearson.  So there was
16  some people that were looking at it.
17      Q.  And this would have been -- the
18  verifications that the workflow software and
19  instruments were validated and ready for
20  accepting patient samples would have been done
21  sometime between April and June of 2016?
22      A.  It would have been done before the go
23  live date.
24      Q.  Okay.  Did Trinity perform proficiency
25  training?

Page 267

1      A.  Yes.
2      Q.  Okay.  And who did that?
3      A.  It would have been your, um --
4  technical supervisor on testing personnel.
5      Q.  And that was Michelle Spruill?
6      A.  Uh-huh.  It was -- it was Kris
7  Franklin for a little bit, and then it was back
8  to Michelle Spruill.
9      Q.  And when was that done?
10      A.  It would have been -- it's done in the
11  hiring and the training phase.  You're talking
12  about proficiency testing for proficiency of,
13  uh --
14      Q.  Proficiency training.
15      A.  Proficiency training.  It would have
16  been handled by the technical supervisor.
17      Q.  Okay.  But --
18      A.  Or the laboratory director.
19      Q.  When was that done?
20      A.  It -- I can't tell you.
21      Q.  Was it -- do you know if it -- if
22  proficiency training or testing of the staff to
23  ensure they knew how to use Merge correctly was
24  done periodically, or was it just done on one
25  occasion?

Page 268

1      A.  Um -- oh, we had the training from the
2  install guys.  And then apparently we were slow
3  learners, so we had to ask more questions.  And
4  we -- we, uh -- I think we ended up having
5  another training date.  Um --
6      Q.  So you had two training dates --
7      A.  I believe we had two --
8      Q.  -- from Merge.
9      A.  I think so.
10      Q.  Okay.  And what about any Trinity
11  training?
12      A.  Yeah.  Internally, we, um -- had Lynn,
13  because she was a very savvy IT person, um --
14  basically do internal training and do videos to
15  be able to show other folks how to use Merge.
16      We had, like, a whole, like, Merge
17  focus group of people who we trained internally
18  to be Merge experts.  And they were the go-to
19  to some all of Merge's problems that they
20  caused, 'cause there was a lot of 'em.
21      Q.  Do you have those training videos?
22      A.  They are.  They're -- I believe I
23  still have a couple of 'em, yes.
24      Q.  Okay.  And I'm talking about your
25  internal training videos.

JOHNS, PENDLETON, FAIRBANKS AND FREESE                                          504 219-1993

**EXHIBIT A**

Page 269

1    A.   Yeah.  From Lynn.  Yeah.
2    Q.   Okay.  And do you know if they've been
3 provided?
4    A.   Uh -- I do not know.
5    Q.   Okay.  What sources did, um -- oh, by
6 the way, did you have to produce any
7 proficiency testing documentation for
8 regulators, or regulatory review?
9    A.   I'm pretty sure.
10    Q.   Okay.  Um -- so Trinity should have
11 that.
12    A.   Sure.
13    Q.   Okay.  What sources did Trinity rely
14 on to establish its lab workflow?
15       MR. STEWART:
16          Object to form.
17    A.   What sources did they rely on?
18 EXAMINATION BY MR. KUPPERMAN:
19    Q.   Yeah.
20    A.   Dr. Trey Martin.
21    Q.   Okay.  So he's the one who established
22 how specimens should be collected and tested
23 and processed?
24    A.   He's ultimately responsible for
25 everything that you just said.

Page 270

1    Q.   Yeah.  But I mean, did he create
2 documentation that establishes that workflow?
3    A.   Between he and Michelle, yes.
4    Q.   Okay.  Have you, um -- scratch that.
5       Now, certain specimens were run, um --
6 on instruments at Performance Labs, but the
7 results weren't sent to the Merge software on
8 the same date as the samples were tested.
9 Correct?
10    A.   That's correct.
11    Q.   Okay.  And whose decision was that not
12 to send them on the date of the test?
13    A.   What do you -- what do you mean?
14    Q.   Okay.  Lab results.  There was a lab
15 test with lab results on Day 1, for example.
16    A.   Uh-huh.
17    Q.   And then the results were imported
18 into Merge on Day 2.
19    A.   Okay.
20    Q.   You with me?
21    A.   Yes.
22    Q.   And that happened.  Right?
23    A.   Yes.
24    Q.   Okay.  Who established the guideline
25 that it was okay -- who at Trinity established

Page 271

1 the guideline that it was okay to wait a day
2 before import ing the result?
3    A.   Uh -- it's a pretty standard practice.
4    Q.   Standard by whom?
5    A.   By the -- by the actual workflow.  Can
6 I give you a for example?
7    Q.   Well, is it standard at Performance
8 Labs?
9    A.   Um -- it's a -- okay.  If on Friday,
10 like in your example, Day 1, Day 2.  So let's
11 say on Friday you run our results.  Okay?  And
12 the basically runs for 12 hours, 14 hours,
13 throughout the night.  Saturday goes, Sunday
14 goes.  On Monday, you wake up, you hit the
15 imported button, that's -- that's a weekend
16 that -- that occurs there.  So there's weekends
17 and holidays, or just from day to day, you're
18 busy, um -- it may carry over to the next
19 Day, because you put your -- it takes all day
20 long to get the, um -- the specimens on the
21 actual equipment, on the LCMS, and then it
22 takes could be 8 to 18 hours, just depending on
23 your method of how long it takes to be able to
24 get those results.  So they'll carry over to
25 the next day.  This is what Merge didn't

Page 272

1 understand whenever they developed the
2 software.
3    Q.   Uh-huh.
4    A.   And they admitted to us.
5    Q.   And, um -- who -- what other labs are
6 you aware of that wait a day for the
7 importation into the LIS software?
8    A.   I haven't heard one that it wouldn't
9 happen to.  They-
10    Q.   Have you heard any that it did?
11    A.   Um -- meaning that they did -- that
12 they import the same day?
13    Q.   No.  Another day.
14    A.   On another day?  No, I'm saying,
15 I've -- I know of laboratories -- that's --
16 that's a -- that's just a lab workflow
17 practice.
18    Q.   Okay.  And I'm asking what labs, other
19 than Performance Labs, do you know of for a
20 fact that says it's okay to import on a
21 subsequent date?
22    A.   Pathway and Phoenix.
23       THE REPORTER:
24          Who?
25       MR. KUPPERMAN:

EXHIBIT A

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                                    April 10, 2019

Page 273

1     Pathway and Phoenix.
2     THE REPORTER:
3         Thank you.
4   EXAMINATION BY MR. KUPPERMAN:
5     Q.  Any other than your own labs.
6     MR. STEWART:
7         Object to the form of the
8     question.
9     A.  Um -- I don't intimately know the
10  workflow of other laboratories besides any own
11  labs.
12  EXAMINATION BY MR. KUPPERMAN:
13    Q.  Okay.  You don't know what is standard
14  in the industry --
15    A.  No, I do --
16    Q.  -- other than what is your labs.
17    MR. STEWART:
18        Object to the form of the
19    question.  Mischaracterization --
20    MR. KUPPERMAN:
21        Well, I'm asking.
22    THE REPORTER:
23        Excuse me.  That's three people
24    talking at the same time now.
25    MR. KUPPERMAN:

Page 274

1     Okay.
2     A.  As I understand the question, you
3   asked me specific labs, and then you said, you
4   don't know industry standards.
5     That's not the same thing.
6   EXAMINATION BY MR. KUPPERMAN:
7     Q.  Yes.  I'm asking the question.  You
8   don't know industry standards on importation;
9   correct?
10    A.  I do know industry standards --
11    Q.  And from --
12    A.  -- on importation.
13    Q.  And from where do you obtain that
14  information, since you have only been involved
15  with the labs we have talked about?
16    A.  In talking to other scientists, in,
17  um -- in -- in -- in Louisiana, it's tough for
18  you to get scientists that can actually do
19  approvals.  Okay?  Because of the education
20  requirements and the licensing.  So we
21  developed a system where we got scientists from
22  Texas that work at other laboratories to remote
23  in to our lab to be able to do approvals.  This
24  is in 2015.  So I learned from other approving
25  scientists that work at places like Ameritox,

Page 275

1   and work at places like Alere, work a places,
2   um -- that were hired by us to approve samples
3   remotely.
4     Q.  Okay.
5     A.  And so that's -- that knowledge comes
6   from other employees that work at other
7   laboratories.
8     Q.  Okay.  Who at Ameritox and Alere?
9     A.  I have to get you the names.  They
10  were on our roster.  We paid 'em as employees
11  or consultants.  Patrita is one of the girls'
12  names.  Um -- um -- I think there's a guy named
13  Daniel who was an approval scientist.  But --
14    Q.  Okay.
15    A.  -- my scientists worked at other labs.
16        Dr. Bourland was, um -- a Ph.D. who
17  was a laboratory -- chief laboratory officer at
18  Ameritox.  Um -- Shea and Michelle came from
19  Alere, and Ameritox.  Um -- so we just -- I
20  mean, people in the industry.  I'm sorry.
21    Q.  Okay.  Did Trinity expect Merge to
22  customize the Merge manual for Trinity-specific
23  workflow?
24    A.  No.
25    Q.  Okay.  Did Trinity create any of its

Page 276

1   own manuals or a customize Merge's manual to
2   fit Trinity's workflow?
3     A.  No.
4     Q.  Did Trinity perform positive and
5   negative testing on the Merge system?
6     A.  What does that mean?
7     Q.  Did Trinity, um -- perform tests to
8   show that a function would work in a specific
9   situation but not work in other situations?
10    A.  I can't -- I can't answer that.  I
11  don't know.
12    Q.  Okay.  Okay.  All right.  Turn, if you
13  will, to the Second Amended Complaint.  And
14  actually, I think I have this right.  Turn if
15  you will to Page 22.  And my question there is,
16  in Paragraph 76, um -- there is a listing of
17  defects in the Merge system.  Correct?
18    A.  Yes.
19    Q.  And --
20    MR. STEWART:
21        And it continues to Page 23.
22    Correct?
23    A.  Correct.
24  EXAMINATION BY MR. KUPPERMAN:
25    Q.  It's Paragraph 76, which continues

JOHNS, PENDLETON, FAIRBANKS AND FREESE                                    504 219-1993

**EXHIBIT A**

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                    April 10, 2019

|  | Page 277 |
|---|---|
| 1 | from 22 to 23. |
| 2 | You didn't have trouble understanding |
| 3 | that, did you? |
| 4 | A.  No.  I was just looking at -- I was |
| 5 | just looking at Page 22. |
| 6 | Q.  Okay. |
| 7 | A.  Sorry. |
| 8 | Q.  And in addition to the ones that are |
| 9 | listed here by bullet point, I believe there is |
| 10 | also the duplicate container defect, um -- |
| 11 | which is referenced in the, um -- introductory |
| 12 | section.  Right? |
| 13 | A.  Correct. |
| 14 | Q.  Oh, and then there's the averaging |
| 15 | number defect that is not listed here. |
| 16 | Correct? |
| 17 | A.  Correct. |
| 18 | Q.  And, um -- other than the averaging |
| 19 | number, the duplicate container, and then each |
| 20 | one of these bullet points, these are, in fact, |
| 21 | all of the defects that, um -- Trinity or any |
| 22 | plaintiff found in the Merge system about which |
| 23 | it is making complaints.  Correct? |
| 24 | A.  Where's the -- where's the security |
| 25 | breach?  The security defect? |

|  | Page 278 |
|---|---|
| 1 | MR. LESUEUR: |
| 2 | In paragraph 77. |
| 3 | A.  Paragraph 77?  Okay. |
| 4 | EXAMINATION BY MR. KUPPERMAN: |
| 5 | Q.  Okay.  And 77, the security. |
| 6 | A.  Uh-huh. |
| 7 | Q.  Okay. |
| 8 | A.  I would -- I'd need to compare it to |
| 9 | what Merge, um -- the back and forth that we |
| 10 | had with Merge, but it appears to be what you |
| 11 | just said.  Yes. |
| 12 | Q.  Yeah, and I think that the |
| 13 | representation from your counsel has been that |
| 14 | that subsumes everything.  I just want to make |
| 15 | sure that we're foreclosing anything outside of |
| 16 | this.  So -- |
| 17 | A.  Okay. |
| 18 | Q.  -- you agree with the stipulation by |
| 19 | counsel? |
| 20 | MR. STEWART: |
| 21 | Yes.  We've stipulated that those |
| 22 | are the universe of defects that, in |
| 23 | addition to the one that's outside the |
| 24 | complaint that we talked about with |
| 25 | the averaging numbers. |

|  | Page 279 |
|---|---|
| 1 | EXAMINATION BY MR. KUPPERMAN: |
| 2 | Q.  Tell me when -- were all -- were all |
| 3 | of these known or discovered by Trinity or any |
| 4 | plaintiff, um -- prior to Performance Labs |
| 5 | actually employing the Merge system with, um -- |
| 6 | tests in 2016 and '17? |
| 7 | MR. STEWART: |
| 8 | Object to the form. |
| 9 | You can answer it if you |
| 10 | understand it. |
| 11 | EXAMINATION BY MR. KUPPERMAN: |
| 12 | Q.  Did you understand that? |
| 13 | A.  I do, but break it up. |
| 14 | Q.  I'll try. |
| 15 | A.  Yeah.  You want me to try to answer |
| 16 | it?  I think I got it. |
| 17 | Q.  Okay. |
| 18 | MR. STEWART: |
| 19 | Well, let him answer it again. |
| 20 | THE WITNESS: |
| 21 | Okay.  Sure. |
| 22 | EXAMINATION BY MR. KUPPERMAN: |
| 23 | Q.  Well, all I'm trying to do is find out |
| 24 | when all of these were learned by Trinity or |
| 25 | any plaintiff.  And my understanding is it was |

|  | Page 280 |
|---|---|
| 1 | sometime after the Merge system went live, but |
| 2 | before Performance Labs started testing. |
| 3 | A.  It was, um -- it was gradual.  Uh -- |
| 4 | it -- it happened -- we knew half of 'em in |
| 5 | October, and we communicated that to Merge. |
| 6 | And then, um -- there was very little |
| 7 | conversation.  And then whenever Performance |
| 8 | Labs, you know, turned the lights on in |
| 9 | January, we started gearing up for it, and |
| 10 | that's when, um -- we started finding even |
| 11 | more -- more issues. |
| 12 | And then once we found the QC issue, |
| 13 | Dr. Martin and Aurora, and Patty, and Michelle, |
| 14 | um -- that's when we -- we really dug in and we |
| 15 | started taking the system apart piece by piece. |
| 16 | So it was -- really, some of the worst |
| 17 | ones, Steve, we found, um -- after Performance |
| 18 | Labs suspended testing in February.  They've |
| 19 | all bad, but -- |
| 20 | Q.  When was the QC issue found? |
| 21 | A.  That was found in an, uh -- so part of |
| 22 | the quality management process that we have, |
| 23 | the technical supervisor and the laboratory |
| 24 | director meet weekly, and they review. |
| 25 | Basically, they do a laboratory audit every |

JOHNS, PENDLETON, FAIRBANKS AND FREESE                                   504 219-1993

EXHIBIT A

April 10, 2019

Page 281

1  week.  So they were doing a laboratory audit
2  every single week.  And in that audit, it
3  produced QC, and it looked like QC was out of
4  range.  And Michelle had seen that that was a
5  possible problem.  She couldn't put her finger
6  on it, and so she started printing out QC
7  whenever she was -- when she was doing it.
8  Um -- so that's when.
9      Q.  Can you give me an approximate time?
10     A.  Um -- that would be February -- call
11 it February 13th, 2017, is whenever we did a --
12 there's a root cause analysis and a corrective
13 action on the QC.  It's voluminous.  It's well
14 documented.
15     Q.  And which of these defects that are
16 listed here do you refer to as a QC problem?
17     A.  The backdating defect.
18     Q.  That's the QC problem.
19     A.  Uh-huh.
20     Q.  Okay.
21     A.  And it's compounded by the audit
22 tracking defect.
23     Q.  Okay.  So the lack of audit tracking,
24 um -- who -- well, let me ask you this:  All of
25 these defects, duplicate container, security,

Page 282

1  averaging, and all the ones with the bullet
2  points, are they -- were they all discovered by
3  Chad Howell?
4      A.  Uh -- no.  They were discovered by the
5  team.
6      Q.  Okay.  Tell me individually who
7  discovered the duplicate container defect.
8      A.  Oh, that would probably be a mixture
9  between testing personnel and Jamie and Danny.
10     Q.  And who were the testing personnel?
11     A.  Um -- I'd have to look at the roster
12 of people that were there at Pathway.
13     Q.  All right.  What about the lack of
14 audit tracking; who discovered that?
15     A.  Um -- I could give that one to Chad
16 Howell.
17     Q.  Pardon?
18     A.  Yeah, I would say Chad Howell.
19     Q.  Okay.  And what about the user manual?
20     A.  That was people who were actually
21 trying to read the manual and have it do what
22 it did.
23     Q.  And who were they?
24     A.  Lynn, Michelle -- testing personnel.
25     Q.  Okay.  What about the illegible

Page 283

1  comments?
2      A.  Um -- Michelle.
3      Q.  All right.  What about the incorrect
4  sample date?
5      A.  Um -- I don't know off the top of my
6  head.
7      Q.  Um -- what would you do to find out?
8      A.  Um -- I would go back and read e-mail
9  and find out who's the one who first discovered
10 it.  But at the end of the day it's on the
11 report.  It was discovered by Trinity at the
12 time.
13     Q.  Okay.  And what about the rejected --
14 the no rejected samples defect, who discovered
15 that?
16     A.  Um -- the team at Trinity.
17     Q.  Um --
18     A.  Prestige Worldwide.
19        THE REPORTER:
20            I'm sorry.
21     A.  The team at Prestige Worldwide.  I
22 mean the employees of either Performance Labs
23 or --
24 EXAMINATION BY MR. KUPPERMAN:
25     Q.  Who?

Page 284

1      A.  The team.  I can just the team right
2  now.
3      Q.  Who's the team?
4      A.  Um -- either Danny, Jamie, Kyle, Chad,
5  Michelle, Lynn, or Shea.
6      Q.  All right.  Who discovered the
7  re preparation sample limbo defect?
8      A.  Same ones I just gave you.
9      Q.  Who discovered he no disabled users
10 defect?
11     A.  Uh -- that would be either Kyle
12 Mouton, um -- either Kyle Mouton or Chad
13 Howell.
14     Q.  All right.  What about the rejected
15 report defect?
16     A.  I don't know.
17     Q.  And the backdating defect?
18     A.  That was in -- very detailed, uh --
19 Michelle Spruill.
20     Q.  And, um -- the average defect?  The
21 average defect?
22     A.  That was between, I think, Connie and
23 Shea.
24     Q.  And finally, the security.
25     A.  Um -- that was Ben Caston.

EXHIBIT A

Page 285

1     Q.   Okay.  Um -- tell me when the -- you
2   said the duplicate container defect, that was
3   found around February of 2017; right?
4     A.   No.  That was the QC, I said.
5     Q.   I'm sorry.  Okay.
6     A.   Hey, I'm still paying attention.
7   That's good.
8     Q.   Good.  I'm glad one of us is.
9          The lack of audit tracking defect was
10  discovered when?
11    A.   I don't know.
12    Q.   When was the user manual defect
13  discovered?
14    A.   Categorically, I can't give you a
15  specific date on any of these things were
16  discovered, just in the normal course of
17  business as we were doing testing.  And we
18  reported them to Merge as we found them.
19    Q.   Okay.  So if I find a document where
20  you reported this to Merge, that would tell me
21  approximately the date on which you found it.
22    A.   Yes, sir.
23    Q.   So any report to Merge, say, the
24  discovery of the defect would be within a day
25  or so prior to that.

Page 286

1     A.   There could have been be little bit of
2   testing internally first.  There may have been
3   some phone calls between Chris Floyd and Lynn
4   to try to work it out.  Um -- we would have
5   reached out to Merge's point person, I think
6   it's -- her last name was Lloyd, um --
7   specifically.  Yeah.
8     Q.   Okay.  On the lack of audit tracking,
9   can you tell me exactly what's missing from the
10  audit report?
11    A.   Being able to know that a user logged
12  into the system, and what they did inside of
13  the system.
14    Q.   Okay.  And, um -- how does that impact
15  the sample --
16    A.   You can't --
17    Q.   -- the test?
18    A.   Yeah.  You can't guarantee that, um --
19  a that a non testing personnel didn't modify
20  the samples.
21    Q.   And one way to solve that would be to
22  restrict access to the samples so only
23  authorized personnel could access it.  Correct?
24    A.   No.  No.  Um -- because when you give
25  somebody a log-in, they -- Merge also doesn't

Page 287

1   have hierarchy of controls.  When they list it
2   as a defect, it's probably just a lack that it
3   has it.  But if you're -- if I'm your boss and
4   you could only do a certain amount of stuff, if
5   I give you a log-in to Merge to do your job,
6   you can -- you have a full range of controls.
7   So there's --
8     Q.   Okay.
9     A.   Yeah.
10    Q.   Okay.
11    A.   As I understand it.
12    Q.   Did you ever come up with a workaround
13  for that?
14    A.   For lack of audit controls?
15    Q.   Yes.
16    A.   There's no workaround for a lack of
17  audit a control, that I'm aware of.
18    Q.   Okay.  Let's talk about the user
19  manual.
20    A.   Did Merge know of a workaround for
21  lack of audit control?
22    Q.   What is the user manual defect?
23    A.   Okay.  So when you read the manual and
24  you do what he manual says --
25    Q.   And you're talking about Merge's

Page 288

1   manual.
2     A.   Merge's manual.  When you read Merge's
3   manual and you do what the manual says, um --
4   the software does something differently.
5     Q.   Uh-huh.  So am I correct that what
6   you're talking about here is that the user
7   manual incorrectly described how to manually
8   change QC ranges?
9     A.   Um -- the -- there's instances where
10  the user manual doesn't align with what the
11  software is supposed to do.
12    Q.   Okay.  And what are they?
13    A.   Michelle videotaped them -- screen
14  recorded 'em, and notated them.  They're
15  available.
16    Q.   And what are they?
17    A.   I don't know off the top of my head.
18    Q.   Okay.  Does that, um -- user manual
19  defect impact QC only, or other things?
20    A.   Um -- specifically, I'm not saying
21  that the user manual defect impacts QC or
22  anything specifically.  I just know that the
23  user manual defect does exist.
24    Q.   Okay.  So you don't know -- you -- you
25  on behalf of Trinity cannot tell me how that

EXHIBIT A

Page 289

1  impacted Trinity; correct?
2      A.  Not today.
3      Q.  Okay.  Is there any way to identify
4  patients or accessions that were negatively
5  impacted by the user manual defect if in fact
6  any were?
7      A.  Um --
8          MR. STEWART:
9              Object to form.
10     A.  I don't know.
11  EXAMINATION BY MR. KUPPERMAN:
12     Q.  Okay.  What was the workaround for
13  that?
14     A.  Um -- we worked with Merge to show
15  them exactly what we were doing as far as
16  touching the buttons.  So then we figured out
17  that where the manual was wrong we had to go in
18  and write a new SOP so that the manual would be
19  right.
20     Q.  Okay.  And you did that.
21     A.  Yeah.
22     Q.  And when was that?  Was that in the
23  August to October 2016 time frame?
24     A.  Um -- no, that would have been
25  whenever we found that the user manual wasn't

Page 290

1  lined up.  So after we realized, hey, when we
2  hit these buttons the system doesn't do what
3  the manual says --
4      Q.  Uh-huh.  When was that?
5      A.  Um -- whenever we found it.  After
6  August 2016.
7      Q.  Okay.  Before you started testing
8  again in January of 2017.
9      A.  Um --
10     Q.  The confirmatory testing.
11     A.  Steve, I don't know the date on that
12  off the top of my head.
13     Q.  Okay.
14     A.  The documents show it, but I don't
15  know the date.
16     Q.  Yeah.  You keep saying documents show
17  it, but I don't see the documents that show it,
18  which is why I'm here to ask you all these
19  questions.  And you were supposed to be
20  prepared to answer 'em.  So that's why I'm
21  asking.
22     A.  Okay.
23     Q.  Okay.  The illegible comments defect.
24  Am I correct that that's simply something
25  prints over something else?

Page 291

1      A.  Yes.
2      Q.  Okay.  And when was that discovered?
3      A.  Um -- I think I remember that one
4  being in the February or March area, maybe, of
5  2017.
6      Q.  Okay.  And how did that impact
7  Trinity?
8      A.  Well, it's -- it's more the being able
9  to actually see what the, um -- the workaround
10  that Merge had told us for one of these defects
11  was just to go in and put in comments.  But it
12  would actually overwrite your comments.  So you
13  couldn't do it.  So then you would -- you'd
14  basically -- the workaround that Merge told us
15  to do, we found actually wasn't a workaround,
16  it was actually another defect in the software.
17     Q.  Uh-huh.
18     A.  And so the way it would impact Trinity
19  is not being able to actually read what those
20  comments were to correct the other defect.
21     Q.  Because it printed over something
22  else?
23     A.  Stacked defects.  Yes.
24     Q.  Okay.  And, um -- did you correct that
25  through your own workflow?

Page 292

1      A.  There was no workflow to correct that,
2  as I understood it.
3      Q.  Okay.  How did Trinity lose money as a
4  result of that?
5      A.  Um -- Trinity lost money because
6  Performance Labs wasn't able to, um -- test.
7  We weren't able to use the system to safely
8  test.
9      Q.  Well, you could use the system,
10  according to this, you just couldn't read the
11  illegible comments.  Right?
12     A.  You couldn't -- the workaround that
13  they gave us for our QC did not work because --
14     Q.  Because it printed over.
15     A.  Because it printed over.  So we could
16  not -- we could not produce an audit to --
17  yeah.
18     Q.  Okay.  And my question is, then, um --
19  can you identify patients or accessions that
20  were negatively impacted?
21     A.  No.
22     Q.  Can you identify customers or clients
23  that Trinity lost as a result?
24     A.  When we went live in January, when we
25  found that these were major issues in February,

EXHIBIT A

Page 293

1  we were not putting patients at risk so.
2      Q.  Uh-huh.  Can you identify any
3  particular patients that you lost as a result
4  of the illegible comments defect?
5          MR. STEWART:
6              Object to form.  Patients that
7          they lost?
8  EXAMINATION BY MR. KUPPERMAN:
9      Q.  Yeah.  Any -- any --
10     A.  Providers?
11     Q.  Customers.
12     A.  Doctors.  Providers.
13     Q.  Whoever you customers are?
14     A.  Yeah.
15     Q.  Can you identify any that you lost as
16  a result of the illegible comments defect?
17     A.  No.
18     Q.  Okay.  The incorrect sample date
19  defect.  Is that the run versus import issue
20  that we talked about?  In other words you run
21  the test one day and import it into the system
22  on a subsequent one?
23     A.  I don't think so.  I think this might
24  be a, um -- um -- I think that might have
25  been -- there was a couple different ways where

Page 294

1  the wrong date would appear on the -- on the
2  test, where the run date wasn't actually the
3  run date.  And so there was several -- several
4  ways that the incorrect sample date defect came
5  into -- into impact.
6      Q.  Okay.  And how did that impact
7  Trinity?  Did you lose any -- can you identify
8  any patient or accessions that were negatively
9  impacted?
10     A.  You couldn't -- you could not, um --
11  go out and, um -- and market to -- me, as the
12  owner of Performance Labs, could not go out and
13  market to customers until we fixed this.
14     Q.  Okay.  When was it discovered?
15     A.  Um -- I don't remember.
16     Q.  Sometime before January of 2017?
17     A.  Either before or after.  Yeah.
18     Q.  Well, that doesn't really help narrow
19  it down.
20     A.  Sorry.
21     Q.  Can you tell me?
22     A.  Um -- this particular incorrect sample
23  date defect may have been tied into the QC --
24  so when you're using a system that is -- you're
25  operating every day and all of these problems

Page 295

1  exist, the root cause analysis and being able
2  to try to find out, like, what was actually
3  going on, it was so ridiculous that this is
4  actually what we purchased, and we could not
5  find all of these at the same time, and one
6  would lead to another.
7          So does that answer your question?
8      Q.  No.
9      A.  Okay.  Sorry.
10     Q.  Let me ask you this:
11     A.  Sure.
12     Q.  Can you identify any customers that
13  you lost as a result of the incorrect sample
14  date defect?
15     A.  I cannot.
16         THE REPORTER:
17             Steve, if you find a good place
18         to find soon --
19         MR. KUPPERMAN:
20             Pause.
21         THE VIDEOGRAPHER:
22             We're going off the record.  The
23         time is 3:25.
24             (Brief recess.)
25         THE VIDEOGRAPHER:

Page 296

1              We are back on the record.  The
2          time is 3:35.
3  EXAMINATION BY MR. KUPPERMAN:
4      Q.  Okay.  Let's look at the no rejected
5  samples defect.  Can tell me if you can
6  identify any customers that were lost as a
7  result of that?
8      A.  Um -- no, sir.
9      Q.  Can you, um -- tell me how much money
10  was lost as a result of that?
11     A.  We were never able to start testing
12  because of it.
13     Q.  Okay.  The re preparation sample limbo
14  defect.  What is re preparation?
15     A.  Um -- if for some reason a specimen
16  fails to run, in the line, or the, um -- the
17  scientist feels like something is wrong with
18  the results, out of range, something happened,
19  um -- a glitch, whatever it is, they'll re prep
20  that sample and then run it again.
21     Q.  And so what is the defect here?
22     A.  Yeah.  So it's -- it's -- it hits it
23  right on the head right here.  I'll just read
24  it.  Uh -- a defect making it impossible to
25  designate a specimen portion as saved for

74 (Pages 293 to 296)

EXHIBIT A

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                    April 10, 2019

Page 297

1  re preparation, a standard process whereby a
2  specimen portion is set aside for a second
3  round of testing in order to confirm the
4  results of the original toxicology testing,
5  exposing the saved specimen portion to
6  unintended testing that could result in
7  incorrect patient reporting, thus, risking
8  laboratory reliability, testing accuracy, and
9  patient safety.
10     Q.  That's all you can tell me about that
11  defect?
12     A.  It's a really good explanation of it.
13     Q.  Okay.  What else can you tell me about
14  it?  Anything?
15     A.  Nothing that would add to what I just
16  read.
17     Q.  Okay.  Can you identify any, um --
18  clients that were lost as a result of that
19  defect?
20     A.  No, sir.
21     Q.  Okay.
22     A.  Trinity -- Trinity as a holding
23  company didn't have any clients.
24     Q.  Uh-huh.
25     A.  So --

Page 298

1     Q.  How 'bout any clients by any
2  plaintiff?
3     A.  By any other plaintiffs?  Um --
4  Prestige Worldwide lost a client.  Pathway.
5  Um --
6     Q.  Well, Prestige lost Pathway because
7  you sold Pathway.  Right?
8     A.  Prestige lost Pathway because we
9  couldn't operate Merge.
10     Q.  Uh-huh.  Okay.  And what did that have
11  to do with the re preparation in particular?
12     A.  Um -- it caused, um -- more time,
13  um -- more resources to create more SOPs, more
14  people, more labor, more expensive to be able
15  to run the process.
16     Q.  And you sold Pathway.  Right?
17     A.  Um -- I never owned Pathway.  We found
18  investors for Pathway.  Pathway's owners sold
19  Pathway.
20     Q.  Okay.  And upon the sale it terminated
21  the agreement with Prestige?
22     A.  Yes, sir.
23     Q.  Okay.  The no disabled users defect.
24  Um -- is that the situation where a former
25  employee was able to access, um -- something

Page 299

1  online?
2     A.  Uh -- yeah.  That would be just a
3  situation where you actually could not, and the
4  defect making it appear as a former
5  laboratory --
6        THE REPORTER:
7           Whoa, whoa, whoa, whoa, whoa.
8        THE WITNESS:
9           I'm sorry.
10        THE REPORTER:
11           Man.
12        THE WITNESS:
13           I apologize.
14        THE REPORTER:
15           I'm trying to write this.
16  EXAMINATION BY MR. KUPPERMAN:
17     Q.  Let me just say, you don't have to
18  read it to me.  I was asking you in particular
19  if that was the occasion when there was a
20  discovery that a former employee could access,
21  um -- information.
22     A.  Yes.
23     Q.  Okay.  And that happened on one
24  occasion?
25     A.  Um -- my understanding is yes.

Page 300

1     Q.  And there was no monetary loss from
2  that one occasion.  Correct?
3     A.  Not that I understand.  No.
4     Q.  Okay.  And there was no loss or theft
5  of information on that one occasion.  Correct?
6     A.  Not that we can discover, no.
7     Q.  Okay.  And you're not aware of any
8  other occasion when that happened.  Correct?
9     A.  No, sir.
10     Q.  No, sir meaning I'm correct?
11     A.  You are correct.
12     Q.  Okay.  And was a workaround created?
13     A.  I don't know the specifics on how the
14  workaround was created.
15     Q.  But there was one that solved the
16  problem.
17     A.  I don't know if we ever did solve the
18  problem.  We changed the password.  That was
19  the workaround.  There was a password change.
20     Q.  Okay.
21     A.  Yeah.
22     Q.  All right.  The rejected report
23  defect.  Um --
24     A.  Other -- one of the problems with that
25  workaround, though, is -- because it's not

JOHNS, PENDLETON, FAIRBANKS AND FREESE

504 219-1993

**EXHIBIT A**

Page 301

1    listed here is, you remember password are
2    unencrypted in the database? So if you did
3    have access, like a Merge employee or somebody
4    who had access to the database would be able to
5    see the disabled person's password, and use it,
6    and come in and come out, and you would never
7    know. So -- because there's no audit tracking.
8         Q. And you had a workaround for that.
9    Right?
10        A. Well, if you change the password, the
11   threat of the fact that the passwords are
12   unencrypted in the database still exists. So
13   there is no workaround for that particular --
14   Again, another one of those multi-level
15   problems with the program.
16        Q. Okay. The rejected report defect.
17   Can you tell me exactly what that did, without
18   reading it to me?
19        A. I'll read it first and then tell you.
20        It couldn't reject, um -- the defect
21   causes the deleted or rejected toxicology test
22   to be reported. So you would -- you would
23   delete the test, or -- or reject the sample
24   from a validity standpoint, and the results
25   could still go out to the -- to the physician,

Page 302

1    and the physician could, um -- prescribe health
2    care on a rejected sample.
3         Q. And that only applied, though, if
4    there were individual lab tests as well as
5    panel lab tests? Is that correct?
6         A. Um -- I don't know.
7         Q. Okay. Do you know what panel lab
8    tests are?
9         A. Please define.
10        Q. Um -- what is a panel? Do you know?
11        A. For me, a panel is like a panel of
12   tests. If you have 12 -- a 12-test panel. But
13   it is -- it is a word that's used in many
14   different instances. So what instance are you
15   using it in right now?
16        Q. In that.
17        A. Okay.
18        Q. Okay. So that reported -- rejected
19   report defect, though, that applies only when
20   there is a panel test, and then an individual
21   lab test, one of the tests already done in the
22   panel, is also done. Correct?
23        A. It would be if you are running
24   validity, um -- you do a valid test, like
25   specific gravity, PH, any adulterants, on every

Page 303

1    single test that you do in toxicology. So on
2    every specimen that you run in toxicology. It
3    makes sure that it's actually a human sample.
4         So my understanding is that if the
5    sample fails validity, that it would still be,
6    possibly -- and you rejected it, it would still
7    be -- could be resulted out.
8         Q. Yeah. So does this defect apply only
9    where there is an individual lab test with
10   regard to a panel lab test that had already
11   been conducted?
12        MR. STEWART:
13        Object to form.
14        A. I don't know the many ways in which
15   the Merge system caused this defect in all the
16   different areas. I just know that we had real
17   instances where we discovered that rejected
18   samples were being reported inside of the Merge
19   system to physicians. And on the second page,
20   it said, specification failed validity. So
21   it's being presented in a way that the specimen
22   had actual reports and it failed validity. So
23   that's what this is documenting.
24        Q. And the failed validity was part of
25   the report?

Page 304

1         A. Yes.
2         Q. So the doctor who received the report
3    would see that it failed validity.
4         A. On the second page.
5         Q. Yes.
6         A. Yeah.
7         Q. And doctors are fully capable of
8    turning a page. Right?
9         A. Uh -- maybe so.
10        Q. Okay. Can you tell me what if any
11   patient or customers you lost --
12        A. So you understand, you should not
13   report out any data, zero data, on a failed --
14   on a failed test.
15        Q. Yeah. I understand what you're
16   telling me.
17        A. It -- it -- it -- it should be
18   rejected, it should be not reported out.
19        Q. Uh-huh. Which is something a doctor
20   could easily see if he looked at the second
21   page when it said validity.
22        A. No.
23        MR. STEWART:
24        Object to the form.
25        A. You shouldn't -- you shouldn't report

**EXHIBIT A**

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                April 10, 2019

Page 305

1  the -- any of the medications that -- any of
2  the test results at all.
3  EXAMINATION BY MR. KUPPERMAN:
4      Q.  Right.
5      A.  Because it's a failed sample.
6      Q.  Right.  I understand.  But when the
7  doctor looks at the second page, it tells him
8  it's a failed sample.
9      A.  It says it's a failed sample, but it's
10 also reporting out on what else it found.
11     Q.  Okay.
12     A.  Which are not reliable.
13     Q.  Okay.
14     A.  So.
15     Q.  Um -- and all I'm saying is the
16 doctor, from seeing it's a failed test, would
17 know that it's not reliable.
18     A.  I'm sayings it's bad medical practice
19 and it puts patients at risk.
20     Q.  I hear what you're telling me, but can
21 you answer my question?
22     A.  Yes.
23     Q.  A doctor looking at the second page
24 would be able to see that it was a failed
25 sample, and he shouldn't rely on it.  Is that

Page 306

1  correct?
2          MR. STEWART:
3              Object to form.
4      A.  Yes.
5  EXAMINATION BY MR. KUPPERMAN:
6      Q.  Okay.  All right.  Can you identify
7  any patients or customers that were lost as a
8  result of this rejected report defect?
9      A.  Um -- Cochise is coming to mind.
10 Cochise had, um -- quite a few issues and
11 problems.  This may have been lost by Pathway,
12 Trinity.  So one of the -- Prestige loses
13 Pathway.  Pathway loses I think Cochise.  And
14 this is one of the problems that we discovered
15 over there.  We'll check and see.
16     Q.  Trinity didn't lose an customer.
17     A.  That's right.
18     Q.  And Performance Labs didn't lose any
19 customer.
20     A.  That's correct.
21     Q.  Okay.  Was a workaround created for
22 that problem?
23     A.  I think this is one of the ones that
24 the workaround was Merge removing their
25 product.  I don't think there was ever a

Page 307

1  workaround developed for this one.  That's my
2  understanding.
3      Q.  Okay.  And the backdating defect,
4  which we've talked some about, can you identify
5  any clients or customers that were lost as a
6  result of that?
7      A.  That's -- it's a game changer.  You
8  can't -- you can't operate with that.  Um --
9      Q.  Can you name me any specific customers
10 that were lost?
11     A.  No.
12     Q.  Okay.  And I think you've already told
13 me you're unaware of the workaround for that.
14 Right?
15     A.  That's correct.
16     Q.  Okay.  The averaging number defect.
17     A.  The workaround -- actually, I did
18 mention that one of the workarounds that --
19 would be to print out, in paper, the QC on the
20 day.  So I am aware of a workaround that we
21 figured out at a later time, where you can
22 actually print it out.  I'm not quite sure how
23 that was used internally, but.
24     Q.  So you could just print it out, and
25 that would solve the problem.

Page 308

1      A.  You'd have to -- you'd print out QC
2  that you did on that day, and then have that
3  collected, so that way whenever you got audited
4  you'd have to present it.
5      Q.  Okay.  And did you all do that?
6      A.  That's how we got -- if I'm not
7  mistaken, that's how we got Sandy Pearson to
8  approve us to be able to use the system again.
9      Q.  Okay.  Averaging number defect.  Um --
10 what is that?
11     A.  That's, um -- well, I just explained
12 with the 1, plus 3, plus 3, plus 3, those 3s
13 are only counted as one 3.
14     Q.  Okay.
15     A.  And then divided wrong.
16     Q.  And can you identify any customers or
17 clients that were lost as a result of that?
18     A.  No.  A of them's patient care would be
19 impacted, but no.
20     Q.  Okay.  And, um -- was there a
21 workaround for that?
22     A.  To fix its math computation?  No.
23     Q.  Okay.  The security defect, um -- that
24 you claim.  Um -- well, can you describe
25 exactly what that is?

JOHNS, PENDLETON, FAIRBANKS AND FREESE                    504 219-1993

**EXHIBIT A**

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                    April 10, 2019

Page 309

1    A.  Yeah.  So, um -- the version of the
2  software that Merge uses is an older version
3  of, um -- Tomcat, or Apache, or Java.  It's a
4  very, very old version.  And it allows you to
5  be able to -- there are known vulnerabilities.
6  Um -- and the reasons why you update software
7  is because those vulnerabilities become known.
8  They're actually out there on Google.  You can
9  just search how to be able to do it, and they
10  walk you through, step by step, how to go ahead
11  and attack that system.
12        Every Merge system that has a server,
13  from my understanding, has that vulnerability.
14        So the security threat would allow
15  somebody to be able to walk through your server
16  door, um -- and remember, this is complicated.
17  I'll get to that point.  But walk in through
18  your server, um -- be able to manipulate
19  data -- it's complicated because there is no
20  audit logs to know that they came in, they'd be
21  able to put up a shell, and effectively, um --
22  leave and you'd never know that they were
23  there.
24        It's also further complicated and made
25  simpler -- excuse me.  It's made simpler

Page 310

1  because Merge's help desk used the same
2  administrative passwords for every single site
3  location.  So the password at our location was
4  actually the same password at multiple
5  locations.  And so basic password security
6  wasn't being used there.  So that's -- that's
7  why it was, like -- yeah.
8    Q.  And all this information was available
9  on the internet?
10    A.  The information on how to, um -- get
11  to the vulnerabilities of --
12        THE WITNESS:
13          Is it Tomcat?  Sorry.  Can I ask
14  you?
15        MR. STEWART:
16          I don't know.  I believe so.
17        THE WITNESS:
18          Yeah.
19    A.  All those vulnerabilities were --
20  EXAMINATION BY MR. KUPPERMAN:
21    Q.  Did anybody for Trinity or any of the
22  plaintiffs check the internet for that before
23  buying Merge?
24    A.  Uh -- no.
25    Q.  Okay.  Did, uh -- was a workaround

Page 311

1  created?
2    A.  Um -- Ban Caston would know that
3  answer, what he did to able to secure it.
4    Q.  Okay.  But on behalf of Trinity, you
5  don't know that answer.
6    A.  On behalf of Trinity, I don't know
7  how -- how to fix that security flaw.
8    Q.  Okay.  You don't know of any actual
9  compromise of the data through this defect, do
10  you?
11    A.  It's impossible to know.  That's the
12  problem with it.
13    Q.  You don't know of any, though.
14    A.  I don't know of any.
15    Q.  Okay.  And you have not seen any
16  evidence that any system of yours was hacked.
17  Correct?
18    A.  Um -- no.  I don't have any evidence
19  of that.
20    Q.  And there's there evidence that any
21  information was stolen from you.
22    A.  No.  No.  We don't know.
23    Q.  Okay.  What was -- what did Merge say
24  about the security of the LIS system before you
25  bought it?

Page 312

1    A.  Um -- I believe it said, safe, secure,
2  up to date, with all of the basic security
3  requirements.
4    Q.  Okay.  And, um -- did you tell CMS of
5  this security defect?
6    A.  In the, um --
7    Q.  At any time.
8    A.  Yes.  We did let them know.
9    Q.  Okay.  Did CMS shut you down as a
10  result?
11    A.  No.
12    Q.  Did it shut Merge down -- or your use
13  of the Merge software down?
14    A.  I don't remember -- let me replace
15  what I just said.  I don't remember when we
16  told CMS about the security flaw.  Um -- it may
17  have been even after we decided that we weren't
18  going to use Merge at all anymore --
19    Q.  Okay.
20    A.  -- after March.  But I'm not sure when
21  we told CMS about it.
22    Q.  But CMS did not shut you down.
23    A.  No.
24    Q.  And CMS did not shut down use of the
25  Merge software either, did it?

78 (Pages 309 to 312)

EXHIBIT A

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                    April 10, 2019

Page 313

1    A.  No.
2    Q.  Okay.  Okay.  All right.  I'm just
3  trying to find the next one.
4        Um -- while we're doing that, have you
5  talked to any experts other than Harold Asher?
6    A.  Um -- no.
7    Q.  Okay.
8    A.  Retained experts?  No.
9    Q.  Any experts, retained or not?
10    A.  I mean, I talk to experts all the time
11  in the laboratory business.
12    Q.  Well, about this case.
13    A.  No.
14    Q.  Okay.  Has any expert other than
15  Harold been engaged?
16    A.  No.
17    Q.  Okay.
18    A.  I talked to a, uh -- excuse me.  I
19  talked to a billing company -- not a billing
20  company, but a billing auditor about taking on
21  the, uh -- the case and providing some expert
22  witness testimony for me, but they said it
23  wasn't the right fit for them.
24    Q.  Okay.  Let me show you what I will
25  mark as Exhibit 11?  11 is next?  Or is it 10?

Page 314

1        MR. STEWART:
2            I don't know that you introduced
3        10.
4        MR. KUPPERMAN:
5            Yeah.  So we'll go with 10.
6        MR. STEWART:
7            10 was your best exhibit all day.
8        I don't know why you're not using it.
9        I liked 10.
10        MR. KUPPERMAN:
11            I thought you would.
12  EXAMINATION BY MR. KUPPERMAN:
13    Q.  Okay.  Let me show you what I have
14  marked as 10 -- a new 10.
15        You recognize this as a document that
16  was put out by Performance Labs on or about
17  May 3, 2017; correct?
18        (Exhibit 10 was marked for
19  identification and is attached hereto.)
20    A.  It's incomplete.  But yes, I do.  I do
21  recognize this.
22  EXAMINATION BY MR. KUPPERMAN:
23    Q.  What is incomplete about it?
24    A.  Um -- there's a finished document that
25  actually has Ben's -- where it says, Jamie, Ben

Page 315

1  please insert detail here -- Data Breach:
2  Jamie/Ben please insert detail here.  Incorrect
3  flagging for run site.  Like, this is --
4  those -- this is a draft.
5    Q.  Okay.  I don't believe we have seen a
6  final.  So if you've got a final, again, I'd
7  appreciate it.
8    A.  Okay.
9    Q.  Um -- let me ask you, who created the
10  document?
11    A.  This would have been a team effort.
12    Q.  Okay.  And it's the same team you told
13  me about earlier?
14    A.  Yes.
15    Q.  And was this done for use in
16  litigation?
17    A.  Uh -- this was, um -- probably so.
18    Q.  Okay.
19    A.  We had, uh -- we didn't have any
20  employees that were going to be left.  So
21  getting ahead of it, I wanted to make sure that
22  the company had a memory that was better than
23  my own.
24    Q.  Okay.
25    A.  A lot of hits to the head.

Page 316

1    Q.  Now, it says at the bottom of that
2  first paragraph there, that one of
3  corrective -- well, I'm sorry.  It says, in the
4  second sentence, after receiving condition
5  level deficiencies that ultimately led to a
6  suspension of patient testing at Performance
7  Labs -- do you see that?
8        The very first paragraph?
9    A.  Uh-huh.
10    Q.  The second sentence.  You got that?
11    A.  Yes.
12    Q.  That's suspension we're talking about
13  was the one that occurred in 2015?
14    A.  Yes, sir.
15    Q.  Okay.  And then it says, one of the
16  corrective actions in place was to change the
17  LIS from the current system in place to the
18  FDA-approved Merge LIS.
19        Do you see that?
20    A.  Yes, sir.
21    Q.  And the current system was the Trinity
22  1.0 or 2.0?
23    A.  It would have been the 1.0 still.
24    Q.  Okay.
25    A.  2.0 is still on the shelf.

79 (Pages 313 to 316)

EXHIBIT A

Page 317

1    Q.  Okay.  Um -- okeydokey.
2         Now, it says in here, in the second
3    paragraph, that this details the
4    ineffectiveness of Merge software when
5    monitoring and tracking, and the inability to
6    prove acceptable control run each day, and then
7    it says it will also detail additional defects
8    found in the software in the course of usage
9    and further investigation.
10        Can you tell me which of these defects
11   that are listed by bullet points were found in
12   the further investigation?
13   A.  I -- let me see.  These additional
14   defects were found in the course of usage and
15   further investigation into quality control
16   issues.  Um -- I think the computed mean was
17   actually -- no, let me go through this one by
18   one.
19        The data breach was further
20   investigation.  The data breach.  Due to the
21   password issue Merge has left the door open to
22   a data breach and a HIPAA violation.  We didn't
23   find that in common usage; we actually
24   investigated and started really looking into
25   things.

Page 318

1    Q.  So it was outside of the --
2    A.  Normal course of --
3    Q.  -- regular operations.
4    A.  That's right.  Yeah.
5    Q.  You kinda had to look for that one.
6    A.  Yeah.
7    Q.  Okay.  Anything else?
8    A.  Um -- passwords in plain text.  We
9    found that whenever we were asking Merge to
10   help us with, um -- with, um -- somebody who
11   couldn't log in at one of our sites, um -- so
12   that could be -- that could be in -- right now,
13   so you can move forward, the, um -- the further
14   investigation would be the data breach.
15   Q.  Okay.  Um -- in talking about the,
16   um -- user manual, and audit tracking, if you
17   look at Page 5, right before it shows
18   workarounds --
19   A.  Sure.
20   Q.  -- it says, Performance Labs is only
21   able to prove the acceptability of QC results
22   because of manual records?
23        Do you see that?
24   A.  Yes.
25   Q.  So -- and I think you may have

Page 319

1    mentioned that before, by making copies and
2    keeping them?
3    A.  That's right.
4    Q.  Okay.  So, um -- Performance was able,
5    in fact, to prove the acceptability of the QC
6    results by keeping manual records.
7    A.  That's correct.
8    Q.  Okay.  Um -- so, um --
9    A.  Laboratory information paper system.
10   Q.  All right.  All right.  Let me do
11   this:  All right.  Let me ask you this:  I'm
12   going to show you what we've marked as
13   Exhibit 11.  (Tendering.)  This is the
14   Solutions Design Document, um -- that you
15   received from Merge.  Correct?
16        (Exhibit 11 was marked for
17   identification and is attached hereto.)
18   A.  Yes, sir.
19   EXAMINATION BY MR. KUPPERMAN:
20   Q.  Bear with me a minute.  Well, I'm all
21   out of order, that's why.  Keep bearing with me
22   here.
23        Now, you're aware of the fact that
24   this Solutions Design Document was created
25   based on information Trinity sent to Merge.

Page 320

1    Correct?
2    A.  Correct.
3    Q.  And this document was acceptable to
4    Trinity and the plaintiffs?
5    A.  Um -- yes, sir.
6    Q.  Okay.  So if any information in hear
7    was incorrect, you would have corrected it to
8    make sure the product was configured correctly.
9    Right?
10        MR. STEWART:
11            Object to form.
12   A.  Um -- yes.
13   EXAMINATION BY MR. KUPPERMAN:
14   Q.  Okay.
15   A.  Our objective was to have a great
16   roll-out, so we would have done what we needed
17   to do to make sure we got in step.
18   Q.  Okay.  There is an operational summary
19   on Page 3.  You with me?
20   A.  Yep.
21   Q.  And that shows that, um --
22        MR. KUPPERMAN:
23            By the way that has Paracelsus
24        spelled out.
25   EXAMINATION BY MR. KUPPERMAN:

EXHIBIT A

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                    April 10, 2019

Page 321

1      Q.  Um -- but the shows that you were
2    anticipating annualized collections of $425,000
3    split between two laboratory sites, one
4    Performance and the other Central Valley?
5         MR. STEWART:
6            Object to form.
7      A.  That's not, um -- I don't believe
8    that's, um -- dollars.
9    EXAMINATION BY MR. KUPPERMAN:
10     Q.  Where it says Estimated Annual
11   Collections.  What else was that?
12     A.  It pay actually be samples collected,
13   or tests ran.
14     Q.  Okay.
15     A.  Yeah.
16     Q.  And that's split between both
17   entities.
18     A.  Yeah.  Yeah.
19     Q.  And only one entity was there.  Right?
20   Only one entity actually existed.
21     A.  That's right.  Yeah.
22     Q.  All right.
23        MR. STEWART:
24           Just to clarify, when you're
25        asking about only one entity, Steve,

Page 322

1        where are you referring to?
2        MR. KUPPERMAN:
3           Well, you see how it says 425,000
4        split across the two laboratory sites?
5        And the labs are mentioned above being
6        Performance and Central Valley.
7        MR. STEWART:
8           And so what is your question
9        regarding one entity?
10       MR. KUPPERMAN:
11          Well, I think it's already been
12       answered, so I don't really have a
13       question pending.  But Jesse, all I
14       was saying is the 425 was not per lab,
15       it was with both of them together.
16       MR. STEWART:
17          So 425,000 between Performance
18       Labs in Mandeville, Louisiana, and
19       Central Valley Diagnostics Labs in
20       Merced, California.
21     A.  Yes.  And it's not -- I don't believe
22   it's dollars.
23   EXAMINATION BY MR. KUPPERMAN:
24     Q.  Yeah.  You said that.
25     A.  Yeah.  It's testing.  Yeah.

Page 323

1      Q.  Okay.  Now, turn if will to Page 10.
2    And do you see at the bottom it says known
3    caveats and assumptions?
4      A.  Yes, sir.
5      Q.  Okay.  And Trinity then was going to
6    provide all the specs to meet or exceed the
7    guidelines.  Correct?
8      A.  Correct.
9      Q.  And Trinity was going to provide the
10   network or certifications for
11   inter-connectivity right?
12     A.  That's correct.
13     Q.  And Trinity was going to calibrate,
14   correlate, um -- and all those other things,
15   the instruments --
16     A.  Uh-huh.
17     Q.  -- um -- as described on Page 10.
18   Correct?
19        MR. STEWART:
20           Object to form.
21   EXAMINATION BY MR. KUPPERMAN:
22     Q.  All right, let me reask it.  Trinity
23   was responsible for the instruments being
24   calibrated, correlated, reagents on board, and
25   ready to run samples.  Correct?

Page 324

1        MR. STEWART:
2           Object to form.
3      A.  Um -- this document explains the
4    relationship, that's what it says, I agree with
5    you.  Yes.
6    EXAMINATION BY MR. KUPPERMAN:
7      Q.  Okay.  And you knew that Trinity had
8    to do that because it was required for
9    instrument validation.  Right?
10     A.  That's correct.
11        MR. STEWART:
12           Object to form.
13   EXAMINATION BY MR. KUPPERMAN:
14     Q.  And you knew that all of that, the
15   calibration, et cetera, had to be accomplished
16   before the installer arrived.  Correct?
17        MR. STEWART:
18           Object to form.
19     A.  Um -- I do believe so.
20   EXAMINATION BY MR. KUPPERMAN:
21     Q.  Okay.  And you also knew that Trinity
22   was responsible for training the lab staff on
23   the operation of the equipment.  Right?
24        MR. STEWART:
25           Object to form.

JOHNS, PENDLETON, FAIRBANKS AND FREESE                      504 219-1993

EXHIBIT A

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                    April 10, 2019

Page 325

1    A.  Correct.
2    EXAMINATION BY MR. KUPPERMAN:
3    Q.  Okay.  Also, if you flip the page,
4  you'll see that the system being sold to you
5  all was in its currently released software
6  version.  Correct?
7    A.  What page is that?
8    Q.  The very next one.
9    A.  11?
10    Q.  Flip it over.  Yes.
11    MR. STEWART:
12        I object to the form.
13    A.  Currently released software version in
14  its present state of development.  Yes.
15    EXAMINATION BY MR. KUPPERMAN:
16    Q.  Okay.  And now look --
17    A.  The recalled version?
18    Q.  No.
19    A.  Okay.
20    Q.  Whatever the version was.
21        Now look at Page 16.
22    A.  All right.
23    Q.  Okay.  You there with me on Page 16?
24    A.  Yes, sir.
25    Q.  Now, in that bullet point, the last

Page 326

1  sentence says, currently, Version 4.1.3 of the
2  Merge LIS software.  That's what it says;
3  right?
4    MR. STEWART:
5        Object to form.
6    A.  Yes, that's what it says.
7    EXAMINATION BY MR. KUPPERMAN:
8    Q.  Okay.  Is there any doubt in your mind
9  that you were receiving Version 4.13 or later?
10    A.  Um -- yes.
11    Q.  Okay.  All right.  Um -- when it says,
12  the next line, when running in a VM, what is
13  that?
14    A.  Virtual machine?
15    Q.  Are you guessing?
16    A.  I'm guessing.
17    Q.  Okay.
18    A.  Yeah.
19    Q.  All right.  And going back to my prior
20  question, your doubt as to the version is based
21  on a sales order?
22    A.  Yes.
23    Q.  Okay.  And by the way, did you see in
24  the lawsuit the explanation for reason for
25  that?

Page 327

1    A.  No, sir.
2    MR. STEWART:
3        Object to form.  There's been no
4    explanation for the reason for that in
5    the lawsuit.  What are you referring
6    to when you're talking about the
7    lawsuit?
8    EXAMINATION BY MR. KUPPERMAN:
9    Q.  You've never seen an affidavit or a
10  pleading filed in this lawsuit that explains
11  that?
12    A.  No, sir.
13    Q.  Okay.  You received this Solutions
14  Design Document before the to move forward
15  with, um -- buying the Merge system; correct?
16    A.  Yes, sir.
17    Q.  Okay.  And it was -- your decision was
18  based, at least in part, on this document.
19  Correct?
20    A.  Yes, sir.
21    Q.  Okay.  Um -- okay.  Let's look at the
22  next document, which we'll mark as Exhibit 12.
23  (Tendering.)  You recognize this as the sales
24  order?
25        (Exhibit 12 was marked for

Page 328

1  identification and is attached hereto.)
2    A.  Yes, sir.
3    EXAMINATION BY MR. KUPPERMAN:
4    Q.  And this document date is January of
5  2016.  Correct?
6    A.  Yes, sir.
7    Q.  Okay.
8    A.  January 5th, 2016.
9    Q.  And do you know how much Trinity in
10  fact paid to Merge?
11    A.  Not off the top of my head, no, sir.
12    Q.  Okay.  Now, Chad Howell signed this on
13  behalf of Trinity?
14    A.  Yes, sir.
15    Q.  And you understood that Trinity would
16  be responsible for, um -- complying with all
17  the obligations, terms, and conditions that are
18  set forth in this agreement.  Correct?
19    A.  Yes, sir.
20    Q.  Okay.  And that includes everything on
21  Exhibit B.  Correct?
22    A.  Yes, sir.
23    Q.  And, um -- either you read this or you
24  expected Chad to read this before signing.
25  Correct?

JOHNS, PENDLETON, FAIRBANKS AND FREESE                    504 219-1993

EXHIBIT A

Page 329

1    A.  That's correct.
2    Q.  Okay.  All right.  Okay.  And in this
3  document only Trinity is mentioned, not, um --
4  Performance or, um -- Prestige.  Correct?
5         MR. STEWART:
6             Object to form.
7    A.  In this document?
8  EXAMINATION BY MR. KUPPERMAN:
9    Q.  Yes, sir.
10   A.  Yes, sir.
11   Q.  Okay.  In fact, in the sales design --
12 the Solutions Design Document that we looked at
13 a minute ago, that does not talk about
14 Performance or Prestige except in the client
15 overview section.  Correct?
16        MR. STEWART:
17            Object to form.
18   A.  It actually -- it says it right here.
19 Performance Labs.  CBDL.
20 EXAMINATION BY MR. KUPPERMAN:
21   Q.  What page are you on?
22   A.  I'm on Page 9.
23   Q.  Ah.  Okay.  I missed that one.
24   A.  Exhibit, uh -- Exhibit 11.
25   Q.  Yeah, I've got that.  I see.  All

Page 330

1  right.  Well, let's limit it, then.  Prestige
2  is not mentioned anywhere, is it?
3    A.  No, it's not.
4    Q.  All right.  And looking back at
5  Exhibit 3 of what we were talking about, which
6  is No. 12, I think --
7    A.  Okay.
8    Q.  -- okay, um -- you'll see -- and look
9  at Page 9 or 9, Paragraph 11.
10   A.  Yes.
11   Q.  And you see there that it says,
12 nothing in the agreement will be construed as
13 giving any right, remedy, or claim to an entity
14 other than the parties?  Do you see that?
15   A.  Um -- yes, sir.
16   Q.  Okay.  And the parties were Trinity
17 and Merge.  Correct?
18        MR. STEWART:
19            Object to form.  Requires a legal
20            conclusion.
21   A.  Um --
22 EXAMINATION BY MR. KUPPERMAN:
23   Q.  Can you answer my question, sir?
24        MR. STEWART:
25            You can answer it if you know it.

Page 331

1    A.  The -- I'm looking at a document that
2  you -- that you gave me, that Chad signed,
3  that's a sales order.  And what you just said
4  is accurate.
5  EXAMINATION BY MR. KUPPERMAN:
6    Q.  Okay.  And so you were aware and
7  Trinity was aware that at the time it signed
8  this there was no third-party beneficiary.
9  Correct?
10        MR. STEWART:
11            Object to form.  Requires a legal
12            conclusion.
13 EXAMINATION BY MR. KUPPERMAN:
14   Q.  Well, that's what it says right there
15 in Paragraph 11, no third-party beneficiaries.
16 Correct?
17   A.  Um -- correct.
18   Q.  Okay.  And it also, in Paragraph 9,
19 talks about limitations of liability, doesn't
20 it?
21   A.  Yes, sir.
22   Q.  And it even says that in no event will
23 Merge's aggregate cumulative monetary
24 liability, whether in contract, or in tort, or
25 any other theory, exceed the total fees

Page 332

1  received by Merge.  You see that?
2    A.  That's correct.
3    Q.  And you agreed to Paragraph 9 and
4  Paragraph 11, didn't you?
5    A.  Yes, sir.
6         MR. STEWART:
7             Object to form.
8  EXAMINATION BY MR. KUPPERMAN:
9    Q.  Okay.  And you fully expected that you
10 would live up to your obligations that you
11 signed and agreed to in this document.  Is
12 that --
13        MR. STEWART:
14            Object to form.
15   A.  I fully expected that Merge would live
16 up to its obligations in this sales order.
17 EXAMINATION BY MR. KUPPERMAN:
18   Q.  Yes, sir.  But I'm asking you, you
19 expected to live up to your obligations.
20 Correct?
21   A.  I --
22   Q.  You meaning Trinity.  Correct?
23   A.  Trinity expected to -- to buy a
24 compliant piece of software, and we would --
25 yes.

83 (Pages 329 to 332)

Page 333

1    Q.  Okay.
2    A.  Let me just make that --
3    Q.  And so Trinity understood that there
4  was a limitation of liability and no
5  third-party beneficiary.  Correct?
6        MR. STEWART:
7            Object.  It requires a legal
8            conclusion.
9  EXAMINATION BY MR. KUPPERMAN:
10   Q.  Correct?
11   A.  Correct.
12   Q.  Thank you.  Okay.  Let me show you
13  what I have marked -- I hate doing this because
14  it's a lot of paper, but I'll show what I've
15  marked as Exhibit 13.  (Tendering.)  Sir,
16  Exhibit 13.
17       (Exhibit 13 was marked for
18  identification and is attached hereto.)
19   A.  Sure.  I was looking for a spot on the
20  misrepresentations.  Okay.
21  EXAMINATION BY MR. KUPPERMAN:
22   Q.  Um -- you recognize this document as a
23  series of e-mails followed by the, uh -- user
24  manual?  Is that correct?
25   A.  Yes.

Page 334

1    Q.  And this is the user manual, as you
2  can see on the top of the e-mail, for, um --
3  Version 4.1.  Correct?
4    A.  Yes.
5    Q.  Okay.  If you thought you were getting
6  Version 3.8, did you ask anybody for a
7  different manual?
8    A.  No.
9    Q.  Okay.  You understand that this was
10  the manual that was appropriate for the version
11  you were receiving.
12   A.  This is the first time I've ever seen
13  the, uh -- the -- this version of this user
14  manual.
15   Q.  Yes, sir.  But it's not the first time
16  Trinity has seen it, is it?
17   A.  Trinity has seen this user manual
18  before.
19   Q.  Okay.  And, um -- Trinity, who you're
20  here to testify on behalf of, did not, um --
21  ask why they were getting the manual for the
22  system or version that it didn't have.
23  Correct?
24   A.  That's correct.
25   Q.  Um -- and Trinity understood that this

Page 335

1  was the appropriate manual for the version it
2  received.  Correct?
3    A.  Um -- to the best of its knowledge,
4  sure.
5    Q.  Okay.  Well, I'm -- what motivated a
6  change in plans on the Central Valley, um --
7  lab?
8    A.  Um -- CMS's letter to us in
9  December 23rd, 2015.
10   Q.  Okay.  It didn't have to do with
11  Merge; it had to do with the CMS sanctions?
12   A.  Yes.
13   Q.  Okay.  All right.  Let me make sure I
14  got the right one.  All right, here's No. 14.
15  (Tendering.)  And I want to direct your
16  attention to one of the last -- or one of the
17  first e-mails, which is on the last pages,
18  May 12, 2016, from Chad to Ron Poe.  If you
19  see, the e-mail leading up to that is May 11,
20  from Ron Poe the Chad Howell, and Ron is
21  sending him information that is helpful with
22  regard to instructions for deployment of Merge
23  sites and ePortal locations.
24       Do you see that?
25       (Exhibit 14 was marked for

Page 336

1  identification and is attached hereto.)
2    A.  Yes, sir.
3        MR. STEWART:
4            Object to form.
5  EXAMINATION BY MR. KUPPERMAN:
6    Q.  And then on the next e-mail coming
7  back, Chad thanks Ron for the user guide.
8  Right?
9    A.  I don't see it.
10   Q.  You on the page with Bates Nos. 920 at
11  the end?
12   A.  920.
13   Q.  You see Chad writes back --
14   A.  Thank you, Ron, for the user guide
15  materials?  Sure.
16   Q.  Right.  Okay.  And then, um -- a
17  couple of paragraphs later, he says, the part
18  that's really bothering me is just not having a
19  full understanding of what it will take to
20  support Merge across the environment that we
21  are setting up.
22       Do you see this?
23   A.  Yes, sir.
24   Q.  Okay.  So, um -- what environment was
25  Trinity setting up?

84 (Pages 333 to 336)

EXHIBIT A

Page 337

1    A.  Um -- the Merge environment.
2    Q.  Okay.  And so what he's saying here is
3  that he doesn't really understand, um -- what
4  it will take to operate the Merge system.
5  Correct?
6    A.  Yes.
7       MR. STEWART:
8           Object to form.
9    A.  If you're asking for my interpretation
10  of what Chad meant here, I'll answer.
11  EXAMINATION BY MR. KUPPERMAN:
12    Q.  Well, you're here for Trinity so.
13    A.  I'm here for Trinity.  Yeah, sure.
14  Thank you.  Uh -- so this was the first time
15  that, um -- we realized that Merge
16  misrepresented the seamlessness of its system.
17  And as we are now installing it, Chris Floyd
18  had came in, um -- we did, like, a couple of --
19  we did a training session.  And if I remember
20  correctly, we did an introduction to the
21  system, but basically there was no, um --
22  training.  So what Chad's doing in this e-mail
23  is asking for some power user training, because
24  the training that Merge gave is on the system
25  is lacking and does not line up on the sales

Page 338

1  order, or the communication from December 31st,
2  2015, of what we were told to expect.  The
3  expectations were not there.
4    Q.  What is power user training?
5    A.  Well, people that are going to be,
6  um -- internal, um -- Prestige Worldwide
7  employees that service both Performance Labs,
8  and Pathway, and Phoenix, that are Jamie Abney,
9  Danny Bozeman, Michelle Spruill, Shea Spruill,
10  Kyle Mouton, Chad Howell.  Like, when you have
11  multiple users inside of a system, you want
12  power users, people who are your go-to to
13  answer questions.  And so we wanted to be able
14  to train our own team to be able to be the
15  first line of response for our own clients.
16    Q.  And Mr. Howell is asking, um --
17  Mr. Poe to try to set up some training --
18    A.  Yes.
19    Q.  -- for power users.
20    A.  Yes, sir.
21    Q.  Okay.  But my question actually went
22  to the next part where Mr. Howell is saying he
23  really doesn't have a full understanding as to
24  what it will take to support Merge.  Right?
25    A.  Yes.

Page 339

1    Q.  Okay.  And among other things, he
2  has -- he doesn't know how many employees
3  they're gonna need.  Right?
4    A.  Yeah.  He's asking -- he's asking
5  Merge to tell us the truth now on what we
6  actually bought.
7    Q.  So as of May 12, 2016, what you're
8  telling me is you knew, um -- that Merge had
9  not been telling you the truth earlier.
10    A.  At this point, what they told us and
11  what we got aren't lining up.
12    Q.  Right.
13    A.  So we -- we need to fill in the gap.
14    Q.  So you were aware as of May 12, 2016,
15  that you did not receive what you thought you
16  were going to receive.
17    A.  Chad Howell -- Trinity was aware of it
18  at that point.  We started to -- yeah.  He's
19  asking for more help.
20    Q.  Okay.  And how long before this was
21  Trinity aware that?
22    A.  This is the first time I've seen it.
23    Q.  Okay.  Um -- and does he say in here
24  that, um -- anywhere, that he doesn't know --
25  I'm sorry.  Does he say in here that he thinks

Page 340

1  Merge lied to him?
2    A.  He says, I don't want the go into this
3  blind with any assumptions, and I know we are
4  not prepared at this point.
5    Q.  Okay.  So what he's saying is Trinity
6  is really not prepared to run this system.
7  Correct?
8       MR. STEWART:
9           Object to form.
10    A.  Yes.
11  EXAMINATION BY MR. KUPPERMAN:
12    Q.  Okay.  And he doesn't want to make
13  assumptions.
14    A.  Correct.
15    Q.  Um -- okay.
16    A.  That's a pretty good e-mail from a guy
17  who's responsible for the process, getting
18  ahead of it.
19    Q.  Uh-huh.
20    A.  Good job, Chad.
21    Q.  Okay.  Okey-dokey.  Have you talked to
22  Mr. Howell about this e-mail?
23    A.  No, sir.
24    Q.  Okay.  So what you're telling me now
25  are your guesses as to what he meant?

85 (Pages 337 to 340)

Page 341

MR. STEWART:
Object.
A. You asked me to give you --
EXAMINATION BY MR. KUPPERMAN:
Q. Yes.
A. -- Trinity's opinion because they're here to testify, and I just did that.
Q. Okay. So where does -- where do you get that information that that's what Mr. Howell was doing?
A. From the words that he wrote down.
Q. Okay.
A. And it's in the e-mail.
Q. It's based on words in the e-mail.
A. Yes, sir.
Q. Not on any external information that you have.
A. We had meetings back then about the training and getting people ready, and how we didn't get what we needed, and that all the employees were concerned that they weren't going to be able to know how to operate the Merge system based on the training that we received. So he's ringing the bell, saying, hey, man, don't want to assume it. We're not

Page 342

prepared.
Q. Okay. All right. And when was Trinity prepared?
A. To put patients at risk and at harm? Never.
Q. No, sir. When was Trinity prepared to run the system?
A. Um -- I would say we had problems running the Merge, um -- we were -- we were -- we were never prepared.
Q. Okay. Um -- now --
MR. STEWART:
Was there the end of your answer?
EXAMINATION BY MR. KUPPERMAN:
Q. Oh, I'm sorry. I thought that was.
A. Sure.
Q. You were never prepared. Trinity was never prepared to run the Merge system.
A. We were never prepared to run the Merge system as it stood, no.
Q. Okay. Okey-dokey. Now I think you told me previously, um -- that -- well, let me ask you this: When did -- I'm looking for the document now. I can't find what I was looking for. Now that I can't find the document I'm

Page 343

looking for --
MR. STEWART:
I have patience.
EXAMINATION BY MR. KUPPERMAN:
Q. Um -- let me ask you this: When did Trinity, um -- know it was probably going to file suit?
A. Um --
MR. STEWART:
Object to the extent that it requires any kind of conversations with attorneys or counsel.
You can answer to the extent that --
A. Around -- around the time that we started speaking with Pete Nanos.
EXAMINATION BY MR. KUPPERMAN:
Q. Which was when?
A. Around February and March.
Q. Of 2017?
A. Of 2017.
Q. Okay. Um -- and what did you do at that moment to preserve all records and documents?
A. Um -- we -- I instructed, um -- this

Page 344

was probably a little bit later, though, because we still had access to the system. But I instruct Michelle to, um -- actually document and video the problems with the software so that we would have them preserved. Um -- but -- we just reviewed one of the exhibits where we had them write up the known Merge effects.
Q. That was the May 3rd document --
A. Right.
Q. -- that --
A. That you previously showed any.
Q. -- is an effect of Merge on Performance Labs.
A. Yes, sir.
Q. So are you telling me that you undertook to preserve all information and records on or about May 3rd of 2017?
A. Well, we have a -- the whole server has been backed up. It's on Dropbox. Um -- there's a -- there's a -- it's -- it's -- all the e-mails that I can have access to that were saved are saved. All of the company records and documents are actually on the server, from accounting to billing, to -- everything is

EXHIBIT A

Page 345

1  basically there that -- it was our -- our
2  process to preserve the records and the
3  documents.  Except for the taxes, um -- and
4  Skip Lloyd and Wegmann -- not Wegmann Dazet.
5  Um --
6      Q.  Call, Riggs?
7      A.  I'll never give 'em credit to remember
8  their name.  On the record.
9          I'm sorry.  Um -- except for that, the
10 documentation is preserved.
11     Q.  Okay.
12     A.  It didn't take much effort to preserve
13 the information.
14     Q.  So, um -- what about, say, e-mails
15 that had been deleted off of a computer, were
16 they also saved even though they had been
17 deleted?
18     MR. STEWART:
19         Object to form.
20     A.  Um -- there was -- our, um --
21 Microsoft Office account, um -- all -- all
22 employees' e-mails, you couldn't delete it off
23 of the computer and it not be in the server.
24 So we had backups that we did.  So we do
25 have -- we have those backups.  It's in our

Page 346

1  backups.
2  EXAMINATION BY MR. KUPPERMAN:
3      Q.  Okay.  And so you have backups as of
4  May 2017?
5      A.  Yes.
6      Q.  Okay.  And what about anything that
7  happened prior to May 2017, were they backed up
8  periodically, or can you retrieve them?
9      A.  We had, um -- yeah.  I can -- I can --
10 whatever I have access to right now I can -- I
11 can retrieve.
12     Q.  Yeah.  And I'm trying to find out do
13 you have access to everything from, say, 2015
14 forward?
15     A.  Um --
16     Q.  Or was any of it destroyed or lost,
17 or --
18     A.  There was -- there a backup in April
19 of 2017, and then there was a manual backup
20 that was done maybe like in September.  And
21 just the way that the -- there's some
22 irregularities in the data that I've seen, but
23 between the two systems I feel like everything
24 is there.
25     Q.  Okay.  Did you search all of those

Page 347

1  materials on the server, et cetera, in order to
2  respond to discovery?
3      A.  Yes.
4      Q.  Okay.  Who responded to discovery, was
5  it you?
6      A.  Yes.
7      Q.  Okay.  And so when we asked for
8  documents, you're the one who actually went
9  back and retrieved the documents from the
10 server?
11     A.  Yes, sir.
12     Q.  Okay.  And did you make the
13 determination what to provide to the lawyers,
14 or did you just give them the entire server?
15     A.  A little bit of both.
16     Q.  Okay.  Well, how do you -- did you
17 give them the entire server?
18     A.  We have -- they have access to the
19 entire Dropbox server, um -- so they can peruse
20 those documents.  And then I went through
21 and -- what you were asking for, I went through
22 and dragged bulk files into each one of them,
23 myself.  I had 150 employees that were doing
24 this.  Now it's just me so.
25     Q.  You talked about the Dropbox server.

Page 348

1      A.  Yes.
2      Q.  Did you actually have the server, or
3  did you just download material from it into
4  Dropbox?
5      A.  So I actually have the server.  So we
6  had a data center that was in Hammond,
7  Louisiana.  And so that -- that data was backed
8  up, and it was just recently I believe backed
9  up again.  Burton Cosse has it.
10     Q.  Okay.  Um -- there are a lot of
11 documents, um -- with, um -- different names
12 like @TrinityMS, but there are some from, you
13 know, @bellehealth, and @prestige, things of
14 that nature.
15     MR. STEWART:
16         I object to form.  Steve, can you
17     clarify what you mean by documents
18     that are --
19     MR. KUPPERMAN:
20         Yeah.  They're like e-mails or --
21     MR. STEWART:
22         You're talking about e-mail
23     handles.
24     MR. KUPPERMAN:
25         Yeah, I'm talking about

EXHIBIT A

Page 349

```
 1        electronic documents that show that
 2        they were coming or going from, um --
 3        a TrinityMS location, or a belle
 4        health location.
 5     A.  Uh-huh.
 6   EXAMINATION BY MR. KUPPERMAN:
 7     Q.  Are they all on the same server?
 8     A.  Belle Health and Trinity, I believe,
 9   are.  The -- Pathway is not.
10     Q.  Okay.  And Phoenix is not?
11     A.  Phoenix is not.
12     Q.  What about Performance?
13     A.  Performance was Trinity.  I mean, it
14   was -- it was --
15     Q.  You used Trinity --
16     A.  Performance Labs d/b/a Trinity Health.
17   Procedural-wide, d/b/a Trinity Health.  Trinity
18   Medical Services d/b/a Trinity Health.
19     Q.  Yeah.  But the e-mail address was --
20     A.  TrinityMS.
21     Q.  TrinityMS for all of those?
22     A.  Most on the time, yes, sir.
23     Q.  Okay.  Do you know how much -- how
24   large that volume of material is?  Gigabytes,
25   terabytes, anything of that nature?
```

Page 350

```
 1     A.  9 terabytes.
 2        MR. STEWART:
 3           Object to form.
 4           If you can answer --
 5           What are -- I mean, when you say
 6        volume of material, what are you
 7        talking about?
 8        MR. KUPPERMAN:
 9           Yeah.  On the server.
10     A.  I believe it's 9 terabytes.
11   EXAMINATION BY MR. KUPPERMAN:
12     Q.  Okay.  What about Dr. Martin?  He used
13   a gmail address.  Do you have records of that?
14     A.  No, I do not have access to his.
15     Q.  Have you asked him for 'em?
16     A.  No, sir.
17     Q.  Okay.
18     A.  He was not an employee of, um -- of
19   Trinity, as far as his e-mail records go.
20     Q.  Um -- he was an employee of Prestige?
21     A.  No.  He was -- he was -- laboratory
22   directors are typically, um -- hired as
23   consultants.  So they -- there was a company
24   that Dr. Martin worked for that we -- we hired,
25   and they employ Dr. Martin.
```

Page 351

```
 1     Q.  And have you asked that company or
 2   Dr. Martin for his records?
 3     A.  No, sir.
 4     Q.  Okay.  What was the name of that
 5   company?
 6     A.  -- oh, John -- John Cangelosi owned
 7   it.  Um --
 8        MR. STEWART:
 9           If you know.
10     A.  I don't know it off the top of my
11   head.
12   EXAMINATION BY MR. KUPPERMAN:
13     Q.  Okay.  What is eHow?  Do you know?
14     A.  EHow?
15     Q.  E, H-O-W.
16     A.  Um -- in the lore and the legacy of
17   Performance Labs, eHow was the first place that
18   we, in 2012, looked at how to, um -- start a
19   toxicology laboratory.
20     Q.  That's just, um --
21     A.  A Google search; eHow.
22     Q.  Okay.  Um -- is it true that, um --
23   from the start Trinity was doomed?
24        MR. STEWART:
25           Object to form.
```

Page 352

```
 1     A.  Um -- you know, different -- different
 2   times, and with different stresses, I may have
 3   even -- I may have even used those words to,
 4   um -- to categorize where -- where we were at
 5   in the process.  Um --
 6   EXAMINATION BY MR. KUPPERMAN:
 7     Q.  So you did state publicly that Trinity
 8   was doomed from the start.
 9     A.  Um -- I don't remember when, I don't
10   remember where, but it doesn't sound like
11   something that I wouldn't have said if I was,
12   um -- angry and mad.
13     Q.  So you don't deny that you said it?
14     A.  No, I do not deny that I said it.
15     Q.  Okay.  And you would tell the truth.
16   Right?
17     A.  That what I'm here for.
18        MR. STEWART:
19           Object to form.
20   EXAMINATION BY MR. KUPPERMAN:
21     Q.  Right.  And you told the truth when
22   you said Trinity was doomed from the start.
23   Didn't you?
24        MR. STEWART:
25           Object to form.
```

88 (Pages 349 to 352)

EXHIBIT A

Page 353

1      A.  Um -- I would -- I would say, um --
2  that if I was angry, um -- that what I said in
3  the heat of that argument, or the heat of that,
4  um -- that anger, um -- was not fact-based, it
5  was feeling-based.
6  EXAMINATION BY MR. KUPPERMAN:
7      Q.  Well, what if didn't say it in anger,
8  you just said it.
9           MR. STEWART:
10              Object.
11  EXAMINATION BY MR. KUPPERMAN:
12      Q.  Say you said it on videotape, in front
13  of people, that you knew would be made public,
14  and you weren't screaming or yelling, and you
15  weren't angry.
16      A.  Uh-huh.
17      Q.  My question to you, sir, is, is what
18  you say true?
19      A.  Yes.
20      Q.  Okay.  So it is true that Trinity was
21  doomed from the start.  Because you made that
22  statement.  Correct?
23           MR. STEWART:
24              Object to form.
25      A.  It is -- it is -- it is true that

Page 354

1  Trinity failed.  It is true that Trinity was
2  doomed.  It's true that we had a CMS audit.
3  And it's true that we purchased a noncompliant
4  software.  And it's true that with all of that,
5  um -- going against us, that, um -- Trinity was
6  effectively doomed from the start.
7  EXAMINATION BY MR. KUPPERMAN:
8      Q.  Yeah.  But, uh -- Merge wasn't there
9  in the start, was it?  Manager didn't come onto
10  the scene until 2016, and Trinity started in
11  2012, you told us.
12           MR. STEWART:
13              Object to form.
14      A.  That's correct.
15  EXAMINATION BY MR. KUPPERMAN:
16      Q.  Okay.  So at the start, Merge wasn't
17  anywhere on the horizon for Trinity, was it?
18      A.  Well --
19           MR. STEWART:
20              Object to form.
21      A.  -- depending on when I made the
22  statement -- you're -- we're Monday morning
23  quarterbacking the --
24  EXAMINATION BY MR. KUPPERMAN:
25      Q.  Uh-huh.

Page 355

1      A.  -- fact that I'm, like, with all of
2  these things that happened.
3      Q.  Uh-huh.  But you're saying from the
4  start Trinity was doomed.  You're not saying
5  years after the start Trinity was doomed;
6  right?
7      A.  At the end of the -- of the story.  If
8  you look back and say we were doomed from the
9  start, picking Merge did not --
10      Q.  Uh-huh.
11      A.  -- help.
12      Q.  I understand it may not have helped,
13  but that's not what you said.  Right?
14      A.  That's correct.
15      Q.  Okay.  Now, you, um -- also indicated
16  that you had to borrow a lot of money from
17  other companies for Trinity.  Correct?
18      A.  Um --
19           MR. STEWART:
20              Object to the form.
21      A.  Other banking institutions?
22  EXAMINATION BY MR. KUPPERMAN:
23      Q.  You said other companies.  That was
24  going to be my question.  Were there companies
25  other than banks that you had to borrow money

Page 356

1  from for Trinity?
2      A.  Um -- not that I recall.
3      Q.  Okay.  Do you recall the interest
4  rates you agreed to pay on the loans to
5  Trinity?
6      A.  Um -- the loans from the banks?
7      Q.  Well, you just told me that you think
8  they're the only loans.  So --
9      A.  Yeah.  No.  That's why I'm asking.
10  Are you -- you -- I'm asking you to be specific
11  with your questions so that I can answer them.
12  I just want to answer them.
13      Q.  Yeah.  I'm just asking about loans.
14  And you said the only loans are banks.  So I'm
15  just asking, what were the interest rates on
16  the loans?
17      A.  Um -- line of credit, prime plus 1
18  percent; um --
19      Q.  Were there any fixed loans?
20      A.  Sure.
21      Q.  Fixed interest rate.
22      A.  Sure.
23      Q.  And what were they?
24      A.  Um -- off the top of my head, I can't
25  remember what they were.

**EXHIBIT A**

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                    April 10, 2019

Page 357

1      Q.  Okay.  Now, the ultimate goal that you
2   had in mind when you formed Trinity was to
3   create the company and then sell Trinity.
4   Correct?
5          MR. STEWART:
6              Object to form.
7   EXAMINATION BY MR. KUPPERMAN:
8      Q.  A few years down the road you wanted
9   to sell it.
10     A.  I don't believe that that was, um --
11  something that we were -- we had -- at one time
12  we had a guy come in and let us know how much
13  life insurance we would need, and like a
14  buy/sell agreement, and we did a free cash flow
15  calculation.  There was only one time in the
16  entire time that we operated it that we even
17  talked about selling it.
18     Q.  Did you ever state publicly that you
19  wanted to see if you could sell Trinity before
20  you invested and borrowed money to build it?
21     A.  Um -- did I state publicly that -- I
22  don't remember.
23     Q.  Did you ever try to sell Trinity to
24  Merge?
25     A.  Um -- Trinity -- we -- we tried to

Page 358

1   sell Merge a solution, and Performance Labs
2   would have come with it.
3      Q.  And why would you think Trinity would
4   be -- I'm sorry.  Why do you think Merge would
5   by interested in owning it's own lab?
6      A.  Because Ron Poe told us that.
7      Q.  Okay.  Did you talk to anyone other
8   than Ron Poe about that?
9      A.  Um -- conversations with Pete -- Pete
10  Nanos about what the team can do, and what -- a
11  laboratory for them to be able to work through
12  workflows and the problems with Merge, what an
13  actual bench laboratory can do to help 'em,
14  yeah.
15     Q.  Okay.  You recall stating that we
16  spent all our cash, lost any people who were
17  there to learn together, and wiped our own
18  business off the face of the earth?
19     A.  Uh-huh.
20     Q.  You recall saying that?
21         MR. STEWART:
22             Object to form.
23     A.  I do believe so.
24  EXAMINATION BY MR. KUPPERMAN:
25     Q.  Okay.  And you didn't mention Merge as

Page 359

1   a problem with Trinity, did you?
2          MR. STEWART:
3              Object to form.
4      A.  Um -- I was advised by counsel not to
5   disparage Merge in the public domain.
6   EXAMINATION BY MR. KUPPERMAN:
7      Q.  Uh-huh.  But you never did mention
8   Merge, did you?
9      A.  I never did disparage Merge in the
10  public domain.
11     Q.  Now, do I understand correctly you
12  adopted your daughter around Christmas of 2016?
13         MR. STEWART:
14             Object to the form.  This is not
15         anywhere on the 30(b)(6) notice.
16  EXAMINATION BY MR. KUPPERMAN:
17     Q.  Am I correct?
18         MR. STEWART:
19             Is there -- and what is your
20         basis, Steve?  Where are you going
21         with this?
22         MR. KUPPERMAN:
23             You'll find out in the next
24         question.
25     A.  September 29th.

Page 360

1   EXAMINATION BY MR. KUPPERMAN:
2      Q.  Of 2016?
3      A.  2016.
4      Q.  Okay.  And then you stated publicly
5   that after your daughter was adopted you
6   couldn't show up the same way the company
7   needed you pre-daughter.  Right?
8      A.  That's correct.
9      Q.  Okay.  So around the same time Trinity
10  was starting to run tests using Merge, in early
11  2017, you were busy, you weren't always there,
12  because of your daughter.  Is the fair?
13         MR. STEWART:
14             Object to the form.
15     A.  That's not correct.
16  EXAMINATION BY MR. KUPPERMAN:
17     Q.  Okay.
18     A.  Can I explain what that statement is?
19     Q.  Sure.
20     A.  Um -- my priorities shifted from my
21  company being my child to actually having a
22  child.  And so we started having more direct
23  conversations between us and our employees
24  about what was required and what was necessary
25  for us to be able to get the job done.  The

JOHNS, PENDLETON, FAIRBANKS AND FREESE

504 219-1993

EXHIBIT A

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                          April 10, 2019

Page 361

1  Blake Bourque that would let things go in 2015,
2  and even in the beginning of 2016, that guy had
3  disappeared.  So I became very focused on
4  getting the laboratories up and running so that
5  way I could actually provide for my family.
6     Q.  Okay.  Now, in May of 2018, you stated
7  publicly you had been sober for 277 days.
8  Correct?
9     A.  Yes, sir.
10    Q.  Okay.  So you were not sober at the
11 time you were dealing with Merge.  Correct?
12       MR. STEWART:
13          Object to form.
14    A.  The, um -- no, I was -- I was drinking
15 socially.
16 EXAMINATION BY MR. KUPPERMAN:
17    Q.  Okay.  Is that what you mean by being
18 sober 277 days?
19    A.  Yeah.  I hadn't had a drop of alcohol
20 in preparation for a couple of triathlons and
21 stuff like that.  I got very healthy.
22    Q.  Okay.  Did you ever consider yourself
23 an alcoholic?
24       MR. STEWART:
25          Object to form.  Where is this in

Page 362

1       the 30(b)(6) notice?
2  EXAMINATION BY MR. KUPPERMAN:
3     Q.  Can you answer my question?
4     A.  Sure.
5        MR. STEWART:
6           Object.  Where is it in the
7           30(b)(6) notice?
8        MR. KUPPERMAN:
9           I don't have to answer.
10       MR. BURGE:
11          Well, he doesn't have to answer
12       either.
13 EXAMINATION BY MR. KUPPERMAN:
14    Q.  You can either answer --
15       MR. KUPPERMAN:
16          Then you may instruct him not to
17          answer, and we can go to the
18          Magistrate.  That's all.
19    A.  I am 100 percent okay with saying
20 that, um -- after I lost my twin girls, um --
21 the dependence on, um -- since you know this,
22 clearly you listened to some podcasts --
23 dependence on pain medication was a, um -- and
24 alcohol was something that I struggled with.
25 And so, I now counsel men who also suffer from

Page 363

1  the disease of alcoholism.  And I help them
2  find clarify in their goals.  And I enjoy
3  speaking publicly about that.
4  EXAMINATION BY MR. KUPPERMAN:
5     Q.  I've noticed.  Okay.  And so you got
6  off of the drugs and alcohol 277 days before
7  May of 2018.
8        MR. STEWART:
9           Object.
10 EXAMINATION BY MR. KUPPERMAN:
11    Q.  Fair?
12    A.  Um -- actually, there was -- there was
13 lot of, um -- spots where I was looking for a
14 streak.  That was the longest streak at that
15 time, but I'd go 60 or 90 days.  The -- the
16 main, you know, real drugs and alcohol problems
17 for me were done around 2011.
18    The reason why we started a toxicology
19 laboratory in the first place was because,
20 um -- of helping physicians- with that
21 conversation with patients, so that they would
22 understand that depression plus dependence
23 equals addiction, and that that dependence
24 could happen from the loss of a child, the loss
25 of a loved one, a divorce, money problems, loss

Page 364

1  of a job.
2     And so we were helping physicians have
3  that crucial, critical, collision-based
4  conversation.  And that's how we were able to
5  grow our samples.  Because we weren't in there
6  saying, hey, look at us; we were in there
7  having a real conversation with physicians
8  about how they can help their patients.
9     Q.  Okay.  Did Trinity have audited
10 financial statements?
11    A.  No, sir.
12    Q.  Okay.  Why don't we take a little
13 break.
14       THE VIDEOGRAPHER:
15          We're going off record.  The time
16       is 4:51.
17          (Brief recess.)
18       THE VIDEOGRAPHER:
19          We are back on the record.  The
20       time is 5:02.
21 EXAMINATION BY MR. KUPPERMAN:
22    Q.  Okay.  Did Trinity present
23 documentation to CMS about all the defects in
24 the Merge system?
25    A.  Yes.

91 (Pages 361 to 364)

EXHIBIT A

Page 365

1    Q.  And CMS did not revoke Performance's
2  CLIA license as a result, did it?
3    A.  No, sir.
4    Q.  And CMS didn't tell Trinity it
5  couldn't use Merge.  Correct?
6      MR. STEWART:
7        Object to form.
8    A.  Um -- couldn't use Merge without,
9  um -- the documented workarounds.
10 EXAMINATION BY MR. KUPPERMAN:
11   Q.  It told Trinity that it could not use
12 Merge without the documented workarounds.
13   A.  That's correct.
14   Q.  And where did it say that?
15   A.  Um -- in the conversation that we had
16 with -- with CMS, with Sandy Pearson.  Um --
17   Q.  Anywhere in writing?
18   A.  Um -- in the -- there was a letter
19 that Sandy wrote back to us where she reviewed
20 the corrective action report, and she reviewed
21 basically the workarounds, and understood why
22 we submitted it, um -- told us to report it to
23 the FDA, agreed with us, those types of things.
24 And then I believe she -- in that -- in that
25 e-mail, I vaguely remember -- I'd have to --

Page 366

1  I'd have to look at the e-mail, but with the
2  workarounds in place you can resume testing is
3  something that I remember.
4    Q.  She didn't say you couldn't resume it
5  without the workarounds because you presented
6  it to her with the workarounds.  Correct?
7      MR. STEWART:
8        Object to form.
9    A.  We -- I'm not quite sure how the
10 process actually went.  I'd have to look at the
11 e-mail and see.
12 EXAMINATION BY MR. KUPPERMAN:
13   Q.  All right.  So basically, you're just
14 telling me what you remember from the e-mail?
15   A.  Yes, sir.
16   Q.  Okay.  Um -- CMS didn't tell Pathway
17 or Phoenix it couldn't use Merge; correct?
18   A.  No, sir.
19   Q.  Okay.  And no, sir meaning I'm
20 correct?
21   A.  Meaning you're correct.
22   Q.  Okay, thanks.  Regulators did not
23 impose any additional sanctions on any of the
24 plaintiffs because of the defects that you're
25 talking about in the Merge system; correct?

Page 367

1    A.  Correct.
2    Q.  And regulators didn't impose any fines
3  on any of the plaintiffs because of any defects
4  that you claim are in the Merge system.
5  Correct?
6    A.  Correct.
7    Q.  And they never -- regulators never
8  shut down Trinity, Performance, or Prestige,
9  because of any defects in Merge.  Correct?
10   A.  That's correct.
11   Q.  Did CMS ever tell Performance, or
12 Prestige, or Trinity, that sanctions would be
13 imposed if they didn't switch away from using
14 Merge?
15   A.  No, on the exit interview, um -- for
16 us, Alexa Little did tell me that she knew that
17 there were laboratories that were shut down,
18 um, that had the Merge system, and they were
19 shut down because of the QC and the lack of
20 audit control.  But she didn't give me specific
21 names.
22   Q.  Did she tell you approximately where
23 they were?
24   A.  Um -- they had to have been in her,
25 uh -- in her region because of, uh --

Page 368

1    Q.  6.
2    A.  No.  Louisiana.  Alexa Little.  So
3  Alexa -- Alexa was the, um -- was the CLIA
4  inspector.  So she only has the state of
5  Louisiana.  So these laboratories would have
6  had to have been in the state of Louisiana.
7      Aurora McKinney told me, also, that
8  she knew of laboratories that were -- that had
9  Merge whenever they got inspected and were shut
10 down.
11     Um -- and I know that there were --
12 there was a laboratory in Covington, Labtrust,
13 that had Merge as an LIS, and whenever it was
14 shut down it took a, um -- it took the
15 opportunity to switch away from the Merge LIS,
16 and they just -- they built their own system.
17 Um -- that's Labtrust in Covington, Louisiana.
18   Q.  And when was that, do you know?
19   A.  Aurora, um -- told -- I think Aurora
20 told, uh -- Aurora told Merge that on one of
21 the group calls.  Also, um -- I think Labtrust
22 was shut down right around the same time that
23 we were.  Maybe a couple months after.  So they
24 have gotten shut down in the beginning of 2016.
25 I don't know specifically when.

92 (Pages 365 to 368)

**EXHIBIT A**

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                    April 10, 2019

Page 369

1    Q.  Okay.  You purchased an aircraft in
2  2014 on behalf of Prestige; is that correct?
3    A.  Yes.
4    Q.  Can you tell me why that was needed?
5    A.  So, um -- we were, um -- doing a lot
6  of regional travel.  First thing I did was I
7  had a driver, whenever we were starting the
8  businesses.  And once our -- my travel and my
9  sales took me from, um -- the regional
10  Louisiana, um -- the aircraft that cost maybe
11  like $60,000, um -- because it was a Piper
12  Lance, it wasn't a very expensive aircraft,
13  um -- that was taking tack us between New
14  Orleans, Lafayette, Houston, um -- Dallas.
15  That was pretty much the route.  So it was all
16  regional routes.
17    Q.  Why did Prestige need that?
18    A.  Um -- because of the time that it took
19  to be able to travel.  It was an efficiency
20  thing.
21    Q.  Well, why did Prestige -- where is
22  Prestige located?
23    A.  Mandeville, Louisiana.
24    Q.  So why did you need to travel anyplace
25  as a result of Prestige?

Page 370

1    A.  Um --
2      MR. STEWART:
3        Object to form.
4    A.  Because we were helping with sales and
5  the marketing efforts of Performance Labs.
6  EXAMINATION BY MR. KUPPERMAN:
7    Q.  Okay.  So it had to do with marketing
8  for Performance?
9    A.  Yes, sir.
10    Q.  Okay.  Um -- and did Prestige charge
11  back that use of the aircraft to Performance?
12    A.  Yeah, I believe -- sometimes we marked
13  Mark Lobell's aircraft, um -- and he sent us --
14  he'd send us an invoice for gas.  But yeah, it
15  was charged back.
16    Q.  Okay.  Now, Trinity was paying
17  DocuSign for services that it really wasn't
18  using in 2016.  Correct?
19    A.  Correct.
20      MR. STEWART:
21        Object to form.
22  EXAMINATION BY MR. KUPPERMAN:
23    Q.  And, um -- Trinity also had issues
24  collecting from insurers, um -- in 2016 and
25  '17.  Correct?

Page 371

1      MR. STEWART:
2        Object to form.
3    A.  Um -- no.  We actually did a really
4  good job collecting, um --
5  EXAMINATION BY MR. KUPPERMAN:
6    Q.  Um -- United HealthCare.  That's a
7  private insurer?
8    A.  Sure.
9    Q.  And, um -- did you -- did Trinity's
10  UHC account get flagged preventing any claims
11  from being processed?
12    A.  Yes.
13    Q.  Explain that to me, if you will.
14    A.  Um -- after the letter came out from,
15  um -- from the CMS audit, um -- United took the
16  position that, um -- they owed us $1.2 million
17  already, and so they basically said, look,
18  we're not going to pay you this because of this
19  letter.  And that was their justification for
20  it.
21    Q.  Okay.  And did you ever collect the
22  $1.2 million?
23    A.  No, sir.
24    Q.  Okay.  So you were having trouble
25  collecting from private insurer?

Page 372

1    A.  Um -- with that -- that case, yes,
2  sir.
3    Q.  Okay.  Did Trinity owe United
4  HealthCare any money?
5    A.  Um -- there was a, um -- a recoupment
6  letter attached in an audit that we were to --
7  to fill out.  And I don't remember the
8  particulars of how -- how Phil and, um -- and
9  Chad turned over the audits.
10    Q.  Well, my question, though, was whether
11  Trinity owed UHC money.
12    A.  It would be Performance Labs who owed
13  the money.  So Trinity did not owe.
14    Q.  Okay.  So Performance Labs owed money
15  to UHC.
16    A.  Very well, yes.
17    Q.  Did it ever pay UHC?
18    A.  The way the recoupment happens is it
19  happens whenever you bill new samples, and
20  because we were never able to bill new samples
21  they never could do an offset.  So it just
22  stayed where it was at.
23    Q.  So you never paid them.  Correct?
24    A.  No.
25    Q.  Performance never paid UHC.

JOHNS, PENDLETON, FAIRBANKS AND FREESE                    504 219-1993

EXHIBIT A

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                    April 10, 2019

Page 373

1    A.  No.
2    Q.  Okay.  There -- in 2017, um -- well,
3  let me ask you this:  Who's -- is it Le Lage --
4    A.  De Lage.
5    Q.  -- Land and Financial?
6    A.  Yes.
7    Q.  And who are they?
8    A.  They financed Waters.
9        THE REPORTER:
10         Spelled?
11       MR. KUPPERMAN:
12         D-E, another word L-A-G-E.  And
13       then I think it's Landen, L-A-N-D-E-N.
14   A.  Yeah.  DLL.
15  EXAMINATION BY MR. KUPPERMAN:
16   Q.  Yeah.
17   A.  Um -- they financed all of the Waters
18  LCMSs.  Waters is a brand of an LCMS.
19   Q.  Okay.  And they were seeking, in March
20  of 2017, over $2 million in lease payments from
21  you.  Correct?
22   A.  That's correct.
23   Q.  Was that from Trinity, or Performance,
24  or both?
25   A.  Um -- I believe both.

Page 374

1    Q.  Okay.  And why didn't you pay?
2    A.  Merge LIS didn't work.
3    Q.  Yes.  But, um -- De Lage was a lease
4  on equipment.  Right?
5    A.  Correct.
6    Q.  And you owed it $2 million, and you
7  didn't pay it.
8    A.  We did not have the money to pay it
9  because our operations --
10   Q.  Okay.
11   A.  -- could not be started --
12   Q.  Okay.
13   A.  -- because of Merge.
14   Q.  Okay.  But you didn't have the money
15  to pay the 2 million.
16   A.  That's correct.
17   Q.  Okay.  Have they sued you?
18   A.  Um -- it's been settled.
19   Q.  Okay.  What did you end up paying?
20   A.  Um -- we ended up having a, um -- part
21  of the Pathway agreement -- Pathway assumed the
22  debt, and they ended up settling it.
23   Q.  Do you know what was paid?
24   A.  No, sir.
25   Q.  Okay.  Now, Trinity was also sued by

Page 375

1  Hancock Bank.  Correct?
2    A.  Yes.
3    Q.  And um -- where does that stand?
4    A.  Um -- currently negotiating a global
5  resolution.
6    Q.  And how much is owed to Hancock?
7    A.  Above 170, I think it's 178, something
8  like that.
9    Q.  Okay.  And when was that due,
10  originally?
11   A.  Oh, we have an action against
12  Hancock -- excuse me -- against Whitney Hancock
13  and, um -- so we're suing them, and they're
14  suing us.
15   Q.  Okay.
16   A.  Well, Linebacker is suing them.  And
17  they're suing Trinity.
18   Q.  When was that $170000-plus supposed to
19  be paid?
20   A.  Um -- we sold the building, and then
21  there was a deficit of the building sale.
22   Q.  That's the building you were in that
23  you told me about earlier?
24   A.  Yes, sir.
25   Q.  Okay.

Page 376

1    A.  I don't remember the exact date.
2    Q.  Was it in 2017?
3    A.  No.  I believe it was in 2018.
4    Q.  Okay.  So you owed the money to
5  Hancock Bank, and a greater amount than the
6  sale paid off.
7    A.  That's correct.
8    Q.  And you owed them -- when was that due
9  to be paid, originally?  Did you get behind in
10  payments on that?
11   A.  Um -- not until after the business was
12  sold and we shut down Performance Labs.  Not
13  until Pathway went on it's way.  That's when we
14  got behind on payments.
15   Q.  Okay.  Um -- now, um -- let me ask --
16  I'd like to ask, but I can't find what I'm
17  looking for.  Just bear with me one sec.
18       Okay.  Now, I'm going to show you what
19  I am going to mark as I think No. 15.
20  Okey-dokey.  Um -- and you recognize this?
21  (Tendering.)
22       Put that down on there.
23       (Exhibit 15 was marked for
24  identification and is attached hereto.)
25   A.  Oh, the sticker?

94 (Pages 373 to 376)

EXHIBIT A

Page 377

1  EXAMINATION BY MR. KUPPERMAN:
2    Q.  Yeah.
3    A.  Okay.
4    Q.  Thank you.  You recognize this as an
5  e-mail from Skip Lloyd to Cathey Saurage at
6  Hancock-Whitney?
7    A.  Yes, sir.
8    Q.  And then an e-mail from Skip to
9  Melanie Maceira, just conveying that e-mail.
10  Right?
11    A.  Yes, sir.
12    Q.  Okay.  And in that, Mr. Lloyd says,
13  find attached Performance Labs for-- basically
14  the calendar year 2016.  Do you see that?
15    A.  Yes, sir.
16    Q.  And it says, it shows a substantial
17  profit for the year.  Correct?
18    A.  Yes, sir.
19    Q.  Okay.  Can you tell me how -- I mean,
20  we don't have the attached document to that, so
21  I don't know what that looks like.  But can you
22  tell me, um -- how Performance Labs showed a
23  substantial profit in 2016?
24    A.  Sure.  So there were samples that were
25  done in 2015 -- done, what I mean is that were

Page 378

1  run in 2015, that, um -- during a handheld
2  audit, um -- we went through every single
3  requisition form, every single HCFA 1500, which
4  is the billing form that you submit, every
5  final report.  We matched them all up, and as
6  we were making sure that they were priced
7  right, they were billed right, it -- was a
8  massive, very, very forensic billing audit that
9  we did, we found that the, um -- the L.I.M.S.
10  system and the Xifin billing system had a
11  flagging error, and we recognized this in the
12  middle of 2015, but we didn't realize the
13  extent to it.  And so there was, you know,
14  thousands of specimens that actually were not
15  billed, and we found them.  And so we organized
16  a billing effort to be able to start -- you
17  have a timely filing issue.  So there's some
18  amount of time that you have, as a laboratory,
19  to be able to actually file and bill.  So we
20  collect another $10 million in 2016.  So on an
21  accrual base accounting method, 2015, we made
22  anywhere between 6 and 10 million bucks.
23    Q.  Uh-huh.
24    A.  So -- 'cause those were all 2015
25  specimens.  So when you book the revenue there,

Page 379

1  that's where it's at.  So for '15 -- excuse me.
2  For '16, it was showing top line revenue of
3  probably around $9-$10 million.
4    Q.  And are your books kept on a cash or
5  accrual basis?
6    A.  Um -- they're -- they're -- both.
7  He -- Skip would keep accrual-base accounting
8  and cash-base accounting.
9    Q.  And the income that was received in
10  '16 was actually accrued for --
11    A.  In '15.
12    Q.  '15.
13    A.  Yes, sir.
14    Q.  Okay.  In March of 2017, as I
15  understand it, Trinity was negotiating with
16  Home Bank on a loan.  Correct?
17    A.  Yes, sir.
18    Q.  And you decided to sell some equipment
19  to help pay that loan.  Correct?
20    A.  Yes, sir.
21    Q.  And when did you decide to sell that?
22    A.  Um -- it was equipment that we had.
23  Um -- it was manufacturing equipment.  And,
24  um -- we wanted to get it out of the building,
25  so we decided we'd sell it and decrease the

Page 380

1  principal price.
2    Q.  Was that in February, March, April?
3    A.  Um -- I don't remember.
4    Q.  Okay.  Um -- you, Trinity, didn't have
5  any accounts receivable in March of 2017;
6  correct?
7    A.  Um -- the repricing of the specimens,
8  because of the way that, um -- when you -- when
9  you reprice a specimen you reset the clock on
10  the receivable time line.  So we would have
11  been running out of receivables around that
12  time.  We had some -- we had some worker's comp
13  that we had just discovered.  And there's no
14  time out on workers' comp.  So we did have
15  receivables in March 2017, but they were
16  starting to -- to -- to dissipate.
17    Q.  Okay.
18    A.  I have -- I have a company right now
19  that's still working on that AR.
20    Q.  And what company is that?
21    A.  Um -- Trinity -- I have -- I'll get
22  you the -- I'm sorry.  It's a law firm.  Um --
23  I'll get you the name of the law firm.
24    Q.  Okay.  Now, the loan to Home Bank, you
25  were aware in March of 2017, was going to go

EXHIBIT A

Page 381

1  into default.  Right?
2      A.  Um -- yeah.  We had a pretty good idea
3  that we were running out of cash and we weren't
4  going to be able to make the payments.
5      Q.  Yeah.  Um -- the -- walk me through --
6  I think you've told me that Pathway and Phoenix
7  were sold in April of 2017.  Is the fair?
8      A.  That's fair.
9      Q.  Okay.  Walk me through that.  How was
10  that sell initiated, why, who was on the other
11  side, what were the terms?
12      A.  So, um -- I had a very, um -- you just
13  said, right? -- I mean, I had a different --
14  different attitude towards what was going on.
15  I'm wanted to get as small as possible.  Um --
16  I wanted to get patients testing again at both
17  Pathway and at Performance Labs, and I didn't
18  need a big team to do it.  So we needed to get
19  expenses down as close as possible.
20      I recommended that had we look at a
21  Chapter 11 bankruptcy.  I looked at -- I
22  recommended us, you know, looking at doing a
23  reorg, at least give us some more time to
24  think.  Because Pathway was producing cash
25  flow.  So um -- my business, uh -- Rhett Bunce

Page 382

1  left in January.  As I said at the time was for
2  health issues.  Um -- that's what he told us.
3      Um -- Trinity -- so I wanted to
4  terminate -- we have a couple of documents
5  called, you know, bone deep.  I wanted to get
6  down to about 20 employees.  And Chad didn't
7  want that.  Um -- I wanted to file Chapter 11
8  bankruptcy, which was going to cause the banks
9  to basically, um -- call guarantors on notes.
10  And that was going to put Mark Lobell's
11  assets -- and all of us, personally, from a
12  personal guaranty standpoint, you know, right
13  there up front.
14      And so they opted for a different
15  strategy.  And the strategy that they opted for
16  was to bring in some investors, have somebody
17  come in and step up and guarantee the notes,
18  and negotiated, um -- a deal that I thought was
19  fair for me and would work for me.  And, um --
20  kicking and screaming, we executed it and we
21  moved on.
22      Q.  When you said you were talking about
23  bankruptcy filing, a Chapter 11 --
24      A.  Uh-huh.
25      Q.  -- what entity was that for?

Page 383

1      A.  We -- we never explored what that
2  would look like globally.  So I was -- I wanted
3  to sit down with an attorney and get counsel.
4  I presented that to the team in one of our
5  meetings, let's experience bankruptcy.  Fear
6  immediately came over everybody about losing
7  their houses, they completely shut down, and we
8  never -- we never pursued it.
9      Q.  Yeah.  But when you talk about
10  exploring bankruptcy, for what entity?
11      MR. STEWART:
12          Object.  I think he just answered
13      your question.
14      A.  Yeah.  We -- yeah, I did.
15  EXAMINATION BY MR. KUPPERMAN:
16      Q.  So you were just talking about
17  declaring bankruptcy but not having an idea of
18  what entity?
19      A.  What I said was we need to explore how
20  we can cut our expenses and reorganize this
21  debt.
22      Q.  Okay.
23      A.  That's it.
24      Q.  But you were just talking about
25  Trinity, Performance, Prestige, Pathway,

Page 384

1  Phoenix?  I'm trying to figure out, were you
2  talking about all of 'em, or --
3      A.  This --
4      Q.  -- any of 'em?
5      A.  This would have --
6      MR. STEWART:
7          Object.  Steve, you've asked the
8      question three different ways.  He's
9      already answered the question.
10          You can answer it again if you
11      want.
12      A.  Performance and Trinity and Prestige,
13  at various different levels, have commercial
14  guaranties in various different debts.  So we
15  were looking to reorganize the companies' debt.
16  EXAMINATION BY MR. KUPPERMAN:
17      Q.  Okay.  Now, who owned Pathway and
18  Phoenix at that time?  Before the sale?
19      A.  Um -- Phil Martinez, and, um -- Kyle
20  Mouton, and I believe Shea Spruill.
21      Q.  Okay.  And are Pathway and Phoenix
22  labs?
23      A.  Yes.
24      Q.  And where were they located?
25      A.  Picayune, Mississippi.

EXHIBIT A

Page 385

1    Q.  Both of them?
2    A.  Yes, sir.
3    Q.  Okay.  And in this sale, do I
4  understand that, um -- Rob Conrad acquired 10
5  percent of both entities?
6    A.  Um -- no.  This is hearsay:  I think
7  Rob and maybe John Hearn had a piece of it as
8  well.
9    Q.  Okay.  Um --
10    A.  At the -- at the closing, though,
11  Robco was -- not Rob Conrad, Robco was taking
12  ownership over those entities.  It wasn't an
13  individual, it was Robco.
14    Q.  Okay.  And you just don't know who
15  owns Robco?
16    A.  That's correct.
17    Q.  But you don't, and to your knowledge
18  Chad doesn't, or anybody like that.
19    A.  That's right.
20    Q.  Okay.  Did, um -- Trinity or
21  Performance or Prestige get anything out of the
22  transfer of ownership in Pathway and Phoenix?
23    A.  I think we got a reduction of debt.
24    Q.  And why did you get -- why did those
25  entities get a reduction of debt if they didn't

Page 386

1  own either Pathway or Phoenix?
2    A.  Um -- that was the deal that was
3  basically structured.  We would give up our
4  management contract with Pathway, and that
5  Pathway, um -- yeah, we'd just give up the
6  management contract with Pathway, and we
7  negotiated that they would step up and take
8  over.
9    Q.  Okay.  Basically, Performance was
10  trying to liquidated its debts, and Pathway was
11  going to try to service those debts out of its
12  cash flow?
13    A.  Um -- it wasn't Performance that was
14  trying to liquidate its debt.  It would be
15  Trinity, Performance had some guaranties, and
16  Prestige may have been on a note or two.
17    Q.  Well, Performance owed -- at least as
18  of that time in 2017, owed about 1.5 million on
19  a home loan?  Correct?
20    A.  Uh-huh.
21    Q.  You have to answer orally.  Yes or no.
22    A.  Oh.  Yes.
23    Q.  And it owed about 2.7 to De Lage?
24    A.  Yes.
25    Q.  2.7 million to De Lage?

Page 387

1    A.  Yes.
2    Q.  And it owed, um -- it had a line of
3  credit with Whitney of about $540,000 it owed?
4    A.  Yes.
5    Q.  And it owed Iberia about $160,000?
6    A.  I don't -- did Performance -- we're
7  talking about -- we're asking about
8  Performance, but did Performance have a line of
9  credit with Whitney?  Was it commercially
10  guarantied on a line of credit with Whitney?
11    Q.  I believe, but I'm asking you.
12    A.  I'd have to go back and look.  I'm not
13  sure.
14    Q.  Okay.  But those -- Iberia it also
15  owed; correct?
16    A.  Yes.  Iberia.
17    Q.  Okay.  And was Trinity also liable on
18  all of those debts?
19    A.  Um -- I don't -- I don't -- I'd have
20  to look at the notes and see.
21    Q.  Okay.  Do you know of any other debts
22  that Trinity was liable for?
23    A.  No.
24    Q.  Okay.  Um -- can you tell me why
25  Trinity was a party to the sale agreement

Page 388

1  between Robco and Pathway and Phoenix?
2    A.  Because it owned 100 percent of
3  Prestige Worldwide.
4    Q.  Okay.  And Prestige was ending its
5  management agreement?
6    A.  That's correct.
7    Q.  Okay.  Why don't you give me a
8  couple of minutes.
9    MR. STEWART:
10      A couple of minutes?
11    THE VIDEOGRAPHER:
12      We're going off the record.  The
13    time is 5:28.
14      (Brief recess.)
15    THE VIDEOGRAPHER:
16      We are back on the record.  The
17    time is 5:32.
18    MR. LESUEUR:
19      We're going to mark all these
20    three as Exhibit 16.  They're not
21    Bates'd.  They haven't been produced
22    yet, so they're not Bates range --
23    they're not Bates stamped, but we're
24    happy to do that after today.  But we
25    only have one copy, unfortunately.

EXHIBIT A

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                                    April 10, 2019

Page 389

1       (Exhibit 16 was marked for
2  identification and is attached hereto.)
3       MR. KUPPERMAN:
4          Just -- so one copy -- there are
5  three that go as part of that.
6       MR. STEWART:
7          And when you say they haven't
8  been produced yet, these are Merge
9  documents?
10      MR. LESUEUR:
11         They're Merge documents.  Right.
12      MR. STEWART:
13         That have not been produced yet.
14      MR. BURGE:
15         Why haven't they been produced?
16      MR. LESUEUR:
17         They weren't requested.
18      MR. BURGE:
19         We didn't request invoices from
20  Merge?
21      (Off the record due to
22  simultaneous discourse of counsel.)
23  EXAMINATION BY MR. KUPPERMAN:
24      Q.  Let me just ask you a couple questions
25  on this document.

Page 390

1          You recognize those as invoices?
2      A.  This is the first time I'm putting my
3  eyes on them.
4      Q.  Well, you've seen invoices before from
5  Merge.  Right?
6      A.  I have seen -- yes, I have.  Yes.
7      Q.  Okay.  And these appear to be invoices
8  from Merge to Trinity?
9      A.  Yes.
10     Q.  And, um -- those invoices have not
11  been paid, have they?
12     A.  No.
13     Q.  Okay.
14     A.  Per Merge.
15     Q.  Pardon?
16     A.  There's -- if you can -- you guys, I'm
17  sure, have seen the six months of us trying to
18  go back and forth to decide and decipher what
19  was actually charged and what wasn't charged
20  through the Merge process.  So when I say
21  they're sending us invoices, they've done that
22  before and they've been incorrect.
23     Q.  Uh-huh.
24     A.  And so, I haven't looked at these to
25  see of they're correct or not correct.

Page 391

1      Q.  Okay.  But they have not been paid.
2      A.  I have not paid these invoices.
3      Q.  Okay.  Thank you very much.  I don't
4  have any other questions.
5      MR. STEWART:
6          We have a few questions.
7      MR. KUPPERMAN:
8          Are you going to ask about these?
9      MR. STEWART:
10         They're an Exhibit.
11      MR. KUPPERMAN:
12         I know.  I want to look 'em.
13  EXAMINATION BY MR. STEWART:
14      Q.  All right.  Just cleaning up a few
15  things:  We talked a lot about the duplicate
16  container defect; correct?
17      A.  Yes.
18      Q.  And you discussed a number of the
19  problems associated with the duplicate
20  container defect.  Correct?
21      A.  Yes.
22      Q.  And isn't one of the problems also
23  that if you deleted the duplicate container it
24  would also delete the original container?
25      MR. KUPPERMAN:

Page 392

1          Object to the form of the
2          question.
3      A.  As I understand it, yes.
4  EXAMINATION BY MR. STEWART:
5      Q.  Okay.  So that would be in addition to
6  the defects that you already discussed.  Is
7  that correct?
8      MR. KUPPERMAN:
9          Object to the form of the
10         question.
11      A.  As I understand it, yes.
12  EXAMINATION BY MR. STEWART:
13      Q.  Okay.  Now, we talked a lot about Skip
14  Lloyd.  Correct?
15      A.  Yes.
16      Q.  And he was your CPA?
17      A.  Yes.
18      Q.  And you trusted him to prepare your
19  taxes?
20      A.  Yes.
21      Q.  And he told you that he prepared your
22  taxes.  Correct?
23      A.  Yes.
24      Q.  He told others that he prepared your
25  taxes?

98  (Pages 389 to 392)

EXHIBIT A

Page 393

1      A.  Yes.
2      Q.  And you believed him when he said
3  that.  Correct?
4      A.  Yes, sir.
5      Q.  Okay.  Talking about the sale of
6  assets to Pathway that occurred around
7  April 2017.  Correct?
8      A.  Yes.
9      Q.  Or I'm sorry.  Not the sale to
10  Pathway; the sale to Robco.
11      Did Robco also obtain any of
12  Performance's on Trinity's equipment?
13      A.  Yes.
14      Q.  And what, um -- what would that
15  equipment have been, just generally?
16      A.  The, um -- well, there was the DLL
17  equipment that was Performance Labs' that was,
18  um -- that was relocated and moved to, um -- to
19  Pathway.  There was the furnitures, the
20  fixtures, the equipment.  Um -- those were the
21  things that -- those were the assets involved
22  in the transaction as I understand it.
23      Q.  Okay.  Were there any other assets
24  from Trinity or Performance that may have been
25  conveyed in that sale?

Page 394

1      MR. KUPPERMAN:
2          Object to the form.
3      A.  There was a, um -- there was AR that
4  was supposed to be transferred.  There was debt
5  that was supposed to be replaced.  The
6  transaction was set up to where, um -- the
7  monies that Prestige Worldwide had loaned
8  Pathway, that Pathway was in the process of
9  paying back, that effectively Prestige wouldn't
10  have a claim on Pathway going forward.  So they
11  were going to transfer AR, so that the document
12  had a fair amount of, um -- the monies that
13  were owed to us, um -- they were attempting to
14  get that perfected in the document.  They
15  attempted.
16      Q.  Okay.  Can you find Exhibit 78?
17  That's the letter from counsel.  It looks like
18  this. (Indicating.)
19      MR. KUPPERMAN:
20          Are you going to mark these in
21      globo?
22      MR. STEWART:
23          Yes.
24      MR. KUPPERMAN:
25          As what?

Page 395

1      MR. STEWART:
2          17.
3      A.  All right.
4  EXAMINATION BY MR. STEWART:
5      Q.  Okay.  And you'll remember that this
6  Exhibit 7 is a letter from me, Jesse Stewart,
7  the opposing counsel, and it references some
8  documents in it?
9      A.  Yes.
10      Q.  And you remember going through these,
11  and you were shown in globo Exhibit 8.
12  Correct?
13      A.  Yes.
14      Q.  And we looked at in globo Exhibit 8,
15  and the numbers on in globo Exhibit 8 did not
16  mark up to the numbers on Exhibit 7.  Correct?
17      A.  That's correct.
18      Q.  Okay.  I'm going to hand you an
19  exhibit that I'm marking as in globo
20  Exhibit 17.  (Tendering.)
21          (Exhibit 17 was marked for
22  identification and is attached hereto.)
23      A.  Okay.
24  EXAMINATION BY MR. STEWART:
25      Q.  Now, looking at Exhibit 7, first,

Page 396

1  starting, um -- with that first parenthetical,
2  it says, stating, quote, the Merge LIS is
3  capable of handling all of the different lab
4  disciplines you have mentioned below in one
5  system, period.
6          Do you see that?  In Exhibit 7.
7      A.  In Exhibit 7 I do see that.
8      Q.  Okay.  Now, if you go over here to in
9  globo Exhibit 17, first page, TRINITY ending in
10  038 --
11      A.  Uh-huh.
12      Q.  -- the e-mail at the bottom of the
13  page, it's an e-mail from Ron Poe to Rick
14  Ornelas dated November 19th, 2015.  Do you see
15  that?
16      A.  Yes.
17      Q.  And the third paragraph -- do you see
18  that?
19      A.  Yes.
20      Q.  And do you see where it says, the
21  first sentence of that paragraph, the Merge LIS
22  is capable of handling all the different lab
23  disciplines you have mentioned below in one
24  system?
25      A.  Yes.

EXHIBIT A

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                                    April 10, 2019

Page 397

1    Q.  Is that the same sentence that appears
2  in Exhibit 7?
3    A.  Yes.
4    Q.  Okay.  Now, the next sentence in
5  Exhibit 7, the next parenthetical, it says,
6  touting, quote, standout features?  Do you see
7  that?
8    A.  Yes.
9    Q.  So flipping a few pages forward in in
10  globo 17, this is an attachment to that e-mail,
11  do you see where we see TRINITY ending in 4048?
12  A few more pages.
13    A.  Yes.
14    Q.  Okay.  And, um -- this is a pdf that's
15  been put together.  The second paragraph under
16  the heading Merge Clinical Lab Solutions.  Do
17  you see that?
18    A.  Yes.
19    Q.  And do you see the sentence, the first
20  sentence of that second paragraph, it says,
21  Merge Clinical Lab Solutions are designed with
22  significant customer input and reflect the
23  workflow and specific needs of the lab with
24  standout features including modular
25  functionality that allows you to grow as needed

Page 398

1  and have web-based access for realtime results.
2    Do you see that?
3    A.  Yes.
4    Q.  That standout features language, is
5  that the same language that is in Exhibit 7?
6    A.  Yes.
7    Q.  Okay.  The third parenthetical in
8  Exhibit 7 inviting plaintiffs to participate in
9  a, quote, web demo, do you see that?
10    A.  Yes.
11    Q.  Turning to the next page of in globo
12  Exhibit 17?
13    A.  Okay.
14    Q.  The next page.  The one that ends 5562
15  at the bottom.
16    A.  Yes.
17    Q.  Do you see the sentence at the top,
18  please join Merge Healthcare for a Web demo of
19  Merge LIS?
20    A.  Yes.
21    Q.  That term web demo, is that the same
22  term that is in that third parenthetical on
23  Exhibit 7?
24    A.  Yes.
25    Q.  Okay.  Now, the fourth parenthetical

Page 399

1  on Exhibit 7 says, quote, offering a
2  significant incentive for you all to move
3  forward, unquoted.
4    Turning to the next page in in globo
5  Exhibit 17, which ends in 6614, it says, I
6  would like to offer -- I'm sorry.  The second
7  sentence of this e-mail from Ron Poe to Chad
8  Howell, dated 12/17/2015, says, I would like to
9  offer a significant incentive for you to move
10  forward on the Central Valley LIS project in
11  2015.  Do you see that?
12    A.  Yes.
13    Q.  And is that the same language that
14  appears in that fourth parenthetical?
15    A.  Yes.  It is it.
16    Q.  Okay.  Now, just scanning through the
17  numbers there are at the bottom of this in
18  globo Exhibit 17, would you agree with me that
19  they're not the same numbers that appear on
20  Exhibit 7?
21    A.  I do agree with you.
22    Q.  Okay.  So would that appear to you to
23  be typos?
24    A.  Yes.  It would be.
25    Q.  And you didn't prepare this letter.

Page 400

1  Correct?
2    A.  I did not.
3    Q.  Your attorney, me, prepared this
4  letter.  Correct?
5    A.  Yes, you did.
6    Q.  Okay.  D you happen to have the Second
7  Amended Complaint in front of you?  It's not an
8  exhibit, but they offered it to you and you've
9  referenced it quite a few times.
10    A.  Second Amended Petition for Damages.
11    Q.  Yep.  If you go to Paragraph 56, which
12  starts on Page 16 and continues onto Page 17 --
13    A.  Yes.
14    Q.  -- the first four bullet points on
15  Page 17, they describe a November 19th, 2015,
16  conversation, or e-mail, from Ron Poe in which
17  the language the Merge LIS system is capable of
18  handling all the different lab disciplines
19  you've mentioned below in one system, end
20  quote.  It goes on.  The second paragraph
21  references the standout features.  The third
22  paragraph mentions the web demos.  And the
23  fourth paragraph mentions the offering a
24  significant incentive for you to move forward.
25    Do you see that?

100 (Pages 397 to 400)

EXHIBIT A

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                    April 10, 2019

Page 401

1     A.  Yes.
2     Q.  Are those the same quotes that appear
3  in this Exhibit 7?
4     A.  Yes.
5     Q.  Okay.  Thank you.  Do you have Exhibit
6  12 in front of you?  This is the, um -- sales
7  agreement from January of 2016.
8     A.  Exhibit what?
9     Q.  Exhibit 12.
10     A.  Yeah.  Exhibit 12.
11     Q.  You got it?
12     A.  I have it, yeah.
13     Q.  Okay.  And you'll recall, I believe,
14  um -- that Mr. Kupperman asked if Performance
15  Labs appears anywhere in this document.
16        Do you recall something to that
17  effect?
18     A.  I do recall that.  Yes.
19     Q.  And do you recall stating that, no,
20  that the term Performance Labs does not appear
21  in this document?
22     A.  That's correct.
23     Q.  Looking at the first page of that
24  document, do you see where there's a section in
25  bold towards the bottom that starts, special

Page 402

1  comments?
2     A.  Yes.
3     Q.  And do you see the one, two, three --
4  it's about the fourth sentence in, it says,
5  this quote is for a core lab to be established
6  at Trinity Medical Services in Mandeville,
7  Louisiana, doing toxicology confirmations?
8     A.  Yes.
9     Q.  Did Trinity Medical Services ever
10  perform toxicology confirmations?
11     A.  No.
12     Q.  Who performed toxicology
13  confirmations?
14     A.  Performance Labs.
15     Q.  And did Merge know that Performance
16  Labs performed toxicology confirmations?
17        MR. KUPPERMAN:
18          Object to the form of the
19        question.
20     A.  Yes, they did.
21        MR. KUPPERMAN:
22          There's no way he can tell us
23        what Merge knew or didn't know.
24     A.  Yes, I .
25  EXAMINATION BY MR. STEWART:

Page 403

1     Q.  And how can you say that Merge knew
2  that Performance Labs was the one who performed
3  toxicology confirmations?
4        MR. KUPPERMAN:
5          Objection.
6     A.  Because we presented a document to
7  them, and on another one of these exhibits I
8  was shown today it actually shows the work
9  flow.
10  EXAMINATION BY MR. STEWART:
11     Q.  And what do you mean, it shows the
12  workflow?
13     A.  Um -- this document right here shows
14  Performance Labs.
15        MR. KUPPERMAN:
16          What document is it?
17     A.  I'm sorry.  This is Exhibit -- Exhibit
18  11, December 31, 2015.  Exhibit 11.  And it --
19  prepared by Merge, it says, Performance Labs
20  right there, with the actual equipment that was
21  going to be used, and how it was going to be
22  mapped out.  And it shows Central Valley
23  Diagnosis Laboratory.  And in here, it says,
24  remote lab in Merced, Central Valley Diagnosis
25  Laboratory, as here.

Page 404

1        But in here, it says, training and
2  medical services in Mandeville, Louisiana,
3  doing toxicology confirmations, which it
4  doesn't do because it's not a laboratory, it's
5  actually Performance Labs.
6        So I can say that they did know that
7  Performance Labs existed because they prepared
8  it with their own writing.
9     Q.  And just to clarify, that is the
10  document titled Solutions Design Document.
11  Correct?
12     A.  That is correct.
13     Q.  Okay.  And that was prepared in
14  December of 2015, which was before the sales
15  contract in January of 2016.  Correct?
16     A.  That's correct.
17     Q.  Okay.  And that particular diagram
18  that you were looking at was on Page 9 of that
19  document.  Correct?
20     A.  That's right.  Page 9.
21     Q.  Okay.  Going back to that sales
22  contract, turning to Page 4 of that document
23  where it says that bundled -- under Exhibit A,
24  the product list, it says, software 3.8.1.
25  Correct?

101 (Pages 401 to 404)

JOHNS, PENDLETON, FAIRBANKS AND FREESE                    504 219-1993

**EXHIBIT A**

Page 405

1    MR. KUPPERMAN:
2        I'm sorry.  Where are you?
3    MR. STEWART:
4        Page 4 on Exhibit 12.
5    MR. KUPPERMAN:
6        Okay.
7    A.  Page 4, Page 4, Page 4.  Yes, it does.
8    EXAMINATION BY MR. STEWART:
9    Q.  Okay.  And you testified that you did
10   your research and you learned, well after the
11   fact, that this Version 3.8.1 was subject to
12   the duplicate container defect product recall.
13   Correct?
14   A.  That's correct.
15   Q.  Okay.  And opposing counsel was asking
16   you about other versions of the software later
17   on.  Correct?
18   A.  Correct.
19   Q.  And you were asked whether it was some
20   version later than this 4.1 that was installed,
21   um -- at Performance Labs.  Correct?
22   A.  Correct.  I remember that.
23   Q.  Now, isn't it true that the version
24   that you received, whether it was 3.8 or 4.1,
25   contained the duplicate container defect.

Page 406

1    Correct?
2        MR. KUPPERMAN:
3        Object to the form of the
4        question.
5    A.  The version -- we did find the
6    duplicate container defect, period.
7    EXAMINATION BY MR. STEWART:
8    Q.  Period.  So whatever version it was,
9    it had the duplicate container defect.
10       MR. KUPPERMAN:
11       Object to the form of the
12       question.
13   A.  Correct.
14   EXAMINATION BY MR. STEWART:
15   Q.  And you were never informed of the
16   Duplicate container defect at any time prior to
17   purchasing the product.  Correct?
18       MR. KUPPERMAN:
19       Object to the form of the
20       question.
21   A.  Correct.  I was not.  Did not know
22   about the duplicate container defect or any of
23   the FDA recalls.  I was never notified, ever,
24   about a FDA recall, at all even the ones that
25   happened when we were under contract.

Page 407

1    EXAMINATION BY MR. STEWART:
2    Q.  Okay.  You were asked, um -- whether
3    you ever presented to Merge, in any form, um --
4    the defects that you experienced at Performance
5    Labs.  Correct?
6        MR. KUPPERMAN:
7        Object to the form.
8    A.  Correct.
9    EXAMINATION BY MR. STEWART:
10   Q.  And you said that you did, in various
11   ways.  Correct?
12       MR. KUPPERMAN:
13       Object to the form.
14   A.  Correct.
15   EXAMINATION BY MR. STEWART:
16   Q.  In preparation for this, um -- for
17   this deposition, do you recall looking at a
18   document dated October 2016 that stated known
19   Merge defects?
20   A.  Yes.
21   Q.  And you're confident that that was
22   turned over to Merge.
23   A.  Yes.
24   Q.  And did that document describe at
25   least some of the defects that are at issue in

Page 408

1    the compliant?
2        MR. KUPPERMAN:
3        Object to the form.
4    A.  The document that we sent to Merge --
5    that I sent to Merge in October 2016 did a good
6    job of addressing what we then knew about.
7    Like, known Merge defects was the proper title
8    for that document because this is what we knew.
9    EXAMINATION BY MR. STEWART:
10   Q.  Okay.  Now, you were talking about,
11   um -- earlier -- I'm sorry.  Strike that.
12       Counsel was asking you questions about
13   what Performance and Trinity and Prestige did
14   to, um -- to learn the Merge system and to get
15   the Merge system up and running.  Correct?
16   A.  Correct.
17   Q.  And I'm paraphrasing here, but I
18   believe at one time, um -- counsel asked you
19   the question whether you would have ever been
20   prepared to run the Merge system.  Correct?
21   A.  Correct.
22       MR. KUPPERMAN:
23       Object.
24   EXAMINATION BY MR. STEWART:
25   Q.  And your answer was that, no, you were

EXHIBIT A

Page 409

1    never prepared to run the Merge system.
2    Correct?
3        A.  That's correct.
4        Q.  Why weren't you ever prepared to run
5    the Merge system at your labs?
6        A.  Um -- because in a -- in a scientific
7    setting, in a laboratory setting, wherein
8    you're supposed to take patient safety, um --
9    as your primary goal, um -- and when you're --
10   when you're looking -- you have to have
11   consistency.  And you have to have accuracy.
12   And you have to have specificity.  And you have
13   all these regulations.
14        You're never prepared for the Merge
15   LIS system and what it brought to our doorstep.
16   Like, you -- you -- you are never prepared to
17   every single time you have a problem to find
18   out that there's a defect and then they knew
19   about it.  Like, we were never prepared to --
20   to -- to give -- to be able to receive what
21   Merge delivered to us, which was just a
22   complete disregard for patient.  I was never
23   prepared to see that.  Um -- not by IBM, not by
24   Merge.
25        So that's what I meant by we were not

Page 410

1    prepared for the system.  We were -- we were
2    never prepared for how bad the system actually
3    was.
4        Q.  So when you say you were never
5    prepared, did that reflects any kind of lack of
6    confidence in your team?
7        MR. KUPPERMAN:
8            Object to the form of the
9            question.
10       A.  No.  In fact, Merge -- Merge, in their
11   own words, in their own comments, told us that
12   they wished that they had more clients like us,
13   and they wished that they can work with us in
14   the past.  They acknowledged that we knew more
15   than them about the bench, about laboratory
16   processes, about workflows.
17        Ron Poe acknowledged that to us, and
18   even pitched us as an idea to his, um -- his,
19   um -- supervisors as a group that they could
20   work with to be able to fix their broken
21   product.  And so, um -- we were -- we were --
22   we were -- we were prepared to put patients
23   first.  We were not prepared to use Merge in
24   that pursuit.
25       Q.  So when you say you were prepared to

Page 411

1    put patients first, is it fair to say that you
2    were not prepared to move forward with Merge
3    because of the defects that you discovered, and
4    the concerns about risks to patients that would
5    result from using Merge in the field?
6        MR. KUPPERMAN:
7            Object to the form.
8        A.  Yes.
9    EXAMINATION BY MR. STEWART:
10       Q.  Now, you were asked a few questions
11   regarding statements you made about whether
12   Trinity was doomed.  Is that correct?
13       A.  That's correct.
14       Q.  Um -- wasn't Trinity actually a
15   profitable business in the beginning?
16       MR. KUPPERMAN:
17           Objection.
18       A.  It was.
19   EXAMINATION BY MR. KUPPERMAN:
20       Q.  Okay.  And, um -- give me an example.
21   Or give me -- give me ballpark.  What were the
22   profits of Trinity in 2014 and 2015?
23       A.  Um -- 2014, um -- north of a million.
24   Um -- 2015, um -- on an accrual basis, anywhere
25   between 6 to 10 million.

Page 412

1        Q.  Okay.  And then, um -- you have
2    Exhibit 15, which is this e-mail involving Skip
3    Lloyd; correct?
4        A.  Correct.
5        Q.  And in that e-mail, Skip is showing a
6    substantial profit for the year ending
7    12/31/2016?
8        A.  Yes.
9        Q.  And this was the year that, um --
10   Performance Labs was shut down.  Correct?
11       A.  That's correct.
12       Q.  And it still turned a substantial
13   profit for that year.  Correct?
14       MR. KUPPERMAN:
15           Objection.
16       A.  That is correct.
17   EXAMINATION BY MR. STEWART:
18       Q.  And do you remember to the order of
19   what kind of profit it made that year?
20       A.  It would have been, um -- this
21   particular document, I believe, shows anywhere
22   between 5 and 8 million.
23       Q.  In profit for the year 2016?
24       A.  In profit for the year 2016.
25       Q.  And at the time this documents was

EXHIBIT A

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                    April 10, 2019

Page 413

1  written, or at least shortly before, in January
2  of 2017, you were still intending to get
3  Performance Labs back up and running.  Correct?
4       MR. KUPPERMAN:
5            Objection to the form.
6       A.  Correct.
7  EXAMINATION BY MR. STEWART:
8       Q.  So you anticipated a profit going
9  forward.
10      MR. KUPPERMAN:
11           Objection to the form.
12      A.  Yes, I did.
13 EXAMINATION BY MR. STEWART:
14      Q.  And did anything change after that
15 initial January 2017 going forward?
16      A.  Um -- we found the QC defect, and then
17 we found the -- Merge LIS doesn't do math
18 correctly and there's no way to release patient
19 results to go forward.  We found a critical
20 flaw in the Merge system that would not allow
21 us to be able to go forward in any capacity and
22 test patient samples.  Not at Performance Labs.
23      Q.  So at that point was when, um -- you
24 realized that you were really at the end of the
25 runway --

Page 414

1       MR. KUPPERMAN:
2            Objection.
3  EXAMINATION BY MR. STEWART:
4       Q.  -- for Performance Labs.
5       MR. KUPPERMAN:
6            Sorry.  Objection.
7       A.  At that point is when we were running
8  out of capital.  Yes.
9  EXAMINATION BY MR. STEWART:
10      Q.  Okay.  And I'm going to hand you the
11 document that counsel -- counsel referenced
12 before.  Um -- it's Merge 5468.  It was not
13 introduced as an exhibit.  Now, this document
14 that was referenced before, have you seen this
15 document before?
16      A.  I have.
17      Q.  Okay.  And how did you come to see it?
18      A.  Um -- I saw it whenever I was
19 reviewing and preparing for the case.
20      Q.  Flipping to -- flipping through this
21 document, was this document a document that was
22 prepared by Trinity?
23      A.  Uh -- no.
24      Q.  Okay.  So we have at the very
25 beginning -- the very first page, we have,

Page 415

1  um -- an e-mail coming from an e-mail address
2  ending in us.ibm.com.  Correct?
3       A.  Correct.
4       Q.  And based of your understanding, is
5  that an e-mail address that is affiliated with
6  Merge?
7       A.  Correct.
8       Q.  Okay.  Then if you look at the, um --
9  the from line on that e-mail, it's from Lorrie
10 Dillon who's the project manager, Merge LIS.
11 Correct?
12      A.  Correct.
13      Q.  And right underneath that, it says,
14 Merge an, IBM company.  Right?
15      A.  That's correct.  Merge, an IBM
16 Company.
17      Q.  And on other side of that document, do
18 you see IBM, the logo, there.  Correct?
19      A.  That's correct.  IBM.
20      Q.  Okay.  And then the second
21 paragraph -- I'm sorry.  The last full
22 paragraph that begins, yes I agree.  It says,
23 yes I agree the new guy is a Band-Aid who will
24 speed the process yes, but that doesn't
25 eliminate the fact that we are implementing a,

Page 416

1  all caps, broken product.  Period, of story.
2       Do you see where it says that?
3       A.  I do see that.
4       Q.  And we've been talking about a lot of
5  defects in Merge today.  Correct?
6       MR. KUPPERMAN:
7            Objection.
8       A.  That's correct.
9  EXAMINATION BY MR. STEWART:
10      Q.  Would you agree with that statement
11 from Lorrie Dillon on 10/26/2016 regarding
12 Merge being a broken product?
13      A.  Yes.  I would.
14      MR. KUPPERMAN:
15           Objection.
16      A.  Absolutely.  I would agree with the
17 Merge employee.
18 EXAMINATION BY MR. STEWART:
19      Q.  Okay.  Thank you.  We have no further
20 questions.
21      MR. KUPPERMAN:
22           Okay.  I've got a few as a
23 follow-up.
24 EXAMINATION BY MR. KUPPERMAN:
25      Q.  Do you know how many users there are

JOHNS, PENDLETON, FAIRBANKS AND FREESE                    504 219-1993

EXHIBIT A

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                                    April 10, 2019

Page 417

1   of Merge software?
2       A.   Somewhere around 400.
3       Q.   And do you know how many have, um --
4   expressed defects -- the same defects that you
5   have expressed?
6       A.   Um -- I don't know that Merge follows
7   documenting complaints or defects
8   appropriately.
9       Q.   Yeah.  But my question is, do you know
10  how many people actually, say, using the 4.1 or
11  higher version, in fact, experienced any of the
12  defects that you are now talking about?
13      A.   Our complaints and defects were not
14  documented internally, so I couldn't even begin
15  to fathom how I would be able to come up
16  with -- if Merge isn't documenting our
17  complaints, as many times as we complained, any
18  statistical mathematical formula to -- it
19  just -- I'm sorry.  My brain has a hard time
20  with that one.
21      Q.   Okay.  So the answer is you don't know
22  how many --
23      A.   The question --
24      Q.   -- of the 400 people or 400 entities
25  that you believe use this Merge software in

Page 418

1   fact experienced the same defects.
2       A.   That's right.
3       Q.   Okay.  And wouldn't -- if there was a
4   defect in the software, wouldn't you expect
5   every one of them to have the same defect?
6       A.   Yes.
7       Q.   So you would expect all 400 to
8   experience the same thing.
9       A.   Yes.
10      Q.   Okay.  Now, you talked about the
11  Performance Labs profit in 2016.  You recall
12  that?
13      A.   Yes.
14      Q.   Okay.  We would like that document,
15  because we don't have it.  It wasn't attached
16  to the e-mail.  So I'll ask for that.
17           But in addition, the profit in 2016,
18  just to make sure I have it right from our
19  earlier conversation, that was all stuff that
20  accrued in 2015 that just was paid in 2016.
21  Correct?
22      A.   That's correct.
23      Q.   So when you talked about the profit in
24  2015, which you mentioned was on an accrual
25  basis, you're actually talking about the same

Page 419

1   stuff that was paid in 2016.  Correct?
2           MR. STEWART:
3               Object to form.
4               You can answer if you know.
5       A.   Yes.
6   EXAMINATION BY MR. KUPPERMAN:
7       Q.   Yes.  The same dollar amounts; right?
8       A.   That's right.
9       Q.   Okay.  Now, you said that Mr. Poe
10  said -- acknowledged that you all knew more
11  than Merge --
12      A.   Yes.
13      Q.   -- right?
14           Okay.  Anyone other than Mr. Poe?
15      A.   Um -- the actual employees of Merge,
16  on the, um -- one of the last group phone calls
17  we had with Patty and Aurora present, um --
18  their -- I don't remember hit title, I don't
19  remember her name, but I do remember her saying
20  this, and we did record that call, that she see
21  said that we don't work with many customers
22  like you, you guys know this stuff, we really
23  hope we can work with you.
24      Q.   Great.
25      A.   Yeah.

Page 420

1       Q.   Okay.  And, um --
2       A.   Pete Nanos also told me.  Pete Nanos
3   said, we're not -- we're not lab people; we're
4   software people.  He told me he always looks
5   for a subject matter expert, and that's one of
6   the ways that he was able to make his imaging
7   software work, is finding people who can
8   actually do it, because we can do it.
9           So there was several employees at
10  Merge that told us that we knew what we were
11  talking about more than they did.
12      Q.   Okay.  The document that you were
13  shown toward the end that begins with Merge
14  5468.
15           MR. STEWART:
16               And we're going to put that in as
17           Exhibit 18, so we can just refer to it
18           as 18.
19           (Exhibit 18 was marked for
20  identification and is attached hereto.)
21  EXAMINATION BY MR. KUPPERMAN:
22      Q.   Okay.  Exhibit 18.  That's the one
23  that talks about the broken product; correct?
24      A.   It says, yes I agree the new guys a
25  Band-Aid.  And it ends with broken product.

JOHNS, PENDLETON, FAIRBANKS AND FREESE                                    504 219-1993

EXHIBIT A

Page 421

1    Q.  And this is one that you and I talked
2  about earlier as relating to a product that in
3  fact was never installed at Trinity.  Correct?
4    A.  Um -- we did -- we did talk about the
5  reference laboratory module not being something
6  that Merge -- a promise that Merge couldn't
7  deliver on.
8    Q.  No, sir.  We talked about it in that
9  it was never installed.  Correct?
10    A.  I -- I said that they -- time lines --
11  you said, the time line you wanted.  I said the
12  time line that we agreed upon.
13    Q.  Okay.  All right.  Well, let me ask it
14  this way:  It was never installed at Trinity,
15  Performance, or Prestige.  Is that correct?
16    A.  That's correct.
17    Q.  Okay.  So this e-mail and the
18  discussion about it has to do with a product
19  that, in fact, is not at issue here because it
20  was never installed.  Is that correct?
21    MR. STEWART:
22       Object to form.
23    A.  I don't know if that's correct or not.
24  EXAMINATION BY MR. KUPPERMAN:
25    Q.  Okay.  Well, you're not suing that

Page 422

1  product, are you?
2    A.  No, sir.
3    Q.  Okay.  Now, you referenced -- what's a
4  standout feature.  Do you know?
5    A.  Do I know what a standout feature is?
6    Q.  Yes, sir.
7    A.  What exhibit are you referencing?
8    Q.  I'm not referencing any.  I'm asking
9  you what a standout feature is.
10    A.  Um --
11    MR. STEWART:
12       Object to the form.
13    A.  The physician portal, the ability to
14  be able to oversee, um -- several laboratories
15  at the same time, um -- any of the automation,
16  those would be standout features.
17    Q.  Okay.  Can you define a standout
18  feature for me?
19    A.  I just gave you what I thought
20  standout features were.
21    Q.  Well --
22    A.  A standout feature would be a feature
23  that you purport that is over the industry
24  standard.
25    Q.  Okay.  Um -- the Exhibit 17 that you

Page 423

1  were shown, I'd like you to go to the document
2  that has TRINITY 95662 on it.
3    A.  17?
4    Q.  Yes, sir.  It's the one that, um.
5    A.  What kind is it.  What's it titled?
6    MR. STEWART:
7       It's the in globo exhibit that we
8    just discussed with the corrections.
9    A.  Oh.  I got you.  Okay.  Sorry.
10    MR. STEWART:
11       This is it.  95662.
12    A.  Okay.
13  EXAMINATION BY MR. KUPPERMAN:
14    Q.  Okay.  I know there's a lot of paper.
15    A.  They got out of order and I hadn't
16  been able to get 'em back in.
17    Q.  You looking at that document?
18    A.  Yes, sir.
19    Q.  There's there misrepresentation on
20  this page, is there?
21    A.  There's no -- there's no
22  misrepresentation on this.  It's an invitation
23  to a meeting.  It was misrepresentation in the
24  call.
25    Q.  But there's nothing on this document.

Page 424

1  Right?
2    A.  Um -- the document references the
3  GoToMeeting that occurred.  But on this
4  particular e-mail, she invites us to a call.
5    Q.  Okay.  And the call was recorded.
6  Right?
7    A.  Yes.
8    Q.  Okay.  Um -- if you look at the next
9  page, which is 96614 --
10    A.  Okay.  Which one you looking at?
11    Q.  The very next page.  Same exhibit.
12    A.  I don't have the -- it's.
13    Q.  It's 96614.  It's not going to be
14  stapled.  It was loose.
15    A.  No.
16    Q.  You probably --
17    MR. STEWART:
18       Here.
19  EXAMINATION BY MR. KUPPERMAN:
20    Q.  It is this document right here.
21  (Tendering.)
22    A.  Okay.  Yes.
23  EXAMINATION BY MR. KUPPERMAN:
24    Q.  Okay.  There's no misrepresentation on
25  that document is there?

106 (Pages 421 to 424)

EXHIBIT A

Page 425

1     A.  Um -- um -- I'm not an attorney.
2     Q.  Yeah.  But I'm asking you.  There's
3  nothing false in this document; right?
4     A.  Is withholding information
5  misrepresentations?
6     Q.  No, sir.  No, sir.  I'm asking you for
7  a misrepresentation, not an omission --
8     A.  Okay.
9     Q.  -- or anything else --
10    A.  As I say, I'm not a lawyer.
11    Q.  -- you can come up with.  I'm talking
12  about a misrepresentation.  A misstatement.  A
13  lie.  There's nothing in here like that.
14    A.  I don't --
15        MR. STEWART:
16            Object to form.
17    A.  I don't see, um -- anything that is a
18  lie in here.
19  EXAMINATION BY MR. KUPPERMAN:
20    Q.  Okay.  And in fact, Mr. Poe is talking
21  about an incentive to move forward on the
22  Central Valley project in 2015.  Right?
23    A.  Uh -- that's correct.
24    Q.  You never did move forward with the
25  Central Valley project, did you?

Page 426

1     A.  Nope.
2     Q.  And you didn't do it in 2015 anyway.
3  Right?
4     A.  That's correct.
5     Q.  Okay.  Um -- now, in Exhibit 11 --
6     A.  We did a change order underneath the
7  original contract to be able to make Central
8  Valley actually Prestige World -- excuse me,
9  um -- Pathway.  So we still used the multisite
10  license.
11    Q.  Yeah.  But you didn't do it in 2015,
12  and you didn't do it with Central Valley.
13  Right?
14    A.  That's correct.
15    Q.  Okay.  Now, um --
16        MR. STEWART:
17            Steve, how much longer you got?
18        MR. KUPPERMAN:
19            A couple --
20        MR. STEWART:
21            Because you gone beyond --
22        MR. KUPPERMAN:
23            Well, I'm just following up on
24  you.  And I don't think I have gone
25  over.

Page 427

1  EXAMINATION BY MR. KUPPERMAN:
2     Q.  But Exhibit 11, um -- you were asked
3  about, um -- the documents that is there, and I
4  think you pointed out Page 9 as the reference
5  to Performance Lab.  Right?
6     A.  Yes, sir.
7     Q.  Nowhere --
8     A.  I'm not looking at it, but I remember
9  what you're talking about.
10    Q.  Nowhere in this document does it
11  indicate that Performance Lab in fact is a
12  separate entity than Trinity, does it?
13    A.  I don't think there's, um --
14    Q.  I see your lawyer is trying to point
15  something out to you.
16    A.  No.  Not at all.
17    Q.  Okay.
18    A.  Yeah.  So, I mean -- I'm trying to get
19  the right exhibit, is what we're trying to do.
20    Q.  Yeah.  11.
21    A.  11.  This one right here?  Can you
22  point me to what you're --
23    Q.  Yeah.  Page 9 is the one you pointed
24  me to.
25    A.  Okay.

Page 428

1     Q.  There's nothing on Page 9 that
2  indicates that Performance Labs is in fact a
3  separate entity on Page 9.  Correct?
4     A.  No.  On Page 3 -- on Page 3, um --
5  where's it at?  Client over -- Trinity Medical
6  Services owns Performance Labs located in
7  Mandeville, Louisiana and Central Valley
8  toxicology laboratory in Merced.  Performance
9  Laboratories is a toxicology laboratory
10  performing both screening and -- I mean, it
11  gives a pretty good -- a pretty good, um --
12  description of what Trinity Medical Services
13  is, and it owns Performance Labs.  So it says
14  that right there.
15    Q.  Right.
16    A.  So on Page 9 the question was what?
17    Q.  Okay.  It doesn't say anything on Page
18  9 about Performance Labs being a separate
19  entity; correct?
20    A.  No.  On Page 3 it says that.  Page 9
21  is a schematic that has pictures of equipment.
22    Q.  Okay.  And Performance Labs, um -- on
23  Page 3, says that the Merge LIS is going to be
24  operated by Trinity employees working in both
25  labs.  And Performance is going to be a

**EXHIBIT A**

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                     April 10, 2019

Page 429

1    reference lab for Central Valley.  Right?
2         A.   That's correct.
3         Q.   Okay.  Um -- did Trinity employees
4    actually operate the Merge system?
5         A.   Um -- Trinity wholly owned Prestige
6    Worldwide.  Prestige Worldwide --
7         Q.   But Trinity did not.
8         A.   Uh -- that would be correct.
9         Q.   Okay.  And Performance Labs in fact
10   was never a reference lab for Central Valley.
11   Was it?
12        A.   No.
13        Q.   Okay.  Now, if you turn to Page --
14        A.   Actually --
15        Q.   -- 12 --
16        A.   Actually, uh -- I think in 2015,
17   Performance Labs was a reference laboratory
18   for, um -- for Central Valley.
19        Q.   Okay.  Well, once you acquired the
20   Merge system, Performance never acted as a
21   reference lab for Central Valley.  Correct?
22        A.   That's correct.
23        Q.   Okay.  Now turn to Exhibit 12, if you
24   will.
25        A.   Where is it?  I remember seeing

Page 430

1    something in here where it said Trinity Medical
2    Services d/b/a Performance Labs.  Anyway, keep
3    going.  I'm sorry.
4         Q.   Well, d/b/a connotes the fact that a
5    company is operating under another name.
6    Correct?
7         A.   Sure.
8         Q.   Okay.  But it's not a separate
9    company, it's just operating under a name, a
10   trade name.
11        A.   Understood.
12        Q.   That's how you understand that?
13        A.   Doing business as.
14        Q.   Yes.
15        A.   Yeah.
16        Q.   Okay.  So the reference to Trinity
17   d/b/a Performance is an indication that Trinity
18   is just doing business under the name
19   Performance.
20        A.   Got you.
21        MR. STEWART:
22            Object to form.
23   EXAMINATION BY MR. KUPPERMAN:
24        Q.   Okay.  Now turn to Exhibit 12.  And I
25   think that you were -- that's right there in

Page 431

1    front of you.  And I think that your attention
2    was drawn to that line in the note, special
3    comment.  It says, this quote's for a core lab
4    to be established at Trinity in Mandeville?
5            Do you see that?
6         A.   Yes.
7         Q.   Okay.  That again does not, um -- it
8    talks about a lab being established at Trinity;
9    correct?
10        A.   This quote is for a core lab to be
11   established at Trinity Medical Services in
12   Lafayette, Louisiana.
13        Q.   No, in Mandeville.  Right?
14        A.   Yeah, Mandeville.  Excuse me.
15   Mandeville, Louisiana, doing toxicology
16   confirmations.
17        Q.   You had me going there for a minute
18   trying to figure out where Lafayette came from.
19        A.   It's -- I'm sorry.
20        Q.   That does not indicate that -- it
21   doesn't say anything about Performance in terms
22   of a name, does it?
23        A.   Um -- not here, no.
24        Q.   And in fact, it -- it gives the
25   impression that the lab is to be run by

Page 432

1    Trinity.  Correct?
2         A.   I would say that, um -- Merge is as
3    bad at writing contracts as they are at
4    building software.
5         Q.   Okay.  But you signed this, right?
6         A.   I did not sign this.
7         Q.   Well, Chad Howell signed it.
8         A.   Yes.  He did.
9         Q.   And Chad Howell had all the authority
10   in the world to sign it on behalf of Trinity.
11   Correct?
12        A.   Understood.
13        Q.   And, um -- he did this voluntarily,
14   under no duress or pressure from Merge.
15   Correct?
16        A.   It's an incentive.
17        Q.   Sir?
18        A.   A pricing -- a pricing incentive.
19        Q.   Yes.  But you could have easily walked
20   away from the pricing incentive.  Right?
21        A.   I could have.
22        Q.   Okay.  So he signed this voluntarily,
23   with full authority.  Right?
24        A.   Yes, sir.
25        Q.   Okay.  And he did so with full

108 (Pages 429 to 432)

**EXHIBIT A**

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                                      April 10, 2019

Page 433

1   knowledge, and -- Trinity did so with full
2   knowledge of the terms and conditions to which
3   it had agreed and was expected to comply with.
4   Correct?
5        A.  Correct.
6        Q.  I don't have any other questions.
7   Thank you.
8   EXAMINATION BY MR. STEWART:
9        Q.  Okay.  Just two:  Turning to
10  Exhibit 12, first.
11       A.  Uh-huh.
12       Q.  Exhibit 12 is a sales contract;
13  correct?
14       A.  Correct.
15       Q.  That was a document that was prepared
16  by Merge; correct?
17       A.  That's correct.
18       Q.  Turning next to Exhibit 11, the
19  Solutions Design Document.  Correct?
20       A.  Correct.
21       Q.  Page 3.  This is a document that was
22  also prepared by Merge; correct?
23           MR. KUPPERMAN:
24               Objection.
25       A.  Correct.  It was a document that was

Page 434

1   prepared by Merge.
2   EXAMINATION BY MR. STEWART:
3        Q.  And counsel asked you whether there
4   was any indication that Trinity and Performance
5   were separate entities.  Correct?
6        A.  That's correct.
7        Q.  In that first sentence, you see
8   Trinity Medical Services LLC.  Correct?
9        A.  Correct.
10       Q.  And in the second sentence, you see
11  Performance Labs LLC.  Correct?
12       A.  Correct.
13       Q.  And the last sentence starts, Merge
14  LIS will be operated by Trinity Medical
15  Services LLC employees working in both
16  laboratories and Performance Laboratories LLC.
17  Correct?
18       A.  Right.
19           MR. KUPPERMAN:
20               And Performance Labs will be a
21           reference lab.  Is that --
22           MR. STEWART:
23               I asked the question.
24           MR. KUPPERMAN:
25               Yes.  But I don't think it's

Page 435

1   fair.
2           MR. BURGE:
3               You're not reading the whole
4           statement, Steve.  It says,
5           Performance Laboratories LLC will be
6           the reference lab.
7           MR. KUPPERMAN:
8               Yeah.  Correct.
9           MR. BURGE:
10              So say the LLC part.
11          MR. KUPPERMAN:
12              Well, he did.
13          MR. BURGE:
14              That's why it's a separate
15          company.
16          MR. KUPPERMAN:
17              He did.  But I'm just saying --
18          MR. BURGE:
19              And I'll --
20          MR. KUPPERMAN:
21              -- that he didn't --
22          MR. BURGE:
23              -- ask you not to --
24          MR. KUPPERMAN:
25              -- read the rest.

Page 436

1           MR. BURGE:
2               -- omit the part that shows it's
3           a separate company.
4           MR. KUPPERMAN:
5               I'm not omitting anything.  He --
6           MR. BURGE:
7               You omitted LLC.
8           MR. KUPPERMAN:
9               -- read that.
10          MR. BURGE:
11              When you just read it back you
12          said Performance Labs.  You omitted
13          LLC.
14          MR. KUPPERMAN:
15              I'm objecting to the question.
16          MR. BURGE:
17              Well, I'm objecting to your
18          objection.
19          MR. STEWART:
20              No further questions.
21          MR. KUPPERMAN:
22              Thank you.
23          THE VIDEOGRAPHER:
24              This concludes this videotaped
25          deposition.  We're going off the

109 (Pages 433 to 436)

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                                        April 10, 2019

Page 437

1    record.  The time is 6:15.
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 439

REPORTER'S PAGE

1    R E P O R T E R ' S   P A G E
2
3        I, JOSEPH A. FAIRBANKS, JR., Certified
4    Court Reporter in and for the State of
5    Louisiana, the officer, as defined in Rule 28
6    of the Federal Rules of Civil Procedure and/or
7    Article 1434(B) of the Louisiana Code of Civil
8    Procedure, before whom this sworn testimony was
9    given, do hereby state for the record;
10       That due to the nature of spontaneous
11   discourse in the foregoing proceedings, dashes
12   (--) have been used to indicate pauses, changes
13   in thought, interruptions by other speakers,
14   and/or talkovers;
15       That this is a complete transcription,
16   and that dashes (--) do not indicate that words
17   have been left out of this transcript;
18       That the phrase (spelled phonetically)
19   is used to denote words and/or names which
20   could not be verified through available
21   references resources.
22
23   _____
24   JOSEPH A. FAIRBANKS JR., CCR, RPR
25   CERTIFIED COURT REPORTER #75005

Page 438

1        WITNESS' CERTIFICATE
2
3        I, BLAKE NICHOLAS BOURGUE, do
4    hereby certify that the foregoing testimony was
5    given by me, and that the transcription of said
6    testimony, with corrections and/or changes, if
7    any, is true and correct as given by me on the
8    aforementioned date.
9
10   _____  _____
11   DATE SIGNED       BLAKE NICHOLAS BOURGUE
12
13   _____  Signed with corrections as noted.
14
15   _____  Signed with no corrections noted.
16
17
18
19
20
21
22
23
24
25   DATE TAKEN:  April 10th, 2018

Page 440

1
2        REPORTER'S CERTIFICATE
3
4        NOTE: This transcript certification is
     valid only when accompanied by my original
5    signature over my state seal.
6
7        I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,
     Certified Court Reporter in and for the State
8    of Louisiana, as the officer before whom the
     foregoing was taken, do hereby certify:
9        That the witness was sworn by me upon
     authority of R.S. 37:2554 and did testify as
10   set forth in the foregoing pages;
         That said proceeding and testimony was
11   reported by me in the stenotype reporting
     method, was thereafter transcribed and prepared
12   by me or under my personal direction and
     supervision, and is a true and correct
13   transcription to the best of my ability and
     understanding;
14       That this transcript was prepared in
     compliance with transcript format guidelines
15   established by statute or by rules of the
     Board;
16       That I am knowledgeable of the
     arrangements, financial and otherwise, with the
17   person on entity arranging for reporting
     services, and that I have acted in compliance
18   with the prohibition on contractual
     relationships as defined by the Louisiana Code
19   of Civil Procedure Article 1434 and in rules
     and advisory opinions of the Board;
20       That I am not related to counsel or to
     the parties herein, nor am I otherwise
21   interested in the outcome of this matter.
22
23   _____
24   JOSEPH A. FAIRBANKS, JR., CCR, RPR
25   CERTIFIED COURT REPORTER #75005

110 (Pages 437 to 440)

JOHNS, PENDLETON, FAIRBANKS AND FREESE

504 219-1993

EXHIBIT A

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE

April 10, 2019

Page 441

**A**

**ab** 70:12,14,22
**abilities** 72:5
**ability** 46:4
76:10 156:6
170:19 185:8
231:23 247:13
247:16 422:13
440:13
**able** 24:25 33:21
39:2 46:3,7
47:11 59:24
60:4,19 65:25
70:5,23 72:6
107:11 108:6
117:16 124:6
124:18 128:15
131:7,10
136:20 142:9
144:22 148:14
149:6 151:14
151:19,24
158:12 162:13
166:19 169:24
170:20 171:18
179:25 180:21
180:25 184:4
185:8,11,16
187:14,17
188:25 196:21
219:22 227:21
228:6 231:24
247:17 248:20
260:10,11,24
268:15 271:23
274:23 286:11
291:8,19 292:6
292:7 295:1
296:11 298:14
298:25 301:4
305:24 308:8
309:5,9,15,18
309:21 311:3
318:21 319:4
338:13,14
341:22 358:11
360:25 364:4

369:19 372:20
378:16,19
381:4 409:20
410:20 413:21
417:15 420:6
422:14 423:16
426:7
**abney** 20:17,21
31:2,3 32:4
34:14 98:2
338:8
**abruptly** 50:12
**absolutely** 15:16
30:6 141:21
211:19,20
228:21 416:16
**academy** 7:15
7:16,17
**acadiana** 63:22
**acceptability**
318:21 319:5
**acceptable**
317:6 320:3
**accepted** 114:2
**accepting**
265:25 266:20
**access** 34:3
90:20 178:14
286:22,23
298:25 299:20
301:3,4 344:2
344:22 346:10
346:13 347:18
350:14 398:1
**accession** 149:4
**accessions** 289:4
292:19 294:8
**accident** 43:13
**accompanied**
440:4
**accomplished**
324:15
**account** 345:21
371:10
**accountant**
177:22
**accounting**

369:19 372:20
84:22 94:1
101:8,13,19
113:11 344:25
378:21 379:7,8
**accounts** 38:2
92:16,18 93:15
178:13 380:5
**accreditation**
74:5 75:9
**accrediting**
74:15 75:7
**accrual** 378:21
379:5 411:24
418:24
**accrualbase**
379:7
**accrued** 379:10
418:20
**accuracy** 121:18
159:22 297:8
409:11
**accurate** 139:13
139:20 167:14
179:11 192:3
192:12 214:13
214:25 216:3
331:4
**accurately**
192:7 221:24
222:7,22
226:22 227:7
**acknowledged**
410:14,17
419:10
**acquired** 385:4
429:19
**acquisition**
145:11
**acronym** 42:2
**act** 42:9,13
111:20 217:17
**acted** 208:8
429:20 440:17
**action** 1:4 75:19
75:22,25
281:13 365:20
375:11

**actions** 316:16
**active** 125:4,4,7
**activities** 32:7
**actual** 23:7
58:13 61:1
91:24 95:23
104:25 108:14
109:9 167:8
187:15 220:15
271:5,21
303:22 311:8
358:13 403:20
419:15
**adamant** 204:9
**add** 197:25
297:15
**added** 80:14
**addiction**
363:23
**addition** 60:24
277:8 278:23
392:5 418:17
**additional** 86:15
317:7,13
366:23
**address** 6:24
31:14 114:15
349:19 350:13
415:1,5
**addressed** 198:3
200:5
**addressing**
408:6
**adjust** 231:24
**adjustment**
234:18
**adjustments**
226:6 229:18
229:20 230:4
230:15,19
231:12,21
232:6,17,19,19
233:2,4,4,5
234:14
**administered**
42:12
**administering**

5:24
**administrative**
133:12 310:2
**admitted** 85:20
86:6 141:18
272:4
**adopted** 359:12
360:5
**adulterants**
302:25
**advertise** 65:25
**advertising** 66:4
**advice** 128:21
**advised** 60:18
128:18 359:4
**advisory** 440:19
**affidavit** 327:9
**affiliated** 95:5
415:5
**affirmatively**
142:14 221:3
227:11
**aforementioned**
5:4 438:8
**agencies** 110:5
**agency** 41:15
110:4
**aggregate**
331:23
**ago** 157:9
329:13
**agree** 194:18
231:11 232:23
250:3 257:9
278:18 324:4
399:18,21
415:22,23
416:10,16
420:24
**agreed** 5:2
259:14 332:3
332:11 356:4
365:23 421:12
433:3
**agreement**
79:13,25 80:19
80:24 83:18,19

83:20,21,25
84:1,1,13
89:11,13
122:21 133:12
133:14 201:7
242:8 298:21
328:18 330:12
357:14 374:21
387:25 388:5
401:7
**agreements**
45:22 89:18,23
**ah** 62:5 329:23
**ahead** 15:4
42:24 107:6
131:2 187:12
208:1 247:9
309:10 315:21
340:18
**aircraft** 369:1
369:10,12
370:11,13
**al** 1:5
**alamosa** 114:9
**alcohol** 361:19
362:24 363:6
363:16
**alcoholic** 361:23
**alcoholism**
363:1
**aldous** 2:15 6:14
**alere** 275:1,8,19
**alert** 191:9
**alexa** 266:11
367:16 368:2,3
368:3
**algorithms** 45:5
**align** 288:10
**aligned** 181:3
**allegation** 203:4
233:8
**allegations**
249:16 250:10
**allege** 219:13,16
**alleged** 147:14
265:14
**allegedly** 141:3

240:6
**allow** 148:3
219:22 309:14
413:20
**allowed** 107:21
**allows** 60:3
180:25 226:21
227:6 309:4
397:25
**aluminum** 228:1
**amended** 13:22
139:6 203:5
219:16 221:18
276:13 400:7
400:10
**amendment**
80:23
**american** 56:15
56:19 57:5,10
57:18 58:16
67:16 68:1,4
68:11,18 69:5
71:8,12 76:2
76:14,16,24
77:8,11 78:6,9
78:10,14
102:20
**ameritox** 274:25
275:8,18,19
**amino** 70:2
**amount** 170:15
171:17 172:11
228:3 287:4
376:5 378:18
394:12
**amounts** 419:7
**analysis** 281:12
295:1
**analyte** 121:19
**analytical** 261:3
**analyzer** 70:2
182:22
**analyzers**
114:21
**anger** 353:4,7
**angry** 352:12
353:2,15

**anmol** 160:18
**annual** 101:3
117:7,11
321:10
**annualized**
321:2
**answer** 5:13 9:4
15:4 19:25
33:10 34:16
39:9 52:3 54:1
58:13 63:9
64:24 67:13
76:22 77:14
81:1 89:3,4
93:24 96:5,10
102:14 108:13
110:2 117:22
134:8 144:18
150:9 152:4
168:18 170:21
170:23 172:4
173:16 185:2
185:11 190:21
190:23 191:14
194:6 195:13
195:23 196:18
197:5 198:6
205:4,13
206:23 208:1
212:22 213:8
223:20 230:21
231:8 234:12
239:24 240:4
240:10 241:8
246:12 253:1
276:10 279:9
279:15,19
290:20 295:7
305:21 311:3,5
330:23,25
337:10 338:13
342:13 343:13
350:4 356:11
356:12 362:3,9
362:11,14,17
384:10 386:21
408:25 417:21

419:4
**answered**
132:19 150:19
151:4 158:9
184:10,20
187:4,7 193:20
205:10 240:8
322:12 383:12
384:9
**answering** 50:14
150:3 212:20
**answers** 96:11
**anticipated**
413:8
**anticipating**
321:2
**antikickback**
217:16,17
**anybody** 10:4
85:20 98:16
99:11 213:23
256:17 265:23
310:21 334:6
385:18
**anymore** 25:21
43:10 90:21
312:18
**anyplace** 369:24
**anyway** 39:13
128:20 426:2
430:2
**apache** 309:3
**apart** 189:22
280:15
**apologize**
191:22,24
299:13
**apparently**
268:2
**appear** 10:5
254:20 294:1
299:4 390:7
399:19,22
401:2,20
**appearances** 2:1
**appeared** 29:5
**appears** 81:20

278:10 397:1
399:14 401:15
**applicable** 197:9
197:15 199:12
**application**
56:11 59:4,23
59:23
**applied** 59:16,17
59:20,20,21
302:3
**applies** 302:19
**apply** 74:1,4
75:16 83:3
303:8
**appointment**
34:19
**appreciate** 40:7
81:8 315:7
**apprenticeship**
108:9
**approach**
241:20
**appropriate**
254:18 334:10
335:1
**appropriately**
188:12 417:8
**approval** 73:13
100:6 124:16
145:22,25
146:2,5 169:14
169:17,22
170:17 208:18
209:2 260:11
275:13
**approvals**
274:19,23
**approve** 73:20
73:25 75:10,11
75:12 76:6,10
76:11,13 107:7
108:6 148:25
275:2 308:8
**approved** 73:9
74:15,23,24
75:1 139:9
145:24 148:9

154:14 162:3
183:24 192:23
205:1 208:13
245:13 266:7,8
**approves** 73:24
**approving**
189:23 274:24
**approximate**
101:2 281:9
**approximately**
216:24 217:2
248:5 285:21
367:22
**april** 1:19 6:4
10:17 11:1,8
27:17 53:20
103:8 119:9
175:19 260:5
261:11,12
266:21 346:18
380:2 381:7
393:7 438:25
**ar** 380:19 394:3
394:11
**arb** 262:20
**area** 37:17 39:14
123:5 291:4
**areas** 303:16
**arent** 26:15
215:16 339:11
**argument** 353:3
**arms** 265:18
**arrangements**
440:16
**arranging**
440:17
**arrived** 324:16
**article** 87:16,18
439:7 440:19
**articles** 61:17
**asher** 177:21
313:5
**aside** 297:2
**asked** 19:22
23:9 31:10
35:25 37:25
46:23 52:25

57:21 58:1
96:6 145:9,11
145:18 151:4
152:12 187:5
212:19 214:9
219:5 274:3
341:3 347:7
350:15 351:1
384:7 401:14
405:19 407:2
408:18 411:10
427:2 434:3,23
**asking** 22:14
28:10 30:1
33:7 56:10,13
57:14 85:6
130:10 144:5,6
158:15 159:5
160:24 168:16
186:17,18
187:20,21
190:8 193:21
196:17 197:4
197:12,12
199:15 210:6
215:22 221:4
229:23 231:6,7
232:14 245:16
246:2,4,10,10
246:11 248:15
251:4 254:19
272:18 273:21
274:7 290:21
299:18 318:9
321:25 332:18
337:9,23
338:16 339:4,4
339:19 347:21
356:9,10,13,15
387:7,11
405:15 408:12
422:8 425:2,6
**aspects** 25:5
109:10
**aspirations**
116:9
**assay** 70:2

226:22 227:7
227:13,19,20
227:20,23,25
228:4
**assays** 228:2,15
**assets** 65:6
137:9,10
382:11 393:6
393:21,23
**assign** 91:25
**assigned** 97:23
97:25 98:13
**assistant** 22:5
**associated**
116:12 391:19
**assume** 9:13
232:4 341:25
**assumed** 374:21
**assumption**
265:10
**assumptions**
323:3 340:3,13
**attached** 12:19
79:15 113:4
123:13 160:11
164:14 249:5
250:20 251:2
255:14 314:19
319:17 328:1
333:18 336:1
372:6 376:24
377:13,20
389:2 395:22
418:15 420:20
**attachment**
397:10
**attachments**
113:12
**attack** 309:11
**attempted**
394:15
**attempting**
394:13
**attend** 61:16
**attention** 61:1
67:4 146:22
204:16 285:6

335:16 431:1
**attitude** 381:14
**attorney** 86:10
383:3 400:3
425:1
**attorneys**
343:12
**attributed** 65:12
**au** 70:3
**au400** 69:25
70:1 182:21
**audit** 31:14
60:16 74:9
76:20 141:23
149:10 200:6
207:1 226:6,13
226:16 231:25
232:3,4,4
233:1 234:21
234:21,21
235:6 247:12
247:13 280:25
281:1,2,21,23
282:14 285:9
286:8,10
287:14,17,21
292:16 301:7
309:20 318:16
354:2 367:20
371:15 372:6
378:2,8
**audited** 308:3
364:9
**auditing** 170:16
**auditor** 313:20
**audits** 372:9
**august** 124:15
124:17,18
125:10 126:2,4
126:7 202:21
217:1,2,3,3
218:7 248:4,8
260:12 289:23
290:6
**aurora** 21:23
40:12 41:2
250:17 266:10

280:13 368:7
368:19,19,20
419:17
**aus** 260:9
**authored** 176:9
176:11
**authority** 432:9
432:23 440:9
**authorized**
139:16 286:23
**automatic**
232:18 233:3
234:14 235:8
**automatically**
231:20 232:17
**automation**
422:15
**available** 13:4
20:7 91:5,8
288:15 310:8
439:20
**avenue** 1:18 2:6
6:3
**average** 284:20
284:21
**averaging**
277:14,18
278:25 282:1
307:16 308:9
**averse** 47:20
**avocado** 46:21
**avocaydo** 46:21
**avoiding** 224:11
**aware** 86:18
150:15 153:24
157:5 158:7
172:1 240:15
272:6 287:17
300:7 307:20
319:23 331:6,7
339:14,17,21
380:25
**awkward**
149:23
**awkwardly**
149:23

---

**B**

**b** 1:15 3:9
110:21 114:24
214:6 262:23
328:21 349:16
349:17,18
359:15 362:1,7
430:2,4,17
439:7
**baa** 111:24
**baby** 25:24
**back** 23:3 34:17
34:24 44:6
45:9 53:9
54:21 55:21
62:23 64:10
76:11 77:12
89:17 93:20
112:14 123:17
124:4 125:2,14
131:2 149:20
158:11,21
169:10 173:25
174:18,20
181:8 184:2
190:14 228:7
229:22 232:3
237:2 244:5
252:18 254:19
257:8 258:21
263:19,20,21
267:7 278:9
283:8 296:1
326:19 330:4
336:7,13
341:18 347:9
355:8 364:19
365:19 370:11
370:15 387:12
388:16 390:18
394:9 404:21
413:3 423:16
436:11
**backdating**
226:24 227:9
281:17 284:17
307:3
**backed** 344:20

346:7 348:7,8
**background**
42:19,20
**backlog** 230:1
**backup** 219:24
346:18,19
**backups** 345:24
345:25 346:1,3
**bad** 125:25
167:2 280:19
305:18 410:2
432:3
**baked** 73:13
125:12
**balance** 244:25
**ball** 83:4
**ballpark** 411:21
**ban** 311:2
**bandaid** 415:23
420:25
**bank** 18:25 22:1
22:2,3,6,9
37:20 44:14,18
44:19 47:11
92:16,18,20,22
92:22 93:7,15
93:22 113:8
126:19 134:11
134:12,14
157:16 375:1
376:5 379:16
380:24
**banker** 43:14
44:9,12 113:8
**banking** 39:24
44:8 64:3
93:10,13
355:21
**bankruptcy**
44:6 63:3,13
63:17,20 65:6
65:8 381:21
382:8,23 383:5
383:10,17
**banks** 44:18
92:18,19
355:25 356:6

356:14 382:8
**barrasso** 2:11
**barry** 48:21
**base** 378:21
**based** 30:18
117:22 129:9
148:20,20
166:3,18,19
181:16 183:22
189:1 244:16
319:25 326:20
327:18 341:14
341:23 415:4
**basic** 31:16,16
31:17 119:25
186:12 215:13
242:10 310:5
312:2
**basically** 23:21
25:23 45:17
50:25 57:21
73:15 95:1
100:7 127:12
138:11 162:19
168:6 182:3
203:25 215:10
256:8 268:14
271:12 280:25
291:14 337:21
345:1 365:21
366:13 371:17
377:13 382:9
386:3,9
**basics** 148:6
**basis** 32:17
101:3 168:8
180:8 249:15
250:10 359:20
379:5 411:24
418:25
**batch** 180:19
182:1,5 183:20
**bates** 249:17,19
249:20,21
251:17 253:8
263:13 336:10
388:22,23

**batesd** 388:21
**bathroom**
162:22
**baton** 32:11
266:12
**bear** 255:8
319:20 376:17
**bearb** 262:18,20
262:21,23
**beard** 262:22
**bearing** 319:21
**bears** 253:7
**becoming** 67:25
**beer** 262:19
**beginning** 20:11
115:7 236:6
361:2 368:24
411:15 414:25
**begins** 131:23
133:23 415:22
420:13
**behalf** 6:10
12:23 150:12
158:15,18
185:3 191:18
197:2 245:21
246:7 265:23
288:25 311:4,6
328:13 334:20
369:2 432:10
**beings** 169:24
**belabor** 168:7
**belief** 73:4
**beliefs** 175:7
**believe** 17:17
20:3 28:25
30:2 31:19
32:11 34:18,22
35:14,18 37:6
37:9,11 42:11
42:13 43:1
48:6 56:18
57:12 58:18
60:10 62:9,11
70:13 71:19,22
72:23 73:1
77:6 80:15,22

82:10 92:22
93:5,17,24
94:8 95:15
98:5,24 99:4
101:10,19
102:1,2 112:19
114:2,3,23
117:12 118:7
123:1 124:15
132:16 136:5,9
147:24 153:12
154:5,7 155:20
157:23,25
163:8 164:8
175:7 204:2
208:5 209:19
216:20 218:2,9
235:19 244:16
244:20 246:18
247:10,12,14
247:18,22
248:11,15
259:20 260:5
262:20 263:21
264:1 268:7,22
277:9 310:16
313:15 315:5
321:7 322:21
324:19 348:8
349:8 350:10
357:10 358:23
365:24 370:12
373:25 376:3
384:20 387:11
401:13 408:18
412:21 417:25
**believed** 156:14
393:2
**bell** 341:24
**belle** 113:14
115:15,16,20
115:23 119:17
119:19 349:3,8
**bellehealth**
348:13
**ben** 98:17,18,19
98:21 144:19

158:10,10,12
284:25 314:25
315:2
**bench** 358:14
410:15
**beneficiaries**
331:15
**beneficiary**
331:8 333:5
**benefits** 103:24
**bens** 314:25
**benzos** 183:3
**best** 132:19
135:7 184:21
209:15 212:4
314:7 335:3
440:13
**better** 119:24
132:3 134:8
150:3,9 185:12
191:13,14,16
315:22
**beyond** 426:21
**big** 45:18 154:15
199:14 204:22
381:18
**bigger** 45:11
**biggest** 184:3
**bill** 121:2,4
138:20 148:23
148:24 372:19
372:20 378:19
**billed** 378:7,15
**billing** 33:14,16
106:2 118:9,12
118:14,15,22
119:12,13,15
120:16 217:18
313:19,19,20
344:25 378:4,8
378:10,16
**billion** 26:22
145:10,12,14
145:15 204:5
**bills** 118:24
**binder** 107:10
**biometric** 44:22

45:15 61:22
**birthday** 44:11
63:18
**bit** 45:11 83:2
129:15 267:7
286:1 344:1
347:15
**blackwell** 113:7
123:10
**blake** 1:17 6:15
6:23 8:3
100:15 115:22
361:1 438:3,11
**blame** 26:3,6
**blamed** 26:11
27:2,4
**blank** 19:7
**blanks** 152:1
**blessed** 52:17
**blind** 340:3
**blood** 119:24
120:1,1 147:22
181:14
**blue** 86:4,4
212:4
**board** 323:24
440:15,19
**boards** 254:7
**bodies** 73:22
**body** 74:15 75:7
208:24 209:12
**boilerplate**
136:11
**bold** 401:25
**bone** 382:5
**book** 162:17
212:4 378:25
**books** 61:17,20
87:14 95:3,3
101:9 104:19
263:7 379:4
**borlin** 235:22
**borrow** 355:16
355:25
**borrowed**
357:20
**boss** 287:3

**bothering**
336:18
**bottled** 183:14
**bottom** 131:24
165:12 237:22
316:1 323:2
396:12 398:15
399:17 401:25
**boudreaux** 94:6
95:5
**bought** 45:1
48:25 50:8
51:8 59:17
65:24 92:5
144:2,7 146:7
146:16 161:1
198:23,25
210:18 211:4
242:16 311:25
339:6
**bourgue** 6:21
438:3,11
**bourland**
235:20,24,24
236:8,23
275:16
**bourque** 1:17
6:15,23 63:1
100:15 361:1
**bout** 95:20
298:1
**bow** 171:18
**box** 191:5,6,6
**boys** 128:20
**bozeman** 21:6
31:24 32:2,10
34:21 98:2
338:9
**brain** 58:13
417:19
**brand** 211:11
213:10,12,13
229:1 373:18
**breach** 247:15
277:25 315:1
317:19,20,22
318:14

**break** 61:10
62:15 164:16
169:4 173:23
243:20,22
279:13 364:13
**breaking** 222:13
**breaks** 14:3
**breaux** 39:12
**bridge** 39:12
**brief** 32:5 62:21
112:12 244:3
295:24 364:17
388:14
**briefly** 43:19
**bring** 382:16
**broken** 257:12
410:20 416:1
416:12 420:23
420:25
**brother** 82:10
154:16
**brought** 27:18
88:25 146:21
237:4,4 409:15
**bucks** 121:1
378:22
**buddies** 46:18
**bueno** 232:1
**build** 25:21
357:20
**builder** 68:15
**building** 57:8,15
57:16 72:15,17
102:19 114:9
125:15 375:20
375:21,22
379:24 432:4
**built** 25:15,24
117:17 130:1
368:16
**bulk** 347:22
**bullet** 221:20
226:4,9 227:3
230:7 237:21
237:22 238:8
238:15 239:14
239:16,20

240:14,18
241:9,18
251:13 277:9
277:20 282:1
317:11 325:25
400:14
**bunce** 48:4,8,10
48:10 51:16,17
52:7,8 53:2,7
53:11 68:9
82:11 114:3
381:25
**bunces** 81:17
**bunch** 46:16
147:22
**bundled** 404:23
**burden** 171:17
**burge** 2:5 6:11
210:2,7,12,22
362:10 389:14
389:18 435:2,9
435:13,18,22
436:1,6,10,16
**burton** 99:1
348:9
**business** 6:24
46:12 51:15
54:4,14 60:14
60:23 61:2
64:9,10 68:13
107:1 125:5,7
125:9,25
129:10,14,24
137:17 178:17
184:4 219:22
285:17 313:11
358:18 376:11
381:25 411:15
430:13,18
**businesses** 55:12
63:21,25 65:9
65:11,15
118:21 369:8
**busy** 271:18
360:11
**button** 25:20
184:14 271:15

**buttons** 150:5 289:16 290:2
**buy** 87:1 204:5 211:7 332:23 357:14
**buying** 145:1 170:17,18 204:9 213:19 213:22 310:23 327:15
**byline** 157:4,11

**C**

**c** 2:12 45:16
**cajun** 43:24 63:22,22
**calculate** 141:9 179:1,9,11 230:4
**calculated** 104:25 235:3 245:1
**calculates** 245:6 245:7
**calculation** 357:15
**calculations** 177:25 178:17 244:23
**calculator** 23:8 38:18 244:24 245:14 246:13
**calendar** 377:14
**calibrate** 258:13 259:6 323:13
**calibrated** 188:22 189:5 189:14 191:10 193:5 196:10 323:24
**calibrating** 187:2
**calibration** 190:18 193:3 193:11,12,24 194:1 195:4,7 196:6 324:15
**california** 127:9

242:7 322:20
**call** 46:17 94:20 94:21,21 95:1 96:19,21,22,24 101:15 102:7 179:21 183:1 281:10 345:6 382:9 419:20 423:24 424:4,5
**called** 11:3 16:6 41:3 43:23 44:23 45:20 46:21 68:22 69:25 70:12 72:16 82:15 147:13 183:16 189:16 382:5
**calling** 85:3
**calls** 286:3 368:21 419:16
**cambridge** 45:12
**canceled** 258:18 259:16
**cangelosi** 351:6
**cant** 9:7,9 28:11 28:12 36:21 89:3 96:16 100:21 164:2,3 169:10 172:12 190:24 196:16 196:23 218:5 218:12 225:4 230:3,4 233:12 238:13,13 239:5 240:1 241:16 243:7 243:15 245:5 246:6,24,25 249:6 267:20 276:10,10 285:14 286:16 286:18 307:8,8 342:24,25 356:24 376:16
**capabilities** 203:15

**capable** 241:22 242:1,5 243:3 304:7 396:3,22 400:17
**capacity** 8:9 33:8,9 41:17 121:2 138:24 151:16 236:13 413:21
**capital** 16:17,18 45:21 50:7 86:13,15,22 414:8
**caps** 416:1
**capt** 266:13,14
**capturing** 126:17
**car** 209:20,23 211:4 212:5,6 212:12,12
**care** 54:14 68:3 176:7 179:25 302:2 308:18
**career** 44:9
**carfax** 211:23 212:5
**carolina** 44:3
**carr** 21:20,21 37:3 38:8
**carry** 271:18,24
**cars** 213:22
**case** 7:9 8:16,20 19:16 25:4 30:2 138:14 169:23 178:24 178:25 313:12 313:21 372:1 414:19
**cash** 86:23 357:14 358:16 379:4 381:3,24 386:12
**cashbase** 379:8
**caston** 98:17,18 98:19,19,21 144:19 158:13 284:25 311:2

**catalanotto** 164:23 167:1
**catchall** 237:21
**categorically** 285:14
**categorize** 66:18 66:21 352:4
**cathey** 377:5
**caught** 31:11 139:21,24
**cause** 29:3 95:11 113:20 180:22 191:1,1 222:16 268:20 281:12 295:1 378:24 382:8
**caused** 27:3 148:22 268:20 298:12 303:15
**causes** 301:21
**causing** 217:16
**caveats** 323:3
**cbdl** 329:19
**ccr** 1:24 5:22 439:24 440:7 440:24
**ceased** 66:22 237:9
**ceh** 82:7
**center** 41:11 348:6
**central** 321:4 322:6,19 335:6 399:10 403:22 403:24 425:22 425:25 426:7 426:12 428:7 429:1,10,18,21
**centralized** 103:21 105:19
**ceo** 94:15
**cerilliant** 183:16
**certain** 121:3 183:17 209:9 240:19 248:14 248:16,18 270:5 287:4

**certainly** 146:25
**certainty** 246:24 246:25
**certificate** 74:1 138:25 139:4 438:1 440:2
**certification** 440:4
**certifications** 323:10
**certified** 1:25 5:23 439:3,25 440:7,25
**certify** 438:4 440:8
**cetera** 324:15 347:1
**cfo** 94:4,5,10,11 94:23 95:9 96:6,7
**cfr** 187:16 246:10
**cfrs** 246:2
**chad** 20:15 25:11,15,15,23 27:10,21,22 44:25 46:16 48:4,24 49:1,5 49:6 53:14 68:2 98:14 115:22 116:14 153:19 163:18 250:17 282:3 282:15,18 284:4,12 328:12,24 331:2 335:18 335:20 336:7 336:13 337:10 338:10 339:17 340:20 372:9 382:6 385:18 399:7 432:7,9
**chads** 337:22
**challenges** 39:1
**chalmette** 31:20
**chance** 212:21

229:15
**change** 74:3
83:4,7,8,11
158:23 162:5
225:3,18 229:2
288:8 300:19
301:10 316:16
335:6 413:14
426:6
**changed** 80:20
83:12 148:15
225:7,23
300:18
**changer** 307:7
**changes** 193:11
438:6 439:12
**chapter** 381:21
382:7,23
**charge** 27:1
105:13 121:1
370:10
**charged** 105:9
370:15 390:19
390:19
**charles** 1:18 2:6
6:3
**charlotte** 81:24
82:1,4 88:12
89:5,9 90:4
94:1 100:18
**chart** 113:22
**charts** 113:2,17
119:3 256:9
**chase** 43:14
**chased** 43:25
44:2
**cheaper** 128:8
129:16,18
**check** 35:16
113:24 141:24
146:1 174:10
184:2,15 193:2
211:21 306:15
310:22
**checked** 146:4
**checking** 178:13
186:24 188:11

190:18
**checks** 189:4
**chemical** 121:22
184:16 186:25
187:23,24
188:23
**chemicals**
180:20 182:18
182:19 183:21
185:25 186:1,4
186:18,19
**chemistries**
120:1
**chemistry**
119:25 242:11
**chevron** 45:23
45:25 46:10,20
47:2 67:8
**chiappinelli**
17:2
**chief** 275:17
**child** 52:17
360:21,22
363:24
**choice** 77:10
**chris** 100:4
286:3 337:17
**christmas**
359:12
**christopher**
17:2
**chromatograp...**
79:6 140:4
**circulated** 198:3
**circumstances**
149:24 150:14
151:2,6
**cities** 44:2
**city** 24:9
**civil** 1:4 5:6
439:6,7 440:19
**claim** 176:12
308:24 330:13
367:4 394:10
**claimant** 7:10
7:11
**claims** 176:20

217:17 238:20
371:10
**clarification**
35:13
**clarify** 88:7
102:23 110:19
124:13 321:24
348:17 363:2
404:9
**class** 45:14
174:24
**cleaning** 391:14
**clear** 252:17
264:4
**clearly** 143:19
362:22
**clia** 41:19 42:2,5
42:5 56:11
59:21,23,25
60:1,3,5,9
73:22,25 74:1
74:4 75:9,16
75:23,24 76:4
76:5,9,10,13
76:19,20 77:1
78:1 83:3
128:12 139:1
149:19 175:2
183:24 185:23
185:23 187:14
260:24 266:12
365:2 368:3
**clias** 78:11
**client** 119:1
298:4 329:14
428:5
**clients** 14:9
15:24,24 16:4
18:4 119:2,5
292:22 297:18
297:23 298:1
307:5 308:17
338:15 410:12
**cliff** 46:9
**clinical** 42:9
397:16,21
**clock** 380:9

**close** 67:1 77:22
95:3 381:19
**closed** 51:14
66:24 67:3
78:18
**closing** 385:10
**clue** 254:13
**clued** 204:7
**clutter** 258:4
**cms** 41:7,9,15,20
57:22 67:18
73:9,15,24
76:1,25 78:19
78:21 110:17
111:9,13
114:18 122:24
127:10 135:11
171:12,13
200:6 201:19
202:2,21 209:5
209:11 236:21
260:11,25
312:4,9,16,21
312:22,24
335:11 354:2
364:23 365:1,4
365:16 366:16
367:11 371:15
**cmss** 123:4
335:8
**cocacola** 183:9
183:13
**cochise** 306:9,10
306:13
**code** 12:5
199:17 439:7
440:18
**coder** 54:19
**coke** 183:13
**cola** 73:22 74:5
74:6,16 75:7,8
75:17 76:15,17
76:20 77:1
183:24
**colaapproved**
75:4
**collaboration**

134:4
**collect** 371:21
378:20
**collected** 269:22
308:3 321:12
**collecting**
370:24 371:4
371:25
**collections**
321:2,11
**college** 43:21
63:2,14 64:6,7
**collisionbased**
364:3
**com** 415:2
**come** 49:3 77:11
80:3 89:17
95:2 148:13
149:20 153:10
169:9 180:11
189:21 221:12
240:4,9 249:22
287:12 301:6,6
354:9 357:12
358:2 382:17
414:17 417:15
425:11
**comes** 47:20
74:6 180:6
275:5
**coming** 306:9
336:6 349:2
415:1
**commander**
266:14
**comment** 431:3
**comments** 283:1
290:23 291:11
291:12,20
292:11 293:4
293:16 402:1
410:11
**commercial**
68:15 93:21,22
115:2,3 384:13
**commercially**
387:9

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE

April 10, 2019

Page 448

commissions
48:3
common 77:20
166:6 317:23
communicate
21:23 39:21
162:14
communicated
280:5
communicating
200:3
communication
21:4 24:17
35:2 41:6
77:13 200:11
204:23 338:1
communicatio...
35:4 97:2
155:12
comp 199:16
380:12,14
companies
10:13 45:9
63:22 66:8
101:20 103:20
116:3 133:18
138:20 153:7
154:19,22
182:16 355:17
355:23,24
384:15
company 13:8
16:12,17 39:18
39:19 41:3
45:2,19 50:17
52:24 84:5,6
84:10,18 87:9
88:13 89:6,7
90:15 91:19
95:6 100:4
104:12 111:20
115:25 131:3
131:20 134:15
136:9,20
138:12,22
150:12,13,14
157:6 160:19

175:2 183:16
185:3 191:18
191:19 197:3
255:15 297:23
313:19,20
315:22 344:23
350:23 351:1,5
357:3 360:6,21
380:18,20
415:14,16
430:5,9 435:15
436:3
companys 247:2
247:3
compare 180:14
278:8
competitive
134:18,22
complained
417:17
complaining
232:5,18
233:14
complaint 13:22
139:7 147:18
203:5 219:17
221:18 251:16
276:13 278:24
400:7
complaints
204:17,18,18
204:19,20
277:23 417:7
417:13,17
complete 246:24
246:25 409:22
439:15
completely
53:14 57:9
383:7
compliance
47:19 100:8
127:19,22
154:16 440:14
440:17
compliant 25:22
175:14,17,24

197:8,14 199:8
199:10,12
200:4,8,9,12
229:8 245:17
245:23 332:24
408:1
complicated
309:16,19,24
complied 72:1
72:10
comply 71:21
72:23 128:5,25
209:5,10,13
433:3
complying
246:8 328:16
compounded
281:21
compress
170:19
compromise
311:9
computation
308:22
computed
317:16
computer
345:15,23
concentrations
228:3
concerned
139:20 217:15
239:7 341:21
concerns 200:5
411:4
concludes
436:24
conclusion 85:4
176:5 330:20
331:12 333:8
condition 316:4
conditions
328:17 433:2
conducted
303:11
confidence
155:20 410:6

confident
407:21
configured
241:21 320:8
confirm 297:3
confirmation
121:10,13,16
confirmations
402:7,10,13,16
403:3 404:3
431:16
confirmatory
121:16,25
124:19,20,22
125:3,17
183:10,11
202:13,14
218:11,14
219:6 290:10
confused 49:24
85:9
confusing 9:10
195:17 206:12
conjunction
130:7
connected 40:25
connie 261:18
262:3,4,6
263:1 284:22
connies 262:7
connotes 430:4
conrad 385:4,11
consent 88:5
89:12
consider 55:8,11
125:6 153:7
361:22
considered
85:13,16 87:13
consistency
409:11
constantly
204:13
construed
330:12
consult 61:17
consultant 16:1

24:14 40:22
consultants 41:3
266:10 275:11
350:23
consulting 16:5
99:20 100:3,12
133:11 138:5
consultive 16:18
contain 239:20
255:3
contained
129:23 139:16
226:1 405:25
container
141:10 147:13
147:20,21,25
148:2,6,21,22
149:12,17,22
149:25 150:4,6
151:6,12 163:6
163:14 164:5
206:25 216:14
218:24 219:12
220:21 221:13
222:25 223:3
223:15,23
224:7,12,25
248:4,8 277:10
277:19 281:25
282:7 285:2
391:16,20,23
391:24 405:12
405:25 406:6,9
406:16,22
containers
150:16 151:11
163:1 220:5,13
220:15,18,22
221:1,2,10,25
222:12,23
223:3
contains 167:13
253:22
contemplated
137:18
contemporane...
162:24 163:4

context 233:7
continues
  276:21,25
  400:12
contract 27:21
  67:7 122:14
  138:5,8 143:21
  144:4 158:22
  159:2 166:22
  166:24 167:15
  167:17,18
  168:2,10,25
  331:24 386:4,6
  404:15,22
  406:25 426:7
  433:12
contracted 95:1
contractor
  68:16
contracts 432:3
contractural
  440:18
contrary 141:22
contributions
  86:14,15,22
control 106:19
  149:15 179:21
  179:23 180:12
  181:11 182:3
  188:16 189:17
  226:22 227:8
  227:13,19
  228:7,9,14,16
  228:17,22
  287:17,21
  317:6,15
  367:20
controller
  113:10
controls 70:15
  182:2 247:18
  287:1,6,14
convenience
  259:22
conversation
  19:14,14 24:19
  25:6 31:3

46:20 161:11
233:9,20
240:19 251:24
258:23 280:7
363:21 364:4,7
365:15 400:16
418:19
conversations
  22:19 23:19
  26:17 32:3,5
  34:23 40:1
  50:10 159:3
  234:4 237:2
  240:22 343:11
  358:9 360:23
conveyed
  393:25
conveying 377:9
cookiecutter
  241:20
copies 319:1
copy 79:12
  140:13 168:1
  168:24 250:18
  388:25 389:4
copying 266:12
core 402:5 431:3
  431:10
corporate 9:18
  21:7 32:18
  33:2,25 34:25
  95:9,23,25
  103:1 104:19
corporation
  197:2
correct 9:19,20
  12:25 13:4
  22:11,12 29:16
  41:22 42:16
  49:20 54:7,8
  54:24,25 55:24
  55:25 56:5,9
  59:9 62:1,5
  63:4,5 66:15
  73:7 75:1
  79:20 84:7,11
  85:14 88:14

89:6 96:3
105:21,22
111:9 113:14
113:16,18
115:8 116:24
117:2 118:5
123:11,14
127:3 129:2
133:15 135:18
138:17,18,21
139:17 145:5,6
146:8,17
148:11 152:6,9
152:23 153:1,4
153:5 154:19
154:23,24
155:2,8,9
156:4,8,11,15
156:18,24
157:6,7,11,12
157:15,18,19
158:1 165:2,7
165:10,11,17
165:18 168:11
174:7,8 175:17
176:3,4,10,13
176:20,23
179:2 181:20
186:2,3,6,11
186:14 188:13
190:19 192:4,8
192:16,20,21
193:6,10,12
194:19 196:11
197:19 200:19
201:11,12,17
201:18,25
202:1,8,19,25
203:1 206:20
207:17 208:19
209:3,4,6,7
213:20 214:2
215:18 216:10
218:11,16
222:8 223:16
223:24 224:12
226:14,15,24

228:24 231:10
231:13 232:6
232:20 237:16
240:7,15,16
241:23,24
242:15 245:24
248:5,9 250:2
250:10,18,21
253:24 258:15
259:13,19,23
259:24 260:22
264:13 270:9
270:10 274:9
276:17,22,23
277:13,16,17
277:23 286:23
288:5 289:1
290:24 291:20
291:24 292:1
300:2,5,8,10
300:11 302:5
302:22 306:1
306:20 307:15
311:17 314:17
319:7,15 320:1
320:2 323:7,8
323:12,18,25
324:10,16
325:1,6 327:15
327:19 328:5
328:18,21,25
329:1,4,15
330:17 331:9
331:16,17
332:2,20,22
333:5,10,11,24
334:3,23,24
335:2 337:5
340:7,14
353:22 354:14
355:14,17
357:4 359:17
360:8,15 361:8
361:11 365:5
365:13 366:6
366:17,20,21
366:25 367:1,5

367:6,9,10
369:2 370:18
370:19,25
372:23 373:21
373:22 374:5
374:16 375:1
376:7 377:17
379:16,19
380:6 385:16
386:19 387:15
388:6 390:25
390:25 391:16
391:20 392:7
392:14,22
393:3,7 395:12
395:16,17
400:1,4 401:22
404:11,12,15
404:16,19,25
405:13,14,17
405:18,21,22
406:1,13,17,21
407:5,8,11,14
408:15,16,20
408:21 409:2,3
411:12,13
412:3,4,10,11
412:13,16
413:3,6 415:2
415:3,7,11,12
415:15,18,19
416:5,8 418:21
418:22 419:1
420:23 421:3,9
421:15,16,20
421:23 425:23
426:4,14 428:3
428:19 429:2,8
429:21,22
430:6 431:9
432:1,11,15
433:4,5,13,14
433:16,17,19
433:20,22,25
434:5,6,8,9,11
434:12,17
435:8 438:7

**EXHIBIT A**

440:12
corrected 320:7
correcting
123:23
corrections
423:8 438:6,13
438:15
corrective
281:12 316:3
316:16 365:20
correctly 88:2
138:12 141:9
143:25 188:22
189:6,8 191:11
193:5 196:10
245:1,8 252:11
267:23 320:8
337:20 359:11
413:18
correlate 323:14
correlated
323:24
cosse 99:1 348:9
cost 125:24
128:8 369:10
costs 104:22
129:17
couldnt 19:25
26:24 58:3
75:17,18 88:4
142:3 162:3
174:11 221:15
231:19 237:3,3
243:5 258:13
258:22 281:5
291:13 292:10
292:12 294:10
298:9 301:20
318:11 345:22
360:6 365:5,8
366:4,17
417:14 421:6
counsel 5:3 6:7
8:2,4 14:6 19:1
19:2,3,4,6 20:5
21:7,14 30:11
30:13 32:19

33:2,9,25
34:25 174:5
215:7 249:1
251:20 254:17
278:13,19
343:12 359:4
362:25 383:3
389:22 394:17
395:7 405:15
408:12,18
414:11,11
434:3 440:20
count 80:10
counted 308:13
counterintuitive
128:11
counting 239:18
country 128:3
135:8
couple 8:25 14:9
43:25 44:1
46:10 60:13
119:1 150:20
169:13 249:2
268:23 293:25
336:17 337:18
361:20 368:23
382:4 388:8,10
389:24 426:19
course 90:1
192:19 194:2
195:7 285:16
317:8,14 318:2
courses 43:6
court 1:1,25
5:23 7:22 9:8
103:2 114:16
439:4,25 440:7
440:25
cover 10:22 32:1
67:10
covington
368:12,17
cpa 21:18 36:23
96:16 392:16
cpas 12:4 94:4
create 72:1

149:25 150:5
183:20 270:1
275:25 298:13
357:3
created 40:16
56:7 68:25
72:10 134:1,5
148:4,7 149:21
150:15 164:4
300:12,14
306:21 311:1
315:9 319:24
creating 116:15
116:19
creation 162:25
credit 345:7
356:17 387:3,9
387:10
critical 156:21
364:3 413:19
cross 86:4
crucial 364:3
crying 38:20
crystal 140:3
cumulative
331:23
cup 196:17
cups 147:24
220:15 221:13
curb 25:25
current 10:12
316:17,21
currently 37:1
325:5,13 326:1
375:4
customer 47:4
208:9 306:16
306:19 397:22
customers 31:13
151:11 241:21
292:22 293:11
293:13 294:13
295:12 296:6
304:11 306:7
307:5,9 308:16
419:21
customize

275:22 276:1
cut 137:2 383:20
cvdl 103:20
198:6 242:6,14
242:16,19,22

                D
d 3:1,9 45:16
110:21 275:16
349:16,17,18
400:6 430:2,4
430:17
da 201:8,8,9,9,9
dads 44:10
daily 32:7 180:8
180:12,13
181:2 184:1
dallas 123:2,5
369:14
damage 177:25
damages 179:1
179:10,12
400:10
daniel 21:6 98:2
266:14 275:13
danny 23:20
31:24 32:2
34:23 282:9
284:4 338:9
darren 17:2
dashes 439:11
439:16
data 23:12 33:20
38:22 70:16,21
70:23 74:8
108:8 166:7
179:24 180:1
231:24 243:6
245:12 247:15
247:17 304:13
304:13 309:19
311:9 315:1
317:19,20,22
318:14 346:22
348:6,7
database 23:21
31:6,17 34:4
70:4,5,16

90:22 221:14
301:2,4,12
databases 31:13
date 28:12,14
94:14 159:15
165:7 166:4,5
198:17 201:20
216:20 236:11
243:8,12,13
248:10 255:23
260:6 264:23
266:23 268:5
270:8,12
272:21 283:4
285:15,21
290:11,15
293:18 294:1,2
294:3,4,23
295:14 312:2
328:4 376:1
438:8,11,25
dated 396:14
399:8 407:18
dates 88:21
198:19 230:3
237:18 240:19
243:14 248:21
268:6
daughter 359:12
360:5,12
david 8:3
day 38:17 46:17
46:19 150:2,2
162:19 180:13
183:14 186:1,2
186:5,5,20,20
187:1,23,24
188:10 192:19
193:11 194:2
195:8 270:15
270:18 271:1
271:10,10,17
271:17,19,19
271:25 272:6
272:12,13,14
283:10 285:24
293:21 294:25

307:20 308:2
314:7 317:6
**days** 14:11 16:8
83:1 108:1,4
111:21 161:1
237:1 361:7,18
363:6,15
**daytoday** 71:1
95:4 109:16
**dazet** 101:16
178:16 345:4
**db** 31:16 32:4
**de** 126:5 202:24
373:4,12 374:3
386:23,25
**deal** 26:2 38:25
45:18 260:15
382:18 386:2
**dealer** 212:5
**dealing** 361:11
**dealt** 153:14
**debris** 44:1
65:18
**debt** 374:22
383:21 384:15
385:23,25
386:14 394:4
**debts** 65:5
384:14 386:10
386:11 387:18
387:21
**december** 43:3
63:2 78:20
114:17 124:11
127:11 201:21
201:23 202:5
241:13 262:12
262:15 335:9
338:1 403:18
404:14
**decide** 379:21
390:18
**decided** 47:23
114:18 201:10
312:17 379:18
379:25
**deciding** 44:5

255:21
**decipher** 390:18
**decision** 92:6,8
92:14 129:6
201:8 204:13
205:2 270:11
327:17
**decisions** 88:17
**declared** 63:17
**declaring**
383:17
**decrease** 379:25
**dedicated**
105:10
**dedicating**
105:11
**deep** 382:5
**default** 381:1
**defect** 141:10
147:13 148:2
148:21,22
150:4,6 151:12
163:6,14 164:5
216:14 218:24
219:12 220:21
223:15,24
224:12,25
226:14,17,24
227:9 229:25
230:1 234:22
248:4,8 277:10
277:15,25
281:17,22
282:7 283:14
284:7,10,15,17
284:20,21
285:2,9,12,24
287:2,22
288:19,21,23
289:5 290:23
291:16,20
293:4,16,19
294:4,23
295:14 296:5
296:14,21,24
297:11,19
298:23 299:4

300:23 301:16
301:20 302:19
303:8,15 306:8
307:3,16 308:9
308:23 311:9
312:5 391:16
391:20 405:12
405:25 406:6,9
406:16,22
409:18 413:16
418:4,5
**defects** 214:20
215:12,17,23
216:6,8 219:16
265:14 276:17
277:21 278:22
281:15,25
291:10,23
317:7,10,14
364:23 366:24
367:3,9 392:6
407:4,19,25
408:7 411:3
416:5 417:4,4
417:7,12,13
418:1
**defendants** 2:10
6:14
**deficiencies**
316:5
**deficit** 375:21
**define** 41:9
302:9 422:17
**defined** 83:18
439:5 440:18
**definitely** 91:12
256:25
**definitive**
262:25
**degree** 42:21
64:9,11
**degreed** 180:23
**degrees** 148:18
**delegated** 94:3
**delegation**
106:24
**delete** 301:23

345:22 391:24
**deleted** 148:15
164:3 301:21
345:15,17
391:23
**deletion** 149:2
**deliver** 421:7
**delivered** 39:24
409:21
**demo** 241:11,12
398:9,18,21
**demos** 400:22
**denham** 32:12
**denote** 439:19
**deny** 352:13,14
**department**
41:18 97:15
104:20 113:11
113:11 118:15
119:12,13,16
**departments**
118:20
**dependence**
362:21,23
363:22,23
**depending**
46:22 271:22
354:21
**deployment**
335:22
**deponent** 5:10
**deposed** 7:3
**deposit** 22:6
38:2 70:4
**deposition** 1:15
5:4,14 6:2 8:16
8:24 12:14,15
12:25 13:12
14:6,15 15:19
18:6 407:17
436:25
**depositions** 10:1
16:3 19:17
**depovue** 1:22
**depression**
363:22
**describe** 96:12

106:16 237:14
239:15 308:24
400:15 407:24
**described** 61:5
145:15 147:17
288:7 323:17
**describing**
191:7
**description**
428:12
**design** 154:13
319:14,24
327:14 329:11
329:12 404:10
433:19
**designate**
296:25
**designated** 9:25
88:13
**designed** 397:21
**designee** 1:16
**desk** 31:12
310:1
**desktop** 23:14
**destroyed**
219:21 346:16
**detail** 102:3,16
142:22 238:14
315:1,2 317:7
**detailed** 106:14
151:7 162:6
284:18
**details** 161:10
317:3
**determination**
347:13
**determine**
144:22 158:12
189:13 227:21
227:24,25
228:2
**determined**
57:20
**develop** 16:19
73:10 116:9
227:20
**developed**

154:11 224:20
228:6 272:1
274:21 307:1
**development**
54:13 325:14
**device** 160:18
174:25
**diagnose** 227:23
**diagnosis**
403:23,24
**diagnostics**
322:19
**diagram** 404:17
**diagrams** 256:9
**diana** 198:12
**dictated** 138:6
**didnt** 15:11
25:20 38:14
44:4 47:4,7,19
51:10 58:2,12
60:11,14 64:9
67:1 73:5
77:11 90:14
94:23 97:19
104:21 105:5,7
110:9 118:3,13
125:6,20 126:3
128:25 138:25
139:3 140:25
141:5,6,7,15
141:16,20,21
143:8 147:8
149:9 170:12
185:4 201:11
204:20 207:1,2
209:2 211:13
212:11 214:1
225:13,16
231:22 257:2
260:8 261:10
271:25 277:2
286:19 297:23
306:16,18
315:19 317:22
332:4 334:22
335:10 341:20
345:12 352:23

353:7 354:9
358:25 365:4
366:4,16 367:2
367:13,20
374:1,2,7,14
378:12 380:4
381:17 382:6
385:25 389:19
399:25 402:23
426:2,11,12
435:21
**diet** 183:13
**difference**
127:18
**different** 19:2,4
38:13 44:2
57:7,9 76:19
80:25 108:24
109:2,3 117:23
127:21,24
136:21 147:23
166:9 167:4,5
183:1,4 187:6
208:5 219:5
228:10,12,14
228:20 241:23
242:2,5,9,11
293:25 302:14
303:16 334:7
348:11 352:1,1
352:2 381:13
381:14 382:14
384:8,13,14
396:3,22
400:18
**differently**
288:4
**difficult** 222:6
**digging** 203:23
**diligence** 17:5
**dillon** 415:10
416:11
**direct** 95:7,8
335:15 360:22
**directed** 23:19
75:19
**directing** 254:21

**direction** 440:12
**directive** 75:21
75:25
**directly** 75:23
100:11 155:16
203:13
**director** 52:18
106:19 203:22
235:12,12
236:7,18,21
237:7 267:18
280:24
**directors** 235:15
350:22
**disabled** 284:9
298:23 301:5
**disagree** 194:21
**disappeared**
361:3
**disciplines**
241:23 242:2,9
242:12 243:3
396:4,23
400:18
**discourse**
389:22 439:11
**discover** 26:13
159:11 161:17
161:18 300:6
**discovered**
160:25 161:16
161:19,20,23
279:3 282:2,4
282:7,14 283:9
283:11,14
284:6,9 285:10
285:13,16
291:2 294:14
303:17 306:14
380:13 411:3
**discovering**
125:12
**discovery** 24:2
204:15 285:24
299:20 347:2,4
**discrepancy**
251:17

**discuss** 18:24
20:1 36:2
173:15 239:3
**discussed**
156:22 391:18
392:6 423:8
**discusses** 233:9
**discussion** 29:17
421:18
**discussions**
14:14 15:20
32:14 34:2
36:17 37:23
38:11 86:9
126:18
**disease** 363:1
**disparage** 359:5
359:9
**display** 242:6
**disregard**
409:22
**dissipate** 380:16
**distracted** 10:23
**distributions**
87:12
**district** 1:1,2
**div** 45:14
**diversified**
131:5
**divided** 308:15
**division** 95:9
**divorce** 363:25
**dll** 373:14
393:16
**doctor** 304:2,19
305:7,16,23
**doctors** 293:12
304:7
**document** 80:4
84:15 88:16,16
88:21 112:24
123:8 124:14
129:23 131:23
132:2,15,19,25
133:1 134:7
158:1 160:7
164:11,25

167:13 177:3
201:6 204:18
204:21 251:12
251:14,15,25
252:7,14,21
253:7,20 254:4
255:9,12,20
256:14 257:7
257:11 285:19
314:15,24
315:10 319:14
319:24 320:3
324:3 327:14
327:18,22
328:4 329:3,7
329:12 331:1
332:11 333:22
342:24,25
344:3,9 377:20
389:25 394:11
394:14 401:15
401:21,24
403:6,13,16
404:10,10,19
404:22 407:18
407:24 408:4,8
412:21 414:11
414:13,15,21
414:21,21
415:17 418:14
420:12 423:1
423:17,25
424:2,20,25
425:3 427:10
433:15,19,21
433:25
**documentation**
29:13 33:21
40:15 58:14
96:15,22
101:12 158:25
169:22 170:15
265:3 269:7
270:2 345:10
364:23
**documented**
159:13 281:14

417:14
**documenting**
204:17 303:23
417:7,16
**documents** 36:6
36:18 81:2
102:4 130:10
132:5 159:22
162:25 163:5
177:7 178:12
238:12 249:15
250:7,9,13
263:3,12,13
265:8,9 290:14
290:16,17
343:24 344:24
345:3 347:8,9
347:20 348:11
348:17 349:1
382:4 389:9,11
395:8 412:25
427:3
**docusign** 370:17
**doesnt** 149:18
181:5 187:18
192:5 193:10
245:8,13,14
257:1 286:25
288:10 290:2
294:18 331:19
337:3 338:23
339:2,24
340:12 352:10
362:11 385:18
404:4 413:17
415:24 428:17
431:21
**doing** 17:4 26:14
46:19 63:19
107:8 124:7,20
143:2 145:4
151:22,23
161:25 162:8
183:19 186:22
188:10 190:17
204:1 216:16
217:18 222:15

243:19 260:12
281:1,7 285:17
289:15 313:4
333:13 337:22
341:10 347:23
369:5 381:22
402:7 404:3
430:13,18
431:15
**dollar** 145:10
419:7
**dollars** 26:23
145:13,14,16
321:8 322:22
**domain** 359:5
359:10
**donated** 87:4
**dont** 7:25 8:10
8:22 9:11,13
10:23 18:15
20:3 22:12
28:14 29:23,24
32:9 34:17
35:18,20 37:16
42:7 48:18
50:8,18 57:25
58:12 60:7
64:16 73:17
75:10 77:8,13
78:12 80:12
82:13 84:22,24
86:2,23 87:10
87:10 89:19
90:20,25 91:8
91:10,10,11,11
93:21 94:13
95:15 96:16
101:1,6 102:1
102:12,21,25
114:2 117:12
122:22 127:17
129:21 130:14
131:9,12,13
132:2 134:9
136:5 140:14
140:21 144:21
146:3 147:3

157:24 159:14
161:10,12,14
163:22 164:8
164:19 167:11
168:6 172:4,14
172:22 173:7
173:12,18
174:16 176:7
176:12,16
177:1 181:9,10
185:16 187:10
190:4 191:8,16
193:17 194:12
194:18 195:11
195:19 197:10
200:22 208:22
211:1 212:25
216:20 218:13
218:15 219:8
231:2,8 232:12
236:10,11,25
240:24 241:1,8
241:19 244:13
245:20 249:6
249:20 252:6,7
252:13,18
253:4,6,12,25
253:25 255:23
255:24 256:15
256:23 258:4
259:20 261:19
262:7,12 263:6
263:6 264:1,21
265:2,7,19
273:9,13 274:4
274:8 276:11
283:5 284:16
285:11 288:17
288:24 289:10
290:11,14,17
293:23 294:15
299:17 300:13
300:17 302:6
303:14 306:25
310:16 311:5,6
311:8,13,14,18
311:22 312:14

312:15 314:2,8
315:5 321:7
322:12,21
336:9 340:2
341:25 351:10
352:9,9,13
357:10,22
362:9 364:12
368:25 372:7
376:1 377:20
377:21 380:3
385:14,17
387:6,19,19
388:7 391:3
417:6,21
418:15 419:18
419:18,21
421:23 424:12
425:14,17
426:24 427:13
433:6 434:25
**doomed** 351:23
352:8,22
353:21 354:2,6
355:4,5,8
411:12
**door** 46:24
78:11 309:16
317:21
**doorstep** 409:15
**dormant** 57:21
78:2,15
**double** 148:23
195:15 217:18
**doublecheck**
130:23
**doubt** 165:19
166:2,12,16
167:13,16
326:8,20
**download** 348:3
**downsize** 114:19
**dozens** 97:3
**dr** 48:21,25
235:20 236:2,8
236:17,20,23
237:6 250:18

263:9 265:11
266:9 269:20
275:16 280:13
350:12,24,25
351:2
**draft** 315:4
**drafted** 122:21
254:16
**dragged** 347:22
**dramatically**
88:25 114:20
**drawn** 431:2
**drinking** 361:14
**drive** 209:20,23
**driver** 369:7
**drop** 23:14
361:19
**dropbox** 24:22
344:20 347:19
347:25 348:4
**drove** 210:1
**drug** 46:23
199:20
**drugs** 121:15
183:4 363:6,16
**drummond**
143:16,16
176:8,11,25
**ds** 196:21
**due** 17:4 53:12
65:8 317:20
375:9 376:8
389:21 439:10
**dug** 280:14
**duly** 6:18
**duplicate**
141:10 147:13
147:19,19
148:2,3,6,7,10
148:21,22
149:12,16,22
149:25 150:3,5
150:16 151:6
151:12 163:1,6
163:13,13
164:5 206:25
216:14 218:24

219:12 220:14
220:18,20
221:13 223:15
223:23 224:7
224:11,25
248:4,7 277:10
277:19 281:25
282:7 285:2
391:15,19,23
405:12,25
406:6,9,16,22
**duress** 432:14
**duties** 94:4
106:24

**E**

**e** 3:1,1,9,9
351:15 439:1,1
439:1
**earlier** 51:3 63:1
64:2 157:21
160:15 167:23
202:19 217:1
261:23 315:13
339:9 375:23
408:11 418:19
421:2
**early** 82:25
115:7 177:6
224:21 260:10
360:10
**earned** 48:1
**earth** 37:18
358:18
**easier** 196:3
**easily** 304:20
432:19
**east** 103:2
114:16
**easy** 25:20 172:6
252:16
**eaves** 17:3
**educate** 185:9
**education** 43:7
274:19
**educational**
42:20
**effect** 344:13

401:17
**effectively** 14:12
46:14 78:22
95:3 98:13
104:1 106:20
118:19 120:16
126:16 147:18
149:5 170:18
309:21 354:6
394:9
**effects** 344:8
**efficiency**
369:19
**effort** 170:12
315:11 345:12
378:16
**efforts** 370:5
**ehow** 351:13,14
351:17,21
**eight** 105:7
**either** 53:15
77:16 78:3
90:18 107:4
153:4 183:24
216:18 252:6
283:22 284:4
284:11,12
294:17 312:25
328:23 362:12
362:14 386:1
**electronic** 349:1
**elicits** 183:2
**eliminate**
415:25
**em** 11:24 69:8
70:6 95:14,16
95:17,21 96:7
105:13 204:21
222:18 268:20
268:23 275:10
280:4 288:14
290:20 345:7
350:15 358:13
384:2,4 391:12
423:16
**email** 24:18
31:14 35:1,4

39:22,23,25
90:19,22 92:12
113:1 123:10
123:24 124:1
131:13 160:8
164:22 171:10
198:2 199:2
216:17 242:4
250:16 263:8
263:11 283:8
334:2 335:19
336:6 337:22
340:16,22
341:13,14
348:22 349:19
350:19 365:25
366:1,11,14
377:5,8,9
396:12,13
397:10 399:7
400:16 412:2,5
415:1,1,5,9
418:16 421:17
424:4
**emailed** 90:12
**emails** 30:8,23
34:9,15 35:20
40:6 91:12
162:25 200:2
200:13 238:11
243:14 248:17
248:20 333:23
335:17 344:22
345:14,22
348:20
**empire** 16:1
**employ** 350:25
**employed** 11:4,5
11:7 18:9 37:6
67:9 98:11
**employee** 10:12
10:16,19,25
47:5 105:18
111:20 149:13
298:25 299:20
301:3 350:18
350:20 416:17

**employees** 10:24
11:3 98:11
103:8 104:4,9
104:14 105:6
105:10 107:3
110:16 118:18
118:19 119:10
119:11 133:2,3
137:11 145:7
145:18 146:4
146:13,21,22
146:25 147:1,3
248:22 275:6
275:10 283:22
315:20 338:7
339:2 341:21
345:22 347:23
360:23 382:6
419:15 420:9
428:24 429:3
434:15
**employing**
279:5
**employment**
103:18
**ended** 50:12
113:21 154:3
224:2 268:4
374:20,22
**ends** 132:7
398:14 399:5
420:25
**energy** 60:20
105:11
**engage** 104:14
**engaged** 16:5
313:15
**engine** 117:17
117:19
**engineer** 39:17
**english** 42:25
**enjoy** 363:2
**ensure** 267:23
**ensures** 189:7
**entire** 132:6
152:17 185:3
198:10 212:22

347:14,17,19
357:16
**entities** 104:23
105:20 118:15
155:13 321:17
385:5,12,25
417:24 434:5
**entitled** 133:11
238:18
**entity** 33:14
50:5 59:7
82:14 83:5,24
105:8 112:17
115:17,20,23
117:4 118:1,9
118:23 132:23
155:1,5 157:18
321:19,20,25
322:9 330:13
382:25 383:10
383:18 427:12
428:3,19
440:17
**environment**
336:20,24
337:1
**eportal** 335:23
**equal** 97:18,20
97:21
**equals** 363:23
**equipment**
59:18 69:25
70:15 99:25
109:8,9,11
115:11 120:6
120:23 121:9
126:14,25
127:13,15
128:4 151:25
180:25 181:3
181:20 183:23
187:2 188:19
188:21,24
189:5,10,14,19
190:16,17,18
191:3,8,10,21
193:4,10,11,24

193:25 195:4,5
196:6,9 229:1
229:1,4 243:7
271:21 324:23
374:4 379:18
379:22,23
393:12,15,17
393:20 403:20
428:21
**equity** 50:7
53:17
**equivital** 45:13
**error** 189:18,19
189:20 378:11
**errors** 140:2
**especially**
118:16
**esquire** 2:4,5,13
2:14,15
**essentially** 88:3
168:8
**establish** 41:6
226:22 227:7
227:13 269:14
**established**
269:21 270:24
270:25 402:5
431:4,8,11
440:15
**establishes**
270:2
**estimated**
321:10
**estrogen** 181:15
**esuite** 166:5,6
**et** 1:5 258:8
324:15 347:1
**evaluate** 74:11
**evaluated**
142:15,17
**evaluating** 17:4
28:23
**evening** 196:10
**event** 31:15
331:22
**eventually**
119:20 259:5

**everybody**
383:6
**evidence** 5:15
311:16,18,20
**exacerbated**
149:17
**exact** 7:25 28:11
28:12 46:19
114:14 159:15
161:10 183:21
214:24 216:20
243:8 376:1
**exactly** 121:12
189:11 197:22
225:5 261:5
286:9 289:15
301:17 308:25
**examination** 3:3
6:20 12:21
15:3,10 17:8
17:21 18:19
21:1,15,24
28:16 29:25
31:1 32:24
36:5 39:11
40:10 41:14
42:6 48:11
52:6 54:3
61:15 62:25
63:12 65:3
66:13,20 69:19
72:7 79:18
81:12 88:1,11
89:24 91:17
94:22 97:5
98:15 105:1
108:17 110:8
112:16 113:6
117:24 123:15
129:7 130:25
132:13 133:25
136:2 140:12
141:1 143:10
144:11,24
146:12 147:2,7
150:22 151:9
152:15 153:2

156:12,19
157:3 158:4
160:5,13
164:21 165:23
166:10,17
168:5,17
169:12 172:21
174:2,19
176:17,24
177:15 178:10
179:6 182:17
184:12 185:20
186:10 187:11
188:8,17
190:13 193:15
194:20 195:25
200:24 201:15
202:12 203:11
205:17 206:14
207:7,25 209:1
209:24 210:10
210:16 211:2,9
211:17 212:8
212:23 213:11
213:18 214:8
215:3,25
219:11 220:9
222:20 224:16
225:21 229:17
230:13 231:17
232:13,24
234:11 235:25
239:19 240:2
244:7 246:5
249:8 250:6,22
252:12 253:3
253:19 255:1
257:25 262:2
264:12 269:18
273:4,12 274:6
276:24 278:4
279:1,11,22
283:24 289:11
293:8 296:3
299:16 305:3
306:5 310:20
314:12,22

319:19 320:13
320:25 321:9
322:23 323:21
324:6,13,20
325:2,15 326:7
327:8 328:3
329:8,20
330:22 331:5
331:13 332:8
332:17 333:9
333:21 336:5
337:11 340:11
341:4 342:14
343:4,17 346:2
349:6 350:11
351:12 352:6
352:20 353:6
353:11 354:7
354:15,24
355:22 357:7
358:24 359:6
359:16 360:1
360:16 361:16
362:2,13 363:4
363:10 364:21
365:10 366:12
370:6,22 371:5
373:15 377:1
383:15 384:16
389:23 391:13
392:4,12 395:4
395:24 402:25
403:10 405:8
406:7,14 407:1
407:9,15 408:9
408:24 411:9
411:19 412:17
413:7,13 414:3
414:9 416:9,18
416:24 419:6
420:21 421:24
423:13 424:19
424:23 425:19
427:1 430:23
433:8 434:2
**examined** 6:18
**example** 105:5

179:17 230:7
270:15 271:6
271:10 411:20
**exceed** 323:6
331:25
**exchange** 86:24
**excuse** 17:25
23:2 60:17
93:7 107:3
198:21 205:20
217:16 260:3
273:23 309:25
313:18 375:12
379:1 426:8
431:14
**executed** 84:13
237:15,17
382:20
**execution**
237:24 238:7
239:22
**executive**
104:20 163:17
**executives**
104:19,20
**exhibit** 3:11,12
3:13,14,15,16
3:17,18,19,20
3:21,22,23,24
3:25 4:1,2,3,4
12:15,18 79:11
79:14 80:25
112:25 113:3
123:8,12
140:18 160:7
160:10 164:11
164:13 248:25
249:4 250:19
255:10,13
257:4 258:5
313:25 314:7
314:18 319:13
319:16 327:22
327:25 328:21
329:24,24
330:5 333:15
333:16,17

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE

April 10, 2019

Page 456

335:25 376:23
388:20 389:1
391:10 394:16
395:6,11,14,15
395:16,19,20
395:21,25
396:6,7,9
397:2,5 398:5
398:8,12,23
399:1,5,18,20
400:8 401:3,5
401:8,9,10
403:17,17,18
404:23 405:4
412:2 414:13
420:17,19,22
422:7,25 423:7
424:11 426:5
427:2,19
429:23 430:24
433:10,12,18
**exhibits** 344:6
403:7
**exist** 66:23
248:20 265:10
288:23 295:1
**existed** 208:4
321:20 404:7
**existence** 94:12
155:8
**existing** 87:2
**exists** 131:14
301:12
**exit** 46:14 50:13
367:15
**exited** 53:8,9,12
53:14
**expect** 16:24
275:21 338:2
418:4,7
**expectations**
338:3
**expected** 247:22
328:24 332:9
332:15,19,23
433:3
**expenses** 67:11

103:24 381:19
383:20
**expensive**
142:19 154:8
298:14 369:12
**experience**
48:12 53:21
54:6 67:24
68:2,10 216:14
216:15 383:5
418:8
**experienced**
107:16 407:4
417:11 418:1
**expert** 41:23
55:9,11 102:12
161:6 177:8,10
177:11,17
178:20,22,24
178:25 245:18
313:14,21
420:5
**experts** 150:1
268:18 313:5,8
313:9,10
**explain** 49:22
55:19 136:20
172:22 185:17
190:11 235:2
360:18 371:13
**explained**
308:11
**explaining**
216:19
**explains** 324:3
327:10
**explanation**
173:6,10,13
256:8 297:12
326:24 327:4
**explore** 383:19
**explored** 383:1
**exploring**
383:10
**exposing** 297:5
**expressed** 417:4
417:5

**extent** 14:24
32:19 81:7
89:22 91:3,4
195:13 213:7,9
213:17 343:10
343:13 378:13
**external** 341:16
**extra** 227:24
**eyes** 95:22 265:9
390:3

**F**

**face** 162:6
358:18
**facility** 205:19
**fact** 29:2 59:4
90:7 134:21
141:21 143:18
146:16 156:13
159:9 166:12
175:16 176:1
189:13 192:7
196:10 205:25
206:15 219:15
222:5 223:22
232:5 258:12
258:17 259:5
259:15 272:20
277:20 289:5
301:11 319:5
319:23 328:10
329:11 355:1
405:11 410:10
415:25 417:11
418:1 421:3,19
425:20 427:11
428:2 429:9
430:4 431:24
**factbased** 353:4
**factoring** 17:24
**factors** 129:5
189:21
**factory** 204:2,25
**facts** 15:7
**fail** 47:4,5
**failed** 65:15,20
66:2,9,15
303:20,22,24

304:3,13,14
305:5,8,9,16
305:24 354:1
**fails** 296:16
303:5
**failure** 65:13
66:19
**fair** 29:19 30:3,6
77:15 81:22
89:12 206:11
233:24 360:12
363:11 381:7,8
382:19 394:12
411:1 435:1
**fairbanks** 1:24
5:22 439:3,24
440:7,24
**fairly** 202:24
**falcon** 56:18
59:10,12,12,20
60:8,12
**fall** 140:9
**false** 217:17
425:3
**falsely** 214:12
**familiar** 73:15
73:17 117:10
147:14
**families** 121:15
183:4
**family** 14:10,13
15:21 109:21
361:5
**far** 139:19 152:3
211:11 239:6,6
248:10 256:15
289:15 350:19
**father** 69:17
82:10 212:5
**fathom** 417:15
**fatigue** 45:6
46:7
**fda** 23:7 141:6
142:25 145:22
145:24,25
146:2,5,15,23
146:23 154:14

157:22 158:20
162:3,10,11,15
167:12 169:14
169:17,22
170:2,14,17
171:4,7,7,11
171:16,21,22
171:24 172:3
174:21 175:3,8
175:14,24
199:10 200:18
200:25 201:3,3
201:7,10,16,24
203:24 204:3,8
204:17,25
205:15,20,21
205:24 207:10
207:16 208:7
208:14,18
209:2,9,14
244:19 245:11
245:13,17,18
245:22 246:7
246:15,18
247:4,12,14,16
247:23 365:23
406:23,24
**fdaapproved**
25:19 26:21
75:2 161:5
162:1 170:24
204:10 316:18
**fdas** 167:19
**fear** 383:5
**feasibility** 45:24
**feature** 422:4,5
422:9,18,22,22
**features** 397:6
397:24 398:4
400:21 422:16
422:20
**february** 113:17
144:20 159:15
175:20 280:18
281:10,11
285:3 291:4
292:25 343:19

380:2
**federal** 5:6 7:22
  41:21 42:10,13
  72:24 172:12
  439:6
**federation** 254:6
**fee** 104:8
**feed** 184:16
**feel** 42:15
  159:15 212:12
  346:23
**feelingbased**
  353:5
**feels** 296:17
**fees** 259:23
  331:25
**fell** 46:9
**felt** 128:16
  175:23
**fflex** 166:6
**field** 48:13 53:22
  411:5
**fields** 111:15
**figure** 50:2
  217:13 237:3,3
  259:2 384:1
  431:18
**figured** 223:22
  224:10 225:17
  257:22 289:16
  307:21
**figures** 46:13
**file** 23:14,14
  74:4 343:7
  378:19 382:7
**filed** 44:6 63:3
  63:13,20 90:19
  95:12 327:10
**files** 34:7 347:22
**filing** 97:9 139:7
  139:9,16
  378:17 382:23
**fill** 339:13 372:7
**final** 79:19,21
  100:22 142:23
  315:6,6 378:5
**finally** 284:24

**finance** 44:5
  65:14 113:10
  157:13,17
**financed** 373:8
  373:17
**financial** 22:8
  33:20 95:4
  157:4,9 364:10
  373:5 440:16
**financials** 36:10
  38:6 104:25
  152:13
**financiers** 138:7
**financing**
  157:17
**find** 36:25
  108:19 110:7
  130:24 145:1
  146:2,5,5,14
  147:8 151:19
  151:20 169:10
  174:17 189:10
  203:3 222:3
  230:18 238:17
  252:4 279:23
  283:7,9 285:19
  295:2,5,17,18
  313:3 317:23
  342:24,25
  346:12 359:23
  363:2 376:16
  377:13 394:16
  406:5 409:17
**finding** 163:6
  280:10 420:7
**findings** 76:19
  171:6,11
**fine** 206:20
**fines** 367:2
**finger** 281:5
**finish** 9:4,5 64:9
  171:20
**finished** 64:11
  124:1 314:24
**firm** 16:6 21:18
  36:23 50:7,8
  94:18 96:16

380:22,23
**first** 6:18 25:16
  26:11 27:23
  30:4 44:12
  48:12 53:9
  62:2,11 114:15
  121:14 123:24
  163:15 187:13
  190:23 203:3
  216:13,22
  221:20 227:3
  238:7 241:18
  250:16 251:13
  251:19 266:9
  283:9 286:2
  301:19 316:2,8
  334:12,15
  335:17 337:14
  338:15 339:22
  351:17 363:19
  369:6 390:2
  395:25 396:1,9
  396:21 397:19
  400:14 401:23
  410:23 411:1
  414:25 433:10
  434:7
**fisher** 182:16
**fishman** 1:17
  2:3
**fit** 276:2 313:23
**five** 14:3 114:15
  243:24
**fix** 77:17 78:3,5
  78:10 259:2
  308:22 311:7
  410:20
**fixed** 224:8
  294:13 356:19
  356:21
**fixes** 265:5
**fixing** 78:13
**fixtures** 393:20
**flagged** 371:10
**flagging** 315:3
  378:11
**flaw** 141:13

148:18 217:9
  311:7 312:16
  413:20
**flaws** 58:5
  225:14
**flew** 162:6
**flexible** 154:13
**flip** 226:20
  325:3,10
**flipping** 397:9
  414:20,20
**floor** 1:18 2:6,16
**flow** 256:9
  357:14 381:25
  386:12 403:9
**flows** 11:14
  174:13
**floyd** 286:3
  337:17
**fluent** 54:16,19
**fluid** 135:7
**fluids** 228:4
**focus** 268:17
**focused** 361:3
**focusing** 264:24
**folder** 29:4
**folks** 22:23
  46:11 110:3
  162:13 263:9
  268:15
**follow** 12:4
  107:1 121:3
  132:6 141:7
  192:7
**followed** 204:3
  333:23
**following**
  192:13 249:17
  426:23
**follows** 6:19
  417:6
**followup** 254:18
  416:23
**fond** 58:5
  147:11
**food** 199:20
**fooled** 111:16

**foot** 129:17
**football** 64:7,8
  114:7
**force** 201:11,11
**forced** 25:17,17
  25:25
**forecasting**
  129:10,13,23
  130:11
**foreclosing**
  278:15
**foregoing** 438:4
  439:11 440:8
  440:10
**forensic** 378:8
**forget** 114:14
  232:3
**form** 5:12 9:7
  41:1 51:19,23
  53:25 56:11
  66:12,17 72:4
  104:16 129:4
  143:7 144:9
  146:10,19
  152:11,25
  156:10,17
  157:1 158:3
  165:22 168:13
  176:15,22
  177:14 179:4
  186:8 188:15
  190:6 192:10
  193:14 194:4
  194:14,16
  200:21 201:14
  202:11 206:9
  206:22 208:21
  214:4,22 219:3
  220:7 222:10
  224:14 225:20
  231:15 232:8
  232:22 246:1
  250:9 269:16
  273:7,18 279:8
  289:9 293:6
  303:13 304:24
  306:3 320:11

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                    April 10, 2019

321:6 323:20
324:2,12,18,25
325:12 326:5
327:3 329:6,17
330:19 331:11
332:7,14 336:4
337:8 340:9
345:19 348:16
350:3 351:25
352:19,25
353:24 354:13
354:20 355:20
357:6 358:22
359:3,14
360:14 361:13
361:25 365:7
366:8 370:3,21
371:2 378:3,4
392:1,9 394:2
402:18 406:3
406:11,19
407:3,7,13
408:3 410:8
411:7 413:5,11
419:3 421:22
422:12 425:16
430:22
**forma** 129:25
**formal** 43:7
**formalities** 5:8
**format** 440:14
**formed** 52:22
116:11 357:2
**former** 28:7
96:7 298:24
299:4,20
**formula** 417:18
**forth** 237:2
278:9 328:18
390:18 440:10
**forward** 25:18
129:10,13
131:16 318:13
327:14 346:14
394:10 397:9
399:3,10
400:24 411:2

413:9,15,19,21
425:21,24
**found** 38:17,18
78:16 147:4
150:20 158:20
174:4,24
203:21 216:19
217:8,24 248:3
248:7 265:4
277:22 280:12
280:17,20,21
285:3,18,21
289:25 290:5
291:15 292:25
298:17 305:10
317:8,11,14
318:9 378:9,15
413:16,17,19
**four** 29:4 116:3
128:22 167:4,4
237:20 249:18
250:9,12
400:14
**fourth** 398:25
399:14 400:23
402:4
**frame** 258:14
259:7,10,12,14
264:5 289:23
**franklin** 100:4
244:8,9 250:24
267:7
**free** 214:19
215:11 216:6
357:14
**freeman** 2:11
**friday** 271:9,11
**friendly** 25:5
**front** 249:14
353:12 382:13
400:7 401:6
431:1
**fulfill** 22:21
**fulfilled** 23:22
92:3
**fulfilling** 22:7
**full** 6:22 227:3

287:6 336:19
338:23 415:21
432:23,25
433:1
**fullservice**
136:18
**fulltime** 225:10
236:7,15,16
**fully** 304:7
332:9,15
**function** 70:25
193:25 195:6
276:8
**functionality**
397:25
**funding** 47:12
58:24
**furnitures**
393:19
**further** 43:7
309:24 317:9
317:12,15,19
318:13 416:19
436:20

_____
**G**
**g** 439:1
**gained** 203:21
**galante** 174:6
**game** 180:12,13
307:7
**gap** 64:12,13
185:7 339:13
**gas** 45:16 370:14
**gather** 20:5 24:1
65:22 124:22
125:19
**gathering** 23:24
**gearing** 280:9
**general** 13:11
19:24 31:10
32:2 42:21
68:16 77:25
99:13 103:24
108:21 109:12
109:14 123:5
178:9 180:22
180:23,24

182:7 246:10
247:6
**generalist**
184:22 193:7
**generalized**
233:12
**generally** 23:5
96:12 241:15
393:15
**generate** 103:16
105:24
**generated** 104:9
192:22
**gentlemen**
229:12
**getting** 26:15
47:5 125:15
135:11 137:14
168:7 178:14
225:15 315:21
334:5,21
340:17 341:19
361:4
**gigabytes**
349:24
**girl** 212:10
**girls** 275:11
362:20
**give** 28:11,12
34:16 42:2
60:19 78:1
101:2 111:19
134:7 164:19
168:20 212:21
229:15 230:21
246:11,24,25
247:1,2 256:20
263:12 271:6
281:9 282:15
285:14 286:24
287:5 341:3
345:7 347:14
347:17 367:20
381:23 386:3,5
388:7 409:20
411:20,21,21
**given** 1:17 77:7

107:13 123:20
123:23 124:15
167:2 438:5,7
439:9
**gives** 176:19
247:21 249:18
428:11 431:24
**giving** 134:14
198:18 330:13
**glad** 285:8
**glitch** 296:19
**global** 104:25
375:4
**globally** 383:2
**globo** 250:13
394:21 395:11
395:14,15,19
396:9 397:10
398:11 399:4
399:18 423:7
**gmail** 350:13
**go** 8:24 13:11
15:4 19:23
23:3 31:2
34:17,24 38:20
39:9 42:24
43:17 44:5,18
45:17 64:25
70:16 75:14
77:12 78:13
93:20 102:5
107:5 110:6
128:18 131:16
149:11 171:19
173:19 174:20
181:8 187:12
190:14,15
208:1 247:9
255:6 260:2,6
262:11 264:11
264:15,23
265:7 266:22
283:8 289:17
291:11 294:11
294:12 301:25
309:10 314:5
317:17 340:2

350:19 361:1
362:17 363:15
380:25 387:12
389:5 390:18
396:8 400:11
413:19,21
423:1
**goal** 357:1 409:9
**goals** 363:2
**goes** 126:21
228:7 253:21
271:13,14
400:20
**going** 10:4,5,7
14:15,18,23
16:2,7 18:15
19:19 22:9
31:12 32:17
47:15 61:9
62:19 64:25
84:6 85:2
87:12 92:2
107:5 109:1
112:8,10
114:18 118:23
120:17 124:22
127:8 131:15
154:1,6 157:16
160:6 164:11
170:19 173:15
173:21 174:9
175:12 178:20
178:22,25
179:1,9,11
182:25 183:12
185:17 186:19
189:14 195:10
199:4 217:20
228:10 244:1
250:12 251:10
254:11 258:5
295:3,22
312:18 315:20
319:12 323:5,9
323:13 326:19
338:5 339:16
341:22 343:6

349:2 354:5
355:24 359:20
364:15 371:18
376:18,19
380:25 381:4
381:14 382:8
382:10 386:11
388:12,19
391:8 394:10
394:11,20
395:10,18
403:21,21
404:21 413:8
413:15 414:10
420:16 424:13
428:23,25
430:3 431:17
436:25
**gonna** 85:22
180:22 183:10
185:16 188:3
195:17 207:21
212:21 257:4
265:7 339:3
**good** 6:21 9:17
13:10 60:1
179:21 185:18
285:7,8 295:17
297:12 340:16
340:20 371:4
381:2 408:5
428:11,11
**goods** 7:18
**google** 213:21
309:8 351:21
**googled** 162:18
**googling** 162:19
**goto** 268:18
338:12
**gotomeeting**
424:3
**gotta** 212:21
**gotten** 368:24
**governing**
208:24 209:12
**government**
59:24

**governmental**
41:15
**governments**
72:25
**grab** 23:13
**gradual** 280:3
**graduate** 43:2
**graduated** 63:2
63:14
**granted** 60:5,8
**gras** 39:5
**gravelles** 1:7
**gravity** 302:25
**great** 19:9 39:8
62:17 127:12
161:3 188:1
212:7 238:14
320:15 419:24
**greater** 183:14
185:10 376:5
**gregario** 235:17
235:18 236:5
**group** 45:11
59:14 82:23
83:1 116:14
142:22,23
157:4 160:14
160:16 175:18
268:17 368:21
410:19 419:16
**groups** 45:16
**grow** 364:5
397:25
**growing** 118:17
**grunts** 9:7
**guarantee** 138:7
192:18 286:18
382:17
**guaranteeing**
192:6,13
**guarantied**
387:10
**guaranties**
87:11 384:14
386:15
**guarantor** 93:23
113:25

**guarantors**
93:21 382:9
**guaranty** 382:12
**guess** 46:21 50:6
105:14 109:15
116:8 129:22
155:22 172:6
255:10 260:6
**guesses** 340:25
**guessing** 326:15
326:16
**guide** 336:7,14
**guidebooks**
110:15
**guideline** 270:24
271:1
**guidelines** 73:14
111:12 121:3
127:20,21
128:12 204:4
323:7 440:14
**guidry** 22:3
37:19 39:21,24
**gulf** 45:20,21
46:11 49:17,24
50:5,8,12 51:3
51:8 67:7,8,9
67:10
**gun** 237:5
**guru** 118:8,8,9,9
118:11,16,22
119:8
**gut** 184:1
**guy** 49:10,12
155:23 275:12
340:16 357:12
361:2 415:23
**guys** 140:7
142:20 219:4
268:2 390:16
419:22 420:24

---

**H**

**h** 2:13 3:9
**hacked** 311:16
**hadnt** 137:18
141:14 361:19
423:15

**haitz** 17:1
**half** 44:20 51:1
114:22 280:4
**hammond** 99:5
348:6
**hancock** 375:1,6
375:12,12
376:5
**hancockwhitn...**
377:6
**hand** 188:20,21
395:18 414:10
**handbooks**
110:15 111:12
**handheld** 378:1
**handle** 163:20
243:5
**handled** 205:14
267:16
**handles** 149:2
348:23
**handling** 241:22
242:2,5 243:3
396:3,22
400:18
**hands** 102:15
**happen** 108:3
127:5 148:5
151:8 230:1
257:2 260:8
272:9 363:24
400:6
**happened** 26:3,6
27:13,14 49:22
50:3,16 53:17
57:17 78:7
90:14 96:7
119:8 162:20
176:25 193:4
216:21 217:14
260:5 270:22
280:4 296:18
299:23 300:8
346:7 355:2
406:25
**happening**
259:21

**EXHIBIT A**

**happens** 106:20 372:18,19
**happy** 222:18 388:24
**hard** 24:24 163:15 237:2 417:19
**hardware** 46:5
**harm** 174:25 342:4
**harming** 131:17
**harold** 177:21 313:5,15
**harry** 16:22
**hate** 333:13
**hats** 16:22
**havent** 25:11 40:6 272:8 388:21 389:7 389:15 390:24
**haygood** 2:3
**hayood** 1:17
**hcfa** 378:3
**head** 9:8 21:5 131:20 161:15 243:15 247:8 247:24 262:8 283:6 288:17 290:12 296:23 315:25 328:11 351:11 356:24
**heading** 87:22 397:16
**headquarters** 114:11
**health** 41:18,20 41:21 43:12 53:12 54:14 68:2 86:5,5 110:22 113:14 115:15,16,20 115:23 302:1 349:4,8,16,17 349:18 382:2
**healthcare** 1:9 33:16 48:13 55:12 119:17

119:19 371:6 372:4 398:18
**healthy** 361:21
**hear** 234:13 305:20 320:6
**heard** 272:8,10
**hearn** 86:7 385:7
**hearsay** 385:6
**heart** 94:15
**heat** 353:3,3
**heavy** 154:1,5
**heck** 162:9
**hed** 242:3 370:14
**held** 6:2
**help** 31:12 45:21 110:7 294:18 310:1 318:10 339:19 355:11 358:13 363:1 364:8 379:19
**helped** 23:24 41:6 100:6 355:12
**helpful** 335:21
**helping** 16:19 204:14 363:20 364:2 370:4
**henry** 44:24 48:21,25
**heres** 335:14
**hereto** 5:3 12:19 79:15 113:4 123:13 160:11 164:14 249:5 250:20 255:14 314:19 319:17 328:1 333:18 336:1 376:24 389:2 395:22 420:20
**hes** 14:24 19:6 24:14 27:16 37:6,9,11,13 37:18,18 39:13 39:17 48:23

99:9 169:5 173:4 177:22 178:24 179:1,9 179:11 184:9 184:19,21 187:4,7 212:20 233:13 244:17 244:17 251:19 269:21,24 337:2 339:4,4 339:18 340:5 341:24 384:8
**hesselgesser** 266:13,15
**hey** 34:3 145:12 154:12 204:24 228:25 252:18 254:19 285:6 290:1 341:25 364:6
**hierarchy** 149:15 247:18 287:1
**high** 49:7,7 114:7 128:13 179:2
**higher** 75:8,9 165:10,17,24 166:13 168:9 417:11
**hipaa** 111:25 317:22
**hire** 94:14 95:7 95:8 236:11
**hired** 107:16 110:4 111:18 236:6 237:5 275:2 350:22 350:24
**hiring** 267:11
**hisself** 24:12 244:18
**historical** 203:7 203:12,19,23 205:7,23 206:5 206:19 207:9 207:18,24

**historically** 205:8
**history** 43:18 142:24
**hit** 25:20 271:14 290:2 419:18
**hits** 296:22 315:25
**hmm** 66:18
**hold** 43:8 102:15 116:3
**holding** 104:12 115:25 138:22 297:22
**holdings** 113:22
**holidays** 271:17
**home** 43:23 65:22 92:22 93:7,10,22 99:3,5 113:8 126:18 134:10 134:12 379:16 380:24 386:19
**hometown** 128:20
**honda** 212:25 213:1,3,10,12
**hope** 419:23
**horizon** 354:17
**horseback** 39:10
**hospital** 94:15 95:10
**hospitals** 41:18 41:20,21
**hour** 18:23 61:10 112:8
**hourlong** 126:18
**hours** 14:4 20:8 107:25 171:18 271:12,12,22
**houses** 383:7
**houston** 24:8,9 24:10 369:14
**howell** 20:15 24:15 27:10 29:11,12,15 30:8 44:25

48:4,24 49:5,6 49:9 52:7,8 53:1,8 67:23 68:25 71:25 82:6 97:14 98:14 116:14 153:19 155:13 155:14,18,22 163:18 282:3 282:16,18 284:13 328:12 335:20 338:10 338:16,22 339:17 340:22 341:10 399:8 432:7,9
**howells** 81:16
**hr** 52:18
**huge** 141:13
**human** 169:24 189:18 303:3
**hundred** 74:13
**hundreds** 152:2 152:2,3
**hunted** 36:21,21
**hurricane** 44:3
**hurt** 175:12
**hurting** 131:17 162:8
**hydromorpho...** 228:10

---

**I**

**iberia** 22:3 37:20 44:17,18 92:20 93:4,6 93:10 387:5,14 387:16
**ibm** 26:22 145:11,14 154:15,16,18 154:21 200:7 203:25 204:6 205:19,20 207:10 255:15 409:23 415:2 415:14,15,18 415:19

**id** 33:10 35:9
40:7 58:14
77:12 93:20
99:7 113:24
142:11 148:19
173:6,9 238:23
239:1 248:16
253:12 263:22
278:8 282:11
315:6 363:15
365:25 366:1
366:10 376:16
387:12,19
423:1
**idea** 44:23 58:24
118:19 127:12
231:9 381:2
383:17 410:18
**identical** 148:11
186:5
**identification**
12:19 79:15
113:4 123:13
160:11 164:14
249:5 250:20
255:14 314:19
319:17 328:1
333:18 336:1
376:24 389:2
395:22 420:20
**identified**
249:17 265:15
265:15,19
**identify** 164:2,3
264:19 265:4
265:21 289:3
292:19,22
293:2,15 294:7
295:12 296:6
297:17 306:6
307:4 308:16
**identifying**
233:1
**ill** 9:3 49:23
56:14 88:15
140:9 219:24
235:2 262:25

279:14 296:23
301:19 309:17
333:14 337:10
345:7 380:21
380:23 418:16
435:19
**illegible** 282:25
290:23 292:11
293:4,16
**im** 11:9,9,10
13:15 14:15,23
16:1 18:15
22:9 24:9
28:10 29:14
30:1 32:17
33:5,6 36:4
41:23 42:17
47:19 48:18
49:23 50:2
53:2 54:16,19
62:5 68:7
76:22 84:21,21
85:2,6,22
86:18 102:7
103:10 105:21
106:3 108:19
113:19,19
115:4 120:23
126:23 132:4
132:21 136:24
137:22 140:1
141:25 144:3,5
144:6,10 149:8
151:20 153:24
155:11 158:15
158:18 160:6
160:24 166:3,5
166:8 167:3
168:16 172:1
173:15 174:14
180:21,22,23
184:24 185:15
185:16,18
186:17,17
187:20,20,21
188:3 189:10
190:7,10,11,20

191:13 193:21
195:10,17
197:4,12,12
198:17,17,18
199:15 200:16
201:5 202:19
202:20 205:4,6
207:21 210:6
211:12 215:20
218:17,20
220:17 221:7
222:3,15,18
225:15 229:23
230:18 231:6,7
231:23 232:14
232:14 233:18
238:17 239:18
245:18 246:4
246:11 247:6,7
250:12 251:10
252:10 253:25
254:5,11 258:4
264:25 265:7
268:24 269:9
272:14,18
273:21 274:7
275:20 279:23
283:20 285:5,6
285:8 287:3,17
288:20 290:18
290:20 299:9
299:15 300:10
305:15,18
307:22 308:6
312:20 313:2
316:3 319:11
319:20 326:16
329:22 331:1
332:18 335:5
337:13 339:25
342:15,23,25
345:9 346:12
348:25 352:17
355:1 356:9,10
356:13,14
358:4 366:9,19
376:16,18

380:22 381:15
384:1 387:11
387:12 390:2
390:16 393:9
395:18,19
399:6 403:17
405:2 408:11
408:17 414:10
415:21 417:19
422:8,8 425:1
425:2,6,10,11
426:23 427:8
427:18 430:3
431:19 435:17
436:5,15,17
**imagine** 84:2
**imaging** 420:6
**immediately**
53:15 383:6
**immunoassay**
182:22
**impact** 216:15
217:5 218:10
218:22,23,25
219:13,18
223:15 286:14
288:19 291:6
291:18 294:5,6
**impacted**
151:12 218:16
289:1,5 292:20
294:9 308:19
**impacts** 288:21
**implement** 26:1
**implementation**
260:17 265:1,2
265:16,20
**implementing**
261:6 415:25
**import** 271:2
272:12,20
293:19,21
**important**
156:15 170:1
170:23 211:3,7
214:2,7
**importation**

272:7 274:8,12
**imported**
270:17 271:15
**impose** 366:23
367:2
**imposed** 367:13
**impossible**
222:6,21 223:5
296:24 311:11
**imprecisely**
241:15,16
**impression**
154:1 431:25
**improvement**
42:9 43:23
65:23
**inability** 317:5
**inaccurate**
101:23,25
102:1
**incentive** 399:2
399:9 400:24
425:21 432:16
432:18,20
**inclination**
143:8
**include** 36:7
**included** 115:21
**includes** 84:10
328:20
**including** 53:2
397:24
**income** 11:14,16
99:16 104:8,9
379:9
**incomplete**
101:24 102:2
314:20,23
**inconsequential**
126:6 208:19
208:22
**incorporation**
91:20
**incorrect** 141:24
167:2 231:16
231:19 234:23
235:4,4,9,10

247:20 254:15
258:16 283:3
293:18 294:4
294:22 295:13
297:7 315:2
320:7 390:22
**incorrectly**
288:7
**independent**
207:23
**independently**
37:6
**indicate** 427:11
431:20 439:12
439:16
**indicated** 6:5
200:16,17
355:15
**indicates** 428:2
**indicating** 25:8
135:25 223:9
394:18
**indication**
430:17 434:4
**indicator** 204:23
**indirectly**
100:12
**individual** 97:22
220:4,12,22
221:24 222:7
222:12,23
228:16 302:4
302:20 303:9
385:13
**individually**
13:6 282:6
**individuals** 29:7
81:20 97:24
110:10
**induced** 141:4
**industry** 199:6
273:14 274:4,8
274:10 275:20
422:23
**ineffectiveness**
317:4
**infirmit** 117:17

117:21
**information**
13:3 20:6,7
22:21 24:1
32:21 36:11,22
36:24 38:7
39:25 68:23
70:3 73:23
99:24 116:9
141:3,17
152:18 157:10
162:19 167:2
167:14 174:5
178:15 196:22
235:3 274:14
299:21 300:5
310:8,10
311:21 319:9
319:25 320:6
335:21 341:9
341:16 344:17
345:13 425:4
**informed** 29:8
61:18 406:15
**informing** 30:3
**ing** 271:2
**ingram** 21:20,21
37:3 94:20
**inherently** 54:14
**inhouse** 94:23
94:25
**initial** 86:13
89:11,13
265:16 413:15
**initials** 79:4
**initiated** 381:10
**injuries** 8:13
**input** 397:22
**inr** 181:14
**insert** 315:1,2
**inside** 26:11
31:9 70:10
73:12 98:13
104:18 127:20
136:8 149:10
193:1 198:7
204:1 205:15

286:12 303:18
338:11
**inspected** 78:8
368:9
**inspection** 57:19
74:12,13 76:17
78:6 236:24
**inspector** 74:16
78:1 171:9
266:11 368:4
**inspectors**
265:12
**inspects** 74:7
**install** 127:9
154:5 165:7
166:5 198:16
241:6 243:12
258:13 259:6
260:3,4,5
268:2
**installation**
138:3 161:2
**installed** 138:9
144:13,15
146:6,16
405:20 421:3,9
421:14,20
**installer** 324:16
**installing**
337:17
**instance** 302:14
**instances** 288:9
302:14 303:17
**instincts** 216:21
**institutions**
355:21
**instruct** 173:16
344:3 362:16
**instructed**
343:25
**instructions**
91:25 335:22
**instrument**
182:23,24
324:9
**instruments**
260:21 265:24

266:19 270:6
323:15,23
**insurance** 43:13
86:5 138:20
357:13
**insurer** 371:7,25
**insurers** 106:8
370:24
**integrate** 70:5
70:17,20
**integrated** 69:24
70:9
**integration**
23:13 45:4,4
49:17 54:17,22
**integrations**
54:18
**intend** 189:1
**intended** 9:15
59:13 116:2
247:21
**intending**
138:16 413:2
**intense** 26:18
**intent** 36:6
256:16
**interconnectiv...**
323:11
**interest** 87:6
356:3,15,21
**interested** 358:5
440:21
**interests** 86:20
87:1
**interface** 258:10
258:14,19
259:6,19
**internal** 244:24
268:14,25
338:6
**internally**
217:19 258:24
268:12,17
286:2 307:23
417:14
**internet** 143:11
143:13 145:1

310:9,22
**interpretation**
337:9
**interrupting**
229:14
**interruptions**
439:13
**interview**
367:15
**intimately** 54:23
273:9
**intricately** 54:23
**intrinsically**
45:14,15
160:17
**introduce** 6:8
**introduced**
314:2 414:13
**introduction**
337:20
**introductory**
277:11
**invested** 357:20
**investigate**
46:25
**investigated**
317:24
**investigation**
317:9,12,15,20
318:14
**investments**
16:1
**investor** 86:11
**investors** 27:18
60:18 82:24
87:8 88:24
298:18 382:16
**invitation**
423:22
**invites** 424:4
**inviting** 398:8
**invoice** 370:14
**invoices** 389:19
390:1,4,7,10
390:21 391:2
**involved** 19:19
54:23 55:1,3,6

62:3 66:9
67:25 68:14
69:4 82:9
274:14 393:21
**involvement**
77:1
**involving** 412:2
**ip** 116:12
**irregularities**
346:22
**irs** 97:6 199:17
**isabel** 44:3
**isnt** 88:16
108:15 186:13
257:9 258:10
391:22 405:23
417:16
**issue** 38:18
77:19 86:4
131:14 221:9
224:7,21
280:12,20
293:19 317:21
378:17 407:25
421:19
**issued** 151:7
**issues** 38:16
53:12 58:6
78:16 125:11
175:21 206:17
207:15 264:19
265:4 280:11
292:25 306:10
317:16 370:23
382:2
**item** 183:8
**itll** 191:9 228:11
**itrelated** 54:13
**ivan** 44:2
**ive** 22:22 29:3
65:12 102:11
112:24 158:19
175:5 196:16
201:6 238:12
241:4 243:13
248:24 249:6,7
250:13 272:15

329:25 333:14
334:12 339:22
346:22 363:5
416:22
**iwatch** 45:10

**J**

**j** 41:3,5
**jaltek** 160:14,16
160:19
**james** 235:20
**jamie** 20:17,19
20:23,25,25
23:20 31:2,3
32:3 34:17
98:2 164:23
167:1 282:9
284:4 314:25
315:2 338:8
**january** 19:17
53:13 123:11
123:19 124:6,9
124:11,21
126:2,4,7
127:6 198:11
198:12,19
202:8 237:18
244:13 260:1,4
260:14 261:9
280:9 290:8
292:24 294:16
328:4,8 382:1
401:7 404:15
413:1,15
**jason** 2:5 6:11
13:18,24 15:5
235:17 236:5
**java** 309:3
**jesse** 2:4 6:10
13:18,24 15:6
81:5 252:18
322:13 395:6
**jesses** 246:9
**jo** 52:11 53:2
**job** 44:15 47:6
287:5 340:20
360:25 364:1
371:4 408:6

**jobs** 71:1
**jogging** 23:25
**john** 17:6,6 86:7
115:24 351:6,6
385:7
**join** 92:7 398:18
**joseph** 1:24 5:22
439:3,24 440:7
440:24
**jpmorgan** 43:14
44:14
**jr** 1:24 2:14 5:22
439:3,24 440:7
440:24
**judge** 1:7
**july** 244:14
260:10,15
**june** 205:1
236:24,25
260:10,15
261:9,13
264:10 266:21
**justification**
371:19

**K**

**k** 45:12
**keep** 179:13
191:21 199:4
290:16 319:21
379:7 430:2
**keeping** 319:2,6
**kelly** 113:7
123:10 212:4
**kept** 28:19 90:9
91:22 262:12
379:4
**key** 46:10
**kick** 25:23
**kicked** 112:19
**kicking** 382:20
**kill** 231:5
**killer** 131:3,20
**kind** 32:20
43:18 46:24
59:14 100:1
126:5 136:19
209:20,23

217:22 230:1
237:21 343:11
410:5 412:19
423:5
**kinda** 260:13
318:5
**knew** 15:14 33:8
38:25 50:9,15
83:3 141:17
162:7 267:23
280:4 324:7,14
324:21 339:8
353:13 367:16
368:8 402:23
403:1 408:6,8
409:18 410:14
419:10 420:10
**know** 8:10 9:12
16:2,7,12
19:18 22:12
23:20 24:21
26:19 29:1,10
29:13,23 30:5
30:10 31:15
35:20 36:21
37:16 44:1
46:8 47:11
50:9 57:25
64:24 73:19
75:3 77:13
82:13 84:23,24
87:10,11 88:20
90:21 91:8,10
91:11 93:21
94:8 96:16
97:6,11 102:13
103:23 104:24
105:7 111:2,21
119:15,25
122:22 130:14
130:23 131:9
131:12,13
132:3,13 134:10
134:11 136:21
141:17 145:3
146:20 147:3,9
148:19 149:6

149:14,21
150:13,23,25
153:15,17,18
153:22 155:7
156:15 158:13
161:12 163:23
164:1,19
167:11 172:4
173:2,12
174:16 175:20
176:16 184:4
185:4 189:18
189:19,20
190:10 191:5
191:18 193:17
200:10 204:22
208:22 211:1
213:7,9,14
214:7 218:13
218:15,18
236:25 238:23
239:24,25
240:24,25
241:1,4,8
244:13 245:20
248:14,16,17
249:20 253:12
255:19 256:13
260:11 261:19
263:6,6 264:21
265:2,7 267:21
269:2,4 272:15
272:19 273:9
273:13 274:4,8
274:10 276:11
280:8 283:5
284:16 285:11
286:11 287:20
288:17,22,24
289:10 290:11
290:15 300:13
300:17 301:7
302:6,7,10
303:14,16
305:17 309:20
309:22 310:16
311:2,5,6,8,11

311:13,14,22
312:8 314:2,8
328:9 330:25
339:2,24 340:3
341:22 343:6
348:13 349:23
351:9,10,13
352:1 357:12
362:21 363:16
368:11,18,25
374:23 377:21
378:13 381:22
382:5,12
385:14 387:21
391:12 402:15
402:23 404:6
406:21 416:25
417:3,6,9,21
419:4,22
421:23 422:4,5
423:14
**knowing** 83:6
**knowledge**
29:20 67:24
72:11,12
130:19 184:21
185:8 187:18
191:19 197:2
203:20 212:4
275:5 335:3
385:17 433:1,2
**knowledgeable**
440:16
**known** 112:17
141:6,8 143:14
224:5 279:3
309:5,7 323:2
344:7 407:18
408:7
**knows** 150:13
158:17
**kris** 244:8,9
250:17,24
267:6
**kupperman**
2:11,13 3:4,6
6:12,13,20

12:21 15:1,3
15:10 17:8,21
18:16,19 21:1
21:15,24 28:9
28:16 29:25
30:15,21 31:1
32:22,24 35:17
36:5 39:11
40:4,10 41:14
48:11 51:20,24
52:6 54:3
61:12,15 62:14
62:25 63:10,12
65:3 66:13,20
69:19 72:7
79:18 81:4,12
85:5 87:24
88:1,9,11
89:15,24 90:24
91:6,17 94:22
97:5 98:15
105:1 108:17
110:8 112:16
113:6 117:24
123:15 129:7
130:16,21,25
132:11,13
133:22,25
136:2 140:6,10
140:12,19,24
141:1 143:10
144:11,24
146:9,12 147:2
147:7 150:22
151:9 152:15
153:2 156:12
156:19 157:3
158:4 160:3,5
160:13 164:18
164:21 165:23
166:10,17
168:3,5,15,17
169:1,8,12
172:19,21
173:1,5,17
174:2,15,19
176:17,24

177:15 178:7
178:10 179:6
182:17 184:12
184:23 185:1
185:20 186:10
187:9,11 188:8
188:17 190:9
190:13 193:15
194:11,15,20
195:25 200:24
201:15 202:12
203:11 205:17
206:10,14
207:7,25 209:1
209:24 210:5
210:10,16
211:2,9,17
212:8,23
213:11,18
214:8 215:3,25
219:7,11 220:9
222:14,20
224:16 225:21
227:4 229:17
230:11,13
231:17 232:11
232:13,24
233:17,21,25
234:7,11
235:25 239:19
240:2 243:21
244:7 246:3,5
249:8 250:6,22
251:21 252:1
252:12,22
253:3,19
254:22 255:1
257:21,25
262:2 264:6,12
269:18 272:25
273:4,12,20,25
274:6 276:24
278:4 279:1,11
279:22 283:24
289:11 293:8
295:19 296:3
299:16 305:3

306:5 310:20
314:4,10,12,22
319:19 320:13
320:22,25
321:9 322:2,10
322:23 323:21
324:6,13,20
325:2,15 326:7
327:8 328:3
329:8,20
330:22 331:5
331:13 332:8
332:17 333:9
333:21 336:5
337:11 340:11
341:4 342:14
343:4,17 346:2
348:19,24
349:6 350:8,11
351:12 352:6
352:20 353:6
353:11 354:7
354:15,24
355:22 357:7
358:24 359:6
359:16,22
360:1,16
361:16 362:2,8
362:13,15
363:4,10
364:21 365:10
366:12 370:6
370:22 371:5
373:11,15
377:1 383:15
384:16 389:3
389:23 391:7
391:11,25
392:8 394:1,19
394:24 401:14
402:17,21
403:4,15 405:1
405:5 406:2,10
406:18 407:6
407:12 408:2
408:22 410:7
411:6,16,19

412:14 413:4
413:10 414:1,5
416:6,14,21,24
419:6 420:21
421:24 423:13
424:19,23
425:19 426:18
426:22 427:1
430:23 433:23
434:19,24
435:7,11,16,20
435:24 436:4,8
436:14,21
**kyle** 23:2 38:9
38:11,14 39:25
86:8 115:24
284:4,11,12
338:10 384:19

───────

**L**

**l** 2:12,12 5:1
25:16,16,25
28:23 68:22
69:4,21,22
70:7,9 71:5,15
71:20 72:15,17
73:8,16 74:11
74:14,20 79:2
101:11 116:7
116:11,15,20
118:16 136:4
142:20 153:9
153:11,14,23
154:10,11
155:11 156:3,6
156:23 208:8
378:9
**lab** 17:9 47:16
55:16,22 56:2
56:4,8,24 59:1
61:18,20,25
62:2,6 77:2
100:9,10
106:13,21
107:1,12,12,22
108:10,15
109:17 114:12
119:24 120:17

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE

April 10, 2019

Page 465

120:20,21
171:4 187:19
187:21 189:5
189:13 199:20
208:18,19
209:3 225:7
228:18,20,23
228:25 235:11
235:12,15
236:18,21,22
237:6 241:23
242:2,5 243:2
258:9,18
259:19 269:14
270:14,14,15
272:16 274:23
302:4,5,7,21
303:9,10
322:14 324:22
335:7 358:5
396:3,22
397:16,21,23
400:18 402:5
403:24 420:3
427:5,11 429:1
429:10,21
431:3,8,10,25
434:21 435:6
**labor** 129:17
298:14
**laboratories**
16:18 17:3
75:8,11 77:21
147:22 247:19
272:15 273:10
274:22 275:7
361:4 367:17
368:5,8 422:14
428:9 434:16
434:16 435:5
**laboratory** 17:6
23:24 24:14
25:15,22 27:20
39:2 41:7 42:9
47:14,24 52:16
56:12 59:5
68:23 73:10

74:7 76:16
98:11 99:24
100:7 106:1,3
106:4,19,20,22
107:4 108:5
109:2,11,16
111:5 114:10
116:9 120:15
120:19,23,25
127:16 128:19
131:11,14
136:19 139:2
151:23 162:17
179:16 180:2,3
180:11 184:4
196:19,23
199:9,19
203:22 207:6
208:25 209:11
214:14 215:1
218:2 219:23
236:7 242:7,12
244:18 267:18
275:17,17
280:23,25
281:1 297:8
299:5 313:11
319:9 321:3
322:4 350:21
351:19 358:11
358:13 363:19
368:12 378:18
403:23,25
404:4 409:7
410:15 421:5
428:8,9 429:17
**laboratorys**
175:1 225:18
**laboratoryspe...**
227:7
**labs** 10:1 16:20
17:7,23,24
38:2 56:13,18
57:11 58:21
60:5,17 62:4
67:25 68:3,10
75:15 76:11

78:7,8,14
82:15,16,19,20
83:6,13,21
93:23 99:17
103:19 104:6
105:4 111:7
112:18,19,20
114:19 115:5
118:17,24
123:17 124:5,8
125:5 126:12
126:15 134:16
134:22 135:3,4
135:15,16,20
136:16,17,18
137:25 138:4,9
151:15 152:8
152:12,19,21
154:25 159:20
164:1 170:6
171:24 201:17
201:25 202:3
224:19 225:3
243:11 244:12
260:7,8 270:6
271:8 272:5,18
272:19 273:5
273:11,16
274:3,15
275:15 279:4
280:2,8,18
283:22 292:6
294:12 306:18
314:16 316:7
318:20 322:5
322:18,19
329:19 338:7
344:14 349:16
351:17 358:1
370:5 372:12
372:14 376:12
377:13,22
381:17 384:22
393:17 401:15
401:20 402:14
402:16 403:2
403:14,19

404:5,7 405:21
407:5 409:5
412:10 413:3
413:22 414:4
418:11 428:2,6
428:13,18,22
428:25 429:9
429:17 430:2
434:11,20
436:12
**labspecific**
226:22 227:13
**labtrust** 368:12
368:17,21
**lacey** 52:11,16
53:2
**laceys** 52:24
**lack** 119:23
234:21 281:23
282:13 285:9
286:8 287:2,14
287:16,21
367:19 410:5
**lacking** 337:25
**lacombe** 94:16
**lafayette** 6:16
7:1,21 37:10
39:14 42:22
43:24 48:23
53:10 369:14
431:12,18
**lafleur** 52:10,11
**lage** 373:3,4,12
374:3 386:23
386:25
**laid** 73:14 95:22
**lance** 369:12
**land** 373:5
**landen** 373:13
373:13
**landry** 102:5,6
**lane** 6:16 7:1
114:16 266:12
266:14
**language** 88:23
88:24 89:14
162:13,15

191:7 252:19
254:13 398:4,5
399:13 400:17
**large** 349:24
**lasted** 50:25
**late** 115:7 124:9
128:22 202:8
260:9
**laurence** 2:14
**law** 5:7 185:24
380:22,23
**laws** 47:21 128:6
172:12
**lawsuit** 326:24
327:5,7,10
**lawyer** 172:15
249:10 425:10
427:14
**lawyers** 174:10
249:14 347:13
**lcms** 70:10,11
79:5 271:21
373:18
**lcmss** 114:20
120:4 373:18
**le** 6:13 373:3
**lead** 154:7 295:6
**leader** 199:7
**leadership** 43:6
**leading** 335:19
**lean** 132:8
**learn** 54:15
238:18 358:17
408:14
**learned** 26:9,9
274:24 279:24
405:10
**learners** 268:3
**learning** 162:12
162:15
**lease** 120:6
373:20 374:3
**leased** 126:15
**leases** 102:24
128:8 129:16
**leasing** 10:2
11:4 99:16

leave 309:22
leaving 64:18,20
led 44:8 175:6
  316:5
left 27:9 28:4
  29:11,14 94:14
  315:20 317:21
  382:1 439:17
legacy 351:16
legal 85:3
  330:19 331:11
  333:7
lesueur 2:14
  39:6 278:1
  388:18 389:10
  389:16
letter 78:21
  203:25 204:4,6
  205:19 207:10
  207:16 249:1
  249:10 251:20
  252:3,17,20
  254:16,19
  335:8 365:18
  371:14,19
  372:6 394:17
  395:6 399:25
  400:4
letters 114:15
letting 134:14
level 41:19
  42:12 50:6
  75:8 155:23
  316:5
levels 183:17,21
  384:13
lexus 210:15,17
  210:21 211:11
  211:22 213:12
liability 331:19
  331:24 333:4
liable 387:17,22
lib 166:6
license 43:13
  59:25 60:2,3,6
  60:9 84:25
  365:2 426:10

licensed 196:20
  208:13
licenses 43:9
licensing 274:20
lie 425:13,18
lied 340:1
life 43:12 196:12
  357:13
light 99:21,23
  154:12 227:9
lights 123:17
  124:4 125:2,13
  280:8
liked 44:15
  154:13 314:9
limbo 284:7
  296:13
limit 330:1
limitation 333:4
limitations
  331:19
limits 72:16
line 296:16
  326:12 337:25
  338:15 356:17
  379:2 380:10
  387:2,8,10
  415:9 421:11
  421:12 431:2
linebacker 19:6
  113:21 114:1,4
  114:5,6,23,25
  115:9 174:6
  375:16
linebackers
  114:7
lined 290:1
lines 421:10
lining 339:11
link 24:22 161:3
  161:24,24
linkedin 244:16
liquid 79:6
  140:3,4
liquidate 386:14
liquidated
  386:10

lis 68:19 69:3
  74:25 79:2
  84:11,14,17,20
  92:6 127:7
  137:23,24
  145:14 149:25
  150:15 152:5
  154:16,17
  155:10 157:22
  174:22 175:16
  176:2 203:6
  206:16 209:18
  214:13 227:6
  272:7 311:24
  316:17,18
  326:2 368:13
  368:15 374:2
  396:2,21
  398:19 399:10
  400:17 409:15
  413:17 415:10
  428:23 434:14
list 21:3 210:3,8
  210:13 287:1
  404:24
listed 12:25 18:6
  119:2 177:8
  237:23 277:9
  277:15 281:16
  301:1 317:11
listened 29:3
  241:5 362:22
listing 276:16
lit 125:15
lite 99:19,22,24
  100:3,12,19,24
  101:9,10,14,22
  105:7 244:10
  244:11
literally 114:21
  183:20
litigation 177:16
  315:16
little 45:11 83:2
  129:15 157:8
  164:19 230:23
  266:11 267:7

280:6 286:1
  344:1 347:15
  364:12 367:16
  368:2
live 74:9 151:13
  151:18 216:23
  243:9,12,13
  260:2,6,9,15
  264:11,15,23
  266:23 280:1
  292:24 332:10
  332:15,19
lives 24:10 31:19
  39:4
llc 1:5,16 9:23
  10:1,2 45:2
  79:13 82:15
  83:21 91:20
  116:20 138:13
  197:4 434:8,11
  434:15,16
  435:5,10 436:7
  436:13
lloyd 21:13,17
  35:3 36:8 37:2
  38:7 39:21,23
  94:18 102:8
  286:6 345:4
  377:5,12
  392:14 412:3
llp 1:17 2:3
loan 87:13 93:22
  379:16,19
  380:24 386:19
loaned 394:7
loans 87:9,13
  93:16,19 356:4
  356:6,8,13,14
  356:16,19
lobell 18:13,20
  19:10 86:7
lobells 370:13
  382:10
locate 89:22
located 56:21
  57:5 102:17
  103:2 114:11

114:12 115:4,5
  120:5 369:22
  384:24 428:6
locating 251:25
location 44:13
  57:6 114:10,23
  310:3,3 349:3
  349:4
locations 46:2,2
  103:3 310:5
  335:23
log 31:15 141:25
  226:6 231:25
  232:3,4,4
  234:21 235:6
  318:11
logged 286:11
login 286:25
  287:5
logo 415:18
logs 141:23
  207:1 247:13
  309:20
lon 6:13
london 45:12
long 14:2 18:22
  39:20 107:20
  107:23 164:20
  170:21 236:12
  259:25 271:20
  271:23 339:20
longer 131:9
  154:7 426:17
longest 363:14
look 26:13 30:25
  34:17,24 58:14
  74:7 81:11
  83:18 101:11
  104:17 115:15
  143:11 145:8,9
  145:11,18
  160:4 166:9,24
  168:19,20
  169:5 171:16
  181:9,11
  204:14 221:17
  230:7 237:12

248:16 253:23
254:8 257:23
265:8,8 282:11
296:4 318:5,17
325:16,21
327:21 330:8
355:8 364:6
366:1,10
371:17 381:20
383:2 387:12
387:20 391:12
415:8 424:8
**looked** 26:10
36:15 142:18
142:21 143:13
146:14 158:21
158:22,22,23
158:24 177:8
281:3 304:20
329:12 351:18
381:21 390:24
395:14
**looking** 17:9
81:2 83:17
84:12 113:19
129:10,14
131:1 132:4
139:22,25
142:17 154:15
166:3 170:13
175:21 232:14
266:16 277:4,5
305:23 317:24
330:4 331:1
333:19 342:23
342:24 343:1
363:13 376:17
381:22 384:15
395:25 401:23
404:18 407:17
409:10 423:17
424:10 427:8
**looks** 305:7
377:21 394:17
420:4
**loose** 424:14
**lore** 351:16

**lorrie** 415:9
416:11
**lose** 149:6,8
292:3 294:7
306:16,18
**loses** 306:12,13
**losing** 383:6
**loss** 178:13
300:1,4 363:24
363:24,25
**lost** 96:24
119:11 178:16
292:5,23 293:3
293:7,15
295:13 296:6
296:10 297:18
298:4,6,8
304:11 306:7
306:11 307:5
307:10 308:17
346:16 358:16
362:20
**lot** 26:3,6,16
33:4 96:11
118:17,18
124:23,23
125:8 126:21
135:1 141:18
141:18 148:4
152:1 154:6,13
162:18 180:15
180:15,15,17
180:18,18,18
180:18,25
181:2,4,6
183:11 185:5
185:21 186:23
187:22 188:10
190:15 192:2
229:13 230:22
258:23 268:20
315:25 333:14
348:10 355:16
363:13 369:5
391:15 392:13
416:4 423:14
**lots** 178:4

181:19,25
**louisiana** 1:2,19
2:7,17 5:24 6:4
6:16 7:2,21
31:20 32:12
39:9 42:22
43:24 44:13
48:23 56:22
94:9 98:22,24
99:5 102:18
107:4 122:25
127:20,25
128:2,11,16
129:1 274:17
322:18 348:7
368:2,5,6,17
369:10,23
402:7 404:2
428:7 431:12
431:15 439:5,7
440:8,18
**loved** 363:25
**lt** 266:14
**ltl** 52:10,23 53:7
53:9 80:14
86:1
**lucrative** 124:23
**lunch** 159:25
164:17 173:23
174:4
**lynn** 98:2,23
261:18,21,22
268:12 269:1
282:24 284:5
286:3

———————

**M**

**m** 3:1 25:16,16
25:25 28:23
68:22 69:4,21
69:22 70:7,9
71:5,15,20
72:15,17 73:8
73:16 74:11,14
74:20 79:2
116:7,11,15,20
118:16 136:4
142:20 153:9

153:11,14,23
154:10,11
155:11 156:3,6
156:23 208:8
378:9
**maceira** 113:9
377:9
**machine** 184:16
326:14
**mad** 352:12
**magistrate** 1:9
362:18
**mail** 221:2,16
**main** 363:16
**maintain** 195:10
**maintained**
92:23
**maintaining**
109:9
**major** 180:23
207:1 214:20
215:12,16,22
217:21 292:25
**majority** 127:13
**makeup** 53:3
227:22
**making** 67:2,5
67:13 113:19
118:20 183:20
187:23 265:10
277:23 296:24
299:4 319:1
378:6
**man** 46:20
161:10 200:7
236:25 299:11
341:25
**manage** 95:3
127:14 225:23
**manageable**
224:20
**managed** 88:3
**management**
27:21 40:14
46:10 54:17
68:23 87:23
106:25 116:10

127:18 153:25
280:22 386:4,6
388:5
**manager** 52:16
88:13 89:5,7
89:25 100:5
354:9 415:10
**managing** 242:9
**mandeville**
23:23 37:11,12
56:21 94:8
98:21,24
102:18 103:6
126:12 127:1
128:21 244:17
322:18 369:23
402:6 404:2
428:7 431:4,13
431:14,15
**manipulate** 31:8
106:22 107:6
128:14,15
196:15 247:17
309:18
**manipulating**
149:13
**manner** 9:6 41:1
**manual** 141:7
226:5 229:18
229:20,25
230:1,4,15,19
231:12,21,22
232:6,17,19
233:1,5 234:17
247:19 275:22
276:1 282:19
282:21 285:12
287:19,22,23
287:24 288:1,2
288:3,3,7,10
288:18,21,23
289:5,17,18,25
290:3 318:16
318:22 319:6
333:24 334:1,7
334:10,14,17
334:21 335:1

346:19
**manually**
231:24 288:7
**manuals** 110:15
111:3,11 112:3
190:1,4 226:2
226:2 276:1
**manufacturer**
156:14
**manufacturing**
379:23
**mapped** 403:22
**march** 44:10,10
53:10 144:20
159:16 161:21
175:19,20
291:4 312:20
343:19 373:19
379:14 380:2,5
380:15,25
**mardi** 39:5
**margins** 134:24
**marian** 114:15
**mark** 12:15
18:13 19:15
86:6 114:2
115:24 140:14
255:10 257:4
258:5 313:25
327:22 370:13
376:19 382:10
388:19 394:20
395:16
**marked** 12:18
79:11,14
112:25 113:3
123:8,12
140:17 160:7
160:10 164:13
248:25 249:4
250:13,19
255:13 314:14
314:18 319:12
319:16 327:25
333:13,15,17
335:25 370:12
376:23 389:1

395:21 420:19
**market** 44:17
116:10 117:9
207:4 294:11
294:13
**marketing**
42:25 199:5,23
256:7 370:5,7
**marketready**
117:9
**markets** 199:6
**marking** 395:19
**markup** 103:22
**married** 52:13
99:9,10
**martin** 235:19
236:2,17,20
237:5,6 250:18
263:9 265:11
266:9 269:20
280:13 350:12
350:24,25
351:2
**martinez** 21:7
32:13,18,25
86:6,10 384:19
**mass** 79:6 140:3
140:5
**massive** 378:8
**master** 45:22
**matched** 378:5
**material** 156:21
216:6,8 221:22
348:3 349:24
350:6
**materials** 199:6
199:23 256:8
336:15 347:1
**math** 244:25
245:2,8,15
308:22 413:17
**mathematical**
417:18
**matt** 15:25
**matter** 7:8
187:18 211:13
231:22 420:5

440:21
**mattered** 206:6
207:18
**matters** 33:1,6
**mckinney** 21:23
40:12 41:2
266:10 368:7
**mean** 15:14 25:9
26:4,7 47:5
59:22 60:2
61:19 70:20
76:1 83:25
85:3 88:8 93:9
105:2 117:13
118:23 120:18
131:4 136:19
139:15 143:4
154:2 160:25
161:4 169:17
178:23 179:14
181:14,24
182:5,9,10
184:6 189:11
189:12 192:5
194:17 195:15
199:7,13,16
203:18 204:14
212:20 216:15
217:22 224:17
242:1 243:13
251:11 256:17
257:1 260:19
270:1,13
275:20 276:6
283:22 313:10
317:16 348:17
349:13 350:5
361:17 377:19
377:25 381:13
403:11 427:18
428:10
**meaning** 13:14
40:17 45:16
55:24 74:19
136:14 143:4
165:4 179:20
272:11 300:10

332:22 366:19
366:21
**meaningful**
143:19
**means** 8:10
70:21 83:20
123:18 124:3
169:19 176:16
186:24 195:12
227:12
**meant** 131:19
215:6 337:10
340:25 409:25
**measured** 46:4
**meaux** 1:22
**mechanical**
39:17
**medicaid** 41:11
41:16 138:21
**medical** 1:4,16
6:25 9:18,23
11:2,11 12:4
27:11 53:22
58:24 60:17
68:6 77:20
79:13,25 83:1
83:9,24 85:22
86:16,24 87:14
92:25 100:13
100:18 101:17
103:1 104:10
104:11,13
107:4,5 115:18
115:22 116:1
116:22 122:12
138:13 174:25
179:25 197:3
254:7 305:18
349:18 402:6,9
404:2 428:5,12
430:1 431:11
434:8,14
**medicare** 41:16
106:10 138:20
200:6
**medicarespeci...**
117:15

**medication**
362:23
**medications**
305:1
**meet** 13:23
48:24 90:7
280:24 323:6
**meeting** 60:18
91:23,25 257:2
423:23
**meetings** 87:23
90:6,13 153:24
156:23 163:16
341:18 383:5
**melanie** 113:9
377:9
**member** 85:21
94:1 244:9,10
**members** 81:21
90:6,7 92:7,9
115:21
**memory** 23:25
169:6 248:21
315:22
**men** 362:25
**mention** 307:18
358:25 359:7
**mentioned**
101:10 157:20
176:9 177:6
198:7 235:12
319:1 322:5
329:3 330:2
396:4,23
400:19 418:24
**mentions** 400:22
400:23
**merced** 322:20
403:24 428:8
**merely** 83:23
**merge** 1:9 23:17
24:25 25:18,23
26:9,20 27:3
27:12,23 28:24
29:2 31:9,11
31:12 32:7
38:14 39:1

71:11,14 74:25
75:13,15 84:11
84:14,16,17,20
84:25 85:8,14
92:5 97:23,25
98:14 125:11
127:7,9 131:10
131:11,14
135:12 137:21
137:22,22,24
138:16 141:3,4
142:14,17,17
142:22 143:12
143:18 144:14
145:1,8,10,14
145:19,23
146:14,22
147:1,20
148:13 149:1
149:11,25
150:15,21
152:5,18 153:8
154:3,16,18,20
155:10,11
156:1,6,23
157:6,14,22
159:5 160:25
162:1,2 163:10
165:1 169:15
169:21 170:17
171:7 172:3
174:22 175:16
175:21 176:2,9
193:1 197:7
198:15,22,24
200:11,16,18
201:4,10 203:6
203:24 204:1,5
204:7,14 206:5
208:6 209:18
214:12,19
215:11 216:2
235:3 242:18
243:3 244:20
245:23 246:8
247:19 248:13
251:8,13,15

252:14 253:5,6
253:11 255:3
255:12,15
256:22 257:14
258:6,12,20
259:5,19 260:2
260:2 263:25
267:23 268:8
268:15,16,18
270:7,18
271:25 275:21
275:22 276:5
276:17 277:22
278:9,10 279:5
280:1,5 285:18
285:20,23
286:25 287:5
287:20 289:14
291:10,14
298:9 301:3
303:15,18
306:24 309:2
309:12 310:23
311:23 312:12
312:13,18,25
316:18 317:4
317:21 318:9
319:15,25
326:2 327:15
328:10 330:17
332:1,15
335:11,22
336:20 337:1,4
337:15,24
338:24 339:5,8
340:1 341:23
342:9,18,20
344:7,13 354:8
354:16 355:9
357:24 358:1,4
358:12,25
359:5,8,9
360:10 361:11
364:24 365:5,8
365:12 366:17
366:25 367:4,9
367:14,18

368:9,13,15,20
374:2,13 389:8
389:11,20
390:5,8,14,20
396:2,21
397:16,21
398:18,19
400:17 402:15
402:23 403:1
403:19 407:3
407:19,22
408:4,5,7,14
408:15,20
409:1,5,14,21
409:24 410:10
410:10,23
411:2,5 413:17
413:20 414:12
415:6,10,14,15
416:5,12,17
417:1,6,16,25
419:11,15
420:10,13
421:6,6 428:23
429:4,20 432:2
432:14 433:16
433:22 434:1
434:13
**merged** 117:8
**merges** 142:24
149:18 175:24
199:5 201:8
203:13,21
206:24 224:2
225:13,23
229:24 256:15
268:19 276:1
286:5 287:25
288:2,2 310:1
331:23
**message** 24:18
24:24 34:23
**messages** 28:14
30:8,13 34:14
34:18 35:1,19
35:24 36:7
96:9

**met** 13:18
143:18
**metabolite**
121:19
**metabolize** 46:4
**methane** 45:17
**method** 189:22
271:23 378:21
440:11
**methodology**
183:25
**methods** 151:24
**metrics** 129:11
129:14,24
130:11
**mexico** 123:1
**michelle** 98:10
99:9 109:4
150:8 163:20
174:24 175:11
185:13 216:18
250:24 261:18
266:4,8 267:5
267:8 270:3
275:18 280:13
281:4 282:24
283:2 284:5,19
288:13 338:9
344:3
**microbiology**
242:11
**microphone**
226:8
**microsoft**
345:21
**middle** 1:2
60:15 94:14
378:12
**mile** 114:22
**million** 45:23,24
46:14 101:4
371:16,22
373:20 374:6
374:15 378:20
378:22 379:3
386:18,25
411:23,25

412:22
**millionplus** 51:4
**milwaukee**
204:2 205:16
207:11,16
**mind** 22:10,23
46:25 112:6
153:10 164:9
217:2 265:22
306:9 326:8
357:2
**minds** 127:8
**minimis** 126:5
202:24
**minority** 88:22
**minors** 42:23,24
**minute** 42:19
168:19,20
255:8 319:20
329:13 431:17
**minutes** 90:9
91:1,22 92:11
107:25 243:24
388:8,10
**mischaracteri...**
63:7 77:5
207:22 273:19
**mischaracteri...**
28:7 168:14
**misimpression**
254:9
**mispronounced**
261:22
**misreport**
179:24 225:13
230:2 243:6
**misreporting**
244:23 247:11
**misreports**
181:7 245:12
245:12
**misrepresenta...**
176:13,19
215:18,24
216:9 222:4
226:18 227:8
232:9 251:8

252:8,13 253:4
253:11,15,24
255:5 423:19
423:22,23
424:24 425:7
425:12
**misrepresenta...**
221:22 232:16
233:11,15
237:15,24
238:6,19
239:15,17,21
240:6 241:12
333:20 425:5
**misrepresented**
216:2 337:16
**missed** 18:11
329:23
**missing** 38:6
234:1 286:9
**mission** 56:18
58:21 59:15,19
60:5
**missions** 58:25
**mississippi**
23:23 27:20
99:4 120:5
126:10,13,16
126:24 127:1
127:14,22
128:1,5,6,9,10
128:13,19,24
129:16 130:3,6
384:25
**misspoke**
262:13
**misstatement**
425:12
**mistaken** 308:7
**misunderstan...**
234:9
**mix** 180:19
182:5 183:17
185:25 186:4
186:18 187:23
187:24
**mixed** 188:12

**mixture** 186:25
188:11,23
282:8
**mobile** 39:7
**model** 70:13
**modern** 69:17
**modification**
149:2,12
**modifications**
162:4
**modified** 88:24
**modifies** 193:12
**modify** 148:14
286:19
**modular** 397:24
**module** 421:5
**molecular** 16:18
16:20 227:21
**moment** 240:1
343:23
**monday** 163:16
271:14 354:22
**monetary** 300:1
331:23
**money** 45:1
47:25 67:2,5
67:14,15,20
87:12 103:16
120:22 292:3,5
296:9 355:16
355:25 357:20
363:25 372:4
372:11,13,14
374:8,14 376:4
**monies** 394:7,12
**monitor** 45:15
46:7
**monitoring**
44:23 61:23
317:5
**monitors** 45:10
**month** 86:3
**months** 97:2
108:2,4 131:9
259:1 368:23
390:17
**morning** 6:21

13:21 24:6
139:21,24
163:16 180:10
181:22 354:22
**motivated** 335:5
**mouton** 23:2
38:9,12 39:3
39:22 86:8
284:12,12
338:10 384:20
**move** 19:19
25:18 126:10
126:24 127:17
128:24 130:3,6
131:18 318:13
327:14 399:2,9
400:24 411:2
425:21,24
**moved** 50:14
53:9 114:21
126:12,16,25
128:4 226:8
382:21 393:18
**moving** 83:2
127:12
**multilevel**
301:14
**multiple** 92:3
97:2,2,3 187:6
310:4 338:11
**multisite** 138:2
426:9

―――――――――
**N**
―――――――――
**n** 1:17 3:1,1,1,9
5:1
**nah** 257:11
**name** 6:22 19:7
19:8 45:13
81:25 83:4,7,8
83:11 84:7,10
84:19 85:10
92:24 96:17
115:12 149:4
166:20 167:14
261:22 262:7
262:14,17
286:6 307:9

345:8 351:4
380:23 419:19
430:5,9,10,18
431:22
**named** 6:17 17:6
69:8 83:6
275:12
**names** 83:12
110:5 167:4,12
263:1 275:9,12
348:11 367:21
439:19
**nanos** 159:17
343:16 358:10
420:2,2
**narrow** 294:18
**nature** 199:21
348:14 349:25
439:10
**near** 32:11
**necessary** 61:2
360:24
**need** 8:23 15:11
21:5 58:14
76:10 77:17,17
101:11 105:5,7
113:24 129:21
134:10 140:14
140:21 168:19
168:19 170:16
181:1 182:14
184:16 185:21
191:1 199:24
209:2 278:8
339:3,13
357:13 369:17
369:24 381:18
383:19
**needed** 15:6
26:18 27:22
83:3,4 110:13
134:12 138:7
171:6 245:4
264:14 320:16
341:20 360:7
369:4 381:18
397:25

**needs** 185:2
198:5 241:21
397:23
**negative** 195:16
276:5
**negatively** 289:4
292:20 294:8
**negotiated**
382:18 386:7
**negotiating**
375:4 379:15
**neither** 112:21
112:23
**network** 323:10
**neuro** 228:10
**never** 11:2,7
29:17 50:10
58:1,19 59:4,8
59:16,18 71:11
72:14 73:3,3,6
74:22,23,24
83:12 112:5
120:15 150:4
151:13,18
159:9 161:2
162:16 164:9
171:21 176:1
196:12,16
201:24 214:9
218:10 242:16
242:18 259:18
265:22 296:11
298:17 301:6
309:22 327:9
342:5,10,17,18
342:19 345:7
359:7,9 367:7
367:7 372:20
372:21,23,25
383:1,8,8
406:15,23
409:1,14,16,19
409:22 410:2,4
421:3,9,14,20
425:24 429:10
429:20
**new** 1:18 2:7,17

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE

April 10, 2019

Page 471

6:3 37:8 50:3,6
80:19 96:23
114:10,12
115:17,23
123:1 289:18
314:14 369:13
372:19,20
415:23 420:24
**nextphase** 118:1
118:4
**nextphasemd**
117:5,5,6
**nicholas** 6:15,23
438:3,11
**night** 271:13
**nimble** 154:12
**nods** 9:7 142:14
221:3 227:11
**noel** 46:21
**non** 286:19
**noncompliant**
174:21 175:7
175:10 176:2
203:22 244:21
244:22 354:3
**nope** 18:7 426:1
**normal** 285:16
318:2
**north** 24:9,10
37:13 44:3
56:15,19 57:4
57:10,17 58:16
67:15 68:1,4
68:10,18 69:5
71:8,11 76:2
76:14,16,24
77:8,11 78:5,9
78:10,14
102:19 411:23
**nos** 336:10
**notated** 288:14
**note** 92:1,4
114:1 386:16
431:2 440:4
**noted** 187:16
438:13,15
**notes** 382:9,17

387:20
**notice** 5:7 12:14
12:25 13:14,16
15:19 18:6
19:12 158:21
159:10 174:23
214:6 249:13
359:15 362:1,7
**noticed** 159:7,9
363:5
**notified** 14:9
15:24 97:7
161:3 406:23
**notify** 175:2,3
**november**
244:12 396:14
400:15
**number** 57:7
70:13 101:2
132:10 149:4
159:1,2 167:6
206:12 226:25
251:17 277:15
277:19 307:16
308:9 391:18
**numbers** 70:6
245:3 249:18
249:19,20,21
249:21 254:15
263:13 278:25
395:15,16
399:17,19
**nurses** 52:15
**nutshell** 19:21

_____
**O**
_____
**o** 3:1 5:1 439:1
**oath** 5:25 6:19
**object** 14:23
15:9 28:6
29:22 32:17,21
51:19,23 53:25
63:7 66:12,17
72:4 77:4 85:2
88:7 104:16
110:1 129:4
140:23 143:7
144:9,17

146:10,19
147:6 152:11
152:25 156:10
156:17 157:1
158:3 165:22
166:1,15
168:13 173:16
176:15,22
177:14 179:4
184:9,19 186:8
187:4 188:3,15
190:6 192:10
193:14 194:4
200:21 201:14
202:11 205:10
206:9,22
207:21 208:21
209:22 210:23
210:25 211:6
211:16 212:2
213:6,16 214:4
214:22 215:20
219:3 220:7
222:10 224:14
225:20 231:15
232:8,22 233:7
239:13 246:1
251:10 269:16
273:7,18 279:8
289:9 293:6
303:13 304:24
306:3 320:11
321:6 323:20
324:2,12,18,25
325:12 326:5
327:3 329:6,17
330:19 331:11
332:7,14 333:7
336:4 337:8
340:9 341:2
343:10 345:19
348:16 350:3
351:25 352:19
352:25 353:10
353:24 354:13
354:20 355:20
357:6 358:22

359:3,14
360:14 361:13
361:25 362:6
363:9 365:7
366:8 370:3,21
371:2 383:12
384:7 392:1,9
394:2 402:18
406:3,11,19
407:7,13 408:3
408:23 410:8
411:7 419:3
421:22 422:12
425:16 430:22
**objected** 172:25
222:16
**objecting**
436:15,17
**objection** 15:9
108:12 195:11
206:11 210:13
253:18 254:12
403:5 411:17
412:15 413:5
413:11 414:2,6
416:7,15
433:24 436:18
**objections** 5:11
**objective** 320:15
**obligations** 22:8
22:21 328:17
332:10,16,19
**obtain** 59:25
274:13 393:11
**obtained** 165:20
**obviously**
254:13
**occasion** 267:25
299:19,24
300:2,5,8
**occasions** 220:2
220:11,20
**occurred** 33:1
205:22 234:4
264:9 316:13
393:6 424:3
**occurring** 86:24

**occurs** 271:16
**ochsner** 95:9,10
**october** 62:12
217:4 218:8
223:24 224:12
224:21 236:19
248:14 255:24
256:22 257:1
280:5 289:23
407:18 408:5
**offer** 135:16,17
399:6,9
**offered** 400:8
**offering** 135:4,5
399:1 400:23
**office** 41:7 75:24
95:2 103:1,4
266:12 345:21
**officer** 275:17
439:5 440:8
**offices** 123:4
**official** 74:9
91:21
**officiated** 5:24
**offset** 372:21
**offshore** 45:18
**oh** 17:1 23:1
39:4 69:12
81:1 127:2
131:9 141:20
159:13 163:2
213:1 235:20
245:18 254:3,3
261:19 262:22
263:7 268:1
269:5 277:14
282:8 342:15
351:6 375:11
376:25 386:22
423:9
**ohh** 87:10
**oil** 46:9 227:24
**okay** 7:12,14,24
8:8,15,22,22
9:15,17,25
10:4,7,10,11
10:15,18,22

**EXHIBIT A**

| | | | | |
|---|---|---|---|---|
| 11:12 12:6,13 | 73:2,5,8,19,25 | 130:6,9,9,15 | 191:12,16 | 247:9 248:3,12 |
| 13:2,10,17 | 74:25 75:3,7 | 131:22 132:17 | 192:5 193:2,23 | 248:19,24 |
| 14:5,13,19 | 75:12 76:4,24 | 132:22 133:4,8 | 194:22 196:8 | 249:9,13,23 |
| 15:2,17,23 | 77:15 79:1,4 | 133:17 134:1,5 | 196:14 197:7 | 250:12 251:7 |
| 16:4 17:11,22 | 79:10 80:8,12 | 134:16 135:1,3 | 197:18 198:9 | 253:7 254:5 |
| 18:1,3,8,12 | 80:14,17,23 | 135:14,19 | 198:18 199:1,4 | 255:5,9,11,16 |
| 19:2 20:1,4,14 | 81:3 82:3,14 | 136:1 137:4,9 | 199:24 200:10 | 256:13,24 |
| 20:16 22:13,24 | 82:14,22 84:3 | 137:11,16,19 | 200:15 201:5 | 257:3,16,23 |
| 23:3 24:15 | 84:17 85:11,16 | 137:21 138:19 | 201:16,23 | 258:7 259:15 |
| 25:2 27:6,9,13 | 85:20 86:9,13 | 138:23 139:3,6 | 202:2,7 203:2 | 259:25 260:14 |
| 28:1,17 29:7 | 86:19 87:1,8 | 139:9,12,15,19 | 203:18 205:18 | 260:17 261:8 |
| 29:11,19 30:1 | 87:15 89:8,23 | 141:2,19 | 207:8,14 208:1 | 261:17,21 |
| 30:7,7,10,14 | 90:3,11,23 | 143:11 144:1 | 208:10,12,16 | 262:3,17,24 |
| 31:2,18,21,24 | 91:16,18 92:5 | 144:25 145:7 | 208:18 209:8 | 263:2,22,23 |
| 32:10,23 33:11 | 92:10,13,21,23 | 145:17,21 | 209:13,17,20 | 264:2,17,22 |
| 33:23 34:1,6,8 | 93:1,15,18,25 | 146:1,4 147:10 | 211:12,13,24 | 265:14,21 |
| 34:21,25 35:3 | 94:17 95:11 | 148:23 149:11 | 213:19 214:1 | 266:24 267:2 |
| 35:9,10,11 | 96:6,10 97:12 | 149:20 150:23 | 214:11 215:4 | 267:17 268:10 |
| 36:4,8,12,16 | 97:12,22 98:7 | 151:10 153:3,6 | 215:10,16 | 268:24 269:2,5 |
| 37:2,15,17,19 | 98:16,20,25 | 153:6,13,20 | 216:11,13 | 269:10,13,21 |
| 38:9 39:15 | 99:13 100:11 | 154:9 155:10 | 217:5 218:4,10 | 270:4,11,14,19 |
| 40:3,11,20 | 100:24 101:5,7 | 156:5,20 157:4 | 218:13 219:10 | 270:24,25 |
| 41:20 42:7,14 | 101:13,18 | 157:8,16,20 | 219:15,20 | 271:1,9,11 |
| 42:18 43:2,4,8 | 102:3,17,22 | 158:7,15 | 220:1,19 221:6 | 272:18,20 |
| 43:17 48:12 | 103:12 105:21 | 159:11,19,24 | 221:20 223:7 | 273:13 274:1 |
| 49:9,9,16,19 | 105:23 106:12 | 160:2,20 | 223:10,19,22 | 274:19 275:4,8 |
| 50:21,25 51:3 | 107:11 108:3 | 161:16,23 | 224:4,6,22,24 | 275:14,21,25 |
| 51:10,12,14,25 | 108:10,14,18 | 163:12,23 | 225:25 226:4 | 276:12,12 |
| 52:5,9 53:4,7 | 108:20,22,25 | 164:2,7,9,10 | 226:12,16,20 | 277:6 278:3,5 |
| 54:4,6,9,10,21 | 109:12 110:12 | 164:25 165:6,9 | 227:10 228:22 | 278:7,17 |
| 55:1,8,14,21 | 110:14,24,25 | 166:11,18,23 | 229:5 230:6,25 | 279:17,21 |
| 56:1,6,15,19 | 111:1,6,8,11 | 168:6 170:22 | 231:6,11,18 | 281:20,23 |
| 56:23 57:1,4 | 111:23 112:3,5 | 171:3,23 172:2 | 232:2,25 | 282:6,19,25 |
| 57:24 58:10,16 | 112:6,24 113:7 | 172:20 173:18 | 234:13,19,24 | 283:13 285:1,5 |
| 58:19,21 59:3 | 113:12 114:5 | 173:18 174:9 | 235:1,2,7,9,11 | 285:19 286:8 |
| 59:7,10,19,22 | 114:25 115:9 | 175:9,15 176:5 | 236:5,9,15,17 | 286:14 287:8 |
| 60:1,5,11 61:4 | 115:13,15,19 | 176:12,25 | 236:20 237:11 | 287:10,18,23 |
| 61:7,22 62:2 | 116:2,6 117:3 | 177:20,22,24 | 237:13,20 | 288:12,18,24 |
| 62:10,13 64:1 | 118:3,6,11,22 | 178:2,19 179:9 | 238:2,10,24 | 289:3,12,20 |
| 64:5,21,25 | 119:2,5,8,13 | 179:13 180:6,8 | 239:4,6 240:3 | 290:7,13,22,23 |
| 65:4,15 66:3,7 | 119:17,22 | 180:20 181:18 | 240:9,13,17 | 291:2,6,24 |
| 66:7,14,24 | 120:10 121:12 | 181:24 182:9 | 241:2,7,9,18 | 292:3,18 |
| 67:5,12,15,23 | 122:5,8,11,17 | 182:20 183:7 | 241:25 242:13 | 293:18 294:6 |
| 68:4,7,13,18 | 122:24 123:4,7 | 183:17 186:4 | 242:21 243:2,2 | 294:14 295:9 |
| 68:21 69:2,20 | 123:16 125:1 | 186:22 188:9 | 243:8,17 | 296:4,13 |
| 70:7 71:2,7,11 | 126:5,9 127:2 | 188:18 189:25 | 244:19 245:20 | 297:13,17,21 |
| 71:14,25 72:20 | 128:23 129:19 | 190:3,16,25 | 246:13,15,20 | 298:10,20,23 |

299:23 300:4,7
300:12,20
301:16 302:7
302:17,18
304:10 305:11
305:13 306:6
306:21 307:3
307:12,16
308:5,9,14,20
308:23 310:25
311:4,8,15,23
312:4,9,19
313:2,2,7,14
313:17,24
314:13 315:5,8
315:12,18,24
316:15,24
317:1 318:7,15
319:4,8 320:6
320:14,18
321:14 323:1,5
324:7,21 325:3
325:16,19,23
326:8,11,17,23
327:13,17,21
327:21 328:7
328:12,20
329:2,2,11,23
330:7,8,16
331:6,18 332:9
333:1,12,20
334:5,9,19
335:5,10,13
336:16,24
337:2 338:21
339:1,20,23
340:5,12,15,21
340:24 341:8
341:12 342:2
342:11,21
343:22 345:11
346:3,6,25
347:4,7,12,16
348:10 349:10
349:23 350:12
350:17 351:4
351:13,22

352:15 353:20
354:16 355:15
356:3 357:1
358:7,15,25
360:4,9,17
361:6,10,17,22
362:19 363:5
364:9,12,22
366:16,19,22
369:1 370:7,10
370:16 371:21
371:24 372:3
372:14 373:2
373:19 374:1
374:10,12,14
374:17,19,25
375:9,15,25
376:4,15,18
377:3,12,19
379:14 380:4
380:17,24
381:9 383:22
384:17,21
385:3,9,14,20
386:9 387:14
387:17,21,24
388:4,7,7
390:7,13 391:1
391:3 392:5,13
393:5,23
394:16 395:5
395:18,23
396:8 397:4,14
398:7,13,25
399:16,22
400:6 401:5,13
404:13,17,21
405:6,9,15
407:2 408:10
411:20 412:1
414:10,17,24
415:8,20
416:19,22
417:21 418:3
418:10,14
419:9,14 420:1
420:12,22

421:13,17,25
422:3,17,25
423:9,12,14
424:5,8,10,22
424:24 425:8
425:20 426:5
426:15 427:17
427:25 428:17
428:22 429:3,9
429:13,19,23
430:8,16,24
431:7 432:5,22
432:25 433:9
**okeydokey**
71:20 140:13
147:12 317:1
340:21 342:21
376:20
**oklahoma** 123:2
**old** 39:5 63:16
63:18 66:21
162:2 309:4
**older** 309:2
**olive** 227:24
**olympus** 70:1
**omission** 176:20
252:8,14 425:7
**omit** 436:2
**omitted** 141:3
141:18 436:7
436:12
**omitting** 436:5
**once** 13:25
196:12 223:2
280:12 369:8
429:19
**ones** 63:24 64:1
101:20 180:4
219:20 240:14
277:8 280:17
282:1 284:8
306:23 406:24
**online** 299:1
**open** 95:2
124:12 132:21
317:21
**opened** 46:25

55:15,20
**operate** 39:2
56:7 58:23
59:1 62:10
106:21 128:8
131:10 219:23
298:9 307:8
337:4 341:22
429:4
**operated** 59:8
83:14 119:14
131:11 357:16
428:24 434:14
**operating** 40:17
40:19 50:19
56:24 60:12
72:17 76:5
78:11 79:12,25
80:19,24 83:19
83:20 84:1,13
89:11,13,18,23
106:18 111:3,8
134:17 137:6
214:14 237:9
294:25 430:5,9
**operation** 66:25
95:4 109:16
324:23
**operational**
112:22,23
135:13 320:18
**operations**
106:17 109:15
117:6 137:8
318:3 374:9
**opiates** 183:2
**opinion** 29:24
170:12 246:23
247:2,3 248:2
341:6
**opinions** 440:19
**opportunities**
130:2,4
**opportunity**
368:15
**opposed** 93:16
132:20

**opposing** 8:4
395:7 405:15
**opposite** 192:11
**opted** 382:14,15
**option** 77:7 78:2
**oral** 135:7
**orally** 386:21
**orchard** 28:25
142:21 153:9
153:16,23,25
154:4 155:11
156:3,6,23
**order** 19:16
142:9 149:3
151:14 162:5
162:14 182:11
182:15 183:15
184:2 237:16
237:17,25
238:7 239:9,22
242:25 255:22
258:18 259:16
297:3 319:21
326:21 327:24
331:3 332:16
338:1 347:1
412:18 423:15
426:6
**ordered** 58:6
**orders** 148:14
158:23
**organization**
76:19 150:2
**organizational**
113:2
**organizations**
81:22
**organized**
378:15
**original** 5:9
86:21 297:4
391:24 426:7
440:4
**originally** 51:11
52:16 375:10
376:9
**orleans** 1:19 2:7

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE

April 10, 2019

Page 474

2:17 6:3 37:8
369:14
**ornelas** 198:4
199:2 200:1
242:4 396:14
**orthopedic**
44:22 48:15
**osha** 111:25
**outcome** 144:21
440:21
**outside** 191:6
192:22 214:5
278:15,23
318:1
**overhear** 204:19
**oversee** 422:14
**overview** 329:15
**overwrite**
291:12
**owe** 372:3,13
**owed** 371:16
372:11,12,14
374:6 375:6
376:4,8 386:17
386:18,23
387:2,3,5,15
394:13
**owned** 12:3
38:14 41:2
49:17 68:5
69:25 84:6,9
84:18,25 85:14
85:18 86:20
102:24 114:8
114:23 115:1,9
116:20,22,25
117:1,5 118:11
126:15 138:3,4
154:14,21
155:1,4 298:17
351:6 384:17
388:2 429:5
**owner** 11:9,10
12:8,9,10 17:5
82:3,6 114:4
151:15 294:12
**owners** 87:2

298:18
**ownership**
77:20 87:5,6
99:19 100:17
113:13,14,16
119:21 385:12
385:22
**owning** 358:5
**owns** 15:25 17:7
160:17 385:15
428:6,13
**oxygen** 46:5

**P**
**p** 5:1 101:11
439:1,1
**packet** 256:20
**page** 3:3,11
81:14 83:17
87:18,19 132:7
132:10 133:9
133:21 202:20
226:20 227:3
230:10 249:14
253:9 254:6
276:15,21
277:5 303:19
304:4,8,21
305:7,23
318:17 320:19
323:1,17 325:3
325:7,21,23
329:21,22
330:9 336:10
396:9,13
398:11,14
399:4 400:12
400:12,15
401:23 404:18
404:20,22
405:4,7,7,7
414:25 423:20
424:9,11 427:4
427:23 428:1,3
428:4,4,16,17
428:20,20,23
429:13 433:21
**pages** 84:4 87:20

133:18 335:17
397:9,12
440:10
**paid** 87:4,5
103:25 106:7
137:14 275:10
328:10 372:23
372:25 374:23
375:19 376:6,9
390:11 391:1,2
418:20 419:1
**pain** 362:23
**panel** 228:15
302:5,7,10,11
302:11,12,20
302:22 303:10
**panels** 135:7
183:1,5
**paper** 59:8
307:19 319:9
333:14 423:14
**paracel** 69:14
**paracelsus** 69:8
69:18,23,24
70:2,22 71:2
71:17 320:23
**paradigm** 45:3,4
48:1 49:17,19
49:22 50:9,16
50:25 51:7,14
52:14,20,22
53:22 54:22
55:2,3 61:22
66:7,14 67:6
67:14 160:16
**paradigms**
67:11
**paragraph** 84:4
126:17,22
214:12 221:18
237:12 238:8
276:16,25
278:2,3 316:2
316:8 317:3
330:9 331:15
331:18 332:3,4
396:17,21

397:15,20
400:11,20,22
400:23 415:21
415:22
**paragraphs**
336:17
**paraphrasing**
408:17
**pardon** 51:21
139:23 282:17
390:15
**parenthetical**
396:1 397:5
398:7,22,25
399:14
**part** 5:14 26:5
46:24 53:5
65:8 73:10
85:8 101:17
162:16 165:12
189:2 202:25
222:13 252:2
256:25 280:21
303:24 327:18
336:17 338:22
374:20 389:5
435:10 436:2
**participant**
56:11
**participants**
155:15
**participate**
47:12 54:12
155:16 398:8
**particular** 30:2
61:17 80:15
88:17 121:22
126:22 136:10
148:18 180:4
183:7 185:19
186:6 191:15
208:24 224:21
229:3 246:2
252:19 293:3
294:22 298:11
299:18 301:13
404:17 412:21

424:4
**particularly**
219:25
**particulars**
372:8
**parties** 5:3
330:14,16
440:20
**partner** 17:12
27:10,15,16
52:14,22,24
90:13 104:22
155:24
**partnered** 44:21
45:8,19 47:18
48:14
**partners** 47:22
49:18 50:3
82:24 97:18,21
**partnership**
11:13 59:12,13
80:15
**partnerships**
80:11
**parts** 189:17
**party** 143:14
387:25
**passed** 76:17
103:13 104:10
**passthrough**
99:15,15 118:1
**password**
300:18,19
301:1,5,10
310:3,4,5
317:21
**passwords**
178:14 301:11
310:2 318:8
**pasted** 137:3
**pathologists**
196:21
**pathway** 27:19
27:24 38:14
53:16 98:12
103:19 105:5
118:25 119:11

119:14,16,21
119:22,23
120:3,7,12
121:6 122:6,15
122:18 125:13
130:1,4,7
131:6 132:5
133:15 138:5,9
208:11 216:22
218:3,19
242:23 272:22
273:1 282:12
298:4,6,7,8,16
298:17,18,19
306:11,13,13
338:8 349:9
366:16 374:21
374:21 376:13
381:6,17,24
383:25 384:17
384:21 385:22
386:1,4,5,6,10
388:1 393:6,10
393:19 394:8,8
394:10 426:9
**pathways**
298:18
**patience** 343:3
**patient** 23:17
54:2 58:6
62:11 74:16
125:11 141:9
149:3,4 151:14
151:18 162:7
163:23 169:23
170:2,20
175:12 179:14
182:4 186:16
196:15 207:2
216:23 226:6
244:23 265:25
266:20 294:8
297:7,9 304:11
308:18 316:6
409:8,22
413:18,22
**patients** 107:3

121:18 131:17
141:15 152:3,4
162:8 175:1,12
189:7 228:4
289:4 292:19
293:1,3,6
305:19 306:7
342:4 363:21
364:8 381:16
410:22 411:1,4
**patrita** 275:11
**patty** 266:10
280:13 419:17
**paula** 261:19,19
262:10,11,11
262:12,18,18
263:1
**paulas** 262:14
**pause** 295:20
**pauses** 439:12
**pay** 34:5,6 85:15
104:3,4 120:25
321:12 356:4
371:18 372:17
374:1,7,8,15
379:19
**payer** 103:21
105:19
**paying** 204:16
285:6 370:16
374:19 394:9
**payments** 87:11
373:20 376:10
376:14 381:4
**payroll** 105:9
**pdf** 397:14
**pearson** 171:5,8
265:11 266:15
308:7 365:16
**pee** 196:17
**pegged** 207:10
**pending** 322:13
**people** 14:10
16:14,21 18:4
22:22 29:15,20
30:3 86:19
88:25 92:3

108:15 109:3
110:7 120:20
128:14 156:1
225:10 258:24
266:16 268:17
273:23 275:20
282:12,20
298:14 338:5
338:12 341:19
353:13 358:16
417:10,24
420:3,4,7
**percent** 80:16
100:21 103:23
139:12,20
142:10 144:1,3
144:6,10,12
155:19 356:18
362:19 385:5
388:2
**percentages**
89:1
**perfect** 84:15
**perfected**
122:23 394:14
**perform** 60:4
138:24 170:20
266:24 276:4,7
402:10
**performance**
10:1,8,19
11:19,22 12:2
12:10 18:10
38:2 55:15
56:1,6,12 57:2
57:11 60:17
62:4,8 71:3,8
71:15 75:13,15
78:7,7,14,16
78:18,23,25
93:23 99:17
101:21 103:14
103:19 104:6
105:4,23,24
111:6,7 114:10
114:12,19
115:5 116:25

118:17,24,25
122:17 123:17
124:4,8,12
125:5,7,14
126:4,12,15
134:16 135:3
135:15,20
136:16,17,18
137:25 138:3,9
151:15 152:8
152:12,19,21
154:25 157:10
159:20 164:1
170:6 201:17
201:25 202:2
208:12 224:19
243:11 244:12
260:7,8 270:6
271:7 272:19
279:4 280:2,7
280:17 283:22
292:6 294:12
306:18 314:16
316:6 318:20
319:4 321:4
322:6,17 329:4
329:14,19
338:7 344:14
349:12,13,16
351:17 358:1
367:8,11 370:5
370:8,11
372:12,14,25
373:23 376:12
377:13,22
381:17 383:25
384:12 385:21
386:9,13,15,17
387:6,8,8
393:17,24
401:14,20
402:14,15
403:2,14,19
404:5,7 405:21
407:4 408:13
412:10 413:3
413:22 414:4

418:11 421:15
427:5,11 428:2
428:6,8,13,18
428:22,25
429:9,17,20
430:2,17,19
431:21 434:4
434:11,16,20
435:5 436:12
**performances**
365:1 393:12
**performed**
260:18 402:12
402:16 403:2
**performer**
44:15
**performing**
428:10
**period** 39:2
159:17 235:14
396:5 406:6,8
416:1
**periodically**
267:24 346:8
**permission**
202:7
**permitted** 5:5
138:19
**person** 18:11,21
31:12 32:4
74:9 109:7
268:13 286:5
440:17
**personal** 8:8
11:17,20 44:12
81:25 95:22
382:12 440:12
**personalinjury**
7:9
**personally** 8:13
13:7 142:5
161:17,19
257:1 258:22
382:11
**personnel** 104:2
104:8 106:13
107:10 109:24

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE

April 10, 2019

Page 476

188:12 192:6
228:23 267:4
282:9,10,24
286:19,23
**persons** 301:5
**peruse** 347:19
**pete** 159:14,17
343:16 358:9,9
420:2,2
**petition** 400:10
**ph** 16:6 196:21
275:16 302:25
**pharmaceutical**
228:3
**phase** 267:11
**phil** 33:3 86:6
115:24 372:8
384:19
**philip** 21:6
**phinance** 16:6
16:10,11,16
17:25
**phoenix** 120:3,4
120:6,13,14,15
121:7 122:9,15
122:18 130:1,4
130:7 138:6,10
272:22 273:1
338:8 349:10
349:11 366:17
381:6 384:1,18
384:21 385:22
386:1 388:1
**phone** 28:13,15
31:22 286:3
419:16
**phonetically**
439:18
**phrase** 191:22
191:23,25
439:18
**phyllis** 22:3
37:24
**physical** 265:9
**physically** 57:13
107:2
**physician**

301:25 302:1
422:13
**physicianowned**
47:10,13,15
**physicians**
47:18 117:8,15
179:24 303:19
363:20 364:2,7
**picayune** 120:5
127:13 384:25
**picked** 26:20
**picking** 355:9
**pictures** 428:21
**piece** 69:24
158:25 181:2
185:19 188:24
229:3 280:15
280:15 332:24
385:7
**pieces** 167:5
184:3
**piper** 369:11
**pipettes** 183:19
**pitched** 410:18
**pivot** 205:2
**pivoted** 127:10
127:11
**place** 29:9 90:15
131:12 186:15
295:17 316:16
316:17 351:17
363:19 366:2
**placed** 265:9
**places** 274:25
275:1,1
**plain** 318:8
**plaintiff** 7:12
8:6 138:13
277:22 279:4
279:25 298:2
**plaintiffs** 2:2
6:11 255:20
298:3 310:22
320:4 366:24
367:3 398:8
**plan** 10:7 75:19
75:21,25

130:11 242:22
**plans** 137:19
335:6
**plant** 207:12,16
**platte** 39:19
**play** 148:14
**played** 64:7
**pleading** 327:10
**please** 6:7 9:1,11
17:15 76:8
177:5 193:22
195:1 196:2
229:14 234:5
263:22 302:9
315:1,2 398:18
**plug** 60:21
**plugged** 46:6
**plus** 308:12,12
308:12 356:17
363:22
**podcasts** 362:22
**poe** 142:20
198:3,13 199:1
199:25 239:4
241:19 259:21
335:18,20
338:17 358:6,8
396:13 399:7
400:16 410:17
419:9,14
425:20
**poes** 198:6
**point** 58:2 102:9
131:8 137:20
203:9 221:21
226:4,9 227:3
230:7 238:16
241:10,18
251:13 277:9
286:5 309:17
325:25 339:10
339:18 340:4
413:23 414:7
427:14,22
**pointed** 206:18
427:4,23
**pointing** 172:15

**points** 237:21,23
238:8 239:14
239:16,20
240:14,18
277:20 282:2
317:11 400:14
**policies** 111:19
205:15
**portal** 422:13
**portfolio** 16:20
17:3
**portion** 100:12
121:14 296:25
297:2,5
**position** 47:8
94:15 249:11
254:25 371:16
**positioned** 26:21
**positive** 144:1,3
144:6,10,12
276:4
**possession** 263:3
**possible** 221:23
281:5 381:15
381:19
**possibly** 32:12
86:7,7 90:19
96:23 143:17
148:8 170:7
217:15 240:11
303:6
**postanalytical**
261:4
**poured** 196:17
**powell** 198:13
221:21
**power** 84:14
337:23 338:4
338:12,19
**poydras** 2:16
**practice** 271:3
272:17 305:18
**pre** 28:24 204:5
256:19 264:11
**preanalytical**
261:3
**precisely** 241:11

241:14,17
**precluded** 220:3
220:12,21,23
**predaughter**
360:7
**predict** 45:5
**preemployment**
46:23 47:3,6
**preference** 78:1
**prep** 189:20
196:16 296:19
**preparation**
13:25 20:9
40:1 284:7
296:13,14
297:1 298:11
361:20 407:16
**prepare** 13:12
392:18 399:25
**prepared** 12:23
22:6 42:17
95:12,21 239:3
240:4,9,11
251:20 290:20
340:4,6 342:1
342:3,6,10,17
342:18,19
392:21,24
400:3 403:19
404:7,13
408:20 409:1,4
409:14,16,19
409:23 410:1,2
410:5,22,23,25
411:2 414:22
433:15,22
434:1 440:11
440:14
**preparing** 36:10
414:19
**prepurchase**
28:24
**prescribe**
179:25 302:1
**present** 70:23
73:23 118:18
121:23 122:1

**EXHIBIT A**

142:5,9 308:4
325:14 364:22
419:17
**presentation**
29:1,3 136:12
137:5 142:1
198:11,15
256:21
**presentations**
24:20 28:18,22
29:5 136:21
142:6 155:20
158:24 159:3
**presented** 38:22
39:1 77:9
152:17 154:4
163:10 208:4
266:11 303:21
366:5 383:4
403:6 407:3
**preserve** 343:23
344:17 345:2
345:12
**preserved** 344:5
345:10
**president** 44:17
44:17 208:13
**pressure** 432:14
**prestige** 10:2,9
10:20 11:4,5
11:20,23 12:3
12:11 27:20
55:15 56:4
98:12 99:16
101:22 103:14
103:16,18
104:2,3,3,6,7,8
104:14 105:18
105:19 110:21
117:1 119:10
132:4,5,18,20
133:2,5,7,15
138:4 153:3
155:4 208:13
224:19 283:18
283:21 298:4,6
298:8,21

306:12 329:4
329:14 330:1
338:6 348:13
350:20 367:8
367:12 369:2
369:17,21,22
369:25 370:10
383:25 384:12
385:21 386:16
388:3,4 394:7
394:9 408:13
421:15 426:8
429:5,6
**pretty** 19:20
50:12 147:18
243:20 252:16
269:9 271:3
340:16 369:15
381:2 428:11
428:11
**prevented** 143:2
145:4
**preventing**
371:10
**prevents** 173:8
**previous** 239:4
259:10
**previously** 18:9
158:9 223:14
249:16 342:22
344:12
**price** 46:9
129:17 380:1
**priced** 378:6
**pricing** 432:18
432:18,20
**primarily** 11:25
**primary** 409:9
**prime** 356:17
**principal** 380:1
**print** 307:19,22
307:24 308:1
**printed** 291:21
292:14,15
**printers** 38:23
**printing** 38:24
281:6

**prints** 290:25
**prior** 68:10
142:25 146:13
237:24 238:6
239:8,21
255:21 256:4
279:4 285:25
326:19 346:7
406:16
**priorities**
360:20
**private** 16:17
44:9,14,18
50:7,7 64:2
371:7,25
**privileged** 32:20
**pro** 129:25
**probably** 8:22
14:3 36:20
135:7 144:20
154:4 163:17
168:4 185:11
237:1 244:13
282:8 287:2
315:17 343:6
344:1 379:3
424:16
**problem** 26:12
149:16 192:25
206:5 217:12
217:21 218:1
224:25 225:9
225:16 229:5,6
231:13 233:3
234:20,25
235:5 252:2
281:5,16,18
300:16,18
306:22 307:25
311:12 359:1
409:17
**problems** 26:2
26:10 38:25
77:17 125:13
146:23 148:5
148:12,18,20
149:18 204:8

204:24 206:1
206:18 207:5
207:11 208:6
212:17 224:11
268:19 294:25
300:24 301:15
306:11,14
342:8 344:4
358:12 363:16
363:25 391:19
391:22
**proceduralwide**
349:17
**procedure** 5:6
111:3 225:8,22
226:2 439:6,8
440:19
**procedures**
40:18,19
106:18 111:9
111:19 205:15
**proceeding**
440:10
**proceedings**
439:11
**process** 17:13
19:20 23:11,15
69:4 73:11,13
78:13 107:24
152:14 162:5
171:20 189:3
189:17,23
191:9 192:3,7
192:14,20
222:11,22
223:6 224:20
225:3,18,23,25
244:25 266:6
280:22 297:1
298:15 340:17
345:2 352:5
366:10 390:20
394:8 415:24
**processed**
269:23 371:11
**processes** 74:8
84:22 110:11

162:1 170:15
410:16
**processing** 23:9
38:18 220:4
**processor**
246:14
**produce** 30:22
33:21 35:24
38:7 70:4,23
97:1 124:23
125:20 131:7
133:4 152:13
187:15,17
188:25 238:25
269:6 292:16
**produced** 33:19
35:7,15 36:13
38:3 40:6
45:14 70:16
89:19 130:13
130:20 133:1
177:2 179:19
247:19 250:8
251:11 263:14
281:3 388:21
389:8,13,15
**produces** 245:14
**producing** 69:5
233:1 381:24
**product** 146:24
170:14 201:8
257:12 306:25
320:8 404:24
405:12 406:17
410:21 416:1
416:12 420:23
420:25 421:2
421:18 422:1
**production**
82:12
**products** 116:13
161:5 162:11
203:14
**professional**
43:8
**professionals**
175:6,19

196:20
proficiency
  107:17,24
  109:9 266:24
  267:12,12,14
  267:15,22
  269:7
profit 67:21
  178:13 377:17
  377:23 412:6
  412:13,19,23
  412:24 413:8
  418:11,17,23
profitable
  125:24 178:17
  182:23 411:15
profits 178:16
  411:22
program 46:24
  117:15 301:15
programmers
  72:19 105:8
programming
  31:9
programs 166:9
progress 93:5
prohibition
  440:18
project 27:2
  46:14 54:16
  60:22 399:10
  415:10 425:22
  425:25
promise 197:7
  197:13 421:6
promoted 44:13
proof 264:19
  265:5
proper 251:25
  408:7
property 43:23
  84:5,5,9
  102:25 114:9
  115:2,3
proprietary
  135:20 136:22
  137:1

protect 89:1
protection 88:22
prove 107:24
  317:6 318:21
  319:5
proven 73:4,6
provide 21:3
  102:4 104:7
  323:6,9 347:13
  361:5
provided 29:12
  45:20 103:18
  163:9,10
  251:12 269:3
providers
  293:10,12
provides 16:17
providing
  313:21
pt 181:14
public 353:13
  359:5,10
publicly 352:7
  357:18,21
  360:4 361:7
  363:3
pull 60:21
  196:21
purchase 119:20
  121:6 141:4
  142:13 145:19
  145:22 146:14
  152:8,22 153:3
  157:13,17
  242:8,25
  255:21 259:18
  260:1
purchased
  25:22 26:22
  27:12 84:14
  85:7 120:22
  121:4 127:7
  145:12,13,15
  152:5,23 161:1
  203:6 204:11
  260:4 295:4
  354:3 369:1

purchasing
  142:25 406:17
purport 422:23
purported
  145:10
purports 237:14
purpose 133:19
  137:21,23
  256:14
purposes 5:5
  11:13 54:4
  118:12,14
pursuant 5:7
pursued 383:8
pursuit 22:7
  410:24
push 184:14
pushed 150:5
put 23:17 46:3
  66:22 70:6
  99:7 104:22
  107:9 137:3
  149:23 173:12
  184:2 212:11
  215:6,7,14
  217:19,25
  225:10 242:18
  242:23 271:19
  281:5 291:11
  309:21 314:16
  342:4 376:22
  382:10 397:15
  410:22 411:1
  420:16
puts 199:8
  305:19
putting 132:25
  293:1 390:2

――――――
Q
――――――
qc 108:8 131:13
  141:24 179:18
  179:20 180:11
  180:12,13,14
  181:1,2,7,10
  181:18,24
  184:1,5,6,14
  184:17 185:5

185:14,21
186:22,23
187:14,15,17
187:22 188:9
188:18,22
189:2,4,9,12
189:22 190:3
190:17 191:3,8
191:9,20 192:1
192:12,15,21
192:23 193:2,6
193:16,23
195:3 196:5,13
206:25 227:16
228:8,11 230:2
243:6 247:11
247:11 280:12
280:20 281:3,3
281:6,13,16,18
285:4 288:8,19
288:21 292:13
294:23 307:19
308:1 318:21
319:5 367:19
413:16
qcs 70:15
qualified 128:9
128:14
quality 40:14
106:25 179:21
179:23 180:12
181:11 188:16
189:16 280:22
317:15
quarterbacking
354:23
question 5:12
9:5,10,14
12:16 21:14
23:21 40:24
52:25 56:10
76:7,23 77:14
85:9 111:1
117:23 120:11
132:14 135:14
146:11 150:10
150:19 151:16

152:20 163:2
166:11 168:16
174:13 184:10
186:13 187:6
188:1 189:11
190:7,23
193:18 194:5
194:10,14,16
194:25 195:12
197:4,5 205:11
205:13 208:2
212:14,19
213:8,24 215:5
215:21 216:7
220:8 221:5
222:17 223:20
229:23 233:24
234:10 239:13
240:8 246:9
250:5 252:24
253:1,14 257:5
258:8 259:4
273:8,19 274:2
274:7 276:15
292:18 295:7
305:21 322:8
322:13 326:20
330:23 338:21
353:17 355:24
359:24 362:3
372:10 383:13
384:8,9 392:2
392:10 402:19
406:4,12,20
408:19 410:9
417:9,23
428:16 434:23
436:15
questions 10:8
19:22,24 31:10
31:17 58:3
64:24 74:13
89:17 117:16
132:3,18 156:7
159:5 169:14
184:20 185:12
191:15 196:18

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                                        April 10, 2019

Page 479

206:13 240:5
240:10 248:15
249:3 250:15
254:24 257:20
268:3 290:19
338:13 356:11
389:24 391:4,6
408:12 411:10
416:20 433:6
436:20
**quick** 110:19
168:21 169:13
249:2 250:14
257:4
**quickbooks**
178:14
**quickly** 42:19
47:17 116:6
**quit** 50:19,22
**quite** 148:8
166:8 306:10
307:22 366:9
400:9
**quote** 241:19
251:18 252:6
396:2 397:6
398:9 399:1
400:20 402:5
431:10
**quoted** 252:19
254:12
**quotes** 254:20
401:2 431:3
**quoting** 251:14
251:15

**R**

**r** 17:19,20 439:1
439:1,1 440:9
**raised** 44:25
**ran** 41:3 70:15
180:14 189:9
203:13 207:6
321:13
**range** 181:4,8
181:13 192:22
198:18 228:9
228:11,14

229:3 248:10
281:4 287:6
296:18 388:22
**ranges** 184:2
189:1 226:23
227:8,14,19
228:7,8,16,17
228:22 229:19
230:2 288:8
**rate** 162:17
356:21
**rates** 356:4,15
**rating** 212:7
**rattle** 247:7
**reach** 21:22
**reached** 20:13
176:6 286:5
**read** 13:13,13
13:15,21 96:8
123:24 134:7
139:6,8 162:16
174:18 201:6
204:19 222:17
257:10 258:22
282:21 283:8
287:23 288:2
291:19 292:10
296:23 297:16
299:18 301:19
328:23,24
435:25 436:9
436:11
**reading** 5:8
252:11 301:18
435:3
**ready** 265:25
266:19 323:25
341:19
**reagents** 180:15
180:19,19
182:11,15,18
182:19 323:24
**real** 74:16
110:19 162:10
168:21 169:13
187:15 250:14
303:16 363:16

364:7
**realize** 204:15
378:12
**realized** 47:17
159:6 290:1
337:15 413:24
**really** 19:25
44:15 58:3
59:8 66:4
110:20 112:2
112:21 118:3
125:20 172:13
204:25 214:18
217:15,15
265:19 280:14
280:16 294:18
297:12 317:24
322:12 336:18
337:3 338:23
340:6 370:17
371:3 413:24
419:22
**realtime** 46:7
398:1
**reapproved**
135:11
**reask** 190:6
323:22
**reason** 26:20
58:8,10 101:18
126:9 142:7
222:15 296:15
326:24 327:4
363:18
**reasons** 60:14
60:23 125:8
128:24 309:6
**rebuild** 38:5
**recall** 23:7 65:5
65:7 141:6
157:22 158:20
158:21 159:6,7
159:10,12
177:1,9 200:25
201:1,3,4,8,10
201:11 203:16
205:1,21

207:12 210:20
211:4,18,22
243:8 356:2,3
358:15,20
401:13,16,18
401:19 405:12
406:24 407:17
418:11
**recalled** 143:23
146:7,17,24
159:1,8 161:1
167:15,17
200:18 210:17
211:14 213:3
213:10,24
224:8 325:17
**recalls** 143:12
145:2,8 211:25
406:23
**receipt** 220:21
220:23,25
**receivable** 380:5
380:10
**receivables**
380:11,15
**receive** 78:21
100:2 221:24
222:7,11,22
223:2,6 339:15
339:16 409:20
**received** 81:6
158:8 159:10
166:13 206:1
206:17 255:20
256:3 304:2
319:15 327:13
332:1 335:2
341:24 379:9
405:24
**receives** 120:21
**receiving** 70:21
81:8 174:23
220:3,12 221:1
316:4 326:9
334:11
**recess** 62:21
112:12 244:3

295:24 364:17
388:14
**recognize** 79:12
79:16 81:13,16
113:1 160:8
164:22 167:6,7
203:24 249:1
255:11 314:15
314:21 327:23
333:22 376:20
377:4 390:1
**recognized**
378:11
**recommend**
78:12
**recommended**
381:20,22
**record** 6:8,22
29:20 30:3
62:19,23
112:10,14
140:20 151:11
173:13,14,19
173:21,25
244:1,5 295:22
296:1 345:8
364:15,19
388:12,16
389:21 419:20
437:1 439:9
**recorded** 24:20
28:18,21,25
29:1,2,6,8,16
30:4 92:11,12
142:8 233:10
240:23,25
288:14 424:5
**recording** 29:9
241:2
**records** 101:8
101:19 318:22
319:6 343:23
344:18,23
345:2 350:13
350:19 351:2
**recoupment**
372:5,18

**EXHIBIT A**

recruited 44:16
recruiter 110:6
redact 36:19
reduction
  385:23,25
reengaged
  142:20
refer 9:21 85:22
  126:24 136:6
  281:16 420:17
reference
  120:14,17,19
  122:20,21
  158:5 221:14
  221:15 226:12
  226:23 258:9
  258:18 259:19
  421:5 427:4
  429:1,10,17,21
  430:16 434:21
  435:6
referenced
  160:15 277:11
  400:9 414:11
  414:14 422:3
references 395:7
  400:21 424:2
  439:21
referencing
  422:7,8
referred 42:3
  226:13 249:16
referring 51:6
  125:2 136:3
  140:1 205:8
  206:2 227:2
  322:1 327:5
refers 134:21
  135:19
reflect 397:22
reflects 166:5
  410:5
refresh 169:6
refund 259:22
reg 246:15,19
  247:12,16,23
regard 19:11

20:5 77:1
  193:23 195:3
  196:5 205:24
  207:11 240:5
  303:10 335:22
regarding
  143:12 203:14
  254:14 322:9
  411:11 416:11
regardless 208:7
regards 17:23
  19:15 32:6
  163:25 167:14
  177:17 242:6
region 122:24
  122:25 123:2
  171:10 367:25
regional 171:9
  369:6,9,16
registered 52:15
regs 247:14
regular 90:6
  318:3
regularly 90:7
regulates 41:16
regulation 41:24
  187:14 245:11
  245:22 247:5
regulations
  71:21 72:24
  162:11 185:24
  197:9,15
  199:12,18,19
  209:6 244:20
  245:17,19
  246:7 248:1
  409:13
regulators 57:20
  269:8 366:22
  367:2,7
regulatory
  127:19,21
  170:18 187:16
  269:8
reject 301:20,23
rejected 283:13
  283:14 284:14

296:4 300:22
  301:16,21
  302:2,18 303:6
  303:17 304:18
  306:8
related 48:13
  84:16 115:17
  130:3 157:6
  440:20
relates 76:1
relating 421:2
relation 25:3,4
relationship
  25:7,10 49:4,6
  50:11 67:8
  93:13 120:12
  122:6,8,18,19
  324:4
relationships
  120:8 440:18
relative 186:13
release 413:18
released 72:14
  148:9 325:5,13
relevance
  209:22 214:4
relevant 30:17
reliability 297:8
reliable 214:13
  214:25 216:3
  305:12,17
relied 177:9
relocated
  393:18
rely 58:13
  269:13,17
  305:25
relying 252:3
remained 55:5
  89:25 237:6
remedy 330:13
remember 7:23
  7:25 8:5 28:14
  32:9 44:11
  48:18 58:25
  60:7 64:16
  86:2,23 94:13

96:17 99:12
  100:22 101:1,6
  102:25 103:3
  110:5 134:6
  142:4,21
  143:20,25
  144:21 146:3
  158:11 159:14
  161:10,14
  162:20 163:22
  174:23 175:3
  197:10,16
  199:22 200:22
  216:20,24
  227:15 236:10
  255:18 256:3
  256:23 262:7
  291:3 294:15
  301:1 309:16
  312:14,15
  337:19 345:7
  352:9,10
  356:25 357:22
  365:25 366:3
  366:14 372:7
  376:1 380:3
  395:5,10
  405:22 412:18
  419:18,19,19
  427:8 429:25
reminded 47:9
remote 274:22
  403:24
remotely 275:3
removal 44:1
  65:18
remove 77:8
removed 88:4
  89:12
removing
  306:24
renamed 45:1,3
rendered 260:22
renewed 65:23
reorg 381:23
reorganize
  383:20 384:15

repair 25:6,9
repeat 88:15
  111:1 129:21
  152:20 174:12
  220:8
rephrase 9:12
replace 27:23
  71:17 312:14
replaced 71:14
  88:22 94:17
  394:5
replacement
  72:18
report 11:16
  75:22,23 76:18
  76:18 97:19
  143:16,20,22
  171:6,10,14,21
  176:8,18 177:1
  181:9 187:18
  211:24 229:7
  233:1 283:11
  284:15 285:23
  286:10 300:22
  301:16 302:19
  303:25 304:2
  304:13,25
  306:8 365:20
  365:22 378:5
reported 1:23
  97:17 150:21
  167:12 189:8
  206:25 248:12
  285:18,20
  301:22 302:18
  303:24 304:18
  440:11
reporter 1:25
  5:23 9:8 16:23
  17:14 20:18,22
  21:9 42:1,6
  48:7 64:22
  69:9,13 117:18
  195:2 235:21
  272:23 273:2
  273:22 283:19
  295:16 299:6

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE

April 10, 2019

Page 481

299:10,14
373:9 439:4,25
440:7,25
reporters 440:2
reporting 297:7
305:10 440:11
440:17
reports 70:23
169:25 181:12
192:22 303:22
representation
278:13
representations
203:14
representative
9:18
represented
250:8 258:20
representing 2:2
2:10
reprice 380:9
repricing 380:7
reproduce 37:1
reputation
208:3,4
request 389:19
requested 36:23
91:4,7 389:17
requesting
22:20 264:5
required 33:20
60:20 110:17
111:9,13
149:19 169:21
260:23 324:8
360:24
requirements
129:1 274:20
312:3
requires 90:5
330:19 331:11
333:7 343:11
requisition
378:3
reread 194:25
rerun 192:24
193:1

rerunning
192:25
research 47:9
161:25 175:5
213:21 405:10
researching
162:10,11
reserve 89:16
reserved 5:13
reset 380:9
resist 64:23
resolution 265:5
375:5
resolutions
264:19,20
265:6
resources
105:12 137:11
137:12 298:13
439:21
respond 42:16
132:23 347:2
responded
347:4
response 161:12
161:15 250:23
250:25 338:15
responses 9:5
responsibility
40:21 175:2
responsible
40:20 97:13
109:8,14
155:22,25
269:24 323:23
324:22 328:16
340:17
responsiveness
5:12
rest 435:25
restart 137:19
restarted 58:19
restate 190:12
194:9
restrict 286:22
result 205:7,7
271:2 292:4,23

293:3,16
295:13 296:7
296:10 297:6
297:18 306:8
307:6 308:17
312:10 365:2
369:25 411:5
resulted 303:7
results 70:6
141:12 179:18
180:2,3 181:1
181:8 189:1,7
203:7,13,19,23
205:24 206:6
206:19 207:9
207:18,24
247:21 260:22
270:7,14,15,17
271:11,24
296:18 297:4
301:24 305:2
318:21 319:6
398:1 413:19
resume 137:17
366:2,4
retail 44:12
retain 90:15
104:1,6
retained 90:11
95:6 101:20
313:8,9
retests 264:20
265:5
retrieve 346:8
346:11
retrieved 347:9
return 60:21
returns 11:17,21
36:24 95:11,22
95:23,25 97:9
revenue 99:14
100:1,24
103:13,17
105:24 118:10
124:23 125:21
126:6 131:7
378:25 379:2

review 77:12
142:11,12
159:21,21
269:8 280:24
reviewed 95:16
95:17,18
124:14 158:19
177:7 238:12
344:6 365:19
365:20
reviewing
142:21 265:12
414:19
revisions 113:20
revoke 365:1
rhett 46:16 48:4
113:21,25
114:3 115:23
127:11 250:18
381:25
rick 198:4,4
199:1,25 242:4
396:13
ridiculous 295:3
riggs 21:20,21
37:3 38:8
94:20,21,21
95:1 96:19,21
96:23,24
101:15 102:7
345:6
right 7:19 12:8
12:13 15:15
17:4,10 21:5
22:10 26:15,19
26:24 36:16
43:17,20 48:16
53:3,20 54:5
57:14,17,23
58:14,20 59:6
61:23 62:7,13
64:18,20 67:2
76:4 80:6,15
83:16,17 84:3
85:13,18 89:16
96:17 99:12
100:23 103:11

103:15 110:20
111:3 117:14
130:22 131:15
131:18,25
132:23 136:10
136:13 137:6
139:4,13
140:11 142:2,4
145:24 150:11
153:10 157:2
157:20 159:22
160:6,22
163:12 164:7
166:4,20
169:10 170:8
170:11,22
171:1 179:10
182:2,21 183:6
183:9,21 185:9
188:21 192:17
196:18 202:20
203:2 204:23
206:7 208:7,23
209:8,18 212:9
213:20 214:11
216:9,21
219:24 221:4
223:12 225:15
226:18 227:10
228:18 230:23
230:24 231:1
232:2,14 235:4
235:11 237:11
238:14 239:1,5
240:1,10
243:16,24
246:21 249:10
249:19 250:1,3
250:24 253:10
253:15 255:6
256:13 258:17
259:7,16
260:16 262:8
264:16,24
270:22 276:12
276:14 277:12
282:13 283:3

284:1,6,14
285:3 289:19
292:11 296:23
296:23 298:7
298:16 300:22
301:9 302:15
304:8 305:4,6
306:6,17
307:14 313:2
313:23 318:4
318:12,17
319:3,10,10,11
320:9 321:19
321:21,22
323:11,22
324:9,23
325:22 326:3
326:11,19
329:2,18 330:1
330:4,13
331:14 335:13
335:14,14
336:8,16
338:24 339:3
339:12 342:2
344:10 346:10
352:16,21
355:6,13 360:7
366:13 368:22
374:4 377:10
378:7,7 380:18
381:1,13
382:12 385:19
389:11 390:5
391:14 395:3
403:13,20
404:20 415:13
415:14 418:2
418:18 419:7,8
419:13 421:13
424:1,6,20
425:3,22 426:3
426:13 427:5
427:19,21
428:14,15
429:1 430:25
431:13 432:5

432:20,23
434:18
righty 12:22
122:5 135:19
259:25
rigorous 170:15
ringing 341:24
rise 176:19
risk 23:18 31:6
47:19,20 131:6
141:16 175:13
207:2,2 212:11
225:24 293:1
305:19 342:4
risking 297:7
risks 411:4
road 357:8
rob 385:4,7,11
robco 385:11,11
385:13,15
388:1 393:10
393:11
role 92:3 178:23
rolled 62:12
rolling 83:5
rollout 320:16
ron 142:20
198:3,6,13
199:1,25 200:3
239:4 258:23
259:21 335:18
335:20,20
336:7,14 358:6
358:8 396:13
399:7 400:16
410:17
room 13:19
217:23
root 281:12
295:1
roster 275:10
282:11
rouge 32:11
266:12
round 96:25,25
297:3
route 369:15

routes 369:16
rpr 1:24 5:22
439:24 440:7
440:24
rule 1:15 439:5
rules 5:6 8:25
71:21 72:24
74:3 181:6
209:6,9,14
439:6 440:15
440:19
ruling 114:18
run 23:6 25:21
42:20 54:11
61:2,18,20
121:2 141:25
152:1 180:11
180:13,25
181:1,2,16,18
181:19,19,24
182:25 184:6
184:14,17
185:21 187:14
187:19,21
188:18,22
191:8,9,20
192:1,15,19
193:16,23
195:3 196:5,9
196:13,23
209:2 244:17
270:5 271:11
293:19,20
294:2,3 296:16
296:20 298:15
303:2 315:3
317:6 323:25
340:6 342:7,18
342:19 360:10
378:1 408:20
409:1,4 431:25
runbased 23:6,9
running 66:9
181:10 185:5
186:23 187:22
188:9 189:12
190:3,16 191:2

192:1 193:2
208:19 209:11
228:14 243:16
302:23 326:12
342:9 361:4
380:11 381:3
408:15 413:3
414:7
runs 271:12
runway 413:25

────────
**S**
s 5:1 25:16,16,25
28:23 68:22
69:4,21,22
70:7,9 71:5,15
71:20 72:15,17
73:8,16 74:11
74:14,20 79:2
116:7,11,15,20
118:16 136:4
142:20 153:9
153:11,14,23
154:10,11
155:11 156:3,6
156:23 208:8
378:9 439:1
440:9
safe 45:15,16
160:18 169:24
212:6,12
214:14,25
216:3 312:1
safeguards
186:15 217:19
217:25
safely 292:7
safety 23:18
44:24 45:3,4
49:17,19 50:16
54:22 58:6
66:8,14 125:11
143:17 162:7
170:2 175:13
179:14 186:16
207:2 212:7
297:9 409:8
salaries 104:24

105:3
salary 103:23
sale 53:16
298:20 375:21
376:6 384:18
385:3 387:25
393:5,9,10,25
sales 24:20
28:18,21 168:1
168:24 237:16
237:17,25
238:7 239:9,22
255:22 256:19
326:21 327:23
329:11 331:3
332:16 337:25
369:9 370:4
401:6 404:14
401:23 413:12
salesman 212:6
sample 121:1,19
125:22 131:6
149:14 179:18
283:4 284:7
286:15 293:18
294:4,22
295:13 296:13
296:20 301:23
302:2 303:3,5
305:5,8,9,25
samples 62:11
69:5 106:22
107:6,12
120:24 128:14
128:15 151:14
151:19 152:1
163:24 164:3
182:4 187:17
189:24 196:16
196:16 216:23
244:24 266:1
266:20 270:8
275:2 283:14
286:20,22
296:5 303:18
321:12 323:25
364:5 372:19

372:20 377:24
413:22
**sanctions**
335:11 366:23
367:12
**sandy** 171:5,8
263:9 265:11
266:15 308:7
365:16,19
**sarver** 2:12
**sat** 70:10,18
**satisfied** 207:17
**saturday** 161:20
271:13
**saurage** 377:5
**save** 5:8,11
140:14 159:24
**saved** 177:3
296:25 297:5
344:23,23
345:16
**savvy** 268:13
**saw** 143:14
158:25 414:18
**saying** 29:14
136:24 167:3
168:9 185:16
186:14 191:2
203:25 214:19
214:23,24
215:11 216:6
221:7,8 231:21
231:23 241:19
252:18 257:14
272:14 288:20
290:16 305:15
322:14 337:2
338:22 340:5
341:24 355:3,4
358:20 362:19
364:6 419:19
435:17
**sayings** 305:18
**says** 83:17,20
89:14 132:8
134:10 140:3
203:12 215:1,2

215:4,14,15
222:11 226:21
232:15 241:10
254:6 255:24
272:20 287:24
288:3 290:3
305:9 314:25
316:1,3,15
317:2,7 318:20
321:10 322:3
323:2 324:4
326:1,2,6,11
329:18 330:11
331:14,22
336:17 340:2
377:12,16
396:2,20 397:5
397:20 399:1,5
399:8 402:4
403:19,23
404:1,23,24
415:13,22
416:2 420:24
428:13,20,23
431:3 435:4
**scaggs** 17:6,6
**scalable** 199:7
**scanning** 399:16
**scariano** 98:5,9
98:23 261:25
262:1
**scarieo** 98:3
**scenario** 217:18
**scene** 354:10
**scheduler** 166:7
**scheduling**
19:16
**schema** 166:8
**schematic**
428:21
**schlumberger**
39:18
**school** 44:6 49:7
49:7 64:18,20
114:7
**schooling** 43:5
**science** 185:8,9

186:13 242:12
**scientific** 121:20
151:24 180:21
196:20 409:6
**scientist** 23:10
180:23 182:8
185:11 191:13
191:17 275:13
296:17
**scientists** 70:24
183:18 274:16
274:18,21,25
275:15
**sciex** 70:13,14
70:22
**scope** 214:5
**scott** 44:13 94:6
95:5 174:6
**scratch** 76:11
176:7 185:22
270:4
**screaming**
353:14 382:20
**screen** 6:5
121:15 124:19
165:13 202:21
202:22 288:13
**screening** 46:23
47:3,6 70:1
120:2 121:14
121:21 124:16
124:24 125:7
125:19 126:6
182:22,24
183:7 260:12
264:23 428:10
**screenings**
202:22
**scrutiny** 26:18
**seal** 440:5
**seamless** 223:8,8
223:11
**seamlessly**
221:24 222:22
223:6
**seamlessness**
337:16

**search** 144:19
144:22 145:1
146:20 158:10
158:11,13
263:11 309:9
346:25 351:21
**searching**
121:23
**sec** 376:17
**second** 13:22
23:7 72:15
81:14 139:6
203:4 219:16
221:18 226:4,9
230:7 241:10
276:13 297:2
303:19 304:4
304:20 305:7
305:23 316:4
316:10 317:2
397:15,20
399:6 400:6,10
400:20 415:20
434:10
**secretary** 91:18
91:21
**section** 165:13
277:12 329:15
401:24
**secure** 214:13
214:25 216:3
311:3 312:1
**security** 31:6
141:13,14
143:15,18
207:1 277:24
277:25 278:5
281:25 284:24
308:23 309:14
310:5 311:7,24
312:2,5,16
**see** 70:25 93:20
104:17 113:24
123:9 124:1
133:8 134:19
135:21 146:15
161:3 165:14

166:20 167:8
168:10 172:14
172:15 185:18
192:2 203:16
204:20 211:21
214:16 215:4
221:20 222:1
226:7 230:16
240:20 251:2
252:6,7,13,19
253:4,6,25
290:17 291:9
301:5 304:3,20
305:24 306:15
316:7,19
317:13 318:23
322:3 323:2
325:4 326:23
329:25 330:8
330:11,14
332:1 334:2
335:19,24
336:9,13,22
357:19 366:11
377:14 387:20
390:25 396:6,7
396:14,17,20
397:6,11,11,17
397:19 398:2,9
398:17 399:11
400:25 401:24
402:3 409:23
414:17 415:18
416:2,3 419:20
425:17 427:14
431:5 434:7,10
**seed** 157:23
**seeing** 199:22
251:19 255:18
305:16 429:25
**seeking** 32:20
373:19
**seen** 12:16 95:24
183:18 243:13
243:14 249:7
255:16 281:4
311:15 315:5

327:9 334:12
334:16,17
339:22 346:22
390:4,6,17
414:14
**self** 201:5
**selfreported**
201:3
**sell** 357:3,9,14
357:19,23
358:1 379:18
379:21,25
381:10
**selling** 49:25
51:6 357:17
**seminars** 61:16
**send** 118:23
120:24 177:4
222:24 254:18
263:8,10
270:12 370:14
**sending** 335:21
390:21
**sense** 221:5
**sent** 24:19 95:21
160:9 203:24
204:4,6 249:1
265:11 270:7
319:25 370:13
408:4,5
**sentence** 129:9
135:23 222:10
316:4,10 326:1
396:21 397:1,4
397:19,20
398:17 399:7
402:4 434:7,10
434:13
**separate** 45:2
59:14 72:18
101:9 104:23
154:19 155:1,5
155:7 157:5
427:12 428:3
428:18 430:8
434:5 435:14
436:3

**separated** 57:13
105:2 154:22
**september**
346:20 359:25
**seq** 258:8
**series** 43:12
333:23
**server** 38:24
154:6 158:10
166:7 309:12
309:15,18
344:19,24
345:23 347:1
347:10,14,17
347:19,25
348:2,5 349:7
350:9
**service** 43:21,22
64:15 65:17
66:2,5 338:7
386:11
**services** 1:4,16
6:25 9:19,23
11:2,11 12:4
27:11 41:11
45:20,22 46:12
48:3 49:25
54:13 68:6
77:21 79:13
80:1 83:1,9,25
85:23 86:16,24
87:6,14 92:25
100:13,18
101:17 103:1
103:19 104:11
104:11,13
115:18,22
116:1,23 121:5
121:6,8 122:12
133:12,19
138:13 197:3
349:18 370:17
402:6,9 404:2
428:6,12 430:2
431:11 434:8
434:15 440:17
**session** 337:19

**set** 19:17 45:2
72:18 119:20
120:8,10,15
128:19 185:10
189:2 228:18
228:23 297:2
328:18 338:17
394:6 440:10
**setting** 34:19
228:8 336:21
336:25 409:7,7
**settle** 19:24
**settled** 8:20
374:18
**settlement** 18:25
**settling** 374:22
**setup** 127:15,15
**shakes** 9:8
**shape** 9:6 41:1
**share** 263:24
**shared** 28:13
105:10
**sharepoint**
90:20
**shares** 114:2
**shea** 17:13 20:13
22:25 23:4
99:7 109:20
150:8 163:19
216:18 261:20
275:18 284:5
284:23 338:9
384:20
**sheared** 24:22
**shelf** 316:25
**shell** 309:21
**shes** 22:5 31:16
37:19
**shield** 86:4
**shifted** 170:13
360:20
**shore** 37:13
**shorebased** 46:1
46:2
**short** 72:21
126:17
**shortly** 57:3

413:1
**shot** 165:13
**shouldnt** 304:25
304:25 305:25
**show** 12:14
43:22,23 65:22
65:23 66:3
79:10 101:7
107:17 112:24
123:7 131:24
132:7 140:13
160:6 162:25
163:5 164:10
168:2 248:24
250:12 255:9
257:3 263:4,15
268:15 276:8
289:14 290:14
290:16,17
313:24 314:13
319:12 333:12
333:14 349:1
360:6 376:18
**showed** 344:12
377:22
**showing** 379:2
412:5
**shown** 395:11
403:8 420:13
423:1
**shows** 165:6,16
318:17 320:21
321:1 377:16
403:8,11,13,22
412:21 436:2
**shuffled** 46:10
**shut** 58:17 67:18
76:1,25 77:11
77:18 78:3,10
78:22,24 170:9
201:16,19,24
202:2 236:21
312:9,12,22,24
367:8,17,19
368:9,14,22,24
376:12 383:7
412:10

**shutting** 38:24
**sick** 111:21
**side** 119:25
120:3 381:11
415:17
**sign** 432:6,10
**signature** 79:22
81:13 440:5
**signatures** 81:17
**signed** 79:20,24
95:14 107:9
242:25 260:14
328:12 331:2,7
332:11 432:5,7
432:22 438:11
438:13,15
**significant** 39:1
397:22 399:2,9
400:24
**signing** 5:9
239:9 255:22
328:24
**similar** 115:25
154:10 157:16
197:18,20
242:4 256:4,11
256:12
**simple** 245:3
**simpler** 309:25
309:25
**simply** 86:21
117:25 147:8
183:5 186:24
187:22 189:12
192:2 197:4
216:7 225:3,7
225:18 290:24
**simultaneous**
389:22
**simultaneously**
53:15
**single** 150:24
158:24 229:6
281:2 303:1
310:2 378:2,3
409:17
**sir** 8:17,19,21

9:16,24 10:3,6
10:14,21 11:6
11:15,18 12:12
12:20 13:1,5,9
14:1 27:25
30:9 31:25
37:4 43:16
49:15 50:20
52:21 55:10
59:2 61:6
63:15,17 64:13
64:20 65:16,21
66:6 67:17,19
67:22 68:12,17
68:20 69:1
71:4,6,10,13
71:16,24 78:17
81:15,18,23,23
82:5,8,18,21
83:10,15 85:24
86:25 87:3
90:2,4,8,10,16
92:25 96:9
106:6,11
108:24 111:5,7
111:10,14
112:4 115:6,14
116:5,18,21
119:4,7 122:4
122:16 123:6
124:10 125:18
126:8 127:4
129:6 133:16
144:5 153:21
168:18 171:13
174:3 177:23
178:1 199:15
201:22 208:15
208:17 227:17
229:21 237:10
242:17,20
262:16 285:22
296:8 297:20
298:22 300:9
300:10 316:14
316:20 319:18
320:5 323:4

325:24 327:1
327:12,16,20
328:2,6,11,14
328:19,22
329:9,10
330:15,23
331:21 332:5
332:18 333:15
334:15 336:2
336:23 338:20
340:23 341:15
342:6 344:15
347:11 349:22
350:16 351:3
353:17 361:9
364:11 365:3
366:15,18,19
370:9 371:23
372:2 374:24
375:24 377:7
377:11,15,18
379:13,17,20
385:2 393:4
421:8 422:2,6
423:4,18 425:6
425:6 427:6
432:17,24
**siscario** 98:3
**sit** 95:2 383:3
**site** 310:2 315:3
**sites** 141:25,25
318:11 321:3
322:4 335:23
**sits** 41:17,19
123:2
**sitting** 245:21
246:6
**situation** 74:2,3
78:5 276:9
298:24 299:3
**situations** 276:9
**six** 131:9 259:1
390:17
**sketch** 43:19
**skill** 185:10
**skilled** 110:7
**skinner** 15:25

**skip** 21:13,17
35:3 38:7
94:18,25 95:1
178:15 345:4
377:5,8 379:7
392:13 412:2,5
**slide** 131:24
132:7
**slow** 83:2 182:14
268:2
**slowdowns** 27:3
**small** 134:24
381:15
**smaller** 88:24
89:1
**sober** 361:7,10
361:18
**socially** 361:15
**software** 23:1
25:21 33:17
46:6 49:11,13
54:11,12 70:10
70:14,17,18,19
74:25 75:10
76:6 84:11,15
84:18,20 85:8
85:14 92:6
97:13 116:13
116:19 117:7
118:12,14
135:20 136:8
136:23 137:1
137:23,24
138:17 141:4
142:13 144:14
145:8 149:18
149:21 150:15
152:6,22,23
153:4,6,23
156:8 160:25
161:5 162:4
165:14 166:21
167:5,9,12
169:15 171:1
172:3 174:22
175:16,24
176:2 197:8,14

200:18 203:6
203:21 204:10
206:5,16,20,24
207:3 208:8
214:13,19
215:1,11 216:2
217:10 221:14
221:23 222:5
224:9 225:6
226:5,21 227:6
230:2,14
231:20 232:16
241:22 243:9
243:11 244:20
245:23 260:21
265:18,24
266:18 270:7
272:2,7 288:4
288:11 291:16
309:2,6 312:13
312:25 317:4,8
325:5,13 326:2
332:24 344:4
354:4 404:24
405:16 417:1
417:25 418:4
420:4,7 432:4
**softwares** 203:7
203:18 207:9
**sold** 25:14 46:12
48:2 49:20
50:5,6 51:4
207:4 298:7,16
298:18 325:4
375:20 376:12
381:7
**sole** 10:11,16,25
11:9 12:8,9,10
82:3,6
**solely** 12:3 92:6
**solid** 129:9
**solution** 224:24
358:1
**solutions** 1:9
119:18,19
319:14,24
327:13 329:12

397:16,21
404:10 433:19
**solve** 223:23
286:21 300:17
307:25
**solved** 207:15
225:9 300:15
**solving** 223:25
**somebody** 51:7
92:1 111:18
161:17 185:10
231:5,24 263:5
263:16,17
286:25 301:3
309:15 318:10
382:16
**someplace** 37:17
169:2
**sood** 160:9,18
160:23
**soon** 61:11
243:20,22
295:18
**sop** 74:8 289:18
**sophia** 81:25
82:2,4 88:12
89:5,9 90:4
94:1 100:18
**sops** 40:15,17
73:12 298:13
**sorry** 13:15 25:3
36:4 51:12
62:5 68:7
96:21 102:7
106:3 115:4
123:22 149:8
151:20 155:11
170:21 174:14
188:5 190:20
198:17 200:16
201:5 205:6
218:17 226:8
229:10,16
253:25 254:5
275:20 277:7
283:20 285:5
294:20 295:9

299:9 310:13
316:3 339:25
342:15 345:9
358:4 380:22
393:9 399:6
403:17 405:2
408:11 414:6
415:21 417:19
423:9 430:3
431:19
sought 5:15
sound 352:10
source 13:7
99:14,18
103:13 105:25
106:1
sources 269:5,13
269:17
space 74:10
134:18 140:15
spaces 43:24
63:23
speak 18:20
33:23 40:13
155:19 162:13
172:11,13
speakers 439:13
speaking 28:8
38:15 72:5
170:3 220:14
343:16 363:3
spec 220:15
special 401:25
431:2
specialist 31:16
specific 106:14
178:6 183:14
221:22 228:18
228:24,25
229:1,2 233:8
233:9,20
240:18 241:21
243:14 274:3
276:8 285:15
302:25 307:9
356:10 367:20
397:23

specifically 5:10
54:18 97:23,25
99:8 154:17
198:3 233:10
238:13 286:7
288:20,22
368:25
specification
303:20
specificity
121:17 183:15
218:6 225:5
409:12
specifics 300:13
specify 234:5
specifying 234:8
specimen
147:19,21
148:3,7,24,25
150:24 163:13
189:20 220:4
220:12,22
221:25 222:12
222:23 296:15
296:25 297:2,5
303:2,21 380:9
specimens 100:6
147:25 151:1,5
221:11,12,16
222:7 269:22
270:5 271:20
378:14,25
380:7
specs 323:6
spectrometer
79:7 140:4,5
sped 204:12
speed 415:24
spell 17:15 79:8
spelled 16:24
20:19 21:10
69:10 320:24
373:10 439:18
spent 135:11
358:16
split 321:3,16
322:4

spoil 181:6
spoke 28:13,15
31:5,6,7,21
37:20 178:12
spoken 25:11
28:1 177:11
sponsor 46:11
spontaneous
439:10
sporting 7:18
spot 333:19
spots 363:13
springs 32:12
spruill 17:13,22
20:13 22:25
23:3 24:3 34:9
98:10 99:7
109:4,20 150:8
150:8 163:19
174:24 175:11
176:1 185:13
250:24 261:18
267:5,8 284:19
338:9,9 384:20
spuill 17:17
square 129:17
st 1:18 2:6 6:3
stability 261:2
stacked 291:23
staff 267:22
324:22
stamped 388:23
stand 375:3
standard 40:17
40:19 75:9
106:17,18
111:2,8 171:25
172:3 271:3,4
271:7 273:13
297:1 422:24
standards 274:4
274:8,10
standout 397:6
397:24 398:4
400:21 422:4,5
422:9,16,17,20
422:22

standpoint
121:20 301:24
382:12
stands 42:8
stapled 424:14
stark 47:21
start 7:6 10:16
38:23 47:23
48:5 53:1 57:1
58:22 59:11,15
60:11 62:10
92:19 124:7,16
124:18,20
202:7 260:12
296:11 351:18
351:23 352:8
352:22 353:21
354:6,9,16
355:4,5,9
378:16
started 48:3
56:7 58:25
59:4,16,18
62:8 64:6,14
70:12 83:5
93:4,6 114:8
159:5 162:10
162:11,15
171:19 203:23
248:15 280:2,9
280:10,15
281:6 290:7
317:24 339:18
343:16 354:10
360:22 363:18
374:11
starting 127:9
360:10 369:7
380:16 396:1
starts 400:12
401:25 434:13
startup 235:17
state 5:23 6:22
41:19,21 42:10
42:12 72:24
119:15 127:20
127:22 128:16

134:15 218:12
254:7 325:14
352:7 357:18
357:21 368:4,6
439:4,9 440:5
440:7
stated 193:17
360:4 361:6
407:18
statement
136:10,11
137:1 194:17
194:19 233:13
353:22 354:22
360:18 416:10
435:4
statements 22:7
22:8,9 38:3
178:13 197:21
259:2 364:10
411:11
states 1:1 12:5
199:17
stating 358:15
396:2 401:19
statistical
417:18
statute 440:15
stayed 372:22
stenotype
440:11
step 309:10,10
320:17 382:17
386:7
stephen 2:13
steps 107:17
steve 6:13 48:19
61:9 65:12
85:2 86:3
96:25 112:8
148:13 150:18
151:16 164:17
176:16 187:7
189:16 194:4,9
196:12 212:19
215:21 218:6
221:11 230:10

233:7 239:13
243:16,19
251:10 254:11
264:5 280:17
290:11 295:17
321:25 348:16
359:20 384:7
426:17 435:4
**stewart** 2:4 3:5
3:7 6:9,10
14:22 15:8
17:18 18:14
21:19 28:5
29:21 30:19,24
32:16 35:12
36:1 40:8 41:8
41:12 51:18,22
52:2 53:24
61:8 62:16
63:6 66:11,16
69:15 72:3
77:3 81:10
85:1 87:21
88:6 89:21
91:2,13 94:19
96:18 98:4,8
104:15 108:11
109:25 112:7
129:3 130:18
132:9 133:20
135:24 140:8
140:16,22
143:6 144:8,16
146:18 147:5
150:17 151:3
152:10,24
156:9,16,25
158:2 164:15
165:21,25
166:14 167:25
168:12,23
169:3 172:17
172:24 173:3
173:11 176:14
176:21 177:13
178:5 179:3
184:8,18 186:7

187:3 188:2,14
190:5 192:9
193:13 194:3,8
194:13,23
195:9,18
200:20 201:13
202:10 203:8
205:9 206:8,21
207:20 208:20
209:21 210:24
211:5,15 212:1
212:18 213:5
213:15 214:3
214:21 215:19
219:2,9 220:6
222:9 224:13
225:19 227:1
229:11 230:9
231:14 232:7
232:21 233:6
233:19,23
234:2 239:12
239:23 243:18
245:25 250:4
251:9,23
252:15,25
253:17 254:10
257:18 261:24
264:3 269:15
273:6,17
276:20 278:20
279:7,18 289:8
293:5 303:12
304:23 306:2
310:15 314:1,6
320:10 321:5
321:23 322:7
322:16 323:19
324:1,11,17,24
325:11 326:4
327:2 329:5,16
330:18,24
331:10 332:6
332:13 333:6
336:3 337:7
340:8 341:1
342:12 343:2,9

345:18 348:15
348:21 350:2
351:8,24
352:18,24
353:9,23
354:12,19
355:19 357:5
358:21 359:2
359:13,18
360:13 361:12
361:24 362:5
363:8 365:6
366:7 370:2,20
371:1 383:11
384:6 388:9
389:6,12 391:5
391:9,13 392:4
392:12 394:22
395:1,4,6,24
402:25 403:10
405:3,8 406:7
406:14 407:1,9
407:15 408:9
408:24 411:9
412:17 413:7
413:13 414:3,9
416:9,18 419:2
420:15 421:21
422:11 423:6
423:10 424:17
425:15 426:16
426:20 430:21
433:8 434:2,22
436:19
**stick** 15:7
**sticker** 376:25
**stipulated** 5:2
278:21
**stipulation** 6:17
278:18
**stolen** 311:21
**stood** 342:20
**stop** 58:7 59:15
194:24
**stopped** 50:13
66:25 92:2
159:20

**stops** 182:7
**store** 7:17,18
**storms** 43:25
**story** 355:7
416:1
**straight** 64:8
**straighten** 54:9
54:10
**strategic** 82:12
**strategy** 382:15
382:15
**streak** 363:14,14
**stream** 45:20
46:11 49:17,24
50:5,8,12 51:4
51:8 67:7,9,9
67:10
**streams** 45:21
**street** 2:16
**stresses** 352:2
**strike** 408:11
**stringent** 127:25
128:6,12 129:1
**structured**
106:23 386:3
**struggled**
362:24
**studies** 42:21
100:7 180:23
183:22 261:2,2
**study** 45:24
**stuff** 33:4
265:13 287:4
361:21 418:19
419:1,22
**subject** 405:11
420:5
**submit** 378:4
**submitted** 59:3
157:10 365:22
**submitting**
157:9
**subsequent** 43:4
80:3,24 272:21
293:22
**substantial**
377:16,23

412:6,12
**substantive**
14:14 15:18,20
18:5 19:11
20:2 22:17
32:14 33:6
34:2,10 36:16
37:22 40:1
80:20 115:13
**substantively**
31:4,5 80:25
**subsumes**
278:14
**success** 66:1
**successful** 207:6
**sue** 7:14
**sued** 8:8,11
374:17,25
**sueur** 6:13
**suffer** 362:25
**suing** 375:13,14
375:16,17
421:25
**suit** 265:15
343:7
**suite** 57:7,12,12
114:24
**suited** 132:3
**summary**
133:19 320:18
**sunday** 271:13
**supervision**
440:12
**supervisor**
107:6,15,19
108:10,15,19
108:20,21,22
109:1,5,13,14
244:11 267:4
267:16 280:23
**supervisors**
109:21 410:19
**supply** 104:2
**support** 336:20
338:24
**supported** 36:24
**supposed** 15:15

35:23 71:23
100:20,21
204:18 239:2
240:4 252:9
288:11 290:19
375:18 394:4,5
409:8
**supposedly**
224:8
**sure** 12:2 16:13
21:16 22:20,20
23:4 24:9
26:19 30:20
40:9 41:2
42:21 43:20
48:19 72:22
76:22 105:16
109:22 110:24
113:20 124:25
132:1,21,22
160:1 166:6,8
168:22 181:3,5
184:25 186:25
187:23 188:11
188:25 189:4
190:2,7,11
196:2 197:24
198:2 202:20
205:4 215:20
217:20 224:18
225:12 226:19
251:6 252:10
257:19 258:3
260:20 269:9
269:12 278:15
279:21 295:11
303:3 307:22
312:20 315:21
318:19 320:8
320:17 333:19
335:4,13
336:15 337:13
342:16 356:20
356:22 360:19
362:4 366:9
371:8 377:24
378:6 387:13

390:17 418:18
430:7
**surgeon** 44:22
48:15
**surprise** 217:9
**survey** 76:18
**suspended**
78:19 87:11
280:18
**suspension**
316:6,12
**sustained** 8:13
**suv** 210:15,17
**swaps** 53:17
**switch** 367:13
368:15
**sworn** 6:18
439:8 440:9
**system** 24:22
25:16,16,23,25
26:9 40:14
68:19,21,23
69:21,22 70:1
70:8 71:7,15
71:18,21 72:1
72:16 73:8,16
74:11,15,18
96:24 106:25
116:10 135:12
136:4 148:8,13
149:2,5 154:1
154:11,17
157:22 198:8
198:23,24
200:4,4 214:15
229:24 241:20
242:1,18 256:9
260:2 261:11
274:21 276:5
276:17 277:22
279:5 280:1,15
286:12,13
290:2 292:7,9
293:21 294:24
303:15,19
308:8 309:11
309:12 311:16

311:24 316:17
316:21 319:9
325:4 327:15
334:22 337:4
337:16,21,24
338:11 340:6
341:23 342:7
342:18,20
344:2 364:24
366:25 367:4
367:18 368:16
378:10,10
396:5,24
400:17,19
408:14,15,20
409:1,5,15
410:1,2 413:20
429:4,20
**systems** 28:24
69:3,4 74:8
346:23

_____
**T**
**t** 3:1,9 5:1,1
439:1
**tack** 369:13
**take** 9:9 27:18
56:14 61:10
62:15 70:3,5
91:14 94:15
107:12,23
108:3 119:21
132:17 135:15
137:16 139:10
140:9 156:5
169:4,5 171:18
173:14 222:18
243:20,22,24
246:18 260:1
336:19 337:4
338:24 345:12
364:12 386:7
409:8
**taken** 5:5 136:11
438:25 440:8
**taker** 92:1,4
**takes** 189:22
271:19,22,23

**talk** 9:3 11:22
11:24 14:5,21
18:3,8,15
19:10 20:4
21:25 24:3,16
25:7 33:4,7
34:20 36:8
40:11 42:18
58:21 123:16
125:1 132:5
158:16 178:11
182:7,7 218:17
220:17 239:9
287:18 313:10
329:13 358:7
383:9 421:4
**talked** 14:17
15:5,23 22:22
22:25 23:4,12
23:16 24:23
25:4 32:25
129:8,9 157:8
159:13 163:18
163:19 169:14
177:24 200:12
217:12 228:8
265:3 274:15
278:24 293:20
307:4 313:5,18
313:19 340:21
347:25 357:17
391:15 392:13
418:10,23
421:1,8
**talking** 9:22
14:24 25:3
33:5 38:19
49:24 51:7
52:19 74:18
81:20 87:22
101:21 108:18
110:18,20,21
120:21 129:12
136:13 137:22
155:10 156:1
159:18 173:8
175:22 179:13

199:18 203:10
207:8 212:3
218:20 219:4
220:17 225:2
226:1 227:16
229:12 233:16
234:3,6 247:4
247:6 258:9
264:25 267:11
268:24 273:24
274:16 287:25
288:6 316:12
318:15 327:6
330:5 348:22
348:25 350:7
366:25 382:22
383:16,24
384:2 387:7
393:5 408:10
416:4 417:12
418:25 420:11
425:11,20
427:9
**talkovers**
439:14
**talks** 84:5 126:9
132:18 134:17
164:25 198:4
201:7 221:21
226:5 230:14
240:18 331:19
420:23 431:8
**tally** 100:22
**tangent** 205:12
**tangents** 92:2
**tank** 45:17
**tax** 11:13 12:5
36:24 95:11
199:17
**taxes** 36:10
345:3 392:19
392:22,25
**team** 27:22
114:8 142:2,15
163:17 196:20
282:5 283:16
283:21 284:1,1

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE

April 10, 2019

Page 489

284:3 315:11
315:12 338:14
358:10 381:18
383:4 410:6
**teams** 54:12
153:25
**tech** 38:20
**technical** 108:22
109:1,4,10
244:11 267:4
267:16 280:23
**technician**
107:16 108:5
**technicians**
107:4 128:10
150:9
**technologies**
44:24
**technologists**
107:5
**technology** 45:9
49:10 54:7
97:14 99:25
160:17
**techs** 38:16
262:5
**tele** 66:1
**television** 43:22
**tell** 7:5 12:1 15:6
15:11,15 22:24
29:15 32:8
34:1 40:21
49:23 58:10,15
60:24 69:7
75:6 80:10
92:16 99:13
101:12 106:12
117:13 120:10
121:21 122:1
123:18 124:3
129:12 141:2,5
141:6,8,10,11
141:12,16,20
141:21 147:4
147:16 148:19
150:14 153:13
153:16 159:22

161:8 174:11
175:15 178:19
180:6 183:12
193:9,25
194:21 195:5
196:8 197:22
199:25 210:11
216:21 218:5
223:21 225:4
227:12 235:15
238:10,13,15
239:1,5 240:17
241:9,11,14,16
244:19 245:22
246:6 248:17
257:7 258:1
261:5 263:13
267:20 279:2
282:6 285:1,20
286:9 288:25
294:21 296:5,9
297:10,13
301:17,19
304:10 312:4
317:10 339:5
352:15 365:4
366:16 367:11
367:16,22
369:4 377:19
377:22 387:24
402:22
**telling** 58:4
173:9 304:16
305:20 339:8,9
340:24 344:16
366:14
**tells** 121:17
193:4 305:7
**temperature**
217:23
**temptation**
64:23
**tendering** 12:16
112:25 123:9
160:8 164:12
172:18 248:25
250:14 255:11

257:5 319:13
327:23 333:15
335:15 376:21
395:20 424:21
**terabytes**
349:25 350:1
350:10
**term** 117:10,21
119:24 120:20
179:16 199:14
208:23 226:24
228:4 398:21
398:22 401:20
**terminate** 382:4
**terminated** 27:7
298:20
**terms** 79:1
80:20 83:19
108:14 112:5
146:20 180:22
180:24 328:17
381:11 431:21
433:2
**test** 23:6,9 46:4
121:13 124:12
181:17 183:10
183:11 186:1,6
186:20 187:25
192:2,15 193:6
193:6 196:9
225:8 228:5,13
229:6 248:21
270:12,15
286:17 292:6,8
293:21 294:2
301:21,23
302:20,21,24
303:1,9,10
304:14 305:2
305:16 413:22
**tested** 73:3,6
74:22 217:12
269:22 270:8
**testified** 6:19
405:9
**testify** 8:18
12:23 13:3

150:11 191:17
197:1 334:20
341:7 440:9
**testimony** 28:7
63:8 77:5
168:14 207:22
232:10 245:21
313:22 438:4,6
439:8 440:10
**testing** 60:4
73:11 74:17
75:11 107:24
109:10 121:17
122:22 124:7
124:20,21
125:3,17,19
159:20 169:23
170:20 182:4
183:25 191:9
198:5 199:9
202:15,22
218:11,14
226:6 229:19
260:17,20,23
260:24 261:17
263:4,15,25
264:9,14,18
265:1,2,5,16
267:4,12,22
269:7 276:5
280:2,18 282:9
282:10,24
285:17 286:2
286:19 290:7
290:10 296:11
297:3,4,6,8
316:6 322:25
366:2 381:16
**testosterone**
181:15
**tests** 23:5 120:22
121:11 141:9
183:5,15
189:15 192:18
192:25 198:7
228:9 261:6
263:10 276:7

279:6 302:4,5
302:8,12,21
321:13 360:10
**texas** 24:8 123:1
127:24 274:22
**text** 24:18,24
28:13 30:8,12
34:9,14,18,22
35:1,4,18,24
36:7 39:22,23
40:5 96:8
318:8
**texts** 30:23
**th** 198:11
**thank** 8:15
18:18 34:13
41:13 51:13
62:13 123:22
216:12 263:2
273:3 333:12
336:14 337:14
377:4 391:3
401:5 416:19
433:7 436:22
**thanks** 336:7
366:22
**thats** 7:19 9:10
9:20,22 10:5
11:12 17:9,10
21:4 22:9,14
24:25 39:8,9
41:24 42:11
44:10,11 47:7
48:16 50:17
53:20 54:5,8
54:25 55:24,25
56:5 57:23
58:20 59:6,9
62:1,7 64:11
65:17 67:1
73:7 75:5 84:2
89:14 96:3
99:12 103:11
103:15 107:9
115:8 116:24
116:24 117:2
118:5 120:8

122:25 123:14
131:19 133:9
133:14 135:18
136:24 138:18
140:5,7 142:4
144:2,7 145:17
148:6 149:22
150:12 156:4
157:5 159:4,17
166:19 167:12
167:18,22
170:1,20,22
171:12 176:4
179:7 180:20
181:14,14,16
181:16 182:2,6
182:6,22,23
183:6 187:19
188:1 191:6
192:17 199:13
199:14,15
201:12,18
202:1,13
206:11 207:21
209:4,4,7
213:24 215:14
215:15 217:22
221:8,13
226:15 227:18
230:24 232:9
236:4 239:2
242:15 245:11
246:15 251:4
252:9 255:25
257:17,23
260:12,16,23
263:4 270:10
271:15,15
272:15,16,16
273:23 274:5
275:5 278:23
280:10,14
281:8,18 285:7
290:20,24
297:10 302:13
303:23 306:17
306:20 307:1,7

307:15 308:6,7
308:11 310:6,6
311:11 316:12
318:4 319:3,7
319:21 321:7,8
321:16,21
323:12 324:4
324:10 326:2,6
329:1 331:3,14
332:2 334:24
336:18 340:16
341:9 351:20
354:14 355:13
355:14 356:9
360:8,15
362:18 364:4
365:13 367:10
368:17 371:6
373:22 374:16
375:22 376:7
376:13 379:1
380:19 381:8
382:2 383:23
385:16,19
388:6 394:17
395:17 397:14
401:22 404:16
404:20 405:14
409:3,25
411:13 412:11
415:15,19
416:8 418:2,22
419:8 420:5,22
421:16,23
425:23 426:4
426:14 429:2
429:22 430:12
430:25 433:17
434:6 435:14
thc 183:3,8
  228:11
theft 300:4
thems 308:18
theory 331:25
thereof 5:14
theres 10:4
  17:19,20 64:11

64:13 79:24
103:20 124:13
133:18 147:22
148:4,12
149:10 167:3
170:14,14
172:10,12
176:18 181:6
185:7 195:15
203:4 215:13
215:22 226:17
230:20,20
232:4 233:3
234:17 250:23
253:23 271:16
275:12 277:14
281:12 287:7
287:16 288:9
301:7 311:20
314:24 327:3
344:21,21
346:21 378:17
380:13 390:16
401:24 402:22
409:18 413:18
423:14,19,21
423:21,25
424:24 425:2
425:13 427:13
428:1
thermo 182:16
theyll 271:24
  296:19
theyre 30:17
  52:15 90:21
  91:4,8 107:8
  109:8 130:5
148:10 154:22
183:19,19
192:13 208:23
228:19 243:15
268:22 288:14
309:8 339:3
341:6 348:20
356:8 375:13
375:17 379:6,6
388:20,22,23

389:11 390:21
390:25 391:10
399:19
theyve 130:19
  171:17 269:2
  280:18 390:21
  390:22
thing 27:23
  61:14 79:2
  108:23 145:17
  217:14 227:22
  253:20 274:5
  369:6,20 418:8
things 33:7
  38:17 111:22
  142:3 162:2,8
  190:15 193:3
  204:1 217:7
  219:5 239:3
  252:5 285:15
  288:19 317:25
  323:14 339:1
  348:13 355:2
  361:1 365:23
  391:15 393:21
think 17:1 19:23
  28:6 29:19
  30:5,17 37:13
  38:21 48:19,25
  50:18 53:18
  63:11 68:7
  77:9,9 81:5
  84:21 86:6
  87:19 89:19
  90:25 93:6
  99:3 100:20
  102:9,10,14,21
  111:24 127:12
  128:11 131:16
  131:17,24
  140:14,21,25
  141:19 143:16
  150:18 151:8
  157:24,24
  163:17 165:12
  167:1,22 168:7
  168:13 184:9

184:19 185:2
185:16 187:4
187:10 191:20
194:18 200:11
200:15,17
202:18 203:2
227:2 231:2
232:8 233:22
233:24 234:1,9
236:19 238:18
240:1,15
246:17 247:25
248:2 252:16
253:12 255:24
257:6 259:4
262:11,12
264:7 265:19
266:13 268:4,9
275:12 276:14
278:12 279:16
284:22 286:5
291:3 293:23
293:23,24
306:13,23,25
307:12 317:16
318:25 322:11
330:6 342:21
356:7 358:3,4
368:19,21
373:13 375:7
376:19 381:6
381:24 383:12
385:6,23
426:24 427:4
427:13 429:16
430:25 431:1
434:25
thinking 141:25
thinks 339:25
third 241:9
  396:17 398:7
  398:22 400:21
thirdparty
  331:8,15 333:5
thirty 143:14
thorough 21:3
thought 11:25

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE

April 10, 2019

Page 491

47:15 156:21
161:6 170:21
185:23 204:13
314:11 334:5
339:15 342:15
382:18 422:19
439:13
**thousands** 231:1
231:4 238:11
378:14
**threat** 301:11
309:14
**three** 10:12 29:4
46:1 86:21
93:18 117:8
167:4 207:23
237:22 238:7
238:20 239:8
239:14,16,17
239:20 240:13
240:14,18
273:23 384:8
388:20 389:5
402:3
**throw** 100:24
**thyroid** 181:15
**tied** 294:23
**till** 141:15
**time** 5:13 6:5,7
7:7 10:12,18
20:10 27:11
31:11 39:5
44:23 57:2
58:9 60:19
61:1 62:9,20
62:24 64:10,17
65:6,14,24
70:11 74:2
76:8 79:22
80:21 88:18
93:2,2,3,8,11
94:24 102:25
105:10,11
109:3,19
112:11,15,20
131:8 132:2
136:25,25

137:2 142:19
146:24 152:17
154:7 159:16
161:7 163:15
164:6,7 170:19
173:22 174:1
193:5 196:19
233:16 234:4
235:14,16
236:21 238:25
244:2,6 245:7
245:7 251:19
252:4 254:23
255:21 258:14
259:7,10,12,14
260:18 263:20
264:4 273:24
281:9 283:12
289:23 295:5
295:23 296:2
298:12 307:21
312:7 313:10
331:7 334:12
334:15 337:14
339:22 343:15
349:22 357:11
357:15,16
360:9 361:11
363:15 364:15
364:20 368:22
369:18 378:18
380:10,12,14
381:23 382:1
384:18 386:18
388:13,17
390:2 406:16
408:18 409:17
412:25 417:19
421:10,11,12
422:15 437:1
**timekeeper** 92:1
**timely** 378:17
**times** 24:4 90:10
93:12 97:3,4
103:22 109:2
110:3 111:21
150:20 152:3

187:7 352:2
400:9 417:17
**timing** 19:15
**title** 91:21
104:18 408:7
419:18
**titled** 84:6,10,18
85:9 115:11
404:10 423:5
**tms** 113:13
**today** 9:17 10:8
11:23 13:12
15:6 27:16
31:18 83:13
94:7 137:7
177:6 196:22
208:9 240:4
244:15 246:6
263:19 289:2
388:24 403:8
416:5
**todays** 12:14
245:21
**todd** 1:22
**told** 15:6,11
27:16 28:17
29:23 30:18
36:12,14 46:18
47:2 60:21
63:1 64:1
141:22,23
142:2 153:22
163:12 167:22
171:3,5,10,23
172:2,6,8
173:4 174:21
175:9,11 176:1
176:6 178:21
202:18 204:24
207:3 208:6
223:14,17
239:8 248:3
258:12 259:11
264:8 291:10
291:14 307:12
312:16,21
315:12 338:2

339:10 342:22
352:21 354:11
356:7 358:6
365:11,22
368:7,19,20,20
375:23 381:6
382:2 392:21
392:24 410:11
420:2,4,10
**tomahto** 46:22
**tomayto** 46:22
**tomcat** 309:3
310:13
**tomorrow** 10:9
10:22 11:23,24
**tone** 19:13
**top** 21:5 22:23
41:17,19 44:14
70:18 83:18
103:23 123:2,9
132:8 134:11
161:14 243:15
247:7,23
250:16 251:1
262:8 283:5
288:17 290:12
328:11 334:2
351:10 356:24
379:2 398:17
**topheavy** 105:6
**topic** 22:19
**topics** 12:24
15:18,21 18:5
19:12 20:2,6
22:25 24:16
32:15 33:6
42:15 210:4,9
210:14
**tort** 331:24
**total** 331:25
**touching** 289:16
**tough** 274:17
**toughest** 128:2
**touted** 214:12
**touting** 397:6
**tox** 119:24
**toxicology** 46:19

47:1,14 48:2
50:15 51:15
55:16,22 56:1
56:4,7,12,16
56:20 57:5,10
57:18 58:17
61:18,20 67:4
67:16,25 68:1
68:3,5,10,11
68:18 69:6,17
71:9,12 76:2
76:14,16,24
77:8 78:6
102:20 120:2
121:10,13
134:22 136:18
181:16 214:14
215:1 229:19
242:10 297:4
301:21 303:1,2
351:19 363:18
402:7,10,12,16
403:3 404:3
428:8,9 431:15
**toyota** 211:8
212:24
**track** 149:6,8
222:11 223:6
**tracked** 105:9
**tracking** 149:10
178:15,16
220:4 226:5,13
226:17 230:14
231:20 234:21
281:22,23
282:14 285:9
286:8 301:7
317:5 318:16
**tracks** 232:17
**tract** 222:23
**trade** 430:10
**trail** 8:18
**train** 107:7
108:5 110:9,10
338:14
**trained** 110:7
268:17

training 106:12
  106:15,24
  107:13,14,20
  109:23 112:1,1
  266:25 267:11
  267:14,15,22
  268:1,5,6,11
  268:14,21,25
  324:22 337:19
  337:22,23,24
  338:4,17
  341:19,23
  404:1
trainings 107:18
transaction
  393:22 394:6
transactions
  248:22
transcribed
  440:11
transcript 5:9
  439:17 440:4
  440:14,14
transcription
  438:5 439:15
  440:13
transfer 385:22
  394:11
transferred
  394:4
transmission
  212:16
travel 369:6,8
  369:19,24
treated 11:13
tree 43:21,21
  63:25 64:15
  65:17 66:2,4
trey 235:19
  236:2 237:5
  269:20
trial 19:17,23
triathlons
  361:20
tried 21:22 25:9
  217:13 357:25
trinity 1:4,15

6:25 9:18,21
9:23 10:16,24
11:2,7,10,10
11:16 12:3,9,9
12:10,24 13:4
18:9 20:7 27:4
27:11 33:2,9
41:1 48:4,5
52:23,24 53:1
53:3,5,8,23
55:6,14,21
57:6,11 60:16
62:3,6 68:6,14
68:22 69:20,22
70:7,9,12 71:5
71:15,20 77:20
79:13,25 81:24
82:1,15,16,19
82:20,25 83:6
83:8,13,21,24
84:24 85:7,13
85:15,21,22,22
86:16,20,24
87:9,14 88:3
88:14 90:1
92:5,17,24,25
93:19,22 94:2
94:12 95:12
96:2 97:13
99:14 100:13
100:17,19,25
101:8,17,21
102:17 103:1,4
103:13 104:1
104:10,11,13
105:17 106:12
109:23 110:9
110:10,14,20
110:21 111:4
112:18,19,20
115:4,18,22,25
116:6,11,15,20
116:22 117:3,4
117:25 122:12
122:14,15
131:23 132:20
132:24 133:4

133:18 134:2
136:3 137:6,10
137:16,24
138:1,2,3,4,6
138:12,12,19
138:22 141:4
142:24 144:2,7
144:13,25
146:6,7,16
151:10,15
152:4,5,18,22
153:7,22 155:1
155:4 156:5,13
156:20 158:8
158:16,17,18
159:19 163:5
163:25 164:2
165:4,19
166:12 168:9
170:3,4 184:24
197:3,8,13,14
203:5 206:16
208:12 216:13
216:16 217:6
218:20,21,22
218:25 219:13
219:18 220:3
220:11 223:16
224:17,18,18
224:19 237:15
238:19 239:7
240:7 241:2
243:9 245:20
245:22 246:7
249:18,22
250:9 253:21
255:2,19
258:12,14,17
259:9,15,18,23
260:7 263:3,5
263:15,16,17
263:24 265:23
266:24 268:10
269:10,13
270:25 275:21
275:25 276:4,7
277:21 279:3

279:24 283:11
283:16 288:25
289:1 291:7,18
292:3,5,23
294:7 297:22
297:22 306:12
306:16 310:21
311:4,6 316:21
319:25 320:4
323:5,9,13,22
324:7,21 328:9
328:13,15
329:3 330:16
331:7 332:22
332:23 333:3
334:16,17,19
334:25 336:25
337:12,13
339:17,21
340:5 342:3,6
342:17 343:6
349:8,13,15,16
349:17,17,18
350:19 351:23
352:7,22
353:20 354:1,1
354:5,10,17
355:4,5,17
356:1,5 357:2
357:3,19,23,25
358:3 359:1
360:9 364:9,22
365:4,11 367:8
367:12 370:16
370:23 372:3
372:11,13
373:23 374:25
375:17 379:15
380:4,21 382:3
383:25 384:12
385:20 386:15
387:17,22,25
390:8 393:24
396:9 397:11
402:6,9 408:13
411:12,14,22
414:22 421:3

421:14 423:2
427:12 428:5
428:12,24
429:3,5,7
430:1,16,17
431:4,8,11
432:1,10 433:1
434:4,8,14
trinityms
  348:12 349:3
  349:20,21
trinitys 10:8
  122:6,8 152:7
  169:18,20
  276:2 341:6
  371:9 393:12
trinityspecific
  275:22
trouble 277:2
  371:24
true 118:7
  238:16 351:22
  353:18,20,25
  354:1,2,3,4
  405:23 438:7
  440:12
trust 181:12
  249:9
trusted 392:18
truth 15:7,12,15
  154:4 339:5,9
  352:15,21
try 9:4,4 26:13
  64:23 76:9
  220:10 279:14
  279:15 286:4
  295:2 338:17
  357:23 386:11
trying 20:5 25:6
  25:19 50:2
  84:21 97:1
  105:15 108:19
  126:23 169:6
  189:10,13
  190:10 198:17
  222:3 227:22
  230:18 238:17

259:2,22
265:18 279:23
282:21 299:15
313:3 346:12
384:1 386:10
386:14 390:17
427:14,18,19
431:18
**tubes** 147:23
220:16
**turn** 22:21 30:12
34:12 38:23
59:24 83:16
84:3 87:15
102:10 104:3
131:22 133:8
133:17 276:12
276:14 323:1
429:13,23
430:24
**turned** 24:2
30:10 34:7
67:3 91:12
102:11 125:14
158:14 280:8
372:9 407:22
412:12
**turning** 33:22
123:17 124:4
125:1 304:8
398:11 399:4
404:22 433:9
433:18
**turns** 223:3
**tv** 65:22,23 66:3
**twice** 148:24,25
**twin** 362:20
**two** 14:11 16:7
44:19 45:24
49:16 69:3
70:18 77:21
78:11 84:4
87:19 114:21
142:23 167:4
188:20,20
189:2 219:4
223:3,9,13

266:9 268:6,7
321:3 322:4
346:23 386:16
402:3 433:9
**twofold** 113:13
**tyler** 52:10,13
52:21,23 53:2
**type** 16:12 86:4
186:1 208:25
217:17 227:22
256:19
**types** 111:22
147:23 365:23
**typically** 350:22
**typo** 83:23 84:2
139:21,24
**typographical**
140:2
**typos** 399:23

─────────

**U**

**u** 5:1 45:12
**uh** 13:18,19,22
18:13 21:13,17
24:21 25:15
26:1,3,5 32:3
36:10,20 42:11
44:25 46:16,17
50:5 59:13
63:22 67:10
82:23 83:1
100:4,4,5
103:5 104:18
107:14 113:21
118:13 119:1
119:11 120:21
125:10 141:22
142:8,10
198:24 218:5
227:25 228:19
238:13 239:8
242:6 246:13
246:16 247:17
247:20 250:25
258:16 261:22
262:20 267:13
268:4 269:4
271:3 280:3,21

282:4 284:11
284:18 296:24
299:2 304:9
310:24,25
313:18,21
315:17,19
329:24 333:23
334:13 337:14
354:8 367:25
367:25 368:20
381:25 414:23
425:23 429:8
429:16
**uhc** 371:10
372:11,15,17
372:25
**uhhuh** 13:20
28:20 31:21
37:21 41:4
51:5 65:19
68:24 76:21
77:24 83:22
89:2 108:7
116:16 122:2
123:25 126:11
126:20 134:20
138:15 148:16
150:7 151:17
152:16 156:2
167:10,20
170:10 190:20
196:7,24 197:1
202:23 206:3
211:10 213:2
213:23 216:4
221:19 222:2
224:10 225:1
225:11 230:8
238:17,22
240:21 251:22
258:25 261:14
261:16 267:6
270:16 272:3
278:6 281:19
288:5 290:4
291:17 293:2
297:24 298:10

304:19 316:9
323:16 340:19
349:5 353:16
354:25 355:3
355:10 358:19
359:7 378:23
382:24 386:20
390:23 396:11
433:11
**ultimate** 357:1
**ultimately** 53:4
53:7 269:24
316:5
**um** 7:1,25 8:3,22
9:6 10:11,24
11:3,9,12 12:2
12:3,13 13:2
13:10,13,18,21
13:23 14:3,10
14:10,10,13,17
14:20 15:5,13
15:17,23,25,25
16:5,11,16,16
16:19 17:3,5
17:12,12,13,25
17:25 18:23,25
19:6,7,10,13
19:24 20:11,13
21:4,6,8,13,21
22:1,3,5 23:1,4
23:4,5,7,12,13
23:16,16,18,21
23:22 24:19,23
24:23,24,25
25:11,11,12,14
25:17,23,24
26:8,17 27:2,6
27:10,12,17,17
27:18,19,19,19
27:21 28:3,11
28:13,14,17,21
28:24,25 29:4
29:5,12,17,19
29:23 30:12
31:5,7,9,12,15
31:15,19 32:2
32:4,6,9,10,11

32:13,25 33:3
33:3,13,19
34:3,10,21
35:2,8,11
36:11,14,22,22
36:25 37:2,9
37:24 38:6,9
38:13,14,15,19
39:4,4,5,13,17
39:19,23,25
40:14,15 41:5
41:5,6,16
42:14,25 43:4
43:6,20,20,21
43:22,24,25
44:1,2,4,8,9,11
44:16,19,21,22
45:2,8,12,18
45:19,23 46:3
46:8,9,16,18
46:22 47:3,11
47:17,23 48:1
48:1,21 49:18
50:8,11,11
52:1,14,17,19
52:21 53:1,4
53:11,11,12,14
53:16,16,21
54:8,11,17,19
54:22 55:12,14
55:19 56:9,10
56:15,19 57:4
57:4,10,19,19
57:20 58:2,5
58:12,12 59:11
59:14,18,21
60:3,13,15,16
60:16 61:7,13
61:19,20 62:9
62:11 63:16,19
63:21 64:6,8
64:16 65:4,12
65:23,24,24,25
67:7,9,12 68:2
68:4,6,20 70:4
70:7,10,11,12
71:2 72:2,18

| | | | | |
|---|---|---|---|---|
| 73:12,16,22 | 115:16,17,20 | 153:1,6,9,25 | 212:3,4,5,6 | 270:5 271:9,18 |
| 74:12,14 75:8 | 115:21,24 | 154:3,5,7,10 | 213:4,21,21 | 271:20 272:5 |
| 75:12,13,16,19 | 116:6,8,8,11 | 155:19 156:13 | 214:7,11,23 | 272:11 273:9 |
| 75:20,20 76:7 | 116:15 117:4,6 | 156:22 157:20 | 215:5 216:17 | 274:17 275:2 |
| 76:9,11,15,17 | 117:7,12,14,16 | 157:21,25 | 216:19,22,22 | 275:12,12,16 |
| 77:1,6,7,19,25 | 118:2,13,15,17 | 158:9,11,19 | 216:24 217:1,3 | 275:18,19 |
| 77:25 78:6,8 | 119:9,19,20,20 | 159:4,21 | 217:4,9,10,11 | 276:7,16 |
| 78:20 79:1,8 | 119:23 120:3,3 | 160:15,16,18 | 217:21,21 | 277:10,11,18 |
| 80:3,14,18 | 120:11,14,19 | 161:8,9,9,11 | 218:2 219:21 | 277:21 278:9 |
| 81:5,19 82:23 | 121:16 122:1 | 161:21,25 | 221:4 224:15 | 279:4,5 280:3 |
| 82:24 83:2 | 122:19,20,24 | 163:2,5,8,12 | 224:24 225:4,6 | 280:6,10,14,17 |
| 84:12,17,20,20 | 122:25 123:1 | 163:17,25 | 226:20,23 | 281:8,10,24 |
| 84:25 86:3,4,6 | 123:19,23 | 165:3,8,11,13 | 227:15,20,21 | 282:11,15 |
| 86:7,12,18,19 | 124:6,7,13 | 166:4,9,12,20 | 228:2,9,11,22 | 283:2,5,7,8,16 |
| 86:21,23 87:3 | 125:6,8,9,11 | 169:21,23,23 | 229:7,24 | 283:17 284:4 |
| 87:7,12,15 | 125:13,22 | 170:7,14,18 | 230:20 235:17 | 284:12,20,25 |
| 88:3,3,15,16 | 126:3,14,15,17 | 171:1,5,6,15 | 235:19 236:11 | 285:1 286:4,6 |
| 88:22 89:25 | 126:23,25 | 171:15,20,23 | 236:24 237:11 | 286:14,18,24 |
| 90:5,6,10,12 | 127:6,6,8,8,9 | 171:24 172:1,4 | 237:20,22 | 288:3,9,18,20 |
| 90:18,19,21 | 127:11,19 | 172:5,10 | 238:11,14,24 | 289:7,14,24 |
| 91:24,24 92:2 | 128:7,8,10 | 173:18 174:3 | 239:4,5 240:3 | 290:5,9 291:3 |
| 92:3,10,13,16 | 129:5,8,16,20 | 174:10,12,12 | 241:1,4,5,8 | 291:9,24 292:5 |
| 92:20 93:4,4 | 131:5,8,11,12 | 174:23,25 | 242:3,9,22 | 292:6,18 |
| 93:24 94:3,6 | 131:16 132:7 | 175:5,6,6,18 | 244:9,11,14,15 | 293:24,24 |
| 94:25 95:13,15 | 133:1,3,17 | 175:23 176:8 | 244:16,22,23 | 294:10,11,15 |
| 96:11,14,16,23 | 134:3,9,13,13 | 177:3,7,12,17 | 245:1,2,8 | 294:22 296:8,9 |
| 96:25 97:1,3 | 135:2,3,6,10 | 178:4,12,18,19 | 246:23,23 | 296:15,16,19 |
| 97:12,22 98:10 | 135:11,14,19 | 178:21,22 | 247:10,10,12 | 297:17 298:3,5 |
| 98:17,21 99:3 | 135:22 136:5,7 | 179:1,5,13,23 | 247:14,15,16 | 298:12,12,13 |
| 99:15,19,19 | 136:9,10 137:1 | 180:2,13,21 | 248:14,25 | 298:17,24,25 |
| 100:5,11,17 | 137:6,8 138:2 | 182:6,11,16,23 | 249:9,13 250:9 | 299:21,25 |
| 101:9,10,13,15 | 138:2,6,7 | 182:24 185:9 | 252:3 253:2,8 | 300:23 301:20 |
| 102:9,12,24 | 139:8,21 141:2 | 186:12 191:18 | 255:6,12,20,23 | 302:1,6,10,24 |
| 103:12,18 | 141:5,6,16,20 | 192:6,11 194:7 | 256:7,10,15,19 | 305:15 306:9 |
| 104:2,5,18,20 | 141:23,23,24 | 194:22 195:15 | 256:20,23 | 306:10 307:8 |
| 104:22 105:4,5 | 141:25 142:1,3 | 195:17 197:20 | 257:5 258:9,17 | 308:9,11,20,23 |
| 105:23 106:1,7 | 142:7,8,11,19 | 198:2,4,8,10 | 258:20 259:3,8 | 308:24 309:1,3 |
| 106:8,14,16,17 | 143:4,8,14 | 199:5,13,22 | 259:20 260:4,6 | 309:6,16,18,21 |
| 106:18,23,23 | 144:10,14,19 | 200:15,17,22 | 260:19,23 | 310:10 311:2 |
| 106:24 109:5 | 144:20,21,25 | 201:2,6,18,21 | 261:7,20 | 311:18 312:1,4 |
| 109:19 110:3,4 | 145:9,9 146:3 | 202:6 203:4,20 | 262:11 263:6 | 312:6,16 313:4 |
| 110:4,14 | 146:20 147:9 | 203:20,25 | 263:12,14 | 313:6 314:24 |
| 111:17 112:1 | 147:12,18,19 | 204:1,3,7,10 | 264:19,22 | 315:9,17 317:1 |
| 113:17,21,25 | 148:4,12 149:1 | 205:8,14,21,22 | 265:17 266:6,9 | 317:16 318:8 |
| 114:3,4,9,14 | 149:7 150:4,20 | 206:4,20,24 | 267:3 268:1,5 | 318:10,10,11 |
| 114:17,17,19 | 151:10,13,22 | 208:3,22 | 268:12,13 | 318:13,15,16 |
| 114:20,25 | 152:5,7,12 | 210:15,19 | 269:5,10 270:4 | 319:4,8,8,14 |

320:5,12,21
321:1,7,8
323:14,17
324:3,19
326:10,11
327:15,21
328:16,23
329:3,4 330:8
330:15,21
331:17 333:22
334:2,19,20,25
335:3,6,8
336:16,24
337:1,3,15,18
337:21 338:6,6
338:16 339:8
339:23,24
340:15 342:8,9
342:11,22
343:5,6,8,22
343:25,25
344:3,5,20
345:3,5,9,14
345:20,20,21
346:9,15
347:19 348:10
348:11,11
349:2 350:18
350:20,22
351:7,16,18,20
351:22,22
352:1,4,5,9,12
353:1,1,2,4,4
354:5,5 355:15
355:18 356:2,6
356:17,18,24
357:10,21,25
358:9 359:4
360:20 361:14
362:20,20,21
362:23 363:12
363:13,20
365:8,9,15,16
365:18,22
366:16 367:15
367:18,24
368:3,11,14,17

368:19,21
369:5,5,9,10
369:11,13,14
369:18 370:1
370:10,13,23
370:24 371:3,4
371:6,9,14,15
371:15,16
372:1,5,5,8
373:2,17,25
374:3,18,20,20
375:3,4,13,20
376:11,15,15
376:20 377:22
378:1,2,9
379:6,22,23,24
380:3,4,7,8,21
380:22 381:2,5
381:12,12,15
381:25 382:2,3
382:7,9,18,19
384:19,19
385:4,6,9,20
386:2,5,13
387:2,19,24
390:10 393:14
393:16,18,18
393:20 394:3,6
394:12,13
396:1 397:14
401:6,14
403:13 405:21
407:2,3,16
408:11,14,18
409:6,8,9,23
410:18,19,21
411:14,20,23
411:23,24,24
412:1,9,20
413:16,23
414:12,18
415:1,8 417:3
417:6 419:15
419:16,17
420:1 421:4
422:10,14,15
422:25 423:4

424:2,8 425:1
425:1,17 426:5
426:9,15 427:2
427:3,13 428:4
428:11,22
429:3,5,18
431:7,23 432:2
432:13
**unable** 40:12
71:25
**unanimous**
92:13
**unaware** 307:13
**unbillable** 229:7
**underneath**
75:21 260:24
415:13 426:6
**understand** 9:11
9:22 12:22
13:2 41:24
42:14 44:4
48:14 51:10
54:15 85:7
87:7,16 88:2
105:14 110:23
126:23 127:17
132:1 138:11
148:3 154:18
154:20 172:14
172:22 173:7
174:3 175:25
176:23 181:13
185:5,14,15
187:20 188:6
190:4,8 193:7
195:11,14,19
212:14 215:21
217:11 221:17
229:25 241:25
245:6,16
254:25 272:1
274:2 279:10
279:12 287:11
300:3 304:12
304:15 305:6
334:9 337:3
355:12 359:11

363:22 379:15
385:4 392:3,11
393:22 430:12
**understanding**
65:13 85:6
169:18,19,20
178:23 179:7
201:2 209:15
277:2 279:25
299:25 303:4
307:2 309:13
336:19 338:23
415:4 440:13
**understood** 9:14
157:21 215:8
240:3 292:2
328:15 333:3
334:25 365:21
430:11 432:12
**undertook**
344:17
**underwriting**
47:12 152:13
**undue** 104:22
**unencrypted**
301:2,12
**unfortunately**
388:25
**unintended**
297:6
**unintentional**
139:18
**united** 1:1 12:5
199:17 371:6
371:15 372:3
**universe** 278:22
**university** 42:22
**unnecessarily**
27:2
**unoperable**
131:15
**unprepared**
42:16
**unquoted** 399:3
**unrelated** 119:6
**unreliable**
229:10

**untrue** 139:17
**update** 134:14
309:6
**updated** 141:14
**upper** 155:23
**urine** 228:4
**usage** 317:8,14
317:23
**usdin** 2:11
**use** 24:25 70:25
72:20 73:5
74:16 76:6
120:20 138:16
143:19 147:24
179:16,25
180:20,22
185:25 189:14
191:7 241:19
242:13 247:20
247:20 267:23
268:15 292:7,9
301:5 308:8
312:12,18,24
315:15 365:5,8
365:11 366:17
370:11 410:23
417:25
**user** 232:19
282:19 285:12
286:11 287:18
287:22 288:6
288:10,18,21
288:23 289:5
289:25 318:16
333:23 334:1
334:13,17
336:7,14
337:23 338:4
**users** 226:21
227:6 230:15
230:19 231:21
232:17 284:9
298:23 338:11
338:12,19
416:25
**uses** 147:20
208:11 309:2

utilized 136:8

**V**

vacations
  111:21
vaguely 255:18
  365:25
valid 302:24
  440:4
validate 141:11
  183:23 243:7
validated
  151:25 265:25
  266:19
validating
  143:15,17
  260:9
validation 38:21
  183:22 261:2
  263:4,15,25
  264:9,14,18
  266:6 324:9
validations
  151:23
validity 100:7
  301:24 302:24
  303:5,20,22,24
  304:3,21
valley 321:4
  322:6,19 335:6
  399:10 403:22
  403:24 425:22
  425:25 426:8
  426:12 428:7
  429:1,10,18,21
valve 39:18
van 212:13,16
  212:24 213:1
various 79:1
  103:21 148:17
  155:14 384:13
  384:14 407:10
vause 266:12,14
venture 45:3
ventures 47:10
  105:12
verbal 9:6 24:17
verification

38:21
verifications
  266:18
verified 31:7
  151:25 263:5
  263:16,17
  439:20
verify 141:12
  179:18 184:5,7
  243:7 248:20
  265:24
versed 55:5
version 79:20,21
  143:21,21,22
  143:24 144:13
  146:6,15
  157:23 158:5,8
  158:8 159:1,2
  165:6,16,20
  166:3,5,13
  167:6,8,15,18
  200:17 205:25
  206:16 207:14
  224:9 309:1,2
  309:4 325:6,13
  325:17,20
  326:1,9,20
  334:3,6,10,13
  334:22 335:1
  405:11,20,23
  406:5,8 417:11
versions 79:17
  79:23,24 80:8
  165:1,9 405:16
versus 1:7 23:6
  293:19
vet 142:24
vials 147:23
video 6:5 344:4
videographer
  1:21 6:1 62:22
  112:9,13
  173:20,24
  243:25 244:4
  295:21,25
  364:14,18
  388:11,15

436:23
videos 268:14,21
  268:25
videotape
  353:12
videotaped
  151:8 155:21
  288:13 436:24
vieographer
  62:18
ville 39:19
violated 171:4
  171:24 172:3
  244:21
violates 246:18
violation 247:11
  247:14,16,23
  317:22
violations
  247:25
virgin 227:24
virtual 326:14
visit 117:7,11
viviana 2:15
  6:14
vm 326:12
vo2 46:3
volume 122:1
  131:6 349:24
  350:6
voluminous
  281:13
voluntarily 27:9
  77:7 432:13,22
vote 142:10
voted 25:18
vulnerabilities
  309:5,7 310:11
  310:19
vulnerability
  309:13

**W**

wages 103:24
wait 271:1 272:6
waived 5:10
wake 180:10
  271:14

walk 23:10
  309:10,15,17
  381:5,9
walked 23:15
  432:19
wall 57:9 229:2
wanna 62:15
want 10:23
  11:22,24 16:11
  25:20 38:1,4
  40:11 47:3,4,7
  47:18,19,22
  61:10 77:12
  89:16 104:21
  132:1,2,22
  164:16 167:7
  168:7 169:4
  170:2,22 178:8
  181:5 194:9
  195:22,22
  212:11 243:19
  243:23 247:3
  252:4,10
  254:24 258:4
  260:9 278:14
  279:15 335:15
  338:11 340:2
  340:12 341:25
  356:12 382:7
  384:11 391:12
wanted 25:21
  50:15 102:3
  110:24 128:20
  134:12 139:12
  142:15,16,16
  143:5,9 161:6
  257:10,17,23
  258:14 259:7
  259:12 315:21
  338:13 357:8
  357:19 379:24
  381:15,16
  382:3,5,7
  383:2 421:11
warned 205:23
warning 203:25
  204:4,6 205:20

wasnt 19:19
  36:15 62:6
  78:5,10 91:21
  105:11 116:22
  116:25 117:1
  138:19 159:6
  204:1 214:2
  217:20 218:1
  221:9 256:25
  262:13 289:25
  291:15 292:6
  294:2 310:6
  313:23 354:8
  354:16 369:12
  370:17 385:12
  386:13 390:19
  411:14 418:15
waste 132:2
wasting 254:23
watch 107:2,7
watching 225:10
water 228:1
waters 373:8,17
  373:18
watson 26:23
wattage 229:2
way 23:5,25
  34:8 38:5,22
  50:8 70:24
  77:10 93:5
  103:12 113:24
  125:20 127:14
  128:7 129:22
  131:2,20
  136:20 149:1
  149:23 174:13
  174:17 185:13
  185:15,17
  189:21 191:2
  191:19 196:1
  205:14 206:15
  214:18,23,24
  215:11 216:5
  220:10 221:8
  221:10,11
  222:5 223:23
  224:10 225:12

230:20 245:1
246:11 247:21
252:16 269:6
286:21 289:3
291:18 303:21
308:3 320:23
326:23 346:21
360:6 361:5
372:18 376:13
380:8 402:22
413:18 421:14
**ways** 23:17
38:13 141:6,8
187:6 293:25
294:4 303:14
384:8 407:11
420:6
**wazoo** 112:2
**wearing** 46:6
**web** 241:11
398:9,18,21
400:22
**webbased** 398:1
**website** 161:24
167:19 171:16
**wed** 70:4 91:25
104:23 111:18
111:18 112:1
379:25 386:5
**week** 281:1,2
**weekend** 161:4
271:15
**weekends**
271:16
**weekly** 280:24
**weeks** 108:1,4
161:2
**wegmann**
101:16 178:16
345:4,4
**welcome** 134:9
**wellness** 117:3,4
117:7,11,25
120:1
**went** 19:7 26:19
27:22,24 36:22
48:2 49:7

51:15 64:8,10
75:20 96:25
117:9 120:23
129:15 158:20
171:15,15
200:6 205:12
243:9,11
260:15 280:1
292:24 338:21
347:8,20,21
366:10 376:13
378:2
**west** 16:1
**weve** 28:13
30:18 61:9
79:1 101:21
172:25 243:14
252:2 278:21
307:4 319:12
416:4
**whatnot** 84:22
147:24
**whats** 26:24
117:3 119:17
120:11,18
121:18 122:24
132:10 154:2
160:24,24
286:9 422:3
423:5
**whe** 236:17
**wheres** 39:4
210:3 277:24
277:24 428:5
**white** 210:15
**whitney** 18:25
92:22 93:6,7
93:11 375:12
387:3,9,10
**whoa** 299:7,7,7
299:7,7
**wholly** 154:20
154:25 429:5
**whos** 22:4 24:11
39:15 171:8
283:9 284:3
340:17 373:3

415:10
**wife** 14:10,13,25
15:20
**wilderdoomes**
1:10
**wiped** 358:17
**wireless** 45:6
**wished** 410:12
410:13
**withholding**
425:4
**witness** 5:4,25
6:17 7:10
16:25 17:16
18:17 20:20,24
21:11 35:22
36:3 41:10
42:4 48:9 52:4
65:1 69:11
91:9,15 96:20
98:6 117:20
178:24,25
182:13 188:4
195:21 235:23
264:7 279:20
299:8,12
310:12,17
313:22 438:1
440:9
**wont** 140:23
162:23 164:20
**woodlake** 6:16
7:1
**word** 147:20
302:13 373:12
**words** 36:19
87:5 197:16,19
199:7,23
200:23 215:6,7
222:4 224:2
293:20 341:11
341:14 352:3
410:11 439:16
439:19
**work** 14:12
38:14 39:16
43:18,18 44:18

45:23 60:14
63:19 98:13
101:14,17
106:4,5 107:12
107:21 120:1,2
120:25 121:4
154:6 170:12
180:21 224:1
242:18 261:3
274:22,25
275:1,1,6
276:8,9 286:4
292:13 358:11
374:2 382:19
403:8 410:13
410:20 419:21
419:23 420:7
**workaround**
224:5 225:7,17
287:12,16,20
289:12 291:9
291:14,15
292:12 300:12
300:14,19,25
301:8,13
306:21,24
307:1,13,17,20
308:21 310:25
**workarounds**
307:18 318:18
365:9,12,21
366:2,5,6
**worked** 21:18
36:23 45:7,11
105:17 160:21
260:13,21
275:15 289:14
350:24
**workers** 45:6
46:3 380:12,14
**workflow** 149:5
150:21 151:19
151:21 260:22
265:24 266:18
269:14 270:2
271:5 272:16
273:10 275:23

276:2 291:25
292:1 397:23
403:12
**workflows**
152:2 358:12
410:16
**working** 16:9
24:11 82:25
135:12 160:16
261:19 380:19
428:24 434:15
**works** 22:6
24:12 73:20
75:5,6 103:10
200:4
**world** 426:8
432:10
**worldwide** 10:2
11:4 98:12
99:16 110:21
118:18 133:2
138:4 224:19
283:18,21
298:4 338:6
388:3 394:7
429:6,6
**worldwides**
119:10
**worst** 280:16
**wouldnt** 60:19
66:18 105:12
139:15 149:14
197:11 206:4,6
272:8 352:11
394:9 418:3,4
**wow** 69:12
**write** 131:13
289:18 299:15
344:7
**writes** 336:13
**writing** 45:5
160:22 252:17
365:17 404:8
432:3
**written** 73:12
190:4 242:3
413:1

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE

April 10, 2019

Page 498

**wrong** 26:12,14
26:25 37:14
38:22 141:12
148:8 190:15
191:6,22,24
202:19 204:3
257:6,11
289:17 294:1
296:17 308:15
**wrote** 341:11
365:19

**X**

**x** 3:1,1,9,9
**xifin** 21:8,12
33:11,14,19,23
34:25 378:10
**xyz** 142:20,22
153:9,11,14,23
154:10 155:10
155:11 156:3,6
156:23 208:8

**Y**

**yall** 178:11
**yeah** 12:2,7
13:15 15:14,16
21:21 22:16,18
27:17 29:14
33:5 36:6
40:19 56:9
57:16,16,23
63:25 66:25
72:5 81:15
84:1 85:12
88:10 89:14
92:20 93:12
94:21 106:6
107:20 108:8,8
113:19 122:3
124:3 125:4,4
125:19 136:15
136:17 143:9
145:20 146:13
152:21 158:18
163:4 167:24
169:2,9 170:5
172:20 179:21

179:22 180:9
184:11 186:9
196:4 202:18
206:11 209:25
211:19 212:14
214:24 216:1
224:21 230:22
231:5 236:16
237:17 247:10
249:12 250:7
251:1,3,5
252:23 253:2
254:8 256:12
257:13,15
259:3,4 262:4
268:12 269:1,1
269:19 270:1
278:12 279:15
282:18 286:7
286:18 287:9
289:21 290:16
292:17 293:9
293:14 294:17
296:22 299:2
300:21 303:8
304:6,15 309:1
310:7,18 314:5
318:4,6 321:15
321:18,18,21
322:24,25,25
326:18 329:25
337:13 339:4
339:18 346:9
346:12 348:20
348:25 349:19
350:9 354:8
356:9,13
358:14 361:19
370:12,14
373:14,16
377:2 381:2,5
383:9,14,14
386:5 401:10
401:12 417:9
419:25 425:2
426:11 427:18
427:20,23

430:15 431:14
435:8
**year** 7:25 25:12
37:25 48:17
51:1,1 74:6
236:14 377:14
377:17 412:6,9
412:13,19,23
412:24
**years** 44:20
63:18 128:22
355:5 357:8
**yelling** 353:14
**yep** 122:4
178:18 320:20
400:11
**yesterday** 13:19
13:25 18:21
**youd** 105:2
182:7 197:25
243:22 291:13
308:1,1,4
309:22
**youll** 123:9
228:13 231:11
325:4 330:8
359:23 395:5
401:13
**youre** 12:8 13:2
17:9 49:14
52:19 54:11
56:10,13 73:16
74:18 75:21
83:17 95:14
105:22 121:23
125:2 129:12
134:9 144:1,6
150:11 151:22
151:23 157:5
158:16 168:6
172:15 175:22
180:16 181:10
182:3,25
185:17 186:14
186:23 188:9
188:10,25
189:12 190:8

190:16,17,22
190:22 191:2,2
191:2,5,7,20
197:1 203:9
204:17 205:8
206:1 207:8
209:10 212:20
215:22 217:18
221:4,8 222:13
227:2,22
228:14 231:21
232:5,18 234:1
234:3,5,9
239:6 251:4
254:23 260:7
267:11 271:17
287:3,25 288:6
294:24,24
300:7 304:15
305:20 307:13
314:8 319:23
321:24 327:6
334:19 337:9
337:12 339:7
340:24 347:8
348:22 354:22
355:3,4 366:13
366:21,24
407:21 409:8,9
409:10,14
418:25 421:25
427:9,22 435:3
**youve** 8:23 9:14
81:19 124:1
174:3 177:24
183:18 187:5
189:2 216:1
225:2 226:13
229:12,13
251:11,11
307:12 315:6
327:9 381:6
384:7 390:4
400:8,19

**Z**

**zenith** 17:7,23
17:24

**zero** 304:13

**0**

**0** 72:16,17,20,23
74:20,21,21,22
116:17,17
316:22,22,23
316:25
**00** 196:6,9
**000** 34:5,6 46:13
46:13 50:13,13
101:5 321:2
322:3,17
369:11 387:3,5
**01575** 249:25
**02** 364:20
**038** 396:10
**07** 6:6 62:20

**1**

**1** 3:12 12:15,18
45:14,14 72:17
74:20,21 82:16
82:20 83:6,13
112:20 116:17
165:9,16,20
166:5,13 168:9
174:1 204:5
245:3,4 270:15
271:10 308:12
316:22,23
326:1 334:3
356:17 371:16
371:22 386:18
404:24 405:11
405:20,24
417:10
**10** 3:21 62:20,24
103:23 257:4,5
313:25 314:3,5
314:7,9,14,14
314:18 323:1
323:17 378:20
378:22 379:3
385:4 411:25
416:11
**100** 46:13 51:4
125:22 139:12

504 219-1993

**EXHIBIT A**

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE

April 10, 2019

Page 499

139:20 142:10
144:1,3,6,10
144:12 155:19
362:19 388:2
**103** 6:16 7:1
**10th** 1:19 6:4
438:25
**11** 3:22 112:11
112:15 166:4
198:11 313:25
313:25 319:13
319:16 325:9
329:24 330:9
331:15 332:4
335:19 381:21
382:7,23
403:18,18
426:5 427:2,20
427:21 433:18
**113** 3:14
**12** 3:12,23
112:11 125:24
173:22 182:25
183:1 271:12
302:12 327:22
327:25 330:6
335:18 339:7
339:14 399:8
401:6,9,10
405:4 412:7
429:15,23
430:24 433:10
433:12
**123** 3:15
**1234** 93:9
**12test** 302:12
**13** 3:24 74:4
95:19 326:9
333:15,16,17
**13958** 255:2
**13th** 281:11
**14** 3:25 37:25
95:19 271:12
335:14,25
**1434** 439:7
440:19
**15** 4:1 38:1

95:19 103:23
262:15 376:19
376:23 379:1
379:11,12
412:2 437:1
**150** 121:1
248:22 347:23
**1500** 378:3
**157543** 253:8
**16** 4:2 53:10
95:20,21 96:1
96:2 124:18
126:7 135:10
174:1 244:14
325:21,23
379:2,10
388:20 389:1
400:12
**160** 3:16 387:5
**164** 3:17
**17** 4:3 53:19,20
95:20 96:4
97:10 123:21
123:22 126:7
135:9 279:6
370:25 395:2
395:20,21
396:9 397:10
398:12 399:5,8
399:18 400:12
400:15 422:25
423:3
**170** 375:7
**170000plus**
375:18
**1700592** 1:5
**178** 375:7
**18** 4:4 271:22
420:17,18,19
420:22
**19** 62:24 230:12
**196458** 131:23
**19th** 396:14
400:15

_____

**2**

**2** 3:13 72:16,20
72:23 74:21,22

79:11,14 80:25
84:4 86:2
112:18,20
116:17 174:25
244:2,6 270:18
271:10 316:22
316:25 371:16
371:22 373:20
374:6,15
386:23,25
**20** 37:24 50:23
75:20 112:15
127:6 227:3
244:14 382:6
**2000** 64:14
**2002** 64:7
**2005** 43:3 44:7
63:2,3
**2006** 44:10
**2007** 123:19
**201** 1:18 2:6 6:3
48:19
**2011** 8:1 48:18
363:17
**2012** 8:1 48:6
50:23 62:9
74:3 128:18
141:14 351:18
354:11
**2013** 50:24
62:12 142:18
210:15
**2014** 46:8
116:11 369:2
411:22,23
**2015** 57:19
58:17 76:2,25
78:19,20 95:17
114:17 115:7
124:11 127:11
135:6 170:8
178:18 201:21
201:24 202:5
236:19 241:13
244:12 274:24
316:13 335:9
338:2 346:13

361:1 377:25
378:1,12,21,24
396:14 399:8
399:11 400:15
403:18 404:14
411:22,24
418:20,24
425:22 426:2
426:11 429:16
**2016** 75:15,20
86:3 94:14
97:10 115:7
127:6 135:9
166:4 198:21
217:2 218:8
223:24 224:12
224:22,23
237:18 248:5,8
255:24 256:22
257:1 260:1,4
261:9,15
264:10 266:21
279:6 289:23
290:6 328:5,8
335:18 339:7
339:14 354:10
359:12 360:2,3
361:2 368:24
370:18,24
377:14,23
378:20 401:7
404:15 407:18
408:5 412:7,23
412:24 416:11
418:11,17,20
419:1
**2017** 10:17 11:1
11:8 27:17
53:13 103:9
113:16,17
119:9 123:11
124:12 135:10
135:10 144:21
159:16 160:23
161:21 175:22
175:23 198:21
202:8 237:9

281:11 285:3
290:8 291:5
294:16 314:17
343:20,21
344:18 346:4,7
346:19 360:11
373:2,20 376:2
379:14 380:5
380:15,25
381:7 386:18
393:7 413:2,15
**2018** 361:6
363:7 376:3
438:25
**2019** 1:19 6:4
95:24
**2020** 19:18
**20th** 198:12
**21** 212:10
**22** 244:2 276:15
277:1,5
**229769** 253:21
**229777** 253:21
253:23
**23** 276:21 277:1
**23rd** 78:20
335:9
**24** 20:8
**240** 46:14 50:13
**249** 3:18
**24th** 2:16
**25** 63:18 295:23
**250** 3:19
**255** 3:20
**2554** 440:9
**2567** 78:8
**26** 416:11
**27** 172:18
**277** 361:7,18
363:6
**28** 241:13
388:13 439:5
**29** 12:24 19:12
**29th** 44:10
359:25
**2yearold** 212:10

_____

**3**

30 (B)(6) TRINITY MEDICAL SERVICES, LLC. BLAKE BOURQUE                                    April 10, 2019

Page 500

**3** 1:5 3:14
112:25 113:3
143:25 144:13
158:5,8 167:22
167:24 245:4,4
245:4 295:23
296:2 308:12
308:12,12,13
314:17 320:19
326:1 330:5
334:6 404:24
405:11,24
428:4,4,20,23
433:21
**30** 1:15 173:22
214:6 244:6
359:15 362:1,7
**31** 403:18 412:7
**314** 3:21
**319** 3:22
**31st** 44:7 338:1
**32** 388:17
**3200** 70:13
**327** 3:23
**333** 3:24
**335** 3:25
**35** 296:2
**37** 440:9
**376** 4:1
**389** 4:2
**391** 3:5
**395** 4:3
**3rd** 344:9,18
**3s** 245:6 308:12

**_____ 4 _____**

**4** 3:15 84:4
123:8,12 165:9
165:16,20
166:4,5,13
168:9 326:1,9
334:3 364:16
404:22 405:4,7
405:7,7,20,24
417:10
**400** 417:2,24,24
418:7
**4048** 397:11

**416** 3:6
**420** 4:4
**425** 321:2 322:3
322:14,17
**433** 3:7
**458** 132:15
**46th** 1:18 2:6
**471** 132:12,15
**484** 133:9,10
**493** 133:23
**4th** 161:21
237:18

**_____ 5 _____**

**5** 3:16 34:5,6
160:7,10 196:9
318:17 364:20
386:18 388:13
388:17 412:22
**50** 103:2 114:16
**500** 101:5
**5045865252** 2:8
**5045899700**
2:18
**51** 364:16
**540** 387:3
**5468** 258:6
414:12 420:14
**5562** 398:14
**56** 400:11
**57** 203:12
**57d** 81:16
**5th** 328:8

**_____ 6 _____**

**6** 1:15 3:4,17
43:12 80:16
122:24 123:3
164:11,13
171:10 214:6
359:15 362:1,7
368:1 378:22
411:25 437:1
**60** 363:15
369:11
**62** 214:12
**64** 221:18 226:5
**65** 237:12 238:8

**6614** 399:5
**6th** 255:24
256:22 257:1

**_____ 7 _____**

**7** 3:18 57:12
87:16 245:4
248:25 249:4
386:23,25
395:6,16,25
396:6,7 397:2
397:5 398:5,8
398:23 399:1
399:20 401:3
**70112** 2:17
**70130** 1:19
**701704600** 2:7
**70508** 6:16 7:2
**75** 100:21
**75005** 1:25
439:25 440:25
**76** 276:16,25
**77** 278:2,3,5
**78** 394:16
**79** 3:13

**_____ 8 _____**

**8** 3:19 57:12
114:20 143:25
144:13 158:5,8
167:22,24
196:6 250:13
250:19 271:22
334:6 395:11
395:14,15
404:24 405:11
405:24 412:22
**88** 228:15,16

**_____ 9 _____**

**9** 3:20 6:6 245:4
245:4 255:10
255:13 329:22
330:9,9 331:18
332:3 350:1,10
379:3 404:18
404:20 427:4
427:23 428:1,3

428:16,18,20
**90** 237:1 363:15
**909** 2:16
**920** 336:10,12
**95662** 423:2,11
**96614** 424:9,13
**97** 74:14
**98** 64:6
**9s** 245:7