# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

TRINITY MEDICAL SERVICES,
L.L.C., ET AL

VERSUS

MERGE HEALTHCARE SOLUTIONS,
INC.

CIVIL ACTION

NO. 17-CV-592-JWD-EWD

## RULING

Before the Court is *Merge Healthcare Solutions, Inc.'s Motion in Limine to Exclude Opinions and Testimony of Plaintiffs' Expert Larry Small* brought by defendant Merge Healthcare Solutions, Inc. ("Defendant" or "Merge"). (Doc. 81.) It is opposed by plaintiffs Trinity Medical Services, L.L.C. ("Trinity"), Performance Labs, L.L.C. ("Performance Labs"), and Prestige Worldwide Leasing, L.L.C. ("Prestige") (collectively, "Plaintiffs"). (Doc. 98.) Defendant also filed a reply brief in support of its motion. (Doc. 129.) For the following reasons, the motion is DENIED.

## BACKGROUND

Trinity is a Louisiana holding company and the sole owner of Performance Labs and Prestige. Performance Labs was a laboratory located in Mandeville, Louisiana that performed toxicology tests. Prestige provided employee leasing and laboratory management services to Performance Labs and other labs, including Pathway Diagnostics, LLC ("Pathway"). Blake Bourque is the only owner of all three Plaintiff companies. Pathway, which is not a party to this suit, is a laboratory owned by insiders of Trinity that performs toxicology tests and is located in Mississippi.

Merge is a developer and manufacturer of clinical laboratory software systems, including the Merge LIS™ software ("Merge LIS Software") at issue in this case.

1

As a toxicology laboratory, Performance Labs was subject to the Clinical Laboratory Improvement Act ("CLIA"). To be able to run tests on live patient samples, Performance Labs needed to be certified by the Centers for Medicare and Medicaid Services ("CMS"). CMS's certification was based on compliance with regulatory and statutory mandates to ensure patient health and safety. In June 2015, Performance Labs failed an inspection by the Louisiana Health and Hospitals Department ("LHHD") and CMS. The state and federal regulators found "condition-level noncompliance" that "posed an immediate jeopardy to patients." (July 31, 2015 Letter from CMS to Performance Labs at 4, Doc. 77-7.) As a result of Performance Lab's noncompliance, it was required to submit plans of correction to state and federal regulators and agreed to cease testing patients on two sets of equipment. (*Id.* at 5.) During an on-site visit in the fall of 2015, state and federal regulators again concluded that Performance Labs "demonstrated continued systemic and pervasive problems through the laboratory which has led to findings of continued immediate jeopardy." (December 23, 2015 Letter from CMS to Performance at 4, Doc. 77-9 at 4.)

Due to these findings, Performance Labs was sanctioned by the state and federal regulators and as a result:

(a) barred from accepting live patient samples (Doc. 77, December 30, 2015 Emails from CMS at 3);
(b) precluded from accepting payments from Medicare and Medicaid (*Id.*);
(c) required to notify all clients who ordered patient testing that the results were not accurate or reliable (Doc. 77, January 12, 2016 Plan of Correction at 20, 46); and
(d) had their CLIA certificate suspended, prohibiting Performance Labs from performing patient testing. (Doc. 77, January 14, 2016 Email from CMS to Performance Labs.)

Facing this pressure from federal and state regulators and hoping to get Performance Labs back into compliance, Trinity negotiated with and on January 11, 2016, signed a Sale Order with Merge to lease the Merge LIS Software to use at Performance Labs and Pathway. As a

result of the sanctions, Performance Labs also reduced their equipment and personnel to a barebones operation, employing only a technical supervisor and a lab technician (M. Spruill Dep., at 117:17-19, Doc. 77-16.)

