# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

TRINITY MEDICAL SERVICES,
L.L.C., ET AL

VERSUS

MERGE HEALTHCARE SOLUTIONS,
INC.

CIVIL ACTION

NO, 17-CV-592-JWD-EWD

## RULING

Before the Court is *Merge Healthcare Solution, Inc.'s Motion In Limine to Exclude the Opinions and Testimony of Plaintiffs' Expert Chris Harol* brought by defendant Merge Healthcare Solution, Inc. ("Merge" or "Defendant"). (Doc. 82.) It is opposed by plaintiffs Trinity Medical Services, L.L.C. ("Trinity"), Performance Labs, L.L.C. ("Performance Labs"), and Prestige Worldwide Leasing, L.L.C. ("Prestige") (collectively, "Plaintiffs"). (Doc. 97.) Defendant filed a reply brief. (Doc. 130.) For the following reasons, the motion is denied.

## BACKGROUND

Trinity is a Louisiana holding company and the sole owner of Performance Labs and Prestige. Performance Labs was a laboratory located in Mandeville, Louisiana that performed toxicology tests. Prestige provided employee leasing and laboratory management services to Performance Labs and other labs, including Pathway Diagnostics, LLC ("Pathway"). Blake Bourque is the only owner of all three Plaintiff companies. Pathway, which is not a party to this suit, is a laboratory owned by insiders of Trinity that performs toxicology tests and is located in Mississippi.

Merge is a developer and manufacturer of clinical laboratory software systems, including the Merge LIS™ software ("Merge LIS Software") at issue in this case.

1

As a toxicology laboratory, Performance Labs was subject to the Clinical Laboratory Improvement Act ("CLIA"). To be able to run tests on live patient samples, Performance Labs needed to be certified by the Centers for Medicare and Medicaid Services ("CMS"). (CMS's certification was based on compliance with regulatory and statutory mandates to ensure patient health and safety. In June 2015, Performance Labs failed an inspection by the Louisiana Health and Hospitals Department ("LHHD") and CMS. The state and federal regulators found "condition-level noncompliance" that "posed an immediate jeopardy to patients." (July 31, 2015 Letter from CMS to Performance Labs at 4, Doc. 77-7.) As a result of Performance Lab's noncompliance, it was required to submit plans of correction to state and federal regulators and agreed to cease testing patients on two sets of equipment. (*Id.* at 5.) During an on-site visit in the fall of 2015, state and federal regulators again concluded that Performance Labs "demonstrated continued systemic and pervasive problems through the laboratory which has led to findings of continued immediate jeopardy." (December 23, 2015 Letter from CMS to Performance at 4, Doc. 77-9 at 4.)

Due to these findings, Performance Labs was sanctioned by the state and federal regulators and as a result:

(a) barred from accepting live patient samples (Doc. 77, December 30, 2015 Emails from CMS at 3);
(b) precluded from accepting payments from Medicare and Medicaid (*Id.*);
(c) required to notify all clients who ordered patient testing that the results were not accurate or reliable (Doc. 77, January 12, 2016 Plan of Correction at 20, 46); and
(d) had their CLIA certificate suspended, prohibiting Performance Labs from performing patient testing. (Doc. 77, January 14, 2016 Email from CMS to Performance Labs.)

Facing this pressure from federal and state regulators and hoping to get Performance Labs back into compliance, Trinity negotiated with and on January 11, 2016, signed a Sale Order with Merge to lease the Merge LIS Software to use at Performance Labs and Pathway. As a

result of the sanctions, Performance Labs also reduced their equipment and personnel to a barebones operation, employing only a technical supervisor and a lab technician (M. Spruill Dep., at 117:17-19, Doc. 77-16.)

