UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

TRINITY MEDICAL SERVICES,
L.L.C., ET AL

VERSUS

MERGE HEALTHCARE SOLUTIONS,
INC.

CIVIL ACTION

NO. 17-CV-592-JWD-EWD

RULING

Before the Court is *Merge Healthcare Solutions, Inc.'s Motion in Limine to Exclude Opinions and Testimony of Plaintiffs' Expert Harold Asher* brought by defendant Merge Healthcare Solutions, Inc. ("Defendant" or "Merge"). (Doc. 83.) It is opposed by plaintiffs Trinity Medical Services, L.L.C. ("Trinity"), Performance Labs, L.L.C. ("Performance Labs"), and Prestige Worldwide Leasing, L.L.C. ("Prestige") (collectively, "Plaintiffs"). (Doc. 96.) Defendant also filed a reply brief in support of its motion. (Doc. 131.) For the following reasons, the motion is DENIED.

BACKGROUND

Trinity is a Louisiana holding company and the sole owner of Performance Labs and Prestige. Performance Labs was a laboratory located in Mandeville, Louisiana that performed toxicology tests. Prestige provided employee leasing and laboratory management services to Performance Labs and other labs, including Pathway Diagnostics, LLC ("Pathway"). Blake Bourque is the only owner of all three Plaintiff companies. Pathway, which is not a party to this suit, is a laboratory owned by insiders of Trinity that performs toxicology tests and is located in Mississippi.

Merge is a developer and manufacturer of clinical laboratory software systems, including the Merge LIS$^{TM}$ software ("Merge LIS Software") at issue in this case.

1

As a toxicology laboratory, Performance Labs was subject to the Clinical Laboratory Improvement Act ("CLIA"). To be able to run tests on live patient samples, Performance Labs needed to be certified by the Centers for Medicare and Medicaid Services ("CMS"). CMS's certification was based on compliance with regulatory and statutory mandates to ensure patient health and safety. In June 2015, Performance Labs failed an inspection by the Louisiana Health and Hospitals Department ("LHHD") and CMS. The state and federal regulators found "condition-level noncompliance" that "posed an immediate jeopardy to patients." (July 31, 2015 Letter from CMS to Performance Labs at 4, Doc. 77-7.) As a result of Performance Lab's noncompliance, it was required to submit plans of correction to state and federal regulators and agreed to cease testing patients on two sets of equipment. (*Id.* at 5.) During an on-site visit in the fall of 2015, state and federal regulators again concluded that Performance Labs "demonstrated continued systemic and pervasive problems through the laboratory which has led to findings of continued immediate jeopardy." (December 23, 2015 Letter from CMS to Performance at 4, Doc. 77-9 at 4.)

Due to these findings, Performance Labs was sanctioned by the state and federal regulators and as a result:

  (a) barred from accepting live patient samples (Doc. 77, December 30, 2015 Emails from CMS at 3);
  (b) precluded from accepting payments from Medicare and Medicaid (*Id.*);
  (c) required to notify all clients who ordered patient testing that the results were not accurate or reliable (Doc. 77, January 12, 2016 Plan of Correction at 20, 46); and
  (d) had their CLIA certificate suspended, prohibiting Performance Labs from performing patient testing. (Doc. 77, January 14, 2016 Email from CMS to Performance Labs.)

Facing this pressure from federal and state regulators and hoping to get Performance Labs back into compliance, Trinity negotiated with and on January 11, 2016, signed a Sale Order with Merge to lease the Merge LIS Software to use at Performance Labs and Pathway. As a

result of the sanctions, Performance Labs also reduced their equipment and personnel to a barebones operation, employing only a technical supervisor and a lab technician (M. Spruill Dep., at 117:17-19, Doc. 77-16.)