Also, in January 2016, Blake Bourque's brother in law, Kyle Mouton, along with Trinity's in-house counsel, Phil Martinez, opened Pathway in Mississippi. (K. Mouton Dep., at 17:19-22, 18:22-20:3, Doc. 77-22.) Pathway is not owned by Trinity. (K. Mouton Dep., at 18:24-19:7, Doc. 95-19; B. Bourque Dep., at 127-28, Doc. 95-12.) Most of Performance Lab's staff and equipment was moved to Pathway. (K. Mouton Dep. at 120:3-15, 30:9-10, 91:2-12, Doc. 77-22.) Trinity provided Pathway with start-up capital to pay expenses as well as management and IT services. (*Id.* at 106:12-19, 87:9-88:3.) Trinity allowed Pathway to use the Merge LIS Software. (*Id.*) In June 2016, Pathway began testing patient samples and billing clients using the Merge LIS Software. (M. Spruill Dep., at 154:23-155:5, 217:11-15, Doc 77-16.)

However, to prove compliance and become recertified under the CLIA, Performance Labs only performed validation and establishment studies until August 24, 2016, when CMS allowed Performance Labs to begin doing screening tests. (August 24, 2016 Email from CMS to Performance Labs, Doc. 77-28.) During this time, it was under heightened scrutiny from federal and state regulators. (C. Howell Dep., at 188:10-189:2, Doc. 95-5.) Performance Labs began with a small panel of tests and had an agreement with Pathway to reference any tests not offered for $85/sample (B. Bourque Dep., at 150:20-21, 203:18-204:11, 406:5-6, Doc. 95-12; (R. Poe Dep., 125:12-22, 144:2-145:21, Doc. 95-2.) On January 17, 2017, CMS permitted Performance to start conducing confirmatory testing. (October 14, 2016 Email from CMS to Performance Labs, Doc 77-29.) On January 20, 2017, Performance Labs began accepting patient samples from one clinic. (M. Spruill Dep. at 189:8-19, Doc. 77-16.)

In February 2017, Performance Labs identified an issue with the tracking of quality control data in the Merge LIS Software and voluntarily ceased patient testing. (W, March 6, 2017 Correspondence from Performance Labs to CMS, Doc. 77-32.) Performance Labs formulated a "work around" for the issue and indicated to CMS that the issue did not cause Performance Labs or Pathway to submit any incorrect testing results. (*Id.*) In March 2017, Performance Labs also reported other issues with the Merge LIS Software to CMS. (March 17, 2017 Email from CMS to Performance Labs, Doc. 77-33.) Despite these reported issues with the Merge LIS Software, in August 2017, Performance Labs' suspension was lifted, it was recertified under the CLIA, and could bill Medicare and Medicaid following a successful onsite inspection in June 2017 by state regulators. (January 24, 2017 Email between CMS and Performance Labs, Doc. 77-30; August 9, 2017 Correspondence from CMS, Doc. 77-34.)

Plaintiffs allege that the Merge LIS Software contained numerous defects but focus on two alleged defects, the Duplicate Container Defect and the Trojan Horse Defect. The Duplicate Container Defect allegedly resulted in the Merge LIS Software creating duplicate container numbers for patients. Therefore, Plaintiffs maintain that when the Duplicate Container Defect occurred, the software created duplicate records for a single toxicology test, which eventually could result in the software deleting both entries in error. Plaintiffs claim that this compromised laboratory reliability and testing accuracy because it increased the risk that the testing laboratory would fail to perform the requested toxicology test. The Trojan Horse Defect resulted in passwords and other security information being discoverable on Google. As such, Plaintiffs assert that the evidence shows that Plaintiffs were not able to use the Merge LIS Software and be HIPAA compliant. Defendant's expert witness testimony controverts that the alleged defects were present in the Merge LIS Software installed at Performance Labs.

Plaintiffs allege that "Performance Labs worked with Merge for months to get these defects resolved but they remained unresolved until 2018. These defects prevented Performance Labs from reopening its laboratory given the level of regulatory scrutiny Performance Labs was under. Ultimately, Performance Labs was unable to resume full testing operations and service its debts, and in mid-2017 the entity closed." (Doc. 96 at 2.)