Also, in January 2016, Blake Bourque's brother in law, Kyle Mouton, along with Trinity's in-house counsel, Phil Martinez, opened Pathway in Mississippi. (K. Mouton Dep., at 17:19-22, 18:22-20:3, Doc. 77-22.) Pathway is not owned by Trinity. (K. Mouton Dep., at 18:24-19:7, Doc. 95-19; B. Bourque Dep., at 127-28, Doc. 95-12.) Most of Performance Lab's staff and equipment was moved to Pathway. (Mouton Dep. at 120:3-15, 30:9-10, 91:2-12, Doc. 77-22.) Trinity provided Pathway with start-up capital to pay expenses as well as management and IT services. (*Id.* at 106:12-19, 87:9-88:3.) Trinity allowed Pathway to use the Merge LIS Software. (*Id.*) In June 2016, Pathway began testing patient samples and billing clients using the Merge LIS Software. (M. Spruill Dep., at 154:23-155:5, 217:11-15, Doc 77-16.)

However, to prove compliance and become recertified under the CLIA, Performance Labs only performed validation and establishment studies until August 24, 2016, when CMS allowed Performance Labs to begin doing screening tests. (August 24, 2016 Email from CMS to Performance Labs, Doc. 77-28.) During this time, it was under heightened scrutiny from federal and state regulators. (C. Howell Dep., at 188:10-189:2, Doc. 95-5.) Performance Labs began with a small panel of tests and had an agreement with Pathway to reference any tests not offered for $85/sample. (B. Bourque Dep., at 150:20-21, 203:18-204:11, 406:5-6, Doc. 95-12; R. Poe Dep., 125:12-22, 144:2-145:21, Doc. 95-2.) On January 17, 2017, CMS permitted Performance to start conducing confirmatory testing. (October 14, 2016 Email from CMS to Performance Labs, Doc 77-29.) On January 20, 2017, Performance Labs began accepting patient samples from one clinic. (M. Spruill Dep. at 189:8-19, Doc. 77-16.)

In February 2017, Performance Labs identified an issue with the tracking of quality control data in the Merge LIS Software and voluntarily ceased patient testing. (March 6, 2017 Correspondence from Performance Labs to CMS, Doc. 77-32.) Performance Labs formulated a "work around" for the issue and indicated to CMS that the issue did not cause Performance Labs or Pathway to submit any incorrect testing results. (*Id.*) In March 2017, Performance Labs also reported other issues with the Merge LIS Software to CMS. (March 17, 2017 Email from CMS to Performance Labs, Doc. 77-33.) Despite these reported issues with the Merge LIS Software, in August 2017, Performance Labs' suspension was lifted, it was recertified under the CLIA, and could bill Medicare and Medicaid following a successful onsite inspection in June 2017 by state regulators. (January 24, 2017 Email between CMS and Performance Labs, Doc. 77-30; August 9, 2017 Correspondence from CMS, Doc. 77-34.)

Plaintiffs allege that the Merge LIS Software contained numerous defects but focus on two alleged defects, the Duplicate Container Defect and the Trojan Horse Defect. The Duplicate Container Defect allegedly resulted in the Merge LIS Software creating duplicate container numbers for patients. Therefore, Plaintiffs maintain that when the Duplicate Container Defect occurred, the software created duplicate records for a single toxicology test, which eventually could result in the software deleting both entries in error. Plaintiffs claim that this compromised laboratory reliability and testing accuracy because it increased the risk that the testing laboratory would fail to perform the requested toxicology test. The Trojan Horse Defect resulted in passwords and other security information being discoverable on Google. As such, Plaintiffs assert that the evidence shows that Plaintiffs were not able to use the Merge LIS Software and be HIPAA compliant. Defendant's expert witness testimony controverts that the alleged defects were present in the Merge LIS Software installed at Performance Labs.