Also, in January 2016, Blake Bourque's brother in law, Kyle Mouton, along with Trinity's in-house counsel, Phil Martinez, opened Pathway in Mississippi. (K. Mouton Dep., at 17:19-22, 18:22-20:3, Doc. 77-22.) Pathway is not owned by Trinity. (K. Mouton Dep., at 18:24-19:7, Doc. 95-19; B. Bourque Dep., at 127-28, Doc. 95-12.) Most of Performance Lab's staff and equipment was moved to Pathway. (Mouton Dep. at 120:3-15, 30:9-10, 91:2-12, Doc. 77-22.) Trinity provided Pathway with start-up capital to pay expenses as well as management and IT services. (*Id.* at 106:12-19, 87:9-88:3.) Trinity allowed Pathway to use the Merge LIS Software. (*Id.*) In June 2016, Pathway began testing patient samples and billing clients using the Merge LIS Software. (M. Spruill Dep., at 154:23-155:5, 217:11-15, Doc 77-16.)

However, to prove compliance and become recertified under the CLIA, Performance Labs only performed validation and establishment studies until August 24, 2016, when CMS allowed Performance Labs to begin doing screening tests. (August 24, 2016 Email from CMS to Performance Labs, Doc. 77-28.) During this time, it was under heightened scrutiny from federal and state regulators. (C. Howell Dep., at 188:10-189:2, Doc. 95-5.) Performance Labs began with a small panel of tests and had an agreement with Pathway to reference any tests not offered for $85/sample. (B. Bourque Dep., at 150:20-21, 203:18-204:11, 406:5-6, Doc. 95-12; R. Poe Dep., 125:12-22, 144:2-145:21, Doc. 95-2.) On January 17, 2017, CMS permitted Performance to start conducing confirmatory testing. (October 14, 2016 Email from CMS to Performance Labs, Doc 77-29.) On January 20, 2017, Performance Labs began accepting patient samples from one clinic. (M. Spruill Dep. at 189:8-19, Doc. 77-16.)

3

In February 2017, Performance Labs identified an issue with the tracking of quality control data in the Merge LIS Software and voluntarily ceased patient testing. (March 6, 2017 Correspondence from Performance Labs to CMS, Doc. 77-32.) Performance Labs formulated a "work around" for the issue and indicated to CMS that the issue did not cause Performance Labs or Pathway to submit any incorrect testing results. (*Id.*) In March 2017, Performance Labs also reported other issues with the Merge LIS Software to CMS. (March 17, 2017 Email from CMS to Performance Labs, Doc. 77-33.) Despite these reported issues with the Merge LIS Software, in August 2017, Performance Labs' suspension was lifted, it was recertified under the CLIA, and could bill Medicare and Medicaid following a successful onsite inspection in June 2017 by state regulators. (January 24, 2017 Email between CMS and Performance Labs, Doc. 77-30; August 9, 2017 Correspondence from CMS, Doc. 77-34.)

Plaintiffs allege that the Merge LIS Software contained numerous defects but focus on two alleged defects, the Duplicate Container Defect and the Trojan Horse Defect. The Duplicate Container Defect allegedly resulted in the Merge LIS Software creating duplicate container numbers for patients. Therefore, Plaintiffs maintain that when the Duplicate Container Defect occurred, the software created duplicate records for a single toxicology test, which eventually could result in the software deleting both entries in error. Plaintiffs claim that this compromised laboratory reliability and testing accuracy because it increased the risk that the testing laboratory would fail to perform the requested toxicology test. The Trojan Horse Defect resulted in passwords and other security information being discoverable on Google. As such, Plaintiffs assert that the evidence shows that Plaintiffs were not able to use the Merge LIS Software and be HIPAA compliant. Defendant's expert witness testimony controverts that the alleged defects were present in the Merge LIS Software installed at Performance Labs.

Plaintiffs allege that "Performance Labs worked with Merge for months to get these defects resolved but they remained unresolved until 2018. These defects prevented Performance Labs from reopening its laboratory given the level of regulatory scrutiny Performance Labs was under. Ultimately, Performance Labs was unable to resume full testing operations and service its debts, and in mid-2017 the entity closed." (Doc. 96 at 2.) Plaintiffs hired Harold Asher "to calculate the losses suffered due to their inability to resume operations and the loss of the business caused by the problems inherent in Merge's software." (*Id*.)