The expert report of Plaintiffs' expert Larry Small is found at Doc. 81-3 at 1-5. His qualifications are set out in Doc. 81-3 at 6-7. He is CEO and Managing Partner of LabPath Consulting. He has a master's degree from Iowa State University in Physiology and Pharmacology and has worked in various roles in the laboratory industry for over forty years. At the request of Plaintiffs, he calculated the expected revenue per specimen that he believes Performance Labs would have earned from various kinds of payors for the years 2016-2023 had it remained in business.[1] His calculations are, in part, the foundation for the damages calculations rendered by another of Plaintiffs' experts, Harold Asher, who calculates the profits lost by Performance Labs as a result of Defendant's alleged wrongful conduct. (Doc. 83-17.)

SUMMARY OF ARGUMENTS OF THE PARTIES

Defendant claims Small is not qualified for the assignment he was given, namely, "to opine on projected revenue Performance Labs could earn per patient specimen for hypothetical tests run from 2016 through 2023." (Doc. 81 at 1.) The basis for this charge is that "Small is not an accountant [and] has no experience projecting revenue per patient sample…" (*Id.*; *see also* Doc. 81-1 at 2.) Although his business provides "laboratory consulting," his main business is "consulting in the area of billing compliance" which, argues Defendant, "does *not* require the calculation of revenues per sample at laboratories, which was Small's task as an alleged expert

---

[1] Small described his assignment as "determin[ing] the effective collectible revenues per sample for Performance Labs for the years 2016-2023 and thereafter." (Doc. 81-3 at 1.)

here." (Doc. 81 at 5.) According to Defendant, Small has no prior experience in using the methodology he chose in this case. (Doc. 81 at 1).

On the issue of qualifications, Plaintiffs respond that Rule 702 does not "limit expert testimony to CPAs and PhDs. A witness may be qualified by knowledge, skill, *experience*, or training, not merely education." (Doc. 98 at 4.) "Small has a master's degree in Physiology and Pharmacology" and "has worked in the laboratory industry for forty-seven years," working for various laboratory companies before he started his own. (*Id.*, at 6.) "Small's experience includes toxicology coding, billing, and collections, the precise areas he is opining on in his report." (*Id.*) Plaintiffs conclude, "Small is unquestionably qualified to give an expert opinion on the billing rates Performance Labs would have received for toxicology samples in 2016 and forward." (*Id.*)

In addition to attacking his qualifications, Defendant attacks Small's "top down" methodology as lacking the standard *Daubert* factors of reliability because his methodology 1) has not been tested or used before; 2) has not been the subject of peer review or publication; 3) the error rate has not been calculated and is unknown; 4) no standards or controls ensure its accuracy; and 5) is not generally accepted in the scientific community and, indeed has never before been used. (Doc. 81-1 at 19.) In addition, his "calculations are derived from unreliable, unsupported, and speculative assumptions and information." (Doc. 81 at 1.) Defendant details the alleged weaknesses in Small's analysis and conclusions at Doc. 81-1 at 6-9. Among the "baseless and unsupported assumptions" Small allegedly makes are his "bundled rate calculation" (Doc 81-1 at 12- 17), and "speculative adjustments" made to same (Id. at 17-18).

Plaintiffs responds that Small's "methodology is straightforward based on his review of Performance Lab's historical data and published industry rates" and "his adjustments are easily defensible based on his knowledge of industry changes in coding and his experience with the

relationships with the different payor types." (Doc. 98 at 1.) Plaintiff explains that his methodology rightly relies on the three variables which drive clinical toxicology laboratory revenues: "the number of patients samples tested, the CPT/HCPCS codes related to the tests performed and billed, and the reimbursement the laboratory expects to receive from each of the payors for the codes billed for each sample." (*Id*. at 2-3.)

Small then "consider[ed] the payor mix, coding and revenue from Performance Labs in 2015. Small noted the relevant code changes and government cost-saving initiatives, and [] considered the effect those changes would have on the billing codes that Performance Labs used. [He] developed his model based on the revised codes after the code change. He applied actual Medicare reimbursement rates from the Clinical Laboratory Fee Schedule to those codes based on how often they would be used, and adjusted the rates for private payors and self-pay, based on his industry experience." (*Id*. at 7, citing to Small's deposition testimony.)