Plaintiffs allege that "Performance Labs worked with Merge for months to get these defects resolved but they remained unresolved until 2018. These defects prevented Performance Labs from reopening its laboratory given the level of regulatory scrutiny Performance Labs was under. Ultimately, Performance Labs was unable to resume full testing operations and service its debts, and in mid-2017 the entity closed." (Doc. 96 at 2.) Harol was assigned the task of providing a report and expert testimony "in relation to the operating expenses for…Performance Labs." (Doc. 82-12 at 1.)

## SUMMARY OF ARGUMENTS OF THE PARTIES

Defendant argues that Harol is unqualified to render the opinions he gives, noting that Harol "does not have a college degree and estimates that he completed only about five semesters of college. He has never taken an accounting class and has taken only one introductory economics class." (Doc. 82-1 at 5, record citations omitted.) Defendant complains that his "real 'industry experience' began only five years ago…" (*Id*.) "He is not an accountant" and while Defendant concedes he has experience projecting expenses for start-up labs, he "has never calculated the operating expenses of an operating lab…" (Doc. 82 at 1.)

Substantively, Defendant claims Harol's methodology does not meet the classic *Daubert* criteria (Doc 82-1 at 6), in that 1) his methodology has not been tested, used before and cannot be independently duplicated; 2) his assumptions have not been subject to peer review or publication; 3) the rate of error was not calculated and is unknown; 4) he fails to utilize standards or controls to ensure reliability and 5) his approach incorporates numerous speculative and unsupported assumptions and is not a generally accepted methodology within the scientific community. (Doc. 82-1 at 19.) Defendant next complains that Harol did not independently investigate and verify the accuracy of the data he was given and "merely assumes" that the data he received was correct. (*Id*. at 9.) His report "inexplicably omits consideration of certain

5

Performance Labs' operating expenses" (Id. at 9-11); he "relies on baseless, unreliable and speculative assumptions" (*Id.* at 11-20); he provides views in his deposition which are inconsistent with those in his report (*Id.* at 12); and he "undertook no action to independently ascertain the reliability of the information spoon-fed him by plaintiffs…." (*Id.* at 13.)

In response to the concerns raised about Harol's qualifications, Plaintiffs respond that, despite his dearth of formal education, Harol has "extensive experience working with start-up laboratories and forecasting their expenses." (Doc. 97 at 1.) During the beginning of his fourteen years as owner a co-manager of Lighthouse Labs and its predecessors, his work included "studying the payroll expenses and employee needs of toxicology laboratories." (Id. at 5.) "For the past five years, he has worked in consulting with laboratories, including financial projections for dozens of start-up laboratories. He calculates the expenses of laboratories professionally on a daily basis." (*Id.*, record citations omitted.) In response to the charge that his experience is inapplicable here because he has only worked with start-ups, Plaintiffs respond that here, "[he] had more data than he would typically have" because he "had the actual financial experience of Performance Labs in 2015…," making his "analysis more reliable, not less." (Id. at 7.)

As to his methodology, Plaintiffs explain that he began by "considering Performance Labs' P&L and general ledger entries from 2015", showing its full expenses for that year. (*Id*. at 3.) He "then adjusted these expenses based on the needs of the laboratory that would be starting with a much lower level of monthly samples…. He then forecast how these expenses would grow as the business ramped up to full production…" and for inflation. (*Id*.; *see also id*. at 6.) "To the extent that Harol changed any of the expenses from 2015, he explained the changes in plain language in his report." (*Id.* at 7.) Plaintiffs then defend the specific changes Defendant makes regarding his analysis and calculations. (*Id*. at 7-9.) As to the allegation that Harol was

"spoon-fed data by Plaintiffs," Plaintiffs respond that Harol relied on actual Performance Labs ledger data. (*Id.* at 9.)