## SUMMARY OF ARGUMENTS OF THE PARTIES

Defendants complain that Asher "assum[es] without any analysis that [Defendant] caused all of plaintiffs' purported damages" (Doc. 83 at 1); he "does not consider whether there were any defects in the Merge LIS" that caused Plaintiffs' damages or whether any of Plaintiffs' damages were "caused by anything Merge did or did not do." (Doc. 83-1 at 4.) He "blindly relies on unsupported information from plaintiffs and the unreliable opinions of plaintiffs' other experts…"[1] (Doc. 83 at 1.) He fails to independently verify the data provided by Plaintiffs and Plaintiffs' other experts. (Doc. 83-1 at 1.) In sum, Asher "fails to employ a reliable methodology." (Doc. 83-1 at 2.)

Plaintiffs respond that Asher's " 'methodology' [for calculating lost profits] is well accepted within the field of damages calculation and was accepted by the Louisiana Supreme Court just last year and cited in the very book on which Merge's expert relies." (Doc. 96 at 1.) Asher "examined Performance Labs' actual financial performance in 2015" and "applied a discounted cash flow ('DCF') model to calculate the profits Performance Labs would have generated had it been able to resume testing in October 2016." (*Id*. at 2.) The DCF model is,

---

[1] Defendant filed separate Daubert motions challenging the opinions and testimony of Plaintiffs' other experts Larry Small (Doc. 81) and Chris Harol (Doc. 82).

argue Plaintiffs, "a widely-accepted method of valuation. (*Id*. at 6, citing *River House Partners, LLC v. Grandbridge Real Estate Capital LLC*, No. 15-00058, 2017 WL 4269838 at *3 (M.D. La. Sept. 26, 2017) *vacated upon settlement*, No. 15-00058, 2018 WL 813903 (M.D. La. Feb. 9, 2018).)

In gathering his data, Asher "worked with" and "relied on other experts with specific experience in the toxicology industry—Larry Small and Chris Harol—to certify the revenues and expenses that Performance Labs could have achieved from 2016 forward." (*Id*. at 3.) He "performed extensive due diligence including: detailed analysis of Performance Labs' general ledgers and bank statements containing historical expenses, revenue and samples tested on a monthly basis" as well as having "lengthy" and "extensive" discussions with Small and Harol. (*Id*. at 8.) "Merge's remaining challenges," contend Plaintiffs, "are at best cross-examination material, and are not a basis to exclude" Asher's testimony. (*Id*. at 1.)

In its reply, Defendant argues that "it is undisputed that Asher's opinions regarding Performance Labs' projected profits are largely based on the opinions of Larry Small and Chris Harol" and Defendant disputes that Asher worked closely with these experts. (Doc. 131 at 1.) Defendant reiterates that Asher failed to review Small's and Harol's figures to confirm their accuracy and, "because he 'failed to conduct any independent research to determine the reliability of his assumptions,'" his testimony should be excluded. (*Id*. at 2, quoting *JRL Enters., Inc. v. Procorp Assocs., Inc.*, No. 01-2893, 2003 WL 21284020 at *8 (E.D. La. June 3, 2003)). It insists that Asher's "failure independently to verify the data and opinions—i.e. his *blind* reliance—renders his methodology unreliable." (*Id*. at 3) (emphasis in original). With respect to Asher's opinion that Merge caused these damages, Defendant maintains that this is merely an assumption for which Asher provides no support and therefore it must be excluded. (*Id*. at 4.)

## STANDARD

Pursuant to Federal Rule of Evidence 702, "a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if the rule's preconditions are met. Defendant's motion is a *Daubert* challenge based principally on Asher's failure to use an accepted methodology, and his opinions' alleged lack of an adequate factual foundation. *See Daubert v. Merrell Dow Pharmaceuticals, Inc*. 509 U.S. 579 (1993). When *Daubert* is invoked, a district court may, but is not required to, hold a hearing at which the proffered opinion may be challenged. *Carlson v. Bioremedi Therapeutic Sys., Inc*., 822 F.3d 194, 201 (5th Cir. 2016). However, when no hearing is held, "a district court must still perform its gatekeeping function by performing some type of *Daubert* inquiry." *Id*. "At a minimum, a district court must create a record of its *Daubert* inquiry and 'articulate its basis for admitting expert testimony.'" *Id.* (quoting *Rodriguez v. Riddell Sports, Inc.,* 242 F.3d 567, 581 (5th Cir. 2001)).