In its reply brief, Defendant argues that Plaintiffs failed in their opposition to address the lack of "analysis to verify whether his 'bundled pay rate' based on three codes he hand-selected among at least eighty others, or his adjustments are accurate reflections of the revenue Performance Labs could expect to receive from 2016 to 2023." (Doc. 129 at 1.) The Reply brief reiterates the weaknesses and failures in Small's methodology and analysis. (*Id*. at 2-5.)

## STANDARD

Pursuant to Federal Rule of Evidence 702, "a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if the rule's preconditions are met. Defendant's motion is a *Daubert* challenge based principally on Small's failure to use an accepted methodology, and his opinions' alleged lack of an adequate factual foundation. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). When *Daubert* is invoked, a district court may, but is not required to, hold a hearing at

which the proffered opinion may be challenged. *Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 201 (5th Cir. 2016). However, when no hearing is held, "a district court must still perform its gatekeeping function by performing some type of *Daubert* inquiry." *Id.* "At a minimum, a district court must create a record of its *Daubert* inquiry and 'articulate its basis for admitting expert testimony.'" *Id.* (quoting *Rodriguez v. Riddell Sports, Inc.,* 242 F.3d 567, 581 (5th Cir. 2001)).

The role of the trial court is to serve as the gatekeeper for expert testimony by making the determination of whether the expert opinion is sufficiently reliable. As the Fifth Circuit has held:

> [W]hen expert testimony is offered, the trial judge must perform a screening function to ensure that the expert's opinion is reliable and relevant to the facts at issue in the case. *Daubert* went on to make "general observations" intended to guide a district court's evaluation of scientific evidence. The nonexclusive list includes "whether [a theory or technique] can be (and has been) tested," whether it "has been subjected to peer review and publication," the "known or potential rate of error," and the "existence and maintenance of standards controlling the technique's operation," as well as "general acceptance." The [Supreme] Court summarized:
>
> The inquiry envisioned by Rule 702 is, we emphasize, a flexible one. Its overarching subject is the scientific validity and thus the evidentiary relevance and reliability-of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.

*Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988-89 (5th Cir. 1997) (internal citations omitted).

Cases following *Daubert* have expanded upon these factors and explained that *Daubert*'s listing is neither all-encompassing nor is every factor required in every case. *See, e.g.*, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997); *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004). Indeed, courts may look to other factors. *Joiner*, 522 U.S. at 146.

As this Court has explained:

> The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, which provide that the court serves as a gatekeeper, ensuring all scientific testimony is relevant and reliable.

This gatekeeping role extends to all expert testimony, whether scientific or not. Under Rule 702, the court must consider three primary requirements in determining the admissibility of expert testimony: 1) qualifications of the expert witness; 2) relevance of the testimony; and 3) reliability of the principles and methodology upon which the testimony is based.

*Fayard v. Tire Kingdom, Inc.*, No. 09-171-BAJ-SCR, 2010 WL 3999011 at *1 (M.D. La. Oct. 12, 2010) (internal citations omitted) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999)).

This Court has broad discretion in deciding whether to admit expert opinion testimony. *See, e.g.*, *Joiner*, 522 U.S. at 138-39 (appellate courts review a trial court's decision to admit or exclude expert testimony under *Daubert* under the abuse of discretion standard); *Watkins*, 121 F.3d at 988 ("District courts enjoy wide latitude in determining the admissibility of expert testimony."); *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1050 (5th Cir. 1998) ("Trial courts have 'wide discretion' in deciding whether or not a particular witness qualifies as an expert under the Federal Rules of Evidence.").