STANDARD

Pursuant to Federal Rule of Evidence 702, "a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if the rule's preconditions are met. Defendant's motion is a *Daubert* challenge based principally on Asher's failure to use an accepted methodology, and his opinions' alleged lack of an adequate factual foundation. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). When *Daubert* is invoked, a district court may, but is not required to, hold a hearing at which the proffered opinion may be challenged. *Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 201 (5th Cir. 2016). However, when no hearing is held, "a district court must still perform its gatekeeping function by performing some type of *Daubert* inquiry." *Id*. "At a minimum, a district court must create a record of its *Daubert* inquiry and 'articulate its basis for admitting expert testimony.'" *Id.* (quoting *Rodriguez v. Riddell Sports, Inc.,* 242 F.3d 567, 581 (5th Cir. 2001)).

The role of the trial court is to serve as the gatekeeper for expert testimony by making the determination of whether the expert opinion is sufficiently reliable. As the Fifth Circuit has held:

> [W]hen expert testimony is offered, the trial judge must perform a screening function to ensure that the expert's opinion is reliable and relevant to the facts at issue in the case. *Daubert* went on to make "general observations" intended to guide a district court's evaluation of scientific evidence. The nonexclusive list includes "whether [a theory or technique] can be (and has been) tested," whether it "has been subjected to peer review and publication," the "known or potential rate of error," and the "existence and maintenance of standards controlling the technique's operation," as well as "general acceptance." The [Supreme] Court summarized:
>
> The inquiry envisioned by Rule 702 is, we emphasize, a flexible one. Its overarching subject is the scientific validity and thus the evidentiary relevance and reliability-of the principles that underlie a proposed submission. The focus, of

course, must be solely on principles and methodology, not on the conclusions that they generate.

*Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988-89 (5th Cir. 1997) (internal citations omitted).

Cases following *Daubert* have expanded upon these factors and explained that *Daubert*'s listing is neither all-encompassing nor is every factor required in every case. *See, e.g.*, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997); *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004). Indeed, courts may look to other factors. *Joiner*, 522 U.S. at 146.

As this Court has explained:

> The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, which provide that the court serves as a gatekeeper, ensuring all scientific testimony is relevant and reliable. This gatekeeping role extends to all expert testimony, whether scientific or not. Under Rule 702, the court must consider three primary requirements in determining the admissibility of expert testimony: 1) qualifications of the expert witness; 2) relevance of the testimony; and 3) reliability of the principles and methodology upon which the testimony is based.

*Fayard v. Tire Kingdom, Inc.*, No. 09-171-BAJ-SCR, 2010 WL 3999011 at *1 (M.D. La. Oct. 12, 2010) (internal citations omitted) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999)).

This Court has broad discretion in deciding whether to admit expert opinion testimony. *See, e.g.*, *Joiner*, 522 U.S. at 138-39 (appellate courts review a trial court's decision to admit or exclude expert testimony under *Daubert* under the abuse of discretion standard); *Watkins*, 121 F.3d at 988 ("District courts enjoy wide latitude in determining the admissibility of expert testimony."); *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1050 (5th Cir. 1998) ("Trial courts have 'wide discretion' in deciding whether or not a particular witness qualifies as an expert under the Federal Rules of Evidence.").

"Notwithstanding *Daubert*, the Court remains cognizant that 'the rejection of expert testimony is the exception and not the rule.'" *Johnson v. Samsung Elecs. Am., Inc.*, 277 F.R.D.

161, 165 (E.D. La. 2011) (citing Fed. R. Evid. 702 Advisory Committee Note (2000 amend.)).

Further, as explained in *Scordill v. Louisville Ladder Grp., L.L.C.*:

> The Court notes that its role as a gatekeeper does not replace the traditional adversary system and the place of the jury within the system. As the *Daubert* Court noted, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." The Fifth Circuit has added that, in determining the admissibility of expert testimony, a district court must defer to "'the jury's role as the proper arbiter of disputes between conflicting opinions. As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.'"

No. Civ. 02-2565, 2003 WL 22427981 at *3 (E.D. La. Oct. 24, 2003) (Vance, J.) (internal citations omitted) (relying on, among others, *Rock v. Arkansas*, 483 U.S. 44, 61 (1987), and *United States v. 14.38 Acres of Land, More or Less Sit. In Leflore County, Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996)).