The role of the trial court is to serve as the gatekeeper for expert testimony by making the determination of whether the expert opinion is sufficiently reliable. As the Fifth Circuit has held:

> [W]hen expert testimony is offered, the trial judge must perform a screening function to ensure that the expert's opinion is reliable and relevant to the facts at issue in the case. *Daubert* went on to make "general observations" intended to guide a district court's evaluation of scientific evidence. The nonexclusive list includes "whether [a theory or technique] can be (and has been) tested," whether it "has been subjected to peer review and publication," the "known or potential rate of error," and the "existence and maintenance of standards controlling the technique's operation," as well as "general acceptance." The [Supreme] Court summarized:
>
> The inquiry envisioned by Rule 702 is, we emphasize, a flexible one. Its overarching subject is the scientific validity and thus the evidentiary relevance and reliability-of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.

*Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988-89 (5th Cir. 1997) (internal citations omitted).

7

Cases following *Daubert* have expanded upon these factors and explained that *Daubert*'s listing is neither all-encompassing nor is every factor required in every case. *See, e.g.*, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997); *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004). Indeed, courts may look to other factors. *Joiner*, 522 U.S. at 146.

As this Court has explained:

> The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, which provide that the court serves as a gatekeeper, ensuring all scientific testimony is relevant and reliable. This gatekeeping role extends to all expert testimony, whether scientific or not. Under Rule 702, the court must consider three primary requirements in determining the admissibility of expert testimony: 1) qualifications of the expert witness; 2) relevance of the testimony; and 3) reliability of the principles and methodology upon which the testimony is based.

*Fayard v. Tire Kingdom, Inc.*, No. 09-171-BAJ-SCR, 2010 WL 3999011 at *1 (M.D. La. Oct. 12, 2010) (internal citations omitted) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999)).

This Court has broad discretion in deciding whether to admit expert opinion testimony. *See, e.g.*, *Joiner*, 522 U.S. at 138-39 (appellate courts review a trial court's decision to admit or exclude expert testimony under *Daubert* under the abuse of discretion standard); *Watkins*, 121 F.3d at 988 ("District courts enjoy wide latitude in determining the admissibility of expert testimony."); *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1050 (5th Cir. 1998) ("Trial courts have 'wide discretion' in deciding whether or not a particular witness qualifies as an expert under the Federal Rules of Evidence.").

"Notwithstanding *Daubert*, the Court remains cognizant that 'the rejection of expert testimony is the exception and not the rule.'" *Johnson v. Samsung Elecs. Am., Inc.*, 277 F.R.D. 161, 165 (E.D. La. 2011) (citing Fed. R. Evid. 702 Advisory Committee Note (2000 amend.)). Further, as explained in *Scordill v. Louisville Ladder Grp., L.L.C.*:

> The Court notes that its role as a gatekeeper does not replace the traditional adversary system and the place of the jury within the system. As the *Daubert* Court noted, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." The Fifth Circuit has added that, in determining the admissibility of expert testimony, a district court must defer to "'the jury's role as the proper arbiter of disputes between conflicting opinions. As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.'"

No. Civ. 02-2565, 2003 WL 22427981 at *3 (E.D. La. Oct. 24, 2003) (Vance, J.) (internal citations omitted) (relying on, among others, *Rock v. Arkansas*, 483 U.S. 44, 61 (1987), and *United States v. 14.38 Acres of Land, More or Less Sit. In Leflore County, Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996)).