"Notwithstanding *Daubert*, the Court remains cognizant that 'the rejection of expert testimony is the exception and not the rule.'" *Johnson v. Samsung Elecs. Am., Inc.*, 277 F.R.D. 161, 165 (E.D. La. 2011) (citing Fed. R. Evid. 702 Advisory Committee Note (2000 amend.)). Further, as explained in *Scordill v. Louisville Ladder Grp., L.L.C.*:

> The Court notes that its role as a gatekeeper does not replace the traditional adversary system and the place of the jury within the system. As the *Daubert* Court noted, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." The Fifth Circuit has added that, in determining the admissibility of expert testimony, a district court must defer to "'the jury's role as the proper arbiter of disputes between conflicting opinions. As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.'"

No. Civ. 02-2565, 2003 WL 22427981 at *3 (E.D. La. Oct. 24, 2003) (Vance, J.) (internal citations omitted) (relying on, among others, *Rock v. Arkansas*, 483 U.S. 44, 61 (1987), and *United States v. 14.38 Acres of Land, More or Less Sit. In Leflore County, Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996)).

The Supreme Court has recognized that not all expert opinion testimony can be measured by the same exact standard. Rather, the *Daubert* analysis is a "flexible" one, and "the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho*, 526 U.S. at 150, (*cited with approval in Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002)).

In that vein, the Fifth Circuit has concluded that "soft sciences" involve "necessarily diminished methodological precision" when compared to other scientific disciplines like mathematics and engineering. *United States v. Simmons*, 470 F.3d 1115, 1123 (5th Cir. 2006) (quoting *Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287, 1297 (8th Cir. 1997)).

> In such instances, other indicia of reliability are considered under *Daubert*, including professional experience, education, training, and observations. Because there are areas of expertise, such as the "social sciences in which the research theories and opinions cannot have the exactness of hard science methodologies," trial judges are given broad discretion to determine "whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case."

*Id.* (internal citations omitted) (relying on *Pipitone*, 288 F.3d at 247).

## ANALYSIS

### *Small's Qualifications*

As summarized above, Defendant claims Small is not qualified for the assignment he was given, namely, "to opine on projected revenue Performance Labs could earn per patient specimen for hypothetical tests run from 2016 through 2023." (Doc. 81 at 1.) The basis for this

10

challenge to his qualifications is that "Small is not an accountant, [and] has no experience projecting revenue per patient sample…" (*Id.*; *see also* Doc. 81-1 at 2.)

Federal Rule of Evidence 702 requires that an expert be properly qualified. Generally, if there is some reasonable indication of qualifications, the court may admit the expert's testimony and then leave to the jury the extent of those qualifications. *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 507 (5th Cir. 1999) (*superseded by statute on other grounds*). "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 199 (5th Cir. 2016) (quoting *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009).

The Supreme Court in *Kumho Tire*, 526 U.S. at 148-149, and *Daubert*, 509 U.S. at 592, endorsed expert testimony based on personal observation and experience.[2] Additionally, the 2000 Advisory Committee Notes to Rule 702 state, "the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience" which may be the "predominant, if not sole, basis for a great deal of reliable expert testimony."

If the expert's testimony does not rest on traditional scientific methods, the court may permit testimony "where a proposed expert witness bases her testimony on practical experience rather than scientific analysis." *Davis v. Carroll*, 937 F. Supp. 2d 390, 412 (S.D.N.Y. 2013). "In such cases . . . courts recognize that experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called 'general truths derived from . . . specialized experience.'" *Id.* (quoting *Kumho Tire*, 526 U.S. at 149-50); *see also Maiz v. Virani*, 253 F.3d 641, 669 (11th Cir. 2001) ("[T]here is no question that an expert may still properly base his

---

[2] *See also, LeBlanc v. Chevron USA, Inc.*, 396 F. App'x 94, 100 (5th Cir. 2010) (per curiam) (unpublished).

11

testimony on 'professional study or *personal experience*.'" (emphasis added)); *Watson v. Snap-On Tools, Inc.*, No. 04-1313-A, 2006 WL 2114558 at *5 (W.D. La. July 26, 2006).