The Supreme Court has recognized that not all expert opinion testimony can be measured by the same exact standard. Rather, the *Daubert* analysis is a "flexible" one, and "the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho*, 526 U.S. at 150, (*cited with approval in Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002)).

In that vein, the Fifth Circuit has concluded that "soft sciences" involve "necessarily diminished methodological precision" when compared to other scientific disciplines like mathematics and engineering. *United States v. Simmons*, 470 F.3d 1115, 1123 (5th Cir. 2006) (quoting *Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287, 1297 (8th Cir. 1997)).

> In such instances, other indicia of reliability are considered under *Daubert*, including professional experience, education, training, and observations. Because there are areas of expertise, such as the "social sciences in which the research theories and opinions cannot have the exactness of hard science methodologies,"

trial judges are given broad discretion to determine "whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case."

*Id.* (internal citations omitted) (relying on *Pipitone*, 288 F.3d at 247).

ANALYSIS

*Harol's Qualifications*

Regarding qualifications, Defendant's main complaints are that Harol has no college degree, is not an accountant and his experience is working with start-ups and not operating laboratories. The Court is not persuaded.

Federal Rule of Evidence 702 requires that an expert be properly qualified. Generally, if there is some reasonable indication of qualifications, the court may admit the expert's testimony and then leave to the jury the extent of those qualifications. *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 507 (5th Cir. 1999) (*superseded by statute on other grounds*). "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 199 (5th Cir. 2016) (quoting *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009). While he isn't, as Defendant points out, an accountant, it is often the case that experts from multiple disciplines may be qualified to testify about the same area and, as long as each expert has sufficient qualifications in that area. *See, e.g. Dawsey v. Olin Corp.*, 782 F.2d 1254, 1262-63, (5th Cir. 1986) (holding that a biochemist who studied the effects of phosgene on animals was "well qualified to extrapolate his research to humans.")

The Supreme Court in *Kumho Tire*, 526 U.S. at 148-149, and Daubert, 509 U.S. at 592, endorsed expert testimony based on personal observation and experience.[1] Additionally, the

---

[1] *See also, LeBlanc v. Chevron USA, Inc.*, 396 F. App'x. 94, 100 (5th Cir. 2010) (per curiam) (unpublished).

2000 Advisory Committee Notes to Rule 702 state, "the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience" which may be the "predominant, if not sole, basis for a great deal of reliable expert testimony."

If the expert's testimony does not rest on traditional scientific methods, the court may permit testimony "where a proposed expert witness bases her testimony on practical experience rather than scientific analysis." *Davis v. Carroll*, 937 F. Supp. 2d 390, 412 (S.D.N.Y. 2013). "In such cases . . . courts recognize that experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called 'general truths derived from . . . specialized experience.'" *Id*. at 412 (quoting *Kumho Tire*, 526 U.S. at 149–50); *see also Maiz v. Virani*, 253 F.3d 641, 669 (11th Cir. 2001) ("[T]here is no question that an expert may still properly base his testimony on 'professional study or *personal experience*.'" (emphasis added)); *Watson v. Snap-On Tools, Inc*., 2006 WL 2114558 at *5 (W.D. La. July 26, 2006).

The Court has carefully reviewed Harol's qualifications and finds that he is well qualified for the assignment he was given and meets Rule 702's standard. The Court agrees with Plaintiffs that his previous work with start-ups, where he has no actual operating data from which to draw his conclusions, does not disqualify him from this case, where he had access to Performance Lab's actual data. While he isn't, as Defendant points out, an accountant, it is often the case that experts from multiple disciplines may be qualified to testify about the same area and, as long as each expert has sufficient qualifications in that area. *See, e.g. Dawsey v. Olin Corp*., 782 F.2d 1254, 1263, (5th Cir. 1986) (holding that a biochemist who studied the effects of phosgene on animals was "well qualified . . . to extrapolate his research to humans.")