The Supreme Court has recognized that not all expert opinion testimony can be measured by the same exact standard. Rather, the *Daubert* analysis is a "flexible" one, and "the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho*, 526 U.S. at 150, *cited with approval in Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002).

In that vein, the Fifth Circuit has concluded that "soft sciences" involve "necessarily diminished methodological precision" when compared to other scientific disciplines like mathematics and engineering. *United States v. Simmons*, 470 F.3d 1115, 1123 (5th Cir. 2006) (quoting *Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287, 1297 (8th Cir. 1997)).

> In such instances, other indicia of reliability are considered under *Daubert*, including professional experience, education, training, and observations. Because there are areas of expertise, such as the "social sciences in which the research theories and opinions cannot have the exactness of hard science methodologies," trial judges are given broad discretion to determine "whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case."

*Id.* (internal citations omitted) (relying on *Pipitone*, 288 F.3d at 247).

ANALYSIS

*Asher's Qualifications*

Defendant does not challenge Asher's qualifications. His qualifications are set forth at Doc. 83-17 at 24-26 and the Court finds that he is well qualified in the area tendered.

*Methodology*

While Defendant couches his concern in terms of Asher's methodology, it is really complaining about the sufficiency of the facts and data utilized and relied upon by Asher. *General Elec. Capital Business Asset Funding Corp. v. S.A.S.E. Military, Ltd*., No. 03-CA-189, 2004 WL 5495590 * 5 (W.D. Tex. Oct. 21, 2004). ("Courts should not [be] lured by arguments disguised as *Daubert* challenges that actually attack the weight of the expert testimony, not its admissibility."); *In re Katrina Canal Breaches Consolidated Litigation*, No. 05-4182, 10-866, 2012 WL 4328354 (E.D. La. Sept. 20, 2012) (Motions "predominantly based on attacks concerning the underlying facts upon which each opinion s based … [are] not contemplated under a *Daubert* challenge.")

As Plaintiffs point out, Asher "examined Performance Labs' actual financial performance in 2015" and "applied a discounted cash flow ('DCF') model to calculate the profits Performance Labs would have generated had it been able to resume testing in October 2016." (Doc. 96 at 2-3.) The Court agrees with Plaintiffs that the DCF model is "a widely accepted method of valuation." *River House Partners, LLC v. Grandbridge Real Estate Capital LLC*, No. 15-00058, 2017 WL 4269838 at *3 (M.D. La. Sept. 26, 2017) *vacated upon settlement*, No. 15-00058, 2018 WL 813903 (M.D. La. Feb. 9, 2018) (*citing Nerco Oil & Gas, Inc. v. Otto Candies, Inc*., 74 F.3d 667, 669-70 (5th Cir. 1996); *see also*, *Hunters Run Gun Club v. Baker*, No. 17-176, 2019 WL 2357365 at *3 (M.D. La. June 4, 2019).

In its reply, Defendant does not address Plaintiffs' argument regarding Asher's use of the DCL model but instead returns to its real concern, what it terms as "Asher's failure independently to verify the data and opinions, i.e. his *blind* reliance" on the data and opinions provided by Performance Labs, Small and Harol. (Doc. 131 at 3, emphasis in original.) The Court finds that Asher's methodology, i.e. his use of the discounted cash flow model, is an acceptable methodology. The issue of the sufficiency and reliability of the underlying data relied upon by Asher is addressed in the next section.

***The Sufficiency of Facts and Data Relied Upon***

Defendant's criticism of Asher's analysis focuses on what it terms the unreliable, unsupported and speculative assumptions which support Asher's calculations and conclusions. The Court disagrees. As this Court said in *Nkansah v. Martinez*,