The Court has carefully reviewed Small's qualifications and opinions and concludes that he is sufficiently qualified to provide the opinions he has given. He has extensive experience in various aspects of the laboratory industry. After gaining a master's degree in Physiology and Pharmacology, he worked for 25 years for a large laboratory testing company serving as Vice President of Laboratory Operations, Director of Billing Revenue and Director of Corporate Compliance Operations. (Doc. 81-2 at 16:1-17:13.) He then worked as Director of Billing Compliance Consulting Division for another laboratory testing company. (*Id*. at 17:17-22.) The company he now owns and operates works for toxicology laboratories regarding billing practices and collections. (*Id*. at 18.) While he isn't, as Defendant points out, an accountant, it is often the case that experts from multiple disciplines may be qualified to testify about the same area and, may testify as long as each expert has sufficient qualifications in that area. *See, e.g. Dawsey v. Olin Corp.*, 782 F.2d 1254, 1263, (5th Cir. 1986) (holding that a biochemist who studied the effects of phosgene on animals was "well qualified . . . to extrapolate his research to humans.")

Furthermore, as stated above, "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Carlson*, 822 F.3d at 199 (quoting *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009). Any weaknesses in Small's qualifications go to the weight of his testimony and may be explored on cross examination.

### *Small's Methodology*

Defendant complains that Small's methodology does not meet the standard *Daubert* criteria. (Doc. 81-1 at 19.) But, as mentioned above, the Supreme Court has recognized that not

all expert opinion testimony can be measured by the same exact standard. Rather, the *Daubert* analysis is a "flexible" one, and "the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire*, 526 U.S. at 150, *cited with approval in Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002). The Court has reviewed Small's methodology and finds it sufficient. Any perceived weaknesses go the weight, not the admissibility, of his testimony.

The parties disagree about whether Small ever used this methodology before. (*Cf.* Doc. 81 at 1 with Doc. 98 at 8.) The Court need not resolve this dispute since courts have rejected the notion that the Federal Rules of Evidence require an expert to have previously opined on a specific issue to be "qualified" as an expert on that issue. *See, e.g., BP Expl. & Prod., Inc. v. Callidus Techs, L.L.C.*, No. 02-2318, 2003 WL 26118097 at *1–2 (E.D. La. Apr. 8, 2003). This, like the issues of his qualifications and methodology generally, go to the weight of his testimony and may be tested by Defendant on cross examination.

## *The Sufficiency of Facts and Data Relied Upon*

Defendant launches an aggressive and extensive attack on Small's opinions and especially what Defendant argues are the unreliable, unsupported and speculative assumptions which support Small's calculations and conclusions. The Court disagrees. Importantly, "[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *United States v. 14.38 Acres of Land More Or Less Situated in Lefore County, Miss.*, 80 F.3d at 1077 (quoting *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987)); *see also Imperial Trading Co. v. Travelers Prop. Cas. Co. of Am.*, No. 06-4262, 2009 WL 2356292 at *3 (E.D. La. July 28, 2009). Furthermore, "[m]atters left for the jury's

consideration include the alleged miscalculations, erroneous assumptions, and inconsistencies that plaintiffs object to." *Imperial Trading*, 2009 WL 2356292 at *3 (citing *Southwire Co. v. J.P. Morgan Chase & Co.*, 258 F. Supp.2d 908, 935 (W.D. Wis. 2007)).

The Court has carefully reviewed Small's report, deposition and the other materials supporting Defendant's motion. The Court finds that there is sufficient data and rationale supporting Small's opinions to allow it to pass *Daubert* muster. While Defendant points to weaknesses in Small's opinions, Defendant's attack goes to the weight, not the admissibility of Small's testimony and, no doubt, these alleged weaknesses will be the subject of vigorous cross-examination by counsel for Defendant at trial—where the sufficiency of same should properly be tested.

## CONCLUSION

In conclusion, and for the foregoing reasons, *Merge Healthcare Solutions, Inc.'s Motion in Limine to Exclude Opinions and Testimony of Plaintiffs' Expert Larry Small.* (Doc. 81) brought by defendant, Merge Healthcare Solutions, Inc., is DENIED.

Signed in Baton Rouge, Louisiana, on March 19, 2020.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**