The fact that this may be the first time he's performed this specific analysis, again, does not disqualify him. The courts have rejected the notion that the Federal Rules of Evidence

require an expert to have previously opined on a specific issue to be "qualified" as an expert on that issue. *See, e.g., BP Expl. & Prod., Inc. v. Callidus Techs, L.L.C.*, No. 02-2318, 2003 WL 26118097 at *1-2 (E.D. La. Apr. 8, 2003). This, like the issues of his qualifications and methodology generally, go to the weight of his testimony and may be tested by Defendant on cross examination.

*The Sufficiency of Facts and Data Relied Upon*

Much of Defendant's criticism of Harol's analysis focuses on what it terms the unreliable, unsupported and speculative assumptions which support Harol's calculations and conclusions. The Court disagrees.

Although Defendant complains that the data relied on by Harol is insufficient, "[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *United States v. 14.38 Acres of Land More Or Less Situated in Lefore County, Miss.*, 80 F.3d at 1077 (quoting *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987)); *see also Imperial Trading Co. v. Travelers Property Cas. Co. of America*, No. 06-4262, 2009 WL 2356292 at *3 (E.D. La. July 28, 2009). Furthermore, "[m]atters left for the jury's consideration include the alleged miscalculations, erroneous assumptions, and inconsistencies that plaintiffs object to." *Imperial Trading*, 2009 WL 2356292 at *3 (citing *Southwire Co. v. J.P. Morgan Chase & Co.*, 258 F. Supp. 2d 908, 935 (W.D. Wis. 2007) ("the alleged errors and inconsistencies are grounds for impeaching the credibility of the experts and the reliability of their ultimate findings; however, mistakes and miscalculations are not grounds for excluding evidence." (citing *Daubert,* 509 U.S. at 596)).

Defendant complains that Harol relies, in part, on data provided by another expert hired by the CPA firm at which Plaintiff's expert Harold Asher works and that Harol did not

independently verify the accuracy of the data provided. (Doc. 82-1 at 9.)[2] As this Court said in *Nat'l Union Fire Ins. Co. v. Smith Tank & Steel, Inc.*, Civ. Action No. 3:11-CV-00830, 2014 WL 5794952 (M.D. La. Nov. 6, 2014):

> Consultation with other experts is entirely permissible under Rule 703. *Callidus Techs.,* 2003 WL 26118097, at *2 (citing *Janopoulos v. Harvey L. Walner & Assocs., Ltd.,* 866 F. Supp. 1086, 1095 (N.D.Ill.1994)) (stating that Rule 703 "allows an expert to rely on information that would otherwise not be admissible including hearsay evidence"); *see also id.* (citing *Janopoulos,* 866 F.Supp. at 1095) ("An expert may even rely on information supplied by another expert witness.").
>
> An expert can rely upon otherwise inadmissible evidence as long as it is of a type "reasonably relied upon by experts in the particular field." Fed. R. Evid. 703. *See also, Monsanto Co. v. David,* 516 F.3d 1009, 1015–1016 (5th Cir.2008) (finding that expert could rely upon a report prepared by someone else). The purpose of allowing experts to rely on another expert's opinions is that "an expert cannot be an expert in all fields, and it is reasonable to expect that experts will rely on the opinion of experts in other fields as background material for arriving at an opinion." *Concerned Area Residents for the Environ. v. Southview Farm,* 834 F. Supp. 1422, 1436 (W.D.N.Y.1993).
>
> "It is common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert.' " *In re: Genetically Modified Rice Litigation,* 666 F.Supp.2d 1004, 1033 (E.D.Mo.2009) (quoting *Dura Auto. Sys. Of Ind., Inc. v. CTS Corp.,* 285 F.3d 609, 613 (7th Cir.2002).
>
> An expert may rely on any facts or data "of a type reasonably relied upon by experts in the particular field," including facts, data, and opinions that are otherwise inadmissible. Fed. R. Evid. 703. The modern view recognizes that experts often rely on facts and data supplied by third parties. *See, Gussack Realty Co. v. Xerox Co.,* 224 F.3d 85, 94 (2d. Cir.2000). This includes relying on analyses performed by one's assistants. *See, e.g., McReynolds v. Sodexho,* 349 F.Supp.2d 30, 36–37 (D.D.C.2004) (admitting expert's opinions based on statistical analyses run by assistants who wrote and understood the computer programming); *Derrickson v. Circuit City Stores, Inc.,* No. 95–3296, 1999 WL 1456538, at *20 (D. Md. Mar. 19 1999) (same).
>
> The term "data" also is intended to encompass the reliable opinions of other experts. Fed. R. Evid. 702 Advisory Committee Notes to 2000 Amendments; *see also, Mason v. Safeco Ins. Co.,* No. 4:09–cv–1081, 2010 WL 3341582 at *8 (E.D. Mo. Aug. 23, 2010) ("[a]n expert may rely on the reliable opinion of another expert in