> [E]xperts are not prohibited from relying on assumptions when reaching their opinions. *Barnes v. Commerce & Industry Insurance Company*, No. 11-0041, 2013 WL 6145309 at *2, (W.D. La. Nov. 21, 2013) (citing *Daubert*, 509 U.S. at 589; *Kuhmo Tire*, 526 U.S. at 153-54; *Nova Consulting Grp., Inc. v. End'g Consulting Servs., Ltd.*, 290 Fed.Appx. 727, 732-33 (5th Cir. 2008)(holding that an expert's opinion was not rendered unreliable merely because he made a number of assumptions)). Indeed, experts frequently make assumptions upon which their opinions rest. "As a general rule, questions related to the bases and sources of an expert's opinions affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *United States v. 14.3 Acres of Land More Or Less Situated in Lefore County, Ms.*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987)); *see also Tyler v. Union Oil Co. of Cal.*, 304 F.3d 379, 392-93 (5th Cir. 2002 (holding that a party's objection that the expert's self-created database was unreliable did not affect admissibility)); *Naquin v. Elevating Boats, LLC*, No. 10-4320, 2012 WL 1664257, at *4 (E.D. La. May 11, 2012); *St Joseph Abbey v. Castille*, No. 10-2717, 2011 WL 2182046, at *1 (E.D. La. June 3, 2011) (" 'The reliability of data underlying an expert's opinion goes to the weight of this evidence, but should not serve as a basis for its exclusion.") (quoting *Gen. Elec. Capital Bus. Asset Funding Corp. v. S.A.S.E. Military, Ltd.*, No. 03-189, 2004 WL 5495590, at *4 (W.D. Tex. Oct. 21, 2004)); *Imperial Trading Co. v. Travelers Property and Casualty Co. of America*, No. 06-4262, 2009 WL 2356292, *3 (E.D. La. July 28, 2009); *Southwire Co. v. J.P. Morgan Chase & Co.*, 258 F. Supp. 2d 908, 935 (W.D. Wis. 2007) ("the alleged errors and inconsistencies are grounds for impeaching the credibility of the experts and the reliability of their ultimate finding; however,

mistakes and miscalculations are not grounds for excluding evidence." (citing *Daubert*, 509 U.S. at 596)).

The most appropriate place to challenge the assumptions made by an expert is at trial on cross-examination and with countervailing expert testimony.

No. 15-CV-00646, 2017 WL 2798520 *4 (M.D. La. June 28, 2017).

While Defendant complains that the data relied on by Asher is insufficient, "[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *United States v. 14.38 Acres of Land More Or Less Situated in Lefore County, Miss.*, 80 F.3d at 1077 (quoting *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987)); *see also Imperial Trading Co. v. Travelers Property Cas. Co. of America*, No. 06-4262, 2009 WL 2356292 at *3 (E.D. La. July 28, 2009). Furthermore, "[m]atters left for the jury's consideration include the alleged miscalculations, erroneous assumptions, and inconsistencies that plaintiffs object to." *Imperial Trading*, 2009 WL 2356292 at *3 (citing *Southwire Co. v. J.P. Morgan Chase & Co.*, 258 F. Supp.2d 908, 935 (W.D. Wis. 2007) ("the alleged errors and inconsistencies are grounds for impeaching the credibility of the experts and the reliability of their ultimate findings; however, mistakes and miscalculations are not grounds for excluding evidence." (citing *Daubert,* 509 U.S. at 596)).

In terms of the sufficiency of data needed to survive challenge, "[t]he word 'sufficient' signifies that the expert may properly base her opinion on something less than all the pertinent facts or data." 29 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 6268 (b) (2d ed. 1987) "As one Court of Appeals has stated, trial judges are gatekeepers, not armed guards." *Id.* at § 6268.2 (citing *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 86 (1st Cir. 1998); *see also*, *Guild v. General Motors Corp.*, 53 F. Supp. 2d 363 (W.D. N.Y. 1999) ("[T]rial judges acting as gatekeepers under *Daubert* must not assume 'the

12

role of St. Peter at the gates of heaven, performing a searching inquiry into the depth of an expert witness's soul' and thereby usurp 'the ageless role of the jury' in evaluating witness credibility and weight of the evidence.") (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1045 (2d Cir. 1995)). As the Court in *General Elec.* stated, "Experts should be excluded only if their testimony is so fundamentally unsupported that it cannot possibly help the factfinder." 2004 WL 5495590 at *5, citing *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987).