---

[2] Defendant filed a separate Daubert motion challenging Asher's opinions. (Doc. 83.) In a separate ruling, the Court denies that motion.

13

forming his own opinion"). Courts recognize that an expert may rely on the conclusions and opinions reached by another expert who performed forensic testing. *See Johnson,* 277 F.R.D. at 166 (permitting expert to rely on conclusions from forensic testing conducted by other experts in products liability case).

No. 3:11-CV-00830, 2014 WL 5794952 at *4 (M.D. La. Nov. 6, 2014).

Defendant relies on *JRL Enters., Inc. v. Procorp Assocs., Inc.*, No. 01-2893, 2003 WL 21284020 (E.D. La. June 3, 2003) for the proposition that an expert's opinion should be prohibited from testifying where the expert "failed to conduct any independent research to determine the reliability of his assumptions." (Doc. 82-1 at 8.) This is a gross overreading of the *JRL* case. In distinguishing *JRL*, the court in *Legier and Matherne, APAC v. Great Plains Software, Inc*., No. 03-278, 2004 WL 1488597 (E.D. La. June 30, 2004), stated:

> This Court finds the facts of *JRL Enterprises* distinguishable from those presented here. *JRL Enterprises* does not support defendant's theory that an expert cannot rely on his client's self-serving projects. Rather, Judge Fallon's ruling holds that an expert should not blindly rely on the projections of a third party when that third party disavows the reliability of those projections himself.

2004 WL 1488597 at *3; *see also Hunters Run Gun Club, LLC v. Baker*, No. 17-176, 2019 WL 2357365 (M.D. La. June 4, 2019).

As in *Legier*, *JRL* is distinguishable here. The data Defendant complains about (the general ledger for Performance Labs for 2015 and an Excel spreadsheet reflecting Performance Lab's profits and loss data on an accrual basis for 2015), which came from the CPA firm Asher and Myers, LLC, was not disavowed by Performance or the CPA firm.

The Court has carefully reviewed Harol's report, deposition and the other materials supporting Defendant's motion. While Defendant points to weaknesses in Harol's opinions, Defendant's attack goes to the weight, not the admissibility of Harol's testimony and, no doubt, these alleged weaknesses will be the subject of vigorous cross-examination by counsel for Defendant at trial—where the sufficiency of same should properly be tested.

14

## CONCLUSION

In conclusion, and for the foregoing reasons, *Merge Healthcare Solution, Inc.'s Motion In Limine to Exclude the Opinions and Testimony of Plaintiffs' Expert Chris Harol* (Doc. 82) brought by defendant, Merge Healthcare Solution, Inc., is DENIED.

Signed in Baton Rouge, Louisiana, on March 19, 2020.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**