Defendant urges that Asher relies, in large part, on data provided by Plaintiffs' other two experts and that Asher did not independently verify the accuracy of the data provided. (Doc. 82-1 at 9.)[2] As this Court said in *National Union Fire Insurance Co. v. Smith Tank & Steel, Inc*:

> Consultation with other experts is entirely permissible under Rule 703. *Callidus Techs.,* 2003 WL 26118097, at *2 (citing *Janopoulos v. Harvey L. Walner & Assocs., Ltd.,* 866 F.Supp. 1086, 1095 (N.D.Ill.1994)) (stating that Rule 703 "allows an expert to rely on information that would otherwise not be admissible including hearsay evidence"); *see also id.* (citing *Janopoulos,* 866 F.Supp. at 1095) ("An expert may even rely on information supplied by another expert witness.").
>
> An expert can rely upon otherwise inadmissible evidence as long as it is of a type "reasonably relied upon by experts in the particular field." Fed.R.Evid. 703. *See also, Monsanto Co. v. David,* 516 F.3d 1009, 1015–1016 (5th Cir.2008) (finding that expert could rely upon a report prepared by someone else). The purpose of allowing experts to rely on another expert's opinions is that "an expert cannot be an expert in all fields, and it is reasonable to expect that experts will rely on the opinion of experts in other fields as background material for arriving at an opinion." *Concerned Area Residents for the Environ. v. Southview Farm,* 834 F.Supp. 1422, 1436 (W.D.N.Y.1993).
>
> "It is common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert.' " *In re: Genetically Modified Rice Litigation,* 666 F.Supp.2d 1004, 1033 (E.D.Mo.2009) (quoting *Dura Auto. Sys. Of Ind., Inc. v. CTS Corp.,* 285 F.3d 609, 613 (7th Cir.2002).
>
> An expert may rely on any facts or data "of a type reasonably relied upon by experts in the particular field," including facts, data, and opinions that are otherwise inadmissible. Fed.R.Evid. 703. The modern view recognizes that experts often rely

---

[2] Defendant filed separate *Daubert* motions challenging Small's opinions. (Doc. 81) and those of Harol (Doc. 83.) In separate rulings, the Court denied those motions. (Docs. 143 and 144.)

13

on facts and data supplied by third parties. *See, Gussack Realty Co. v. Xerox Co.,* 224 F.3d 85, 94 (2d. Cir.2000). This includes relying on analyses performed by one's assistants. *See, e.g., McReynolds v. Sodexho,* 349 F.Supp.2d 30, 36–37 (D.D.C.2004) (admitting expert's opinions based on statistical analyses run by assistants who wrote and understood the computer programming); *Derrickson v. Circuit City Stores, Inc.,* No. 95–3296, 1999 WL 1456538, at *20 (D.Md. Mar. 19 1999) (same).

The term "data" also is intended to encompass the reliable opinions of other experts. Fed.R.Evid. 702 Advisory Committee Notes to 2000 Amendments; *see also, Mason v. Safeco Ins. Co.,* No. 4:09–cv–1081, 2010 WL 3341582 at *8 (E.D.Mo. Aug. 23, 2010) ("[a]n expert may rely on the reliable opinion of another expert in forming his own opinion"). Courts recognize that an expert may rely on the conclusions and opinions reached by another expert who performed forensic testing. *See Johnson,* 277 F.R.D. at 166 (permitting expert to rely on conclusions from forensic testing conducted by other experts in products liability case).

No. 3:11-00830, 2014 WL 5794952 at *4 (M.D. La. Nov. 6, 2014).

Defendant relies on *JRL Enters., Inc. v. Procorp. Assocs., Inc*., No. 01-2893, 2003 WL 21284020 (E.D. La. June 3, 2003) for the proposition that an expert's opinion should be prohibited from testifying where the expert "failed to conduct any independent research to determine the reliability of his assumptions." (Doc. 82-1 at 8.) This is a gross overreading of the *JRL* case. In distinguishing JRL, the court in *Legier and Matherne, APAC v. Great Plains Software, Inc*., No. 03-278, 2004 WL 1488597 (E.D. La. June 30, 2004), stated:

This Court finds the facts of *JRL Enterprises* distinguishable from those presented here. *JRL Enterprises* does not support defendant's theory that an expert cannot rely on his client's self-serving projects. Rather, Judge Fallon's ruling holds that an expert should not blindly rely on the projections of a third party when that third party disavows the reliability of those projections himself.

2004 WL 1488597 at *3; *see also Hunters Run Gun Club v. Baker*, No. 17-176, 2019 WL 2357365 (M.D. La. June 4, 2019).

As in *Legier*, *JRL* is distinguishable here. The data Defendant complains about (the general ledger for Performance Labs for 2015 and an Excel spreadsheet reflecting Performance

14

Lab's profits and loss data on an accrual basis for 2015), which came from the CPA firm Asher and Myers, LLC., was not disavowed by Performance Labs or the CPA firm.

Furthermore, both Small and Harol are experts in a field different than Asher. As stated earlier, "an expert cannot be an expert in all fields, and it is reasonable to expect that experts will rely on the opinion of experts in other fields as background material for arriving at an opinion." *Concerned Area Residents for the Environ. v. Southview Farm,* 834 F.Supp. 1422, 1436 (W.D.N.Y.1993). While Defendant and its expert may disagree with and challenge the data, this is a matter of weight rather than admissibility and is more appropriately addressed at trial.

Nor can Defendant take comfort from *Hunt v. McNeil Consumer Healthcare*, 297 F.R.D. 268, 275 (E.D. La. 2014) ("[E]xpert testimony based solely or primarily on the opinions of other experts is inherently unreliable.") Here, Asher clearly did his own extensive review of records and financial information of both Performance Labs and Trinity Management as well as various depositions, pleadings and correspondence, some 20 items. (Doc. 83-17 at p. 2-3.) He did a comparison of data generated by other experts with Performance Labs' financial data for 2015. (*Id*. at ¶ 17-18.) He and/or members of his firm reviewed data with Plaintiff's other expert Chris Harol in the preparation of his opinions. (*See, e.g.* Doc. 83-20 at 41:2-46:10, 53:12-54:13.) In short, the record belies Defendant's claim that Asher "relied blindly" on Plaintiffs' other experts.

Defendant takes issue with Asher's assumption that the damages he calculates were caused "as a result of the improper actions of…Merge in this matter" (Doc. 83-1 at 12 (quoting Doc. 83-17 at 6); *see also* Doc. 83-20 at 10:19-14:3, and 89:23-90:25), since Asher did no independent assessment of causation. Here, the Court agrees with Judge Dick in *Hunters Run Gun Club v. Baker*, where she states:

> Defendants argue that causation is a necessary prerequisite for damages and Asher "performed no independent investigation into the factual assertion provided by

Duplessis and failed to establish a causal connection between Defendants' action and the Plaintiffs' alleged damages." Asher explained in his deposition that "causation is an assumption of mine that it does exist. Causation is not required in the calculation." Causation is a question of fact for the trier of fact to determine. If the trier of fact finds causation lacking, the question of damages is not reached. Merely assuming causation for purposes of reaching the damages calculation does not render the calculation unreliable.

2019 WL 2357365 at * 3.

Here also, the issue of causation will be decided by the jury. Asher does not purport to opine relative to the Merge LIS software and what role, if any, it had in causing Plaintiffs' damages, nor will he be allowed to. But, as in *Hunters Run Club*, the fact that Asher assumed causation for purposes of his calculations "does not render the calculation unreliable." (*Id.*)

## CONCLUSION

For the foregoing reasons, is *Merge Healthcare Solutions, Inc.'s Motion in Limine to Exclude Opinions and Testimony of Plaintiffs' Expert Harold Asher* (Doc. 83) brought by defendant, Merge Healthcare Solutions, Inc., is DENIED.

Signed in Baton Rouge, Louisiana, on <u>March 19, 2020</u>.

_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**